UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER,<br>　　　Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| CITY OF HOLYOKE,<br>　　　Defendant | )<br>)<br>) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This is an action brought by Tammy Walker, a former sergeant with the City of Holyoke Police Department, against the City of Holyoke alleging discrimination based on gender (female), race (African-American) and sexual orientation (lesbian); creation of a hostile work environment based on her race, gender and sexual orientation; and retaliation. *M.G.L. c. 151B, § 4; Title VII (42 U.S.C. § 2000e et seq.); M.G.L. c. 149, § 185; 42 U.S.C. § 1981*; and *42 U.S.C., § 1983*.

## CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### Parties

1.　　　The plaintiff, Tammy Walker ("Walker"), is an African-American, lesbian female who was hired by the City of Holyoke Police Department (the "Department") in April 1993.[2]

2.　　　The defendant, City of Holyoke (the "City"), is a municipality located in and existing under the laws of the Commonwealth of Massachusetts.[3]

---

[1] The defendant does not dispute these facts for purposes of summary judgment only.
[2] *See* Amended Complaint at ¶¶ 1-6.

**Other Key Individuals**

3.     Anthony R. Scott ("Chief Scott") became Chief of Police of the City on May 21, 2001. Chief Scott is an African-American.[4]

4.     John Francis Monaghan ("Sgt. Monaghan") became a member of the Department in 1993.[5]

5.     Joseph Garcia ("Sgt. Garcia") became a member of the Department in 1987. On June 20, 1999, Sgt. Garcia was appointed a full-time sergeant.[6]

6.     Lt. David Fournier and Sgt. Daniel McCavick make up the Professional Standards Division ("PSD") which is the internal affairs division of the Department.[7]

7.     Lieutenant Donald Whelihan  ("Lt. Whelihan") was the immediate supervisor of Walker, Monaghan and Garcia in 2002 on the third shift.[8]

8.     Sergeant John Lenihan ("Sgt. Lenihan") was the senior sergeant on the third shift that Walker, Monaghan and Garcia were assigned to in 2002.[9]

9.     Captain Alan Fletcher ("Capt. Fletcher") became a member of the Department in 1968. He became a captain in 1992 and is the Commander of the Field Operations Bureau.[10]

10.     Jorge Rodriguez ("Rodriguez") was a patrolman with the Department at all times relevant hereto.[11]

**Chronology of Events**

11.     In April 1993, Walker was hired by the Department.[12]

---

[3] *See* Amended Complaint at ¶2.
[4] Exhibit 1, Deposition of Chief Scott at pp. 5-8.
[5] Exhibit 2, Deposition of Sgt. Monaghan at pp. 5-10.
[6] Exhibit 3, Affidavit of Sgt. Garcia at pp. 1-2.
[7] Exhibit 1, Deposition of Chief Scott at p. 101.
[8] Exhibit 2, Deposition of Sgt. Monaghan at pp. 43-44.
[9] Exhibit 1, Deposition of Chief Scott at p. 143.
[10] Exhibit 4, Affidavit of Capt. Fletcher at ¶ 1.
[11] Exhibit 5, Deposition of Rodriguez at pp. 16-18.

12.     On July 19, 1993, Walker was appointed a full-time police officer for the Department.[13]

### Promotion Bypass (6/20/1999)

13.     On April 15, 1999, the following members of the Department took the civil service examination for the position of full-time sergeant and received the following scores:

| | |
|---|---|
| Denise Dugay: | 88 |
| David Pratt: | 87 |
| Michael McCoy: | 80 |
| John Monaghan: | 80 |
| Tammy Walker: | 80 |
| Joseph Garcia: | 78[14] |

14.     On June 6, 1999, then-Mayor, Daniel Szostkiewicz, interviewed the candidates for the position of permanent full-time sergeant.[15]

15.     On June 20, 1999, Mayor Szostkiewicz, promoted Michael McCoy and Joseph Garcia to the position of permanent full-time sergeant.[16]

16.     Mayor Szostkiewicz decided to bypass Walker for the position for several reasons including:  Walker did not have "an in-depth and detailed knowledge of the [D]epartment and its programs;" Walker lacked the experience within the Department to effectively act as supervisor; and Walker lacked necessary communication skills.[17]

17.     On October 15, 1999, Walker filed a charge of discrimination against the City with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC"), alleging that the City discriminated against

---

[12] *See* Amended Complaint at ¶ 6 and Exhibit 3, Affidavit of Garcia at ¶ 2.
[13] Exhibit 6, Deposition of Walker, Vol. I, at p. 35.
[14] Exhibit 7, Civil Service Certification of exam scores.
[15] Exhibit 8, Correspondence from Mayor Szostkiewicz to Joseph Trainor dated July 6, 1999.
[16] Exhibit 9, Special Order announcing sergeant promotions; and Exhibit 8, Correspondence from Mayor Szostkiewicz to Joseph Trainor dated July 6, 1999.
[17] Exhibit 8, Correspondence from Mayor Szostkiewicz to Joseph Trainor dated July 6, 1999.

her when it bypassed her for promotion to Sergeant. Walker also appealed her bypass to the Civil Service Commission.[18]

18.    In her MCAD complaint, Walker alleged that she was bypassed on the date of the interviews, **June 9, 1999**, rather than the actual date of bypass (the appointment date) which was June 20, 1999.[19]

19.    Based on this erroneous bypass date, on May 23, 2000, Walker and the City entered into a settlement agreement whereby the City agreed to place Walker at the top of the eligibility list for the next promotion to sergeant and to adjust Walker's seniority date to June 9, 1999 if she were appointed sergeant (the "Settlement Agreement").[20]

20.    On May 5, 2002, Walker was promoted to the position of full-time permanent sergeant with the erroneous seniority date of June 9, 1999.[21]

21.    On May 15, 2002, Sgt. Monaghan was promoted to the position of full-time permanent sergeant.[22]

22.    On June 16, 2002, the City Solicitor asked Walker to correct her seniority date by filing a Motion to Amend Decision to correct the erroneous seniority date of June 9, 1999 to the correct seniority date of June 20, 1999. Walker refused to make the correction.[23]

### Problems with Sergeant Monaghan and Sergeant Garcia (5/02)

23.    Walker alleges that soon after she was promoted to sergeant, she "began having problems with other officers," in particular, Sgt. Monaghan and Sgt. Garcia.[24]

---

[18]Exhibit 10, Discrimination Complaint and Exhibit 11, Civil Service Appeal (this was marked as part of Exhibit 1 to Walker deposition, Vol. I).
[19] Exhibit 10, Discrimination Complaint.
[20] Exhibit 12, Settlement Agreement dated 5/23/00 (this was marked as part of Exhibit 3 to Walker deposition, Vol. I).
[21] *See* Amended Complaint at ¶ 10.
[22] Exhibit 2, Deposition of Sgt. Monaghan at p. 54.
[23] Exhibit 13, Proposed Assented to Motion to Amend Decision (marked as part of Exhibit 3 to Walker deposition, vol. I) and Exhibit 6, Deposition of Walker, Vol. I, pp. 55-56.

24.    At the time, Lt. Whelihan was Walker's supervisor.  Walker told Lt. Whelihan that she believed Sgt. Monaghan and Sgt. Garcia were avoiding her because her June 9, 1999 seniority date made her senior to them in rank.  Walker never informed Lt. Whelihan that Sgts. Monaghan and Garcia were calling her names or making derogatory comments about her.[25]

25.    Walker also reported to Capt. Fletcher that she believed Sgts. Monaghan and Garcia were mad at her since her seniority date made her senior to them.  She never told Capt. Fletcher that either Sgt. Monaghan or Sgt. Garcia took any action or said anything which she considered to be discriminatory.[26]

26.    Capt. Fletcher told Walker that he believed the solution was for her to change her seniority date to the correct date.[27]

27.    Sgt. Monaghan maintains that he did not discriminate against Walker because of her seniority date or for any other reason.[28]

28.    Sgt. Garcia maintains that he had no problem accepting Walker's authority.  In fact, Sgt. Garcia is emphatic that he did not discriminate against Walker at any time because of her race, gender, sexual orientation or because of any other reason.[29]

29.    Sgt. Garcia never witnessed Sgt. Monaghan make a derogatory comment about Walker related to her race, gender, or sexual orientation.[30]

30.    Rodriguez admits that he never observed any difficulties between Walker and Sgt. Garcia and Walker never discussed Sgt. Garcia with him.[31]

---

[24] *See* Amended Complaint at ¶ 11.
[25] Exhibit 14, Affidavit of Lt. Whelihan at ¶ 2.
[26] Exhibit 15, Deposition of Capt. Fletcher at pp. 135-136; and Exhibit 4, Affidavit of Capt. Fletcher at ¶¶ 2-3.
[27] Exhibit 15, Deposition of Capt. Fletcher at p. 142; Exhibit 4, Affidavit of Capt. Fletcher at ¶ 2; and Exhibit 6, Deposition of Walker, Vol. I at p. 84.
[28] Exhibit 2, Deposition of Sgt. Monaghan at p. 110; and Exhibit 18, Affidavit of Lt. Monaghan at ¶ 8.
[29] Exhibit 3, Affidavit of Sgt. Garcia at ¶¶ 6 and 7.
[30] Exhibit 3, Affidavit of Sgt. Garcia at ¶ 8.

5

## Police Radio (WMLEC) Transmissions (6/20/02)

31.     Law enforcement personnel in Western Massachusetts use a police radio system referred to as "WMLEC" (Western Massachusetts Law Enforcement Channel).[32]  The system is accessible by all police officers in the Commonwealth of Massachusetts.[33]

32.     Walker alleges that on or about June 20, 2002, Sgt. Monaghan "made comments with sexual and racial connotations" over WMLEC after Walker ended a radio transmission on the Holyoke Police Department radio.  Walker claims that Sgt. Monaghan changed his pronunciation to imitate an African-American dialect and said, "lick it, lick it, good."[34]

33.     According to Walker, this is the **only** derogatory comment that she ever heard which she believes was directed toward her over WMLEC.[35]

34.     Walker concedes that she never heard any derogatory comments toward her over the local Holyoke police radio.[36]

35.     Officer Rodriguez claims that he heard  the "lick it good song" and comments like "el freako" two or three times over WMLEC which he took to be directed at Walker.[37]

36.     Rodriguez claims that he heard these comments in November 2002, nearly five (5) months **after** Walker claims she heard the one and only derogatory comment over WMLEC.[38]

37.     Walker admits that she never heard the "el freako" comment and she does not know whether any such comment was directed to her.[39]

---

[31] Exhibit 5, Deposition of Rodriguez at pp. 58-59.
[32] Exhibit 2, Deposition of Sgt. Monaghan at pp. 57-58.
[33] Exhibit 5, Deposition of Rodriguez at p. 69.
[34] *See* Amended Complaint at ¶ 12; and Exhibit 6, Deposition of Walker, Vol. I at p. 81.
[35] Exhibit 6, Deposition of Walker, Vol. I at pp. 162-163.
[36] Exhibit 6, Deposition of Walker, Vol. I at pp. 159-160.
[37] Exhibit 5, Deposition of Rodriguez at pp. 75-77 and p. 81 and Exhibit 16, IOC from Rodriguez (marked as Exhibit 5 at Rodriguez deposition).
[38] Exhibit 16, IOC from Rodriquez.

38.    Rodriguez claimed that he heard sexually derogatory comments.  However, he admitted: "I have no idea of who is doing it."  Rodriguez thought the voice sounded like Sgt. Monaghan's, but he could not be certain.[40]

39.    Rodriguez also claimed he heard meowing like cat fighting over WMLEC. Again, he could not identify who was making the alleged sounds.[41]

40.    In fact, at his deposition, Rodriguez testified as follows:

> Q.    To this day can you state with certainty whether or not Sergeant Monaghan was the voice that you heard over WMLEC?
>
> A.    Not for sure.[42]

41.    Walker concedes that she never heard meowing like a cat over WMLEC and no one ever told her that they heard any cat noises over WMLEC which appeared to be directed at her.[43]

42.    Sgt. Monaghan denies ever making the "lick it good" statement.  He also denies ever making the "el freako" statement or making cat noises.[44]  In fact, Sgt. Monaghan denies making "any type of derogatory or sexual comments on the police radio with respect to Sergeant Walker or anyone else."[45]

43.    Sgt. Garcia maintains that he never heard any derogatory comments over WMLEC regarding Walker.  However, he maintains that it is common to "hear unusual sounds

---

[39] Exhibit 6, Deposition of Walker, Vol. I at pp. 165-166.
[40] Exhibit 5, Deposition of Rodriguez at pp. 71 and 93; and Exhibit 17, Rodriguez's response to Questionnaire by Internal Affairs (marked as Exhibit 3 at Rodriguez deposition).
[41] Exhibit 5, Deposition of Rodriguez at pp. 94-95.
[42] Exhibit 5, Deposition of Rodriguez at p. 101.
[43] Exhibit 6, Deposition of Walker, Vol. I at p. 170.
[44] Exhibit 2, Deposition of Sgt. Monaghan at pp. 58-59 and 115.
[45] Exhibit 18, Affidavit of Lt. Monaghan at ¶ 10.

7

and remarks, as well as songs played. The WMLEC police radio is accessible to many communities in the area, not just the Holyoke Police Department."[46]

44.    Walker never informed her supervisor, Sgt. Lenihan, that Sgt. Monaghan was making derogatory comments either about her or to her, and Sgt. Lenihan never heard any derogatory statements over WMLEC about Walker.[47]

45.    Walker told Lt. Whelihan that Sgt. Monaghan had made an unprofessional comment about her over WMLEC. Lt. Whelihan asked Sgt. Monaghan about the allegation. Sgt. Monaghan denied making the comment.[48]

46.    As part of the investigation into the allegations made by Walker, Chief Scott ordered Officer Kenneth Moriarty ("Officer Moriarty"), who worked in the Technical Systems Bureau of the Department, to obtain and preserve the WMLEC radio tapes for all the dates that Walker and Sgt. Monaghan worked together in 2002.[49]

47.    The tapes were reviewed as part of the investigation. According to Chief Scott, "We got the tapes, we went over the tapes and the allegations could not be substantiated." After reviewing the tapes, there was nothing to substantiate Rodriguez's claim that someone said "I'm a freak-o" on WMLEC.[50]

48.    In 2004, City Solicitor, Karen Betournay, requested that Officer Moriarty listen to the tapes. After listening to the tapes, Moriarty concluded:

> I did not hear any voice on the tapes that I recognize to be Sergeant Monaghan's voice. I also did not hear any transmission that had

---

[46] Exhibit 3, Affidavit of Sgt. Garcia at ¶ 9.
[47] Exhibit 19, Affidavit of Sgt. Lenihan at ¶¶ 4 and 6.
[48] Exhibit 14, Affidavit of Lt. Whelihan at ¶ 3.
[49] Exhibit 20, Affidavit of Officer Moriarty at ¶ 2.
[50] Exhibit 1, Deposition of Chief Scott at pp. 80 and 92-93.

8

any reference to Sergeant Walker or that appeared derogatory with regard to Sergeant Walker.[51]

## Racist Remarks About Chief Scott

49.     Walker alleges that Sgt. Monaghan referred to Chief Scott, an African-American, as "Uncle Charlie."[52]

50.     Walker claims that she observed Sgt. Monaghan imitate an African-American dialect when speaking about African-Americans.  In particular, Walker states that she heard Sgt. Monaghan say, "Uncle Charlie done come out wit (with) anutter (another) order."[53]

51.     According to Walker, this is the only derogatory comment she ever heard Sgt. Monaghan make regarding Chief Scott.[54]

52.     Rodriguez claims that he heard Chief Scott referred to as "Uncle Charlie" during roll calls.  However, he cannot recall who said it.[55]

53.     On October 17, 2002, Capt. Fletcher, Lt. Whelihan, Walker and Sgt. Monaghan had a meeting to discuss this allegation.   At the meeting, Sgt. Monaghan denied ever calling Chief Scott any derogatory name.[56]

54.     Sgt. Monaghan maintains that he has "nothing but deep respect for Chief Scott" and has only referred to Chief Scott as "Chief" or "the Chief."[57]

55.     Sgt. Lenihan never heard Sgt. Monaghan speak about Chief Scott in a negative way.  In fact, Sgt. Lenihan has only heard Sgt. Monaghan refer to "Chief Scott" as "Chief."[58]

---

[51] Exhibit 20, Affidavit of Officer Moriarty at ¶ 4.
[52] *See* Amended Complaint at ¶ 13.
[53] *See* Amended Complaint at ¶ 14.
[54] Exhibit 6, Deposition of Walker, Vol. I at pp. 178-179.
[55] Exhibit 5, Deposition of Rodriguez at pp. 117-118.
[56] Exhibit 18, Affidavit of Lt. Monaghan at ¶ 9.
[57] Exhibit 18, Affidavit of Lt. Monaghan at ¶ 9.
[58] Exhibit 19, Affidavit of Sgt. Lenihan at ¶ 7.

9

**"Tyrone"**

56.      Walker claims that Sgt. Monaghan referred to her as "Tyrone" which she believes is "a stereotypical African American, male name."[59]

57.      On October 25, 2002, Walker filed an Employee Complaint with Chief Scott stating, in part:

> It has also been brought to my attention by several officers, that Sgt. Monaghan refers to me as Tyrone, rather than by my birth name Tammy.  I feel these are personal attacks on me, based on my race and sexual orientation.[60]

58.      Capt. Fletcher met with Walker and Sgt. Monaghan to discuss the matter.  During the meeting, Walker told Capt. Fletcher that she had a witness who informed her that Sgt. Monaghan had called her "Tyrone."  However, Walker refused to identify the witness.  During the meeting, Sgt. Monaghan denied ever calling Walker "Tyrone."[61]

59.      PSD investigated the "Tyrone" allegations by Walker.   As part of the investigation, PSD requested that Walker provide the names of any witnesses who heard Sgt. Monaghan refer to Walker as Tyrone.  Walker refused to provide any names to PSD.[62]

60.      At her deposition, Walker claimed that "more than three" officers told her that Sgt. Monaghan referred to her as "Tyrone."  However, she could not recall the identity of a single officer.[63]

61.      Walker also maintains that Sgt. Monaghan stated that she "should not be a sergeant because of her lesbian lifestyle."[64]  However, Walker never told either Capt. Fletcher or Chief Scott about this alleged comment.[65]

---

[59] *See* Amended Complaint at ¶ 17.
[60] Exhibit 21, Employee Complaint filed 10/25/02 (marked as Exhibit 4 to Walker depo. Vol. I).
[61] Exhibit 15, Deposition of Capt. Fletcher at p. 61; and Exhibit 4, Affidavit of Capt. Alan Fletcher at ¶ 4.
[62] Exhibit 22, PSD Request dated 10/28/02 (marked as Exhibit 5 to Walker depo. Vol. I); and Exhibit 23, Response of Walker dated 10/30/02 (marked as Exhibit 6 to Walker depo. Vol. I).
[63] Exhibit 6, Deposition of Walker, Vol. I at pp. 144-145.

62.    Sgt. Monaghan denies ever making this statement.  In fact, Sgt. Monaghan maintains that he "never said (or thought) that she was unqualified to be sergeant because of her sexual orientation."[66]

63.    Sgt. Monaghan maintains that he has never referred to Walker as "Tyrone" and that he has only referred to her as "Tammy" or "Sergeant Walker."[67]

64.    Sgt. Lenihan never heard Sgt. Monaghan refer to Walker as "Tyrone" or by any derogatory name.[68]

65.    After completing its investigation, PSD determined that Walker's allegations against Sgt. Monaghan with respect to the "Tyrone" allegations were unfounded.[69]

### 7-Eleven Incident (10/15/02)

66.    On October 15, 2002, Walker went to the 7-Eleven store in Holyoke as she "normally did on [her] shift."  The clerk informed her that a Blazer had pulled in and almost struck another vehicle.  A few minutes later, the Blazer returned and parked next to Walker's cruiser.[70]

67.    Walker went outside and began talking to the driver of the Blazer, Mr. Lee Moran.  Walker called for back-up.  She and Mr. Moran then got into a "tussle" wherein she grabbed Mr. Moran and pushed him to the ground.[71]

68.    Mr. Moran filed a report against Walker alleging that she beat him at the scene.[72]

---

[64] *See* Amended Complaint at ¶ 18.
[65] Exhibit 15, Deposition of Capt. Fletcher at p. 65; and Exhibit 1, Deposition of Chief Scott at p. 85.
[66] Exhibit 18, Affidavit of Lt. Monaghan at ¶ 8.
[67] Exhibit 18, Affidavit of Lt. Monaghan at ¶ 8.
[68] Exhibit 19, Affidavit of Sgt. Lenihan at ¶ 5.
[69] Exhibit 24, PSD findings dated 12/09/02 (marked as Exhibit 8 to Walker deposition, Vol. I).
[70] Exhibit 6, Deposition of Walker, Vol. I at pp. 110-111.
[71] Exhibit 6, Deposition of Walker, Vol. I at p. 112.
[72] Exhibit 6, Deposition of Walker, Vol. I at p. 117.

360999v1

69.     The next day, on October 16, 2002, Walker went back to the 7-Eleven. While she was there, the clerk told her that two officers had come into the store asking about the arrest of Mr. Moran. From the clerk's description of the officers, Walker concluded that Sgts. Monaghan and Garcia were the officers.[73]

70.     Sgt. Monaghan and Sgt. Garcia did question the clerk at 7-Eleven on October 16, 2002 to find out what happened the previous day. According to Sgt. Monaghan, Walker drove by the store and saw Sgts. Monaghan and Garcia speaking with the clerk. Sgt. Monaghan later learned that Walker was "very upset" that they were speaking to the clerk. Sgt. Monaghan surmised that Walker's anger motivated her to file a complaint about him the following day.[74]

### Offensive Song (10/17/02)

71.     On October 17, 2002, the day after Walker saw Sgt. Monaghan speaking with the 7-Eleven Clerk, Walker claims that Sgt. Monaghan leaned over her and sang a line from an offensive song to her.[75]

72.     On October 25, 2002, Walker filed an Employee Complaint with Chief Scott stating that on October 17, 2002, she was in the commander's office with Officer Christopher Dunn, Sgt. Garcia, and Sgt. Lenihan. Sgt. Monaghan reportedly entered the office after roll call and leaned over Walker and sang: "You shouldn't go sticking your tongue where it don't belong."[76]

---

[73] Exhibit 6, Deposition of Walker, Vol. I at pp. 117-120.
[74] Exhibit 18, Affidavit of Lt. Monaghan at ¶ 11.
[75] *See* Amended Complaint at ¶¶ 19-20.
[76] Exhibit 21, Employee Complaint filed 10/25/02 (marked as Exhibit 4 to Walker deposition, Vol. I).

73.    On October 17, 2002, the date that Sgt. Monaghan allegedly sang the "offensive song," Sgt. Lenihan recalls being in the commanding officer's office together with Walker, Sgt. Monaghan, Sgt. Garcia and Officer Dunn.[77]

74.    Sgt. Lenihan did not hear Sgt. Monaghan sing any song or make any derogatory comments to Walker.  In addition, Walker gave no indication of being upset.[78]

75.    A meeting was held among Lt. Whelihan, Capt. Fletcher, Walker, and Sgt. Monaghan regarding Walker's offensive song allegations.  During the meeting, Sgt. Monaghan denied Walker's allegations.[79]

76.    Also during the meeting, Sgt. Monaghan told Walker that he wanted to be friends with her and he wanted to "get along."  Walker simply responded, "It's gone too far, John."[80]

77.    On November 13, 2002, the entire third shift was given a questionnaire to fill out concerning Walker's allegations and everyone on the shift was interviewed.[81]

78.    On December 2, 2002, Walker filed a charge with the MCAD and the EEOC against the Department alleging discrimination based on her "gender, color, and sexual orientation, and interfer[ence] with her exercise and enjoyment of her civil rights."[82]

79.    On December 4, the Department received a statement from Rodriguez who also claimed to have heard discriminatory comments by Sgt. Monaghan.[83]

80.    After investigating the alleged "offensive song" incident, the Department found that Walker's allegations against Sgt. Monaghan were "unfounded."[84]

---

[77] Exhibit 19, Affidavit of Sgt. Lenihan at ¶ 3.
[78] Exhibit 19, Affidavit of Sgt. Lenihan at ¶ 3.
[79] Exhibit 14, Affidavit of Lt. Whelihan at ¶ 5; Exhibit 15, Deposition of Capt. Fletcher at pp. 61 and 152-153; Exhibit 2, Deposition of Sgt. Monaghan at pp. 100-102; and Exhibit 18, Affidavit of Lt. Monaghan at ¶ 9.
[80] Exhibit 6, Deposition of Walker, Vol. I at pp. 153-154.
[81] Exhibit 15, Deposition of Capt.  Fletcher at pp. 156-157; and Exhibit 25, Questionnaire (marked as Exhibit 3 to Sgt. Monaghan depo.).
[82] *See* Amended Complaint at ¶ 25.
[83] *See* Amended Complaint at ¶ 26.

### Elizur's Pub Incident

81.     On June 23, 2003 at 2:17 a.m., Officer Timothy Skwira was dispatched to Elizur's

Pub in Holyoke after the Department received a call that people were "refusing to leave the bar."

While Officer Skwira was en route, Walker responded to the call and went to Elizur's Pub.[85]

82.     Officer Thomas Dore, Officer Joseph Wilson, Officer Philip McKay, and Sgt.

Monaghan were all at Elizur's Pub when Walker arrived.[86]

83.     The officers and the sergeant were all off-duty at the time and none of them were

in uniform.[87]

84.     Walker arrived at the pub at 2:18 a.m. and saw the three officers and Sgt.

Monaghan.  She claims that Sgt. Monaghan was holding a bottle of beer.  She asked both the

owner of the pub, David Czelusniak, and the bartender, Karen Desautels, if they had called the

police.  Both responded "no."  According to Walker, she then told the four men to leave the bar.

At that time, she claims that Sgt. Monaghan took one last drink from his beer; slid the bottle to

the end of the bar and asked the bartender if the tab was "all set."  At that point, all four men left

the bar.[88]

85.     Officer Skwira arrived at Elizur's Pub one minute after Walker at 2:19 a.m.  Upon

his arrival he observed all three officers and Sgt. Monaghan "heading to the front door."[89]

86.     That same morning, Walker verbally reported the Elizur's Pub incident to her

immediate supervisor, Lt. Whelihan.[90]

87.     Lt. Whelihan informed Walker that he would handle the matter.[91]

---

[84] *See* Amended Complaint at ¶ 26.
[85] Exhibit 26, Recorded Statement of Officer Skwira dated 8/2/03.
[86] Exhibit 27, Recorded Statement of Sgt. Monaghan dated 7/21/03.
[87] Exhibit 2, Deposition of Sgt. Monaghan at p. 122; and Exhibit 6, Deposition of Walker, Vol. I at pp. 190-191.
[88] Exhibit 6, Deposition of Walker, Vol. I at pp. 186-188; and Exhibit 28, Incident Report of Walker dated 6/23/03.
[89] Exhibit 26, Recorded Statement of Officer Skwira.
[90] *See* Amended Complaint at ¶ 27; and Exhibit 14, Affidavit of Lt.  Whelihan at ¶ 8.

14

88.    Lt. Whelihan spoke with each individual who was in Elizur's Pub and disciplined them with verbal reprimands.[92]

89.    Walker was not satisfied with Whelihan's response.  As such, she reported the incident to Capt. Fletcher, the Bureau Commander.  In fact, Lt. Whelihan had already informed Capt. Fletcher of the allegations made by Walker against the four members of the Department.[93]

90.    Captain Fletcher asked Walker to prepare a written report of the incident and submit it to him.[94]

91.    Walker prepared a written report.  However, she did not submit the report to Capt. Fletcher as instructed.  Instead, she submitted the report directly to Chief Scott on June 23, 2003.[95]

92.    In doing so, Walker violated the chain of command.  Accordingly, Capt. Fletcher recommended that Chief Scott discipline Walker.[96]

93.    On or about June 25, 2003, Chief Scott ordered an internal investigation of the incident set forth in Walker's report of the Elizur's Pub incident.[97]

94.    As part of the investigation, Chief Scott asked Capt. Fletcher and Lt. Whelihan to submit  interoffice communications ("IOCs") as to their conversations with Walker and their handling of the initial complaint filed by her.[98]

---

[91] Exhibit 14, Affidavit of Lt. Whelihan at ¶ 8.
[92] Exhibit 1, Deposition of Chief Scott at p. 56.
[93] Exhibit 14, Affidavit of Lt.  Whelihan at ¶ 8; and Exhibit 29, Statement of Capt. Fletcher dated 7/1/03.
[94] Exhibit 15, Deposition of Capt. Fletcher at pp. 95-97.
[95] Exhibit 15, Deposition of Capt. Fletcher at pp. 99-100.
[96] Exhibit 15, Deposition of Capt. Fletcher at pp. 100-101; and Exhibit 29, Statement of Capt. Fletcher.
[97] Exhibit 1, Deposition of Chief Scott at p. 57.
[98] Exhibit 29, Statement of Capt. Fletcher; and Exhibit 30, Statement of Lt. Whelihan dated 7/3/03.

360999v1

95.    As part of the investigation, PSD obtained a recorded statement from the bartender, Karen Desautels. Ms. Desautels stated that neither she nor her boss had called the police on the morning of June 23, 2003.[99]

96.    PSD also obtained a recorded statement from the owner of Elizur's Pub, David Czelusniak. Mr. Czelusniak confirmed that he did not call the police on the morning of June 23, 2003.[100]

97.    PSD also obtained recorded statements from Officer Skwira, Sgt. Monaghan, Officer Dore, Officer McKay, and Officer Wilson.

98.    According to Sgt. Monaghan, Officer Dore called Officer Skwira from the bar about golf the next day. The officers and Sgt. Monaghan were in the process of leaving the bar. Sgt. Monaghan had misplaced his keys and was looking for them. They were not drinking. Sgt. Monaghan asked the bartender if the bill was all set. They were leaving expecting to meet Officer Skwira outside when Walker arrived.[101]

99.    Officer Dore confirmed that he had called dispatch; that they were not drinking after 2:00 a.m.; that Sgt. Monaghan asked the bartender if the bill was all paid up; and that they were all leaving as Walker came into the pub through the back door.[102]

100.    Officers McKay and Wilson confirmed this information in their recorded statements.[103]

101.    On July 2, 2003, Capt. Fletcher submitted his report of the incident. Fletcher reported that he "believe[d] Sgt. Walker intentionally violated the chain of command when she

---

[99] Exhibit 31, Recorded Statement of Karen Desautels.
[100] Exhibit 32, Recorded Statement of David Czelusniak.
[101] Exhibit 27, Recorded Statement of Sgt. Monaghan.
[102] Exhibit 33, Recorded Statement of Officer Dore dated 7/30/03.
[103] Exhibit 34, Recorded Statement of Officer McKay dated 7/30/03; and Exhibit 35, Recorded Statement of Officer Wilson dated 7/30/03.

submitted her report to Chief Scott." Capt. Fletcher also reported that Walker told him that "she was going to get Sgt. Monaghan because of his inquiry into an incident that involved her at a 7-11 store on Pleasant Street." She also told Capt. Fletcher that she did not "like Sgt. Monaghan because he called her disrespectful names over the radio" and further stated, "'No good deed goes unpunished.'"[104]

102.   PSD obtained the cassette tape of the dispatch call from Elizur's Pub. PSD confirmed that it was Officer Dore who made the call.[105]

103.   PSD also researched Massachusetts law which provides that alcoholic beverages cannot be sold after 2:00 a.m. (*M.G.L. c. 138, § 12*). The statute does not provide any deadline or time frame for the consumption of alcohol. Therefore, PSD contacted the Alcoholic Beverages Control Commission ("ABCC") on July 28, 2003 to determine if there is a time deadline for the consumption of alcohol. The PSD was informed that patrons are "given a reasonable period of time to finish consumption of their beverage" after 2:00 a.m.[106]

104.   On July 28, 2003, after speaking with the ABCC, PSD contacted the Holyoke License Commission and was informed "that the City of Holyoke had never enacted any regulation that would be more restrictive than M.G.L. Ch. 138, sec. 12."[107]

105.   A local newspaper article noted that there was neither a state law nor a local regulation barring customers from remaining in a liquor-serving establishment past closing time.[108]

---

[104] Exhibit 29, Statement of Capt. Fletcher.
[105] Exhibit 36, PSD Report to Chief Scott dated 8/4/03.
[106] Exhibit 36, PSD Report to Chief Scott dated 8/4/03.
[107] Exhibit 36, PSD Report to Chief Scott dated 8/4/03.
[108] Exhibit 37, Newspaper article.

106.    On August 4, 2003, PSD submitted its findings with respect to the Elizur's Pub

incident to Chief Scott, in pertinent part, as follows:

> The matter is reduced to the fact that Sergeant Monaghan, Officer
> McKay, Reserve Officer Dore or Reserve Wilson has not (sic.)
> violated any departmental rule or state law by being in Elizur's
> Pub after 02:00.  There is no evidence to suggest that any sale of
> alcoholic beverages took place after 02:00.
>
> Two secondary issues arise out of this matter.  First regards the call
> for service made by reserve Officer Thomas Dore….  Officer
> Dore's actions could have jeopardized both the safety of the public
> and his fellow officers by having officers respond to an
> unnecessary call for service.  I would suggest that Officer Dore is
> in violation of Rule and Regulation 5.5….
>
> Second regards Captain Fletcher's charge that Sergeant Walker
> violated the chain of command when she submitted her report on
> the incident to you.  At the time of this report this investigating
> officer does not know it if the charge has been addressed by
> yourself or Captain Fletcher.[109]

107.    On August 7, 2003, Chief Scott issued a Letter of Reprimand to Walker in writing

for failure to follow the chain of command with respect to the report of the Elizur's Pub incident.

The official order provides, in part, that an "Officer shall report up the chain to their Unit,

Section, and Division commanders before going to the Bureau commander or the Chief of

Police.[110]

108.    According to Chief Scott, Walker was disciplined "because she didn't follow

orders; not because she wrote a report, not because she reported the incident, because she plain

and simple did not follow orders."[111]

109.    Walker did not appeal the disciplinary action.[112]

---

[109] Exhibit 36,  PSD Report to Chief Scott dated 8/4/03.
[110] Exhibit 1, Deposition of Chief Scott at p. 55; and Exhibit 38, Official Letter of Reprimand (marked as Exhibit 9 to Walker Depo. Vol. I).
[111] Exhibit 1, Deposition of Chief Scott at p. 58.
[112] Exhibit 6, Deposition of Walker, Vol. I at p. 203.

110.    Chief Scott disciplined each of the four individuals involved in the Elizur's Pub incident.    He gave written reprimands to all of the officers, except for the reserve officer responsible for the call who was suspended from working any tours of duty for thirty days. Chief Scott disciplined the officers despite the fact that "there was no violation of any state statute, there was no violation of any city ordinance."[113]

### Late Court Appearance  (April 2004)

111.    On March 30, 2004, Captain Monfette sent the following e-mail to all police personnel, including Walker:

> I have received a complaint from the District Court that some officers are not showing up on time.  When you have court, you are obligated to be there at 8:30.  You should immediately sign-in and then see the ADA in charge of your case....[114]

112.    It was, and still is, the practice of Captains Monfette and Fletcher to conduct "spot checks" at the courthouse for attendance.[115]

113.    On April 6, 2004, Capt. Monfette conducted a "surprise roll-call" at the District Court at 8:30 a.m.  Captain Monfette reported the following to Chief Scott:

> The surprise roll-call resulted in a total of 6 Officers late for court. Amount of time-late varied between 5 and 15 minutes.    The following Officers were late for court; (sic)
>
> 1.    Sgt. Tammy Walker
> 2.    Off. Sean Shattuck
> 3.    Off. James Briant
> 4.    Off. Jorge Rodriguez
> 5.    Off. Jan Saj
> 6.    Off. Ronald Mihalak

---

[113] Exhibit 1, Deposition of Chief Scott at p. 58; and Exhibit 2, Deposition of Sgt. Monaghan at p. 121.
[114] Exhibit 6, Deposition of Walker, Vol. I at p. 208; and Exhibit 39, E-mail correspondence (marked as Exhibit 11 to Walker depo. Vol. I).
[115] Exhibit 15, Deposition of Capt. Fletcher at pp. 92-93.

360999v1

> The above Officers were ordered to submit, to me, a "To-From",
> indicating the reason for their late arrival. I have attached these to
> this memo. I make no recommendation as to reprimands. I leave
> that to you. My only reason for conducting the surprise roll-call
> was to nip this matter, before it got out of hand.[116]

114.    On April 7, 2004, Walker sent a "To-From" (IOC) to Capt. Monfette stating: "I have no excuse for being late for court. The time to report is 8:30 a.m. I arrived at 8:40 a.m. I will make every effort to appear on time in the future."[117]

115.    On April 20, 2004, Chief Scott suspended Walker for one (1) day for appearing late for court.[118] The suspension was issued in light of the fact that Walker had been disciplined eight months earlier for the Elizur's Pub incident and because Walker had admitted that she had "no excuse" for being late in her "To-From" memorandum.[119]

116.    According to Walker, "[o]ther employees of the Department were not similarly disciplined...."[120] In fact, however, Chief Scott disciplined each of the officers who reported late to court on that date.[121]

117.    Walker appealed her suspension to Mayor Michael J. Sullivan pursuant to *M.G.L. c. 31, § 41*. At the hearing, Walker was represented by counsel and evidence was presented on her behalf. On June 22, 2004, Mayor Sullivan affirmed the one (1) day suspension issued by Chief Scott.[122]

---

[116] Exhibit 40, IOC from Capt. Monfette to Chief Scott dated 4/6/04.
[117] Exhibit 6, Deposition of Walker, Vol. I at pp. 209-211; and Exhibit 41, "To-From" (marked as Exhibit 12 to Walker depo. Vol. I).
[118] Exhibit 1, Deposition of Chief Scott at p. 60.
[119] Exhibit 6, Deposition of Walker, Vol. I at pp. 213-214; and Exhibit 42, Suspension Notification (marked as Exhibit 13 to Walker depo. Vol. I).
[120] *See* Amended Complaint at ¶ 30.
[121] Exhibit 1, Deposition of Chief Scott at p. 61 and 96; and Exhibit 5, Deposition of Rodriguez at p. 131.
[122] Exhibit 6, Deposition of Walker, Vol. I at p. 214; and Exhibit 43, Correspondence from Mayor Michael Sullivan (marked as Exhibit 14 to Walker depo. Vol. I).

360999v1

## Terrorism Threat Incident (7/23/04)

118.    On July 23, 2004 at 8:39 p.m., a telephone call came into Brenda Therrien in dispatch (Call No. 04-26734).  A female called to report that she saw a suspicious person at the Holyoke Mall.  The caller stated that she had seen a Middle Eastern male videotaping the property.  The caller stated that the man was not taping people at the mall but was taping the interior structure of the mall.[123]

119.    Dispatcher Therrien attempted to transfer the call to the detective bureau. However, there was no answer at the time.  Accordingly, Dispatcher Therrien transferred the call to Walker.  When Dispatcher Therrien transferred the call, she said to Walker, "A woman with some information Sarge, she wants to give it, I'm not taking it."[124]

120.    Walker claims that Dispatcher Therrien referred the call to her by saying, "informational call, Sarg."[125]

121.    Walker did not take down either the name or the telephone number of the caller.[126]

122.    Walker did not record the call.[127]

123.    Dispatcher Therrien informed Lt. Denise Duguay about the phone call because she was concerned about the risk of terrorism.  Lt. Duguay called Sergeant James Albert, who was off-duty at home, to report the matter.  Sgt. Albert was a member of the Department who was assigned to the Joint Terrorism Task Force of the FBI at the time.[128]

---

[123] Exhibit 44, Dispatch Log 7/23/04.
[124] Exhibit 45, Transcript of Dispatch Call No. 04-26734.
[125] Exhibit 6, Deposition of Walker, Vol. I at p. 220.
[126] Exhibit 6, Deposition of Walker, Vol. I at pp. 226-227.
[127] Exhibit 6, Deposition of Walker, Vol. I at p. 237.
[128] Exhibit 46, Recorded Statement of Sgt. Albert dated 7/28/04; Exhibit 47, Recorded Statement of Lt. Duguay dated 7/28/04; and Exhibit 48, Recorded Statement of Dispatcher Therrien dated 7/29/04.

124.    After speaking with Sgt. Albert, Lt. Duguay spoke to Walker and asked Walker to leave a copy of her report of the phone call on the clipboard for Sgt. Albert. Walker replied that she did not prepare a report. Lt. Duguay requested that Walker do so because it was a serious matter. Walker replied that she did not have any information such as the caller's name or phone number so that Sgt. Albert could follow up on the report.[129]

125.    Sgt. Albert went into work after talking to Lt. Duguay to follow-up on the call. Upon arriving, he spoke to Dispatcher Therrien and told her it was an urgent matter. Sgt. Albert asked to speak with Walker about the phone call.[130]

126.    According to Walker's narrative concerning the call:

> [The caller] wanted to report she saw a man, which she thought was Middle Eastern video taping in the Holyoke Mall. She wanted to know what she should do. I told her to notify Mall Security if this happened in the future.[131]

127.    Lt. O'Connell spoke to Walker about the phone call. She advised Walker to obtain more detailed information from a caller reporting a possible terrorist threat in the future, including the name and telephone number of the caller. She also told Walker that she should prepare a detailed report of any such call and submit the same to Sgt. Albert for further follow-up and inclusion into the National Intelligence Bureaus.[132]

128.    On July 28, 2004, Chief Scott initiated an internal investigation of Walker's handling of the possible terrorism report.[133]

---

[129] Exhibit 46, Recorded Statement of Sgt. Albert; and Exhibit 47, Recorded Statement of Lt. Duguay.
[130] Exhibit 46, Recorded Statement of Sgt. Albert.
[131] Exhibit 49, Narrative for of Walker dated 8/17/04.
[132] Exhibit 50, Recorded Statement of Lt. O'Connell dated 7/28/04.
[133] Exhibit 51, IOC from PSD to Chief Scott dated 7/30/04.

129.    As part of its investigation, PSD reviewed the tape recorded call. PSD also obtained statements from Dispatcher Therrien, Sgt. Albert, Lt. Duguay, Lt. O'Connell, and Walker.[134]

130.    In her statement to PSD, Walker claims that Dispatcher Therrien transferred the call to her stating it was "an informational call." Walker states that the caller reported the videotaping incident and asked Walker what she should do. Walker advised her to contact mall security. Walker then thanked the woman for calling and hung up.[135]

131.    On July 30, 2004, PSD issued its findings including, but not limited to, the following:

> Clearly, Sgt. Walker does not take an initiative to solicit the caller's information stating that the call was informational only. Here, a private citizen, observing suspicious activity, does what the public has been asked to do since 9/11.
>
> Sgt. Walker as a supervisor is responsible for gathering more information than the dispatcher, regardless of weather (sic.) the dispatcher relays the nature of the call. Sgt. Walker admits to gathering less information than Ms. Therrien. If this is so, it is at the fault of Sgt. Walker. In reviewing the dispatch tape, the caller is most forthcoming in providing her observations to Dispatcher Therrien.
>
> Sgt. Walker further diminishes the value of the call by citing the caller's tone in which she was speaking. In reviewing the tape, the caller is genuine and is seeking to report suspicious activity. Sgt. Walker in her response to the caller instructs her to simply contact mall security.[136]

132.    On August 24, 2004, Walker was notified that she was suspended for five (5) days without pay for violating numerous Department rules. This suspension was "forwarded to

---

[134] Exhibit 51, IOC from PSD to Chief Scott dated 7/30/04.
[135] Exhibit 52, Recorded Statement of Walker.
[136] Exhibit 51, IOC from PSD to Chief Scott dated 7/30/04.

Mayor Michael J. Sullivan, for a hearing to determine whether Sergeant Walker should be subjected to further suspension, demotion or termination.[137]

133.    An appeal was held on September 15, 2004 pursuant to Chapter 31 in the Mayor's office. The Mayor upheld the five (5) day suspension without pay and added an additional five (5) day suspension without pay.[138]

### Disrespect (9/6/04) and Verbal Assault by Sgt. Monaghan (9/9/04)

134.    On September 6, 2004, Walker responded to a murder scene. No one at the scene had yellow caution tape to cordon off the crime scene. Walker asked officers at the scene and over the air to get caution tape. Walker claims that she then saw Sgt. Monaghan approximately 20 yards away from her roping off part of the scene with caution tape.[139]

135.    Despite the fact that Walker was only 20 yards away from Sgt. Monaghan, she radioed Sgt. Monaghan twice to request the tape rather than speaking with him in person. According to Walker, Sgt. Monaghan did not respond to her. Therefore, she asked Officer Jose Montalvo to retrieve the leftover tape from Sgt. Monaghan.[140]

136.    Walker believes that Sgt. Monaghan was showing "disrespect" to her by not responding to her radio calls.[141]

137.    Walker never spoke to Sgt. Monaghan about the incident.[142]

---

[137] Exhibit 53, Suspension Notification dated 8/17/04 (marked as Exhibit 19 to Walker depo, Vol. I).
[138] Exhibit 54, Chapter 31, sec. 41 Discipline letter from Mayor Sullivan dated 9/28/04.
[139] Exhibit 55, IOC from Walker to Chief Scott dated 9/11/04; and Exhibit 56, Deposition of Walker, Vol. II at pp. 9-12.
[140] Exhibit 55, IOC from Walker to Chief Scott dated 9/11/04; and Exhibit 56, Deposition of Walker, Vol. II at pp 9 and 15.
[141] Exhibit 55, IOC from Walker to Chief Scott dated 9/11/04.
[142] Exhibit 56, Deposition of Walker, Vol. II at p. 17.

24

138.    On September 9, 2004, Sgt. Monaghan was conducting roll-call at 4:00 p.m. After roll-call, Walker claims that Sgt. Monaghan came over to her and stated: "Start packing your bags."[143]

139.    On September 10, 2004, Sgt. Walker orally reported the events of September 6, 2004 and September 9, 2004 to her supervisor, Lt. Eva O'Connell.[144]

140.    Walker told Lt. O'Connell that she thought Sgt. Monaghan was being insubordinate to her by failing to answer her radio calls at the crime scene on September 6, 2004. Lt. O'Connell disputed Walker's contentions. She told Walker that crime scenes are very hectic and radio calls are often missed. In addition, Lt. O'Connell told Walker that she did not believe the failure to respond to two requests for caution tape created a safety issue.[145]

141.    With respect to the verbal "threat" on September 9, 2004, Walker reported that she believed Sgt. Monaghan made the comment in light of her five-day suspension related to the alleged terrorism report at the Holyoke Mall. Walker told Lt. O'Connell that Sgt. McMullan, Officer Deborah Clement and Officer McKay were present when the comment was made.[146]

142.    Lt. O'Connell told Walker that she would speak to Sgt. Monaghan about the incident. She told Walker not to put anything in writing. She told Walker that if there were any additional problems, Walker should inform her right away. Lt. O'Connell told Walker that she could call her at home or on her cell phone if she was not working at the time.[147]

---

[143] Exhibit 57, IOC from Walker to Chief Scott dated 9/11/04.
[144] Exhibit 57, IOC from Lt. O'Connell to Chief Scott dated 9/16/04; and Exhibit 56, Deposition of Walker, Vol. II at p. 22.
[145] Exhibit 57, IOC from Lt. O'Connell to Chief Scott dated 9/16/04.
[146] Exhibit 57, IOC from Lt. O'Connell to Chief Scott dated 9/16/04.
[147] Exhibit 57, IOC from Lt. O'Connell to Chief Scott dated 9/16/04.

143.    Lt. O'Connell asked Sgt. Monaghan about the alleged incidents of September 6 and 9.[148]  Sgt. Monaghan told Lt. O'Connell that he did not hear Walker call him on the radio the night of September 6, 2004.  Sgt. Monaghan also denied making the "start packing your bags" comment to Walker on September 9, 2004.[149]

144.    Lt. O'Connell told both Walker and Sgt. Monaghan that she did not want either of them "going to the Chief's office" with the issues raised by Walker.  Lt. O'Connell told the sergeants that she would go to the Chief immediately if there were any further problems.  Lt. O'Connell informed Capt. Fletcher of her conversations with Walker and Sgt. Monaghan.[150]

145.    On September 11, 2004, Walker ignored the chain of command and submitted a written report of the 9/6/04 and 9/9/04 incidents directly to Chief Scott.  Walker reported that she felt Sgt. Monaghan made the statement, "Start packing your bags," in reference to her suspension for the terrorism call.  Walker further reported that Sgt. Monaghan had been verbally assaulting her for two (2) years.  Walker reported that she did not feel safe and that she feared Sgt. Monaghan would verbally assault her every time he walked past her.  She reported fearing for her own safety and for the safety of other officers.[151]

146.    On September 15, 2004, Chief Scott called Lt. O'Connell and asked her to put Sgt. Walker's complaints in writing.  Lt. O'Connell submitted an IOC to the Chief on September 16, 2004.[152]

147.    Chief Scott ordered an internal investigation into both the September 6 and September 9 matters by PSD.[153]

---

[148] Exhibit 2, Deposition of Sgt. Monaghan at pp. 135-137.
[149] Exhibit 2, Deposition of Sgt. Monaghan at p. 128; and Exhibit 57, IOC from Lt. O'Connell to Chief Scott dated 9/16/04.
[150] Exhibit 57, IOC from Lt. O'Connell to Chief Scott dated 9/16/04.
[151] Exhibit 55, IOC from Walker to Chief Scott dated 9/11/04.
[152] *See* Exhibit 57, IOC from Lt. O'Connell to Chief Scott dated 9/16/04.

148.    On October 27, 2004, PSD took the recorded statement of Sgt. Monaghan.  Sgt. Monaghan stated that he responded to the murder scene on 9/6/04 to "lend a hand."  There were 100 to 150 people at the scene which Sgt. Monaghan characterized as "utter chaos."  He was given caution tape and began to tape off the scene.  Sgt. Monaghan maintains that he did not hear any radio transmission from Walker.  He also maintains that he was not ignoring Walker.[154]

149.    Sgt. Monaghan heard Sgt. Walker ask Officer Montalvo to get the tape from him since they were standing within hearing distance of each other.  Sgt. Monaghan gave the tape to Montalvo.[155]

150.    As part of its investigation, PSD obtained and reviewed Walker's radio transmissions from September 6, 2004.    The tapes reveal that Walker made two radio transmissions to Sgt. Monaghan as follows:

    1.    "Sgt. Monaghan do you need any more tape?" and

    2.    "Sgt. Monaghan come in."[156]

151.    PSD also obtained recorded statements from Officer Phillip McKay[157], Officer Deborah Clement[158], Sergeant Robert Laramee[159], Sgt. Daniel Fallon[160], and Sgt. Michael McMullan[161], who were on duty during the 4:00 p.m. roll-call on September 9, 2004.  All of these officers stated that they did not hear Sgt. Monaghan make the "start packing your bags" comment to Walker.

---

[153] See Exhibit 58, IOC from PSD to Chief Scott dated 11/8/04 regarding 9/6/04 incident; and Exhibit 59, IOC from PSD to Chief Scott dated 11/8/04 regarding 9/9/04 incident.
[154] Exhibit 60, Recorded Statement of Sgt. Monaghan dated 10/27/04.
[155] Exhibit 60, Recorded Statement of Sgt. Monaghan dated 10/27/04.
[156] Exhibit 58, IOC from PSD to Chief Scott dated 11/8/04 regarding 9/6/04 incident.
[157] Exhibit 61, Recorded Statement of Officer McKay dated 10/27/04.
[158] Exhibit 62, Recorded Statement of Officer Clement dated 10/27/04.
[159] Exhibit 63, Recorded Statement of Sgt. Laramee dated 10/28/04.
[160] Exhibit 64, Recorded Statement of Sgt. Fallon dated 10/29/04.
[161] Exhibit 65, Recorded Statement of Sgt. McMullan dated 10/29/04.

360999v1

152.    On November 8, 2004, PSD issued its findings on the 9/6/04 incident.  PSD found that Walker's complaint could not be sustained because there was "no way to determine whether [Monaghan's failure to respond to the radio calls was] intentional or unintentional…."  PSD also found that Walker's submission of a written report directly to Chief Scott was "a violation of Lt. O'Connell's order not to put this matter in writing."[162]

153.    On November 17, 2004, PSD informed Walker in writing that, after investigation of the 9/9/04 alleged "start packing your bags" threat, it was determined that there was "no evidence" to support her allegation and, as such, the matter was classified as "Not Sustained."[163]

154.    On November 17, 2004, Chief Scott sent an interoffice correspondence to PSD stating that he concurred with PSD's finding that Walker's complaints were "Not Sustained." However, he also stated that Lt. O'Connell "cannot issue an order prohibiting the Sergeant from documenting an alleged incident.  Therefore, I cannot hold Sergeant Walker accountable for violating this order."[164]

### Report of Dispatching Cruisers Via E-Mail

155.    In late October 2004, Walker claims that she noticed she was not receiving dispatch calls over her car radio or hand-held radio such that she did not know where her subordinates were in the field.[165]

156.    Walker believed that her supervisor, Lt. O'Connell, "had ordered the dispatchers to send calls via e-mail, which would preclude Walker from hearing them." [166]  However, at her

---

[162] Exhibit 58, IOC from PSD to Chief Scott dated 11/8/04 regarding 9/6/04 incident.
[163] Exhibit 66, IOC from PSD to Walker dated 11/17/04.
[164] Exhibit 67, IOC from Chief Scott to PSD dated 11/17/04 regarding 9/6/04 incident; and Exhibit 68, IOC from PSD to Walker dated 11/17/04 regarding 9/9/04 incident.
[165] *See* Amended Complaint at ¶ 34.
[166] *See* Amended Complaint at ¶ 35.

deposition, Walker admitted that she does not know what would motivate Lt. O'Connell to do such a thing.[167]

157.    On October 31, 2004, Walker asked Lt. O'Connell whether an order had been given to dispatch calls via e-mail because she was not hearing any out-going calls.  Lt. O'Connell informed Walker that no such order had been given.  Lt. O'Connell also informed Walker that she would investigate the matter.[168]

158.    After Walker spoke to her, Lt. O'Connell asked Officer Craven (the communications supervisor) if he knew anything about e-mail dispatches.  Officer Craven told Lt. O'Connell that the laptops (also referred to as "mobile data terminals or "MDTs") had not even been working and that he was not dispatching cruisers via laptop.[169]

159.    Lt. O'Connell also spoke to Officer Moriarty about the alleged e-mails.  Officer Moriarty stated that he kept records of all e-mails sent over the laptops so he could check if Walker had a particular date(s) in mind.[170]

160.    Lt. O'Connell relayed her conversations to Walker.  However, Walker did not provide Lt. O'Connell with any specific dates or incidents so that Lt. O'Connell could further investigate the matter.[171]

161.    No other supervisor, officer or personnel ever mentioned a laptop e-mail issue to Lt. O'Connell.[172]

---

[167] Exhibit 56, Deposition of Walker, Vol. II at p. 46.
[168] Exhibit 69, Affidavit of Lt. O'Connell at ¶ 8; Exhibit 70, Recorded Statement of Lt. O'Connell dated 12/13/04; and Exhibit 56, Deposition of Walker, Vol. II at p. 34
[169] Exhibit 69, Affidavit of Lt. O'Connell at ¶ 8; and Exhibit 70, Recorded Statement of Lt. O'Connell dated 12/13/04.
[170] Exhibit 20, Affidavit of Officer Moriarty at ¶ 5; Exhibit 69, Affidavit of Lt. O'Connell at ¶ 8; and Exhibit 70, Recorded Statement of Lt. O'Connell dated 12/13/04.
[171] Exhibit 69, Affidavit of Lt. O'Connell at ¶ 8.
[172] Exhibit 70, Recorded Statement of Lt. O'Connell dated 12/13/04.

360999v1

162.    On November 3, 2004, Lt. O'Connell told Walker that she had spoken with the dispatchers and the dispatchers stated that they were not using e-mails to dispatch cruisers.[173]

163.    On November 4, 2004, Walker went to Lt. Duguay and told her about her conversation with Lt. O'Connell.  Walker said that she wanted to talk to Chief Scott about her allegations and that she wanted Lt. Duguay present during the meeting.[174]

164.    Lt. Duguay and Walker met with Chief Scott.  After the meeting, Chief Scott spoke to one of the dispatchers, John O'Donnell, and to Officer Jack Craven, both in the presence of Lt. Duguay.  Dispatcher O'Donnell and Officer Craven stated that it is unusual to dispatch via e-mail unless the parties involved have a scanner.[175]

165.    Lt. Duguay told Walker that the dispatchers denied that they were dispatching via e-mail and that Walker's concerns appeared to be unfounded.  Walker remained unconvinced. Lt. Duguay reminded Walker of the chain of command and suggested that she speak to Lt. O'Connell.  Walker told Lt. Duguay that she would have her attorney call Chief Scott.[176]

166.    On November 8, 2004, Chief Scott requested that PSD conduct an internal investigation of the allegations brought forward by Walker concerning e-mail dispatches.[177]

167.    On November 10, 2004, Lt. O'Connell reassigned Walker to inside duty.[178]

168.    Lt. O'Connell reassigned Walker to the position of booking officer because she had concerns about Walker's knowledge of her job.[179]  In fact, Lt. O'Connell had previously reported her concerns in an IOC to Capt. Fletcher on August 3, 2004.  In the IOC, Lt. O'Connell

---

[173] Exhibit 70, Recorded Statement of Lt. O'Connell dated 12/13/04; and Exhibit 56, Deposition of Walker, Vol. II at p. 49.
[174] Exhibit 71, IOC of Lt. Duguay to Chief Scott dated 11/4/04.
[175] Exhibit 71, IOC of Lt. Duguay to Chief Scott dated 11/4/04.
[176] Exhibit 71, IOC of Lt. Duguay to Chief Scott dated 11/4/04.
[177] Exhibit 72, Affidavit of Sgt. Daniel McCavick at ¶ 2; and Exhibit 73, Affidavit of Lt. Fournier at ¶ 2.
[178] *See* Amended Complaint at ¶ 37.
[179] Exhibit 69, Affidavit of Lt.  O'Connell at ¶¶ 3-5.

outlined five (5) specific incidents of concern including Walker making arrests on two separate occasions for incidents in which there was no right of arrest.[180]

169.    Lt. O'Connell also had concerns about Walker's temperament since Walker seemed "very emotional" at the time.[181]

170.    According to Chief Scott, the reassignment was not a form of discipline but simply an assignment change.  The assignment change "did not affect payroll, did not affect salary, did not violate contract."  Walker concedes her salary and benefits did not change.[182]

171.    Walker claims this reassignment constituted retaliation by Lt. O'Connell.[183] However, at her deposition, Walker conceded that the only basis she has for this claim is that: "I could feel it from her."[184]

172.    PSD conducted an investigation into Walker's allegations that dispatch calls were being sent via e-mail for the time period of September 15, 2004 through November 4, 2004.[185]

173.    PSD asked the Commander of the Technical Services Bureau of the Department, Capt. Frederick Seklecki, to provide a communications event log between dispatch and mobile units over laptop e-mail for all of the dates that Walker worked from September 15, 2004 to November 4, 2004.[186]

174.    As part of its investigation, PSD also took statements from every dispatcher who worked the same shift as Walker from September 15, 2004 to November 4, 2004 including:

---

[180] Exhibit 74, IOC from Lt. O'Connell to Capt. Fletcher dated 8/3/04 (marked as Exhibit 26 to Walker depo, Vol. II).
[181] Exhibit 69, Affidavit of Lt. O'Connell at ¶ 5.
[182] Exhibit 1, Deposition of Chief Scott at p. 68; and Exhibit 56, Deposition of Walker, Vol. II at p. 89.
[183] *See* Amended Complaint at ¶ 37.
[184] Exhibit 56, Deposition of Walker, Vol. II at pp. 78-79.
[185] Exhibit 73, Affidavit of Lt. Fournier at ¶ 4.
[186] Exhibit 73, Affidavit of Lt. Fournier at ¶ 5; and Exhibit 75, Affidavit of Capt. Seklecki at ¶¶ 1-2.

31

Patricia Alicea, John O'Donnell, Scott Burns, Bjarney Cruz, Brenda Therrien, Deanna O'Neill, Kevin Hennessey, and William Cauley.[187]

175.    The dispatchers all stated that Lt. O'Connell never ordered them to dispatch cruisers via laptop e-mail instead of by radio.  They also stated that the only time they dispatched via laptop was for incidents involving loud music complaints at certain addresses because those residents had scanners and would turn off the music before the police arrived.[188]

176.    PSD also obtained statements from Walker, Capt. Fletcher, Lt. O'Connell, Sgt. Monaghan, Sgt. Daniel Fallon, Lt. Brian Cassidy, Officer John Craven, Officer Shaun Kelley, and Officer Jose Montalvo.[189]

177.    Capt. Fletcher stated that Walker never brought this matter to his attention. Instead, he first learned about Walker's complaint from Chief Scott.[190]

178.    Lt. Brian Cassidy stated that Walker never brought this matter to his attention.  In addition, he stated that neither Lt. O'Connell nor any other supervisor ever ordered him to instruct dispatchers to use the laptop e-mail system instead of the radio.[191]

179.    Sergeant Daniel Fallon stated that Walker asked him if he had any knowledge of cruisers being dispatched by e-mail instead of by radio.  Fallon told her "no."  Fallon stated that neither he nor Lt. O'Connell ever issued an order to dispatch cruisers via e-mail rather than by radio.  Fallon corroborated that e-mail dispatch is primarily used for loud music calls at addresses with scanners.[192]

---

[187] Exhibit 72, Affidavit of Sgt. McCavick at ¶ 3; and Exhibit 73, Affidavit of Lt. Fournier at ¶ 5.
[188] Exhibit 73, Affidavit of Lt. Fournier at ¶¶ 10-12; and Exhibit 76, IOC from PSD to Chief Scott dated 1/11/05.
[189] Exhibit 72, Affidavit of Sgt. McCavick at ¶ 3; and Exhibit 73, Affidavit of Lt. Fournier at ¶¶ 6-7.
[190] Exhibit 76, IOC from PSD to Chief Scott dated 1/11/05.
[191] Exhibit 76, IOC from PSD to Chief Scott dated 1/11/05.
[192] Exhibit 76, IOC from PSD to Chief Scott dated 1/11/05.

360999v1

180.    Sgt. Monaghan stated that neither Lt. O'Connell nor any other supervisor ever ordered him to have dispatchers use e-mail instead of the radio.[193]

181.    Officer John Craven stated that neither Lt. O'Connell nor any other supervisor instructed him to dispatch cruisers via e-mail.[194]

182.    Lt. O'Connell stated that she never issued an order to dispatch via e-mail with the exception of certain specific addresses with known scanners.[195]

183.    Walker did not ask Lt. O'Connell's permission to report the matter to either Chief Scott or Lt. Duguay.[196]

184.    On November 15, 2004, PSD obtained a statement from Walker. Walker told PSD that she had spoken to Dispatchers Therrien and O'Neill about the e-mail issue. Walker admitted that neither dispatcher told her they were instructed to dispatch via laptop.[197]

185.    During her interview with PSD, Walker stated that she had a notebook in which she noted dates and times when she was not receiving information over her radio. PSD ordered Walker to produce the dates and times the following day so it could complete its investigation. Walker did not produce the information until 2 days later. Walker claimed that she did not hear dispatches on October 30, 2004 and November 2, 2004.[198] PSD reviewed the dispatch computer logs for both of the dates provided by Walker and found that "no laptop/e-mails" between dispatch and field units were sent on those dates.[199]

---

[193] Exhibit 76, IOC from PSD to Chief Scott dated 1/11/05.
[194] Exhibit 76A, Recorded Statement of Officer Craven dated 12/13/04.
[195] Exhibit 76, IOC from PSD to Chief Scott dated 1/11/05.
[196] Exhibit 73, Affidavit of Lt. Fournier at ¶ 16; and Exhibit 69, Affidavit of Lt. O'Connell at ¶ 9.
[197] Exhibit 77, Recorded Statement of Walker dated 11/15/04.
[198] Exhibit 77, Recorded Statement of Walker dated 11/15/04; and Exhibit 76, IOC from PSD to Chief Scott dated 1/11/05.
[199] Exhibit 73, Affidavit of Lt. Fournier at ¶ 7.

360999v1

186.    Walker also reported that she did not hear dispatches on November 3, 2004.[200]

187.    PSD reviewed the dispatch computer log for this date and found that the only dispatch sent via e-mail on that date was in fact sent to Walker.[201]

188.    As part of its investigation, PSD asked the Technical Services Bureau of the Department to review its communications system, in particular, the communications system in the cruiser used by Walker.  Capt. Frederick J. Seklecki responded that a problem with dispatch communication had been reported on July 17, 2004 which resulted in the Darcomm receiver on Mt. Tom being overhauled in September 2004.  He also reported:

> On Friday, November 5, 2004, Officer Moriarty addressed a radio problem in [Walker's] car #14.  This problem was eventually traced to a faulty vehicle computer and is presently being replaced….
>
> In summary, there have been communication issues with our system.  These issues are being addressed; hardware upgrades and improvements are in the planning stages.  [Walker's cruiser] has two documented instances of poor radio reception:  July 17, 2004 and November 5, 2004.[202]

189.    Walker never inquired of Moriarty as to whether there may have been a problem with the computer in her vehicle.[203]

190.    The e-mail communication event log showed that only five (5) e-mails were sent from dispatch to police vehicles during the twenty-three (23) dates that were reviewed.  Two of these e-mails were made from dispatch to Walker.[204]

191.    On January 11, PSD reported its findings to Chief Scott.  PSD's findings included the following in pertinent part:

---

[200] Exhibit 77, Recorded Statement of Walker dated 11/15/04.
[201] Exhibit 73, Affidavit of Lt. Fournier at ¶ 7.
[202] Exhibit 78, Report of Seklecki; and Exhibit 75, Affidavit of Capt. Seklecki at ¶ 3.
[203] Exhibit 56, Deposition of Walker, Vol. II at p. 35.
[204] Exhibit 73, Affidavit of Lt. Fournier at ¶ 8.

34

Lt. O'Connell informed Sgt. Walker in a timely manner that her allegation was unfounded.

Sgt. Walker goes outside her chain of command….

A review of the radio communications system revealed there have been some communication problems. The problems have been diagnosed as both technical and environmental.

In summation, it is clear that Lt. O'Connell at no time issued an order to any dispatcher instructing them to dispatch by laptop/e-mail instead of by radio. Further it is unreasonable for Sgt. Walker to conclude that because she did not hear a call for service over the radio that this was done to prevent her from knowing what was occurring on the watch.[205]

192.    On January 18, 2005, Walker was notified that she was being suspended for five (5) days. This suspension was imposed because, in the previous two (2) months, she had filed three (3) complaints against superior ranking officers (including the e-mail complaint against O'Connell), all of which were found to be unsubstantiated.[206]

193.    Walker also complained to the FBI about the alleged e-mail dispatches. The FBI reviewed two years worth of e-mails and confirmed that only five e-mails were sent during that time period.[207]

### Sick Leave Abuse

194.    On November 15, 16 and 17, 2004, Walker called in sick to work with a migraine headache. On November 17, 2004, Lt. Fournier observed Walker driving her personal vehicle in Holyoke.[208]

195.    On November 17, 2004, Walker requested to be approved for holiday days off for Saturday, November 20, 2004 and Sunday, November 21, 2004.[209]

---

[205] Exhibit 76, IOC from PSD to Chief Scott dated 1/11/05.
[206] Exhibit 79, Suspension Notification dated 1/18/05.
[207] Exhibit 1, Deposition of Chief Scott at pp. 72-73; and Exhibit 56, Deposition of Walker, Vol. II at p. 52.
[208] Exhibit 73, Affidavit of Lt. Fournier at ¶ 19; and Exhibit 80, Personnel Sick Reports dated November 15, 16, and 17, 2004.

196.    On November 18, 2004, Lt. Fournier sent correspondence to Chief Scott informing him that he had observed Walker driving her vehicle the previous day when Walker had called in sick.  Lt. Fournier also informed Chief Scott of Walker's use of sick time based on Walker's personnel file.[210]

197.    As of November 18, 2004, Walker had zero sick days accrued and three sick leave abuse letters in her personnel file.  According to the head personnel records clerk, Kathleen McCoy, Walker was aware that she had no available sick time since McCoy had discussed this fact with Walker on several occasions.[211]

198.    On November 18, 2004, Walker was examined by her primary care physician, Stephen J. Levine, M.D., for "work related stress."  Dr. Levine certified Walker to return to work on November 19, 2004 without restrictions.[212]

199.    Walker's request for a day off on Sunday, November 21, 2004 was allowed.[213]

200.    On November 19, 2004, a written denial of Walker's request for the day off on November 20 was hand-delivered to Walker at her home.  The denial was written by Lt. O'Connell after Lt. O'Connell consulted with Capt. Fletcher, who denied Walker's request, indicating that allowing Walker to have November 20 off would place the supervisory staff below minimum standards and would create the mandatory use of overtime.[214]

---

[209] Exhibit 81, IOC from Lt. O'Connell to Chief Scott dated 11/18/04.
[210] Exhibit 73, Affidavit of Lt. Fournier at ¶ 19-20; and Exhibit 82, IOC from Lt. Fournier to Chief Scott dated 11/18/04.
[211] Exhibit 82, IOC from Lt. Fournier to Chief Scott dated 11/18/04; Exhibit 83, IOC from Melinda Lane to Chief Scott dated 11/30/04; and Exhibit 84, IOC from Kathleen McCoy to Chief Scott dated 12/2/04.
[212] Exhibit 85, Certificate to Return to Work dated 11/18/04.
[213] Exhibit 86, IOC from Lt. O'Connell to Walker dated 11/20/04.
[214] Exhibit 86, IOC from Lt. O'Connell to Walker dated 11/20/04; and Exhibit 87, IOC from Lt. O'Connell to Chief Scott dated 12/13/04 (clarifying date).

201. Walker admits that she received the denial. However, Walker called in sick on November 20, 2004 alleging "family issues."[215]

202. On November 21, 2004, Walker took her scheduled Holiday day off.[216]

203. On November 22, 2004, Walker again called in sick; this time, reporting that she had reinjured her left shoulder.[217]

204. Upon hearing that Walker had called in sick again, Chief Scott issued Walker a direct order to report to his office no later than 2:30 p.m. that day.[218]

205. On November 22, 2004, Chief Scott conducted an inquiry into Walker's absences on November 17 and November 20. In her interview, Walker stated that she had a migraine headache on November 17. Walker could not recall whether she left her home that day. Walker claimed that she had to "check in" on her 64 year-old brother who is mentally ill. However, when interviewed she admitted that she did not need to be with her brother 24-hours a day, seven days a week.[219]

206. On November 22, 2004, Dr. Levine examined Walker for left shoulder bursitis and determined that she was able to return to work without restrictions on November 24, 2004.[220]

207. On November 23, 2004, Walker sent an IOC to Chief Scott requesting to meet with him regarding her "health." Walker stated that she had been "under a great deal of stress for the past 2 years due to certain members of this Dept…. The stress has now moved to my

---

[215] Exhibit 88, Recorded Statement of Walker dated 11/22/04; and Exhibit 56, Deposition of Walker, Vol. II at pp. 101-102.
[216] Exhibit 86, IOC from Lt. O'Connell to Walker dated 11/20/04.
[217] Exhibit 89, Direct Order from Chief Scott to Walker dated 11/22/04.
[218] Exhibit 89, Direct Order from Chief Scott to Walker dated 11/22/04.
[219] Exhibit 88, Recorded Statement of Walker dated 11/22/04.
[220] Exhibit 90, Certificate to Return to Work dated 11/22/04.

37

shoulder and neck area. I have been under a doctor's care regarding the stress for the past 2 years, and feel the only way to relieve the stress is simply to leave the Dept."[221]

208.    On November 24, 2004, Walker met with Chief Scott. She requested that Lt. Fournier not be present during the meeting. Chief Scott honored this request. However, the Chief's secretary, Jacqueline Sanky, was present during the meeting.[222]

209.    Walker told Chief Scott that she could not handle the stress. Walker indicated that she was stressed by Sgt. Monaghan and the internal investigations. Chief Scott stated that he was merely investigating complaints that Walker herself had filed. Walker stated that her therapist had advised her to resign.[223]

210.    Walker asked to be put on the First Watch. Chief Scott informed her that there were no positions available on the First Watch at that time.[224]

211.    Walker complained that Lt. O'Connell had assigned her to indoor duty. Chief Scott informed Walker that the Watch Commander had the authority to make such assignments; that such assignments were not grievable; and that the Watch Commander was not required to give Walker an explanation for the assignment.[225]

212.    During this meeting, Walker also complained that her shoulder was hurting because of the stress she was under. However, she did not allege that it was a "re-injury" of a previous work-related injury.[226]

213.    Also on November 24, 2004, Walker told Officer James Taylor "that everytime (sic.) she comes in contact with Sgt. Monaghan he calls her nasty names…."[227]

---

[221] Exhibit 91, IOC from Walker to Chief Scott dated 11/23/04.
[222] Exhibit 92, Memorandum from Chief Scott dated 11/24/04.
[223] Exhibit 92, Memorandum from Chief Scott dated 11/24/04.
[224] Exhibit 92, Memorandum from Chief Scott dated 11/24/04.
[225] Exhibit 92, Memorandum from Chief Scott dated 11/24/04.
[226] Exhibit 92, Memorandum from Chief Scott dated 11/24/04.

214.    On November 26, 2004, Walker went to Capt. Fletcher and told him that she was having pain in her shoulder and was emotionally stressed out.  Walker stated that she wanted to go to occupational health.  Capt. Fletcher informed Walker that she had to fill out an "Injured on Duty" form stating when and where the reoccurrence had occurred and to whom she had reported it.[228]

215.    Later that same day, Walker submitted "Injured on Duty" paperwork to Capt. Monfette.  Capt. Monfette noted that the "Injured on Duty" form had not been signed by the attending physician as required.   As such, he instructed Walker to obtain the necessary signature.[229]

216.    Capt. Monfette gave Chief Scott a copy of the documents submitted by Walker. Because the documents did not provide adequate information, Chief Scott ordered Walker to submit an IOC to him specifically outlining when, where, how and at what time she allegedly reinjured her left shoulder.[230]

217.    On November 29, 2004, Walker gave Capt. Fletcher an Injured-on-Duty Report.[231]

218.    Chief Scott received Dr. Levine's note which stated "shoulder bursitis, history of rotator cuff tear, 7/98 work injury" produced by Walker.  Chief Scott again ordered Walker in

---

[227] Exhibit 93, IOC from Officer Taylor to Capt. Seklecki dated 11/24/04.
[228] Exhibit 94, IOC from Capt. Fletcher to Chief Scott dated 11/26/04.
[229] Exhibit 95, IOC from Capt. Monfette to Chief Scott dated 11/26/04.
[230] Exhibit 95, IOC from Capt. Monfette to Chief Scott dated 11/26/04; and Exhibit 96, Injured-on-Duty Report (marked as Exhibit 2 to Fletcher Depo.).
[231] Exhibit 4, Deposition of Capt. Fletcher at p. 7; and Exhibit 96, Injured-on-Duty Report (marked as Exhibit 2 to Fletcher Depo.).

the presence of Capt. Fletcher to submit an IOC specifically outlining when, where, how and at what time she allegedly re-injured her left shoulder.[232]

219.    On November 29, 2004, Walker submitted an IOC stating she tore her left rotator cuff in the line of duty in July 1998. Walker claimed that she began "to feel little signs of weakness" in her left shoulder in October of 2004 and that she believed the "pain is directly due to the stress of dealing with the IAD investigation 04-26," which pertains to Walker's claim that Lt. O'Connell ordered calls to be dispatched via the radio.[233]

220.    On November 30, 2004, Chief Scott denied Walker's renewed request to treat her present absence as "Injured on Duty."[234]

221.    According to Chief Scott, the denial had nothing to do with Walker's complaint against Lt. O'Connell. Chief Scott denied the request because "there was no precipitating incident that led to this mysterious injury and [Walker] was told that she could seek remedy under Chapter 41, Section 100."[235]

222.    Also on November 30, 2004, Chief Scott suspended Walker for five (5) days for sick leave abuse.[236]

223.    Walker appealed this suspension to the Mayor pursuant to M.G.L. Chapter 31.

224.    Mayor Sullivan found that Walker's "attendance record demonstrates a clear record of sick leave abuse." In particular, Mayor Sullivan noted:

> For the past five (5) years, you have used 'Sick Leave' in conjunction with your regular two (2) days off or in conjunction with vacation, compensatory time off (time owed), holiday time

---

[232] Exhibit 94, IOC from Capt. Fletcher to Chief Scott dated 11/26/04; and Exhibit 96, Injured-on-Duty (marked as Exhibit 2 to Fletcher Depo.).
[233] Exhibit 97, IOC from Walker to Chief Scott dated 11/29/04.
[234] Exhibit 98, IOC from Chief Scott to Walker dated 11/30/04.
[235] Exhibit 1, Deposition of Chief Scott at p. 158.
[236] Exhibit 99, Suspension Notification 11/30/04.

40

off, or personal days off on at least forty-six (46) occasions. Further, with eleven (11) years and four (4) months as a full-time police officer not utilizing 'sick leave' you should have accumulated one hundred sixty-five (165) days of 'sick leave.' However, as of November 24, 2004, you have no 'Sick Leave,' twenty-one (21) hours of compensatory time (time owed), no personal days and two (2) unearned holidays (Thanksgiving and Christmas).[237]

225.    Mayor Sullivan affirmed the five (5) day suspension issued by Chief Scott and added an additional five (5) day suspension without pay.  Mayor Sullivan informed Walker in writing:  "I am providing you a <u>final</u> opportunity to meet fully the duties and responsibilities of your job.  Failure to do so will subject you to further discipline up to and including demotion or termination."  (Emphasis in the original).[238]

226.    Walker concedes that she received three (3) sick leave abuse notices prior to the notice for the November 17, 2004 date.[239]

### Complaint Against Lt. David D. Fournier (12/12/04)

227.    On December 8, 2004, Walker received a copy of her personnel file from her union attorney.  In the file, Walker saw the IOC from Lt. Fournier stating that he observed Walker to be driving her vehicle in Holyoke on November 17, 2004, a day that she had called in sick.[240]

228.    Walker noted that Lt. Fournier had reported the status of Walker's use of sick leave time in the IOC.  On December 12, 2004, Walker sent an IOC to Chief Scott stating that in her opinion, Lt. Fournier was not authorized to review her personnel record and, as such, Lt. Fournier had violated "several rules" of the Department.  Walker concluded that Lt. Fournier's

---

[237] Exhibit 100, Notice of Ch. 31, § 41 Discipline by Mayor Sullivan dated 12/27/04.
[238] Exhibit 100, Notice of Ch. 31, § 41 Discipline by Mayor Sullivan dated 12/27/04.
[239] Exhibit 56, Deposition of Walker, Vol. II at p. 100.
[240] Exhibit 101, IOC from Walker to Chief Scott dated 12/12/04.

41

"conduct and abuse of authority as the Commander of Professional Standards Division has created a great burden and distrust."[241]

229.    On December 13, 2004, Walker filed a Grievance Complaint Form with the International Brotherhood of Police Officers National Association of Government Employees requesting that Investigation into all cases conducted by Lt. Fournier regarding her be dismissed and that he be removed from his position.[242]

230.    Chief Scott conducted an internal investigation into the allegations by Walker against Lt. Fournier.[243]

231.    In May 2001, Chief Scott created the PSD (Internal Affairs) and assigned Lt. Fournier and Sgt. McCavick to that division.  The Chief moved all personnel files to the PSD office and Lt. Fournier and Sgt. McCavick were designated keepers of the records.  Lt. Fournier and Sgt. McCavick were authorized to review the files when conducting an investigation or when there was a suspected violation of departmental rules and regulations.[244]

232.    Article XX, Employee Files, Paragraph 20.2 does not require the Chief's designee or the keeper of the records to notify an individual member that the designee or keeper reviewed their file.[245]

233.    On December 28, 2004, Chief Scott took Lt. Fournier's statement.  Lt. Fournier stated that all Department personnel files are kept in his office under lock and key.  Lt. Fournier stated that he was acting in his official capacity when he reviewed Walker's personnel file.  In particular, Lt. Fournier stated as follows:

---

[241] Exhibit 100, IOC from Walker to Chief Scott dated 12/12/04.
[242] Exhibit 102, Grievance Complaint dated 12/13/04.
[243] Exhibit 103, Memorandum from Chief Scott dated 1/5/05.
[244] Exhibit 103, Memorandum from Chief Scott dated 1/5/05.
[245] Exhibit 103, Memorandum from Chief Scott dated 1/5/05.

Q.      Lieutenant Fournier, do you have any personal malice or animosity toward Sergeant Walker which would prohibit you from fairly and impartially conducting an investigation of her alleged violations of this department's rules, regulations and procedures?

A.      No, sir.

Q.      When you observed Sergeant Walker operating her vehicle while out on sick leave, did you believe she was violating departmental rules, regulations, policies and/or procedures?

A.      Yes, I did.

Q.      Was this the reason you reported you (sic.) observations to the Chief of Police?

A.      It is.

Q.      As the Commander of the Professional Standards Division, do you have the authority granted by the Chief of Police to initiate personnel investigations?

A.      I do.

Q.      As a supervisor of the Holyoke Police Department do you have the authority to initiate personnel investigations?

A.      Yes, sir.[246]

234.    On January 5, 2005, Chief Scott informed Walker in writing that Lt. Fournier was exonerated of the allegations made by Walker since Lt. Fournier was acting "well within the contract and the rules and regulations of this department."[247]

235.    On January 18, 2005, Walker was notified that she was being suspended for five (5) days. This suspension was imposed because in the previous two (2) months, she had filed

---

[246] Exhibit 104, Recorded Statement of Lt. Fournier dated 12/28/04.
[247] Exhibit 105, Correspondence from Chief Scott to Walker dated 1/5/05.

three (3) complaints against superior ranking officers (including the e-mail complaint against O'Connell), all of which were found to be unsubstantiated.[248]

### Complaint Against Lt. O'Connell For Memo Regarding Inside Duty

236.    As stated above, Walker received a copy of her personnel file from her union attorney on December 8, 2004.  In the file, Walker saw an IOC dated November 10, 2004 to her from Lt. O'Connell.  The IOC letter in the file stated that Walker was being re-assigned from Street Supervisor to Booking Officer.  The letter also stated:

> Unless your duties as Booking Officer take you into the Dispatch or Records Bureau, you will refrain from **hanging around** those offices." (Emphasis added).[249]

237.    Walker claimed that the IOC she received from Lt. O'Connell on November 10, 2004 was different from the IOC in her personnel file in that the IOC she received stated:

> Unless your duties as Booking Officer take you into the Dispatch or Records Bureau, you will refrain from **visiting** those offices." (Emphasis added).[250]

238.    Walker filed a complaint with Chief Scott on December 20, 2004 alleging that Lt. O'Connell "altered the document" to "suit her objectives" since the words "hanging around" and "visiting" have "different meanings."[251]

239.    Walker also complained that the indoor lighting caused her to suffer from a migraine headache and that she was never told why she was being assigned to inside duty.[252]

---

[248] Exhibit 79, Suspension Notification dated 1/18/05.
[249] Exhibit 106, IOC from Walker to Chief Scott dated 12/20/04; and Exhibit 107, Correspondence from Lt. O'Connell to Walker dated 11/10/04 (marked as Exhibit 27 to Walker depo. Vol. II).
[250] Exhibit 106, IOC from Walker to Chief Scott dated 12/20/04; and Exhibit 108, Correspondence from Lt. O'Connell to Walker dated 11/10/04 (revised)(marked as Exhibit 28 to Walker Depo., Vol. II).
[251] Exhibit 106, IOC from Walker to Chief Scott dated 12/20/04.
[252] Exhibit 106, IOC from Walker to Chief Scott dated 12/20/04.

240.    Walker concluded her complaint by stating: "Lt. O'Connell's lack of truthfulness by creating two different documents, sending them out as though they were CC (Carbon Copies), is in my opinion is (sic.) EVIL behavior and clearly represents her intent."[253]

241.    On December 20, 2004, Walker filed a Grievance Complaint Form with the International Brotherhood of Police Officers National Association of Government Employees requesting that Lt. O'Connell "be removed from her position."[254]

242.    On December 29, 2004, Chief Scott obtained a statement from Lt. O'Connell as part of his internal investigation. Lt. O'Connell stated that she was not trying to hide or conceal anything by changing the wording in the IOCs. Lt. O'Connell also stated that she has the authority to change an officer's duty assignment and that she is not required to provide any reason for making an assignment. Furthermore, Lt. O'Connell stated that she did not change Walker's duty assignment as a disciplinary action. Finally, she stated that she was not taking any punitive action against Walker by prohibiting her from visiting the communications center or records division.[255]

243.    On January 5, 2005, Chief Scott informed Walker in writing that Lt. O'Connell was exonerated of the allegations made by Walker since Lt. O'Connell was "well within [her] authority as Watch Commander" and "there was no violation of the contract or any departmental rule or regulation on the part of Lt. O'Connell."[256]

244.    Walker requested and obtained a right to sue letter from the EEOC on January 11, 2005.[257]

---

[253] Exhibit 106, IOC from Walker to Chief Scott dated 12/20/04.
[254] Exhibit 109, Grievance Complaint dated 12/20/04.
[255] Exhibit 110, Recorded Statement of Lt. O'Connell dated 12/29/04.
[256] Exhibit 105, Correspondence from Chief Scott to Walker dated 1/5/05.
[257] *See* Amended Complaint at ¶ 43.

245.    On January 18, 2005, Walker was notified by Chief Scott that she was being suspended for five (5) days.  This suspension was imposed because in the previous two (2) months, she had filed three (3) unfounded complaints against superior ranking officers.[258]

246.    Chief Scott also requested that Mayor Sullivan consider taking additional disciplinary action against Walker.[259]

247.    Walker alleges that Chief Scott's actions were in retaliation for the dispatch E-mail report and the complaint concerning her reassignment to inside duty. [260]

### Whistleblower Claim

248.    On February 15, 2005, Walker sent a letter to Chief Scott and Mayor Sullivan alleging violation of the Massachusetts Whistleblower statute, *M.G.L. 149, § 185*.[261]  In the letter, Walker reported that the City violated the Whistleblower statute by reprimanding her for reporting:  the Elizur's Pub incident; the September 6, 2004 (disrespect) incident; and the Dispatch E-mail Report incident and requested "that the City of Holyoke promptly correct these violations of the Whistleblower Statute."[262]

249.    On May 4, 2005, Walker sent another letter to the City in which she claimed that the City violated the Whistleblower statute by reprimanding and terminating her for reporting the physical confrontation (book incident) involving Lt. O'Connell on February 25, 2005.[263]

### Lt. O'Connell Book Incident (2/25/05)

250.    On February 25, 2005, Walker claims that Lt. O'Connell acted in a "hostile and aggressive manner" towards her.  In particular, Walker claims that Lt. O'Connell "abruptly and

---

[258] Exhibit 79, Suspension Notification dated 1/18/05.
[259] *See* Amended Complaint at ¶ 44.
[260] *See* Amended Complaint at ¶ 44.
[261] *See* Amended Complaint at ¶ 45.
[262] Exhibit 111, Letter dated February 15, 2005.
[263] *See* Amended Complaint at ¶ 54; and Exhibit 112, Letter dated May 4, 2005.

vigorously pulled a book" out of Walker's hands, "exacerbating an injury to Walker's shoulder." Walker claims that Lt. O'Connell also "stood up and took steps toward [her] in an aggressive, intimidating and hostile manner."[264]

251.    At her deposition, however, Walker claimed that she (Walker) took the open book off of Lt. O'Connell's desk and Lt. O'Connell "pulled the book out of [her] hand" injuring Walker's elbow.[265]

252.    Walker also stated at her deposition that she (Walker) simply let go of the book and no further altercation occurred.  Walker claims that she placed a call to Jack Craven and asked him to come into the Commanding Officer's office.  Walker then left.[266]

253.    According to Lt. O'Connell, she (O'Connell) was in the Commanding Officer's office with the scheduling book in front of her speaking with Officer Shattuck.  Walker came into the office even though she had taken a vacation day.[267]  (In fact, Walker had not worked since November 14, 2004.[268])

254.    According to Lt. O'Connell, Walker came into the office without saying anything, and grabbed the open scheduling book from the desk.  Lt. O'Connell placed her hands on the book to prevent Walker from removing it from the desk.  Lt. O'Connell then said, "Excuse me Sergeant Walker."[269]

---

[264] *See* Amended Complaint at ¶ 46.
[265] Exhibit 56, Deposition of Walker, Vol. II at pp. 107-108.
[266] Exhibit 56, Deposition of Walker, Vol. II at pp. 113-115.
[267] Exhibit 69, Affidavit of Lt. Eva O'Connell at ¶ 10.
[268] Exhibit 56, Deposition of Walker, Vol. II at p. 105.
[269] Exhibit 69, Affidavit of Lt. Eva O'Connell at ¶ 10; and Exhibit 1, Deposition of Chief Anthony Scott at p. 117.

360999v1

255.    Walker tried to pull the book away again.  Lt. O'Connell told Walker to "Let go" and Lt. O'Connell shut the book.  Lt. O'Connell then signaled Officer Shattuck to leave the room so she could speak with Walker in private.[270]

256.    Lt. O'Connell walked to the door to close it.  Walker went over to O'Connell and stood nose to nose with her.  Walker quietly said, "F--- you."  Walker then stated that she wanted to put some requests for time owed in the scheduling book.  Lt. O'Connell told Walker to give her the "blue slips" and that she (Lt. O'Connell) would take care of it.  Walker took her blue slips and left the room.[271]

257.    According to Lt. O'Connell, Walker made no indication that she was injured during the incident.[272]

258.    On February 27, 2005, Lt. O'Connell reported the incident to Capt. Fletcher.[273]

259.    On that same day, Walker reported to Capt. Fletcher that she had injured her arm and shoulder during the confrontation with Lt. O'Connell.  She claimed the injury occurred when Lt. O'Connell pulled the scheduling book from her hands.[274]

260.    At her deposition, Walker claimed that she injured her elbow in the confrontation.[275]

261.    Capt. Fletcher denied Walker's injury claim for two (2) reasons:  (1) Walker had no work-related reason to be in the Commanding Officer's office on February 25, 2005 since she had taken a vacation day; and (2) there was no evidence to support Walker's claim that she was injured during the incident.  In fact, it was Capt. Fletcher's understanding that it was Walker who

---

[270] Exhibit 69, Affidavit of Lt. Eva O'Connell at ¶ 10.
[271] Exhibit 69, Affidavit of Lt. Eva O'Connell at ¶ 10; and Exhibit 1, Deposition of Chief Anthony Scott at pp. 117-118.
[272] Exhibit 69, Affidavit of Lt. Eva O'Connell at ¶ 11
[273] Exhibit 69, Affidavit of Lt. Eva O'Connell at ¶ 11.
[274] Exhibit 4, Affidavit of Capt. Fletcher  at ¶ 6.
[275] Exhibit 56, Deposition of Walker, Vol. II at pp. 86-87.

48

tried to take the book from O'Connell and that Walker had been disrespectful to Lt. O'Connell, her supervisor.[276]

262.    On February 27, 2005, Walker filed a complaint with Chief Scott about the incident with Lt. O'Connell.    Walker claimed that she was injured in the "physical confrontation" and that she was concerned for her "physical safety."[277]

263.    On February 28, 2005 Chief Scott requested that PSD conduct an internal investigation of the incident that took place between Walker and Lt. O'Connell on February 25, 2005.[278]

264.    As part of the investigation, PSD interviewed the following individuals:    Lt. O'Connell, Officer John Craven, Officer Sean Shattuck, Officer William Delgado, Kate McCoy, Officer Manuel Reyes, and Dispatcher Kevin Hennessey.[279]

265.    On March 15, 2005, PSD attempted to take a statement from Ms. Walker. However, she declined to provide a statement.[280]

266.    In addition, PSD requested that Capt. Seklecki locate communication tapes for the date of the incident to determine if calls were made to dispatch regarding the incident.    PSD also requested that Capt. Seklecki provide communication tapes for February 26, 2005 regarding Walker's reported telephone call to Officer John Craven.[281]

---

[276] Exhibit 4, Affidavit of Capt. Fletcher  at ¶ 6.
[277] *See* Amended Complaint at ¶ 47; Exhibit 1, Deposition of Chief Scott at p. 110; and Exhibit 113, Injury Report (marked as Exhibit 6 to Chief Scott's depo).
[278] Exhibit 72, Affidavit of Sgt. McCavick at ¶ 4; and Exhibit 73, Affidavit of Lt. Fournier at ¶¶ 22.
[279] Exhibit 72, Affidavit of Sgt. McCavick at ¶ 4.
[280] Exhibit 73, Affidavit of Lt. Fournier at ¶ 22.
[281] Exhibit 73, Affidavit of Lt. Fournier at ¶ 22; and Exhibit 75, Affidavit of Capt. Seklecki at ¶¶ 4-5.

360999v1

**Suspensions and Termination**

267.    On March 7, 2005, Mayor Sullivan held a hearing regarding the five (5) day suspension issued to Walker by Chief Scott on January 18, 2005 for filing three unfounded complaints against her supervisors.[282]

268.    Walker was scheduled to give a statement on March 15, 2005.  Although Walker reported to the PSD on that date, she refused to be interviewed.[283]

269.    On March 18, 2005, Mayor Sullivan affirmed the five (5) day suspension and imposed an addition fifteen (15) days of suspension, without pay.[284]

270.    On March 29, 2005, Walker filed her complaint in the subject action.[285]

271.    Chief Scott suspended Walker for five (5) days for Walker's complaint concerning the Lt. O'Connell book incident.[286]

272.    On April 12, 2005, Mayor Sullivan held a hearing regarding the five (5) day suspension.   On April 18, 2005, Mayor Sullivan affirmed the suspension and terminated Walker's employment.[287]

**Overview of Complaint**

273.    On June 29, 2005, Walker filed an Amended Complaint.

274.    In Count I, Walker alleges that the City discriminated against her on the basis of her gender in violation of *M.G.L. c. 151B, § 4(1)*.[288]

---

[282] Exhibit 114, Correspondence from Mayor Sullivan to Walker dated 3/18/05.
[283] Exhibit 72, Affidavit of Sgt. McCavick at ¶ 5.
[284] Exhibit 114, Correspondence from Mayor Sullivan to Walker dated 3/18/05 (marked as Exhibit 35 to Walker Depo., Vol. II).
[285] *See* Amended Complaint at ¶ 50.
[286] *See* Amended Complaint at ¶ 51.
[287] *See* Amended Complaint at ¶¶ 52-53; and Exhibit 115, Correspondence from Mayor Sullivan to Walker dated 4/18/05.
[288] *See* Amended Complaint at ¶¶ 55-58.

275.    In Count II, Walker alleges that the City discriminated against her on the basis of her gender in violation of Title VII (*42 U.S.C. § 2000e et seq.*).[289]

276.    In Count III, Walker alleges that the City discriminated against her on the basis of her race in violation of *M.G.L. c. 151B, § 4(1).*[290]

277.    In Count IV, Walker alleges that the City discriminated against her on the basis of her race in violation of Title VII (*42 U.S.C. § 2000e et seq.*).[291]

In Count V, Walker alleges that the City discriminated against her on the basis of her sexual orientation in violation of *M.G.L. c. 151B, § 4(1).*[292]

278.    In Count VI, Walker alleges that the City created a hostile work environment for her based on her race, which was severe and pervasive, in violation of *M.G.L. c. 151B.*[293]

279.    In Count VII, Walker alleges that the City created a hostile work environment for her based on her race, which was severe and pervasive, in violation of Title VII (*42 U.S.C. § 2000e et seq.*).[294]

280.    In Count VIII, Walker alleges that the City created a hostile work environment based on her gender, which was severe and pervasive, in violation of *M.G.L. c. 151B.*[295]

281.    In Count IX, Walker alleges that the City created a hostile work environment for her based on her gender, which was severe and pervasive, in violation of Title VII (*42 U.S.C. § 2000e et seq.*).[296]

---

[289] *See* Amended Complaint at ¶¶ 59-62.
[290] *See* Amended Complaint at ¶¶ 63-66.
[291] *See* Amended Complaint at ¶¶ 67-70.
[292] *See* Amended Complaint at ¶¶ 71-74.
[293] *See* Amended Complaint at ¶¶ 75-78.
[294] *See* Amended Complaint at ¶¶ 79-82.
[295] *See* Amended Complaint at ¶¶ 83-86.
[296] *See* Amended Complaint at ¶¶ 87-90.

282.   In Count X, Walker alleges that the City created a hostile work environment for her based on her sexual orientation, which was severe and pervasive, in violation of *M.G.L. c. 151B*.[297]

283.   In Count XI, Walker alleges that the City illegally retaliated against her for engaging in protected activities in violation of Title VII (*42 U.S.C. § 2000e et seq.*).[298]

284.   In Count XII, Walker alleges that the City illegally retaliated against her for engaging in activities protected by *G.L. c. 151B* and that the City, "through its officials, agents, and/or employees, illegally retaliated against Walker for engaging in activities protected" by *G.L. c. 151B* in violation of *G.L. c. 151B, §§ 4(4)* and *4(4A)*.[299]

285.   In Count XIII, Walker alleges that the City illegally retaliated against her for engaging in activities protected by the Massachusetts Whistleblower Statute (*M.G.L. c. 149, § 185*).[300]

286.   In Count XIV, Walker alleges that the City discriminated against her based on race in violation of *42 U.S.C. § 1981*.[301]

287.   In Count XV, Walker alleges that the City retaliated against her for engaging in activities protected by the First Amendment to the United States Constitution in violation of *42 U.S.C. § 1983*.[302]

## STANDARD OF REVIEW

Under *Rule 56(c)* of the *Federal Rules of Civil Procedure*, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file,

---

[297] *See* Amended Complaint at ¶¶ 91-94.
[298] *See* Amended Complaint at ¶¶ 95-99.
[299] *See* Amended Complaint at ¶¶ 100-105.
[300] *See* Amended Complaint at ¶¶ 106-110.
[301] *See* Amended Complaint at ¶¶ 111-114.
[302] *See* Amended Complaint at ¶¶ 115-119.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A 'genuine' issue is one that reasonably could be resolved in favor of either party, and a material fact is 'one that might affect the outcome of the suit under the governing law.'" *Wagner v. City of Holyoke*, 241 F. Supp. 2d 78, 82 (D. Mass. 2003)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986)). In order to avoid summary judgment, the plaintiff must establish the existence of every element essential to his case on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The plaintiff cannot rely on "mere allegations or evidence that is less than significantly probative." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). A summary judgment opponent must do more than show that there is some metaphysical doubt as to the material facts. Instead, the opponent must present definite, competent evidence in order to survive the motion. *Maldonado-Denis* at 581. Not every genuine factual conflict necessitates a trial. *Wagner, supra* at 83. "It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Id.* (quotations and citation omitted).

## ARGUMENT

I.    **THIS COURT SHOULD ENTER JUDGMENT IN FAVOR OF THE CITY BECAUSE WALKER HAS FAILED TO ESTABLISH DISCRIMINATION BASED ON GENDER, RACE OR SEXUAL ORIENTATION IN VIOLATION OF *M.G.L. c. 151B* OR *TITLE VII*.**

In her amended complaint, Walker alleges that the City discriminated against her on the basis of her gender (Counts I and II) and her race (Count III and IV) in violation of *M.G.L. c. 151B, § 4(1)* and Title VII (*42 U.S.C., § 2000e et. seq.*). Walker also alleges that the City

discriminated against her on the basis of her sexual orientation (Count V) in violation of *M.G.L.*

*c. 151B, § 4(1).*[303]

> Section 4(1) of *Mass. Gen. Laws ch. 151B* states that it shall be an unlawful practice:
>
> > For any employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, sexual orientation, . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.
>
> Section 703 of *Title VII* states that it is unlawful for an employer:
>
> > to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. *42 U.S.C. § 2000e-2(a)(1).*

Massachusetts courts "have adopted the well-established analytical framework used in federal employment discrimination cases arising under *Title VII*." *McKenzie v. Potter,* 2004 U.S. Dist. LEXIS 17356, *10 (D. Mass.)*(citing *Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination, 431 Mass. 655 (2000)* overruled on other grounds by *Stonehill College v. Mass. Comm'n Against Discrimination,* 441 Mass. 549, 562 (2004)).

The burden-shifting pretext framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973)* involves a three-stage analysis. *McKenzie, supra at *11-13.*

First, Walker must establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) her employer took adverse employment action against her; and (4) her position remained open or was filled by a person whose qualifications were similar to hers. *Id. at *13; Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1ˢᵗ Cir. 2001).* Walker must show that she was able to perform her duties at an

---

[303] Sexual orientation is not protected by Title VII. *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 259 *(1st. Cir. 1999).*

acceptable level to support her claims of discrimination. _Sbrogna v. ChipCom Corp._, _1997 Mass. Super. LEXIS 271, *10_; _Beal v. Board of Selectmen of Hingham_, _419 Mass. 535, 544-545 (1995)_. "In determining whether an employee performs at an acceptable level, prior complaints and peer reviews may be examined." _Id_.

If Walker can establish a _prima facie_ case, the burden of production shifts to the second stage of the analysis to the City to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action by "identifying enough admissible evidence to support a rational finding that unlawful discrimination was not the cause of the employment action." _McKenzie, supra at *13_ (internal quotations and citation omitted); _Straughn, supra at 33_. An employer can satisfy its burden by offering evidence that the employee was discharged because of poor job performance. _Ianetta v. Putnam Investments, Inc._, _2002 U.S. Dist. LEXIS 3277, *29 (D. Mass.)_; _Hodgens v. General Dynamics Corp._, _144 F.3d 151, 166 (1st Cir. 1998)_.

"In the third and final stage of the pretext analysis, if [the City] proffers a legitimate, nondiscriminatory reason, the burden shifts back to [Walker] who bears the ultimate burden of proof of showing that the [City] intentionally discriminated against her on the basis of gender [race or sexual orientation], and she can do so by showing that the employer's proffered explanation is unworthy of credence." _McKenzie, supra at *14_ (internal quotation omitted). "'If the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation,' summary judgment may be appropriate even when intent is an issue." _Ianetta, supra at *30_ (entering summary judgment in favor of employer where it was undisputed that employee had a "number of … problems on the job"); _see also Beasley v. Aramark Uniform & Career Apparel, Inc._, _430 F. Supp. 2d 8, 13(D. Mass. 2006)_(entering summary judgment in

55

favor of employer where "undisputed facts document sufficient, legitimate reasons for that termination.").

In this instance, Walker cannot prevail on her discrimination claims under *G.L. c. 151B* and *Title VII* because she cannot establish a *prima facie* case of discrimination. In particular, Walker cannot establish that she was able to perform her job at an acceptable level. This is evidenced by the fact that the City had sufficient legitimate nondiscriminatory reasons for disciplining and ultimately terminating Walker, including, but not limited to, her failure to follow the chain of command, being late for court without excuse, failure to follow terrorism protocol, sick leave abuse, making numerous unfounded complaints against superiors, and especially the threatening confrontation with her supervisor, Lt. O'Connell. There is no evidence to the contrary.

In the alternative, these incidents, which were the subjects of progressive discipline, demonstrate that the City had legitimate, non-discriminatory reasons for the adverse employment actions.

As such, this Court should enter judgment in favor of the City on Counts I, II, III, IV and V of the amended complaint.

## II. THIS COURT SHOULD ENTER JUDGMENT IN FAVOR OF THE CITY BECAUSE WALKER HAS FAILED TO ESTABLISH THAT SHE SUFFERED A HOSTILE WORK ENVIRONMENT IN VIOLATION OF *M.G.L. c. 151B* OR *TITLE VII.*

Walker also alleges that the City created a hostile environment for her based on her race (Counts VI and VII) and her gender (Counts VIII and IX), which was severe and pervasive, in violation of *M.G.L. c. 151B* and *Title VII*. In addition, Walker alleges that the City created a hostile environment for her based on her sexual orientation (Count X), which was severe and pervasive, in violation of *M.G.L. c. 151B*.

56

The "standard applicable to a Title VII claim charging hostile environment is essentially 'analogous' to the standards under *chapter 151B*." *Bourbeau v. City of Chicopee*, 445 F. Supp. 2d 106, 111(D. Mass. 2006).

To succeed on her hostile work environment claim, Walker must prove:

> (1) that [she] is a member of a protected class; (2) that [she] was subjected to unwelcome sexual [orientation] or racial [or gender] harassment; (3) that the harassment was based upon sex or race [or gender]; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually or racially [or gender] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. *Douglas v. J.C. Penney Co., Inc.*, 474 F.3d 10, 15 (1st Cir. 2007)(quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001); *see also*, *Bourbeaux*, *supra* at 112.

A hostile work environment may exist when the workplace is "permeated with discriminatory intimidation, ridicule, and insult," that is sufficiently "severe or pervasive" so as to alter the conditions of the plaintiff's employment. *Bourbeau*, *supra at 112* (internal quotations omitted). Not all offensive conduct is actionable as harassment; "trivial offenses do not suffice." *Id*. (internal quotations omitted). "The pervasiveness and severity of the conduct is determined by looking at all of the circumstances, which include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. (internal quotations omitted). "Gender-based harassment need not be overtly sexual, but may be based on gender hostility." *Luciano v. Coca-Cola Enterprises, Inc.*, 2004 U.S. Dist. LEXIS 17186, *10 (citing *O'Rourke*, *supra*). "'Merely because a supervisor is overbearing or fellow employees unsociable and hard to get along with, does not suffice to make out a hostile environment claim unless the underlying motives of a sexual or gender discriminatory nature are

360999v1

implicated." _Id. at *11_ (quoting _Morrison v. Carleton Woolen Mills, Inc., 108 F. 3d 429, 441 (1st Cir. 1997)_).

In this instance, Walker essentially maintains that she was subject to a hostile work environment based on a few isolated incidents which allegedly occurred from May 2002 through February 2005. These alleged incidents include: (1) Sgts. Monaghan and Garcia avoiding her in May 2002 when she was promoted to sergeant with a seniority date ahead of them even though they took the exam on the same date; (2) Sgt. Monaghan singing "lick it good" on one occasion over WMLEC in June 2002; (3) Sgt. Monaghan referring to Chief Scott as "Uncle Charlie" during roll call; (4) someone telling Walker that Sgt. Monaghan called her Tyrone; (5) Sgt. Monaghan saying "You shouldn't go sticking your tongue where it don't belong" in October 2002; (6) Sgt. Monaghan not responding to Walker's radio request for caution tape in September 2004; (7) Sgt. Monaghan saying "start packing your bags"; (8) Walker's belief that cruisers were being dispatched by e-mail in October 2004; (9) Walker being assigned to inside duty in December 2004; and (10) Lt. O'Connell taking her book back from Walker in February 2005. These incidents do not evidence a workplace "permeated with discriminatory intimidation, ridicule, and insult" which is so "severe and pervasive" to have altered the conditions of Walker's employment. Moreover, these incidents, even if true, do not amount to sexually, racially or gender objectionable conduct which is both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive. This is particularly true in light of the fact that the only statements that could possibly have a gender, racial or sexual connotation were allegedly made by Sgt. Monaghan, who was Walker's subordinate or, at most, her fellow employee. As such, the City cannot be liable under the theory of respondeat superior. _Fleenor v. Hewitt Soap Co., 81 F.3rd 48, 50 (6th Cir. 1996); College-Town, Div. of Interco, Inc. v. Mass._

_Commission Against Discrimination_, 400 Mass. 156, 165-167 (1987).    Where the alleged harassing conduct is between fellow employees, the plaintiff must prove that the employer knew or should have known of the conduct to establish liability.  _Sarin v. Raytheon Co._, 905 F. Supp 49, 52 (D. Mass. 1995); _Mikels v. City of Durham_, 183 F. 3d 323 (4th Cir. 1999).  In this case, the City investigated the allegations and found them to be unfounded.

In light of these facts, Walker cannot meet her burden of proving her hostile work environment claims under either _G.L. c. 151B_ or _Title VII_.  Therefore, this Court should enter judgment in favor of the City on Counts VI, VII, VIII, IX and X of the amended complaint.

## III.    RETALIATION IN VIOLATION OF _M.G.L. c. 151B_ AND _TITLE VII_.

Walker also alleges that the City retaliated against her for engaging in protected activities in violation of _Title VII_ (Count XI) and for engaging in protected activities in violation of _G.L. c. 151B_ (Count XII).

### A.    The City is Entitled to Judgment as a Matter of Law Because Walker Has Failed to Establish That The City Retaliated Against Her For Engaging in Protected Activities in Violation of _M.G.L. c. 151B_ or _TITLE VII_.

"To establish a _prima facie_ case of retaliation under _Title VII_, a plaintiff must prove that (1) [s]he engaged in protected conduct, (2) [s]he suffered an adverse action, and (3) a causal connection exists between the two.  The elements are essentially the same for a retaliation claim brought pursuant to _chapter 151B_." _Bourbeau v. City of Chicopee_, 445 F. Supp. 2d 106, 122(D. Mass. 2006)(internal citation omitted).  "Under both statutes, once the plaintiff has established this _prima facie_ showing, the defendant must articulate a legitimate, nonretaliatory reason for its action…." _Billings v. Town of Grafton_, 441 F. Supp. 2d 227, 239 (D. Mass. 2006).  "If the defendant meets this burden, plaintiff must show that the decision was a pretext for the defendant's retaliatory animus." _Id_.

The primary issue is whether the employer's actions were "*materially* adverse" to the plaintiff. *Id.* at 238 (emphasis in the original). A materially adverse action is one that "might well have dissuaded a reasonable person from making or supporting a charge of discrimination." *Id.* at 239 (internal quotation omitted). "Whether an action is adverse is measured by an objective standard." *Id.* "Where an adverse action is alleged to have occurred in the workplace, it is materially adverse if the employer (1) takes something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withholds from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for a promotion after a particular period of service." *Id.* at 240. A "transfer or reassignment that involves only minor changes in working conditions normally is not actionable, even if it causes the plaintiff to feel 'stigmatized or punished.'" *Id.* (internal quotations omitted).

With respect to the causation element, the plaintiff "must establish facts sufficient to show that a causal connection existed between her protected conduct and the allegedly adverse action." *Id.* at 242. The mere fact that one event follows another is not sufficient to make out a causal link of retaliation. *Id.* at 244, n. 25. "This is true even as to events that follow closely in time." *Id.* "Were the rule otherwise, then a disgruntled employee, no matter how poor [her] performance or how contemptuous [her] attitude toward [her] supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint." *Id.* (internal quotations omitted).

A legitimate nondiscriminatory reason for terminating an employee includes poor job performance and repeated warnings to the employee, as well as a final written warning to the employee. *Ianetta, supra* at *27-28 (entering summary judgment in favor of employer on

60

retaliation claim where it was undisputed that a number of the plaintiff's problems on the job took place long before he filed his MCAD complaint).

Where a defendant articulates a non-retaliatory reason for its actions, the plaintiff must proffer "sufficient evidence" that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for a desire to retaliate. *Billings, supra at 243.* The plaintiff cannot meet this burden simply by showing that her actions "set in motion a chain of events" that ultimately led to her discharge. *Id.*

In this instance, as set forth above, Walker cannot prevail on her retaliation claims against the City because there is no evidence that any causal connection existed between Walker's conduct and the City's progressive discipline and ultimate termination of Walker. The record simply reflects a disgruntled employee with poor performance who is upset about a well-deserved discharge. The City has set forth legitimate nondiscriminatory reasons for disciplining and terminating Walker based on poor job performance, repeated written warnings to Walker, as well as a final written warning. Walker has failed to proffer sufficient evidence that the City's reasons were anything other than legitimate. As such, this Court should enter judgment in favor of the City on Counts XI and XII of the amended complaint.

### B. The City is Entitled to Judgment as a Matter of Law Because Walker's State Law Retaliation Claim is Barred Pursuant to *M.G.L. c. 149, § 185(f)*.

In addition to the foregoing, Walker's state law retaliation claim under *G.L. c. 151B* (Count XII) is barred pursuant to *M.G.L. c. 149, § 185(f)*. As discussed below, Walker has filed a claim for retaliation under the Whistleblower Statute (*G.L. c. 149, § 185*)(Count XIII) in which she alleges that the City retaliated against her because she was a whistleblower. By filing such a claim, Walker has waived all rights and remedies available to her under state law arising out of the retaliatory action. *M.G.L. c. 149, § 185(f)*.; *see also Mailloux v. Town of Littleton*, 473 F.

*Supp. 2d 177,185 (D. Mass. 2007)* <u>*Reilly v. Robbins*</u>*, 2006 U.S. Dist. LEXIS 46121, \*2 (D. Mass.).*

### IV.    <u>THIS COURT SHOULD ENTER JUDGMENT IN FAVOR OF THE CITY ON THE WHISTLEBLOWER CLAIM (*G.L.c. 149, § 185*) BECAUSE WALKER DID NOT DISCLOSE ANY POSSIBLE LEGAL ACTIVITY WHICH RESULTED IN RETALIATION AGAINST HER.</u>

In Count XIII of her amended complaint, Walker alleges that the City discriminated against her for engaging in activities protected by the Massachusetts Whistleblower statute, (*M.G.L. c. 149, § 185*).

Walker sent two letters to the City in which she maintained that the City violated the Whistleblower statute by reprimanding, and ultimately terminating, her for reporting four (4) incidents: (1) the Elizur's Pub incident; (2) the Disrespect incident (September 6, 2004), (3) the Dispatching Cruisers Via E-mail incident; and (4) the Lt. O'Connell Book incident. Because she reported the Elizur Pub incident, she alleges that she was also subjected to discipline far greater than required as a result of being late for court.

"The Massachusetts Whistleblower Statute gives a municipal employee a civil claim for damages against a city or town that takes 'retaliatory action' against him 'because he engages in certain protected conduct. Conduct protected by the statute includes disclosing 'to a supervisor or to a public body' conduct which the employee **'reasonably believes'** is in violation of law or poses a risk to the public." <u>*Wagner v. City of Holyoke*</u>*, 241 F. Supp. 2d 78, 97 (D. Mass. 2003)*(emphasis added). To succeed on a whistleblower claim, the plaintiff must show "that: (1) [she] disclosed an activity, policy or practice of the employer that [she] reasonably believed to be in violation of a law, rule, or regulation; (2) [her] disclosure played a substantial or motivating part in the retaliatory action; and (3) the retaliatory action caused [her] damage." <u>*Taylor v. Town of Freetown*</u>*, 2007 U.S. Dist. LEXIS 23044, \* 35 (D. Mass. 2007)*. In other words, the plaintiff

62

must show that she disclosed possible illegal conduct to her employer and, rather than remedy the problem, her employer retaliated against her.

In order to receive the protection of the Whistleblower Statute, the plaintiff must "bring the 'activity, policy or practice in violation of a law . . . to the attention of a supervisor of the employee by written notice' **and** afford the employer a 'reasonable opportunity to correct the activity, policy or practice.'" *Wagner* *supra; see also, Dirrane v. Brookline Police Dept., 315 F. 3d 65, 71 (1st Cir. 2002).* (emphasis added). None of the notice exceptions contained in G.L. c. 149, § 185(c)(2) would apply in this case.

With respect to the first incident, which occurred at the Elizur's Pub on June 23, 2003, Walker's attorney claimed in her correspondence, dated February 15, 2005[304], that Walker gave a written report regarding possible illegal conduct at Elizur's Pub. The report that she gave was an incident report[305] which she prepared after responding to a call at Elizur's Pub. This report, entitled "A Narrative," merely states that Walker observed off-duty police officers in the pub and that she told them to leave which they did. This report can hardly be considered the requisite notice required by Chapter 149, Section 185 as she never requested that the City take corrective action. However, the City, through Chief Scott, did take corrective action in the form of issuing discipline to each of the off-duty officers who were at Elizur's Pub when Walker arrived even though, in his opinion, they had not violated any law or policy. Furthermore, Walker's contention that she believes that what she witnessed at the Elizur's Pub may have involved possible illegal conduct is somewhat ludicrous, given that she, as a law enforcement officer, could have taken action against any of the officers who were in the pub or the bar owner if, in fact, she really believed that illegal conduct occurred. That is, the situation was in her hands. In

---

[304] Exhibit 111, Letter dated February 15, 2005.
[305] Exhibit 28, Incident Report of Walker dated 6/23/03.

addition, as the investigation of this incident has shown, there was no violation of the law by the off-duty officers being in the pub after 2:00 a.m. since they were entitled to a reasonable amount of time to consume the beverages that had been purchased prior to 2:00 a.m. To the extent that Walker now tries to claim that her correspondence, dated February 15, 2005, which is Exhibit 111, satisfies the notice requirement of G.L. c. 149, § 185(c), her claim must also fail. As stated above, one of the purposes of G.L. c. 149, § 185(c)(1) is to allow the employer a reasonable opportunity to correct the activity, policy or practice. By serving Exhibit 111 twenty months after the Elizur's Pub incident, Walker has failed to provide the requisite opportunity. Furthermore, by that late date, Walker was well aware that there was no violation of law. In fact, the matter was publicized in the local media.[306]

The second incident that is the subject of Walker's whistleblower claim is the so-called disrespect incident that occurred on September 6, 2004. At that time, Walker claims that she was at a crime scene and Sgt. Monaghan, who was 20 yards away, failed to respond to two calls that she made to him over the radio. The subject matter of the calls was caution tape and whether Sgt. Monaghan needed any more. When Sgt. Monaghan reportedly did not respond to her calls, she sent another officer over to retrieve the tape from him which he produced. Walker reduced her complaint about Sgt. Monaghan's alleged behavior in an IOC to Chief Scott, dated September 11, 2004.[307] In it, she claimed that she feared for her safety and the safety of other officers who worked with Sgt. Monaghan. Walker's claim pursuant to G.L. c. 149, § 185 with respect to this incident must fail since no reasonable employee could believe that Sgt. Monaghan's alleged failure to respond to her radio call constituted a violation of a law or posed a risk to public health, safety or the environment. Given that Walker was a mere 20 yards away

---

[306] Exhibit 105, Correspondence from Chief Scott to Walker dated 1/5/05.
[307] Exhibit 37, Newspaper article.

from Sgt. Monaghan, she should have walked over to him if, in fact, she really wished to communicate with him.

The third incident involves Walker's claim that Lt. O'Connell was dispatching cruisers via e-mail instead of over the police radio so that Walker would not be able to hear the calls. In the correspondence sent by Walker's attorney, dated February 15, 2005[308], Walker's attorney claims that Walker filed a written report to Chief Scott on November 5, 2004. The defendant has no record of receiving such written notice, however. Notwithstanding the failure to provide written notice, Walker cannot maintain this claim since there was no reasonable basis to believe that not dispatching calls over the radio violated the law or posed a risk to public health, safety or the environment. As discussed above, Chief Scott did order an investigation of Ms. Walker's verbal allegations that there may have been a problem with regard to radio calls and determined that her complaint was completely unfounded. Indeed, except for a few rare occasions when the circumstances warranted calls to be dispatched via e-mail, the calls were dispatched over the radio. To the extent that Walker may not have heard some of the calls, the investigation demonstrated that there may have been a problem with her vehicle which she never bothered to question, even though that would have been the most reasonable step for her to have taken.[309]

The fourth scenario that Walker claims constitutes a violation of Chapter 149, Section 185 involves the scheduling book incident pertaining to Lt. O'Connell on February 25, 2005. On February 27, Walker sent an IOC to Chief Scott setting forth her version of events.[310] As with the above three incidents, there is no basis for a reasonable employee to believe that this incident constituted a violation of law. Furthermore, there is no evidence to establish that Walker

---

[308] Exhibit 111, Letter dated February 15, 2005.
[309] Exhibit 56, Deposition of Walker, Vol. II at p. 35.
[310] Exhibit 113, Injury Report (marked as Exhibit 6 to Chief Scott's depo).

reasonably believed that the incident posed a risk to public health, safety or the environment. While Walker claims that she felt that her safety was at risk, the investigation has shown that Walker herself posed a safety problem. Therefore, there is no basis to support Walker's claim that this incident constituted a violation of G.L. c. 149, § 185.

Therefore, the Court should enter judgment in favor of the City on Count XIII of the amended complaint.

## V.    DISCRIMINATION BASED ON RACE (*42 U.S.C.* § 1981)

In Count XIV of her complaint, Wagner alleges that the "actions and conduct of the City, through its officials, agents and/or employees, violated title 42 U.S.C. § 1981."

### A.    The City is Entitled to Judgment as a Matter of Law Because Walker's Failure to Establish a *Title VII* Claim is Dispositive of Her *§ 1981* Claim.

*Section 1981* provides as follows:

(a)    Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)    Make and enforce contracts defined

For purposes of the section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c)    Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

66

"*Section 1981* claims are analyzed under the Title VII McDonnell Douglas/Burdine framework." *Newman v. Federal Express Corp.*, 266 F. 3d 401, 406 (6th Cir. 2001)(citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363 (1989)).  Indeed, the facts and defenses to be developed under a Section 1981 claim are substantially similar to those which must be developed under Title VII. *Ahanotu v. Mass. Turnpike Authority*, 466 F. Supp. 2d 378, 397 (D.Mass 2006).  As such, if a plaintiff fails to establish a Title VII claim, the defendant is likewise entitled to summary judgment on the § 1981 claim against it as a matter of law.  *Id.* (granting summary judgment in favor of employer on § 1981 claim in light of plaintiff's failure to establish Title VII claim).

As discussed above, Walker has failed to establish a *Title VII* claim for racial discrimination against the City under the McDonnell Douglas burden shifting analysis.  As such, Walker's § 1981 claim against the City, which is analyzed under the same standard, likewise must fail as a matter of law.  Therefore, this Court should enter judgment in favor of the City on Count XIV of the amended complaint.

**B.    <u>The City is Entitled to Judgment as a Matter of Law Because Walker's Exclusive Remedy Against The City is Under § 1983</u>.**

In addition to the foregoing, the City is entitled to judgment on Walker's § 1981 claim against it for racial discrimination because § 1983 provides the exclusive federal damages remedy to Walker in this instance.  Since the defendant is a municipality, Walker is required to show that the alleged violations of her rights were caused by a custom or policy. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 735; 109 S.Ct. 2702 (1989).  She is also required to identify an impaired contractual relationship.  § 1981(b); *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 126 S. Ct 1246, 1249; 163 L. Ed. 2d 1069 (2006).  The plaintiff has failed to plead the

67

existence of an unconstitutional policy or custom or an impaired contractual relationship as required by F.R.C.P. 8(a).

In *Jett v. Dallas Independent School Distr.*, the United States Supreme Court held that "the express 'action at law' provided by [*42 U.S.C.*] *§ 1983* for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and the law' provides the exclusive federal damages remedy for the violation of rights guaranteed by *§ 1981* when the claim is pressed against a state actor." *491 U.S. 701, 735; 109 S. Ct. 2702 (1989)*. "After the Supreme Court decided *Jett*, Congress, in 1991, added *subsection (c)* to *§ 1981*, which states that 'the rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.'" *Bond v. City of Middletown*, 389 F. Supp. 2d 319, 327 (2005).

The enactment of *subsection (c)* to *§ 1981* caused a circuit split as to whether *Jett's* holdings were overruled. *Id. at 328*. The First Circuit has not made any express findings on this issue.

In *Bond, supra*, the United States District Court for the District of Connecticut ruled that, "in the absence of controlling authority to the contrary, [we] will not deviate from the Supreme Court's analysis of *§ 1981* in *Jett.*" *Id*. The court concluded that "[u]nder *Jett*, any claim of a deprivation [of] Constitutional rights, privileges, or immunities by a state actor must be brought pursuant to *§ 1983*, not *§ 1981.*" *Id*. Likewise, in *St. Louis v. Sands*, 401 F. Supp. 2d 1351, 1358 (S.D. Fla. 2005), the United States District Court for the Southern District of Florida ruled that, under, *Jett*, the plaintiff's *§ 1981* claim was "improperly brought as a separate claim." As such, the court ruled that the *§ 1981* claim was merged into the plaintiff's *§ 1983* claim. *Id*.

In this instance, Walker has brought race discrimination claims against the City, a state actor, under both *§ 1981* and *§ 1983*. The First Circuit has not determined whether *subsection (c)* of *§ 1981* overrules the Supreme Court's ruling in *Jett*. In the absence of controlling authority to the contrary, Walker cannot maintain an action against the City under *§ 1981* since her exclusive federal damages remedy is under *§ 1983*. As discussed below, Walker's § 1983 claim must fail. Therefore, this Court should enter judgment in favor of the City on Count XIV of the amended complaint.

## VI.  RETALIATION BASED ON EXERCISE OF FIRST AMENDMENT RIGHTS (*42 U.S.C. § 1983*).

In Count XV of her amended complaint, Walker alleges that the City, "through its officials, agents and/or employees, retaliated against [her] for engaging in speech activities protected by the First Amendment of the United States Constitution" in violation of *42 U.S.C. § 1983*.

The seminal case in this context is *Pickering v. Board of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)*. Under *Pickering*, "the court must proceed in four steps[:]

> First, the court must consider whether the employee was speaking "as a citizen upon matters of public concern." Garden variety employment beefs do not, in general, qualify for constitutional protection. Second, if the speech was a matter of public concern, the court must "balance the strength of the employee's First Amendment interest, and any parallel public interest in the information . . . against the strength of the countervailing governmental interest in promoting efficient performance." Third, if the court finds the balance tips towards the employee's First Amendment interests, "the plaintiff-employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision." Fourth, if the plaintiff meets that test, "the defendant governmental entity must be afforded an opportunity to show by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Wagner v. City of Holyoke, 241 F. Supp.*

2d 78, 90 (D. Mass. 2003), aff'd by 404 F.3d 504, cert. denied by 546 U.S. 977 (2005)(internal citations and quotations omitted).

**A.**    **Walker's Claim Against The City Pursuant to _42 U.S.C. § 1983_ Must Fail Because Her Expressions Were Matters of Personal Interest and/or Were Made Pursuant to Her Official Duties.**

"[T]he _First Amendment_ protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." _Garcetti v. Ceballos, 126 S. Ct. 1951, 1957,164 L. Ed. 2d 689 (2006)._  The law recognizes that the free speech protections offered to public employees, including police officers, must balance the employee's interest in free expression against the interest of the governmental entity, and the public, in the reasonably smooth operation of public business. _Wagner, supra at 8)._

The _First Amendment_ does not empower public employees to "constitutionalize the employee grievance." _Connick v. Myers, 461 U.S. 138, 154, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)._  As such, where a public employee expresses a disagreement regarding an internal personnel matter, or on a matter of personal interest, "the grievance is not a matter of pubic concern" protected by the _First Amendment. Taylor v. Town of Freetown, 2007 U.S. Dist. LEXIS 23044, *20, and *22-23_ (citing _Connick, supra, at 148-149_).

In addition, the United States Supreme Court recently ruled that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for _First Amendment_ purposes, and the Constitution does not insulate their communications from employer discipline." _Garcetti, supra, at 1960._  The Court reasoned that "[t]o hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." _Id. at 1961._  As such, the Court concluded that "the _First Amendment_ does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." _Id._

360999v1

(finding that calendar deputy did not engage in protected *First Amendment* speech when he reported inconsistencies in an affidavit to his supervisors because deputy made the report pursuant to his employment duties).

In this instance, Walker cannot prevail in her *§ 1983* claim because her expressions of speech were not protected by the *First Amendment* in that they constitute either statements regarding her personal interest or statements made pursuant to her official duties as a supervisory police sergeant. In particular, Walker's complaints that other sergeants made derogatory and discriminatory comments to her, and about her, solely concern Walker' personal interest. Likewise, her complaints about being disciplined for her late court appearance and her complaints regarding assignment to inside duty and the book incident with Lt. O'Connell are internal personnel matters and are not matters of public concern. Walker's reporting of the Elizur's Pub incident, the alleged dispatching of cruisers via e-mail, and the disrespect incident were all reports made pursuant to her official duties. That is, as a supervising sergeant, Walker had an obligation to report such matters to her superiors in accordance with the chain of command.

Because Walker's expressions were not matters of public concern protected by the *First Amendment*, this Court should enter judgment in favor of the City on Count XV of the amended complaint.

**B.** **Walker's Claim Against The City Pursuant to *42 U.S.C. § 1983* Must Fail Because Her Expressions Were Not a Substantial or Motivating Factor in Any Adverse Employment Decision.**

Even if this Court finds that Walker's expressions were protected under the *First Amendment* as matters of public concern which were not made pursuant to Walker's official duties, Walker still cannot prevail on her *§ 1983* claim against the City because there is no

71

360999v1

evidence that her expressions were a substantial or motivating factor in any adverse employment decision against Walker. *See Wagner, supra.* As set forth above, the disciplinary actions and ultimate termination of Walker all resulted from legitimate non-discriminatory reasons, including failure to follow the chain of command, being late for court without excuse, failure to follow terrorism protocol, sick leave abuse, making numerous unfounded complaints against superiors, and the threatening confrontation with her supervisor, Lt. O'Connell while Walker was off duty. Therefore, this Court should enter judgment in favor of the City on Count XV of the amended complaint.

     **C.**     **Walker's Claim Against The City Pursuant to *42 U.S.C. § 1983* Must Fail Because She Cannot Prove an Unconstitutional Policy or Custom of The City Itself.**

Even if Walker is able to get past the four *Pickering* steps, the Court's analysis does not end there when a municipality is the defendant. *Wagner, supra at 94-95; Dirrane, supra.* "A plaintiff seeking damages against a municipality under § 1983 must demonstrate the existence of an 'unconstitutional policy or custom of the municipality itself.'" *Wagner, supra at 95* (quoting *Dirrane, supra*). The plaintiff must show that the policy or custom is causally related to her conduct and caused her injury. *Chaabouni v. City of Boston, 133 F. Supp. 2d 93 (D. Mass. 2001); Monell v. Dep't. of Soc. Servs., 436 U.S. 658 (1978).* In this case, the record must contain evidence that the City had a policy or custom of retaliating against members of the police department who filed internal complaints and grievances.

If there is no "constitutional violation in the first place," there can be no "unconstitutional policy or custom." *Vickowski v. Hukowicz, 201 F. Supp. 2d 195, 214 (D. Mass. 2001)*(entering summary judgment in favor of municipality on former police officer's, *§ 1983* retaliation claim based on the First Amendment where plaintiff's speech did not touch upon matters of public concern).

72

In this instance, there can be no unconstitutional policy or custom because Walker was not engaged in protected *First Amendment* speech as discussed above.  Furthermore, there is no evidence in the record that the City itself had a policy or custom of disciplining sergeants who brought forward a broad range of complaints within the Department.  Therefore, this Court should enter judgment in favor of the City on Count XV of the amended complaint.

### D.    The City is Entitled to Judgment as a Matter of Law Because Walker's Title VII Claim Against The City is Inadequate.

In addition to the foregoing, the City cannot be liable under *§ 1983* as a matter of law since Walker's *Title VII* claims against the City are inadequate.

"When a plaintiff attempts to use *§ 1983* as a parallel remedy to a *Title VII* claim, the prima facie elements to establish liability are the same under both statutes.  In either case, the plaintiff must prove that the defendants acted with discriminatory intent." *Rivera v. P.R Aqueduct and Sewers Auth.*, 331 F.3d 183,  192 (1st Cir. 2003)(internal citations and quotations omitted); *Carmack v. AMTRAK*, 2007 U.S. Dist. LEXIS 27501, *98 (D. Mass.).  As a matter of law, the inadequacy of Walker's *Title VII* claim likewise establishes the inadequacy of her *§ 1983* claim. *Rivera, supra* Because Walker's *Title VII* claims against the City are inadequate, as set forth fully above, the City is entitled to judgment as a matter of law on Walker's *§ 1983* claim (Count XV) against it as a matter of law.

### CONCLUSION

In light of the foregoing, this Court should enter judgment in favor of the defendant, City of Holyoke, on all counts of the amended complaint against it.

360999v1

The Defendant,
CITY OF HOLYOKE,

By Its Attorneys
MORRISON MAHONEY LLP


_____/s/ Carole Sakowski Lynch_____
Carole Sakowski Lynch, BBO# 547718
1500 Main Street, Suite 2400
P.O. Box 15387
Springfield, MA  01115-5387
(413) 737-4373
(413) 739-3125 (Fax)


I hereby certify that this document, filed through the ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on June 14, 2007.

_/s/ Carole Sakowski Lynch_____

74

## WALKER V. CITY OF HOLYOKE
### Docket No. 05-30074-MAP

### LIST OF EXHIBITS FOR MEMORANDUM IN
### SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| Exhibit | Document |
|---------|----------|
| 1. | Deposition of Chief Scott |
| 2. | Deposition of Sergeant Monaghan |
| 3. | Affidavit of Sergeant Garcia |
| 4. | Affidavit of Captain Fletcher |
| 5. | Deposition of Rodriguez |
| 6. | Deposition of Walker, Vol. I |
| 7. | Civil Service Certification of Exam Scores |
| 8. | Correspondence from Mayor Szostkiewicz to Joseph Trainor dated 7/6/99 announcing sergeant promotions |
| 9. | Special Order #1167 6/17/99 |
| 10. | Discrimination Complaint of Walker filed with the MCAD and the EEOC on 10/15/99 |
| 11. | Civil Service Appeal |
| 12. | Settlement Agreement dated 5/23/00 |
| 13. | Proposed Assented to Motion to Amend Decision |
| 14. | Affidavit of Lieutenant Whelihan |
| 15. | Deposition of Captain Fletcher |
| 16. | IOC from Rodriguez |
| 17. | Rodriguez's Response to Questionnaire by Internal Affairs |

| 18. | Affidavit of Lieutenant Monaghan |
|-----|----------------------------------|
| 19. | Affidavit of Sergeant Lenihan |
| 20. | Affidavit of Officer Moriarty |
| 21. | Employee Complaint filed 10/25/02 |
| 22. | PSD Request dated 10/28/02 |
| 23. | Response of Walker dated 10/30/02 |
| 24. | PSD findings 12/9/02 |
| 25. | Monaghan's Response to Questionnaire by Internal Affairs officer |
| 26. | Recorded Statement of Officer Skwira 8/2/03 |
| 27. | Recorded Statement of Sgt. Monaghan 7/21/03 |
| 28. | Incident Report of Walker 6/23/03 |
| 29. | Statement of Capt. Fletcher 7/1/03 |
| 30. | Statement of Lt. Whelihan 7/3/03 |
| 31. | Recorded Statement of Karen Desautels |
| 32. | Recorded Statement of David Czelusniak |
| 33. | Recorded Statement of Officer Dore |
| 34. | Recorded Statement of Officer McKay |
| 35. | Recorded Statement of Officer Wilson |
| 36. | PSD report to Chief Scott 8/4/03 |
| 37. | Newspaper Article: Local Laws Key at Closing Time |
| 38. | Official Letter of Reprimand |
| 39. | E-mail Correspondence |
| 40. | IOC Capt. Monfette to Chief Scott 4/6/04 |

| 41. | "To-From" Ex. 12 |
| 42. | Suspension Notification 4/20/04 |
| 43. | Correspondence from Mayor Michael Sullivan |
| 44. | Dispatch Log |
| 45. | Transcript of Dispatch Call No. 04-26734 |
| 46. | Recorded Statement of Sergeant Albert 7/28/04 |
| 47. | Recorded Statement of Lieutenant Duguay 7/28/04 |
| 48. | Recorded Statement of Dispatcher Therrien 7/29/04 |
| 49. | Narrative for Sergeant T. Walker 8/17/04 |
| 50. | Recorded Statement of Lieutenant O'Connell 7/28/04 |
| 51. | IOC from PSD to Chief Scott 7/30/04 |
| 52. | Recorded Statement of Walker 7/29/04 |
| 53. | Suspension Notification 8/17/04 |
| 54. | Chapter 31, Section 41 Discipline Letter from Mayor Sullivan 9/28/04 |
| 55. | IOC from Walker to Chief Scott 9/11/04 |
| 56. | Deposition of Walker Vol. II |
| 57. | IOC from Lt. O'Connell to Chief Scott 9/16/04 |
| 58. | IOC from PSD to Chief Scott 11/8/04 re: 9/6/04 incident |
| 59. | IOC from PSD to Chief Scott 11/8/04 re: 9/9/04 incident |
| 60. | Recorded Statement of Sgt. Monaghan 10/27/04 |
| 61. | Recorded Statement of Officer McKay 10/27/04 |
| 62. | Recorded Statement of Officer Clement 10/27/04 |
| 63. | Recorded Statement of Sgt. Laramee 10/28/04 |

| 64. | Recorded Statement of Sgt. Fallon 10/29/04 |
|---|---|
| 65. | Recorded Statement of Sgt. McMullan 10/29/04 |
| 66. | IOC from PSD to Walker 11/17/04 |
| 67. | IOC from Chief Scott to PSD  dated 11/17/04 9/6/04 incident |
| 68. | IOC from Chief Scott to PSD 11/17/04 9/9/04 incident |
| 69. | Affidavit of  Lt. O'Connell |
| 70. | Recorded Statement of Lt. O'Connell 12/13/04 |
| 71. | IOC Lt. Duguay to Chief Scott 11/4/04 |
| 72. | Affidavit of Sergeant McCavick |
| 73. | Affidavit of Lieutenant Fournier |
| 74. | IOC from Lt. O'Connell to Capt. Fletcher 8/3/04 |
| 75. | Affidavit of Captain Seklecki |
| 76. | IOC from PSD to Chief Scott 1/11/05 |
| 76. A | Recorded Statement of Officer Craven dated 12/13/04 |
| 77. | Recorded Statement of Walker dated 1/15/04 |
| 78. | Report of Captain Seklecki |
| 79. | Suspension notification dated 1/18/05 |
| 80. | Personnel sick report 11/15, 16, 17/04 |
| 81. | IOC from Lt. O'Connell to Chief Scott dated 11/18/04 |
| 82. | IOC from Lt. Fournier to Chief Scott dated 11/18/04 |
| 83. | IOC from Melinda Lane to Chief Scott dated 11/30/04 |
| 84. | IOC from Kathleen McCoy to Chief Scott dated 12/2/04 |
| 85. | Certification to Return to Work dated 11/18/04 |

| 86.  | IOC from Lt. O'Connell to Walker dated 11/20/04 |
|------|--------------------------------------------------|
| 87.  | IOC from Lt. O'Connell to Chief Scott dated 12/13/04 |
| 88.  | Recorded Statement of Walker dated 11/22/04 |
| 89.  | Direct Order from Chief Scott to Walker dated 11/22/04 |
| 90.  | Certificate to return to work 11/22/04 |
| 91.  | IOC from Walker to Chief  Scott dated 11/23/04 |
| 92.  | Memo from Chief Scott dated 11/24/04 |
| 93.  | IOC from Officer Taylor to Capt. Seklecki 11/24/04 |
| 94.  | IOC from Capt. Fletcher to Chief Scott 11/26/04 |
| 95.  | IOC from Capt. Monfette to Chief Scott 11/26/04 |
| 96.  | Injured-on-Duty Report |
| 97.  | IOC from Walker to Chief Scott 11/29/04 |
| 98.  | IOC from Chief Scott to Walker 11/30/04 |
| 99.  | Suspension notification 11/30/04 |
| 100. | Notice of Chapter 31, Section 41 Disc. by Mayor Sullivan 12/27/04 |
| 101. | IOC from Walker to Chief Scott 12/12/04 |
| 102. | Grievance Complaint 12/13/04 |
| 103. | Memo from Chief Scott 1/5/05 |
| 104. | Recorded Statement of Lt. Fournier 12/28/04 |
| 105. | Correspondence from Chief Scott to Walker 1/5/05 |
| 106. | IOC from Walker to Chief Scott 12/20/04 |
| 107. | Correspondence from Lt. O'Connell to Walker 11/10/04 |
| 108. | Correspondence from Lt. O'Connell to Walker 11/10/04 (revised) |

| 109. | Grievance Complaint of 12/20/04 |
|------|----------------------------------|
| 110. | Recorded Statement of Lt. O'Connell 12/29/04 |
| 111. | Letter 2/15/05 to Chief Scott and Mayor Sullivan re:   Whistle blower claim |
| 112. | Letter 5/4/05 to Chief Scott and Mayor Sullivan re:   Whistle blower claim |
| 113. | Injury Report |
| 114. | Correspondence from Mayor Sullivan to Walker 3/18/05 |
| 115. | Correspondence from Mayor Sullivan to Walker 4/18/05 |
| 116. | Affidavit of Denise M. Tremblay |

# EXHIBIT 1

IN THE MATTER OF:

TAMMY WALKER vs.

CITY OF HOLYOKE

---

DEPOSITION OF:

ANTHONY SCOTT
DATE:  SEPTEMBER 11, 2006

---

## PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

**TAMMY WALKER vs. CITY OF HOLYOKE**
**ANTHONY SCOTT          SEPTEMBER 11, 2006**

---

5

1    ANTHONY SCOTT, the Deponent, having been
2  satisfactorily identified by the production of his
3  Police Department identification and having been
4  first duly sworn by the Notary Public, deposes and
5  says as follows:
6                    *****
7        MR. HUDSON:  Good morning.  Let the
8  record show that I'm Ozell Hudson appearing as
9  attorney for the Plaintiff Tammy Walker in the
10  matter of Walker versus City of Holyoke.  Also
11  present is the Plaintiff, Ms. Tammy Walker, who
12  will have to leave around eleven-thirty or shortly
13  before for another appointment.
14        Counsel Lynch is here representing the
15  deponent, the Chief of the Police for the Holyoke
16  Police Department.
17                    *****
18    DIRECT EXAMINATION BY MR. HUDSON
19    Q.   Sir, would you state your full name?
20    A.   Anthony R. Scott -- S-C-O-T-T.
21        MR. HUDSON:  I'd like to have marked
22  as Plaintiff's Exhibit 1 the notice of deposition
23  for -- renotice, rather, for Chief Scott.
24

---

6

1        (Plaintiff's Deposition Exhibit
                No. 1 offered and marked.)
2
3    Q.   (BY MR. HUDSON) Just a couple of
4  preliminary statements, sir.
5        Have you had the opportunity to go over
6  this case with your counsel, without telling me
7  what was said?
8    A.   Yes.
9    Q.   Do you understand the nature of a
10  deposition?
11    A.   Absolutely.
12    Q.   Do you understand that any question that
13  I put to you, you will have an opportunity -- if
14  you don't understand it you will have an
15  opportunity to have me rephrase it or repeat it,
16  just let me know?
17    A.   Yes.
18    Q.   Do you also understand, sir, that verbal
19  responses are required, that gestures and -- or
20  hand gestures or head gestures will not make it
21  into the recorded transcript?
22    A.   Yes, sir.
23    Q.   Thank you.  Sir, are you familiar with
24  the occurrences of this lawsuit of Tammy Walker

---

7

1  versus the City of Holyoke in the U.S. District
2  Court?
3    A.   Yes.
4    Q.   You have mentioned that you have talked
5  with your attorney about a deposition.  Has your
6  attorney explained to you what a deposition would
7  be like?
8    A.   Yes.
9    Q.   You understand what an oath is and that
10  you -- that an oath is primarily a promise to tell
11  the truth?
12    A.   Sir, I've been a police officer for
13  forty years.  I've given numerous depositions,
14  testified in criminal and in federal court.  I am
15  quite familiar with an oath.
16    Q.   Very good, sir.  I would expect you are;
17  we just want that on the record.
18        Basically you understand that a
19  transcript of your testimony here may be used at
20  trial?
21    A.   Yes.
22    Q.   Sir, what is your present occupation?
23    A.   I'm the Chief of Police in the City of
24  Holyoke.

---

8

1    Q.   When did you become Chief of Police in
2  the City of Holyoke?
3    A.   May 21st, 2001.
4    Q.   Were you appointed by the present mayor
5  or selected by the present mayor and council?
6    A.   I was appointed by Mayor Michael
7  Sullivan who is presently the Mayor of Holyoke.
8    Q.   What's your present business address?
9    A.   138 Appleton Street, Holyoke,
10  Massachusetts 01040-5706.
11    Q.   Is that the offices of the Holyoke
12  Police Department headquarters?
13    A.   That is Police Department headquarters.
14    Q.   What is your current age, sir?
15    A.   I'm sixty years old.
16    Q.   For the record what is your race?  How
17  do you identify yourself racially?
18    A.   I'm an African-American.  I've been so
19  for the last sixty years.
20    Q.   And proud of it.  Are you married, sir?
21    A.   Yes.
22    Q.   Do you have children?
23    A.   Yes.
24    Q.   Are they adults, sir?

---

**PERLIK and COYLE REPORTING**

**TAMMY WALKER vs.  CITY OF HOLYOKE**
**ANTHONY SCOTT            SEPTEMBER 11, 2006**

---

53

1 like to take a break, sir?
2            THE WITNESS:  Yes.
3            (A recess was taken.)
4      Q.   (BY MR. HUDSON) Sir, with regard to
5 these -- with regard to the various incidents that
6 you testified that Ms. Walker was disciplined for,
7 you don't have any specific dates?
8      A.   No; she was given a letter on each date,
9 each suspension and an outline of what the
10 suspensions were for and I didn't bring copies
11 with me.
12           MR. HUDSON:  Sir, do you recall
13 receiving -- can I have this document marked?
14           See if these will help refresh your
15 recollection here.  Let's mark this Exhibit 4,
16 please.
17           (Plaintiff's Deposition Exhibit
           No. 4 offered and marked.)
18
19      Q.   (BY MR. HUDSON) If you could take a
20 moment and look at that? (Indicating.)
21      A.   (Witness examining document.)  Oh, yes.
22 This is to do -- I'm just reading the first page,
23 this is to do with the incident at the Elizer's --
24 that's a pub.

---

54

1      Q.   First of all, sir, let me -- I draw your
2 attention to the -- do you recognize this
3 document?
4      A.   This was sent to my office; yes, by
5 Sapirstein & Sapirstein.
6      Q.   Do you recall them being Ms. Walker's
7 previous attorneys?
8      A.   Yes.
9      Q.   In what came to be her federal court
10 case?
11      A.   Yes.
12      Q.   U.S. District Court?
13      A.   Yes.
14      Q.   Against the City of Holyoke?
15      A.   Against the City of Holyoke and the
16 Holyoke Police Department.
17      Q.   Now sir, I draw your attention to the
18 second paragraph on page one of Exhibit 4.
19      A.   Mmm-hmm.
20      Q.   Is it true that Ms. Walker reported that
21 there was several officers who had refused to
22 leave a pub after closing?
23      A.   Yes; she reported it.
24      Q.   And she reported it to whom?

---

55

1      A.   She reported it first to her lieutenant.
2      Q.   That would have been her supervisor?
3      A.   Yes; then she came up and reported it to
4 me.
5      Q.   Is it true also, sir, that in or around
6 August of 2003 you issued a written reprimand to
7 Sergeant Walker?
8      A.   Yes.
9      Q.   In that written reprimand you indicated
10 that Sergeant Walker had been insubordinate when
11 she filed her written report of the alleged
12 illegal activity?
13      A.   No.  Would you care for me to tell you
14 how it happened -- as it would be said on the
15 radio, to give you the rest of the story that's
16 not in this, the facts?
17      Q.   Did you give Ms. Walker a written
18 reprimand?
19      A.   Yes.
20      Q.   Concerning her report?
21      A.   No.
22      Q.   Involving her report of officers
23 drinking after hours?
24      A.   No.

---

56

1      Q.   Then what happened, sir?
2      A.   Thank you.  Ms. Walker reported that
3 some officers were in a bar after the closing.
4 She reported it to her supervisor, Lieutenant
5 Whelihan.
6            Lieutenant Whelihan called all of the
7 individuals in and he chewed their butts.  He
8 disciplined them, he gave them all verbal
9 reprimands, he spoke to every one of them.
10           Sergeant Walker came up to my office and
11 told me that she reported this and nobody did
12 anything.  She said she reported it to her
13 lieutenant, he didn't do anything.  She reported
14 it to her captain and he didn't do anything.
15 That's what she came to my office and told me.
16           Subsequently I called in the captain.  I
17 said did you talk to Sergeant Walker about this
18 incident at the bar.  He said yes; not only did I
19 talk to her and the Lieutenant talked to her and
20 the Lieutenant told her what he was going to do.
21 Captain Fletcher told her to write a report and
22 give it to me -- give it to him as the captain.  I
23 said okay.
24           I think the next day or a couple of days

---

**PERLIK and COYLE REPORTING**

TAMMY WALKER vs. CITY OF HOLYOKE
ANTHONY SCOTT                    SEPTEMBER 11, 2006

---

57

1   later Sergeant Walker comes up and gives me a
2   report. I said what is this? She said, "This is
3   my report of the incident." So I took the report
4   and I in turn called Captain Fletcher. I said,
5   "What's this?" He said, "That's a report from
6   Sergeant Walker." I said, "But why is she giving
7   it to me?" "I told her to write a report and give
8   it to me and I was going to look into it
9   further" -- Captain Fletcher told her this.
10          So I in turn conducted an investigation
11  into the matter. I took statements from everyone
12  involved.
13          I also contacted the state's Alcohol and
14  Beverage Control Board to ascertain what was the
15  statute or the policies regarding an individual
16  purchasing some alcohol about ten minutes before
17  closing, what would be done. I was advised by the
18  chief investigator that they're given about thirty
19  minutes to finish that, even after the bar closes
20  but they couldn't buy anything else.
21          I in turn issued discipline to everyone
22  who was in that bar and I issued discipline to
23  Sergeant Walker for not obeying orders. She was
24  told to write a report and give it to the captain.

---

58

1   She didn't do that. She wrote a report and gave
2   it to me and bypassed her captain, bypassing the
3   chain of command.
4           That's why she was disciplined --
5   because she didn't follow orders; not because she
6   wrote a report, not because she reported the
7   incident, because she plain and simple didn't
8   follow orders.
9           I disciplined everybody who was involved
10  and actually there was no violation of any state
11  statute, there was no violation of any city
12  ordinance.
13      Q.  Now sir, when you say you disciplined
14  everyone involved, what kind of discipline?
15      A.  I gave Sergeant Walker I think a written
16  reprimand. I gave Sergeant Monaghan a written
17  reprimand.
18          I gave all of the police officers who
19  were there all written reprimands except for one
20  reserve officer who I suspended from working any
21  tours of duty for thirty days.
22      Q.  But it is true that Sergeant Walker did
23  report to you and her supervisor that several
24  members of the Holyoke Department had refused to

---

59

1   leave a pub after closing?
2       A.  She reported that; yes. She reported it
3   to her supervisor and then she came right up to my
4   office after reporting it to two of her
5   supervisors -- a lieutenant and captain -- that
6   she bypassed them and came directly up to me.
7           She was not disciplined for reporting
8   it. Even the captain told her to write a report
9   on it.
10      Q.  But the fact -- but you gave her
11  discipline because she actually gave you a written
12  report?
13      A.  No; I disciplined her -- despite what
14  Ms. Walker says -- or Ms. Sapirstein says in this
15  letter and I'm not going to let you put words in
16  my mouth.
17          I issued her discipline for not
18  following the chain of command and following an
19  order that was given to her. That's the only
20  reason I disciplined her.
21      Q.  And that was after she had complained to
22  you, the captain and the lieutenant about what she
23  perceived to be illegal activity of four officers
24  drinking after hours, is that correct?

---

60

1       A.  No; it's not correct.
2       Q.  You did not discipline her for failing
3   to follow the orders and chain of command after
4   she filed a written report with you and made
5   verbal reports to her lieutenant and captain about
6   the four officers drinking after hours at the pub?
7       A.  No, sir; I did not. I gave you in great
8   detail why I disciplined Sergeant Walker.
9       Q.  Sir, do you recall that -- I want to
10  draw your attention --
11      A.  (Interposing) I have to take this,
12  excuse me.
13          MR. HUDSON:  Let's take a break.
14          (A recess was taken.)
15      Q.  (BY MR. HUDSON) I draw your attention
16  to the second page.
17          Sir, do you recall that in or around
18  April, 2004 you suspended Sergeant Walker from
19  work for one day?
20      A.  Yes.
21      Q.  For appearing fifteen minutes late for
22  court?
23      A.  Yes; am I permitted to explain that?
24      Q.  Well, yes, you may but let me just ask

---

PERLIK and COYLE REPORTING

TAMMY WALKER VS. CITY OF HOLYOKE
ANTHONY SCOTT                    SEPTEMBER 11, 2006

61

1  you a couple of questions before you explain.
2      A.   Go right ahead.
3      Q.   Were there any other officers who were
4  late for court?
5      A.   That day?
6      Q.   That day or any other day during your
7  tenure?
8      A.   Yes; and I disciplined every one of
9  them.
10     Q.   What other officers did you --
11     A.   (Interposing) I don't remember but there
12 was six officers that I disciplined that day and
13 if I'm permitted I can explain my actions.
14     Q.   Sir, let me just ask the questions,
15 please.
16         You gave her a written -- you gave
17 Ms. Walker a written notice of suspension, is that
18 correct?
19     A.   Yes.
20     Q.   In that written notice, did you state in
21 any way that that suspension was in any way
22 related to the previous written reprimand for
23 insubordination, if you recall?
24     A.   In every suspension that I issue I put

62

1  past discipline that was taken.
2      Q.   So in fact you did, in April -- on or
3  about April of 2004 reference the insubordination
4  of not following orders of Ms. Walker?
5      A.   Yes; every person on the job, I put in
6  background on every suspension that I issue -- not
7  suspension -- on any disciplinary action that I
8  take I put background information in -- past
9  disciplinary records.
10     Q.   Do you recall -- I draw your attention
11 to paragraph two on page two of Exhibit 4.
12         Do you recall, sir, whether Ms. Walker
13 ever made a report that officers that were
14 subordinate to her were ignoring her while they
15 were performing their duties and verbally
16 assaulting her?
17     A.   May I speak with my attorney for a
18 minute, please?
19     Q.   Why don't you answer the question and
20 then you can speak with your attorney?
21         MS. LYNCH:  Can you answer the
22 question without speaking to me?
23         THE WITNESS:  No.
24         MR. HUDSON:  Unless it's privileged

63

1  then the witness should answer.  Otherwise counsel
2  should not direct the witness as to his answer.
3          Again, if it's a matter of
4  attorney-client privilege or statutory privilege
5  the witness should proceed with answering the
6  question and then he may consult with counsel.
7          MS. LYNCH:  Well, I guess I have no
8  way of knowing if that's what it is without
9  talking to him.
10         MR. HUDSON:  The question, there is
11 nothing in this question that's asking -- that I
12 see as --
13         THE WITNESS:  (Interposing) I can
14 answer this question, sir, if I'm permitted to
15 actually answer the question because what
16 Ms. Sapirstein has put in here is not based
17 entirely on facts.
18         This is a compilation of whatever that
19 was put into this letter so you're referring --
20 this is a letter -- this is not an affidavit or
21 anything else.  This is a letter that was sent by
22 Mrs. Sapirstein to myself, the Mayor, and the
23 entire City Council.  This is a letter.  This is
24 not a statement of facts.

64

1          I'm trying to answer your question but
2  I'm also trying to give you the real answer to
3  your question and I can't answer it yes or no so
4  if you want a yes or no answer, I can't give you
5  any answer at all.
6          MR. HUDSON:  Let's first of all,
7  would you repeat my question, please?
8              (Reporter read back as
                requested.)
9
10     Q.   (BY MR. HUDSON)  Sir, did she file a
11 written complaint or report that subordinate
12 co-workers --
13     A.   (Interposing) Ms. Walker filed several
14 complaints --
15     Q.   (Interposing) Let me finish, please.
16 I'm going to tie it directly here and I'll preface
17 it by saying, sir, I'm also trying to pin down the
18 approximate dates.
19         In or around September of 2004 did
20 Ms. Walker file a written complaint with her
21 supervisor that a subordinate co-worker was
22 ignoring her while performing duties and ignoring
23 her?  Did she file anything?
24     A.   She filed a complaint.  The exact date

Case 3:05-cv-30074-MAP    Document 46-6    Filed 06/14/2007    Page 7 of 18

TAMMY WALKER vs. CITY OF HOLYOKE
ANTHONY SCOTT                SEPTEMBER 11, 2006

**65**

1 I'm not sure but she filed a complaint.

2    Q.   Did she file a complaint on or about

3 September, 2004 that she feared for her own safety

4 and safety of others as a result of the

5 subordinate's conduct?

6    A.   She filed a complaint.

7    Q.   Do you know what subordinates she was

8 complaining of?

9    A.   At this particular point in time, no, I

10 don't.

11        MS. LYNCH: By the way, did you

12 still want to speak with me or not?

13        THE WITNESS: No; it's not

14 necessary.

15    Q.   (BY MR. HUDSON) Is it true that

16 approximately two weeks or less than two weeks

17 after filing the complaint referenced in paragraph

18 two, Mayor Sullivan increased a five-day

19 suspension issued to Sergeant Walker?

20    A.   I'm not sure.

21    Q.   Do you recall giving Ms. Walker a

22 ten-day suspension?

23    A.   I can't give her a ten-day suspension.

24 By statute I can only give her five.

**66**

1    Q.   So did you give her five days and do you

2 recall whether or not the Mayor added an

3 additional five days?

4    A.   No; I don't.

5    Q.   But do you recall on any other occasion

6 where the Mayor may have added or increased a

7 suspension that you gave Ms. Walker?

8    A.   He increased the suspensions but as to

9 it being related to this particular incident I

10 don't know.

11    Q.   Do you recall whether or not

12 Ms. Walker -- I draw your attention to the third

13 paragraph on page two of Exhibit 4.

14        Do you recall whether or not Ms. Walker

15 ever complained about not hearing any dispatch

16 calls over the radio and that the calls were being

17 placed perhaps by e-mail to officers?

18    A.   She made that allegation.

19    Q.   Did you recall that she made that

20 allegation against Lieutenant Eva O'Connell?

21    A.   She made that allegation.

22    Q.   Against Lieutenant O'Connell -- that

23 Lieutenant O'Connell authorized those calls --

24 allegedly authorized those calls over e-mail instead of over

**67**

1 the radio?

2    A.   She made that complaint.

3    Q.   Do you recall that being around November

4 of 2004?

5    A.   I don't remember the exact dates unless

6 I look at the suspensions but she made that

7 allegation.

8    Q.   She in fact filed a written report to

9 you concerning this, didn't she?

10    A.   Yes; and it was investigated.

11    Q.   Do you recall whether or not Lieutenant

12 O'Connell reprimanded Sergeant Walker about not

13 following the chain of command concerning the

14 complaint or allegation in paragraph three of

15 Exhibit 4 -- in Exhibit 4, page two, paragraph

16 three?

17    A.   No; Lieutenant O'Connell can't issue

18 discipline. I'm the person that issues discipline

19 on the Department.

20    Q.   Well, Lieutenant O'Connell can

21 reprimand, can she not?

22    A.   She can counsel, she can give verbal

23 reprimands.

24    Q.   Do you know whether or not Lieutenant

**68**

1 O'Connell reprimanded Sergeant Walker about not

2 following the chain of command?

3    A.   No; I do not recall that.

4    Q.   Do you recall whether or not Lieutenant

5 O'Connell assigned Plaintiff Tammy Walker to

6 booking or desk duty?

7    A.   Yes; and that was not discipline. That

8 was an assignment change. Assignments are

9 management prerogative and does not have to be

10 explained.

11    Q.   In fact Lieutenant O'Connell did not

12 explain, is that correct?

13    A.   That's correct; and I told her she

14 didn't have to explain.

15        She's the Lieutenant on the watch, she

16 moved her on that watch. It did not affect

17 payroll, did not affect salary, did not violate

18 contract.

19    Q.   This was after sergeant Tammy Walker had

20 made a written complaint to you alleging that

21 Lieutenant O'Connell was I guess -- not I guess,

22 but alleging that dispatch calls were being sent

23 by e-mail as opposed to radio, is that correct?

24    A.   No; I do not think so. No.

**TAMMY WALKER VS. CITY OF HOLYOKE**
**ANTHONY SCOTT                SEPTEMBER 11, 2006**

---

**69**

1  Q. Sir, do you recall that you suspended
2  Sergeant Walker for sick leave abuse?
3  A. No; I never suspended Sergeant Walker
4  for sick leave abuse.
5  Q. You testified that Sergeant Walker's
6  allegations about Lieutenant O'Connell making the
7  dispatch calls via e-mail as opposed to radio was
8  investigated?
9  A. Yes.
10  Q. Who did the investigation?
11  A. The investigation was done by the
12  Criminal Justice Information Authority and
13  Lieutenant David Fournier and the allegations were
14  unfounded.
15        Once again, Ms. Walker was found to be
16  untruthful.
17  Q. In order for her to be found
18  untruthful --
19  A. (Interposing) It means she had to tell a
20  lie.
21  Q. There was no instances at all of
22  dispatch calls being made by e-mail?
23  A. There were three and guess who two of
24  them went to? Your client; and it wasn't

---

**70**

1  dispatching any calls. There was zero calls
2  dispatched.
3        There was e-mail transmissions, three,
4  during that time period that she alleged and two
5  of them went to the Sergeant.
6  Q. With regard to the last paragraph on
7  page two of Exhibit 4, did the City or the Police
8  Department take any action at all to make any
9  corrections concerning the allegations in
10  Exhibit 4 of the complaints or allegations of
11  whistleblowing?
12  A. How can you correct something that did
13  not occur?
14  Q. So the Police Department did not take
15  any corrective action?
16        MS. LYNCH: Note my objection; you
17  can go ahead and answer.
18        THE WITNESS: We had nothing to
19  correct.
20        Every allegation that Sergeant Walker
21  made was investigated and she was found to be
22  untruthful by documented evidence so there was
23  nothing for us to correct.
24  Q. (BY MR. HUDSON) Sir, are you -- let me

---

**71**

1  give you the opportunity to correct something,
2  sir.
3        Would it be -- would you agree if it was
4  reported that there were actually five e-mail
5  transmissions and two of them went to Ms. Walker?
6  A. I don't have the report at hand. I
7  thought it was three and two of them went.
8        There was no dispatching of any calls
9  over the laptop computers in the cars. The state
10  looked into that and the state came back with a
11  report. It could have been five.
12        It wasn't any more than five, if you say
13  so, if you have a copy of the report. I'm telling
14  you that I remember three and two of them was to
15  Sergeant Walker.
16  Q. But you would not disagree if it was
17  five and two of them went to Ms. Walker?
18        MS. LYNCH: Objection; you can
19  answer.
20  Q. (BY MR. HUDSON) Let me do this, sir. I
21  don't want to take too much time on the report,
22  itself?
23  A. We received the report from CJIS --
24  Criminal Justice Information System.

---

**72**

1  Q. Thank you, sir. Do you remember the
2  specific number?
3  A. I remember for some reason three is
4  sticking in my head. If you say there was five,
5  then I have no reason to doubt that you're looking
6  at the report and there was five.
7        I know two of them went to Sergeant
8  Walker. Now that's out of two years of data I
9  sent to CJIS.
10  Q. Sir, if it will help to refresh your
11  recollection on the specific -- are we talking
12  about -- let me back up a minute, sir.
13        These would have been the dates that
14  Sergeant Walker worked, is that correct?
15  A. If the e-mails were sent to her I guess
16  it would be on the dates that she worked.
17  Q. And also the investigation centered on
18  e-mails that were sent to anyone else on the days
19  that she worked?
20  A. Yes.
21  Q. So it's not two years but really --
22  A. (Interposing) I sent two years of data
23  to CJIS.
24  Q. But the investigation focussed on --

---

**PERLIK and COYLE REPORTING**

**TAMMY WALKER vs. CITY OF HOLYOKE**
**ANTHONY SCOTT                    SEPTEMBER 11, 2006**

73

1      A.   (Interposing) The investigation by
2  Lieutenant Fournier focussed on the days that
3  Sergeant Walker was working.
4         The investigation by CJIS -- she
5  complained to CJIS also; she complained to the
6  FBI.  That went -- we sent them two years worth of
7  data and if they found five instances in two
8  years, I think that's pretty good.
9      Q.   Again, that's Criminal Justice --
10     A.   (Interposing) Criminal Justice
11  Information System -- CJIS.
12     Q.   They are part of the U.S. Department --
13     A.   (Interposing) No; CJIS is the state
14  entity; NCIC -- National Crime Information Center
15  is the federal.
16        The FBI deferred their investigation to
17  CJIS; CJIS conducted the investigation.
18        MR. HUDSON:  At this time let the
19  record show that Ms. Walker just re-entered but at
20  this time I'd also -- let's go off the record,
21  please?
22        (Discussion off the record.)
23     Q.   (BY MR. HUDSON)  Sir, do you recall --
24  with regard to -- let me back up.

74

1         I want to draw your attention to --
2  let's mark this as Exhibit 5, please.
3         (Plaintiff's Deposition Exhibit
             No. 5 offered and marked.)
4
5      Q.   (BY MR. HUDSON)  If you would take a
6  moment to look at that. (Indicating.)
7      A.   (Witness examining document.)  I'm
8  familiar with it.
9      Q.   What is it, sir?  Is it a letter
10  addressed to you and the Mayor?
11     A.   Yes; it is.
12     Q.   From?
13     A.   Attorney Sapirstein.
14     Q.   Do you recall it being Ms. Walker's
15  notice under the whistleblower statute?
16     A.   I didn't hear your question; I'm very
17  sorry.
18     Q.   Do you recall that the letter represents
19  itself as a notice of a claim of Ms. Walker's
20  under the whistleblower statute?
21     A.   Yes; it was subsequent to the
22  February 15th, 2005 letter.
23     Q.   In the letter it references the
24  February 15th, 2005 letter, does it not?

75

1      A.   Yes; it does.
2      Q.   Do you recall whether or not on
3  March 7th, 2005 Mayor Sullivan held a hearing on a
4  five-day suspension without pay that you issued to
5  Ms. Walker?
6      A.   Yes.
7      Q.   Do you recall what that five-day
8  suspension was for, sir?
9      A.   I believe it was the actions of Sergeant
10  Walker -- then Sergeant Walker -- against
11  Lieutenant O'Connell but I don't agree with
12  paragraph five of this letter -- I mean paragraph
13  two of this letter.
14     Q.   Do you recall that following the hearing
15  on May 18th, Mayor Sullivan not only affirmed the
16  five-day suspension that you issued but added an
17  additional suspension of fifteen days?
18        MS. LYNCH:  I'm sorry, did you say
19  May 18th?
20        MR. HUDSON:  March -- March 18th.
21        THE WITNESS:  I don't remember if it
22  was March 18th and I don't agree with the contents
23  of that first paragraph.
24     Q.   (BY MR. HUDSON)  Well the question, sir,

76

1  is:  Do you recall whether or not after the
2  hearing on March 18th that the Mayor increased
3  Ms. Walker's suspension from five days by adding
4  fifteen days?
5      A.   I believe he did but I don't know --
6  once again I don't know if it was March 18th.
7      Q.   Do you recall whether or not on or about
8  February 25 Ms. Walker complained about Lieutenant
9  O'Connell's actions towards her?
10     A.   Once again I know she complained about
11  Lieutenant O'Connell but I don't know if it was
12  around or about February the 25th, 2005.
13     Q.   What about on or around February 27th,
14  she filed a complaint with you, Chief Scott,
15  alleging that Lieutenant O'Connell engaged in
16  retaliatory behavior and injured Ms. Walker in a
17  physical confrontation.
18        Do you recall her filing such a
19  complaint with you?
20     A.   Not about retaliations, alleging a
21  physical confrontation.
22        She filed a complaint.  I don't remember
23  exactly what it is about and I'm not going to base
24  it on what Ms. Sapirstein has written in here --

# TAMMY WALKER VS. CITY OF HOLYOKE
## ANTHONY SCOTT      SEPTEMBER 11, 2006

---

### 77

1  written in this document.
2      Q.   Are you aware that on or about
3  March 29th, 2005 Ms. Walker filed a complaint
4  against the City in United States District Court?
5      A.   I know she filed a complaint.  I don't
6  know if it was on February 15th or the date that
7  you mentioned in May of 2005.  I know a complaint
8  was filed.
9      Q.   And do you know that she filed a
10  complaint before she was terminated, isn't that
11  correct?
12      A.   She may have.
13      Q.   She filed a complaint -- a Federal Court
14  complaint -- she may a filed a Federal Court
15  complaint before she was terminated?
16      A.   She may have filed it before she was
17  terminated.
18      Q.   In fact isn't it true that Ms. Walker
19  was terminated on or around April 18th, 2005?
20      A.   I can't recall the exact date.  I do
21  know she was terminated.
22      Q.   Do you recall the year?
23      A.   It was in 2005.
24      Q.   Do you recall the month?

---

### 78

1      A.   No, sir; I don't.  I had asked the Mayor
2  to fire her some time back.
3      Q.   Sir, you just testified that you asked
4  the Mayor to fire her some time back -- excuse me
5  counsel?
6          THE WITNESS:  Go ahead, sir -- way
7  before the suit was filed.
8      Q.   (BY MR. HUDSON)  What did you ask the
9  Mayor to fire her for?
10      A.   The incident that occurred at the Mall.
11      Q.   And that's the incident that you gave a
12  five-day suspension?
13      A.   That's all I could give.  If I could
14  have fired her personally then, I would have fired
15  her; and if I could have figured out a way to
16  charge her, I would have had her charged
17  criminally.
18      Q.   Sir, with regard to complaints of
19  discrimination by Ms. Walker, do you recall
20  whether or not Ms. Walker ever complained to you
21  verbally or to her supervisors about being
22  discriminated against by Sergeant Garcia and
23  Sergeant Monaghan?
24      A.   Ms. Walker made complaints about things

---

### 79

1  that were said to her, what she alleged to be
2  racially or sexually charged statements and those
3  were investigated.
4      Q.   And did Ms. Walker complain to you, sir,
5  that after she was given a retroactive seniority
6  of June 9th, I believe -- June 9th, 1999 I
7  believe -- that she was subjected to
8  discrimination by Sergeant Monaghan and Sergeant
9  Garcia?
10      A.   Sir, could you tell me, what do you mean
11  by discrimination?
12      Q.   Well sir, let's say did Ms. Walker
13  complain to you that -- first of all, on or about
14  May 5, 2002 when Ms. Walker was promoted to
15  sergeant and her seniority was adjusted to
16  June 9th, 1999, did she complain to you about any
17  problems that she was having with Officers John
18  Monaghan and Sergeant Garcia?
19      A.   It was sometime after that -- way after
20  that.
21      Q.   Do you recall whether or not Ms. Walker
22  complained to you that Sergeant Monaghan made
23  comments with sexual and racial connotations over
24  the police radio?

---

### 80

1      A.   Yes; she filed a complaint to that
2  effect and that was investigated.
3      Q.   Did she file a complaint that whenever
4  she ended a radio transmission -- there were
5  occasions when she ended a radio transmission that
6  she could hear Sergeant Monaghan change his
7  pronunciation to imitate an African-American
8  dialect and said "lick it, lick it good"?
9      A.   All of those allegations, sir -- she
10  made those allegations.
11        We went back and listened to the tapes
12  when Sergeant Walker and Sergeant Monaghan were
13  working together.  We could find none of what she
14  alleged on the tapes -- and all of the radio
15  conversations are taped.  We could find none of
16  those statements, none of those allegations.
17        All of the witnesses, sir -- all of the
18  witnesses she pointed out she alleged heard these
19  things were questioned.  Written, signed
20  statements was taken from everyone who worked on
21  the watch -- sergeants, lieutenants, police
22  officers.  We questioned everyone.  We got the
23  tapes, we went over the tapes and the allegations
24  could not be substantiated.

---

## 85

1    Q.   Do you recall whether or not Ms. Walker
2  informed you that Sergeant Monaghan regularly
3  referred to her as Tyrone?
4    A.   She made that in a complaint which we
5  investigated.
6    Q.   Do you recall whether or not Ms. Walker
7  ever informed you that Sergeant Monaghan stated
8  that she should not be a sergeant because of her
9  gender or sexual orientation?
10    A.   No.
11    Q.   She never informed you of that?
12    A.   No; I do not recall her saying that to
13  me at all.
14    Q.   Do you recall whether or not Ms. Walker
15  ever reported to you -- well, excuse me, let me
16  back up.
17         Do you recall whether or not Ms. Walker
18  ever reported that to another supervisor --
19    A.   (Interposing) No; I don't.
20    Q.   -- about Sergeant Monaghan saying she
21  shouldn't be a sergeant because of her gender or
22  sexual orientation?
23    A.   No, sir, I don't.  All of the complaints
24  that Sergeant Walker made were in writing and

## 86

1  those complaints you may have or they are on file
2  in my office and all of her allegations were
3  contained in those complaints.
4         I didn't read up on every complaint
5  Ms. Walker filed.  She filed a lot of complaints
6  and we investigated them all.
7    Q.   Didn't Ms. Walker inform you that
8  Sergeant Monaghan on or about October, 2002 saying
9  in her ear that "you shouldn't go sticking your
10  tongue where it don't belong"?
11    A.   I don't know the exact words but I know
12  that she alleged that Sergeant Monaghan sang some
13  kind of song to her which a complaint was taken
14  and once again, it was investigated.
15         I believe, sir, that she said someone
16  overheard this and we went to that individual and
17  we took a statement from that individual.  I
18  think, once again, we questioned everybody on the
19  watch.
20    Q.   Do you recall that Ms. Walker was
21  offended by this song?
22    A.   She made a complaint.
23    Q.   And to you that means that she was
24  offended by it?

## 87

1    A.   She made a complaint about it so
2  evidently she was offended by it and we
3  investigated it.
4    Q.   In fact you also referred her to
5  someone, didn't you, sir?
6    A.   (No response.)
7    Q.   Did you ask her to go to talk to one of
8  the captains under her command?
9    A.   I told her I think that she should be
10  reporting this to her immediate supervisor instead
11  of coming directly to me.  There's a chain of
12  command.
13         Could I explain something about chain of
14  command in the Police Department, sir, to you?
15    Q.   Well -- excuse me --
16    A.   (Interposing) It relates to how you
17  handle things in a law enforcement agency.  She
18  worked under a lieutenant who works under a
19  captain.
20         If you have a complaint you go to your
21  lieutenant -- and this was told to the sergeant by
22  me on more than one occasion.
23    Q.   Let me ask you --
24    A.   (Interposing) You go through the chain

## 88

1  of command to me.
2    Q.   Thank you, sir, but did you refer her to
3  Captain Fletcher?
4    A.   I can't say it was Captain Fletcher
5  directly but I referred her back to her captain.
6    Q.   Thank you, sir.  Did you ever have any
7  conversation with Captain Fletcher about
8  Ms. Walker's allegations of discrimination or
9  sexual harassment?
10    A.   Other than the fact that the complaints
11  were made or either I called him in and said
12  Captain, I referred Sergeant Walker back to you
13  with these allegations or advised him that I was
14  passing it on to Internal Affairs.
15    Q.   These allegations -- those were
16  allegations of sexual harassment, was that it?
17    A.   No; I don't know if the comment -- the
18  song that was sang, I don't remember exactly what
19  it was about, whether it had sexual overtones or
20  racial overtones, I don't remember which one but I
21  did refer it to Internal Affairs.  Basically all
22  of her complaints were referred to Internal
23  Affairs.
24    Q.   So Ms. Walker's complaints, though,

**TAMMY WALKER vs. CITY OF HOLYOKE**
**ANTHONY SCOTT          SEPTEMBER 11, 2006**

---

89

1  involved either race or sexual harassment or both?
2      A.   It could have been either/or, or both.
3  I haven't sat down and read over all of the
4  complaints that were filed but I can tell you
5  this:  All of the complaints that she made were
6  investigated.
7      Q.   Sir, let me just ask you:  Do you know,
8  when you say complaints, did that also include
9  grievances?
10     A.   Sergeant Walker filed complaints which
11 was a complaint against another officer.  She also
12 filed grievances.
13         The grievances came directly to me.  I
14 handled the grievances.  By contract I have to
15 handle the grievances.
16         The complaints I had either Internal
17 Affairs handle them or I handled them but
18 everything she filed was investigated.
19     Q.   Sir, with regard to at least one key
20 grievance -- one grievance -- strike that.
21         I want to draw your attention again to
22 Exhibit -- Mr. Jorge Rodriguez's affidavit and I
23 can't make out the exhibit number?
24     A.   2.

---

90

1      Q.   Exhibit 2.  You stated that every
2  complaint Ms. Walker -- is it your testimony that
3  every complaint Ms. Walker filed, it was
4  investigated and you could not substantiate it?
5      A.   Formal complaint that she made -- any
6  formal complaint, formal grievance that she made
7  was investigated.
8      Q.   And that you also stated that you had
9  interviewed -- with regard to some of her
10 complaints you had interviewed witnesses, other
11 officers and there was no --
12     A.   (Interposing) Substantiation.
13     Q.   -- no substantiation?
14     A.   Correct.
15     Q.   I draw your attention to -- excuse me
16 just a minute please.
17         I draw your attention to page two of
18 Exhibit Number 2, paragraph six where Officer
19 Jorge Rodriguez stated -- submitted an affidavit
20 that Sergeant Lenihan -- on or about December 4th,
21 2002 Sergeant Lenihan stated to a group of
22 officers that "we all had to stick together" and I
23 believe he was referring to Sergeant Walker's
24 charge of harassment.  Was that ever brought to

---

91

1  your attention?
2      A.   No; this affidavit was taken July 15th,
3  2003 and the investigation was being conducted
4  into Sergeant Walker's allegation November 13th,
5  2002.
6          We took a statement from Sergeant
7  Rodriguez -- I mean Officer Rodriguez.  We had
8  sent him a list of questions for him to answer and
9  that was in 2002.
10         The allegations that he's making here in
11 2003 he's making these to her attorney and I don't
12 know -- I didn't get this until -- receive this or
13 see this, I don't recall seeing this until the day
14 it was passed on to the Police Department after it
15 was sent to the City.
16         I do not recall this statement being
17 made by Officer Rodriguez during the investigation
18 in November of 2002.
19     Q.   Sir, thank you.  Let's look at Bates
20 number 462 in that same Exhibit Number 2.  I
21 believe that's the typed -- you see Bates
22 number 462, sir, at the bottom of the page?
23     A.   Yes.
24     Q.   Do you see where Officer Rodriguez is

---

92

1  responding to a request to submit an IOC?
2      A.   Yes.
3      Q.   What's an IOC?
4      A.   An interoffice correspondence.
5      Q.   To describe in detail comments that he
6  heard over the WMLEC radio -- what's the WMLEC
7  radio?
8      A.   Western Massachusetts Law Enforcement
9  Communications.
10     Q.   Do you see where he states that "on one
11 occasion after she," referencing -- "after she"
12 meaning Sergeant Walker referencing this preceding
13 sentence?
14     A.   Yes.
15     Q.   "On one occasion after she went over the
16 air someone started singing a rap song over WMLEC,
17 "leak it now, leak it good, leak it real good."
18 Do you see that?
19     A.   Yes; and once again we went to the tapes
20 and we could not find that on the tapes.
21     Q.   Then also you see where Officer
22 Rodriguez also reported that someone was saying,
23 "I'm a freak-o" on the WMLEC after Sergeant Walker
24 had gone on the radio.

---

93

1    A.   Yes; and once again there is nothing on
2  the tape to substantiate this.
3    Q.   Do you recall sir, that after -- do you
4  recall, sir, that after -- pardon me.
5        I draw your attention to paragraph
6  eleven, page 0458.  At that last paragraph eleven
7  there, do you read where Officer Rodriguez states
8  that he had also heard officers refer to Chief
9  Scott as Uncle Charlie during roll calls?
10   A.   Yes.
11   Q.   And that he believed those comments were
12 racist?
13   A.   That was his belief.
14   Q.   But he did write that?
15   A.   He wrote that in there.  I don't care
16 whatever they called me at roll call.  I get the
17 respect when I walk through that station.
18       Being raised down South I know what
19 discrimination is a lot better than a lot of
20 people and this does not bother me because when I
21 give an order it's carried out.
22       They may have -- if this was done at
23 roll call and it wasn't reported to me, I could
24 care less.  There's people in this room who have

94

1  said some worse things about me.
2    Q.   Didn't Sergeant Walker report it to you
3  that officers were saying or calling you Uncle
4  Charlie?
5    A.   It did not mean anything to me, sir,
6  okay?  I've been called a racist in this community
7  and that still doesn't mean anything to me.
8        Whether or not they call me anything is
9  the fact that I am the chief; I still give the
10 orders and I get the respect when I walk into a
11 room.
12   Q.   Sir, do you recall that Officer
13 Rodriguez believed that he was retaliated against
14 for giving the statements in support of
15 Ms. Walker's complaint?
16       MS. LYNCH:  Objection; you can
17 answer.
18   Q.   (BY MR. HUDSON)  Let me rephrase the
19 question.
20       Do you recall Officer Rodriguez
21 informing the Holyoke Police Department that he
22 believed he was retaliated against?
23   A.   Yes; he came up -- I think he came up to
24 my office with a supervisor.

95

1    Q.   Let me --
2    A.   (Interposing)  You asked me the question;
3  do you want me to answer it?
4    Q.   Yes, but he was retaliated against for
5  giving up information favorable to Ms. Walker?
6    A.   He said that he felt he was being
7  retaliated against.  I don't remember all of the
8  circumstances.
9        He came up to my office with his
10 supervisor -- I think he came up with the union
11 president; I'm not sure -- and we asked:  Do you
12 feel like you're being retaliated, what happened,
13 put it in writing and let's investigate it.
14   Q.   Did Officer Rodriguez submit something
15 in writing?
16   A.   I don't remember if he put anything in
17 writing.  If he did put it in writing, it was
18 investigated.  I don't remember.
19       MR. HUDSON:  Why don't we take a
20 break now.
21       (A luncheon recess was taken.)
22   Q.   (BY MR. HUDSON)  Chief Scott, I would
23 like to draw your attention back to some of your
24 earlier testimony and at that point I had -- you

96

1  were testifying about reasons why -- reasons that
2  you recall Ms. Walker was disciplined.  One of
3  those reasons you testified she was late for
4  court.
5        Was that one occasion or several
6  occasions that you disciplined her for being late
7  to court?
8    A.   Once.
9    Q.   As I recall -- do you recall that was
10 about -- was it five or ten minutes late, do you
11 recall?
12   A.   I believe it was fifteen.
13   Q.   And that there were other officers that
14 were also late, is that your testimony?
15   A.   Yes.
16   Q.   And that all officers were given some
17 type of discipline, is that correct?
18   A.   Yes.
19   Q.   That discipline was -- was it verbal or
20 written reprimands, do you recall?
21   A.   I believe everybody was issued a written
22 reprimand.  Some was issued a verbal.  I think one
23 or two were issued a verbal but it was documented.
24   Q.   These reprimands, they go into the

101

1        MR. HUDSON:  We have already
2  submitted a production of document request.
3        MS. LYNCH:  Right; and I'm working
4  on them.  I hope to get them done shortly.
5    Q.   (BY MR. HUDSON) Sir, you didn't do the
6  investigation in these incidents yourself, did
7  you?
8    A.   Some of them I did do.
9    Q.   With regard to -- let's back up.  On the
10  untruthfulness one with regard to the O'Connell
11  incident concerning the off-duty book, I believe,
12  did you investigate that yourself?
13    A.   That was investigated I believe by
14  Internal Affairs but I review all investigations
15  because I'm the one that has to take the
16  discipline.  If there's questions that I have --
17    Q.   (Interposing) You mean give the
18  discipline not take the discipline?
19    A.   Give the action.
20    Q.   When you say Internal Affairs, would
21  that be Lieutenant Fournier?
22    A.   Lieutenant Fournier and Sergeant
23  McCavick.
24    Q.   Did Lieutenant Fournier or Sergeant

102

1  McCavick tell you verbally or in writing that
2  Ms. Walker was not being truthful with regard to
3  the O'Connell incident regarding the book?
4    A.   The statements that were taken after I
5  read all of the reports and all of the statements,
6  I determined that based on the statements that
7  Ms. Walker was not being truthful.
8    Q.   Would these have been statements from
9  Lieutenant Fournier or Sergeant McCavick?
10    A.   No; it would be taking statements from
11  people that the Sergeant was making complaints
12  against and also witnesses that allegedly
13  witnessed the incident.
14        Then they compile the statements and
15  they do an investigative report and then I read
16  the investigative report and if necessary, I go to
17  each statement and read each statement, what's
18  contained in each statement.  Then I make my
19  decision on what Department rule or regulation was
20  or wasn't violated.
21    Q.   Thank you, sir.  With regard to the
22  statement alleging that Lieutenant O'Connell gave
23  an order that caused dispatch to be over e-mail,
24  upon what basis do you claim that that allegation

103

1  is untrue?
2    A.   Ms. Walker alleged that Lieutenant
3  O'Connell gave that order to the people in
4  Communications -- the dispatchers -- and to the
5  officers.
6        We questioned every dispatcher, took
7  written statements from every dispatcher and the
8  supervisors.  Every one of them denied being given
9  such an order; and the Lieutenant denied giving
10  such an order.
11    Q.   Sir, did Ms. Walker state or allege for
12  a fact that she knew Lieutenant O'Connell was
13  giving orders or did she say that she believed
14  that Lieutenant O'Connell was giving the orders
15  that these --
16    A.   (Interposing) She said Lieutenant
17  O'Connell gave that order to the dispatchers to
18  dispatch calls using the Departmental e-mails --
19  that you e-mail from headquarters to the laptop --
20  rather than use the radio.
21        That was her allegation; that was not
22  true.
23    Q.   Do you recall if there was any reason
24  why -- do you recall why -- whether there was any

104

1  reason Ms. Walker stated that Lieutenant O'Connell
2  did this or gave the orders over the e-mail?
3    A.   To keep her, Sergeant Walker, from
4  finding out what was going on on the watch.
5    Q.   Didn't Sergeant Walker also inform you
6  or the investigators that Lieutenant O'Connell had
7  denied sending the calls out by e-mail?
8    A.   She talked to Lieutenant O'Connell about
9  it, I believe, and the Lieutenant told her she
10  didn't do any such thing.
11        Then she went to lieutenant Duguay and I
12  believe she talked to -- don't quote me on this; I
13  don't have the investigation sitting in front of
14  me -- but I think she talked to Officer John
15  Craven who is a police officer who is a supervisor
16  of dispatchers.
17    Q.   Sir, isn't it true that -- didn't
18  Sergeant Walker say she believed that Lieutenant
19  O'Connell was sending out the dispatchers -- the
20  calls by e-mail to keep her from being informed?
21    A.   She alleged that Lieutenant O'Connell
22  was having the dispatchers dispatch calls on the
23  cars out on the street over the laptop instead of
24  over the radio.

**TAMMY WALKER VS. CITY OF HOLYOKE**
**ANTHONY SCOTT                    SEPTEMBER 11, 2006**

---

**109**

1   statement, I don't recall.

2       Q.   You know that Mr. Walker's son is a

3   college person -- attends Northeastern?

4       A.   I knew her son was attending college.

5   What university, I did not know.

6       Q.   I was just trying to establish his

7   approximate age level.

8           Is there anyone else you remember that

9   was present when Ms. Walker had allegedly

10  threatened Lieutenant O'Connell?

11      A.   There was another dispatcher. I don't

12  recall whether or not that dispatcher heard what

13  was actually transpiring in the room but I think a

14  statement was taken from him and I don't remember

15  the dispatcher's name.

16      Q.   Sir, with regard to the other

17  allegations that -- oh, was Lieutenant O'Connell

18  injured in any way?

19      A.   No.

20      Q.   Isn't it true that Ms. Walker filed an

21  injury report concerning this incident when she

22  was alleged to have threatened Lieutenant

23  O'Connell?

24      A.   She alleged an injury; yes.

---

**110**

1       Q.   She filed something in writing, didn't

2   she?

3       A.   She filed a first report of injury and I

4   disapproved it.

5       Q.   That first report was written?

6       A.   It was a short narrative -- I don't know

7   how many lines or anything was in the report but

8   she alleged that the Lieutenant had snatched a

9   book from her so violently that she injured her

10  shoulder.

11          Based on the statements of everybody

12  that was there, that wasn't the truth.

13          MR. HUDSON: Let's do this as a

14  composite exhibit. Please mark that as Exhibit 6.

15          (Plaintiff's Deposition Exhibit

            No. 6 offered and marked.)

16

17      Q.   (BY MR. HUDSON) If you could take a

18  look at those, sir? (Indicating).

19      A.   (Witness examining document.) Okay.

20      Q.   I draw your attention to the third page

21  of this exhibit. Is this the date of injury

22  reporting February 25, '05?

23      A.   This is the injury form.

24      Q.   And the injury was described as

---

**111**

1   "scheduling book being jerked from hands." Is

2   that what's described in here?

3       A.   Yes. There's something missing in here.

4   There's something missing in all of this.

5       Q.   Also, sir, in addition to that, the

6   first page --

7       A.   (Interposing) Yes; and once again

8   there's something missing.

9       Q.   But do you recognize this document

10  addressed to you?

11      A.   Yes.

12      Q.   This also reflects where you denied

13  Ms. Walker's request to have medical attention?

14      A.   Yes; this is my denial or a disapproval

15  is on the page that's marked 000032.

16          Once again, there's something missing

17  from the first page.

18      Q.   What is missing?

19      A.   How this starts. It should have began

20  "once upon a time."

21          MR. HUDSON: Excuse me, please.

22          THE WITNESS: Because this is a

23  fairy tale. This document is a fairy tale.

24      Q.   (BY MR. HUDSON) Sir, the question is

---

**112**

1   you did receive this, is that correct?

2       A.   Yes; and I disapproved it.

3       Q.   What you disapproved -- what you're

4   saying you disapproved is that medical attention,

5   medical care? What are you disapproving here?

6       A.   I'm disapproving this entire report

7   because this is a fabrication. This did not

8   happen as Ms. Walker says.

9           There was no such injury, based on the

10  information that I learned. This is a

11  fabrication.

12      Q.   Did you ask Ms. Walker for any medical

13  information before your disapproval?

14          Did you ask her to submit any medical

15  documentation or do you know whether or not she

16  submitted any medical documentation?

17      A.   Ms. Walker submitted this first report

18  of injury.

19          What you see here, this is what I got

20  and I already had an investigation and what she

21  alleged did not occur.

22      Q.   My question, sir, is -- I see down here

23  on the third page -- the third page of Exhibit 6.

24          It looks like some of these documents

---

**PERLIK and COYLE REPORTING**

Case 3:05-cv-30074-MAP    Document 46-6    Filed 06/14/2007    Page 16 of 18

**TAMMY WALKER vs. CITY OF HOLYOKE**
**ANTHONY SCOTT                    SEPTEMBER 11, 2006**

117

1    A.    Based on the statements that were taken,
2 Lieutenant O'Connell was at her desk speaking to
3 Officer Shattock going over some training because
4 Officer Shattock is our firearms instructor.  She
5 had a ring binder in front of her with her arms
6 similar to this -- laying across the book --
7 talking to Officer Shattock.
8        When Sergeant Walker came in, did not
9 ask, reached for the book and was lifting the book
10 up to take it off the desk, not even asking the
11 Lieutenant could she have the book and the
12 Lieutenant pushed the book back down.  It couldn't
13 have been no more than a half an inch or an inch
14 off the desk and said, "Excuse me, Sergeant."
15 This is from statements from Officer Shattock who
16 was in there across the desk from the Lieutenant.
17 She then reached for the book a second time.  She
18 said "Excuse me, Sergeant," putting both of her
19 hands on top of her notebook.
20        When the Lieutenant got up to go around
21 the desk to tell the officer to go outside so the
22 Lieutenant and Sergeant Walker could discuss this
23 matter without getting subordinates involved was
24 when the Sergeant, according to statements, walked

118

1 up on the Lieutenant's face and made the comment
2 about F-U with her fists clenched and her arms at
3 her side in a manner to attack.
4        Once again this is based on statements
5 from three individuals.  I was not there.
6    Q.    You said with her fists at her side?
7    A.    Well, they were kind of at her side.
8 The statements said they believed that she was
9 going to strike the Lieutenant and that's why the
10 police officers did not want to leave the room.
11 They were afraid that the Sergeant was going to
12 attack the Lieutenant.
13    Q.    The Sergeant never touched the
14 Lieutenant, is that correct?
15    A.    No; she did not touch the Lieutenant but
16 it was a threat.
17    Q.    Based upon the hearsay information that
18 you obtained?
19    A.    Not hearsay; firsthand knowledge.
20 People were in the room.  I would arrest people
21 for less than that.
22        To get one statement I would have
23 arrested somebody.  I got three statements.  If it
24 would have been a civilian I would place them

119

1 under arrest.
2    Q.    And convicted them as well?
3    A.    I would have taken them to court and
4 gave it a damn good try.
5    Q.    In fact, sir, does that kind of reflect
6 your philosophy about law enforcement?
7        MS. LYNCH:  Objection; you can
8 answer if you can.
9        THE WITNESS:  My philosophy on law
10 enforcement is to be fair, use community policing,
11 but put people in jail when they violate the law.
12        Crime -- excuse me sir; I'd also like to
13 say since I've been Chief in the City of Holyoke,
14 major crime has dropped seventeen percent.  You
15 can't tell the last time they had a drive-by
16 shooting in the City of Holyoke.
17        Before I came here, the homicides were
18 running amok, the drive-by shootings were running
19 amok.  It happened every night.  We were in the
20 paper every day for shootings in the City of
21 Holyoke.  That isn't going on now and that's my
22 philosophy of policing.
23    Q.    (BY MR. HUDSON) Sir, do you recall ever
24 making this quote since you've been police chief,

120

1 that "the judiciary don't give a good damn about
2 the public that it's supposed to be serving?
3    A.    I don't know if I said exactly that but
4 I say it over and over again that the judiciary
5 doesn't care about the citizens of Holyoke.  Why?
6 Because they continually release people back out
7 on the street to plague the poor neighborhoods
8 that we're arresting them out of, over and over
9 again.
10        I said it once; I said it twice, and I'm
11 going to continue saying it as long as they keep
12 doing it.
13    Q.    In fact you blame the City's plight on
14 judges?
15        MS. LYNCH:  Objection; what does
16 that have to do with this case?  What is the
17 relevancy?
18        MR. HUDSON:  The relevancy is -- let
19 me withdraw that.
20    Q.    (BY MR. HUDSON) The question is:  Would
21 you have judges act as prosecutors, factfinders
22 and impose sentences based on arrests alone?
23        MS. LYNCH:  Objection; I don't
24 understand what that has to do with this case.

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT        SEPTEMBER 11, 2006

---

141

1  Attorney Lynch, the City Solicitor, but to Mr. --
2  the union -- Clancy -- and to Attorney Dan
3  Sheridan.
4      Q.   Were these all files concerning
5  Ms. Walker?
6      A.   It's based on her appeals.  When she did
7  her appeals of discipline to the Mayor we had to
8  supply copies of the files to the labor attorney
9  representing the City and we had to supply files
10  to the union attorney so there was a lot of
11  copying of files.
12          Who all got them, what was copied, I
13  don't remember.  I don't do the copying.
14     Q.   Who does the copying, sir?
15     A.   Either my secretary or Lieutenant
16  Fournier or Sergeant McCavick.
17          I don't think the City pays me to stand
18  at the copier to make copies of the files.  They
19  pay me too much to be a file copier.
20     Q.   I'm sure they do, but not enough I'm
21  sure.
22          MR. HUDSON:  Can we mark this, I
23  believe it's Exhibit 8.
24

---

142

1          (Plaintiff's Deposition Exhibit
            No. 8 offered and marked.)
2
3      Q.   (BY MR. HUDSON)  If you would look at
4  that. (Indicating.)
5      A.   (Witness examining document.)
6      Q.   Sir, do you recognize this document?
7      A.   This is the complaint to the
8  Massachusetts Commission Against Discrimination
9  filed by Ms. Walker.
10     Q.   Do you see the filing date on that, on
11  Exhibit 8?
12     A.   12/2 of '02.
13     Q.   In the introductory paragraph under
14  cause of discrimination, in that paragraph do you
15  see where it says, "In or beginning around May of
16  2002 and continuing up to most recently October
17  21, 2002 Holyoke Police Department discriminated
18  against me by subjecting me to a hostile work
19  environment, by harassing me based on my gender,
20  female; my color, back; and my sexual orientation,
21  lesbian and interfering with," et cetera?
22     A.   Mmm-hmm.
23     Q.   You see that?  Okay.  Do you see in
24  paragraph two where the complainant alleged that

---

143

1  she -- since her promotion to sergeant she has had
2  a problem with other sergeants who are less
3  senior, specifically John Monaghan and Joseph
4  Garcia?
5      A.   Yes.
6      Q.   You have seen this document before,
7  isn't that correct?
8      A.   I think the first time I saw this
9  document was when Ms. Sapirstein filed this
10  document.
11     Q.   When you're saying "this document," are
12  you talking about the notices of whistleblowing?
13     A.   Yes.
14     Q.   Do you know whether or not -- do you
15  recall whether or not you knew whether or not --
16  who is Sergeant Lenihan?  Do you know a Sergeant
17  Lenihan?
18     A.   Yes.
19     Q.   Who is Sergeant Lenihan?
20     A.   Sergeant Lenihan was the senior sergeant
21  on the third watch midnight to eight in the
22  morning, the watch that former Sergeant Walker was
23  assigned to and Sergeant Monaghan and Garcia.  I
24  think they were all assigned to the third watch.

---

144

1      Q.   Sir, are you aware that Ms. Walker --
2  Sergeant Walker had spoken with Sergeant Lenihan
3  twice about her concerns about Sergeant Monaghan
4  and Garcia?
5      A.   No; I'm not aware.  Could she have?
6  Probably, because that was her senior sergeant.
7      Q.   This was a complaint -- you said you
8  became aware --
9      A.   (Interposing) I believe I became aware
10  of it.
11     Q.   But that would have been when Ms. Walker
12  was represented by Ms. Sapirstein and those
13  whistleblower letters -- notices -- were mailed
14  out.  That was around --
15     A.   (Interposing) 2005.
16     Q.   February 15th and May 4th, 2005?
17     A.   Yes.
18     Q.   According to Exhibits 4 and 5, is that
19  correct?
20     A.   Yes.
21     Q.   Sir, it is your testimony that even
22  though there was an MCAD complaint filed in
23  December, 2002 --
24     A.   (Interposing) They don't come to my

---

157

1 that Sergeant Walker on or about November 4 had
2 reported her concerns -- November 4, 2004, her
3 concerns about Lieutenant O'Connell using --
4 issuing an order to have dispatchers send units to
5 calls by e-mail and in fact -- excuse me, that's
6 the question.
7         Isn't it true that on or about that
8 time, 2004 Sergeant Walker -- November of 2004
9 Sergeant Walker had complained, made allegations
10 about Lieutenant O'Connell?
11      A.   Yes; Sergeant Walker made complaints
12 about Lieutenant O'Connell.
13      Q.   On or about November, 2004?
14      A.   I don't know what the date is but
15 she had made complaints.  It was in 2004.
16         My disapproval, sir, had nothing to do
17 with her making a complaint about the Lieutenant.
18 There was no precipitating incident.  The last
19 time she reported an injury to her shoulder, she
20 alleged that a door had opened and the steel door
21 had hit her in the shoulder.  That was the
22 precipitating incident.  There was no
23 precipitating incident that led up to this and I
24 disapproved it.

158

1         I was asked to, could I relook at this
2 so what I did was I got Meditrol to look at all of
3 the documents that she had given me and all of the
4 documents that she had given them and I asked
5 them, look, I want to have you review this.  They
6 reviewed it and they came to the same conclusion I
7 did, that there was no precipitating incident that
8 led to this mysterious injury and she was told
9 that she could seek remedy under Chapter 41,
10 Section 100.
11      Q.   Thank you, sir.  My question is really
12 quite simple and that is whether or not as of
13 November 4, 2004 Sergeant Walker had complained
14 and in fact an IOC had been issued concerning
15 Lieutenant O'Connell being accused of sending out
16 dispatches over the e-mail instead of radio?
17      A.   That was in November, 2004.
18      Q.   Thank you.  Also by November 8th isn't
19 it true that you had authorized an internal
20 investigation into Sergeant Walker's allegations?
21      A.   Yes; it may have been.  I don't know if
22 it was November the 8th.  If you say so, it was,
23 okay, because I don't think you would lie to me
24 about that but I don't remember when I authorized

159

1 the investigation.
2      Q.   I'm not introducing this into evidence,
3 sir, but if you want to take a look at this, I
4 believe it's the copy of something that says "as
5 of November 8th"?  (Indicating.)
6      A.   I told you I took your word for it, sir.
7      Q.   Thank you.  Sir, with regard to -- let's
8 see, on or about December 20th do you recall --
9 December 20, 2004 do you recall receiving a
10 grievance from Sergeant Walker?
11      A.   I received several grievances from
12 Sergeant Walker.
13      Q.   A grievance from Sergeant Walker
14 involving Lieutenant O'Connell and being
15 reassigned to in-house duty, desk duty?
16      A.   Yes; she did file a grievance.  Exactly
17 when her grievance was, I don't know.
18      Q.   Did you investigate that yourself or did
19 you authorize someone else to investigate that?
20      A.   Grievances -- I have to look into
21 grievances.
22      Q.   Do you recall whether or not you were
23 able to substantiate Ms. Walker's I guess
24 allegations?

160

1      A.   I would have to see my report on it
2 because I respond to all grievances that are
3 filed.
4      Q.   Do you recall whether or not Sergeant
5 Walker complained about other officers reviewing
6 her personnel records?
7      A.   Once again if I was permitted to review
8 the report I made and the grievance that she filed
9 I would be able to answer your question
10 intelligently.
11      Q.   Is it customary to restrict an officer
12 who is assigned to booking from going to other
13 areas of the Police Department, like to restrict
14 them from going to the dispatch or Records Bureau?
15      A.   Yes.
16      Q.   Under what circumstances?
17      A.   That's because we don't want the
18 officers hanging in those locations.  I put out an
19 order to that, myself.  I don't want the officers
20 hanging in the record room or hanging in the
21 dispatch center.
22      Q.   Do you know of any officers who have
23 received such --
24      A.   (Interposing)  I issued it to the whole

# EXHIBIT 2

## IN THE MATTER OF:

TAMMY WALKER vs.

CITY OF HOLYOKE

---

## DEPOSITION OF:

JOHN MONAGHAN
DATE:   SEPTEMBER 18, 2006

---

### PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

**5**

1  JOHN MONAGHAN, the Deponent, having been
2  satisfactorily identified by the production of his
3  driver's license and having been first duly sworn
4  by the Notary Public, deposes and says as follows:
5  MR. HUDSON:  This will be our first
6  exhibit.
7  (Plaintiff's Deposition Exhibit
   No. 1 offered and marked.)
8
9  *****
10  DIRECT EXAMINATION BY MR. HUDSON
11  Q.  Good morning.
12  A.  Good morning.
13  Q.  Sir, would you state your name?
14  A.  John Francis Monaghan.
15  MR. HUDSON:  We have the usual
16  stipulations, counsel?
17  MS. LYNCH:  Yes.
18  MR. HUDSON:  I have marked as
19  Exhibit 1 -- Plaintiff's Exhibit 1 -- a renotice
20  of deposition.
21  Please let the record show that
22  Plaintiff Tammy Walker is also present and that
23  the City Solicitor's office is present as well.
24  Q.  (BY MR. HUDSON) Mr. Monaghan, are you

**6**

1  represented by Attorney Carole Lynch?
2  A.  That's correct.
3  Q.  Sir, are you familiar with the
4  occurrences in this lawsuit?
5  A.  Somewhat.
6  Q.  Have you had the opportunity to talk
7  with your attorney before today to get ready for
8  your deposition?
9  A.  Yes.
10  Q.  Your attorney has explained to you what
11  a deposition would be like?
12  A.  Yes.
13  Q.  And you know what a deposition is?
14  A.  Yes.
15  Q.  You understand that an oath is a promise
16  to tell the truth, the whole truth, and nothing
17  but the truth?
18  A.  I do.
19  Q.  You understand that you must answer
20  truthfully and fully unless you are advised by
21  your attorney not to answer at all?
22  A.  Yes.
23  Q.  You understand that what you say -- that
24  is, your testimony -- will be taken down word for

**7**

1  word and typed up as a transcription of your
2  testimony?
3  A.  I do.
4  Q.  Do you understand that the transcript of
5  your testimony may be used at trial?
6  A.  Yes.
7  Q.  You understand that you will have an
8  opportunity to review your deposition before
9  trial?
10  A.  Yes.
11  Q.  Do you understand that if you make
12  changes of substance, these changes may be
13  commented on at trial?
14  A.  Yes.
15  Q.  You understand that at any time if you
16  do not understand any question, you should state
17  that you do not understand the question and you
18  may ask me to rephrase or repeat the question?
19  A.  Yes.
20  Q.  I will be using the word "occurrence" to
21  describe the facts relating to the allegations and
22  claims in this suit.
23  Do you have any problem with
24  understanding the word "occurrence"?

**8**

1  A.  No.
2  Q.  Sir, are you married?
3  A.  I am.
4  Q.  How long have you been married?
5  A.  Eleven years.
6  Q.  Do you have any nicknames?
7  A.  No.
8  Q.  Do you reside in Holyoke?
9  A.  I do.
10  MR. HUDSON:  I'm not going to ask
11  for his actual address.
12  MS. LYNCH:  Okay.
13  Q.  (BY MR. HUDSON)  Your business address
14  is at the Holyoke Police Department?
15  A.  Yes.
16  Q.  What is that address?
17  A.  138 Appleton Street.
18  Q.  Was that your business address at the
19  time of the occurrences in Ms. Walker's lawsuit?
20  A.  You're going to have to define
21  "occurrence."
22  Q.  Since 2001 has that been your business
23  address?
24  A.  Yes.

Case 3:05-cv-30074-MAP Document 46-4 Filed 08/14/2007 Page 4 of 15

TAMMY WALKER vs. CITY OF HOLYOKE
JOHN MONAGHAN                    SEPTEMBER 18, 2006

**9**

Q. How old are you, sir?

A. I am forty-one years young.

Q. Were you born in Holyoke?

A. I was actually born in the hospital in Springfield but I'm from Holyoke my entire life.

Q. You went to high school there?

A. Yes.

Q. How would you define your sex, sir?

MS. LYNCH: Objection.

Q. (BY MR. HUDSON) How do you define your sex? How do you define it?

A. My gender?

Q. Yes.

A. I'm a male.

Q. Good; thank you. How do you define -- or how do you classify your race?

A. I'm a Caucasian male of European descent.

Q. Would that commonly be referred to as a white male?

A. Sure.

Q. Do you have any children?

A. I do.

Q. How many?

**10**

A. Two.

Q. Approximately, their ages -- what are their ages?

A. I have a boy who is nine and a daughter who is seven.

Q. Sir, what high school did you go to?

A. Holyoke High.

Q. Did you graduate?

A. Yes.

Q. After -- when did you graduate?

A. 1983.

Q. After you graduated what did you do?

A. I worked in a hardware store called Highland Hardware and Bike Shop in Holyoke. I've had a number of jobs.

Q. Let's say from 1983 you graduated, right?

A. Yes, sir.

Q. When did you become a member of the Holyoke police force?

A. 1993, July.

Q. Immediately before becoming a member of the Holyoke police force what did you do?

A. I sold insurance and securities for John

**11**

Hancock in Holyoke.

Q. Were you actually employed or were you self-employed?

A. I was an actual agent.

Q. For John Hancock?

A. Right.

Q. How long did you do that?

A. Approximately three years I believe.

Q. That would have been 1990 to 1993, approximately?

A. Yes; in that ballpark.

Q. Prior to selling insurance for John Hancock what did you do?

A. I believe I went from the hardware store to John Hancock.

Q. What hardware store?

A. Highland Hardware and Bike Shop. In the middle of that stint I tried some landscaping but that was not for me.

Q. From about -- when did you begin at Highland Hardware?

A. I was in high school. I'm not sure exactly when.

Q. So as early as 1983?

**12**

A. It's possible.

Q. Did you have any other positions before Highland Hardware and Bike?

A. I was a lifeguard for the City; I worked in the Sweet Life Food Warehouse I think for one summer, which was miserable. I believe that was right around when I graduated school, right around the time I was with Highland Hardware.

Q. Sweet Life -- what is that?

A. It was called Sweet Life Food Warehouse on Pine Street in Holyoke and it was basically a food distribution center for groceries, bulk.

I can't think of what else. I've been doing this for a long time now.

Q. Who was your supervisor when you were at John Hancock?

A. A man by the name of Frank Higgins -- H-I-G-G-I-N-S.

Q. When you came on to the Holyoke Police Department in 1993 who was the Chief?

A. Bob Wagner was the Chief of Police.

Q. Short for Robert?

A. Robert; yes.

Q. Who was your immediate supervisor?

**41**

1  discrimination -- in other words, for example a
2  person arrested accused the officer of being
3  beaten up because he was Hispanic or black or
4  being strip-searched or sexually molested because
5  she was a woman or the unnecessary use of force by
6  a police officer because of a person's race or
7  gender?
8      A.  I'm not aware of anything like that.
9      Q.  You have no knowledge of any civil
10  rights complaints against any officer of the
11  Holyoke Police Department, is that correct?
12     A.  No; none.
13     Q.  Do you know if the -- are you aware of
14  any complaints by any member of the Holyoke Police
15  Department alleging retaliation because they
16  either filed an MCAD complaint or they
17  participated in giving information in connection
18  with an MCAD complaint?
19     A.  No.
20     Q.  Are you aware of any member of the
21  Holyoke Police Department claiming retaliation
22  because they gave assistance or testified in
23  connection with another employee's complaint of
24  race discrimination?

**42**

1      A.  No.
2      Q.  Are you aware of any employee claiming
3  retaliation because they filed a complaint or
4  participated in giving evidence in connection with
5  another employee's sexual harassment complaint?
6      A.  No.
7      Q.  Are you aware of any employee claiming
8  retaliation for giving evidence or information in
9  connection with any other employee's whistleblower
10  complaint?
11     A.  A present employee or at any time?
12     Q.  At any time.
13     A.  Former Chief Wagner I believe filed a
14  federal whistleblower suit.
15     Q.  Do you know of any employee that claimed
16  they were retaliated for supporting Chief Wagner
17  in his whistleblower suit?
18     A.  No.
19         MR. HUDSON:  I'd like to take a
20  couple of minutes here, please.
21         (A recess was taken.)
22     Q.  (BY MR. HUDSON)  Sir, did you happen to
23  work the same shift as Ms. Walker at the Holyoke
24  Police Department?

**43**

1      A.  Initially, yes.
2      Q.  When you say initially, what period of
3  time?
4      A.  1993 and I don't know when it ended.
5      Q.  Any idea about how many years?
6      A.  No; it may have -- no.  I stayed three
7  and a half years, I know that.
8      Q.  In 2001 did you work the same duty shift
9  as -- maybe third shift as Ms. Walker?
10     A.  2001?
11     Q.  In 2002 -- excuse me, 2002?
12     A.  In 2002 I was promoted to sergeant and I
13  changed shifts.
14     Q.  In 2002 Ms. Walker was promoted to
15  sergeant too, right?
16     A.  Yes.
17     Q.  Did you all work the same shift in 2002?
18     A.  Yes.
19     Q.  What shift was that?
20     A.  That was the midnight to eight a.m.
21  shift.
22     Q.  That's to eight a.m.?
23     A.  Unfortunately.
24     Q.  In 2002 who was your supervisor on that

**44**

1  shift?
2      A.  That would be Lieutenant Whelihan.
3      Q.  Was Lieutenant O'Connell -- do you know
4  Lieutenant O'Connell?
5      A.  Sure; yes.
6      Q.  What's her race?
7      A.  She's a Caucasian female.
8      Q.  What was her position?
9      A.  I have no idea.
10     Q.  Did she work that third shift?
11     A.  No.
12     Q.  Were there any other supervisors on that
13  third shift?
14     A.  Yes.
15     Q.  Who were they?
16     A.  Sergeant George Girard, Sergeant Brian
17  Cassidy, and Larry Cournoyer -- Sergeant Lawrence
18  Cournoyer, Senior, I believe.
19     Q.  The first person, Sergeant Girard?
20     A.  Yes, sir.
21     Q.  Is that G-I-R-A-R-D?
22     A.  G-E-R-A-R-D.
23     Q.  And Sergeant Brian Cassidy?
24     A.  Yes, sir.

53

1    A.    Yes, sir.
2    Q.    At that time what was your position?
3    A.    I was a patrolman.
4    Q.    And Ms. Walker, what was her position?
5    A.    Also.
6    Q.    A patrolman?
7    A.    Yes, sir.
8    Q.    So the next position above patrolman is
9    sergeant?
10    A.    In our department; yes.
11    Q.    So you did learn or obtain information
12    that Ms. Walker had settled her Civil Service
13    complaint?
14    A.    Yes; that was my understanding.
15    Q.    And that as a result of that she would
16    be at the top of the list and included in the next
17    three?
18    A.    Yes, sir.
19    Q.    For purposes of Civil Service
20    appointment?
21    A.    Yes.
22    Q.    To the position of sergeant?
23    A.    Yes.
24    Q.    In fact does that mean that it wasn't

54

1    automatic, that she still had to be selected from
2    three by the Mayor or the Chief or whoever did the
3    appointing?
4    A.    I don't know.  I never saw a document.
5    I can't answer that.
6    Q.    Are you aware of or do you have any
7    knowledge as to when Ms. Walker -- do you know
8    whether or not Ms. Walker became a full-time
9    sergeant?
10    A.    I know she did; yes.
11    Q.    Do you know about when that was?
12    A.    Maybe very early spring of 2002, late
13    winter.  I'm not sure exactly.
14    Q.    Well, didn't you become a full-time
15    sergeant, a permanent Civil Service sergeant
16    around May 15th, 2002?
17    A.    Yes.
18    Q.    Isn't it true that Ms. Walker probably
19    preceded your appointment by maybe about ten days?
20    A.    She preceded me.  I don't know if it was
21    ten days or three months.  I don't remember.
22    Q.    But she did precede you?
23    A.    Yes; definitely.
24    Q.    Not only did she precede you, did you

55

1    ever have occasion to learn that her seniority was
2    going to be retroactive to, say, June, 1999?
3    A.    I don't know about the dates.
4    Q.    But did you ever have the occasion to
5    learn that her seniority was going to even
6    pre-date that of Sergeant Garcia?
7    A.    Yes.
8    Q.    How did you learn that?
9    A.    Sergeant Garcia told me.
10    Q.    Did Sergeant Garcia say anything about
11    how far -- about how much seniority Ms. Walker was
12    going to receive?
13    A.    I don't believe he knew.
14    Q.    Sir, I draw your attention to on or
15    about June 18, 2002.
16          Do you recall ever referring to -- do
17    you have any knowledge of referring to Chief Scott
18    as Uncle Charlie?
19    A.    No.
20    Q.    Have you ever used that term, Uncle
21    Charlie?
22    A.    We discussed this.  The only Uncle
23    Charlie I'm aware of is a nickname for a curve
24    ball, the C.

56

1          That's the only time I've ever heard it
2    or used it.
3    Q.    And you don't have a relative name Uncle
4    Charlie?
5    A.    No.
6    Q.    You have used the word Uncle Charlie but
7    in connection with a curve ball?
8    A.    The term in a baseball context.  That's
9    all I can think of; yes.
10    Q.    Have you used that term within the
11    Police Department?
12    A.    I wouldn't; no.
13    Q.    You wouldn't know or no?
14    A.    I'm sorry, I was going to say I wouldn't
15    have any reason to and the answer is no.
16    Q.    Do you have any knowledge of trying to
17    mimic a so-called black dialect?
18    A.    Do I have any knowledge of it?
19    Q.    Yes.  You know what mimicry is?
20    A.    Sure I do.  I have not done that but --
21    no.
22    Q.    Do you have any -- do you recall stating
23    the following quote:  "Uncle Charlie dun come out
24    wit" -- W-I-T -- "wit anutter" -- A-N-U-T-T-E-R --

Case 3:05-cv-30144-MAP    Document 46-7    Filed 08/14/2007    Page 7 of 15

**TAMMY WALKER vs. CITY OF HOLYOKE**
JOHN MONAGHAN                    SEPTEMBER 18, 2006

---

**57**

1    "order," end quote.  Do you recall ever using that
2    phrase?
3        A.    I never did.
4        Q.    Do you know anyone who ever used that
5    phrase?
6        A.    No.
7        Q.    Do you have any knowledge of ever being
8    accused other than by -- excuse me, strike that.
9            Do you have any knowledge of anyone
10   complaining that you used that terminology, "Uncle
11   Charlie dun come out wit anutter order"?
12       A.    I've seen that on Tammy's complaint.
13   That's certainly the only time.
14       Q.    Did you ever talk with Ms. Walker about
15   this allegation?
16       A.    Certainly not.
17       Q.    I draw your attention to June 20th,
18   2002.  Do you have any knowledge of using -- of
19   Ms. Walker being on the radio, I believe it's the
20   Western Mass. radio?
21       A.    We say WMLEC.
22       Q.    What does that stand for?
23       A.    Western Mass. -- I don't know.
24   Emergency Communication the last two, but we say

---

**58**

1    WMLEC.
2        Q.    Is that a radio system or station or
3    frequency that's used primarily by law enforcement
4    personnel?
5        A.    Yes; that's fair to say.
6        Q.    In Western Mass.?
7        A.    Yes.
8        Q.    Do you have any recollection -- any
9    knowledge that on or about June 20, 2002 you
10   stated -- well, after Ms. Walker ended her
11   broadcast you stated, "lick it good" over the
12   radio?
13       A.    I'm having a problem with "do you have
14   any knowledge."
15            If you want to just ask me directly if
16   I've done that, the answer is no and everything is
17   on tape.  Do you understand?
18       Q.    I understand.  Thank you for your help,
19   sir.  You want to interrogate yourself, that's
20   fine.
21       A.    I don't know if you're leaving a window
22   open here but it didn't happen; the answer is no.
23   When you say do I have any knowledge, me,
24   personally, I have knowledge.

---

**59**

1        Q.    What knowledge do you have, sir?
2        A.    I have extensive knowledge, sir.  I'm a
3    history guy.
4        Q.    I mean what knowledge do you have of
5    having -- of this -- of having said or not said
6    "lick it good" over the radio?
7        A.    That did not occur.
8        Q.    It did not occur?
9        A.    I did not say that.
10       Q.    Did you receive any information from
11   anyone in a supervisory position that Ms. Walker
12   accused you of saying it over the radio?
13       A.    No.
14       Q.    Did you receive any information from any
15   other employee that you were being accused of
16   saying "lick it good" over the radio after
17   Ms. Walker terminated her transmission?
18       A.    My first recollection of that was
19   reading it again in print in one of her
20   complaints.
21       Q.    Do you have a partner?
22       A.    No.
23       Q.    Do you work solo?
24       A.    I'm sorry, presently?

---

**60**

1        Q.    Let's say in 2002, let's say the summer
2    and fall of 2002.
3        A.    Okay.
4        Q.    Did you -- were you assigned a partner?
5        A.    No; supervisors don't have partners.
6    Occasionally due to circumstances they'll ride in
7    the same car as you're only allowed two cars and
8    there may be more than three officers.
9            The City generally doesn't have
10   partners.
11       Q.    Is there an officer that you tend to
12   ride more often with than not to perform your
13   duties?
14       A.    I ride by myself if possible.
15       Q.    Do you ever recall making the statement
16   or using the words to the effect that Tammy Walker
17   should not be a sergeant because of her sexual
18   orientation?
19       A.    No.
20       Q.    That Tammy Walker should not be a
21   sergeant because of her sexuality?
22       A.    No.
23       Q.    That Tammy Walker should not be a
24   sergeant because she is a lesbian?

**TAMMY WALKER vs. CITY OF HOLYOKE**
**JOHN MONAGHAN                    SEPTEMBER 18, 2006**

97

1    Q.   Did you answer them in writing?
2    A.   Yes.
3    Q.   When you finished with your answer, who
4  did you give it to?
5         Did you return it to Lieutenant
6  Fournier?
7    A.   I'm not sure what the process was, if I
8  had to give it back to the commanding officer or
9  upstairs.
10    Q.   It says at the bottom that you shall --
11  you see where it says on the first page, "You
12  shall submit your response in writing to me"?
13    A.   Okay.
14    Q.   "No later than Wednesday,
15  November 20th," so that was an order and you would
16  have followed it?
17    A.   And that's what I did.
18    Q.   When you say that's what you did, you
19  returned it to Lieutenant -- you returned your
20  written answers to Lieutenant Fournier?
21    A.   Yes, sir.
22    Q.   Do you recall, sir, how you answered
23  question number one, "Have you personally ever
24  heard Sergeant Monaghan refer to Sergeant Walker

98

1  as Tyrone or heard him say you shouldn't go
2  sticking your tongue where it don't belong"?
3    A.   I would have answered no.
4    Q.   "Have you personally ever heard" --
5  number two, "Have you personally ever heard" --
6  "personally ever actually heard Sergeant Monaghan
7  refer to Sergeant Walker in a derogatory manner?"
8  How did you answer that?
9    A.   No.
10    Q.   When you answer no, sir, did you just
11  put the words -- do you recall just writing the
12  word "no" or did you write any explanation or
13  description like "this is something I would never
14  have done"?
15    A.   I wouldn't have -- no; I don't recall
16  and I would not have said that.  I would have
17  answered no.
18    Q.   "Have you personally ever heard Sergeant
19  Monaghan refer to Sergeant Walker in a racially
20  derogatory manner?"
21         How would you have answered that
22  question, sir?
23    A.   No.
24    Q.   "Have you personally ever actually

99

1  heard" -- number four -- excuse me, the last
2  question was number three?
3    A.   Yes, sir.
4    Q.   Now number four, "Have you personally
5  ever actually heard Sergeant Monaghan refer to
6  Sergeant Walker in a sexually explicit or sexually
7  derogatory manner?"  How would you have answered
8  that question?
9    A.   No.
10    Q.   With regard to number five, sir, "If you
11  answered yes to any of these questions," would you
12  have provided any of the details?
13    A.   That didn't apply to me.
14    Q.   Well, if you had answered yes, would you
15  have provided any of the details?
16    A.   Well, sir --
17         MS. LYNCH:  (Interposing) Objection;
18  you can answer.
19         THE WITNESS:  I would have complied
20  with whatever -- if I answered yes, I would have.
21    Q.   (BY MR. HUDSON)  So if you had answered
22  yes, you would have answered 5 A as to when,
23  correct?
24    A.   Yes.

100

1    Q.   If you had answered yes, you would have
2  answered 5 B, who was present?
3    A.   Yes.
4    Q.   And likewise for C and D, you would have
5  provided the information requested?
6    A.   Yes, sir.
7    Q.   With regard to number six, "If you have
8  other than firsthand knowledge of any of the above
9  inquiries please provide the following."  How did
10  you answer number six?
11    A.   Again these didn't apply.  I don't have
12  any other -- I have no knowledge of any of this
13  but I would have answered the questions had I had
14  the information.
15    Q.   Thank you.  Did you have the occasion to
16  meet with any officer or supervisor about the
17  allegations in Tammy Walker's -- Sergeant Tammy
18  Walker's October 24th internal complaint?
19    A.   Yes.
20    Q.   Who did you meet with?
21    A.   There was a meeting with Captain
22  Fletcher, Lieutenant Whelihan, Tammy, and myself
23  in an office off the Chief's office -- I'm sorry,
24  it was Captain Fletcher's office up on the second

Case 3:05-cv-30080-MAP Document 46-7 Filed 06/14/2007 Page 9 of 15

TAMMY WALKER vs. CITY OF HOLYOKE
JOHN MONAGHAN                    SEPTEMBER 18, 2006

**101**

1  floor by the Chief's office.
2      Q.  Do you remember when that meeting
3  occurred?
4      A.  No.
5      Q.  You don't remember when it occurred?
6      A.  The date?  No.
7      Q.  Do you remember approximately when it
8  happened?
9      A.  No.
10     Q.  But obviously it would have to have
11  happened after Ms. Walker's complaints, right?
12     A.  Not necessarily.  There's dates here,
13  there's the incident at 7-Eleven and all of a
14  sudden there's this complaint and then there was a
15  lapse of days so I have no idea what was the
16  complaint date.
17     Q.  Do you recall having information as to
18  whether or not the meeting occurred in October of
19  2002?
20     A.  No.
21     Q.  Do you have any recollection as to
22  whether the meeting occurred in the fall of 2002?
23     A.  I'm sorry, no.
24     Q.  But you do recall a meeting with Captain

**102**

1  Fletcher, Lieutenant Whelihan, is it?
2      A.  Yes.
3      Q.  And Sergeant Tammy Walker?
4      A.  Yes, sir.
5      Q.  What was said at that meeting?
6      A.  I'd have to paraphrase.  I can't speak
7  for anybody else.
8      Q.  What did you say?
9      A.  Well, I think the gist of the meeting
10  was to try to find some middle ground here and
11  iron out any differences that we had.
12        I maintained the entire time that none
13  of this stuff took place but I was willing to work
14  with Tammy as a professional and if she wanted to
15  bury the hatchet and start over, we'd be fine.  I
16  thought it was an embarrassment to the shift and
17  to our profession to be behaving that way.
18        That's what I said and she just kept
19  looking at me and said, "You know what you did to
20  me; you know what you said to me; you know what
21  you said about me" which was obviously not true
22  but spoken with conviction.
23        I knew right there this was going to go
24  up and be lawsuits and why we're sitting here

**103**

1  today.
2      Q.  What did Captain Fletcher say?
3      A.  I don't recall.  Again the gist of it
4  was the two superior officers were trying to get
5  the two junior officers to get along.
6        What they weren't understanding from my
7  perspective was I was getting along, these were
8  falsified allegations and there's nothing you can
9  do about that except I didn't do it.
10     Q.  You have no recollection of what Captain
11  Fletcher said?
12     A.  Not specifically; no.
13     Q.  Do you have any recollection of what
14  Lieutenant Whelihan said?
15     A.  You'd really have to ask him.  I don't
16  know what he said.
17     Q.  But you were there?
18     A.  Yes, sir; I was there a number of years
19  ago.
20     Q.  And you're a trained police officer?
21     A.  Yes, sir.
22     Q.  And you're trained to be observant of
23  facts and details, is that correct?
24     A.  Yes, sir.

**104**

1      Q.  And you're also trained to listen to and
2  be able to record or recall what witnesses or
3  others may say about an event or activity?
4      A.  Yes.
5      Q.  By the time -- by the year 2002 you had
6  been on the police force almost ten years, is that
7  correct?
8      A.  Correct.
9      Q.  With not only a great deal of training
10  but experience?
11     A.  I would say so.
12     Q.  And you have no recollection of what
13  Lieutenant Whelihan said?
14     A.  I would not be comfortable quoting what
15  this gentleman said.  I don't remember.
16     Q.  And you have no recollection of what
17  Captain Fletcher said?
18     A.  No; not specifically.
19     Q.  But you do remember that Tammy Walker
20  specifically said to you, "You know what you did
21  to me"?
22     A.  Yes; I can see her saying it.  Yes; I
23  remember that.
24     Q.  What was some of the topics that were

# TAMMY WALKER vs. CITY OF HOLYOKE
## JOHN MONAGHAN                SEPTEMBER 18, 2006

### 109

1 attending the meeting?

2     A.   I would assume because he was the shift

3 commander and we both worked for him and the three

4 of us worked for Captain Fletcher.

5          MR. HUDSON:  I'd like to mark this

6 Exhibit 4.

7          (Plaintiff's Deposition Exhibit

        No. 4 offered and marked.)

8

9     Q.   (BY MR. HUDSON)  Sir, I'll show you

10 what's been marked as Exhibit 4.

11          Do you recognize this document?

12 (Indicating.)

13     A.   (Witness examining document.)  Yes.

14     Q.   What is it?

15     A.   This is Tammy's discrimination complaint

16 with the MCAD against Sergeant Garcia and myself.

17     Q.   And the Holyoke Police Department?

18     A.   Yes.

19     Q.   I want to draw your attention to the

20 paragraph where Sergeant Tammy Walker alleges that

21 basically since she was promoted to sergeant on

22 May 5, 2002, paragraph one --

23     A.   (Interposing) Mmm-hmm.

24     Q.   -- that she has had problems with you --

### 110

1 Monaghan and Garcia.

2          Did you and -- did you cause Sergeant

3 Walker -- did you make life miserable or

4 discriminatory against Sergeant Walker because she

5 got promoted to sergeant with a seniority that was

6 above Garcia's?

7          MS. LYNCH:  Objection; you can

8 answer.

9          THE WITNESS:  Can you repeat that

10 question?

11     Q.   (BY MR. HUDSON)  The question is:  Were

12 you motivated to discriminate against Sergeant

13 Walker because she received as a result of the

14 Civil Service settlement a permanent Civil Service

15 position as sergeant with a seniority date senior

16 to Joseph Garcia?

17          MS. LYNCH:  Objection; you can

18 answer.

19          THE WITNESS:  The answer is no.

20     Q.   (BY MR. HUDSON)  Did Sergeant Walker's

21 retroactive seniority pursuant to her -- pursuant

22 to the settlement between the City and Ms. Walker

23 affect your professional relationship with her?

24     A.   No.

### 111

1     Q.   Well, were you happy that she had a

2 seniority that was senior to you and Garcia and

3 even others -- and other white male sergeants?

4          MS. LYNCH:  Objection; you can

5 answer.

6          THE WITNESS:  She was appointed

7 ahead of me so her seniority had nothing to do

8 with me.

9          The other sergeant is Spanish.  There

10 were no white male sergeants involved in this.

11     Q.   (BY MR. HUDSON)  Well, there was a

12 Sergeant Garcia, right?

13     A.   Yes, sir.

14     Q.   Isn't it true that the seniority that

15 Sergeant Walker received ended up pre-dating the

16 seniority of other sergeants who -- like McCoy --

17 Michael McCoy?

18          MS. LYNCH:  Can you repeat that

19 question?

20     Q.   (BY MR. HUDSON)  Didn't the seniority

21 that Sergeant Walker receive make her more senior

22 to other sergeants like Joseph Garcia?

23     A.   Yes, sir.

24     Q.   Michael McCoy?

### 112

1     A.   Yes.

2     Q.   And Michael McCoy is a white male, isn't

3 he?

4     A.   Yes.

5     Q.   What about David Pratt?

6     A.   Yes; I forgot about those two.

7     Q.   Since May of 2002 did Lieutenant

8 Whelihan have any conversations with you about any

9 of Sergeant Walker's concerns or allegations --

10 specifically I draw your attention to paragraph

11 five?

12     A.   Mmm-hmm.

13     Q.   Where Ms. Walker alleges that she has

14 been speaking with Lieutenant Whelihan since

15 around the end of May, 2002?

16     A.   Yes.

17     Q.   "About how Sergeant Monaghan and Garcia

18 are treating me and he," meaning Lieutenant

19 Whelihan, "has been very cooperative and he has

20 had conversations with them," meaning Garcia and

21 you?

22     A.   Yes, sir.

23     Q.   "About their conduct but their

24 insubordination has continued."

113

1    Do you know whether or not Lieutenant
2  Whelihan -- do you recall whether or not
3  Lieutenant Whelihan has had any conversations with
4  you since May, 2002 until you met in -- met with
5  Lieutenant Whelihan, Sergeant Walker, and Captain
6  Fletcher?
7    A.   The only intervention I recall from
8  Lieutenant Whelihan was telling us that I would
9  gas the cars -- Sergeant Garcia would gas the cars
10 and Sergeant Walker would approve reports.  It's
11 another supervisory duty.
12     In other words he dictated what roles we
13 would play.
14    Q.   So that was basically what --
15    A.   (Interposing) That was it.
16    Q.   -- what Lieutenant Whelihan dictated --
17 I mean ordered?
18    A.   Yes.
19    Q.   That Tammy write reports and you and
20 Garcia gas the cars?
21    A.   Yes, sir.
22    Q.   That's the only intervention that you
23 can recall involving Lieutenant Whelihan --
24    A.   (Interposing) That's it.

114

1    Q.   -- from May, 2002 until the meeting with
2  Captain Fletcher and Whelihan and you and
3  Ms. Walker?
4    A.   That's all there was.
5    Q.   Do you recall any order that Chief Scott
6  may have come out with on or about June 19th
7  or 20th, 2002?
8    A.   No.
9    Q.   So as of the date that you received --
10 do you recall how you got -- did you ever receive
11 a copy of Exhibit 4?
12    A.   Yes; I have a copy of this.
13    Q.   How did you receive it?
14    A.   I don't remember.
15    Q.   Do you know if you got it from the
16 Chief?
17    A.   I don't recall.
18    Q.   Did you get a copy from the MCAD?
19    A.   I don't know.
20     MS. LYNCH:  It's one o'clock.
21     MR. HUDSON:  Let's resume then at
22 quarter to two.
23     (A luncheon recess was taken.)
24    Q.   (BY MR. HUDSON) Sir, I will draw your

115

1  attention to December 4, 2002.  If you look at
2  Exhibit 3?
3    A.   This is 4, the MCAD.
4    Q.   Exhibit 4, what is the date on
5  Exhibit 4, sir?
6    A.   I've got December 2, 2002.
7    Q.   And that was the date it was filed,
8  correct?
9    A.   Yes.
10    Q.   Do you recall, sir, whether on or about
11 December 4, 2002 you sang a song over the radio
12 when Tammy Walker ended her transmission, the song
13 went something like "lick it, lick it good?"
14     Do you remember that -- having a
15 recollection of that?
16    A.   I never said that.
17    Q.   Did you ever say anything to the effect
18 of "lick it, lick it good"?
19    A.   No.
20    Q.   Did you ever say anything to the effect
21 over the radio, "I'm a freak-out -- el freako" and
22 made cat fight noises?
23    A.   No.
24     MR. HUDSON:  May we have this marked

116

1  as Exhibit 5, please?
2     (Plaintiff's Deposition Exhibit
3     No. 5 offered and marked.)
4    Q.   (BY MR. HUDSON)  Sir, do you recognize
5  Exhibit 5? (Indicating.)
6    A.   (Witness examining document.)  Yes.
7    Q.   Sir, according to your affidavit, in mid
8  May 2002 is when you became a permanent full-time
9  sergeant, is that correct, paragraph two?
10    A.   Yes.
11    Q.   With regard to paragraph three, you have
12 known -- you knew Sergeant Tammy Walker and her
13 brother Vincent only during the grammar school
14 years, is that correct?  Is that what you
15 testified to earlier?
16    A.   Yes.
17    Q.   You mention here that you wrote in
18 paragraph five, "Sergeant Walker generally stayed
19 in the Records Department, whereas I generally did
20 the roll call and patrolled in a cruiser."  Is
21 that your --
22    A.   (Interposing) Generally speaking, yes.
23    Q.   Does the Records Department include the
24 commander's office?

Case 3:05-cv-30074-MAP    Document 46-7    Filed 06/14/2007    Page 12 of 15

TAMMY WALKER vs. CITY OF HOLYOKE
JOHN MONAGHAN                    SEPTEMBER 18, 2006

**121**

1  internal investigation ordered by your supervisors
2  concerning the Elizer's Pub?
3      A.  I do.
4      Q.  Do you know what the outcome of that
5  investigation was?
6      A.  I can only speak for myself but I was
7  disciplined.
8      Q.  How were you disciplined?
9      A.  I was given a written reprimand which
10  was placed in my permanent personnel file.
11     Q.  Who gave you the written reprimand?
12     A.  That comes from the Chief of Police.
13     Q.  Who else was with you in the Elizer Pub
14  at that time?
15     A.  Officer PJ -- Phillip J. McCay -- and
16  Officer Thomas Dore -- D-O-R-E -- and Officer
17  Joseph Wilson.
18     Q.  These were all just patrolmen?
19     A.  At the time the latter two names were
20  reserves.
21     Q.  Dore and Wilson were reserve police
22  officers?
23     A.  Correct; and Phil McCay was full time
24  and I was a sergeant.

**122**

1      Q.  Do you have any recollection as to when
2  Chief Scott ordered an internal investigation?
3      A.  No.
4      Q.  Do you have any recollection as to when
5  you were disciplined as far as the date?
6      A.  No.
7      Q.  During that time were -- during the time
8  of the Elizer Pub incident were you on
9  injured-on-duty status?
10     A.  Yes.
11     Q.  Did that mean that you that you -- what does
12  injured-on-duty status mean?
13     A.  It means that I had an injury such that
14  I couldn't perform my duties.
15     Q.  You were off work?
16     A.  Yes.
17     Q.  When you were at the Elizer Pub were you
18  in uniform?
19     A.  No, sir.
20     Q.  That date?
21     A.  No, sir.
22     Q.  Was Phillip McCay in uniform?
23     A.  No one was working nor was anyone in
24  uniform.

**123**

1          MR. HUDSON:  I'd like to mark this
2  as Exhibit 6, please.
3          (Plaintiff's Deposition Exhibit
           No. 6 offered and marked.)
4
5      Q.  (BY MR. HUDSON)  Sir, do you recognize
6  or can you identify Exhibit 6? (Indicating.)
7      A.  (Witness examining document.)  It is a
8  newspaper article written by David Reid.
9      Q.  Do you know David Reid or know of him?
10     A.  Yes.
11     Q.  Who is David Reid?
12     A.  A reporter for the Springfield
13  Republican.
14     Q.  Does this -- looking at the first page,
15  I guess the second paragraph from the bottom?
16     A.  Yes.
17     Q.  It says -- it reads that "the incident,
18  described in a police report, occurred about
19  two-fifteen a.m., Monday, June 23."  Do you see
20  that language?
21     A.  Yes.
22     Q.  Would that help you to recall the date
23  that this incident happened?
24     A.  I believe that; sure.

**124**

1      Q.  Would you have any information as to
2  what year?
3      A.  It says 2003 here.
4      Q.  I'm not asking you for the handwritten
5  version?
6          Would it have been after Tammy Walker
7  filed her complaint against you?
8      A.  Certainly.
9      Q.  And Tammy Walker filed her complaint
10  October 24, 2002, right?
11     A.  I believe I had surgery in January of
12  2003 so that would be this.
13     Q.  You would recall then that this incident
14  in Elizer Pub took place June 23rd, 2003?
15     A.  Yes.
16     Q.  Do you happen to know who, if anyone,
17  called the police headquarters for the pub?
18     A.  I believe Officer Dore called police
19  headquarters.
20     Q.  Officer Dore was a reserve officer?
21     A.  Yes.
22     Q.  Do you have any information as to why
23  Officer Dore called the police?
24     A.  Yes; he wanted to meet with an officer

**TAMMY WALKER vs. CITY OF HOLYOKE**
**JOHN MONAGHAN                SEPTEMBER 18, 2006**

---

125

1  who was working and wanted to arrange a golf date
2  the next morning.
3      Q.   He wanted to meet with an officer who
4  was working?
5      A.   Yes.
6      Q.   Any specific officer?
7      A.   I believe it was officer Tim Skwira.
8      Q.   How is it that Officer Dore's call to
9  the police station to arrange a golf date ended up
10  with Sergeant Walker responding to a call of
11  drinking after hours?
12          MS. LYNCH:  Objection; you can
13  answer.
14          THE WITNESS:  I'm not sure what
15  Officer Dore said to dispatch but the idea was to
16  meet with Officer Skwira.
17      Q.   (BY MR. HUDSON)  Do you have any
18  recollection of Tammy Walker coming to Elizer Pub
19  that night?
20      A.   Yes.
21      Q.   On June 23rd; and it was --
22          MS. LYNCH:  (Interposing) Do you
23  have an answer?
24          THE WITNESS:  Yes; June 23rd.

---

126

1      Q.   (BY MR. HUDSON)  And it was after about
2  two-fifteen a.m.?
3      A.   Yes.
4      Q.   What was the outcome -- the outcome of
5  that was that you were disciplined, is that
6  correct?
7      A.   Yes.
8      Q.   You got a written reprimand?
9      A.   Yes, sir.
10      Q.   Sir, later on in that same year did you
11  have the occasion to know that Tammy Walker
12  received a five-day suspension for a July 23rd,
13  2004 incident at the Holyoke Mall?
14      A.   I had no personal knowledge of that; no.
15      Q.   But did you hear that she had received a
16  five-day suspension?
17      A.   I believe the disciplinary action
18  normally comes out in the form of like an
19  interoffice correspondence which is to be read at
20  roll call in order to inform of someone's good
21  behavior or bad behavior, generally.
22      Q.   Was your written reprimand announced at
23  roll call?
24      A.   I don't remember; and I'm not sure if it

---

127

1  only applies to suspensions versus -- I don't
2  know.
3          You'd have to ask the Chief what his
4  policy is on that.
5      Q.   Was there a special order -- a special
6  written order concerning your written reprimand
7  that was issued?
8      A.   I don't understand.
9      Q.   Like a written -- the Chief issues what
10  is called special orders about discipline?
11      A.   I don't recall if mine did or not.
12      Q.   But there was -- the so-called
13  interdepartmental memorandum, is that sometimes
14  referred to as a special order if that comes from
15  the Chief?
16      A.   Yes; we call it a To-From.  Yes.
17      Q.   You did find out that the Chief had
18  issued a five-day suspension --
19      A.   (Interposing) Yes.
20      Q.   -- of Tammy Walker for either failing to
21  undertake some act or not taking some act in
22  connection with the Holyoke Mall?
23      A.   When these come out they are not
24  specific to the events.  All it tells you is that

---

128

1  they violated an SOP.
2          It doesn't say violated 2.6 so you can't
3  tell what took place other than someone violated
4  the rules of the Department.
5      Q.   So they just mentioned like -- so
6  basically did you later -- did you have the
7  occasion to later find out what was involved with
8  the Holyoke Mall incident?
9      A.   Not specifically; no.  Just rumor type
10  stuff.
11      Q.   I'm asking specifically whether you had
12  the occasion to find out what was involved with
13  the Holyoke Mall incident concerning Tammy Walker
14  on or about September 9th, 2004?
15      A.   The answer is no.
16      Q.   Did you ever -- isn't it true that you
17  told Tammy Walker to start packing her bags?
18      A.   Are you done?
19      Q.   Yes.
20      A.   No; it's not true.
21      Q.   It's not true that after Tammy Walker
22  received a discipline of a five-day suspension
23  from the Chief you didn't tell her to start
24  packing her bags?

---

TAMMY WALKER vs. CITY OF HOLYOKE
JOHN MONAGHAN                    SEPTEMBER 18, 2006

133

1   bags?
2       A.   There was Sergeant Michael McMullin was
3   there.
4       Q.   Is he -- what's his race or ethnicity?
5       A.   He's a Caucasian male.
6       Q.   What other persons were present?
7       A.   I can't recall.  I wrote them all down
8   three years ago.
9       Q.   What did you do with the document that
10  you wrote down -- the names?
11      A.   I'm not sure if I responded to this
12  internally or not but it would be on there if I
13  did.
14      Q.   Did you file any written response to
15  this?
16      A.   Again I don't know but if this was
17  investigated, I would have.
18      Q.   Do you recall whether or not the
19  allegations were investigated?
20      A.   That's what I'm saying; I don't recall.
21  I'm assuming so but I don't know.
22      Q.   You have no recollection of being
23  interviewed by Sergeant McCavick about this
24  matter?

134

1       A.   No.
2       Q.   You have no recollection of being
3   interviewed by Lieutenant Fournier about the
4   allegations in Exhibit 7?
5       A.   I don't remember.
6       Q.   But it is your testimony that if in fact
7   you were investigated you would have provided
8   those names to the investigator?
9       A.   Of course.
10      Q.   Did you make any other efforts to obtain
11  information about the allegations of harassment
12  alleged in Exhibit 7?
13      A.   No.
14      Q.   With regard to deliberately ignoring
15  Sergeant Walker's communication at a murder scene,
16  did you make a written -- did you file an incident
17  report concerning that?
18      A.   Concerning what?
19      Q.   The murder scene -- your participation
20  in police work at the murder scene?
21      A.   No; I don't believe so.
22      Q.   Did you file a response if any to this
23  September 11th -- in connection with this
24  September 11th memo?

135

1       A.   Only if it was investigated by the
2   bureau upstairs.
3       Q.   Did you ever have a talk -- did
4   Lieutenant O'Connell -- first of all did Chief
5   Scott ever talk with you about items -- about
6   deliberately ignoring Tammy Walker's
7   communications at a murder scene?
8       A.   Not that I recall; no.
9       Q.   Did Chief Scott ever talk with you about
10  the "start packing your bag" comment?
11      A.   No.
12      Q.   Did Chief Scott ever talk to you about
13  two years of verbal assaults and Tammy Walker not
14  feeling safe?
15      A.   No.
16      Q.   Did Chief Scott ever talk to you about
17  Tammy Walker's fear of being verbally assaulted by
18  you?
19      A.   No.
20      Q.   Did Chief Scott ever talk to you about
21  Lieutenant O'Connell -- about Tammy Walker's
22  request to Lieutenant O'Connell not to work with
23  you for fear of her safety?
24      A.   No.

136

1       Q.   Did Lieutenant O'Connell ever talk with
2   you about Tammy Walker's complaint about you,
3   Sergeant Monaghan deliberately ignoring her
4   communications at a murder scene?
5       A.   Yes.
6       Q.   When did that conversation happen?
7       A.   I don't know.
8       Q.   What did Lieutenant O'Connell say?
9       A.   She asked me what happened.
10      Q.   What did you tell her happened?
11      A.   This was the first I found out that
12  there was a problem and I told her I just mustn't
13  have heard her in the chaos in the alley.
14      Q.   Did Lieutenant O'Connell happen to
15  mention whether Tammy Walker alleged that you
16  spoke -- that she spoke directly to you, face to
17  face?
18      A.   I don't recall that; no.
19      Q.   Did Lieutenant O'Connell allege that
20  Tammy Walker stated that you ignored her order
21  that she gave over the radio or walkie-talkie?
22      A.   Yes; it's the order word.  She asked me
23  if I heard Tammy calling me in the alley.
24      Q.   Did Lieutenant O'Connell ever talk to

PERLIK and COYLE REPORTING

137

1  you about Tammy Walker's complaint that you told
2  her to start packing her bags?
3      A.   Yes.
4      Q.   What did Lieutenant O'Connell say?
5      A.   She asked me if there were any witnesses
6  around.
7      Q.   What did you say?
8      A.   I said several.
9      Q.   Did you say anything else?
10      A.   No.
11      Q.   Was there anybody else present at that
12  time?
13      A.   Between this conversation --
14      Q.   (Interposing) You and Lieutenant
15  O'Connell?
16      A.   No; she took me aside and spoke with me.
17      Q.   Was this the same time that she spoke
18  with you about deliberately ignoring Tammy
19  Walker's communication at the murder scene?
20      A.   It was the same conversation; yes.
21      Q.   How long did that conversation last?
22      A.   It was very brief.  I don't think she
23  put any credence in it either.
24      Q.   Where did the conversation take place?

138

1      A.   It was in the station outside of the
2  commanding officer's office.  It was in the
3  hallway somewhere.
4      Q.   In the Police Department?
5      A.   Yes.
6      Q.   Do you recall whether it was in
7  September of 2004 or October, 2004?
8      A.   No; I can't recall.  It was shortly
9  after this incident, though.
10      Q.   Which incident?
11      A.   The alley thing.
12      Q.   By alley thing, you mean the
13  September 6th, 2004 murder scene?
14      A.   Correct.
15      Q.   And arrest?
16      A.   Correct; two days.
17      Q.   Well, did Lieutenant O'Connell speak
18  with you about Tammy Walker's allegations that you
19  had been involved in two years of verbal assaults
20  against her and that she did not feel safe?
21      A.   I don't recall that.  The conversation
22  we had basically included the discussion of the
23  murder scene which, thank God, I was there, and
24  this go pack your bags comment.

139

1          I don't recall anything about not being
2  safe or whatnot.
3      Q.   Do you have any recollection of
4  Lieutenant O'Connell speaking with you about
5  Ms. Walker's complaints of being fearful of being
6  verbally assaulted by you?
7      A.   No; I think I read that.  That was the
8  first time I heard about that.
9      Q.   Did Lieutenant O'Connell speak with you
10  about Ms. Walker's interest or request not to work
11  with you for fear of safety to herself and others?
12      A.   No; no.
13      Q.   No that Lieutenant O'Connell did not
14  speak with you about this matter?
15      A.   Correct; I don't recall that being part
16  of the conversation but I was aware of Tammy's
17  stance on that because I read it somewhere in one
18  of these things.
19          I'm just not sure when it initially came
20  up.
21      Q.   Did anyone else other than Lieutenant
22  O'Connell or Chief Scott speak with you about any
23  of the allegations or complaints Tammy Walker made
24  in Exhibit 7?

140

1          MS. LYNCH:  Objection; you can
2  answer.
3          THE WITNESS:  Did anyone else speak
4  with me about that?
5          First of all I never spoke with Chief
6  Scott about any of this.
7      Q.   (BY MR. HUDSON) So Chief Scott never did
8  an investigation?
9      A.   I didn't say that.  I never spoke with
10  him.
11      Q.   So he never personally discussed it with
12  you?
13      A.   That's correct.
14      Q.   You have no recollection of Internal
15  Affairs Professional Standards people -- David
16  Fournier, McCavick -- speaking with you about this
17  matter?
18      A.   I don't recall but again this kind of
19  gets all jumbled with these complaints so at some
20  point if they addressed it I would have answered
21  it and again my answer is all right there on
22  paper.
23      Q.   When you're talking about complaints,
24  what complaints are you speaking of, sir?

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER,<br>    Complainant | )<br>)<br>) |
| v. | )<br>) |
| HOLYOKE POLICE DEPARTMENT,<br>JOHN MONAGHAN and JOSEPH<br>GARCIA,<br>    Respondents | )<br>)<br>)<br>)<br>) |

## **AFFIDAVIT OF SERGEANT JOSEPH GARCIA**

I, Joseph Garcia, hereby depose and say as follows upon personal knowledge:

1.    I have been a member of the Holyoke Police Department since 1987. I became a reserve officer on June 4, 1987. I was appointed a full-time patrolman on February 21, 1988. On February 28, 1999, I was appointed provisional sergeant.

2.    On June 20, 1999, I was appointed a permanent full-time sergeant. I was appointed from a Civil Service List, dated April 15, 1999.

3.    I have known Tammy Walker since she was appointed to the Police Department in 1993. I have always had a professional relationship with her.

4.    After I was appointed sergeant, I became aware that Sergeant Walker was angry that I had been appointed prior to her since she had received a score on the Civil Service test that was two points higher than mine. In fact, she filed an appeal.

5.    On May 5, 2002, Tammy Walker was appointed sergeant. On her first day working, I congratulated her. Toward the end of the shift, I asked her whether she wanted to be the early supervisor which would require that she arrive at 11:00 p.m. instead of 12:00 p.m. She quickly stated that she would prefer the 11:00 p.m. time since it would help her with her children. As the conversation continued, she told me that in a few weeks I would no longer be senior to her. She said she had to do what she had to do and I could do what I wanted.

6.    Sergeant Walker's allegations that I had a problem accepting her authority because of her race, gender or sexual orientation are completely false.

225951v1

7.      At no time did I ever harass or discriminate against Sergeant Walker because of her race, gender, sexual orientation or because of any other reason.  In fact, there were times that I tried to assist her in her work based upon my experience.

8.      I have never witnessed Sergeant Monaghan make a derogatory comment about Sergeant Walker related to her race, gender, or sexual orientation.

9.      I have never heard any derogatory comments on the police radio regarding Sergeant Walker.  However, it is common to hear unusual sounds and remarks, as well as songs played.  The police radio is accessible to many communities in the area, not just the Holyoke Police Department.  Because of the unusual nature of some of the horseplay on the radio, I tend to shut it off until I am instructed that I need to turn it on.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _____ DAY OF _____ 2007.

_____
Joseph Garcia

2

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

TAMMY WALKER,          )
    Plaintiff          )
              )
v.          )
              )
CITY OF HOLYOKE,          )
    Defendant          )

## AFFIDAVIT OF CAPTAIN ALAN FLETCHER

I, Alan Fletcher, hereby depose and say as follows upon personal knowledge:

1.    I have been a member of the Holyoke Police Department since 1968. I have been a captain since 1992. I am the Commander of the Field Operations Bureau at the Holyoke Police Department.

2.    In approximately September 2002, I had a conversation with Sergeant Walker. For the most part, Sergeant Walker came to see me regarding some personal problems that she was having. Toward the end of the conversation, I asked her how things were going at work. In response, she stated that she thought Sergeant Garcia and Sergeant Monaghan were mad at her because they were reportedly not talking to her. In response, I told her that I thought that she may be having problems because she was given an incorrect seniority date. That is, she was given a date ahead of some of the other sergeants, even though they had all taken the Civil Service exam on the same date. I told her that it was incumbent upon her to correct the date. Furthermore, I indicated that I thought her problems would self-correct once the date was changed. In the meantime, she had a credibility problem.

3.    During this meeting, Sergeant Walker never alleged that Sergeant Monaghan or Sergeant Garcia were calling her derogatory names.

4.    Following the complaint that Sergeant Walker filed against Sergeant Monaghan regarding an alleged incident on October 17, 2002, I held a meeting with Sergeant Walker, Sergeant Monaghan and Lieutenant Whelihan. Sergeant Walker stated that she had witnesses who informed her that Sergeant Monaghan had called her Tyrone. However, she refused to identify the witnesses. Sergeant Monaghan adamantly denied this allegation. He also denied singing a song to Sergeant Walker and denied making any derogatory comments to her or about her. During

359039v1

the meeting, I told both Sergeant Walker and Sergeant Monaghan that they needed to get along and needed to act like leaders since they are supervisors. Sergeant Monaghan agreed that they needed to get along with each other.

5.  I recall having a conversation with Sergeant Walker about the seniority issue and the fact that she had been bypassed for the sergeant position by Sergeant Garcia. I shared with her my feeling that everyone has problems in the Department from time to time. For instance, I told her that when I took the sergeant's examination, I received the highest score but was bypassed for an individual who received the third highest score. I told her that the individual appointed must be the mayor's choice. I did not tell her that she was being discriminated against because of her gender, race, or sexual orientation.

6.  On February 27, 2005, Tammy Walker contacted me and informed me that she had injured her arm and shoulder as a result of a confrontation with Lieutenant Eva O'Connell, her direct supervisor, on February 25, 2005. She claimed that Lieutenant Eva O'Connell pulled the scheduling book from her hands while she was in the Commanding Officer's (CO's) office. I denied Ms. Walker's claim that she was injured on duty for two reasons. First, Ms. Walker had no work related reason for being in the CO's office on February 25, 2005 as she had taken a vacation day. Secondly, I had no evidence to support Ms. Walker's claim that she was injured as a result of this incident. Based on my knowledge of the incident, which was that Ms. Walker had attempted to remove the scheduling book from Lieutenant O'Connell's possession and had cursed at Lieutenant O'Connell, I informed Ms. Walker that she had been disrespectful to her supervisor.

7.  In November 2004, Ms. Walker requested to take holidays off for November 20 and November 21. I denied Ms. Walker's request to take November 20 off because giving her this day off would have created the need for overtime on the shift. Despite my denial, Ms. Walker called in sick on November 20, claiming that she had family issues to attend to. It is my understanding that she had already exhausted all of her sick time by that date. Furthermore, the collective bargaining agreement contains no provision for family sick leave.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _14 TH_ DAY OF _JUNE_ 2007.

Captain Alan Fletcher

# EXHIBIT 5

## IN THE MATTER OF:

TAMMY WALKER vs.

CITY OF HOLYOKE

---

## DEPOSITION OF:

JORGE RODRIGUEZ
DATE:  SEPTEMBER 20, 2006

---

## PERLIK and COYLE REPORTING
### *Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

**TAMMY WALKER VS. CITY OF HOLYOKE**
**J0RGE RODRIGUEZ                    SEPTEMBER 20, 2006**

---

**13**

1  her statement; I can't recall but I have something
2  with her name on it.
3      Q.   But you no longer have it?
4      A.   No.
5      Q.   Has it been destroyed?
6      A.   Yes.
7      Q.   Number three, "All documents that you
8  gave to or received from Tammy Walker that related
9  to any member of the Holyoke Police Department or
10  to Mayor Michael Sullivan."
11          Do you have any responsive documents in
12  response to that request?
13      A.   Not at all.
14      Q.   I'm sorry?
15      A.   I don't have any statements or
16  documents.
17      Q.   Did you ever have any documents
18  responsive to number three?
19      A.   Yes.
20      Q.   What did you have?
21      A.   The statement that the MCAD gave me
22  about the case of Tammy Walker.
23      Q.   The one that you've already mentioned?
24      A.   Yes.

**14**

1      Q.   Anything else?
2      A.   No.
3      Q.   At this time do you have any documents
4  either with you today, at your home or accessible
5  to you regarding Tammy Walker's employment with
6  the Holyoke Police Department?
7      A.   Nothing related to the Holyoke Police
8  Department or Tammy Walker.
9      Q.   Can you tell me about your educational
10  background in terms of how far you went to school?
11      A.   I went -- I finished high school and I
12  went one year to the Holyoke Community College
13  Bridge Program.
14      Q.   Which program?
15      A.   Bridge.
16      Q.   Bridge Program?
17      A.   Yes.
18      Q.   Which high school did you go to?
19      A.   In Puerto Rico, Bayamón High School.
20      Q.   Did you grow up in Puerto Rico?
21      A.   Yes.
22      Q.   When did you come to the States?
23      A.   When I joined the Army.  I was
24  twenty-one years old.

**15**

1      Q.   Where did you primarily live when you
2  came to the States?
3      A.   Comerio, Puerto Rico.
4      Q.   That's where you lived in Puerto Rico?
5      A.   Yes.
6      Q.   Where did you live when you came to the
7  States?
8      A.   There.
9      Q.   Meaning to the mainland?
10      A.   Here?
11      Q.   Yes.
12      A.   In Holyoke.
13      Q.   In Holyoke?
14      A.   Yes.
15      Q.   Is that where you've always lived?
16      A.   Yes.
17      Q.   Do you remember what year you came to
18  Holyoke to live?
19      A.   1979.
20      Q.   You stated a few moments ago that you
21  retired because of a nervous condition and a
22  physical condition?
23      A.   Yes.
24      Q.   Can you describe that?

**16**

1      A.   In February 6th, 2004 I was
2  investigating an accident when I was on duty and I
3  got struck by a motor vehicle.
4          Due to that I was under stress,
5  depression, and my physical pain and all that was
6  affecting my nerves and my condition.
7      Q.   Have you not worked at the Holyoke
8  Police Department since February 6th, 2004?
9      A.   Right.
10      Q.   Are you on a disability?
11      A.   Involuntary retirement.  I didn't want
12  to retire but due to my condition I had to retire.
13      Q.   Have you worked anywhere since the
14  Holyoke Police Department?
15      A.   Yes; I'm recently working part time at
16  American International College.
17      Q.   What do you do there?
18      A.   It's like police work.
19      Q.   Security guard?
20      A.   Yes; special police.
21      Q.   Special police?
22      A.   Mmm-hmm.
23      Q.   That's a yes?
24      A.   Yes.

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ          SEPTEMBER 20, 2006

17

1    Q.   How long have you been doing that there?
2    A.   Ten months.
3    Q.   I notice you have glasses on.  What do
4  you wear glasses for -- meaning for distance, for
5  close work or both?
6    A.   Just for reading.
7    Q.   Just for reading?
8    A.   Yes; and writing.
9    Q.   Do you have any problems with your
10 hearing at all?
11   A.   No.
12   Q.   Are you on any medication today?
13   A.   No.
14   Q.   When did you first start working at the
15 Holyoke Police Department?
16   A.   1985 I was a reserve police officer.
17   Q.   When did you become a full-time police
18 officer?
19   A.   Like a year later.
20   Q.   A year later?
21   A.   Yes.
22   Q.   So 1986?
23   A.   Approximately; yes.
24   Q.   Have you held any other positions other

18

1  than patrolman?
2    A.   Before or?
3    Q.   Since you were on the Holyoke Police
4  Department?
5    A.   Yes; I worked -- in 1990 I retired from
6  the Police Department and I went to Puerto Rico
7  and then two years later I decided to come back
8  here and I started working for Mount Holyoke
9  College, like a year later, in 1993 sometime to
10 1995.
11   Q.   1993 to '95 you were at Mount Holyoke
12 College?
13   A.   Yes.
14   Q.   What did you do there?
15   A.   Same thing; police work.
16   Q.   And then after '95 what did you do?
17   A.   I was reinstated as a police officer in
18 Holyoke.
19   Q.   Did you stay there until your retirement
20 on February 6th, 2004?
21   A.   Yes.
22   Q.   Or thereafter?
23   A.   Mmm-hmm.
24   Q.   Yes?

19

1    A.   Yes.
2    Q.   Did you ever get beyond the rank of
3  patrolman?
4    A.   No.
5    Q.   In other words, you haven't been a
6  sergeant or a lieutenant or anything like that?
7    A.   No.
8    Q.   Were you ever disciplined at all at the
9  Holyoke Police Department?
10   A.   Yes.
11   Q.   Do you recall when and for what reason?
12   A.   October -- I don't know if it was 2002
13 or 2003 I failed to pick up a code of conduct book
14 in the Chief's office by the date that they gave.
15   Q.   As a result of failing to pick that up
16 were you disciplined?
17   A.   Yes.
18   Q.   What discipline did you receive?
19   A.   A written reprimand.
20   Q.   I'm sorry?
21   A.   A written reprimand.
22   Q.   Did anyone else get one for the same
23 thing or any kind of discipline for the same
24 thing?

20

1    A.   Probably, yes but they don't say.  I
2  don't know.  I'm sure that somebody else forgot
3  like me to pick it up on time.
4    Q.   Did you ever receive any other
5  discipline at the Holyoke Police Department?
6    A.   Yes.
7    Q.   For what and when?
8    A.   On March 7 or close to that of 2004 when
9  I was injured I was supposed to be in court at
10 eight-thirty and I arrived at eight thirty-five
11 and I was suspended for a day -- a day without
12 pay.
13   Q.   You were five minutes late that day?
14   A.   Yes; I was using a cane because I got
15 injured on my knee, my back, and my arm.
16       It was a snowy day and I couldn't be
17 there on time but they still gave me a day
18 suspension for that.
19   Q.   Did you explain that that was why you
20 were late?
21   A.   Also I was under medication and I
22 explained that I was under medication and I wake
23 up late that day also.
24   Q.   You did explain that to someone, though?

**PERLIK and COYLE REPORTING**

**TAMMY WALKER VS. CITY OF HOLYOKE**
**J0RGE RODRIGUEZ          SEPTEMBER 20, 2006**

21

1    A.    Yes.
2    Q.    Who did you tell, do you remember?
3    A.    Lieutenant Monfette. I was supposed to
4    make a To-From and I explained the situation I was
5    having and he also saw me with a cane and when I
6    arrived in the station I had a cast on my arm. It
7    was snowy out.
8    Q.    When you say you were supposed to do a
9    To-From, do you mean an IOC?
10   A.    Yes.
11   Q.    I guess, what is it --
12   A.    (Interposing) A To-From is from the
13   officer to whoever is going to receive it.
14   Q.    Did you do one explaining why you were
15   late?
16   A.    Yes.
17   Q.    But you still got a suspension?
18   A.    Mmm-hmm.
19   Q.    Yes?
20   A.    Yes.
21   Q.    Were you ever disciplined any other
22   time?
23   A.    Years back but they took that out
24   because it was like -- I don't know how to explain

22

1    it.
2         It was a time that I was having problems
3    with some officers and some officers from the rank
4    and they tried to discipline me different -- they
5    tried to discipline me in different ways like
6    writing me for whatever they want. I don't know
7    how to explain it.
8         Like for example I was disciplined for
9    not calling a supervisor when I was in Puerto Rico
10   on vacation. I was supposed to be in some court
11   or something and they went to my house and knocked
12   on the door and my son was there and they told my
13   son that -- and asked him if I was hiding under
14   the bed and things like that.
15   Q.    From what you're saying you were on
16   vacation in Puerto Rico but you were supposed to
17   be in court in Holyoke, was it, and they came to
18   your house looking for you because you didn't come
19   to court? Is that what you're saying?
20   A.    Yes.
21   Q.    How did that -- I'm sorry, are you done
22   with your answer?
23   A.    Yes.
24   Q.    How did that turn out? Were you ever

23

1    disciplined?
2    A.    No. They tried like three different
3    disciplines but they had to drop them all. Three
4    different supervisors tried at the same time to
5    discipline me for each for something related to
6    the case but not -- they were all dropped.
7    Q.    Do you remember who the chief was at the
8    time?
9    A.    Cournoyer.
10   Q.    Do you remember what year that was?
11   A.    I believe the year 2000.
12   Q.    Do you remember who the supervisors
13   were?
14   A.    Lieutenant Eva O'Connell, Sergeant
15   Fallon, and Sergeant Cournoyer.
16   Q.    Had you told anyone that you were going
17   on vacation before you went?
18   A.    They have it in the books. I'm working
19   there, they have the books. They know I was not
20   working.
21        If I was not working, I was on vacation.
22   I could be in Puerto Rico or anywhere in the
23   world. They went to my house and then they
24   started harassing my kids if I was hiding under

24

1    the bed and stuff like that.
2    Q.    Any other discipline that you ever
3    received?
4    A.    No; just the two that I mentioned
5    earlier.
6    Q.    Did you ever file any claims with
7    respect to your employment with the Holyoke Police
8    Department?
9    A.    Claims?
10   Q.    Either that you alleged that you were
11   not treated properly with respect to your
12   employment?
13   A.    Yes.
14   Q.    Or that you were discriminated against
15   or anything like that?
16   A.    Yes; in 1997.
17   Q.    What did you claim?
18   A.    I was working as a house officer.
19   That's the person that takes care of the cells --
20   the prisoners and the booking -- assist the
21   booking to the commanding officer.
22        When the commanding officer is booking
23   someone, I'm there to take the property or the
24   prisoners and read them their rights and stuff

**PERLIK and COYLE REPORTING**

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ            SEPTEMBER 20, 2006

25

1 like that.
2    Q.   You were one of the officers involved in
3 the booking process?
4    A.   Yes.
5    Q.   Okay.
6    A.   One of the -- a mother of one of the
7 prisoners gave twenty-five dollars to put away for
8 the clerk and the clerk was called and the
9 twenty-five dollars was given to him to release
10 the person but that person has a warrant for
11 somewhere else for -- he was a juvenile and he has
12 like a DSS warrant and when he was released, DSS
13 or whoever -- the juvenile officer came to pick
14 him up and took him to the juvenile place to have
15 him go to court the next day for that case.
16        Then the mother came back the next day
17 in the morning.  I was already out because I
18 worked midnight to eight.  The mother came back
19 and claimed that she gave twenty-five dollars for
20 her son to be released and her son was never
21 released and that she wanted the money back.
22        Lieutenant Cournoyer -- he was a
23 lieutenant before he was chief; he was the
24 commanding officer of the day shift -- he called

26

1 up my house and he asked me what I did with the
2 twenty-five dollars; why I took the twenty-five
3 dollars of that person.
4        I explained to him that that was given
5 to the clerk and I explained the situation of the
6 case; and then he said that he claimed that he
7 couldn't understand what I was saying and that he
8 was coming to my house.
9        Then he came to my house with a sergeant
10 and then he started screaming at me and telling me
11 that I was a thief and why I took the twenty-five
12 dollars.  I tried to explain to him again that the
13 clerk already had that money and he just kept
14 saying that I took the money, that he won't leave
15 my house without the twenty-five dollars.
16        Then when I closed the door he told me
17 to come outside and fight with him.
18    Q.   Lieutenant Cournoyer said that?
19    A.   Yes; mmm-hmm.
20    Q.   What exactly did he say?
21    A.   He said why you don't come out and we
22 can arrange this or we may go to a gym.
23    Q.   What did you say?  How did that
24 situation end?

27

1    A.   One of my sons heard that and came down
2 from the second -- it was like a townhouse.  He
3 came down with a broom when he heard that he was
4 getting kind of violent and he -- I just hauled
5 him back because he was coming out with a
6 broomstick.  I didn't -- I just told him not to
7 listen to him.
8        Then they left and that was it.
9    Q.   As a result of that did you file some
10 sort of a claim?
11    A.   Yes; with the MCAD.
12    Q.   What did the claim allege?
13    A.   First, he made fun of my accent when I
14 was talking to him on the phone.  Then for
15 inviting me to fight and saying that I was a
16 thief.
17    Q.   That you were deaf?
18    A.   A thief -- that I stole the money.
19    Q.   What happened with that MCAD claim?
20    A.   Well, the lawyer and the City came to an
21 accord -- we came to an accord.
22    Q.   Did you settle it?
23    A.   Yes.
24    Q.   Did you ever file any other type of MCAD

28

1 claim when you were at the Holyoke Police
2 Department?
3    A.   Yes; against the union.
4    Q.   Against the union?
5    A.   Yes, because the union wasn't backing me
6 up and was laying on the City instead of
7 protecting me.
8    Q.   Did you file an MCAD claim against the
9 union?
10    A.   Yes; I did.  At the same time that I had
11 the claim against the City I had the claim against
12 the union.
13    Q.   Was it the same claim, you mean -- the
14 same incident?
15    A.   The same incident; yes, as retaliation.
16 I was getting retaliation from the union and from
17 the City.
18    Q.   But it had to do with that incident with
19 Lieutenant Cournoyer at your house?
20    A.   Yes.
21    Q.   What happened with the union claim?
22    A.   Well, the union president was very
23 friendly of Lieutenant Cournoyer and he wanted me
24 to try to come to peace with him and trying to

57

1  probably something going on between seniority in
2  regards to the sergeant position but other than
3  that, nothing else.
4          I think they were made sergeant about
5  the same time and she had more -- I don't know how
6  that happened but there was something related to
7  the position of the sergeant and who had more
8  seniority or less.
9      Q.  You recall Ms. Walker talking about John
10  Monaghan with regard to that issue?
11      A.  I don't know if I heard it from her or
12  probably some -- from other officers but I'm not
13  sure.
14      Q.  Do you know whether Ms. Walker liked
15  Sergeant Monaghan?
16      A.  Well, they were working together for
17  years.  I never heard of any problem between them
18  other than after they were promoted.
19      Q.  Did she ever tell you that she didn't
20  like Sergeant Monaghan?
21      A.  No; never.
22      Q.  Did Sergeant Monaghan ever tell you he
23  didn't like Tammy Walker?
24      A.  No.

58

1      Q.  Did Tammy Walker ever tell you she liked
2  Sergeant Monaghan?
3      A.  No.
4      Q.  Joseph Garcia -- did you ever observe
5  Ms. Walker interact with Joseph Garcia at work?
6      A.  Yes.
7      Q.  Based on what you observed did you
8  notice any difficulties that they seemed to be
9  having with each other?
10      A.  Well, they both were supervisors and
11  sergeants.  I didn't notice nothing.
12      Q.  You didn't notice any problems between
13  the two of them or difficulties getting along?
14      A.  I probably heard --
15          MR. HUDSON:  (Interposing)
16  Objection.
17          THE WITNESS:  -- but I don't know.
18  I can't recall.  I cannot say.
19      Q.  (BY MS. LYNCH)  Based on your own
20  observations, your own firsthand observations, you
21  didn't notice any difficulties between Ms. Walker
22  and Mr. Garcia?
23      A.  No.  I was most of the time out in the
24  streets.  The supervisors are probably together in

59

1  the office.  We don't have access to that.
2      Q.  Did Tammy Walker ever discuss Joseph
3  Garcia with you?
4          MR. HUDSON:  Objection as to time
5  frame.
6          THE WITNESS:  No.
7      Q.  (BY MS. LYNCH) Just wide open.
8      A.  No.
9      Q.  She did not?
10      A.  No.
11      Q.  Do you know whether Ms. Walker liked
12  Mr. Garcia?
13      A.  I don't know.
14      Q.  Do you know whether she disliked him?
15      A.  I don't know that, either.
16      Q.  How about Captain Fletcher?  Did you
17  ever see Ms. Walker interact with him?
18          MR. HUDSON:  Objection as to time
19  frame.
20          MS. LYNCH:  The entire time that the
21  two of them were working together.
22          THE WITNESS:  I have never seen
23  anything wrong between Captain Fletcher.
24      Q.  (BY MS. LYNCH) That was going to be my

60

1  next question.
2          You did not observe any difficulties
3  between Ms. Walker and Captain Fletcher?
4      A.  No.
5      Q.  Did you ever observe Ms. Walker with
6  Chief Scott?
7      A.  No.
8      Q.  You didn't observe them together?
9      A.  No.
10      Q.  Do you know whether they had any
11  difficulties?
12      A.  No.
13      Q.  Did you ever observe Ms. Walker with Eva
14  O'Connell?
15      A.  No.
16      Q.  Do you know whether they had any
17  difficulties?
18      A.  I heard rumors from other officers but
19  that was it.
20      Q.  Briefly what were the rumors that you
21  heard?
22          MR. HUDSON:  Objection.
23          THE WITNESS:  I was not too sure
24  about that.

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ                SEPTEMBER 20, 2006

69

1   A.   Yes.
2   Q.   Incidentally, who would have access to
3   WMLEC?
4   A.   All officers.
5   Q.   Would any civilians?
6   A.   No.
7   Q.   Just the officers?
8   A.   All the officers.
9   Q.   Officers in the Police Department, as
10  far as you know?
11  A.   In the whole state.
12  Q.   In other words officers from all the
13  police departments in the state?
14  A.   Yes; they can communicate.
15  Q.   Over WMLEC?
16  A.   Yes.
17  Q.   At this point do you have any memory of
18  what the comments were that you heard that caused
19  you concern?
20  A.   Right now, I can't recall.  I don't have
21  it.
22  Q.   Did you ever write it down?
23  A.   Yes.
24  Q.   Do you know where you wrote it down?

70

1   A.   I think it was for Lieutenant Fournier.
2   Q.   Just drawing your attention again to
3   Exhibit Number 3 where it says "this incident," it
4   says, "I have noticed some tension in the air
5   since all this incident started."  Which incident
6   are you referring to?
7   A.   What was that question again?
8   Q.   Where you wrote, "I have noticed some
9   tension in the air since all this incident
10  started," what is "this incident" referred to --
11  "this incident"?
12  A.   In regard to the investigation of some
13  things said over the WMLEC.
14  Q.   Then it says, "I have heard some
15  sexually derogatory comments over the WMLEC radio
16  directed to Sergeant Tammy Walker especially when
17  she is working."
18         Can you describe the sexually derogatory
19  comments?
20  A.   I cannot remember.
21  Q.   Why did you think that they appeared to
22  be directed to Sergeant Tammy Walker?
23  A.   I have to see my statements.  I cannot
24  recall.

71

1   Q.   At this time you can't recall?
2   A.   Yes.
3   Q.   And then you wrote, "I have no idea of
4   who is doing it," was that correct?
5   A.   Yes; the voice sounded familiar but I
6   couldn't say for certainty who was that person.
7   Q.   Can you describe the voice?
8   A.   It was kind of a like rough spoken --
9   you know, the person that has a...
10  Q.   Do you recall hearing that voice over
11  WMLEC prior to the statement that you gave on
12  November 20, 2002?
13  A.   Prior to that?  I'm not sure.
14  Q.   I can't recall if I asked you this or
15  not -- why did you think they were directed to
16  Sergeant Tammy Walker?
17  A.   I got to see the statement because I
18  cannot recall.
19  Q.   With regard to WMLEC, how did Holyoke
20  police officers access it?
21  A.   Just by pressing the button on the
22  radio.
23  Q.   In the cars?
24  A.   Yes.

72

1   Q.   Could you also access --
2   A.   (Interposing) Like a walkie-talkie, you
3   just click the bottom and talk.
4   Q.   Was that something that was attached to
5   the dashboard of the car?
6   A.   Yes.
7   Q.   Do you know if any handheld radio could
8   access it?
9   A.   No.
10  Q.   It could not?
11  A.   No; only the car radios.
12  Q.   How often would you listen to WMLEC?
13  A.   All the time because it's already on in
14  the cruiser.  Anybody that would speak, every
15  officer is listening.
16  Q.   So if you're riding around in your
17  cruiser you would hear it the whole time?
18  A.   Yes; even the dispatcher hears it all
19  the time.  They also have WMLEC in the police
20  station.
21  Q.   Is there another radio then that just
22  handles internal Holyoke Police Department calls?
23  A.   Yes; there are two separate radios.
24  Q.   Two separate radios?

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ          SEPTEMBER 20, 2006

73

1    A.    Yes.
2    Q.    Are they both on at the same time?
3    A.    Yes.
4    Q.    From your experience when you were at
5  the Holyoke Police Department around this time
6  frame of November 20, 2002, how often would
7  Holyoke police officers communicate over WMLEC?
8    A.    Just to communicate with the state
9  police or Springfield or -- like if we have a hot
10  pursuit of a motor vehicle, we notify all the
11  cities where we are going, our location, what's
12  going on.
13    Q.    Is it fair to say -- I'm sorry, are you
14  done with your answer?
15    A.    Yes.
16    Q.    Is it fair to say that the reason that
17  Holyoke police officers would communicate over
18  WMLEC is if the issue would involve other
19  communities outside of Holyoke?
20    A.    Yes; or sometimes we have two
21  frequencies and if we are out of frequencies, we
22  will go over WMLEC or if the officer is not
23  responding, go over the local radio.
24

74

1              (Defendant's Deposition Exhibit
                No. 4 offered and marked.)
2
3    Q.    (BY MS. LYNCH)  Mr. Rodriguez, showing
4  you what's been marked as Exhibit 4, do you recall
5  receiving that document? (Indicating.)
6    A.    Yes.
7    Q.    As a result of receiving that document
8  did you prepare a statement?
9    A.    Yes.
10    Q.    Or I guess an IOC?
11    A.    Mmm-hmm; yes, I did.
12    Q.    Does IOC stand for interoffice
13  communication?
14    A.    Yes.
15              (Defendant's Deposition Exhibit
                No. 5 offered and marked.)
16
17    Q.    (BY MS. LYNCH)  Mr. Rodriguez, showing
18  you what's been marked as Exhibit Number 5, is
19  that the statement that you prepared in response
20  to receiving Lieutenant Fournier's correspondence
21  of December 2, 2002? (Indicating.)
22    A.    Mmm-hmm.
23    Q.    Is that a yes?
24    A.    Yes.

75

1    Q.    Why don't you just take a moment and
2  read that to yourself to refresh your memory.
3    A.    (Witness examining document.)  Okay.
4    Q.    Okay?
5    A.    Yes.
6    Q.    You've read that through?
7    A.    Yes.
8    Q.    Does that refresh your memory as to the
9  comments that you heard over WMLEC that caused you
10  concern?
11    A.    Yes.
12    Q.    What were those comments?
13    A.    What it says here, like someone is
14  singing a rap song over the WMLEC, "lick it now,
15  lick it good, lick it real good."
16    Q.    Is that an actual song?
17    A.    Yes.
18    Q.    It is?
19    A.    Yes.
20    Q.    Do you know who sang it?
21    A.    No; I don't.  It is some kind of a rap
22  song.
23    Q.    Is it "leak it" or "lick it"?
24    A.    I probably spelled it wrong but it's

76

1  "lick it."
2    Q.    "Lick it"?
3    A.    Yes.
4    Q.    Like with your tongue?
5    A.    Yes.
6    Q.    Had you heard that song over the
7  radio -- the AM or FM radios?
8    A.    Yes; many times.
9    Q.    So it's definitely a song by a singer?
10    A.    Mmm-hmm.  Most of the time that someone
11  came out singing that song was when she was
12  finishing any transmissions over our radio and
13  then someone would go over WMLEC singing the song.
14    Q.    Why did you think that was related to
15  her?
16    A.    Because every time she finished a
17  conversation over the air someone was coming over
18  WMLEC saying something.
19    Q.    Singing that song?
20    A.    Yes; either singing that or other
21  comments like -- I wrote down "el freako."
22    Q.    Let's just talk about the rap song.  Why
23  did you think that was related to Ms. Walker?
24    A.    Because the interruption of every time

## TAMMY WALKER vs. CITY OF HOLYOKE
## J0RGE RODRIGUEZ                SEPTEMBER 20, 2006

---

77

1 she talks over the air and then they came over
2 WMLEC talking about with this remark.
3     Q.   How often would she say something over
4 the air?
5     A.   When a dispatcher is calling or to
6 respond to a call and she's got to answer back or
7 if she finishes investigating an incident, she's
8 got to transmit -- any regular transmission over
9 the air.
10     Q.   Let me clarify then.  Would she be
11 saying something over the Holyoke police radio,
12 the internal radio, or over WMLEC?
13     A.   The internal radio.
14     Q.   You're saying that after she would say
15 something over the Holyoke Police Department
16 radio, someone would sing that song on WMLEC?
17     A.   Yes.
18     Q.   Why did you think that was connected to
19 her then?
20     A.   Because the voice sounded familiar.  It
21 sounds like Sergeant Monaghan's but I didn't
22 specify that it was him but it sounds like it was
23 his voice.
24     Q.   You thought it sounded like his voice?

---

78

1     A.   Yes.
2     Q.   Back to my other question:  Given that
3 she was saying something over the Holyoke police
4 radio and the lick it song was over WMLEC why did
5 you think it was any connection to Ms. Walker?
6         MR. HUDSON:  Objection; asked and
7 answered.
8         THE WITNESS:  Because of the
9 friction that was going on between them during
10 that time.
11     Q.   (BY MS. LYNCH)  I'm sorry, I guess I'm
12 not understanding the connection.
13         Given that they were on two different
14 frequencies, meaning the Holyoke internal and
15 WMLEC, why did you think there was a connection to
16 Ms. Walker?
17         MR. HUDSON:  Objection; asked and
18 answered.  You may answer if you know.
19         THE WITNESS:  Well, the same thing
20 that I told you -- that I connected with the
21 friction that was going on between them and every
22 time that she communicated, this was going over
23 the air or something else.  The voice sounded
24 familiar.

---

79

1         Sergeant Monaghan wasn't the only one
2 playing around with the WMLEC because when I ride
3 with other officers, they were doing the same
4 thing.  They were using the WMLEC just to play
5 around, singing songs over the air that wasn't
6 related to the job.
7     Q.   (BY MS. LYNCH)  Who were those officers
8 and what would they say over WMLEC?
9     A.   I cannot recall what they were saying
10 but it's like -- even in different cities, just go
11 over the air and go with something -- some
12 stupidity -- something not related with the job.
13     Q.   Would it be sexual in nature at all?
14     A.   Sometimes.
15     Q.   Sometimes?
16     A.   Yes.
17     Q.   Or just topics that had no relation to
18 work?
19     A.   Yes.
20     Q.   Any examples?
21     A.   Like -- I don't want to say it.
22         MR. HUDSON:  Tell the truth, sir.
23         THE WITNESS:  Like someone having
24 sex and the woman responding to what they are

---

80

1 feeling, things like that, the noise.
2     Q.   (BY MS. LYNCH)  So you'd hear things
3 like that over WMLEC?
4     A.   Yes.
5     Q.   Any idea who would say those types of
6 things?
7     A.   No.
8     Q.   How often did you hear someone sing that
9 lick it song over the radio other than an actual
10 singer?
11     A.   A few times after she ended
12 communication.
13     Q.   What do you mean by a few times?
14     A.   During the night or different dates.
15     Q.   But I mean when you said a few times, do
16 you mean two times?  Do you mean three times?
17 What do you mean?
18     A.   Like once a night or twice or if the
19 radio -- if the song is over the radio, they will
20 put the mic close to the radio to have it.
21     Q.   You're saying that a cruiser would have
22 the song come over an AM/FM radio and they would
23 put the mic up to it so it would be broadcast over
24 WMLEC?

---

TAMMY WALKER vs.  CITY OF HOLYOKE
JORGE RODRIGUEZ            SEPTEMBER 20, 2006

|  | 81 |
|---|---|
| 1 | A.   Mmm-hmm. |
| 2 | Q.   Yes? |
| 3 | A.   Yes. |
| 4 | Q.   Any idea when that song came out? |
| 5 | A.   Well, it was very heard many times. |
| 6 | That year was kind of a -- they were playing it on |
| 7 | the radio a lot of times. |
| 8 | Q.   In 2002? |
| 9 | A.   Yes. |
| 10 | Q.   Did it seem to be a popular song on the |
| 11 | radio? |
| 12 | A.   Yes; a popular song. |
| 13 | Q.   You said that you would hear it once or |
| 14 | twice a night, is that correct? |
| 15 | A.   Not every night but every time she would |
| 16 | converse on the radio, someone would come up with |
| 17 | something behind it over the WMLEC. |
| 18 | Q.   Just focusing on this lick it song right |
| 19 | now, any idea how many times you heard it |
| 20 | altogether after she said something over the |
| 21 | radio? |
| 22 | MR. HUDSON:  Objection. |
| 23 | THE WITNESS:  No; probably two or |
| 24 | three times out of altogether. |

|  | 82 |
|---|---|
| 1 | Q.   (BY MS. LYNCH)  How long after |
| 2 | Ms. Walker would say something on the Holyoke |
| 3 | internal radio would it be -- strike that. |
| 4 | How much time was there between the time |
| 5 | that Ms. Walker said something and someone said |
| 6 | that lick it song? |
| 7 | A.   Like between a minute -- just after she |
| 8 | communicated it would come on over the air, right |
| 9 | away. |
| 10 | Q.   What is your understanding as to what |
| 11 | the connection would be to the lick it song and |
| 12 | Ms. Walker? |
| 13 | MR. HUDSON:  Objection; asked and |
| 14 | answered. |
| 15 | Q.   (BY MS. LYNCH)  I haven't heard the song |
| 16 | so really I would have no idea. |
| 17 | What is your understanding as to what |
| 18 | the connection would be between that song and |
| 19 | Ms. Walker? |
| 20 | MR. HUDSON:  Objection; asked and |
| 21 | answered. |
| 22 | THE WITNESS:  Do I answer it? |
| 23 | MS. LYNCH:  You can answer; yes. |
| 24 | MR. HUDSON:  You can answer if you |

|  | 83 |
|---|---|
| 1 | know. |
| 2 | THE WITNESS:  I would say it's by |
| 3 | the sexual preference. |
| 4 | Q.   (BY MS. LYNCH)  Do you think the song |
| 5 | has to do with being a lesbian? |
| 6 | A.   Yes. |
| 7 | Q.   You do? |
| 8 | A.   Yes. |
| 9 | Q.   Why do you think that? |
| 10 | A.   Well, it can be connected with many |
| 11 | things but I would say that was the reason why |
| 12 | they would communicate that. |
| 13 | Q.   Did the song have to do with a lesbian |
| 14 | relationship? |
| 15 | A.   It depends on the way that people hear |
| 16 | and connect it with whatever they... |
| 17 | Q.   I don't know the song, that's why I'm |
| 18 | asking you. |
| 19 | Do you know what the song is about?  Do |
| 20 | you know any other words to it? |
| 21 | A.   No; "lick it now, lick it good." |
| 22 | Q.   Based on your understanding of that |
| 23 | song, could it be relevant to a heterosexual |
| 24 | relationship as well? |

|  | 84 |
|---|---|
| 1 | A.   Yes; could be. |
| 2 | Q.   You don't have a copy of that song, do |
| 3 | you? |
| 4 | A.   No. |
| 5 | Q.   Did you ever observe Sergeant Monaghan |
| 6 | playing around on the WMLEC as you describe? |
| 7 | A.   I probably did.  Almost every officer |
| 8 | was doing that, just playing with the WMLEC and |
| 9 | saying things over the air with WMLEC. |
| 10 | Q.   Did you ever do that? |
| 11 | A.   I probably did once or twice; I can't |
| 12 | recall. |
| 13 | Q.   What's the attraction to do doing that |
| 14 | over WMLEC? |
| 15 | A.   I don't know.  Probably nobody is |
| 16 | catched doing it. |
| 17 | Q.   Probably nobody is what? |
| 18 | A.   Nobody will know who is doing the |
| 19 | transmission over the air. |
| 20 | Q.   Did you ever observe that Ms. Walker |
| 21 | would play around with WMLEC? |
| 22 | A.   No; never. |
| 23 | Q.   How often would you hear someone playing |
| 24 | around with it as you described, meaning |

**TAMMY WALKER VS. CITY OF HOLYOKE**
**JORGE RODRIGUEZ          SEPTEMBER 20, 2006**

93

1      Q.   The "I am freak out, el freako."  I just
2    want to clarify, you interpreted that the person
3    who said that was afraid?
4      A.   I don't know how to describe it but it's
5    like when someone is playing around like saying
6    oh, yeah, you're freaking me out, I'm scared of
7    you.
8      Q.   Based on the statement you heard, you
9    thought Sergeant Monaghan was afraid of
10   Ms. Walker?
11     A.   Yes; because she put an incident against
12   him, the complaint.
13     Q.   By the way, this "I am freak out, el
14   freako," that's not a song, is it?
15     A.   No.
16     Q.   Your next statement is, "I can't say
17   with certainty that Sergeant Monaghan did the
18   talking but the voice sounds like his."
19          Is that statement accurate that you
20   made?
21     A.   Yes.
22     Q.   In other words you couldn't say with
23   certainty that it was him?
24     A.   I cannot prove that it's him.  There is

94

1    even people that can talk like me or talk like
2    her, even a male person can talk like any woman.
3    Anybody else can be making voice sounds like
4    anybody else.
5      Q.   You're saying that individuals from your
6    experience are capable of imitating other voices?
7      A.   Right; by experience, by seeing other
8    officers doing it.  I've seen officers imitating
9    other officers.
10     Q.   Can you think of anyone that might have
11   had a motivation to imitate Sergeant Monaghan's
12   voice?
13     A.   I'm not sure.
14     Q.   Then it says, "In few other occasions
15   someone goes over WMLEC radio meowing like a
16   fighting cat after she end transmission."
17          Can you describe that -- meowing like a
18   fighting cat?
19     A.   Yes.
20     Q.   Can you do it?
21     A.   Like meow, meow -- like cats start
22   fighting.
23     Q.   Who do you believe was doing that?
24     A.   Well personally I've seen officers doing

95

1    that in the Department.
2      Q.   Under what circumstances?
3      A.   Just when someone goes over the air, if
4    it's a female or something, they would do it.
5      Q.   I'm sorry, did you finish your answer?
6      A.   Yes.
7      Q.   From your experience you'd hear male
8    officers meowing over WMLEC if a female spoke?
9      A.   Mmm-hmm.
10     Q.   Yes?
11     A.   Yes.
12     Q.   What do you think the connection is
13   there?
14     A.   I don't know.  I would say
15   discriminatory against a woman.
16     Q.   Do you believe that that meowing like a
17   fighting cat had any connection with Ms. Walker?
18     A.   Yes.
19     Q.   Why do you say that?
20     A.   Because a few times after she finished
21   the conversation this came over the air.
22     Q.   How often did you hear that?
23     A.   A lot; like sometimes three times a
24   night.

96

1      Q.   With regard to Ms. Walker?
2      A.   Mmm-hmm.
3      Q.   That's a yes?
4      A.   Yes.
5      Q.   You're saying that three times on a
6    night after you would hear her speak on the
7    Holyoke radio you would hear a fighting cat sound?
8      A.   Yes.
9      Q.   On the WMLEC?
10     A.   Mmm-hmm.
11     Q.   Yes?
12     A.   Yes.
13     Q.   How often other than the three times a
14   night, how many times, how many days did you hear
15   that?
16     A.   I don't recall how many times.  More
17   than a few nights.
18     Q.   What's your best estimate?
19     A.   Three or four times a month or more.
20     Q.   For how many months?
21     A.   I cannot recall.
22     Q.   Who do you believe was meowing like a
23   fighting cat after she ended a transmission?
24     A.   Well, one time I remember Emil Morales

101

1   besides what's indicated there?

2       A.   No.

3       Q.   You write here, "We have a natural duty

4   and obligation to comply with the duty of justice

5   and the principle of fairness." Why did you write

6   that?

7       A.   Because our job is to be fair and

8   protect all the people. It is part of our duty as

9   a police officer to -- if we see anything wrong to

10  come forward and put it in light and bring it to

11  light.

12      Q.   You were asked to prepare this by

13  Lieutenant Fournier, is that correct?

14      A.   Right.

15      Q.   To this day --

16          MR. HUDSON:  (Interposing) Excuse

17  me, when you say "prepare this"?

18          MS. LYNCH:  Exhibit 5.

19          MR. HUDSON:  Thank you.

20      Q.   (BY MS. LYNCH)  To this day can you

21  state with certainty whether or not Sergeant

22  Monaghan was the voice that you heard over WMLEC?

23          MR. HUDSON:  Objection.

24          THE WITNESS:  Not for sure.

102

1       Q.   (BY MS. LYNCH)  Any ideas as to anyone

2   else who might have made those statements over

3   WMLEC?

4          MR. HUDSON:  Objection as to which

5   statements and what time period?

6          MS. LYNCH:  The statements that have

7   been referenced in Exhibit 5 and to which have

8   been testified to today.

9          MR. HUDSON:  Objection; asked and

10  answered. You may answer.

11          THE WITNESS:  I can't say for

12  certainty but the voice sounded like he was the

13  one saying it.

14      Q.   (BY MS. LYNCH)  Do you know whether in

15  fact he was working on the days that these

16  statements were made?

17      A.   Yes.

18      Q.   How do you know that?

19      A.   Because I see him during the night --

20  the days that these incidents happened.

21      Q.   Did you ever do any investigation of

22  your own in terms of listen to any WMLEC tapes,

23  check any schedules, things like that?

24          MR. HUDSON:  Objection as to form.

103

1   You may answer if you know.

2          THE WITNESS:  I'm not sure if WMLEC

3   is recorded.

4          I know our own radio frequency is

5   recorded but I don't know about WMLEC.

6       Q.   (BY MS. LYNCH)  But my question is did

7   you do any type of investigation yourself such as

8   listening to any WMLEC tapes or checking schedules

9   to see who was working when?

10          MR. HUDSON:  Objection as to form.

11          THE WITNESS:  No.

12      Q.   (BY MS. LYNCH)  Do you know who -- do

13  you know whether or not Sergeant Monaghan ever saw

14  Exhibit 5 after you prepared it?

15      A.   It is my belief that he did.

16      Q.   What do you --

17      A.   (Interposing) Because he is very

18  friendly with Lieutenant Fournier and Sergeant

19  McCavick.

20          They are both Internal Affairs officers

21  and I notice his attitude towards me changed after

22  I wrote that complaint -- I mean the IOC.

23      Q.   But do you know if in fact he did see

24  Exhibit 5 after you prepared it?

104

1       A.   No; I don't.

2       Q.   When you say that Sergeant Monaghan was

3   very friendly with Lieutenant Fournier and

4   Sergeant McCavick, what do you mean?

5       A.   You know, that they are about -- you

6   know -- I cannot say with certainty that they are

7   friends but they are about the same age, they talk

8   often, they are rank officers.

9       Q.   Do you know whether they socialize

10  outside of work?

11      A.   No; I cannot say.

12      Q.   When you say that Sergeant Monaghan's

13  attitude toward you changed, can you describe what

14  you mean?

15      A.   Well, after I wrote this IOC the gas

16  incident where I was gassing up happened like one

17  week or two weeks after I wrote the IOC.

18      Q.   The gas incident you said happened about

19  one or two weeks after you prepared Exhibit 5?

20      A.   Yes.

21      Q.   Any other reason you think his attitude

22  changed?

23      A.   No.

24      Q.   Do you know if any other officers ever

**TAMMY WALKER vs. CITY OF HOLYOKE**
**JORGE RODRIGUEZ          SEPTEMBER 20, 2006**

117

1      A.   It was close to that December 4 when
2   Sergeant Lenihan made the comment of stick
3   together -- by sticking together.
4      Q.   Why did you believe he made that
5   statement in relation to Ms. Walker's complaint?
6      A.   Because at the time frame and -- I don't
7   know if I heard rumors of something going between
8   them.
9           I know that there was some issues
10  between them at that time.
11     Q.   Paragraph eleven.  You state that you
12  have heard officers refer to Chief Anthony R.
13  Scott as Uncle Charlie during roll calls.
14          Who were the officers that you heard say
15  that?
16     A.   I heard a few officers saying that but I
17  didn't put any emphasis in noticing who was saying
18  it or to recall that officer because it was like
19  ten to twelve officers at the time.
20     Q.   You're saying ten to twelve officers
21  said that?
22     A.   No; that were present.  At this time I
23  cannot recall.
24     Q.   You don't recall who said it?

118

1      A.   Right; but I heard it.
2      Q.   You said, "Chief Scott is a black
3   individual.  I believe the comments were racist."
4   Why do you believe calling Chief Scott Uncle
5   Charlie is racist?
6      A.   As far as I know Uncle Charlie comes
7   from a character playing a black person.
8      Q.   Which character is that?
9      A.   Something -- Uncle Charlie sounds like
10  when you talk a story about a black person.
11     Q.   But Chief Scott's name is Anthony so why
12  do you believe that calling him Uncle Charlie --
13  why do you think that is related to his race?
14     A.   In the way they said it -- Uncle
15  Charlie.
16     Q.   But why do you think they'd be calling
17  him Charlie when his name is Anthony or Tony?
18          MR. HUDSON:  Objection; asked and
19  answered.
20          THE WITNESS:  I don't know.
21     Q.   (BY MS. LYNCH)  You don't know?
22     A.   No.
23     Q.   Did you ever hear any other officer make
24  a statement with regard to Chief Scott that you

119

1   thought was racist?
2      A.   I heard a few but I cannot put it
3   together or recall at this time but at the
4   beginning that he started, it was kind of
5   unacceptable to have a black chief in the Police
6   Department.
7      Q.   You think that to the extent any
8   negative statements were made with regard to Chief
9   Scott that it was related to his race?
10     A.   Yes.
11     Q.   Did you think that to the extent any
12  negative statements were made with regard to Chief
13  Scott, it was because he was a so-called newcomer
14  to the Police Department?
15     A.   Yes.
16     Q.   You thought that too?
17     A.   (Witness nodding.)
18     Q.   Is that a yes?
19     A.   Yes; because he was black and the top of
20  the Police Department.
21     Q.   Do you think that Chief Scott was
22  respected?
23     A.   Yeah, by many.  Even since he started.
24     Q.   Did you respect him?

120

1      A.   Yes.
2      Q.   Can you tell us any officer who made
3   statements that you considered negative about
4   Chief Scott?
5      A.   You mean at the beginning when he
6   started?
7      Q.   At any time.
8      A.   At the beginning officers were talking
9   about his coming to the Police Department but
10  after that, they were getting used to him and the
11  way he works.  I think everybody got to like him.
12     Q.   So by the time you left, the overall
13  sentiment was that he was liked and respected?
14     A.   Yes.
15     Q.   Back to my question:  Can you identify
16  anyone that you heard making negative statements
17  about him that you considered to be racist?
18     A.   No; not that I can recall.
19     Q.   Did you ever hear something like "Uncle
20  Charlie dun come out wit anutter order?"
21          Did you ever hear someone say something
22  like that?
23     A.   Yes; because he was changing all the
24  code of conduct, even made another book.  That's

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ          SEPTEMBER 20, 2006

129

1    A.   No.
2    Q.   Did you ever hear anyone say to
3 Ms. Walker, "You shouldn't go sticking your tongue
4 where it don't belong"?
5    A.   I believe I heard it but I cannot recall
6 where or how the circumstances.
7    Q.   Do you know who said it?
8    A.   I don't know if it was Sergeant Garcia
9 or Sergeant Monaghan.
10   Q.   You think they said it to Ms. Walker?
11   A.   I'm not sure if they were in some kind
12 of discussion and I walked by and I heard it or
13 how the circumstances but I heard something like
14 that.
15   Q.   When you heard it did you hear it said
16 to Ms. Walker or did you just hear someone in
17 conversation say it?
18   A.   I believe I heard it when they were
19 discussing.
20   Q.   By the way, did you ever complain about
21 getting junk mail belonging -- strike that.
22        Did you ever complain about getting junk
23 mail in your mailbox that had John Monaghan's name
24 on it?

130

1    A.   Yes.
2    Q.   When did that happen?
3    A.   That was after he became a sergeant.  It
4 was about the same time frame that the complaint
5 against him by Sergeant Tammy Walker was going
6 on -- was being investigated.
7        The whole stack of books for sergeants
8 or how to be a sergeant and stuff like that or
9 supervisor and -- the whole stack was put in my
10 mailbox that belonged to him.
11   Q.   Who do you think put it in your mailbox?
12   A.   I don't know if he did it himself.  I
13 cannot accuse him because I didn't see him do it
14 but it was done that way.
15   Q.   Where is your mailbox in relationship to
16 his mailbox?
17   A.   In the same board.
18   Q.   But in other words is it next to yours,
19 above or below yours?  How close is it to yours?
20   A.   It's below mine a few blocks away.
21   Q.   Do you have any idea who did that?
22   A.   No.
23   Q.   Do you have any idea --
24   A.   (Interposing) In my thinking --

131

1    Q.   -- why?
2    A.   What it came to in my mind was that he
3 did it himself but then it came to my mind that
4 who would do that, having his own name.
5        I don't know if another officer did it
6 because what was going on in the complaint and the
7 investigation and my involvement with the issue to
8 bring more friction.  I don't know.
9        I cannot accuse him directly or say that
10 he did it.
11   Q.   Why would you think he would do it
12 himself?
13   A.   In my opinion I don't believe he did it.
14   Q.   To this day do you know who did it?
15   A.   No.
16   Q.   Did Ms. Walker ever discuss with you the
17 incident of Elizer's Pub on June 23, 2003?
18   A.   No.
19   Q.   Did she ever discuss with you the fact
20 that she was disciplined for being late for court
21 on April 6, 2004?
22   A.   That was the same day that I was also
23 reprimanded for being five minutes late.
24   Q.   Right; did she ever discuss with you the

132

1 fact that she was disciplined?
2    A.   No; but I was present when she was
3 called and told you are late, you are late.  I
4 think we arrived about the same time.
5    Q.   Did she ever discuss with you an
6 incident involving the Holyoke Mall on July 23,
7 2004?
8    A.   Never heard it.
9    Q.   Did she ever discuss with you an
10 incident that occurred on September 6, 2004 where
11 she and Sergeant Monaghan were at a murder scene?
12   A.   At a murder scene?
13   Q.   Right.
14   A.   No.
15   Q.   Did she ever discuss an incident with
16 you of November 4, 2004 -- strike that.
17        Did she ever discuss with you her belief
18 that orders were being issued over a laptop
19 instead of over the radio?
20   A.   No; never heard.
21   Q.   Did she ever discuss with you the
22 circumstances of her being terminated?
23   A.   No.
24   Q.   Did you ever witness her get injured on

# EXHIBIT 6

## IN THE MATTER OF:

TAMMY WALKER vs.

CITY OF HOLYOKE

---

## DEPOSITION OF:

TAMMY WALKER
DATE:  SEPTEMBER 26, 2006

---

## PERLIK and COYLE REPORTING
### *Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

| 29 |
|---|
| 1    Q.   Did he offer you any advice? |
| 2    A.   Something like get them, "go get 'em." |
| 3    Q.   When you were employed at the Holyoke |
| 4   Police Department and Mr. Wagner was employed, |
| 5   what kind of a relationship did you have with him? |
| 6   In other words was it good, bad, neutral? |
| 7         MR. HUDSON:  Objection; you may |
| 8   answer if you know. |
| 9         THE WITNESS:  I believe it was good. |
| 10    Q.   (BY MS. LYNCH)  You had a good |
| 11   relationship with him? |
| 12    A.   He was my boss; he was my chief. |
| 13    Q.   How about with regard to Mr. Bennett |
| 14   when you were both employed at the Holyoke Police |
| 15   Department?  What kind of a relationship did you |
| 16   have with him? |
| 17    A.   Professional, the same. |
| 18    Q.   Did Mr. Bennett offer you any other |
| 19   advice besides "go get 'em"? |
| 20    A.   Not that I can recall. |
| 21    Q.   Did you testify at his trial? |
| 22    A.   No. |
| 23         MR. HUDSON:  Objection to the form. |
| 24         MS. LYNCH:  I'm sorry? |

| 31 |
|---|
| 1    Q.   (BY MS. LYNCH)  Well, at any time. |
| 2    A.   Back in 2002 I believe he made a |
| 3   statement. |
| 4    Q.   Was that a statement that was given to |
| 5   the MCAD? |
| 6    A.   That's correct. |
| 7    Q.   Any other statements that he gave to |
| 8   you? |
| 9    A.   No. |
| 10    Q.   Or affidavits? |
| 11    A.   No. |
| 12    Q.   Did he ever testify at any hearing that |
| 13   was held with regard to either allegations that |
| 14   were made against you or claims that you brought |
| 15   with respect to your employment? |
| 16         MR. HUDSON:  Objection. |
| 17         THE WITNESS:  I don't know. |
| 18         MR. HUDSON:  Objection.  Counsel, I |
| 19   don't want to keep making these objections but |
| 20   they are really just to the form of the question |
| 21   as to when, where, some time frame. |
| 22         There are many different claims.  I mean |
| 23   if you just want to keep asking open-ended |
| 24   questions I'm just going to keep doing my job and |

| 30 |
|---|
| 1         MR. HUDSON:  Object to the form of |
| 2   the question. |
| 3    Q.   (BY MS. LYNCH)  Have you had any contact |
| 4   with Jorge Rodriguez since your employment |
| 5   terminated with the Holyoke Police Department with |
| 6   regard to the claims that you are making in this |
| 7   lawsuit? |
| 8         MR. HUDSON:  Objection. |
| 9         THE WITNESS:  No; not with Jorge. |
| 10   No. |
| 11    Q.   (BY MS. LYNCH) You were here when he |
| 12   testified the other day, correct? |
| 13    A.   Yes. |
| 14    Q.   Do you recall the contacts that he |
| 15   testified about? |
| 16    A.   I invited him to my wedding. |
| 17    Q.   Do you recall any other contacts with |
| 18   him? |
| 19    A.   No. |
| 20    Q.   Did you ask him to be a witness for you |
| 21   or to provide any statements for you with regard |
| 22   to your lawsuit? |
| 23         MR. HUDSON:  Objection. |
| 24         THE WITNESS:  When? |

| 32 |
|---|
| 1   objecting. |
| 2         MS. LYNCH:  That's fine.  I don't |
| 3   see a problem with the question.  If I did I would |
| 4   have rephrased it. |
| 5    Q.   (BY MS. LYNCH)  I'm talking at any time |
| 6   at any of the hearings that were held either with |
| 7   regard to your claims or allegations that were |
| 8   brought against you, do you remember him ever |
| 9   testifying? |
| 10         MR. HUDSON:  Objection. |
| 11         THE WITNESS:  I don't know if he |
| 12   testified.  You have to ask him. |
| 13    Q.   (BY MS. LYNCH)  But meaning if you were |
| 14   at a hearing, do you recall him being there on |
| 15   your behalf, Mr. Rodriguez? |
| 16    A.   I don't know. |
| 17    Q.   Have you ever filed for bankruptcy? |
| 18    A.   No. |
| 19    Q.   Have you ever had a Website? |
| 20    A.   Yes. |
| 21    Q.   What was the address for it? |
| 22    A.   Define address? |
| 23    Q.   How do you get to it using the Internet? |
| 24    A.   You can put in www.penalizedfortruth. |

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER        SEPTEMBER 26, 2006

33

1    Q.   When did you have that Website?
2    A.   When did I put it up?
3    Q.   Is it still in existence?
4    A.   Yes.
5    Q.   It is?
6    A.   Yes.
7    Q.   Do you remember when you did start it
8    then?
9    A.   I believe it was May, 2005.
10   Q.   Did you put any information on that
11   Website that pertained to the Holyoke Police
12   Department?
13   A.   Yes.
14   Q.   What types of information did you put on
15   it?
16   A.   My Internal Affairs investigation, part
17   of it.
18   Q.   Do you recall what the subject matter
19   was?
20   A.   No; there's too much to recall at this
21   time.
22   Q.   Why did you put that information on the
23   Website?
24   A.   Because it was pertinent to my story.

34

1    Q.   Given that it was Internal Affairs, was
2    it non-public information?
3         MR. HUDSON:  Objection, that's a
4    legal question.
5         THE WITNESS:  I'm not a lawyer.
6    Q.   (BY MS. LYNCH)  When you say Internal
7    Affairs information, can you describe what you're
8    referring to?
9    A.   A statement -- when Internal Affairs
10   takes a statement.
11   Q.   Do you remember whose statements you put
12   on there?
13   A.   I believe I put my statement on there.
14   Q.   Anyone else's?
15   A.   I believe Lieutenant O'Connell's
16   statement is on there.
17   Q.   Was this with regard to the laptop
18   incident -- I'm sorry, the scheduling book
19   incident?
20   A.   I don't recall.  I haven't looked at my
21   Website in quite awhile.
22   Q.   Do you recall anything else that you put
23   on the Website?
24   A.   No.

35

1    Q.   Are these documents still on there now?
2    A.   I don't know.  I haven't looked at it in
3    quite awhile.
4    Q.   Do you have any other Websites?
5    A.   No.
6    Q.   You were appointed a full-time police
7    officer for the Holyoke Police Department on
8    July 19, 1993, is that correct?
9    A.   Full time, yes.
10   Q.   Who appointed you?
11   A.   That would be the mayor at the time.
12   Q.   Do you remember who that was?
13   A.   Mayor Hamilton.
14   Q.   Up until the point when you became a
15   sergeant in 2002 do you recall what positions you
16   held other than a police officer with the Holyoke
17   Police Department?
18   A.   What positions I held within the Police
19   Department before I was made sergeant?
20   Q.   Right.
21   A.   I was a rape investigator; I was a DARE
22   officer; I was a bike patrol officer; I was a
23   detective with the Detective Bureau.  I was
24   assigned to the DEA task force.

36

1    Q.   When were you assigned there -- from
2    what date to what date?
3    A.   It was May, 2000 to May, 2002.
4    Q.   What is your understanding as to why
5    your position with the DEA terminated in May of
6    2002?
7         MR. HUDSON:  Objection.
8         THE WITNESS:  I was promoted to
9    sergeant.
10   Q.   (BY MS. LYNCH)  Do you know whether the
11   DEA had made any complaints about you which led to
12   your being taken off of the DEA Task Force?
13   A.   No; there was no complaints with DEA.
14   Q.   Did Chief Scott ever speak with you at
15   all about removing you from the DEA task force?
16   A.   No.
17   Q.   Were you present at the Chief's
18   testimony on this issue -- Chief Scott's
19   testimony?
20   A.   No.
21   Q.   Do you recall what watches you worked
22   prior to becoming sergeant?
23   A.   It's a very broad question but midnight
24   to eight.

**PERLIK and COYLE REPORTING**

---

**53**

1  Do you see that?

2  A.  "I received" -- on ten "I received a

3  letter dating," it says July 9.  Then it is

4  scratched out and then it says "on July 9" --

5  number ten?

6  Q.  Right.  What is the July 9, 1999 -- do

7  you know where that date comes from?

8  A.  No.

9  Q.  Do you believe that was a typo, that it

10  should have been June 9, 1999?

11      MR. HUDSON:  Objection it.

12      THE WITNESS:  I don't know.

13  Q.  (BY MS. LYNCH)  On the date that you

14  were informed that you weren't chosen for the

15  Sergeant's position, did you also receive a

16  letter?

17  A.  A letter on that date?

18  Q.  Right.

19  A.  June 9?  I recall a phone call from

20  Chief Cournoyer.

21  Q.  So you don't recall a letter that day?

22  A.  Not -- that's a long time ago.  I don't

23  recall a letter that day.

24  Q.  Why do you believe that Joseph Garcia

---

**54**

1  was chosen over you for the Sergeant's position?

2      MR. HUDSON:  Objection.

3      THE WITNESS:  Because he was Mayor

4  Szostkiewicz's friend.

5  Q.  (BY MS. LYNCH)  Did you provide the date

6  June 9, 1999 as the date of your bypass to the

7  MCAD?

8  A.  That's the date that I was informed that

9  I was bypassed.

10  Q.  That's the date that you provided to the

11  MCAD in filing this complaint?

12      MR. HUDSON:  Objection.

13      THE WITNESS:  According to this

14  "cause of discrimination based on" and then it

15  starts off on June 9, 1999.

16      I don't recall this document; it's been

17  several years.

18  Q.  (BY MS. LYNCH)  I understand but is it

19  your memory that you gave the June 9, 1999 date to

20  the MCAD?

21  A.  According to this document, yes.

22      (Defendant's Deposition Exhibit

23      No. 3 offered and marked.)

24  Q.  (BY MS. LYNCH)  Ms. Walker, I'm showing

---

**55**

1  you what's been marked as Exhibit Number 3.

2  You'll notice that's an eight-page document.

3      Referring you to the first page, do you

4  recall receiving that letter dated July 16, 2002

5  from City Solicitor Stephen Fitzgibbons?

6  (Indicating.)

7      MR. HUDSON:  Take your time to read

8  it thoroughly.

9      (Witness examining document.)

10  Q.  (BY MS. LYNCH)  Do you recall receiving

11  the first page, Ms. Walker?

12  A.  I'm sorry?

13  Q.  Do you recall receiving that letter

14  dated June 16, 2002 which is the first page of

15  Exhibit 3?

16  A.  (Witness examining document.)  I don't

17  recall this first page.

18  Q.  Do you recall receiving the assented

19  motion to amend decision which are the second and

20  third pages of Exhibit 3?

21      MR. HUDSON:  Take your time to read

22  them, please.

23      THE WITNESS:  (Witness examining

24  document.)  I'm sorry, what was the question

---

**56**

1  again?

2  Q.  (BY MS. LYNCH)  Do you recall receiving,

3  along with the letter, page one of Exhibit 3, the

4  Assented to Motion to Amend Decision?

5  A.  I remember seeing part of this document.

6  Like I say I don't remember the first page of this

7  document.

8      I do recall the second page of this

9  document.

10  Q.  Which is the Assented to Motion to Amend

11  Decision?

12  A.  Yes; I do recall seeing that.

13  Q.  Why didn't you sign that -- the Assented

14  to Motion to Amend Decision?

15  A.  From what I gathered, this was to give

16  up my seniority.  The City Solicitor is asking me

17  to give up my seniority.

18  Q.  Well, he was asking you to change the

19  seniority date to June 20, 1999 from June 9, 1999,

20  is that correct?

21      MR. HUDSON:  Objection.

22  Q.  (BY MS. LYNCH)  Is that correct?

23  A.  I don't know.

24  Q.  Well, you just read it and you said you

---

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                SEPTEMBER 26, 2006

81

1   more hostile and negative.
2           Do you recall that testimony a few
3   minutes ago?
4       A.   Yes.
5       Q.   What do you mean by that?
6       A.   That he began verbally attacking me.
7       Q.   Can you describe how you believe that he
8   was verbally attacking you?
9       A.   Well, what's in my complaint as far as
10  going over the air after I speak.
11          On the HPD frequency after I'm finished,
12  he would come on and say "lick it, lick it good"
13  on a different frequency.
14      Q.   Are you referring to the WMLEC?
15      A.   WMLEC; yes.
16      Q.   Anything else that he did that you
17  believe was verbally attacking you?
18      A.   The incident where he said "start
19  packing your bags."
20      Q.   Anything else?
21      A.   "Don't go sticking your tongue where it
22  don't belong."
23      Q.   Anything else that you believe stepped
24  up or constituted stepping up to be more hostile

82

1   and negative to you after you became a sergeant?
2       A.   Not speaking to me at all when we were
3   sergeants.
4       Q.   Anything else?
5       A.   Refusing to leave the bar on my first
6   command.
7       Q.   Are you talking about that Elizer's Pub
8   incident?
9       A.   That's correct.
10      Q.   Anything else?
11      A.   Not off the top of my head.
12      Q.   We'll go over those in more detail.  You
13  stated that you do believe that Donald Whelihan
14  spoke to Sergeant Garcia and Sergeant Monaghan, is
15  that correct?
16      A.   Yes.
17      Q.   Did anything change after he spoke to
18  them?
19      A.   Yes; I was assigned to gas up the -- I
20  was assigned to review all the reports for the
21  evening and Sergeant Garcia was instructed to gas
22  the cruisers.
23      Q.   Any other changes?
24      A.   Yes; he was ordered not to change the

83

1   roster.
2       Q.   Garcia?
3       A.   Correct.
4       Q.   Any other changes?
5       A.   Define any other changes.
6       Q.   Let me ask you this:  Did your
7   relationship with Sergeant Garcia improve at all
8   after you believe that Lieutenant Whelihan spoke
9   to him?
10      A.   No.
11      Q.   How about with respect to Sergeant
12  Monaghan?  Did your relationship with him improve
13  after you believe that Lieutenant Whelihan spoke
14  to him?
15      A.   No.
16      Q.   Were there any changes with respect to
17  his job duties?
18      A.   His?
19      Q.   John Monaghan's after Lieutenant
20  Whelihan spoke to him?
21      A.   I guess they both gassed the cruisers.
22  I was just instructed to approve reports.
23      Q.   Are you alleging that you began having
24  problems with officers -- patrol officers after

84

1   you became sergeant as well?
2       A.   I never had problems with patrol
3   officers.
4       Q.   The only individuals then that you had
5   problems with after you became sergeant were John
6   Monaghan and Joseph Garcia?
7       A.   Yes.
8       Q.   Do you recall having a conversation with
9   Captain Fletcher after you became sergeant and he
10  told you that he thought that any problems you may
11  have been having with Sergeant Garcia and Sergeant
12  Monaghan would self correct if you changed the
13  seniority date?
14          MR. HUDSON:  Objection; you may
15  answer.
16          THE WITNESS:  Yes; he said that he
17  felt that the seniority date was incorrect and
18  that any problems that I was having would go away
19  if I would just change the date.
20      Q.   (BY MS. LYNCH)  Is that the conversation
21  you mentioned earlier when you said it wasn't a
22  union matter?
23      A.   No.
24      Q.   That's a different conversation?

**TAMMY WALKER VS. CITY OF HOLYOKE**
**TAMMY WALKER          SEPTEMBER 26, 2006**

---

109

1  you thought was inappropriate during that time
2  period?
3       A.  No.
4       Q.  Other than that issue involving DEA, did
5  you have any other problems with Lieutenant
6  O'Connell?
7       A.  When?
8       Q.  When you worked at the Holyoke Police
9  Department?
10       A.  Did I have any problems with Lieutenant
11  O'Connell while I worked at the Holyoke Police
12  Department before I made sergeant?
13       Q.  No; at any time.  You said before when I
14  asked you the question, you said your relationship
15  with her was fine until you became a liaison
16  between the DEA and the Holyoke Police Department.
17       My question to you is:  Is there any
18  other reason that you believe that you may have
19  had problems with her?
20       A.  No.
21       MR. HUDSON:  Before she became a
22  sergeant, is that correct?
23       MS. LYNCH:  No; I was talking about
24  the entire time.

---

110

1       THE WITNESS:  The entire time that I
2  worked at the Holyoke Police Department have I
3  ever had any problems with Lieutenant O'Connell?
4       Q.  (BY MS. LYNCH)  Right.
5       A.  Not until I was a DEA liaison.
6       Q.  And after that, did you have any other
7  problems -- given that that relationship ended in
8  May of 2002?
9       A.  Yes; with the complaints that are set
10  forth.  Yes.
11       Q.  Are you referring to the laptop and the
12  scheduling book incident?
13       A.  All the complaints that are listed in
14  the complaint and whatever Internal Affairs
15  complaint I initiated.
16       Q.  Okay; we'll go over those individually.
17  Do you recall going to a 7-Eleven store in Holyoke
18  on October 15, 2002 and having some involvement
19  with an individual by the name of Lee Moran?
20       A.  Yes; I arrested him.
21       Q.  Can you tell me what occurred on that
22  date with regard to him?
23       A.  I pulled into 7-Eleven as I normally did
24  on my shift.  I walked into the store, the clerk

---

111

1  told me that a Blazer had pulled up and almost
2  struck a vehicle.
3       I proceeded to get my coffee.  The
4  individual had already left the store.  As we
5  were -- as I was coming in, he was going out so we
6  didn't have any interaction.
7       A few minutes later this vehicle came
8  back in, parked very closely to the cruiser.  I
9  went out to talk to the driver of the vehicle; I
10  don't recall her name.  As I was speaking with her
11  Mr. Moran was screaming and yelling.  I asked him
12  to be quiet while I speak to her.
13       Q.  And then what happened?
14       A.  He attempted to get out of the vehicle
15  and I asked him to stay inside the vehicle.  I
16  then called for backup.
17       While I'm calling for backup, he pushes
18  me and we get into a tussle.
19       Q.  You're saying that he got out of the
20  vehicle and pushed you?
21       A.  Yes.
22       Q.  Who else was around when that happened?
23       A.  Meaning customers or police officers at
24  the time?

---

112

1       Q.  Let me ask you:  Were there any police
2  officers around when that occurred?
3       A.  No; they were on their way.
4       Q.  Was that in the parking lot?
5       A.  Correct.
6       Q.  What happened after he -- strike that.
7  How did he push you?  Can you describe that?
8       A.  Push.
9       Q.  But where on your body?
10       A.  Upper part of my body.
11       Q.  The front or the back?
12       A.  Front.
13       Q.  What happened next?
14       A.  I tried to grab ahold of him and bring
15  him to the ground, which unfortunately I couldn't
16  do.  We tussled and we wound up near the fence --
17  there was a fence there.
18       I could see the blue lights coming and I
19  used my hip and put him to the ground.  As he was
20  going to the ground, that's when the officers
21  showed up.
22       Q.  How tall was he and approximately how
23  much did he weigh?
24       A.  I'm not sure how tall he was or what his

---

TAMMY WALKER VS. CITY OF HOLYOKE
TAMMY WALKER                    SEPTEMBER 26, 2006

117

1    Q.   Are you aware that Mr. Moran alleges
2    that he was beaten at the scene -- meaning at the
3    7-Eleven?
4    A.   I'm aware of a report; yes.
5    Q.   Was that a report that was prepared by
6    Sergeant Garcia?
7    A.   I'm aware of that report; yes.
8    Q.   Are you aware that -- strike that.  Did
9    you ever speak to the clerk at the 7-Eleven
10   regarding that incident?
11   A.   Yes.
12   Q.   Do you recall when that was?
13   A.   I went into the store I believe it was
14   the day after the arrest and the clerk pulled me
15   aside.
16   Q.   What did you two discuss?
17   A.   He wanted me to know that two officers
18   came into the store and was asking about the
19   arrest.
20   Q.   Did he give you any other information?
21   A.   He said that there was a tall one and a
22   short one and I said it might be IAD -- which is
23   Internal Affairs -- and he said they were in
24   uniform and that's when I told him to stop.

118

1    Q.   You told him to stop?
2    A.   I told him to stop talking and to put it
3    in writing.
4    Q.   Why did you tell him to do that?
5    A.   Because the people that he described to
6    me I knew was Sergeant Monaghan and Sergeant
7    Garcia.
8    Q.   How did you know that?
9    A.   Because there's only two sergeants --
10   they have gold badges and gold stripes so I know
11   it wasn't officers; it was another ranking
12   officer.
13   Q.   So you're saying that he said the
14   officers that came in had stripes on their
15   shoulders?
16   A.   Had -- the uniform the guy had and a
17   gold badge.
18   Q.   A gold badge?
19   A.   A gold badge.
20   Q.   You're saying gold as in the gold?
21   A.   Gold -- G-O-L-D.
22   Q.   That's how he described them?
23   A.   Yes; he described Sergeant Monaghan and
24   Garcia.

119

1    Q.   So this gold badge signifies a
2    sergeant's badge?
3    A.   Gold badge signifies a ranking officer.
4    Q.   So the captain can have the same color?
5    A.   The people that he described to me were
6    Sergeant Garcia and Sergeant Monaghan.
7    Q.   But my question is with regard to the
8    gold badge, is that something that all officers
9    have?
10   A.   Ranking officers have gold badges on
11   their shirts.
12   Q.   Meaning sergeant and up?
13   A.   Correct -- well, lieutenants have bars.
14   Q.   How tall is Joe Garcia, approximately?
15   A.   I don't know.
16   Q.   But you would describe him as short?
17   A.   He's shorter than me.
18   Q.   Did he give you any other description
19   about them in terms of hair color or skin color,
20   anything like that?
21   A.   No.
22   Q.   Why did you tell him to stop talking and
23   put it in writing?
24   A.   Because I'm not Internal Affairs.  I'm

120

1    not Internal Affairs, Professional Standards
2    Division.
3    Q.   What do you mean by that?
4    A.   I'm not Internal Affairs.  I don't
5    investigate other officers.  That's for Internal
6    Affairs to do.
7    Q.   In other words you thought that Monaghan
8    and Garcia, assuming they were the ones that went
9    in, should be investigated?
10   A.   No.  You asked me why I stopped the
11   clerk from speaking further on and just to put it
12   in writing.
13   Q.   Right.
14   A.   From what the clerk told me and the way
15   he felt, I told him to stop and put it in writing,
16   just put it in writing and I will give it to the
17   appropriate parties.
18   Q.   You were planning to give whatever he
19   wrote to Internal Affairs?
20   A.   I was planning on giving it to the
21   appropriate parties; yes.
22   Q.   I'm sorry, I'm just still trying to
23   understand your statement.
24        You told him to put it in writing

TAMMY WALKER VS. CITY OF HOLYOKE
TAMMY WALKER                SEPTEMBER 26, 2006

141

1    Q.    How about Sergeant Lenihan?  How did you
2    get along with him?
3    A.    Not well.
4    Q.    Not well?
5    A.    (Witness shaking head.)
6    Q.    Why do you say that?
7    A.    Sergeant Lenihan and I -- I have asked
8    him to speak with Sergeant Garcia, Sergeant
9    Monaghan since he was my next chain in command and
10   he simply said he didn't want to get involved.
11   When I went to him on another occasion, he said
12   don't make waves.
13        He wasn't supportive in bringing it to
14   my superior officer following the chain of
15   command.
16   Q.    You also wrote in Exhibit 4 that "it has
17   also been brought to my attention by several
18   officers that Sergeant Monaghan refers to me as
19   Tyrone rather than by my birth name Tammy."
20        First of all, who told you that?
21        MR. HUDSON:  You need to just go
22   ahead and answer the question.  If you want to
23   take a break --
24        MS. LYNCH:  (Interposing) Well,

142

1    there's a question pending.
2         MR. HUDSON:  I said you need to go
3    ahead and answer the question.
4         THE WITNESS:  I was asked this
5    question before.  For fear of retaliation against
6    the parties being placed on them, if I give their
7    names they will be retaliated against as well.
8    Q.    (BY MS. LYNCH)  Well, I disagree with
9    you, Ms. Walker and I'm asking you to answer the
10   question.
11   A.    I don't recall at this time.
12   Q.    Was it Jorge Rodriguez?
13   A.    No.
14   Q.    You honestly don't recall who told you
15   that?
16   A.    I honestly don't recall.
17   Q.    Did you write it down anywhere?
18   A.    No.
19   Q.    What significance does the name Tyrone
20   have to you?
21   A.    It is not my name.
22   Q.    Right; other than that does the name
23   Tyrone have any significance to you?
24   A.    It conjures up an African-American male.

143

1    Q.    Why do you say that?
2    A.    Because it does to me.
3    Q.    What do you base that upon?
4    A.    You don't find that many white males
5    with the name Tyrone.
6         The fact that he called me Tyrone and
7    not my birth name and I'm African-American, I
8    presume that he feels that I'm a male instead of a
9    female.
10   Q.    How many males do you know named Tyrone?
11   A.    Personally?
12   Q.    Yes.
13   A.    One.
14   Q.    What is their race?
15   A.    African-American.
16   Q.    Do you know any other Tyrones?
17   A.    Personally?
18   Q.    At all.
19   A.    No.
20   Q.    Do you know if they are another race
21   besides African-American or any white males?
22   A.    No.
23   Q.    How many do you know not personally, but
24   know of?

144

1    A.    I know one personal named Tyrone.
2    Q.    But other than knowing personally, do
3    you know of any other person with the name Tyrone?
4    A.    There was someone booked in our station
5    by the name of Tyrone.
6    Q.    Do you know what their last name is?
7    A.    No.
8    Q.    The one that you do know, what is his
9    last name?
10   A.    I don't know his last name.
11   Q.    The one that was booked, what was their
12   race?
13   A.    African-American.
14   Q.    Do you know any other Tyrones?
15   A.    No.
16   Q.    Did you ever hear Sergeant Monaghan
17   refer to you as Tyrone?
18   A.    No.
19   Q.    You said here in Exhibit 4, "It has been
20   brought to my attention by several officers."
21        How many officers told you that he
22   called you Tyrone?
23   A.    More than three.
24   Q.    More than three?

PERLIK and COYLE REPORTING

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                    SEPTEMBER 26, 2006

145

1    A.   (Witness nodding.) Over the time, yes.
2    Q.   And you can't remember any of the three?
3    A.   Not at this time.
4         (Defendant's Deposition Exhibit
          No. 5 offered and marked.)
5
6    Q.   (BY MS. LYNCH)  You were given Exhibit 5
7   by Lieutenant Fournier with regard to this
8   incident, is that correct? (Indicating.)
9    A.   (Witness examining document.)
10   Q.   In other words, you were ordered to
11  provide the name of the officers who told you that
12  Monaghan called you Tyrone?
13   A.   Yes.
14        (Defendant's Deposition Exhibit
          No. 6 offered and marked.)
15
16   Q.   (BY MS. LYNCH)  And showing you
17  Exhibit 6, is that the response that you wrote to
18  Exhibit 5? (Indicating.)
19   A.   (Witness examining document.)
20   Q.   Is that the response that you made?
21   A.   Yes.
22   Q.   The word "rat" in quotes in Exhibit 6,
23  is that your word or is that the word of the
24  officers that gave you the information about

146

1   Tyrone?
2    A.   That is a general word used by police
3   officers that turn in other police officers.
4    Q.   In other words you used that word on
5   your own as opposed to they used that word?
6    A.   All officers use that word referring to
7   officers that turn in other officers.
8    Q.   But I mean did they say to you, "I don't
9   want to be called a rat," or did you use that term
10  on your own that you thought if you turned them in
11  they'd be called a rat?
12   A.   They would be called a rat if I gave the
13  names of the people that said that; that's why I
14  wrote that.
15   Q.   But I mean did they say to you that they
16  were concerned that they'd be called a rat?
17   A.   They would be concerned about the
18  harassment that would follow.
19   Q.   That's what they said to you?
20   A.   Yes.
21   Q.   Other than your attorney, have you told
22  anyone the identity of these officers who told you
23  that John Monaghan referred to you as Tyrone?
24   A.   I never told my attorney the names of

147

1   the individuals.
2    Q.   You're saying to this day you haven't
3   told anyone?
4    A.   No one.
5    Q.   These officers that told you that John
6   Monaghan called you Tyrone, did they tell you that
7   they considered it to be derogatory or anything
8   like that?
9    A.   Yes; that's why they told me.
10   Q.   What do you recall them saying to you,
11  other than John Monaghan called you Tyrone?
12   A.   "John Monaghan refers to you as a black
13  male."
14   Q.   That's what they said?
15   A.   Yes.
16   Q.   Anything else that you recall them
17  saying?
18   A.   No.
19   Q.   Do you recall when it was that they told
20  you that he called you Tyrone?
21   A.   November sometime.
22   Q.   November?
23   A.   November sometime.
24   Q.   Of what year?

148

1    A.   Maybe it was September -- September-ish.
2    Q.   Of what year?
3    A.   2002.
4    Q.   Your complaint is dated October 24, 2002
5   so you think it was September, 2002?
6    A.   I believe so.  I have to check the date
7   on here.  What was the date here?
8    Q.   Your complaint -- actually, it's right
9   there.
10   A.   This is October 24th is the date of the
11  complaint.  This was written October 30th, 2002 so
12  according to this, three weeks before.
13   Q.   Okay; all right.  As a result of your
14  not providing the names of the officers who told
15  you that Monaghan referred to you as Tyrone, do
16  you recall that the Internal Affairs Bureau
17  required all officers on the watch that you were
18  on to complete a questionnaire?
19        MR. HUDSON:  Objection.
20        (Defendant's Deposition Exhibit
          No. 7 offered and marked.)
21
22   Q.   (BY MS. LYNCH)  Do you recall that --
23  and I'm showing you Exhibit Number 7.
24        Do you recall that that questionnaire

153

1  a -- he phrased it a Wagner case.
2      Q.   That's what Captain Fletcher said?
3      A.   A Wagner case; yes.
4      Q.   What did you think he meant by that?
5      A.   Filing a lawsuit.
6          MR. HUDSON:  Objection.
7      Q.   (BY MS. LYNCH)  You can answer.
8      A.   Filing a lawsuit is what I thought.
9      Q.   Do you recall what you said during that
10  meeting?
11     A.   I pretty much stayed silent in the
12  meeting, just listening to what the Captain had to
13  say -- the Captain and the Lieutenant had to say.
14     Q.   Did you express during that meeting what
15  you had either heard or had been told that
16  Monaghan had stated to you that you found
17  offensive?
18     A.   No; I pretty much wanted to hear what
19  Monaghan and the Captain and the Lieutenant had to
20  say.
21     Q.   Did Monaghan say anything to the effect
22  of he wanted to be friends with you and get along
23  with you?
24     A.   He did make a reference to that; yes.

154

1      Q.   Did you accept that?
2      A.   I said, "It's gone too far, John."
3      Q.   What did you ask to be done during that
4  meeting, if anything?
5      A.   I didn't call for the meeting.
6      Q.   Right, but did you ask that anything be
7  done?
8      A.   Just to have him stop harassing me.
9      Q.   Anything else that you recall that
10  anyone said during that meeting?
11     A.   No.
12     Q.   How about Whelihan?  Do you remember
13  anything that he specifically said?
14     A.   No.
15     Q.   How did the meeting end?  What was the
16  outcome of it?
17     A.   We just all left the office.
18     Q.   Did you notice any improvement in your
19  relationship with John Monaghan following that
20  meeting?
21     A.   No; there was never any improvements.
22     Q.   Were there any other meetings of that
23  nature held where you got together in the same
24  place with Monaghan and any supervising officers

155

1  to discuss your concern that he was being
2  offensive to you?
3      A.   No; I don't recall any other meetings.
4      Q.   Any with Lieutenant O'Connell to that
5  effect?
6      A.   No; not with Lieutenant O'Connell that I
7  can recall.
8      Q.   Do you recall a meeting with Lieutenant
9  O'Connell either with you alone or with the two of
10  you -- meaning you and Monaghan present where she
11  said "I know" -- to the effect, and I'm
12  paraphrasing -- "I know that you two have had
13  problems and I want you to get along now that you
14  are on the same shift"?  Do you recall anything
15  like that?
16     A.   No.
17     Q.   With regard to WMLEC, you mentioned it
18  earlier that you believe that offensive comments
19  were made over the WMLEC radio after you
20  transmitted information over the Holyoke internal
21  radio station, is that correct?
22     A.   No; I don't believe.  I know after I
23  finished my conversation, Sergeant Monaghan would
24  get on WMLEC and say "lick it, lick it good."

156

1      Q.   Which radio station were you on?  In
2  other words were you on WMLEC or were you on the
3  Holyoke?
4      A.   I would speak over the Holyoke Police
5  Department's frequency and WMLEC is always on.
6      Q.   Do you remember anything that you said
7  over the Holyoke radio station that preceded the
8  WMLEC transmission that you described?
9      A.   No.
10     Q.   Was it business-related, whatever you
11  said?
12     A.   It's always business-related on the
13  police radio, the HPD radio.
14     Q.   When you say it's always
15  business-related, do you mean you're always
16  speaking about business or do you mean in general
17  anything that's transmitted over the Holyoke radio
18  station is business-related?
19     A.   When I speak on the Holyoke radio it's
20  for business purposes calling for a unit,
21  answering dispatch.
22     Q.   Have you ever heard anyone say anything
23  that would be considered non-business-related over
24  the Holyoke radio?

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                    SEPTEMBER 26, 2006

157

1    A.   When?
2    Q.   At any time when you were a police
3  officer?
4    A.   Yes.
5    Q.   What types of things would you hear?
6    A.   Several things.  Some are professional;
7  some aren't, officers.
8    Q.   But would you hear any types of
9  statements made over the Holyoke radio that you
10 would consider to be offensive?
11   A.   To whom?
12   Q.   To anyone.  Let me ask you a different
13 question.
14        While you were a police officer did you
15 ever hear any statements over the Holyoke radio
16 that you would consider to be not related to the
17 business of the Holyoke Police Department?
18   A.   Yes.
19   Q.   What types of things did you hear?
20   A.   If I worked overtime shift as a patrol
21 officer you'd hear an officer make a rude comment
22 about a pedestrian.
23   Q.   Can you give me an example?
24   A.   Not verbatim -- actually an order came

158

1  out from Chief Scott pertaining to this exact
2  conversation we're having right now.
3    Q.   What was the substance of the order?
4    A.   The order was to not say vulgar or
5  inappropriate things over the air.  It was a
6  general order that he had put out that he would be
7  disciplining officers for using the radio for
8  non-professional reasons and to be courteous over
9  the radio.
10   Q.   Is it your understanding that that order
11 came out after you made a complaint?
12   A.   I don't know when the order came out.
13   Q.   Do you recall if the order came out as a
14 result of offensive statements made over the radio
15 as opposed to, say, an officer using the radio to
16 order a pizza or something like that, that would
17 be considered non-business-related?
18        MR. HUDSON:  Objection.
19        THE WITNESS:  No; the order came out
20 to act professional over the air.
21   Q.   (BY MS. LYNCH)  What I just want to
22 clarify with you, though, when you say that there
23 were non-business-related topics discussed over
24 the Holyoke radio, were they offensive in nature

159

1  as opposed to being non-professional like can you
2  order me a pizza, something that wasn't
3  work-related?
4    A.   It would depend on who they were
5  targeted to.  What's offensive to you may not be
6  offensive to me.
7    Q.   But do you understand the distinction
8  I'm making between something being
9  non-business-related between getting a pizza and
10 ostensibly not being offensive and calling someone
11 a derogatory name?
12        Do you understand the distinction I'm
13 making?
14   A.   Yes; they are not non-professional.
15   Q.   Right, so my question is when you have
16 heard non-professional statements over the Holyoke
17 radio, have they been derogatory in nature?
18        MR. HUDSON:  Objection.
19        THE WITNESS:  That would depend on
20 whom they're referring to.  That's a question I
21 can't answer.  You're not asking a personal
22 question.
23   Q.   (BY MS. LYNCH)  Well, did you ever hear
24 a statement over the Holyoke radio that you

160

1  considered to be derogatory in nature?
2    A.   Over the Holyoke radio or over WMLEC?
3    Q.   Holyoke radio.
4    A.   To me, no.
5    Q.   Is it common for -- based on your
6  experience as a Holyoke police officer is it
7  common for non-professional statements to be made
8  over WMLEC in your experience?
9        MR. HUDSON:  Objection.
10        THE WITNESS:  It's not common.
11   Q.   (BY MS. LYNCH)  It's not?
12   A.   No.
13   Q.   How often would you listen to WMLEC?
14   A.   I used to always listen to WMLEC.
15   Q.   Is that something that when you're in
16 the cruiser you could hear both the Holyoke radio
17 and the WMLEC radio at the same time?
18   A.   Yes.
19   Q.   Is that something that you would listen
20 to when you were in the station?
21   A.   What do you mean in the station?  When I
22 was CO -- commanding officer?
23   Q.   Any time when you were physically in the
24 station could you also listen to the Holyoke radio

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER          SEPTEMBER 26, 2006

161

1  and the WMLEC radio?
2      A.   It's only distributed to the dispatch
3  room.
4      Q.   How often would you be in the dispatch
5  room?
6      A.   Only if I had to go in there to speak to
7  the people that were in there.
8      Q.   You didn't -- is it fair to say that you
9  did not spend much time in the dispatch room when
10 you were in the station?
11     A.   No; I never spent much time in there.
12     Q.   Other than when you were reassigned to
13 be the booking officer, were you mainly in a
14 cruiser when you worked?
15     A.   As a police sergeant?
16     Q.   Okay; let's just focus on when you were
17 a sergeant.
18     A.   Yes; when I was a sergeant I was a
19 street supervisor.
20     Q.   Are you claiming that the derogatory
21 statements that you say were made over WMLEC were
22 only made with reference to you when you were a
23 sergeant?
24     A.   I can only make reference to the one I

162

1  heard, the one I heard about me.
2      Q.   Were you a sergeant?
3      A.   Yes.
4      Q.   What did you yourself hear that you
5  believe was derogatory?
6      A.   "Lick it, lick it good" by Sergeant
7  Monaghan.
8      Q.   Anything else?
9      A.   No.
10     Q.   How many times did you hear that?
11     A.   I heard it once.
12     Q.   Do you remember when that was that you
13 heard it?
14     A.   No.
15     Q.   Why do you believe that it was Sergeant
16 Monaghan who stated that?
17     A.   I know Monaghan's voice.
18     Q.   You didn't actually witness him say it,
19 did you?
20     A.   No; I know Monaghan's voice.  We got on
21 the same time, I rode with him in a cruiser.  I
22 had thousands of conversations with him.  I know
23 his voice.
24     Q.   The fact that you believe that the "lick

163

1  it, lick it good" was stated by John Monaghan is
2  based on your recognition of his voice?
3      A.   I don't believe.  I know it was Sergeant
4  John Francis Monaghan who said "lick it, lick it
5  good" over the air after I finished talking on the
6  HPD radio.
7      Q.   How long after you finished talking was
8  that said over the WMLEC?
9      A.   As soon as I finished my transmission.
10     Q.   So like within a few seconds?
11     A.   Yes.
12     Q.   How many other officers have access to
13 that WMLEC radio?
14     A.   WMLEC is located in every cruiser -- let
15 me correct that.
16          Generally every cruiser has WMLEC
17 attached to it.  It depends on if there is a newer
18 cruiser that's down, you go to an old cruiser it
19 may not have WMLEC so most cruisers that are on
20 the road when I was working for the HPD had WMLEC.
21     Q.   But which other communities have access
22 to it?
23          In other words, is it throughout the
24 State of Massachusetts?

164

1      A.   I believe so.
2      Q.   How would you describe John Monaghan's
3  voice?
4      A.   I can't.
5      Q.   In other words do you consider it to be
6  a deep voice, a loud voice, a high voice?
7          Can you give me any terms, any
8  characteristics to describe it?
9      A.   It's not high-pitched; it's not
10 high-pitched.
11     Q.   The statement "lick it, lick it good,"
12 when you heard that over the radio was it sang or
13 was it stated?
14     A.   Stated.
15     Q.   Is there any song that you know of with
16 those words in it?
17     A.   No.
18     Q.   Did anyone else ever tell you that they
19 heard someone go over WMLEC after you transmitted
20 over the Holyoke radio and make derogatory
21 statements over WMLEC?
22     A.   Did anyone else ever tell me?
23     Q.   Right; that they heard someone make
24 derogatory statements over WMLEC after you had

PERLIK and COYLE REPORTING

165

1  transmitted over the Holyoke radio?
2      A.   No.
3      Q.   Did you ever talk to Jorge Rodriguez
4  about that issue?
5      A.   Yes.
6      Q.   What did he tell you?
7      A.   He stated he filled out the
8  questionnaire.
9      Q.   Did he tell you anything else about what
10  he may have heard on WMLEC?
11      A.   He referred to a freak out, el freako
12  that he heard.
13      Q.   Anything else that you recall him
14  saying?
15      A.   No.
16      Q.   Do you believe that that statement, el
17  freako or el freak out had any reference to you?
18          MR. HUDSON:  Objection.
19          THE WITNESS:  I don't know.  I
20  didn't hear that one.
21      Q.   (BY MS. LYNCH)  But based on what
22  Mr. Rodriguez or anyone else told you, if that
23  statement were made over WMLEC, do you think it
24  had any reference to you?

166

1      A.   I couldn't answer that.
2      Q.   Are there any other statements that were
3  made either over the WMLEC radio or the Holyoke
4  radio that you believe were directed to you that
5  you considered to be offensive besides what you've
6  already testified to today?
7      A.   Define offensive?
8      Q.   Well, that you consider to be
9  offensive -- that you believe?
10      A.   Disrespectful?
11      Q.   That you believe was directed to you?
12      A.   Over the HPD or over WMLEC?
13      Q.   Either one.
14      A.   Over the HPD radio there was one
15  officer, I instructed him to write a report on a
16  loud music call I believe, and in his frustration
17  made a large sigh, "ahhhh," right as he was
18  displeased that I told him to write a word on a
19  loud music call.  That's disrespectful.
20      Q.   How about derogatory with respect to
21  having to do with your race, gender, or sexual
22  orientation?  I'm sorry, what was your answer?
23      A.   I was waiting for you to finish.
24      Q.   Why don't I rephrase it.  Have you

167

1  either heard or has anyone else told you that
2  there were statements made over either the Holyoke
3  radio station or WMLEC that were derogatory with
4  respect to gender, race or sexual orientation
5  which you believe were related to you?
6          MR. HUDSON:  Objection.
7          THE WITNESS:  The first part of your
8  question is did anyone else tell me?  No.
9      Q.   (BY MS. LYNCH)  I asked you if either
10  anyone told or you heard.
11      A.   The first question did anyone tell me;
12  no one told me.
13          The second part of the question is did I
14  hear anything other than "lick it, lick it good"?
15      Q.   Let me ask the question again.  First of
16  all, other than what you've already testified to
17  have you, yourself, heard any other statements
18  over either the Holyoke radio station or the WMLEC
19  radio station pertaining to derogatory references
20  to gender, sexual orientation or race which you
21  believe were made with respect to you?
22          MR. HUDSON:  Objection.
23          THE WITNESS:  It's a long question.
24  I think the question is besides what I've

168

1  testified to here, "lick it, lick it good," have I
2  heard any more from any other officer besides John
3  Monaghan?
4          That answer would be no.  I only heard
5  John Monaghan say that over WMLEC after I finished
6  my transmission.
7      Q.   (BY MS. LYNCH)  And that's the only
8  statement that you believe John Monaghan made over
9  either radio transmission?
10      A.   I don't believe John Monaghan said it; I
11  know he said it.  I heard him.
12      Q.   But my question is are there any other
13  statements that you attribute to him of a
14  derogatory nature that we've been discussing?
15      A.   Not that I personally have heard.
16      Q.   Other than what you've already testified
17  to that you've been told by other officers, are
18  there any other statements that you attribute to
19  John Monaghan of a derogatory nature related to
20  you?
21      A.   That's a long question; I got lost in
22  it.
23          MR. HUDSON:  Is that in general or
24  over WMLEC?

TAMMY WALKER VS. CITY OF HOLYOKE
TAMMY WALKER                    SEPTEMBER 26, 2006

169

1    Q.   (BY MS. LYNCH) I'm referring to both
2  radio stations.
3         Other than what you've already testified
4  to, has any other officer told you that statements
5  were made over either the Holyoke radio station or
6  WMLEC of a derogatory nature that were related to
7  you?
8    A.   I don't understand the question.  Sorry;
9  I don't mean -- I'm sorry; I really don't
10 understand the question.  It's just a little
11 long-winded.
12   Q.   Let me just go back.  You testified that
13 you heard a voice that you believe was John
14 Monaghan's say "lick it, lick it good" over the
15 WMLEC, correct?
16        MR. HUDSON:  Objection.
17        THE WITNESS:  Not correct.
18   Q.   (BY MS. LYNCH)  Well I know you say you
19 know it's him for sure.
20   A.   You said I testified that I believe.  I
21 did not testify that I believe.  I said I know it
22 was John Francis Monaghan --
23   Q.   (Interposing) I understand --
24        MR. HUDSON:  (Interposing) Let her

170

1  finish.
2         THE WITNESS:  Who said "lick it,
3  lick it good" over the WMLEC radio after I made my
4  transmission over the Holyoke police radio.  I do
5  not believe; I know.
6    Q.   (BY MS. LYNCH) I understand your
7  testimony.
8         Did any other officer tell you that they
9  heard John Monaghan make derogatory statements
10 over either the Holyoke radio or the WMLEC radio
11 after you transmitted over the Holyoke radio
12 station?
13   A.   No.
14   Q.   How about meowing like a cat?  Did
15 anyone ever tell you that they heard meowing like
16 a cat or a fighting cat over WMLEC after you
17 transmitted over the Holyoke radio?
18   A.   No one ever told me that.
19   Q.   Did you ever hear that?
20   A.   Over Holyoke radio or the WMLEC?
21   Q.   After you transmitted over the Holyoke
22 radio, did you ever hear meowing like a cat or a
23 fighting cat over WMLEC?
24   A.   I never heard that.

171

1    Q.   After you said that you heard John
2  Monaghan say "lick it, lick it good" over WMLEC
3  after you transmitted over the Holyoke radio did
4  you ever report that to any supervisor?
5    A.   I may have reported that to Lieutenant
6  Whelihan; I may have reported it to him.
7    Q.   But you're not sure?
8    A.   I'm not sure if I told him about that
9  one or not.
10   Q.   Is there anyone that you do recall for
11 certain reporting that to?
12   A.   Internal Affairs.
13   Q.   When did you report it to Internal
14 Affairs?
15   A.   In the conversation with David Fournier.
16   Q.   What specifically did you report?
17   A.   In the conversation I said David, you
18 know he's going on WMLEC, he's -- the allegations
19 aren't false.
20   Q.   Ms. Walker, showing you what was marked
21 as Exhibit 4, did you report anything to Internal
22 Affairs about statements you attribute to Monaghan
23 other than what's indicated in Exhibit 4?
24 (Indicating.)

172

1    A.   (Witness examining document.)  I
2  reported a lot to Internal Affairs.  Give me a
3  time frame as your basis.
4    Q.   In terms of the WMLEC statements, did
5  you ever report that to Internal Affairs?
6    A.   I had a conversation with David
7  Fournier -- Lieutenant Fournier regarding John
8  Monaghan.
9    Q.   Did you ever give him a written
10 complaint about the WMLEC statement that you said
11 you heard, "lick it, lick it good," after you
12 transmitted over the Holyoke radio?
13   A.   No; it was a verbal conversation I had
14 with David D. Fournier.
15   Q.   Do you recall when that conversation was
16 in relation to the statement that Jorge Rodriguez
17 gave about WMLEC?
18   A.   No.
19   Q.   Why didn't you put that complaint in
20 writing about the "lick it, lick it good" that you
21 said you heard over WMLEC?
22   A.   It is disgusting, it's vulgar.  I didn't
23 want to be humiliated any more.
24   Q.   The song that Mr. Rodriguez referenced

**PERLIK and COYLE REPORTING**

177

1  reference to.
2      Q.   But Charlie, the name Charlie itself
3  doesn't have any significance to you with respect
4  to a black man?
5      A.   No; but when you put the text together,
6  "Uncle Charlie dun come out wit anutter order,"
7  that would mean Uncle Charlie would be Chief
8  Scott, since I was handing him a document where
9  Chief had come out with yet another order.
10     Q.   Had anyone else ever referred to Chief
11  Scott as Charlie?
12     A.   Not in my presence.
13     Q.   You said that you were the commanding
14  officer that night?
15     A.   Correct.
16     Q.   Did you say anything to John Monaghan
17  after he said that?
18     A.   I just shot him a look.
19     Q.   Why didn't you say something to him,
20  given that you were the commanding officer?
21     A.   Because I don't say much to John
22  Monaghan.
23     Q.   But you considered that to be
24  disrespectful to Chief Scott, is that right?

178

1      A.   Correct.
2      Q.   Do you think that you had the authority
3  to discipline him for saying something
4  disrespectful about the Chief?
5      A.   It wasn't directed towards me.
6      Q.   But it was directed toward the Chief who
7  was your boss, correct?
8      A.   Yes.
9      Q.   Do you think you had the authority to
10  take disciplinary action against John Monaghan for
11  making that statement?
12     A.   Could I have --
13     Q.   (Interposing) Yes.
14     A.   -- written him up for saying that?
15     Q.   Yes.
16     A.   Possibly.
17     Q.   So why didn't you, then?
18     A.   If I wrote up John Monaghan for
19  everything, he'd have a stackful of papers in his
20  file.
21     Q.   Have you ever heard him say anything
22  else of an offensive, derogatory or disrespectful
23  nature towards Chief Scott other than that
24  statement?

179

1      A.   No; not towards Chief Scott.  No.
2      Q.   Did you ever hear any other officers
3  make derogatory statements about him?
4      A.   No.
5      Q.   No?
6      A.   No.
7      Q.   Did you ever hear anyone -- John
8  Monaghan or otherwise -- state that they didn't
9  think he should be the Chief of the Holyoke Police
10  Department because he was black?
11     A.   Not because he was black.
12     Q.   Did you ever hear anyone state that he
13  shouldn't be chief because he was considered to be
14  an outsider, meaning not from the Department?
15     A.   Yes.
16     Q.   Overall, was it your experience that
17  Chief Scott was respected as a chief?
18     A.   Excuse me?
19     Q.   Based on what you observed or heard, was
20  Chief Scott was respected as the Chief when you
21  were at the Department?
22     A.   Respected by whom?
23     Q.   By the officers, by the other members of
24  the Police Department?

180

1      A.   No.
2      Q.   You don't think he was respected?
3      A.   I know he is not.
4      Q.   Why do you say that?
5      A.   Because I've heard ranking officers have
6  issue with him.
7      Q.   Just briefly what are you referring to?
8      A.   Captain Fletcher has an issue with him;
9  Lieutenant O'Connell has an issue with him.
10     Q.   What do you think their issues are?
11     A.   I don't think their issues are; I've
12  heard their issues.  They don't like him, period.
13     Q.   Did they say why?
14     A.   He's an outsider; he's not fit for duty;
15  he doesn't carry a gun in Massachusetts; he's a
16  publicity hound.
17          I could go on for days.  They just don't
18  like him.
19     Q.   Did you ever hear John Monaghan make a
20  derogatory racial remark about anyone else besides
21  the statement you said you heard him make about
22  Chief Scott and the statement that you said you
23  heard over the WMLEC -- and right now I'm
24  referring to other police officers or citizens in

TAMMY WALKER vs.  CITY OF HOLYOKE
TAMMY WALKER              SEPTEMBER 26, 2006

185

1        I think he was referring to when the
2  Mayor was going to bring them in and we do have a
3  Somali family and I think they do have about
4  fourteen kids.
5      Q.   Any other statements that you attribute
6  to John Monaghan that you consider to be
7  derogatory towards someone's race, sexual
8  orientation or gender besides what you've already
9  stated?
10           MR. HUDSON:  Objection to form.
11           THE WITNESS:  Not that I can recall
12  at this second.
13      Q.   (BY MS. LYNCH)  Did the Holyoke Police
14  Department have a progressive discipline policy
15  when you were there?
16      A.   I was never privy to the disciplinary
17  policies of the HPD until my first discipline
18  after fifteen years so there was never a
19  progressive discipline policy that I was aware of
20  until my first discipline ever in the Holyoke
21  Police Department.
22      Q.   Do you know the progressive discipline
23  policy, what that means?
24      A.   Yes.

186

1      Q.   And you're saying that the first time
2  you were disciplined was when you heard that?
3      A.   The first time I was ever disciplined
4  was eleven years after being on the job.
5      Q.   Right; but is that the first time you
6  heard that there was a progressive discipline
7  policy?
8      A.   Yes -- I'm sorry; let me rephrase that.
9  I heard that after I was suspended for being five
10  minutes late for court.
11      Q.   There was an incident involving Elizer's
12  Pub?
13      A.   Correct.
14      Q.   I believe that was June 23, 2003, is
15  that correct?
16      A.   Yes.
17      Q.   When you got to Elizer's Pub what did
18  you observe in terms of the Holyoke police
19  officers that were there?
20      A.   The call came out over the air that
21  there was four guys refusing to leave Elizer's
22  Pub.
23        I was at 7-Eleven which was around the
24  corner from Elizer's Pub.  I pulled into the rear

187

1  of Elizer's Pub, I got out of the cruiser and
2  walked in the door.
3        As soon as I walked in the door, the
4  first person that I took notice of that I could
5  say was Officer McCay was five steps in to the
6  left, John Monaghan was at the bar, the very end
7  of the bar.  Thomas Dore was right behind Sergeant
8  Monaghan and Joseph, I believe his last name is
9  Wilson, was to the left of the Thomas Dore.
10      Q.   What were they doing?
11      A.   They were standing there in the spots I
12  just indicated.
13      Q.   In other words were they drinking?  Were
14  they just standing there?
15      A.   Sergeant Monaghan was at the bar.  There
16  was beers on the bar.
17      Q.   Meaning glasses that had some beer in
18  them as opposed to empty beer glasses?
19      A.   No; beer bottles.
20      Q.   Beer bottles?
21      A.   Fresh beer bottles with condensation on
22  the outside of the bottle.
23      Q.   Is that something you observed?
24      A.   Yes.

188

1      Q.   What time was it that you got there?
2      A.   I asked the bartender and she said it
3  was two-seventeen or two-eighteen.
4      Q.   What did you do when you got there and
5  you saw them?
6      A.   I first said what's going on.  No one
7  replied.
8      Q.   Then what happened?
9      A.   I asked who called this in.  No one
10  replied.
11      Q.   And then what happened?
12      A.   I specifically asked the bartender if
13  she called this call in.
14      Q.   And what was her response?
15      A.   She said no.  I asked the owner of the
16  bar, Steve, did you call this in and he said no.
17  I said let's go, guys.
18      Q.   And then what was the response?
19      A.   They stood there with blank looks on
20  their faces.  Sergeant Monaghan took a sip of the
21  beer, slid it down the bar, and he asked -- I'm
22  paraphrasing -- is my tab all set and I said let's
23  go with a more stern voice.
24        I want to back up.  The first time I

189

1  said let's go, one officer did start walking out
2  the door -- the front door.
3      Q.  Which one was that?
4      A.  Joe Wilson.  He did start heading for
5  the front door.
6      Q.  Okay.
7      A.  The other three just stood there.
8      Q.  Did you think that they were doing
9  something that was against the law?
10     A.  I thought the -- they shouldn't be in
11  the bar after hours drinking.
12     Q.  Because it was after two o'clock?
13     A.  Yeah; it was after two.
14     Q.  You said that John Monaghan took a sip
15  and then slid -- you said he slid the beer down
16  the bar?
17     A.  He slid it towards the bar.  Here's the
18  bar, he slid it like that.  (Indicating.)
19     Q.  In other words away from himself?
20     A.  Right.
21     Q.  Then you said he said the tab is all
22  set.
23         Did you understand that to mean he
24  wanted to make sure they had paid for the beers?

190

1      A.  I guess he was asking if the tab was all
2  set.
3      Q.  And then you said let's go and then what
4  happened?
5      A.  Thomas Skwira came inside the bar.  He
6  just stood there.
7      Q.  Then what happened?
8      A.  I told the guys to leave.  I turned
9  around and Thomas and I -- Officer Skwira and I
10  walked out the back door together.
11     Q.  Was that the end of it as far as in the
12  bar?
13     A.  Meaning?
14     Q.  Meaning you didn't have any further
15  communication with the officers that were in the
16  bar and they left?
17     A.  Yes; I asked them to leave once.  One
18  officer began to leave and then I raised my voice
19  and I said "let's go."
20         From my recollection without the report
21  in front of me I did call out to dispatch and say
22  that these four will be leaving the bar.
23     Q.  Did any of them have a uniform on?
24     A.  No.

191

1      Q.  Do you know if any of them were working
2  at the time as Holyoke police officers?
3      A.  They were not on the schedule; no.
4      Q.  Do you remember if John Monaghan
5  actually was working at the time, meaning not at
6  that moment but at that time period as opposed to
7  being out on leave or out of work?
8      A.  He was on injured-on-duty status
9  actually and so was Officer McCay.
10     Q.  After you left the bar did you have any
11  further contact with those officers that night?
12     A.  No; not with those officers, no.
13     Q.  When you went back to the station did
14  you speak with any supervisors about that incident
15  at Elizer's?
16     A.  Before I got back to the station I
17  stopped at another -- there was a situation I had
18  to take care of as a supervisor.  There was a big
19  Mac truck parked the wrong way.
20         I took care of that and then I went to
21  the station.  When I got to the station I was
22  looking for Lieutenant Whelihan.
23     Q.  Did you discuss that incident with him?
24     A.  Yes.

192

1      Q.  What was that discussion?
2      A.  That there were four officers in the
3  bar; that the call came in was actually not a real
4  call, it was one of the officers.  It wasn't the
5  call that I thought that came over the air.  It
6  was a prank.
7      Q.  Did you have any discussion with
8  Whelihan about whether or not these officers had
9  violated the law by being in the bar at that time?
10     A.  We didn't discuss the law, the reality
11  of it.
12     Q.  Did you say something to the effect that
13  you thought something needed to be done with
14  respect to those officers because they were in the
15  bar at that time?
16     A.  I informed him that I was going to be
17  doing a report on it.
18     Q.  You told Whelihan that?
19     A.  Yes.
20     Q.  What was his response?
21     A.  He said to talk to Captain Fletcher in
22  the morning.
23     Q.  He said for you to talk to Captain
24  Fletcher?

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                SEPTEMBER 26, 2006

201

1  incident report.  That's in our SOPs, you're bound
2  to.
3      Q.    When you did write it, who did you give
4  it to?
5      A.    I wrote the report and I gave it to
6  Chief Scott.  I knocked on his door and I gave him
7  the report.
8      Q.    Why did you give it to him?
9      A.    Because after Captain Fletcher's
10  swearing at me in the office and throwing his pen
11  saying if you wrote the f'ing report you f'ing
12  sign it, I'm not f'ing signing it, I didn't think
13  he really wanted it.
14      Q.    Was it the chain of command that you
15  should have given it to him?
16      A.    It was -- no; that's where everyone is
17  wrong.  It's an incident report.  It is not a
18  disciplinary action I was seeking; it was an
19  incident report.
20           Incident reports stay in the system and
21  they can be printed out at any time.
22      Q.    In other words they're not public
23  records?
24      A.    No; they're not public records.  Now if

202

1  I hadn't done a report at all I would be in
2  violation of our SOP and I would be in trouble so
3  I at least was going to do an incident report on
4  this.
5           Since I had called Chief Scott and asked
6  him after going up the chain of command to
7  Lieutenant Whelihan and Captain Fletcher and the
8  response I got from Captain Fletcher I went to
9  Chief Scott.  I was a new sergeant looking for
10  guidance as to what I should do in this situation.
11           I was instructed to do my job, which I
12  did my job.
13           (Defendant's Deposition Exhibit
14           No. 9 offered and marked.)
15      Q.    (BY MS. LYNCH)  Ms. Walker, showing you
16  what's been marked as Exhibit Number 9, is that
17  the letter of reprimand that you received as a
18  result of giving the report on the Elizer's Pub
19  incident to Chief Scott? (Indicating.)
20      A.    (Witness examining document.)  The
21  question?
22      Q.    Is that the letter of reprimand that you
23  gave after -- I'm sorry; that you were given after
24  you gave the incident report regarding the

203

1  Elizer's Pub incident to Chief Scott?
2      A.    Yes; it is.
3      Q.    Did you appeal that in any way?
4      A.    I went to the union president, Captain
5  Alan Fletcher saying I want to appeal this.
6           He pulled me in his office and actually
7  he told all of us not to appeal this, to let it
8  go.
9      Q.    When you say all of us, who are you
10  referring to?
11      A.    Sergeant Monaghan, myself -- I wasn't at
12  the same time with him, obviously -- but I said I
13  want to appeal this and Captain Fletcher said it
14  is a letter of reprimand, Tam, don't worry about
15  it.  As soon as Chief Scott leaves we're going to
16  pull it out of your file anyway so I didn't follow
17  my gut and I didn't appeal it.
18           It was my very first reprimand in the
19  Department after eleven, twelve years.  It was
20  just one letter of reprimand through twelve years
21  of good service.  I let it go.
22      Q.    Do you know whether or not you could
23  have appealed a letter of reprimand?
24      A.    I've never been involved in the union or

204

1  any disciplinary action.  I have no idea if I
2  could have appealed it or not.
3           I went to Captain Fletcher and told him
4  I wanted to fight this.  I said you didn't tell me
5  to write a report, Captain.  You told me the
6  opposite.  You told me if I write a report, I have
7  to f'ing sign it.
8      Q.    Did you say that to him when you went to
9  speak to him about appealing it?
10      A.    Yes.
11      Q.    What was his response?
12      A.    "I told you to write a report."  I
13  looked at him like he was green.  "Captain, you
14  didn't tell me to write a report.  If you told me
15  to write a report, I wanted to write a report.  I
16  already grabbed the number for the report so if
17  you wanted me to write a report, Captain, I would
18  have wrote the report and gave it to you.  You
19  didn't want me to write a report, 'that's why I
20  didn't give it to you and gave it to the Chief."
21           It doesn't make any sense logically if I
22  want to write a report and he wants me to write a
23  report, why didn't I just write a report and give
24  it to him?

205

1    He was cursing at me in his office,
2  throwing his pencil on the desk. No; he didn't
3  want me to write the report. I had to cover my
4  own situation here because I know the SOP says if
5  you find something wrong, you write a report.
6    Q.   Is it your understanding that the other
7  officers, the ones that were in the bar that
8  night, that they were disciplined as well?
9    A.   I was told they were disciplined.
10    Q.   And they wanted to file an appeal and
11  they were told not to?
12    A.   I just know about Sergeant Monaghan.
13  Sergeant Monaghan wanted to appeal it as well.
14    Q.   How do you know that?
15    A.   I heard him saying he wants to appeal
16  it. I heard him saying it in the hall, "I want to
17  appeal this."
18    Can I make note on something here,
19  actually?
20    Q.   Sure.
21    A.   The second page, Chief Scott, "you
22  subsequently wrote a report and turned the report
23  directly in to me as Chief of Police."
24    Q.   Right.

206

1    A.   I turned the report in to Chief Scott.
2  I knocked on his door and handed it to him.
3    Q.   What did he say when you gave it to him?
4    A.   Thank you; that was it but I handed it
5  to him. He said, "Thank you, Sergeant." That was
6  it.
7    Q.   How long after you gave him the report
8  was it that you received Exhibit 9?
9    A.   I would have to see the actual report
10  because it has on it the date of when I actually
11  wrote the text and when it was printed. It's on
12  the top of the page so I don't really know how
13  many days after.
14    Q.   After you got Exhibit 9 did you speak to
15  either Chief Scott or Captain Fletcher?
16    A.   Yes; I spoke to Captain Fletcher.
17    Q.   I'm sorry, with regard to the appeal?
18    A.   Yes.
19    Q.   I'm sorry. Do you recall being late for
20  court on April 6, 2004?
21    A.   Yes, Ma'am.
22    Q.   Were you ten minutes late?
23    A.   No.
24    Q.   Did you arrive at eight-forty instead of

207

1  eight-thirty?
2    A.   No.
3    (Defendant's Deposition Exhibit
4    No. 10 offered and marked.)
5    Q.   (BY MS. LYNCH) You have in front of you
6  Exhibit 10. Do you see your name listed on the
7  left-hand side? (Indicating.)
8    A.   (Witness examining document.) Yes; I
9  do.
10    Q.   Did you fill that out yourself?
11    A.   Did I fill?
12    Q.   Where it has your name and time?
13    A.   No; that's already filled out. The
14  officer's name is already filled out; the
15  Defendant's name is already filled out.
16    Q.   How about the time where it says
17  eight-forty -- time in, eight forty, did you fill
18  that out?
19    A.   I rounded it out, yes.
20    Q.   And you had to sign it as well?
21    A.   Yes.
22    Q.   So were you ten minutes late that day?
23    A.   No; I was seven minutes late that day.
24    Q.   Seven minutes late?

208

1    A.   According to Lieutenant Monfette's
2  watch.
3    Q.   Do you recall there being an issue prior
4  to April 6, 2004 where all police officers were
5  advised that they could not be late to court
6  because of a complaint made by the District Court?
7    A.   I believe an e-mail came out regarding
8  to make sure you're on time for court.
9    (Defendant's Deposition Exhibit
10    No. 11 offered and marked.)
11    Q.   (BY MS. LYNCH) Showing you what has
12  been marked as Exhibit 11, did you receive that
13  e-mail? (Indicating.)
14    A.   (Witness examining document.) I'm sure
15  if it was sent out to everyone, I'm sure I
16  received it on the computer.
17    Q.   Other than that e-mail Exhibit 11, had
18  anyone else brought it to your attention that
19  officers coming to court late was creating a
20  problem for the prosecution of cases?
21    A.   No one ever brought it to my personal
22  attention that there was an issue about being late
23  for court other than this e-mail being sent out.
24    Q.   After you were late on April 6th, 2004

209

1  were you asked to write a statement as to why you
2  were late?
3      A.   It's called a To-From.  Yes, I was asked
4  to write a To-From.
5              (Defendant's Deposition Exhibit
6              No. 12 offered and marked.)

7      Q.   (BY MS. LYNCH)  Did you write the
8  To-From statement which is Exhibit 14?
9  (Indicating.)
10     A.   (Witness examining document.)
11             MR. HUDSON:  I'm missing something
12  here.  You say this is Exhibit 14?
13             MS. LYNCH:  I'm sorry, I took the
14  wrong number.
15             MR. HUDSON:  So this should be 12?
16             MS. LYNCH:  I'll put that on the
17  record.
18     Q.   (BY MS. LYNCH) Ms. Walker, I'm showing
19  you what I've marked as Exhibit 12 which I
20  incorrectly marked as Exhibit 14.
21             Is that the To-From statement that you
22  wrote?  (Indicating.)
23             MR. HUDSON:  Excuse me, I don't
24  understand what's going on here.  Are you marking

210

1  the exhibits or is she marking the exhibits?  Is
2  counsel marking the exhibits?  I just want to be
3  clear on what's going on.
4             Who is putting the stickers on the
5  exhibits.
6             MS. LYNCH:  I am.
7             MR. HUDSON:  Let's let the court
8  reporter put the stickers on the exhibits, please?
9  Okay, please.  This is highly unusual from my
10  practice.
11             MS. LYNCH:  Just so you know, the
12  only reason I'm doing this is to save time.
13             MR. HUDSON:  If they are pre-marked,
14  that would be better.  I wouldn't have a problem
15  if they were pre-marked.
16             MS. LYNCH:  I apologize for the
17  mistake that I made in taking the wrong sticker
18  but I'm just trying to save time.
19             MR. HUDSON:  We also had a mistake
20  like this in one of your other depositions.
21             MS. LYNCH:  You're correct.
22             MR. HUDSON:  I would appreciate it
23  if the reporter would go ahead and that way I feel
24  a lot more -- I think she's probably more

211

1  experienced in marking those documents.
2             MS. LYNCH:  You're challenging my
3  sticker abilities?  We can have the stenographer
4  mark it.
5             MR. HUDSON:  As long as she approves
6  it.
7      Q.   (BY MS. LYNCH)  Ms. Walker, you have in
8  front of you what's been marked as Exhibit 12?
9      A.   Yes.
10     Q.   Is that the statement that you prepared
11  following being late for court?
12     A.   Yes; this is a To-From that I went to
13  Captain Monfette's office.
14     Q.   Did he ask you to prepare that?
15     A.   Yes; he did but when I prepared this
16  statement I had it in an envelope and I looked at
17  Captain Monfette and I said, "Captain Monfette, am
18  I going to be in trouble over this?"  And Captain
19  Monfette said, "No, you are not going to be in
20  trouble over this.  It is not you we're looking at
21  or targeting.  You rarely have court.  We're
22  targeting people that are forty-five minutes late
23  for court that are affecting the Court's preparing
24  for a case."

212

1             I asked him for -- I asked him this
2  because if you are going to be reprimanded or in
3  any trouble whatsoever, you are warranted to have
4  a union representative with you so before I handed
5  this To-From to Captain Monfette I specifically
6  asked him am I going to be in any trouble
7  regarding being -- which was really seven minutes
8  late for court and I rounded it off to ten
9  minutes, am I going to be in any trouble.  He
10  basically said no, that he wasn't targeting me.
11  After he said that, I handed it to him.
12             If I thought there was going to be a
13  disciplinary action regarding it I would have
14  never handed it in, I would have waited for union
15  representation.
16     Q.   The language, though, that you used in
17  Exhibit 12, that's your own, is that correct?
18     A.   Yes.
19     Q.   Are you aware that other officers
20  received some sort of discipline for being late on
21  April 6th, 2004?
22     A.   I'm aware that Officer Jan Saj.  I don't
23  believe Ronnie Mahalak was reprimanded although I
24  believe he was late.  I was reprimanded for being

213

1    late.
2            I don't have a list of who others were
3    reprimanded on the same day that signed this
4    docket.  Is that the same docket?
5        Q.   I just have this page of it.  I don't
6    know if there's more or not.
7            Did you have any discussion with Chief
8    Scott about the issue of your being late and the
9    issue of discipline related to it?
10       A.   Not that I recall at this time.
11       Q.   After you turned in Exhibit 12 to
12   Captain Monfette was the next thing that happened
13   that you received a notice of discipline?
14       A.   I believe I was suspended for a day if
15   I'm not mistaken.
16       Q.   Was there any communication between the
17   time that you prepared Exhibit 12 and you got a
18   notice of discipline?
19       A.   I don't recall; I'm sorry.  I don't
20   recall.
21           MS. LYNCH:  Would you mark this,
22   please?
23           (Defendant's Deposition Exhibit
             No. 13 offered and marked.)
24

214

1        Q.   (BY MS. LYNCH)  Showing you what's been
2    marked as Exhibit Number 13, is that the notice of
3    discipline that you received with regard to the
4    punctuality issue? (Indicating.)
5        A.   (Witness examining document.)  Yes,
6    Ma'am.
7        Q.   Did you appeal that?
8        A.   Yes, Ma'am.
9        Q.   Did you give any kind of testimony?  In
10   other words was there any kind of hearing,
11   anything like that?
12       A.   Yes.
13           (Defendant's Deposition Exhibit
             No. 14 offered and marked.)
14
15       Q.   (BY MS. LYNCH)  Showing you what's been
16   marked as Exhibit Number 14, is this the
17   correspondence that you received from the Mayor
18   following the appeal? (Indicating.)
19       A.   (Witness examining document.)  This is a
20   letter from Mayor Sullivan.
21       Q.   Was that affirming the one-day
22   suspension following the appeal regarding the late
23   for court issue?
24       A.   Yes.

215

1        Q.   I just want to go back over one thing.
2    With regard to when you worked between May of 2002
3    and December of 2002 with Jorge Rodriguez and John
4    Monaghan were you all on the same line?
5        A.   Meaning?  Line?
6        Q.   Meaning the same schedule with regard to
7    the watch that you were on?  Like you worked the
8    same days and had the same days off?
9        A.   No; I believe I was in A group and I
10   believe they were in C group.
11           MR. HUDSON:  You either know or you
12   don't know.
13           THE WITNESS:  I was in A group, I
14   know that.
15       Q.   (BY MS. LYNCH)  You think that Monaghan
16   and Rodriguez were in the C group?
17       A.   I know I was in A group.
18       Q.   But you don't recall them being in A
19   group?
20       A.   I don't recall.  I know that I was in A.
21   I don't know if they switched groups or not.  I
22   just know I was in A group.
23       Q.   What's the difference between A and C?
24       A.   We're on a four-on-two-off schedule.

216

1    There's three groups -- A group, B group and C
2    group.
3            Group A always works their four days
4    together, group B always works their four days
5    together, group C always works their four days
6    together so I will work two with B and two with C.
7        Q.   How did you learn the correct way to
8    write reports as a police officer with the Holyoke
9    Police Department in terms of what information
10   should go in a report?
11       A.   There's a class at the Academy where
12   there's basic writing.
13       Q.   In a nutshell, what do they teach you in
14   terms of what should go in a report?
15           MR. HUDSON:  Objection; when?
16           MS. LYNCH:  In the Academy.
17           MR. HUDSON:  She went to the Academy
18   in 1993.
19           MS. LYNCH:  Right.
20           MR. HUDSON:  So if you're talking
21   about that period of time.
22           MS. LYNCH:  Right.
23           THE WITNESS:  It was a one-week
24   course on writing a report.  It depends on the

217

1  report, actually.  It really depends on the
2  report.
3        Q.   (BY MS. LYNCH)  Other than the course
4  that you took at the Academy, did you receive any
5  other training in terms of what should be put in a
6  report that you prepare as a police officer?
7        A.   Not to my knowledge; no.
8        Q.   Going back then to the training that you
9  received at the Academy, when you were taught to
10  write reports based on reports made by citizens of
11  incidents, what were you taught?
12       A.   We weren't really taught how to write a
13  text report.  They wanted to make sure we knew
14  grammar, punctuation.
15            It was a one-week course.  Basically it
16  was a one-week course to make sure you could
17  write, period.
18       Q.   Do you recall being taught that you
19  should include the name of the individual
20  providing the information to the Police
21  Department?
22       A.   No.
23       Q.   Do you recall being taught that you
24  should provide identifying information about the

218

1  individual making the report to the Police
2  Department such as their address, phone number,
3  any information you have about them?
4            MR. HUDSON:  Objection.
5            THE WITNESS:  That's if you're going
6  on a call.  If you're going on a call and you're
7  taking down a person's information -- if I'm going
8  out on a call and I'm taking down information, I
9  want to know your name, date of birth, Social
10  Security Number, what your problem is.  That's
11  different than being shipped a call in the office.
12           The dispatchers have a job to take down
13  the information when they pick up that phone.  It
14  is in their manual, their handbook that they
15  identify who they are speaking to, name, phone
16  number to contact them back.
17           When you're doing a general report, a
18  regular incident report and you're out in the
19  field you would take pertinent information.  When
20  you're shipped a call from the dispatcher who
21  throws a call to you, you are under the impression
22  that this dispatcher has already done her job in
23  taking the pertinent information.
24           They go to school for that for more than

219

1  a week.
2        Q.   (BY MS. LYNCH) How about in the instance
3  where the dispatcher tells you that they have not
4  taken any information from the caller as to their
5  identity?
6        A.   If a dispatcher were to relay that to a
7  supervisor, that would be one story.  If a
8  dispatcher says informational call, you know,
9  someone wants some information, that's a different
10  story, depending on what the dispatcher states.
11           Regardless of what the dispatcher
12  states, their job is to pick up the phone and say
13  "Holyoke Police Department, your call is being
14  recorded" and therefore they take all information
15  pertaining to the person that they are speaking to
16  on that line.
17           If they need to ship that call anywhere
18  else and say it gets dropped for some reason in
19  transferring it, how are you going to get that
20  person back if the dispatcher didn't do their job
21  in gaining the information of that party.  That is
22  their job.  It is in their manual.
23       Q.   With respect to the telephone call that
24  you received on July 23, 2004 from a citizen who

220

1  reported viewing an individual at the Holyoke
2  Mall, can you describe first of all what was
3  stated to you by the dispatcher before you took
4  the call?
5        A.   I was sitting at the CO's desk, the
6  phone was ringing off the hook at dispatch.  The
7  next thing I hear is Brenda Therrien yelling from
8  across the room, "Sarg, informational call."
9            I pick it up, start talking to the
10  individual on the phone.  I knew nothing about --
11  anything about this call whatsoever.  I pick up
12  the phone.
13       Q.   Did she tell you before she gave you the
14  call that she had not taken any identifying
15  information from the person who called?
16       A.   The only thing that dispatcher Brenda
17  Therrien said, yelling from across the room, from
18  what I recall, the phone is ringing in the office,
19  dispatch office, is "informational call, Sarg."
20  That's all I heard.
21           My phone rang in the CO's office and I
22  picked it up and started speaking to an
23  unidentified female.
24       Q.   Was anyone else present when you took

225

1  said I did.
2           MS. LYNCH:  I've got the report that
3  you did, I think.
4           If you'd like to see that, why don't we
5  have that marked as the next exhibit.
6           (Defendant's Deposition Exhibit
           No. 16 offered and marked.)
7
8      Q.  (BY MS. LYNCH)  Ms. Walker, showing you
9  what has been marked as Exhibit 16, do you
10  recognize that? (Indicating.)
11      A.  Yes.
12      Q.  Is that the report that you wrote?
13      A.  (Witness examining document.)  Yes.
14      Q.  Do you recall any other information that
15  you received from the individual besides what is
16  written there?
17      A.  At this time, no.  I received this call
18  shipped from Brenda Therrien -- Dispatcher
19  Therrien.
20           The caller wanted to know information as
21  to what she should do if she had seen someone
22  videotaping in the Mall.  I believe I instructed
23  this woman to contact Mall security, without
24  giving her any information as to why to contact

226

1  Mall security.
2           The Mall has massive cameras all over
3  the place in that Mall but I wouldn't tell her
4  that.  I told her to contact Mall security.  Mall
5  security would contact us, knowing that there's
6  massive cameras all over the Mall.
7      Q.  Had you ever done any work at the
8  Holyoke Mall?
9      A.  Yes.
10      Q.  In other words -- well, how do you know
11  that there are massive cameras around the Mall?
12      A.  I've used the Mall security team in my
13  DEA work.  I've been in the office where all the
14  cameras are.  I know what -- I should say back
15  then I knew what parking lots the cameras were,
16  how extensive they can zoom in.
17           I've used them to secure a drug dealer
18  and follow him throughout the Mall for an hour or
19  more, see exactly where he goes.
20      Q.  Why didn't you get the name and
21  identifying information of the woman that called?
22      A.  Because I'm assuming that the dispatcher
23  had gotten all of the information from the person
24  that called.  She said "information call, Sarg."

227

1  I picked up the phone and started speaking with
2  the woman.
3           The woman appeared to be pretty young.
4  She stated that she was at the Mall earlier and
5  that she was just wondering if this ever happened,
6  what would I do and I said you'd call the Mall
7  security and get ahold of Mall security.  I didn't
8  tell her about the cameras that are all inside the
9  Mall.
10           I let her know that if she thought she
11  saw someone with a video camera inside the Mall
12  that shouldn't have a video camera or she feels
13  that they were doing something wrong, that that's
14  what you would do.
15      Q.  Did she say what the person was
16  videotaping?
17      A.  She didn't mention that to me.  None of
18  this information came out to me about this person
19  videotaping anything until after I had a brief
20  conversation with this woman and then and only
21  then did all of this information start coming out
22  about what Brenda Therrien said, what's on the
23  tape and what Brenda Therrien said.
24           It is like when you go fishing, the fish

228

1  gets bigger and bigger and bigger as the story
2  grows.  Brenda Therrien expounded on the story and
3  shipped the call to a sergeant that was sitting in
4  there saying "informational, Sarg."
5           You get thousands of calls of nuts
6  saying that I'm drunk and I can't get up, you
7  know.  If you're really busy in there and the
8  phone is ringing off the hook, you don't have time
9  to play around with a drunk person so they'll ship
10  it out.
11      Q.  When you just said a moment ago that
12  what Brenda Therrien said and what's on the tape
13  is different, what are you referring to?
14      A.  What Brenda Therrien stated to me after
15  this whole incident was -- after the phone was
16  hung up was that she said that the woman called
17  and stated to her that there was a man in the Mall
18  videotaping.
19           That call never came to me in that
20  manner.  Brenda Therrien never said anything about
21  a man in a Mall, a woman reporting a man in the
22  Mall.  None of that came to me until well after
23  the fish had gotten to be eight feet did I learn
24  of any of this information.

237

1  was Middle Eastern videotaping in the Holyoke
2  Mall?
3      A.  An olive complexion male.
4      Q.  Why didn't you write that, that she
5  reported seeing an olive complected male as
6  opposed to a Middle Eastern male?
7      A.  I don't know; I don't know.
8      Q.  Do you know if she was from Holyoke --
9  the Holyoke area at all so that she would know
10 there was a large Hispanic population in Holyoke?
11     A.  I asked her if she was aware there was a
12 large Hispanic population in the City.
13     Q.  What was her response?
14     A.  No; she wasn't aware.  So I would assume
15 she's not from Holyoke.
16     Q.  How long did you speak to the female?
17     A.  Two minutes, maybe three and a half.
18     Q.  Why didn't you tape record the call?
19     A.  I don't tape record the calls.  I never
20 tape record a call since I've been at the Police
21 Department in twelve years, ever.
22     Q.  Did you have that capacity on the phone
23 that you were in, in the CO's office -- was it the
24 CO's office that you were in?

238

1      A.  That's correct.
2      Q.  Did you have that capacity to tape the
3  call?
4      A.  Yes; but why would I tape a call
5  that's -- the woman is asking a question about
6  what she should do, not that she saw but what
7  should she do if she did see something.  Why would
8  I tape that?
9          If someone called the station and said
10 Sergeant Tammy Walker I'm calling because I see a
11 Middle Eastern man with a video camera and he's
12 taping structures, then you would probably tape it
13 and go ahead with it.  This is not the call that
14 came through.
15     Q.  Also in Exhibit 16, the last sentence up
16 said, "I then spoke to Sergeant Albert" -- next to
17 last sentence, "I then spoke to Sergeant Albert
18 regarding this matter."
19         Can you recall what you stated to
20 Sergeant Albert?
21     A.  Yes; I spoke to Sergeant Albert
22 regarding this situation.  He came to me the next
23 night and he said, "Sarg, I checked out and had
24 the Mall security do the entire scan of the Mall

239

1  and there's nothing to this call."  I said, "I
2  knew there was nothing to the call, Jimmy, don't
3  worry about it."
4          There was such nothing to this call that
5  Homeland Security liaison, Sergeant Albert didn't
6  even write a report himself for probably five days
7  after the twenty-fourth, after he had the Mall
8  check it out.
9      Q.  When did he tell you that there was
10 nothing to the call?
11     A.  The next night.  He just wanted to let
12 me know.  He said, quote, "Sarg, there was nothing
13 to that call."  I said, "I know, Jimmy, there was
14 nothing to it.  I know."  He said I just wanted to
15 let you know.
16     Q.  Did you ever discuss this issue
17 involving the Holyoke Mall with Chief Scott?
18     A.  Through a suspension.  Yes; I was
19 suspended on this as well.
20     Q.  But did you ever talk to him one on one
21 about that incident?
22     A.  No.
23     Q.  Do you know what time of day it was that
24 the woman observed the man videotaping at the

240

1  Mall?
2      A.  The woman didn't say she observed the
3  man videotaping at the Mall.
4      Q.  Well, your second sentence says, "She
5  wanted to report she saw a man who she thought was
6  Middle Eastern videotaping in the Holyoke Mall."
7          My question is what time did she say she
8  saw him videotaping?
9      A.  I don't know what time it was but
10 according to the other text, the dispatch, he
11 wasn't videotaping in the Mall -- according to
12 Brenda's dispatch log.
13     Q.  Her dispatch log?
14     A.  Yes; her dispatch logs of the call that
15 she took from this woman.
16     Q.  You've seen that in writing?
17     A.  I've seen it in writing; yes.
18     Q.  Did you have a discussion with
19 Lieutenant Denise Duguay about this incident at
20 the Holyoke Mall?
21     A.  When?
22     Q.  After you took the call?
23     A.  I was only in the station for half an
24 hour relieving another sergeant for lunch.  I

# EXHIBIT 7

TITLE CODE: 00833
REQUISITION NUMBER:          990205
HOLYOKE POLICE DEPARTMENT

DATE: 04/15/1999    PAGE:

DANIEL J. SZOSTKIEWICZ, MAYOR
HOLYOKE CITY HALL
DWIGHT STREET
HOLYOKE 01040

LOCATION: HOLYOKE
2 PERM F/T POLICE SERGEANTS
SELECTION MUST BE OF    2 OF THE FIRST    5 HIGHEST WHO WILL ACCEPT

| Application No. | Name and Address of Eligible Applicants Notified to Report for Interview | Eligibility Expires | Per Cent | FAILED TO RESPOND | DECLINED APPOINTMENT | OTHER REPORT (STATE BELOW) | WILLING TO ACCEPT | SELECTED FOR |
|---|---|---|---|---|---|---|---|---|
| PROM | DUGUAY, DENISE 133 FEDERAL STREET BELCHERTOWN 01007 | | 88.00 | | | | | |
| ☐ I WILL accept the appointment.  ☐ I WILL NOT accept the appointment. | | Applicant's Signature:- | | | | | | |
| PROM | PRATT, DAVID R 2 BRETON LANE HOLYOKE 01040 | | 87.00 | | | | | |
| ☑ I WILL accept the appointment.  ☐ I WILL NOT accept the appointment. | | Applicant's Signature:- #239 | | | | | | |
| PROM | MCCOY, MICHAEL J 9 BRAY PARK DRIVE HOLYOKE 01040 | | 80.00 | | | | | |
| ☑ I WILL accept the appointment.  ☐ I WILL NOT accept the appointment. | | Applicant's Signature:- Michael McCoy #198 | | | | | | |
| PROM | MONAGHAN, JOHN F 21 VASSAR CIR HOLYOKE 01040 | | 80.00 | | | | | |
| ☑ I WILL accept the appointment.  ☐ I WILL NOT accept the appointment. | | Applicant's Signature:- John F Monaghan | | | | | | |
| PROM | WALKER, TAMMY 425 PLEASANT STRE HOLYOKE 01040 | | 80.00 | | | | | |
| ☑ I WILL accept the appointment.  ☐ I WILL NOT accept the appointment. | | Applicant's Signature:- Tammy Walker | | | | | | |
| | 0 | | | | | | | |
| ☐ I WILL accept the appointment.  ☐ I WILL NOT accept the appointment. | | Applicant's Signature:- | | | | | | |

05/06/1999
☐ I WILL accept the appointment.

**HUMAN RESOURCES DIVISION**
REQ-NO.          DATE OF CERT.
990205 04/15/99
THIS IS AN EMPLOYMENT INTERVIEW NOTICE FOR:
2 PERM F/T POLICE SERGEANTS

☐ I WILL accept the appointment.

☐ I WILL accept the appointment.

LOCATION:  HOLYOKE

☐ I WILL accept the appointment.

IF YOU DESIRE TO BE CONSIDERED, REPORT IN PERSON TO:
MARC A. COURNOYER, CHIEF
HOLYOKE POLICE DEPARTMENT
220 APPLETON STREET
HOLYOKE, MA 01
ON OR BEFORE:
    APRIL 28, 1999

☐ I WILL accept the appointment.

☐ I WILL accept the appointment.

☐ I WILL accept the appointment.

135M-12-90-G552127

SEE REVE... SEE REVERSE SIDE OF THIS FORM FOR FURTHER INFORMATION



THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE FOR ADMINISTRATION AND FINANCE
HUMAN RESOURCES DIVISION
ONE ASHBURTON PLACE, BOSTON, MA 02108

**ARGEO PAUL CELLUCCI**
Governor

**JANE SWIFT**
Lieutenant Governor

**ANDREW S. NATSIOS**
Secretary

**JAMES J. HARTNETT, JR.**
Personnel Administrator



April 26, 1999

Report in person to:

The Honorable Daniel Szostkiewicz
Mayor of the City of Holyoke
City Hall
Holyoke, MA 01040

The Honorable Daniel Szostkiewicz
Mayor of the City of Holyoke
City Hall
Holyoke, MA  01040

Dear Mayor Szostkiewicz:

The following applicant has been added to certification number 99-0205 dated April 15, 1999, issued to fill 2 permanent full-time Police Sergeant positions:

Joseph H. Garcia          78.00
57 Granby Road
South Hadley, MA  01075

This name should be placed after the name of Tammy Walker on page 1 of the certification.

A copy of this letter is being sent to the applicant, who, upon receipt, is advised to appear before you or your designee to indicate their interest in being considered for the position **by May 6, 1999.**

| I WILL ACCEPT APPOINTMENT | I WILL NOT ACCEPT APPOINTMENT |
| --- | --- |
| *Joseph Garcia* #200 | |
| SIGNATURE OF APPLICANT | |

Sincerely,

*Brenda A. Geoghan*

Brenda A. Geoghan, Assistant Director
Test Administration Group
Public Safety Unit

BG:ne
990205

*DANIEL J. SZOSTKIEWICZ, MAYOR*

# EXHIBIT 8



HON. DANIEL J. SZOSTKIEWICZ
MAYOR, CITY OF HOLYOKE

July 6, 1999

Mr. Joseph A. Trainor
Personnel Administrator
Human Resources Division
Bureau of Local Government
One Ashburton Place
Boston, MA 02108

Attention: Brenda Geoghan

Dear Mr. Trainor:

Submitted in accordance with the requirements of the Division of Personnel Administration selection process in selecting and appointing Michael McCoy and Joseph Garcia to the permanent position of police Sergeant from certification No. 990205, dated April 15, 1999.

At the time of appointment, McCoy and Garcia were serving in a provisional capacity as Sergeants. Pratt was serving as a temporary full-time Sergeant. McCoy was number three on the list of eligible candidates and Garcia was number five on the list of eligible candidates that included David Pratt in the number two position and Tammy Walker and John Monaghan tied in the number four position. Denise Duguay occupied the first position on the list and has recently been promoted to Permanent Sergeant.

The City, after careful consideration of the candidates through review of the personnel files and detailed interviews, and critical input from the Chief of Police, decided on the above referenced candidates for the following reasons:

1. I conducted interviews on June 9, 1999. Assisting in the interview process were Chief of Police Marc A. Cournoyer, Personnel Director David A. Lawrence and City Solicitor Stephen P. Fitzgibbons. Each of the candidates was asked a series of questions and hypotheticals. Provisional Sergeant McCoy revealed in his interview that he possessed extensive police experience and knowledge about the Holyoke Police Department and all facets of police work. It is important to me that supervisors have extensive experience with the department; McCoy has over twelve years of experience with the



department. I was particularly impressed that McCoy had experience in many different areas of operation within the department such as operations, traffic, and the Crime Prevention Bureau. It is my firm belief that this broad knowledge of the department and police work in general will suit McCoy well as a permanent Sergeant. McCoy has also participated in and attained a thorough working knowledge of many of the programs of the department, including the Community Policing and Bike Patrol Programs. It is my opinion that McCoy will prove to be an effective leader within the department based on his extensive knowledge and understanding of the department's many functions and its role in the community.

2. I relied heavily on the input of Chief Cournoyer in making my decision. In our discussions after the interviews, Chief Cournoyer suggested that Officer McCoy would be an excellent permanent appointment to the position of Sergeant, because he had a tremendous amount of experience in various aspects of the department. The Chief felt strongly that this would enable McCoy to lead by example. The Chief and I were particularly impressed with McCoy's answer to a lengthy "real life" hypothetical situation (attached herein as question number three) dealing with controlling an unruly crowd in a neighborhood. McCoy was very detailed and accurate in explaining how a Sergeant should take control and defuse the situation. McCoy also correctly pointed out and discussed many, if not all, of the relevant issues and offered realistic solutions from a supervisor's perspective. The Chief and I both believe that McCoy's varied experience is reflected in this answer and is indicative of the professional manner and ability in which McCoy will act as a Sergeant. I firmly believe that a Sergeant should be an excellent decision-maker; the detailed analytical answers provided by McCoy indicate that he has a strong ability to make quick, effective decisions. Further, McCoy's in-depth answers displayed extremely effective communication skills, which will enable him to succeed in a department where communication can often be lacking between the ranks. McCoy's understanding of all of the operations of the department and his experience in making difficult decisions in many areas of the department as an officer and as a Provisional Sergeant will enable him to continue to be an effective and reliable decision-maker when dealing with important public safety matters.

3. Provisional Sergeant McCoy has been in service with the Holyoke Police Department since June 4, 1987. McCoy has been in the operations aspect of the department for most of his career, but has also

served as a traffic investigator, served on the traffic platoon, Bike Patrol (since 1994) and in the Community Policing Program. McCoy has also served in the Crime Prevention Bureau and as a Provisional Sergeant of Police in Operations. Further, McCoy served as an agent of the Board of Health to enforce the state sanitary code and municipal health ordinances. McCoy has obtained a Bachelor's Degree in Criminal Justice. I believe McCoy is the ideal candidate for Sergeant, because he possesses a good working knowledge of the functions of the entire department and has the necessary communication skills and abilities to lead the officers under his command.

4. McCoy has received eight memorandums of appreciation and four letters of commendation. McCoy also possesses sixty-seven in-service credits, which add to his overall experience and skill within the department. McCoy possesses significant patrol, operations and investigation experience with commendation. It is also apparent that McCoy has worked diligently to attain an extensive amount of training and experience.

5. Provisional Sergeant Joseph Garcia also elaborated in his interview on his extensive and varied experience in the department. Garcia has been assigned and performed to a high standard in both operations and administration. The interview revealed that Garcia has extensive experience and knowledge of the function and operations of the department. Once again, it is important to me that supervisors have extensive experience with the department, like McCoy, Garcia has over twelve years of experience with the department. It is my belief that Garcia's experience in the operations and administration aspects of the department will suit him well as a Sergeant. Both the Chief and I agree that such operations or "street experience" is an extremely important pre-requisite for a Sergeant and his additional experience in administration will add to his broad base of knowledge. Garcia also has extensive knowledge and understanding of such department programs as the Community Policing and Bike Patrol Programs. It is vital that a Sergeant in the Holyoke Police Department understands these programs in order to insure that they are effectively administered. Garcia's interview answers reflected this knowledge and experience. Garcia's answers were very detailed and fact specific, an indication of the excellent verbal communication skills Garcia possesses and a predictive factor of an individual that will be able to convey instruction and leadership to those officers he will supervise.

6. For instance, Garcia was not only able to answer all questions appropriately, but he was able to elaborate on the police function and policy issues presented and provide detailed remedies for problems presented. I consider Garcia's ability to elaborate and define these issues to also be indicative of strong decision making abilities. Garcia's answer to a complex hypothetical situation concerning a neighborhood disturbance (attached) revealed his knowledge of police enforcement and supervisory skills. Garcia was able to identify all issues and clearly elaborate on the functions of a Sergeant in a hectic and dangerous situation. For instance, Garcia effectively provided a detailed analysis from a supervisor's perspective on the best method to diffuse the situation, calm the inexperienced officer and utilize the officers on the scene to protect public safety. It is essential that supervisor's act in such a detailed and decisive manner as displayed by Garcia in his answer. Garcia proved to be an effective communicator with excellent organizational skills.

7. The interview also revealed that Garcia has an excellent working relationship with the other members of the department and the community. The chief cited Garcia's unblemished record and the fact that he has an excellent rapport with and the ability to communicate effectively with all members of the department as a predictive factor of his success as a Sergeant. Once again, I believe that communication between the ranks is an extremely important factor in the Holyoke Police Department. The City of Holyoke has a large Hispanic community. Garcia cited as one of his strengths his effective working relationship and strong community relations with the Hispanic community in the city. The Chief supported this relationship in the post-interview discussion. As racial tensions often arise in this city, the Chief and I both feel that it is of utmost importance to promote officers that have established excellent working relationships with the Hispanic community and all other groups in the city. The Chief and I were impressed that Garcia has a well-established and productive relationship with the Hispanic community and are certain that this rapport will be a tremendous asset to the community and the department. The appointment of Joseph Garcia is consistent with the city's policy of promoting qualified minority candidates into supervisory positions and is also consistent with my efforts to promote such candidates. Further, this appointment addresses the concerns of the City Council in this regard (see attached order of City Council).

8. Provisional Sergeant Garcia has been in service with the department since June 4, 1987. Garcia has been a provisional Sergeant since

February 28, 1999. Garcia has served the department in the operations aspect of the department, served as a court liaison for the department and is a member of the Bike Patrol. Garcia possesses an Associate's Degree in Criminal Justice. I am confident that Garcia's extensive experience will continue to suit him well as a Sergeant.

9. Garcia has received five letters of appreciation and seven letters of commendation. Garcia has also earned forty-five (45) in-service training credits, which add to his overall experience in the department.

10. David Pratt was number two on the list of eligible candidates and bypassed. Officer Pratt has been a member of the department since 1993. As stated, in making my decisions, I rely heavily on the input of Chief Cournoyer and the interview conducted on June 9, 1999. The Chief opined that Officer Pratt is an excellent officer, although he is not yet ready to assume the rank of Permanent Sergeant. The reasons behind this opinion are that Officer Pratt does not yet possess the working knowledge of the department and the experience within the department. Many of the answers provided in the interview were reflective of this lack of experience and knowledge. It is my belief that a Supervisor should possess many different skills and working knowledge of the department to effectively supervise the officers under his command. I believe Officer Pratt has not yet attained the level of experience and knowledge to effectively supervise. The interview revealed that Pratt has some knowledge of the department and its procedures, but he failed to apply this knowledge in his answers. For instance, question two was a question about police discretion. Although Pratt could define police discretion, he was unable to elaborate on police discretion and apply it to situations where police discretion must be utilized. On question number six regarding disgruntled employees, Pratt failed to notify his commanding officer. The Chief believes this answer to be incorrect and an indication of Pratt's inexperience in dealing with these types of supervisory situations. Further, I feel that the lack of detail in Pratt's answers displayed a lack of communication and analytical skills that are essential for a public safety supervisor.

11. While I do not believe that Officer Pratt presently has the police experience to handle the permanent full-time Sergeant position, I do feel that he has a bright future in law enforcement. The Chief has recommended Officer Pratt for the position of temporary Sergeant, which the Chief believes, will enable Pratt to gain the valuable experience within the department, which he presently lacks.

12. Officer Tammy Walker was fourth on the list of eligible candidates and was bypassed. Officer Walker has been a member of the department since 1993. Officer Walker was interviewed on June 9, 1999 at 11:00 a.m. The interview revealed that Officer Walker has a basic of understanding the department, but it is not an in-depth and detailed knowledge of the department and its programs. The interview also revealed that Walker presently lacks the requisite experience within the department to act effectively as a Supervisor. This lack of understanding and inexperience were evident in the many brief answers provided during the interview. For instance, Walker failed to answer questions one, two and four correctly. Question one was a question regarding what the officer felt was the public's view of the department. Walker provided her view of the department. Walker also provided a nondescript answer to question number two dealing with police discretion, which essentially rendered her answer incorrect. Walker also failed to provide an appropriate response to number three. In question number four, Walker was asked to answer a question about what community policing meant to her and instead stated her opinion on what would have to happen to attain the community policing philosophy. The brief, undetailed answers provided were indicative of a lack of depth of understanding of police work and the department in general and a lack of necessary and effective communication skills.

13. The detailed hypothetical situation regarding the neighborhood disturbance is a good barometer for the candidates to display their knowledge of a supervisor's function, organizational and communication skills. Officer Walker's brief answer to this hypothetical question states that she must get the crowd under control but lacks sufficient analytical detail as to how this should be accomplished and what her role would be to diffuse the situation as a supervisor. For instance, she failed to discuss all the issues presented, she failed to describe the best manner in which to utilize the officers on the scene to protect public safety and failed to address the situation with the inexperienced officer. The Chief and I believe Walker's brief answer to this detailed hypothetical question indicates that she presently lacks the detailed knowledge of the functions of department, the role of a supervisor in the department and the requisite organizational, analytical and communication skills to be an effective supervisor.

14. John Monaghan was tied for fourth on the list of eligible candidates and was bypassed. Officer Monaghan has been a member of the department since 1993. Officer Monaghan was interviewed on June 9, 1999 at 10:30 a.m. The interview revealed that Monaghan lacks sufficient understanding and knowledge of the department and its programs to be an effective supervisor. Further, I believe that Monaghan lacks the sufficient communication skills to be an effective supervisor at this time. The interview answers were indicative of an officer with inexperience within the department. Many of the answers provided were brief and many answers were unresponsive to the questions posed. For example, Monaghan's answer to question one only briefly described the public view of the department and was not supported with any details. This indicated to the Chief to be a lack of understanding of the police function in society and how the citizens of Holyoke presently view the department. In describing police discretion, Monaghan stated that it was the most important aspect of police work, but failed to elaborate and articulate on police discretion. The hypothetical answers were similarly brief and lacking the detail of a satisfactory supervisor's answer. For instance, Monaghan was able to identify many of the issues in the hypotheticals, but was unable to elaborate and provide solutions to the public safety problems presented. I believe that this overall lack of detail is an indication of poor organizational, analytical and communication skills, all of which are essential prerequisites for effective public safety supervisors.

If I can provide any additional information, please do not hesitate to contact me.

Very truly yours,

Daniel J. Szostkiewicz
Mayor

Cc: Chief of Police
       Law Department
       Personnel Department

# EXHIBIT 9

HON. DANIEL J. SZOSTKIEWICZ

MAYOR, CITY OF HOLYOKE



DEPARTMENT OF POLICE

MARC A. COURNOYER
CHIEF OF POLICE

17 June 1999

SPECIAL ORDER
NUMBER   1167

We are pleased to announce that the following have been sworn in and will be effective 0001 hours 20 June 1999.

David Pratt to the position of Temporary Full Time Police Sergeant.

Michael McCoy and Joseph Garcia to the position of Permanent Full Time Police Sergeant.

Per order of,

MARC A. COURNOYER
Chief-of-Police



# EXHIBIT 10



DEFENDANT'S DEPOSITION EXHIBIT
2 Walker
9/26/06

Discrimination Complaint

Massachusetts Commission Against Discrimination and EEOC

FEPA NO. 99230641                    FILING DATE: 10|15|99

EEOC NO. :                           VIOLATION DATE: 7/99

**NAME OF AGGRIEVED PERSON OR ORGANIZATION:**
Tammy Walker                         **TELEPHONE NUMBERS:**
425 Pleasant St.                     **HOME: (413)533-1216**
Holyoke, MA 01027                    **BUSINESS:**

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT
AGENCY OR STATE/LOCAL GOVERNMENT AGENCY WHO
DISCRIMINATED AGAINST ME:**
City of Holyoke • Holyoke Police Dept.
Mayor Szostkiewicz & City Hall       **TELEPHONE NUMBER:**
220 Appleton St.                     (413) 536-6431
Holyoke, MA 01040                    NO. OF EMPLOYEES: 25+

**CAUSE OF DISCRIMINATION BASED ON:** Race, Color, Sex
On June 9, 1999, the city of Holyoke discriminated against me by subjecting me to
unequal terms, conditions, privileges of employment, and denying me a promotion to
the position of Police Sergeant because of my race and color (African American), and
sex (female). Mayor Szostkiewicz interfered with the exercice and enjoyment of my
rights granted and protected by law. The respondents are in violation of M.G.L.
Chapter 151B, Section (4(1)(4a) and Title VII of the Civil Rights Act as Amended.
THE PARTICULARS ARE:

1. I was hired in April, 1993, as a reserve patrol officer by the Holyoke Police
   Department.
2. I became a full-time police officer in July, 1993.
3. I am in good standing as an officer and my personal file doesn't possess any
   negative incidents.
4. On April 21, 1999, Holyoke Mayor, Daniel Szostkiewicz, received an order from the
   Holyoke City Council requesting information as to what efforts he is making to
   promote minorities into supervisory positions within the Holyoke police department.
5. Interviews of candidates for two Police Sergeant permanent positions were
   conducted by Mayor Szostkiewicz on June 9, 1999. Prior to the interview process,
   Michael McCoy, Joseph Garcia, and David Pratt were serving in a provisional
   capacity as Sergeants. They were placed into provisional positions by Mayor
   Szostkiewicz. FEb 28 1999
6. There was a total of of 5 candidates available for the two Sergeant positions. Each
   candidates was rated on a scale which determined the rank of order. The rank and

rating was as follows: Denise Dugay (88), David Pratt (87), Michael McCoy (80), John Managhan (80) and myself (80). This scale was derived from a written examination, education, training, and experience. Note that the third, fourth, and fifth positions were in a numeric tie.

7. The procedure for appointments outlined by the Civil Service Commission states that only appointments can be made from the designated certified list. If a candidate of lower rank is chosen over a higher ranked individual then the reasons must be clearly outlined.

8. Officer Joseph Garcia's name didn't originally appear in the above list. His name was only added to the list after Denise Dugay's name was rescinded for reasons listed below. Joseph Garcia's name was added to the list of candidates only after the strong urging of Mayor Szostkiewicz. The Mayor wrote a detailed letter to the Civil Service Commission requesting that another name be added to the candidate list, knowing that Officer Garcia was next in succession.

9. On June 9, 1999, I was interviewed by Mayor Szostkiewiez, Chief of Police Marc A. Cournoyer, Personnel Director David A. Lawrence and City Solicitor Stephen P. Fitzgibbons.

10. I received a letter dating July 9, 1999, informing me that the appointing authority for the City of Holyoke had bypassed me for selection for the position of Police Sergeant on Certification No, 99-0205.

11. I immediately decided to appeal their decision.

12. On July 14, 1999, I contacted the Human Resources Division for The Commonwealth of Massachusetts requesting the selection reasons for the appointed candidates. Human resources supplied me with the rationale for the decision which was written by Mayor Szistkiewicz.

13. Although Mayor Szostkiewicz's official rationale appears to be solid, there are several major fallacies contained within it. First, Mayor Szostkiewicz failed to include information regarding his personal friendship with officer Garcia who was the best man at the Mayor's wedding. This incident continues the mayor's history of bypassing more qualified candidates to assure appointments for his friends, i.e., Ralph Danapoli who is white. Another incident occurred when Denise Dugay, a female, was bypassed for Sergeant position while two male officers, Daniel Fallon and Christropher Stevenson, were chosen selected. Mr. Fallow and and mr. Stevenson ranked lower than Ms. Dugay.

14. Mayor Szostkiewicz stated that I lack communication skills as one of the reasons for my bypass. He didn't cite factual evidence to the above claim nor did he document any of my responses to the questions that were directed at me during the interview

15. Mayor Szostkiewicz, in a letter to Councilor Alejandro Sanchez of Holyoke City Council, dated July 8, 1999, states that he has successfully complied with Sanchez's request to promote minorities into supervisory positions within the Holyoke Police Department. In addition, Mayor Szostkiewicz also indicated that he upheld the policy of promoting only the "most qualified candidates" taken from the certified lists.

16. The Mayor's claim is certainly hypocritical because I was, and still am, more qualified than Officer Garcia.

17. Mayor Szostkiewicz wrongly appointed Mr. Garcia as a Hispanic candidate. Mr. Garcia is not Hispanic; he is of French and Portuguese decent. Mr. Garcia is monolingual; namely, English. According to the Holyoke Police Department the guidelines for hiring minority police officers as follows: must be "Black, Hispanic speaking, or raised in a predominately Spanish speaking home." Officer Garcia does not fulfill any of these requirements.

18. I was the only qualified minority by exam and experience on the certified list of candidates for the Sergeant position.

19. Upon reviewing Mayor Szostkiewicz's reasons for appointments and non-appointments, it is clear that the Mayor "padded" Officer Garcia's record with information that is commendable but is really misleading.

20. The unfair reasoning exhibited by Mayor Szostkiewicz has supported his pattern of behavior with regards to appointments of candidates into positions of importance in the Holyoke Police Department. As previously mentioned, Denise Dugay, although possessing the highest rank on five previous certified lists, was bypassed each time by Mayor Szostkiewicz. It was not until Denise Dugay finally appealed his decision and won was she promoted to Sergeant. Mayor Szostkiewicz appointed male officers instead of women.

21. I charge Mayor Szostkiewicz and the Holyoke Police department with discriminating against me because I am female.

22. I charge Mayor Szostkiewicz and the Holyoke Police with discriminating against me because I am African American. Mayor Szostkiewicz and the city of Holyoke appointed a non-Hispanic, less qualified male candidate over me.

I ALSO WANT THIS CHARGE FILED WITH EEOC:   _XXX_
I WILL ADVISE THE AGENCIES IF I CHANGED MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.
I SWEAR OR AFFIRM THAT I HAVE READ THIS COMPLAIN AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Tammy Walker

SWORN TO AND SUBSCRIBE BEFORE ME THIS __15__ DAY OF __Oct__ 1999.

NOTARY PUBLIC
My Commission Expires:     /     /

MARYANN K. BRUNTON
NOTARY PUBLIC
MY COMMISSION EXPIRES
JULY 31, 2003

# EXHIBIT 11

DEFENDANT'S DEPOSITION
EXHIBIT

T Walker
9/26/05 n

PENGAD 800-631-6989

# COMMONWEALTH OF MASSACHUSETTS
## CIVIL SERVICE COMMISSION

**AMENDED**
### APPEAL PURSUANT TO M.G.L. CHAPTER 31, SEC. 2, PARAGRAPH (b)
### Case No: G-9914

August 31, 1999
(Date)

Civil Service Commission
One Ashburton Place, Room 2112
Boston, Massachusetts 02108

Dear Commissioners:

I am aggrieved by the following decision, action, or failure to act on the part of the Personnel Administrator, which has caused actual harm to my employment status:

**The approval of the appointment as sergeant within the City of Holyoke on or about June 9, 1999 of Joseph Garcia, said appointment being made by the Mayor of the City of Holyoke, address c/o City Hall, Dwight Street, Holyoke, MA. 01040.**
**See: Certification No: 990205**

[Note: if this appeal concerns the Personnel Administrator's approval of the appointment or promotion of a person or persons ranking lower than you on a civil service list, be sure to specify the name and address of such person or persons, if known, the title of the position for which you were not selected, and the name and address of the Appointing Authority (agency).]

I allege that the foregoing constitutes a violation of Basic Merit Principle, as defined in M.G.L. Chapter 31, Section 1, clause (a), which require that employees be recruited, selected and advanced on the basis of their relative ability, knowledge, and skills, and/or a violation of the following specific provisions of Chapter 31 or the rules promulgated thereunder:

**In that Tammy Walker placed fourth on the Certified Eligible List and was as qualified, or more qualified, than the individual named above in the fifth position who was appointed to the sergeant position.**

I hereby certify that I have sent a copy of this appeal to the Personnel Administrator, Human Resources Division, Room 203, One Ashburton Place, Boston, MA 02108, and to the Appointing Authority involved in this matter.

Tammy Walker
(your name)
425 Pleasant Street
(your street address)
Holyoke, MA 01040
(your city or town)

(your signature)
*(413) 533-1216
(your daytime telephone number)

**\* All communications and correspondence may be addressed to my legal counsel as follows:**
**William J. Fennell, Esquire, Fennell, Liquori & Powers**
**1331 Main Street, Suite 400, Springfield, MA 01103**

COMMONWEALTH OF MASSACHUSETTS
CIVIL SERVICE COMMISSION

APPEAL PURSUANT TO M.G.L. CHAPTER 31, SEC. 2, PARAGRAPH (b)

06-24-99
(date)

Civil Service Commission
One Ashburton Place, Room 2112
Boston, MA 02108

Dear Commissioners:

    I am aggrieved by the following decision, action or failure to act by the Personnel Administrator, which has caused actual harm to my employment status:

    Joseph Garcia   ( Score 78)

    220 Appleton Street   ( Holyoke Police Department)

    Holyoke Ma. 01040         Sergeant Position    Appointment # 990205, 990207

[ Note: if this appeal concerns the Personnel Administrator's approval of the appointment or promotion of a person or persons ranking lower than you on a civil service list, be sure to specify the name and address of such person or persons, if known, the title of the position for which you were not selected, and the address of the Appointing Authority (agency).]

    I allege that the foregoing constitutes a violation of basic merit principles as defined in M.G.L. Chapter 31, Section 1, Clause (a), which require that employees be recruited, selected and advanced on the basis of their relative ability, knowledge and skills, and/or a violation of the following specific provision of Chapter 31 or the rules promulgated thereunder:

    I hereby certify that I have sent a copy of this appeal to the Personnel Administrator, Human Resources Division, Room 203, One Ashburton Place, Boston, MA 02108, and to the Appointing Authority involved in this matter.

| | |
|---|---|
| Tammy Walker | Mayor Daniel Szostkiewicz |
| (your name) | (Appointing Authority) |
| 425 Pleasant Street | 538 Dwight Street |
| (your street address) | (Appointing Authority address) |
| Holyoke MA 01040 | Holyoke MA 01040 |
| (your city or town) (your zip) | (Appointing Authority city or town) |
| (your signature) | |
| 1-413-533-1216 | |
| (your daytime telephone number) | |

# EXHIBIT 12

Tammy Walker
           Appellant
     v.
City of Holyoke
           Appointing Authority

Civil Service Commission

Docket #
   G-9914

SETTLEMENT
AGREEMENT

Whereas, the Appellant Tammy Walker was by-pass for promotion to sergeant on June 9, 1999 and after having filed this appeal and now desires to enter into a settlement agreement with the Appointing Authority; which agreement upon approval of The Civil Service Commission will result in the Appellant Tammy Walker withdrawing her appeal; now therefore, parties agree as follows:

1. That the Civil Service Commission, act favorably upon the parties joint motion to approve settlement agreement and direct the Human Resources Division to place the Appellant at the top of the current list or if necessary, revive her eligibility and place her at the top of the next requested certification so that the appellant will be considered in accordance with the agreement for the next permanent sergeant position in the city of Holyoke; and

2. In the event the appellant is appointed to the rank of sergeant within the Holyoke Police Department, the Appellant's effective date of appointment for the purpose of determining actual service time as sergeant shall be adjusted to the date of her original bypass ie. June 9, 1999, and

Settlement Agreement
Cont'd

3. Pursuant to the parties' Motion and the granting of the above additional relief, the Appellant's appeal G-9914 is hereby withdrawn.

The Appellant, Jimmy Walker

by _Jimmy Watt_

The Appointing Authority, City of Holyoke

May 23, 2000

by _P. _____
    City Solicitor

# EXHIBIT 13



Mayor Michael J. Sullivan                    Stephen P. Fitzgibbons, City Solicitor

City of Holyoke                                                    Law Department

July 16, 2002



DEFENDANT'S DEPOSITION
EXHIBIT
3 Walker
9/26/02
PENGAD 800-631-6989

Sergeant Tammy Walker
Holyoke Police Department
138 Appleton Street
Holyoke, MA 01040

RE: Seniority Date

Dear Sgt. Walker:

Enclosed please find copy of Assented To Motion To Amend Decision. Please review with your attorney and advise at your earliest convenience if you will assent to the motion. Should you have any questions, please do not hesitate to contact me. Thank you for your assistance in resolving this matter.

Sincerely,

Stephen P. Fitzgibbons
City Solicitor

CC:    Michael J. Sullivan, Mayor
       Anthony R. Scott, Chief of Police

## MASSACHUSETTS CIVIL SERVICE COMMISSION

Docket No. G-9914

Tammy Walker, )
  Appellant )
   )
v. ) ASSENTED TO MOTION TO
 ) AMEND DECISION
City of Holyoke, )
  Appointing Authority )

  Now comes the appointing authority and moves this Honorable Commission to amend its decision dated May 31, 2000 and states as reason therefore the following:

1.  On May 23, 2000, with the assistance of the Chairperson, the parties executed a Settlement Agreement whereby the appellant withdrew her bypass appeal in exchange for placement at the top of the current civil service list and if necessary at the top of the next requested certification list. A copy of the Settlement Agreement is attached hereto as "Exhibit A".

2.  In the event of promotion to sergeant, the Settlement Agreement further required an adjustment of actual service time, "to the date of her original bypass, i.e. June 9, 1999".

3.  The Civil Service Commission issued a decision dated May 31, 2000 reflecting the terms of the Settlement Agreement. A copy of the decision is attached hereto as "Exhibit B".

4.  The date of promotional appointment of Joseph Garcia is June 20, 1999 and thus, the date of original bypass is June 20, 1999, not June 9, 1999. Attached hereto and marked "Exhibit C" is Authorization of Employment Form 14 reflecting an appointment date of June 20, 1999.

5.  The appellant was promoted to the position of sergeant on May 5, 2002.

6.  On May 9, 2002, the appointing authority received a letter from the Human Resources Division approving the appointment of the appellant and recording the seniority date as June 9, 1999. See HRD letter attached hereto and marked "Exhibit D".

7. The date of June 9, 1999 provides the appellant with a seniority date prior to individuals listed before the appellant on the same certification list and appointed on June 20, 1999.

8. The seniority date of June 9, 1999 has had a detrimental effect on the effective management, operation and morale of the Holyoke Police Department.

9. The parties agree that June 20, 1999 is the date of original bypass, reflects the intent of the parties when they signed the Settlement Agreement and agree that June 20, 1999 is the appropriate date for seniority purposes.

WHEREFORE, the parties request the following remedy:

1. Amend the May 31, 2000 decision by deleting the seniority date of June 9, 1999 and replacing therewith the date of original bypass, June 20, 1999 to be the seniority date for Sergeant Tammy Walker; and

2. Such other relief as the Civil Service Commission deems just and equitable.

Dated: _____

Respectfully submitted,

_____
Stephen P. Fitzgibbons
City Solicitor
Holyoke Law Department
20 Korean Veterans Plaza
Holyoke, MA 01040
(413) 534-2183/FAX 534-2223

Assented To: _____
        Tammy Walker

## CERTIFICATE OF SERVICE

I, Stephen P. Fitzgibbons, hereby state that I have this day served upon appellant, Tammy Walker by first class mail, postage pre-paid a copy of the foregoing Assented To Motion To Amend Decision.

Date:_____

_____
Stephen P. Fitzgibbons
City Solicitor

EXHIBIT

A

Tammy Walker
Appellant
v.

City of Holyoke
Appointing Authority

Docket #
G-9914

SETTLEMENT
AGREEMENT

Whereas, the Appellant Tammy Walker was by-passed for promotion to sergeant on June 9, 1999 and after having filed this appeal and now desires to enter into a settlement agreement with the Appointing Authority; which agreement upon approval of the Civil Service Commission will result in the Appellant Tammy Walker withdrawing her appeal; now therefore, parties agree as follows:

1. That the Civil Service Commission, act favorably upon the parties joint motion to approve settlement agreement and direct the Human Resources Division to place the Appellant at the top of the current list or if necessary, revive her eligibility and place her at the top of the next requested certification so that the appellant will be considered in accordance with the agreement for the next permanent sergeant position in the City of Holyoke; and

2. In the event the appellant is appointed to the rank of sergeant within the Holyoke Police Department, the Appellant's effective date of appointment for the purpose of determining actual service time as sergeant shall be adjusted to the date of her original bypass i.e. June 9, 1999; and

Settlement Agreement
Cont'd

3. Pursuant to the parties' Motion and the granting of the above additional relief, the Appellant's appeal G-9914 is hereby withdrawn

The Appellant, Jerry Walker

by Craig Watt

MAY 23, 2000

The Appointing Authority, City of Holyoke

by ___ P. ___

City Solicitor

EXHIBIT

B

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

CIVIL SERVICE COMMISSION
One Ashburton Place , Rm. 503
Boston, MA 02108

Tammy Walker,
    Appellant

v.

MAY 31 2000

Docket Number G- 99-14

City of Holyoke,
    Appointing Authority

## DECISION

The appellant, Tammy Walker, filed this appeal with the Civil Service Commission pursuant to G.L. c.31 §2(b). The Commission hereby adopts the parties' joint motion for settlement agreement to place the Appellant at the top of the certification list for the Holyoke Police Department in Holyoke, Massachusetts for the position of Sergeant.

The Commission, pursuant to the powers of relief inherent in Chapter 534 of the acts of 1976, as amended by Chapter 310 of the Acts of 1993, orders the Personnel Administrator to take the following action:

The Personnel Administrator shall place Tammy Walker's name at the top of the current list or if necessary, revive her eligibility and place her at the top of the list for the next requested certification so that the appellant will be considered for the permanent position of Sergeant with the City of Holyoke.

In the event that the appellant is promoted to Sergeant, her seniority date shall made retroactive to the effective date of June 9, 1999.

By vote of the Civil Service Commission (Lopez, Chairman, O'Neil , Tierney and Tivnan Commissioners) on May 25, 2000.

A true record.  Attest:

France A. Lopez, Chairman
CIVIL SERVICE COMMISSION

| City or Town | HOLYOKE | | | | | | |
| Department | POLICE | | Division | | | | |
| | | | Requisition/Certification Number 990205 | | | | |

**EXHIBIT**

C

**TO THE APPOINTING OFFICER:**
Authority is hereby given to fill the vacancy(ies) identified on the above referenced requisition among the applicants listed on the attached certification in accordance with the instructions

### DESCRIPTION OF POSITION TO BE FILLED

| Position Title: Police Sergeant | Number of Vacancies: 2 | Salary Rate: 49,431.00 |
|---|---|---|

Permanent [X]  Temporary [ ]  Military Substitute [ ]  Full Time [X]  Part Time [ ]
Intermittent [ ]  Reserve [ ]

_James J. Whitrat Jr._
Personnel Administrator

### NOTIFICATION OF EMPLOYMENT UNDER THE ABOVE AUTHORIZATION

**To the Personnel Administrator:**
As the legal Appointing Authority I have selected the undersigned individuals for appointment (or promotion) in accordance with the law and the above authorization as follows:*

I, the signed appointee, hereby certify, under the penalties of perjury, that I have not paid and have agreed not to pay, and to the best of my knowledge, no other person has paid nor agreed to pay any money or other thing of value to any person in anticipation or as a result of my appointment. I hereby accept the appointment with the understanding that, under the Civil Service Law and Rules, appointments are governed as follows:

- Permanent appointments are subject to a probationary period of six months (twelve months for police and fire forces).
- Temporary appointments are for the duration of the vacancy.
- Military substitute appointments are temporary subject to the provisions of Chapter 708, Acts of 1941, as amended.

| Date Of Birth | Name Home Address S.S. # of Appointee | Employment Date | Appointee's Signature |
|---|---|---|---|
| 10/25/63 | SS# 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    Holyoke, Ma. 01040  Michael J. McCoy, 2 Cypress Road | 6- 20 - 99 | Michael McCoy |
| 8/16/66 | SS# 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    So. Hadley, Ma. 01075  Joseph H. Garcia, 57 Granby Road, | 6- 20 - 99 | Joseph Garcia |
| | | | |
| | | | |
| | | | |
| | | | |

*See reverse of this form

Signed: _Daniel Szostkiewicz_
(Officer authorized by law to make appointments)

DANIEL J. SZOSTKIEWICZ, MAYOR
Name    (please print or type)    Title

If appointee is in military service, statement to that effect should be made.

This form must be properly completed, returned to the Department of Personnel Administration and approved before the Auditor will authorize payment of salary. Please file reports early enough to eliminate the necessity of withholding pay.



THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE FOR ADMINISTRATION AND FINANCE
# HUMAN RESOURCES DIVISION
ONE ASHBURTON PLACE, BOSTON, MA 02108



EXHIBIT
D

JANE SWIFT
Governor

KEVIN J. SULLIVAN
Secretary

PATRICIA S. WADA
Personnel Administrator

May 9, 2002

Honorable Michael J. Sullivan
Mayor, City of Holyoke
536 Dwight Street
Holyoke, MA 01040

**RECEIVED**

MAY 13 2002

CHIEF'S OFFICE

Re: Tammy Walker

Dear Mayor Sullivan:

    Enclosed please find the approval for the appointment of Tammy Walker to Police Sergeant on Certification 220058. To comply with the Chapter 310, Civil Service Commission Decision, dated May 31, 2000, Ms. Walker's seniority date has been recorded as June 9, 1999. Please amend your records accordingly.

    Should you have any questions regarding the above, please contact me at (617) 727-3777, extension 467.

Sincerely,

Sharon Canavan
Sharon Canavan
Paralegal Specialist
Civil Service Unit

Enclosures

cc: Chief, Anthony Scott
    Sergeant, Tammy Walker

# EXHIBIT 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

TAMMY WALKER,                    )
     Plaintiff                  )
                                )
v.                               )
                                )
CITY OF HOLYOKE,                 )
     Defendant                  )

## AFFIDAVIT OF DONALD WHELIHAN

I, Donald Whelihan, hereby depose and say as follows upon personal knowledge:

1.     I have been a member of the Holyoke Police Department for 34 years. I have been a Lieutenant for approximately 12 years. I work the midnight to 8:00 a.m. shift.

2.     After Sergeant Walker's promotion, I was her immediate supervisor. She told me that she believed Sergeants Monaghan and Garcia were avoiding her. She seemed to think that they did not acknowledge that she was the senior officer based on her seniority date. She never said that they were calling her names or making derogatory comments about her.

3.     On another evening in October 2002, Sergeant Walker alleged that Sergeant Monaghan had made an unprofessional comment on the police radio which she seemed to think was related to her. Subsequently, I spoke to Sergeant Monaghan and he denied making the comment.

4.     After Sergeant Walker filed a complaint in October 2002, in which she alleged that Sergeant Monaghan sang a song to her, I attended a meeting with Sergeant Walker, Sergeant Monaghan and Captain Fletcher. Sergeant Monaghan denied Sergeant Walker's allegations.

5.     I have never heard Sergeant Monaghan make any inappropriate comments on the radio. I also have never heard him make derogatory comments to or about Sergeant Walker.

6.     I spoke with Captain Fletcher about Sergeant Walker's allegations. I informed him that I believed that any problems Sergeant Walker was having with Sergeant Garcia and Sergeant Monaghan had to do with the issue of her seniority. That is,

after she became sergeant, her seniority date was changed so that she went past Sergeant Garcia who took the sergeant's exam on the same date that she did.

7.    On the morning of June 23, 2003, Walker informed me of an incident that occurred at Elizur's Pub several hours earlier.  I informed Walker that I would handle the matter.  I immediately informed Captain Alan Fletcher about Walker's allegations against the four members of the department who were allegedly drinking in the pub after hours.

SIGNED UNDER THE PENALTIES OF PERJURY THIS __11__ DAY OF _June_ 2007.

_Lt. Donald W. Whelihan_
Lieutenant Donald Whelihan

# EXHIBIT 15

## IN THE MATTER OF:

TAMMY WALKER vs.

CITY OF HOLYOKE

---

## DEPOSITION OF:

ALAN FLETCHER
DATE:  SEPTEMBER 12, 2006

---

### PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

## TAMMY WALKER vs. CITY OF HOLYOKE
## ALAN FLETCHER          SEPTEMBER 12, 2006

---

**5**

1  ALAN FLETCHER, the Deponent, having been
2  satisfactorily identified by the production of his
3  driver's license and having been first duly sworn
4  by the Notary Public, deposes and says as follows:
5  MR. HUDSON:  Can we have the usual
6  stipulations, the same ones that we used
7  yesterday?
8  MS. LYNCH:  Yes; and Captain
9  Fletcher will read and sign.
10  MR. HUDSON:  Just to make sure that
11  we are in accord with that, these are the same
12  ones from yesterday.  (Indicating.)
13  MS. LYNCH:  That's fine.  Out here
14  in Western Mass. those are the usual stipulations.
15  MR. HUDSON:  No problem.  I usually
16  think so myself but I don't like to take anything
17  for granted.
18  (Plaintiff's Deposition Exhibit
   No. 1 offered and marked.)
19
20  *****
21  DIRECT EXAMINATION BY MR. HUDSON
22  Q.  Captain Fletcher, good morning.  I'm
23  Ozell Hudson.  I'm counsel for Ms. Tammy Walker.
24  Thank you for coming today.

**6**

1  MR. HUDSON:  Please let the record
2  show that Ms. Walker is present and that Captain
3  Fletcher is being represented by Attorney Carole
4  Lynch and also present is the City Solicitor,
5  Karen Betournay.
6  Q.  (BY MR. HUDSON)  Just a couple of brief
7  introductory matters.  Sir, I'd like to ask you
8  whether or not you've had the opportunity to go
9  over this case with your attorney prior to coming
10  in today?
11  A.  I have.
12  Q.  Do you understand the nature of a
13  deposition?
14  A.  I do.
15  Q.  Do you understand that any question that
16  I put to you, that if you don't understand it and
17  would like for me to either repeat it or clarify
18  it, just let me know and I'll be glad to do that?
19  A.  Okay.
20  Q.  Also, verbal responses are required.
21  Hand gestures or head gestures just simply don't
22  get recorded, okay?
23  A.  Okay.
24  Q.  Did you have an opportunity to look at

**7**

1  any documents in preparation for your testimony?
2  A.  No.
3  Q.  Captain Fletcher, I'd like to draw your
4  attention to an Injured-On-Duty Report or request
5  dated November 29th, 2004 from Sergeant Walker --
6  former Sergeant Walker.
7  Did Sergeant Walker give you an
8  Injured-On-Duty Report of November 29th, 2004?
9  A.  It came to me; yes.
10  MR. HUDSON:  I'd like to have this
11  marked as Exhibit 2.
12  (Plaintiff's Deposition Exhibit
   No. 2 offered and marked.)
13
14  Q.  (BY MR. HUDSON)  If you would take a
15  look at that? (Indicating.)
16  A.  (Witness examining document.)
17  Q.  This document, do you recognize
18  Exhibit 2, sir?
19  A.  This is Exhibit 2?
20  Q.  Yes; it's a composite?
21  A.  Okay.
22  Q.  Okay meaning you do recognize it?
23  A.  I signed it.
24  Q.  Do you know Chief Anthony Scott?

**8**

1  A.  Yes.
2  Q.  Do you know Sergeant Walker?
3  A.  Yes.
4  Q.  What is your position, sir, at the
5  Holyoke Police Department?
6  A.  I'm a captain in charge of -- bureau
7  commander of Operations.
8  Q.  How long have you been a captain?
9  A.  Since 1992.
10  Q.  Before that, what position did you hold?
11  A.  I was in charge of a drug unit as a
12  lieutenant.
13  Q.  In the Holyoke Police Department?
14  A.  I was; yes.
15  Q.  Before you were a lieutenant, what
16  position did you hold?
17  A.  Several, but I was mostly a uniform
18  sergeant on the midnight-to-eight shift.
19  Q.  When did you begin your employment with
20  the Holyoke Police Department?
21  A.  1968.
22  Q.  Before that, what position did you hold?
23  A.  I was a uniform officer.  Then I did
24  undercover work with the Holyoke Police Department

---

TAMMY WALKER vs. CITY OF HOLYOKE
ALAN FLETCHER            SEPTEMBER 12, 2006

61

1   complained that Mr. Monaghan had called her
2   Tyrone, had sung a song in her ear of "lick it,
3   lick it good"?
4        A.   That's what she said.
5        Q.   But you heard that?
6        A.   We talked about it right in front of the
7   Sergeant and he denied ever saying those things
8   about her.  He said he wanted to get along with
9   her.
10            We had this conversation in my office
11  with her commanding office and Mr. Monaghan with
12  me so that was addressed.
13       Q.   Do you remember about when that
14  happened, sir?
15       A.   Right when it happened, whenever she
16  reported it, immediately when she reported it,
17  immediately it was brought to my attention.
18  Immediately when she brought it to my attention it
19  was addressed.
20       Q.   Sir, on or about -- do you know whether
21  or not on or about June 18th, 2002 Ms. Walker --
22  sometime around that time Ms. Walker brought to
23  your attention that Sergeant Monaghan had referred
24  to the Chief as Uncle Charlie?

62

1        A.   No; I don't recall that.
2        Q.   Or made reference to something like
3   "Uncle Charlie, the Chief dun come out wit
4   anutter" -- A-N-U-T-T-E-R -- in other words,
5   Monaghan trying to speak in a so-called black
6   dialect?
7        A.   No.
8        Q.   Did you ever hear Monaghan --
9             MS. LYNCH:  (Interposing) Did you
10  respond?
11            THE WITNESS:  No; I never heard
12  this.  This is the first I heard this.
13       Q.   (BY MR. HUDSON)  What about on or about
14  June 20th, 2002 whether or not Ms. Walker reported
15  that Monaghan -- after she signed off the radio or
16  went off the radio he -- she heard him say things
17  like "lick it it good"?
18       A.   I never heard that.
19       Q.   Did she ever tell you that at all?
20  Never reported that he said something like that?
21       A.   She complained that he made remarks to
22  her.
23       Q.   Like that?
24       A.   Not like that.  She never said that.

63

1        Q.   Did you have -- who was the former chief
2   the police?
3             MS. LYNCH:  When?
4        Q.   (BY MR. HUDSON)  Before -- I said
5   former, sir.  I mean before Chief Scott?
6        A.   Chief Mark Cournoyer.
7        Q.   How long was he chief?
8        A.   Thirty-nine months.
9        Q.   Did you have a personal relationship or
10  a friendship relationship with him?
11       A.   I would say it would be adversary.
12       Q.   Before him, who was chief?
13       A.   Steve Donoghue.
14       Q.   Did you have a relationship with
15  Mr. Donoghue?
16       A.   Positive.
17       Q.   Friends?
18       A.   Friends.
19       Q.   Knew his family?
20       A.   Very much so.
21       Q.   Did he have a daughter?
22       A.   Yes.
23       Q.   Who is his daughter?
24       A.   He has two daughters.

64

1        Q.   One of his daughters was in the
2   military.  Do you know her?
3        A.   Kathy.
4        Q.   Did you know that Kathy and Sergeant
5   Walker were close friends?
6        A.   Yes.
7        Q.   Did you know that they may have been
8   even more than close friends?
9        A.   Yes.
10       Q.   In fact that they dated each other?
11       A.   Yes.
12       Q.   In other words you had knowledge of
13  Ms. Walker's sexual orientation?
14       A.   Yes.
15       Q.   Isn't it a fact that other officers had
16  knowledge of Ms. Walker's sexual orientation?
17            MS. LYNCH:  Objection; you can
18  answer if you know.
19       Q.   (BY MR. HUDSON)  Other Holyoke Police
20  Department officers?
21       A.   I would say they all did.
22       Q.   Would you understand how, if Sergeant
23  Monaghan had stated publicly "lick it, lick it
24  good," how that may have some negative effect upon

TAMMY WALKER vs. CITY OF HOLYOKE
ALAN FLETCHER                SEPTEMBER 12, 2006

65

1  Ms. Walker?
2            MS. LYNCH:  Objection; you can
3  answer.
4            THE WITNESS:  I have no opinion to
5  answer that question.
6       Q.   (BY MR. HUDSON)  Thank you.  Didn't
7  Ms. Walker -- did Ms. Walker ever tell you that
8  Sergeant Monaghan said she shouldn't be a sergeant
9  because of her sexual orientation?
10      A.   No.
11      Q.   Did Ms. Walker report to you that
12  Mr. Monaghan referred to her as Tyrone?
13      A.   She did.
14      Q.   When you talked with Sergeant Monaghan,
15  he denied calling her Tyrone?
16      A.   Right in front of her.
17      Q.   Did Ms. Walker also report to you that
18  Mr. Monaghan made a statement, "you shouldn't go
19  sticking your tongue where it don't belong"?
20      A.   No; I never heard that.
21      Q.   Do you recall whether or not on or about
22  October 21, 2002 Ms. Walker spoke with you about
23  the sergeants didn't like her seniority -- the
24  other sergeants didn't like her seniority because

66

1  she is a woman and black?
2       A.   I don't recall that.
3       Q.   You don't recall -- do you recall
4  whether or not you discussed with her the
5  possibility that she might be retaliated against
6  if charges were brought by her concerning officers
7  or sergeants opposing her seniority because she
8  was a woman or black?
9       A.   No; never.
10      Q.   Tell me, how did you feel about
11  Ms. Walker's relationship with the daughter of
12  your former chief?
13      A.   How I felt?
14      Q.   How you felt about the fact that
15  Ms. Walker had a sexual lesbian relationship with
16  the daughter of the former chief?
17      A.   I have no personal opinion whatsoever on
18  that topic.
19      Q.   Did you approve of it?
20      A.   No.
21      Q.   No, you did not approve of it?
22      A.   I'm indifferent about it.  That's her
23  life, they want to do it, that's fine with me.  I
24  never expressed any dissatisfaction or any

67

1  discourse with either party.
2            As a matter of fact, I was involved
3  socially with both of them so it's not a case that
4  I walked the other way.  That's their business;
5  not my business.
6       Q.   Were you ever like a godfather or
7  anything to Kathy?
8       A.   I don't think I am.  I don't think I am
9  but would I go out socially with them?  Yeah.  Had
10  I been at family events?  Yeah.  I'm very close
11  with the family.
12           I don't know how to say it.  I don't
13  have any personal feelings or animosity toward
14  either one of them.
15      Q.   Are you aware that they are married?
16      A.   Yes.
17      Q.   How do you feel about that?
18      A.   If that's what they want to do, that's
19  what they want to do.
20      Q.   Do you know -- have any other officers
21  made any comments about Ms. Walker and her
22  relationship with Kathy?
23      A.   Not that I know of.
24      Q.   Are you aware that on or about

68

1  April 15th, 1999 there was a sergeant's
2  examination list that was issued?
3       A.   Personally -- there could have been.  Do
4  I know personally?  No; I don't.
5       Q.   Are you aware that on or about June,
6  1999 Officers Garcia and McCoy were appointed
7  full-time sergeants?
8       A.   I don't know that.
9       Q.   But you know --
10      A.   (Interposing) I know they are sergeants
11  but I don't know when they were appointed.  I have
12  no idea.
13      Q.   Are you aware that Ms. Walker filed both
14  an MCAD complaint and a Civil Service bypass
15  complaint about being passed over for sergeant?
16      A.   The best way for me to answer that
17  question is I'm aware of it but I'm not personally
18  aware of it.
19      Q.   But you know about it?
20      A.   Yes; through conversations with the
21  Sergeant.
22      Q.   Are you aware that Ms. Walker and the
23  City of Holyoke settled their Civil Service
24  complaint and MCAD complaint?

TAMMY WALKER VS. CITY OF HOLYOKE
ALAN FLETCHER          SEPTEMBER 12, 2006

89

1    Q.   Is it cc'd to you?
2    A.   It is.
3    Q.   If Chief Scott cc'd a document to you,
4  would you have received it?
5    A.   I would.
6    Q.   Isn't it Exhibit 11 -- what is
7  Exhibit 11, sir?
8    A.   I don't know.  It says a grievance filed
9  by Tammy Walker against the Lieutenant David
10 Fournier and Lieutenant Eva O'Connell.
11   Q.   So if you received it, you would have
12 had knowledge of Ms. Walker's grievance or
13 grievances against Lieutenant O'Connell and
14 Fournier?
15   A.   No.
16   Q.   It doesn't --
17   A.   (Interposing) No; the document doesn't
18 mean anything to me.  I gave that document to the
19 union attorney.
20   Q.   You gave the document?
21   A.   To the attorney and he already had a
22 copy of it.
23   Q.   But this document was cc'd to you as the
24 union president, is that correct -- Captain Alan

90

1  Fletcher, Union President?
2    A.   That's correct.
3    Q.   And you would have just simply given it
4  to the union attorney without even reading it?
5    A.   She didn't file the grievance with me,
6  she filed it with the Chief.  She's supposed to
7  give it to me.  I'm supposed to file the
8  grievance.
9         She bypassed our rules and regulation
10 and our policies and procedures and our bylaws of
11 our union.  She took it upon herself to do
12 something and she did it.
13   Q.   Sir, the question is simply whether or
14 not you had knowledge?
15   A.   I had no knowledge of anything except
16 what was sent to me.
17   Q.   What was sent to you was this letter
18 addressed to Ms. Walker which is signed by Chief
19 Scott, is that correct?
20   A.   That's correct.
21   Q.   Cc'd to you as union president?
22   A.   Right.
23   Q.   Included in Plaintiff's Exhibit
24 Number 11 of Chief Scott's deposition?

91

1    A.   That's correct.
2    Q.   And he specifically states that the two
3  grievances you filed -- "Dear Sergeant Walker, the
4  two grievances you filed were handled in
5  accordance with Article XX," et cetera "in that
6  the allegation is made against Lieutenant Fournier
7  and Lieutenant O'Connell" et cetera, et cetera.
8         My point being, sir, isn't it true that
9  you would have at least had knowledge that
10 Ms. Walker had filed these grievances based upon
11 simply --
12   A.   (Interposing) The only knowledge I have
13 is that the Chief acknowledged that he received
14 grievances from her through a cc to me.
15        MR. HUDSON:  Why don't we -- you
16 want to keep going until one or you want to take a
17 break now?
18        MS. BETOURNAY:  Yes; please.
19        (A luncheon recess was taken.)
20   Q.   (BY MR. HUDSON)  Do you recall ever
21 having an occasion to perform a spot check at the
22 court on April 6, 2004?
23   A.   I do spot checks of the court but I
24 don't know the dates.  As a matter of fact, I did

92

1  one today.
2    Q.   You're very busy.
3    A.   Well, I get paid a lot.
4    Q.   How much do you get paid?
5        MS. LYNCH:  Objection.
6        THE WITNESS:  You would cry.
7    Q.   (BY MR. HUDSON)  I'm serious, sir.
8    A.   I'm the highest paid city employee, I
9  think -- about a buck seventy-five, a buck eighty.
10 This year I'll do about two.
11   Q.   Two hundred thousand?
12   A.   Yes.
13   Q.   I'm sure you deserve every dime you get,
14 sir.
15   A.   Well, I've got a hard boss.  He works me
16 hard.
17   Q.   You would not want to do anything that
18 would jeopardize your job, do you, sir?
19   A.   No; I wouldn't.
20   Q.   In the history of the Holyoke Police
21 Department -- what do you do a spot check for at
22 the Courthouse?
23   A.   Attendance.
24   Q.   Attendance by whom?

**TAMMY WALKER vs. CITY OF HOLYOKE**
**ALAN FLETCHER          SEPTEMBER 12, 2006**

93

1    A.    The officers assigned to court that day.
2    Q.    How do you perform the spot checks
3 regarding attendance?
4    A.    I go in and see if they've signed in.  I
5 come in unannounced.  They don't know what day I'm
6 going to be there.
7          Another captain does it, too, Captain
8 Monfette.
9    Q.    How long have you been doing spot
10 checks?
11    A.    I don't know.
12    Q.    Have you been doing them in -- did you
13 do any before 2004?
14    A.    I can't answer the question.  I don't
15 know.  We were directed by the Chief to do spot
16 checks.  I don't know the date of the order.
17    Q.    Which chief was this?
18    A.    Scott.
19    Q.    Had he been around --
20    A.    (Interposing) He's been around since
21 2001.
22    Q.    Did he impose that order immediately
23 upon his hiring or within a couple of years later?
24    A.    I guess there was some officers late for

94

1 court one day and -- a lot of them -- and he
2 wanted to correct it.
3    Q.    So there have been spot checks performed
4 since April of 2004?
5    A.    I would think so.
6    Q.    Since you did one yesterday, I guess --
7    A.    (Interposing) I did one today.
8    Q.    Do you recall whether or not you did a
9 spot check involving Ms. Walker being late?
10    A.    No; I do not.
11    Q.    Do you know of any officers that have
12 been reprimanded since April of 2004 for being
13 late to court?
14    A.    Since?
15    Q.    Since April of 2004?
16    A.    Not to my knowledge.
17    Q.    Do you know if any officers have been
18 suspended since April of 2004 for being late to
19 court?
20    A.    I have no knowledge.
21    Q.    Are you aware that Ms. Walker was
22 reprimanded for being late five to -- I believe
23 it's five to ten or five to fifteen minutes late
24 to court?

95

1    A.    She was.
2    Q.    Who reprimanded her?
3    A.    I believe it was the Chief.
4    Q.    Do you know who did the spot check that
5 informed the Chief that Ms. Walker was late?
6    A.    I believe it was Captain Monfette.
7    Q.    Were there other officers that were also
8 found to be late to court?
9    A.    Yes.
10    Q.    When Captain Monfette did the spot
11 check --
12    A.    (Interposing) Yes, sir.
13    Q.    -- do you know who those officers were?
14    A.    No, sir.
15    Q.    Are you familiar with the Elizer's Pub?
16    A.    Yes, sir.
17    Q.    Are you aware that Sergeant Walker filed
18 a complaint -- filed allegations of misconduct
19 involving the Elizer's Pub?
20    A.    I'm not personally aware of that.
21    Q.    Did you ever instruct Sergeant Walker to
22 write a report on the Elizer's Pub incident?
23    A.    I did.
24    Q.    Why did you instruct her to write a

96

1 report?
2    A.    Because she didn't do one.
3    Q.    Why did you determine it was needed?
4    A.    Because when an officer writes an
5 incident and leaves it blank and has a complaint
6 number I'm entitled to that report and I wanted
7 it.
8          She said she'll give it to me later.  I
9 said you give it to me now.  I said I wanted that
10 report.  She reported it to me verbally and I said
11 I wanted it in writing.
12    Q.    What did she report to you verbally?
13    A.    That people were in there drinking after
14 hours.
15    Q.    Did she report to you that these people
16 involved police officers?
17    A.    Yes, sir.
18    Q.    Did you think that she was trying to get
19 your guidance about what to do under that
20 circumstance -- in that situation?
21    A.    No; I didn't think that at all.
22    Q.    But you did give it to her?
23    A.    Give her what?
24    Q.    Guidance?

**PERLIK and COYLE REPORTING**

TAMMY WALKER vs.  CITY OF HOLYOKE
ALAN FLETCHER            SEPTEMBER 12, 2006

97

1    A.   I gave her an order.
2    Q.   An order, excuse me.
3    A.   I don't know if that's guidance but I
4  gave her an order.
5    Q.   To write up an incident report?
6    A.   That's right; and give it to me.
7    Q.   Did she write a report?
8    A.   Not right away.
9    Q.   Did she ultimately write a report?
10    A.   She did.
11    Q.   This incident -- do you remember when
12  this incident occurred?
13    A.   No; I don't.
14    Q.   Around June 23rd, do you know what year?
15    A.   I don't know.
16    Q.   June 23rd, 2003, does that sound maybe
17  right?
18    A.   I don't know.
19    Q.   Under state law is it a crime to be in a
20  bar past two a.m.?
21    A.   No.
22    Q.   Is it a crime to be in a bar consuming
23  alcohol past two a.m.?
24    A.   No.

98

1    Q.   Is it a crime to order or purchase
2  alcohol in a public facility like a bar that you
3  are consuming well past two a.m.?
4    A.   Yes.
5    Q.   Was Sergeant John Monaghan one of those
6  officers involved?
7    A.   Yes, sir.
8    Q.   And that's the same Sergeant Monaghan
9  that Ms. Walker had made allegations of racial and
10  gender discrimination and harassment against?
11    A.   Yes, sir.
12    Q.   In fact Ms. Walker had made her
13  allegations against Mr. Monaghan prior to
14  June 23rd, 2003, isn't that correct?
15    A.   I don't understand the question.
16    Q.   The allegations involving the racial
17  discrimination --
18    A.   (Interposing) Oh, yes, they were prior
19  to that.  Yes, sir.
20    Q.   And also the allegations involving the
21  gender discrimination, that is the "lick it good"
22  and "don't put your tongue" -- those types of
23  things?
24    A.   I guess.

99

1    Q.   And the Tyrone that you were familiar
2  with?
3    A.   That's the only one I'm familiar with.
4  I'm not familiar with the other ones you mentioned
5  today.
6    Q.   Was there a Phillip J. McCay?
7    A.   Yes; he was.
8    Q.   Mr. Monaghan, is he a white male?
9    A.   Yes; he is.
10    Q.   Mr. McCay, is he a white male?
11    A.   Yes; he is.
12    Q.   He's a patrolman?
13    A.   Yes, sir.
14    Q.   And there was a reserve patrolman Thomas
15  Dore?
16    A.   Yes, sir.
17    Q.   Is he a white male?
18    A.   Yes, sir.
19    Q.   Approximately when did Ms. Walker write
20  up that report, sir?
21    A.   I don't know when she did.
22    Q.   Did you ever receive a report?
23    A.   No; I didn't.
24    Q.   Do you know if in fact she ever gave a

100

1  report to the Chief or anyone else?
2    A.   She did.  She gave it to the Chief.
3    Q.   Chief Scott?
4    A.   That's correct.
5    Q.   Did you write Ms. Walker up for
6  violating the chain of command?
7    A.   I did.
8    Q.   In other words for giving the report to
9  Chief Scott and not to you?
10    A.   That's correct.
11    Q.   Did you counsel her before you wrote her
12  up?
13    A.   Counsel?
14    Q.   Yes; did you talk with her about why you
15  were giving her this write-up?
16    A.   No.
17    Q.   In your I guess discipline -- was it a
18  reprimand or a suspension?  What was it?
19    A.   I don't know what discipline she
20  received.
21    Q.   Did you recommend discipline to be
22  administered by the Chief?
23    A.   I recommended that disciplinary action
24  be taken for violating the chain of command; yes.

**101**

1  Q.  And you made that recommendation to who?
2  A.  The Police Chief.
3  Q.  Scott?
4  A.  That's correct.
5  Q.  Did he act on your recommendation?
6  A.  I believe he did.
7  Q.  Did he give you any type of written
8  confirmation of what conduct he may have taken or
9  discipline imposed?
10  A.  He gave it out to the Department in a
11  special order; yes, he did.
12  Q.  So he broadcast it -- I mean he informed
13  the entire --
14  A.  (Interposing) That's correct.
15  Q.  -- staff --
16  A.  (Interposing) That's correct.
17  Q.  -- what action was being taken?
18  A.  That's correct.
19  Q.  Is that customary?
20  A.  Yes, sir.
21  Q.  That any time disciplinary action is
22  taken against a police officer it's not just
23  between the supervisors and that officer but it's
24  communicated to the entire -- to all the

**102**

1  employees?
2  A.  When discipline is issued; yes, sir.
3  Q.  Is that consistent with the union
4  contract?
5  A.  I don't think the union contract has
6  anything to say about it.
7  Q.  Are you aware of any officer causing a
8  prank call to be made to the station on the night
9  of June 23rd, 2003?
10  A.  Which June 23rd, 2003?
11  Q.  June 23rd, 2003, the night that these
12  officers were found to be drinking in Elizer's Pub
13  after two a.m. in the morning?
14  A.  What do you mean by a crank call.
15  Q.  A prank phone call; a false call, a
16  prank?
17  A.  I wouldn't have knowledge of that.
18  Q.  So you wouldn't have any knowledge of
19  any officer to made a prank call?
20  A.  They said Officer Dore made a call from
21  that place.
22  Q.  Who said Officer Dore made a call from
23  Elizer's Pub?
24  A.  I don't know.  I just heard that.

**103**

1  Q.  Do you know whether or not Reserve
2  Patrolman Thomas Dore lied, told a falsehood?
3  A.  No.
4  Q.  During the internal investigations
5  regarding the --
6  A.  (Interposing) I have no idea.
7  Q.  Investigation of the Elizer Pub
8  incident?
9  A.  I have no idea.
10  Q.  Of June 23rd, 2003?
11  A.  I have no idea.
12  Q.  When did you inform Sergeant Walker to
13  write a -- former Sergeant Walker to write a
14  report regarding the Elizer Pub incident?
15  A.  Right after it happened, the day it
16  happened.
17  Q.  So if it happened on June 23rd,
18  two-fifteen in the morning, 2003?
19  A.  I asked her for a report right then.
20  Q.  Are you aware that the License
21  Commission held a hearing on the allegation that
22  three officers were drinking -- Officers Monaghan,
23  Dore, and McCay -- Phillip McCay?
24  A.  I'm not aware of that.

**104**

1  Q.  I believe a hearing on August 7th,
2  you're not aware of a hearing being held on
3  August 7th, 2003?
4  A.  I'm not aware of that.
5  Q.  Do you recall how it is that former
6  Sergeant Walker went to Elizer's Pub?
7  A.  I don't know.
8  Q.  Did you read Ms. Walker's report -- the
9  one she finally wrote up and gave to you?
10  A.  Probably did; yes.
11  Q.  Did Ms. Walker's report say the
12  dispatcher sent her to a bar after a caller said
13  patrons refused to leave?
14  A.  I don't recall.
15  Q.  When you say that Officer Dore was
16  reported to have made the telephone call from the
17  pub are you speaking -- are you referencing that
18  it was Officer Dore who was reported to have
19  actually called the Police Department?
20  A.  I have no knowledge of it.
21  Q.  What do you --
22  A.  (Interposing) Just scuttlebutt in the
23  station that he made the phone call.
24  Q.  He made the phone call about what?

109

1    Q.   And it bypasses -- does it include IAD
2  as well?
3    A.   They're the ones that present it to the
4  captains.
5    Q.   Do you recall whether or not a captain's
6  mast was ever held?
7    A.   I don't recall.
8    Q.   The Captain's mast would be four or five
9  captains?
10   A.   Three.
11   Q.   In the same room?
12   A.   That's correct.
13   Q.   And discussing this matter?
14   A.   That's correct.
15   Q.   And you don't have any recollection?
16   A.   I don't recall this.
17   Q.   You don't recall it?
18   A.   No.
19   Q.   You don't deny it happened but you don't
20  recall it?
21   A.   I don't deny it and I don't recall it.
22   Q.   Did you ever instruct Sergeant Walker
23  not to file any complaint on the incident of the
24  Elizer Pub matter?

110

1    A.   No, sir.
2    Q.   Did you ever threaten her in any way
3  about -- did you ever threaten, intimidate or
4  coerce her -- let me break that down.
5        Did you ever threaten Sergeant Walker in
6  any way to not file a report concerning these
7  three officers regarding the Elizer Pub?
8    A.   I never threatened Officer Walker on
9  anything.
10   Q.   Did you ever intimidate --
11   A.   (Interposing) I never --
12   Q.   (Interposing) Let me finish.  Did you
13  ever intimidate Sergeant Walker in any way by --
14  in any way not to file a report or an incident
15  concerning the three officers involved in the
16  Elizer Pub?
17   A.   The only communication I had with
18  Sergeant Walker, she said to me, "No good deed
19  goes unpunished" and I said what do you mean by
20  that.  She was referring to Monaghan.
21        I said I want a report.  I said I want a
22  report.  She said, "I'll figure out what I'm going
23  to do."  She said, "I'll figure it out" and I
24  said, "No, I want a report" -- and that's just

111

1  what I told her.
2    Q.   When you were speaking to her were you
3  jabbing your finger?
4    A.   I don't know if I was jabbing my finger.
5    Q.   Right when you were testifying here
6  today you were jabbing your finger.  Did you do
7  that?
8    A.   I don't recall.
9    Q.   Let the record show that I saw you do a
10  jab with your finger while you're saying what you
11  told Ms. Walker.  You're denying that?
12   A.   No; but you did the same thing to me.
13  You were pointing your finger to me.
14        I'm not denying it but you did the same
15  thing to me.
16   Q.   Sir, you're the witness.
17   A.   My hand motions are different from
18  yours?
19   Q.   That's not the issue, sir.
20   A.   What is the issue?
21   Q.   The issue is -- my question is to you
22  that when you just described your conversation
23  with Sergeant Walker --
24   A.   (Interposing) Right.

112

1    Q.   -- did you take your finger and jab your
2  index finger of your right hand and jab it two or
3  three times in my direction?  Did you do that?
4    A.   Just now, you mean?
5    Q.   Yes, sir; just now.
6    A.   Jab my finger where?
7    Q.   Just pointing it towards me?
8    A.   I didn't point my finger toward you.
9    Q.   You did it, pointing down toward the
10  table?
11   A.   At the exhibit that you gave me I did,
12  yes.
13   Q.   So you did point your finger in a
14  jabbing motion towards the paper, is that correct,
15  sir?
16   A.   Yes, sir.
17   Q.   Thank you, sir.
18   A.   Okay.
19   Q.   And while you were doing that you were
20  talking about your conversation -- recalling your
21  conversation you had with Ms. Walker?
22   A.   I don't recall saying that.  I was
23  recalling my conversation I had with you where you
24  were pointing at me.

TAMMY WALKER vs. CITY OF HOLYOKE
ALAN FLETCHER        SEPTEMBER 12, 2006

113

1    Q.  Thank you, sir.
2    A.  You're welcome.
3    Q.  Did you at any time take any action that
4  would be perceived as intimidating towards
5  Ms. Walker with regard to filing or not filing an
6  incident report or write-up about the officers
7  involved in the Elizer Pub incident?
8    A.  No, sir.
9    Q.  Do you recall -- did your conversation
10  with Ms. Walker, did it occur in your office or
11  did it occur in the hallway?
12    A.  I don't recall.  I think it occurred in
13  my office.
14    Q.  In fact were you sitting at your desk?
15    A.  I was.
16    Q.  You were not standing and you were not
17  in Ms. Walker's face?
18    A.  No; I wasn't.
19    Q.  Do you harbor or do you -- you were --
20  you recommended disciplinary action against
21  Ms. Walker for violating the chain of command as
22  you saw it when she took a report to Chief Scott,
23  is that correct?
24    A.  That's correct.

114

1    Q.  And not to you?
2    A.  Correct.
3    Q.  Isn't it true that Ms. Walker didn't
4  take a report to you because you ordered her not
5  to take one?
6    A.  That isn't true.
7    Q.  Isn't it true that you directed or
8  recommended Ms. Walker be written up because
9  you -- strike that.  I withdraw the question.
10    Sir, you had Ms. Walker written up
11  because she basically sided with the Chief of
12  Police in writing up a report on those three
13  officers and went against you, isn't that correct?
14    MS. LYNCH:  Objection; you can
15  answer.
16    THE WITNESS:  That's absolutely not
17  true.
18    Q.  (BY MR. HUDSON)  You in essence sought
19  to punish Ms. Walker because she didn't follow
20  your position on the matter?
21    MS. LYNCH:  Objection; you can
22  answer.
23    THE WITNESS:  I don't give out
24  punishment in the Holyoke Police Department.

115

1    Q.  (BY MR. HUDSON)  You recommend it?
2    A.  I recommend discipline action, yes, due
3  to violation of the chain of command.
4    Q.  Do you have any knowledge of when Chief
5  Scott received a copy of the report -- of the
6  report concerning the Elizer Pub incident?
7    A.  I don't remember the time of day, no.
8    Q.  Are all incident reports from Holyoke
9  Police Department officers saved in the HPD's
10  computer system?
11    A.  I believe they are.
12    Q.  Do you know what period of time?
13    A.  I don't know.
14    Q.  Are there any circumstances under which
15  incident reports are destroyed or removed from the
16  system?
17    A.  Not to my knowledge.
18    Q.  Do you know who authorizes reports to
19  be -- incident reports to be produced say to a
20  union officer involved in a grievance proceeding?
21    A.  I don't understand the question.
22    Q.  If in fact an incident report was
23  relevant to some legal proceeding such as a union
24  initiated or grievance proceeding or arbitration,

116

1  who on the force has the authority to authorize a
2  particular police incident report be produced to,
3  say, the union attorney or the City Solicitor's
4  office?
5    MS. LYNCH:  Objection; you can
6  answer if you understand.
7    THE WITNESS:  I still don't
8  understand the question.
9    Q.  (BY MR. HUDSON)  Let's see if we can
10  rephrase it.
11    Who has the authority on the Holyoke
12  Police Department to authorize the release of a
13  specific police incident report for purposes of
14  utilization in a legal proceeding?
15    A.  The best way to answer that would be if
16  it was in a legal proceeding the attorney who
17  would request the report would file what we would
18  call discovery and then it would be released.
19    Q.  Would it be released to the City's
20  attorney or to the adversarial attorney?
21    A.  I don't know.  It depends who filed for
22  the discovery.
23    Q.  Who has the authority, though, to order
24  the release?

TAMMY WALKER VS. CITY OF HOLYOKE
ALAN FLETCHER            SEPTEMBER 12, 2006

133

1  sir, I draw your attention to paragraph one.
2       You state -- you write that "I have been
3  a member of the Holyoke Police Department since
4  1968"?
5     A.   That's correct.
6     Q.   "I have been a captain since 1992."
7     A.   That's correct.
8     Q.   So you have extensive experience with
9  the Holyoke Police Department, is that safe to
10 say?
11    A.   Yes, sir.
12    Q.   Is it safe to say that you know all of
13 the operating procedures and policies and the way
14 things are done at the Holyoke Police Department?
15    A.   I should know them all but...
16    Q.   Would you ordinarily under most
17 circumstances be the go-to guy because of your
18 vast array of knowledge of the Holyoke Police
19 Department?
20    A.   I wouldn't say that but I'm pretty
21 knowledgeable.
22    Q.   Are you motivated in any way, sir, by
23 any feelings of being bypassed yourself for the
24 Chief of Police position at the Holyoke Police

134

1  Department?
2     A.   That's an appointed position but I've
3  been bypassed on sergeant's lists and stuff like
4  that; yes.
5     Q.   Do you feel that you deserved to have
6  been appointed Chief of Police?
7     A.   I'm qualified.
8     Q.   Do you feel that Chief Scott was
9  appointed based on affirmative action and not
10 qualification?
11    A.   No; I really don't feel that way.  I
12 think he was qualified.
13    Q.   Do you feel that you are more qualified?
14    A.   Equally.  He has slightly stronger
15 points than I have in areas.  He's computer
16 literate and I'm probably not so he's -- he has a
17 lot of strong points.
18    Q.   In your capacity as union president do
19 you negotiate directly with the Chief or do you
20 negotiate with the -- on matters of collective
21 bargaining do you negotiate with the City's
22 designee?
23    A.   We negotiate with the City's designee,
24 not with the Chief of Police.

135

1     Q.   I draw your attention to paragraph two.
2  Sir, you write that in approximately September,
3  2002 you had a conversation with Sergeant Walker.
4  Do you recall that?
5     A.   I do.
6     Q.   Do you know what that conversation was
7  about?
8     A.   We were talking about seniority and the
9  sergeant's list and stuff like that; yes.
10    Q.   Furthermore you write that "for the most
11 part Sergeant Walker came to see me regarding some
12 personal problems that she was having."
13       What personal problems was Sergeant
14 Walker -- did Sergeant Walker come to see you
15 about other than seniority issues?
16    A.   We talked for a long time.  You know I
17 think she had a problem with her brother and the
18 kids and things like that.
19       For the job, she talked about getting
20 along with the other sergeants.
21    Q.   You say you spoke for a long time so an
22 hour or so?
23    A.   Or less but...
24    Q.   And toward the end of the conversation

136

1  you write -- is there something you wanted to say,
2  sir?
3     A.   Sir?
4     Q.   Were you finished?  I didn't want to
5  interrupt you.
6     A.   No; I'm listening to what you are
7  saying.
8     Q.   "Toward the end of the conversation I
9  asked her how things were going at work.  In
10 response she stated that she thought Sergeant
11 Garcia and Sergeant Monaghan were mad at her
12 because they were reportedly not talking to her??
13    A.   That's what she said.
14    Q.   Did she at any time say to you that
15 Sergeant Monaghan and Garcia were doing -- were
16 taking actions or saying things that she
17 considered to be discriminatory?
18    A.   No; she didn't say that.
19    Q.   That was September, 2002, correct?
20    A.   That's what I think, I guess.
21    Q.   Prior to September, 2002 would Garcia
22 and McCoy have been appointed sergeants
23 provisionally before becoming permanent?
24    A.   They could have.  I think they were

**TAMMY WALKER VS. CITY OF HOLYOKE**
**ALAN FLETCHER                SEPTEMBER 12, 2006**

141

1  is "I told her that she may be having problems
2  because she was giving an incorrect seniority
3  date."
4         So you told her that specifically in
5  response to her identifying Garcia and Sergeant
6  Monaghan?
7      A.   We both thought that was the problem.
8      Q.   And that they were the ones who had the
9  problem with seniority -- Garcia and Monaghan at
10 least were included in the ones that had the
11 problem with seniority, is that correct?
12     A.   Right; it was her first and then it was
13 reversed.
14     Q.   You go on to state specifically that
15 "she was given a date ahead of some of the other
16 sergeants even though they had all taken the Civil
17 Service exam on the same date."
18     A.   I asked her how it happened and she said
19 that there was an agreement and one of the dates
20 was changed.  I said how did it change.  She said
21 well, it was in the agreement.  I had no knowledge
22 of the agreement.
23     Q.   But then you told her it was
24 incumbent -- what do you mean, "incumbent upon her

142

1  to correct the date"?
2      A.   I said to her the solution to it is just
3  correct the date, change the date to what it was
4  supposed to be.
5      Q.   But you wrote, "I told her it was
6  incumbent upon her"?
7      A.   Because she had the agreement.  I didn't
8  have the agreement.
9      Q.   What do you mean by the word
10 "incumbent"?
11     A.   She was in the position to change it;
12 that's what I meant.
13         She knew the agreement.  I didn't know
14 the agreement.
15     Q.   Then you wrote that "her problems" -- "I
16 indicated that I thought her problems would
17 self-correct"?
18     A.   I thought that was the issue, was the
19 date.
20     Q.   Once the date was changed?
21     A.   That's what I thought.  I mean in the
22 way she explained it to me that's what I thought.
23     Q.   Are there any other black sergeants on
24 the Holyoke Police Department back in September,

143

1  2002 other than Ms. Walker?
2      A.   I don't know.  There was an officer
3  Stevenson was a black sergeant.  I don't know if
4  he was still there or not.  There was one but I
5  don't know.
6      Q.   Do you know whether or not there was any
7  black female sergeants other than Ms. Walker --
8      A.   (Interposing) No; she was the only one.
9      Q.   Please let me finish -- other than
10 Ms. Walker in September, 2002?
11     A.   She was the only one.
12     Q.   Thank you.  Did you ever call Sergeant
13 Monaghan and Garcia or speak with Sergeant
14 Monaghan and Garcia about they ought to get over
15 it and accept the fact that Ms. Walker has gotten
16 a sergeant position and has seniority?
17     A.   I don't know if I ever did that.  The
18 only thing I know I did was I talked to Monaghan
19 about the other issue we brought up today in front
20 of the sergeant.
21     Q.   And that issue was the Tyrone?
22     A.   That's correct, sir.
23     Q.   That matter?
24     A.   Yes, sir.

144

1      Q.   But you never told them that it was
2  incumbent upon --
3      A.   (Interposing) I don't recall.
4      Q.   Please let me finish, sir.  Did you
5  indicate or write or communicate in any way to
6  Sergeant Monaghan and/or Sergeant Garcia that
7  Ms. Walker has received a Civil Service
8  appointment to sergeant and she has whatever
9  seniority Civil Service gave her?
10     A.   I could have had a conversation with
11 them but I don't recall it.
12     Q.   Did you ever offer any support to
13 Ms. Walker other than -- around the seniority
14 issue other than that she ought to give up the
15 seniority that she achieved through the Civil
16 Service settlement?
17     A.   No; I never said that to her, never.
18 What I suggested was we get the date corrected and
19 that should resolve the issues if there was
20 issues.
21     Q.   With regard to paragraph three you write
22 that "Sergeant Walker never alleged that Sergeant
23 Monaghan or Sergeant Garcia were calling her
24 derogatory names," is that correct?

**PERLIK and COYLE REPORTING**

TAMMY WALKER VS. CITY OF HOLYOKE
ALAN FLETCHER                SEPTEMBER 12, 2006

---

149

1   statement "you shouldn't go sticking your tongue
2   where it don't belong."
3           You refer to an incident on
4   October 17th, 2002 in your affidavit at paragraph
5   four.  Do you see that, sir?
6       A.   Yes, sir.
7       Q.   Do you recall whether or not Sergeant
8   Walker complained or made any grievance or
9   complaint about Sergeant Garcia changing the
10  roster and refusing to obey her orders on or about
11  October 19th?
12      A.   I don't know about any dates but she was
13  saying that she didn't get along with him.
14      Q.   The date that -- on or about
15  October 19th, 2002, do you have any knowledge of
16  Ms. Walker?
17      A.   The knowledge I have sir is what she
18  told me.
19      Q.   Are you aware that on October 20th, 2002
20  a Khuram Shahzad -- K-H-U-R-A-M, S-H-A-H-Z-A-D --
21  submitted a letter on behalf of Ms. Walker
22  regarding the Moran complaint that she had
23  allegedly been abused by Ms. Walker?
24          Did you know that this person Khuram

---

150

1   Shahzad was the 7-Eleven clerk?
2       A.   I don't know.
3       Q.   Did you know that as of October 20th,
4   2002 Ms. Walker had spoken with Lieutenant
5   Whelihan about the tongue song and being called
6   Tyrone?
7       A.   The Tyrone, I recall that.  The other I
8   don't recall but we did meet -- myself, Whelihan,
9   and Tammy and Sergeant Monaghan.
10      Q.   Did you know that as of October 20, 2002
11  Ms. Walker had written a memo to Lieutenant
12  Whelihan regarding Sergeant Garcia changing the
13  roster?
14      A.   She could have.  You know we could have
15  discussed it but I'm not sure.
16      Q.   And that in fact the meeting that you
17  had with Ms. Walker was on October 21, 2002?
18      A.   I don't know the date.
19      Q.   Even though all of these other -- she
20  had written a memo to Lieutenant Whelihan.
21  Lieutenant Whelihan was in the meeting with you?
22      A.   Right.
23      Q.   And Ms. Walker and Sergeant Monaghan?
24      A.   Right.

---

151

1       Q.   She had previously complained about
2   Garcia changing a roster.  She had obtained -- she
3   had somehow managed to obtain an affidavit from
4   the clerk at the 7-Eleven to support her position
5   about the arrest, that Ms. Walker met with you and
6   none of these things came up?
7       A.   I didn't question the arrest.
8       Q.   You didn't question whether or not there
9   was any retaliation or racial harassment or sexual
10  harassment again Ms. Walker?
11      A.   That was the purpose of the meeting that
12  we had.  We wanted to find out what was going on.
13      Q.   Sir, again in paragraph five you write
14  that you did have a conversation with Sergeant
15  Walker about the seniority issue, is that correct?
16      A.   That is correct.
17      Q.   Paragraph five of Exhibit 14?
18      A.   That's correct.
19      Q.   And the fact that she had been bypassed
20  for the Sergeant position by Sergeant Garcia?
21      A.   She was bypassed.
22      Q.   By Sergeant Garcia, that's what you
23  wrote, isn't that true, sir?
24      A.   That's what I wrote but she was

---

152

1   bypassed; right.
2       Q.   I understand but we're just simply
3   trying to refresh your recollection about who was
4   one of the individuals who was bypassed?
5       A.   He was one of a couple, I think.
6       Q.   Sir, I believe you testified earlier
7   that in connection with Ms. Walker's
8   September 29th report of injury on duty -- there
9   was an acronym that was used that I'm trying to
10  remember but in any event, I think this is it.
11  Officer injury report -- it's IOD. (Indicating.)
12      A.   I've got it; yes.
13      Q.   I'm going to withdraw that proposed
14  question, sir.
15          Sir, is it your -- when you held that
16  meeting with Lieutenant Whelihan, Sergeant
17  Monaghan, and Sergeant Walker on October 21, 2002
18  was there anyone else present other than the four
19  of you?
20      A.   I don't recall anybody present.
21      Q.   Where did the meeting take place?
22      A.   My office.
23          MS. LYNCH:  Just as a point of
24  clarification, the affidavit indicates October 17.

---

**PERLIK and COYLE REPORTING**

**TAMMY WALKER VS. CITY OF HOLYOKE**
**ALAN FLETCHER          SEPTEMBER 12, 2006**

153

1          THE WITNESS:  I don't know the date
2   but we did have a meeting.
3          MR. HUDSON:  Which affidavit are you
4   referring to?
5          MS. LYNCH:  Exhibit 14.
6          THE WITNESS:  This one here.  I
7   don't know the date.
8          MS. LYNCH:  I'm sorry.
9          MR. HUDSON:  The incident occurred
10  on October 17th.
11         MS. LYNCH:  Yes; I'm sorry.  I made
12  a mistake on that.  This doesn't indicate a date.
13     Q.   (BY MR. HUDSON)  Ms. Walker alleges
14  October 21.
15         In any event, what if anything did
16  Lieutenant Whelihan say during the meeting?
17     A.   Well, he just said he never heard
18  Monaghan say anything derogatory about the
19  Sergeant and he just want to clear the air.
20  Monaghan denied he said anything derogatory to
21  her.  She said she didn't hear it -- it was
22  hearsay on her part as far as someone told her he
23  said it.
24         What we were trying to do as supervisors

154

1   was to try to get these two subordinate
2   supervisors to work together on their shift
3   assignments and resolve their differences if they
4   had them.  That's what the purpose of the meeting
5   was for.
6      Q.   Did Mr. Whelihan or Lieutenant Whelihan
7   inform you that a day or so before this meeting
8   Sergeant Walker had given him a memo complaining
9   about Sergeant Garcia changing the roster?
10     A.   That could have been brought up there.
11  I was more concerned about the other issues that
12  were discussed that day.
13     Q.   Did Officer Walker mention that she was
14  also concerned about Garcia refusing to obey her
15  orders?
16     A.   She could have brought that up to
17  Lieutenant Whelihan.  I think we focussed on
18  Monaghan at the time of this meeting.  I think
19  that was my focus.
20     Q.   Are you aware that on or about
21  October 22nd Sergeant Garcia gave a memorandum the
22  day following the meeting with Sergeant Walker,
23  Lieutenant Whelihan, and Monaghan?
24     A.   Yes.

155

1      Q.   And you?
2      A.   Yes.
3      Q.   Sergeant Garcia gave a memorandum to the
4   Chief concerning the booking of Mr. Moran and
5   noting that there was evidence that Moran had
6   injuries and he claimed that he was beaten by the
7   police.  Are you aware of that?
8      A.   I know there was something -- there was
9   an incident report on that but I think that's
10  required by law.
11         If a prisoner is injured we have to
12  notify the Chief in writing of the injuries, the
13  type of injuries if they're visible and stuff like
14  that.  I don't know --
15     Q.   (Interposing) Well, if the arrest
16  occurred on October 15th, 2002 and Monaghan and
17  Garcia go back and question the clerk on
18  October 16th, 2002 and the clerk provides a letter
19  on October 20th, 2002 on behalf of Ms. Walker and
20  Garcia waits until the twenty-second of October,
21  2002 to file a report of this Mr. Moran having
22  been injured, is there -- is that normal, sir, for
23  that much time to go by?
24         MS. LYNCH:  Objection; you can

156

1   answer.
2      Q.   (BY MR. HUDSON)  In your years of
3   experience?
4      A.   All I can say is I was unaware of the
5   timeline of these events.
6          I don't know -- some of this stuff is
7   the first I heard today and others I knew about
8   but I don't know about the Garcia thing where he
9   wrote -- or what he wrote.
10         Who did he give this to?  The Chief?
11     Q.   Yes.
12     A.   Oh.
13     Q.   If you don't remember, that's fine.
14     A.   I didn't see it.  Maybe I did but I
15  don't recall it.  I don't think I approved it.
16     Q.   Sir, you do recall that by November 13,
17  2002 the entire third shift was given a
18  questionnaire about Ms. Walker's claims?
19     A.   That's correct; everybody had to go give
20  a statement.
21     Q.   So in between the -- excuse me -- so as
22  of that date when the questionnaire was delivered
23  to all of the entire third shift, November 13,
24  2002 and by February 27th, 2003 you were providing

**PERLIK and COYLE REPORTING**

# TAMMY WALKER VS. CITY OF HOLYOKE
## ALAN FLETCHER          SEPTEMBER 12, 2006

157

1  an affidavit at the MCAD, isn't that correct?
2      A.   That's correct.
3      Q.   So you were aware then that between the
4  circulation to the entire third shift of the
5  questionnaire on November 13th and by
6  February 27th, Ms. Walker had filed an MCAD
7  complaint?
8      A.   I don't know the dates.
9      Q.   But you know you were providing an
10  affidavit to her complaint?
11      A.   I was but I don't know all these dates
12  that you're mentioning.  They're confusing.
13      Q.   Well sir, do you know whether the entire
14  third shift was given a questionnaire about
15  Ms. Walker's claims before she filed an MCAD
16  complaint?
17      A.   I don't know what the questionnaire was.
18  I wasn't part of that investigation so I don't
19  know what questions they asked.
20          I just know they interviewed everybody
21  on the third shift.
22      Q.   Did they interview you?
23      A.   No; I don't think so.  I gave an
24  affidavit but I don't know if that was in

158

1  reference to that.  I don't think it was.  I think
2  this had to deal with an MCAD complaint.
3      Q.   Did you talk with Sergeant Garcia about
4  any affidavit that he may have given in connection
5  with --
6      A.   (Interposing) I don't recall.
7      Q.   -- in connection with the response to
8  Ms. Walker's MCAD complaint?
9      A.   I don't recall.
10      Q.   Did you talk with Sergeant Monaghan
11  about what he should have included in his
12  affidavit in response to Ms. Walker's MCAD
13  complaint?
14      A.   I really don't talk to Monaghan so I
15  don't recall ever having a conversation with him.
16      Q.   Why don't you talk to Monaghan?
17      A.   I just don't.
18      Q.   You don't like him?
19      A.   (No response.)
20      Q.   What does that mean, sir?  You shook
21  your head?
22      A.   We don't have anything in common, put it
23  that way.
24      Q.   Is he a supervisor under your command?

159

1      A.   He is one of my supervisors; that's
2  correct.
3      Q.   What is it you don't have in common,
4  sir?
5      A.   I don't know.
6      Q.   You're both police officers in law
7  enforcement?
8      A.   I think the biggest thing is our age
9  difference.
10      Q.   How old is he?
11      A.   I think he's in his thirties.
12      Q.   Did any of the -- did Sergeant Garcia
13  ever consult with you about his affidavit to the
14  MCAD?
15      A.   The best of my recollection; no.
16      Q.   Did Lenihan consult with you about his
17  affidavit to the MCAD?
18      A.   Lenihan?
19      Q.   Lenihan -- L-E-N-I-H-A-N -- do you know
20  that person?
21      A.   He's a sergeant but, no.
22      Q.   Did Whelihan consult with you about
23  his --
24      A.   (Interposing) I don't recall having a

160

1  conversation with him.
2          MS. LYNCH:  You have to let him
3  finish the question, okay?
4      Q.   (BY MR. HUDSON)  Did the Chief consult
5  with you -- did Chief Scott consult with you about
6  his affirmation to the MCAD -- his statement to
7  the MCAD?
8      A.   I don't think -- he probably ordered me
9  to give an affidavit to the City Solicitor.
10      Q.   Did he order or request it?
11      A.   I think he orders us.
12      Q.   Do you know Jorge Rodriguez?
13      A.   Yes; I do.
14      Q.   Do you know if Jorge Rodriguez was ever
15  given a formal reprimand for failing to pick up an
16  operations manual?
17      A.   Personally, no, I don't know that.
18      Q.   Do you know whether in the history of
19  the Holyoke Police Department any officer has been
20  given a formal reprimand for something akin to
21  failure to pick up an operations manual?
22      A.   I think there has been; yes.
23      Q.   Who?
24      A.   I don't know who but they have been.

## PERLIK and COYLE REPORTING

# EXHIBIT 16

HOLYOKE POLICE DEPARTM
INTEROFFICE MEMORAND

*ORIGINAL NOT
SUBMITTED*



TO:       LIEUTENANT DAVID D. FOURNIER
FROM:     OFFICER JORGE L. RODRIGUEZ
SUBJECT:  WALKER V. MONAGHAN  COMPLAINT
DATE:     DECEMBER 04, 2002
CC:       IAD 02-20

DEFENDANT'S DEPOSITION EXHIBIT
S Rodriguez
9/20/06
PENGAD 800-631-6989

LIEUTENANT DAVID FOURNIER:

This letter is in response of your request to submitt an IOC
describing in detail the comments that I heard over the WMLAC
radio. I cann't give you an exact date or time of the incidents
but I started noticing the communications about three weeks ago
around 0630 hrs. when we responded to gas up the cars. This
comments are performed after Seargent Walker is in use of our
Police Radio. In one ocassion after she went over the air some
one started singing a Rap song over WMLAC " Leak it now, leak it
good, leak it real good" In other acassions when this song is heard
over the FM radio someone placed the mike close to the WMLAC radio
to transmitted the song. In one other ocassion Seargent Walker
end radio transmission, someone spoke over WMLAC saying "I am
freak out, El Freako". I cann't say with certainty that Seargent
Monaghan did the talking but the voice sounds like his. In few
other ocassions someone goes over WMLAC radio Meawing like a
fighting cat after she end transmission. We have a natural duty
and an obligation to comply with the duty of Justice and the
principle of Fairness.

                                     Jorge L. Rodriguez.
                    Signature: *Jorge L. Rodriguez*

# EXHIBIT 17

## HOLYOKE POLICE DEPARTMENT
## INTEROFFICE MEMORANDUM

TO:        CHIEF   SCOTT

FROM:      OFFICER Jorge L. Rodriguez

SUBJECT:   INTERNAL INVESTIGATION

DATE:      11/ 20/ 02

CC:



DEFENDANT'S DEPOSITION EXHIBIT
3 Rodrigu
9/20/06

Dear Chief Scott:

This is my response in regard to questions submitted by your office in regards to an internal investigation, Walker Vs Monaghan.

1- No

2- No

3- No

4- No

5- N/a

6- No

I have noticed some tension in the air since all this incident started which I have never seen before happening in this shift in the many years that I have been working on it. I have heard some sexually derogatory comments over the WMLAC Radio which appeared to be directed to Sergeant Walker specially when she is working.  I have no idea of who is doing it. since

Signature: *Jorge L Rodriguez*

# EXHIBIT 18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER,<br>　　　　Plaintiff | ) <br> ) <br> ) |
| v. | ) <br> ) |
| CITY OF HOLYOKE,<br>　　　　Defendant | ) <br> ) <br> ) |

## **AFFIDAVIT OF LIEUTENANT JOHN MONAGHAN**

I, John Monaghan, hereby depose and state as follows upon personal knowledge:

1.  I have been a member of the Holyoke Police Department since April 27, 1993 when I was appointed a permanent reserve officer. I was appointed a regular full-time police officer on July 19, 1993.

2.  In mid-May 2002, I was appointed a permanent full-time sergeant. I was appointed from a Civil Service List, dated April 15, 1999. I was recently appointed a lieutenant.

3.  I have known Sergeant Tammy Walker since we were children as her brother, Vincent, was one of my best friends. We both became police officers for the City of Holyoke on the same date.

4.  Sergeant Walker and I have always had a professional relationship. In fact, I invited Sergeant Walker to my wedding in May 1995 and she attended.

5.  At work, I spent very little time with Sergeant Walker, usually only seeing her in passing. Sergeant Walker generally stayed in the records department. Whereas, I generally did the roll call and patrolled in a cruiser.

6.  At no time did I not follow an order given by Sergeant Walker as she never gave me any orders. I recall only two conversations with Sergeant Walker. On one occasion, without even looking up, she made a request of me by rudely ripping off a piece of paper and telling me to take it upstairs. In response, I said, "Please." The other occasion entailed her giving me my sergeant's badge and saying, "Congratulations."

7.  It is my normal practice to do roll call and then bring the paperwork into the commanding officer's office. I usually give the paperwork to Sergeant John

Lenihan, who signs it, and then I place it in the tray. I do not have a memory of seeing Sergeant Walker in the office on October 17, 2002. However, at no time did I ever sing a song to her as alleged in her complaint. I have never heard of the song that she is referring to.

8.     At no time have I ever harassed or discriminated against Sergeant Walker because of her gender, race, sexual orientation or for any other reason. I have only called her "Tammy" or "Sergeant Walker." I have never referred to her as "Tyrone." While I have had a problem with some of Sergeant Walker's work practices, I never said (or thought) that she was unqualified to be sergeant because of her sexual orientation.

9.     After Sergeant Walker filed a complaint regarding the alleged incident of October 17, 2002, I attended a meeting with Sergeant Walker, Captain Fletcher and Lieutenant Whelihan which lasted approximately one hour. At the meeting, Sergeant Walker alleged that I sang a song to her and also referred to Chief Scott as "Uncle Charlie" at a roll call. To say the least, the meeting became quite heated because I absolutely never called Chief Scott any derogatory names. In fact, I have had nothing but deep respect for Chief Scott. I have never called him anything but "Chief" or "the Chief." I also never sang the song as alleged.

10.     In addition, I have never made any type of derogatory or sexual comments on the police radio with respect to Sergeant Walker or anyone else.

11.     On October 16, 2002, I became aware of an incident that had occurred at a convenience store in Holyoke on October 15, 2002 involving Sergeant Walker. Subsequently, I spoke to the clerk of the store about the incident. Sergeant Garcia was also in the store as we were partners that evening. While we were in the store, Sergeant Walker drove by and saw us. I later learned that she was very upset that I had been speaking with the clerk. I believe that her anger over this incident motivated her to file this complaint since I never discriminated against her.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _8th_ DAY OF _June_ 2007.

_LT. John Monaghan_
Lieutenant John Monaghan

# EXHIBIT 19

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER,<br>         Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| CITY OF HOLYOKE,<br>         Defendant | )<br>)<br>) |

## **AFFIDAVIT OF SERGEANT JOHN LENIHAN**

I, John Lenihan, hereby depose and say as follows upon personal knowledge:

1.    I have been a member of the Holyoke Police Department for 25 years.  I have been a Sergeant since May 1998.  I work the midnight to 8:00 a.m. shift.

2.    I began working with Sergeant Walker on approximately May 5, 2002.

3.    On October 17, 2002, I recall being in the commanding officer's office along with Sergeant Walker, Sergeant Monaghan, Sergeant Garcia and Officer Dunn.  I recall the evening because it was unusual to see Sergeant Walker in the office as she spent the majority of her time in the Records Department when she was not on the road.  I did not hear Sergeant Monaghan sing a song, as alleged, or make any derogatory comments to Sergeant Walker.  I never saw her get upset in the commanding officer's office nor did she call Sergeant Monaghan aside to question him.  Whereas, it has been my experience that Sergeant Walker is not shy about confronting others.  She also never informed me that any comments were made to her that evening.  I learned of the allegations on October 27, 2002 from Sergeant Monaghan who had received a copy of her complaint.  To say the least, I was shocked by the allegations.

4.    Sergeant Walker never informed me that Sergeant Monaghan was making derogatory comments about her or to her.

5.    I also have never heard Sergeant Monaghan refer to Sergeant Walker as Tyrone or make any derogatory comments about her or to her.

6.    I never heard any derogatory comments over the police radio about Sergeant Walker.  In my experience, Sergeant Monaghan is usually upbeat and friendly to the other officers.

358804v1

7.    I have never heard Sergeant Monaghan speak about Chief Scott in a negative way. In fact, whenever I have heard Sergeant Monaghan refer to Chief Scott, he has called him "Chief" and has indicated that he really likes him.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _____7_____ DAY OF ___June___ 2007.

_____
Sergeant John Lenihan

2

358804v1

# EXHIBIT 20

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF HOLYOKE, | ) |
| Defendant | ) |

### AFFIDAVIT OF KENNETH MORIARTY

I, Kenneth Moriarty, hereby depose and say as follows upon personal knowledge:

1.  I have been employed by the Holyoke Police Department for approximately 22 years. I work in the Technical Systems Bureau.

2.  I received an order from Chief Anthony Scott to obtain and preserve the WMLEC Radio tapes for the dates that Sergeant Tammy Walker and Sergeant John Monaghan worked together in 2002. At the request of City Solicitor Karen Betournay, I have listened to these tapes for the shifts that Sergeant Walker and Sergeant Monaghan worked together.

3.  I have known Sergeant Monaghan since he became a police officer in 1993. I am very familiar with his voice and am totally confident that I would recognize it if I heard it on the tapes.

4.  I did not hear any voice on the tapes that I recognized to be Sergeant Monaghan's voice. I also did not hear any transmission that had any reference to Sergeant Walker or that appeared derogatory with regard to Sergeant Walker.

5.  In early November 2004, Lieutenant Eva O'Connell told me that Sergeant Walker was concerned that calls were being dispatched via mobile data terminals (MDTs) because she was not hearing calls over her radio. I informed Lieutenant O'Connell that I kept records of all MDT traffic. Therefore, I could check the records if Sergeant Walker had particular dates that concerned her.

SIGNED UNDER THE PENALTIES OF PERJURY THIS_____ DAY OF
_____ 2007.

_____
Officer Kenneth Moriarty

358666v1

# EXHIBIT 21



**HOLYOKE POLICE DEPARTMENT**
**CITIZEN/EMPLOYEE COMPLAINT FORM**

(TO BE COMPLETED BY A SUPERVISORY OFFICER)

**RECEIVED**

OCT 25 2002

**CHIEF'S OFFICE**



DEFENDANT'S DEPOSITION
EXHIBIT
4 Walker
9/26/06 Jr

P.S.D. Number: _02-20_

Date: _10/24/02_     Rec 10-25-02 #105

### This form is to be printed legibly or typed

Complainant's name: _Sgt. Tammy Walker_ .

Address: _372 Hillside Ave_

City: _Holyoke_    State: _MA_  Zip Code: _01040_

Telephone (Home) _1-413-533-1216_

Telephone (Business) _1-413-536-6431_ .

Location of Incident: _CO's office_

Date of Incident: _10/17/02_

Time of Incident: _1200_  (A.M.)/P.M.

List personnel on which Complaint is being filed:
_____ _Sgt. John F Monaghan_ _____

_____

Witnesses: (list names, addresses, and telephone numbers of any and all witnesses)
_Sgt Garcia_
_Sgt Lenihan_
_Off Chris Dunn_

Should you have any evidence such as video tapes, photographs, etc. please advise and provide them with your complaint.

Description of Occurrence:
_See Attached Report._
_____
_____
_____
_____
_____

Go To Backside of Form       HPD Form 6.20 Rev. 08/01

On 10-17-02, at approximately 12:00 am, I Sergeant Tammy Walker was sitting in the commander's office. I was seated to the right, as you enter the office. Officer Christopher Dunn was seated in front of the desk where I was seated. Sergeant Joseph Garcia was seated across from Officer Dunn in front of the other desk. Sergeant John Lenihan was seated to the left as you enter the office at the other desk. Sgt. John Monaghan entered the office. He had just finished roll call.

Sgt Monaghan had the paper work from doing roll call. Sgt. Monaghan then placed some paper work back on the clipboard. He then walked over to the desk where I was seated. He leaned over my desk to place the roll call list in its slot. While leaning over to do this, Sgt Monaghan begin to sing a song. The words to the song were as follows… " You shouldn't go sticking your tongue where it don't belong". Officer Dunn began to laugh at this comment.

Being a lesbian, I know what Sgt. Monaghan was referring to. I gave no response to his comments, and left the office.

It has also been brought to my attention by several officers, that Sgt. Monaghan refers to me as Tyrone, rather than by my birth name Tammy. I feel these are personal attacks on me, based on my race and sexual orientation.

Respectfully Submitted

*Sgt. Tammy Walker* 10/24/02

Sgt Tammy Walker #229

# EXHIBIT 22



**HOLYOKE POLICE DEPARTMENT**
**INTEROFFICE CORRESPONDENCE**

DEFENDANT'S DEPOSITION
EXHIBIT
_T Walker_
9/26/06 jr

**TO:**      Sergeant Tammy Walker

**FROM:**    Lieutenant David D. Fournier

**SUBJECT:**  Employee Complaint v. Sergeant John Monaghan

**DATE:**     October 28, 2002

**NUMBER:**   IAD CASE 02-20

---

Sergeant Tammy Walker:

In your complaint against Sgt. Monaghan, you indicate in your last paragraph that it has been brought to your attention by several officers that Sgt. Monaghan refers to you as Tyrone, rather than your birth name. You are directed to submit a To: - From: to me with the names of the officers that provided you this information. Your response shall be submitted to me no later than Thursday, October 31, 2002.

Sincerely,

Lt. David D. Fournier

# EXHIBIT 23

DEFENDANT'S DEPOSITION
EXHIBIT
6 Walker
9/26/06

TO:  Lieutenant David D. Fournier

FROM  Sergeant Tammy Walker

SUBJECT:  Employee Complaint VS. Sergeant John Monaghan

DATE: October 30, 2002

NUMBER: IAD CASE 02-20

Lieutenant David D. Fournier:

The Officers that came to me with the information did so because they felt this attack on me was wrong and wanted it to stop. These officers asked me to please not mention their names. This request was made because, they fear that the harassment will then shift to them, and other members within the Department will call them a "rat". I have given these officers my word that their names would never be mentioned. I was informed about three weeks ago, that Sergeant Monahan refers to me as Tyrone.  I did nothing with the information, hoping it would end there. As you know, based on the other paragraphs in the complaint it has instead escalated. I am sure these officers are not the only officers aware of this harassment.

Respectfully Submitted

Sergeant Tammy Walker#229

# EXHIBIT 24



# HOLYOKE POLICE DEPARTMENT
# INTEROFFICE CORRESPONDENCE

**TO:**  SERGEANT TAMMY WALKER

**FROM:**  LIEUTENANT DAVID D. FOURNIER
COMMANDER, PROFESSIONAL STANDARDS DIVISION

**SUBJECT:** EMPLOYEE COMPLAINT V. SERGEANT JOHN MONAGHAN

**DATE:**  MONDAY, DECEMBER 09, 2002

**NUMBER:**  IAD CASE 02-20



Sergeant Walker:

The Professional Standards Division and the Board of
Inquiry have reviewed allegations of misconduct made by you
against Sergeant John Monaghan.  This matter was
investigated in accordance with General Order #191 of the
internal investigations procedure as contained in the
current agreement between the City of Holyoke and Local
Union 409.

As a result of the investigation, the Board of Inquiry
unanimously agreed that the complaint against Sergeant John
Monaghan be classified as "Unfounded", which as defined,
showed that the investigation indicates that the act or
acts complained of did not occur or failed to involve
police personnel,

A record of your complaint will be maintained by the
Professional Standards Division for documentary purposes.


Sincerely,

David D. Fournier,
Lieutenant, Commander
Professional Standards Division

# EXHIBIT 25



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**     OFFICER

**FROM:**   LIEUTENANT DAVID D. FOURNIER
COMMANDER, PROFESSIONAL STANDARDS DIVISION

**SUBJECT:** INTERNAL INVESTIGATION

**DATE:**   WEDNESDAY, NOVEMBER 13, 2002

**NUMBER:** IAD CASE 02-20

---

The Chief has ordered an internal investigation as a result
of an employee complaint submitted by Sergeant Tammy Walker
against Sergeant John Monaghan.  The Chief has formulated a
number of questions which you are ordered to answer.  He
has also instructed me to provide you with a copy of an
information package concerning truthfulness.  You are
instructed to submit your responses by number as they are
listed in the questions below.  You shall submit your
response in writing to me no later than Wednesday, November
20, 2002, via a To: - From: format.

1. Have you personally ever heard Sergeant Monaghan refer
   to Sergeant Walker as "Tyrone" or heard him say "You
   shouldn't go sticking your tongue where it don't
   belong"?

2. Have you personally ever actually heard Sergeant
   Monaghan refer to Sergeant Walker in a derogatory
   manner?

3. Have you personally ever heard Sergeant Monaghan refer
   to Sergeant Walker in a racially derogatory manner?

4. Have you personally ever actually heard Sergeant
   Monaghan refer to Sergeant Walker in a sexually
   explicit or sexually derogatory manner?



PLAINTIFF'S
EXHIBIT
3 Monaghan
9/15/06
PENGAD 800-631-6989

5. If you answered yes to any of these questions, provide the following details:

   a. When this occurred?

   b. Who was present?

   c. Where specifically this occurred?

   d. What was said and by whom?

6. If you have other than first hand knowledge on any of the above inquires, please provide the following:

   a. Who told you this information?

   b. Who was present when you were told?

   c. When and where were you told?

   d. Provide the details of what you were told.

David D. Fournier,
Lieutenant, Commander
Professional Standards Division

# EXHIBIT 26

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040
I.A. Case #03-17

This statement is being taken in the Professional Standards Division office at Holyoke Police Headquarters on Saturday, August 2, 2003, the time is 8:56 a.m. Present while the statement is being taken are Lieutenant David Fournier and Sergeant Daniel McCavick. This statement is being tape recorded and will be reduced to writing for signature.

This statement is being taken from Officer Timothy Skwira regarding report #03-4442-OF regarding a report submitted by Sergeant Tammy Walker, on June 23, 2003, regarding off duty Holyoke police officers being in Elizur's Pub, 874 Hampden Street, Holyoke after 2:00 a.m.

Q denotes questions by Lieutenant Fournier:

Q. Just for the record, would you state your name and rank?
A. Timothy Skwira, police officer.

Q. Were you working on June 23, 2003?
A. Yes, I was.

Q. Did you respond to a call or were you dispatched for a call for service at Elizur's Pub?
A. Yes, I was.

Q. And do you recall the time of the dispatch or call for service?
A. I'm not sure of the exact time; it was a little bit after 2:00 o'clock.

Q. Okay. And what was the nature of the call?
A. The call came in - my recollection is people refusing to leave the bar.

Q. Okay. And did any other units respond to assist on the call?
A. Prior to my getting there, while I was in route, I heard Sergeant Walker call out at the scene.

Q. Okay. And at some point you did arrive at Elizur's Pub?
A. Yes. It had to be within – probably within a minute. I was on Pleasant Street, Pleasant and Lincoln when she called out.

Q. Okay And at some point did you enter the bar?
A. Yes, I did.

Q.  Okay. And where there any off duty officers present at that time?
A   Yes, there was.

Q.  Okay.  Was Sergeant Walker already on scene?
A.  Yes, sir, she was.

Q.  Okay.  And did you take notice of any conversation between Sergeant Walker and the
    officers on scene?
A.  When I –

Q.  Or off duty – excuse me – the off duty officers at the establishment?
A.  When I walked in, I recall Sergeant Walker saying let's go and the four individuals
    started heading to the front door.

Q.  Okay.  Any other conversation?
A.  No, sir.

Q.  Did you – in Sergeant Walker's report and I'll just – the exact wording I don't have – but
    she indicates that Officer – Sergeant Monaghan took a drink of his beer, slid the bottle or
    glass to the bartender and stated is our tab all set.  Do you -
A.  I don't recall that, sir.

Q.  Okay.  Do you – so the officers at that point left?
A.  They were – yep, all four of them were heading to the front door.

Q.  Okay.  Did you take notice of any beer bottles or alcoholic beverages on the bar at that
    time?
A.  Ah – if I remember there was a couple of beers on the bar.

Q.  Okay.  Any other patrons present at that time?
A.  No, sir, there wasn't.

Q.  Did any other officers come inside the bar while the off duty officers were present
    besides yourself and Sergeant Walker?
A.  No, sir, there wasn't.

Q.  Okay.  Did you take notice of any other conversations between either yourself and
    Sergeant Walker and the staff at Elizur's – bartender or owner?
A.  As a matter of fact, when the four officers began to leave. she asked the bartender who
    made the call.  The bartender said she wasn't sure.  At that time the owner walked in and
    she asked him and he said he wasn't sure and at that time I exited the establishment.

Sergeant McCavick:  I don't have any questions.

Lieutenant Fournier:  Is there anything else that you would like to add?

Officer Skwira:  No, that's it.

Lieutenant Fournier:  Okay, very good.  Statement concludes at 9:01 a.m.

This statement was given of my own free will and is true and correct.

_____          _____
Timothy Skwira                                          Date

Witnessed by:

_____
Lieutenant David Fournier

_____
Sergeant Daniel McCavick

# EXHIBIT 27

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040
I.A. Case #03-17

This statement is being taken in the Professional Standards Division office at Holyoke Police Headquarters on Tuesday, July 29, 2003, at 1:16 p.m.  Present while the statement is being taken are Lieutenant David Fournier and Sergeant Daniel McCavick.  This statement is being tape recorded and will be reduced to writing for signature.

This statement is being taken from Sergeant John Monaghan regarding report #03-4442-OF regarding a report submitted by Sergeant Tammy Walker, incident on June 23, 2003, into June 24, 2003, regarding off duty Holyoke police officers being in or at Elizur's Pub, 874 Hampden Street, Holyoke after 2:00 a.m.

Q denotes questions by Lieutenant Fournier:

Q.  For the record, would you state your name and rank?
A.  Sergeant John F. Monaghan, M-O-N-A-G-H-A-N.

Q.  Were you at Elizur's Pub on Sunday, June 23, 2003, into Monday, June 24, 2003?
A.  Yes, I was.

Q.  Were there any other off duty Holyoke police officers present during that time frame?
A.  Yes, myself, Officer Phil McKay, Reserve Officer Thomas Dore and Reserve Officer Joseph Wilson.

Q.  Okay.  Were you consuming alcoholic beverages during that time frame?
A.  Yes.

Q.  And were the other off duty officers that you mentioned also consuming?
A.  I believe we all were.

Q.  Okay.  And at what time did you order your last alcoholic beverage, approximately?
A.  We got last call when everyone else did and I'm just going to estimate 1:45, 1:50, I wasn't wearing a watch but that's around the time.

Q.  Okay.  In Sergeant Walker's report, she indicates that she instructed you and the other off duty officers to leave the establishment, it that true?
A.  No, it's not.

Q. Okay. And also referring to Sergeant Walker's report that after instructing you and others to leave the establishment, you took another drink of your beer, slid the bottle to the bartender and stated, "Karen, is our tab all set". Is any or all of that true?

A. The only truthful part of that is that I did speak with the bartender on the way out the door as we were passing by and asked her if our tab was all set.

Q. Okay. Again referring to the report submitted by Sergeant Walker and the dispatch log reflects that the approximate time of the call for service at Elizur's was 2:15 or 2:15 p.m. on June 24, 2003, and I would ask what was your purpose for being there at that time.

A. We were just getting ready to leave. I think 2:16 is not when the call came in. When I checked I thought it was 2:09 that the call was made. I think Sergeant Walker arrived around 2:15, as we were leaving.

Q. Okay.

A. I could be wrong on that but I'm pretty confident that that's what the time frame was.

Q. Again you refute a portion of Sergeant Walker's report, is there anything you'd like to add to that, giving you an opportunity to respond to her report and allegations made in the report submitted?

A. Yeah, most of her report is false. If I can lay out the scene, essentially the four of us were at the bar near the back side close to the parking lot, we're standing four in a row, it was Joe Wilson, Thomas Dore, PJ McKay and myself, I was closest to the back door. We were getting ready to leave after we had finished up and at one point I had mislaid my keys, it took about two minutes to find them, it wasn't the reason we were there afterwards, it just took a little bit of time. We were getting ready to go, Tommy Dore had made a call, he wanted to talk to Reserve Officer Skwira about golf the next day. My understanding was we were going to meet him out front. I looked to my right and I saw Sergeant Walker come through the double doors closest to the parking lot. I immediately said to Officer McKay – at this point now, no one's drinking, we had our keys in our hands, we're ready to go – I said to PJ McKay, let's go, here comes Sergeant Walker. Everybody took a left and we headed right out the door towards Hampden Street. As she came in - now we're walking away from her, she's looking at the back of our heads - I heard her say who called, did anybody call, and no one answered her obviously. And then she asked the bartender what's your name and what time do you have 2:15, 2:16, something like that? That was it, there was no exchange between the two of us. We were never ordered to leave, no one was drinking at that time. If there were any half empty bottles or full bottles in front of us, it's because the whole bar's worth of stuff was in front of the bar where the bartender was cleaning at that point. That was it. I did ask the – Karen if our tab was all set because frequently one guy pays it or one guy thinks someone else paid it. The last thing you want to do is walk out on a tab. I knew it was paid earlier but you never know if someone adds on to something or what so - I just didn't want any misunderstanding on that. I always ask that as we're leaving any place, are we all set, just in case. That's essentially it. Anything that she contends otherwise is a complete fabrication as she is one to do.

Q. Okay.

Sergeant McCavick:  No, I have no questions, no.

The statement concludes at 1:23 p.m.

This statement was given of my own free will and is true and correct.

_John F. Monaghan_                                    _8-8-03_
Sergeant John F. Monaghan                              Date

Witnessed by:

_David W. Fournier_
Lieutenant David Fournier

_Sergeant Daniel McCavick_
Sergeant Daniel McCavick

# EXHIBIT 28



             Incident #: 03-4442-OF
             Call #: 03-25619

                Date/Time Reported: 06/23/2003 0217
                  Report Date/Time: 06/23/2003 0449
                 Occurred Between: 06/23/2003 0215-06/23/2003 0450
                          Status: No Crime Involved
               Reporting Officer: SERGEANT TAMMY WALKER

                       Signature: _____

## # EVENTS(S)

LOCATION TYPE: Bar/Night Club              Zone: RA-7
ELIZUR'S PUB
874 HAMPDEN ST
HOLYOKE MA 01040

1   PARTIES REFUSING TO LEAVE BAR                    C

| # | PERSON(S) | PERSON TYPE | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|---|
| 1 | CZELUSNIAK, DAVID | WITNESS | M | W | 31 | 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 | 413-539-6504 |

874 HAMPDEN ST
HOLYOKE MA 01040
DOB: 11/29/1971
EMPLOYER: ELIZURS PUB  ·  413-539-6504

| 2 | DESAUTEL, KAREN | WITNESS | F | W | 00 | NOT AVAIL | |

874 HAMPDEN ST
HOLYOKE MA 01040
DOB: NOT AVAIL



Lt. Fournier and Sgt. McCavick:

Please assign an IAD case number to the attached, send the necessary notices to the officers listed as in the bar after closing.  I would like states taken from all parties involved as to their knowledge.  Ask Captain Fletcher and Lt. Whelihan to complete IOCs as to their conversations with Sgt. Walker and handling of the initial complaint file by her.

Thank you

Chief Scott  6/25/03  10:31 AM

On 06-23-03, at approximately 0215 Hrs, unit #381 (Officer Skwira) was dispatched to the Elizur Pub. The dispatcher #423, William Cauley, stated he received a call stating people in the bar refusing to leave. I was around the corner and went to back Officer Skwira. Officer Ribeiro also stated he could respond to back up this officer.

As I approached the rear of the pub, I let the dispatcher know that I had arrived. As I entered the bar, I took notice of four parties standing at the end of the bar. On the bar were bottles of beer. As I moved closer I observed one of the four drinking from a beer bottle. As I got closer I noticed it was John Monoghan drinking. As I looked around the bar I took notice of Phil McKay, Thomas Dore and an unidentified male present. I asked, "what's going on?", who called to have people removed from the bar?. None of these parties responded to the question posed to them. It was at that time Officer Skwira arrived inside the bar.

I then turned to the owner, Dave Czelusniak and asked the same question. Czelusniak stated "I didn't call". I asked the bartender Karen Desautel if she called, Desautel stated "I didn't call". I stated, then who called? There was no response to this question. I then told the four parties to leave the bar. The unidentified male started to head for the front door, while the other three stood there looking blank. I stated, "LET'S GO". It was at that time John Monoghan took another drink of his beer, he then slid the bottle to the bartender and stated "Karen is our tab all set?". Karen stated, yes, just go. The other three then started heading towards the front door. I, along with Officer Skwira exited the rear of the bar. Officer Ribeiro was pulling up to the bar as we exited.

I went to the station to speak with Lt. Whelihan regarding what had just happened. When I arrived at the station I heard dispatcher Cauley stating "I didn't know, I thought you really needed help. I then asked who he was speaking with. After hanging up Cauley stated he was speaking with Dore.

A few hours later I ran into Dave Czelusniak. I reminded him, that I had spoken to him in the past about people stay in the bar and drink after hours. Czelusniak stated he was between a rock and a hard place. He stated "What am I going to tell them, to leave?". I said yes, tell them to get out. Czelusniak stated he really didn't want any trouble. Czelusniak went to state, the phone call was made from a cell phone.

# EXHIBIT 29

TO:           Lt. David D. Fournier

FROM:         Capt. Alan G. Fletcher

SUBJECT:      Internal Investigation – After Hours (Elizer's Pub)

Date:         July 1, 2003


On June 23, 2003 at approximately 0700 hours Lt. Whelihan reported to me that Sgt. Walker investigated a report that Elizur's Pub on Hampden Street was open after 0200 hours. Lt. Whelihan stated that Sgt. Walker's report was not complete as of 0700 hours and that he would speak with all parties involved about after hours violations. I then went to my office on the second floor.

At approximately 0810 hours Sgt. Walker came to my office and reported after hour violations at Elizer's Pub involving three or four off duty officers. Sgt. Walker only observed one individual with a bottle of beer in his hand (Sgt. John Monaghan – Off Duty). I asked Sgt. Walker if she spoke with her superior Lt. Whelihan about this incident and she responded yes but was not satisfied with his advice.

I then inquired about the incomplete report on this incident and she stated she would finish it and would request an investigation into this incident from the Chief's office. I then advised Sgt. Walker that Lt. Whelihan spoke with me about this incident and that I agreed with him on the way it should be handled. Sgt. Walker stated she was not taking our advise and was going to report this incident to the Chief for further action.

Sgt. Walker stated she was going to get Sgt. Monaghan because of his inquiry into an incident that involved her at the 7-11 store on Pleasant street. She also stated that she does not like Sgt. Monaghan because he called her disrespectful names over the radio. She further stated, "No good deed goes unpunished".

I instructed Sgt. Walker to complete her report and forward it to me for further action if that what she wanted to do. Sgt. Walker contacted Chief Scott a few hours later and informed him about the above incident. The incident report was not completed and forward to me when Chief Scott was contacted by Sgt. Walker.

Chief Scott contacted this officer a day or two later and reported that Sgt. Walker placed the completed report under his office door at approximately 0700 hours. Sgt. Walker was instructed by this officer to complete the report and to submit it to me for further investigation. I believe Sgt. Walker intentionally violated the chain of command when she submitted her report to Chief Scott.

I spoke with Sgt. Monaghan on June 30, 2003 about this incident and he denied drinking after hours at Elizur's Pub.on June 23, 2003 at approximately 0200 hours.  He did state that he was leaving the Pub when Sgt. Walker arrived on the scene.

07. 04 - 2003

# EXHIBIT 30

# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE MEMORANDUM

TO: LT. David Fournier
FROM: LT Donald Whelihan
SUBJECT: Internal Investigation- After Hours Liquor
DATE: 07-03-03

---

Lt. Fournier:

This report is in regard to Sgt. Walker's report concerning after hours drinking by officers of this department. On 06-23-03 at 2:15 a.m. a call came into the police department stating Elizur's Bar on Hampden Street had trouble removing customers. That report turned out to be false. Sgt. Walker responded to the call. After the call Sgt. Walker returned to the station. She informed me the following officers were at Elizur's: Sgt. John Monaghan, Officer Phillip McKay, Reserve Officer Thomas Dore, and Reserve Officer Wilson. ( I learned later the fourth unknown individual was Reserve Officer Wilson)

I informed Sgt. Walker this situation should be handled on this shift. I told Sgt. Walker I was going to inform Captain Fletcher of this situation. I believe Captain Fletcher would have handled this in a more professional way. I believe Sgt. Monaghan and Officer McKay are two fine officers and are a credit to this department. I cannot speak for the two reserve officers. They have never worked for me.

In closing, I believe this situation could be handled better by Captain Fletcher and myself. I was unaware Sgt. Walker submitted a report on this incident.

Respectfully submitted,

Lt. Donald Whelihan

# EXHIBIT 31

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040
I.A. Case #03-17

This statement is being taken in the Professional Standards Division office at Holyoke Police Headquarters on Monday, July 28, 2003, at 2:45 p.m.  Present while the statement is being taken are Lieutenant David Fournier and Sergeant Daniel McCavick.  This statement is being tape recorded.

This statement is a follow up statement from Karen Desautels regarding a report submitted by Sergeant Tammy Walker, incident #03-4442-OF submitted on June 23, 2003,  by Sergeant Walker.

Q denotes questions by Lieutenant Fournier:

Q.  Karen, you agree again to have this statement recorded
A.  Yes.

Q.  Again, would you state your name and address for the record
A.  Karen Desautels, 13 O'Conner Ave., Holyoke, Mass.

Q.  Karen, we're just asking as a follow up to your initial statement - on June 23rd again you
      indicate you were working that evening?
A.  Yes.

Q.  Do you recall when the last call or service was made for alcohol that evening?
A.  No later than 2:40, 2:45, probably the latest.

Q.  I'm sorry.
A.  I'd say 2:45.

Q.  2:40.
A.  2:40 is probably -- when I called last call, I probably served my last drink at 2:45; I
      always make sure I don't serve past 2:45.

Q.  I don't know if you have your hours – the original call was at – the call for service –
A.  1:40, I mean, sorry.

Q.  1:40
A.  No, 1:40.

Q.  1:40 a.m.?

A   Yeah.

Q.  Ok, I just want to make sure that's correct and there's no confusion on that.  And there
     was no alcohol served or was there any alcohol served after 2:00 a.m.?
A.  No.

Q.  Going on to June 24th?
A.  Nope.

Q.  Ok.  Again do you have anything else you'd like to add to that?
A.  Nope.


This statement was given of my own free will and is true and correct.


_Karen L Desautels_                              _7/28/03_
Karen Desautels                                  Date


Witnessed by:

_____
Lieutenant David Fournier


_____
Sergeant Daniel McCavick

# EXHIBIT 32

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040
I.A. Case #03-17

This statement is being taken in the Professional Standards Division office at Holyoke Police Headquarters on Thursday, July 3, 2003, at 4:45 p.m.  Present while the statement is being taken are Lieutenant David Fournier and Sergeant Daniel McCavick.  This statement is being tape recorded.

This statement is being taken from David Czelusniak regarding a report # 03-4442-OF regarding a report submitted by Sergeant Tammy Walker on June 23, 2003,  regarding off duty Holyoke Police Officers being in Elizur's Pub, 874 Hampden Street, Holyoke, again, after hours.

Q denotes questions by Lieutenant David Fournier

---

Q. For the record, I would ask that you state your name and address?
A. My name is Dave Czelusniak; I live at 876 Hampden Street.

Q. And where are you currently employed?
A. I'm self employed at Elizur's Pub.

Q. Okay.  You would be the owner?
A. Yes.

Q. Again, you give authorization to record this statement?
A. Yes.

Q. Okay.  And how long have you been in that position?
A. Just over three and a half years.

Q. Were you working on Sunday, June 22, into Monday, June 23, 2003?
A. Yes.

Q. Or on the premises?
A. Yes.

Q. Okay.  What were your hours on the premises during that time frame?
A. I usually get in there about 5:30 and get out of there about 3:00, 3:30.

Q. Okay.  So that would have been the case Sunday –
A. Yes.

Q. -- the 22nd, into June 23rd?

A.  Yes.

Q.  Okay.  Was there anyone else working with you or an employee there –
A.  Karen Desautels, yes, she was bar tending.

Q.  Okay.  And what time did the bar close on June 23, 2003, being that Monday morning?
A.  Actually we were fortunate to have everybody out relatively early and we were officially closed at 2:00.

Q.  Okay.  Were they are patrons or non employees in the bar after the 2:00 a.m. closing?
A.  Yes, there was.

Q.  Okay.  And did you or any other employee give notice that the bar was closed at 2:00 a.m. --
A.  Yes.

Q.  -- and inform the patrons to leave?
A.  Yes.

Q.  Okay.  Do you know the name of any of the patrons that were there after the 2:00 a.m. closing?
A.  Yes.  There was PJ McKay, Tommy Dore, I believe John Monaghan or Moynihan and Joe Wilson.

Q.  Okay.  Were there any other civilians or non –
A.  No.

Q.  -- or non police personnel there?
A.  No.

Q.  Okay.  At some point after that 2:00 a.m. closing, did on duty uniformed members of the Holyoke Police Department arrive at Elizur's?
A.  Yes.

Q.  Okay.  And did you take notice of the time that they arrived?
A.  It would have to be maybe five after two, ten after two.

Q.  Okay.  Approximate?
A.  Yeah.

Q.  Alright.  And do you know why the officers responded to –
A.  They said they received a phone call.

Q.  Okay.  A phone call for –
A.  Regarding people being at the bar.

Q. Okay.  Did you call –
A. No.

Q. -- the Holyoke Police Department requesting assistance?
A. No.

Q. Okay.  Do you know who called?
A No, I do not.

Q. Okay.  Did Sergeant Walker have any conversation with the off duty officers present?
A. I don't believe she did, no.

Q. Alright.  Did Sergeant Walker have any conversation with you?
A. Yes, she asked if we were serving after hours or something along those lines.

Q. Okay.
A. And there was no way we were, I mean, we were cleaning up the _____

Q. Okay.  Were any of the patrons --  as you know them as off duty police officers since you
   know them by first and last name -- drinking after the 2:00 a.m. closing time?
A. No, I don't believe so.  They were there – supposedly misplaced keys and they were
   looking for the keys and I didn't feel any threat by them being there, you know.

Q. Okay.  Do you know if they located the keys?
A. I do not.

Q. Okay.  Getting back, what was your conversation with Sergeant Walker?  Can you
   explain.
A. It was very vague – she came in and she asked if I had called the police and I said no and
   then I guess there was beer on the bar or something, which there always is at that hour I
   mean, it takes us a good hour to clean the place after we close the doors so –

Q. Okay.  You indicated that you asked the officers to leave at some point or they were
   notified –
A. Well, they knew they had to leave but I wasn't going to tell them not to look for their
   keys and get lost, you know what I mean.

Q. Okay, alright.
A. It's -- on occasion before we've had customers come after we've been closed and they
   forget a cell phone or something.

Q. Alright.  And then sometime later in the evening in a report submitted by Sergeant
   Walker she indicates she ran into you a few hours later –
A. Yes.

Q. -- doesn't have a time frame involved here, what time was that approximately?

A. I have no idea.  I ran into her at the 7-Eleven.

Q. Was she still on duty or off duty?
A. I believe she was still on duty --

Q. Okay.
A. -- she was still in her uniform.

Q. Okay.  Was there conversation during that point?
A. She just told me that she had warned me about having people there after hours before and I realized that they shouldn't have been there but at the same time – what am I going to tell them to leave and forget it, don't look for your keys – I mean it's not --

Q. Okay.  Alright.  Is there anything else you'd like to add?
A. No.

Q. Okay.  To your knowledge this statement is true and correct?
A. Yes.

Q. Okay.  And there's nothing else you'd like to add?
A. No.  Very good.  Thank you for your time.

This statement concluded at _____ p.m. on July 3, 2003.


This statement was given of my own free will and is true and correct.

_____          7-25-03
Dave Czelusniak                           Date

Witnessed by:

_____
Lieutenant David Fournier

_____
Sergeant Daniel McCavick

# EXHIBIT 33

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040
I.A. Case #03-17

This statement is being taken in the Professional Standards Division office at Holyoke Police Headquarters on Wednesday, July 30, 2003, at 1:57 p.m.  Present while the statement is being taken are Lieutenant David Fournier and Sergeant Daniel McCavick.  This statement is being tape recorded and will be reduced to writing for signature.

This statement is being taken from Reserve Officer Thomas Dore regarding report #03-4442-OF regarding a report submitted by Sergeant Tammy Walker, incident on June 23, 2003, into June 24, 2003, regarding off duty Holyoke police officers being in or at Elizur's Pub, 874 Hampden Street, Holyoke after 2:00 a.m.

Q denotes questions by Lieutenant Fournier:

---

Q.  For the record, would you state your name and rank?
A.  Thomas Dore, Reserve officer.

Q.  Were you in Elizur's Pub on Sunday, June 23, 2003, into Monday, June 24, 2003?
A.  Yes.

Q.  Were there any other off duty Holyoke police officers present during that time frame?
A.  Yes.

Q.  And you indicated that there were other off duty Holyoke police officers there during that time frame?
A.  Yes, there was.

Q.  Would you name those officers that were there?
A.  Sergeant Monaghan, Officer McKay and Reserve Officer Joe Wilson.

Q.  Were you consuming alcoholic beverages during that time frame?
A.  We finished our beer probably right before 2:00 o'clock or at 2:00 o'clock.

Q.  Okay.  Were any of the other off duty officers that you mentioned also consuming?
A.  Yeah, we all finished our beers just about the same time.

Q.  And at what time did you order your last alcoholic beverage, approximately?
A.  1:45, 1:50, probably in that area, when they called last call.

Q. And where were you situated in the bar?

A. At the end of the bar near the rear entrance, you know, the parking lot to Elizur's. We were standing at the end of the bar.

Q. Okay. And a group in close proximity to each other?

A Yeah.

Q. In Sergeant Walker's report, she indicates that she instructed you and the other off duty officers to leave the establishment upon her arrival, it that true?

A. She never said a word to any of us.

Q. Okay. And also referring to Sergeant Walker's report that after instructing you and the other officers to leave the establishment, she observed Sergeant Monaghan take another drink of his beer, slide the bottle to the bartender and stated "Karen, is our tab all set". Is any or all of that true?

A. He wasn't drinking, he might have asked if our bar tab was all set. As she was walking in the door, we just looked at each other and said alright it's time to go and we turned and walked out the front door. We weren't drinking after 2:00, we had finished our beers and we were standing there talking with the bartender Karen and the owner Dave and the lights were on, we weren't trying to hide anything and we got stuck in there a little after 2:00.

Q. Okay. The dispatch log reflects the call for service at approximately at 2:17, so you would admit that you were there at that time frame still, approximately?

A I made two phone calls to dispatch, alright. The first one it was 2:10 and she came walking in, I think, right at like 2:15, so yeah 2:15, 2:17, yeah, that sounds about right that we were still in there. We left right as Sergeant Walker was walking in the back door. .

Q. Okay. Again, for the record, there was no conversation between –

A. No.

Q. – either yourself or any of the other officers present and Sergeant Walker?

A. No.

Q. Okay. And again you mentioned you called headquarters or the station and what was your purpose for calling the station at that time?

A. I called to see if dispatch could arrange for Officer Skwira to meet me out front as we were leaving the bar. I just wanted to see if he wanted to get an extra nine holes in on Monday before our league goes off at 4:00 o'clock. That was it. I joked around a little bit with Dispatcher Cauley and he either couldn't understand me or didn't hear me and ended up – I guess Sergeant Walker ended coming up but my intention was just to talk to Officer Skwira out front after we left the bar.

Q. Did you call back at any other time –

A. Yeah, I called - after Sergeant Walker came in, I called back and Dispatcher Cauley answered again and I said what are you doing I just wanted to talk to Timmy about golfing tomorrow you didn't need to send a supervisor out or something to that effect and he's like, sorry, I didn't know - I couldn't understand what you were saying. I said, you know, no problem and I think I hung up and that was it.

Q. Okay. Is there anything that – any other thing you would like to add, giving you an opportunity to respond to the allegation of the report submitted by Sergeant Walker?

A. No, I think we pretty much covered it. Nobody was drinking after 2:00, nobody talked to her or said a word to her, she didn't say anything to us. Like I said, the lights were on, we were getting ready to go, we were talking with the bartender and the owner and it got to be a little past 2:00 and that's all there was.

Q. Alright. Were there any other uniformed on duty officers there besides Sergeant Walker?

A. Not in the bar, no.

Q. (By Sergeant McCavick) She was the only officer that came into the bar?

A. That I saw.

Q. Okay. That you saw. Okay.

A. Yeah.

Q. Were there any other uniformed officers outside when you left?

A. I think there was one that pulled up out back, I didn't see who it was. And then after we left the front of the bar, Officer Skwira then showed up and I talked to him for a moment and that was it but nobody else that I saw came into the bar with Sergeant Walker.

Q. (By Lieutenant Fournier) Okay. So nothing further?

A. No.


Okay. The statement concludes at 2:05 p.m.

This statement was given of my own free will and is true and correct.


_____          _____
Thomas Dore                                    Date


Witnessed by:

_____
Lieutenant David Fournier

Sergeant Daniel McCavick

# EXHIBIT 34

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040
I.A. Case #03-17

This statement is being taken in the Professional Standards Division office at Holyoke Police Headquarters on Wednesday, July 30, 2003, at 2:33 p.m. Present while the statement is being taken are Lieutenant David Fournier and Sergeant Daniel McCavick. This statement is being tape recorded and will be reduced to writing for signature.

This statement is being taken from Officer Philip McKay regarding report #03-4442-OF regarding a report submitted by Sergeant Tammy Walker, incident on June 23, 2003, into June 24, 2003, regarding off duty Holyoke police officers being in or at Elizur's Pub, 874 Hampden Street, Holyoke after 2:00 a.m.

Q denotes questions by Lieutenant Fournier:

Q. For the record, would you state your name and rank?
A. Philip McKay, patrolman.

Q. Were you at Elizur's Pub on Sunday, June 23, 2003, into Monday, June 24, 2003?
A. Yes, I was.

Q. Were there any other off duty Holyoke police officers present during that time frame?
A. Yes, there were..

Q. Would you name the officers?
A. Reserve Officer Joe Wilson, Reserve Officer Tommy Dore and Sergeant John Monaghan.

Q. Were you consuming alcoholic beverages during that time frame?
A. Yes, I was.

Q. Were the other off duty officers that you named also consuming alcohol?
A. Yes, they were.

Q. And where were you situated in the bar during that time frame?
A. Sitting actually at the bar, would be the back door entrance, corner of the bar.

Q. Okay. And you were together as a group, in close proximity?
A  We were sitting together.

Q. And what time did you order your last alcoholic beverage, approximately?

A. Approximately, it was when they gave last call, I'd say quarter of two, maybe ten of two, in that area.

Q. Okay. In Sergeant Walker's report, she indicates that she instructed you and the other off duty officers to leave the establishment upon her arrival, it that true?

A. Absolutely not. We were standing at the corner at that time when she walked in, we saw her – I saw her open the door to the vestibule, we turned, we looked at her, the four of us just said we'd better go, we all turned and walked single file out the front door, we never spoke to Sergeant Walker and she never spoke with us.

Q. Okay. And what door did she enter?

A. The back door, the back door entrance.

Q. And also referring to Sergeant Walker's report she indicates that after instructing you and the other officers to leave the establishment, she observed Sergeant Monaghan take another drink of his beer, slide the bottle to the bartender and stated "Karen, is our tab all set". Is any or all of that true?

A. No, it's not true.

Q. Okay. Referring to the dispatch log which reflects a call for service time at approximately at 2:17 p.m. on June 24, 2003, were you present at that time?

A If that's when the call was made, I believe – yes, I was there.

Q. Okay.

A. I don't know the exact time I was there.

Q. So you made no – you didn't note the time or -

A. No.

Q. - didn't take any observation of the time?

A. No, at that time I wasn't aware that a call was being made.

Q. Alright. But you would not dispute that fact that the call for service –

A. If that's when it came in, yes, I was there.

Q. Okay. At that time were there any other on duty officers that arrived with Sergeant Walker and that came into Elizur's?

A. At that time, no, just Sergeant Walker is the only one I can recall being in the bar when we left.

Lieutenant Fournier:  Okay.

Q. (By Sergeant McCavick)  I just have one question maybe just to ask you. The Lieutenant asked you about Sergeant Walker entering the bar and he asked you if the previous question if any or all of it was true or not true and that was regarding Sergeant Monaghan

drinking a beer and then inquiring about the tab being accounted for. Are you saying that both of that is false or both of that is true?

A. No, the part about him drinking the beer and sliding it forward is absolutely untrue.

Q. Okay.

A. When she walked in, we all stood up and then we walked out. And like I said before we never spoke to her and she never spoke to us. As we were walking out single file, John was behind me, that's when John turned to the bartender and said are we all set with our tab.

Q. Okay. So that part was true?

A. Absolutely.

Q. Okay, the other part.

A. The part about him drinking the beer and sliding it forward is not true.

Sergeant McCavick: That's not true, okay.

Q. (By Lieutenant Fournier) Did she have any conversation with the bartender?

A. I went out the front door, I actually looked back and she was standing at the corner of the bar talking to the bartender but by the time we were walking out, she was still coming in so there was no interaction between us at all. So, she might have spoken to the bartender but the contents of that conversation, I couldn't tell you.

Q. Okay. Is there anything that you would like to add or give you an opportunity to respond to the report submitted by Sergeant Walker?

A. Just that, you know – in my ten years on this job, I've never been insubordinate to any sergeant and any supervisor for that matter. I kind of resent the implication that she told us to leave and that we refused that order once and that she had to tell us again. That's not true, I stand by that 100 percent.

Lieutenant Fournier: Okay.

Q. (By Sergeant McCavick) Any other officers enter the – on duty officers enter that bar while you were there?

A. Not that I recall. When we pulled up there was other officers pulling up.

Q. Okay.

A. Including, I think, Officer Lambert was one of them and, I believe, Officer Skwira was another but they never actually entered the bar when we were in there, they might have afterwards but by the time that happened, we were already out of the establishment.

Sergeant McCavick: Okay.

Lieutenant Fournier: If you have nothing further, the interview concludes at 2:39 p.m.

This statement was given of my own free will and is true and correct.

_____     _____
Philip McKay                                                           Date      08-08-03

Witnessed by:

_____
Lieutenant David Fournier

_____
Sergeant Daniel McCavick

# EXHIBIT 35

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040
I.A. Case #03-17

This statement is being taken in the Professional Standards Division office at Holyoke Police Headquarters on Wednesday, July 30, 2003, at 1:30 p.m. Present while the statement is being taken are Lieutenant David Fournier and Sergeant Daniel McCavick. This statement is being tape recorded and will be reduced to writing for signature.

This statement is being taken from Reserve Officer Joseph Wilson regarding report #03-4442-OF regarding a report submitted by Sergeant Tammy Walker, incident on June 23, 2003, into June 24, 2003, regarding off duty Holyoke police officers being in or at Elizur's Pub, 874 Hampden Street, Holyoke after 2:00 a.m.

Q denotes questions by Lieutenant Fournier:

---

Q. For the record, would you state your name and rank?
A. Joseph H. Wilson, Reserve patrolman.

Q. Were you at Elizur's Pub on Sunday, June 23, 2003, into Monday, June 24, 2003?
A. Yes, I was.

Q. Were there any other off duty Holyoke police officers present during that time frame?
A. Yes.

Q. And who were the officers, off duty officers?
A. Johnny Monaghan, PJ McKay, Tommy Dore.

Q. Were you consuming alcoholic beverages during that time frame?
A. Yes, we were, we had drinks.

Q. And the other off duty officers also that you mentioned?
A. Yeah, we hadn't – we weren't drinking when Sergeant Walker came in the building but we had been drinking in the night.

Q. Okay. Prior to that?
A. Yeah.

Q. And where were you situated in the bar?

A. We were on the – at the end of the bar by the back entrance, that's the door she came in. It was - PJ was on like the corner, Johnny was next to him, I was next to him and Tommy was by my side.

Q. Okay. So you were as a group –
A  Yeah.

Q. - in close proximity to each other?
A. Yep.

Q. What time did you order your last alcoholic beverage, approximately?
A. I would say it was - when she gave last call which was probably quarter off or ten of two, somewhere in that time frame.

Q. In Sergeant Walker's report, she indicates that she instructed you and the other off duty officers to leave the establishment, it that true?
A. I never heard her give us any instructions.  As soon as she came in the door we all immediately saw her, we got up in a single file and we headed out the front door, so there was no problem.

Q. Alright.  And also referring to Sergeant Walker's report that after instructing you and the others to leave the establishment, she observed Sergeant Monaghan take a drink of beer, slide the bottle to the bartender and state to the bartender "Karen, is our tab all set".  Is any or all of that true?
A. I was – as I said, I was standing right next to him and my vision – I mean, I saw her when she came in, he definitely didn't consume any more beer and the only part of that thing that I think is truth is I remember him asking Karen if everything was all set which it had been because we paid it shortly after she gave us last call.

Q. Okay.
A. Again, I never heard her give us any instruction or say a word to any of us.

Q. And she came in the back door, is that correct –
A. Yeah.

Q. – where you were seated?
A. Yeah, from the parking lot, yeah.

Q. So that she was there –
A. She was very close to us as soon as she came in the door.

Q. Again, within how many feet would you say between the back door to your seating area?
A. Can't be more than ten feet, I would think.

Q. Okay. Referring to the report submitted by Sergeant Walker and the dispatch log reflects that the call for service came in at approximately at 2:17 p.m. on Monday, June 24, 2003, and I would ask that you explain your purpose for being there at that time frame.

A  I can't really explain it other than Tommy had made a phone call down to – he wanted to see Timmy Skwira and when we were done we were kind of – I wasn't even really aware of the time. I probably had a watch on but I wasn't – it just wasn't even something I was concerned about. We were the last people to leave, other people had just been filing out and we were waiting for him to arrive so we could go out and talk to him. My explanation is – I don't know what really happened other than I wasn't really aware that we were doing anything wrong.

Q. Again, for the record, you or any of the other officers had not consumed any of the alcoholic beverages after 2:00 a.m.?

A. I never saw anyone drink after 2:00.

Sergeant McCavick: I have no questions.

Q. (By Lieutenant Fournier) Is there anything that you would like to add for the record in an opportunity to respond to the allegations brought forward?

A. I don't believe so. The only other thing – because I had seen the report – she also made mentioned there was only one bottle on the bar at the time, I remember when I looked at the thing, and there were actually several because Karen, the bartender, hadn't cleaned up yet. So there was leftover stuff all over the bar. So her statement that there was only one drink in front of Sergeant Monaghan was false.

Lieutenant Fournier:  Okay, very good.


The statement concludes at 1:36 p.m.

This statement was given of my own free will and is true and correct.


_____          _____
Joseph Wilson                                                    Date  8/8/03

Witnessed by:

_____
Lieutenant David Fournier

_____
Sergeant Daniel McCavick

# EXHIBIT 36



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**        **Chief Anthony R. Scott**

**FROM:**      **Lt. David D. Fournier**
               **Commander, Professional Standards Division**

**SUBJECT:**   **Internal Investigation – "Elizur's Pub"**

**DATE:**      **August 04, 2003**

**NUMBER**:    **IAD Case # 03-17**

---

Chief Scott:

On June 25, 2003 the Office of Professional Standards was assigned to conduct an internal investigation based on a report (03-4442-OF) submitted by Sergeant Tammy Walker on June 25, 2003. Sergeant Walker reports that on June 23, 2003 at approximately 02:15 she responded as a back-up officer to a call for service at Elizur's Pub, 874 Hampden, Holyoke MA. Said call for service was a report of patrons refusing to leave the establishment. **Note**: The dispatch log reflects the time of the call to be 02:17 with Sergeant Walker arriving on scene at 02:18, Officer Timothy Skwira arriving on scene at 02:19 and with both officers clearing at 02:22. Sergeant Walker indicates that upon entering the Pub she took notice of four parties standing at the end of the bar. The Sergeant reports that there were beer bottles on the bar. Upon moving closer Sergeant Walker indicates that she observed one of the four parties drinking form a beer bottle. Sergeant Walker identified that party as Sergeant John Monaghan, with the other parties identified as Officer Philip McKay, Reserve Officer Thomas Dore and an unknown male subject. Sergeant Walker reports that she asked what's going on and who called to have people removed form the bar? The Sergeant indicates that there was no response from the parties present. Sergeant Walker advised that she posed the same question to the bar owner, David Czelusniak, and the bartender, Karen Desautel, who replied that they did not call. Sergeant Walker reports that she instructed that four parties to leave, whereby Seregant Monaghan took another drink of his beer, slid the bottle to the bartender and asked if their tab was all set. The bartender was to have replied, "Yes, Just go". The four parties then left the establishment. Sergeant Walker indicates that she returned to the station and reported the incident to Lieutenant Donald Whelihan.

On June 30, 2003 I notified Sergeant Monaghan, Officer McKay and Officer Dore that an internal investigation had been ordered as a result of Sergeant Walker's report on the incident. The fourth party was later identified as Reserve Officer Joseph Wlison, who was notified on July 03, 2003.

As directed, I sent an IOC to Captain Alan Fletcher and Lieutenant Donald Whelihan instructing them to submit an IOC as to their conversation with Sergeant Walker and subsequent handling of the report filed by her. I instructed both officers to be particular in their response and to submit the same by July 02, 2003.

On July 02, 2003 I received an IOC form Captain Flethcer on the matter. The Captain reports that on June 23, 2003 at approximately 07:00 Lt. Whelihan advised him that Sergeant Walker had investigated a report that Elizur's Pub was open after 02:00. Captain Fletcher reported that Lt. Whelihan had informed him that Sergeant Walker's report was not complete as of 07:00 and that he would speak with all parties involved about the after hours violations.

Captain Fletcher reports that at about 08:10 Sgt. Walker came to his office and reported the after hour violation at Elizur's to him. Captain Fletcher indicated that he asked Sgt. Walker if she had spoken with her superior (Lt. Whelihan) about this incident and she responded yes but she was not satisfied with his advice.

Captain Fletcher indicated he then inquired of the Sergeant about the incomplete report on the incident whereby Sergeant Walker responded that she would finish it and request an investigation into the incident by the Chief. Captain Fletcher reports that he advised Sergeant Walker that Lt. Whelihan had spoken to him about the matter and that he was in agreement with Lt. Whelihan as how it should be handled. Captain Flethcer reports that Sergeant Walker stated she was not taking their advice and was going to report the incident to the Chief for further action.

Captain Flethcer reports that Sergeant Walker stated to him that she was going to get Sergeant Monaghan because of his inquiry into an incident that involved her at the 7-11 store on Pleasant Street. The Captain further reports that Sergeant Walker stated that she does not like Sergeant Monahgan because he called her disrespectful names over the radio and stated, "No good deed goes unpunished".

Captain Fletcher indicated he instructed Sergeant Walker to complete her report and forward it to him if she requested further action. Captain Fletcher reports that Sergeant Walker contacted you (Chief Scott) a few hours later and informed you of the incident. Captain Fletcher indicates that Sergeant Walker's report was not complete when she made contact with you.

Finally, Captain Fletcher reports that you contacted him a day or two later indicating that Sergeant Walker had placed the completed report under your office door at approximately 07:00. Captain Fletcher indicated that Sergeant Walker was specifically instructed to complete the report and submit it to him for further investigation. Captain Fletcher reports that Sergeant Walker intentionally violated the chain of command when she submitted her report to you.

On July 03, 2003 I received Lieutenant Whelihan's IOC regarding the matter.  Lieutenant Whelihan reported that after the call for service to Elizur's Pub Sergeant Walker returned to the station and informed him that Sergeant John Monahgan, Officer Philip McKay, Officer Thomas Dore and a fourth officer who he later learned to be Officer Joseph Wilson were at Elizur's.

Lieutenant Whelihan indicates that he informed Sergeant Walker that the situation should be handled on the shift.  Lieutenant Whelihan indicated that Captain Fletcher would have handled the matter in a more professional way and that he was unaware that Sergeant Walker had submitted a report on the incident.

On July 01, 2003 I sent an IOC to Officer Kenneth Moriarty requesting a copy of both the telephone call for service and the dispatch and officer communications regarding incident 03-4442-OF on June 23, 2003 at 02:17.

On July 03, 2003 I received a cassette tape from Officer Moriarty with the requested information.  After reviewing the tape it was determined that Officer Thomas Dore made the call for service, as he identifies himself to the dispatcher (William Cauley).  Officer Dore asks the dispatcher to send Officer Keith Williams and lights and siren up to Elizur's.  Dispatcher Cauley explains that Officer Willaims is off-duty whereby Officer Dore responds then whoever is in the area car with lights and sirens to get everybody out of here, out of Elizur's.  Dispacther Cauley asks Officer Dore if he needs a cruiser at Elizur's with Officer Dore replying just one car.  Dispatcher Cauley asks who is this Tommy.  Officer Dore replies "yeah".  Again Officer Dore requests one car light and siren.  Dispatcher Cauley acknowledges and informs Officer Dore that Officer Timothy Skwira will be responding.  At this point the telephone conversation concludes.

A short time later Dispatcher Cauley dispatches Officer Skwira to Elizur's Pub on report of parties refusing to leave.  Officer Skwira acknowledges receipt of the call.  Dispatcher Cauley later requests that Officer Skwira switch over to frequency two.  Dispatcher Cauley explains that it was (off-duty) Officer Dore that had called and he was not sure but he sounded a little under the weather.  Dispatcher Cauley advises Officer Skwira that he is not sure if Officer Dore was serious or not.  Again Officer Skwira acknowledges.

The next radio communication on the matter would reflect Sergeant Walker and Officer Skwira arriving on-scene.  Sergeant Walker advises dispatch that they have four parties here and they will be leaving now.

Later in the morning Officer Dore calls HQ and asks Dispatcher Cauley why the fuck did he put over the radio that we were having problems taking people out of there.  Dispatcher Cauley replies that he didn't I said people refused to leave.  Officer Dore asks "why".  Dispatcher Cauley informs Officer Dore because that is what you said.  Officer Dore says "no sir".  Dispatcher Cauley asks Officer Dore what he said over the phone.  Officer Dore states he just said to send Timmy or whoever.  Dispatcher Cauley informs Officer Dore that he let Officer Skwira know it was he.  Dispatcher Cauley again reiterates that's what you told me, people refused to leave the bar.  Officer Dore replies

that it was like me and like two other people. Dispatcher Cualey replies that I didn't know that, I'm not there. Dispatcher Cauley again informs Officer Dore that he told him to send somebody because people refuse to leave the bar. Officer Dore states I told you to send Timmy. Dispatcher Cauley informs Officer Dore that he told Timmy to go and that he didn't tell anyone else to go. Officer Dore states it wasn't a huge deal but you put it out over the radio like it was a huge deal. Dispatcher Cauley states that's what you told me though you told me people refuse to leave, I didn't know, I'm not there. Dispatcher Cauley informs Officer Dore that he didn't know he was just kidding. Dispatcher Cauley apologizes whereby Officer Dore instructs Dispatcher Cauley if anyone asks, nobody fuckin said nothing. At this time conversation ends. The cassette tape (side A ) is submitted for review.

On July 03, 2003 a statement was taken from Mr. David Czelusniak, owner of Elizur's Pub. Mr. Czelusniak indicated he was working on June 22, 2003 into June 23, 2003 along with his bartender Karen Desautel. Mr. Czelusnaik reported that the bar had officially closed at 02:00 however several patrons had remained after this time. Mr. Czelusniak identified the patrons as PJ McKay, Tommy Dore, John Monaghan and Joe Wilson. Mr. Czelusniak affirmed that about five or ten minutes after 2:00 AM uniformed members of the Holyoke Police Department arrived at the establishment. Mr. Czelusniak reports that he was advised by the officers' on-scene that they had received a phone call for people being in the bar. Mr. Czelusniak indicates that he does not believe Sergeant Walker had any conversation with the off-duty officers present. Further, Mr. Czelusniak does not believe any of the off-duty officers were drinking after the 2:00 AM closing time and were present because one of the parties had misplaced his keys.

On July 03, 2003 a statement was taken from Ms. Karen Desautel, bartender at Elizur's Pub. Ms. Desautel indicated she was bartending On June 22, 2003 into June 23, 2003 and that the bar had closed at 02:00. Ms. Desautel also confirmed that several patrons had remained after the 02:00 closing. Ms. Desautel could only identify the parties by the first names of PJ, John, Joe and Tommy. Ms. Desautel noted that at approximately 02:15 hours uniformed members of the Holyoke Police Department arrived on-scene. Ms. Desautel stated that Sergeant Walker asked if she had called whereby she replied that she did not know who called. Ms. Desautel reports that she did not see Sergeant Walker talk to any of the patrons present as they walked out as Sergeant Walker walked in. Ms. Desautel indicates that she did not see any of the off-duty officers drinking after 02:00 and that she had made the last call for alcohol 01:40. She explained that the beer bottles were on the bar as she had yet to pick them up.

On July 29, 2003 a statement was taken form Sergeant John Monahgan concerning the incident. Sergeant Monaghan indicates that on June 22, 2003 into June 23, 2003 he, Officer Philip McKay, Officer Thomas Dore and Officer Joseph Wilson were present at Elizur's Pub and that the group had been consuming alcoholic beverages. Sergeant Monaghan stated that they got their last call for alcoholic beverages at 01:45 to 01:50. Sergeant Monaghan denies that Sergeant Walker instructed him or the other off-duty officers to leave the bar and further denies Sergeant Walker's claim that he drank in her presence. Sergeant Monaghan does admit that he asked the bartender, Karen Desautel, if

the tab was all set. Sergeant Monaghan does not contend the fact the he was present after the 02:00 closing however he believed the time to be 02:09. Sergeant Monaghan explained that he had misplaced his keys and had found them shortly before Sergeant Walker's arrival and when he took notice of Sergeant Walker entering the establishment he and the other off-duty officers got up and began walking toward Hampden Street door. Sergeant Monaghan reports he could hear Sergeant Walker ask the bartender who called and what time do you have.

On July 30, 2003 a statement was taken from Reserve Officer Thomas Dore. Officer Dore does not contend the fact that he was present on July 22, 2003 into July 23, 2003 after the 02:00 closing time with the previously specified officers. He indicted that he had ordered his last alcoholic beverage at 01:45 or 01:50 when last call was made. Officer Dore indicates that Sergeant Walker never said a word to any of the off-duty officers present. Officer Dore reports that neither he nor the other off-duty officers had been drinking after the 02:00 closing. He reports that they were not trying to hide anything, they lights had been turned on and they had been talking to Karen and the owner. He indicates that as soon as Sergeant Walker was entering they (off-duty officers) looked at each other and said it's time to go. Officer Dore admitted he had called the station to arrange a meeting with Officer Skwira in front Elizur's. Officer Dore indicated that he had joked around a little bit with Dispatcher Cauley and that he (Cauley) couldn't understand him or didn't hear him. Officer Dore stated that he had called back later in the morning and spoke with Officer Cauley and asked him what he was doing, that he only wanted to speak with Officer Skwira and that Dispatcher Cauley did not need to send a supervisor to the scene.

On July 30, 2003 a statement was taken from Officer Philip McKay. Officer McKay does not deny being present on the specified date and time along with Sergeant Monaghan, Officer Dore and Officer Wilson and to the fact they had order their last drink at 01:45 to 01:50. Officer McKay adamantly denies that Sergeant Walker instructed he and the others to leave upon her arrival. Officer McKay stated that as soon as they saw Sergeant Walker open the door to the vestibule, we turned, looked at her, and the four of us walked single file out the front door, at that time Sergeant Monaghan asked if the tab was all set. Officer McKay testified that they never spoke to Sergeant Walker and she never spoke to them. Officer McKay indicated that Sergeant Walker's report that Sergeant Monaghan had drank his beer in her presence and slid the bottle to the bartender was absolutely untrue. Officer McKay indicates that he had had looked back upon Sergeant Walker's entrance as she was talking to the bartender although he admits he does not know the nature of the conversation.

On July 30, 2003 a statement was taken form Reserve Officer Joseph Wilson. Officer Wilson also does not contend that he was present on the specified date and time along with Sergeant Monaghan, Officer McKay and Officer Dore and that he had been consuming alcoholic beverage prior to 02:00. Officer Wilson explained that they had last call between 01:45 and 01:50. Officer Wilson stated that he never heard Sergeant Walker give them any instruction to leave the bar and that as soon as she came in the door they immediately saw her, got up single file and headed out the front door so there was no

problem. Officer Wilson indicated that Sergeant Monaghan definitely hadn't consumed any more beer when Sergeant Walker had come in. Officer Wilson indicated that the truth is that he remembers that Sergeant Monaghan asked Karen if everything was all set which it because they had paid shortly after she had given last call.

On August 02, 2003 a statement was taken form Officer Timothy Skwira. Officer Skwira reports that he was working on June 23, 2003 and that he had been dispatched to a call for service at Elizur's Pub shortly after 02:00 for people refusing to leave the bar. Officer Skwira advised that Sergeant Walker called out at the location and he arrived about a minute later as he was on Pleasant Street and Lincoln Street when she called out. Officers Skwira recalled as he walked in Sergeant Walker said lets go and the four individuals started heading toward the front door. Officer Skwira indicates that he didn't recall Sergeant Monaghan taking a drink or sliding his bottle to the bartender, stating was his tab all set. Officer Skwira indicates that there were no other on-duty officers present inside the bar besides himself and Sergeant Walker. Officer Skwira reports that as the four were leaving Sergeant Walker asked the bartender who made the call whereby the bartender replied that she wasn't sure. At that time the owner walked in and was asked the same question, whereby he replied he wasn't sure. Officer Skwira reports that he then exited the establishment. **NOTE:** All statements in full are submitted for review.

In researching the matter I found that Massachusetts General Law chapter 138, section 12 prohibits the sale of alcoholic beverages after 02:00. The statue does not address the consumption of alcoholic after this time frame. As a result, I then contacted Alcoholic Beverages Control Commission, Supervising Investigator, James Staples on July 28, 2003. Investigator Staples confirmed that MGL Ch.138, sec. 12 again does not speak of the consumption of alcoholic beverages after 02:00. Investigator Staples advised me that many cities and towns have adopted more stringent regulations concerning the sale and consumption of alcoholic beverages. Investigator Staples gave Boston for an example, indicating they have passed an ordinance or regulation prohibiting the sale of alcoholic beverages past 01:30 and further all patrons must vacate the premises at 02:00. Investigator Staples advised that this is allowed by statute. I explained the scenario at hand to Investigator Staples. He again gave another example that if a sale had been made just prior to 02:00 the patron could then remain in the establishment after 02:00 and be given a reasonable period of time to finish consumption of their beverage. Investigator Staples suggested that I check with the local licensing authority to see if more prohibitive regulations had been adopted.

On July 28, 2003 I contacted Holyoke License Commission Chairmen Thomas Wilson. Attorney Wilson advised me that he had researched the matter and found that the City of Holyoke had never enacted any regulation that would be more restrictive than M.G.L. Ch. 138, sec. 12.

# FINDINGS

Sergeant Monaghan, Officer McKay, Reserve Officer Dore and Reserve Officer Wilson do not deny being at Elizur's Pub after 02:00 on June 23, 2003. The officers do contest that they were instructed to leave the establishment by Sergeant Walker. Sergeant Monaghan denies Sergeant Walker's allegation that he had consumed beer in her presence. The matter is reduced to the fact that Sergeant Monaghan, Officer McKay, Reserve Officer Dore or Reserve Wilson has not violated any departmental rule or state law by being in Elizur's Pub after 02:00. There is no evidence to suggest that any sale of alcoholic beverages took place after 02:00.

Two secondary issues arise out of this matter. First regards the call for service made by Reserve Officer Thomas Dore on June 23, 2003. Officer Dore's explanation in his statement varies form that of the telephone conversation between he and Dispatcher William Cauley. It is clear that Officer Dore instructs the dispatcher several times to send an officer with lights and siren to Elizurs', which is done. Dispatcher Cauley does relay to Officer Skwira that he is not sure if Officer Dore is serious or not but errs on the side of caution by sending a unit. Officer Dore reasons that it is Dispatcher Cauley who does not understand or does not hear him concerning the reason for the call. In reviewing the telephone conversation it is clear that Officer Dore is under the influence of alcohol. Dispatcher Cauley makes note of Officer Dore's condition by relaying to Officer Skwira that Officer Dore sounds a bit under the weather. Officer Dore's actions could have jeopardized both the safety of the public and his fellow officers by having officers respond to an unnecessary call for service. I would suggest that Officer Dore is in violation of Rule and Regulation 5.5 which states that "Officers, while off duty, shall refrain form consuming intoxicating beverages to the extent that it results in public impairment, intoxication, or obnoxious or offensive behavior which discredits them or the Department, or renders the officer unfit for their next regular tour of duty."

Second regards Captain Fletcher's charge that Sergeant Walker violated the chain of command when she submitted her report on the incident to you. At the time of this report this investigating officer does not know it if the charge has been addressed by yourself or Captain Fletcher.

Respectfully submitted,

Lt. David D. Fournier
Commander
Professional Standards Division

# EXHIBIT 37

B3

## Chief says he knows 4th officer in bar

HOLYOKE – Police Chief Anthony R. Scott says he knows the name of a fourth off-duty police officer reported drinking after hours at Elizur's Holyoke Pub on Hampden Street June 23, although that person's name was left out of a police report on the incident.

Scott said he will not name that person until after an internal investigation, if at all. The incident led to a License Board hearing Thursday.

State law does not set a time when patrons must leave drinking establishments. Closing time here is 2 a.m. after which no liquor may be sold or given away. Commission Chairman Thomas N. Wilson said he supports setting times for when patrons are required to leave.



Staff photo by DON TREEGER

d mathematics program at

## ightened

A    Superintendent Basan N. Nembirkow said he was concerned about Horizon diplomas because the school had never been accredited.

Cunningham said he hopes many students can return full-time to the regular high schools, or part-time to take classes not offered at Horizon.

Officials are also planning to start a career culinary arts program at Horizon for students interested in that type of vocational training who do not want to return to Comprehensive High School.

"My biggest fear with these kids going back is they are going back to a place where they are not wanted," said committee member Marjorie A. Wojcik. Nembirkow and Cun-

# Local laws key at closing time

### By DAVID REID
*Staff writer*

HOLYOKE – City officials say top administrators with the state Alcoholic Beverages Control Commission have told them there is no state law barring customers from remaining in a liquor-serving establishment past closing time.

Police Chief Anthony R. Scott and Mayor Michael J. Sullivan say Alcoholic Beverages Control Commission higher-ups claim that, while local license commissions have adopted such rules, state law is silent on the subject.

Sullivan said Alcoholic Beverages Control Commission General Counsel William A. Kelley Jr. told him Friday that, as long as no liquor is sold after closing time, which is 2 a.m. in Holyoke, patrons can remain in the bar for an undetermined amount of time. State law does not set any such limits, Kelley reportedly said.

"He said you'll have to check it with the local licensing board," which sets such regulations, Sullivan said.

"I was shocked when he told me that," said Sullivan, who owned Nick O'Neill's, a High Street bar, for years before running for mayor.

The issue arose last month when at least three city police officers were discovered at Elizur's Holyoke Pub on Hampden St. at 2:15 a.m. with open beers in front of them. A similar incident involving city inspectors was reported by police this spring at the Latin Spot nightclub on High Street.

The latest incident triggered an internal Police Department investigation as well as an Aug. 5 hearing by the city License Commission.

As a bar owner, Sullivan said, he always understood that patrons were required to vacate the bar by 2 a.m.

"I believe that's what we were told by the licensing board," Sullivan said.

Ida M. Sudsbury, License Commission clerk from 1980-89, agreed with the mayor's recollection that drinks had to be off the tables and patrons out of the bar by 2 a.m.

"That's what I understood," Sudsbury said yesterday, adding that violators were brought before the board for a hearing.

Former commission clerk Thomas J. Moriarty echoed Sudsbury's comments, saying it was commission policy to send letters to violators. But he said commission practice in the late 1990s was to allow patrons until 2:15 a.m. to leave a bar.

Former License Commission Chairman James A. McDermott, who served as commission chairman in the early 1990s, said the commission enforced after-hours violations.

"I know it was a regulation," McDermott said. "They had to be out of the bar by closing time. That was my understanding."

Sullivan said he suspects the License Commission at some time in the past adopted such a policy, whether or not it was written down.

Either way, he said, the commission should consider adopting such a regulation at its earliest convenience.

"I think it should be clarified," he said yesterday.

He urged the commission to hold a public hearing before deciding what to do. But he stated his support for a "last call," or final serving of drinks at 1:30 or 1:45 a.m., with all patrons required to leave bars by 2 a.m.

While License Commission Chairman Thomas N. Wilson is not aware of such a local regulation, he said yesterday he will support one.

"We're going to have to codify this at some point . . . so everybody is on the same playing field," he said.

*David Reid can be reached at dreid@repub.com*

## Crash: Family sues police

# EXHIBIT 38

DEFENDANT'S DEPOSITION
EXHIBIT

*9 Walker*
*9/26/06 jr*

PENGAD 800-631-6989



## HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**       SEE DISTRIBUTION LIST BELOW

**FROM:**   ANTHONY R. SCOTT, CHIEF OF POLICE

**SUBJECT:** OFFICIAL LETTER OF REPRIMAND – OBEDIENCE TO ORDERS

**DATE:**   THURSDAY, AUGUST 07, 2003 AT 1:06 PM

**IAD #:**   03-017

Sergeant Tammy Walker, this is to advise you that I find you violated:

1.    Rule 1, Authority, Section 1.2, Obedience to Orders, "Members of the Department shall promptly obey any lawful order emanating from any superior officer. Should any such order conflict with a previous order from any other superior officer, with any General or Special Order, or any provision of the Rules, the member to whom such order is given shall respectfully call attention to such conflict, his order shall stand and the responsibility shall be his, and the person obeying the same shall not be held in any way responsible for disobedience of any orders theretofore issued. If any unlawful order is given to any member of the department, such member shall promptly report such fact in writing to the Chief of Police. (old # 1.5)"

2.    Rule 1, Authority, Section 1.3, Obedience to Orders, "No member of the Department shall willfully disobey any lawful command of any commissioned officer, non-commissioned officer, or member of the Department senior to him. (old #1.50)"

3.    S.O.P. 1.4.0, Chain of Command, Article IV, Chain of Command – Commissioned Members, Section A, "The Holyoke Police Department shall follow the Chain of Command enumerated below for Commissioned members of the department. Officer shall report up the chain to their Unit, Section, and Division commanders before going to the Bureau commander or the Chief of Police."

and as a result you are being issued this official letter of Reprimand.

You responded to a call for service at Elizur's Pub at 874 Hampden Street on the morning of June 23, 2003 at approximately 2:15 a.m. and observed Sergeant John F. Monaghan, Sr. and three other officers present. According to your report you instructed the Sergeant and the other officers to leave the establishment. You reported this matter to your immediate supervisor, Lieutenant Donald J. Whelihan. You were not satisfied with Lieutenant Whelihan's handling of the matter and thereafter went to Captain Alan G. Fletcher. According to both Lieutenant Whelihan and Captain Fletcher they informed you that they would handle the matter. Captain Fletcher went on to inform you that the matter would not be overlooked and that he would not tolerate the behavior you described. You were instructed by Captain Alan G. Fletcher, your Bureau Commander, to complete a report on the matter and turn same over to him. You subsequently wrote a report and turn the report directly in to me as the Chief of Police. You intentionally failed to submit your report through the proper chain of command outlined in S.O.P. 1.4.0. which would have been your lieutenant and captain. Therefore, you disobeyed a direct order and violated the chain of command.

You are further advised that this "Written Reprimand" has been entered into your personnel file and any subsequent violation of any rule, regulation or standing operating procedure shall be handled in a stricter manner.

Anthony R. Scott
Chief of Police

ARS/jas

Acknowledge: _____    Date: _5/8/03_

cc:   Professional Standards Division

Page 2 of 2

# EXHIBIT 39

Email Report Printed: 04/20/2004 @ 1435

 Sent : 03/30/2004 @ 0958 By: CAPTAIN ARTHUR R MONFETTE
Subject: LATE FOR COURT
    To: OFFICER KEVIN J BOYLE



   All Police Personnel,

  have received a complaint from the District Court that some Officers are
not showing up on time.  When you have court, you are obligated to be there
at 08:30.  You should immediately sign-in and then see the ADA in charge of
your case.  After you have consulted with ADA, you may return to your
duties,( if you are "On-Duty" ), providing that the ADA, or the Court
Liaison knows how to get in touch with you.  If you are not On-Duty, then
you are being paid to be IN the courthouse.  If you leave, for any reason,
make sure that you clear it with the ADA, or the Court Liaison.

Thank You,
Cpt. Monfette

| Date/Time Sent | To ID | Name | Subject | Status | Delivery Type | Reply |
|---|---|---|---|---|---|---|
| 2004 03 30  0958 | 073 | SERGEANT DANIEL J FALLON | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 106 | OFFICER KEVIN J BOYLE | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 109 | SERGEANT ROBERT J LARAMEE | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 112 | LIEUTENANT EVA M OCONNELL | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 119 | CAPTAIN WILLIAM MCCOY | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 121 | SERGEANT MICHAEL E SHEEDY JR | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 126 | SERGEANT ROBERT WAGNER | LATE FOR COURT | UnOpened | To | N |
| 2004 03 30  0958 | 127 | OFFICER JEANNE T KING | LATE FOR COURT | UnOpened | To | N |
| 2004 03 30  0958 | 128 | OFFICER GREGORY JUDGE | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 136 | Lieutenant MICHAEL J HIGGINS | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 142 | OFFICER WILFREDO GUZMAN | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 143 | OFFICER SCOTT E BARBER | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 144 | OFFICER RICHARD F CONNER | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 146 | OFFICER HENRY J WIELGOSZ JR | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 147 | SERGEANT JOHN J LENIHAN | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 152 | OFFICER RAMONA GUILBE | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 153 | OFFICER JAMES E TAYLOR JR | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 155 | OFFICER ROBERT G CHARLEBOIS | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 158 | OFFICER EDWARD J MOSKAL | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 160 | OFFICER DAVID R BEAUCHEMIN | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 161 | OFFICER JOHN M COLLAMORE | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 162 | CAPTAIN FREDERICK J SEKLECKI | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 164 | OFFICER HERBERT M SPAFFORD III | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 166 | OFFICER DONALD R WELCH | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 167 | OFFICER JAN R SAJ | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 168 | OFFICER STEPHEN T LOFTUS | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 170 | OFFICER KENNETH J MORIARTY | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 173 | OFFICER LONNIE WESTBROOK | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 174 | OFFICER JOEY L JONES | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 177 | OFFICER JORGE L RODRIGUEZ | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 180 | OFFICER MELVIS ROMERO | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 185 | SERGEANT DAVID M OCONNELL | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 186 | OFFICER STEVEN J ROGERS | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 188 | OFFICER JOSE R MONTALVO | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 191 | OFFICER DAVID T ZOLENDZIEWSKI | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 193 | OFFICER RONALD M MIHALAK JR | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 194 | OFFICER JAMES M WHELIHAN | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 195 | OFFICER AURELIO GARCIA | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 197 | SERGEANT DANIEL P MCCAVICK | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 201 | OFFICER PETER OYER | LATE FOR COURT | Read | To | N |

| Date/Time Sent | To ID | Name | Subject | Status | Delivery Type | Reply |
|---|---|---|---|---|---|---|
| 2004 03 30  0958 | 205 | OFFICER KENNETH P FERRIS | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 210 | OFFICER DEBORAH C CLEMENT | LATE FOR COURT | Mobile | To | N |
| 2004 03 30  0958 | 211 | OFFICER JAMES D BRIANT | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 215 | OFFICER PATRICK J CADIGAN | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 216 | OFFICER JAMES E MCDONALD | LATE FOR COURT | UnOpened | To | N |
| 2004 03 30  0958 | 217 | OFFICER JAMES MCGILLICUDDY | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 218 | OFFICER DAVID S USHER | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 219 | OFFICER CHRISTOPHER T DUNN | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 228 | OFFICER EDWIN SUSTACHE | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 229 | SERGEANT TAMMY WALKER | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 230 | OFFICER SEAN C SHATTUCK | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 232 | SERGEANT JOHN F MONAGHAN | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 237 | OFFICER BRIAN J CHIRGWIN | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 239 | LIEUTENANT DAVID R PRATT | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 240 | OFFICER PHILIP J MCKAY JR | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 243 | OFFICER PAUL N DONZE JR | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 246 | OFFICER JAMES M ALBERT | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 255 | OFFICER JENNIFER L SATTLER | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 256 | OFFICER RICHARD B STUART | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 259 | OFFICER PAUL C BARKYOUMB | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 262 | SERGEANT ISAIAS CRUZ | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 267 | OFFICER STEPHEN M MURPHY | LATE FOR COURT | UnOpened | To | N |
| 2004 03 30  0958 | 271 | OFFICER KEITH A WILLIAMS | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 273 | OFFICER JAMES J BARTOLOMEI | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 275 | OFFICER STEVEN M COURNOYER | LATE FOR COURT | UnOpened | To | N |
| 2004 03 30  0958 | 280 | OFFICER MANUEL RIVERA 280 | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 283 | OFFICER GINO S VIAMARI | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 285 | OFFICER JOHN F SEVIGNE JR | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 288 | OFFICER KEVIN M KLESZCZYNSKI | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 289 | OFFICER MANUEL T REYES | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 291 | OFFICER ANDREW D DINAPOLI | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 292 | CHIEF ANTHONY SCOTT | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 293 | OFFICER WILLIAM DELGADO | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 294 | OFFICER JAMES J PARNELL | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 296 | OFFICER JORGE MONSALVE | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 297 | OFFICER THOMAS GLASHEEN | LATE FOR COURT | UnOpened | To | N |
| 2004 03 30  0958 | 298 | OFFICER JOSEPH H WILSON | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 300 | OFFICER TROY COPELAND | LATE FOR COURT | Deleted | To | N |
| 2004 03 30  0958 | 302 | OFFICER JARED HAMEL | LATE FOR COURT | Read | To | N |
| 2004 03 30  0958 | 303 | OFFICER KEITH M HOLBROOK | LATE FOR COURT | Deleted | To | N |

| Date/Time Sent | To ID | Name | Subject | Status | Delivery Type | Reply |
|---|---|---|---|---|---|---|
| 2004 03 30 0958 | 304 | OFFICER PHILIP J EVANS | LATE FOR COURT | Deleted | To | N |
| 2004 03 30 0958 | 305 | OFFICER BRIAN W SUMMERS | LATE FOR COURT | Deleted | To | N |
| 2004 03 30 0958 | 306 | OFFICER VICTOR M HEREDIA | LATE FOR COURT | Deleted | To | N |
| 2004 03 30 0958 | 307 | OFFICER MATTHEW T WELCH | LATE FOR COURT | Deleted | To | N |
| 2004 03 30 0958 | 308 | OFFICER JUAN E CRUZ | LATE FOR COURT | UnOpened | To | N |
| 2004 03 30 0958 | 310 | OFFICER PATRICK T LEAHY | LATE FOR COURT | Deleted | To | N |
| 2004 03 30 0958 | 311 | OFFICER MICHAEL A MEAD | LATE FOR COURT | Deleted | To | N |
| 2004 03 30 0958 | 312 | OFFICER JAMES P LAVELLE | LATE FOR COURT | UnOpened | To | N |
| 2004 03 30 0958 | 313 | OFFICER WALBER BORREGO | LATE FOR COURT | Deleted | To | N |
| 2004 03 30 0958 | 314 | OFFICER JOHN F WIELAND II | LATE FOR COURT | Read | To | N |
| 2004 03 30 0958 | SP2277 | TROOPER DANIEL H SOTO | LATE FOR COURT | UnOpened | To | N |
| 2004 03 30 0958 | SP331 | SERGEANT GARY M GADREAULT | LATE FOR COURT | UnOpened | To | N |
| 2004 04 07 0810 | 211 | OFFICER JAMES D BRIANT | LATE FOR COURT | Read | To | N |
| 2004 04 07 0810 | 229 | SERGEANT TAMMY WALKER | LATE FOR COURT | Deleted | To | N |

# EXHIBIT 40



# HOLYOKE POLICE DEPARTMENT
# INTEROFFICE CORRESPONDENCE

TO:        Chief Scott

FROM:      Cpt. Monfette

RE:        Officers late for Court

DATE:      4/6/04

---

Chief,

During the first days of April, I was notified by the District Court Liaison, ( Officer Donald Welch ), that Officers were showing-up late for court. He stated that it was happening frequently and that on several occasions, Officers were not present, when the DA was ready to conference the case. I later confirmed this with ADA Joan Lynch.

On 4/6/04, I went to the District Court and conducted a Roll-Call at exactly 08:30. This is the time that Officers must sign-in. Before doing so, I informed Captain Fletcher, ( Acting Chief ), of what I was about to do, and he approved.

The surprise roll-call resulted in a total of 6 Officers late for court. Amount of time-late varied between 5 and 15 minutes. The following Officers were late for court;

1. Sgt. Tammy Walker
2. Off. Sean Shattuck
3. Off. James Briant
4. Off. Jeorge Rodriguez
5. Off. Jan Saj
6. Off. Ronald Mihalak

The above Officers were ordered to submit, to me, a "To-From", indicating the reason for their late arrival. I have attached these to this memo. I make no recommendation as to reprimands. I leave that to you. My only reason for conducting the surprise roll-call was to nip this matter, before it got out of hand.

Respectfully submitted,

Cpt. Arthur R. Monfette, Jr.

# EXHIBIT 41

## HOLYOKE POLICE DEPARTMENT
### INTEROFFICE MEMORANDUM

TO: CAPT. MONFETTE

FROM: SGT. TAMMY WALKER

SUBJECT: LATE FOR COURT

DATE:    4/7/2004

CC:



I have no excuse for being late for court. The time to report is 8:30am. I arrived at 8:40am I will make every effort to appear on time in the future.

Respectfully Submitted

Sgt Tammy Walker



# EXHIBIT 42



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:** SERGEANT TAMMY WALKER, EMPLOYEE # 229

**FROM:** ANTHONY R. SCOTT

**SUBJECT:** SUSPENSION NOTIFICATION – PUNCTUALITY TO DUTY AND COURT

**DATE:** TUESDAY, APRIL 20, 2004

**NUMBER:** IAD 04-011



DEFENDANT'S DEPOSITION EXHIBIT

13 Walker
9/26/06 jr

Sergeant Walker, this department was notified by our court officer that he was receiving complaints from Holyoke District Court personnel that officers of this department who were subpoenaed were reporting late for court. The court personnel indicated that this reporting late was becoming a serious problem and hampering prosecution of cases.

Based on this report Captain Arthur R. Monfette, Commander, Criminal Investigations Bureau, under whose command Court Officers are assigned, conducted a personal investigation into these allegations. Captain Monfette confirmed the Court Officer's report with Supervising Assistant District Attorney, Joan Lynch, Esquire, of the Holyoke District Court. On April 6, 2004 Captain Monfette conducted a roll call at the Holyoke District Court at exactly 8:30 a.m., the time scheduled for officers attending court to sign-in. You were found to be between 5 and 15 minutes late.

Based on Captain Monfette's investigative report, I find that you violated the following departmental rules, regulations, policies, procedures or standing operating procedures.

> Rule 4, Performance of Duty, Section 4.13 PUNCTUALITY TO DUTY AND COURT, which states, Members of the Department must be punctual in attendance to calls, requirements of duty, court appointments and other situations where time is specified except when illness or other foreseen mishaps occur in which case the commanding officer shall be notified immediately or as soon as possible. (old #1.82)

S.O.P. 3.4.0 TESTIFYING IN COURT, Section III. PROCEDURES, Paragraph B "1." At the Courthouse, which states, Officers shall be punctual in reporting at the time and place set for the hearing, trial or other proceeding. Officers' physical appearance, personal conduct and professional manner should be aimed at making the best possible impression.

Further, you were directed by Captain Monfette to provide him with an IOC (Interoffice Correspondence) indicating the reason you were late for a scheduled court appearance. In your correspondence, you indicated that you had no excuse.

A review of your disciplinary records indicated that eight months prior you were issued a letter of reprimand for violation of:

Rule 1 Authority, Section 1.2 Obedience to Orders

Rule 1 Authority, Section 1.3 Obedience to Orders

S.O.P. 1.4.0, Article IV Chain-of-Command

Therefore, you are hereby notified that pursuant to the powers conferred on me by Massachusetts General Laws, Chapter 31, Sections 41 through 45 (attached hereto), I find that your actions are in violation of the rules stated herein and I suspend you without pay for a period of 1 working day. This suspension shall be on <u>Sunday, April 25, 2004.</u>

You have a right to appeal this suspension, in writing, to the Mayor of the City of Holyoke, the Appointing Authority, within forty-eight (48) hours after you affix your signature, date and time to this notice acknowledging receipt, not guilt on the question of whether there was just cause for the suspension. Should you appeal this suspension to the Appointing Authority and the suspension is upheld, you have a right to appeal this suspension to the Civil Service Commission pursuant to General Laws Chapter 31, Section 43, a copy of which is attached hereto for your information, within ten (10) days following the receipt of written notice from the Appointing Authority.

Calculating time periods such as days for appeals, etc. referred to herein shall not include Saturdays, Sundays or Holidays.

Anthony R. Scott
Chief of Police

ARS/jas


Acknowledged: _____
Sergeant Tammy Walker

Date: / 04·20·04     Time: 13:30

Witness: _____


cc:  Mayor
     City Solicitor
     Professional Standards Division

# EXHIBIT 43

MAYOR MICHAEL J. SULLIVAN

CITY OF HOLYOKE

June 22, 2004

Sergeant Tammy Walker
6 Clark Street
Holyoke, Massachusetts 01040-2904

Re:  Appeal Hearing - G.L. c. 31, § 41

DEFENDANT'S DEPOSITION
EXHIBIT
14 Walker
9/26/08
PENGAD 800-631-6989

Dear Sergeant Walker:

On September 15, 1998, I held a hearing regarding your appeal, pursuant to G.L. c. 31, § 41, of the one (1) day suspension dated April 20, 2004.  At the hearing, you were represented by counsel and allowed to present evidence on your own behalf.

Based on the evidence presented, I am affirming the Police Chief's decision to suspend you for one (1) day and I hereby deny your appeal.  My decision is based on the following:

On March 30, 2004, following several complaints from the Court Officers at the Holyoke District Court about police officers being tardy for court, Captain Arthur Monfette sent an email message to the entire Department reminding everyone that they are required to be on time for court.  On April 6, 2004, pursuant to the Chief's request to randomly check to be sure officers are on time for court, Captain Monfette went to the courthouse and personally observed you arriving late.

I find that your actions are a clear violation of the Department rules and regulations and the March 30, 2004 directive from Captain Monfette.

Taking into consideration you have a prior reprimand in your recent employment record, I find that a one (1) day suspension is appropriate.

Pursuant to the provisions of G.L. c. 31, § 38, you may request a review of this decision by the Personnel Administrator of the Human Resources Division for the Commonwealth of Massachusetts.  A copy of G.L. c. 31, § 43 is enclosed for your review.

Michael J. Sullivan
Mayor

Enclosures
cc:   Attorney Rebecca Proakis, NAGE/IPBO
      Attorney Shawn Willis, Sheridan & Sheridan
      Anthony Scott, Chief of Police

# EXHIBIT 44

For Date: 07/23/2004  - Friday

| Call Number | Time | Call Reason | Action | Priority | Duplicate |
|---|---|---|---|---|---|

**730      2022    Phone - LOUD MUSIC              UNFOUNDED          3**
```
        Call Taker:    422 - ONEILL, DEANNA
    Location/Address:  71 NEWTON ST @ 30 ESSEX ST
             Post:     2211 CHIRGWIN, BRIAN
                       Disp-21:17:27          Arvd-21:23:23  Clrd-21:23:25
         Narrative:    07/23/2004 2022 ONEILL, DEANNA
                       CALLER REPORTS LOUD MUSIC COMING FROM A WINDOW AT THIS
                       LOCATION

         Narrative:    07/23/2004 2124 ONEILL, DEANNA
                       MUSIC COULD BE HEARD FROM HERITAGE PARK SERVICE
```

**04-26731   2028    Phone - ALARM              CHECKED/SECURE       3**
```
        Call Taker:    450 - THERRIEN, BRENDA
    Location/Address:  [HOY 818] LIZOTTE GLASS - 390 RACE ST
    Party Entered By:  07/23/2004 2028 450 - THERRIEN, BRENDA
      Calling Party:   18006269364
             Post:     2211 CHIRGWIN, BRIAN
                       Disp-20:51:20          Arvd-20:56:56  Clrd-20:56:58
         Narrative:    07/23/2004 2028 THERRIEN, BRENDA
                       FRONT MOTION.

         Narrative:    07/23/2004 2057 THERRIEN, BRENDA
                       CODE TWO ALL CHECKED AND SECURED. THERE IS NO KEY HOLDER
                       RESPONDING.
```

**04-26733   2029    Phone - SUSPICIOUS PERSON       UNFOUNDED          3**
```
        Call Taker:    422 - ONEILL, DEANNA
    Location/Address:  336 MAIN ST @ 82 CABOT ST
             Post:     2211 CHIRGWIN, BRIAN
                       Disp-20:32:38          Arvd-20:39:31  Clrd-20:50:56
         Arrived By:   450 - THERRIEN, BRENDA
             Post:     2291 CZUPKIEWICZ, PAUL
                       Disp-20:32:44          Arvd-20:39:30  Clrd-20:50:55
         Arrived By:   450 - THERRIEN, BRENDA
         Narrative:    07/23/2004 2032 ONEILL, DEANNA
                       CALLER REPORTS THREE HISPANIC MALES CHASING ANOTHER MALE
                       WITH A PIPE DOWN THE ALLEY FROM HAMILTON TO CABOT EAST OF
                       MAIN
```

**04-26732   2031    Phone - ALARM              ERROR/ACCIDENTAL      3**
```
        Call Taker:    450 - THERRIEN, BRENDA
    Location/Address:  [HOY 500] GOSS & MCLAIN INSURANCE - 474 APPLETON ST
    Party Entered By:  07/23/2004 2032 450 - THERRIEN, BRENDA
      Calling Party:   18006332677
             Post:     2232 MCMAHON, MICHAEL
                       Disp-20:49:42          Arvd-20:51:49  Clrd-20:54:57
                       SUMMERS, BRIAN
         Narrative:    07/23/2004 2032 THERRIEN, BRENDA
                       GEN ALARM.

         Narrative:    07/23/2004 2055 THERRIEN, BRENDA
                       CODE TWO EMPLOYEES WERE THERE.
```

**04-26734   2039    Phone - SUSPICIOUS PERSON       REPORT             3**
```
        Call Taker:    450 - THERRIEN, BRENDA
    Location/Address:  1 MALL RING RD
             Post:     2250 WALKER, TAMMY
                       Disp-20:50:14          Arvd-20:50:16  Clrd-20:50:17
         Narrative:    07/23/2004 2041 THERRIEN, BRENDA
         Modified By:  07/23/2004 2046 THERRIEN, BRENDA
                       I HAD RECIVED A CALL FROM A FEMALE PARTY STATING THAT SHE
                       WAS AT THE MALL AND SHE WANTED TO REPORT A SUSPICIOUS
                       PERSON THAT WAS AT THE MALL. THE FEMALE WENT ON STATING THAT
```

WHEN SHE WAS THERE SHE HAD SAW A MALE PARTY THAT WAS MIDDLE
EASTERN VIDEO TAPING THE PROPERTY, SHE WENT ON STATING THAT
HE WAS NOT VIDEO TAPING PEOPLE THAT WERE AROUND BUT THE
STAIRS AND SO ON. I THEN TOLD THE FEMALE TO HOLD ON AND I
WILL TRANSFER UP TO THE DB. THERE WAS NO ANSWER THEN I HAD
GIVEN THE CALL TO THE CO WHO WAS SGT WALKER.

Refer To Incident:     04-5079-OF

04-26736      2040    Phone - SUSPICIOUS PERSON           OTHER                 3
    Call Taker:      422 - ONEILL, DEANNA
Location/Address:    WHITNEY AVE
    Narrative:       07/23/2004 2047 ONEILL, DEANNA
                     OFF DUTY SARGEANT LENIHAN CALLED IN A SUSPICIOUS PARTY
                     PICKING UP A LARGE SHOPPING BAG IN THE WOODS NEAR THE MALL
                     THE OFFICER FOLLOWED THE PARTY WHO GOT IN THE PASSENGER SIDE
                     OF A BLUE DODGE CARAVAN WITH NORTH CAROLINA PLATE OF
                     STY6255. THE SUSPECT IS A BLACK MALE EARLY 20'S 5'10"
                     WEARING A WHITE PINSTRIPE BASEBALL JERSEY VAN HEADED SOUTH
                     ON WHITNEY TO HIGHLAND AND RIGHT ON HIGHLAND TOWARD THE DEAD
                     END. THE VAN THEN TURNED AROUND AND WENT EAST ON HIGHLAND
                     AND TURNED INTO THE DUNKIN DONUTS PARKING LOT. WEST
                     SPRINGFIELD PD WAS NOTIFIED.

04-26735      2041    Phone - AMBULANCE/ FIRE             ASSISTED              2
    Call Taker:      450 - THERRIEN, BRENDA
Location/Address:    36 ST KOLBE DR
    Narrative:       07/23/2004 2042 THERRIEN, BRENDA
                     AMR AND FIRE RESPONDING FOR A FEMALE WITH PAINS IN HER
                     STOMACH.

04-26737      2054    Initiated - M/V STOP                VIOLATION             3
    Call Taker:      422 - ONEILL, DEANNA
Location/Address:    1147 MAIN ST @ 415 INGLESIDE ST
   Initiated By:     2262 - DUNN, MICHAEL
                            MONSALVE, JORGE
         Post:       2262  DUNN, MICHAEL
                                             Arvd-20:54:25  Clrd-21:03:01
                            MONSALVE, JORGE
Vehicle Entered By:  07/23/2004 2055 422 - ONEILL, DEANNA
       Vehicle:      Reg: PC MA 917RLC

04-26738      2103    911 - 911 HANG UP                   ERROR/ACCIDENTAL      3
    Call Taker:      422 - ONEILL, DEANNA
Location/Address:    475 MAPLE ST 504
Party Entered By:    07/23/2004 2104 422 - ONEILL, DEANNA
  Calling Party:     FERNANDEZ @ 475 MAPLE ST - HOLYOKE, MA 01040 413-532-9872
         Post:       2211 CHIRGWIN, BRIAN
                     Disp-21:05:11              Arvd-21:06:17  Clrd-21:06:19

04-26739      2104    Phone - SHOPLIFTING                 ARREST                3
    Call Taker:      450 - THERRIEN, BRENDA
Location/Address:    [HOY 420] FILENE'S BASEMENT - 2 MALL RING RD
         Post:       2251 WIELGOSZ, HENRY
                     Disp-21:10:24              Arvd-21:16:23  Clrd-21:28:28
   Cleared By:       422 - ONEILL, DEANNA
Refer To Arrest:     04-1967-AR
       Arrest:       GONZALEZ, LUIS ANTONIO
      Address:       168 PINE ST 1ST   HOLYOKE, MA
          DOB:       09/13/1990    SSN: 013746063
      Charges:       SHOPLIFTING BY ASPORTATION

04-26740      2115    Phone - LOUD MUSIC                  OTHER                 3
    Call Taker:      422 - ONEILL, DEANNA
Location/Address:    [HOY 877] MCNALLY FIELD - 1 WINTER ST
    Narrative:       07/23/2004 2116 ONEILL, DEANNA
                     CALLER FROM 21 SAMOSETT ST STATES THERE ARE PARTIES SITTING
                     IN THE FIELD WATCHING THE BALLGAME WITH THE MUSIC BEING
                     PLAYED FROM THEIR VEHICLE LOUDLY

04-26741      2134    Phone - LOUDGROUP                   SPOKEN                3

```
            Call Taker:    450 - THERRIEN, BRENDA
        Location/Address:  163 FARNUM DR
                    Post:  2222 DELGADO, WILLIAM
                           Disp-21:36:32                      Clrd-21:38:03
                                 MURPHY, STEPHEN
                    Post:  2703 WESTBROOK, LONNIE
                           Disp-21:38:59           Arvd-21:39:05 Clrd-21:39:07
               Narrative:  07/23/2004 2137 THERRIEN, BRENDA
                           CALLER REPORTS THAT THERE IS LOUD GROUP OUT FRONT.


               Narrative:  07/23/2004 2139 THERRIEN, BRENDA
                           CODE TWO SPOKEN WITH.


04-26742    2155    911 - AMBULANCE/ FIRE              TRANSPORT            2
            Call Taker:    450 - THERRIEN, BRENDA
        Location/Address:  63 WEST ST APT 2
        Party Entered By:  07/23/2004 2156 450 - THERRIEN, BRENDA
           Calling Party:  MALDONADO @ 63 WEST ST - HOLYOKE, MA 01040 413-533-4873
                    Post:  2211 CHIRGWIN, BRIAN
                           Disp-21:56:25           Arvd-21:57:51 Clrd-22:28:14
                    Post:  2250 WALKER, TAMMY
                           Disp-22:03:59           Arvd-22:05:51 Clrd-22:28:15
               Narrative:  07/23/2004 2157 THERRIEN, BRENDA
                           CALLER REPORTS THAT THERE IS A FEMALE PARTY THAT IS IN THE
                           BATHROOM AND SHE IS BLUE AND SHE IS NOT BREATHING. AMR AND
                           FIRE WERE BOTH DISPATCH. UNIT 211 IS RESPONDING.

               Narrative:  07/23/2004 2229 THERRIEN, BRENDA
                           CODE TWO THE FEMALE WILL BE TRANSPORTED TO THE ER.


04-26743    2158    Initiated - M/V STOP               REPORT              3
            Call Taker:    450 - THERRIEN, BRENDA
        Location/Address:  154 HIGH ST @ 94 HAMPDEN ST
             Initiated By: 2262 - DUNN, MICHAEL
                                 MONSALVE, JORGE
                    Post:  2262 DUNN, MICHAEL
                                              Arvd-21:58:17 Clrd-22:30:40

                                 MONSALVE, JORGE
      Vehicle Entered By:  07/23/2004 2158 450 - THERRIEN, BRENDA
                 Vehicle:  Reg: PC MA 41EE04
               Narrative:  07/23/2004 2201 THERRIEN, BRENDA
                           MV WILL BE TOWED. APPROVED BY UNIT 250.


     Refer To Incident:    04-5080-IF


04-26744    2158    Phone - ACCIDENT                   REPORT              2
            Call Taker:    422 - ONEILL, DEANNA
        Location/Address:  51 APPLETON ST @ 95 WINTER ST
                    Post:  2222 DELGADO, WILLIAM
                           Disp-22:01:27           Arvd-22:02:55 Clrd-22:36:24
                                 MURPHY, STEPHEN
           Dispatched By:  450 - THERRIEN, BRENDA
              Arrived By:  450 - THERRIEN, BRENDA
              Cleared By:  450 - THERRIEN, BRENDA
                    Post:  2291 CZUPKIEWICZ, PAUL
                           Disp-22:01:30           Arvd-22:02:50 Clrd-22:32:27
           Dispatched By:  450 - THERRIEN, BRENDA
              Arrived By:  450 - THERRIEN, BRENDA
                    Post:  2232 MCMAHON, MICHAEL
                           Disp-22:02:16           Arvd-22:02:49 Clrd-22:02:53
                                 SUMMERS, BRIAN
           Dispatched By:  450 - THERRIEN, BRENDA
              Arrived By:  450 - THERRIEN, BRENDA
              Cleared By:  450 - THERRIEN, BRENDA
                    Post:  2232 MCMAHON, MICHAEL
                           Disp-22:02:57           Arvd-22:02:59 Clrd-22:22:43
                                 SUMMERS, BRIAN
           Dispatched By:  450 - THERRIEN, BRENDA
              Arrived By:  450 - THERRIEN, BRENDA
       To Accident:       04-1064-AC


04-26745    2158    Phone - AMBULANCE/ FIRE            ASSISTED            2
```

Holyoke Police Department                                      Page:    4
Dispatch Log  From: 07/23/2004  Thru: 07/23/2004   1900 - 2200  Printed: 09/08/2004

```
    Call Taker:     450 - THERRIEN, BRENDA
Location/Address:   126 BEECH ST 1 FL
     Narrative:     07/23/2004 2200 THERRIEN, BRENDA
                    AMR AND FIRE RESPONDING FOR A 37 FEMALE THAT HAS FLU.
```

# EXHIBIT 45

INGLESIDE MALL/911 CALL

| | |
|---|---|
| Dispatch: | Holyoke Police, recorded line, Therrien. |
| Caller: | Hi, I just wanted to call and report something that I thought was suspicious today in the Holyoke Mall. |
| Dispatch: | Okay. |
| Caller: | I saw like a Middle Eastern looking man like in the downstairs level – |
| Dispatcher: | Uh-hun. |
| Caller: | He just looked kind of suspicious and he had like a video camera and he didn't appear to be like video taping any like people, any family members or anything, he was video taping like the mall like the upstairs, like the railings and just kind of, you know, just video taping all around just the mall. |
| Dispatch: | Okay, let me see if I have a detective who can speak with you.   Hold on. |
| Caller: | Okay, thanks. |
| 2nd Dispatch: | Is that her? |
| Dispatch: | Okay, Mam, nobody's answering.  Hold on one second. |
| Caller: | Okay. |
| Dispatch: | I'm going to have you speak with a supervisor; hold on, okay? |
| Caller: | Okay. |
| Dispatch: | ---- have some information, Sarge, she wants to give and I'm not taking it. |
| (phone rings) | |
| Dispatch: | Yes.  Communications |
| Lt. Duguay: | (laughing) Wow. |
| Dispatch: | Hold on a minute. |
| (phone rings) | |
| Dispatch: | Holyoke Police |

Caller:          This is New England Securities; I've got a burglar alarm on a business.

Dispatch:        Can you hold, please?

(phone rings)

Dispatch:        Holyoke Police

Sgt. Albert:     Hey Brenda, it's Jim.

Dispatch:        Hi.

Sgt. Albert:     I got separated from Denise there; I'm trying to get back to her.

Dispatch:        Ok, hold on.

Sgt. Albert:     Thanks.

(phone rings)

Dispatch:        Hello

Lt. Duguay:      Hello.  You know, somebody who works on the phone for a living should have better phone manners.

Dispatch:        Well, I know it's you guys calling us, so – go ahead.

Lt. Duguay:      So it's ok to be rude to us because you work with us.

Dispatch:        Yeah.

Lt. Duguay:      How rude.  All right, could you please have Sgt. Walker put the report on the clipboard for Sgt. Albert.  When he comes in tonight he'll take care of it.

Dispatch:        Well, he's on the phone so hold on.

Lt. Duguay:      Ok.

Dispatch:        I'll ship him out, you've got to hang up though.

Lt. Duguay:      Ok, bye.

Dispatch:        Jimmy?

Sgt. Albert:     Yeah.

Dispatch:        Hold on.

Sgt. Albert:     All right.

(phone rings)

Dispatch:        Yes.

Lt. Duguay:      How about good evening, may I help you?   What is this yes stuff?

Dispatch:        Well, I know –

Lt. Duguay:      It's just rude.

Dispatch:        I sound like my father.  Go ahead.

Lt. Duguay:      Ah – ok, so I talked to Sgt. Albert, please have Sgt. Walker leave a copy of the report on the clipboard for him.

Dispatch:        What report?  She doesn't --

Lt. Duguay:      The report that she's going to do because it's an important thing.

Dispatch:        Oh.  Okay.

Lt. Duguay:      Thank you.

Dispatch:        Yep.

Lt. Duguay:      Bye.

Dispatch:        Hello.

Sgt. Albert:     Hey, Brenda, it's Jim.

Dispatch:        Oh, hi.

Sgt. Albert:     I'm in.  You can log me into the computer.

Dispatch:        Where are you?

Sgt. Albert:     In C.I.B.

Dispatch:        I know but what unit.

Sgt. Albert:     420.

Dispatch:        Oh, my goodness.

Sgt. Albert:     Yeah, yeah, hot shit.  Do you have a name or a phone number for that woman?

Dispatch:        No, I didn't get any information, I transferred the call over so --

Sgt. Albert:     Ok.  Did Tammy take a number on it?

Dispatch:        Yeah.

Sgt. Albert:     I'm in to follow that up.  That's going to be kind of an urgent deal.

Dispatch:        All right.  I know she didn't do anything yet, so --

Sgt. Albert:     What's the number you've got on it?

Dispatch:        I'll call you right back.

Sgt. Albert:     All right.

(phone rings)

Sgt. Albert:     Brenda?

Dispatch:        Yep.

Sgt. Albert:     Go ahead.

Dispatch:        5079.

Sgt. Albert:     Thanks.

Dispatch:        And what unit are you again?

Sgt. Albert:     420.

Dispatch:        402?  No – 420.

Sgt. Albert:     There you go.

Dispatch:        All right.

Sgt. Albert:     Thanks, Brenda.

Dispatch:        All right.  Bye-bye.

Dispatch:        Yes.

Sgt. Albert:     Can you have Tammy call the station and ship it to me but don't say it's from me,
                 I don't what the world to know what's going on.

Dispatch:        No, I just basically – what happened was I took the call –

Sgt. Albert:     Yep

Dispatch:        -- and then she started to tell me and I said –

Sgt. Albert:     Yeah.

Dispatch:        -- this is something that I'm not going to let go --

Sgt. Albert:     Yeah, that's cool, I understand.

Dispatch:        I was like okay, hold on one second I'm going to transfer you to the DB.

Sgt. Albert:     Yeah.

Dispatch:        Well, nobody answered.

Sgt. Albert:     Right.

Dispatch:        So then I said, well, I'm not being held responsible so I said –

Sgt. Albert:     Yeah.

Dispatch:        -- here you go, Sgt. Walker – that's all I did.

Sgt. Albert:     I don't blame you, you did the right thing.  I'm just going to need to move on this;
                 this isn't something you have the luxury of time on –

Dispatch:        Ok.

Sgt. Albert:     -- so I came in to play with it but I want Tammy to tell me this woman's name
                 and number so that I can get to her.

Dispatch:        I don't think she has it, she didn't take it.

Sgt. Albert:     Ah, you're shitting me?

Dispatch:      No. I didn't take it because just -- I didn't sit there and say what's your name and phone number because somebody was here to talk to her. She doesn't have that, she has less information than I have.

Sgt. Albert:   We have no idea who this woman is?

Dispatch:      No.

Sgt. Albert:   Why didn't she take her name and number?

Dispatch:      I don't know but I'm almost 100 percent positive she does not have it.

Sgt. Albert:   Ok. Well, why don't you have her call me?

Dispatch:      Yep, I will.

Sgt. Albert:   Ok?

Dispatch:      Yep, bye.

               99 to Sgt. Walker

Sgt. Walker:   Go ahead.

Dispatch:      Signal for the station please.

Dispatch:      Holyoke Police

Sgt. Walker:   Walk--ker.

Dispatch:      (laughing) Albert wants to talk to you.

Sgt. Walker:   What? What?

Dispatch:      Jimmy Albert's upstairs, he wants to talk to you. I told him, I said hey listen – I said

Sgt. Walker:   Bren – you ship me a call and she wanted information on what she should do –

Dispatch:      That's all – I said that

Sgt. Walker    All right.

Dispatch:      I said that. I said the information was given to me, I transferred it up to the DB, the DB wasn't there and I said, I says, Sergeant Walker, this female wants to pass on information, the call was transferred to you. That's it, nothing else.

Sgt. Walker:    (laughing)

Dispatch:    I'm sorry, I didn't mean --

Sgt. Walker:    No, no big deal.  I mean, it's no big deal.  I just kind of find it strange it's not against the law to, you know, videotape – she wasn't even sure if he was Middle Eastern but – see, I don't know what she said to you, so I can't comment.

Dispatch:    Well, I put that in the dispatch notes so.

Sgt. Walker:    But -- yeah, he's upstairs now?

Dispatch:    Yeah, hold on, okay?

Sgt. Walker:    Yeah.  Ok.

(phone ringing)


END OF TRANSMISSION

# EXHIBIT 46

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the Professional Standards Division at the Holyoke Police
Department on Wednesday, July 28, 2004, at 10:30 a.m. Present while the statement is being
taken are Sergeant Daniel McCavick, and Lieutenant David Fournier. This statement is being
taken from Sergeant James Albert regarding an internal investigation ordered by the Chief of
Police concerning a call to the Holyoke Police Department on July 23, 2004, at approximately
8:39 p.m. The call was received by Dispatcher Brenda Therrien from a female party stating that
she was at the Holyoke Mall and wanted to report a suspicious person that was at the mall. The
female went on stating that when she was there she had seen a male party that was Middle
Eastern videotaping the property. She went on to say, according to the dispatch notes, that he
was not videotaping people that were around but the stairs and so on. At this time Dispatcher
Therrien attempted to transfer the call to the Detective Bureau, at that time there was no answer
and according to the notes the call was turned over to the CO, Sergeant Walker. Same date, an
incident report was submitted by Sergeant Walker, reference number 04-5079-OF, indicating a
report submitted by Sergeant Walker that at the above date and time an unidentified woman was
transferred to the Sergeant, Sergeant Walker. She wanted to report that she saw a man which she
thought was Middle Eastern videotaping in the Holyoke Mall. She wanted to know what she
should do. Sergeant Walker informed the caller to notify mall security if this happened in the
future. Sergeant Walker also reports that she spoke to Sergeant Albert regarding this matter and
he would, as a result, make a follow up with mall security. I would ask that Sergeant Albert
respond to both the dispatcher report and report submitted by Sergeant Walker.

Sergeant Albert: Certainly. On that particular night I was at home, I was off duty at the time and
I received a call from Lieutenant Duguay who advised that dispatch had received this call and
she described the details of the call and that it had been forwarded to Sergeant Walker after an
attempt to send it to the Detective Bureau failed. No one was present. I requested from
Lieutenant Duguay that there be an incident report issued and that the report on file so that when
I came in I could review it. I was advised that Sergeant Walker was the party who took the call
but that there was no follow up information at the time. When I came in that night for my shift I
believe it was close to quarter to 11, 11:00 o'clock at night. I spoke briefly with Lieutenant
Duguay and Brenda Therrien who advised the details that you just read and I then I spoke – I
requested Brenda request that Sergeant Walker call me in the DB, she was on the street, I think,
at the time. Sergeant Walker did call and I asked her what the details were and she stated that it
really wasn't much of a call, she spoke to the woman briefly, the woman had advised that she
observed a Middle Eastern male that date videotaping in the Holyoke Mall and she thought it
was suspicious because it appeared he was videotaping structures and building material but not
people or activity. Sergeant Walker stated that this woman did not provide many details so
Sergeant Walker didn't have many to provide me and basically there was not a name or a phone
number for a follow up to me. I asked Sergeant Walker if she was going to do a report and she
stated no that she thought she'd do a To/From instead and I said okay and I left it at that. When I
came back in to work the next night I spoke to Lieutenant O'Connell in the hallway and she

1

advised that she had spoken with Sergeant Walker and advised her in the future that that type of report would require more detail; certainly the name of the caller and the telephone number for a follow up. This report would come to me because I'm assigned to the Joint Terrorism Task Force of the FBI and the nature of the call would require further follow up and inclusion into the National Intelligence Bureaus. And that's basically it.

Sergeant McCavick: Can I ask, Sergeant Albert, to your knowledge in speaking to Sergeant Walker do you know if she ascertained or attempted to ascertain the subject's identity, the time frame when this occurred at the mall, the description of the individual with the video camera, if any of this information was even attempted to have been obtained?

Sergeant Albert: I really don't know. I did not get into all of that with Sergeant Walker; I simply wanted to know if the report was done and if there was a phone number and a follow up with the name. I believe in talking with all three, Sergeant Walker, Brenda Therrien, and Lieutenant Duguay that the time frame was during the day that date but other than that I don't have any further information.

Sergeant McCavick: Okay. I have no further questions at this time.

Lieutenant Fournier: No further questions unless Sergeant Albert would like to –

Sergeant McCavick: -- comment on the situation.

Lieutenant Fournier: -- anything that you'd like to add.

Sergeant Albert: I don't have much to add directly just in the future we need this information, it is significant giving the context of world politics and the threat of terrorism. This is a particular nature that we need this information as innocuous as it may seem it's something that would be documented and included in the data base within the FBI.

Sergeant McCavick: Okay.

Lieutenant Fournier: Very good. The statement would conclude at 10:37 a.m., July 28, 2004.


_____        _____
Sergeant James Albert                     Date

2

# EXHIBIT 47

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the office of Professional Standards on Wednesday, July 28, 2004, at 4:06 p.m. Present are Lieutenant David Fournier, myself and Sergeant Daniel McCavick. This statement is being taken from Lieutenant Denise Duguay regarding an investigation initiated by the Chief concerning a call to the Holyoke Police Department dispatch communications center on Friday, July 23rd at approximately 8:39 p.m. The caller reported to the dispatch – wanted to report a suspicious person at the Holyoke Mall further indicating that she had seen a male party of Middle Eastern descent videotaping the mall property. She went on to say he was not videotaping people that were around but the stairs and so on. And as a result of that Sergeant Tammy Walker submitted a report from the caller who was transferred from dispatch.

Questions denotes Lieutenant David Fournier

Answer denotes Lieutenant Denise Duguay

_____

Q. And I would ask of Lieutenant Duguay if you're aware of any or all of that incident?
A. Yes, On Friday, August 23, 2004, (sic) I was assigned as a supervisor in charge of the Records and Communications Divisions. At approximately 8:45 p.m. one of the dispatchers, Brenda Therrien, arrived in the Records Bureau and said she needed to speak to me. She told me that she had received a telephone call from a party who had been up to the mall earlier in the day and she was very concerned that it might be something serious. So I asked her what the caller had said. She told me that the caller had stated that a man of Middle Eastern descent had been seen videotaping the mall earlier in the day. Apparently he was videotaping the stairwells, the escalators, the elevators, the floor plan from a birds eye view on the second floor and the ceiling area of the mall. Basically, the entire interior area of the mall. She told me she was concerned about it. I told her I was also concerned about it. I asked her what she did with that call. She told me that she transferred it to the Criminal Investigations Bureau and that there was no response there. The call came back to the dispatch area; she then transferred it to the Commanding Officer. The Commanding Officer assigned that evening was Sergeant Daniel Fallon, however, he was out of the station and replacing him was Sergeant Tammy Walker so the call was then transferred to Sergeant Tammy Walker. She spoke with the party for a few minutes and then subsequently spoke to Dispatcher Therrien. I then called our terrorist expert which is Sergeant James Albert at home and I told him about what had transpired. He then requested that a copy of the report be left for him. I went out to the hallway and I spoke to Sergeant Walker. I requested that she leave a copy of the report on the clipboard for Sergeant Albert. She told me she did not do a report. I requested that she do that because it was a serious matter. She stated that she did not have very much information. She didn't take down the information of the caller and I told

1

her well, write down what you do have so that Sergeant Albert can do a follow up when he comes in that evening, he was due to come in at midnight.

Q.  Okay.  So no further conversation with the Sergeant then concerning – Sergeant Walker concerning the – other than you instructing her to complete a report on the incident?
A.  No.

Sergeant McCavick:  Lieutenant, based upon your conversation with Sergeant Walker, was it your impression that she did not take the information from the caller or I mean, that she failed to ascertain this information or that the caller was not forthcoming with her information?  I don't know – you would or not know?

Lieutenant Duguay:  You would have to talk to Sergeant Walker about that, I don't know.  I do know that I asked Dispatcher Therrien to make a detailed log entry about the information that she was aware of and I am certain because I have seen it that she did, in fact, do that.

Sergeant McCavick:  Okay.  Subsequent to this at any point have you had an opportunity to read Sergeant Walker's narrative on this incident?

Lieutenant Duguay:  Yes, I have.

Sergeant McCavick:  Okay.  Is it fair to say, Lieutenant, in reading that that this report does not in any way, shape or form delineate even the approximate time that this may have occurred, description of the subject with the camera and obviously the name of the caller to the police department?

Lieutenant Duguay:  (no response)

Sergeant McCavick:  That is a copy of the report if you want to refresh your memory.

Lieutenant Duguay:  The – I'm not sure what your question is.

Sergeant McCavick:  The question is, is it fair to say that that report, police report does not delineate the actual time or even the approximate time that this observation was made at the Holyoke Mall nor does it indicate a description of the individual with the video camera, nor is there any mention of the caller to the Holyoke Police Department that initiated this information.

Lieutenant Duguay:  No.

Sergeant McCavick:  Okay.  Any questions, Lieutenant Fournier?

Lieutenant Fournier:  I have no further questions.  Is there anything else you'd like to add before this statement concludes?

Lieutenant Duguay:  No.

Lieutenant Fournier:   Okay.  Very good.  This statement will conclude at 4:12 p.m.
Wednesday, July 28, 2004.


*Lt. Denise Duguay*                          8/4/4
Lieutenant Denise Duguay                 Date

# EXHIBIT 48

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the office of Professional Standards on Thursday, July 29, 2004, at 9:40 a.m.  Present while the statement is being taken are myself, Lieutenant David Fournier and Sergeant Danny McCavick.  This statement is being taken from Dispatcher Brenda Therrien based on an investigation initiated by the Chief of Police concerning a call for service or I shouldn't say a call for service but a call to the Holyoke Police Department on Friday, July 23, 2004, at approximately 8:39 p.m.   The call would reflect a female party calling the Holyoke Police Department reporting a suspicious person at the Holyoke Mall.  The female indicating that a Middle Eastern male videotaping the property of the Holyoke Mall and not people at the location there.  A further report submitted by Sergeant Tammy Walker reference #04-5079-OF indicates that Sergeant Walker submitted a report on the same date, an unidentified woman reported to her that she saw a man which she thought was Middle Eastern videotaping the mall and she wanted to know what to do.  And we're going to ask you your knowledge as to -- and you're entered as the call taker on the call, is that correct?

Ms. Therrien:  Yes.

Questions denotes Sergeant Daniel McCavick

Answer denotes Brenda Therrien

_____

    Q.  Ms. Therrien, I just have a few questions for you.  The caller initially indicates to you that there was videotaping in the downstairs level of the Holyoke Mall and that was on the tape.  This information is not outlined in your dispatch notes, could you just respond to this issue here?

    A.  When she first called she stated that she had a situation that she saw that she wanted to report to the Holyoke Police.  So then I continued listening to her conversation, stating that she was at the Holyoke Mall, she did not state her time, she did state the date, that she was there that date of the call, stating that there was a Middle Eastern gentleman videotaping, videotaping the property of the mall not the people.   She wanted to know what to do.  So then I transferred the call up to the Detective Bureau.  Nobody answered at the Detective Bureau, the call came back to me and the supervisor that was in the CO's office was Sergeant Walker, then I transferred the call to her.

    Q.  Okay.  You indicate to Sergeant Walker that you were not going to take the caller information you stated to Sergeant Walker "I'm not taking it", did the actual content of the information concern you such to warrant that response?

    A.  I'm not sure, I don't quite understand.

1

Q. This is information taken from the dispatch tapes, that's where this is originating and on the tape you're heard to say "I'm not taking the information", and I believe you're referencing this to Sergeant Walker and we're just curious what elicited that comment?

A. The reason – the call – when the call came in I listened to the female then I personally felt as a dispatcher that this might have been something – could be serious so I said to Sergeant Walker as she was sitting in the CO's office as I was transferring the call, I said I'm not taking this information, I'm passing it on to you and that's when the call was transferred to Sergeant Walker.

Q. Okay. Lieutenant Duguay instructed you to have Sergeant Walker leave her police report on the clipboard for Sergeant Albert and you're heard to say – your response is "what report"? Could you explain that in detail?

A. After the call I was on a quick break, I just went into Records briefly talking to the girls in there and I was saying how weird it was about this Middle Eastern guy videotaping in conversation not telling anybody about the call but just in general conversation, Lieutenant Duguay stated to me is there a report done? -- I'm sorry, excuse me, no -- she didn't, she said what did you do to the call? I said I first transferred it upstairs to the Detective Bureau; I transferred the call over to Sergeant Walker. And then as I was standing there she called Sergeant Jimmy Albert to let him know about the situation. Then I left the room and went back to my post in dispatch.

Q. Okay. Who and when – who and when were you instructed to assign a number to this call for a police report?

A. Lieutenant Duguay called me maybe approximately five minutes after she talked to Detective Jimmy Albert about this situation and told me to tell Sergeant Walker that she must do a report. I then got up from my post, went in to talk to Lieutenant Duguay and stated to her being a civilian I don't feel it's my place to tell a supervisor to do a report. If there's a report needed, maybe she should tell Sergeant Walker. As I was walking down the hallway, I saw Sergeant Walker and I said to Sergeant Walker that Lieutenant Duguay wants you to do a report and then she asked me on what and I said on the call that I transferred to you and then she said that I don't have much information did you get it I said well I got the information I had I didn't get the lady's name or her phone number or where she was calling from but that I do have the other information that she gave me. And then she says well I have nothing to do a report on and then I said then go speak with Lieutenant Duguay.

Q. Okay. So that probably answers my next question but subsequent to Sergeant Walker's phone conversation with the female caller, I was going to ask was there any conversation between you and Sergeant Walker concerning she, Sergeant Walker, intending to initiate a police report. So prior to that point do you know if she had intended to even do a report?

A. No. She was not going to do a report until Lieutenant Duguay told her to do a report then shortly after that Detective Albert I think it was approximately 10:00 o'clock at night, that night came in to investigate in this, called me downstairs at dispatch and asked me for a report number. I said well, there is no report number issued yet or done, I'm sorry, there was a report issued but there was no report done I said the only thing that's logged

2

is my dispatch notes and then I called Sergeant Walker over the radio and told Sergeant Walker to call the station and Detective Albert told me not to tell her over the air who was calling just to have her call the station. So I then did that, she called the station, I told her that Detective Jimmy Albert wanted to talk to her regarding this issue that was transferred to her – the call that was transferred to her.

Q. You indicate on tape that you were 100 percent sure that Sergeant Walker did not take the caller's information and you conveyed this to Sergeant Albert and you even indicate that Sergeant Walker had less information than you regarding the caller, that she did not take the information, I believe those were your exact words. What was your basis of knowledge that you could be 100 percent sure that she did not take any information from the caller and to initiate a report.

A. I am 100 percent sure she did not take the information. As I was getting a soda in the break room she was also in the break room and she said to me I do not have any information regarding this, I have less information than you have. I don't have the female's name, address or phone number and then she went on and asked me do you have it. I said no, the proper way -- if the call was transferred to a supervisor or somewhere else you don't get that information right away you transfer the call and let the higher officer, the supervisor to get that information. If I was to take the call and then nobody was around I would have gotten the female's name and phone number and have a detective follow up on it but at the time Sergeant Walker was sitting in the room so that's why I transferred it.

Q. Okay. Where were you when Sergeant Walker spoke to the female caller?
A. I was in dispatch as she was in her office. She was in the CO's office, I was in dispatch.

Q. Okay. What observations did you make, if any, regarding the time frame that Sergeant Walker spent on the phone with the female caller? Could you estimate how much time she spent on the call?
A. I would say approximately five minute, maybe, no more. It wasn't long at all.

Q. I realize that you indicate you were in dispatch, were you able to hear any of the conversation between Sergeant Walker and the female caller?
A. No, I did not hear anything.

Q. Okay. Did you have any conversation in detail with Sergeant Walker just subsequent to her taking the phone call from the female wishing to supply information to the Holyoke Police Department?
A. The only thing I said to Sergeant Walker, this is something that you need take the information, I tried to transfer it up to the DB, nobody answered, then I transferred the call.

Q. Okay. So you did tell Sergeant Walker that she needed to take this information?
A. Yes, I did.

Q. Did you alert or confer at any time with Lieutenant Duguay regarding the events of the call in question which related to the Holyoke Mall and the caller's attempt to report suspicious activity?

A. Yes, I did.  I did speak to Lieutenant Duguay about it.

Q. Okay.  And could you elaborate on that, why?

A. Why?  I was just in general – nothing to – I don't know who to explain it – just in general conversation I was speaking to Lieutenant Duguay regarding the call and I thought that it was kind of suspicious, weird that this female was reporting this and that was really basically the end of the conversation, it wasn't much into Records.

Q. Okay.  Were you concerned with the handling of the call by Sergeant Walker?

A. Was I concerned?  Yes, I was only because she questioned me after the call regarding if I got the information that she didn't have.

Q. Do you – you indicate that you were not in the room when the call was made, do you have knowledge if Sergeant Walker asked the caller for her information?

A. I have no knowledge.

Q. Okay.  In so many words did you tell Sergeant Albert when speaking of the call that it was something that you were not going to let go, that there was no one in the Detective Bureau, that you were not going to be held responsible so here you go, Sergeant Walker and the call was given to a supervisor.  Based upon the initial caller information to you did you think that this could be a potentially serious call?

A. Yes, I did and that's why the call was transferred to a supervisor.

Q. Okay.  At a later time did Sergeant Walker conveyed to you by phone that the caller only wanted to know what she should do and that it was not against the law to videotape with referenced to being Middle Eastern?

A. I'm not sure if that was said on the phone, I recall her saying that in the dispatch room.

Q. Okay.

A. That it's not against the law to videotape and I said well, I'm not sure about the whole law but it was something I personally thought as a dispatcher should have been reported to a supervisor or a detective bureau at the time.

Sergeant McCavick:  I don't have any further questions.   Lieutenant?

Lieutenant Fournier:  No questions.   Anything you'd like to add before this statement concludes?

Ms. Therrien:  I would just – I figured the call was transferred to the Detective Bureau like I said, nobody answered, I transferred it to Detective – I'm sorry, Sergeant Walker and then after that I went into Records and just spoke with Lieutenant Duguay.  Lieutenant Duguay went on and called Jimmy Albert and then after that Lieutenant Duguay told me – called me into dispatch by phone and said let Sergeant Walker – she has to do a report and I just said

being a civilian I personally feel that you should tell her to do a report not me and then it went on from there, the report and Sergeant Walker asked me if I had any more information than she had. I said my information will be put in the dispatch notes and Sergeant Walker did ask me to do a report. And I said, I'm a civilian, I'm not doing a report, my information will be in the dispatch log.

Lieutenant Fournier: And what time – if you can recall was the incident number assigned? I know you entered your dispatch notes, but what time was incident number where a report would be required to –
Ms. Therrien: I would say it was – the call came in – I would say approximately within a half hour, within a half hour after all this happened I went into the computer and I personally put my notes in then I issued Sergeant Walker the number. I'm not exactly sure exact times on when I entered the call into the computer.

Sergeant McCavick: Can I just – I guess maybe one final question. Is it fair to say, Ms. Therrien, that based upon the call contact that you had with the initial caller that she was calling the Holyoke Police Department to actually give information, that she was forthcoming in trying to give information -- did she strike you as being reluctant to give any information?
Ms. Therrien: No, she was very open about the information, she just didn't know what to do and she wanted to report this and if I'm not mistaken I thought she said it might not be anything but she needed to report it to the police department.

Sergeant McCavick: Okay. Any further questions?

Lieutenant Fournier: No further questions. This statement would conclude at 9:56 a.m.


*Brenda Therrien*
_____
Brenda Therrien

8·5·04
_____
Date

5

# EXHIBIT 49

NARRATIVE FOR SERGEANT TAMMY WALKER

Ref: 04-5079-OF

On the above date and time, an unidentified women was transferred to this Sgt.(Walker). She wanted to report she saw a man, which she thought was MiddleEastern video taping in the Holyoke Mall. She wanted to know what she should do. I told her to notify Mall Security if this happened in the future. I then spoke to Sgt. Albert regarding this matter. He will follow up with Mall Security.

# EXHIBIT 50

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the office of Professional Standards on Wednesday, July 28, 2004, at 3:44 p.m. Present are Lieutenant David Fournier and Sergeant Daniel McCavick. This statement is being taken from Lieutenant Eva O'Connell in regards to an internal investigation the Chief has initiated as a result of a call to the Holyoke Police Department on Friday, July 23rd at approximately 8:39 p.m. The call relates to a suspicious party at the Holyoke Mall reportedly videotaping. The description of the male to the dispatcher is Middle Eastern male indicating that he was videotaping – appeared to be videotaping the property.

Questions denotes Lieutenant David Fournier

Answer denotes Lieutenant Eva O'Connell

_____

Q. I would ask, Lieutenant O'Connell, are you aware of the incident?
A. I am aware of a report done about it.

Q. How did you become aware of that report?
A. I was going over dispatch notes for the night before, I wasn't working the night of the incident, the next night I went down to dispatch, I saw it, read the report, read the dispatch notes. *The dispatch log call*

Q. As a result of becoming aware of that information or that incident report, did you have any conversation with Sergeant Walker as a result of that?
A. I did. I waited until the end of the shift, approximately 11:30, quarter of 12:00 when she came in the following night -- actually the date of it, I spoke to her in regards to it and advised her that there should be a name, address, date of birth, social security number of the person making the phone call. She indicated the woman didn't give her name, I said she should have asked for it. Sergeant Walker didn't seem to think that it was of major concern, she said it's not illegal to videotape. I explained to her that it was a serious matter. That, in fact, that is exactly why we have Sergeant Albert tied into the FBI that's his thing and that he would be looking to talk to the body of the report person as important as current -- which was not there.

Q. Okay. Do you have anything else – any conversation eventually with Sergeant Albert regarding the incident?
A. I did. I spoke to Sergeant Albert and I advised him that I had reviewed the report. I was sorry that there was no information but that I did speak to Sergeant Walker about it ----

Lieutenant Fournier: Any questions?

1

Sergeant McCavick:  Lieutenant, is it fair to say – again you indicate that no name was ascertained, social security or date of birth but also that the report which is approximately four lines does not in any way, shape or form delineate the exact time or approximate time when this may have occurred and/or a description of the subject at the mall.   I don't know if you had a chance to review the report.

Lieutenant O'Connell:  I haven't had a chance but to the best of my recollection no, it didn't have any of that information in it.  I also explained to Sergeant Walker that if she had been very busy at that time doing bookings or whatever I wasn't aware of what the situation was but she should have turned it over to a patrolman to take the report and do a ---

Sergeant McCavick:  I just have one last question.    And again you may or may not know but did Sergeant Walker indicate if she even asked the individual's name or it just came up that she was unidentified as the report indicates?

Lieutenant O'Connell:  She didn't indicate to me that she asked.  She more or less indicated that the woman didn't want to give her name which I found strange since she's the one that made the phone call to begin with.

Sergeant McCavick:   Okay.   I don't have any other questions for the Lieutenant:

Lieutenant Fournier:   No further questions.   Anything you' like to add?

Lieutenant O'Connell:  No.

Lieutenant Fournier:  This statement would conclude at 3:48 p.m. on Wednesday,  July 28, 2004.

_Lt. Eva M O'Connell_                          _8-2-04_
Lieutenant Eva O'Connell                    Date

2

# EXHIBIT 51



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**  **Chief Anthony R. Scott**

**FROM:**  **Lt. David D. Fournier**

**SUBJECT:**  **Internal Investigation RE: Sgt. Tammy Walker**

**DATE:**  **July 30, 2004**

**NUMBER:**  **IAD Case # 04-17**

---

Chief Scott:

As directed, the Office of Professional Standards conducted an internal investigation regarding a telephone call to the Holyoke Police Department on July 23, 2004 at 20:39 hours, concerning a suspicious male at the Holyoke Mall.

The following data is compiled and submitted for your review.

The dispatch log would reflect that a call (04-26734) was in fact received on the above date and time.   Dispatch notes by Brenda Therrien would reflect that she spoke to caller and later transferred the caller over to Sergeant Walker.

A report (04-5079-OF) was later submitted by Sgt. Walker and is as follows: "On the above date and time, an unidentified women was transferred to this Sgt.(Walker).  She wanted to report she saw a man, which she thought was Middle Eastern video tapping in the Holyoke Mall.  She wanted to know what she should do.  I told her to notify Mall Security if this happened in the future.  I then spoke to Sgt. Albert regarding this matter.  He will follow up with Mall Security."

On July 28, 2004 I notified Sergeant Tammy Walker via IOC that an internal investigation had been initiated as a result of the call (04-26734) and the subsequent handling of the call.

On July 28, 2004 I sent an IOC to Captain Frederick Seklecki requesting a copy of the dispatch tapes for call 04-26734.

Later in the day the tape was produced and is transcribed as follows:

Dispatcher Therrien: Holyoke Police, recorded line, Therrien.

Caller: Hi, I just wanted to call and report something that I thought was suspicious today in the Holyoke Mall.

Therrien: OK.

Caller: I saw like a middle eastern looking man in the downstairs level, and he just looked kind of suspicious, he had like a video camera and did not appear to be video tapping any people or family members or anything, he was video taping like the mall, like the upstairs, the railings and just video taping around just the mall.

Therrien: OK, let me see if I can have a detective speak with you.

Caller; OK, thanks.

At this time the call is transferred, the phone is heard ringing with no answer and is returned to dispatch.

Therrien: OK Mam, nobody is answering, hold on one second.

Caller: OK.

Therrien: I'm going to have you speak with the supervisor, hold on OK.

Caller: OK

Therrien: A women with some information Sarge, she wants to give it, I'm not taking it.

At this time the call is transferred.

Lt. Denise Dugauy contacts Dispatcher Therrein informing her that she has talked with Sgt. Albert and to have Sgt. Walker leave a copy of the report on the clipboard for him. Dispatcher Therrien replies what report. Lt. Duguay informs Therrein for the report she is going to do, because it's an important thing. Therrien states OK.


Lt. Duguay calls back and instructs Therrein to have Sgt Walker put the report on the clipboard for Sgt. Albert and when he comes in tonight he will take care of it.

Sgt. James Albert calls dispatch and speaks with Brenda Therrien informing her that he is in for duty. Sgt. Albert asks Dispatcher Therrien if she has a name or phone number for the caller. Therrien informs Sgt. Albert that she does not that she did not get any information that she transferred that call over. Sgt. Albert advised Dispatcher Therrien that he is in to follow-up and that it is an urgent deal.

Sgt. Albert calls Dispatcher Therrien to have Sgt. Walker call the station.

Dispatcher Therrien explains to Sgt. Albert that she took the call and it was not something she was going to let go and transferred the call to the DB, but nobody answered. Dispatcher Therrien informed Sgt. Albert that she was not going to be held responsible so she transferred the caller to Sgt. Walker. Sgt. Albert informs Dispatcher Therrien she did the right thing. Sgt. Albert informs Dispatcher Therrien that he is going to have to move on this, this is not something you have the luxury of time on and that he wants Sgt. Walker to tell him the caller's name and number so he can get to it. Dispatcher Therrien advises Sgt. Albert that she does not think Sgt. Walker has it. Sgt. Albert replies "you're shitting me." Dispatcher Therrien explains that she didn't take it because someone was here to talk to the caller. Dispatcher Therrien advises that Sgt. Walker doesn't have it, have the name, and that Sgt. Walker has less information than she does. Dispatcher Therrien indicates she is almost 100 % positive that Sgt.Walker does not have the information. Sgt. Albert requests that Sgt. Walker call him.

Dispatcher Therrien calls Sgt. Walker by radio to have her call the station.

Sgt. Walker calls and identifies herself.

Dispatcher Therrien informs Sgt. Walker that Sgt. Albert wants to speak with her and that he is upset. Sgt. Walker states you shipped me a call and she wanted information on what she should do. Sgt. Walker states she finds it strange, it's not against the law to videotape, she wasn't even sure if he was middle eastern. Sgt. Walker asks Dispatcher Therrien, I don't' know what she said to you. Dispatcher Therrien advises that she put that in the dispatch notes. The call is then transferred to Sgt. Albert

On July 28, 2004 a statement was taken from Sergeant James Albert.

Sgt. Albert advised that on this particular night he was home while off-duty and had received a call from Lt. Duguay who briefed him on the call (04-26734). Sgt. Albert requested that there be an incident report on file so that he could review it when he came in. Sgt. Albert advised that he later spoke with Sgt. Walker concerning the details and was advised it really wasn't much of a call, that she spoke with the woman briefly, that the caller had observed a middle eastern male that date video taping in the Holyoke Mall and she thought it was suspicious because it appeared he was video taping structures and building material but not people or activity. Sgt. Walker stated that this woman did not provide many details so she didn't have many to provide Sgt. Albert. Basically there was not a name or phone number for follow-up. Sgt. Albert reports that he asked Sgt. Walker if she was going to do a report and stated no that she thought she'd do To/From instead. Sgt. Albert stated that when he came back to work the next night he spoke with Lt. Eva O'Connell who informed him that she had spoken to Sgt. Walker about the incident. Lt. O'Connell was reported to have instructed Sgt. Walker to complete a more detailed report in the future, certainly containing the name and telephone number of the caller for follow-up. (See statement in entirety)

On July 28,2004 a statement was taken from Lt. Denise Duguay regarding her knowledge of the matter and is as follow:

Lt. Duguay reports that on July 23, 2004 she was assigned as the supervisor in charge of records/communication division.  At approximately 08:45 PM Brenda Therrien requested to speak with her concerning the information she had received regarding the Holyoke Mall.  Dispatcher Therrien relayed that she was concerned about the call and Lt. Duguay stated she too was concerned.  Lt. Duguay questioned Dispatcher Therrien as to the handling of the call whereby she explained that she had tried to transfer the caller to the CIB however there was no response and the call was returned to dispatch.  Dispatcher Therrien then reports transferring the call to the Commanding Officer who at that time was Sgt. Walker.  Lt. Duguay advised that she then contacted Sgt. James Albert and a briefed him on what had transpired.  Sgt. Albert requested that a copy of the report be left for him.  Lt. Dugauy reports that she instructed Sgt. Walker to leave a copy of the report on the clipboard for Sgt. Albert.  It was at this time that Sgt. Walker informed Lt. Duguay that she did not do a report.  As a result Lt. Duguay requested that one be done due to the serious matter.  Sgt. Walker explained that she did not have very much information and that she did not take down the information of the caller.  Lt. Duguay indicates that she informed Sgt. Walker to write down what she did have so that Sgt. Albert could do a follow-up. (See statement in entirety)

On July 28, 2004 a statement was taken form Lt. Eva O'Connell, Watch Commander, 2nd Watch concerning her action in the matter.

Lt. O'Connell reports that she was going over the dispatch notes for the night before (07-23-04) as she was not working the night of the incident, and on the next night she had gone down to dispatch, saw it, read the report, read the dispatch notes.  As a result Lt. O'Connell reports speaking with Sgt. Walker at the end of the shift, approximately 11:30, 11:45 PM when she came in the following night.  Lt. O'Connell instructed Sgt. Walker that there should be a name, address, date of birth, ss# of the person making the call.  Sgt. Walker advised that the women didn't give her name whereby Lt. O'Connell states she should have asked for it.  Sgt. Walker didn't seem to think it was a major concern, she said it's not illegal to videotape.  Lt. O'Connell explained that is was a serious matter.  Lt. O'Connell reports that she spoke with Sgt. Albert and apologized that there was no information but that she had talked to Sgt. Walker about it.  (See statement in entirety)

On July 29, 2004 a statement was taken from Dispatcher Brenda Therrien.

Ms. Therrien reports fielding the call in question and after speaking with the caller attempted to transfer the call to the CIB.  After no answer the call was returned to dispatch and then transferred to Sgt. Walker.

Ms. Therrien, after listening to the caller, felt as a dispatcher that this might be something, that it could be serious, so she informed Sgt. Walker that she was not going to take the information.

After the call Ms. Therrien reports being in records and talking to other personnel about how weird it was concerning the caller's observations from the mall. Lt. Dugauy questioned what she had done with the call and Ms. Therrien explained her actions. Dispatcher Therrien reports that Lt. Duguay instructed her that Sgt. Walker must do a report. Ms.Therrien stated that she later spoke with Lt. Duguay and informed her that she did not think it was her place being a civilian, to tell a supervisor to do a report and that if a report was needed maybe Lt. Duguay she tell her.

Ms. Therrien reports that she later saw Sgt. Walker in the hallway and relayed Lt. Dugauy's instruction to submit a report. Dispatcher Therrien indicates that Sgt. Walker stated that she did not have much information and that Sgt. Walker asked her if she taken the caller's information. Ms. Therrien explained that she did not.

When questioned Ms. Therrien stated that Sgt. Walker was not going to do a report until told to do so by Lt. Duguay. Ms. Therrien reports being 100% sure that Sgt. Walker did not take the caller's information. Dispatcher Therrien elaborated that while in the break room Sgt. Walker explained that she had less information than Therrien.

Ms Therrein explained that as the call was transferred she did not take the caller's information feeling that it was the responsibility of the supervisor to do so. If a supervisor was unavailable she would have gathered the information for follow-up. (See statement in entirety)

On July 29, 2004 a statement was taken from Sgt. Tammy Walker.

Sgt. Walker reports being shipped an informational call from dispatch. The caller reported being at the mall and thought see saw someone that might have been middle eastern, videotaping in the mall. Sgt. Walker indicates she asked the caller if she was able to get a plate or anything from the guy like on the car. Sgt. Walker advised that the caller wanted to know what she should do in an instance like that. Sgt. Walker indicates that she informed the caller to contact mall security. At this time Sgt. Walker reports that she thanked the caller and that was it.

Sgt. Walker stated that the call was forwarded to her as an information call and when the call came in she had no idea what the call was.

Sgt. Walker was asked if she had ascertained the time of the incident. Sgt. Walker replied, "I don't recall if I asked how long ago it was. She said she was at the mall earlier today. I believe."

Sgt. Walker was asked if she had ascertained the caller's identification. Sgt. Walker replied, "No, basically she was doing the talking and she just wanted to let me know that it was kind of strange that, you know, she thought that this guy – this middle eastern guy was taping in the mall with all that's going on with terrorists, she thought that maybe she should call. I don't know exactly what time she was at the mall."

Sgt. Walker was asked if she ascertained a description of the subject videotaping. Sgt. Walker replied, "She made a description of middle eastern guy."

Sgt. Walker was asked if she ascertained a particular location where the videotaping was to have taken place. Sgt. Walker replied, "No. I don't think – I don't recall if I did or not."

(See statement in entirety)

## FINDINGS

The call is received by Dispatcher Brenda Therrien, who after speaking with the caller fells that it is necessary to transfer the call to the CIB for further investigation. The call is retuned to dispatch as there is no answer in CIB. Ms. Therrien then transfers the call to Sgt. Walker. Ms. Therrien can be heard on tape to say "A woman with some information Sarge, she wants to give it, I'm not taking it."

Ms. Therrien later conveys the information of the call to Lt. Duguay. Lt. Dugauy later instructs Dispatcher Therrien that Sgt. Walker must do a report "because it's an important thing"

Sgt. Albert reports early for duty in order to follow-up on the call indicating that "it is an urgent deal." Sgt. Albert also states that he is going to have to move on this ,this is not something you have the luxury of time on.

Lt. O'Connell upon reporting for duty on the following night flags the report submitted by Sgt. Walker. Lt. O'Connell later speaks with Sgt. Walker concerning the lack of information submitted in the report. Lt. O'Connell apologizes to Sgt. Albert and informs him that she has talked to Sgt. Walker.

Clearly, Sgt. Walker does not take an initiative to solicit the caller's information stating the call was informational only. Here, a private citizen, observing suspicious activity, does what the public has been asked to do since 9/11.

Sgt. Walker as a supervisor is responsible for gathering more information than the dispatcher, regardless of weather the dispatcher relays the nature of the call. Sgt. Walker admits to gathering less information than Ms. Therrein. If this is so, it is at the fault of Sgt. Walker. In reviewing the dispatch tape, the caller is most forthcoming in providing her observations to Dispatcher Therrien.

Sgt. Walker further diminishes the value of the call by citing the caller's tone in which she was speaking.  In reviewing the tape, the caller is genuine and is seeking to report suspicious activity.  Sgt. Walker in her response to caller instructs her to simply contact mall security.

Respectfully submitted,

Lt. David D. Fournier
Commander
Professional Standards Division

# EXHIBIT 52

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the office of Professional Standards on Thursday, July 29, 2004, at 3:40 p.m.  Present while the statement is being taken are myself, Lieutenant David Fournier and Sergeant Danny McCavick.  This statement is being taken from Sergeant Tammy Walker as a result of an investigation initiated by the Chief concerning a call to the Holyoke Police Department on Friday, July 23, 2004, at approximately 8:39 p.m., regarding a call of an incident at the Holyoke Mall concerning a videotaping inside the mall.

Questions denotes Lieutenant David Fournier

Answer denotes Sergeant Tammy Walker

_____

Q. My first question to Sergeant Walker – on July 23, 2004, at approximately 8:39 p.m. did you take a call from Dispatcher Therrien concerning a call for a suspicious person at the Holyoke Mall doing some type of videotaping?
A. Well, I was shipped a call from Dispatcher Therrien stating it was an informational call. That's how it came in.

Q. Okay.  And what was the nature of your call, what was the nature of your conversation with the caller?
A. When I picked up the phone she stated she was at the mall and she said that she thought she saw someone that might have been Middle Eastern, you know, videotaping in the mall.  I asked if she was able to get a plate or anything from the guy like on the car she said no.  I asked her what she did she said she left with her daughter.  She wanted to know what she should do in an instance like that I said contact mall security.  Let them know if you, know, if you really believe there's something going on.  I thanked her for calling and that was it.

Q. Okay.  Getting back to that – did Dispatcher Therrien inform you at any time that she wasn't going to take the call or information?
A. This is before I spoke to the woman or after I spoke to the woman?

Q. At any time – at any time did she inform you that she wasn't going to take either the call or the information that she was going to forward that to you?
A. No, when she forwarded it to me she yelled that's an informational call.  I talked to the person on the phone, I didn't know what transpired with the conversation she had with the person until after the woman had hung up the phone.  And then after a while I went in and talked to her and then she told me what the woman had said to her.

*TW*
*8/4/04*

1

Q. Okay.
A. So when the call came in I had no idea what the call was, what the information was going to be, it was an informational call. That's all she stated to me.

Q. Okay. And again you indicated you spoke with a caller, did you ascertain the time of the incident?
A. I don't recall if I asked how long ago it was. She said she was at the mall earlier today, I believe.

Q. Did you ascertain the caller's identification name, address, telephone number, etc.?
A. No, basically she was doing the talking and she just wanted to let me know she thought it was kind of strange that, you know, she thought that this guy – this Middle Eastern guy was taping in the mall with all that's going on with the terrorists, she thought that maybe she should call. I don't know exactly what time she was at the mall.

Q. All right. Did you ascertain a description of the subject videotaping within the mall?
A. She made a description of a Middle Eastern guy.

Q. Okay.
A. Which would infer that he was dark skinned, could be Hispanic.

Q. Did you ascertain a particular location where the videotaping was to have taken place?
A. No. I don't think – I don't really recall if I did or not.

Q. All right. Did Lieutenant Duguay instruct you to submit a report on the incident at any time during that evening?
A. Yes, she said that Jimmy would like me to have – Detective – or Sergeant Albert would like a report on the matter.

Q. All right. Did you inform Lieutenant Duguay that you didn't have very much information on that and that you didn't take down the information of the caller?
A. Right, I instructed her that I didn't have the basic information regarding what Brenda had known. I was shipped a call. There was no information given to me to go on before I was shipped a call. So what I told her was what Brenda is now saying half an hour or so later that the woman said that they were videotaping all over the mall and the escalator and all that, I didn't have that information when I spoke to this woman.

Q. But you didn't ask her that yourself or she didn't convey that to you?
A. No.

By Sergeant McCavick

Q. I just want to ask one question, Sergeant Walker. You did speak to this woman on the phone and she did indicate to you that there was a gentleman of – she indicated suspicious activity at the mall – Middle Eastern.

TW
8/4/04

2

A. She said he was possibly Middle Eastern, she wasn't sure. The call came in like she wasn't sure, should she make this call, was she being stupid, what should she do in this instance --

Q. Okay.
A. -- is the type of call that came in.

Q. Did she indicate to you personally that he did have a videotape – that he had a video camera?
A. That he did have a video camera, that he – that she thought he was videotaping in the mall.

Q. Okay. But that wasn't --
A. We have this on tape, don't we have this recorded?

Q. That's – I'm asking you, did she convey this to you on the phone? I'm asking you personally. Did the caller indicate to you that the individual was of Middle -- her perception -- of Middle Eastern origin and that she had a video camera?
A. Yes, that he may have been Middle Eastern, she wasn't sure if he was Hispanic or not.

Q. Okay. But that information was conveyed to you?
A. That he possibly was Middle Eastern?

Q. Yes.
A. Yes.

Q. And that he had a video camera?
A. That there was a video camera.

Q. Okay. All right. And based upon that you didn't seek to obtain her name, her address just for future reference?
A. Again, she was just asking what should she do in that situation.

Q. Okay.
A. Again, do you have this on tape? You can pull the tape up and listen to what the conversation was.

Lieutenant Fournier:   We'll follow through on that, that's incumbent upon us to cover that.

By Lieutenant Fournier:

Q. And on July 24, 2004, did Lieutenant O'Connell speak to you concerning your handling of the call and informing you that you should obtain the name, address, social security number of the person making the call?

3

A. She asked me about the call. I don't recall her saying, you know, name, date of birth, social security number. She asked if I took a call and I told her yes, I did take the call. I mean –

Q. But you don't recall whether that was brought up whether you should have obtained the date of birth, name –
A. She said in the future – well, I don't know if she said date of birth, name, social security –

Q. Identity of the caller, would that be fair?
A. She said, you know, next time get the identity of a caller. I mean if it's – I told her it was information, she wanted to know what she would do in that situation.

By Sergeant McCavick:

Q. You didn't find that even a least bit suspect, the information that she gave you that you would want to maybe inquire a little bit more about the information that she had?
A. The tone of her voice and the way that she was speaking, no, she wasn't sure he was Middle Eastern, he could have been Hispanic. We have a large Hispanic population. If she was adamant about it – she wasn't even sure if she should call, you know, she wasn't sure she should even call. So it was more of an informational call.

Q. So your perception it was informational so you didn't –
A. What should I do in this situation?

Q. We're just asking you a question. You didn't see the need then to get a name and an address just based upon --
A. Based on what she informed me, no.

Q. Okay.
A. There was no need to get information as to what it was. She wasn't sure, she might have been a little paranoid, she felt a little silly, but regardless she wanted to call. I asked her what she did, she said she left with her daughter. No, based on what information I got when I received that call from the dispatcher and the conversation I had with the woman, no.

B. How long was your conversation with this subject, do you think?
A. (pause)

Lieutenant Fournier:   Approximate.

Sergeant Walker:   Four minutes, maybe, I'm guessing. Totally guessing.

Sergeant McCavick:   Okay

By Lieutenant Fournier:

TW
8/4/04

4

Q. Would you consider this call a legitimate threat to public safety?

A. Based on her information that she gave, it wasn't that descriptive.   You're asking me if I had other information that was given to me  -- Sergeant Walker, I got a call on the line, a lady says, you know, they're videotaping escalators, this, that at the mall – what she described to me was a man in the mall who she may have thought might have been Middle Eastern videotaping.  He could be videotaping his children, he couldn't have been – you know, maybe he wasn't Middle Eastern; maybe she's paranoid.

Q. Did you ask her if he was videotaping children?

A. I don't – look at the tape, I mean, listen to the tape.  I'm really not positive if I asked her if he was videotaping children, what was he videotaping.   It wasn't -- if it was an informational call, I gave her the information as to what she should do.

By Sergeant McCavick:

Q. Okay.  And your information was to notify mall security?

A. Yes, I said if you have a concern – you know, with everything that's going on if you have a concern call mall security you know, and mall security will handle it from there.

Q. Okay.

A. I asked her if she got a plate – did you get a plate on the guy or anything like that and she didn't get a plate.

Q. Sergeant Walker, after your call, were you going to do a report on this incident?

A. What's that?

Q. I said after the call you took from the female party, was it your intention to do a police report on this incidence

A. When Sergeant Duguay told me to do a report on it –

Q. No, no.  Immediately after your phone call with the female caller, the informational caller, was it your intent to do a police report?

A. Immediately after the call not knowing the information that I know now about the call that was given to Brenda Therrien, no.

Q. Okay.

A. So when I hung up the phone I didn't think much of it.   Speaking with Brenda Therrien, a little more information came out about the initial call that she had shipped to me.

Q. Okay.   Do you have any further questions, Lieutenant?

Lieutenant Fournier:  No –

Sergeant Walker:  A To/From would have been and I told that to Sergeant Albert.  I talked to him and I said a To/From may be suffice in just letting you know I received a call based on this. And I said I'll just do a report on it but I did have a phone conversation with Sergeant Albert.

8/4/04

5

# EXHIBIT 53



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**      SERGEANT TAMMY WALKER, EMPLOYEE # 229

**FROM:**    ANTHONY R. SCOTT

**SUBJECT:** SUSPENSION NOTIFICATION – DERELICTION OF DUTY

**DATE:**    TUESDAY, AUGUST 17, 2004

**NUMBER:**  IAD 04-011



Sergeant Walker, on Friday, July 23, 2004, at approximately
8:39 p.m. a call was received by Dispatcher Brenda Therrien
in the Communications Center, logged in as call # 04-26734
from an unknown caller and the conversation between
Dispatcher Therrien and the Unknown Female Caller went
exactly as follows:

*"Dispatch Therrien:*      *Holyoke Police, recorded line, Therrien.*
*Unknown Female Caller:*      *Hi, I just wanted to call and report something that I
thought was suspicious today in the Holyoke Mall.*
*Dispatch Therrien:*      *Okay.*
*Unknown Female Caller:*      *I saw like a Middle Eastern looking man like in the
down stairs level –*
*Dispatcher Therrien:*      *Uh-hun.*
*Unknown Female Caller:*      *He just looked kind of suspicious and he had like a
video camera and he didn't appear to be like video
taping any like people, any family members or anything,
he was video taping like the mall like the upstairs, like
the railings and just kind of, you know, just video taping
all around just the mall.*
*Dispatch Therrien:*      *Okay, let me see if I have a detective who can speak
with you. Hold on.*
*Unknown Female Caller:*      *Okay, thanks."*

It is crystal clear from listening to the tape and the
above transcription of the conversation that the unknown
female caller wanted to report suspicious activity she
observed and was not seeking advice as to what she should
do, as you indicated in your report and statement. This is
in exact contrast to what you are now trying to make us
believe with your self-serving statement and police report.

Dispatcher Therrien, speaking with the female caller,
believed the call was of such an important nature that she
immediately attempted to placed the caller in touch with a

detective.  Being unable to transfer the caller to a
detective, she immediately transferred the caller to you
stating, "I'm not taking the information!"  It was clear at
that moment or should have been clear to you that
Dispatcher Therrien did not gather any information from the
caller.  You spoke with the caller, according to your
statement, approximately four minutes and failed to obtain
the caller's name, address, telephone number, date of
birth, social security number or any pertinent information.
Further, you had no intention of documenting the contents
of the information that transpired between you and the
caller as is required by S.O.P. 3.1.4 entitled Criminal
Intelligence.

Federal, State, and Local officials continue to ask
Americans, in this time of terrorism attacks upon the
United States, to participate in the protection of
"Homeland" security by reporting anything believed to be
suspicious.  When citizens report suspicious activity and
we in law enforcement fail to act upon their reports or
fail to consider their report serious, we loose the faith
of the public.  The caller clearly stated she wanted to
report something she believed to be suspicious to the
police.  You did not take this report serious and
disregarded a report which a concerned citizen wanted to
report.

Five days following the report on the 23rd of July 2004
(July 28, 2004) another individual reported a Middle
Eastern male with olive complexion was making inquires
about the Mall which concerned her.  The female telephoned
the police and Detective Jennifer L. Sattler immediately
acted upon the report completing a three page investigative
report.

Seventeen days following the report on the 23rd of July 2004
(August 9, 2004) a 2nd report was received regarding Middle
Eastern males video taping the Mall.  Once again Detective
Jennifer L. Sattler immediately acted upon the report
completing an investigative report.

Your failure to collect even the minimal personal history
data from the caller, document the complete content of your
conversation, or at the very least assign an officer to
handle the matter made it impossible for Sergeant Albert to
conduct a proper follow-up investigation to possibly find a
nexus to the calls which came in on the 23rd and 28th of July
and the 9th of August which connection could possibly exist.

Dispatcher Therrien knew that you would not or did not
document your conversation with the caller she transferred
to you because to her knowledge you failed to obtain an
incident number to write a report.  Dispatcher Therrien
knew that you did not gather information from the caller as
to her name, address, etc.  Knowing this, she brought the
matter to the attention of her immediate supervisor,
Lieutenant Denise M. Duguay.  Upon hearing the
circumstances surrounding the call, Lieutenant Duguay
instantly knew the importance of the call and immediately
telephoned Sergeant James Albert, the Department's liaison
to the JTTF (Joint Terrorism Task Force) to notify him of
the occurrence.  Sergeant Albert asked Lieutenant Duguay to
have a copy of the report placed on his clipboard so that
he could conduct a follow-up investigation.  Sergeant
Albert, realizing the importance and significances of the
call, immediately reported for duty.

Following her conversation with Sergeant Albert, Lieutenant
Duguay instructed Dispatcher Therrien to have you place a
copy of your report on the clipboard for Sergeant Albert.
Dispatcher Therrien informed Lieutenant Duguay that you did
not request an incident number or write a report.
Dispatcher Therrien was then instructed by Lieutenant
Duguay to have you write a report.  Dispatcher Therrien
observed you walking in the hallway and informed you that
Lieutenant Duguay instructed you to write a report.  You
than asked Dispatcher Therrien, "On what?" and she informed
you ". . . . on the call that I transferred to you."  You
said to Dispatcher Therrien, "I don't have much
information, did you get it?"  As she indicated in her
statement, "And then she (Sergeant Walker) says well I have
nothing to do a report on and then I said then go speak
with Lieutenant Duguay."

Even though informed by Dispatcher Therrien that Lieutenant
Duguay instructed you to write a report on the matter you
still failed to do so.  It was not until ordered by
Lieutenant Duguay did you write a report and it was at this
time you obtained an incident number, 04-5079-OF and wrote
a four line report.  The report did not contain any of the
information mandated by SOP 3.1.2 Preliminary
Investigations, and SOP 3.1.6. Interviewing Victims and
Witnesses.

Based on the investigative report prepared by the staff in
the Professional Standards Division, I find that you

violated the following departmental rules, regulations, policies, procedures or standing operating procedures.

**SOP 3.1.6 INTERVIEWING VICTIMS AND WITNESSES, I GENERAL CONSIDERATIONS AND GUIDELINES**, which states, The interviewing of a victim or witness is a vital part of the criminal investigation procedure. It can lead directly to the identification, subsequent apprehension and conviction of the guilty offender. It is the task of a police officer to convince witnesses of the need for their testimony by appealing to their sense of civic responsibility and to their duty as a citizen to ensure that the purposes of justice are effectively achieved. **II POLICY, paragraph A.** It is the policy of this department that:, **section 1.** Officers shall attempt to identify and interview all witnesses and victims of crimes, and **2.** Officers shall obtain as complete and accurate a record of the witness or victim's statement as possible. **III PROCEDURE, paragraph B.** Interviews at the Scene, **section 1** Witnesses/victims shall be instructed to remain at the scene until interviewed. **Section 2** Obtain the names, addresses and telephone numbers of all persons present at the scene. **Paragraph E.** Report Writing, **section 1.** All information obtained from witnesses shall be passed on to the follow-up investigator, if any., **section 2.** All pertinent data, including notes, tapes, and written statements shall be included in the officer's official report and submitted in accordance with departmental practice and procedures.

**SOP 3.1.2 PRELIMINARY INVESTIGATIONS, Paragraph I. GENERAL CONSIDERATIONS AND GUIDELINES**, which states, The ultimate success or failure of police efforts in the identification, apprehension and subsequent prosecution of criminal offenders is often based upon the immediate police response and investigation. The preliminary investigation should never be handled routinely. It is not only a vital link in the criminal investigation process but it can often be the means of uncovering information leading to the solution of other crimes or for initiating crime prevention procedures. **Section A.** Upon Arrival at Crime Scene, **subsection 6.** Interviewing witnesses, **subparagraph b.** As soon as possible after arrival on the scene, the officer shall: **i.** Obtain the name, address and telephone number of all witnesses.

**Subsection 7.** Report writing, **subparagraph a.** The officer conducting a preliminary investigation shall make an accurate and complete report of the incident in accordance with departmental procedures.

**SOP 3.1.4 CRIMINAL INTELLEGENCE, Paragraph I., General Considerations and Guidelines, Section 4,** Terrorism, **Paragraph III Procedures, Section A, subparagraph 1.** It is the responsibility of all officers to assist in the gathering of information on organized crime, subversive activities, vice activities, terrorism and civil disorders.

**Rule 3, Conduct and Responsibility, Section 3.2 UNBECOMING CONDUCT** Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorable upon the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer. (old #1.6)

**Rule 4, Performance of Duty, Section 4.1 PERFORMANCE OF DUTIES AND RESPONSIBILITY** Members of the Department shall be held responsible for his proper performance of the duties assigned them, and for the strict adherence on their part to the Rules adopted from time to time for the government of the department; and it shall not be received as an excuse or justification for anything that they may omit to do, that they followed the advice or suggestion of any other person, whether that person be connected with the department or not, except when an officer of higher rank may take upon himself the responsibility of issuing direct and positive orders. (old #1.4)

**Rule 4, Performance of Duty, Section 4.2 COMPETENCY IN PERFORMANCE OF DUTY** Officers shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions. Officers shall perform their duties in a manner which will maintain the highest standard of efficiency in carrying out the functions and objectives of the department. Unsatisfactory performance may be demonstrated by a lack of reasonable knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks;

the failure to take reasonable action on the occasion of a crime, disorder or other condition deserving police attention; or absence without leave.  In addition to other indications of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance; repeated poor evaluations or a written record of repeated infractions of rules, regulations, directives or orders of the department.  (old #1.13)

**Rule 4, Performance of Duty, Section 4.3  HANDLING REPORTS AND COMPLAINTS**  When any person applies for assistance or advice, or makes complaints or reports, either by telephone or in person, all pertinent information will be properly and judiciously acted upon consistent with established departmental procedures.  (old #1.20)

**Rule 4, Performance of Duty, Section 4.5  SUBMISSION OF REPORTS**  Officers shall submit all necessary reports on time and in accordance with established departmental procedure.  Reports submitted by officers shall be truthful and complete, and bear the signature of the officer submitting the report.  No officer shall knowingly enter or cause to be entered any inaccurate, false, or improper information.  (old #1.33)

**Rule 4, Performance of Duty, Section 4.12 TRUTHFULNESS IN OFFICIAL DEALINGS**  No member of the Department shall make false official reports, or knowingly enter or cause to be entered in any Department books, or records, any inaccurate, false, or improper entries or registration of police information or matter.  (old #1.72)

A review of your disciplinary records indicate that eight months prior you were issued a letter of reprimand for violation of:

> **Rule 1 Authority, Section 1.2 Obedience to Orders**
> **Rule 1 Authority, Section 1.3 Obedience to Orders**
> **S.O.P. 1.4.0, Article IV Chain-of-Command**

Further, on April 20, 2004 you were suspended for one day for violation of the following rules and/or procedures for your failure to report for Court in a timely manner as required by policy.

**Rule 4, Performance of Duty,** Section 4.13 PUNCTUALITY
TO DUTY AND COURT
S.O.P. 3.4.0 TESTIFYING IN COURT, Section III.
PROCEDURES, Paragraph B "1." At the Courthouse

In this particular incident your careless and lackadaisical
attitude as a supervisor to minimally assess the importance
of this situation and obtain the basic data such as the
caller's name, address, telephone number, etc. is a
dereliction of duty and a failure by you to adequately
protect the health, safety and wellbeing of the community.
Dispatcher Therrien, a civilian employee, Lieutenant
Duguay, and Sergeant Albert hearing the bare minimum
information believed this matter to be very serious and a
possible threat to our homeland security.  Your failure to
take even the most minor action to appropriately document
the caller's information placed the general safety of this
community and its citizens in jeopardy.  Further, your
failure to collect even the most minimal personal history
data from the caller made it impossible for Sergeant Albert
to investigate a link between the call which came in on the
23rd and 28th of July and the 9th of August which, connection
could possible exist.  As a supervisor you knew or should
have known that the activity described by the unknown
female caller should have been taken seriously.  On page 2
of your statement in answer number three you state, "No,
basically she was doing the talking and she just wanted to
let me know she thought it was kind of strange that, you
know, she thought that this guy – this Middle Eastern guy
was taping in the mall with all that's going on with the
terrorists, she thought that maybe she should call.  I
don't know exactly what time she was at the mall."  It
would appear that this unknown female caller knew more
about terrorists and protecting the homeland than you.  At
least she did what is expected of her as a citizen.

Therefore, you are hereby notified that pursuant to the
powers conferred upon me by Massachusetts General Laws,
specifically Chapter 31, Sections 41 through 45 (attached
hereto for your information), I find that your actions
constitute a violation of the rules, regulations, policies
and/or procedures of this department and a threat to the
health, safety and wellbeing of the citizens of this
community.  I hereby suspend you without pay for a period
of 5 working days with said suspension begin on *Saturday,
August 28, 2004, Sunday, August 29, 2004, Monday, August 30, 2004, Tuesday,*

*August 31, 2004 and Friday, September 3, 2004.*   Unless otherwise
instructed, you shall return to duty on Saturday, September
4, 2004.

Further, by means of this correspondence I am asking Mayor
Michael J. Sullivan, the appointing authority, to seriously
consider removing you from the service or at the very least
demoting you to the position of police officer.  I make
this request based on your complete and utter failure to
take even minimal actions to protect the public.  Your
failures are compounded taking into consideration events
which have occurred here and across the United States in
recent weeks, for example;

- *A memo issued by the Federal Bureau of Investigation and Department of Homeland Security issued on August 3, 2004 which states in the third bullet point "Report any persons showing uncommon interest in critical infrastructure/key resources facilities, networks, or systems (e.g. photographing or videotaping assets).*

- *Special Order 03-016 dated Monday, February 10, 2003 at 8:53 a.m. in which I stated, "Any and all suspicious activity believed to be associated with possible terrorist activity shall be reported to supervisors who shall contact Lieutenant Arthur Monfette."*

- *An article in the Wednesday, August 11, 2004 issue of the Republican newspaper under Nation Briefs, entitled "Pakistani in custody for taping buildings."*

- *An article in The New York Times on August 11, 2004 entitled "Man is held after police seize tapes of building and dam."*

- *Homeland Security and Terrorism Summary (For Official Use Only) issued on August 12, 2004 – Westfield Mall (Illinois) receives a suspicious e-mail*

- *Homeland Security and Terrorism Summary (For Official Use Only) issued on August 12, 2004 – Charlotte, NC Middle Eastern man held for filming bank headquarters*

- *Homeland Security and Terrorism Summary (For Official Use Only) issued on August 12, 2004 –Sault Ste. Marie unidentified individual sought for photographing bridges*

- *Homeland Security and Terrorism Summary (For Official Use Only) issued on August 12, 2004 – An Arabic male made a bomb threat to Tallahassee Mall in Florida*

·    *On July 20, 2004 a Middle Eastern man arrested for video taping*
     *locations in six U.S. cities to include the Mall at Peachtree Center*

You have a right to appeal this suspension, in writing, to
the Mayor of the City of Holyoke, the Appointing Authority,
within forty-eight (48) hours after you affix your
signature, date and time to this notice acknowledging
receipt, not guilt on the question of whether there was
just cause for the suspension.  Should you appeal this
suspension to the Appointing Authority and the suspension
is upheld, you have a right to appeal this suspension to
the Civil Service Commission pursuant to General Laws
Chapter 31, Section 43, a copy of which is attached hereto
for your information, within ten (10) days following the
receipt of written notice from the Appointing Authority.

Calculating time periods such as days for appeals, etc.
referred to herein shall not include Saturdays, Sundays or
Holidays.


                              Anthony R. Scott
                              Chief of Police

ARS/jas

Acknowledged:    _____
                      Sergeant Tammy Walker

               Date: _____   Time: _____

Witness: _____

cc:  Mayor
     City Solicitor
     Labor Attorney
     Professional Standards Division

# EXHIBIT 54




MAYOR MICHAEL J. SULLIVAN

CITY OF HOLYOKE

September 28, 2004

**CORRECTED COPY**

Sergeant Tammy Walker
6 Clark Street
Holyoke, MA  01040

Re:  Chapter 31 Section 41 – Discipline

Dear Sergeant Walker:

On August 7, 2003, you were issued a written reprimand for insubordination.

On June 22, 2004, after a Chapter 31, Section 41, I upheld a one (1) day suspension, without pay, issued to you for failing to follow a directive regarding being at court on time.

On August 19, 2004, Chief Scott, after investigating your actions on July 23, 2004 issued you the maximum five (5) day suspension allowed under Section 41 and forwarded the matter to me for consideration of further discipline including suspension demotion or discharge.  You appealed the initial five (5) day suspension.  A hearing on your appeal, and to consider further discipline was held by mutual agreement on September 15, 2004, at my office at the City Hall.

After considering the testimony and the evidence I upheld the five (5) day suspension issued by the Chief and, even after giving you every benefit of the doubt, find a suspension without pay for an additional five (5) days is also warranted due to your conduct on July 23, 2004, and your failure to comprehend and/or accept responsibility for your actions/ inaction on that date.  Your history of recent disciplines did not help your case but the failures on your part on July 23, 2004 are so serious, it's likely I would have reached this result even on a clean re-cord.

On July 23, 2004, the dispatcher received a call from a citizen who wished to "report" "suspicious activity" by a "Middle Eastern looking man," videotaping lower level structures in the Holyoke Mall.  This call was given to you as a Sergeant.  In so doing, she was told she was transferring to you a caller with information to give and that the dispatcher "was not taking it."

You took no information from the caller on the identity of the caller or her contact information.  You took no steps before ending the call to see if the dispatcher took any identifying information.

You obtained no description of the suspect beyond the term, Middle Eastern.  You obtained no information as to the area of the mall or what it was he appeared to be videotaping.  You obtained no time frame or any other information whatsoever.  You spoke to the woman for

you say four (4) minutes, but recall no other information than he was Middle Eastern and was video taping at the mall and she had terrorist concerns. You have been a watch commander and an assistant watch commander and are well aware the watch commander phones, with the flip of a switch by you, you could have recorded the call which, you seem to recall very little of.

Your statement indicates the woman asked you, a Sergeant, for the Holyoke Police Department, what she should do. The only advice you gave was, in the future to report it to the unarmed civilian mall security who are without law enforcement power, much less jurisdiction to investigated potential terrorist activity.

You admit you wrote no report, told no one of the caller or her concerns regarding terrorists and never took any action to report on or investigate the matter or assign anyone else to do so. You admit, in fact you took no action whatsoever. You stated later in the shift, after laughing about the matter, that it was no big deal, as videotaping is not illegal.

On July 23, 2004, you issued a four (4)-line report, only after being ordered to do so. Even then, you did not comply with the order to have the report ready for Sergeant Albert's arrival at work that evening. In fact, when the Sergeant asked for the report you told him you did not plan on doing one. In the report you state, you told her to notify mall security not about this event, but "if this happened in the future." You noted she mentioned a Middle Eastern man video taping in the mall, but neglected to mention her specific reference to "terrorists," which was only revealed in your later questioning. You say in your first report you spoke to Sergeant Albert on this matter, but you failed to disclose this was only after he contacted you to try unsuccessfully to get information from you or the details of this call and the caller.

The report you belatedly wrote on September 23, 2004, did not contain any of the information mandated by SOP 3.1.2 Preliminary Investigations, and SOP 3.1.6. Interviewing Victims and Witnesses.

Your failures also stand is stark contrast to how another officer of lower rank has handled other like calls. She had taken the necessary information, acted upon the information urgently, and documented same.

Your failure to collect even the minimal personal history data from the caller; document the complete content of your conversation; immediately notify the terrorist liaison and your supervisors; could have catastrophic consequences in its own right and made it impossible for Sergeant Albert to conduct a proper follow-up investigation. It also made it impossible to find if this event was related to the calls which came in shortly thereafter in connection with video taping or other reported suspicious activity by Middle Eastern men.

Federal, State, and Local officials continue to ask Americans, to participate in the protection of "Homeland" security by reporting anything believed to be suspicious. When citizens report suspicious activity and those in law enforcement fail
to act upon their reports or fail to consider their report serious, we loose the faith of the public. The caller clearly

stated she wanted to report something she believed to be suspicious to the police. You did not take the necessary information and disregarded the information which a concerned citizen was providing. You failed to report and act on the very serious report of a potential threat to a well-known potential soft target for terrorists.

Based on the evidence at hearing, I find that you violated the following departmental rules, regulations, policies, procedures, or standing operating procedures.

SOP 3.1.6 INTERVIEWING VICTIMS AND WITNESSES, I GENERAL CONSIDERATIONS AND GUIDELINES, which states, The interviewing of a victim or witness is a vital part of the criminal investigtion procedure. It can lead directly to the identification, subsequent apprehension, and conviction of the guilty offender. It is the task of a police officer to convince witnesses of the need for their testimony by appealing to their sense of civic responsibility and to their duty as a citizen to ensure that the purposes of justice are effectively achieved. II POLICY, paragraph A. It is the policy of this department that: Section 1. Officers shall attempt to identify and interview all witnesses and victims of crimes, and 2. Officers shall obtain as complete and accurate a record of the witness or victim's statement as possible. III PROCEDURE, paragraph B. Interviews at the Scene, Section 1. Witnesses/Victims shall be instructed to remain at the scene until interviewed. Section 2. Obtain the names, addresses and telephone numbers all persons present at the scene. Paragraph E. Report Writing, Section 1. All information obtained from witnesses shall be passed on to the follow-up investigator, if any, Section 2. All pertinent data, including notes, tapes, and written statements shall be included in the officer's official report and submitted in accordance with departmental practice and procedures.

SOP 3.1.2 PRELIMINARY INVESTIGATIONS, Paragraph I.
GENERAL CONSIDERATIONS AND GUIDELINES, which states,
The ultimate success or failure of police efforts in the identification, apprehension, and subsequent prosecution of criminal offenders is often based upon the immediate police response and investigation. The preliminary investigation should never be handled routinely. It is not only a vital link in the criminal investigation process but it can often be the means of uncovering informa-
tion leading to the solution of other crimes or for initiating crime prevention procedures. Section A. Upon Arrival at Crime Scene, Subsection 6. Interviewing wit
nesses, subparagraph b. As soon as possible after arrival on the scene, the officer shall: i. Obtain the name, address and telephone number of all witnesses.
Subsection 7. Report writing, subparagraph a. The officer conducting a preliminary investigation shall make an accurate and complete report of the incident in accordance with departmental procedures.

SOP 3.1.4 CRIMINAL INTELLIGENCE, Paragraph I., General Considerations and Guidelines, Section 4, Terrorism, Paragraph III Procedures, Section A, subparagraph

1. It is the responsibility of all officers to assist in the gathering of information on organized crime, subversive activities, vice activities, terrorism, and civil disorders.

Rule 3, Conduct and Responsibility, Section 3.2
UNBECOMING CONDUCT  Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorable upon the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer.  (old #1.6)

Rule 4, Performance of Duty, Section 4.1 PERFORMANCE OF DUTIES AND RESPONSIBILITY Members of the Department shall be held responsible for his proper performance of the duties assigned them, and for the strict adherence on their part to the Rules adopted from time to time for the
government of the department; and it shall not be received as an excuse or justification for anything that
they may omit to do, that they followed the advice or suggestion of any other person, whether that person be
connected with the department or not, except when an officer of higher rank may take upon himself the
responsibility of issuing direct and positive orders.  (old #1.4)

Rule 4, Performance of Duty, Section 4.2 COMPETENCY IN PERFORMANCE OF DUTY Officers shall maintain sufficient
competency to properly perform their duties and assume the responsibilities of their positions.  Officers shall perform their duties in a manner which will maintain the highest standard of efficiency in carrying out the functions and objectives of the department.  Unsatisfactory performance may be demonstrated by a lack of reasonable knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks; the failure to take reasonable action on the occasion of a crime, disorder or other condition deserving police attention; or absence without leave.  In addition to other indications of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance; repeated poor evaluations or a written record of repeated infractions of rules, regulations, directives, or orders of the department.  (old #1.13)

Rule 4, Performance of Duty, Section 4.3 HANDLING REPORTS AND COMPLAINTS When any person applies for assistance or advice, or makes complaints, or reports, either by telephone or in person, all pertinent information will be properly and judiciously acted upon, consistent with established departmental procedures.  (old #1.20)

Rule 4, Performance of Duty, Section 4.5 SUBMISSION OF REPORTS Officers shall submit all necessary reports on time and in accordance with established departmental procedure.  Reports submitted by officers shall be truthful and

# EXHIBIT 55



=================================================

HOLOKE POLICE DEPARTMENT
INTEROFFICE CORRESPONDENCE

=================================================

TO: CHIEFANTHONY R SCOTT
FROM: SGT. TAMMY WALKER
SUBJECT: WORKING CONDITIONS
DATE: SEPTEMBER, 11TH 2004


On Sept 6th, 2004 I responded to a murder scene Arrest #2438. When I arrived, I took notice of a male party lying in the middle of the alley way. I asked officers in person and over the air, to get the yellow caution tape to cordon off the crime scene area. Cruisers were checked and no one at the scene had any in their cruiser. I recall asking Sgt Albert over the air if he could bring some to the scene, as he was on his way down. Sgt Albert responded that he would bring some down. Before Sgt Albert arrived I was speaking with some potential witnesses.

I noticed Sgt Monaghan walking through the alley with the caution tape in his hand.  He walked past me approximately 20 yards; I noticed he was roping off part of the crime scene. I radioed "Sgt Monaghan come in". I received no response from him although we had a clear view of each other. I paused then transmitted again over the air to Sgt Monaghan" do you have enough tape to secure this area. " Again I received  no response from him.  Once I realized Sgt. Monaghan was not going to answer me. I then asked Officer Montalvo to go over to Sgt Monaghan to retrieve the left over tape which was in his hand after he had finished roping off the other area. Montalvo went over and retrieved the tape from Sgt Monaghan. Officer (Montalvo) roped the other crime scene area off.

A short time after Officer Barber came up to me and stated "I guess he's not going to answer you. huh? Officer Barber then stated, he was a ways off and heard me clearing calling for Sgt Monaghan. I explained to him I was fully aware of him not answering my calls and would take care of it. When my officers clearly see and hear the disrespect shown to me by Sgt. Monaghan and the seriousness of this incident and any other potential incident which my arise,. I feel I can not let it go unreported.

COPY

On Sept 9th 2004, at approximately 4:00 PM, I was waiting for roll call to finish, which Sgt Monaghan had conducted. I needed a copy of the information given at roll call as well as a copy of the roster, to see where the officers were placed on that evening. I waited around then went over to the cabinet where extra copies are kept. I retrieved the copy. Sgt Monagahn came over to where I was standing and stated to me "start packing your bags".  I feel this comment was made in reference to the personnel order # 045-04.

I gave him no response and went over to Lt. O'Connell and asked if there were any changes made to the copy of the roster I was showing her. I then left the Co's office. It is clear to me the hostility Sgt Monaghan feels towards me out ways his professionalism, since I have had to take and have taken his verbal assaults towards me for over the past two years. I do not feel safe and fear each time he walks by me I will be verbally assaulted.

I respectfully request I not work with him. I not only fear for my safety, but for the safety of the officers  involved in any incidents which we made find ourselves working with him  on any given night. It is apparent to me that the hostile working conditions, which were present on the Third Watch by Sgt Monaghan, have been brought to the Second Watch.  I spoke with Lt. O'Connell on Sept 10th 2004, at approximately 400PM, regarding these recent events and informed her I would like this to go via chain of command to you. She stated she would talk to Sgt. Monaghan, and if it happened again she would bring it to your attention. I am in such fear of the next time I feel it should be brought to your attention now.

Respectfully Submitted

Sgt Tammy Walker # 229
Second Watch Supervisor


APPROVED
DISAPPROVED
Lt. O'Connell
Second Watch Commander

CC: KEPT

APPROVED
DISAPPROVED
Captain Alan Fletcher
Field Operations Bureau

# EXHIBIT 56

IN THE MATTER OF:

TAMMY WALKER vs.

CITY OF HOLYOKE

---

DEPOSITION OF:

TAMMY WALKER
DATE:  MAY 1, 2007

---

### PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER          MAY 1, 2007

## 9

1      Q.   Did she say what he appeared to be
2  videotaping or how long?
3      A.   No; she didn't.
4      Q.   Chief Scott gave you a five-day
5  suspension with respect to that incident, is that
6  correct?
7      A.   That's correct.
8      Q.   The Mayor increased it to ten days?
9      A.   I'm not sure how many days he increased
10  it.
11      Q.   There was an incident that occurred on
12  September 6, 2004 involving a murder scene where
13  you were present and John Monaghan was present.
14  Do you recall that incident?
15      A.   Yes.
16      Q.   Can you describe what occurred that
17  prompted you to initiate a complaint against him?
18      A.   I was asking over the air, calling for
19  him.  I needed some caution tape to tape off the
20  scene.
21          He didn't answer me several times.  I
22  had an officer go over and retrieve the tape from
23  him to cordon off the scene.
24      Q.   Which officer was it that went over to

## 10

1  him?
2      A.   Joe Montalvo.
3      Q.   Do you know -- strike that.  How were
4  you communicating with him?  In other words, was
5  it a radio?
6      A.   Yes; over the radio.
7      Q.   Do you know whether or not he had a
8  radio with him?
9      A.   Yes; he did.
10      Q.   How do you know that?
11      A.   Because he said he had one when we did
12  the deposition and he always carries a radio.
13      Q.   When you were at the scene, though, did
14  you see a radio on him?
15      A.   No; it was dark.
16      Q.   Was he actually working under your
17  supervision that night?
18      A.   He was working outside detail.
19      Q.   Do you know what kind of an outside
20  detail?
21      A.   No; I don't remember what he was
22  working.
23      Q.   Do you know where that outside detail
24  was in relation to this murder scene?

## 11

1      A.   No; I don't.
2      Q.   Do you know how it was that he ended up
3  being at the murder scene?
4      A.   He heard it over the air.
5      Q.   Do you know whether, in fact, he heard
6  you calling to him?
7          MR. HUDSON:  Objection.
8          THE WITNESS:  Other officers heard
9  me so I am sure he did.
10      Q.   (BY MS. LYNCH)  The other officers that
11  heard you, who were they and where were they?
12      A.   One was Officer Barber.  He was out in
13  the West Holyoke area.
14      Q.   He was not at the scene, then?
15      A.   Not at the time I was asking for the
16  tape; no.
17      Q.   At some point did he come to the scene?
18      A.   Yes.
19      Q.   Was he close to you when you were
20  calling to Sergeant Monaghan?
21      A.   He showed up afterwards.
22      Q.   In other words when you were calling for
23  the tape to Sergeant Monaghan was he near you?
24      A.   No.

## 12

1      Q.   You're saying that he was in West
2  Holyoke at that time?
3      A.   That's correct.
4      Q.   So when you were at that murder scene
5  anything that you said over the radio, could it be
6  heard as far as you know by all officers who had
7  radios?
8      A.   Yes.
9      Q.   Did you make any type of eye contact at
10  all with Sergeant Monaghan?
11      A.   We were about twenty-five feet away from
12  each other so I saw him but I couldn't see his
13  eyes.
14      Q.   Did you try to call to him at all other
15  than through the radio?
16      A.   No.
17      Q.   Any particular reason why you didn't?
18      A.   He was twenty-five feet away from me and
19  there was other people around.  That's why you
20  have the radio.
21      Q.   Was it hectic at all at the scene --
22  noisy?
23      A.   Not where we were standing; no.
24      Q.   How many people, approximately, were

**TAMMY WALKER          MAY 1, 2007**

|  | 13 |
|---|---|

1   there?
2      A.   I was surrounded by about ten people.
3      Q.   How many were police officers,
4   approximately?
5      A.   There were three that I was -- there
6   were three officers, two that I can name.
7      I don't recall who the other officer
8   was.
9      Q.   Do you recall who the two were?
10      A.   One was Montalvo and one was Tony Brock.
11      Q.   Did they make any comment to you about
12   Officer Monaghan -- or Sergeant Monaghan not
13   responding to you?
14      A.   No; they didn't.
15      Q.   The person who had been murdered, were
16   they still at the scene or had they already been
17   taken away during the time that you were
18   communicating with Sergeant Monaghan?
19      A.   They were still at the scene.
20      Q.   The suspect -- had the suspect been
21   apprehended already?
22      A.   No.
23      Q.   Do you know what happened with regard to
24   the suspect?

|  | 14 |
|---|---|

1      A.   The suspect was subsequently
2   apprehended.
3      Q.   Do you know how long after?
4      A.   Ten, fifteen minutes.
5      Q.   Since Sergeant Monaghan was working an
6   extra detail did you have any authority over him?
7      A.   Yes; it still falls under street
8   supervisor if you're working outside detail.
9      Q.   If he had not shown up at the scene
10   would you have been able to require him to show
11   up?
12      A.   Yes.
13      Q.   Under what authority?
14      A.   I would ask him to just come if I needed
15   his assistance.
16      Q.   Did you know where he was before you saw
17   him at the scene?
18      A.   No; I did not. I did not even know that
19   he was working.
20      Q.   Did you see what he was doing at the
21   scene?
22      A.   He walked past me with tape. Yes; I saw
23   what he was doing.
24      Q.   How close did he get to you?

|  | 15 |
|---|---|

1      A.   He was less than six feet away from me
2   when he walked by me with the tape.
3      Q.   Did you communicate with him at all at
4   that point?
5      A.   No.
6      Q.   How long did he stay at the scene while
7   you were there?
8      A.   I don't recall what time -- how much
9   time had elapsed.
10      Q.   Can you give me an approximation?
11      A.   Well, after I asked for the tape and he
12   didn't give it to me, I asked again; he didn't
13   give it to me.
14      I sent the officer over to retrieve the
15   tape. We cordoned off the area and then I went to
16   go look for the suspect.
17      Q.   Who was the officer that you sent over
18   to him?
19      A.   Joe Montalvo.
20      Q.   Do you know if they had any
21   communication at all about the fact that you had
22   been calling him over the radio and he hadn't
23   responded?
24      A.   I don't know. They were twenty-five

|  | 16 |
|---|---|

1   feet away from me.
2      Q.   Who arrived at the scene first, you or
3   Sergeant Monaghan?
4      A.   I arrived first.
5      Q.   You did in fact raise a complaint
6   against Sergeant Monaghan for not responding to
7   you, is that correct?
8      A.   Yes.
9      Q.   Who did you raise that to?
10      A.   I attempted to give it to Lieutenant
11   O'Connell.
12      Q.   You said you attempted to?
13      A.   Yes; she didn't want me to hand it in.
14      Q.   So then what did you do?
15      A.   I told her that I needed to hand it in
16   and I wrote it.
17      Q.   Did she say why she didn't want you to
18   hand it in?
19      A.   She said that she would handle it and
20   asked me not to hand it in.
21      Q.   But you did in fact hand it in?
22      A.   I handed it in, yes, in front of Chief
23   Scott to her.
24      Q.   And then what happened? In other words,

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER          MAY 1, 2007

17

1  was there any kind of investigation?
2      A.   Allegedly there was an investigation and
3  it was unfounded.
4      Q.   Did you ever speak to Sergeant Monaghan
5  about that incident -- ask him why he didn't
6  respond to you?
7      A.   No.
8      Q.   And why not?
9      A.   We didn't have a communication at all.
10     Q.   Why did you think that that incident was
11 important enough to file a complaint against him?
12     A.   Because if a co-worker is not answering
13 you over the air -- we rely on communication out
14 in the field.
15          If one is not communicating with the
16 other it puts the officers in jeopardy, puts my
17 life in jeopardy, puts his life in jeopardy.  If
18 I'm calling you out in the air and you're not
19 answering me because you're being unprofessional,
20 that could lead to someone getting hurt.
21     Q.   Did you have any other interaction or
22 communication with Sergeant Monaghan at the scene?
23     A.   No.
24     Q.   Did you see him -- or do you know

18

1  whether he communicated with anyone else over the
2  radio?
3      A.   Yes; I heard him say that he was coming
4  down to the scene, that he had tape.
5      Q.   You heard him say that over the radio?
6      A.   Over the air; yes.
7      Q.   Where exactly was this murder scene?
8      A.   It was in the alleyway, I think it was
9  Bridge Street.  I believe it was Bridge; I'm not
10 sure but it was in the alley way in Southwest
11 Holyoke.
12     Q.   Is there any businesses there?
13     A.   There's Capri Pizza in the vicinity.
14     Q.   What time of the evening was that?
15     A.   I don't recall what time it was exactly.
16     Q.   In other words was it after midnight?
17     A.   No; it was before midnight.
18     Q.   Were there sirens in the area at all?
19     A.   Not at the time that we were standing
20 there.
21     Q.   Were there any sources of noise while
22 you were standing there?
23     A.   Where I was standing there was just
24 people talking.

19

1      Q.   Did any other supervisors show up at the
2  scene while you were there?
3      A.   I believe Sergeant Cassidy was in the
4  area.  Yes; Sergeant Cassidy was in the area.
5      Q.   There was an incident that reportedly
6  occurred on September 9, 2004 when you were at
7  roll call and you reported that Sergeant Monaghan
8  made the statement to you, "Start packing your
9  bags."  Do you recall that?
10     A.   Yes.
11     Q.   What significance did that have for you,
12 that statement you said he made?
13     A.   That I would be leaving the Department.
14     Q.   Do you know what the basis was for that?
15     A.   No.
16     Q.   In other words was there any sort of
17 discipline that was pending, any incident that had
18 occurred which placed your job in jeopardy prior
19 to that?
20          MR. HUDSON:  Objection.
21          THE WITNESS:  I don't know.
22     Q.   (BY MS. LYNCH)  Who was present when he
23 made that statement?
24     A.   Lieutenant O'Connell.

20

1      Q.   Where was she in relation to you and
2  Sergeant Monaghan?
3      A.   About four feet from us.
4      Q.   Can you state where you were and where
5  he was when he made this statement to you?
6      A.   I was standing in the back of Lieutenant
7  O'Connell's desk and he was right next to me.
8      Q.   I'm sorry, you said you were standing?
9      A.   Standing.
10     Q.   Do you remember what you were doing?
11     A.   Gathering up information I guess to go
12 outside.
13     Q.   Do you remember what time it was?
14     A.   Around four o'clock.
15     Q.   Was it the beginning of the
16 four-to-twelve shift?
17     A.   Correct.
18     Q.   Where was Lieutenant O'Connell?
19     A.   Seated at her desk.
20     Q.   Where was Sergeant Monaghan?
21     A.   Standing right beside me.
22     Q.   When you say right beside you, how much
23 space was there?
24     A.   Inches.

**TAMMY WALKER VS. CITY OF HOLYOKE**
**TAMMY WALKER          MAY 1, 2007**

---

**21**

1    Q.    Did he say anything else to you besides
2    "Start packing your bags"?
3    A.    Nope.
4    Q.    Do you know whether anyone else heard
5    him say that to you?
6    A.    No; it was in a very low voice.
7    Q.    What was your response, if any?
8    A.    No response.
9    Q.    Any particular reason why you didn't
10    respond?
11    A.    I didn't give him that space and time.
12    In other words I wasn't going to respond to his
13    childish acts.  I wasn't going to respond to them.
14    Q.    When did you first report that he said
15    that?
16    A.    I believe it was on the ninth.
17    Q.    You're saying the same day?
18    A.    No; I wrote a report.  I'm not sure what
19    the date is on the report.
20    Q.    According to my records it would have
21    been the following day, the tenth.  Is that your
22    memory?
23    A.    That would be good; yup.  That would be
24    good.

---

**22**

1    Q.    Who did you report that to?
2    A.    I reported it to Lieutenant O'Connell at
3    first.
4    Q.    What was her response?
5    A.    Don't put it in writing.
6    Q.    Did she say why?
7    A.    She said she would handle it.
8    Q.    But you did put it in writing?
9    A.    Yeah.
10    Q.    Was it to her?
11    A.    Yes.
12    Q.    Did she say how she would handle it?
13    A.    No.
14    Q.    After you put it in writing what
15    happened?
16    A.    I asked her to go upstairs with me to
17    the Chief's office.
18    Q.    Did you do so?
19    A.    Yes.
20    Q.    Did you have a meeting with the Chief,
21    the three of you?
22    A.    Yes.
23    Q.    What was discussed?
24    A.    Officer safety.

---

**23**

1    Q.    Can you be more specific?
2    A.    The incident that -- we were talking
3    about the murder scene and how officer safety was
4    in jeopardy with him not answering the air and a
5    few other complaints in that same statement.
6    Q.    When you went to the Chief's office --
7    was that on the tenth -- September 10th, 2004?
8    A.    Yes.
9    Q.    You talked about the incident at the
10    murder scene at that time.
11    Did you talk about this incident about
12    him saying "Start packing your bags"?
13    A.    I don't know.  I'd have to see the
14    report.
15    Q.    Based on your testimony earlier I
16    thought you had reported the comment that he made
17    to you and that prompted the meeting with Chief
18    Scott.  Is that not correct?
19    A.    I'd have to see what I wrote to answer
20    that question.
21    Q.    But just right now based on your memory,
22    what do you recall --
23    A.    (Interposing) I don't remember.  That's
24    why I would have to see the point.

---

**24**

1    Q.    So you don't recall at this point what
2    you talked about?
3          MR. HUDSON:  Objection.
4    Q.    (BY MS. LYNCH)  At the meeting?
5    A.    No.
6    Q.    Do you recall if the issue of the "start
7    packing your bags" came up during that meeting?
8    A.    No.
9          MR. HUDSON:  Objection; asked and
10    answered.
11    Q.    (BY MS. LYNCH)  As a result of your
12    writing the report to Lieutenant O'Connell about
13    the comment, "Start packing your bags," did you
14    ever speak with Chief Scott about that?
15    A.    I don't know.
16    Q.    What occurred in terms of an
17    investigation, if any, following your reporting
18    the "start packing your bags" comment?
19    A.    Unfounded.
20    Q.    Who else was present at the roll call
21    when he made that statement?
22    A.    I don't know.
23    Q.    At this point you just recall him,
24    yourself, and Lieutenant O'Connell?

---

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER          MAY 1, 2007

---

33

1  put down.  I know I wrote something on it.
2       Q.  In other words did you notice that it
3  was quiet when you worked under other supervisors
4  besides Lieutenant O'Connell?
5       A.  I'd have to see what dates I put down.
6  I don't know.  I know I wrote something on it.
7       Q.  When you noticed that it was more quiet
8  do you recall approximately how long of a period
9  it would be that you wouldn't hear any calls over
10  the radio?
11       A.  No.
12       Q.  In other words I mean would it go as
13  long as a half an hour, an hour?
14            MR. HUDSON:  Objection.
15            THE WITNESS:  I don't know.  I'd
16  have to see something.
17       Q.  (BY MS. LYNCH)  What is it that you need
18  to see?
19       A.  I wrote something on this.  I had to
20  hand something in so I wrote something on it.
21  It's been over a year.
22       Q.  Did you speak to Lieutenant O'Connell
23  about the issue of not hearing calls over the
24  radio?

---

34

1       A.  Yes.
2       Q.  Do you recall when that was?
3       A.  October 31st.
4       Q.  That was October 31st that you spoke to
5  her?
6       A.  Yes.
7       Q.  Of 2004?
8       A.  Correct.
9       Q.  Was anyone else present when you spoke
10  to her?
11       A.  No.
12       Q.  Can you tell us what the two of you
13  discussed?
14       A.  That the radio was very quiet, that I
15  was missing calls.
16       Q.  Did you tell her how long that had been
17  occurring that you had noticed it?
18       A.  I don't recall if I told her the length
19  of time.
20       Q.  What was her response?
21       A.  She said it must be busy.
22       Q.  She said it must be busy?
23       A.  I must be busy and not hearing my radio.
24       Q.  Any other conversation about that on

---

35

1  that day?
2       A.  No.
3       Q.  Did you ever talk to her at any other
4  time about the issue of not hearing calls over the
5  radio?
6       A.  She called me into the office on
7  November 3rd.
8       Q.  Was anyone else present?
9       A.  No.
10       Q.  What did the two of you discuss that
11  day?
12       A.  She said she had checked with Kenny
13  Moriarty and that everything was fine.
14       Q.  Did you ask her to check with Kenny
15  Moriarty?
16       A.  No.
17       Q.  Who is Kenny Moriarty, by the way?  What
18  is his job?
19       A.  He's an officer.  He takes care of the
20  radios.
21       Q.  Had you ever spoken to Kenny Moriarty
22  regarding the radios?
23       A.  No.
24       Q.  She told you that she had checked with

---

36

1  Kenny Moriarty and he said that there was no
2  problem with the radios?
3       A.  Yes.
4       Q.  Which car number did you used to drive?
5       A.  Nine and fourteen.
6       Q.  Do you know whether she asked him to
7  check just the cars that you drove or others as
8  well?
9       A.  I don't even know if she had a
10  conversation with him.  It's just what she told
11  me.
12       Q.  By the way, what was your response when
13  she told you that?
14       A.  I answered her, "Yes, Ma'am."
15       Q.  In other words, did you question it any
16  further?
17       A.  No.
18       Q.  Did you have any other discussion with
19  Lieutenant O'Connell about the issue of not
20  hearing calls over the radio?
21       A.  No.
22       Q.  At any time?
23       A.  No.
24       Q.  When you did not hear calls over the

---

PERLIK and COYLE REPORTING

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER          MAY 1, 2007

45

1      Do you have any other identifying
2  information about this incident?
3      A.   No.
4      Q.   Do you know when the e-mail was sent
5  telling officers not to go in the area in relation
6  to when the officers called out for assistance?
7          MR. HUDSON:  Objection.
8          THE WITNESS:  No.
9      Q.   (BY MS. LYNCH)  In other words which one
10  was first?
11      A.   No.
12      Q.   How many other officers showed up at the
13  scene?
14      A.   I don't remember.
15      Q.   I can't recall if I asked you or not, do
16  you know who sent the e-mail saying stay out of
17  this area?
18      A.   It was the dispatcher.
19      Q.   Do you know why that e-mail was sent
20  telling officers to stay out of the area?
21          MR. HUDSON:  Objection.
22          THE WITNESS:  No.
23      Q.   (BY MS. LYNCH)  Do you know if
24  Lieutenant O'Connell had anything to do with that

46

1  e-mail being sent telling officers to stay out of
2  the area?
3          MR. HUDSON:  Objection; asked and
4  answered.
5          THE WITNESS:  I don't know.
6      Q.   (BY MS. LYNCH)  Were there any other
7  incidents where you believe that there were
8  repercussions as a result of missing calls over
9  the radio?
10      A.   Not that I can recall right now.
11      Q.   When you said that you thought that
12  Lieutenant O'Connell was deliberately having calls
13  sent over the laptop as opposed to the radio to
14  box you out, what do you think her motivation
15  would be for doing that?
16      A.   I don't know.
17          MR. HUDSON:  Objection.
18      Q.   (BY MS. LYNCH)  In other words -- well,
19  did you think that it was meant toward you
20  personally?
21      A.   Yes.
22      Q.   Why did you think that?
23      A.   Because she doesn't care for me.
24      Q.   Why do you think that?  Why did you

47

1  think that at the time?
2      A.   Just her reaction to me.
3      Q.   Can you be more specific?
4      A.   No.
5      Q.   Can you give me examples of what you say
6  her reaction was toward you?
7      A.   No.
8      Q.   Prior to this laptop issue had she ever
9  disciplined you in any way?
10      A.   No.
11      Q.   Did you receive any information that
12  other officers were not hearing calls over the
13  radio?
14      A.   No.
15      Q.   Did you ever speak with any other
16  officers on the shift about that?
17      A.   No.
18      Q.   Was there any other time when you worked
19  for the Holyoke Police Department that you noticed
20  that you weren't hearing calls over the radio?
21      A.   No.
22      Q.   Did you notice whether the not hearing
23  the calls had anything to do with the weather, for
24  instance?

48

1      A.   No.
2      Q.   Had you ever heard that -- that there
3  might have been a reason pertaining to Mount Tom
4  and thermal warning?
5          MR. HUDSON:  Objection.
6      Q.   (BY MS. LYNCH)  Had anyone informed you
7  of that?
8      A.   No.
9      Q.   Or maybe thermal inversion maybe was the
10  term?
11      A.   No.
12          MR. HUDSON:  Objection.
13      Q.   (BY MS. LYNCH)  No one said that to you?
14      A.   No.
15      Q.   Did you speak to Lieutenant Denise
16  Duguay about the issue of not hearing calls over
17  the radio?
18      A.   Yes.
19      Q.   Do you recall when that was and what
20  your discussion was with her?
21      A.   I don't remember the date but I informed
22  her that I wasn't hearing the calls come over the
23  air.
24      Q.   What was her response?

49

1    A.    She stated that this wasn't Sunderland
2  and if I wasn't hearing the calls over the air
3  then I needed to tell the Chief.
4    Q.    Did you speak to the Chief about the
5  calls?
6    A.    Yes.
7    Q.    Do you remember when that was?
8    A.    November 4th.
9    Q.    Was anyone else present?
10   A.    Lieutenant Duguay.
11   Q.    Did the two of you meet with him?
12   A.    Yes.
13   Q.    In his office?
14   A.    Correct.
15   Q.    What was discussed?
16   A.    That I didn't hear any communication
17 over the air.
18   Q.    Did you tell him how long the periods
19 were that you weren't hearing communications over
20 the air?
21   A.    Sporadic, twenty-two days.
22   Q.    Approximately over twenty-two days?
23   A.    Sporadically.
24   Q.    Did you tell him for how long of a

50

1  period you were not hearing calls, meaning
2  minutes, hours?
3    A.    No.
4    Q.    At this point can you give an estimate
5  as to how long it would be before you would hear a
6  call when you thought there was a problem?
7    A.    No.
8         MR. HUDSON:  Objection.
9         THE WITNESS:  No.
10   Q.    (BY MS. LYNCH)  Do you recall it ever
11 being more than an hour?
12   A.    I don't know.
13   Q.    Do you recall it ever being more than a
14 half an hour?
15   A.    I don't know.
16   Q.    On the shifts that you worked with
17 Lieutenant O'Connell would she generally be inside
18 the station?
19   A.    Yes.
20   Q.    Did she ever go out in a cruiser when
21 you worked with her?
22   A.    Yes.
23   Q.    She did?
24   A.    Yes.

51

1    Q.    On those occasions when you did work the
2  same shift with her, was she in charge or was
3  there someone above her?
4    A.    She was in charge of the shift.
5    Q.    Do you have any knowledge as to how many
6  calls were dispatched over the laptop instead of
7  the radio?
8    A.    No.
9    Q.    Did you ever report any problems with
10 regard to the radio for car number fourteen?
11   A.    No.
12   Q.    Was there an investigation that occurred
13 as far as you know with regard to your complaint
14 that you were not receiving calls over the radio?
15   A.    Yes; there was.
16   Q.    Do you know what that investigation
17 consisted of?
18   A.    No.
19   Q.    In other words do you know anyone who
20 was contacted or what was done to investigate your
21 complaint?
22         MR. HUDSON:  Objection.
23         THE WITNESS:  No; I don't remember.
24   Q.    (BY MS. LYNCH)  Do you recall if your

52

1  statement was taken?
2    A.    A statement was taken from me.
3    Q.    Do you remember during the twenty-two
4  days that you said that you were sporadically
5  hearing calls over the radio how many e-mails you
6  had gotten over the laptop?
7    A.    No.
8    Q.    Do you know if there were any?
9    A.    I don't know.
10   Q.    Do you remember speaking to a José
11 Montalvo regarding this issue of not hearing calls
12 over the radio?
13   A.    No.
14   Q.    Is he another officer -- José Montalvo?
15   A.    Yes.
16   Q.    Was he on your shift?
17   A.    Yes.
18   Q.    Did you eventually report this issue of
19 not hearing calls over the radio to any agency
20 outside of the Holyoke Police Department?
21   A.    Yes.
22   Q.    Who did you report it to and when?
23   A.    Agent Sue Kessler of the FBI.
24   Q.    Do you remember when you reported it to

Case 3:05-cv-30074-MAP   Document 46-61   Filed 09/14/2007   Page 10 of 17

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER          MAY 1, 2007

77

1     MR. HUDSON: 25.
2     MS. LYNCH: Yes.
3     MR. HUDSON: Okay.
4     THE WITNESS: There's a fax on
5  yours.
6     MS. LYNCH: That's the exhibit
7  that's in front of you.
8     Q.   (BY MS. LYNCH) I just want to clarify
9  something, Ms. Walker.
10    Did you have any communications with
11 regard to the issue of the missed radio calls or
12 the issue of the plates with the Criminal History
13 Systems Board?
14    MR. HUDSON: Objection.
15    THE WITNESS: No.
16    Q.   (BY MS. LYNCH) You did not?
17    MR. HUDSON: Objection as to the
18 form of the question.
19    Q.   (BY MS. LYNCH) I'm sorry, you did not?
20    A.   No.
21    Q.   There was an issue with regard to you
22 being reassigned as a booking officer I believe on
23 November 10, 2004. Do you recall that?
24    A.   Yes.

78

1     Q.   That was Lieutenant O'Connell that
2  reassigned you?
3     A.   Yes.
4     Q.   What reason did she give you?
5     A.   She didn't.
6     Q.   None at all?
7     A.   No.
8     Q.   Do you know whether you were entitled to
9  a reason under the contract that you had as a
10 police officer in the collective bargaining
11 agreement?
12    MR. HUDSON: Objection.
13    THE WITNESS: No.
14    Q.   (BY MS. LYNCH) You don't know either
15 way?
16    A.   I don't know.
17    Q.   Was there something as far as you know
18 that prompted your being reassigned as a booking
19 officer?
20    A.   The investigation of IAD 04-26.
21    Q.   With regard to the laptops?
22    A.   Correct.
23    Q.   Why did you think that prompted it?
24    A.   She was very upset.

79

1     Q.   How do you know that?
2     A.   I could feel it from her.
3     Q.   Did she say anything to you?
4     A.   No.
5     Q.   Did anyone else tell you that your
6  reassignment was prompted by that investigation?
7     A.   No.
8     Q.   Prior to being reassigned as a booking
9  officer did you have any communications with
10 either Lieutenant O'Connell and/or Captain
11 Fletcher regarding some incidents that had
12 occurred where Lieutenant O'Connell had raised an
13 issue about your knowledge of the job?
14    MR. HUDSON: Objection.
15    THE WITNESS: I don't know.
16    MS. LYNCH: Can I have this marked,
17 please?
18    (Defendant's Deposition Exhibit
      No. 26 offered and marked.)
19
20    Q.   (BY MS. LYNCH) Ms. Walker, I'm going to
21 show you what's been marked as Exhibit Number 26.
22    My first question to you is have you
23 seen that before? (Indicating.)
24    MR. HUDSON: Look at it and read it,

80

1  please.
2     THE WITNESS: (Witness examining
3  document.)
4     Q.   (BY MS. LYNCH) Have you seen that
5  before, Ms. Walker?
6     A.   Yes; I've seen the top document. The
7  second page doesn't go with this. I'm not sure
8  what this is.
9     I don't know if that's a complete
10 document of the first -- it's not. The first
11 document here is missing the second page.
12    Q.   Do you know what was on the second page
13 that's missing?
14    A.   No. Look at date on this? No; I don't.
15    Q.   So you've seen page one but you haven't
16 seen page two of Exhibit 26, is that correct?
17    A.   This is a partial of something I wrote
18 to Captain Fletcher -- an IOC that I wrote to
19 Captain Fletcher. This is partial.
20    Q.   This document says it's from Lieutenant
21 O'Connell to Captain Fletcher.
22    A.   (Witness examining document.) Okay;
23 this is one she wrote, then.
24    Q.   Right. In any event do you remember an

85

```
1              MR. HUDSON:  Thank you.
2       Q.    (BY MS. LYNCH)  Did you oppose being
3    reassigned to the booking officer position?
4       A.    I questioned why; yes.
5       Q.    In other words, did you not want to be
6    reassigned to the booking officer?
7       A.    Yes.
8       Q.    And why not?
9       A.    There was never a job as a booking
10   officer and to stay in one area, so it was new.
11      Q.    It was a new position, you're saying?
12      A.    Yeah.
13      Q.    Did you not like performing that
14   position?
15      A.    It wasn't -- no; it wasn't that I didn't
16   like performing it.  There is no basis for me to
17   sit at the desk and do nothing.
18      Q.    You wouldn't be booking individuals that
19   were brought in to the station after being
20   arrested?
21      A.    I would if I was a commander of the
22   shift, the CO.
23      Q.    You're saying that task was done by the
24   commanding officer?
```

86

```
1       A.    That's correct.
2       Q.    How long did you actually perform the
3    job as booking officer after you were reassigned?
4       A.    Five days, if five days.
5       Q.    Why did you stop?
6       A.    Because I went out on medical leave.
7       Q.    What was the condition that sent you out
8    on medical leave?
9       A.    Shoulder and neck.
10      Q.    During the five days when you did do
11   that position what were your job duties?
12      A.    To book prisoners in.
13      Q.    You actually did do the bookings then?
14      A.    Yes.
15      Q.    In other words the commanding officer no
16   longer did that?
17      A.    She was on the road at the time.
18      Q.    When you went out on medical leave
19   approximately five days after you were reassigned
20   to the booking officer position did you ever
21   return to work?
22      A.    No.
23      Q.    Why didn't you return to work?
24      A.    Injuries due to the job.
```

87

```
1       Q.    Were there any new injuries?
2       A.    Elbow.
3       Q.    How did you injure your elbow?
4       A.    Lieutenant O'Connell snatched the book
5    binder out of my hand.
6       Q.    You're talking about the February 25th
7    incident and we'll get to that in a moment.  Any
8    other injuries?
9       A.    The neck and the shoulder.
10      Q.    How did those injuries occur?
11      A.    On the job.
12      Q.    Do you recall the dates and the
13   incidents?
14      A.    I believe it was 2003 in July.
15            MR. HUDSON:  You either know or you
16   don't know.
17            THE WITNESS:  I know it was 2003 in
18   July.  I was hit with a metal door.
19      Q.    (BY MS. LYNCH)  Anything else?
20      A.    It was 1998 I was assaulted by a
21   defendant.
22      Q.    After July, 2003, though, you continued
23   to work until November of 2004?
24      A.    Correct.
```

88

```
1       Q.    Did anything happen in November of 2004
2    that caused you to be reinjured or need to go out
3    of work?
4       A.    Not that I can remember right now.
5       Q.    Is it fair to say that working the job
6    as the booking officer was more physically safe
7    than going out on the road?
8       A.    Yes; it is.  Yeah.
9       Q.    But you didn't like doing that job?
10      A.    It's not a matter of liking it or not.
11   I liked all aspects of my job.
12      Q.    You didn't actually oppose being the
13   booking officer, then?
14      A.    No; I've been the CO a number of times.
15      Q.    So as the CO you would stay in and be
16   the booking officer then?
17      A.    That's correct; commander of the shift.
18   Yes.
19      Q.    Let me ask you this question:  What in
20   particular bothered you -- if it did bother you --
21   about being reassigned to the booking officer
22   position?
23      A.    I'd rather be on the road outside than
24   be the commander of the shift.  She made me
```

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                MAY 1, 2007

89

1    commander of the shift.
2        Q.   Why did you prefer to be on the road?
3        A.   I like the interaction with the people.
4        Q.   Even though it's potentially more
5    dangerous?
6        A.   That's my job; it's dangerous.
7        Q.   You said that she actually made you the
8    commanding officer of the shift and she went out
9    on the road?
10       A.   That's correct.
11       Q.   So you were making decisions affecting
12   all the officers as opposed to her?
13       A.   Yeah; I was inside.
14       Q.   In terms of your salary and benefits,
15   was it the same being the booking officer?
16       A.   Yes; it's always the same.
17           MR. HUDSON:  Clarification.  When
18   you use the word "she," were you referring to
19   Lieutenant Duguay or Lieutenant O'Connell?
20           MS. LYNCH:  When I used the word
21   "she"?
22           MR. HUDSON:  She made you the
23   commander of the shift.
24           MS. LYNCH:  Lieutenant O'Connell.

90

1        Q.   (BY MS. LYNCH)  That's who made you the
2    commander of the shift?
3        A.   Yes.
4        Q.   Do you know whether the medical --
5    strike that.
6            Before Lieutenant O'Connell had
7    reassigned you to the booking officer had you
8    raised issues about your medical condition?
9        A.   I don't remember on those dates.
10       Q.   Do you know whether one of the reasons
11   she made you the booking officer was because you
12   had raised medical issues?
13       A.   No.
14       Q.   You don't know?
15       A.   No.
16       Q.   Or you don't believe that that was the
17   reason?
18       A.   I believe it was retaliation.
19       Q.   Why do you believe it was retaliation?
20       A.   Well I know it was retaliation because
21   on the fourth I told the Chief about the e-mails
22   and on the tenth I was reassigned to being the
23   booking officer in charge of inside duties.
24       Q.   Is your belief that it was retaliation

91

1    based on anything other than the two dates that
2    you just stated?
3        A.   No.
4        Q.   Incidentally, did you ever take the
5    lieutenant's exam on October 16, 2004?
6        A.   Yes; I did.
7        Q.   You did?
8        A.   Yes.
9        Q.   Do you remember what score you got?
10       A.   I believe --
11           MR. HUDSON:  (Interposing) If you
12   know.
13           THE WITNESS:  No; I don't remember
14   the score.
15       Q.   (BY MS. LYNCH)  Did you pass?
16       A.   No.
17       Q.   Did you think that someone or some
18   individuals did not want you to become a
19   lieutenant?
20       A.   Yes.
21       Q.   Who do you believe did not want you and
22   why?
23           MR. HUDSON:  Do you know?
24           THE WITNESS:  I don't know by them

92

1    telling me; I just felt it.
2        Q.   (BY MS. LYNCH)  Who made you feel that
3    way?
4        A.   Captain Fletcher, Lieutenant O'Connell,
5    Chief Scott.
6        Q.   What did Captain Fletcher do or say that
7    led you to believe that?
8        A.   It is not what they did; it's the way
9    they acted towards me.
10       Q.   Anything in particular that you can
11   point to?
12       A.   No.
13           MS. LYNCH:  Could I have these two
14   marked, please?
15           (Defendant's Deposition Exhibit
16           No. 27-28 offered and marked.)
17       Q.   (BY MS. LYNCH)  Showing you, Ms. Walker,
18   what have been marked Exhibits 27 and 28.
19           If you could just take a look at those
20   and my question to you is --
21           MR. HUDSON:  (Interposing) Excuse
22   me, which one is 27?  Is 412 27 and 28 is Bates
23   number 411?
24           MS. LYNCH:  That's correct.

TAMMY WALKER VS.  CITY OF HOLYOKE
TAMMY WALKER          MAY 1, 2007

97

1          MR. HUDSON:  If you know.
2          THE WITNESS:  It wasn't -- it was a
3  disk that I made of the calls that I heard over
4  the air -- the only calls I heard over the air.
5  Lieutenant Fournier wanted a copy of it.
6      Q.  (BY MS. LYNCH)  You're saying that you
7  had given that to your friend?
8      A.  No; I had used the computer to pull --
9  to put on paper, to print it.
10      Q.  So you just used the friend's computer?
11      A.  Correct.
12      Q.  Did you ever give that disk to
13  Lieutenant Fournier?
14      A.  I gave him a copy of the calls that I
15  heard.
16      Q.  But going back to being out sick that
17  day, why was it that you were doing that --
18  getting the computer disk and so forth when you
19  had called in sick?
20          MR. HUDSON:  Objection; asked and
21  answered.
22          THE WITNESS:  Because I wanted the
23  disk.
24      Q.  (BY MS. LYNCH)  Do you remember why you

98

1  had called in sick?
2      A.  Because I had a migraine headache.
3      Q.  Did you see Lieutenant Fournier when you
4  were out driving that day?
5      A.  No.
6      Q.  Subsequently you learned that he had
7  looked at your personnel file, is that correct?
8      A.  That's correct.
9      Q.  And you had filed a complaint about
10  that, is that correct?
11      A.  That's correct.
12      Q.  Why did you file a complaint about him
13  looking at your personnel file?
14      A.  Because he doesn't have a right to look
15  in my sick file.
16      Q.  Why do you say that -- that he didn't
17  have the right?
18      A.  That's part of what was in the union
19  book.
20      Q.  Do you know who -- well first of all, do
21  you recall specifically what it said in the union
22  book on that issue?
23      A.  No.
24      Q.  Did it say who was designated to review

99

1  personnel --
2      A.  (Interposing) I don't know.
3      Q.  -- records?
4      A.  I don't know.
5      Q.  But do you believe it said someone other
6  than him?
7      A.  I don't know.
8          MR. HUDSON:  Objection; asked and
9  answered.
10      Q.  (BY MS. LYNCH)  Did you hear that
11  Lieutenant Fournier was designated by the Chief to
12  look at personnel files?
13      A.  I don't know.
14      Q.  You never heard that?
15      A.  No.
16      Q.  But in any event it's your belief that
17  there is something in the collective bargaining
18  agreement that deals with the issue of --
19          MR. HUDSON:  (Interposing)
20  Objection.
21      Q.  (BY MS. LYNCH) -- who can look in
22  personnel files?
23          MR. HUDSON:  Asked and answered.
24          THE WITNESS:  I don't know.

100

1      Q.  (BY MS. LYNCH)  I'm sorry, what was your
2  answer?
3      A.  I don't know.
4      Q.  Do you recall receiving, Ms. Walker,
5  prior sick leave abuse notices prior to this
6  November 17, 2004 date?
7      A.  Yes.
8      Q.  Were there three of them, do you recall?
9      A.  I don't know.
10          MS. LYNCH:  If I could have these
11  three marked.
12          (Defendant's Deposition Exhibit
                No. 29-31 offered and marked.)
13
14      Q.  (BY MS. LYNCH)  Ms. Walker, showing you
15  what have been marked as Exhibits 29, 30,
16  and 31 -- and my question to you is:  Did you
17  receive those letters? (Indicating.)
18          MR. HUDSON:  Please look at those.
19          THE WITNESS:  (Witness examining
20  document.)
21      Q.  (BY MS. LYNCH) Did you receive
22  Exhibit 29 before, Ms. Walker?
23      A.  I don't remember if I received these or
24  not.

PERLIK and COYLE REPORTING

101

1    Q.   You don't recall receiving them?
2    A.   No.  From 1995?  I don't remember.
3    Q.   But you do recall that prior to
4  November 17, 2004 that you had received sick leave
5  abuse memos?
6    A.   Yes.
7    Q.   Do you recall asking to take
8  November 20, 2004 and November 21, 2004 off from
9  work and Lieutenant O'Connell denying
10  November 20th, 2004?
11          MR. HUDSON:  Objection to the form
12  of the question.
13    Q.   (BY MS. LYNCH)  Do understand the
14  question?
15    A.   No; I don't.
16    Q.   Let me rephrase it.  Do you recall,
17  first of all, requesting that you be allowed to
18  take off November 20, 2004 and November 21, 2004?
19    A.   I probably did.
20    Q.   Do you recall that she denied your
21  request with regard to November 20, 2004?
22    A.   I recall; yes.
23    Q.   Do you recall actually receiving the
24  notice that it had been denied at your home on

102

1  November 19, 2004?
2    A.   I received a denial from two officers
3  but I don't know the date.
4    Q.   After it had been denied you did end up
5  calling in sick, do you recall that?
6    A.   Yes.
7    Q.   Why did you end up calling in sick after
8  it had been denied?
9    A.   I had prior agreements to do something.
10    Q.   Do you recall what that was?
11    A.   Yes.
12    Q.   What was that?
13    A.   It was to take care of my sibling.
14  That's as far as I'm going -- take care of a
15  sibling.
16    Q.   Which sibling was that?
17    A.   My brother George.
18    Q.   Was it that you needed to take care of
19  him?
20    A.   I just needed to.
21    Q.   In other words did he have a medical
22  condition?
23    A.   Yes.
24    Q.   Were you told that the reason

103

1  November 20th was denied was because it would have
2  created a need to pay other officers overtime?
3    A.   I don't remember.
4    Q.   Do you recall as a result of taking
5  November 20, 2004 off after it had been denied by
6  Lieutenant O'Connell that you had been -- you
7  received a suspension pertaining to that?
8          MR. HUDSON:  Objection.
9          THE WITNESS:  I don't remember.
10    Q.   (BY MS. LYNCH)  You don't recall getting
11  a suspension for that?
12    A.   No.
13    Q.   According to my records you received a
14  five-day suspension from Chief Scott and then an
15  additional five-day suspension from the Mayor.  Do
16  you recall that?
17          MR. HUDSON:  When?
18          THE WITNESS:  No.
19    Q.   (BY MS. LYNCH)  You don't recall?
20    A.   No; I don't.
21    Q.   Were there any hearings that occurred,
22  Ms. Walker, with regard to the suspensions that
23  you did not testify at -- hearings before the
24  Mayor?

104

1          MR. HUDSON:  Objection.
2          THE WITNESS:  I don't know what
3  you're talking about.
4    Q.   (BY MS. LYNCH)  Do you recall that you
5  had asked to appeal various suspensions issued to
6  you by Chief Scott to the Mayor and that you did
7  not testify at some of them -- or at least one of
8  them?
9    A.   I don't know.
10    Q.   You don't recall?
11    A.   No.
12    Q.   Was there an issue raised about your
13  faxing medical records to Kate McCoy instead of
14  your supervisor when you were out on medical
15  leave?
16    A.   What do you mean by an issue raised?  I
17  don't know.
18    Q.   In other words, did any of your
19  supervisors indicate to you that they had a
20  problem with your giving your medical records to
21  Kate McCoy instead of to your supervisor?
22    A.   Not that I know of.
23    Q.   There was an incident that occurred on
24  February 25, 2005 regarding a scheduling book and

TAMMY WALKER VS. CITY OF HOLYOKE
TAMMY WALKER            MAY 1, 2007

105

1  Lieutenant O'Connell.
2          Why were you at the station that day?
3      A.   To put time in so I could take
4  subsequent days off.
5      Q.   What do you mean?
6      A.   I don't know what you mean.
7      Q.   When you say to put time in so you could
8  take subsequent days off, can you describe what
9  you mean by that?
10      A.   Just what I said, put time in so I can
11  take days off.
12      Q.   Do you mean to enter time on a calendar?
13  When you say put time in I'm not sure what you're
14  referring to?
15      A.   Take time off -- put time off in the
16  books.
17      Q.   You had not worked though since November
18  of 2004, is that correct?
19      A.   Right.
20      Q.   Why was it that you needed to go in on
21  February 25, 2005 to indicate the time that you
22  would be off?
23      A.   I don't know.
24      Q.   Was that something -- between the last

106

1  date that you worked in November of 2004 and
2  February 25, 2005 had you ever gone into the
3  station prior to that to enter your time in a
4  book?
5      A.   I'm sure I have; yes.
6      Q.   I'm not familiar with how that worked.
7  Can you describe -- if you were going to be out
8  sick are you saying you had to go in or if you
9  wanted to take vacation time you had to go in and
10  enter it in a book?
11      A.   Yes.
12      Q.   Who would have the book?
13      A.   Lieutenant O'Connell.
14      Q.   In other words you couldn't just call
15  the Department and say I'm either taking a sick
16  day or a vacation day?
17          You had to enter it into a book,
18  yourself?
19          MR. HUDSON:  Objection to the form
20  of the question.
21          THE WITNESS:  You had to enter it;
22  yes.
23      Q.   (BY MS. LYNCH)  In pen?
24      A.   You could do it in pen or you could

107

1  do it with the time-owed slip if you had one, but
2  you had to put it in.
3      Q.   Did that pertain to sick time and
4  vacation time?
5      A.   Yes.
6      Q.   Would there be any other kind of time
7  such as personal days, that kind of thing?
8      A.   Yes.
9      Q.   What other kind of days?  Personal days?
10      A.   Yes.
11      Q.   Do you know approximately how many other
12  times you had physically gone in to the station to
13  enter your time off in the books prior to
14  February 25, 2005?
15      A.   No; I don't.
16      Q.   Any estimate?
17      A.   No.
18      Q.   But at least once prior?
19      A.   Many more; yes.
20      Q.   Who was with you that day at the
21  station?
22      A.   My son.
23      Q.   Can you describe what happened in
24  Lieutenant O'Connell's office?

108

1      A.   No.
2      Q.   You can't describe what happened?
3      A.   No.
4      Q.   Do you not have a memory of it?
5      A.   It is foggy.
6      Q.   Well, you mentioned earlier that you had
7  injured your elbow with regard to that event so
8  that's what I'm asking you to describe.
9      A.   Yes; she pulled the book out of my hand.
10      Q.   Describe what happened?
11      A.   She pulled the book out of my hand.
12      Q.   How did you end up with the book in the
13  first place?
14      A.   I picked it up off the desk.
15      Q.   Which desk was it on?
16      A.   Her desk.
17      Q.   Where was she?
18      A.   Sitting at her desk.
19      Q.   Was the book in front of her?
20      A.   Yes.
21      Q.   Was it open or closed?
22      A.   Open.
23      Q.   Was anyone else in the room?
24      A.   Sean Shattuck.

TAMMY WALKER VS. CITY OF HOLYOKE
TAMMY WALKER          MAY 1, 2007

113

1    Q.   At what point did he leave?
2    A.   When I said let's go after the book and
3  after I spoke to Jack and left.
4    Q.   So when you were in the room and she
5  took the book back from you --
6    A.   (Interposing) No; that's not how it
7  went.
8    Q.   Was your son in the room?
9    A.   No; he was not.
10          MR. HUDSON:  Let her finish asking
11  the question.
12    Q.   (BY MS. LYNCH)  Was your son in the room
13  when you were in the process of taking the book?
14    A.   No.
15    Q.   Where was he located?
16    A.   In the doorway.
17    Q.   Do you know if he observed that exchange
18  between you and Lieutenant O'Connell?
19    A.   No.
20    Q.   You don't know or he did not?
21    A.   No; I don't know.
22    Q.   After Lieutenant O'Connell took the book
23  away from you, did you stay there or what did you
24  do?

114

1    A.   I called for Jack.
2    Q.   Jack?
3    A.   Craven.
4    Q.   And then what happened?
5    A.   I asked Jack to come into the room.
6    Q.   And then what happened?
7    A.   He came into the room and me and my son
8  exited the room.
9    Q.   You didn't have any discussion at all
10  with Lieutenant O'Connell?
11    A.   No.
12    Q.   What was the purpose of asking him to
13  come into the room?
14    A.   Because I wanted him in that room.  I
15  didn't want to be in the room alone with her.
16    Q.   But then you just left as soon as he got
17  there?
18    A.   Yes.
19    Q.   How long do you think you were in the
20  room --
21    A.   (Interposing) I don't know.
22    Q.   -- the entire time of this incident?
23    A.   I don't know -- minutes.
24    Q.   Did Lieutenant O'Connell say anything to

115

1  you after she took the book back?
2    A.   Not that I recall.
3    Q.   Other than you asking to see the book
4  neither of you said anything while you were both
5  in that room together?
6    A.   Not that I remember; no.
7    Q.   There was an investigation -- strike
8  that.
9          Besides Officer Shattuck, you, and
10  Lieutenant O'Connell and your son were there any
11  other officers in the room?
12    A.   Not that I remember.
13    Q.   Were there any other officers in the
14  vicinity of the room so they would have been able
15  to see in?
16    A.   I don't remember.
17    Q.   Was there an investigation following the
18  incident?
19    A.   Yes.
20    Q.   Do you believe that the investigation
21  was conducted properly?
22    A.   No.
23    Q.   What do you think was improper about it?
24    A.   Statements were not taken correctly.

116

1    Q.   Whose statement in particular?
2    A.   Officer Shattuck.
3    Q.   What was not taken down --
4    A.   (Interposing) I don't remember offhand.
5  I just know that I didn't think it was conducted
6  properly.
7    Q.   Can you recall anything in particular?
8    A.   No.
9    Q.   And it was Officer Shattuck's statement?
10    A.   Yes.
11    Q.   Any other statement that you thought was
12  not taken down correctly?
13    A.   Mine.
14    Q.   How was your statement taken?
15    A.   The words I spoke weren't the words that
16  came out over the transcript when I received the
17  transcript.
18    Q.   Your statement was recorded on tape as
19  far as you know?
20    A.   As far as I know; yes.
21    Q.   And you're saying the way it was
22  transcribed is not accurate?
23    A.   Not according to what I said, no.  The
24  tape doesn't -- the tape is not the same as the

PERLIK and COYLE REPORTING

**TAMMY WALKER VS. CITY OF HOLYOKE**
**TAMMY WALKER          MAY 1, 2007**

---

133

1      A.   (Interposing) It may have been 2003 or
2   2004.  I'm not positive of the year.
3      Q.   You said it occurred September 17th?
4      A.   It was September, I believe.
5      Q.   That you got the treatment, you mean?
6      A.   I think that was the date of the
7   accident.
8      Q.   Yes; you said the accident was
9   September 17, 2003 so when did you receive the
10   first medical treatment?
11      A.   August.
12      Q.   You mean the following year?
13      A.   Probably, yes.
14      Q.   If this occurred September, '03 you
15   received treatment in August, '04?
16      A.   (Witness nodding.) Yes.
17      Q.   You filed an application for a criminal
18   complaint against Daniel McCavick.  Why did you do
19   that?
20      A.   I don't know.  It is on there.
21      Q.   Apparently you filed it in August 24 of
22   2005.
23           Why did you want to bring criminal
24   charges against him?

---

134

1           MR. HUDSON:  Did she testify that
2   she filed a criminal complaint?
3           THE WITNESS:  No; I didn't.
4           MR. HUDSON:  She didn't testify that
5   she filed a criminal complaint.
6      Q.   (BY MS. LYNCH)  Did you file a criminal
7   complaint against Sergeant McCavick?
8      A.   I'd have to see it.
9      Q.   You don't recall doing that?
10      A.   No; I'd have to see it.
11      Q.   Did you ever file an application for a
12   criminal complaint against any other officer from
13   the Holyoke Police Department?
14      A.   I believe Lieutenant O'Connell.
15      Q.   Why did you file that against her?
16      A.   For injuring my elbow.
17      Q.   Did anything -- well, did that complaint
18   ever get processed?
19      A.   No.
20      Q.   Why did it not get processed?
21      A.   I don't know.  I was sent something in
22   the mail saying that it wasn't going to be
23   processed.
24      Q.   Did you file a criminal complaint

---

135

1   against any other officer of the Holyoke Police
2   Department?
3      A.   Not that I recall.
4      Q.   So your only memory is against
5   Lieutenant O'Connell?
6      A.   That's correct.
7      Q.   Did you ever bring conspiracy -- apply
8   for conspiracy charges to be brought against any
9   officer of the Holyoke Police Department?
10      A.   Not that I recall.
11      Q.   Did you ever make any allegations that
12   any officer of the Holyoke Police Department was
13   involved in organized crime?
14      A.   Yes.
15      Q.   Who did you make that allegation
16   against?
17      A.   Lieutenant O'Connell.
18      Q.   What was the nature of the organized
19   crime that you were alleging that she committed?
20      A.   I can't recall at this time all of the
21   incidences.
22      Q.   Can you recall anything about the
23   allegations of organized crime?
24      A.   They are all in my complaint.

---

136

1      Q.   Which complaint are you referring to?
2      A.   My lawsuit complaint.
3      Q.   I don't recall anything about organized
4   crime there.
5      A.   Okay; then no.
6      Q.   Did you ever allege that any officer of
7   the Holyoke Police Department committed identity
8   theft?
9      A.   Yes.
10      Q.   Who did you make that allegation
11   against?
12      A.   Lieutenant O'Connell.
13      Q.   How did she commit identity theft?
14      A.   By running the plates that were run in
15   NCIC.
16      Q.   Say that again?
17      A.   The plates that are run through NCIC,
18   the event log that I was given.
19      Q.   She's the one that ran the plates?
20      A.   I don't believe those plates were
21   actually run, so, no.
22      Q.   You're referring to the event log that
23   you said had one hundred plates that were run?
24      A.   Correct.

---

**PERLIK and COYLE REPORTING**

# EXHIBIT 57

===========================================================

# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE COMMUNICATION

===========================================================

TO:         Anthony R. Scott, Chief of Police
FROM:       Lt. Eva M. O'Connell
SUBJECT:    Sgt. Walker complaint – working conditions
DATE:       September 16, 2004

---

On September 10, 2004, shortly after 4:00 PM Sgt. Walker asked to speak to me with regard to Sgt. Monaghan. Sgt. Walker and I went to the break room in order to have some privacy. Sgt. Walker told me of the following two incidents that she has had with Sgt. Monaghan.

Sgt. Walker advised me that on September 6, 2004 she responded to a murder scene in South Holyoke. Sgt. Walker told me that when she tried to rope off the crime scene area she found that neither she nor any other marked unit had crime scene tape in the cars. Sgt. Albert was responding to the scene and, advised Sgt. Walker that he would bring tape to the scene. Sgt. Walker than noticed Sgt. Monaghan in the alley and he was roping off an area in the alley. Sgt. Walker told me that she than radioed Sgt. Monaghan and asked him if he had enough tape to rope off the area where she was in the alley. Sgt. Walker told me that she called Sgt. Monaghan two or three times and received no answer. Sgt. Walker is talking about Sgt. Monaghan being insubordinate and causing a safety situation. I told Sgt. Walker that I felt that saying Sgt. Monaghan was insubordinate was incorrect. On the night in question, Sgt. Monaghan was working a special detail and fell under The Commanding Officer. I also told Sgt. Walker that I have put her and Sgt. Monaghan in separate groups so that they only work together two nights out of four. There is always at least one senior supervisor and many nights there are two. Sgt. Monaghan is assigned below Maple St. and Sgt. Walker is assigned above Maple St. There is always a Commanding Officer and frequently Sgt. Fallon is on the street for the whole city. I also told Sgt. Walker that I have been at many crime scenes where it is very hectic and I have missed radio calls. There is often a large number of people and a lot of confusion. The fact that a radio call was missed at a crime scene I do not see as a safety issue.

The second issue Sgt. Walker had was she told me that the night before (September 9, 2004) when Sgt. Monaghan came down from roll call he whispered in her ear "pack your bags". Sgt. Walker felt that it was because of her having received a five-day suspension. The time that Sgt. Walker is talking about, I was sitting at the desk in the CO's office, Sgt. McMullan, Officer Deborah Clement and Officer P.J. McKay were also in the office. Sgt. McMullan and Officers Clement & McKay were working an OUI special detail and were getting ready to go on the road. Sgt. McMullan was talking about who was going to ride with whom and whether or not Det. Gresh was going to be working the detail.

I advised Sgt. Walker that I would speak to Sgt. Monaghan but that I did not want her to put anything in writing. I also told Sgt. Walker that I had spoken with Sgt. Monaghan when he came to the shift and told him that I did not want any problems between him and Sgt. Walker. I explained to Sgt. Monaghan that I did not want to happen on the 4-12 watch the problems that had happened on the midnight watch. I told Sgt. Walker that if there were any further problems that she should tell me right away and not wait a day or two. I told Sgt. Walker that she could call me at home, if I was not working and if I was not at home to call my cell phone.

I spoke with Sgt. Monaghan and he told me that he did not say anything to Sgt. Walker on September 9th and that he would be willing to take a lie detector test. I told Sgt. Monaghan that I wanted this to be the end of it and I wanted nothing in writing. Sgt. Monaghan also told me that the night of the murder he did not hear Sgt. Walker call him on the radio.

I told both Sgt. Walker & Sgt. Monaghan that I did not want anything going to the Chiefs office at this time but if there were any further incidents, I would go to Capt. Fletcher and ask to see the Chief right away. I did make Capt. Fletcher aware of my conversations with Sgt. Walker & Sgt. Monaghan.

On Wednesday September 15, 2004, I received a call from the Chief telling me to put Sgt. Walker's complaint in writing. I was in Holyoke and I went to the station where I spoke with Officers Clement & McKay. I asked both Officers if they heard Sgt. Monaghan make any remark to Sgt. Walker. Both Officers recalled the afternoon in question but neither heard any remark directed to Sgt. Walker by Sgt. Monaghan. Sgt. McMullan was not working at the time.

Yesterday afternoon around 5:00 PM, Sgt. Walker came into the CO's office and told me that she could just not let things go. Sgt. Walker had two interoffice correspondences directed to the Chief. The subject on one was working conditions and the other was Lt O'Connell's concerns. This is in response to the memo titled working conditions.

Sgt. Walker told me that she did not feel safe going on the street if she did not see the Chief. I told Sgt. Walker that I did not see a safety issue that I would call the Chief Thursday and see about setting up an appointment. Sgt. Walker was insistent on seeing the Chief. I called you and you said that you would see us. I told you and Sgt. Walker that I do not see a safety issue. If Sgt. Walker need backup all she needs is to call dispatch. If Sgt. Walker needs additional help, she can request from dispatch and/or the Commanding Officer.

Sgt. Walker's interoffice is attached. I would ask you to take note that I had told Sgt. Walker not to put this in writing but she did anyway.

cc: Capt. Alan G. Fletcher

Signature _Lt Ava M. O'Connell_

Springfield Police Department
Daily Personnel Assignments

Bureau of Operations Plt. C          Day _Monday_          Date _9-6-04_

| Name | # | Rank | | | | | |
|------|---|------|---|---|---|---|---|
| O'Connell, Eva | 112 | Lieutenant | C | O | | | |
| Cassidy, Brian | 134 | Lieutenant | B | I | CO | 220 | |
| Wagner, Robert | 126 | Sergeant | C | O | | | |
| Fallon, Daniel | 73 | Sergeant | A | I | | 240 | AM |
| Walker, Tammy | 229 | Sergeant | A | I | | 250 | BM |
| Monaghan, John | 232 | Sergeant | C | O | | | |
| | | | | | | | |
| Barber, Scott | 143 | Police Off. | A | I | | 221 | C2 |
| Spafford, Herbert | 164 | Police Off. | A | I | | 242 | C4 |
| Wielgosz, Henry | 146 | Police Off. | A | I | | 251 | C5 |
| Chirgwin, Brian | 237 | Police Off. | A | I | | 291 | C55 |
| Reyes, Manuel | 289 | Police Off. | A | H | | | HOLIDAY |
| Delgado, William | 293 | Police Off. | A | I | | SD | |
| | | | | | | | |
| Montalvo, Jose | 188 | Police Off. | B | I | | 211 | C1 |
| Colon, Josue | 264 | Police Off. | B | I | | SD | |
| Rivera, Manuel | 265 | Police Off. | B | I | | 232 | C3 |
| Alicea, Loumag | 274 | Police Off. | B | I | P21 | 219 | |
| Brach, Anthony | 258 | Police Off. | B | I | | 262 | C6 |
| Moriarty, Mathew | 284 | Police Off. | B | I | | 262 | C6 |
| Skwira, Timothy | 287 | Police Off | B | I | | 232 | C3 |
| | | | | | | | |
| Thomas, Kevin | 223 | Police Off | C | O | | | |
| Czupkiewicz, Paul | 252 | Police Off | C | O | | | |
| Dunn, Michael | 268 | Police Off | C | O | | | |
| McMahon, Michael | 272 | Police Off | C | O | | | |
| Bartolomie, James | 273 | Police Off | C | O | | | |
| Monsalve, Jorge | 296 | Police Off | C | O | | | |

ROLL CALL BY:

# EXHIBIT 58



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**       **Chief Anthony R. Scott**

**FROM:**     **Lt. David D. Fournier**

**SUBJECT:**  **Internal Investigation**

**DATE:**     **November 08, 2004**

**NUMBER:**   **IAD Case # 04-21**

---

Chief Scott:

On September 22, 2004 the Office of Professional Standards was assigned to conduct an internal investigation based on an interoffice correspondence (dated September 11, 2004) submitted by Sergeant Tammy Walker. In Sergeant Walker's IOC to you, see reports that on September 06, 2004 she responded to a murder scene (arrest # 2438). Upon arrival Sgt. Walker indicates that she took notice of a male party lying in the middle of the alleyway. Sgt. Walker states that she asked officers in person and over the air to get yellow caution tape to cordon off the crime scene area. It was determined that no one at the scene had tape and Sgt. Walker reports that asked Sgt. James Albert over the air if he could bring some down.

Sgt. Walker reports that she noticed Sgt. John Monaghan walking through the alley with caution tape in his hand. Sgt. Walker states that Sgt. Monaghan walked past her approximately 20 yards and she noticed that he was roping off part of the crime scene. Sgt. Walker advises that she radioed "Sgt. Monaghan come in." She indicates that she received no response from Sgt. Monaghan although they had a clear view of each other. Sgt. Walker reports that she paused then transmitted again over the air to Sgt. Monaghan "do you have enough tape to secure this area." Again she reports receiving no response from Sgt. Monaghan. Sgt. Walker indicates that once she realized that Sgt. Monaghan was not going to answer she had Officer Jose Montalvo go over to Sgt. Monaghan to retrieve the left over tape.

Sgt. Walker reports that a short time later Officer Barber came up to her and stated "I guess he's not going to answer you, huh?" Sgt. Walker further reports that Officer Barber stated to her that he was a ways off and heard her clearly calling for Sgt. Monaghan.

Sgt. Walker indicates that when her officers clearly see and hear the disrespect shown to her by Sgt. Monaghan and the seriousness of the incident and any other potential incident that may arise, she feels that she cannot let it go unreported.

On September 16, 2004 Lieutenant Eva O'Connell submitted an IOC to you concerning working conditions brought forward by Sgt. Walker in relation to Sgt. Monaghan.  Lt. O'Connell reports that she met with Sgt. Walker on September 10, 2004 who brought forward the issue of Sgt. Monaghan failing to answer her radio transmissions. Lt. O'Connell indicates that she did not feel that Sgt. Monaghan was being insubordinate or causing a safety situation.  Lt. O'Connell states that she told Sgt. Walker that saying Sgt. Monaghan was insubordinate was incorrect.  Lt. O'Connell reports that on the night in question, Sgt. Monaghan was working a special detail and fell under the commanding officer.  Lt. O'Connell explained to Sgt. Walker that she has been at many crime scenes where it is very hectic and had missed radio calls.  Lt. O'Connell reports that she did not see a safety issue in the fact that a radio call missed at a crime scene.

On September 23, 2004 I sent Sgt. John Monaghan an IOC informing him of Sgt. Walker's allegation and that an internal investigation had been initiated.

On October 20, 2004 Officer Montalvo provided a statement concerning his knowledge of the incident of September 06, 2004.  Officer Montalvo reports upon arrival to the scene of 547 South Bridge Street a lot of people started to gather around and he tried to keep the crowd back.  Officer Montalvo reports that both Sgt. Walker and Sgt. Monaghan were out at the scene and that Sgt. Walker called Sgt. Monaghan.  Officer Montalvo indicates that he did hear the radio transmission.  Officer Montalvo states that he was ordered by Sgt. Walker to go over to Sgt. Monaghan and grab the yellow tape to block the alley.  Officer Montalvo was asked if Sgt. Monaghan made any comments when he obtained the tape.  Officer Montalvo replied "Not – no, I can't say.  If he did, I don't remember."  (Statement submitted for review).

On October 21, 2004 Officer Scott Barber provided a statement concerning his knowledge of the incident.  Officer Barber reports that on September 06, 2004 he was assigned to Car 2, unit 221 and that he was at the corner of Cabot and South Bridge to watch the suspect's car relating to the stabbing and subsequent murder.  Officer Barber reports that he did make comment to Sgt. Walker, although he was not sure of the exact wording, from her trying to get a hold of Sgt. Monaghan and hearing no response.  Officer Barber indicates that he had no contact with Sgt. Monaghan during the course of the evening.  (Statement submitted for review).

On October 27, 2004 Sgt. John Monaghan provided a statement concerning Sgt. Walker's allegation that he failed to respond to her radio transmissions on September 06, 2004. Sgt. Monaghan advised that he was assigned to a special detail (OUI) on the date in question, from 19:00 to 23:00 hours.  Sgt. Monaghan reports that he responded to the area of 547 South Bridge Street at approximately 19:45 hours on report of a stabbing.  Sgt. Monaghan reports that his purpose for responding to the scene was to lend a hand and technically he was not in charge.  Sgt. Monaghan indicates the crowd to be from 100 to

150 people and the place to be in utter chaos. Upon walking up, Sgt. Monaghan reports seeing a body with Officer Brach working on the victim along with ambulance personnel. Sgt. Monaghan reports that he was given crime scene tape and he later taped off one section of the alley and then the east section of the alley to prevent access to the crime scene. Sgt. Monaghan indicates that he was very close and heard Sgt. Walker ask Officer Montalvo to get the tape from him. Sgt. Monaghan advises that at no time did he hear Sgt. Walker radio him and that if Sgt. Walker could see him all she had to do was yell to him. Sgt. Monaghan reports that he was not ignoring Sgt. Walker and was not sure if he had his radio on. (Statement submitted for review).

In review of the radio communications for September 06, 2004 Sgt. Walker does in fact call Sgt. Monaghan and asks "Sgt. Monaghan, do you need any more tape?" (located at 191 on the cassette tape counter) There is no reply from Sgt. Monaghan. Sgt. Walker makes another radio transmission "Sgt. Monaghan come in." (194 on tape counter) There is no reply from Sgt. Monaghan. In review of the tape there is no further radio communication between Sgt. Walker and Sgt. Monaghan.

## FINDINGS

A review of the radio communications for September 06, 2004 would reflect that Sgt. Walker made two radio calls to Sgt. Monaghan that went unanswered. Sgt. Walker contends that this was intentional on Sgt. Monaghan's part. Sgt. Monaghan denies hearing any radio transmission to him while at the murder scene from Sgt. Walker. In this case there is no way to determine whether this is intentional or unintentional on Sgt. Monaghan's part and thus the complaint cannot be sustained.

A secondary issue arises in Lt. O'Connell's IOC to you whereby she asks you to take note that she had told Sgt. Walker not to put this in writing but she did anyway. Sgt. Walker's IOC to you, dated September 11, 2004, is a violation of Lt. O'Connell's order not to put this matter to writing.

Respectfully submitted,

Lt. David D. Fournier
Commander
Professional Standards Division

Approved:
Disapproved:

Anthony R. Scott
Chief of Police

# EXHIBIT 59



## HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**       **Chief Anthony R. Scott**

**FROM:**     **Lt. David D. Fournier**

**SUBJECT:**  **Internal Investigation**

**DATE:**     **November 08, 2004**

**NUMBER**:   **IAD Case # 04-22**

---

Chief Scott:

On September 22, 2004 the Professional Standards Division was assigned to conduct an internal investigation based on an interoffice correspondence submitted by Sergeant Tammy Walker on September 11, 2004. In Sgt. Walker's IOC to you, she reports that on September 09, 2004 at approximately 16:00 hours she was waiting for roll call to finish, which was conducted by Sergeant John Monaghan. Sgt. Walker indicates that she needed a copy of the information given at roll call as well as a copy of the roster to see where the officers were placed on that evening. Sgt. Walker reports that she waited around, and then went over to the cabinet where the extra copies are kept and retrieved the copy. Sgt. Walker indicates that Sgt. Monaghan came over to where she was standing and stated to her "start packing your bags." Sgt. Walker believes that this comment was made in reference to personnel order # 045-04. Sgt. Walker indicates that she gave Sgt. Monaghan no response and went over to Lt. O'Connell and asked if there were any changes made to the roster. Sgt. Walker reports that she then left CO's office.

Sgt. Walker states that it is clear to her that the hostility Sgt. Monaghan feels toward her out ways his professionalism, since she has had to take and has taken his verbal assaults towards her for over the past two years. Sgt. Walker reports that she does not feel safe and fears each time Sgt. Monaghan walks by her she will be verbally assaulted. Further, Sgt. Walker requests not to work with Sgt. Monaghan fearing not only her safety but also the safety of the officers involved in any incidents, which they may find themselves working with Sgt. Monaghan on any given night.

On September 16, 2004 Lieutenant Eva O'Connell sent you an IOC regarding Sgt. Walker's complaint of working conditions. Lt. O'Connell's report that on September 10, 2004 Sgt. Walker informed her of the incident whereby Sgt. Monaghan was to have made the comment, start packing you bags. Lt. O'Connell indicates that at the time in question

she was sitting at the CO's desk, with Sgt. Michael McMullan, Officer Deborah Clement and Officer Philip McKay also being present.

Lt. O'Connell reports that she advised Sgt. Walker that she would speak with Sgt. Monaghan but did not want her to put anything in writing. Lt. O'Connell reports that she informed Sgt. Walker that if there were any further problems that Sgt. Walker should tell her right away and not wait a day or two. Lt. O'Connell instructed Sgt. Walker that she could call her at home if not working and if not home to call her cell phone.

Lt. O'Connell indicates that she spoke with Sgt. Monaghan who stated he did not say anything to Sgt. Walker on September 09, 2004.

Lt. O'Connell informed both Sgt. Walker and Sgt. Monaghan that she did not want anything going to the Chief's office at that time but if there were any further incidents she would go to Captain Fletcher and ask to see the Chief right away. Lt. O'Connell reports that she made Captain Fletcher aware of her conversations with Sgt. Walker and Sgt. Monaghan.

Lt. O'Connell states that on September 15, 2004 she spoke with both Officer Clement and Officer McKay who recalled the afternoon in question however both officers heard no remark directed at Sgt. Walker from Sgt. Monaghan.

Lt. O'Connell asks that you take note of the fact that she informed Sgt. Walker not to put this to writing, but she did anyway.

On September 29, 2004 I sent Sgt. Walker an IOC directing her to answer the following questions:

1. The location where Sgt. Monaghan made the alleged comment.
2. To list all personnel who were present in the shift commander's office when the alleged comment was made.
3. To list any witnesses who heard the alleged comment.

Sgt. Walker responded as follows:

1. She was in the commander's office when Sgt. Monaghan approached her and made the comment.
2. Lt. O'Connell was sitting at her desk, which is located in front of the file cabinet. She moved away from him and asked Lt. O'Connell if there were any changes to the roster that evening. Sgt. Walker reports that she then left the office.
3. She does not know if any other officers were in the office at that precise time. Sgt. Walker indicates that she left the office quickly.

Sgt. McMullan, Officer Clement and Officer McKay recall being present in the commander's office on September 09, 2004 at approximately 16:00 hours. All officers were informed of the allegation made by Sgt. Walker and were asked if they ever heard

Sgt. Monaghan make the comment to Sgt. Walker, start packing your bags. All officers responded in the negative.

It was determined that Sgt. Robert Laramee and Sgt. Daniel Fallon may have been present in the commander's office on September 09, 2004 at approximately 16:00 hours. Work schedules would reflect that both officers were working on September 09, 2004. Sgt. Fallon indicates that he was not sure if he was in the office at that time. Sgt. Laramee reports that it was quite possible that he was in the commander's office at that time. Both officers state that they never heard Sgt. Monaghan say to Sgt. Walker, start packing your bags.

On October 27, 2004 Sgt. Monaghan was again informed of the allegation made by Sgt. Walker and a statement was taken. Sgt. Monaghan reports that he was working on September 09, 2004 and was in the commander's office at approximately 16:00 hours. Sgt. Monaghan indicates that he had absolutely no conversation with Sgt. Walker during that time frame and more specifically denied ever making the comment to Sgt. Walker "start packing your bags." (All statement are submitted for review)

## FINDINGS

In review of the complaint and questioning all parties present there are no witnesses to Sgt. Walker's allegation. Sgt. Monaghan denies that he ever made the comment to Sgt. Walker, "start packing your bags." The case involves one person's word against another and cannot be sustained.

Lt. David D. Fournier
Commander
Professional Standards Division

Approved:
Disapproved:

Anthony R. Scott
Chief of Police

# EXHIBIT 60

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the Professional Standards Division office of the Holyoke Police Headquarters on Wednesday, October 27, 2004 at 4:04 p.m. Present while this statement is being taken are myself, Lieutenant David Fournier and Sergeant Daniel McCavick. This statement is being taken from Sergeant John Monaghan regarding an internal investigation initiated by the Chief of Police based on an interoffice correspondence submitted by Sergeant Tammy Walker dated September 11, 2004. And in her interoffice correspondence to the Chief Sergeant Walker indicates on September 6, 2004, she responded to a murder scene and she references an arrest number 2438, she indicates when she arrived she took notice of a male party lying in the middle of the alleyway. Sergeant Walker indicates she asked officers and persons over the air to get yellow caution tape to cordon off the crime scene area. She indicates cruisers were checked and no one at the scene had any in their cruiser. Sergeant Walker indicates she recalls asking Sergeant Albert over the air if he could bring some to the scene as he was on his way down. Sergeant Walker indicates that Sergeant Albert responded that he would bring some down. Sergeant Walker further notes or noticed Sergeant Monaghan walking through the alley with caution tape in his hand. Sergeant Walker indicated Sergeant Monaghan walked passed her approximately 20 yards and she noticed he was roping off part of the crime scene. Sergeant Walker indicates she radioed Sergeant Monaghan to come in, she indicates she received no response from him although she indicates she had a clear view of Sergeant Monaghan. Sergeant Walker indicates she paused then transmitted again over the air to Sergeant Monaghan "do you have enough tape to secure this area?" She indicates again she received no response from Sergeant Monaghan. Sergeant Walker reports once she realized that Sergeant Monaghan was not going to answer her, she then asked Officer Montalvo to go over to Sergeant Monaghan to retrieve the leftover tape which was in his hand after he finished off roping the other area. Sergeant Walker indicates Officer Montalvo went over and retrieved the tape from Sergeant Monaghan and roped off the crime scene area. And she further indicates that when she -- officers clearly see to her -- the disrespect shown to her by Sergeant Monaghan and the (inaudible) of the incident and the other potential incident which may arise she feels that she cannot let this go unreported.

Questions denotes Lieutenant David Fournier

Answer denotes Sergeant John Monaghan

---

    Q. I would ask again, Sergeant Monaghan, if you were working on September 6, 2004?
    A. Yes, I was.

    Q. What was your assignment that evening?
    A. I was working a special detail, I think, 7:00 p.m. to 11:00 p.m., an OIU detail.

1

Q.  Okay.  And at approximately 1945 hours, did you respond to the area of 547 South
    Bridge Street on report of a stabbing – listed as the dispatch, assault and battery with a
    dangerous weapon?
A.  Yes, I did.

Q.  Okay.  And upon arrival, what was your purpose at the scene?
A.  I technically was not in charge, I just wanted to lend a hand.  I was close.  I parked on
    Hamilton Street and I wasn't even sure exactly what the location was, I had been calling
    out cars back and forth, I was stopping cars a number of cars.  At any rate, I saw Officer
    Montalvo at the foot of the alley on Hamilton Street and I just went in to take a peek and
    I noticed that there were, I don't know, 100, 150 people in this alley, the place was – it
    was utter chaos.  So I walked in and I saw the body and I saw Officer Brach – I shouldn't
    say body, at this point I'm not sure what the victim's condition was but Officer Brach
    was working on the victim.  There were some ambulance personnel, I walked passed
    them and I just started asking people to step back because there was a – I recall a baseball
    hat, a shoe, a tire track and what not and I didn't want anything trampled.  So like I say I
    pushed people like towards the far end of the alley and asked them to step to the sides.
    As far as when I received caution tape – I mean, you know, at the time I didn't know this
    was going to be – this would come up so I don't have all the exact details but someone
    gave me a big ball of the stuff it wasn't on a spool like it normally is, it was like a big
    beach ball.  All I could think of was like a big extension cord and I'm going to have a
    hard time straightening it out but at any rate it went pretty smoothly.  I taped off one
    section of the alley and then I taped off what would be the east section of the alley
    because I didn't want people coming from the back of the blocks and accessing the alley
    – the crime scene.  And that was about it.  I finished that and I didn't do the section that
    Sergeant Walker is talking about at the time because they were just removing the victim.
    It really made no sense at that point and I heard her ask Officer Montalvo – I was very
    close to her – to get the tape from me and tape that section off.   And I then – I actually
    left the car running on Hamilton Street so I was a little nervous about that but I held the
    light for the detectives to take the photographs of the various objects and I left.  I wasn't
    there very long.  Once again -- at no time did I hear her radio me and if she could see me,
    she could have yelled to me.  I wasn't ignoring her, I'm not sure I had my radio on.  I
    mean it's a heavy murder scene, it was chaos and I'd been dealing with screaming
    people, guys telling me they're family members.  I'm still asking them to push back.  I
    don't know what she was doing but she certainly wasn't controlling that scene at all.  As
    a matter of fact, before I knew this was happening, Officer Brach approached me the next
    day and said I'm really happy to see you show up there because she was screaming at me
    to move a car or something, I was trying to help this guy, help this victim.  He's a first
    responder, he's an EMT.  Utter chaos.  But at any rate, the last thing I was thinking of
    was that anybody would even call me.  I'm taping this place off.  I'm doing what I'm
    supposed to do -- and again she didn't even say anything.  If anybody called me on the
    radio – if you can see me just yell or wave your hands or something.  And to think that
    I've got this beach ball size wad of tape and we haven't spoken in two years but she's
    going to call me in this chaotic alley and say hey, do you have enough tape?  How
    ridiculous is that.  That didn't occur.  I mean, I'm sure she said it on the radio but as soon

as I didn't answer, I'm sure there came another one and that's, you know, where the big deal is.

Q. Okay.
A. I would assume my radio on but I'm not even sure it was. And if it was it's on my hip I don't have the piece on my lapel and I would not have heard it under most circumstances.

Q. All right. So for the record you would – you did not hear her –
A. Absolutely not.

Q. -- her radio – her first radio transmission, she indicates two radio transmissions so --
A. Yeah, I read the – yeah.

Q. Okay.
A. No, under no circumstances – especially in a scene like that would I ever – I mean, what good would it do me to fail to answer her on a taped radio frequency. Again, it doesn't make any sense. And again, this is the same week as this other alleged incident, the same week that she drops and picks up a case against us.

Q. Okay.
A. It's so blatant, it's unbelievable.

Q. All right. At some point Officer Montalvo did come over to you and did retrieve some tape, is that correct?
A. I actually heard her, yeah. When I got done – I think I lit the place up later on for the detectives after it was taped off but when I got the two sections taped, I worked my way to where the victim had been, to where she was, to where Officer Montalvo was, to where Officer Brach had been and – so I was pretty close – maybe from here to the wall, a few feet away and I heard her say to Joe get the tape from him and tape off this section. I thought nothing of it. I thought she wouldn't ask me do it so she was having him do it.

Q. Okay.
A. And I never thought about it again. I just handed it to him and I think I assisted Detective McGillicuddy or Sattler or somebody.

Q. Yeah. Could you approximate in feet how far between yourself and Sergeant Walker?
A. Well, at this point everyone was cleared out so – I mean, I could hear her but I couldn't tell you how close I was.

Q. So you –
A. It wasn't like when I first arrived and everybody was screaming. I got all the people away so – I did hear her say it to him but I couldn't tell you how close I was.

Lieutenant Fournier: Okay. Sergeant McCavick, any questions?

Sergeant McCavick: No, I don't have any questions, no.

3

Lieutenant Fournier:   Again, we'll give you the opportunity to response – if there's anything you'd like to respond to in this allegation presented by Sergeant Walker.

Sergeant Monaghan:   Just that I'm disgusted, that's all I can say.

Lieutenant Fournier:  Okay.  At this point the statement will conclude at 4:12 p.m., October 27, 2004.

_____          _____
Sergeant John Monaghan                                     Date

# EXHIBIT 61

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the Professional Standards Division office at the Holyoke Police Headquarters on Wednesday, October 27, 2004 at 10:50 a.m. Present while this statement is being taken are Lieutenant David Fournier, myself and Sergeant Daniel McCavick. This statement is being taken from Officer Philip McKay regarding an internal investigation initiated by the Chief of Police as a result of an interoffice correspondence received by him, the Chief, from Sergeant Tammy Walker dated September 11, 2004. And in Sergeant Walker's interoffice correspondence she indicates on September 9, 2004, at approximately 4:00 p.m., she was waiting for Roll Call to finish which Sergeant Monaghan had conducted. Sergeant Walker indicates she needed a copy of the information given at Roll Call as well as a copy of the roster to see where the officers were placed on that evening. Sergeant Walker indicated that around – she waited around then went over to the cabinet where extra copies are kept and retrieved a copy. She indicates Sergeant Monaghan came over to where she was standing and stated to her start packing your bags. Sergeant Walker feels this comment was made in reference to Personnel Order number 045-04. Sergeant Walker indicates she gave no response to Sergeant Monaghan and went over to Lieutenant O'Connell and asked if there were any changes made to the copy of the roster which she was showing her. She indicates she then left the CO's office. Sergeant Walker indicates that it's clear to her that the hostilities Sergeant Monaghan feels towards her outweighs his professionalism since she has taken and has had to take verbal assaults towards her for over the past two years. She does not feel safe and fears each time she walks by she may be verbally assaulted. A subsequent report submitted by Lieutenant O'Connell dated September 16, 2004, to the Chief of Police indicates that there were several officers that were present at that time frame when the alleged comment was made, in particular Officer Philip McKay.

Questions denotes Lieutenant David Fournier

Answer denotes Officer Philip McKay

---------------

Q. I would ask, Officer McKay, you were working on September 9, 2004?
A. Yes, I was.

Q. Do you know what your assignment was for that particular evening or tour of duty?
A. I had just completed the day shift and I was then assigned to an overtime detail for the – to 8:00 o'clock for the OUI detail.

Q. Okay. Were you in the Shift Commander's office on September 9, 2004, at approximately 4:00 p.m.?
A. Yes, I was.

Q. Okay. Do you recall – was anyone else present during that time frame?

A. I believe it was myself, Officer Clement, Sergeant McMullan. I believe, Lieutenant O'Connell; I believe, Sergeant Walker and later on Sergeant Monaghan came in.

Q. Okay. In reference to Sergeant Walker's allegation, she indicates Sergeant Monaghan came over to her and said start packing your bags. Did you hear that comment?

A. No, I didn't. I didn't see any interaction between Sergeant Walker or Sergeant Monaghan at all.

Q. Okay. So no interaction to – any observation on your part of the two Sergeants?

A. Not that I saw, no.

Lieutenant Fournier: Okay. Sergeant McCavick, any questions?

Sergeant McCavick: No questions, no.

Lieutenant Fournier: That would conclude – anything you'd like to add, Officer McKay, prior to conclusion?

Officer McKay: No. No. That's pretty much it.

Lieutenant Fournier: That would conclude the statement at 10:59 a.m., October 27, 2004.


_____          _____
Officer Philip McKay                                    Date  11/11/04


2

# EXHIBIT 62

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the Professional Standards Division office at the Holyoke Police Headquarters on Wednesday, October 27, 2004 at 11:12 a.m. Present while this statement is being taken are myself, Lieutenant David Fournier and Sergeant Daniel McCavick. This statement is being taken from Officer Deborah Clement regarding an internal investigation initiated by the Chief of Police as a result of an interoffice correspondence received by the Chief from Sergeant Tammy Walker. The interoffice correspondence is dated September 11, 2004. And in her interoffice correspondence Sergeant Walker indicates on September 9, 2004, at approximately 4:00 p.m., while waiting for Roll Call to finish which Sergeant Monaghan conducted, she needed a copy of the information given at Roll Call as well as a copy of the roster to see where the officers were placed on that evening. Sergeant Walker indicated she waited around then went over to the cabinet where extra copies are kept and retrieved a copy. Sergeant Walker alleges that Sergeant Monaghan came over to where she was standing and stated to her "start packing your bags". Sergeant Walker feels this comment was made in reference to Personnel Order number 045-04. Sergeant Walker indicates she gave no response to Sergeant Monaghan and went over to Lieutenant O'Connell and asked if there was any changes made in the copy of the roster which she was showing her. Sergeant Walker indicates she then left the CO's office. Sergeant Walker indicates it is clear to her that the hostility Sergeant Monaghan feels towards her outweighs his professionalism since she had to take and has taken verbal assaults towards her for over the past two years. She does not feel safe and fears each time he walks by she will be verbally assaulted. A subsequent report submitted by Lieutenant O'Connell on September 16, 2004, indicates that there may have been several officers present while the alleged statement may have been made, including Officer Deborah Clement.

Questions denotes Lieutenant David Fournier

Answer denotes Officer Deborah Clement

_____

Q. I would ask, Officer Clement, if you were working on September 9, 2004?
A. Yes.

Q. Do you recall were you were assigned?
A. I was assigned to a special detail with Sergeant McMullan and PJ McKay.

Q. Okay. And do you know the hours of that detail?
A. It was 4:00 to 8:00.

Q. Okay. Were you in the Shift Commander's office on September 9, 2004, at approximately 4:00 p.m.?

1

A. Yes.

Q. Okay. Were there any other officers present during that time frame?
A. Sergeant McMullan and PJ McKay. I remember Lieutenant O'Connell and Sergeant Fallon and other than that, I don't recall anybody else.

Q. Okay. Did you hear Sergeant Monaghan make the statement to Sergeant Walker start packing your bags?
A. No, I did not.

Q. Okay. Did you hear or see any interaction between the two Sergeants?
A. No, I didn't.

Lieutenant Fournier: Okay. Sergeant McCavick, any questions?

Sergeant McCavick: No questions, no.

Lieutenant Fournier: Officer Clement, anything you'd like to add?

Officer Clement: No.

Lieutenant Fournier: That would conclude the statement at 11:16 a.m., October 27, 2004.

_Officer Deborah Clement_                _11/10/04_
Officer Deborah Clement                  Date

2

# EXHIBIT 63

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the Professional Standards Division office at the Holyoke Police Headquarters on Thursday, October 28, 2004 at 2:07 p.m. Present while this statement is being taken are myself, Lieutenant David Fournier and Sergeant Danny McCavick. This statement is being taken from Sergeant Robert Laramee regarding an internal investigation initiated by the Chief of Police as a result of an interoffice correspondence submitted through the chain of command to the Chief of Police from Sergeant Tammy Walker. The interoffice correspondence is dated September 11, 2004. And in her correspondence, Sergeant Walker indicates on September 9, 2004, at approximately 4:00 p.m., she was waiting for Roll Call to finish which Sergeant Monaghan had conducted. Sergeant Walker indicates she needed a copy of the information given at Roll Call as well as a copy of the roster to see where the officers were placed on that evening. Sergeant Walker waited around then went over to the cabinet where the extra copies are kept and she indicates she retrieved a copy. Sergeant Walker indicates Sergeant Monaghan came over to where she was standing and stated to her "start packing your bags". Sergeant Walker feels this comment was made in reference to Personnel Order number 045-04. As a result of questioning of Sergeant Monaghan he indicates that additionally these other officers being present; Sergeant Laramee was present at this time frame.

Questions denotes Lieutenant David Fournier

Answer denotes Sergeant Robert Laramee

_____

    Q. I would ask, Sergeant Laramee, if you were working on September 9, 2004?
    A. Yes, I was.

    Q. Okay. At approximately 4:00 p.m. were you in the Shift Commander or Watch
       Commander's Office?
    A. It's quite possible.

    Q. Okay. And I would ask if you ever heard Sergeant Monaghan say to Sergeant Walker
       start packing your bags?
    A. No, I didn't.

Lieutenant Fournier: Okay. Sergeant McCavick, any questions?

Sergeant McCavick: No questions.

Lieutenant Fournier: That would conclude the statement. Sergeant Laramee, anything you'd like to add?

1

Sergeant Laramee:  Not only did I not hear anything but neither officer came to me to complain of any interaction between the two of them.

Lieutenant Fournier:  Okay.  Anything further?

Sergeant Laramee:  Nope.

Lieutenant Fournier:  Okay.  That would conclude the statement on September – excuse me – October 28, 2004, at 2:10 p.m.

_____     _____
Sergeant Robert Laramee                            Date

2

# EXHIBIT 64

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the Professional Standards Division office at the Holyoke Police Headquarters on Friday, October 29, 2004 at 1855 hours. Present while this statement is being taken is myself, Lieutenant David Fournier. This statement is being taken from Sergeant Daniel Fallon regarding an internal investigation initiated by the Chief of Police regarding an interoffice correspondence submitted by Sergeant Tammy Walker on September 11, 2004. And in Sergeant Walker's interoffice correspondence to the Chief she reports that on September 9, 2004, at approximately 4:00 p.m., she was waiting for Roll Call to finish which was conducted by Sergeant Monaghan. Sergeant Walker reports that she needed a copy of the information given at Roll Call as well as a copy of the roster to see where the officers were placed on that evening. Sergeant Walker reports that she waited around then went over to the cabinet where the extra copies are kept and retrieved a copy. Sergeant Walker reports Sergeant Monaghan came over to where she was standing and stated to her "start packing your bags". Sergeant Walker feels this comment was made in reference to Personnel Order number 045-04.

Questions denotes Lieutenant David Fournier

Answer denotes Sergeant Daniel Fallon

_____

    Q. I would ask, Sergeant Fallon, if you were working on Thursday, September 9, 2004?
    A. Yes, I was working.

    Q. Okay. Were you in the Shift Commander or Watch Commander's Office at approximately 4:00 p.m.?
    A. I am not sure. I would have been in there around that time but I don't know if I would have been in there at that time.

    Q. Okay. And did you – do you recall any interaction between Sergeant Monaghan and Sergeant Walker on September 9, 2004, at approximately that time frame, 4:00 p.m.?
    A. No, I do not.

    Q. Okay. In particular do you – on that date or any other time, have you ever heard Sergeant Monaghan say to Sergeant Walker start packing your bags?
    A. No, I have not.

Lieutenant Fournier: Okay. I have no further questions. Anything you'd like to add before the statement concludes?

Sergeant Fallon: No.

Lieutenant Fournier:  Okay.  So the statement will conclude at 1857, October 29, 2004.


_____     Nov 15, 2004
Sergeant Daniel Fallon                        Date

2

# EXHIBIT 65

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the Professional Standards Division office at the Holyoke Police Department on Monday, October 25, 2004 at 1359.  Present while this statement is being taken are Lieutenant David Fournier, myself and Sergeant Daniel McCavick.  This statement is being taken from Sergeant Michael McMullan regarding an internal investigation initiated by the Chief of Police based on an interoffice correspondence submitted by Sergeant Tammy Walker dated September 11, 2004.  Sergeant Walker indicates in her interoffice correspondence to the Chief that on September 9, 2004, at approximately 4:00 p.m. while waiting for Roll Call to finish which Sergeant Monaghan had conducted, she was waiting in the CO's office where the cabinet and extra copies are kept.  She indicates she retrieved a copy, Sergeant Monaghan came over to where she was standing and stated to her start packing your bags.  Sergeant Walker feels that this comment was made in reference to Personnel Order number 045-04.  Sergeant Walker indicates she gave Sergeant Monaghan no response and went over to Lieutenant O'Connell and asked her if there's any changes made to the copy of the roster which she was showing Lieutenant O'Connell.  Sergeant Walker indicates she then left the CO's office.  She indicates that it's clear to her that the hostilities Sergeant Monaghan feels towards her outweighs his professionalism since she's had to take and has taken verbal assaults toward her over the past two years.  And she indicates she does not feel safe for each time Sergeant Monaghan walks by and that she'll be verbally assaulted.

Questions denotes Lieutenant David Fournier

Answer denotes Sergeant Michael McMullan

_____

Q.  I would ask, Sergeant McMullan, if you were working on September 9, 2004?
A.  Yes.

Q.  And what was your assignment during that time frame?
A.  Special assignment, OUI detail.

Q.  And do you recall the hours of the detail?
A.  4:00 to 8:00.

Q.  Okay.  Do you recall being present in the Shift Commander's office approximately during that time frame?
A.  Yes, just prior to 4:00 o'clock I was sitting at the CO's – day CO's desk, I believe.

Q.  Okay.  Do you recall who was in the office during that time frame?
B.  No.

1

Q. Okay. Do you have any – I'll just ask you for the record, do you recall if Sergeant Monaghan or Sergeant Walker were either there?

A. No, I was – my purpose for being there was waiting on Officer Deborah Clement and Phil McKay because they were accompanying me on the detail and I was in the process of trying to obtain cruisers for our detail which was difficult because we were short on our cruisers. So my main focus was trying to obtain police cars, to supply them with vehicles and myself because I was also on the detail. The office had quite a few officers in it at the time but as to any interaction between those two officers, I heard nothing and know nothing about it.

Q. Okay. So is it possible – or was Officer McKay or Officer Clement present during that time frame?

A. I don't recall them being there either.

Q. Okay. All right.

A. They did come in later on and did show up for the detail and did work the detail.

Q. Okay. And just for the record did you at that time or any other time hear Sergeant Monaghan say to Sergeant Walker start packing your bags or anything resembling that effect?

A. I heard nothing.

Lieutenant Fournier: Okay. Sergeant McCavick, any questions?

Sergeant McCavick: I have no questions, no.

Lieutenant Fournier: All right. That would conclude the statement of Sergeant McMullan, if you would like to add anything prior to conclusion?

Sergeant McMullan: No. That's all I have.

Lieutenant Fournier: Okay. The statement will conclude at 1403, 2004 October 25th. Thank you.

_____          _____
Sergeant Michael McMullan                 Date   11-11-04

# EXHIBIT 66



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**       **Sgt. Tammy Walker**

**FROM:**     **Lt. David D. Fournier**
              **Commander, Professional Standards Division**

**SUBJECT:**  **Internal Investigation**

**DATE:**     **November 17, 2004**

**NUMBER:**   **IAD CASE # 04-22**

---

Sgt. Walker:

On September 11, 2004 you submitted an interoffice correspondence (IOC) to Chief Anthony R. Scott regarding working conditions. In your IOC you allege that on September 09, 2004 at approximately 4:00 PM Sgt. Monaghan came over to where you were standing and stated to you "start packing your bags", feeling this comment was made in reference to personnel order #045-04.

The matter has been investigated and statements from personnel present have been taken. There is no evidence to support your allegation and thus has been classified as **"Not Sustained"**, which as defined indicates that the investigation failed to discover sufficient evidence to clearly prove or disprove the allegation made.

Sincerely,

Lt. David D. Fournier
Commander
Professional Standards Division

# EXHIBIT 67



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**   LIEUTENANT DAVID D. FOURNIER, COMMANDER, PROFESSIONAL STANDARDS DIVISION

**FROM:**   ANTHONY R. SCOTT, CHIEF OF POLICE

**SUBJECT:**   IAD CASE # 04-21 – OFFICER SAFETY CONCERNS

**DATE:**   WEDNESDAY, NOVEMBER 17, 2004

Lieutenant Fournier:

I have read your investigative report and find it to be complete. Sergeant Tammy Walker's allegation that Sergeant John Monaghan's failure to respond to her two <u>NON-EMERGENCY</u> radio calls regarding enough crime scene tape raised concerns of her and other officers' safety.  I conclude that her allegations of "Officer Safety" violations are UNFOUNDED.  Sergeant Walker cannot articulate one incident that threatens "Officer Safety" violations on the party of Sergeant Monaghan or any other officer.  As to whether or not Sergeant Monaghan's failure to respond to the two <u>NON-EMERGENCY</u> radio calls was intentional, I concur with your finding of NOT SUSTAINED.  As to Sergeant Monaghan's failure to respond to the two <u>NON-EMERGENCY</u> radio calls to be insubordinate, I find this to be UNFOUNDED.  In order for insubordination to be substantiated, Sergeant Walker would have to prove that Sergeant Monaghan actually heard her radio call and intentionally ignored the transmission.  Sergeant Walker did not produce any evidence nor did any officer present on the scene conclusively state that Sergeant Monaghan heard the transmission and ignored them.

As to Lieutenant Eva O'Connell's order to Sergeant Walker that she was not to put this complaint in writing as she (Lieutenant O'Connell) was in the process of investigating the matter, the Lieutenant cannot issue an order prohibiting the Sergeant from documenting an alleged incident.  Therefore, I cannot hold Sergeant Walker accountable for violating this order.

Anthony R. Scott
Chief of Police

ARS/jas

# EXHIBIT 68



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**   LIEUTENANT DAVID D. FOURNIER, COMMANDER,
         PROFESSIONAL STANDARDS DIVISION

**FROM:**   ANTHONY R. SCOTT, CHIEF OF POLICE

**SUBJECT:** IAD CASE # 04-22 – COURTESY VIOLATION

**DATE:**   WEDNESDAY, NOVEMBER 17, 2004

---

Lieutenant Fournier:

I have read your investigative report and find it to be complete.
Sergeant Tammy Walker's allegation that Sergeant John Monaghan
made the comment, "Start packing your bags" to her in the Watch
Commander's office cannot be substantiated.  Therefore, I concur
with your finding of "Not Sustained" in that we can neither prove
nor disprove the allegation.

As to Lieutenant Eva O'Connell's order to Sergeant Walker that
she was not to put this complaint in writing as she (Lieutenant
O'Connell) was in the process of investigating the matter, the
Lieutenant cannot issue an order prohibiting the Sergeant from
documenting an alleged incident.  Therefore, I cannot hold
Sergeant Walker accountable for violating this order.

Anthony R. Scott
Chief of Police

ARS/jas

# EXHIBIT 69

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER, | ) |
|     Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF HOLYOKE, | ) |
|     Defendant | ) |

## AFFIDAVIT OF EVA O'CONNELL

I, Eva O'Connell, hereby depose and say as follows upon personal knowledge:

1.  I was a member of the Holyoke Police Department for approximately 37 years. I became a Lieutenant in 1998. I retired on January 31, 2007.

2.  Tammy Walker was transferred to my watch (4 p.m. to midnight) in approximately January 2004. Until August 2004, I did not have any significant behavioral issues with Ms. Walker, generally only issues pertaining to the quality of her work.

3.  By August 2004, I had become aware of five separate incidents involving Ms. Walker's job performance that concerned me. As a result, I spoke to her at that time. I told her that she needed to concentrate on being a good street supervisor. I advised her to study the law books because I thought that she lacked certain knowledge required of her job as a supervisor. For instance, one incident involved what I perceived to be an illegal arrest made by Ms. Walker. I even gave her a copy of the applicable law on the elements of the crime for which she arrested the individual to show her that the elements were not present to support the arrest.

4.  In response, Ms. Walker denied my contention. Because I was still very concerned, however, on August 3, 2004, I sent a memo to my supervisor, Captain Alan Fletcher, outlining the five incidents that concerned me. Subsequently, Captain Fletcher, Ms. Walker and I had a discussion about the incidents. It was my intention that this memo not go in Ms. Walker's personnel file or be given to Chief Scott. However, I later learned that Ms. Walker gave the memo to Chief Scott on her own.

5.  Because I did not notice any improvement in Ms. Walker's knowledge of her job and because I had concerns about her temperament, in that she seemed very

emotional, I made the decision on November 10, 2004 to reassign her to the position of booking officer until further notice.

6.    On November 10, 2004, I sent notice to Ms. Walker of the reassignment. The initial draft of the interoffice correspondence that I prepared used the following language:

> Unless your duties as booking officer take you into dispatch or records bureau, you will refrain from **hanging around** those offices. (emphasis added)

Upon further reflection, I decided that this language was unprofessional and, therefore, changed this line to the following language:

> Unless your duties as booking officer take you into dispatch or records bureau, you will refrain from **visiting** those offices. (emphasis added)

I thought that I had given Ms. Walker the second version of the November 10, 2004 correspondence. However, I later learned that Ms. Walker may have inadvertently received both copies. On December 20, 2004, she filed a grievance against me in which she accused me of altering the correspondence, dated November 10, 2004, to suit my objectives. She also complained that I did not give her a reason for the reassignment. She requested that I be removed from my position. Chief Scott conducted an investigation of Ms. Walker's grievance which included taking a statement from me.

7.    As Ms. Walker's supervisor, I have the authority to change her duty assignment since she worked under my command. I am not required to provide an officer that I supervise with an explanation as to why their duty assignment is changed. In Ms. Walker's case, the reassignment was not a disciplinary action.

8.    Toward the end of October 2004, Ms. Walker asked me if I had issued an order to have dispatch calls shipped via e-mail to the patrol officers in police vehicles. In response, I told her "no" and asked her why she would think that I would issue such an order. In response, she stated that she had heard police vehicles clear from calls but had not heard the calls that were sent. I told her that there was one address where the police vehicles were being assigned to report either via a call or via e-mail over the laptop due to concerns that individuals at the address had scanners. I also told Ms. Walker that I would investigate her inquiry which I did. That is, I spoke to Officer Craven, a dispatcher on the second watch, who informed me that the laptop had not been working for a few days. He also told me that he had not been dispatching the police vehicles via e-mail. In addition, I checked with Officer Moriarty of the Electronic Section who informed me that any assignments sent over the laptop are stored. As a result, I told Ms. Walker that if there was something in particular that she was concerned about, it would be possible to look into it. While Ms. Walker informed me that she was

2

documenting everything, she could not give me any specific incidents or dates when I inquired.

9.  At no time did I make any change in the general protocol as to the way dispatchers send police vehicles to calls, and I informed Ms. Walker of this. I later learned that Ms. Walker spoke to Lieutenant Denise Duguay and to Chief Scott regarding this issue which violated the chain of command. That is, I never gave her permission to speak to anyone else about the issue and I am not aware that she obtained authorization from any other supervisor before speaking to Chief Scott or Lieutenant Duguay.

10. On February 25, 2005, I was in the Commanding Officer's Office (CO's office) with the scheduling book on the desk in front of me speaking about scheduling issues with Officer Shattuck. Ms. Walker came into the office even though she had taken a vacation day. Without saying anything, and without any warning, she approached my desk and grabbed both ends of the scheduling book that was open in front of me. As she attempted to remove it from the desk, I put my hands on the scheduling book to prevent her from removing it. At that point, the scheduling book was about 1 to 2 inches off the table. I also said "excuse me Sergeant Walker." Ms. Walker again tried to grab hold of the scheduling book to pull it away from me. I told her to let go of it. I then closed the book. I signaled for Officer Shattuck to leave the room so that I could speak privately with Ms. Walker. I then stood up and went to close the door. At that point, Ms. Walker came over to me and went nose to nose with me. She then quietly said "F---You." She then stated that she wanted to put in some requests for time owed in the scheduling book. I told Ms. Walker to give me her blue slips and that I would take care of them. Subsequently, Ms. Walker picked up the blue slips and left the area.

11. On February 27, 2005, I reported the February 25, 2005 incident via an interoffice correspondence to Captain Alan Fletcher. I later learned that Ms. Walker attempted to claim that she was injured as a result of the incident. Ms. Walker made no indication that she was injured, however.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _11th_ DAY OF
_June_____ 2007.

_Eva O'Connell_
Eva O'Connell

# EXHIBIT 70

COPY

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the Professional Standards Division Office at the Holyoke Police Headquarters on Monday, December 13, 2004, at 8:47 p.m. Present while this statement is being taken are myself, Lieutenant David Fournier and Sergeant Danny McCavick. This statement is being taken from Lieutenant Eva O'Connell regarding an investigation initiated by the Chief of Police as a result of an allegation brought forward by Sergeant Tammy Walker reporting that dispatchers are sending units to calls using laptop e-mails instead of by radios and the said date in question would be from September 15, 2004, to November 4, 2004.

Questions denotes Lieutenant David Fournier

Answer denotes Lieutenant Eva O'Connell

_____

Q. And I would ask, Lieutenant O'Connell, did – and I refer to a statement from Sergeant Walker and again according to Sergeant Walker did she ever ask you if an order had come down to have e-mails shipped, in her words, or to have calls shipped over to e-mails?
A. Yes, she did.

Q. Okay. And do you recall when she first brought this forward to your attention?
A. I would say it was the end of October.

Q. Okay. And what was the nature of her allegation?
A. She came in in the middle of the shift and asked me if there had been an order out with regards to dispatching units via laptop as opposed to the radio.

Q. Uh-huh. And did she give specific dates and times of these –
A. No, she didn't.

Q. Okay. And what was your reply to her?
A. I told her no and asked her why would she – why she would think that and she told me that it because she had heard units clear from calls and had not heard them sent to calls. I told her that there was one address, 119 Nonotuck Street where the units were being told to go either having them calling or via the laptop and that a supervisor was accompanying them due to the problems we've had at that particular address. However that had not been in recent – within the recent past couple of nights. I told her I'd check into it which I did, I spoke to Officer Craven later on that night and asked him if he knew anything

1

000028

000028

about it and he said that the laptop hasn't even been working for a few days and that he hadn't been dispatching the units via that way.

Q. Okay. Is this the only time she approached you, you said the end of October regarding this matter?

A. Yes, I think it was a couple of days later I spoke to her and I told her that I'd checked into it and that in fact – exactly what Officer Craven had told me that the laptops had not been working, that they could use it unit to unit but they couldn't use it from dispatch to unit and I also told her that I had checked with Officer Moriarty and that everything that goes over the laptop is stored upstairs and if there was something particular we could look at it. She told me she was documenting everything but when I asked her for specific incidents or dates, she couldn't give me any.

Q. Okay. And what was her response to your explanation?

A. She just again told me she was documenting everything.

Q. Alright. What was her – do you recall her emotional state at that time?

A. She was very antsy, very uptight.

Q. Okay. Did any other supervisor, police officer or dispatcher bring to your attention or raise a concern of officer's safety that officers were being dispatch by e-mail instead of by radio?

A. No.

Q. So she was the only officer bringing this to your attention?

A. That's right.

Q. Okay. For the record, did you ever order any dispatcher either verbally or in writing to have officers dispatched by e-mail instead of by radio?

A. As I say we have that one address 119 Nonotuck Street, sometimes they do it and sometimes they don't. Sometimes they asked them to go to freq 2 just because we think the people up there have a scanner.

Q. Alright. Well regarding that is there any change in general protocol to the way the dispatchers are sending units to calls?

A. No.

Q. Okay. And again you indicated a specific instant, what's the -- again the nature of that, the reason to have a silent dispatch or to dispatch by laptop e-mail to the officers?

A. On that 119 Nonotuck Street?

Q. Yes.

A. The woman on the third floor has complained numerous times about the people on the second floor, there's two apartments on the second floor. I've gone up there, the officers have gone up there and it's just a neighborhood thing that's ongoing. We've had three

2

000170

calls there tonight. Frequently what happens is by the time the officer gets there, you know, the noise has stopped.

Q. Uh-huh. Sergeant?

Sergeant McCavick: Just a couple of things, Lieutenant, and some of them might be a little overlapping but I would just ask that you'd bear with me.

Q. (By Sergeant McCavick) According to an interoffice correspondence submitted by Lieutenant Denise Duguay, it was indicated that Sergeant Tammy Walker approached her, that being Lieutenant Duguay, on 11/4 of 2004 and according to Lieutenant Duguay's correspondence, Sergeant Walker conveyed to her that on 11/3/04 she had been called into the Commanding Officer's office by you and that you indicated conducting an investigation relative to Sergeant Walker's allegations of calls being dispatched over the laptops or the e-mails to police officers. Sergeant Walker indicated your investigation was unfounded and that you additionally indicated to Sergeant Walker that she reports to you. Could you respond in detail to Sergeant Walker's assertions or statements made to Lieutenant Duguay.

A. I'm not really clear on what that question is all about. As I say, I think it was October 31st she initially came to me about the laptops. It took me – I talked to Officer Craven, I talked to Officer Moriarty, Kenny Moriarty and then I think Sergeant Walker was off for a couple of days, I'm going to say November 3rd would be the time that I got back to her with my answer saying that there had been no change in the protocol of dispatching. What else is she telling Lieutenant Duguay that I said on November 3rd?

Q. I'll just kind of go back here and it says here – let's see here -- Sergeant Walker conveyed to her that on 11/3/04 she had been called into the Commanding Officer's office by you being Lieutenant O'Connell and that you had indicated conducting an investigation relative to Sergeant Walker's allegations of the calls being dispatched over the laptops to police officers. Sergeant Walker indicated that your investigation was unfounded and that you additionally indicated to Sergeant Walker that she reports to you and that's what she had conveyed.

A. Okay. I guess what she's saying is that I said that the investigation came up that it was her allegation was unfounded and she told me that – I got the impression that she wasn't happy and that she was going to go elsewhere and I advised her that she worked for me, I was her immediate supervisor. So if she had any correspondence for Captain Fletcher, the Chief or anybody else, it should go through to me.

Q. Okay. Did Sergeant Walker seek permission from you to speak with Chief Scott relative to this matter?
A. No, she did not.

Q. Okay. Did Sergeant Walker, to your knowledge, seek permission from any immediate Operation's supervisor in speaking to Chief Scott relative to this matter?
A. No, she did not.

Q. Okay. And for the record, Sergeant Walker is assigned to Operations?
A. She is.

Q. Okay. And did you give permission to Sergeant Walker to speak to Lieutenant Duguay relative to this matter?
A. No, I did not.

Q. Okay. And then just the final thing, Lieutenant, in Lieutenant Duguay's IOC she indicates the following, "when Sergeant Walker told me about her concerns that the dispatchers were using the laptops rather than being dispatched by the radio, she said that she believed that Lieutenant O'Connell had issued a verbal order to the dispatchers telling them to do this". And according to Lieutenant Duguay, "I explained to Sergeant Walker that it is possible that some calls would be done via laptop such as loud noise complaints due to the use of scanners" and she said, that being Sergeant Walker, that it wasn't some of the calls it was almost all of them. And I would just ask and again some of this is overlapping if you could just respond to that final statement.
A. I think it's very simple. I think she's paranoid, I think she's got some emotional problems but if there's any concerns that there's any grounds to what she says, it's just a matter of go to Officer Moriarty and look at the – he tells me everything's on the computer upstairs. Everything that goes over dispatch – or over the laptop and that was one of the questions that I asked him and I explained to her the exact same thing and that's why I asked her when she said that she had everything documented, I wanted to know what the incidents were and I would have asked for them. And if she has any particular incidents, then I think we can just go to Officer Moriarty and ask him to check the dates and times and see what the story is.

Q. And at no time – she has not supplied –
A. No.

Q. -- any of that documentation?
A. No.

Sergeant McCavick: I have nothing else to ask.

Lieutenant Fournier: And we'll give Lieutenant O'Connell to respond, anything you'd like to bring forward regarding the allegation that we have not touched on that you think it's appropriate.

Lieutenant O'Connell: I don't think – I think it's pretty clear, she made the allegation, I didn't do it, I don't think that – if she's got some specific places and times and dates, then let's just check the computer. It's as simple as all that. I did not give anybody any change of mode, I didn't tell them to use telephones, I didn't tell them to use laptops, I didn't tell them to do anything as far as changing the way of dispatching. I just think she's got some emotional problems and she feels persecuted and I think she just brings it all on herself.

Lieutenant Fournier: Okay.

000031

Sergeant McCavick:  Okay.

Lieutenant Fournier:  Very good.  Then the statement will conclude at 8:57 p.m.  Thank you.

_Eva M. O'Connell_                     _12·29·04_
Eva O'Connell                          Date

000635

# EXHIBIT 71

COPY

==================================================================

HOLYOKE POLICE DEPARTMENT
INTEROFFICE CORRESPONDENCE

==================================================================

TO:        CHIEF ANTHONY R. SCOTT                    **RECEIVED**
FROM:      LT. DENISE DUGUAY
DATE:      11/04/04                                   NOV 05 2004
RE:        SGT. TAMMY WALKER
                                                    **CHIEF'S OFFICE**

---

As per your request, I am submitting the following Interoffice Correspondence regarding Sgt. Tammy Walker and her concerns regarding the dispatching of police officers via laptop rather than by radio.

Today, 11/04/04, Sgt. Walker came into the Records Bureau and asked to speak to me in private. We went into my office and closed the door. Sgt. Walker told me that last night, 11/03/04, at 10:31 PM, she had been called into the CO's office by Lt. Eva O'Connell. According to Sgt. Walker, Lt. O'Connell told her that she had conducted an investigation regarding her allegation that the dispatchers were using the laptops to "e-mail" police officers to calls, rather than dispatch them by the radio airwaves. As a result of her investigation, Lt. O'Connell felt that the allegations by Sgt. Walker were unfounded. Sgt. Walker stated that Lt. O'Connell also told her that she was her lieutenant and that she (Sgt. Walker) reports to "her" (Lt. O'Connell).

I asked Sgt. Walker if she had reported this to you (Chief Anthony R. Scott) yet. She said that she had been intending to have her attorney contact you, but that has not happened yet. Sgt. Walker was emotional and I could see that this situation was bothering her. I asked her if she wanted to speak to the Chief now and she said yes. She wanted me to be present with her when she spoke to you about the situation.

I called you on the telephone in your office and explained that Sgt. Walker was in my office. I further told you that she wanted to speak with you and that she wanted me to be present. You agreed to speak with her and said that we could come upstairs to your office, which we did.

After our meeting, you asked me to get one of the dispatchers and bring that person to your office. I brought John O'Donnell to your office, whereupon you spoke with him, and then a few minutes later, you spoke to Officer Jack Craven (both in my presence). Both individuals stated that it is unusual for dispatchers to have officers dispatched via laptop. On the rare occasions that it does occur, it is usually due to a request by a caller (such as for a loud music complaint) because the people involved have a scanner.

*Page 1 of 2*

000038

Dispatcher O'Donnell pointed out that sometimes an officer is dispatched from the police station in person (such as when an officer is in the report writing room completing a report.). Officer Craven also stated that for the most part "over the last month and a half", the laptops have not been working. For the times that the computers have been working, it is possible to obtain a transcript of the written correspondence between dispatch and the cruiser laptops.

When Sgt. Walker told me about her concerns that the dispatchers were using the laptops rather that being dispatched by the radio, she said that she believed that Lt. O'Connell had issued a (verbal) order to the dispatchers telling them to do this. I explained to Sgt. Walker that it is possible that some calls would be done via laptop, such as loud noise complaints due to the use of scanners. She said that it wasn't some of the calls, it was almost all of them. Specifically, she remembered hearing some officers clear from calls that she had not heard them dispatched to. In addition, she was also convinced that this was happening was because there have been periods of long silences on the air (radio airwaves), which is unusual on the second watch. She asked me if I was aware that officers were being dispatched via laptop instead of by radio and I said no.

I asked Officer Craven if officers were being dispatched via laptop as a matter of course and he said no, that there was no changes to the protocol. He said that on rare occasions, officers are dispatched via laptop but that most of the time, they are dispatched via the radio. I believe I also asked another dispatcher on the second watch (Dispatcher O'Neill or Dispatcher Therrien) who confirmed that the calls were still being dispatched over the radio as usual.

I told Sgt. Walker that the dispatchers denied that they were dispatching calls differently than normal, and that her fears appeared to be unfounded. Sgt. Walker remained unconvinced. I reminded her of her chain-of-command, and suggested that she speak to Lt. O'Connell about her concerns. Sgt. Walker said she felt it was a safety issue and I told her that if she really believes that, she should notify Lt. O'Connell and the Chief. I explained to her that she was putting me in an uncomfortable situation by coming to me rather than to Lt. O'Connell. She said she was not coming to me as a lieutenant but as a person. At that time, she stated she would have her attorney contact the Chief.

Respectfully submitted,

*Lt. Denise Duguay*
Lt. Denise Duguay

000039

# EXHIBIT 72

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER, <br>     Plaintiff | ) <br> ) <br> ) |
| v. | ) <br> ) |
| CITY OF HOLYOKE, <br>     Defendant | ) <br> ) <br> ) |

## AFFIDAVIT OF SERGEANT DANIEL MCCAVICK

I, Sergeant Daniel McCavick, hereby depose and say as follows upon personal knowledge:

1.  I have been a member of the Holyoke Police Department for 20 years. I am currently assigned to the Professional Standards Division which is responsible for conducting internal investigations.

2.  On November 8, 2004, Police Chief Anthony Scott requested that the Professional Standards Division conduct an internal investigation of an allegation brought forward by Tammy Walker. Specifically, Ms. Walker asserted on November 11, 2004 that Lieutenant Eva O'Connell, the Watch Commander for the 2nd watch (the 4 p.m. to midnight shift) who was Ms. Walker's supervisor, issued an order to have dispatchers send police officers to calls by e-mail or laptop communication instead of by radio. Ms. Walker alleged that Lieutenant O'Connell was doing this to prevent her from knowing what was occurring on her shift. She alleged that it was a safety issue.

3.  As part of the investigation, I witnessed the statements that were obtained by Lieutenant David Fournier, Commander of the Professional Standards Division, from the following individuals: Tammy Walker, Lieutenant Eva O'Connell, Captain Alan Fletcher, Dispatcher Bjarney Cruz, Dispatcher Scott Burns, Dispatcher John O'Donnell, Dispatcher William Cauley, Dispatcher Brenda Therrien, Sergeant John Monaghan, Sergeant Daniel Fallon, Lieutenant Brian Cassidy, Officer John Craven, Officer Shaun Kelley, Officer Jose Montalvo, Dispatcher Patty Alicea, Dispatcher Deanna O'Neill and Dispatcher Kevin Hennessey.

4.  On February 28, 2005, the Office of Professional Standards Division was assigned by Chief Scott to conduct an internal investigation with regard to an incident that took place between Lieutenant Eva O'Connell and Tammy Walker on February 25, 2005. The request arose as a result of correspondence, dated February 27, 2005, from Lieutenant O'Connell in which she reported that while

she was seated at the desk in the Commanding Officer's (CO's) office on February 25, 2005 at about 4:45 p.m., she was involved in an altercation of sorts with Ms. Walker.  As a result of Chief Scott's request, an investigation occurred which included obtaining statements from members of the Holyoke Police Department.  I was present during the interviews of the following individuals: Lieutenant Eva O'Connell, Officer John Craven, Officer Sean Shattuck, Officer William Delgado, Kate McCoy, Officer Manuel Reyes and Dispatcher Kevin Hennessey.  Their statements were reduced to writing.

5.     Tammy Walker was also scheduled to give a statement on March 15, 2005. While she reported to the Professional Standards Division, she refused to be interviewed.

SIGNED UNDER THE PENALTIES OF PERJURY THIS ___8___ DAY OF June _____ 2007.

Sergeant Daniel McCavick

# EXHIBIT 73

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER,<br>        Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| CITY OF HOLYOKE,<br>        Defendant | )<br>) |

## AFFIDAVIT OF LIEUTENANT DAVID FOURNIER

I, Lieutenant David Fournier, hereby depose and say as follows upon personal knowledge:

1.    I have been a member of the Holyoke Police Department for approximately 22 years. Approximately 6 years ago, I was assigned to be the Commander of the Professional Standards Division which is responsible for conducting internal investigations.

2.    On November 8, 2004, Police Chief Anthony Scott requested that the Professional Standards Division conduct an internal investigation of an allegation brought forward by Tammy Walker. Specifically, Ms. Walker asserted on November 11, 2004 that Lieutenant Eva O'Connell, the Watch Commander for the 2nd watch (the 4 p.m. to midnight shift) who was Ms. Walker's supervisor, issued an order to have dispatchers send police officers to calls by e-mail or laptop communication instead of by radio. Ms. Walker alleged that Lieutenant O'Connell was doing this to prevent her from knowing what was occurring on her shift. She alleged that it was a safety issue.

3.    Before beginning the investigation, I had been informed by Chief Scott that he learned during a meeting with Ms. Walker and Lieutenant Denise Duguay that Ms. Walker had previously inquired of Lieutenant O'Connell as to whether Lieutenant O'Connell had issued such an order. Chief Scott informed me that Sergeant Walker reported that Lieutenant O'Connell had denied issuing such an order.

4.    I also reviewed a memorandum, dated November 4, 2004, that was prepared by Lieutenant Denise Duguay. Among other things, Lieutenant Duguay reported that both dispatcher John O'Donnell and Officer John Craven stated that it is unusual for dispatchers to have officers dispatched via laptop. Lieutenant Duguay indicated that on the rare occasions when it does occur, it is usually due to a request by a caller, such as for a loud music complaint, because the individuals

involved in creating the nuisance have a scanner which allows them to overhear the police radio. Lieutenant Duguay also reported that, at times, an officer is dispatched from the Police Station in person such that it is not necessary to dispatch the person over the radio. Furthermore, Lieutenant Duguay reported, based on statements from Officer Craven, that for about 45 days prior to November 4, 2004, the laptops had not been working. In addition, Officer Craven stated that calls were not being dispatched via laptop as a matter of course.

5.      On November 8, 2004, I sent correspondence to Comptroller, Melinda Lane, requesting a copy of the work schedules for the shift (second watch) that Ms. Walker worked for the period of September 15, 2004 to November 4, 2004. This time period was chosen based on Ms. Walker's report of November 4, 2004 that since September 15, 2004, she noticed cruisers clearing from calls that she had not heard dispatched via the radio. Based on the information I received, I determined the days that Ms. Walker worked. Subsequently, I sent correspondence to Captain Fred Seklecki, the Commander of the Technical Services Bureau for the Holyoke Police Department, and requested that he obtain the event log (the communications) that occurred between dispatch and the mobile police vehicles over the laptop/e-mail system for all of the dates (23) that Ms. Walker worked between September 15, 2004 and November 4, 2004. After I received this information from Captain Seklecki, I obtained statements from all ten dispatchers who worked the second watch during the period of September 15, 2004 to November 4, 2004.

6.      In addition, I obtained statements from Ms. Walker, Lieutenant O'Connell, Lieutenant Brian Cassidy, Sergeant Daniel Fallon and Sergeant John Monaghan. These were the officers who worked the second watch with Ms. Walker.

7.      In her statement, Ms. Walker was unable to state precisely when she thought that the laptop was used instead of radio transmissions and she did not know why this was reportedly being done. Ms. Walker also reported that she usually used car 14. In addition, Ms. Walker stated that she was informed by Lieutenant O'Connell that she had not issued an order instructing that cars be dispatched via laptop instead of over the radio. She also stated that Lieutenant O'Connell had informed her that she (Lieutenant O'Connell) had conducted an investigation regarding Ms. Walker's allegations and concluded that they were unfounded. Ms. Walker was asked whether she had any specific dates, times and calls when she believed that the information was given out via laptop as opposed to by radio. In response, she claimed that she had written some information down in a little notepad that she did not bring with her. I gave her until 4 p.m. on the following day to submit any supporting documentation regarding her allegations. Ms. Walker failed to meet this deadline, but eventually submitted a list of calls that she claimed to hear on October 30, November 2, and November 3, 2004. The number of calls listed was significantly less than the number of calls listed on the dispatch entries for these days. However, on October 30 and November 2, 2004, there were no laptop e-mails between dispatch and the police vehicles. On November 3, 2004, there was only one e-mail message from dispatch to the police vehicles. As it turns out, the one e-mail on November 3, 2004 was sent to Ms. Walker who acknowledged receiving it.

2

8.    On November 10, 2004, I received the e-mail communication event log for the relevant time period that Ms. Walker worked. It showed that only five e-mail transmissions from dispatch to police vehicles were made on the 23 dates and that two of the e-mail transmissions were made from dispatch to Ms. Walker.

9.    On November 17, 2004, I sent correspondence to Captain Frederick Seklecki requesting confirmation that the radio communication system and the radio system in Car 14 were working properly. I asked him to research this issue going back to September 15, 2004. On November 18, 2004, Captain Seklecki reported that, based on his research, a report had been submitted by Sergeant Laramee on July 17, 2004 regarding a problem he was having communicating with dispatch while in Car 14. Captain Seklecki also reported that NEC (New England Communication), had diagnosed and repaired the problem. He also reported that in September 2004, the Darcomm receiver on Mount Tom had been overhauled and that additional fine tuning was done on Mount Tom by NEC throughout September. In addition, he reported that complaints from dispatch had decreased considerably since September but that he was informed by Officer Kenneth Moriarty of the Electronic Section at the Holyoke Police Department that he continued to receive sporadic complaints from police vehicles which were not hearing other police vehicles. Captain Seklecki reported that, in his experience, the spring and fall periods bring an increase in radio reception complaints because of thermal cooling in the spring and fall. Finally, Captain Seklecki reported that on November 5, 2004, Officer Kenneth Moriarty addressed a radio problem in Car 14. The problem was eventually traced to a faulty vehicle computer which was in the process of being replaced.

10.   I also questioned the dispatchers regarding Ms. Walker's allegations. On November 24, 2004, Dispatcher Brenda Therrien gave a statement in which she reported being questioned by Ms. Walker about a message that she had relayed to officers via the laptop. She acknowledged to Ms. Walker that she did use the laptop on that occasion because it was believed that scanners were being used by the suspects. Dispatcher Therrien also stated that she was not aware of any change in protocol as to calls being given out over the radio.

11.   On November 26, 2004, Dispatcher Deanna O'Neill confirmed that she had never received an order from Lieutenant O'Connell or any other supervisor to dispatch police vehicles by laptop e-mails instead of by radio. She could only recall one order that had been issued over the summer which requested that police vehicles be dispatched to an address via e-mail instead of by radio since each time the police vehicles arrived at the address they came back unfounded. The assumption was that a scanner was being used.

12.   I also questioned each of the other dispatchers on the second watch who confirmed that they had never been ordered by Lieutenant O'Connell or any other supervisor to dispatch police vehicles by laptop e-mail instead of by radio. They also confirmed that there had been no change in dispatch protocol as to how police vehicles were sent to calls for service.

3

13.   On December 16, 2004, I obtained a statement from Sergeant Daniel Fallon, a street supervisor on the second watch. He reported that he was not aware of any changes in the dispatch protocol and he had no knowledge that Lieutenant O'Connell had ever issued an order that calls be dispatched via laptop. In addition, he contradicted statements that Ms. Walker had made about him with respect to his use and knowledge of the computer in his cruiser.

14.   Lieutenant Brian Cassidy, an Assistant Watch Commander for the second watch, and Sergeant John Monaghan, a Street Supervisor for the second watch, also confirmed that Lieutenant O'Connell had not issued an order to dispatchers instructing them to dispatch by laptop e-mail instead of by radio.

15.   On December 28, 2004, I obtained a statement from Captain Alan Fletcher, the Commander of the Field Operation Bureau. He reported that Ms. Walker had not brought the issue of the alleged use of laptops to his attention. In addition, he reported that Ms. Walker had not sought his permission before she spoke with Lieutenant Duguay and Chief Scott regarding the issue. He also reported that no officers had ever brought this issue to his attention.

16.   On December 23, 2004, I obtained a statement from Lieutenant Eva O'Connell. Lieutenant O'Connell confirmed that there was only one address for which police vehicles were being told to call the station or to use the laptop in responding to that address. Lieutenant O'Connell also confirmed that she did an investigation of Ms. Walker's complaint about the alleged use of laptops, which she concluded was unfounded, and she confirmed that there had been no change in dispatch protocol in the way that dispatchers were sending police vehicles to calls. She also reported that when she questioned Ms. Walker about her allegations, Ms. Walker was unable to provide any specific incidents or dates. She confirmed that she did not give Ms. Walker permission to speak with Chief Scott or Lieutenant Duguay regarding the matter.

17.   On January 5, 2005, I obtained a statement from Officer Jose Montalvo regarding Ms. Walker's statement that he had reportedly responded to a call as a result of an e-mail communication. Officer Montalvo stated that he did not recall being questioned by Ms. Walker about the call and confirmed that he received the call by radio transmission, not via e-mail as Ms. Walker alleged.

18.   As a result of the investigation that I conducted, I concluded that, but for one address, Lieutenant O'Connell had never issued an order to any dispatcher instructing them to dispatch by laptop/e-mail instead of by radio. I also concluded that it was unreasonable for Ms. Walker to conclude that because she did not hear a call for service over the radio, it was done to prevent her from knowing what was occurring on the watch. While a review of the radio communication system revealed that there had been some communication problems, the problems had been diagnosed as both technical and environmental. Furthermore, a review of the motor vehicle reports for Car 14 from September 15, 2004 to November 4, 2004 showed that Ms. Walker reported only one problem with Car 14 during the period which was not a radio problem. If, in fact, she heard a limited number of calls during that time frame, it would have been reasonable for her to first

4

question if there was a radio problem with Car 14. I also concluded that Lieutenant O'Connell had informed Ms. Walker in a timely manner that her allegation was unfounded. In addition, Lieutenant O'Connell instructed Ms. Walker with regard to the chain of command regarding this incident. The investigation showed that Ms. Walker went outside her chain of command when she raised the allegation with Lieutenant Denise Duguay and then with Chief Scott.

19. On November 17, 2004, I was traveling on Lincoln Street in Holyoke when I observed Ms. Walker operating her vehicle at approximately 8:30 p.m. I clearly observed that it was her in the operator's seat and I took note of her license plate. I later reviewed the second watch schedule for November 17, 2004 and found that Ms. Walker called in sick, claiming that she was ill with a migraine headache. As a result of the fact that she was driving around instead of working, as scheduled, I concluded that her conduct was unbecoming in violation of Holyoke Police Department Rule 3.2. That is, conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer. I also noted that with the use of a sick day on November 17, 2004, Ms. Walker had zero sick days accrued. In fact, she had used more than 150 sick days since being appointed to the Holyoke Police Department in 1993. Furthermore, I noted that she had two sick leave abuser notices in her file. I found her conduct of operating a vehicle while on sick leave egregious since it sets a poor example for the officers that she supervised and also placed a burden on her fellow officers and the tax payers of the City of Holyoke.

20. On November 18, 2004, I sent correspondence to Chief Scott informing him of my observation of Ms. Walker on November 17, 2004 and the information that I had reviewed with regard to her sick leave abuse. Subsequently, on December 13, 2004, Ms. Walker filed a grievance against me. In her grievance, she requested that I be removed from my position. In addition, she challenged my authority to review her use of sick time, claiming that I was in violation of several rules of the Holyoke Police Department.

21. Following Ms. Walker's complaint against me, Chief Scott conducted an investigation which included taking a statement from me on December 28, 2004. In the statement, I confirmed that as Commander of the Professional Standards Division, I, as well as Sergeant Daniel McCavick, who was also assigned to the Professional Standards Division, are the individuals designated to maintain the personnel files of the Holyoke Police Department and to review the files when conducting personnel investigations. I am aware that following his investigation, Chief Scott concluded that Ms. Walker's allegations against me were unfounded.

22. On February 28, 2005, the Office of Professional Standards was assigned by Chief Scott to conduct an internal investigation with regard to an incident that took place between Lieutenant Eva O'Connell and Ms. Walker on February 25, 2005. The request arose as a result of correspondence, dated February 27, 2005, from Lieutenant O'Connell in which she reported that while she was seated at the desk in the Commanding Officer's (CO's) office on February 25, 2005 at about

5

4:45 p.m., she was involved in an altercation of sorts with Ms. Walker. As a result of Chief Scott's request, the following investigation was conducted. On February 28, 2005, a statement was taken from Lieutenant O'Connell. On March 1, 2005, a statement was taken from Officer Sean Shattuck who was in the CO's office with Lieutenant O'Connell when Ms. Walker entered. On March 1, 2005, a statement was taken from Officer John Craven who was working as a dispatcher on that evening and located next door to the CO's office. On March 2, 2005, a statement was taken from Officer William Delgado. Officer Delgado observed Ms. Walker in the CO's office with Lieutenant O'Connell. On March 2, 2005, a statement was taken from Officer Manuel Reyes. Officer Reyes observed Ms. Walker in the CO's office with Lieutenant O'Connell. On March 15, 2005, I and Sergeant McCavick attempted to take a statement from Ms. Walker. However, she declined to provide a statement. In addition, I requested that Captain Frederick Seklecki locate communication tapes for the date of the incident to determine if calls were made to dispatch regarding the incident. I also requested that he provide communication tapes for February 26, 2005 regarding Ms. Walker's reported telephone call to Officer John Craven. I reviewed the information after receiving it from Captain Seklecki.

23.     The investigation showed that Lieutenant O'Connell was in the CO's office with a scheduling book in front of her which she was reviewing with Officer Shattuck. Without any notice, Ms. Walker attempted to grab the book from Lieutenant O'Connell's possession, whereby Lieutenant O'Connell said "excuse me, Sergeant" and pushed the book back down onto the desk. In addition, Ms. Walker came nose to nose with Lieutenant O'Connell and stated "F___ You." Ms. Walker was also heard saying that she needed to see the "f___ing book." Witness accounts indicate that Ms. Walker was aggressive toward Lieutenant O'Connell. Whereas, Lieutenant O'Connell remained calm during the incident.

24.     Despite the fact that Ms. Walker refused to provide a statement regarding the incident, I also reviewed and considered an interoffice correspondence that Ms. Walker submitted, dated February 27, 2005, in which she claimed that Lieutenant O'Connell grabbed the book binder and jerked it vigorously toward her. Ms. Walker reported that on February 27, 2005, she called Captain Fletcher to report the incident and informed him that she had injured her left elbow in the incident.

25.     Witness accounts indicated that, contrary to Ms. Walker's claim, she was not injured in this incident.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _8TH_ DAY OF _JUNE_ 2007.

David W Fournier 169

Lieutenant David Fournier

# EXHIBIT 74

# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE MEMORANDUM

TO:        Capt. Alan G. Fletcher
FROM:      Lt. Eva M. O'Connell
SUBJECT:   Sgt. Tammy Walker
DATE:      August 3, 2004



DEFENDANT'S EXHIBIT
26 Walker
5/1/07

Since Sgt. Walker was transferred to the second watch, there have been a number of incidents that concern me.

May 14th Sgt. Walker arrested a Max Frimpong for Assault & Battery, Malicious Destruction of property less than $250.00. Sgt. Walker towed Mr. Frimpong's M/V from the parking lot of B&D Citgo. Once at the station I was booking Mr. Frimpong and Sgt. Walker gave me the above charges. I called Sgt. Walker to one side and asked her to explain the event that led to the arrest. I advised Sgt. Walker that there is no right of arrest in this situation. Mr. Frimpong was released and was not charged the ten-dollar fee for the release of his M/V. Sgt. Walker told me that Lt. Cassidy, Sgt. Fallon and I all had different rules with regard to arrest for A&B. I explained that it was the law and I later made a copy of the law and gave it to Sgt. Walker.

On May 25th, Sgt. Walker arrested Angela Pariseault at the station. Sgt. Walker than towed the M/V that was legally parked. I am told that Sgt. Walker knows Ms. Pariseault from other than this incident.

On May 27th, Sgt. Walker arrested Richard Rodriguez at 288 Pine St. for Possession of a BB gun and Malicious Destruction of property less than $250.00. Once at the station Sgt. D. Fallon explained to Sgt. Walker that there was no right of arrest. Mr. Rodriguez was released. In Sgt. Walker's report, she says that there will be a complaint requested. As of this date there was no complaint requested. (In Sgt. Walker's report, I did not see enough for a complaint).

On July 23rd there is a situation where Sgt. Walker did not did not get information from a caller for what I would call an important call. I explained to Sgt. Walker that if she had at least gotten Name, DOB, SS#, address and phone number that Sgt. Albert would have done a follow up. Sgt Walker first saw nothing wrong with someone videotaping at the mall. Second Sgt. Walker indicated that she was unaware that Sgt. Albert's assignment with the F.B.I. was tied to Homeland Security.

On Friday July 30th Sgt. Walker came to the station early and was in the CO's office when at about 3:40PM she said to me "the only reason that I came in today was because I thought that they were going to want me to sign a statement. I am going home at 6:00PM I am taking vacation." This was a TBOS night and I was busy with getting our cars out and than doing roll call for TBOS. I do say yes to 95% of the requests for time off. To come in on a Friday in July and a TBOS night does not show much concern for the job.

Signature *Lt. Eva M. O'Connell*

# EXHIBIT 75

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER, | ) |
|      Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF HOLYOKE, | ) |
|      Defendant | ) |


## AFFIDAVIT OF CAPTAIN FREDERICK J. SEKLECKI

I, Captain Frederick J. Seklecki, hereby depose and say as follows upon personal knowledge:

1.  Since approximately 2001, I have been the Commander of the Technical Services Bureau for the Holyoke Police Department.

2.  On November 9, 2004, I received an inquiry from Lieutenant Fournier, the Commander of the Professional Standards Division at the Holyoke Police Department, in which he provided me with 23 dates between September 15, 2004 and November 4, 2004 for which he requested that I retrieve the communications (event log) between dispatch and the mobile police vehicles over the laptop/e-mail system. As requested, I provided him with this information.

3.  On November 17, 2004, Lieutenant David Fournier requested that I confirm that the radio communication system and the car radio system to Car 14 were working properly. I was told that the information was needed as part of an investigation of an allegation made by Tammy Walker that police vehicles were being dispatched to calls via the laptop computer system instead of by radio. As a result of the request, I researched the department motor vehicle inventory reports for Vehicle 14. I found that Sergeant Robert Laramee had submitted a report on July 17, 2004 regarding a problem communicating with dispatch in Car 14. Specifically, he reported having difficulty transmitting messages from a particular area. I learned that NEC (New England Communication) had diagnosed and repaired the problem. I also determined that in early September 2004, the DARCOM on Mount Tom had been overhauled and that fine tuning had been done on Mount Tom by NEC throughout September 2004. While complaints from dispatch had decreased considerably since that time, Officer Moriarty of the Electronic Section reported that sporadic complaints continued to be received from police vehicles which indicated that they could not hear other vehicles. I also informed

Lieutenant Fournier that I had observed an increase in radio reception complaints in the spring and fall periods, reportedly because of thermal cooling in the spring and fall. In addition, I informed Lieutenant Fournier that when radio issues are raised, the necessary steps are taken to address them which usually involves contacting NEC. Finally, I reported that, on November 5, 2004, Officer Moriarty addressed a radio problem in Car 14 which was traced to a faulty vehicle computer. At the time of my report, it was being replaced.

4.    On March 1, 2005, I received correspondence from Lieutenant Fournier requesting that I review the communication tape for February 25, 2005 from approximately 4:45 p.m. to 5:00 p.m. to determine if Officer Shattuck made a telephone call to dispatch regarding an incident that occurred on February 25, 2005 involving Lieutenant Eva O'Connell and Tammy Walker. I obtained the tapes and provided them to Lieutenant Fournier.

5.    On March 2, 2005, I received a written request from Lieutenant Fournier requesting a review of the communication tapes for February 26, 2005 at approximately 3:00 p.m. to 3:20 p.m. with respect to a phone call from Tammy Walker to Officer Craven. I arranged for Lieutenant Fournier to receive a copy of the telephone conversation between Tammy Walker and Officer Craven.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _11 Th_ DAY OF _June_ 2007.

_Frederick J. Seklecki_

Frederick J. Seklecki

# EXHIBIT 76



**HOLYOKE POLICE DEPARTMENT**
**INTEROFFICE CORRESPONDENCE**

---

**TO:**        Chief Anthony R. Scott

**FROM:**     Lt. David D. Fournier

**SUBJECT:**  Internal Investigation -Walker vs. O'Connell

**DATE:**      January 11, 2005

**NUMBER**:   IAD Case # 04-26

---

Chief Scott:

On November 08, 2004, the Professional Standards Division was assigned to conduct an internal investigation based on an allegation brought forward by Sergeant Tammy Walker (Special Order # 04-188). Sgt. Walker asserts that Lieutenant Eva O'Connell issued an order to have dispatchers send units to calls by e-mail or laptop communication instead of by radio. As later reported, it is Sgt. Walker's belief that Lt. O'Connell did this to prevent her form knowing what was occurring on the watch.

The following facts are submitted for your review.

On November 08, 2004, Lt. Eva O'Connell was notified in writing that an internal investigation had been initiated as a result of Sgt. Walker's allegation.

As indicated in your interoffice correspondence (IOC) dated November 08, 2004, Special Order 04-188, on November 04, 2004, at approximately 16:38 hours, you received a telephone call from Lieutenant Denise Duguay requesting that you meet with Sgt. Walker. At that time you authorized the meeting and shortly thereafter, approximately 16:42 hours, Lt. Duguay and Sgt. Walker arrived at your office. You asked Sgt. Walker what the problem was, whereby she began to talk in a mumbled voice and began to cry. You report that Sgt. Walker asked Lt. Duguay to explain her problem to you.

Lt. Dugauy indicated that Sgt. Walker came to her with concerns that officers were being dispatched to calls via the in-cruiser laptop computers and not over the radio. Sgt. Walker stated that since September 15, 2004, she has noticed cruisers are clearing from calls that she had not heard dispatched over the radio. Sgt. Walker believed that they were being dispatched via laptop computers, as she put it "e-mails", to keep her from hearing that they were dispatched to calls. Sgt. Walker expressed concerns that this involved officer safety because other officers could not hear them being dispatched. Sgt.

Walker stated that she confronted Lt. O'Connell with her concerns and asked if an order had "come down" instructing that cars be dispatched via the laptops and not over the radio. Sgt. Walker stated that Lt. O'Connell said that no such order had been handed down.

You indicate that you asked Sgt. Walker if she really believed that this practice was occurring to keep her from knowing what was occurring on the watch, to which she answered yes. Sgt. Walker also indicated to you that she reported this matter to the Union attorney, Mr. Michael Clancy.

On November 04, 2004, as directed, Lt. Denise Duguay submitted an IOC to you concerning her interaction with Sgt. Walker over her concerns of officers being dispatched via laptop rather than by radio.

Lt. Duguay reports that on November 04, 2004, Sgt. Walker came into the Records Bureau and asked to speak with her in private. Sgt. Walker reported that on November 03, 2004, at 22:31 hours, she had been called into the CO's office by Lt. O'Connell. Sgt. Walker reported that Lt. O'Connell informed her that she had conducted an investigation regarding her allegation and felt it to be unfounded. Sgt. Walker stated that Lt. O'Connell also told her that she was her lieutenant and that she (Sgt. Walker) reports to "her" (Lt. O'Connell).

Lt. Duguay asked Sgt. Walker if she had reported this to you yet. Sgt. Walker stated that she had been intending to have her attorney contact you, but that had not happened yet. Lt. Duguay indicated that Sgt. Walker was emotional and could see that the situation was bothering her. Lt. Duguay asked Sgt. Walker if she wanted to speak to you now and she replied yes. Lt. Duguay reports that Sgt. Walker wanted her to be present when she spoke to you.

Lt. Duguay reports that after her meeting with you she was instructed to bring one of the dispatchers to your office. At this time Dispatcher John O'Donnell reported whereupon you spoke with him and later with Officer John Craven. Both individuals stated that it is unusual for dispatchers to have officers dispatched via laptop. Lt. Duguay indicated on rare occasions that it does occur, it is usually due to a request by a caller (such as for a loud music complaint) because the people involved have a scanner. Lt. Duguay reports that Dispatcher O'Donnell pointed out that sometimes an officer is dispatched from the police station in person (such as when an officer is in the report writing room completing a report). Officer Craven also stated that for the most part "over the last month and a half", (prior to 11/04/04) the laptops have not been working.

Lt. Duguay also reports that Sgt. Walker told her of the concerns that dispatchers were using laptops rather than being dispatched by radio and believed that Lt. O'Connell had issued an (verbal) order to the dispatchers telling them to do this. Lt. Duguay explained to Sgt. Walker that it is possible that some calls would be done via laptop, such as loud noise complaints due to the use of scanners. Lt. Duguay reports that Sgt. Walker stated that it wasn't some of the calls, it was almost all of them. Specifically, Sgt. Walker

reported to Lt. Duguay that she remembered hearing some officers clear from calls that she had not heard them dispatched to. In addition, Sgt. Walker was also convinced that this was happening because there have been periods of long silences on the air, which is unusual for the second watch. Lt. Duguay indicates that Sgt. Walker asked if she was aware that officers were being dispatched via laptop instead of by radio, whereby Lt. Duguay said no.

Lt. Duguay reports that she asked Officer Craven if officers were being dispatched via laptop as a matter of course and he said no, that there were no changes to the protocol.

Lt. Duguay reports that she told Sgt. Walker that the dispatchers denied that they were dispatching calls differently than normal, and her fears appeared to be unfounded. Lt. Duguay indicates that Sgt. Walker remained unconvinced.

On November 05, 2004, you issued Special Order 04-186 to Captain Frederick Seklecki instructing him to have the computer records of communications between the cruisers and dispatch saved and printed out for all days Sgt. Walker worked between September 15, 2004 and November 04, 2004.

On November 08, 2004, I sent an IOC to Comptroller Melinda Lane requesting a copy of all work schedules for communications and field operations, second watch, from September 15, 2004 to November 04, 2004. As requested, the schedules were provided.

In review, I was able to determine that Sgt. Walker worked the following days during the specified time period:

| | | |
|---|---|---|
| 09/15/04 | 10/10/04 | 11/02/04 |
| 09/16/04 | 10/11/04 | 11/03/04 |
| 09/17/04 | 10/12/04 | 11/04/04 |
| 09/18/04 | 10/17/04 | |
| 09/21/04 | 10/18/04 | |
| 09/22/04 | 10/27/04 | |
| 09/27/04 | 10/28/04 | |
| 09/28/04 | 10/29/04 | |
| 09/29/04 | 10/30/04 | |
| 09/30/04 | 10/31/04 | |

On November 09, 2004, I sent Captain Seklecki an IOC with the above listed work dates for Sgt. Walker in reference to retrieving the communications (event log) between dispatch and mobile units over the laptop/e-mail system. As requested, the communications (event log) between dispatch and mobile units over laptop e-mail was provided by Captain Sekelcki.

As delineated in Special Order # 04-188, you instructed me to question every dispatcher who had worked the second watch, 4:00 p.m. to midnight, since September 15, 2004, obtaining a statement from each of them.  In review of the second watch schedules form September 15, 2004 to November 04, 2004, the following dispatchers worked the shift as either their regular assignment or on an overtime basis:

| | | | |
|---|---|---|---|
| John O'Donnell | Officer John Craven | William Cauley | Deanna O'Neill |
| Brenda Therrien | Bjarney Cruz | Patricia Alicea | |
| Kevin Hennessey | Shaun Kelley | Scott Burns | |

Also delineated in Special Order # 04-188, you instructed me to obtain a statement from Sgt. Walker, Lt. O'Connell, Lt. Brian Cassidy, Sgt. Daniel Fallon and Sgt. John Monaghan.

On November 11, 2004, I sent an IOC to Sgt. Walker ordering her to report to the Professional Standards Division on said date to give her statement regarding this matter. Captain Fletcher, Lt. O'Connell and Lt. Cassidy were provided a copy of my IOC to Sgt. Walker.

On November 11, 2004, at 15:55 hours, Lt. Cassidy arrived at the Professional Standards Division and informed Sgt. Daniel McCavick and myself that Sgt. Walker had called to report that she was running late.  At 16:03 hours, Sgt. Walker reported to the Professional Standards Division office at which time we convened to the conference room for her statement.

The statement began at 16:05 hours at which time I asked Sgt. Walker if she had brought forward concerns that cruisers were clearing from calls that she did not hear dispatched over the radio.

Sgt. Walker replied that she did not have union representation and did not feel comfortable making a statement without a union representative.

I informed Sgt. Walker that she was not the subject of the investigation and this was from her allegation.

She replied that she knew.

I informed Sgt. Walker that I would reschedule the meeting, giving her the opportunity to have union representation.

The statement was rescheduled for November 15, 2004 at 16:00 hours.

On November 12, 2004, I sent Sgt. Walker an IOC ordering her to report to the Professional Standards Division on November 15, 2004 at 16:00 hours, again to give her statement regarding the matter.

On November 15, 2004, Sgt. Walker reported and was in the presence of IBPO attorney, Mr. Michael Clancy. The statement began at 15:56 hours and a general summary is as follows:

I asked Sgt. Walker if as a result of her meeting with you on November 04, 2004, she brought forward concerns that cruisers are clearing from calls that she did not hear over the radio.

Sgt. Walker replied "correct".

I asked Sgt. Walker if it was her belief that dispatchers were sending units to calls using laptop e-mails instead of radio transmissions.

Sgt. Walker replied "yes".

I asked Sgt. Walker if it was her belief that this was being done to keep her from hearing the calls.

Sgt. Walker replied that she was not sure why it's being done. She indicated that she was not sure it was to keep her away from the calls or if an order had come down for that, she didn't know.

I asked Sgt. Walker if it was her belief that this was a safety issue. That the use of laptop emails, the dispatching of units by laptop e-mails instead of radio transmission was an officer safety issue.

Sgt. Walker replied that not if the supervisors are also e-mailed as to where the people are, no. As long as the supervisors know where they are.

I asked Sgt. Walker if she ever brought this matter to the attention to her commanding officer.

Sgt. Walker replied that she brought it to the attention to both Sgt. Fallon and Lt. O'Connell.

I asked Sgt. Walker how long this had been an issue.

Sgt. Walker replied that she didn't know how long it had been an issue, she suspected that something might be going on, she wasn't sure. She indicated that some days it happened, some days it didn't. She indicated that she gave an IOC to Lt. O'Connell on the 15th of September and that there was feedback, that she (Lt. O'Connell) wasn't happy about it, so maybe it started then, maybe it started October, maybe it started August, she couldn't say for sure what day it started. She could only say it happened.

I asked Sgt. Walker when she brought this matter of officers being dispatched via laptop computers instead of over the dispatch radio to the attention of Lt. O'Connell.

Sgt. Walker replied October 31, 2004.

I asked Sgt. Walker if any officer had ever brought this matter to attention in general or as a safety issue.

Sgt. Walker replied that no officer came to her personally and said that.

I asked Sgt. Walker if she as a supervisor ever questioned any of the dispatchers regarding this matter.

Sgt. Walker replied that she has questioned Brenda Therrien and Dee O'Neill.

Sgt. Walker further indicated that she had spoken to Dee (Deanna O'Neill) again on October 30, 2004 and had spoken to her earlier on September 17th or 18th. Sgt. Walker stated that she said to put things over the air, if she was the only supervisor on the road her hands were tied. She stated that she specifically spoke to Dee and again said to put everything over the air. Sgt. Walker indicated that Dee said yes she would.

I asked Sgt. Walker if they had been instructed otherwise to do anything differently than that.

Sgt. Walker replied nope.

I asked Sgt. Walker if she had ever questioned any other supervisors assigned to the shift to see if they felt or noticed that this was a problem.

Sgt. Walker replied that she had spoken to Sgt. Fallon and asked him if his computer was on. She further reports asking him does his computer work. Sgt. Walker indicates that she stated to Sgt. Fallon that she was not getting all of the messages over the computer or over the radio, so you know, are you having a problem? Sgt. Walker indicates that Sgt. Fallon informed her there might be computer problems. Sgt. Walker reports that on the 30th she asked Sgt. Fallon if his computer actually worked and he said yeah, it did. On the 3rd of November, she asked him if he turned his computer on every day. And he said yeah so she though it was October 30th when she asked him if his computer actually worked and on Wednesday, the 3rd, she asked him if he turned it on.

I asked Sgt. Walker if Sgt. Fallon took a different car, is there a certain car he's assigned to that she would not.

Sgt. Walker replied that Sgt. Fallon usually takes car 9 and she usually takes car 14.

I asked Sgt. Walker in her meeting with you on November 04, 2004, if she stated to you that this practice (dispatch by laptop/email) was occurring to keep her from knowing what was occurring on the watch.

Sgt. Walker replied at that time yes, I guess so.

I asked Sgt. Walker if she had asked Lt. O'Connell if an order had come down instructing that cars be dispatched via laptop and not over the radio.

Sgt. Walker replied that she had asked Lt. O'Connell if an order had come down to have e-mails shipped over or to have calls shipped over to e-mail. And she (Lt. O'Connell) said her reply was no.

I asked Sgt. Walker if Lt. O'Connell had informed her that she had conducted an investigation regarding her allegation that dispatchers were using laptops to e-mail police officers to calls rather than dispatch by radio.

Sgt. Walker replied yes on November 3rd.

I asked Sgt. Walker if Lt. O'Connell had informed her that as a result of the investigation her allegation was unfounded.

Sgt. Walker replied correct.

I asked Sgt. Walker if she had met with Lt. Duguay on November 04, 2004.

She replied yes.

I asked Sgt. Walker if she had informed Lt. Duguay of her concerns that dispatchers were using laptops rather than being dispatched by radio.

She replied yes.

I asked Sgt. Walker if she had informed Lt. Duguay that she believed Lt. O'Connell had issued a verbal order to the dispatchers telling them to use laptops rather than being dispatched by radio.

She replied yes.

I asked Sgt. Walker if Lt. Duguay had informed her that is was possible that some calls were done via laptop such as loud noise complaints due to the use of scanners.

She replied yes.

I asked Sgt. Walker if she had informed Lt. Duguay that it wasn't some of the calls it was almost all of the calls that she had not heard them dispatched to.

000007

She replied yeah, almost all of them.

I asked Sgt. Walker if it was possible that she may have missed the radio transmission for the initial call and only heard the officers clearing from the call.

She replied that it was a possibility.

I asked Sgt. Walker if she had informed Lt. Duguay that she was convinced that this was happening because there had been long periods of silence over the air which was unusual for the 4:00 to 12:00.

She replied yes.

I asked Sgt. Walker if she asked Lt. Duguay if she was aware that officers were being dispatched via laptop instead of by radio.

She replied yes.

I asked Sgt. Walker if Lt. Duguay had informed her that the dispatchers had denied dispatching calls differently than normal and that her fears appeared to be unfounded.

Sgt. Walker replied that she didn't think she phrased it that way. Sgt. Walker thought Lt. Duguay phrased it to her that the dispatchers stated that they weren't shipping calls via e-mail, that Lt. Duguay asked them and they said they weren't and they wouldn't lie to her.

I asked Sgt. Walker if it was true in referring to Lt. Duguay, that she (Lt. Duguay) told her that the dispatchers denied that they were dispatched to calls differently than normal and that her fears appeared to be unfounded. Further, that Lt. Duguay indicated that she (Sgt. Walker) remained unconvinced. Is that true?

Sgt. Walker replied that she could not respond to that. I mean, I don't know.

I asked Sgt. Walker if she had specific dates, times and calls were information was given out via laptop as opposed by radio.

Sgt. Walker replied that there were some occasions where she had written it down. She indicated that it was written down in a little note pad.

I asked Sgt. Walker if she had the information available today (11/15/04).

She replied no. That she didn't think that I would want it today (11/15/04), that she just thought I wanted a statement.

I asked Sgt. Walker if she ever questioned dispatch or the unit in question at the time to confirm her suspicion.

Sgt. Walker replied yes, when an officer would clear from a call, she would ask to, what was the incident in that call.

I asked Sgt. Walker to specifically name the officer.

Sgt. Walker replied that she really didn't want to get these officers involved.

I informed Sgt. Walker that she was ordered to answer the question.

She replied Officer Montalvo, he was on a Providence Hospital call.

I asked if there were any other officers.

She replied no.

Sgt. Walker was given until November 16, 2004, at 16:00 hours to submit her supporting documentation.

On November 16, 2004, I received a telephone voice message from IBPO attorney, Mr. Michael Clancy. At approximately 10:20 hours I returned Mr. Clancy's call. Mr. Clancy asked if Sgt. Walker should submit her IOC, regarding her supporting documentation, through the chain of command or directly to the Professional Standards Division. I informed Mr. Clancy as this was an internal investigation Sgt. Walker was to submit her IOC directly to my office. Mr. Clancy indicated he would relay this information to Sgt. Walker.

On November 16, 2004, at approximately 14:05 hours, I received a telephone call from Sgt. Walker. She reported to me that she was calling out sick for her scheduled tour of duty (2nd Watch) for November 16, 2004. Sgt. Walker requested an extension for submission of her IOC until November 17, 2004. Sgt. Walker stated that she was trying to put the pieces of her notes together. I informed Sgt. Walker that she should have submitted the information as required earlier in the day to comply with the order. I informed Sgt. Walker that her extension had been denied and she was responsible to adhere to the order on the 16:00 hour deadline.

On November 16, 2004, at 16:05 hours, Sgt. Daniel McCavick informed me that Sgt. Walker had failed to submit her IOC by 16:00 hours. At this time I returned to the office on an unrelated matter. At 16:10 hours, while in the office, I received a telephone call from Sgt. Walker. She informed me that she was having a problem gathering all her information. I informed Sgt. Walker that she was in violation of my order. Sgt. Walker asked me what she should do. I informed her that her IOC should be submitted immediately. At this time I secured for the evening.

On November 17, 2004, on reporting for duty, I received an envelope from you in my mailbox. A note from you on the outside of the envelope indicated that on November 16,

000003

2004, at 17:09, there was a very light knock at the main office door of the Chief's Office suite. You indicate that upon answering the door Sgt. Walker handed you an envelope and asked that you place it in my basket. You informed her that you would.

Contained in the envelope was an IOC submitted by Sgt. Walker. In her IOC Sgt. Walker indicates that on October 30, 2004, she heard in a three hour span (16:00 – 19:00) a total of four calls given out over the air. Calls as follows:

16:44 Carlton St. car blocking driveway
16:55 South Canal kids throwing rocks
17:00 Sand Castle guy running through park
18:11 Cabot St. overdose on meds

In review of the dispatch log for October 30, 2004, there are a total of fourteen dispatch entries between 16:00 and 19:00 hours. A review of the communication event log for this date and time period shows there were no laptop/e-mails between dispatch and any field units.

On November 02, 2004, Sgt. Walker indicates that in a six hour and forty minutes span (16:00 – 22:46) a total of six calls given out over the air. Sgt. Walker points out that an officer called out at the Providence Hospital at approximately 16:40 hours and cleared at 19:01 hours. A review of the dispatch log for November 02, 2004, would reflect call # 04-41263, incident # 04-7727, was entered by dispatch at 18:10 hours after a call was received by phone from the Providence Hospital for a report of threats. This call was assigned to Officer Scott Barber. Sgt. Walker questions where are incident numbers 7725 and 7726. Calls as follows:

16:41 JFK skateboarder
17:03 Holiday Inn Incident # 7724 given out
17:43 East Dwight St. Paint Balls
18:12 Oak Street gun call
19:36 blocked intersection
20:31 Essex St Fire AMR responding

In review of the dispatch log for November 02, 2004, there are a total of thirty eight (38) dispatch entries between 16:00 and 22:46 hours. A review of the communication event log for this date and time period shows there were no laptop/e-mails between dispatch and any field units.

Sgt. Walker in her IOC raises a question of where incident number 7725 and 7726 are. A check of the dispatch log for November 02, 2004, reveals that incident #7725 was assigned to Detective Jennifer Sattler at 18:16 hours. The incident is entered as a rape with the location to be at 10 Bristol Place.

Incident #7726 at 17:37 hours was assigned to Officer Scott Barber. The incident is listed as violation of a restraining order at 96 Brooks Street.

In review of the computer generated event log for this date there are no e-mail or laptop communications between dispatch and the assigned officers in incident #7725 and #7726.

On November 03, 2004, Sgt. Walker reports that she asked Sgt. Fallon if he turned his computer on everyday, his reply was "no". She reports that she then asked Sgt. Fallon how do you know where your men are? Sgt. Fallon replied, "If they call for help I'll be there". Sgt. Walker reports saying that she has been missing way too many calls, something's going on. At this time she reports walking out. **NOTE:** In Sgt. Walker's statement on November 15, 2004, she indicates that on November 03, 2004, she asked Sgt. Fallon if he turned his computer on every day, do you turn it on and he said yeah. This is in direct conflict with Sgt. Walker's IOC submitted on November 16, 2004, whereby Sgt. Fallon was to have replied that no, he did not turn his computer on everyday.

On this same date (11/03/04) Sgt. Walker reports that in a span of four hours (16:00 – 20:00) she heard a total of six calls given out over the air. Calls as follows:

16:17 Beech & Essex St.
16:24 300 Walnut St.
17:44 Suffolk St & Chestnut St.
18:23 Kmart B&E
18:38 officers went to R. Clement
19:57 man down at Stop N Shop

In review of the dispatch log for November 03, 2004, there are a total of forty eight (48) dispatch entries between 16:00 and 20:00 hours.

A review of the event log for this date shows there is only one e-mail message from dispatch to any field units and that is to Sgt. Walker at 17:40: 06 advising that units 262 and 702 are going to 456 Maple Street to pick up two females for DSS. At 17:42:38, Sgt. Walker e-mails dispatch to thank them, that she was just going to e-mail them to see where…, at this point the message ends.

In concluding, Sgt. Walker reports that on November 03, 2004, she was called into the station per Lt. O'Connell at 10:21 pm. At this time Sgt. Walker reports that Lt. O'Connell informed her that she had spoken with the dispatchers who stated they were not sending e-mails. Sgt. Walker indicates that Lt. O'Connell stated that she was her Lieutenant and that if she (Walker) had any problems to bring them to Lt. O'Connell and no one else. Sgt. Walker reports it was at this time she felt her suspicions were correct, e-mails were being sent over laptop.

On November 17, 2004, I sent an IOC to Captain Frederick Seklecki, Commander, Technical Services Bureau, (TSB), requesting that I would like to confirm the fact that

the radio communication system and the car radio system to car 14 were working properly. I asked that Captain Seklecki research the matter from September 15, 2004.

On November 18, 2004, I received an IOC response from Captain Seklecki. Captain Seklecki reports that he researched the department motor vehicle inventory reports for vehicle number 14. He indicates that Sgt. Laramee submitted a report on July 17, 2004, regarding a problem communicating with dispatch. Sgt. Laramee reported that the station could not receive his transmissions from the Bemis Road and Northampton Street area. Captain Seklecki reports that NEC (New England Communication) commenced diagnosed and repair. In early September, the Darcomm receiver on Mt. Tom was overhauled.

Captain Seklecki indicates that additional fine-tuning was done on Mt. Tom by NEC throughout September. He reports that complaints from dispatch have decreased considerably since September but Officer Kenneth Moriarty (Electronic Section) continues to receive sporadic complaints from filed units who indicate not hearing other units.

Captain Seklecki reports that since assuming command of the TSB he has noted that the spring and fall periods bring an increase in radio reception complaints. Captain Seklecki cites Tony Ambrosino of NEC, who indicates thermal cooling in the spring and fall does cause sporadic reception problems.

Captain Seklecki reports that on November 05, 2004, Officer Kenneth Moriarty addressed a radio problem in car #14. The problem was eventually traced to a faulty vehicle computer and was in the process of being replaced at that time.

On November 24, 2004, a statement was taken from Dispatcher Brenda Therrein. Dispatcher Therrien indicates that Sgt. Walker questioned her once regarding dispatchers sending units to calls by e-mail/laptop instead of by radio. Dispatcher Therrien states the call was on Olive Avenue regarding a warrant, which was given out by Dispatcher Deanna O'Neill. Dispatcher Therrien states she believed the caller informed her that they had scanners. Dispatcher Therrien states that Sgt. Walker did call the station and question what the officers were doing up there. Dispatcher Therrien reports that she did inform Sgt. Walker that she wrote the message on the laptop to the officers. Dispatcher Therrien indicates that Sgt. Walker informed her that as a supervisor she needed to know where her officers were at all times. Dispatcher Therrien indicates that she agreed with Sgt. Walker and there was nothing else said.

A selective search of the dispatch log for Olive Avenue shows a call logged on September 21, 2004 at 17:48 hours for 27 Olive Avenue. Units 262 and 241 are dispatched on caller reporting a male party (William Santiago) with warrants. A check of computer generated record log (event log) for September 21, 2004 shows an e-mail dispatch at 17:37:04 to car 6, listed as unit 252 by dispatch, informing the unit that it is being given to car 4 also, William Santiago DOB 2-3-8. A second e-mail is transmitted

by dispatch at 17:38:11 to car4/164 informing the officer it had been given to car 6 also. William Santiago DOB 2-3-81.

Dispatcher Therrien stated that Sgt. Walker had never confronted her regarding any kind of messages being sent over prior to September 21, 2004. Further she indicated that no other supervisor had approached her or brought this matter up as an issue.

I asked Dispatcher Therrien if Lt. O'Connell had ever ordered her to dispatch cruisers by laptop e-mails instead of by radio.

Dispatcher Therrien stated not that she could recall. She indicated that it might have been a call to give officers a message or regarding a call but definitely not in writing. Dispatcher Therrien stated that in general there has been no change in protocol as to calls being given out over the air (radio).

On November 26, 2004, a statement was taken from Dispatcher Deanne O'Neill. Dispatcher O'Neill indicated that Sgt. Walker spoke with her on October 30, 2004 (regarding the e-mailing if cruisers to calls) and asked to make sure that if a call is given out by e-mail to send her an e-mail as well. Dispatcher O'Neill stated that Sgt. Walker had a question regarding this earlier, possibly a month or couple months earlier.

Dispatcher O'Neill stated that she had never been ordered by Lt. O'Connell or any other supervisor to dispatch cruisers by laptop e-mails instead of by radio.

Dispatcher O'Neill did point out that an order had been put out over the summer to laptop dispatch for calls to 199 Walnut Street as cruisers were heading up there and were always coming back unfounded.

The remaining dispatchers listed earlier were all questioned and indicated that they had never been ordered by Lt. O'Connell or any other supervisor to dispatch cruisers by laptop e-mail instead of by radio. Further all stated that there has been no change in dispatch protocol as to how units are sent to calls for service.

On December 16, 2004, a statement was taken from Sgt. Daniel Fallon, Street Supervisor, 2nd Watch. Sgt. Fallon indicated that Sgt. Walker had spoken to him once regarding the dispatching of cruisers by e-mail and that Sgt. Walker asked if he had any knowledge of it. Sgt. Fallon indicated that he told Sgt. Walker no.

I asked Sgt. Fallon if Sgt. Walker ever asked him if his computer was on.

Sgt. Fallon replied no, she didn't.

I asked Sgt. Fallon if she ever asked if his computer worked.

Sgt. Fallon replied not to his knowledge, that he didn't remember her asking anything about his computer.

At this point I read a portion of Sgt. Walker's statement referring to her conversation with Sgt. Fallon, whereby she states that she asked Sgt. Fallon if you computer is on, does his computer work. I informed Sgt. Fallon that Sgt. Walker reported that she asked him on the 30th (September) does his computer actually work, which he was to replied yeah. I informed Sgt. Fallon that Sgt. Walker stated that she had asked him on November 03, 2004, if he turns his computer on every day.

Sgt. Fallon stated that response was wrong because he does not use his computer, that he did not know how to use the computer so he never turns it on.

Sgt. Fallon indicated that no other officer or civilian personnel had come to him with concerns of cruisers being dispatched by e-mail nor had he ever instructed a dispatcher to do the same.

Sgt. Fallon stated he was not aware of any changes in the dispatch protocol and to his knowledge Lt. O'Connell had never issued an order to the dispatchers

When questioned, Sgt. Fallon stated that Sgt. Walker never sought his permission to speak with Lt. Duguay regarding the matter.

As directed, a statement was taken from both Lt. Brain Cassidy, Assistant Watch Commander, 2nd Watch, and Sgt. John Monaghan, Street Supervisor, 2nd Watch. Both supervisors stated that Lt. O'Connell had not issued an order to the dispatchers instructing them to dispatch by laptop e-mail instead of by radio. Further, Lt. Cassidy indicated that Sgt. Walker had neither brought this matter to his attention nor sought his permission to speak to Lt. Duguay.

On December 28, 2004, at statement was taken from Captain Alan Fletcher, Commander, Field Operation Bureau. Captain Fletcher advised that the matter had not been brought to his attention by Sgt. Walker and that he had become aware of the matter after being informed by you that both Sgt. Walker and Lt. Duguay had been in your office complaining about communications going over laptop computers, avoiding the Sergeant.

Captain Fletcher was asked if prior to this, did any other officers ever bring this to his attention.

Captain Fletcher replied that this was the first time he had heard of such a complaint.

Captain Fletcher further indicated that Sgt. Walker had not sought his permission to speak with either Lt. Duguay or yourself regarding the matter.

On December 13, 2004, a statement was taken from Lt. Eva O'Connell, Watch Commander, 2nd Watch. Lt. O'Connell confirmed the fact that at the end of October, Sgt. Walker had asked her if an order had come down to have calls shipped over to e-mails. Lt. O'Connell indicates that she told Sgt. Walker there was one address, 119 Nonotuck

Street where the units were being told to go either having them call or via laptop and that a supervisor was to accompany them due to the problems at that particular address. Lt. O'Connell reports that it had not been recent – within the past couple of nights. Lt. O'Connell indicates that she told Sgt. Walker that she would check into it and spoke with Officer John Craven (Communications Supervisor). Lt. O'Connell states that Officer Craven informed her that the laptops hadn't been working in a few days and that he had not been dispatching units via that way.

Lt. O'Connell reports that a couple of days later she spoke with Sgt. Walker and told her that she checked into it and that in fact exactly what Officer Craven had told her that the laptops had not been working, that they could be used from unit to unit but not from dispatch to unit. Lt. O'Connell indicates that she informed Sgt. Walker that she had checked with Officer Kenneth Moriarty (Electronic Section) who informed her that all communications sent over laptop were stored and if there was something particular they could look it up. Lt. O'Connell reports that Sgt. Walker informed her she was documenting everything but when asked for specific incidents or dates, she (Sgt. Walker) couldn't give any.

Lt. O'Connell reports that in her November 03, 2004, meeting with Sgt. Walker she (Lt. O'Connell) got the impression that Sgt. Walker wasn't happy and was going to go elsewhere. Lt. O'Connell indicates that she advised Sgt. Walker that she worked for her and that she was her immediate supervisor. Further if she had any correspondence for Captain Fletcher, the Chief or anybody else, it should go through her. Lt. O'Connell advised that Sgt. Walker did not seek permission from her to speak with you or Lt. Duguay regarding the matter.

Lt. O'Connell advised that no other supervisor, police officer or dispatcher ever brought the matter of dispatchers sending officers to calls by laptop e-mail instead of by radio.

Lt. O'Connell advised that there has been no change in dispatch protocol in the way dispatchers are sending units to calls.

On November 10, 2004, I received the e-mail communication event log for the specified dates that Sgt. Walker worked. All dates were provided. A review of the event log reflects that there are five e-mail transmissions from dispatch to field units and two from dispatch to Sgt. Walker and are as follows:

09/15/04 – 19:41 hours – To C2/143 & C4/164 advising of the use of a scanner.
09/21/04 – 17:23 hours – To C1/237 request extra patrols 60-62 Commercial parties ha….message ends.
09/21/04 – 17:37 hours – To C6/252 & C4/164 info regarding William Santiago. Dispatcher Brenda Therrien referenced this call in her statement indicating the caller believed there were scanners in use.
09/21/04 – 19:18 hours – C14/229 Dispatch informs Sgt. Walker that units 211 & 261 are responding to drag racers on N. Canal. **NOTE: A review of the event log would reflect that his call was not given to units 211 & 261 by laptop/e-mail.**

09/21/04 – 20:05 hours – To C2/143 & C9/232 advising of another call of drag racers on Main.
10/10/04 – 20:10 hours – To C6/273 Check Canal St. again numerous ca…message ends.
11/03/04 – 17:40 hours – To C14/229 Dispatch informs Sgt. Walker units 262 & 702 are going to 456 Maple 2lr to pick up two females for DSS. **NOTE: A review of the event log would reflect that this call was not given to units 262 & 702 by laptop/e-mail.**

On January 05, 2005, a statement was taken from Officer Jose Montalvo pertaining to Sgt. Walker's statement of November 15, 2004 whereby she states she spoke with Officer Montalvo about a particular call he was on at the Providence Hospital.

I asked Officer Montalvo if Sgt. Walker had ever questioned him regarding a call to the Providence Hospital during the specified time period (September 15, 2004 – November 04, 2004).

Officer Montalvo remembered responding to the hospital but did not receive an e-mail communication to do so. Officer Montalvo could not provide a specific date only that he may have responded sometime between the end of October and the beginning of November.

Officer Montalvo stated he could not remember if Sgt. Walker questioned him regarding the call.

Officer Montalvo indicated that he responded himself and that he had heard the call by radio transmission.

A call history for the Providence Hospital from September 15, 2004 to November 04, 2004, shows that a phone call was received from the Providence Hospital on September 17, 2004 at 17:24 hours regarding an investigation. Officer Montalvo and Sgt. Fallon responded at 17:34 and 17:53 hours respectively. A check of the event log shows that there were no laptop/e-mails regarding this call for service between dispatch and Officer Montalvo or Sgt. Fallon.

## FINDINGS

Sgt. Walker brought forward an allegation that was investigated by her Commanding Officer, Lt. O'Connell. Lt. O'Connnell advised Sgt. Walker that she had issued no such order to dispatch via laptop/e-mail instead of by radio. Lt. O'Connell informed Sgt.Walker in a timely manner that her allegation was unfounded. Sgt. Walker does not contest the fact that Lt. O'Connell instructed her on the chain of command regarding this matter.

Sgt. Walker goes outside her chain of command and raises the same allegation with Lt. Denise Duguay. Lt. Duguay reports that Sgt. Walker makes an assertion that Lt. O'Connell issued an order to the dispatchers instructing them to dispatch by laptop/e-mail instead of by radio. Further, Lt. Duguay reported that Sgt. Walker contends this wasn't

missed the radio transmission for the initial call and only head the officers clearing from the call.

A review of the motor vehicle reports (HPD form 020) for Car 14, from September 15, 2004 to November 04, 2004, shows that Sgt. Walker submitted only one form during the period. She makes no indication of a possible radio problem for Car 14. If Sgt. Walker heard a limited number of calls during this time frame it would be reasonable to first question if there was a radio problem with Car 14.

A review of the radio communications system revealed there have been some communication problems. The problems have been diagnosed as both technical and environmental.

In summation, it is clear that Lt. O'Connell at no time issued an order to any dispatcher instructing them to dispatch by laptop/e-mail instead of by radio. Further it is unreasonable for Sgt. Walker to conclude that because she did not hear a call for service over the radio that this was done to prevent her from knowing what was occurring on the watch.

Respectfully Submitted,

Lt. David D. Fournier
Commander
Professional Standards Division

# EXHIBIT 76A

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the Professional Standards Division Office at the Holyoke Police Headquarters on Monday, December 13, 2004, at 2:35 p.m.  Present while this statement is being taken are myself, Lieutenant David Fournier and Sergeant Daniel McCavick.  This statement is being taken from Officer John Craven regarding an investigation initiated by the Chief of Police as a result of an allegation brought forward by Sergeant Tammy Walker reporting that dispatchers are sending units to calls using laptop e-mails instead of by radios and the date in question would be from September 15, 2004, to November 4, 2004.

Questions denotes Lieutenant David Fournier

Answer denotes Officer John Craven
_____

Q. I would ask, Officer Craven, did Sergeant Walker ever question you regarding this matter?
A. No, sir, he never – she never did.

Q. Okay.  And did Lieutenant O'Connell ever order you either verbally or in writing to dispatch cruisers or officers by laptop e-mails instead of by radio?
A. No, sir.

Q. Okay.  Did any other supervisor or dispatcher instruct you to do the same?
A. No, sir.

Q. Okay.   Has there been any change in dispatch protocol concerning the dispatch of units to calls for service?
A. No, there wasn't.  The only specification the Chief came out with a while back where two particular addresses where loud music complaints were constantly originating from, the officers would get there, there'd be nothing found.  He recommended that we use the silent dispatch for those two particular calls of loud music only and between the time period you mentioned here September to November I don't recall any instances and besides which the laptop wasn't working all the time.

Q. Okay.  And what would be the reason for dispatching by the silent dispatch?
A. In case somebody -- a citizen has a scanner, they can listen to our calls and they can shut down the music or whatever.

Lieutenant Fournier:  Okay.  I have no further questions.  Sergeant McCavick?

1

Sergeant McCavick:  No questions.

Lieutenant Fournier:   Anything you'd like to add before we conclude?

Officer Craven:  No, sir.  I just never used it for anything like that, wouldn't do it.

Lieutenant Fournier:  Okay.  That's it.  The statement will conclude at 2:37 p.m.   Thank you.

Officer Craven:  Thank you.

_____
John Craven

_____
Date

2

000053

# EXHIBIT 77



Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

This statement is being taken in the office of Professional Standards Division Office at the
Holyoke Police Headquarters on Monday, November 15, 2004, at 3:56 p.m.  Present while this
statement is being taken are myself, Lieutenant David Fournier and Sergeant Danny McCavick.
This statement is being taken from Sergeant Tammy Walker regarding an allegation of officers'
safety violations filed by Sergeant Walker and for the record, Sergeant Walker is in the presence
of IBPO attorney Michael Clancey.

Questions denotes Lieutenant David Fournier

Answer denotes Sergeant Tammy Walker

_____

Q. As a result of your meeting with the Chief on November 4, 2004, you brought forward
   concerns that cruisers are clearing from calls that you do not hear dispatched over the
   radio, is that correct?
A. Right – correct.

Q. Okay.  And it is your belief that dispatchers are sending units to calls using laptop e-mails
   instead of radio transmissions, is that correct?
A. Yes.

Q. Okay.  And it is your belief that this is being done to keep you from hearing the calls, is
   that correct?
A. I'm not sure why it's being done.

Q. Okay.  Well, let me – alright, so you're not sure why that's being done –
A. I'm not sure if it's to keep me away from the calls or if it's just – an order came down for
   that, I don't know.  That's the problem, I don't know.

Q. Okay.  And it's your belief that this is a safety issue?
A. Do I belief it's a safety issue that the supervisors don't know where their – supervisors
   don't know where their people are?

Q. No, that the use of the laptop e-mails, the dispatching of units by laptop e-mails instead of
   radio transmission is an officer safety issue?
A. Not if the supervisors are also e-mailed as to where the people are, no.  As long as the
   supervisors know where they are.

Q. Did you ever bring this matter to the attention of your commanding officer?

1

A.  Yes, I did.

Q.  And who would that be?
A.  I brought it to the attention of both.  I brought it to the attention of Sergeant Fallon and I brought it to the attention of Lieutenant O'Connell.

Q.  Okay.  And when did you – how long has this been an issue?
A.  I don't know how long it's been an issue, I suspected that something might be going on, I wasn't sure.  Some days it happened, some days it didn't.  I wasn't sure.  Exactly when it started, I'm not positive.  I know that I gave an IOC to Lieutenant O'Connell on the 15th of September and then there was a feedback, she wasn't happy about it, so – maybe it started then, maybe it started October, maybe it started August, I can't – I can't say for sure what day it started.  I can only say that it happened.

Q.  And you said you brought this to the attention of Lieutenant O'Connell when?
A.  I asked Lieutenant O'Connell if an order had come down on October –

Q.  No, no, I asked – not to interrupt but specifically you said you brought this to the matter to Lieutenant O'Connell when?  Initially you said September 15th you brought this to an IOC to Lieutenant O'Connell.
A.  No, no, no, no, no.  That was an IOC feedback I gave to Lieutenant O'Connell.  She wrote an IOC of some concerns she had with me and I responded back to that IOC and gave it to her on the 15th.

Q.  Yeah, but that has nothing to do with this particular – that was never – your IOC to Lieutenant O'Connell never mentioned any of this –
A.  That's correct.

Q.  Okay.  But I'm asking specifically of this matter not of that – when you brought this matter of officers being dispatched via laptop computers instead of over the dispatch radio waves or airwaves -- when you brought this particular matter to her attention?
A.  When did I do that?

Q.  Um-hum
A.  October 31st.

Q.  October 31st, okay.  Did any officer ever bring this matter to you, to your attention in general or as a safety issue?
A.  Did any officer bring it to my attention that –

Q.  That this was a safety issue – was this ever brought to your attention by any officer?
A.  I'm not getting the question, sorry.

Q.  I'll rephrase it.  Did any officer ever bring to your attention that this was an issue where the officers were being dispatched via laptop computers as opposed to over the radio airwaves?

2

000019

A.  (pause) If I understand the question correctly, no officer came to me personally and said Tammy, you know, we're being dispatched over the air – over laptop.

Q.  Okay.  Did you as a supervisor question any of the dispatchers regarding this matter?
A.  Yes, I did.

Q.  And who did you question?
A.  Brenda Therrien and Dee O'Donnell – O'Connell – I don't know, O'Neill.  Dee O'Neill

Q.  Okay.  And when did you question them?
A.  I'm not positive of the date I questioned them, I'm not – you know, dates are kind of fuzzy but I think it was either October 10th – no, I wrote it down – October 30th  I spoke to Dee again – yeah, October 30th I spoke to Dee.

Q.  You say again.
A.  Again, yeah, because I did speak to her – I spoke to her – it might have been September – I said to her – I believe it was the 18th I'm not positive – 17th or 18th – I just said that -- you know, put things over the air, you know, if I'm the only supervisor on the road, you're tying my hands.  Put everything over the air.  Um – that's when I spoke to her – and Brenda was in the room at that time.  And then the 30th I specifically spoke to Dee again and said put everything over the air.  If you send them via laptop, e-mail me as well.  If you listen – yeah, if you listen to the recordings I'm sure I said that to her.

Q.  Just sit for one second.   What was their response to you?
A.  Dee said yes, I will.

Q.  Did they indicate that they had been instructed otherwise to do anything differently than that?
A.  Nope.

Q.  Okay.  And again did you ever question any other – any of the other supervisors assigned to the shift to see if they felt or noticed that this was a problem?
A.  I spoke to Dan Fallon – Sergeant Fallon.

Q.  Okay.
A.  And I asked him – you know, if his computer is on – I asked him does his computer work, I also asked him if – I asked him – well, I stated to him instead of asking, I said you know, I'm not getting all of the messages over the computer or over the radio, so, you know, are you having that problem?  And he said there might be computer problems but I said well, how you know where the men are, you know, so I asked -- and I think that was also on the 30th, if I'm not mistaken.  Yeah, I asked him on the 30th.  You know, does his computer work – and making – yeah, that was it, on the 30th.  On the 30th I asked him if his computer – if he turns it on every day – no, wait, sorry, sorry – on the 30th I asked him if his computer actually works and he said yeah, it did.  And then on the 3rd, November 3rd, I asked him do you turn your computer on every day, do you turn it on.
Q.  Um-hum.

3

000026

A. And he said yeah so I think it was October 30th is when I asked him if his computer actually worked and on Wednesday, the 3rd, I asked him if he turned it on.

Q. Did he take a different car, is there a certain car that he's assigned to that you would not be assigned to, that he would have the same car every night that someone else would not have as a supervisor or –

A. No, he has car 9, he usually takes car 9, I usually take car 14.

Q. Okay.

Sergeant McCavick:    Can I just interrupt?

Q. (By Sergeant McCavick) Sergeant, you said that you spoke to two of the dispatchers and you questioned them regarding maybe the use of the laptop computers, what were their initial responses to you?

A. (pause)

Q. I know you instructed them that you would like the calls to go over the air when you're working but what was their initial response, you questioned them regarding their use of laptop computers?

A. Yes, I said, you know, are you shipping calls via e-mail – if you ship calls via e-mail, make sure you e-mail me.

Q. Right. But before that what was their initial response when you questioned them regarding the use of it or the actual practice of it. Did they say they were doing it or not doing it?

A. They said that they – I don't recall what they said if they said they were doing it or they weren't doing it, they said that they would make sure – if they e-mailed somebody –

Q. Okay.

A. -- I would be e-mailed as well.

Q. Alright.   But to your knowledge or to you recollection today you don't  remember what they said to you as if it was a practice or not a practice or under what circumstances they were doing it or not doing it.

A. Well, from working here all this time sometime it is – you did e-mail over.

Q. Okay.

A. I mean sometimes if it's like a loud music and you don't want people –

Q. Right.

A. -- um – knowing that there was loud music going on there –

Q. Sure.

A. -- then they do.

4

000021

Q. But I'm just concerned about that date in question when you spoke to them, what their response was.

A. My response was – my response or their response?

Q. No, their response.   I mean, obviously this was of a concern to you as an officer safety issue and I would think it would be of interest to know what they said.

A. Well, I didn't take as an officers safety issue at that point, I just was – because I assumed that other supervisors are on the road and their computers are on and therefore, I'm not going to be able to save the world.

Q. Okay.

A. So I figured everyone's computer was on and if I wasn't getting the e-mail then they were getting the e-mails if the e-mails were being sent out.

Q. (By Lieutenant Fournier)  I'm just going to refer back to one of the questions where I asked if this was being done to keep you from hearing the calls and your answer to that was again?

A. All I can tell you in response to that question is after September 15th the radio just became quiet maybe it was because, you know, that's the time of the season it starts to be quiet on 4:00 to 12:00, I was under the assumption and I wasn't sure and I was listening to the radio and I'm not sure  what's going on so I inquired to the dispatchers if they were sending calls via e-mail and if they were to send them to me.  I wasn't sure – I wasn't 100% sure of what was really going on until probably November 3rd when Lieutenant O'Connell pulled me into the office.  After I asked her on the 31st, I asked her on the 31st did an order come down and she said no, no order came down and I wanted to know where -- if an order did come down from the Chief, I wanted to know did an order came down, am I missing something here.

Q. Alright.  Well, for the record and in your meeting with Chief Scott on November 4th, the Chief indicates that he asked you specifically if you really believed that this practice was occurring to keep you from knowing what was occurring on the Watch to which you answered yes, is that correct?

A. I was emotional – I was very emotionally upset.  I was so emotionally upset that I couldn't even explain what was transpiring, I mean, there was a lot of emotion that I was carrying and I was very emotional, I was in tears, it was very emotionally for me to even bring this to the surface.

Q. Is that a correct statement by the Chief?

A. Could be.  What did he say?

Q. Well, he says -- according to the Chief he asked you, Sergeant Walker, if you really believe that this practice was occurring to keep you from knowing what was occurring on the Watch, to which you replied yes.

A. At that time yes, I guess so.  I mean –

Q. Okay.

5

A. - everyone else knew where everybody else was, I guess, I didn't.

Q. Okay. Alright. We'll continue. Did you confront Lieutenant O'Connell and ask her if an order had come down and again, you've already responded to this but I'll continue – instructing that cars be dispatched via laptops and not over the radio?

A. I don't like word confront, I didn't confront her, I sat -- we were sitting in the CO's office and I asked Lieutenant, did an order come down to have e-mails shipped over – or to have calls shipped over to e-mail? And she said – her reply was no.

Q. Okay. Did Lieutenant O'Connell inform you that she had conducted an investigation regarding your allegation that dispatch was using laptops to e-mail police officers to calls rather than dispatch them by the radio airwaves?

A. I'm sorry, I'm lost.

Q. Again, did Lieutenant O'Connell inform you that she had conducted an investigation regarding your allegation that dispatchers were using the laptops to e-mail police officers to calls rather than dispatch by the radio airwaves?

A. On -- yes, on – I think it was the 4th, the 3rd, November 3rd.

Q. Alright. And Did Lieutenant O'Connell inform you that as a result of her investigation your allegation was unfounded?

A. That's correct.

Q. Alright. And did you meet with Lieutenant Duguay on November 4, 2004?

A. Yes.

Q. Did you inform Lieutenant Duguay that Lieutenant O'Connell had called you into the CO's office, Shift Commander's office on November 3, 2004?

A. Yes.

Q. Alright. And did you inform Lieutenant Duguay of your concerns that dispatchers were using the laptops rather than being dispatched by radio?

A. Yes, yes.

Q. Did you inform Lieutenant Duguay that you believed that Lieutenant O'Connell had issued a verbal order to the dispatchers telling them to use laptops rather than being dispatched by the radio?

A. Yes.

Q. And did Lieutenant Duguay inform you that it was possible that some calls were being done via laptop such as loud noise complaints due to the use of scanners?

A. Yes.

Q. Alright. Are you aware personally of this ever being done –

A. What's that?

Q. -- or practice of either calls being given out via laptop or as the case may be given out by telephone, landline?

A. (pause) Am I aware that sometimes the calls were sent that way?

Q. Yes.

A. Yes, I am.

Q. Okay. Did you inform Lieutenant Duguay that it wasn't some of the calls it was almost all of the calls that you had not heard them dispatched to?

A. I said there was too many calls, there was just too many calls that I wasn't picking up that I thought should be dispatched over the air.

Q. Alright. Well, I'm going to refer to Lieutenant Duguay's report.

A. Uh-hum.

Q. And she indicates according to you that you said it wasn't some of the calls it was almost all of them.

A. Yeah, almost all of them, that's what I said, almost all the calls.

Q. Okay. And let me ask you this, is it possible that you may have missed the radio transmission for the initial call and only heard the officers clearing from the call, is that a possibility?

A. (pause) It's a possibility.

Q. Okay. And did you inform Lieutenant Duguay that you're also convinced that this was happening because there'd been long periods of silence over the air which is unusual for the 4:00 to 12:00?

A. Yes.

Q. Okay. Did you ask Lieutenant Duguay if she was aware that officers were being dispatched via laptop instead of by the radio?

A. Did I ask Lieutenant Duguay that?

Q. Yes.

A. Yes.

Q. Okay. And did Lieutenant Duguay inform you that the dispatchers had denied dispatching calls differently than normal and your fears appeared to be unfounded?

A. I don't think she phrased it that way. I think she phrased it to me that the dispatchers stated that they weren't shipping calls via e-mail, that she asked them and that they said they weren't and that they wouldn't lie to her.

Q. I just – again, I'm going to refer to Lieutenant Duguay's report, she indicates that she told you, Sergeant Walker that the dispatchers denied that they were dispatched – were being dispatched to calls differently than normal and that her fears appeared to be unfounded. She indicates that Sergeant Walker remained unconvinced. Is that true?

A. I can't respond to that. I mean, I don't know –

Q. Would you deny that the Lieutenant is incorrect –
A. I'm not denying anything, I'm saying we had a lengthy conversation regarding this and it depends on what date she said that, it depends on, you know, a lot of things. We spoke and I said that I think that the calls are being shipped via e-mail and I'm not picking them up because they're not e-mailing them to me. Whether it's just me, whether it's Sergeant Fallon as well, I don't know. That's it – the fear is that I don't know, that's the fear is I don't know where the calls are being – how they're getting the calls so I want to know. I want to be informed of where my men are if I'm responsible for them.

Q. Alright. Do you have specific dates, times and calls were information was given out via laptop as opposed by radio?
A. (pause) Do I have specific dates, time?

Q. Yes. You've made -- I take it you've made notations in your notebook on other matters –
A. Yes.

Q. -- have you made notations of particular incidents were this has occurred –
A. Where a call has gone over the air and I haven't heard it?

Q. Or has not gone over the air via laptop and you've heard them clearing from calls?
A. There's been some occasions yeah, yeah. I did write it down –

Q. Alright.
A. -- and I spoke to some, you know –

Q. No specific dates, times, calls?
A. In here? No. No.

Q. So where do you have that written down?
A. I have it written down in a little note pad.

Q. You don't have that available today?
A. No. I didn't know you'd want it today, I thought you just wanted a statement today.

Q. Yeah, well, this is a statement, yes. Alright. As a result of officers clearing from calls did you ever question – and this is a going to be a repeat question – dispatch or the unit in question at the time to confirm your suspicion?
A. Yes, when an officer would clear from a call, I'd ask -- I'd see him and I'd ask where was -- what was the incident in that call?

Q. Alright. So you can remember that specifically than I'll ask the officer specifically?
A. The last -- the officer what?

000025

Q. Who was the officer you spoke with?  You say you specifically spoke with an officer after that incident or when that happened, who would that be?

A. I really don't want to get these officers involved.

Q. You're ordered to answer the question here.   Who were the officers involved?  That's a direct order.

A. The officer that I spoke with about a particular call –

Q. Yes.

A. -- was Officer Montalvo, he was on a Providence Hospital call.

Q. Okay.  Any other officers?

A. No.

Q. Okay.

Sergeant McCavick:  I would add that, Sergeant Walker, we would like those dates and times that you have made note of so that we can look into that on your behalf and we would like that this week.

Lieutenant Fournier:  And more specifically, I'll give you until tomorrow at 4:00 p.m. to submit that.

Sergeant McCavick:  And you  can do that in an interoffice to/from to the Lieutenant.

Lieutenant Fournier:  So we're clear, that will be November 16th at 1600 hours.  Any further questions, Sergeant?

Sergeant McCavick:  I don't have any further questions.

Lieutenant Fournier:  And I'll give you the opportunity to respond to anything you'd like to at this point, open to give you  – obviously an opportunity you brought the complaint forward or allegation to the Chief, I'll give you free air time to come forward.

Sergeant Walker:      Like I said I had my suspicions, I weren't sure of them, I asked dispatch if they were shipping calls, they said they were not.  I spoke to Lieutenant Duguay and again spoke to the dispatchers, spoke to Sergeant Fallon, spoke to Lieutenant O'Connell.  Lieutenant O'Connell stated on the 31st that no that the Chief did not send an order down on the 31st of October and on November 3rd – sorry, I just want to check my notes – on November 3rd I again asked Dee to please make sure that the calls – if she shipped someone somewhere to e-mail me as well.  I asked Dan on that date as well – I think it was that date – I asked Dan on that date as well – I believe it's that date, you know, if his computer was actually on – Lieutenant O'Connell called me into the office on November 3rd and stated that she had checked into it and the dispatchers stated that they were not doing that.  I stood there, I didn't respond, I stood there and she again said that it's been a little quiet, the guys were keying their radio, I just nodded my head and then she said Sergeant, I'm your Lieutenant and I said I'm aware of that.   She said if you

000025

have a problem, you come to me, you don't go anywhere else.   And I said to whom?  She said to anyone.  So all this time there's -- I'm feeling that there's something going on but I can't put my finger on it, I'm not 100% sure anything's going on.  I would not bring an allegation unless I was 100% sure that something was going on and I wasn't – I didn't want to bring it forward  in the beginning but it's an officers safety thing, I don't know.  I wasn't sure.  I was under a lot of stress and I wasn't sure.  I was not sure, 100% sure and that's what made me weary.

Lieutenant Fournier:  So you're not satisfied with Lieutenant O'Connell's explanation or Lieutenant Duguay's explanation that both appear to be unfounded.

Sergeant Walker:   It's not that I wasn't satisfied with it, it was – I wanted to make sure.  When she called me in her office, I wanted to make sure that I was correct.  That there were calls that were -- that I was just not getting.  I can't say about anyone else, I know what I was feeling – what I was feeling and I wasn't sure and until I was sure, I didn't want to say anything until I was sure that it was actually going to be real – you know, I mean, that's just the way it is.  I'm not the type of person who would do that, so.  I'm just giving you the dates that -- because actually I was off a lot in October and September so – like I said, I can put it on paper for you better than I can speak it to you but, you know, you can always check the tapes, you can always check the e-mails and ask the dispatchers.  I mean if no order came out, no order came out.  If the dispatchers did it on their own, they did it on their own, I don't know.  I'm sure making sure that I know where my men are.

Lieutenant Fournier:  Anything further?

Sergeant Walker:  No.

Sergeant McCavick:  I have no further questions, no.

Lieutenant Fournier:  Attorney Clancey?

Attorney Clancey:  No questions.

Lieutenant Fournier:  Okay.  The statement will conclude at 4:21 p.m. on November 15, 2004.  Thank you.

_____          11/23/04
Sergeant Tammy Walker                              Date

ORDaked to sisn
11/23/04

10

# EXHIBIT 78



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO: LT. DAVID FOURNIER**

**FROM: CAPT. FREDERICK J. SEKLECKI**

**SUBJECT: STATUS OF COMMUNICATION SYSTEM**

**DATE: NOVEMBER 18, 2004**

Lieutenant,

In response to your inquiry regarding the status of our communication system, I have researched department motor vehicle inventory reports (blue form 020) for vehicle number #14 which you indicated that Sergeant Tammy Walker frequently used. Sergeant Robert Laramee submitted a report on July 17, 2004 regarding a problem communicating with dispatch. Sergeant Laramee indicated that the station could not receive his transmissions from the Bemis avenue and Northampton Street area. NEC (New England Communication) commenced diagnoses and repair. In early September, the Darcomm receiver on Mt Tom was overhauled.

Additional fine tuning was done on Mt Tom by NEC (New England Communication) throughout September. Complaints from dispatch have decreased considerably since September but Officer Moriarty continues to receive sporadic complaints from field units who indicate not hearing other units.

Since I have assumed command of the technical Services bureau, I have noted that the spring and fall periods bring an increase in radio reception complaints. According to Tony Ambrosino of NEC (New England Communication) thermal cooling in the spring and fall does cause very sporadic reception problems.

Each time officer Kenneth Moriarty or I are advised of a radio issue, we take the necessary steps to address the problem which usually involves contacting NEC (New England

Communication). Many times no obvious problem is detected by service personnel.

On Friday, November 5, 2004, Officer Moriarty addressed a radio problem in car #14. This problem was eventually traced to a faulty vehicle computer and is presently being replaced at Marcotte Ford.

In summary, there have been communication issues with our system. These issues are being addressed; hardware upgrades and improvements are in the planning stages. Car#14 has two documented instances of poor radio reception; July 17, 2004 and November 5, 2004.

Capt. Frederick Seklecky

Technical Services Bureau

2

000043

# EXHIBIT 79



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**     SERGEANT TAMMY WALKER, EMPLOYEE # 229

**FROM:**   ANTHONY R. SCOTT

**SUBJECT:** SUSPENSION NOTIFICATION - CONDUCT UNBECOMING, ET ALS

**DATE:**   TUESDAY, JANUARY 18, 2005

**NUMBER:** IAD 04-026, 04-033 AND 04-034

Sergeant Walker over the past two months, November and December 2004, you have filed three (3) complaints against superior ranking officers.  You filed one (1) complaint against Lieutenant David D. Fournier and two (2) separate complaints against Lieutenant Eva M. O'Connell.  All three (3) of your complaints were found to be unsubstantiated.

On December 20, 2004, following a pre-grievance meeting on another matter, you presented me with two new grievances, one against Lieutenant David D. Fournier and the other against Lieutenant Eva M. O'Connell.  In a two page <u>unsigned</u> memo to me you alleged that the only person I, as the Chief of Police, authorized to review your records was the Police Comptroller, Melinda J. Lane, and that Lieutenant Fournier did not have my authorization to review your personnel records.  You further alleged that Lieutenant Fournier violated Rule 3, Conduct and Responsibility, Paragraph 3.2, Unbecoming Conduct; Rule 3, Conduct and Responsibility, Paragraph 3.4, Compliance to Law; Rule 4, Performance of Duty, Paragraph 4.2, Competence in Performance of Duty and Rule 4, Performance of Duty, Paragraph 4.1, Performance of Duty and Responsibility.

I conducted an investigation into your complaint in accordance with Article XX, Employee Files, Paragraph 20.9, Interdepartmental Complaints, in that the allegation is made against Lieutenant Fournier, Commander, Professional Standards Division (Internal Affairs), the complaint was not referred to the Internal Affairs but was handled by me.

I assumed command of the Holyoke Police Department in May of 2001 I began to reorganize the department by creating

three primary bureaus: Field Operations Bureau, Criminal Investigations Bureau and Technical Services Bureau commanded by captains and two divisions which report directly to the Chief of Police. These two divisions are the Professional Standards Division and the Budget and Fiscal Control Division. Lieutenant David Fournier and Sergeant Daniel P. McCavick were assigned to the Professional Standards Division. I moved all personnel files from my office into the Professional Standards Division (Internal Affairs) office. Lieutenant Fournier and Sergeant McCavick were and are designated by me as "designated keeper" of the records to wit, the personnel and internal investigative files. These two officers handle the filing of data into these personnel files and have authorization to review these files when conducting an investigation or a suspected violation of departmental rules and regulations.

Captain Fletcher stated he provided you with a copy of Local 409's latest contract in early 2004. If you would note Article XX, Employee Files, Paragraph 20.2, clearly states, "Except as otherwise required by law, upon release by the Chief of Police or his/her designee or upon review by any other person, the keeper shall notify the employee in writing, the identity of the person making such review." Lieutenant David Fournier and Sergeant Daniel McCavick are the Chief of Police's designees as keeper of the records (personnel file). Therefore, you did not have to be notified because Lieutenant Fournier was reviewing the records and this article does not require the keeper of the records or his designee to notify an individual member that the keeper of the records' designee reviewed their file.

Therefore based on my investigation I found your allegation that Lieutenant Fournier violated Article XX, Paragraph 20.2 to be UNSUBSTANTIATED. While, Lieutenant Fournier did review the personnel file of Sergeant Walker, there was no violation of either the contract or the rules and regulations of this department. As to your allegation that Lieutenant Fournier violated of Rule 3, Paragraph 3.2; Rule 3, Paragraph 3.4; Rule 4, Paragraph 4.2 and Rule 4, Paragraph 4.1, I found your complaint UNSUBSTANTIATED. Moreover, your complaint against Lieutenant Fournier immediately followed his complaint against you for abuse of sick leave.

In your December 20, 2004, complaint against Lieutenant Eva M. O'Connell you allege that Lieutenant O'Connell violated Rule 3, Conduct and Responsibility, Paragraph 3.2 and 3.4; Rule 4, Performance of Duty, Paragraph 4.1, 4.2 and 4.12. The remedy sought by you was to remove Lieutenant O'Connell from her position.

In a two page memo, which you signed, you alleged that Lieutenant O'Connell altered an IOC (Interoffice Correspondence) addressed to you dated November 10, 2004. You further allege that Lieutenant O'Connell submitted a different memo to me. I conducted this investigation in accordance with Article XX, Employee Files, Paragraph 20.9, Interdepartmental Complaints, because you made the allegations against Lieutenant O'Connell who is your Watch Commander. I did not refer the matter to (Professional Standards) Internal Affairs due to the fact that they were already conducting an investigation into other allegations you made against Lieutenant O'Connell. I marked the memos you alleged were altered and/or forged by Lieutenant O'Connell as "Lieutenant O'Connell 1" and "Lieutenant O'Connell 2" for identification purposes and the alleged alterations in the two documents are as follow:

- Lieutenant O'Connell 1 reads "........you will refrain from hanging around those offices."

- Lieutenant O'Connell 2 reads "........you will refrain from visiting those offices."

In your complaint you claimed that your assignment was changed by Lieutenant O'Connell and the lieutenant did not provided with an explanation as to why your assignment was changed.

As to the your allegation that your assignment was changed and that you were not provided an explanation, this in and of itself is not grievable under the contract in accordance with Article II, Union Recognition, Paragraph 2.5. Assignments are an exclusive "administrative right" which does not have to be explained under the contract. You were informed of this fact by Captain Alan G. Fletcher, President, Local 409 and you were informed of this by me during your meeting with me on November 24, 2004.

You were informed by Lieutenant O'Connell in the IOC dated
November 10, 2004 not to hang around and/or visit the
Records Division and the Communications Center. As the
Watch Commander Lieutenant O'Connell had the absolute right
to change or reassign you within the Watch without
providing you with an explanation for the reassignment, as
do I, when I transfer officers from one assignment to
another. You were not demoted from the position of
Sergeant; you did not lose any pay or benefits. Lieutenant
O'Connell's action was not a disciplinary action and
therefore was not subject to bargaining or grievance.
After being informed of this very fact by both me and
Captain Fletcher you still chose to file a grievance
regarding your assignment.

I further found that your allegation that Lieutenant
O'Connell altered documents to be unsubstantiated. There
was absolutely no evidence that Lieutenant O'Connell
altered any documents as it related to the two documents of
November 10, 2004. The changing of the wording from
"hanging around" to "visiting" does not constitute an
alteration or forgery and as a police sergeant you should
have knowledge of the General Laws and departmental rules
and regulations as it relates to altering and/or forging
documents.

I found that your re-assignment by Lieutenant O'Connell was
well within her authority as Watch Commander and I found
that there was no violation of the contract or any
departmental rule or regulation on the part of Lieutenant
O'Connell. I marked your complaint as UNSUBSTANTIATED as
Lieutenant O'Connell did in fact re-assign you; however, it
was well within Lieutenant O'Connell's authority as Watch
Commander.

As to your allegation that Lieutenant O'Connell altered
and/or forged documents and violated Rule 3, Paragraph 3.2;
Rule 3, Paragraph 3.4; Rule 4, Paragraph 4.2; Rule 4,
Paragraph 4.1 and Rule 4, Paragraph 4.12, I found all of
your allegations to be unsubstantiated as there is no
evidence to support these allegations. Moreover, your
complaint against Lieutenant O'Connell followed her re-
assignment of you.

On November 4, 2004 following a telephone call I received from Lieutenant Denise Duguay I met with you and Lieutenant Duguay at your request. At that meeting you accused Lieutenant O'Connell of issuing an order to dispatchers and the supervisors on the Second Watch to dispatch officers to calls via laptop computer e-mail. You further accused Lieutenant O'Connell of issuing this order to keep you from knowing what was occurring during the watch. Additionally, you stated that because of this order Lieutenant O'Connell was affecting officers' safety. Following this meeting I ordered the Professional Standards Division personnel to conduct an investigation into your allegations against Lieutenant O'Connell.

The investigative report prepared by the Professional Standards Division revealed that you brought your allegation of officers being dispatched via laptop e-mail to Lieutenant O'Connell's attention on October 31, 2004. Lieutenant O'Connell conducted an investigation into this matter and informed you that your allegations were unfounded. You confirm this fact in the statement you gave to the personnel of the Professional Standards Division. Lieutenant O'Connell further informed you that no order had "come down" from my office instructing calls to be dispatched via laptop e-mail. After receiving Lieutenant O'Connell's findings, you approached Lieutenant Duguay, an officer outside of your chain-of-command. You had been previously informed by Lieutenant O'Connell of the chain-of-command, but you still chose to violate the chain-of-command by consulting a lieutenant in another Bureau without prior authorization.

Lieutenant Duguay listened to your allegations that Lieutenant O'Connell had issued an order to dispatch via laptop e-mail to keep you from knowing what was occurring on the watch. Lieutenant Duguay informed you she too conducted an inquiry into your allegations and found them to be unfounded. You then asked Lieutenant Duguay to call me and make arrangements to meet with me regarding this matter. You once again violated your chain-of-command by going through another bureau to see me and not through your Watch Commander, Lieutenant O'Connell, or bureau commander Captain Alan G. Fletcher.

This matter was thoroughly investigated and written statements were obtained from all dispatchers and supervisors on the Second Watch. Everyone questioned contradicted your allegations and denied that such an order was issued by Lieutenant O'Connell. All of the laptop e-mail transmissions were obtained and reviewed during the time period you allege these events occurred. There is absolutely no evidence to support your allegations; however, there is sufficient evidence to support the fact that Lieutenant O'Connell did not issue such an order. Further, your allegation that the alleged order issued by Lieutenant O'Connell affected officers' safety is totally without merit.

Therefore, based on my investigation into your allegations filed against Lieutenants Fournier and O'Connell and Lieutenant Fournier's investigation into your allegations against Lieutenant O'Connell, I find that you violated the following departmental rules:

1.) Rule 1 Authority, paragraph 1.2 OBEDIENCE TO ORDERS Members of the Department shall promptly obey any lawful order emanating from any superior officer. Should any such order conflict with a previous order from any other superior officer, with any General or Special Order, or any provision of the Rules, the member to whom such order is given shall respectfully call attention to such conflict, his order shall stand and the responsibility shall be his, and the person obeying the same shall not be held in any way responsible for disobedience of any orders theretofore issued. If any unlawful order is given to any member of the department, such member shall promptly report such fact in writing to the Chief of Police. (old # 1.5)

2.) Rule 1 Authority, paragraph 1.3 OBEDIENCE TO ORDERS No member of the Department shall willfully disobey any lawful command of any commissioned officer, non-commissioned officer, or member of the Department senior to him. (old #1.50)

3.) Rule 1 Authority, paragraph 1.4 COMPLIANCE TO ORDERS Officers shall promptly obey any lawful orders of a superior officer. This will include orders relayed from a superior officer by an officer of the same or lesser rank. (old # 1.18)

4.)   Rule 3 Conduct and Responsibility, paragraph 3.2
UNBECOMING CONDUCT - Officers shall conduct themselves
at all times, both on and off duty, in such a manner
as to reflect most favorable upon the Department.
Conduct unbecoming an officer shall include that which
brings the Department into disrepute or reflects
discredit upon the officer as a member of the
Department, or that which impairs the operation or
efficiency of the Department or officer.  (old #1.6)

5.)   S.O.P. 1.4.0 Chain of Command, Section VI By Passing
the Chain of Command, Members of the department shall
not bypass the next level in the Chain of Command,
except in an emergency situation.

6.)   Rule 5 Restrictive Activity, paragraph 5.13
MISREPRESENTATION OF FACTS IN OFFICIAL CAPACITY, No
member of the Department shall, under any
circumstances, make any false official statement or
intentional misrepresentation of facts. (old #1.71)

7.)   Rule 4 Performance of Duty, paragraph 4.2 COMPETENCY
IN PERFORMANCE OF DUTY, Officers shall maintain
sufficient competency to properly perform their duties
and assume the responsibilities of their positions.
Officers shall perform their duties in a manner which
will maintain the highest standard of efficiency in
carrying out the functions and objectives of the
department.  Unsatisfactory performance may be
demonstrated by a lack of reasonable knowledge of the
application of laws required to be enforced; an
unwillingness or inability to perform assigned tasks;
the failure to take reasonable action on the occasion
of a crime, disorder or other condition deserving
police attention; or absence without leave.  In
addition to other indications of unsatisfactory
performance, the following will be considered prima
facie evidence of unsatisfactory performance; repeated
poor evaluations or a written record of repeated
infractions of rules, regulations, directives or
orders of the department.  (old #1.13)

By way of background, a check of the Professional Standards
Division's files was conducted and I was provided with the
following as to your disciplinary record:

1.    On August 7, 2003, you were issued a 'Letter of
Reprimand' for violation of Rule 1 Authority, Section

    1.2 Obedience to Orders; Rule 1 Authority, Section 1.3
    Obedience to Orders and SOP 1.4.0 Article IV Chain-of-
    Command.

 2.  On April 20, 2004 you were suspended for one day for
    violation of Rule 4 Performance of Duty, Section 4.13
    Punctually to Duty and Court and SOP 3.4.0 Testifying
    in Court, Section III Procedures, paragraph B "1." At
    the Courthouse.

 3.  On August 19, 2004 you were suspended for five days
    for violation of SOP 3.1.6 Interviewing Victims and
    Witnesses, paragraph I, General Consideration and
    Guidelines; SOP 3.1.2 Preliminary Investigations,
    paragraph I General Considerations and Guidelines; SOP
    3.1.4 Criminal Intelligence, paragraph I, General
    Considerations and Guidelines, Section 4, Terrorism,
    paragraph III Procedures, Section A, subparagraph 1.;
    Rule 3, Conduct and Responsibility, Section 3.2
    Unbecoming Conduct; Rule 4 Performance of Duty,
    Section 4.1 Performance of Duty and Responsibility;
    Rule 4 Performance of Duty, Section 4.2 Competency in
    Performance of Duty; Rule 4 Performance of Duty,
    Section 4.3 Handling Reports and Complaints; Rule 4
    Performance of Duty, Section 4.5 Submission of
    Reports; and Rule 4 Performance of Duty, Section 4.12
    Truthfulness in Official Dealings.

 4.  On September 28, 2004 your appeal of this suspension
    to the Appointing Authority, Mayor Michael J.
    Sullivan, was upheld and an additional five day
    suspension was added.

 5.  On November 30, 2004 you were suspended for five days
    for violation of Rule 1 Authority, paragraph 1.2
    Obedience to Orders; Rule 1 Authority, paragraph 1.3
    Obedience to Orders; Rule 1 Authority, paragraph 1.4
    Compliance to Orders; Rule 3 Conduct and
    Responsibility, paragraph 3.2 Unbecoming Conduct; and
    Rule 4 Performance of Duty, paragraph 4.2 Competency
    in Performance of Duty.

 6.  On December 27, 2004 your appeal of this suspension to
    the Appointing Authority, Mayor Michael J. Sullivan,
    was upheld and an additional five day suspension was
    added.

You are hereby notified that pursuant to the powers
conferred on me by Massachusetts General Laws, Chapter 31,

Sections 41 through 45 (attached hereto), I find that your
actions are in violation of the rules stated herein and I
suspend you without pay for a period of 5 working days.
This suspension shall be served on Thursday, January 20,
2005, Friday, January 21, 2005, Saturday, January 22, 2005,
Tuesday, January 25, 2005, and Wednesday, January 26, 2005.
Further, by means of this correspondence I am forwarding
the matter to Mayor Michael J. Sullivan, for a hearing to
determine whether you should be subjected to further
disciplinary action up to and including discharge.

Anthony R. Scott
Chief of Police

ARS/jas

Acknowledged: _____
                Sergeant Tammy Walker

          Date: _____ Time: _____

Witness: _____

cc:  Mayor
     City Solicitor
     Professional Standards Division

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

### CHAPTER 31. CIVIL SERVICE

**Chapter 31: Section 41 Discharge; removal; suspension; transfer; abolition of office; reduction of rank or pay; hearings; review**

Section 41. Except for just cause and except in accordance with the provisions of this paragraph, a tenured employee shall not be discharged, removed, suspended for a period of more than five days, laid off, transferred from his position without his written consent if he has served as a tenured employee since prior to October fourteen, nineteen hundred and sixty-eight, lowered in rank or compensation without his written consent, nor his position be abolished. Before such action is taken, such employee shall be given a written notice by the appointing authority, which shall include the action contemplated, the specific reason or reasons for such action and a copy of sections forty-one through forty-five, and shall be given a full hearing concerning such reason or reasons before the appointing authority or a hearing officer designated by the appointing authority. The appointing authority shall provide such employee a written notice of the time and place of such hearing at least three days prior to the holding thereof, except that if the action contemplated is the separation of such employee from employment because of lack of work, lack of money, or abolition of position the appointing authority shall provide such employee with such notice at least seven days prior to the holding of the hearing and shall also include with such notice a copy of sections thirty-nine and forty. If such hearing is conducted by a hearing officer, his findings shall be reported forthwith to the appointing authority for action. Within seven days after the filing of the report of the hearing officer, or within two days after the completion of the hearing if the appointing authority presided, the appointing authority shall give to such employee a written notice of his decision, which shall state fully and specifically the reasons therefor. Any employee suspended pursuant to this paragraph shall automatically be reinstated at the end of the first period for which he was suspended. In the case of a second or subsequent suspension of such employee for a period of more than five days, reinstatement shall be subject to the approval of the administrator, and the notice of contemplated action given to such employee shall so state. If such approval is withheld or denied, such employee may appeal to the commission as provided in paragraph (b) of section two.

A civil service employee may be suspended for just cause for a period of five days or less without a hearing prior to such suspension. Such suspension may be imposed only by the appointing authority or by a subordinate to whom the appointing authority has delegated authority to impose such suspensions, or by a chief of police or officer

performing similar duties regardless of title, or by a subordinate to whom such chief or officer has delegated such authority. Within twenty-four hours after imposing a suspension under this paragraph, the person authorized to impose the suspension shall provide the person suspended with a copy of sections forty-one through forty-five and with a written notice stating the specific reason or reasons for the suspension and informing him that he may, within forty-eight hours after the receipt of such notice, file a written request for a hearing before the appointing authority on the question of whether there was just cause for the suspension. If such request is filed, he shall be given a hearing before the appointing authority or a hearing officer designated by the appointing authority within five days after receipt by the appointing authority of such request. Whenever such hearing is given, the appointing authority shall give the person suspended a written notice of his decision within seven days after the hearing. A person whose suspension under this paragraph is decided, after hearing, to have been without just cause shall be deemed not to have been suspended, and he shall be entitled to compensation for the period for which he was suspended. A person suspended under this paragraph shall automatically be reinstated at the end of such suspension. An appointing authority shall not be barred from taking action pursuant to the first paragraph of this section for the same specific reason or reasons for which a suspension was made under this paragraph.

If a person employed under a provisional appointment for not less than nine months is discharged as a result of allegations relative to his personal character or work performance and if the reason for such discharge is to become part of his employment record, he shall be entitled, upon his request in writing, to an informal hearing before his appointing authority or a designee thereof within ten days of such request. If the appointing authority, after hearing, finds that the discharge was justified, the discharge shall be affirmed, and the appointing authority may direct that the reasons for such discharge become part of such person's employment record. Otherwise, the appointing authority shall reverse such discharge, and the allegations against such person shall be stricken from such record. The decision of the appointing authority shall be final, and notification thereof shall be made in writing to such person and other parties concerned within ten days following such hearing.

Any hearing pursuant to this section shall be public if either party to the hearing files a written request that it be public. The person who requested the hearing shall be allowed to answer, personally or by counsel, any of the charges which have been made against him.

If it is the decision of the appointing authority, after hearing, that there was just cause for an action taken against a person pursuant to the first or second paragraphs of this section, such person may appeal to the commission as provided in section forty-three.

Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section.

Notice of any action taken under this section shall be forwarded forthwith by the appointing authority to the personnel administrator.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 41A Discharge, removal or suspension; hearing before disinterested hearing officer; review**

Section 41A. Upon the request of the appointing authority and a tenured employee, who is entitled to a hearing pursuant to the first paragraph of section forty-one, a hearing before a disinterested hearing officer, designated by the chairman of the commission, may be held in lieu of a hearing before the appointing authority. Such hearing officer shall make findings of facts and may make recommendations for decision to the commission. Following the decision of the commission, there shall be no appeal pursuant to the provisions of section forty-three; provided, however, that a petition to review may be filed pursuant to the provisions of section forty-four. All requirements relative to written notice and the holding of hearings pursuant to this section shall be governed by those set forth in section forty-one.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 42 Complaints; hearings; jurisdiction; filing of civil action**

Section 42. Any person who alleges that an appointing authority has failed to follow the requirements of section forty-one in taking action which has affected his employment or compensation may file a complaint with the commission. Such complaint must be filed within ten days, exclusive of Saturdays, Sundays, and legal holidays, after said action has been taken, or after such person first knew or had reason to know of said action, and shall set forth specifically in what manner the appointing authority has failed to follow such requirements. If the commission finds that the appointing authority has failed to follow said requirements and that the rights of said person have been prejudiced thereby, the commission shall order the appointing authority to restore said person to his employment immediately without loss of compensation or other rights.

A person who files a complaint under this section may at the same time request a hearing as to whether there was just cause for the action of the appointing authority in the same manner as if he were a person aggrieved by a decision of an appointing authority made pursuant to all the requirements of section forty-one. In the event the commission determines that the subject matter of such complaint has been previously resolved or litigated with respect to such employee, in accordance with the provisions of section eight of chapter one hundred and fifty E, or is presently being resolved in accordance with said section eight, the commission shall forthwith dismiss such complaint. If said complaint is denied, such hearing shall be conducted and a decision rendered as provided by section forty-three.

The supreme judicial court or the superior court shall have jurisdiction over any civil action for the reinstatement of any person alleged to have been illegally discharged, removed, suspended, laid off, transferred, lowered in rank or compensation, or whose civil service position is alleged to have been illegally abolished. Such civil action shall be filed within six months next following such alleged illegal act, unless the court upon a showing of cause extends such filing time.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

### CHAPTER 31. CIVIL SERVICE

### Chapter 31: Section 43 Hearings before commission

Section 43. If a person aggrieved by a decision of an appointing authority made pursuant to section forty-one shall, within ten days after receiving written notice of such decision, appeal in writing to the commission, he shall be given a hearing before a member of the commission or some disinterested person designated by the chairman of the commission. Said hearing shall be commenced in not less than three nor more than ten days after filing of such appeal and shall be completed within thirty days after such filing unless, in either case, both parties shall otherwise agree in a writing filed with the commission, or unless the member or hearing officer determines, in his discretion, that a continuance is necessary or advisable. If the commission determines that such appeal has been previously resolved or litigated with respect to such person, in accordance with the provisions of section eight of chapter one hundred and fifty E, or is presently being resolved in accordance with such section, the commission shall forthwith dismiss such appeal. If the decision of the appointing authority is based on a performance evaluation conducted in accordance with the provisions of section six A and all rights to appeal such evaluation pursuant to section six C have been exhausted or have expired, the substantive matter involved in the evaluation shall not be open to redetermination by the commission. Upon completion of the hearing, the member or hearing officer shall file forthwith a report of his findings with the commission. Within thirty days after the filing of such report, the commission shall render a written decision and send notice thereof to all parties concerned.

If the commission by a preponderance of the evidence determines that there was just cause for an action taken against such person it shall affirm the action of the appointing authority, otherwise it shall reverse such action and the person concerned shall be returned to his position without loss of compensation or other rights; provided, however, if the employee, by a preponderance of evidence, establishes that said action was based upon harmful error in the application of the appointing authority's procedure, an error of law, or upon any factor or conduct on the part of the employee not reasonably related to the fitness of the employee to perform in his position, said action shall not be sustained and the person shall be returned to his position without loss of compensation or other rights. The commission may also modify any penalty imposed by the appointing authority.

Any hearing pursuant to this section shall be public if either party so requests in writing. The person who requested the hearing shall be allowed to answer, personally or by counsel, any of the charges which have been made against him.

The decision of the commission made pursuant to this section shall be subject to judicial review as provided in section forty-four.

Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section.

# GENERAL LAWS OF MASSACHUSETTS

### PART I.
### ADMINISTRATION OF THE GOVERNMENT

---

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

---

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 44 Judicial review**

Section 44. The commission may institute appropriate proceedings in the superior court for enforcement of its final orders or decisions. Any party aggrieved by a final order or decision of the commission following a hearing pursuant to any section of this chapter or chapter thirty-one A may institute proceedings for judicial review in the superior court within thirty days after receipt of such order or decision. Any proceedings in the superior court shall, insofar as applicable, be governed by the provisions of section fourteen of chapter thirty A, and may be instituted in the superior court for the county (a) where the parties or any of them reside or have their principal place of business within the commonwealth, or (b) where the commission has its principal place of business, or (c) of Suffolk. The commencement of such proceedings shall not, unless specifically ordered by the court, operate as a stay of the commission's order or decision.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 45 Reimbursement for defense expenses**

  Section 45. A tenured employee who has incurred expense in defending himself against an unwarranted discharge, removal, suspension, laying off, transfer, lowering in rank or compensation, or abolition of his position and who has engaged an attorney for such defense shall be reimbursed for such expense, but not to exceed two hundred dollars for attorney fees for each of the following: (1) a hearing by the appointing authority; (2) a hearing pursuant to section forty-two or forty-three; (3) a judicial review pursuant to section forty-four; and not to exceed one hundred dollars for each of the following: (1) summons of witnesses; (2) cost of stenographic transcript; (3) any other necessary expense incurred in such defense.

  Any person seeking such reimbursement shall file with his appointing authority a written application therefor within thirty days after final disposition of his case. The appointing authority shall, within thirty days after receipt of such application, pay such reimbursement from the same source as that from which the salary of the person seeking the reimbursement is paid, but only upon receipt of satisfactory proof that such expenses were actually incurred for the purposes set forth in this section.

  Saturdays, Sundays, and legal holidays shall not be counted in the computation of any time period specified in this section.

# EXHIBIT 80

# HOLYOKE POLICE DEPARTMENT
## PERSONNEL SICK REPORT
### (THIS FORM IS TO BE PRINTED OR TYPED)

Member: _WALKER    Tammy_    Assignment: _OPERATIONS_
LAST    FIRST    MIDDLE INITIAL    BUREAU, DIVISION OR UNIT

Date Sickness or Injury Occurred: _11-15-04_    Time Occurred: _4:50 PM_

Date Sickness or Injury Reported: _11-15-04_    Time Reported: _450 PM_

Described Nature of Injury and/or Sickness: _Headache_

Sickness and/or Injury Reported to: _LT. O'CONNELL_
PRINT FULL NAME, INCLUDING MIDDLE INITIAL OF MEMBER RECEIVING REPORT

Signature of Member Receiving Report: _Lt Eva M O'Connell_

Supervisor Reviewing Report: _Lt. Eva M. O'CONNELL_
PRINT FULL NAME, INCLUDING MIDDLE INITIAL OF SUPERVISOR REVIEWING REPORT

Signature of Supervisor Reviewing Report: _Lt Eva M O'Connell_

[X] Reported sick or injured during tour of duty    [ ] Reported sick or injured prior to tour of duty

Reviewed by Bureau Commander: _____    Date: _____
SIGNATURE OF BUREAU COMMANDER

ORIGINAL COPY TO BE SENT TO CHIEF'S OFFICE    HPD FORM 019  REV SEPT. 2003

# HOLYOKE POLICE DEPARTMENT
## PERSONNEL SICK REPORT
*(THIS FORM IS TO BE PRINTED OR TYPED)*

Member: _Walker Tammy_          Assignment: _2nd watch_
LAST   FIRST   MIDDLE INITIAL                    BUREAU, DIVISION OR UNIT

Date Sickness or Injury Occurred: _____          Time Occurred: _____

Date Sickness or Injury Reported: _11/16/04_          Time Reported: _14:07_

Described Nature of Injury and/or Sickness: _migraine_

Sickness and/or Injury Reported to: _Sgt. Girard   Bjurney A. Cru_
PRINT FULL NAME, INCLUDING MIDDLE INITIAL OF MEMBER RECEIVING REPORT

Signature of Member Receiving Report: _Bjurney A. Croz   Bjurney A. Cruz_

Supervisor Reviewing Report: _Sgt. Girard_
PRINT FULL NAME, INCLUDING MIDDLE INITIAL OF SUPERVISOR REVIEWING REPORT

Signature of Supervisor Reviewing Report: _____

[ ] Reported sick or injured during tour of duty          [ ] Reported sick or injured prior to tour of duty

Reviewed by Bureau Commander: _____          Date: _____
SIGNATURE OF BUREAU COMMANDER

NAL COPY TO BE SENT TO CHIEF'S OFFICE

HPD FORM 019 REV SEPT. 2003

# HOLYOKE POLICE DEPARTMENT
## PERSONNEL SICK REPORT
### (THIS FORM IS TO BE PRINTED OR TYPED)

Member: _Walker Tammy_          Assignment: _2nd watch_
      LAST    FIRST   MIDDLE INITIAL                BUREAU, DIVISION OR UNIT

Date Sickness or Injury Occurred: _____          Time Occurred: _____

Date Sickness or Injury Reported: _11/17/04_          Time Reported: _13:45_

Described Nature of Injury and/or Sickness: _Migraine_

Sickness and/or Injury Reported to: _Bjurney A. Cruz_
                                      PRINT FULL NAME, INCLUDING MIDDLE INITIAL OF MEMBER RECEIVING REPORT

Signature of Member Receiving Report: _Bjurney A. Cruz_

Supervisor Reviewing Report: _Sgt. Girard_
                            PRINT FULL NAME, INCLUDING MIDDLE INITIAL OF SUPERVISOR REVIEWING REPORT

Signature of Supervisor Reviewing Report: _____

[ ] Reported sick or injured during tour of duty          [ ] Reported sick or injured prior to tour of duty

Reviewed by Bureau Commander: _____          Date: _____
                                SIGNATURE OF BUREAU COMMANDER

*ORIGINAL COPY TO BE SENT TO CHIEF'S OFFICE*          *HPD FORM 019  REV SEPT. 2003*

# EXHIBIT 81

===============================================================

# INTEROFFICE CORRESPONDENCE
## HOLYOKE POLICE DEPT.

| | |
|---|---|
| **TO:** | Chief Anthony R. Scott |
| **FROM:** | Lt. Eva M. O'Connell |
| **SUBJECT:** | Sgt. Tammy Walker |
| **DATE:** | November 18, 2004 |

When I spoke with you earlier today I was not aware that Sgt. Walker had put in a slip for Time Off. When Lt. Cassidy arrived at work, Wednesday, November 17, 2004 there was a slip from Sgt. Walker for time off. The Time Off Request slip was for November 20th and 21st Sgt. Walker is requesting to use two Holidays.

I am enclosing a copy of the schedule for the rest of the month of November and a copy of Sgt. Walker's attendance calendar. I have not approved Sgt. Walkers request and will wait to hear from you.

*Lt. Eva M O'Connell*

Lt. Eva M. O'Connell

cc: Captain Alan Fletcher

Nov 2004

Month _____ Year _____

Holyoke Police Department

Platoon B, Bureau of Operations

| Name | ID | Grp | 1 M | 2 T | 3 W | 4 T | 5 F | 6 SA | 7 SU | 8 M | 9 T | 10 W | 12 F | 13 SA | 14 SU | 15 M | 16 T | 17 W | 18 T | 19 F | 20 SA | 21 SU | 22 M | 23 T | 24 W | 26 F | 27 SA | 28 SU | 29 M | 30 T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lieut. O'Connell | 112 | C | 1 | 1 | 1 | 1 | O | O | O | 1 | 1 | 1 | 1 | 1 | 1 | 1 | O | O | 1 | 1 | O | O | O | O | O | | | | O | O |
| Lieut. Cassidy, B. | 134 | B | S | O | 1 | 1 | V | O | O | 1 | 1 | O | V | V | V | V | O | O | V | V | V | V | O | O | | V | V | V | O | O |
| Sgt. Wagner, R | 126 | C | 1 | 1 | 1 | 1 | 1 | J | J | J | 1 | 1 | M | M | M | M | O | O | M | M | M | M | O | O | M | M | M | | M | M |
| Sgt. Fallon, D | 73 | C | O | 1 | 1 | 1 | 1 | V | V | 1 | 1 | 1 | 1 | 1 | 1 | 1 | O | O | 1 | 1 | 1 | 1 | O | O | | J | J | J | O | O |
| Sgt. Walker, T. | 229 | A | 1 | H | 1 | H | 1 | 1 | S | S | H | 1 | 1 | 1 | J S | J S | S | S | J | J S | S | S | O | O | | S | S | | O | O |
| Sgt. Monaghan, J. | 232 | C | 1 | H | 1 | O | H | 1 | H | H | H | O | O | 1 | 1 | O | O | P | O | H | H | O | O | O | | O | O | | O | O |
| P.O. Barber, S | 143 | A | 1 | 1 | 1 | 1 | O | O | O | 1 | 1 | 1 | O | 1 | 1 | 1 | 1 | P | 1 | 1 | O | O | O | O | | O | O | O | O | O |
| Spafford, H | 164 | A | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | TO | TO | TO | 1 | 1 | 1 | 1 | 1 | 1 | 1 | O | O | O | 76 | | O | O | O | O | O |
| Wielgosz, H. | 146 | A | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | TO | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | O | O | O | O | | O | O | O | O | O |
| Chirgwin, B | 237 | A | 1 | 1 | 1 | 1 | O | O | 1 | 1 | 1 | 1 | O | 1 | 1 | 1 | 1 | 1 | 1 | 1 | O | O | O | O | | O | O | O | O | O |
| Czupkiewicz, P | 252 | A | 1 | 1 | 1 | 1 | TO | TO | 1 | 1 | 1 | 1 | TO | 1 | 1 | 1 | VS | P | P | 1 | V | O | O | O | | O | O | O | O | O |
| P.O. Reyes, M | 289 | A | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | O | 1 | 1 | 1 | 1 | 1 | 1 | 1 | V | O | O | O | | O | O | O | O | O |
| P.O. Montalvo, J. | 188 | B | 1 | 1 | 1 | 1 | 1 | 1 | O | 1 | O | O | O | 1 | 1 | 1 | 1 | O | O | O | O | O | O | O | | O | O | O | O | O |
| Colon, J | 264 | B | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | TO | TO | TO | 1 | 1 | 1 | 1 | 1 | 1 | O | O | O | O | O | | O | O | O | O | O |
| Rivera, M | 265 | B | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | O | 1 | 1 | 1 | 1 | 1 | 1 | 1 | O | O | O | O | O | | O | O | O | O | O |
| Alicea, L. | 274 | B | 1 | O | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | TO | 1 | 1 | 1 | 1 | 1 | 1 | O | O | O | O | O | | O | O | O | O | O |
| Moriarty, M. | 284 | B | 1 | 1 | 1 | 1 | PD | TO | 1 | 1 | 1 | 1 | B | B | B | 1 | 1 | 1 | 1 | O | O | O | O | O | | O | O | O | O | O |
| Skwira, T. | 287 | B | 1 | 1 | 1 | 1 | TO | 1 | O | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 76 | O | O | O | O | O | | O | O | O | O | O |
| P.O. Thomas, K. | 223 | C | O | 1 | 1 | O | 1 | 1 | 1 | 1 | 1 | O | 1 | O | 1 | O | O | O | O | O | O | O | O | O | | O | O | O | O | O |
| Shattuck, Sean | 230 | C | 1 | O | O | O | 1 | 1 | 1 | 1 | 1 | O | V | V | V | O | O | O | O | O | V | V | O | O | | V | V | V | O | O |
| Dunn, M. | 268 | C | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | | M | M | M | M | M |
| McMahon | 272 | C | O | O | O | O | 1 | 1 | 1 | 1 | 1 | O | V | V | V | V | O | O | V | V | V | V | O | O | | M | M | | O | O |
| Bartolomie | 273 | C | 1 | 1 | 1 | 1 | S | S | S | P | B | 1 | B | B | B | O | O | O | O | O | O | O | O | O | | O | O | | O | O |
| Delgado, W | 293 | C | 1 | 1 | O | O | V | 1 | 1 | 1 | O | 1 | 1 | 1 | 1 | 1 | O | O | O | O | O | O | O | O | | O | O | | O | O |
| Monsalve, J. | 296 | C | 1 | 1 | to/1 | O | 1 | 1 | 1 | 1 | 1 | O | 1 | 1 | 1 | 1 | O | O | 1 | 1 | O | O | O | O | | O | O | | O | O |

HOLYOKE POLICE DEPARTMENT

YEARLY ATTENDANCE CALENDAR

JANUARY to DECEMBER 2004

RANK _____

HPD Form 1

I.D. NO. 229

ASSIGNMENT Oper'ns 3rd Watch

NAME WALKER, Tammy

**NAME** WALKER, Tammy          **ID #229**

## TIME OWED CARRIED OVER _17 1/4_

| DATE | CREDIT | TAKEN | BALANCE |
|------|--------|-------|---------|
| 2/7 | | 2 | 23 1/4 |
| 1-16 | 11 1/4 | | 34 1/2 |
| 2-18 | 6 | | 40 1/2 |
| 2/24 | | 2 | 38 1/2 |
| 2/27 | 41/6 | | 38 1/2 |
| 2/27 | | 8 | 30 |
| 2/24 | | 2 | 28 |
| 3-11 | 41/2 | 8 | 19 |
| 4/23 | 21/2 | | 23 1/2 |
| 4/12 | 41/2 | 8 | 28 |
| 5/14 | | 8 | 23 1/2 |
| 6-6 | | 8 | 19 3/4 |
| 6-20 | | 4 | 20 3/4 |
| 4/25 | | 8 | 29 3/4 |
| 5/14 | | | 37 3/4 |
| 5/24 | 6 | 4 | 33 3/4 |
| 5/24 | 5 1/4 | | 33 1/2 |
| 5/14 | 6 | 1 | 9 1/2 |
| 4/30 | 41/2 | 6 | 2 1/2 |
| 3-9 | | 1 | 3 1/2 |
| 31 | 41/2 | 6 | 1 1/2 |
| 2.9 | 6 | | 3 |
| 2.9 | 1/2 | | 2 1/2 |
| 34 | | 8 | 2 1 |

## MISCELLANEOUS

| DATE | CREDIT | TAKEN | BALANCE |
|------|--------|-------|---------|

## VACATION TIME

| Month | Credit | Taken | Bal. | Total |
|-------|--------|-------|------|-------|
| Jan. | | 5 | | |
| Feb. | | | 23 | |
| Mar. | | 2 | 21 | |
| Apr. | | 3 | 18 | |
| May | | 4 | 14 | |
| Jun. | | 3 | 11 | |
| Jul. | | 3 | 8 | |
| Aug. | | 4 | 4 | |
| Sep. | | 3 | 1 | |
| Oct. | | 1 | | |
| Nov. | | | | |
| Dec. | | | | |

28

## SICK LEAVE CARRIED OVER

| Month | Credit | Taken | Bal. | Total |
|-------|--------|-------|------|-------|
| Jan. | | 1 | 21 1/4 | 21 1/4 |
| Feb. | | 1 | 20 1/4 | |
| Mar. | | 2 | 18 1/4 | |
| Apr. | | 5 | 13 1/4 | |
| May | | 2 | 11 1/4 | |
| Jun. | | 1 | 10 1/4 | |
| Jul. | | 5 | 5 1/4 | |
| Aug. | | 5 | 5 1/4 | |
| Sep. | | 1 | 4 | |
| Oct. | | 1 | 3 | |
| Nov. | | | | |
| Dec. | | | | |

## HOLIDAYS

| | | TAKEN ON | # To Be Paid |
|---|---|----------|---------------|
| + | New Years Day | 10-15 | |
| + | M.L. King's Birthday | 10-21 | |
| | Washington's Birthday | | |
| + | Patriot's Day | 10-23 | |
| + | Memorial Day | 11-5 | |
| + | Independence Day | 11-9 | |
| + | Labor Day | | |
| | Columbus Day | | |
| | Veteran's Day | | |
| + | Thanksgiving Day | | |
| | Christmas Day | | |
| # To Take _____ | | # To Be Paid _____ |

Vacation increased to _8_ _35_ days on _2¹_

## INCENTIVE DAYS TAKEN

| 2-1 | 2-16 | 12-21 |
|-----|------|-------|

HPD Form 1.3



# EXHIBIT 82



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**        Chief Anthony R. Scott

**FROM:**      Lt. David D. Fournier
               Commander, Professional Standards Division

**SUBJECT:**   Sgt. Tammy Walker

**DATE:**      November 18, 2004

**NUMBER:**

---

Sir:

Be advised that on November 17, 2004, I observed Sergeant Tammy Walker operating her motor vehicle at 20:27 hours. I was traveling west on Lincoln Street, making a right hand turn onto Pleasant Street and Sgt. Walker was in the southbound lane on Pleasant Street, stopped for the red light. I clearly observed her in the operator's seat and as I passed her vehicle I took note of her license plate, CURVED.

In review of the second watch schedule for November 17, 2004, I find that Sgt. Walker called out sick for her tour of duty, listing a migraine as her illness.

It my contention that Sgt. Walker is in violation of H.P.D. Rule 3.2. Unbecoming Conduct, which states that officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorable upon the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer.

With the use of her sick day on November 17, 2004, Sgt. Walker now has zero (0) sick days accrued. Sgt. Walker was appointed to the department in 1993 and as a result has received and used more than 150 sick days. Further, Sgt. Walker has two (2) sick leave abuser notices on file. Sgt. Walker in operating her vehicle while out on sick leave sets a poor example for her subordinates. Should a physician excuse her absence, I would still

suggest that she is violation of Rule 3.2. Further, her use of sick leave places a burden on both her fellow officers and the taxpayers of the City of Holyoke.

Respectfully submitted,

Lt. David D. Fournier
Commander
Professional Standards Division



# HOLYOKE POLICE DEPARTMENT
## DISCIPLINARY ACTION NOTICE
### *(THIS FORM SHALL BE TYPED)*

IAD CASE #: _____

**Accused Member:** Walker _____ Tammy _____ W. _____
LAST                    FIRST              MIDDLE

**Employee #:** 229 ____    **Rank/Classification:** Sergeant ____    **Assignment:** FOB ____

---

## VIOLATION DATA

**Date:** 11/17/04 ____    **Time:** 20:27 AM/PM    **Location:** Pleasant & Lincoln Street _____

**Violation: Rule Title:** Unbecoming Conduct ____    **Rule #:** 3.2 ____    **Rule Short Title:** _____

---

## DESCRIPTION OF VIOLATION

See Attached IOC

**IF ADDITIONAL SPACE NEEDED USE PLAIN WHITE PAPER AND ATTACHED**

---

## RECOMMENDED DISCIPLINARY ACTION

[ ] Warning/Cautioned      [ ] Verbal Reprimand      [ ] Written Reprimand      [X] Suspension ___ Days      [ ] Suspension Extra Work
[ ] Restitution      [ ] Termination

**Recommending Supervisor:** Fournier _____ David _____ D. _____
LAST                    FIRST              MIDDLE

**Supervisor's Signature:** _William W. Fournier_ _____    **Date:** 11/18/04 ____

APPROVED:                                          APPROVED:
DISAPPROVED:                                       DISAPPROVED:

_____                        _____
Bureau Commander                                   Chief of Police

Member's Acknowledgement Signature : _____    **Date:** _____
DISTRIBUTION AFTER CHIEF HAS SIGNED: WHITE COPY TO OFFICER    YELLOW COPY SUPERVISOR    HARD COPY PROFESSIONAL STANDARDS DIVISION

HPD FORM 015 - DAN # _____

# EXHIBIT 83



## HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**     ANTHONY R. SCOTT, CHIEF OF POLICE

**FROM:**   MELINDA J. LANE, POLICE COMPTROLLER

**SUBJECT:** USE OF SICK TIME BY SERGEANT TAMMY WALKER

**DATE:**   TUESDAY, NOVEMBER 30, 2004

On Tuesday, November 30, 2004, I was directed by you to
develop a time-line to track the use of 'Sick Time' by
Sergeant Tammy Walker for the month of November 2004. I
was also directed to ascertain, if possible, when Sergeant
Walker became aware that she had no 'Sick Time' remaining
in her account. To ascertain this information I spoke with
Head Clerk Kathleen McCoy who handles all departmental
payroll records including the balances of all sick,
vacation, personal, holiday times, etc. Ms. McCoy informed
me that she had spoken with Sergeant Walker several times
and that the Sergeant was well aware of the status of her
'Sick Time' and when she had run out. This conversation
with Ms. McCoy occurred on Tuesday, November 30, 2004 at
approximately 3:45 p.m. in the Budget and Fiscal Control
Division office.

Attached you will find the time-line I developed and a copy
of Sergeant Walkers' 'Yearly Attendance Calendar' record.

Melinda J. Lane
Police Comptroller


attachments


ARS/jas

# EXHIBIT 84



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**           Chief Anthony R. Scott

**FROM:**       Kate McCoy

**SUBJECT:**

**DATE:**       Sgt. Tammy Walker

December 2, 2004

I have communicated either in person or by telephone with Sgt. Tammy Walker approximately 10-12 times over the last month or month and ½.

We have discussed her personal time (Vac. Sick, Holiday) during these conversations.

I sent to each Commanding Officer on a monthly basis, a list of their personnel's own personal time remaining.

Twice a year, July and September, I sent to each employee (Police and Civilian) an update of their own personal time.

Kate McCoy
Payroll

# EXHIBIT 85



BOARD CERTIFIED IN FAMILY PRACTICE

HOLYOKE FAMILY PRACTICE • 1221 MAIN STREET • SUITE 302
HOLYOKE, MASSACHUSETTS 01040
(413) 536-5525

## CERTIFICATE TO RETURN TO WORK OR SCHOOL

Name _TAMMY WALKER_

has been examined by me on _11/18/04_ and is able to return to work / school on

_11/19/04_ (PLEASE EXCUSE ABSENCE ON 11/15-17/04

Restrictions: ✓ None _____ Light Work _____ Other _____

_____

Physical Education: _____ May Take _____ Limited _____ May Not Take

Nature of Illness / Injury : _WORK RELATED STRESS_

Date: _11/18/04_                    _Signature_

# EXHIBIT 86

========================================================

# INTEROFFICE CORRESPONDENCE
# HOLYOKE POLICE DEPT.

| | |
|---|---|
| **TO:** | Sgt. Tammy Walker |
| **FROM:** | Lt. Eva M. O'Connell |
| **SUBJECT:** | Request Day off 11/20/04 |
| **DATE:** | November 20, 2004 |

This is to advise you that your request for a Holiday on Saturday November 20, 2004 has been denied. By giving, you Saturday off it would create an overtime situation. Your request for Sunday November 21, 2004 has been granted

If you have, any questions please feel free to call me. I left a message on your machine with this same message.

Lt. Eva M. O'Connell

cc: Chief Anthony R. Scott
    Captain Alan Fletcher

Received
11-22-2004

# EXHIBIT 87

# INTEROFFICE CORRESPONDENCE
## HOLYOKE POLICE DEPT.

**TO:**       **Chief Anthony R. Scott**
**FROM:**     **Lt. Eva M. O'Connell**
**SUBJECT:**  **Clarification on Date**
**DATE:**     **December 13, 2004**

When I was reviewing documents in Sergeant Walker's file, I realized that the IOC to Sergeant Walker dated November 20, 2004 should have been dated November 19, 2004.

On November 18, 2004, I had sent you an IOC, which was copied to Captain Fletcher. In this IOC, I advised you that by approving Sergeant Walker's request for a Holiday on November 20, 2004 it would create overtime. Captain Fletcher denied the Holiday request on November 19, 2004 at 650 AM. When I got to work on November 19, 2004, I called Sergeant Walker and left the message on her answering machine. (I believe that call was on a taped line). I than did an IOC and had Officers Bartolomei and Mead deliver the IOC to Sergeant Walker. (see attached dispatch log for November 19, 2004 call # 04-43420)

Lt. Eva M. O'Connell

**For Date: 11/19/2004  -  Friday**

| Call Number | Time | Call Reason | Action | Priority | Duplicate |
|---|---|---|---|---|---|

**0    17    1620    Phone - HARASSMENT              ARREST              3**

```
        Call Taker:    087 - CRAVEN, JOHN
  Location/Address:    517 HIGH ST @ 141 CABOT ST
              Post:    2211  RIVERA, MANUEL
                       Disp-16:21:35              Arvd-16:28:05  Clrd-16:37:04
       Arrived By:     429 - ODONNELL, JOHN
              Post:    2241  SKWIRA, TIMOTHY
                       Disp-16:29:19              Arvd-16:29:22  Clrd-16:35:57
    Dispatched By:     429 - ODONNELL, JOHN
       Arrived By:     429 - ODONNELL, JOHN
              Post:    2699  LOPEZ, EDGAR
                       Disp-16:33:39              Arvd-16:33:40  Clrd-16:37:06
         Narrative:    11/19/2004 1622 CRAVEN, JOHN
                         MALE CALLER STATED HE IS BEING HARASSED BY A FEMALE


         Narrative:    11/19/2004 1635 CRAVEN, JOHN
                           WHILE UNIT WAS RESPONDING, A FEMALE WALKED INTO HQ AND
                       REPORTED THAT A MALE HAD VIOLATED A 209A THAT SHE HAS
                       AGAINST HIM.  IT TURNS OUT THAT THIS IS THE OTHER HALF OF
                       THIS ORIGINAL CALL.  OFFICER LOPEZ IS SPEAKING WITH THE
                       FEMALE AND STAYING IN TOUCH WITH UNIT 211.


    Refer To Arrest:    04-3087-AR
            Arrest:     MARMOL, FREDDIE
           Address:     362 HIGH ST 2E   HOLYOKE, MA
               DOB:     11/22/1967    SSN: 134584913
           Charges:     ABUSE PREVENTIONORDER,VIOLATE
```

**04-43418    1627    Phone - SUSPICIOUS PERSON        GONE               3**

```
        Call Taker:    429 - ODONNELL, JOHN
     tion/Address:     [HOY 980] PAL JOEY'S - 2229 NORTHAMPTON ST
              Post:    2221  MCMAHON, MICHAEL
                       Disp-16:30:22              Arvd-16:40:24  Clrd-16:40:38
              Post:    2241  SKWIRA, TIMOTHY
                       Disp-16:36:02              Arvd-16:40:30  Clrd-16:40:36
    Dispatched By:     087 - CRAVEN, JOHN
         Narrative:    11/19/2004 1637 ODONNELL, JOHN
                       WHITE FEMALE WEARING A NAROON JACKET AND BLUE JOGGING PANTS
                       IS SCREAMING AT EVERYONE THAT GOES BY HER.
```

**04-43419    1635    Radio - DISABLED MOTOR VEHICLE    GONE              3**

```
        Call Taker:    429 - ODONNELL, JOHN
  Location/Address:    RT 91 EXIT 15
              Post:    2251  MONSALVE, JORGE
                       Disp-16:36:00              Arvd-16:40:45  Clrd-16:41:24
```

**04-43420    1642    Initiated - ADMINISTRATIVE       SPOKEN             3                ✓**

```
        Call Taker:    087 - CRAVEN, JOHN
  Location/Address:    6 CLARK ST
      Initiated By:    2262 - BARTOLOMEI, JAMES
                             MEAD, MICHAEL
              Post:    2262  BARTOLOMEI, JAMES
                                                  Arvd-16:42:14  Clrd-16:50:30
                             MEAD, MICHAEL
         Narrative:    11/19/2004 1642 CRAVEN, JOHN
                         OFFICERS ARE DELIVERING PAPERWORK TO THIS ADDRESS.


         Narrative:    11/19/2004 1647 CRAVEN, JOHN
                         OFFICERS CALLED OUT AT ADDRESS AT 1645 HOURS.


         Narrative:    11/19/2004 1650 CRAVEN, JOHN
                         OFFICERS RADIOED THAT THEY HAVE MADE SERVICE IN HAND AND
```

ARE CLEARING.


04-43421      1644    **Initiated - ANIMAL-DEAD DEER**        **ASSISTED**              3
    Call Taker:    087 - CRAVEN, JOHN
  ation/Address:    [HOY 1000] PECK JR HIGH SCHOOL - 1916 NORTHAMPTON ST
   Initiated By:    2241 - SKWIRA, TIMOTHY
       Post:    2241  SKWIRA, TIMOTHY
                            Arvd-16:44:39  Clrd-17:27:18
     Narrative:    **11/19/2004 1645 CRAVEN, JOHN**
          MOTORIST REPORTED A DEAD DEER NEAR THE SCHOOL.


     Narrative:    **11/19/2004 1650 CRAVEN, JOHN**
          OFFICER REPORTED FINDING A GUTTED DEER CARCUS ON THE
WEST SIDE OF THE SCHOOL BUILDING, NEAR WHERE CROSIER FIELD
PROPERTY ABUTS SCHOOL PROPERTY.  MR TRYON WAS BEEPED.


04-43422      1652    **Initiated - FOLLOW UP**          **OTHER**                3
    Call Taker:    087 - CRAVEN, JOHN
 Location/Address:    214 LOCUST ST
   Initiated By:    2231 - THOMAS, KEVIN
       Post:    2231  THOMAS, KEVIN
                            Arvd-16:52:55  Clrd-17:12:31

    Cleared By:    429 - ODONNELL, JOHN
       Post:    2410  MCCOY, MICHAEL
         Disp-16:53:18                Arvd-16:53:23  Clrd-17:12:45

# EXHIBIT 88

Holyoke Police Department
Professional Standards Division
138 Appleton Street
Holyoke, MA 01040

It's 2:30 p.m. on Monday, November 22, 2004, in the conference room and present is Sergeant Tammy Walker and Sergeant Daniel McCavick. Sergeant Walker I am conducting an inquiry into your absence from work on November 17th and Saturday, November 20th. It is now 2:30 p.m. you have exactly 20 minutes to contact a union attorney or union representative and they have 40 minutes to get here. So it is now 2:30 you have until 10 minutes to 3:00 to contact a union representative or union attorney and they have until 3:30 to get here. You are not and I repeat not to leave the building. Use the telephone and at 3:30 you are to report back to this office at 3:30 p.m. and you are not that's a direct order to leave this building.

Sergeant Walker: This inquiry for the dates that I was out sick?

Chief Scott: That's right. I'm conducting an inquiry into your absence from work on November 17th and November 20th.

Recess taken.


Chief Scott: It is now 3:26 p.m. Once again present is Sergeant Daniel McCavick and Sergeant Tammy Walker. Sergeant, I've given you the opportunity to make about – to get yourself a union representative or union attorney. You're present now without a union representative or union attorney. Are you aware that I plan on taking a statement from you?

Sergeant Walker: No. I thought you wanted to go over this –

Chief Scott: No, Sergeant, when I – Sergeant, when I told you to get a union representative or an attorney I told you that I was going to be taking a statement from you regarding your absence from work, that's why I gave you the time to get an attorney or a union representative.

Sergeant Walker: Okay. If it's regarding the statements from work, I have that documentation with me. I have no problem –

Q denotes Chief Anthony R. Scott
A denotes Sergeant Tammy Walker

_____

Q. For the record, please state your full name, rank, assignment and number of years you have been employed in the Holyoke Police Department?

1

A. My name is Sergeant Tammy Walker; I have been employed with the Holyoke Police Department for approximately 11 years.

Q. What it your present assignment?
A. I presently work the second shift as Assistant Watch Commander.

Q. Sergeant, did you report yourself sick with a migraine headache at 1:45 p.m. on Wednesday, November 17, 2004?
A. (pause)  The time reported was 1345.

Q. Sergeant Walker, when did you begin to feel too ill to report for duty on that date?
A. (pause)  When did I – I don't know exactly what time I started feeling ill.

Q. Sergeant Walker, from what location did you call in and report yourself sick on Wednesday, November 17, 2004?
A. I believe I was in the station at the time, I didn't make a phone call, I think I was here already.

Q. Were you suffering from a migraine headache at that time?
A. Yes, I suffer from migraine headaches and there was one at that time.

Q. Sergeant Walker, did you take any medication for the migraine headache?
A. Yes, I do have a prescription medication for migraine headaches.

Q. Was this a prescribed medication or was this over the counter medication?
A. Prescribed.

Q. Who prescribed the medication for migraine headaches for you?
A. Doctor Steven Levine, my primary physician.

Q. Sergeant Walker, when you have a migraine headache, how long does it last?
A. It varies; it can last from when I get up in the morning until I go to bed.  It can last -- whenever it wants to come, whenever it wants to go.  There's no set time when they come on and no set time when they leave.

Q. Sergeant Walker, did you seek medical attention from a doctor for this particular migraine headache?
A. On this particular day?

Q. Yes, on November 17th?
A. No, I just took the medication.

Q. Sergeant, if you haven't seen a doctor for this most recent migraine headache, when was the last time you saw a doctor for the migraine headaches?
A. I saw Doctor Steve Levine on the 18th, November 18th.

2

Q. Sergeant Walker, what if anything did the doctor prescribe for the migraine headache on the 18th?

A. On the 18th, he didn't prescribe anything, I already still had medication left over for the migraine headaches, he stated to take I believe it's Naprosyn for the inflammation in my shoulder.

Q. Right now I'm only speaking about the migraine headache you called in sick for on the 17th of November.

A. Uh-huh.

Q. Sergeant Walker, at what time on Wednesday, November 17, 2004, did you begin to feel better?

A. (pause)  I don't know what time it was I started feeling better.

Q. Sergeant Walker, did you feel good enough to report for duty on November 17, 2004, when you began to feel better?

A. No.

Q. Sergeant Walker, did you remain at your residence the remainder of the day after you reported yourself sick with a migraine headache on November 17, 2004?

A. (pause)  What date was that – what day of the week was that?

Q. Wednesday, November 17, 2004, did you remain at your residence the remainder of the day after you reported yourself sick with a migraine headache?

A. Um, I would either be at my house or my sister's house so I really don't know, I can't recall.  I may have been home all day, I may have dropped my daughter off at my sister's house.  I really don't remember.

Q. Sergeant Walker, where did you go and please be specific to the times and locations if you left your house on Wednesday, November 17, 2004, after you reported yourself sick?

A. (pause)  Chief, I really don't remember.

Q. Did you leave your home on Wednesday, November 17, 2004, after you reported yourself sick?

A. (pause)  I really don't recall if I left the house or not, Chief, I really don't.  It was the 17th, it's now the 22nd, I really don't recall Wednesday's activity.

Q. Sergeant Walker, what is the make, model and color and registration of your personal vehicle?

A. It's a 1998 red Pathfinder.

Q. As a police officer, you're required to remember information that happened months, and weeks after you have conducted an investigation when you testify on the stand.  Are you telling me at this time you do not remember Wednesday -- what you did on Wednesday, November 17th which was approximately four days prior to today?

A. (pause)  Yes, sir, I'm sorry, I am.  I don't recall what I was doing that day, um --.

3

Q. You did recall reporting yourself ill with a migraine headache on that date?
A. Yes, I believe I came into the station.

Q. You recalled coming into the station on that date?
A. Yes.

Q. But you do not recall what you did after you left the station on that date?
A. No. (pause) I mean, I want to say I'm 100% sure I was in the station.

Q. Sergeant Walker, do you have more than one vehicle?
A. Yes, I do.

Q. How many vehicles do you have, Sergeant?
A. Ah -- two – well, three total.

Q. Could you give me the make and models of the other two vehicles?
A. I have a 1987 300ZX and a -- I think it's an S10 pickup truck.

Q. Are all of these vehicles in operating condition?
A. Yes.

Q. So you could have left you residence on November 17, 2004, you just do not recall
    whether or not you left your residence?
A. I don't remember what I did Wednesday, the 17th after leaving here, sir. The two
    vehicles that you questioned are running vehicles.

Q. Did you loan your vehicles to anyone on November 17, 2004?
A. No.

Q. And that no stands for all of your vehicles?
A. (pause) I didn't loan any vehicle out on that day.

Q. Sergeant Walker, on November 20, 2004, were you informed that you could not have the
    day off in writing by Lieutenant O'Connell?
A. Yes. A letter was sent by an officer to my home.

Q. However you pulled up sick on that date?
A. I received a letter from an officer stating that it had been denied. I came into the station –
    well, I think it was the day before I actually received this – I came into the station and
    checked the book, our regular book and (pause) the next day I came in and checked the
    book and there was a sick slip from Sergeant Fallon dating this date that he was calling in
    sick on 10/29 and here's the sick slip and here's my slip which I made a copy of on the
    17th when I came in –

Q. Sergeant, that's not the question. My question is did you report yourself sick on
    November 20, 2004, yes or no?

4

A.  Yes.

Q.  For what reason did you report yourself sick on that date?
A.  Family issues.

Q.  What family issues required you to pull up sick on November 20, 2004?
A.  Um, my brother is sick, my family is taking – we're taking care of him, he's 64, mental
    ill issues and we check on him and I have a daughter.

Q.  So your pull – you're telling me you pulled up sick because you had to care for your
    brother?
A.  No, I didn't have to stay with him 24/7.  I had put in for this day and another day after
    that because we had made arrangements as to who was going to be able to check on him
    on these dates.  I checked on him, Terry checked on him and I couldn't get out of it.  I
    informed Sergeant Sheedy that day that I couldn't get out of that family obligation and
    the fact that I had put the slip in 17 days prior – or, I'm sorry, four days prior to having
    the 20th off and there was no indication that it would cause overtime as stated in the letter,
    it would cause overtime, I put it in 17 days in advance so there was no overtime caused
    by my putting my slip in.

Q.  You put that slip in four days, not 17 days in advance.
A.  I meant to correct myself, yes, it was on the 17th that I put the slip in and it wasn't denied.
    I called Katie McCoy and asked her if the slip had come upstairs, had it been denied on
    Friday and she said no, it hadn't come upstairs.  Um -- I believe it was a Thursday or
    Friday I called her and asked her if the slip had come upstairs stating, you know, denied
    or granted and she said it hadn't made it upstairs yet.   I went into the station and made a
    copy of the slip and there was no – it was exactly how I put it in the book.

Q.  Sergeant –
A.  Yes.

Q.  -- Walker, on November 17th were you in the vicinity of Pleasant and Lincoln Street?
A.  My sister lives near that street, yes.

Q.  So you were in that vicinity?
A.  I could have been she lives there.

Q.  Earlier you told me that you did not remember where you were on that date being
    November the 17th?
A.  (pause)  Correct.

Q.  Now you're telling me there's a possibility you were in that vicinity on that date?
A.  There is a possibility, that's where my sister lives.

Q.  It is now 3:35, Sergeant, is this statement true and correct?
A.  (pause) Yes.

Chief Scott:  It is still 3:55 – I'm sorry, 3:40 p.m. – I correct myself, it was 3:40 p.m. and this statement is concluded.  You may depart and return home, Sergeant.  Thank you.

Sergeant Walker:  Would you like copies of --

_____          _____
Sergeant Tammy Walker                                    Date

ORDER to sign
11/23/04

# EXHIBIT 89



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**      SEE DISTRIBUTION LIST BELOW

**FROM:**    ANTHONY R. SCOTT, CHIEF OF POLICE

**SUBJECT:** REPORT TO THE CHIEF'S OFFICE

**DATE:**    MONDAY, NOVEMBER 22, 2004 AT 1:34 PM

**NUMBER:**  DIRECT ORDER 043-001

---

<u>DISTRIBUTION LIST:</u>
Sergeant Tammy Walker, Second Watch

You shall consider this a DIRECT ORDER.  This order shall
remain in effect until rescinded, amended, revised or
canceled by the undersigned.

As you unexpectedly reported yourself Sick on this date
alleging a re-injury of your left shoulder.  I was planning
on speaking with you on this date, Monday, November 22,
2004, when you reported for duty.  However, since you have
reported yourself sick I am hereby ordering you to report
to my office no later than 2:30 p.m. on Monday, November
22, 2004.

Per Order of:

Anthony R. Scott
Chief of Police

ARS/jas

cc:  Attorney Karen T. Betournay, City Solicitor
     Central Files

Page 1 of 1

# EXHIBIT 90



HOLYOKE FAMILY PRACTICE • 1221 MAIN STREET • SUITE 302
HOLYOKE, MASSACHUSETTS 01040
(413) 536-5525

## CERTIFICATE TO RETURN TO WORK OR SCHOOL

Name ____TAMMY WALKER_____

has been examined by me on ___11/22/04_____ and is able to return to work / school on

_____11/24/04_____.

Restrictions:    ✓ None ____ Light Work _____ Other _____    TODAY,
                                                                    INTECTION INTO
_____    DISORDER
                                                    JOINT
Physical Education: _____ May Take _____ Limited _____ May Not Take    MTA
                                                                      METARPISD
Nature of Illness / Injury : __DISORDER BURSITIS_____    + XYLOCAIN

Date: _11/22/04____                          _____ M
                                             Signature

# EXHIBIT 91

**HOLYOKE POLICE DEPARTMENT**
**INTEROFFICE CORRESPONDENCE**

To: Chief Anthony R. Scott
From: Sgt Tammy Walker
Subject Direct Order 043-001
Date: 11-23-04

Chief Scott I am requesting a meeting with you regarding my health. I have been under a great deal of stress for the past 2 years due to certain members of this Dept. Trying to cope with IAD Case#04-26 has become too much. Members have noticed and commented on the weight lost and the fact that I looked so stressed. The stress has now moved to my shoulder and neck area. I have been under doctor's care regarding the stress for the past 2 years, and feel the only way to relieve the stress is to simply leave the Dept. I would greatly appreciate your input on this matter.

Respectfully Submitted # 229
Sgt. Tammy Walker

# EXHIBIT 92



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**      MEMO TO FILE

**FROM:**    ANTHONY R. SCOTT, CHIEF OF POLICE

**SUBJECT:** MEETING WITH SERGEANT TAMMY WALKER

**DATE:**    WEDNESDAY, NOVEMBER 24, 2004

On November 24, 2004, at approximately 11:06 or 11:08 a.m. Sergeant Tammy Walker arrived at my office with an IOC (interoffice correspondence) and asked my secretary, Mrs. Jacqueline Sanky if she could speak with me. With some trepidation, I agreed to speak with the Sergeant but in the presence of Lieutenant David Fournier.

According to Mrs. Sanky, when Sergeant Walker came into the outer office she handed her the paperwork for me and she asked if she were to speak with me if Mrs. Sanky could be in attendance at that meeting as well.    *Jacqueline A. Sanky*

I agreed to speak with the Sergeant and honored her request not to have Lieutenant Fournier present when I met with her as she indicated that she did not want anyone who she grew up with in the meeting. I asked my Secretary, Mrs. Sanky, to be present when I spoke with Sergeant Walker. I read the memo, which suggested that she was going to leave this job but would greatly appreciate my input. I advised the Sergeant that I could not advise her as to whether or not she should leave this department as she should seek the advice of her personal attorney, Mr. Black; the union attorney, Mr. Clancey; her union representatives, Captain Alan G. Fletcher, Lieutenant Eva M. O'Connell; her personal physician, Dr. Levine, Steven Levine; or her therapist, whose name she did not reveal. This advice was given to her repeatedly during the meeting, which lasted approximately 20 minutes. When Sergeant Walker said she could not handle the stress that she is alleged to be under I informed her that anyone can survive anything if they wished. I pointed out a story recently in the news within the past few weeks of a young lady who survived for eight days without food or water pinned in a car that ran off of the road. The Sergeant repeatedly said that she was under a lot of stress mentioning Sergeant John Monahan and the

internal investigations as the cause.  I immediately
informed her that she precipitated all of these
investigations and I was merely having the matters
investigated based on the complaints she filed.

Mrs. Sanky noted that during the course of the meeting
Sergeant Walker specifically said that the last two years
in particular have been very stressful on her; the alleged
harassment that she has undergone has been unbearable; she
said every time that she files a complaint it's classified
as unfounded; she mentioned Sergeant Monaghan on a couple
of occasions; she indicated that she's under a lot of
stress and suffering health related issues because of the
stress; that she loves the job and she doesn't want to
leave but she doesn't know what to do; she's torn; she
indicated that she has spoken to her attorneys and her
therapist and doctor as to what to do and she's just
looking for some guidance as to what she should do.  She
indicated that some members of the department are
encouraging her to continue in her fight. *Jacqueline A. Sanky*

Sergeant Walker mentioned that the stress she is under was
causing her health problems and had spread to her shoulder.
The Sergeant stated she had to see her doctor and receive a
shot because of her shoulder.  She indicated that she had
loss weight due to the alleged stress.  I did not
acknowledge her comments regarding her health but did note
that during the meeting Sergeant Walker stated her
therapist, an unknown individual, has advised her to resign
from her position, however, I did not comment as to that
remark.  I consistently informed the Sergeant that that was
a decision that was up to her and her attorneys, union
representatives, physician and therapist.

Mrs. Sanky noted during the course of the conversation
Sergeant Walker asked what she was supposed to do as it
related to her job and I consistently said that she was
just to do that, just to do her job, no more, no less and
that she had been on the job long enough to know what that
meant.  Sergeant Walker asked if she could be placed on the
first watch or given another assignment, she asked
specifically a couple of times if she could be brought on
to the First Watch to which I indicated there are no
positions open at this point in time. *Jacqueline A. Sanky*

Sergeant Walker repeatedly asked what she should do and I repeatedly commented to her to do her job, do what she's told to do and it wasn't that hard to do her job.

Mrs. Sanky noted that Sergeant Walker also made the comment that she was recently put in behind a desk as of November 10th and she wanted to know why she had been brought in off street assignment.  Mrs. Sanky further noted that Sergeant Walker stated she had questioned Lieutenant O'Connell and Lieutenant O'Connell did not give her a reason for her being assigned to the station.  I reiterated the fact that it was the Watch Commander's responsibility to determine where staff needed to be and it was Lieutenant O'Connell's call to reassign her if that's what she felt she needed to do or where she needed to be assigned.  *Jacqueline A. Sanky*

I further informed the Sergeant that assignments are the sole authority of the Chief of Police or Watch Commanders and that it wasn't a grievable issue and neither I nor the Lieutenant had to provide her with an explanation for placing her into the station.

Anthony R. Scott
Chief of Police


ARS/jas

# EXHIBIT 93

# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO: CAPT. SEKLECKI**

**FROM: OFC. JAMES TAYLOR**

**SUBJECT:** SGT. WALKER

**DATE:** 11/24/2004

ON 11/24/200 SGT. WALKER WAS IN THE PERMIT SECTION, AND SHE LOOKED TO BE VERY UPSET. I ASKED HER WHAT WAS WRONG? SGT. WALKER INDICATED THAT EVERYTIME SHE COMES IN CONTACT WITH SGT. MONAGHAN HE CALLS HER NASTY NAMES (NAMES NOT REVEALED). THAT IS ALL SGT. WALKER TALKED TO ME ABOUT.

RESPECTFULLY SUBMITTED

*James E. Taylor Jr.  #153*

OFFICER JAMES E. TAYLOR JR.

This memo submitted to Chief Anthony Scott on 11-24-04

Capt. Frederick Seklecki

# EXHIBIT 94



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**   ANTHONY R. SCOTT, CHIEF OF POLICE

**FROM:**   ALAN G. FLETCHER, CAPTAIN,
             COMMANDER, FIELD OPERATIONS BUREAU

**SUBJECT:** MEETING WITH SERGEANT TAMMY WALKER

**DATE:**   WEDNESDAY, NOVEMBER 26, 2004

On November 26, 2004 Sergeant Tammy Walker came into my office at approximately 10:20 to explain to me that she's having discomfort in her shoulder, she was emotionally stressed out and that she wanted to go to Occupational Health. I asked the Sergeant when she re-injured her shoulder recently and who she reported it to as is required by the Rules and Regulations of the Department. I asked the Sergeant what immediate supervisor she reported this injury or re-injury or re-aggravation of an old injury and she said she reported it to the Chief of Police earlier this week after seeing Dr. Levine, her personal physician. As a result of this conversation with Sergeant Walker, I told her that it was necessary that she fill out an Injured On Duty form stating when and where the reoccurrence occurred and to whom she reported it to.

Sergeant Walker during this meeting and conversation also stated that she was having problems with Sergeant John Monaghan and she also disagreed with the way Lieutenant Eva O'Connell was addressing some of her deficiencies in her work. I informed Sergeant Walker that Lieutenant O'Connell did this in front of me and her and that I stood by the Lieutenant's criticism of her.

I inquired of the Sergeant as to when she was coming back to work. I asked her outright when she was planning on coming back to work and she didn't respond to me. As a result we finally went to the Chief's office and the Chief ordered Sergeant Walker to complete an IOC immediately as to how she re-injured her shoulder and to be specific before he left the building for the day.

As a result of my meeting with Sergeant Walker the Chief asked me to complete an IOC to him outlining the

discussions I had with the Sergeant and her injury claims.
Sergeant Walker claimed two things, stress and this
shoulder – she said she has a hard time raising her arm to
shoulder level.

Captain Alan G. Fletcher
Commander
Field Operations Bureau

AGF/jas

# EXHIBIT 95



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

TO:       Chief Scott

FROM:     Capt. Monfette

RE:       Sgt. Tammy Walker

DATE:     11/26/04

---

On this date, at about 11:30 hours, I was informed by you that Sgt Walker would be coming-in, soon thereafter, to submit some "Injured on Duty" paperwork. You instructed me to look over the paperwork, and if all was in order, to accept it and submit it to you.

At about 11:45 hours, Sgt Walker came into my office with the above paperwork. It consisted of:
1) A memo to Captain Fletcher
2) A "Return to Work Certificate"
3) An H.P.D. "Injured on Duty Form"
4) An instruction form for shoulder pain – from Dr. Lavine
5) A form for follow-up care – from Dr. Lavine

I examined the above paperwork and found that the "Injured on Duty" form was not signed by the attending Physician. I informed Sgt. Walker that this form needed to be signed by the doctor who treated her at the ER. I gave her the form and instructed her to go back to the ER and have it signed. I then instructed Sgt. Walker to wait while I brought her paperwork to you, for your approval. You then examined the various papers and informed me that the "Memo to Captain Fletcher" was unacceptable. You said that it was not what you had asked for, and told me to give it back to Sgt. Walker and instruct her to submit a more detailed report, stating how she had re-injured herself. I then returned to Sgt. Walker and told her what you said. I instructed her to submit a more detailed report on how she had re-injured her shoulder and to get the "Injured on Duty" report signed.

At about 12:05 hours, Sgt Walker returned to my office and again submitted the same 5 documents, plus an additional memo to Captain Fletcher. She stated that this additional document was submitted in response to the Chief's request for more details on the re-injury. I also noticed that the "Injured on Duty Form", which she was re-submitting, was still not signed by the attending Physician. I

again instructed her to have this form signed by the Doctor, who treated her at the ER.   I took all the documents, except for the I.O.D. form, and told her that I would pass them along to the Chief.  She then left my office.

At about 12:20 hours, I went to your office and gave you what Sgt. Walker had submitted and informed you that she had, once again, submitted the I.O.D. form, unsigned.  I informed you that I again gave it back to her with instructions to get it signed.  You then examined the paperwork that she had turned-in and still were not pleased with it.  You stated that it did not provide the details that you had requested.  You then instructed me to submit the packet to Captain Fletcher so that he could deal with it on Monday.  You also instructed me to submit this memo.

Respectfully submitted,

Cpt. Arthur R. Monfette, Jr.



## INTEROFFICE MEMORANDUM

TO: Capt. Fletcher
FROM: Sgt Tammy Walker
SUBJECT: Left Shoulder
DATE: 11-27-04

On Nov. 18th 2004, I went to see Doctor Stephen Levine. I told him of trouble I was having picking up heavy items with my left shoulder. He thought it might be bursitis. He offered to give me a Cortisone shot on 11-22-04. I still am unable to left heavy items with my shoulder. I have been having weakness for about 3 weeks, but was able to manage with it until I brought in to the attention of Dr Levine. This is an injury I sustained in 1998 while on duty. I have had these shots in the past to help with the inflammation. I can not give an exact time the soreness began. The chief was notified on 11-22-04.

Respectfully Submitted
Sgt Tammy Walker #229

# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE MEMORANDUM

TO: Capt. Fletcher
FROM: Sgt Tammy Walker
SUBJECT: Left Shoulder
DATE. 11-27-04

I am not sure exactly when the inflammation started. I can only state when it became unbearable, 11-21-04 .I went to the emergency room on 11-21-04, in order to get the cortisone shot... The Doctor stated he believed it was bursitis or tendonitis. Again I went back to Dr. Levine for the shot. I have been havening weakness for about 3 weeks. I then brought it to the attention of my Doctor, Doctor Steven Levine.

Respectfully Submitted

Sgt Tammy Walker

FOLLOW-UP CARE:
Your physician today has been DR. BARRY FEINGOLD

.or follow-up care you have been referred to the following doctor or clinic:

    DR. STEPHEN LEVINE            Phone: (413)536-5525
    1221 MAIN STREET SUITE#302, HOLYOKE, MA. 01040

Please make an appointment for further treatment in 3-4 days.  Be sure to
tell your referral doctor or clinic that we have sent you, and bring your
medicines and instructions to the office.  If you had x-rays, an EKG, or lab
tests today, they have been reviewed by your doctor.  We will contact you at
once if other important findings are noted after further review by our staff.
If you do not continue to improve or if your condition worsens, please call
your doctor or the emergency department right away so you can be examined.

I acknowledge receipt of these instructions.  I understand that my condition
may require more care and will arrange for further treatment as recommended.

_____          _____
Staff Signature             Patient or Representative Signature
    Sunday, November 21, 2004 - 02:01 PM

INSTRUCTIONS FOR << TAMMY WALKER - MRN: 075460 >>

Our doctors and staff appreciate your choosing us for your emergency medical
care needs.  Read these aftercare instructions carefully.  Please call us if
you have any questions about your medical problem. We are here to serve you.

--------------------------------------------------------------------------------

SHOULDER PAIN:

Your exam shows your shoulder pain is due to either tendinitis, bursitis, or
an injury to the tendons that surround the joint (the rotator cuff).  All
these conditions cause pain and inability to move the shoulder; they can also
lead to a "frozen" immobile shoulder if they are not treated properly.  The
treatment of these related problems is similar:

* Rest the shoulder and avoid any painful movements for the next
  week.  Use a sling for comfort if needed for up to one week.
* Apply ice packs every few hours to the shoulder for 2-3 days; then
  begin heat treatments to improve motion when the pain is better.
* Oral medicine to reduce inflammation and pain is very helpful.
* Cortisone-like medicine injected into the bursa or around the
  inflammed tendon can also bring prompt relief.

Shoulder rehabilitation exercises are important in preventing a frozen joint.
When your pain improves you should bend forward and gently swing your arm
like a pendulum 3-4 times daily to help restore motion. Please see your
doctor for further care as advised. Rarely shoulder pain is caused by heart
problems; call your doctor, 911, or the emergency room right away if you have
severe chest pain, weakness, sweating, breathing difficulty, or nausea.

--------------------------------------------------------------------------------

ADDITIONAL INSTRUCTIONS:
warm compresses
gently range of motion
avoid heavy lifting
return if worse or see Dr. Levine

--------------------------------------------------------------------------------

STEPHEN J. LEVINE, M.D., F.A.A.F.P.
BOARD CERTIFIED IN FAMILY PRACTICE

HOLYOKE FAMILY PRACTICE • 1221 MAIN STREET • SUITE 302
HOLYOKE, MASSACHUSETTS 01040
(413) 536-5525

CERTIFICATE TO RETURN TO WORK OR SCHOOL

Name ___ Tammy Walker

has been examined by me on ___ 11/22/04 ___ and is able to return to work / school on

___ 11/24/04 ___

Restrictions: ___ None ___ Light Work ___ Other ___ Today,
Discharge
joint

Physical Education: ___ May Take ___ Limited ___ May Not Take

Nature of Illness / Injury: ___ Bladder Burstts
Infection into
bloodstream
metaphysis +
Osteomyelitis
of...

Date: 11/22/04

# EXHIBIT 96



# HOLYOKE POLICE DEPARTMENT
## OFFICER INJURY REPORT
### *(THIS FORM IS TO BE PRINTED OR TYPED)*

Department Case Number: _____

Name of Injured Officer: __WALKER  TAMMY__          Rank: ___SGT___
                          Last    First   Middle Initial

Date Injury Occurred: _____     Time Occurred: _____ AM / PM

Location (In City) Where Injury Occurred: _____City_____

Date Injury Reported: __11-18-04__      Time Reported: __400__ AM /(PM) To Stephen Levine

Describe Nature of Injury: unable to lift heavy item w/ left arm w/o pain, stiffness

Describe Cause of Injury: STRESS Related work · CASE #04-26

Injury Reported to: __CAPT Fleccher__
PRINT FULL NAME, INCLUDING MIDDLE INITIAL OF SUPERVISOR RECEIVING REPORT

Signature of Injured Officer: __Sgt Tammy WalQa__     Date: __11/29/04__

Signature of Supervisor Investigating Report: _____     Date: _____

Check One: [ ] On Duty     [ ] Off Duty     [X] Performance of Duty     [ ] Non-Performance of Duty

---

1. Injuries shall be reported and investigated immediately.
2. Injured officer must sign report immediately unless incapacitated.
3. Report shall be investigated immediately and certified by a Supervisory Officer
4. Included in the report shall be the names and addresses of all persons having knowledge of the injury whether eye-witnesses or not.
5. The original and three (3) copies of the report shall be submitted to the Bureau Commander for transmittal to the Chief of Police
6. Use reverse side of this form or additional blank 8.5 X11 typing paper if necessary
7. This form shall be typed or printed legibly.
8. Any and all Incident Reports and supporting documents shall be attached to this report at time of submission.

---

Statement of Facts by Injured Officer (use additional paper if necessary):

See Attached PAPERS (JOC)

STEPHEN J. LEVINE, MD
HOLYOKE FAMILY PRACTICE
1221 MAIN STREET, SUITE 302
HOLYOKE, MA 01040

---

Physician/Doctor's Report describing the nature and extent of injury to include the PROGNOSIS:

11/29/04 PAIN OF (L) SHOULDER WORSE WITH ARM ABDUCTION. No IMPROVEMENT WITH RECENT ANTHOLDENTIS/INJECTION OR DEPOMEDROL. PATIENT APPEARS QUITE UNCOMFORTABLE. NO ERYTHEMA OR SWELLING NOTED. ABDUCTION LIMITED TO 95°. CONSISTENT OR ROTATOR CUFF TEAR. THE HISTORY OF WORK RELATED TRAUMA IN 7/98 → REPAIR OF ROTATOR CUFF TEAR HAD NO IMMEDIATELY OBVIOUS IMPACT CAUSE OF THE CURRENT FLAREUP THIS MONTH HAD NO IMMEDIATELY OBVIOUS INCITING EVENT.

Signature of Attending Physician: _____     Date: 11/29/04     (Print Name of Physician Here) STEPHEN J. LEVINE MD

Reviewed: _____     Date: 11-30-2004
          Bureau Commander

Reviewed: _____     Date: _____
          Chief of Police

PLAINTIFF'S EXHIBIT 2 Fletcher 9/12/06

Ex 2



# INTEROFFICE MEMORANDUM

TO: Capt. Fletcher
FROM: Sgt Tammy Walker
SUBJECT: Left Shoulder
DATE: 11-27-04

On Nov. 18th 2004, I went to see Doctor Stephen Levine. I told him of trouble I was having picking up heavy items with my left shoulder. He thought it might be bursitis. He offered to give me a Cortisone shot on 11-22-04. I still am unable to left heavy items with my shoulder. I have been having weakness for about 3 weeks, but was able to manage with it until I brought in to the attention of Dr Levine. This is an injury I sustained in 1998 while on duty. I have had these shots in the past to help with the inflammation. I can not give an exact time the soreness began. The chief was notified on 11-22-04.

Respectfully Submitted
Sgt Tammy Walker #229

# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE MEMORANDUM

TO: Capt. Fletcher
FROM: Sgt Tammy Walker
SUBJECT: Left Shoulder
DATE: 11-27-04

I am not sure exactly when the inflammation started. I can only state when it became unbearable, 11-21-04 .I went to the emergency room on 11-21-04, in order to get the cortisone shot... The Doctor stated he believed it was bursitis or tendonitis. Again I went back to Dr. Levine for the shot. I have been havening weakness for about 3 weeks. I then brought it to the attention of my Doctor, Doctor Steven Levine.

Respectfully Submitted

Sgt Tammy Walker

BOARD CERTIFIED IN FAMILY PRACTICE



HOLYOKE FAMILY PRACTICE • 1221 MAIN STREET • SUITE 302
HOLYOKE, MASSACHUSETTS 01040
(413) 536-5525

## CERTIFICATE TO RETURN TO WORK OR SCHOOL

Name _____ TAMMY WALKER _____

has been examined by me on _____ 11/29/04 _____ and is able to return to work / school on

_____ 12/21/04 _____.   PLEASE EXCUSE OOW
.11/26-12/20/04

Restrictions:    ✓ None    _____ Light Work    _____ Other _____

_____

Physical Education:    _____ May Take    _____ Limited    _____ May Not Take

Nature of Illness / Injury : L/S SHOULDER BURSITIS   HISTORY OF ROTATOR CUFF
TEAR 7/98 (WORK INJURY)

Date: _11/29/04_                              Signature

HOLYOKE POLICE DEPARTMENT
INTEROFFICE CORRESPONDENCE

To: Chief Anthony R. Scott
From: Sgt Tammy Walker
Subject Injury to Shoulder
Date: 11-29-04

In July of 1998, I sustained an injury to my left shoulder in the line of duty. A few months later I had a surgical procedure done on my left Rotor Cuff. In 2003 I re injured the same shoulder, I was struck by a melt door. I received therapy for that injury as well. In the month of Oct 2004 I started to feel little signs of weakness in my left shoulder. A short time later my range of motion began to diminish. I would attempt to left something heavy (like a gallon of milk) I would have to put in down quickly and pick it up with my right hand. Like most people, you think it would just subside, but it did not. It just became worse. I believe the on set on this increasing shoulder pain is directly due to the stress of dealing with the IAD Investigation 04-26.

In. the beginning of Nov.2004 I began to feel a great deal of pain in the left joint area, which became constant. During the month of Nov. it started to feel like a headache in the muscle of my upper arm area. I went to see my private Physician on Nov 18th 2004 I told him of the shoulder pain I was experiencing, along with stress issues at work.

He suggested giving me cortisone, believing it was bursitis. I declined at that time, and was given instructions to take an inflammatory medication. I took them for 3 days with no relief. I went to the emergency room Nov 21, 2004 I was seen by a physician there, who agreed that it may be bursitis on tendentious, but suggested I have my private Physician give me the cortisone shot.

I then went to my physician and received the shot on Nov 22, 2004 the shot did not relieve the pain or restore the range of motion. I attempted to go to the work connection on Nov 26th 2004 to be seen, but the office was closed. I called in sick until the office reopened. I was informed my request was denied. I am resubmitting the paper work in request for approval.

Respectfully Submitted
# 229 Sgt. Tammy Walker

 

# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

TO:        Anthony R. Scott, Chief of Police

FROM:    Captain Alan G. Fletcher

RE:        Sgt. Tammy Walker's Claim for Injured on Duty
             Friday, February 25, 2005

DATE:    February 28, 2005

On February 27, 2005 at approximately 11:40 hours I received a phone call from Sgt. Tammy Walker informing me that she was injured as a result of a confrontation with Lt. Eva O'Connell on February 25, 2005 at police headquarters.

Sgt. Walker stated that Lt. O'Connell pulled the attendance notebook out of her hands injuring her arm and shoulder when she attempted to record her time off requests. I informed Sgt. Walker to file her request for injured on duty with her commanding officer.

On this date I checked the attendance schedule for February 25, 2005 and observed that Sgt. Walker was on a vacation day off. Sgt. Walker also submitted an injured on duty request for Friday, February 25, 2005 with her commanding officer Lt. O'Connell which was denied.

I am submitting to your office all correspondence from Lt. Eva O'Connell and Sgt. Tammy Walker for further action on this incident.

Respectfully submitted,

000033

# EXHIBIT 97

HOLYOKE POLICE DEPARTMENT
INTEROFFICE CORRESPONDENCE
-----------------------------------------------------------------------------------------------------

To: Chief Anthony R. Scott
From: Sgt Tammy Walker
Subject Injury to Shoulder
Date: 11-29-04


In July of 1998, I sustained an injury to my left shoulder in the line of duty. A few months later I had a surgical procedure done on my left Rotor Cuff. In 2003 I re injured the same shoulder, I was struck by a melt door. I received therapy for that injury as well. In the month of Oct 2004 I started to feel little signs of weakness in my left shoulder. A short time later my range of motion began to diminish.  I would attempt to left something heavy (like a gallon of milk) I would have to put in down quickly and pick it up with my right hand. Like most people, you think it would just subside, but it did not.   It just became worse. I believe the on set on this increasing shoulder pain is directly due to the stress of dealing with the IAD Investigation 04-26.

In. the beginning of Nov.2004 I began to feel a great deal of pain in the left joint area, which became constant. During the month of Nov. it started to feel like a headache in the muscle of my upper arm area. I went to see my private Physician on Nov 18th 2004 I told him of the shoulder pain I was experiencing, along with stress issues at work.

He suggested giving me cortisone, believing it was bursitis. I declined at that time, and was given instructions to take an inflammatory medication. I took them for 3 days with no relief. I went to the emergency room Nov 21, 2004 I was seen by a physician there, who agreed that it may be bursitis on tendentious, but suggested I have my private Physician give me the cortisone shot.

I then went to my physician and received the shot on Nov 22, 2004 the shot did not relieve the pain or restore the range of motion. I attempted to go to the work connection on Nov 26th 2004 to be seen, but the office was closed. I called in sick until the office reopened. I was informed my request was denied. I am resubmitting the paper work in request for approval.

Respectfully Submitted
# 229 Sgt. Tammy Walker

# EXHIBIT 98



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**      SERGEANT TAMMY WALKER, EMPLOYEE # 229

**FROM:**    ANTHONY R. SCOTT

**SUBJECT:** ALLEGED RE-AGGRAVATION OF AN INJURED ON DUTY CLAIM
             INITIALLY OCCURRING IN JULY OF 1998

**DATE:**    TUESDAY, NOVEMBER 30, 2004

Your renewed request to treat your present absence as
Injured on Duty is denied.

Anthony R. Scott
Chief of Police

ARS/jas

Acknowledged: _____
                    Sergeant Tammy Walker

              Date: 11 30/04  Time: 2v: pm

Witness: _____

cc:  Mayor
     City Solicitor
     Professional Standards Division

# EXHIBIT 99



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:**     SERGEANT TAMMY WALKER, EMPLOYEE # 229

**FROM:**   ANTHONY R. SCOTT

**SUBJECT:** SUSPENSION NOTIFICATION – ABUSE OF SICK LEAVE,
           INSUBORDINATION, ETC.

**DATE:**   TUESDAY, NOVEMBER 30, 2004

**NUMBER:** IAD 04-029

Based on the complaint filed by Lieutenant David D.
Fournier, Commander, Professional Standards Division, I
initiated an inquiry into the Lieutenant's allegations that
you were abusing 'Sick Leave' by driving around while out
on 'Sick Leave' (see attached).   Lieutenant Fournier
contends that if you were too sick to report for duty as
you claimed you were too sick to be out driving around the
city.   Additionally, I began an inquiry into the use of
'Sick Leave' by you over the past five years (2000 through
2004).

Lieutenant Fournier, in an IOC (Interoffice Correspondence)
dated November 18, 2004 states at 20:27 hours (8:27 p.m.)
on November 17, 2004 he observed you operating your
personal vehicle at the intersection of Pleasant and
Lincoln Streets.   The Lieutenant states he was absolutely
positive that you were operating the vehicle and that he
verified the license plate, which read 'CURVED'.   In his
IOC the Lieutenant contends that you were out on 'Sick
Leave' and therefore was in violation of Rule 3.2 Conduct
Unbecoming an Officer.   The Lieutenant further contends
that you were appointed a full-time police officer in 1993
and as of November 18, 2004 has zero sick days accrued and
two 'Sick Leave Abuse Letters' in your personnel file.   One
'Sick Leave Abuse Letter' was issued on August 14, 1995 and
the other 'Sick Leave Abuse Letter' was issued on August
12, 1997.

Prior to conducting a hearing or inquiry into the
Lieutenant's allegations against you, as per Article XX,
paragraph 20.9 of the labor agreement between the Command
Officers Union Local 409 and the City of Holyoke, I

obtained a complete record of your attendance from the
Fiscal and Budget Control Division for a five-year period
beginning in the year 2000 and ending on November 24, 2004.
Additionally, I obtained copies of the your 'Personnel Sick
Report' for November 15th, 16th, 17th and 20th of 2004.

You reported yourself sick with a headache at 4:50 p.m. to
Lieutenant Eva M. O'Connell on November 15, 2004. It
should be noted that you were scheduled to begin your tour
of duty at 3:45 p.m. on that date. On November 16, 2004
you reported yourself sick once again to Dispatcher Bjarney
A. Cruz at 2:07 p.m. with a migraine and a third time on
November 17, 2004 at 1:45 p.m. with a migraine again to
Dispatcher Cruz. In an effort to obtain a statement from
you so that I could investigate Lieutenant Fournier's
allegations, I planned to obtain a statement from you on
Saturday, November 20, 2004 at 4:00 p.m. as this was to be
your first day back at work from 'Sick Leave.'

You requested to be carried Holiday off on Saturday,
November 20, 2004 and Sunday, November 21, 2004. However,
your request for Saturday, November 20, 2004 was denied in
writing by Lieutenant O'Connell after the Lieutenant
consulted with Captain Alan G. Fletcher, Commander, Field
Operations Bureau, who also denied your request. Captain
Fletcher indicated that permitting you off on Holiday would
place the supervisory staff below minimum standards and
create the mandatory use of overtime. Lieutenant O'Connell
had a supervisor hand deliver a written denial of your time
off request to your home on Saturday, November 20, 2004
(see attached).

I arrived at police headquarters at approximately 3:30 p.m.
and at 4:00 p.m. I telephoned Lieutenant Eva M. O'Connell,
Commander, Second Watch, Field Operations Bureau to have
her escort you to my office. Lieutenant O'Connell informed
me that you reported yourself sick alleging 'Family Issues'
on Saturday, November 20, 2004 after you had been informed
that you could not have the day off. It should be noted
here that you had exhausted all of your accumulated 'Sick
Leave' and did not have any sick time to use on Saturday,
November 20, 2004 or any subsequent dates.

Due to the fact that you did not report for duty as
scheduled on Saturday, November 20, 2004 I planned to
obtain the statement from you on Monday, November 22, 2004

at 4:00 p.m. when the you reported for duty.  At
approximately noon on Monday, November 22, 2004 I observed
you in the Chief's office suite headed towards the Budget
and Fiscal Control office where the head clerk who handles
the department's payroll is located.  After you departed
the Chief's office suite I discovered that the you again
reported yourself sick utilizing a note from Doctor Stephen
J. Levine which stated "L Shoulder Bursitis" able to return
to work/school on November 24, 2004.  It should be noted
that you were scheduled on a regular day off on November
24th and 25th.  Based on this information I issued a 'Direct
Order' (see attached) instructing you to report to my
office at 2:30 p.m. on Monday, November 22, 2004.  It
should be noted again that you had exhausted all of the
'Sick Leave' you accumulated since becoming a full-time
police officer on July 19, 1993, a total of 11 years and 4
months.

At approximately 2:30 p.m. you arrived at my office suite
and was escorted to my Conference Room along with Sergeant
Daniel P. McCavick of the Professional Standards Division.
You were informed that I was conducting an inquiry into
your absence from duty on November 17, 2004 and November
20, 2004.  I permitted you 20 minutes to contact a Union
Representative or Union Attorney and permitted your
representative or attorney 40 minutes to arrive at police
headquarters.  I strongly urged you to obtain
representation.  I further ordered you not to leave police
headquarters but to use the telephone and I recessed the
inquiry to permit you to obtain representation.

At approximately 2:40 p.m. Sergeant McCavick informed me
that you were just sitting in the waiting area near my
secretary's desk.  I informed Sergeant McCavick to inform
you that you should attempt to obtain representation, which
he did.

At approximately 3:20 p.m. I observed that you were still
seated in the waiting area near my secretary's desk.
Therefore, at approximately 3:26 p.m., I resumed the
inquiry with you and Sergeant McCavick.  I began the
statement at 3:26 p.m.

In your statement you admitted reporting yourself 'sick'
with a migraine headache at 1:45 p.m. on Wednesday,
November 17, 2004 while at police headquarters.  Please

note that while allegedly suffering with a migraine headache you were at police headquarters conducting some type of business almost two hours before you were due to report for duty. You stated that you took medication for the headache that which you had been previously given by your primary physician, Doctor Stephen Levine. You also stated that you visited Doctor Levine's office on Thursday, November 18, 2004.

When questioned regarding whether or not you left home on Wednesday, November 17, 2004 after you left police headquarters you stated, "I would either be at my house or my sister's house so I really don't know, I can't recall. I may have been home all day, I may have dropped my daughter off at my sister's house. I really don't remember." You stated that your sister resides in the vicinity of Pleasant and Lincoln Streets where Lieutenant Fournier observed you.

As for reporting yourself 'sick' on Saturday, November 20, 2004 you stated you had to care for your brother who is 64 years old and has mental problems. You stated that you had to check on him on Saturday, November 20, 2004 as it was your turn and needed the day off. You also stated, "No, I didn't have to stay with him 24/7."

On Wednesday, November 17, 2004 you engaged in activity inconsistent with your claim of illness both immediately before and during your tour of duty. Your claim of memory loss as to your activities during your tour of duty is not credible. On Saturday, November 20, 2004 you disobeyed a direct order to work and ignored a denial of time off, purportedly to check on your brother after having the entire day Saturday to do so. Moreover, your attendance record demonstrates a clear record of sick leave abuse. For the past five years you have used 'Sick Leave' in conjunction with your regular two days off or in conjunction with vacation, compensatory time off (Time Owed), holiday time off, or personal days off on at least forty-six (46) occasions. With eleven (11) years and four (4) months as a full-time police officer not utilizing 'sick leave' you should have accumulated 165 days of 'sick leave.' However, as of November 24, 2004 the you have no 'Sick Leave', 21 hours of compensatory time (time owed), no personal days and 2 unearned holidays (Thanksgiving and Christmas).

In May 2002 you were transferred back to the department from your detail with DEA (Federal Drug Enforcement Administration) and it was at this time that your abuse of 'sick leave' became pronounced and really intensified in July 2002.  In the last five years you worked only 37 weekends out of 260 weekends using 'sick leave' and other forms of leave to avoid the weekends.  In 2000 you worked only half of the year, in 2001 you worked 53% of the year, in 2002 you worked only 49% of the year, in 2003 you worked only 39% of the year, and through November 24, 2004 you have only worked 41% of the year.

Based on my investigation into allegations filed against you by Lieutenant Fournier, your failure to follow orders issued from an authoritative source, and the utilizing 'Sick Leave' in conjunction with regular days off, vacation days, holiday days, personal days, and compensatory days you are abusing 'sick leave'.  The Civil Service Commission has held that a pattern of utilizing 'Sick Leave' in conjunction with regular days off and other forms of leave is a pattern of abuse (*William Guerrin v. Town of Athol July 20, 1989*), I find that you violated the following departmental rules:

1.)  Rule 1 Authority, paragraph 1.2 OBEDIENCE TO ORDERS Members of the Department shall promptly obey any lawful order emanating from any superior officer.  Should any such order conflict with a previous order from any other superior officer, with any General or Special Order, or any provision of the Rules, the member to whom such order is given shall respectfully call attention to such conflict, his order shall stand and the responsibility shall be his, and the person obeying the same shall not be held in any way responsible for disobedience of any orders theretofore issued.  If any unlawful order is given to any member of the department, such member shall promptly report such fact in writing to the Chief of Police. (old # 1.5)

2.)  Rule 1 Authority, paragraph 1.3 OBEDIENCE TO ORDERS No member of the Department shall willfully disobey any lawful command of any commissioned officer, non-commissioned officer,

or member of the Department senior to him.  (old #1.50)

3.)   Rule 1 Authority, paragraph 1.4 COMPLIANCE TO ORDERS Officers shall promptly obey any lawful orders of a superior officer.  This will include orders relayed from a superior officer by an officer of the same or lesser rank. (old # 1.18)

4.)   Rule 3 Conduct and Responsibility, paragraph 3.2 UNBECOMING CONDUCT - Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorable upon the Department.  Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer.  (old #1.6)

5.)   Rule 4 Performance of Duty, paragraph 4.2 COMPETENCY IN PERFORMANCE OF DUTY - Officers shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions.  Officers shall perform their duties in a manner which will maintain the highest standard of efficiency in carrying out the functions and objectives of the department.  Unsatisfactory performance may be demonstrated by a lack of reasonable knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks; the failure to take reasonable action on the occasion of a crime, disorder or other condition deserving police attention; or absence without leave.  In addition to other indications of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance; repeated poor evaluations or a written record of repeated infractions of rules, regulations, directives or orders of the department.  (old #1.13)

By way of background, a check of the Professional Standards Division's files was conducted and I was provided with the following as to your disciplinary record:

1. On August 7, 2003, you were issued a 'Letter of Reprimand' for violation of Rule 1 Authority, Section 1.2 Obedience to Orders, Rule 1 Authority, Section 1.3 Obedience to Orders and SOP 1.4.0 Article IV Chain-of-Command.

2. On April 20, 2004 you were suspended for one day for violation of Rule 4 Performance of Duty, Section 4.13 Punctually to Duty and Court and SOP 3.4.0 Testifying in Court, Section III Procedures, paragraph B "1." At the Courthouse.

3. On August 19, 2004 you were suspended for five days for violation of SOP 3.1.6 Interviewing Victims and Witnesses, I General Consideration and Guidelines; SOP 3.1.2 Preliminary Investigations, paragraph I General Considerations and Guidelines; SOP 3.1.4 Criminal Intelligence, paragraph I General Considerations and Guidelines, Section 4, Terrorism, paragraph III Procedures, Section A, subparagraph 1.; Rule 3, Conduct and Responsibility, Section 3.2 Unbecoming Conduct; Rule 4 Performance of Duty, Section 4.1 Performance of Duty and Responsibility; Rule 4 Performance of Duty, Section 4.2 Competency in Performance of Duty; Rule 4 Performance of Duty, Section 4.3 Handling Reports and Complaints; Rule 4 Performance of Duty, Section 4.5 Submission of Reports; and Rule 4 Performance of Duty, Section 4.12 Truthfulness in Official Dealings.

4. On September 28, 2004 your appeal of this suspension to the Appointing Authority, Mayor Michael J. Sullivan, was upheld and an additional five day suspension was added.

You are hereby notified that pursuant to the powers conferred on me by Massachusetts General Laws, Chapter 31, Sections 41 through 45 (attached hereto), I find that your actions are in violation of the rules stated herein and I suspend you without pay for a period of 5 working days. This suspension shall be served on Thursday, December 2, 2004, Friday, December 3, 2004, Saturday, December 4, 2004, Sunday, December 5, 2004, and Wednesday, December 8, 2004.

Further, by means of this correspondence I am forwarding
the matter to Mayor Michael J. Sullivan, for a hearing to
determine whether you should be subjected to further
disciplinary action up to and including further suspension,
demotion or termination.

Anthony R. Scott
Chief of Police

ARS/jas

Acknowledged: _____
                    Sergeant Tammy Walker

                    Date: __1-30-0__   Time: ___2:46 0__

Witness: _____


cc:  Mayor
     City Solicitor
     Professional Standards Division

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

---

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

---

**CHAPTER 31. CIVIL SERVICE**

**Chapter 31: Section 41 Discharge; removal; suspension; transfer; abolition of office; reduction of rank or pay; hearings; review**

Section 41. Except for just cause and except in accordance with the provisions of this paragraph, a tenured employee shall not be discharged, removed, suspended for a period of more than five days, laid off, transferred from his position without his written consent if he has served as a tenured employee since prior to October fourteen, nineteen hundred and sixty-eight, lowered in rank or compensation without his written consent, nor his position be abolished. Before such action is taken, such employee shall be given a written notice by the appointing authority, which shall include the action contemplated, the specific reason or reasons for such action and a copy of sections forty-one through forty-five, and shall be given a full hearing concerning such reason or reasons before the appointing authority or a hearing officer designated by the appointing authority. The appointing authority shall provide such employee a written notice of the time and place of such hearing at least three days prior to the holding thereof, except that if the action contemplated is the separation of such employee from employment because of lack of work, lack of money, or abolition of position the appointing authority shall provide such employee with such notice at least seven days prior to the holding of the hearing and shall also include with such notice a copy of sections thirty-nine and forty. If such hearing is conducted by a hearing officer, his findings shall be reported forthwith to the appointing authority for action. Within seven days after the filing of the report of the hearing officer, or within two days after the completion of the hearing if the appointing authority presided, the appointing authority shall give to such employee a written notice of his decision, which shall state fully and specifically the reasons therefor. Any employee suspended pursuant to this paragraph shall automatically be reinstated at the end of the first period for which he was suspended. In the case of a second or subsequent suspension of such employee for a period of more than five days, reinstatement shall be subject to the approval of the administrator, and the notice of contemplated action given to such employee shall so state. If such approval is withheld or denied, such employee may appeal to the commission as provided in paragraph (b) of section two.

A civil service employee may be suspended for just cause for a period of five days or less without a hearing prior to such suspension. Such suspension may be imposed only by the appointing authority or by a subordinate to whom the appointing authority has delegated authority to impose such suspensions, or by a chief of police or officer

performing similar duties regardless of title, or by a subordinate to whom such chief or officer has delegated such authority. Within twenty-four hours after imposing a suspension under this paragraph, the person authorized to impose the suspension shall provide the person suspended with a copy of sections forty-one through forty-five and with a written notice stating the specific reason or reasons for the suspension and informing him that he may, within forty-eight hours after the receipt of such notice, file a written request for a hearing before the appointing authority on the question of whether there was just cause for the suspension. If such request is filed, he shall be given a hearing before the appointing authority or a hearing officer designated by the appointing authority within five days after receipt by the appointing authority of such request. Whenever such hearing is given, the appointing authority shall give the person suspended a written notice of his decision within seven days after the hearing. A person whose suspension under this paragraph is decided, after hearing, to have been without just cause shall be deemed not to have been suspended, and he shall be entitled to compensation for the period for which he was suspended. A person suspended under this paragraph shall automatically be reinstated at the end of such suspension. An appointing authority shall not be barred from taking action pursuant to the first paragraph of this section for the same specific reason or reasons for which a suspension was made under this paragraph.

If a person employed under a provisional appointment for not less than nine months is discharged as a result of allegations relative to his personal character or work performance and if the reason for such discharge is to become part of his employment record, he shall be entitled, upon his request in writing, to an informal hearing before his appointing authority or a designee thereof within ten days of such request. If the appointing authority, after hearing, finds that the discharge was justified, the discharge shall be affirmed, and the appointing authority may direct that the reasons for such discharge become part of such person's employment record. Otherwise, the appointing authority shall reverse such discharge, and the allegations against such person shall be stricken from such record. The decision of the appointing authority shall be final, and notification thereof shall be made in writing to such person and other parties concerned within ten days following such hearing.

Any hearing pursuant to this section shall be public if either party to the hearing files a written request that it be public. The person who requested the hearing shall be allowed to answer, personally or by counsel, any of the charges which have been made against him.

If it is the decision of the appointing authority, after hearing, that there was just cause for an action taken against a person pursuant to the first or second paragraphs of this section, such person may appeal to the commission as provided in section forty-three.

Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section.

Notice of any action taken under this section shall be forwarded forthwith by the appointing authority to the personnel administrator.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
### ADMINISTRATION OF THE GOVERNMENT

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 44 Judicial review**

Section 44. The commission may institute appropriate proceedings in the superior court for enforcement of its final orders or decisions. Any party aggrieved by a final order or decision of the commission following a hearing pursuant to any section of this chapter or chapter thirty-one A may institute proceedings for judicial review in the superior court within thirty days after receipt of such order or decision. Any proceedings in the superior court shall, insofar as applicable, be governed by the provisions of section fourteen of chapter thirty A, and may be instituted in the superior court for the county (a) where the parties or any of them reside or have their principal place of business within the commonwealth, or (b) where the commission has its principal place of business, or (c) of Suffolk. The commencement of such proceedings shall not, unless specifically ordered by the court, operate as a stay of the commission's order or decision.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

---

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

---

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 43 Hearings before commission**

Section 43. If a person aggrieved by a decision of an appointing authority made pursuant to section forty-one shall, within ten days after receiving written notice of such decision, appeal in writing to the commission, he shall be given a hearing before a member of the commission or some disinterested person designated by the chairman of the commission. Said hearing shall be commenced in not less than three nor more than ten days after filing of such appeal and shall be completed within thirty days after such filing unless, in either case, both parties shall otherwise agree in a writing filed with the commission, or unless the member or hearing officer determines, in his discretion, that a continuance is necessary or advisable. If the commission determines that such appeal has been previously resolved or litigated with respect to such person, in accordance with the provisions of section eight of chapter one hundred and fifty E, or is presently being resolved in accordance with such section, the commission shall forthwith dismiss such appeal. If the decision of the appointing authority is based on a performance evaluation conducted in accordance with the provisions of section six A and all rights to appeal such evaluation pursuant to section six C have been exhausted or have expired, the substantive matter involved in the evaluation shall not be open to redetermination by the commission. Upon completion of the hearing, the member or hearing officer shall file forthwith a report of his findings with the commission. Within thirty days after the filing of such report, the commission shall render a written decision and send notice thereof to all parties concerned.

If the commission by a preponderance of the evidence determines that there was just cause for an action taken against such person it shall affirm the action of the appointing authority, otherwise it shall reverse such action and the person concerned shall be returned to his position without loss of compensation or other rights; provided, however, if the employee, by a preponderance of evidence, establishes that said action was based upon harmful error in the application of the appointing authority's procedure, an error of law, or upon any factor or conduct on the part of the employee not reasonably related to the fitness of the employee to perform in his position, said action shall not be sustained and the person shall be returned to his position without loss of compensation or other rights. The commission may also modify any penalty imposed by the appointing authority.

Any hearing pursuant to this section shall be public if either party so requests in writing. The person who requested the hearing shall be allowed to answer, personally or by counsel, any of the charges which have been made against him.

The decision of the commission made pursuant to this section shall be subject to judicial review as provided in section forty-four.

Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

---

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

---

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 42 Complaints; hearings; jurisdiction; filing of civil action**

Section 42. Any person who alleges that an appointing authority has failed to follow the requirements of section forty-one in taking action which has affected his employment or compensation may file a complaint with the commission. Such complaint must be filed within ten days, exclusive of Saturdays, Sundays, and legal holidays, after said action has been taken, or after such person first knew or had reason to know of said action, and shall set forth specifically in what manner the appointing authority has failed to follow such requirements. If the commission finds that the appointing authority has failed to follow said requirements and that the rights of said person have been prejudiced thereby, the commission shall order the appointing authority to restore said person to his employment immediately without loss of compensation or other rights.

A person who files a complaint under this section may at the same time request a hearing as to whether there was just cause for the action of the appointing authority in the same manner as if he were a person aggrieved by a decision of an appointing authority made pursuant to all the requirements of section forty-one. In the event the commission determines that the subject matter of such complaint has been previously resolved or litigated with respect to such employee, in accordance with the provisions of section eight of chapter one hundred and fifty E, or is presently being resolved in accordance with said section eight, the commission shall forthwith dismiss such complaint. If said complaint is denied, such hearing shall be conducted and a decision rendered as provided by section forty-three.

The supreme judicial court or the superior court shall have jurisdiction over any civil action for the reinstatement of any person alleged to have been illegally discharged, removed, suspended, laid off, transferred, lowered in rank or compensation, or whose civil service position is alleged to have been illegally abolished. Such civil action shall be filed within six months next following such alleged illegal act, unless the court upon a showing of cause extends such filing time.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
### ADMINISTRATION OF THE GOVERNMENT

---

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

---

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 42 Complaints; hearings; jurisdiction; filing of civil action**

Section 42. Any person who alleges that an appointing authority has failed to follow the requirements of section forty-one in taking action which has affected his employment or compensation may file a complaint with the commission. Such complaint must be filed within ten days, exclusive of Saturdays, Sundays, and legal holidays, after said action has been taken, or after such person first knew or had reason to know of said action, and shall set forth specifically in what manner the appointing authority has failed to follow such requirements. If the commission finds that the appointing authority has failed to follow said requirements and that the rights of said person have been prejudiced thereby, the commission shall order the appointing authority to restore said person to his employment immediately without loss of compensation or other rights.

A person who files a complaint under this section may at the same time request a hearing as to whether there was just cause for the action of the appointing authority in the same manner as if he were a person aggrieved by a decision of an appointing authority made pursuant to all the requirements of section forty-one. In the event the commission determines that the subject matter of such complaint has been previously resolved or litigated with respect to such employee, in accordance with the provisions of section eight of chapter one hundred and fifty E, or is presently being resolved in accordance with said section eight, the commission shall forthwith dismiss such complaint. If said complaint is denied, such hearing shall be conducted and a decision rendered as provided by section forty-three.

The supreme judicial court or the superior court shall have jurisdiction over any civil action for the reinstatement of any person alleged to have been illegally discharged, removed, suspended, laid off, transferred, lowered in rank or compensation, or whose civil service position is alleged to have been illegally abolished. Such civil action shall be filed within six months next following such alleged illegal act, unless the court upon a showing of cause extends such filing time.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
### ADMINISTRATION OF THE GOVERNMENT

---

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

---

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 41A Discharge, removal or suspension; hearing before disinterested hearing officer; review**

Section 41A. Upon the request of the appointing authority and a tenured employee, who is entitled to a hearing pursuant to the first paragraph of section forty-one, a hearing before a disinterested hearing officer, designated by the chairman of the commission, may be held in lieu of a hearing before the appointing authority. Such hearing officer shall make findings of facts and may make recommendations for decision to the commission. Following the decision of the commission, there shall be no appeal pursuant to the provisions of section forty-three; provided, however, that a petition to review may be filed pursuant to the provisions of section forty-four. All requirements relative to written notice and the holding of hearings pursuant to this section shall be governed by those set forth in section forty-one.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
### ADMINISTRATION OF THE GOVERNMENT

---

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

---

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 45 Reimbursement for defense expenses**

Section 45. A tenured employee who has incurred expense in defending himself against an unwarranted discharge, removal, suspension, laying off, transfer, lowering in rank or compensation, or abolition of his position and who has engaged an attorney for such defense shall be reimbursed for such expense, but not to exceed two hundred dollars for attorney fees for each of the following: (1) a hearing by the appointing authority; (2) a hearing pursuant to section forty-two or forty-three; (3) a judicial review pursuant to section forty-four; and not to exceed one hundred dollars for each of the following: (1) summons of witnesses; (2) cost of stenographic transcript; (3) any other necessary expense incurred in such defense.

Any person seeking such reimbursement shall file with his appointing authority a written application therefor within thirty days after final disposition of his case. The appointing authority shall, within thirty days after receipt of such application, pay such reimbursement from the same source as that from which the salary of the person seeking the reimbursement is paid, but only upon receipt of satisfactory proof that such expenses were actually incurred for the purposes set forth in this section.

Saturdays, Sundays, and legal holidays shall not be counted in the computation of any time period specified in this section.

# EXHIBIT 100



MAYOR MICHAEL J. SULLIVAN

CITY OF HOLYOKE

December 27, 2004

Sergeant Tammy Walker
6 Clark Street
Holyoke, Ma  01040

Re:  Chapter 31 Section 41 - Discipline

Dear Sergeant Walker:

On August 7, 2003, you were issued a written reprimand for
insubordination.

On June 22, 2004, after a Chapter 31, Section 41, I upheld a
one (1) day suspension, without pay, issued to you for failing
to follow a directive regarding being at court on time.

On August 19, 2004, Chief Scott, after investigating your
actions on July 23, 2004 issued you the maximum five (5) day
suspension allowed under Section 41 and forwarded the matter
to me for consideration of further discipline including sus-
pension demotion or discharge.  You appealed the initial five
(5) day suspension.  A hearing on your appeal, and to consider
further discipline was held by mutual agreement on September
15, 2004, at my office at the City Hall.

I then issued you a letter upholding the Chief's five (5) day
suspension without pay and added an additional five (5) day
suspension without pay to that discipline.  In that letter, I
forewarned you that failure to meet the requirements and
obligations of your position as a Sergeant with the Holyoke
Police Department would subject you to further discipline.

On December 14, 2004, by mutual agreement, we had a hearing
to hear your appeal of Chief Scott's November 30, 2004 five
(5) day suspension of you without pay and to review Chief
Scott's request that I consider further discipline of you.

On November 17, 2004, Lieutenant Fournier observed you
operating your personal vehicle at the intersection of
Pleasant and Lincoln Streets.  The Lieutenant states he was

absolutely positive that you were operating the vehicle and that he verified the license plate, which read 'CURVED'. In his report, the Lieutenant testified that you were out on 'Sick Leave' and therefore were in violation of Rule 3.2 Conduct Unbecoming an Officer. He noted you were appointed a full-time police officer in 1993 and as of November 18, 2004 had zero sick days accrued and two (2) 'Sick Leave Abuse Letters' in your personnel file. One (1) was issued on August 14, 1995, a second issued on August 12, 1997. In fact, on August 11, 2003 a third such letter was issued. In your testimony at hearing, you acknowledged this.

You requested to be approved for Holiday days off for Saturday, November 20, 2004, and Sunday, November 21, 2004. Your request for Saturday, November 20, 2004 was denied in writing by Lieutenant O'Connell after the Lieutenant consulted with Captain Alan G. Fletcher, Commander, Field Operations Bureau, who also denied your request. Captain Fletcher indicated that permitting you off on Holiday would place the supervisory staff below minimum standards and create the mandatory use of overtime. Lieutenant O'Connell had a supervisor hand deliver a written denial of your time off request to your home on Friday, November 19, 2004. You admit you received this notice requiring you to work Friday afternoon. Despite this directive to report for work, you reported yourself sick alleging 'Family Issues' on Saturday, November 20, 2004. It should be noted that you had exhausted all of your accumulated 'Sick Leave' and did not have any sick time to use on Saturday, November 20, 2004 or any subsequent dates. I also note that the Union's collective bargaining agreement contains no provision for family sick leave.

During your investigatory interview, you admitted reporting yourself 'sick' with a migraine headache at 1:45 p.m. on Wednesday, November 17, 2004 while at police headquarters. While allegedly suffering with a migraine, you were at police headquarters conducting some type of business almost (2) hours before you were due to report for duty. You stated that you took medication for the headache that you had been previously given by your primary physician Doctor Stephen Levine. You also stated that you visited Doctor Levine's office on Thursday, November 18, 2004.

During the investigation on November 22, 2004, when questioned regarding whether or not you left home on Wednesday, November 17, 2004 after you left police headquarters, you stated, "I would either be at my house or my sister's house so I really

don't know, I can't recall.  I may have been home all day.  I
may have dropped my daughter off at my sister's house.  I
really don't remember."  You stated that your sister resides
in the vicinity of Pleasant and Lincoln Streets where Lieuten-
ant Fournier observed you.  At hearing, you recalled not only
driving to your sister's, but also driving to a friend's house
as well during your scheduled shift.  You admitted both your
sister and your friend drive and could have, if you requested,
come to your house.  You could not recall what else you did
during your scheduled shift.

As for reporting yourself 'sick' on Saturday, November 20,
2004, in your interview you stated you had to care for your
brother who is 64 years old and has mental problems.  You
stated that you had to check on him on Saturday, November 20,
2004 as it was your turn and needed the day off.  You also
stated, "No, I didn't have to stay with him 24/7."

At the hearing, you admitted that it would not have caused
overtime and you could have gone to see your brother during
the day or Saturday on your prior days off that week or any
other time.  You indicated (based on some incorrect
assumptions) that you should have been granted the day off as
you requested it and therefore, took it.  You admit you did
not grieve the denial of the day off request.  Instead, you
decided to ignore the denial of the day off and refused to
report.

On Wednesday, November 17, 2004 you engaged in activity incon-
sistent with your claim of illness both immediately before and
during your tour of duty.  Your claim of memory loss as to
your activities during your tour of duty is not credible.  On
Saturday, November 20, 2004, you disobeyed a direct order to
work and ignored a denial of time off, purportedly to check on
your brother after having the entire day Saturday to do so and
being granted a time off request for the following day,
Sunday, November 21, 2004.

Moreover, your attendance record demonstrates a clear record
of sick leave abuse.  For the past five (5) years, you have
used 'Sick Leave' in conjunction with your regular two (2)
days off or in conjunction with vacation, compensatory time
off (time owed), holiday time off, or personal days off on a
least forty-six (46) occasions.  Further, with eleven (11)
years and four (4) months as a full-time police officer not
utilizing 'sick leave' you should have accumulated one hundred
sixty-five (165) days of 'sick leave.'  However, as of Novem-

ber 24, 2004, you have no 'Sick Leave', twenty-one (21) hours
of compensatory time (time owed), no personal days and two (2)
unearned holidays (Thanksgiving and Christmas). Much of your
absences have been sporadic and short-term, rather than for
significant blocks of time.

In May 2002, you were transferred back to the department from
your detail with DEA (Federal Drug Enforcement Administration)
and it was at this time that your abuse of 'sick leave' became
pronounced and really intensified in July 2002. Moreover, in
the last five (5) years, you worked only thirty-seven (37)
weekends out of two hundred and sixty (260) weekends using
'sick leave' and other forms of leave to avoid the weekends.
In 2000, you worked only half of the year. In 2001, you
worked 53% of the year. In 2002, you worked only 49% of the
year. In 2003, you worked only 39% of the year and through
November 24, 2004, you have only worked 41% of the year.

Your failure to report for work after the denial of your time
off request on November 20, 2004, your actions and evasiveness
regarding same with respect to November 17, 2004, and your use
of 100% of your sick leave when particularly given the
patterns involving such things as the pattern of sick leave
use tied to weekends, violated the following departmental
rules:

   1.) Rule 1 Authority, paragraph 1.2 OBEDIENCE TO ORDERS
       Members of the Department shall promptly obey any
       lawful order emanating from any superior officer.
       Should any such order conflict with a previous order
       from any other superior officer, with any General or
       Special Order, or any provision of the Rules, the
       member to whom such order is given shall respectfully
       call attention to such conflict, his order shall
       stand and the responsibility shall be his, and the
       person obeying the same shall not be held in any way
       responsible for disobedience of any orders thereto-
       fore issued. If any unlawful order is given to any
       member of the department, such member shall promptly
       report such fact in writing to the Chief of Police.
       (old # 1.5)

   2.) Rule 1 Authority, paragraph 1.3 OBEDIENCE TO ORDERS
       No member of the Department shall willfully disobey
       any lawful command of any commissioned officer, non-
       commissioned officer, or member of the Department
       senior to him. (old #1.50)

3.) Rule 1 Authority, paragraph 1.4 COMPLIANCE TO ORDERS
Officers shall promptly obey any lawful orders of a
superior officer.  This will include orders relayed
from a superior officer by an officer of the same of
lesser rank. (old # 1.18)

4.) Rule 3 Conduct and Responsibility, paragraph 3.2
UNBECOMING CONDUCT - Officers shall conduct them-
selves at all times, both on and off duty, in such a
manner as to reflect most favorable upon the Depart-
ment.  Conduct unbecoming an officer shall include
that which brings the Department into disrepute or
reflects discredit upon the officer as a member of
the Department, or that which impairs the operation
or efficiency of the Department or officer.  (old
#1.6)

5.) Rule 4 Performance of Duty, paragraph 4.2 COMPETENCY
IN PERFORMANCE OF DUTY - Officers shall maintain suf-
ficient competency to properly perform their duties
and assume the responsibilities of their positions.
Officers shall perform their duties in a manner which
will maintain the highest standard of efficiency in
carrying out the functions and objectives of the
department.  Unsatisfactory performance may be demon-
strated by a lack of reasonable knowledge of the
application of laws required to be enforced; an
unwillingness or inability to perform assigned tasks;
the failure to take reasonable action on the occasion
of a crime, disorder or other condition deserving
police attention; or absence without leave.  In addi-
tion to other indications of unsatisfactory perform-
ance, the following will be considered prima facie
evidence of unsatisfactory performance; repeated poor
evaluations or a written record of repeated infrac-
tions of rules, regulations, directives or orders of
the department.  (old #1.13)

Therefore, you are hereby notified that pursuant to the powers
conferred on me by Massachusetts General Laws, specifically
Chapter 31, Sections 41 through 45 (attached hereto for your
information), I find that your actions constitute a violation
of the rules, regulations, policies and/or procedures of the
Police Department.  I hereby affirm the five (5) day suspen-
sion issued by Chief Scott and add an additional five (5) day
suspension without pay to be served from January 1, 2005

through January 14, 2005.  Either your insubordination or your sick leave abuse independently justifies this action.  I am providing you a _final_ opportunity to meet fully the duties and responsibilities of your job.  Failure to do so will subject you to further discipline up to and including demotion or termination.

Sincerely,

Michael J. Sullivan, Mayor


Cc:  w/o enclosures
     Attorney Michael Clancy, IBPO
     Sheridan & Sheridan
     Chief Scott
     City Solicitor

# EXHIBIT 101

INTEROFFICE CORRESPONDENCE
HOLYOKE POLICE DEPT.                    1 of 2

TO: Anthony R Scott
FROM: Sgt Tammy Walker
SUBJUCT: Lt. David D Fournier
DATE: December 12th 2004


On Dec. 8th 2004, I received my personnel file from Union Attorney Michael Clancy. Contained in the file was a copy of an IOC written by Lt. David D. Fournier. (See Attached)

Lt David D. Fournier stated,"Sgt Walker now has zero (0) sick days accrued. Sgt Walker was appointed to the department in 1993 and as a result has received and used more than 150 sick days. Further, Sgt Walker has two (2) sick leave abuser notices on file."

According to Article XX Employee Files Paragraph 20.2 Except as otherwise required by law, upon release by the Chief or his/her designee or upon review by any other person, the keeper of records shall notify the employee in writing, the identity of the person making such review. In criminal matters, the officer shall not be entitled to such notification until completed and the provisions of present statute as to discovery shall be in effect.

The keeper of the records shall be identified as the Chief of Police or his/her designee. It is my contention that the only person the Chief designated to review my use of sick time was Melinda J. Lane on Tuesday November 30, 2004. Lt. David D. Fournier on November 18, 2004 submitted an IOC to Chief Anthony R Scott. The information contained in the IOC regarding my sick time is part of employee's personnel record, (Paragraph 20.3).

It is my contention that Lt. David D. Fournier has violated several rules of the H.P.D.:

1. Rule 3 Conduct and Responsibility, paragraph 3.2 Unbecoming Conduct, which states, that officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorable upon the Department.  Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer

2. Rule 3 Conduct and Responsibility, paragraph 3.4 Compliance to Law, which states, Officers shall obey all laws of the United States and of any state and local jurisdiction in which the officers are present.

3. Rule 4 Performance of Duty, paragraph 4.2 Competency in Performance of Duty which states, Officers shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions. Officers shall perform their duties in a manner which will maintain the highest standard of efficiency in carrying out the function and objectives of the Department. Unsatisfactory performance maybe demonstrated by a lack of responsible knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks; the failure to take reasonable action on the occasion of a crime, disorder or other conditions deserving police attention; or absence without leave. In addition to other indications of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance; repeat poor evaluation or a written record of repeated infractions of rules, regulations, directives or orders of the Department.

4. Rule 4.1 Performance of Duties and Responsibility, which states, Members of the Department shall be held responsible for his proper performance of the duties assigned them, and for the strict adherences on their part to the rules adopted from time to time for the government of the department; and it shall not be received as an excuse or justification for anything that they may omit to do, that they followed the advise or suggestion of any other person, whether that person be connected with the department or not, except when an officer of higher rank may take upon himself the responsibility of issuing direct and positive orders.

Further, Lt David D. Fournier's conduct and abuse of authority as the Commander of Professional Standard Division has created a great burden and distrust.


Respectfully submitted


Sgt Tammy Walker
Assistant 2nd Watch Commander

# EXHIBIT 102



# GRIEVANCE COMPLAINT FORM
## INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS
## NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES
*Note: Please use a typewriter or an*
*ink pen to fill out this form*



Employee filing grievance: _Sgt. Tammy Walker_   Date of Grievance: _12-13-04_

Title/Classification: _____   Department: _Holyoke_

Date alleged violation of contract occurred: _____ Nov 18th 2004 _____

Facts alleged concerning the violation of the contract (Use back of form if necessary and attached any supporting documents):

_____ ( SEE ATTACHED IOC ) _____ ~~RECEIVED~~

_____ ~~CHIEF'S OFFICE~~

List Article, Section and/or Paragraph of contract alleged to have been violated: _____

_Article XX Employee Files Paragraph 202_

Indicate remedy being sought: _Investigation into All cases conducted by Lt. Fournier regarding Sgt Tammy Walker be dismissed. The Lt. Should be removed from his Position_

_Sgt Tammy Walker_                          Date: _12/13/04_
t or Type Name of Employee Submitting Grievance

_[signature]_
Signature of Employee Submitting Grievance

# EXHIBIT 103



# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

**TO:** INVESTIGATIVE MEMO TO FILE

**FROM:** ANTHONY R. SCOTT, CHIEF OF POLICE

**SUBJECT:** INTERNAL INVESTIGATION INTO ALLEGATIONS FILED BY SERGEANT TAMMY WALKER

**DATE:** WEDNESDAY, JANUARY 05, 2005 AT 12:01 PM

**NUMBER:** IAD CASE #04-033

On December 20, 2004, Sergeant Tammy Walker, following a pre-grievance meeting on another matter, presented the undersigned with two new grievances, one against Lieutenant David D. Fournier and the other against Lieutenant Eva M. O'Connell. In this report I will attempt to address Sergeant Walker's allegations against Lieutenant Fournier for alleged violation of Article XX, Employee Files; Paragraph 20.2. The remedy sought by Sergeant Walker in this matter is that all investigations conducted into cases against her by Lieutenant Fournier be dismissed and that Lieutenant Fournier be removed from his position in the office of Professional Standards.

In a two page, **unsigned** memo to the undersigned from Sergeant Walker she alleges that the only person that I as the Chief of Police authorized to review her records was the Police Comptroller, Melinda J. Lane, and that Lieutenant Fournier did not have my authorization to review her personnel records. Sergeant Walker further alleges that Lieutenant Fournier violated Rule 3, Conduct and Responsibility, Paragraph 3.2, Unbecoming Conduct; Rule 3, Conduct and Responsibility, Paragraph 3.4, Compliance to Law; Rule 4, Performance of Duty, Paragraph 4.2, Competence in Performance of Duty and Rule 4, Performance of Duty, Paragraph 4.1, Performance of Duty and Responsibility.

The primary allegation that I gleaned from the Sergeant's unsigned memo is that Lieutenant Fournier did not have the authorization from the Chief of Police to review her personnel files; therefore, this is the matter that I have addressed in this investigation. I conducted this investigation in accordance with Article XX, Employee Files, Paragraph 20.9, Interdepartmental Complaints, in that the allegation is made against Lieutenant Fournier, Commander, Professional Standards Division (Internal Affairs), I did not refer the matter to Internal Affairs but handled the matter myself. A statement was taken from Lieutenant Fournier and from Captain Fletcher, both on the 28th of December.

On assuming command of the Holyoke Police Department in May of 2001 I began to reorganize the department by creating three primary bureaus: Field Operations Bureau, Criminal Investigations Bureau and Technical Services Bureau commanded by captains and two divisions which report directly to the Chief of Police. These two divisions are the Professional Standards Division and the Budget and Fiscal Control Division. Lieutenant David Fournier and Sergeant Daniel P. McCavick were assigned to the Professional Standards Division. I moved all personnel files from my office into the Professional Standards Division (Internal Affairs) office. Lieutenant Fournier and Sergeant McCavick were and are designated by me as "designated keeper" of the records to wit, the personnel and internal investigative files. These two officers handle the filing of data into these personnel files and have authorization to review these files when conducting an investigation or a suspected violation of departmental rules and regulations.

In a statement taken from Captain Alan Fletcher on December 28, 2004, I asked the Captain was he the administrative assistant to former Chief of Police Stephen F. Donoghue to which he replied "yes". When asked did he have control of the department's personnel files; he replied "I did". When asked was he responsible for filing certain documents into member's personnel files, he replied "on a daily basis I would file correspondence from the Chief's office into the officer's personnel files". When asked on occasions did you review certain files as part of your duties as administrative assistant, he replied "I did". When asked were you required to inform a member each and every time you reviewed their personnel files, the Captain replied, "No, I was not."

Article XX, Employee Files, Paragraph 20.2, clearly states, "Except as otherwise required by law, upon release by the Chief of Police or his/her designee or upon review by any other person, the keeper shall notify the employee in writing, the identity of the person making such review." Lieutenant David Fournier and Sergeant Daniel McCavick are the Chief of Police's designees as keeper of the records (personnel file). Therefore, Sergeant Walker did not have to be notified because Lieutenant Fournier was reviewing the records and this article does not require the keeper of the records or his designee to notify an individual member that the keeper of the records' designee reviewed their file. This fact was also supported by Captain Fletcher who was Chief Donoghue's keeper of the records' designee.

Therefore, I find that the allegation that Article XX, Paragraph 20.2 was violated to be **EXONERATED** in that Lieutenant Fournier did review the personnel file of Sergeant Walker but was well within the contract and the rules and regulations of this

department.  As to the alleged violations of Rule 3, Paragraph
3.2; Rule 3, Paragraph 3.4; Rule 4, Paragraph 4.2 and Rule 4,
Paragraph 4.1, I find the complaint **UNFOUNDED**.  Sergeant Walker
merely makes an allegation and provides absolutely no evidence to
support these allegations.  Based on my review and investigation
of the facts in this matter the complaint is without merit.

Sergeant Walker has once again filed unsubstantiated complaints
against supervisory officers of this department because they have
recommended or taken corrective actions against her.  I am
tempted to take disciplinary action against Sergeant Walker;
however, I don't think further disciplinary action at this time
will move the Sergeant to reconsider her attitude and/or
professionalism.  I sincerely believe that Sergeant Walker will
continue to under perform and have a negative impact on this
department.

Anthony R. Scott
Chief of Police


ARS/jas


cc:  Central Files

# EXHIBIT 104

Holyoke Police Department
138 Appleton Street
Holyoke, MA 01040

Lieutenant David Fournier, I'm conducting an inquiry into a complaint filed by Sergeant Walker that you abused your authority as a Lieutenant. This investigation is in accordance with departmental and contractual procedure. This statement is being taken in the Chief's conference room on Tuesday, December 28, 2004, at 9:51 a.m.

Q denotes questions by Anthony R. Scott, Chief of Police

A denotes answers by Lieutenant David Fournier

---

Q. Lieutenant Fournier, do you wish to have a union representative present for this statement?
A. No, sir.

Q. For the record please state your full name, rank, assignment and the number of years you have been on the Holyoke Police Department?
A. My name is David D. Fournier, I'm a Lieutenant of Police, I am currently assigned as the Commander of the Professional Standards Division and I have been employed by the City of Holyoke Police Department for 22 years.

Q. Lieutenant, are you familiar with the complaint filed by Sergeant Walker?
A. A grievance filed by Sergeant Walker? Yes, sir.

Q. Did you have – have you had an opportunity to read this complaint?
A. Yes, I have.

Q. Lieutenant, have all the personnel files been placed in your office which is under lock and key?
A. Yes, sir.

Q. How long have these files been maintained in your office?
A. Since you took office in May or June – I'm not even sure the year at this point but when you took over as Chief and assigned us – myself and Sergeant McCavick to Internal Affairs, the file – all files – personnel were moved from the Chief's office to the Internal Affairs' office, Professional Standards Division.

Q. Have you and Sergeant Daniel McCavick been designated by the Chief of the Police as his representative for maintaining the personnel files?

A. Yes, sir.

Q. Have you and Sergeant McCavick been designated to review these files when conducting personnel investigations by the Chief of Police?
A. Yes, sir.

Q. Were you acting in your official capacity as Commander of the Professional Standards Division when you reviewed the personnel files of Sergeant Walker?
A. Yes, sir.

Q. Do I, as the Chief of Police, have to notify a member of this department when I review a member's personnel file?
A. No, sir.

Q. Therefore, do you, as my representative, have to notify a member when you review these files while conducting an investigation?
A. No, sir.

Q. Lieutenant Fournier, do you have any personal malice or animosity towards Sergeant Walker which would prohibit you from fairly and impartially conducting an investigation of her alleged violations of this department's rules , regulations and procedures?
A. No, sir.

Q. When you observed Sergeant Walker operating her vehicle while out on sick leave, did you believe she was violating department rules, regulations, policies and/or procedures?
A. Yes, I did.

Q. Was this the reason you reported you observations to the Chief of Police?
A. It is.

Q. As the Commander of the Professional Standards Division, do you have the authority granted by the Chief of Police to initiate personnel investigations?
A. I do.

Q. As a supervisor of the Holyoke Police Department do you have the authority to initiate personnel investigations?
A. Yes, sir.

Q. Lieutenant Fournier, is this statement true and correct to the best of your knowledge?
A. It is.

Chief Scott:  This statement concluded at 9:55 a.m. on Tuesday, December 28, 2004.

_____          ___12/29/04_____
Lieutenant David Fournier                                  Date

2

# EXHIBIT 105




**Holyoke Police Department**
**138 Appleton Street**
**Holyoke, Massachusetts 01040-5706**

MICHAEL J. SULLIVAN
Mayor

ANTHONY R. SCOTT
Chief of Police

MEMBER OF:





January 5, 2005

CF 0002-05



Sergeant Tammy Walker
6 Clark Street
Holyoke, MA 01040-2904

Re:  Grievance filed by you on December
     20, 2004 against Lieutenant David
     D. Fournier and Lieutenant Eva M.
     O'Connell

Dear Sergeant Walker:

The two grievances you filed were handled in accordance
with Article XX, Employee Files, Paragraph 20.9,
Interdepartmental Complaints, in that the allegation is
made against Lieutenant Fournier, Commander, Professional
Standards Division (Internal Affairs) and Lieutenant
O'Connell, Commander, Second Watch, Field Operations Bureau
were not refer to the Professional Standards Division
(Internal Affairs) but handled by myself as personnel
investigations.

I find that the allegation you made against Lieutenant
Fournier that Article XX, Paragraph 20.2 was violated to be
**EXONERATED** in that Lieutenant Fournier did review the
personnel file of Sergeant Walker but was well within the
contract and the rules and regulations of this department.
I further found that the alleged violations of Rule 3,
Paragraph 3.2; Rule 3, Paragraph 3.4; Rule 4, Paragraph 4.2
and Rule 4, Paragraph 4.1 you filed against Lieutenant
Fournier were **UNFOUNDED**.

I find that your re-assignment by Lieutenant O'Connell was
well within her authority as Watch Commander and find that
there was no violation of the contract or any departmental
rule or regulation on the part of Lieutenant O'Connell.  I
therefore your allegation against Lieutenant O'Connell as
**EXONERATED** in that Lieutenant O'Connell did in fact re-
assign you; however, it was well within Lieutenant
O'Connell's authority as Watch Commander.  As to your

*Birthplace of Volleyball 1895*



Telephone: (413) 536-6431 • Fax: (413) 532-7583 • Email: hpdmgr@c1mail.com

allegation that Lieutenant O'Connell altered the documents in question and violated Rule 3, Paragraph 3.2; Rule 3, Paragraph 3.4; Rule 4, Paragraph 4.2; Rule 4, Paragraph 4.1 and Rule 4, Paragraph 4.12, I find that all of your allegations are UNFOUNDED in that there is no evidence to support these allegations.

Sincerely,

Anthony R. Scott
Chief of Police

ARS/jas


cc:  Karen T. Betournay, Esquire, City Solicitor
     Daniel J. Sheridan, Esquire, Laborer Attorney
     Michael Clancey, Esquire, Union Attorney
     Captain Alan G. Fletcher, Union President
     Central Files

# EXHIBIT 106

I of 2

NTEROFFICER CORRESPONDENCE
HOLYOKE POLICE DEPT.

To: Chief Anthony R. Scott
From: Sgt Tammy Walker
Subject: IOC Nov. 10th 2004 by Lt. O'Connell
Date: Dec 20th 2004

On Dec 8th 2004 at approximately 5:00pm, I received my personnel file from Union
Attorney Michael Clancy. Contained in the file was an IOC I thought I received on
November 10h 2004 from Lt. Eva O'Connell. The letter stated my assignment had been
changed. I was no longer a Street Supervisor. I was now assigned as a Booking Officer,
and "Unless your duties as Booking Officer take you into Dispatch or Records Bureau,
you will refrain from HANGING AROUND those offices". The above duties are your
only duties until further notice." This Letter was CC the Chief Anthony R. Scott, Capt.
Alan Fletcher, Capt. Fred Seklecki, Lt. Brian Cassidy and Sgt Daniel Fallon.

The IOC I received on November 10th 2004 stated "Unless your duties as Booking
Officer take you into Dispatch or Records Bureau, you will refrain from VISITING those
offices. The above duties are your only duties until further notice. It is clear to me that Lt
"O'Connell altered this document. to suit her objectives. Again these documents are
identical except for the words HANGING AROUND and VISITING. As you well know
the words have very different meanings Lt.O'Connell had first hand knowledge I suffers
from migraine headaches as we have discussed the issue in the past, and how light effects
the intencity of the migraine. The IOC on November 10th 2004 restricted my movements
for the entire 8 hour tour of duty. I was forced to sit in the Commanders Office.under
extremely bright lights with very specific instruction of my duties as well as my
movements.

I complied with her orders on Novermember 10, 11, 12th 2004, but he lights became too
much. I asked Lt. O'Connell on November 15th 2004 at approximately 5:45pm, "Lt. can I
ask you why I'm inside?" Lt. O'Connell stated "you can ask" a few seconds later she
stated, "because this is the place I want to for now" and continued doing her paper work.
I then requested to go home due to the headache, which was only going to get worse by
sitting under the lights. To this date I still have not been given a reason for being put
inside.

It is my contention that Lt. O'Connell has violated several rules of the HPD well as Labor
Laws.

1 Rule 3 Conduct and Responsibility, Paragraph 3.2 Unbecoming Conduct, which states, that officer shall conduct themselves at all time, both on and off duty, in such a manner as to reflect most favorable upon the Department. Conduct Unbecoming an officer   shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer.

2. Rule 3 Conduct and responsibility, paragraph 3.4 Compliance to Law, which states, Officer shall obey all laws of the United States and of any state and local jurisdiction in which the officers are present.

3. Rule 4. Performances of duty, paragraph 4.2 Competency in Performance of Duty, which states Officers shall maintain sufficient competency to properly perform their duties and assume the responsibility of their positions. Officers shall perform their duties in a manner which will maintain the highest standards of efficiencies in carrying out the function and objectives of the Department. Unsatisfactory performance maybe demonstrated by a lack of responsible knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks; the failure to take reasonable action on the occasion of a crime, disorder or other condition deserving police attention; or absence without leave. In addition to other indications of unsatisfactory performance the following will be prima facie evidence of unsatisfactory performance, repeat poor evaluation or written records of repeated infractions of rules; regulations, directives or orders of the Department

4. rule 4.1 Performance of Duties and Responsibility, which states Members of the department shall be held responsible for his performance of the duties assigned them, and for the strict adherence on their part to the rules adopted from time to time for the government of the department; and it shall not be received as an excuse or justification for anything that they may omit to do, that they followed the advise or suggestion of any other person, whether that person be connected with the department or not, except when an officer of higher rank may take upon himself the responsibility of issuing direct and positive orders,

5,  Rule 4.12 Truthfulness in Official Dealings, which states No member of the department shall make false official reports, or knowingly enter or cause to be entered in any department books, or records, any inaccurate, false, or improper entries or registration of police information or matter.

Further, Lt. O'Connell's lack of truthfulness by creating two different documents sending them out as though they were CC (Carbon Copies) is in my opinion is EVIL behavior and clearly represents her intent.

Respectfully Submitted

Sgt Tammy Walker #229

# EXHIBIT 107

Lieutenant O'Connell

# INTEROFFICE CORRESPONDENCE
# HOLYOKE POLICE DEPT.

**TO:**      Sgt. Tammy Walker
**FROM:**    Lt. Eva M. O'Connell
**SUBJECT:** Assignment
**DATE:**    November 10, 2004

As of this date, you are assigned as Booking Officer until further notice. You will do all bookings and oversee the care of all prisoners during your tour of duty unless otherwise instructed by the Commandeering Officer.

- You will see that a matron is called when there is a female prisoner.
- Check all paper work on juvenile prisoners to see that it is completed correctly.
- Update the arrest board as far as the disposition of prisoners.

Unless your duties as Booking Officer take you into Dispatch or Records Bureau, you will refrain from hanging around those offices. The above duties are your only duties until further notice.

Lt. Eva M. O'Connell

cc: Chief Anthony R. Scott
    Capt. Alan Fletcher
    Capt. Fred Seklecki
    Lt. Brian Cassidy
    Sgt. Daniel Fallon

*Approved and received on 11-10-2004*

DEFENDANT'S EXHIBIT
27 Walker
5/11/07

000412

# EXHIBIT 108



# INTEROFFICE CORRESPONDENCE
## HOLYOKE POLICE DEPT.

**TO:**      **Sgt. Tammy Walker**
**FROM:**      Lt. Eva M. O'Connell
**SUBJECT:**      Assignment
**DATE:**      November 10, 2004

As of this date, you are assigned as Booking Officer until further notice. You will do all bookings and oversee the care of all prisoners during your tour of duty unless otherwise instructed by the Commandeering Officer.

- You will see that a matron is called when there is a female prisoner.
- Check all paper work on juvenile prisoners to see that it is completed correctly.
- Update the arrest board as far as the disposition of prisoners.

Unless your duties as Booking Officer take you into Dispatch or Records Bureau, you will refrain from visiting those offices. The above duties are your only duties until further notice.

_Lt. Eva M. O'Connell_
Lt. Eva M. O'Connell

cc: Chief Anthony R. Scott
     Capt. Alan Fletcher
     Capt. Fred Seklecki
     Lt. Brian Cassidy
     Sgt. Daniel Fallon



DEFENDANT'S EXHIBIT
29 Walker
5/1/07
PENGAD 800-631-6989

000411

# EXHIBIT 109



# GRIEVANCE COMPLAINT FORM
## INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS
## NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES
### Note: Please use a typewriter or an ink pen to fill out this form



Employee filing grievance: _Sgt Tammy Walker_     Date of Grievance: _12/20/04_

Title/Classification: _____     Department: _Holyoke_

Date alleged violation of contract occurred: _Nov 10th 2004 / Dec 8th 2004_

Facts alleged concerning the violation of the contract (Use back of form if necessary and attached any supporting documents):

_(See Attached IOC)_

**RECEIVED**

**CHIEF'S OFFICE**

List Article, Section and/or Paragraph of contract alleged to have been violated: _____

_Rule 3 Conduct and Responsibility Par 3.2 – 3.4_

_Rule 4 Performance of duty Par 4.2, 4.7    Rule 4.12 Truthfulness_

Indicate remedy being sought: _Investigation, The Lt should be removed from her position_

_Sgt Tammy Walker_                          Date: _12/20/04_
or Type Name of Employee Submitting Grievance

_Sgt Tammy Walker_

# EXHIBIT 110

Holyoke Police Department
138 Appleton Street
Holyoke, MA 01040

Lieutenant Eva O'Connell, I'm conducting an investigation into allegations that you abused your authority as a Supervisor.   These allegations were filed by Sergeant Tammy Walker in a grievance filed with me on Monday, December 20, 2004.  This investigation is in accordance with departmental and contractual procedures.   This statement is being taken in the Chief's conference room on Wednesday, December 29, 2004, at 10:19 a.m.

Q denotes questions by Anthony R. Scott, Chief of Police

A denotes answers by Lieutenant O'Connell

_____

Q. Lieutenant O'Connell, do you wish to have a union representative present while you give this statement?
A. No.

Q. For the record, please state your full name, rank, assignment and the number of years you have been on the Holyoke Police Department?
A. Eva Marie O'Connell, Lieutenant of Police, assigned to Operations, the Second Watch, it will be 35 years in May that I have been on the job.

Q. Lieutenant O'Connell, I show you two IOCs dated November 10, 2004, from you to Sergeant Walker which I have taken the liberty of labeling Lieutenant O'Connell one and Lieutenant O'Connell two and ask did you write both of these documents?
A. Yes, I did.

Q. Lieutenant O'Connell, is there any attempt on your part to hide or conceal anything by changing the wording from "you will refrain from hanging around those officers" to "you will refrain from visiting those officers"?
A. No.

Q. Lieutenant, do you have the authority to change a member's duty assignment who is working under your command?
A. Yes, I do.

Q. As a Watch Commander, do you have to seek prior approval to change a member's duty assignment who is working under your command?
A. No, I don't.

1

Q. Lieutenant, are you required to provide an explanation to a member as to why their duty assignment was changed?
A. No, I do not.

Q. Lieutenant, was the changing of Sergeant Walker's duty assignment a disciplinary action?
A. No, it was not.

Q. Lieutenant, prohibiting Sergeant Walker from hanging around or refrain from visiting the Communications Center and/or Records Division a punitive action?
A. No, it is not.

Q. Lieutenant, is this statement true and correct to the best of your knowledge?
A. Yes, it is.

Chief Scott:  This statement concluded at 10:27 a.m.


*Lt Eva M O'Connell*                                    *12-29-04*
Lieutenant Eva O'Connell                        Date

2

# EXHIBIT 111

SAPIRSTEIN & SAPIRSTEIN, P.C.
ATTORNEYS AT LAW
1341 MAIN STREET, 3RD FLOOR
SPRINGFIELD, MASSACHUSETTS 01103
TELEPHONE (413) 827-7500

JONATHAN C. SAPIRSTEIN*
TANI E. SAPIRSTEIN*

CARLY L. MASSEY

TELECOPIER (413) 827-7797
EMAIL: FIRM@SANDSLAW.COM
WWW.SANDSLAW.COM

*ALSO ADMITTED IN CONNECTICUT AND NEW YORK

February 15, 2005

Anthony R. Scott
Chief of Police, Holyoke Police Department
138 Appleton Street
Holyoke, MA 01040
**CERTIFIED MAIL/RETURN RECEIPT REQUESTED
RECEIPT NO. 7002-0860-0004-9485-2186**

Michael J. Sullivan
Mayor, City of Holyoke
536 Dwight Street
Holyoke, MA 01040
**CERTIFIED MAIL/RETURN RECEIPT REQUESTED
RECEIPT NO. 7002-0860-0004-9485-2179**

　　　　Re:　　Sergeant Tammy Walker

Dear Sirs:

Please be advised that this office represents Sergeant Tammy Walker, a sergeant in the Holyoke Police Department.　Pursuant to the Massachusetts Whistleblower Statute, Massachusetts General Laws, Chapter 149, Section 185 (c)(1) (the "Whistleblower Statute"), and the case of Dirrane v. Brookline Police Department, et al, 315 F 3d. 65 (1st Circuit 2002) to the extent it applies, Sgt. Walker is hereby providing written notice of activities, policies, and/or practices which violate the Whistleblower Statute and a reasonable opportunity to correct such activities, policies, and/or practice.

In or around June of 2003, Sgt. Walker reported to her supervisor that several members of the Holyoke Police Department had refused to leave a pub after closing, in violation of the law.　After no action was taken as a result of her report, Sgt. Walker filed a written report regarding this possible illegal conduct with the Chief of Police, Anthony R. Scott.　In or around August of 2003, Chief Scott issued a written reprimand to Sgt. Walker.　In the written reprimand, Chief Scott indicated that Sgt. Walker had been insubordinate when she filed her written report of the possible illegal activity with him. By reprimanding Sgt. Walker in retaliation for reporting possible illegal activity, the City of Holyoke violated the Whistleblower Statute.

1

In or around April of 2004, Chief Scott suspended Sgt. Walker from work for one (1) day for appearing five to fifteen minutes late for court. In his notice of suspension, Chief Scott indicated that the suspension was justified partially because Sgt. Walker had been given a written reprimand in August of 2003 for insubordination. In upholding Chief Scott's one (1) day suspension, the Mayor of Holyoke, Michael Sullivan, also mentioned the written reprimand for insubordination of August, 2003. By using the retaliatory reprimand as a basis for imposing unusually severe disciplinary action, the City of Holyoke violated the Whistleblower Statute.

In or around September of 2004, Sgt. Walker filed a written complaint with her supervisor that a subordinate co-worker was ignoring her while they were performing their duties and verbally assaulting her. She complained that she feared for her own safety and the safety of others as a result of the subordinate's conduct. Less than two (2) weeks after filing this complaint, Mayor Sullivan increased a five (5) day suspension issued to Sgt. Walker by Chief Scott to ten (10) days. It appears that Mayor Sullivan increased the severity of Sgt. Walker's discipline because she complained about activity which she reasonably believed was posing a risk to public health and safety. Such retaliatory actions violate the Whistleblower Statute.

In or around November of 2004, Sgt. Walker noticed that she was not hearing any dispatch calls over her radio and, as a result, did not know where her men were in the field. Sgt. Walker suspected that her supervisor, Lieutenant Eva O'Connell, had ordered that dispatch calls be sent to officers via email, precluding Sgt. Walker from hearing them. On or around November 5, 2004, Sgt. Walker filed a written report to Chief Scott regarding this situation. Sgt. Walker complained to Chief Scott that this situation was unsafe for the officers and the public. Within days of these complaints, Lt. O'Connell reprimanded Sgt. Walker about the chain of command and reassigned Sgt. Walker to inside duty. Soon after that, Lt. O'Connell denied Sgt. Walker's time off request at the last minute and requested that Sgt. Walker be placed on the sick leave abusers list. At or around the end of November of 2004, Chief Scott suspended Sgt. Walker for five (5) days for sick leave abuse. At the end of December of 2004, Mayor Sullivan increased the five (5) days suspension issued by Chief Scott to ten (10) days. It appears that the City of Holyoke has taken retaliatory actions against Sgt. Walker because she complained about activity which she reasonably believed was posing a risk to public health and safety. Such retaliatory actions violate the Whistleblower Statute.

Sgt. Walker requests that the City of Holyoke promptly correct these violations of the Whistleblower Statute. Please be advised that if the City fails to correct these violations of the Whistleblower Statute within thirty (30) days from the date of this letter, Sgt. Walker may elect to pursue a lawsuit against the City of Holyoke. If suit is filed against the City of Holyoke pursuant to the Whistleblower Statute, Sgt. Walker will seek any and all remedies available to her under statute or at common law.

2

Very truly yours,

*Tani E. Sa—*

Tani E. Sapirstein, Esq.

TES/ag

cc:   Ms. Tammy Walker

Members of Holyoke City Council:

      John P. Brunelle
      131 Vermont Street
      Holyoke, MA
      *CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
      *RECEIPT NO.* 7002-0860-0004-9485-2162

      Raymond H. Feyre
      33 Longfellow Road
      Holyoke, MA
      *CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
      *RECEIPT NO.* 7002-0860-0004-9485-2155

      Kevin A. Jourdain
      357 Jarvis Avenue
      Holyoke, MA
      *CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
      *RECEIPT NO.* 7002-0860-0004-9485-2148

      Marc E. Joyce
      41 George Street
      Holyoke, MA
      *CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
      *RECEIPT NO.* 7002-0860-0004-9485-2131

3

James M. Leahy
12 Park Slope
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2124*

John P. Lecca
388 Pleasant Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2117*

Diosdado Lopez
19 Springdale Avenue
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2100*

Mark A. Lubold
111 Norwood Terrace
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2094*

James A. McDermott
54 Clemente Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2087*

Joseph M. McGiverin
27 Downing Avenue
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2070*

Helen F. Norris
2090 Northampton Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2063*

4

Elaine A. Pluta
72 Berkshire Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2056*

Lillian Santiago
123 St. Kolbe Drive
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.-7002-0860-0004-9485-2049*

Peter R. Tallman
10 Hendel Drive
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2032*

John E. Whelihan
34 Merrick Avenue
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO. 7002-0860-0004-9485-2025*

K:\WP61\CASEFILE\Walker\whistleblower notice letter.wpd

5

```
** TX STATUS REPORT **                    AS OF   FEB 18 '05 18:18   PAGE.01

                                             MM&M SPRINGFIELD


        DATE  TIME        TO/FROM        MODE   MIN/SEC   PGS   CMD#  STATUS
    03  02/18 18:15 FAX                  G3--S  02'27"   006         OK
```

# EXHIBIT 112

SAPIRSTEIN & SAPIRSTEIN, P.C.
ATTORNEYS AT LAW
1341 MAIN STREET, 3RD FLOOR
SPRINGFIELD, MASSACHUSETTS 01103
TELEPHONE (413) 827-7500

JONATHAN C. SAPIRSTEIN*
TANI E. SAPIRSTEIN*

CARLY L. MASSEY

TELECOPIER (413) 827-7797
EMAIL: FIRM@SANDSLAW.COM
WWW.SANDSLAW.COM

*ALSO ADMITTED IN CONNECTICUT AND NEW YORK

May 4, 2005

Anthony R. Scott
Chief of Police, Holyoke Police Department
138 Appleton Street
Holyoke, MA 01040
**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**
**RECEIPT NO. 7004 1350 0005 6385 8562**

Michael J. Sullivan
Mayor, City of Holyoke
536 Dwight Street
Holyoke, MA 01040
**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**
**RECEIPT NO. 7004 1350 0005 6385 8555**

Re:    **Sergeant Tammy Walker**

Dear Sirs:

Please be advised that this office represents Tammy Walker, a former sergeant in the Holyoke Police Department ("Walker").   Pursuant to the Massachusetts Whistleblower Statute, Massachusetts General Laws, Chapter 149, Section 185 (c)(1) (the "Whistleblower Statute"), and the case of Dirrane v. Brookline Police Department, et al, 315 F.3d. 65 (1st Cir. 2002) to the extent it applies, Walker is hereby providing written notice of activities, policies, and/or practices which violate the Whistleblower Statute and a reasonable opportunity to correct such activities, policies, and/or practice.

On or around February 15, 2005, Walker provided the City with her first written notice that the City's retaliatory activities, policies, and/or practices were in violation of the Massachusetts Whistleblower Statute, Massachusetts General Laws, Chapter 149, Section 185.  On or about March 7, 2005, Mayor Michael Sullivan held a hearing on a retaliatory five (5) days suspension without pay that was issued by Chief Anthony Scott to Walker.  Chief Scott issued the five (5) days suspension because Walker made complaints, including complaints that her supervisor's actions violated the law and created public safety concerns.  Chief Scott requested that Mayor Sullivan could consider additional disciplinary action against Walker.

1

Following the hearing, on or about March 18, 2005, Mayor Sullivan affirmed a retaliatory five (5) days suspension issued by Chief Scott and added an additional unpaid suspension of fifteen (15) days.   Thus, the City of Holyoke ("City") took retaliatory actions against Walker because she complained about activity which she reasonably believed was violating the law and posing a risk to public health and safety. Additionally, the close proximity of this harsh disciplinary action to Walker's February 15, 2005 written notice, strongly indicates that the disciplinary action was taken in retaliation for Walker's exercise of her rights under the Whistleblower statute.   Such retaliatory action violates the Whistleblower Statute.

On or around February 25, 2005, Lieutenant Eva O'Connell, Walker's direct supervisor, acted in a hostile and aggressive manner towards Walker.   As Walker has recently made complaints about Lt. O'Connell, Walker believed that O'Connell's actions were retaliatory.  On or around February 27, 2005, Walker filed a complaint with Chief Anthony Scott alleging that Lieutenant Eva O'Connell engaged in retaliatory behavior and injured Walker in a physical confrontation.  Walker expressed concern for her physical safety.

On or around March 29, 2005, Walker filed a complaint against the City in the United States District Court for the District of Massachusetts, alleging various claims including violations of Mass. Gen. Laws Ch. 151B, the Whistleblower Statute, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), and violations of her rights under the First Amendment of the United States Constitution.  One week later, Chief Scott suspended Walker for five (5) days regarding Walker's February 27, 2005 complaint. On or around April 12, 2005, Mayor Sullivan held a hearing on this suspension despite Walker's request for a continuance.  On or around April 18, 2005, Mayor Sullivan terminated Walker's employment.  Mayor Sullivan's termination of Walker occurred less than three weeks after Walker filed her complaint against the City with the U.S. District Court.  It appears that the City took retaliatory action against Walker in violation of several laws, including but not limited to the Whistleblower Statute.

Sgt. Walker requests that the City promptly correct these violations of the Whistleblower Statute.  Please be advised that if the City fails to correct these violations of the Whistleblower Statute within thirty (30) days from the date of this letter, Walker may elect to amend her lawsuit against the City to include these allegations.

Very truly yours,

Tani E. Sapirstein, Esq.

TES/ag

2

cc:    Ms. Tammy Walker

Members of Holyoke City Council:

John P. Brunelle
131 Vermont Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 8548

Raymond H. Feyre
33 Longfellow Road
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 8531

Kevin A. Jourdain
357 Jarvis Avenue
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 8524

Marc E. Joyce
41 George Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 8517

James M. Leahy
12 Park Slope
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 8500

John P. Lecca
388 Pleasant Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 8494

3

Diosdado Lopez
19 Springdale Avenue
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 9200

Mark A. Lubold
111 Norwood Terrace
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 9170

James A. McDermott
54 Clemente Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 9194

Joseph M. McGiverin
27 Downing Avenue
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 9187

Helen F. Norris
2090 Northampton Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 9163

Elaine A. Pluta
72 Berkshire Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 9156

Lillian Santiago
123 St. Kolbe Drive
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* 7004 1350 0005 6385 9149

4

# EXHIBIT 113

HOLYOKE POLICE DEPARTEMENT
INTEROFFICE CORRESPONDENCE



To: Chief Anthony R. Scott
From: Sgt Tammy Walker
Subject: Injury Report
Date: 02-27-2005

On 02-25-05 I entered the station at approximately 5:00 PM. I came in the station to put in a Request Times off. Form. I approached the Commanders Office I noticed Lt. O'Connell seated in the Commander's Office. I went into the report writing room to retrieve the time off request slips. I walked into the Commander Office and placed the time slips on the desk across from where the Lt. O'Connell was seated.

I then walked over the desk and pointed to the book, and stated Lt. I needed to put some time in. As I lifted each ends of the open book off of the desk about an inch or two, without warning Lt. O'Connell grabbed from the middle of the book binder and jerked it vigorously towards her, jerking me and my left arm along with the book. I looked over at Officer Shattuck in shock He looked at me in shock as well.

After she had jerked it away I raised my hands and took a step back from her desk. Lt O'Connell still seated at the desk with her arms folded and upper body draped over the book on the desk

She could have simply stated it verbally that she didn't want me to have to book and not jerk it out of my hands. I have always viewed the book in the past, before submitting any time off slips, as not duplicate the same request as another supervisor. There was no justification for her to jerking the book out of my hands. As you know from my doctors notes I am experiencing sever chronic pain in the left shoulder region. Lt. O'Connell action has reaggraved this area. I am now experiencing stiffness in my inner elbow. I am having difficulty fully extending and bending my elbow without pain.

Lt. O'Connell then stood up from her chair and took a step towards my direction. I again backed up, several steps to the dooryway of the dispatch room. I then called for Officer Craven; he didn't hear me at first, so I called his name again. I motioned for him to enter the room. At that time Lt.O'Connell stated she didn't want to get the officer's involved. I simply stated to Officer Craven that I just wanted him to be present while I was attempted to put in a request form. Officer Craven stated to me that he could not get involved. I told him I understood, but I just wanted him to be present while I was attempting to put in a Time off Request Form.



000031

While speaking with Officer Craven Lt. O'Connell then walked to the House mans door and closed it. Having dealt with what just occurred. I was not going to remain in the room with her, .and left through the dispatch exit. I couldn't believe Lt O'Connell jerked the book out of my hands especially in light of my injuries. Having this take place in front of my child was inexcusable.

On 02-27-05 I called Captain Fletcher at home to report what had happened I informed him I had written a report of the injury to my left elbow. I was instructed by the Capt to submit the report to Lt' O'Connell. As I do not feel safe in the presents of  Lt.O'Connell. I will have a family member bring it to the station today (02-27-04).

Chief I have suffered more than enough traumatic events by the actions of Lt. O'Connell. I have attempted to go through Chain Of Command, I have attempted to put time off request forms in, but she still finds a way to deny me.  I have done everything humanly possible to deal with this situation. In a respectful and professional manner, but it just seems to escalate. Her actions have now reached to physically jerking the book out of my hand.
I have not sought medical attention for my elbow, hoping it is just a strain, but would like to have it looked at by a medical professional.  I will wait to her from you regarding this matter.

_Lt. Eva M O'Connell_
Lt. Eva M O'Connell
Second Watch Commander
Second Watch

APPROVED
~~DISAPPROVED~~

~~DISAPPROVED~~
~~APPROVED~~
~~DISAPPROVED~~
02-28-05   ANTHONY R. SCOTT
Chief of Police

Respectfully submitted,
Sgt Tammy Walker
Assistant Watch Commander

Captain Alan G. Fletcher
Commander
Field Operations Bureau

APPROVED
~~DISAPPROVED~~

000032

# HOLYOKE POLICE DEPARTMENT
## OFFICER INJURY REPORT
### (THIS FORM IS TO BE PRINTED OR TYPED)

Department Case Number: _____

Name of Injured Officer: __WALKER Tammy__  Rank: __SGT__
                          Last    First    Middle Initial

Date Injury Occurred: _2/25/05_    Time Occurred: _5:00_ AM (PM)

Location (In City) Where Injury Occurred: __Commander's Office__

Date Injury Reported: _2/27/05_    Time Reported: _1202_ AM (PM)

Describe Nature of Injury: __STIFFNESS in Left Elbow and Left Shoulder__

Describe Cause of Injury: __Scheduling book being Jerked from hands__

Injury Reported to: __Capt. Alan Fletcher by Phone on 2/27/05__
        PRINT FULL NAME, INCLUDING MIDDLE INITIAL OF SUPERVISOR RECEIVING REPORT

Signature of Injured Officer: __Sgt Tammy Walker__    Date: __02/27/05__

Signature of Supervisor Investigating Report: _____    Date: _____

Check One: [ ] On Duty    [ ] Off Duty    [ ] Performance of Duty    [ ] Non–Performance of Duty

1.  Injuries shall be reported and investigated immediately.
2.  Injured officer must sign report immediately unless incapacitated.
3.  Report shall be investigated immediately and certified by a Supervisory Officer
4.  Included in the report shall the names and addresses of all persons having knowledge of the injury whether eye-witnesses or not.
5.  The original and three (3) copies of the report shall be submitted to the Bureau Commander for transmittal to the Chief of Police
6.  Use reverse side of this form or additional blank 8.5 X11 typing paper if necessary
7.  This form shall be typed or printed legibly.
8.  Any and all Incident Reports and supporting documents shall be attached to this report at time of submission.

Statement of Facts by Injured Officer (use additional paper if necessary):    ( SEE ATTACHED IOC )

Physician/Doctor's Report describing the nature and extent of injury to include the PROGNOSIS:

Signature of Attending Physician    Date: _____    (Print Name of Physician Here)

Reviewed: _____    Date: _____
          Bureau Commander

Reviewed: _____    Date: _____
          Chief of Police

# EXHIBIT 114



MAYOR MICHAEL J. SULLIVAN

CITY OF HOLYOKE

March 18, 2005

DEFENDANT'S
EXHIBIT
35 Walker
5/1/07 jm

Sergeant Tammy Walker
6 Clark Street
Holyoke, MA  01040

Re:  Chapter 31 Section 41 - Discipline

Dear Sergeant Walker:

On August 7, 2003, you were issued a written reprimand for
insubordination.

On June 22, 2004, after a Chapter 31, Section 41 hearing, I
upheld a one (1) day suspension, without pay, issued to you
for failing to follow a directive regarding being at court on
time.

On August 19, 2004, Chief Scott, after investigating your
actions on July 23, 2004 issued you the maximum five (5) day
suspension allowed under Section 41 and forwarded the matter
to me for consideration of further discipline including sus-
pension demotion or discharge.  You appealed the initial five
(5) day suspension.  A hearing on your appeal, and to consider
further discipline was held by mutual agreement on September
15, 2004, at my office at the City Hall.

I then issued you a letter upholding the Chief's five (5) day
suspension without pay and added an additional five (5) day
suspension without pay to that discipline.

On November 30, 2004, Chief Scott, after investigating
allegations of sick leave abuse, issued you the maximum five
(5) day suspension allowed under Section 41 and forwarded the
matter to me for consideration of further discipline including
suspension demotion or discharge.  You appealed the initial
five (5) day suspension.  A hearing on your appeal, and to
consider further discipline was held by mutual agreement on
December 14, 2004, at my office at the City Hall.

536 DWIGHT STREET • MAYOR'S OFFICE • HOLYOKE, MASSACHUSETTS 01040-5019
PHONE: (413) 322–5510 • FAX: (413) 322–5515 • EMAIL: sullivam@cl.holyoke.ma.us
*Birthplace of Volleyball*

SEP 22 '06 12:36                                                    4133225581            PAGE.01

I then issued you a letter upholding the Chief's five (5) day
suspension without pay and added an additional five (5) day
suspension without pay to that discipline.

On March 7, 2005, by mutual agreement, we had a hearing to
consider your appeal of Chief Scott's January 20, 2005 five
(5) day suspension of you without pay and to review Chief
Scott's request that I consider further discipline of you.

On November 4, 2004, following a telephone call Chief Scott
received from Lieutenant Denise Duguay, the Chief met with you
and Lieutenant Duguay at your request. At that meeting you
accused Lieutenant Eva O'Connell of issuing an order to
dispatchers and the supervisors on the Second Watch to
dispatch officers to calls via laptop computer e-mail.  You
further accused Lieutenant O'Connell of issuing this order to
keep you from knowing what was occurring during the watch.
Additionally, you stated that because of this order Lieutenant
O'Connell was affecting officers' safety.  Following this
meeting Chief Scott ordered the Professional Standards
Division personnel to conduct an investigation into your
allegations against Lieutenant O'Connell.

The investigative report prepared by the Professional
Standards Division and the testimony given at hearing revealed
that you brought your allegation of officers being dispatched
via laptop e-mail to Lieutenant O'Connell's attention on
October 31, 2004.  Lieutenant O'Connell conducted an
investigation into this matter and informed you that your
allegations were unfounded.  Furthermore, you confirmed this
fact in the statement you gave to the personnel of the
Professional Standards Division.  Lieutenant O'Connell further
informed you that no order had "come down" from Chief Scott's
office instructing calls to be dispatched via laptop e-mail.
Additionally, it was unrebutted at hearing that Lieutenant
O'Connell gave you a **direct order** not to violate the chain of
command.

However, less than twenty-four (24) hours after receiving
Lieutenant O'Connell's findings, you approached Lieutenant
Duguay, an officer outside of your chain-of-command.  You had
been previously informed by Lieutenant O'Connell of the chain-
of-command, but you still chose to violate the chain-of-
command and by doing so violated a direct order of a superior
officer by consulting with a lieutenant in another Bureau
without prior authorization.

Lieutenant Duguay listened to your allegations that Lieutenant O'Connell had issued an order to dispatch via laptop e-mail to keep you from knowing what was occurring on the watch. Lieutenant Duguay informed you she too conducted an inquiry into your allegations and found them to be unfounded. You then asked Lieutenant Duguay to call Chief Scott and make arrangements to meet with him regarding this matter.

This matter was thoroughly investigated and written statements were obtained from all dispatchers and supervisors on the Second Watch. These documents were submitted at hearing. Everyone questioned contradicted your allegations and denied that such an order was issued by Lieutenant O'Connell. All of the laptop e-mail transmissions were obtained and reviewed during the time period you allege these events occurred. There is absolutely no evidence to support your allegations; however, there is sufficient evidence to support the fact that Lieutenant O'Connell did not issue such an order.

Moreover, the unrebutted evidence presented at hearing establishes that you deliberately violated a direct order given by Lieutenant O'Connell and circumvented Second Watch's chain of command. This is further magnified by Captain Alan Fletcher's testimony at hearing that obeying orders given by superior officers is a basic tenet of police work and that in the past he has counseled you on maintaining the chain of command.

In addition, on December 20, 2004, following a pre-grievance meeting on another matter, you presented Chief Scott with two (2) grievances, one against Lieutenant David D. Fournier and the other against Lieutenant O'Connell. In a two page unsigned memo to the Chief you alleged that the only person Chief Scott authorized to review your records was the Police Comptroller, Melinda J. Lane, and that Lieutenant Fournier did not have the Chief's authorization to review your personnel records. You further alleged that Lieutenant Fournier violated Rule 3, Conduct and Responsibility, Paragraph 3.2, Unbecoming Conduct; Rule 3, Conduct and Responsibility, Paragraph 3.4, Compliance to Law; Rule 4, Performance of Duty, Paragraph 4.2, Competence in Performance of Duty and Rule 4, Performance of Duty, Paragraph 4.1, Performance of Duty and Responsibility.

Subsequently, Chief Scott conducted an investigation into your allegation. The evidence and testimony at hearing established that Chief Scott had designated Lieutenant Fournier and Sergeant Daniel McCavick as the Chief of Police's keeper of

the records (personnel file). Moreover, your complaint against Lieutenant Fournier immediately followed his complaint against you for abuse of sick leave.

In your December 20, 2004, complaint against Lieutenant Eva M. O'Connell you allege that Lieutenant O'Connell violated Rule 3, Conduct and Responsibility, Paragraph 3.2 and 3.4; Rule 4, Performance of Duty, Paragraph 4.1, 4.2 and 4.12. The remedy sought by you was to remove Lieutenant O'Connell from her position.

In a two page memo, which you signed, you alleged that Lieutenant O'Connell altered an IOC (Interoffice Correspondence) addressed to you dated November 10, 2004. You further allege that Lieutenant O'Connell submitted a different memo to Chief Scott. Chief Scott conducted this investigation because you made the allegations against Lieutenant O'Connell who is your Watch Commander. Chief Scott did not refer the matter to (Professional Standards) Internal Affairs due to the fact that they were already conducting an investigation into other allegations you made against Lieutenant O'Connell. The Chief marked the memos you alleged were altered and/or forged by Lieutenant O'Connell as "Licutenant O'Connell 1" and "Lieutenant O'Connell 2" for identification purposes and the alleged alterations in the two documents are as follow:

- Lieutenant O'Connell 1 reads "…….you will refrain from hanging around those offices."

- Lieutenant O'Connell 2 reads "…….you will refrain from visiting those offices."

In your complaint you claimed that your assignment was changed by Lieutenant O'Connell and the lieutenant did not provide you with an explanation as to why your assignment was changed.

As to the your allegation that your assignment was changed and that you were not provided an explanation, this in and of itself is not grievable under the contract in accordance with Article II, Union Recognition, Paragraph 2.5. Assignments are an exclusive "administrative right" which does not have to be explained under the contract. Testimony by Captain Alan G. Fletcher, President, Local 409 and Lieutenenant O'Connell, Vice President, Local 409, confirmed this assertion. Moreover, you were informed of this by the Chief during your meeting with him on November 24, 2004.

You were informed by Lieutenant O'Connell in the IOC dated
November 10, 2004 not to hang around and/or visit the Records
Division and the Communications Center. As the Watch
Commander Lieutenant O'Connell had the absolute right to
change or reassign you within the Watch without providing you
with an explanation for the reassignment, as does Chief Scott,
when he transfers officers from one assignment to another.
You were not demoted from the position of Sergeant; you did
not lose any pay or benefits. Lieutenant O'Connell's action
was not a disciplinary action and therefore was not subject to
bargaining or grievance. After being informed of this very
fact by both Chief Scott and Captain Fletcher you still chose
to file a grievance regarding your assignment.

The changing of the wording from "hanging around" to
"visiting" does not constitute an alteration or forgery and as
a police sergeant you should have knowledge of the General
Laws and departmental rules and regulations as it relates to
altering and/or forging documents.

The evidence and testimony at hearing showed that your re-
assignment by Lieutenant O'Connell was well within her
authority as Watch Commander and there was no violation of the
contract or any departmental rule or regulation on the part of
Lieutenant O'Connell.

As to your allegation that Lieutenant O'Connell altered and/or
forged documents and violated Rule 3, Paragraph 3.2; Rule 3,
Paragraph 3.4; Rule 4, Paragraph 4.2; Rule 4, Paragraph 4.1
and Rule 4, Paragraph 4.12, I found all of your allegations to
be unsupported by the evidence. Moreover, your complaint
against Lieutenant O'Connell followed her re-assignment of
you.

Finally, because of your unwillingness to testify at the very
hearing that you requested, I am drawing an adverse inference
as to the reasons behind said refusal.

Therefore, based on the evidence and testimony presented at
hearing with regards to your allegations filed against
Lieutenants Fournier and O'Connell and Lieutenant Fournier's
investigation into your allegations against Lieutenant
O'Connell, I find that you violated the following departmental
rules:

    1.)  Rule 1 Authority, paragraph 1.2 OBEDIENCE TO ORDERS
        Members of the Department shall promptly obey any
        lawful order emanating from any superior officer.

Should any such order conflict with a previous order from any other superior officer, with any General or Special Order, or any provision of the Rules, the member to whom such order is given shall respectfully call attention to such conflict, his order shall stand and the responsibility shall be his, and the person obeying the same shall not be held in any way responsible for disobedience of any orders theretofore issued. If any unlawful order is given to any member of the department, such member shall promptly report such fact in writing to the Chief of Police. (old # 1.5)

2.) Rule 1 Authority, paragraph 1.3 OBEDIENCE TO ORDERS No member of the Department shall willfully disobey any lawful command of any commissioned officer, non-commissioned officer, or member of the Department senior to him. (old #1.50)

3.) Rule 1 Authority, paragraph 1.4 COMPLIANCE TO ORDERS Officers shall promptly obey any lawful orders of a superior officer. This will include orders relayed from a superior officer by an officer of the same or lesser rank. (old # 1.18)

4.) Rule 3 Conduct and Responsibility, paragraph 3.2 UNBECOMING CONDUCT - Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorable upon the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer. (old #1.6)

5.) S.O.P. 1.4.0 Chain of Command, Section VI By Passing the Chain of Command, Members of the department shall not bypass the next level in the Chain of Command, except in an emergency situation.

6.) Rule 5 Restrictive Activity, paragraph 5.13 MISREPRESENTATION OF FACTS IN OFFICIAL CAPACITY, No member of the Department shall, under any circumstances, make any false official statement or intentional misrepresentation of facts. (old #1.71)

7.)  Rule 4 Performance of Duty, paragraph 4.2 COMPETENCY
     IN PERFORMANCE OF DUTY, Officers shall maintain
     sufficient competency to properly perform their
     duties and assume the responsibilities of their
     positions.  Officers shall perform their duties in a
     manner which will maintain the highest standard of
     efficiency in carrying out the functions and
     objectives of the department.  Unsatisfactory
     performance may be demonstrated by a lack of
     reasonable knowledge of the application of laws
     required to be enforced; an unwillingness or
     inability to perform assigned tasks; the failure to
     take reasonable action on the occasion of a crime,
     disorder or other condition deserving police
     attention; or absence without leave.  In addition to
     other indications of unsatisfactory performance, the
     following will be considered prima facie evidence of
     unsatisfactory performance; repeated poor
     evaluations or a written record of repeated
     infractions of rules, regulations, directives or
     orders of the department.  (old #1.13)

You are hereby notified that pursuant to the powers conferred
on me by Massachusetts General Laws, specifically Chapter 31,
Sections 41 through 45 (attached hereto for your information),
I find that your actions constitute a violation of the rules,
regulations, policies and/or procedures of the Police
Department.  I hereby affirm the five (5) day suspension
issued by Chief Scott and add an additional 15 day suspension
without pay to be served on March 21, 22, 23, 26, 27, 28, 29,
and April 1, 2, 3, 4, 7, 8, 9, 10.  Once again, I am providing
you with an opportunity to meet fully the duties and
responsibilities of your job.  Failure to do so will subject
you to further discipline up to and including demotion or
termination.

Sincerely,

Michael J. Sullivan, Mayor

CC: w/o enclosures - IBPO, Attorney Dan Bair, Chief Scott,
City Solicitor

# EXHIBIT 115



RECEIVED
APR 2 0 2005
By_____

MAYOR MICHAEL J. SULLIVAN

**CITY OF HOLYOKE**

April 18, 2005

Sergeant Tammy Walker
6 Clark St.
Holyoke, MA  01040



DEFENDANT'S
EXHIBIT
36 Walker
5/1/07

Re:  Chapter 31 Section 41 - Discipline

Dear Sergeant Walker:

On August 7, 2003, you were issued a written reprimand for insubordination.

On June 22, 2004, after a Chapter 31, Section 41 hearing, I upheld a one (1) day suspension, without pay, issued to you for failing to follow a directive regarding being at court on time.

On August 19, 2004, Chief Scott, after investigating your actions on July 23, 2004 issued you the maximum five (5) day suspension allowed under Section 41 and forwarded the matter to me for consideration of further discipline including suspension demotion or discharge.  You appealed the initial five (5) day suspension.  A hearing on your appeal, and to consider further discipline was held by mutual agreement on September 15, 2004, at my office at the City Hall.

I then issued you a letter upholding the Chief's five (5) day suspension without pay and added an additional five (5) day suspension without pay to that discipline.

On November 30, 2004, Chief Scott, after investigating allegations of sick leave abuse, issued you the maximum five (5) day suspension allowed under Section 41 and forwarded the matter to me for consideration of further discipline including suspension, demotion or discharge.  You appealed the initial five (5) day suspension.  A hearing on your appeal, and to consider further discipline was held by mutual agreement on December 14, 2004, at my office at the City Hall.

I then issued you a letter upholding the Chief's five (5) day suspension without pay and added an additional five (5) day suspension without pay to that discipline.

On January 20, 2005, Chief Scott, after thoroughly investigating your allegations of November 4, 2004 and December 20, 2004 against superior officers, issued you the maximum five (5) day suspension under Section 41 and forwarded the matter to me for consideration of further discipline including suspension demotion or discharge. You appealed the initial five (5) day suspension. On March 7, 2005, by mutual agreement, we had a hearing to consider your appeal of Chief Scott's January 20, 2005 five (5) day suspension of you without pay and to review Chief Scott's request that I consider further discipline of you.

I then issued you a letter upholding the Chief's five (5) day suspension without pay and added an additional fifteen (15) day suspension without pay to that discipline.

On April 6, 2005 Chief Scott suspended you for five (5) days without pay. On April 8, 2005, you requested a public hearing to appeal that suspension. On April 12, 2005 at 3:30pm, in accordance with Section 41, a hearing was scheduled to consider your appeal of Chief Scott's suspension.

You were given the required notice and the hearing was held within the timeframe delineated under Section 41. On April 12, 2005, my office received a fax. This fax was authored by you and requested a continuance of the hearing and any documents upon which your April 6, 2005, suspension was based.

After the commencement of the public hearing you choose not to remain even though you requested the hearing.

Based upon the evidence and testimony presented at the hearing,
I have determined that on February 25, 2005, you entered the Watch Commander's office. In an extremely rude and unprofessional manner you attempted to remove the "Scheduling Book" which was open on the desk in front of Lieutenant O'Connell (and which was obviously being used by her at the time), without inquiring whether or not the Lieutenant was using the book. After Lieutenant O'Connell indicated to you that she was using the book, you attempting to pull it out of her hands. At **all** times you, and not Lieutenant O'Connell acted in an aggressive manner.

Moreover, testimony presented established that you used foul language in speaking to a superior officer, Lieutenant

O'Connell, stating, "Fuck you" and/or "I want to see that fucking book." Further, your physical demeanor displayed during your presence in the Watch Commander's office toward the Lieutenant caused concern on the part of at least two officers who were present. These officers stated that they were concerned for the Lieutenant's safety because of your mannerisms and actions. All of this has been verified by the testimony of several officers of this department. Your actions were both insubordinate and unprofessional.

On February 27, 2005 you submitted an "Officer Injury Report" indicating that Lieutenant O'Connell injured your left shoulder by "jerking" the "Scheduling Book" from your grasp. The report you submitted is contradicted by the testimony of Lieutenant O'Connell and Officer Sean Shattuck who were present when your alleged injury occurred. I find that you knowingly filed a false "Officer Injury Report" and supporting documentation.

Therefore, based upon the evidence and testimony presented at hearing, I further find that you violated the following departmental rules:

1.) **Rule 3 Conduct and Responsibility, paragraph 3.2 UNBECOMING CONDUCT** - Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorable upon the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer. (old #1.6)

2.) **Rule 5 Restrictive Activity, paragraph 5.13 MISREPRESENTATION OF FACTS IN OFFICIAL CAPACITY,** No member of the Department shall, under any circumstances, make any false official statement or intentional misrepresentation of facts. (old #1.71)

3.) **Rule 4 Performance of Duty, paragraph 4.2 COMPETENCY IN PERFORMANCE OF DUTY,** Officers shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions. Officers shall perform their duties in a manner which will maintain the

highest standard of efficiency in carrying out the
functions and objectives of the department.
Unsatisfactory performance may be demonstrated by a lack
of reasonable knowledge of the application of laws
required to be enforced; an unwillingness or inability to
perform assigned tasks; the failure to take reasonable
action on the occasion of a crime, disorder or other
condition deserving police attention; or absence without
leave.  In addition to other indications of
unsatisfactory performance, the following will be
considered prima facie evidence of unsatisfactory
performance; repeated poor evaluations or a written
record of repeated infractions of rules, regulations,
directives or orders of the department.  (old #1.13)

4.)   **Rule 3, Conduct and Responsibility, Section 3.14 CONDUCT
      TOWARDS MEMBER,** No member of the Department shall, on any
      pretense whatsoever strike his superior officer or non-
      commissioned officer, or any other member of the
      Department, or draw or lift up any weapon or offer any
      violence against him whatsoever.  (old #1.48)   (b) No
      member of the Department shall use threatening or
      insulting language, or behave in an insubordinate or
      disrespectful manner toward any commissioned officer,
      non-commissioned officer, or any member of the Department
      senior to him.  (old #1.51)

5.)   **Rule 4, Performance of Duty, 4.12  TRUTHFULNESS IN
      OFFICIAL DEALINGS,** No member of the Department shall make
      false official reports, or knowingly enter or cause to be
      entered in any Department books, or records, any
      inaccurate, false, or improper entries or registration of
      police information or matter.  (old #1.72)

6.)   **Rule 5, Restricted Activities, Section 5.13
      MISREPRESENTATION OF FACTS IN OFFICIAL CAPACITY**
      No member of the Department shall, under any
      circumstances, make any false official statement or
      intentional misrepresentation of facts. (old #1.71)

You are hereby notified that pursuant to the powers conferred
on me by Massachusetts General Laws, specifically Chapter 31,
Sections 41 through 45 (attached hereto for your information),
I find that your actions constitute a violation of the rules,

regulations, policies and/or procedures of the Police
Department.  I hereby affirm the five (5) day suspension
issued by Chief Scott. Additionally, based upon your lack of
professionalism, physically aggressive behavior, vulgarity and
overall conduct unbecoming a member of the Holyoke Police
Department, I terminate your employment effective immediately.

You are ordered to immediately return all firearms and your
badge to the Chief or his designee.  All other departmental
equipment and/or uniforms shall be returned to the department
within seventy-two (72) hours of receipt of this letter.
Please make arrangements with the Chief's office to do so.


Sincerely,



Michael J. Sullivan, Mayor


Cc:  Attorney Dan Bair
     Chief Scott
     City Solicitor
     Attorney Carole Lynch

# EXHIBIT 116

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

| | |
|---|---|
| TAMMY WALKER, | ) |
|     Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF HOLYOKE, | ) |
|     Defendant | ) |

### AFFIDAVIT OF DENISE M. TREMBLAY

I, Denise M. Tremblay, hereby depose and state as follows:

1.      I am an attorney at Morrison Mahoney LLP, 1500 Main Street, Springfield, Massachusetts which law firm represents the defendant, City of Holyoke, in the above matter.

2.      Attached hereto as Exhibit 1 is a true and accurate copy of excerpts of the deposition transcript of Chief Anthony Scott.

3.      Attached hereto as Exhibit 2 is a true and accurate copy of excerpts of the deposition transcript of Sergeant John Monaghan.

4.      Attached hereto as Exhibit 5 is a true and accurate copy of excerpts of the deposition transcript of Jorge Rodriguez.

5.      Attached hereto as Exhibit 6 is a true and accurate copy of excerpts of the deposition transcript of Tammy Walker, Volume I.

6.      Attached hereto as Exhibit 7 is a true and accurate copy of a civil service certification.

7.      Attached hereto as Exhibit 8 is a true and accurate copy of correspondence from Mayor Szostkiewicz to Joseph Trainor dated July 6, 1999.

8.      Attached hereto as Exhibit 9 is a true and accurate copy of Special Order # 1167 dated June 17, 1999.

360996v1|3360996v1|

9.     Attached hereto as Exhibit 10 is a true and accurate copy of the discrimination complaint of Tammy Walker filed with the Massachusetts Commission Against Discrimination and the EEOC on October 15, 1999.

10.     Attached hereto as Exhibit 11 is a true and accurate copy of Tammy Walker's civil service appeal dated August 31, 1999.

11.     Attached hereto as Exhibit 15 is a true and accurate copy of excerpts of the deposition transcript of Captain Alan Fletcher.

12.     Attached hereto as Exhibit 26 is a true and accurate copy of the transcribed recorded statement of Officer Timothy Skwira dated August 2, 2003.

13.     Attached hereto as Exhibit 27 is a true and accurate copy of the transcribed recorded statement of Sergeant John Monaghan dated July 21, 2003.

14.     Attached hereto as Exhibit 28 is a true and accurate copy of the Incident Report of Tammy Walker dated June 23, 2003.

15.     Attached hereto as Exhibit 29 is a true and accurate copy of the statement of Captain Alan Fletcher dated July 1, 2003.

16.     Attached hereto as Exhibit 30 is a true and accurate copy of the statement of Lieutenant Donald Whelihan dated July 3, 2003.

17.     Attached hereto as Exhibit 31 is a true and accurate copy of the transcribed recorded statement of Karen Desautels dated June 23, 2003.

18.     Attached hereto as Exhibit 32 is a true and accurate copy of the transcribed recorded statement of David Czelusniak dated June 23, 2003.

19.     Attached hereto as Exhibit 33 is a true and accurate copy of the transcribed recorded statement of Officer Thomas Dore dated July 30, 2003.

2

20.    Attached hereto as Exhibit 34 is a true and accurate copy of the transcribed recorded statement of Officer Philip McKay dated July 30, 2003.

21.    Attached hereto as Exhibit 35 is a true and accurate copy of the transcribed recorded statement of Officer Joseph Wilson dated July 30, 2003.

22.    Attached hereto as Exhibit 36 is a true and accurate copy of the Professional Standard Division's report to Chief Anthony Scott dated August 4, 2003.

23.    Attached hereto as Exhibit 37 is a true and accurate copy of a newspaper article discussing the Elizur's Pub incident.

24.    Attached hereto as Exhibit 40 is a true and accurate copy of an interoffice correspondence from Captain Monfette to Chief Anthony Scott dated April 6, 2004.

25.    Attached hereto as Exhibit 44 is a true and accurate copy of the Dispatch Log dated July 23, 2004.

26.    Attached hereto as Exhibit 45 is a true and accurate copy of the transcribed dispatch call number 04-26734.

27.    Attached hereto as Exhibit 46 is a true and accurate copy of the transcribed recorded statement of Sergeant James Albert dated July 28, 2004.

28.    Attached hereto as Exhibit 47 is a true and accurate copy of the transcribed recorded statement of Lieutenant Denise Dugay dated July 28, 2004.

29.    Attached hereto as Exhibit 48 is a true and accurate copy of the transcribed recorded statement of Dispatcher Brenda Therrien dated July 29, 2004.

30.    Attached hereto as Exhibit 49 is a true and accurate copy of the narrative of Tammy Walker dated August 17, 2004.

31.    Attached hereto as Exhibit 50 is a true and accurate copy of the transcribed recorded statement of Lieutenant Eva O'Connell dated July 28, 2004.

3

32.     Attached hereto as Exhibit 51 is a true and accurate copy of an interoffice correspondence from the Professional Standards Division to Chief Anthony Scott dated July 30, 2004.

33.     Attached hereto as Exhibit 52 is a true and accurate copy of the transcribed recorded statement of Tammy Walker dated 7/29/04.

34.     Attached hereto as Exhibit 54 is a true and accurate copy of a Chapter 31, sec. 41 discipline letter from Mayor Michael J. Sullivan to Tammy Walker dated September 28, 2004.

35.     Attached hereto as Exhibit 55 is a true and accurate copy of an interoffice correspondence from Tammy Walker to Chief Anthony Scott dated September 11, 2004.

36.     Attached hereto as Exhibit 56 is a true and accurate copy of excerpts of the deposition transcript of Tammy Walker, Volume II.

37.     Attached hereto as Exhibit 57 is a true and accurate copy of an interoffice correspondence from Lt. Eva O'Connell to Chief Anthony Scott dated September 16, 2004.

38.     Attached hereto as Exhibit 58 is a true and accurate copy of an interoffice correspondence from the Professional Standards Division to Chief Anthony Scott dated November 8, 2004 concerning the September 6, 2004 incident.

39.     Attached hereto as Exhibit 59 is a true and accurate copy of an interoffice correspondence from the Professional Standards Division to Chief Anthony Scott dated November 8, 2004 concerning the September 9, 2004 incident.

40.     Attached hereto as Exhibit 60 is a true and accurate copy of the transcribed recorded statement of Sergeant John Monaghan dated October 27, 2004 regarding the September 6, 2004 alleged disrespect incident.

41.     Attached hereto as Exhibit 61 is a true and accurate copy of the transcribed recorded statement of Officer Philip McKay dated October 27, 2004.

4

42.    Attached hereto as Exhibit 62 is a true and accurate copy of the transcribed recorded statement of Officer Deborah Clement dated October 27, 2004.

43.    Attached hereto as Exhibit 63 is a true and accurate copy of the transcribed recorded statement of Sergeant Robert Laramee dated October 28, 2004.

44.    Attached hereto as Exhibit 64 is a true and accurate copy of the transcribed recorded statement of Sergeant Daniel Fallon dated October 29, 2004.

45.    Attached hereto as Exhibit 65 is a true and accurate copy of the transcribed recorded statement of Sergeant Michael McMullen dated October 29, 2004.

46.    Attached hereto as Exhibit 66 is a true and accurate copy of the interoffice correspondence from the Professional Standards Division to Tammy Walker concerning the September 9, 2004 incident dated November 17, 2004.

47.    Attached hereto as Exhibit 67 is a true and accurate copy of an interoffice correspondence from Chief Anthony Scott to the Professional Standards Division dated November 17, 2004 concerning the September 6, 2004 incident.

48.    Attached hereto as Exhibit 68 is a true and accurate copy of an interoffice correspondence from Chief Anthony Scott to the Professional Standards Division dated November 17, 2004 concerning the September 9, 2004 incident.

50.    Attached hereto as Exhibit 70 is a true and accurate copy of the transcribed recorded statement of Lt. O'Connell dated December 13, 2004.

51.    Attached hereto as Exhibit 71 is a true and accurate copy of an interoffice correspondence from Lt. Denise Dugay to Chief Anthony Scott dated November 4, 2004.

52.    Attached hereto as Exhibit 74 is a true and accurate copy of an interoffice correspondence from Lt. Eva O'Connell to Captain Alan Fletcher dated August 3, 2004.

5

53.    Attached hereto as Exhibit 76 is a true and accurate copy of an interoffice correspondence from the Professional Standards Division to Chief Anthony Scott dated January 11, 2005.

54.    Attached hereto as Exhibit 76A is a true and accurate copy of the transcribed recorded statement of Officer Jon Craven dated December 13, 2004.

55.    Attached hereto as Exhibit 77 is a true and accurate copy of the transcribed recorded statement of Tammy Walker dated November 15, 2004.

56.    Attached hereto as Exhibit 78 is a true and accurate copy of the report of Captain Frederick J. Seklecki dated July 17, 2004.

57.    Attached hereto as Exhibit 79 is a true and accurate copy of the Suspension Notification to Tammy Walker dated January 18, 2005.

58.    Attached hereto as Exhibit 80 are true and accurate copies of the Personnel Sick Reports for Tammy Walker dated November 15, 16 and 17, 2004.

59.    Attached hereto as Exhibit 81 is a true and accurate copy of the interoffice correspondence from Lt. Eva O'Connell to Chief Anthony Scott dated November 18, 2004.

60.    Attached hereto as Exhibit 82 is a true and accurate copy of the interoffice correspondence from Lt. Fournier to Chief Anthony Scott dated November 18, 2004.

61.    Attached hereto as Exhibit 83 is a true and accurate copy of the interoffice correspondence from Melinda Lane to Chief Anthony Scott dated November 30, 2004.

62.    Attached hereto as Exhibit 84 is a true and accurate copy of the interoffice correspondence from Kathleen McCoy to Chief Anthony Scott dated December 2, 2004.

63.    Attached hereto as Exhibit 85 is a true and accurate copy of the Certification to Return to Work for Tammy Walker dated November 18, 2004.

6

64.    Attached hereto as Exhibit 86 is a true and accurate copy of the interoffice correspondence from Lt. Eva O'Connell to Tammy Walker dated November 20, 2004.

65.    Attached hereto as Exhibit 87 is a true and accurate copy of the interoffice correspondence from Lt. Eva O'Connell to Chief Anthony Scott dated December 13, 2004.

66.    Attached hereto as Exhibit 88 is a true and accurate copy of the transcribed recorded statement of Tammy Walker dated November 22, 2004.

67.    Attached hereto as Exhibit 89 is a true and accurate copy of the Direct Order from Chief Anthony Scott to Tammy Walker dated November 22, 2004.

68.    Attached hereto as Exhibit 90 is a true and accurate copy of the Certification to Return to Work for Tammy Walker dated November 22, 2004.

69.    Attached hereto as Exhibit 91 is a true and accurate copy of the interoffice correspondence from Tammy Walker to Chief Anthony Scott dated November 23, 2004.

70.    Attached hereto as Exhibit 92 is a true and accurate copy of the Memorandum of Chief Anthony Scott dated November 24, 2004.

71.    Attached hereto as Exhibit 93 is a true and accurate copy of the interoffice correspondence from Officer Taylor to Capt. Seklecki dated November 24, 2004.

72.    Attached hereto as Exhibit 94 is a true and accurate copy of the interoffice correspondence from Capt. Fletcher to Chief Anthony Scott dated November 26, 2004.

73.    Attached hereto as Exhibit 95 is a true and accurate copy of the interoffice correspondence from Capt. Monfette to Chief Anthony Scott dated November 26, 2004.

74.    Attached hereto as Exhibit 97 is a true and accurate copy of the interoffice correspondence from Tammy Walker to Chief Anthony Scott dated November 29, 2004.

75.    Attached hereto as Exhibit 98 is a true and accurate copy of the interoffice correspondence from Chief Anthony Scott to Tammy Walker dated November 30, 2004.

7

76.     Attached hereto as Exhibit 99 is a true and accurate copy of the Suspension Notification to Tammy Walker dated November 30, 2004.

77.     Attached hereto as Exhibit 100 is a true and accurate copy of the Notice of Chapter 31, Section 41 Discipline by Mayor Sullivan dated December 27, 2004.

78.     Attached hereto as Exhibit 101 is a true and accurate copy of the interoffice correspondence from Tammy Walker to Chief Anthony Scott dated December 12, 2004.

79.     Attached hereto as Exhibit 102 is a true and accurate copy of the Grievance Complaint of Tammy Walker dated December 13, 2004.

80.     Attached hereto as Exhibit 103 is a true and accurate copy of the Memorandum from Chief Anthony Scott dated January 5, 2005.

81.     Attached hereto as Exhibit 104 is a true and accurate copy of the transcribed recorded statement of Lt. Fournier dated December 28, 2004.

82.     Attached hereto as Exhibit 105 is a true and accurate copy of the correspondence from Chief Anthony Scott to Tammy Walker dated January 5, 2005.

83.     Attached hereto as Exhibit 106 is a true and accurate copy of the interoffice correspondence from Tammy Walker to Chief Anthony Scott dated December 20, 2004.

84.     Attached hereto as Exhibit 109 is a true and accurate copy of the Grievance Complaint of Tammy Walker dated December 20, 2004.

85.     Attached hereto as Exhibit 110 is a true and accurate copy of the transcribed recorded statement of Lt. Eva O'Connell dated December 29, 2004.

86.     Attached hereto as Exhibit 111 is a true and accurate copy of the so-called "whistleblower letter" dated February 15, 2005.

87.     Attached hereto as Exhibit 112 is a true and accurate copy of the so-called "whistleblower letter" dated May 4, 2005.

8

88.     Attached hereto as Exhibit 114 is a true and accurate copy of the correspondence from Mayor Sullivan to Tammy Walker dated March 18, 2005.

89.     Attached hereto as Exhibit 115 is a true and accurate copy of the correspondence from Mayor Sullivan to Tammy Walker dated April 18, 2005.

360996v1|3360996v1|

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14th DAY OF JUNE, 2007

Denise M. Tremblay

I hereby certify that this document, filed through the ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on June 14, 2007.

/s/ Carole Sakowski Lynch

10