UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-30074-MAP

_____

TAMMY WALKER,       )
      Plaintiff       )
                     )
v.                    )
                     )
CITY OF HOLYOKE,     )
      Defendant_____  )

PLAINTIFF TAMMY WALKER'S RESPONSES TO
DEFENDANT CITY OF HOLYOKE'S MOTION FOR SUMMARY JUDGMENT,
AND CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS;
AND PLAINTIFF'S RULE 56.1 CONCISE STATEMENT
OF ADDITIONAL MATERIAL FACTS

Now comes the plaintiff, Tammy Walker (hereinafter "plaintiff" or "Walker"), pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1, submits: (1) Walker's responses to the defendant City of Holyoke's (hereinafter "defendant" or "the city") statement of facts as to which defendant claims there is no genuine issue to be tried; (2) Walker's concise statement of additional material facts as to which Walker contends there is a genuine issue to be tried; (3) Plaintiff's statement of disputed issues of material fact; and (4) Plaintiff's memorandum of law.

I.    <u>PLAINTIFF'S RESPONSE TO DEFENDANT'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS</u>[1]

<u>PARTIES</u> (not controverted)

1.    Not controverted.

2.    Not controverted.

<u>OTHER KEY INDIVIDUALS</u> (controverted)

3.    Not controverted.

_____

[1] The plaintiff may or may not controvert these facts for purposes of summary judgment only. Plaintiff controverts all alleged facts neither provided pursuant to affidavit nor Fed. R. Civ. P. 56 (c).

4.      Not controverted.

5.      Not controverted.

6.      Not controverted.

7.      **Controverted as misleading**. Defendant's Exhibit 8, Deposition of Sgt. Monaghan at pp. 43-44 does not even mention (Sgt.) Garcia.

8.      Not controverted.

9.      Not controverted.

10.     Not controverted.

<u>CHRONOLOGY OF EVENTS</u> (controverted)

11.     Not controverted.

12.     Not controverted.

<u>PROMOTION BYPASS (6/20/1999)</u> (controverted)

13.     **Controverted as misleading**. Defendant's Exhibit 4 only shows April 15, 1999 as date of certification, but not date the named police officers took the civil service examination.

14.     Not controverted.

15.     Not controverted.

16.     **Controverted as misleading**. See Defendant's Exhibit 10. (Tammy Walker's MCAD/EEOC Discrimination Complaint).

17.     Not controverted.

18.     **Controverted as misleading**. In her October 15, 1999 MCAD Complaint Walker alleged that on June 9, 1999, the City interviewed candidates, discriminated against her, and denied her a promotion to the position of Police Sergeant because of her race and color and sex (female). In addition Walker alleged that she received a letter on <u>July 9, 1999</u> informing her that the city had bypassed her for the position of Police Sergeant. (Defendant Exhibit 10 at ¶ 5 and 10).

19.     **Controverted as misleading**. Officer Walker and the City entered into a Civil Service Settlement Agreement. The City was represented at the time by the City Solicitor. Walker's effective date of appointment as Sergeant (June 9, 1999) has not been declared erroneous by the Civil Service Commission. (Defendant Exhibit 12).

20.    **Controverted as misleading** insofar as it is alleged that Walker's seniority date of June 9, 1999 was erroneous.

21.    Not controverted.

22.    **Controverted as misleading**. Defendant's Exhibit 13 (cover letter) is dated July 16, 2002, not June 16, 2002, and Walker had no recollection of ever seeing the July 16 cover letter. Walker didn't sign the Assented to Motion to Amend Decision because she understood that she was being asked to give up her seniority.

PROBLEMS WITH SERGEANT MONAGHAN AND SERGEANT GARCIA (5/2002)
(controverted)

23.    Not controverted.

24.    **Controverted as misleading and inaccurate**. Lt. Whelihan's Affidavit does not specifically mention Walker's "June 9 1999" seniority date. In addition Lt. Whelihan admits that Walker told him that Monaghan had made an unprofessional comment on the police radio ("Lick it good") and Monaghan had sang ("You shouldn't go sticking your tongue where it don't belong") to her. (Defendant's Exhibit 14, Affidavit of Lt. Whelihan at ¶ 3 and 4).

25.    **Controverted as misleading and inaccurate**. Walker told Capt. Fletcher that Garcia and Monaghan were not talking to her. Fletcher responded by telling Walker he thought she was having problems because of her seniority date. In addition, Fletcher knew Walker had filed a complaint against Monaghan for the October 17, 2002 song ("You shouldn't go sticking your tongue where it don't belong"). Walker also told Fletcher that Monaghan had called her "Tyrone". (Def. Exhibit 4, Affidavit of Capt. Fletcher at ¶ 2, 4).

26.    Not controverted.

27.    **Controverted**.

28.    **Controverted**.

29.    **Controverted**,

30.    Not controverted.

POLICE RADIO (WMLEC) TRANSMISSIONS (6/20/2002) (controverted)

31.    Not controverted.

32.    Not controverted.

33.  **Controverted as misleading**. In addition to the "lick it, lick it good" comment over WMLEC, Walker heard Monaghan sing directly to her, "Don't go sticking your tongue where it don't belong."

34.  Not controverted.

35.  **Controverted as misleading and incomplete**. Rodriguez testified that "every time" Walker finished a transmission or conversation over the Holyoke Police Department radio, someone sounding like Monaghan would broadcast over WMLEC singing, "lick it now, lick it good, lick it real good," or make other comments like "el freako" or meowing like a fighting cat. (Def. Exhibit 5, Deposition of Rodriguez at pp. 75-77, 81 and Exhibit 16, IOC from Rodriguez [marked as Exhibit 5 at Rodriguez's deposition] ).

36.  **Controverted as misleading**. In his Dec. 04, 2002, IOC, Rodriguez said, "I can't give you an exact date or time… but I started noticing the communications about three weeks ago…."

37  Not controverted.

38.  **Controverted as incomplete**. Rodriguez was Monaghan's partner and they rode in the same car for more than a year. Rodriguez had heard Monaghan's voice almost a thousand times, and 4 or 5 days a week for many years. (Deposition of Rodriguez at pp. 45-46, and 92).

39.  Not controverted.

40.  Not controverted.

41.  Not controverted.

42.  Not controverted.

43.  Not controverted.

44.  **Controverted**. Walker made complaints to her supervisors including Sgt. Lenihan. (See Amended Complaint at ¶ 15, 20, and 2, and Plaintiff's Exhibit 10, Walker's pro se [answers] to Defendant's Interrogatories at ¶ 12).

45.  Not controverted.

46.  **Controverted as incomplete**. Officer Kenneth Moriarty's Affidavit is not dated.

47.  Not controverted.

48.  Not controverted.

<u>RACIST REMARKS ABOUT CHIEF SCOTT</u> (not controverted)

49.     Not controverted.

50.     Not controverted.

51.     Not controverted.

52.     Not controverted.

53.     Not controverted.

54.     **Controverted as inaccurate and incomplete**. (Fletcher Deposition at pp. 151).

55.     Not controverted.

<u>"TYRONE"</u> (not controverted)

56.     Not controverted.

57.     Not controverted.

58.     Not controverted.

59.     **Controverted as to first sentence**. Not controverted as to remainder of paragraph.

60.     Not controverted.

61.     Not controverted as to first sentence. The remainder of paragraph is **controverted as misleading**.

62.     Not controverted.

63.     Not controverted.

64.     Not controverted.

65.     Not controverted.

<u>7-ELEVEN INCIDENT (10/15/2002)</u> (controverted as incomplete)

66.     Not controverted.

67.     **Controverted as incomplete**.

68.     **Controverted as incomplete**.

69.     Not controverted.

70.     Not controverted.

OFFENSIVE SONG (10/17/2002) (controverted as incomplete:
"You Shouldn't Go Sticking Your Tongue Where It Don't Belong")

71.     **Controverted as inaccurate**. Walker never "saw" Sgt. Monaghan speaking with the 7-11 clerk.

72.     Not controverted.

73.     Not controverted.

74.     Not controverted.

75.     Not controverted.

76.     Not controverted.

77.     **Controverted** insofar as it is alleged "everyone on the shift was interviewed." Jorge Rodriguez was not interviewed after he provided specific information of the harassment of Walker. (Plaintiff Exhibit 2, Rodriguez Deposition at pp 107).

78.     Not controverted.

79.     Not controverted.

80.     **Controverted as misleading and incomplete**.

ELIZUR'S PUB INCIDENT (controverted as incomplete)

81.     Not controverted.

82.     Not controverted.

83.     Not controverted.

84.     Not controverted.

85.     Not controverted.

86.     Not controverted.

87.     **Controverted as inaccurate**.

88.    **Controverted as incomplete and misleading** concerning the timing of the verbal reprimand.

89.    Not controverted as to sentence one and two. **Controverted as to third sentence**.

90.    **Controverted as inaccurate**. (Defendant's Exhibit 6, Walker Deposition at pp. 204).

91.    Not controverted as to the first and third sentence. **The second sentence is controverted and inaccurate**.

92.    **Controverted as to first sentence**. Not controverted as to second sentence.

93.    **Controverted as to accuracy** of date not referenced in Defendant's Exhibit 1.

94.    **Controverted** insofar as Defendant's Exhibits 29 and 30 do not show Chief Scott asked either Whelihan or Fletcher to submit inter-office communications ("IOCs").

95.    Not controverted.

96.    Not controverted.

97.    Not controverted.

98.    Not controverted.

99.    Not controverted.

100.   Not controverted.

101.   **Controverted as inaccurate**.

102.   Not controverted.

103.   Not controverted.

104.   Not controverted.

105.   Not controverted.

106.   **Controverted as inaccurate third paragraph**. First and second paragraphs not controverted.

107.   **First sentence controverted as inaccurate determination**. Second sentence not controverted.

108.   Not controverted.

109.   **Controverted as incomplete**. (Defendant's Exhibit 6, Walker Deposition at pp. 203).

110.   Not controverted.

<u>LATE COURT APPEARANCE (APRIL 2004)</u> (controverted)

111.   Not controverted.

112.   Not controverted.

113.   Not controverted.

114.   Not controverted.

115.   Not controverted.

116.   Not controverted.

117.   Not controverted.

<u>TERRORISM THREAT INCIDENT (7/23/2004)</u> (controverted)

118.   Not controverted.

119.   **Controverted as unverifiable information not provided under affidavit**.

120.   Not controverted.

121.   Not controverted.

122.   Not controverted.

123.   Not controverted.

124.   Not controverted.

125.   Not controverted.

126.   Not controverted.

127.   Not controverted.

128.   Not controverted.

129.   Not controverted.

130.  Not controverted.

131.  Not controverted.

132.  Not controverted.

133.  Not controverted.

<u>DISRESPECT (9/6/2004) AND VERBAL ASSAULT<br>BY SGT. MONAGHAN (9/9/2004)</u> (controverted)

134.  Not controverted.

135.  Not controverted.

136.  Not controverted.

137.  Not controverted.

138.  Not controverted.

139.  Not controverted.

140.  Not controverted.

141.  First sentence not controverted. **Second sentence controverted as inaccurate**.

142.  Not controverted.

143.  Not controverted.

144.  Not controverted.

145.  **Controverted as misleading**.

146.  Not controverted.

147.  Not controverted.

148.  Not controverted.

149.  Not controverted.

150.  Not controverted.

151.  Not controverted.

152.    Not controverted.

153.    Not controverted.

154.    Not controverted.

REPORT OF DISPATCHING CRUISERS VIA E-MAIL (controverted as incomplete)

155.    Not controverted.

156.    **First sentence controverted as incomplete and misleading**. "Walker believed that this practice posed a serious risk to the health and safety of the police officers and the public, as well as herself." (Walker's Amended Complaint at ¶ 35-36).

157.    Not controverted.

158.    Not controverted.

159.    Not controverted.

160.    Not controverted.

161.    **Controverted as unverifiable, and not produced pursuant to affidavit or Fed.R.Civ.P.56 (c)**.

162.    Not controverted.

163.    Not controverted.

164.    Not controverted.

165.    Not controverted.

166.    Not controverted.

167.    Not controverted.

168.    Not controverted.

169.    Not controverted.

170.    Not controverted.

171.    **Controverted as misleading and inaccurate**. Walker testified that Lt. O'Connel "was very upset" and she knew that Lt. O'Connel was upset because "I could feel it from her."

172.   Not controverted.

173.   Not controverted.

174.   Not controverted.

175.   Not controverted.

176.   Not controverted.

177.   **Controverted as misleading and unverifiable pursuant to Fed.R.Civ.P. 56(c)**.

178.   **Controverted as misleading and unverifiable pursuant to Fed.R.Civ.P. 56(c)**.

179.   **Controverted as misleading and unverifiable pursuant to Fed.R.Civ.P. 56(c)**.

180.   **Controverted as unverifiable pursuant to Fed.R.Civ.P. 56(c)**.

181.   **Controverted as unverifiable pursuant to Fed.R.Civ.P. 56(c)**.

182.   **Controverted as unverifiable pursuant to Fed.R.Civ.P. 56(c)**.

183.   Not controverted.

184.   Not controverted.

185.   **Controverted as unverifiable pursuant to Fed.R.Civ.P. 56(c)**.

186.   Not controverted.

187.   **Controverted as incomplete**.

188.   Not controverted.

189.   **Controverted as misleading**. Walker didn't check with Officer Moriarty about any problem with her radio in her police vehicle. (Defendant Exhibit 56, Deposition of Walker, Vol. II at p. 35).

190.   Not controverted.

191.   Not controverted.

192.   Not controverted.

193.   Not controverted.

194.   Not controverted.

195.   Not controverted.

196.   Not controverted.

197.   Not controverted.

198.   Not controverted.

199.   Not controverted.

200.   Not controverted.

201.   Not controverted.

202.   **Controverted as incomplete**.

203.   Not controverted.

204.   Not controverted.

205.   Not controverted.

206.   Not controverted.

207.   Not controverted.

208.   Not controverted.

209.   Not controverted.

210.   Not controverted.

211.   Not controverted.

212.   Not controverted.

213.   Not controverted.

214.   Not controverted.

215.   Not controverted.

216.   **Controverted as incomplete**.

217.   Not controverted.

218.   Not controverted.

219.   Not controverted.

220.   Not controverted.

221.   Not controverted.

222.   Not controverted.

223.   Not controverted.

224.   Not controverted.

225.   Not controverted.

226.   **Controverted as inaccurate**. Reference to supporting Defendant Exhibit 100 inapplicable.

227.   Not controverted.

228.   **Controverted as inaccurate**. Reference to supporting Defendant Exhibit 100 inapplicable.

229.   Not controverted.

230.   Not controverted.

231.   Not controverted.

232.   Not controverted.

233.   Not controverted.

234.   Not controverted.

235.   Not controverted.

<u>COMPLAINT AGAINST LT. O'CONNOR FOR MEMO REGARDING INSIDE DUTY</u> (not controverted)

236.   Not controverted.

237.   Not controverted.

238. **Controverted as incomplete**.

239. Not controverted.

240. Not controverted.

241. Not controverted.

242. Not controverted.

243. Not controverted.

244. Not controverted.

245. Not controverted.

246. Not controverted.

247. **Controverted as incomplete**.

<u>WHISTLEBLOWER CLAIM</u> (not controverted)

250. Not controverted.

251. **Controverted as misleading and inaccurate**. Walker only testified that "She [O'Connor] pulled the book out of my hand." (Defendant Exhibit 56, Walker Deposition Vol. II at 107-108).

252. **Controverted as incomplete**.

253. Not controverted.

254. **Controverted**.

255. **Controverted**.

256. **The first sentence is controverted**. The second and third sentences are not controverted.

257. **Controverted as inaccurate**.

258. Not controverted.

259. Not controverted.

260. Not controverted.

261.  **Controverted**.

262.  Not controverted.

263.  Not controverted.

264.  Not controverted.

265.  **Controverted as inaccurate and misleading**.

266.  Not controverted.

267.  **Controverted**.

268.  **Controverted as misleading and inaccurate**.

269.  Not controverted.

270.  Not controverted.

271.  Not controverted.

272.  Not controverted.

<u>OVERVIEW OF COMPLAINT</u> (controverted)

273.  Not controverted.

274.  **Controverted as incomplete**.

275.  **Controverted as incomplete**.

276.  **Controverted as incomplete**.

277.  **Controverted as incomplete**.

278.  **Controverted as incomplete**.

279.  **Controverted as incomplete**.

280.  **Controverted as incomplete**.

281.  **Controverted as incomplete**.

282.  **Controverted as incomplete**.

283.   **Controverted as incomplete**.

284.   **Controverted as incomplete**.

285.   **Controverted as incomplete**.

286.   **Controverted as incomplete**.

287.   **Controverted as incomplete**.

II.   WALKER'S CONCISE STATEMENT OF ADDITIONAL FACTS AS TO WHICH
      WALKER CLAIMS THERE IS A GENUINE ISSUE TO BE TRIED.

1.   04-27-93 – Tammy Walker (hereinafter "Walker") became a reserve officer.
     (Deposition of Walker Vol. I, at pp. 12).[2]

2.   Oct. 2005 – Dec. 2005:  Walker worked for American Red Cross after employment
     terminated at Holyoke Police Dept (hereinafter "HPD). (Deposition of Walker at pp. 12-
     13).

3.   Harassment that happened at HPD included the name calling by Sgt. Monaghan.
     (Deposition of Walker at pp. 24).

4.   July 19, 1993  Ms. Walker was appointed a full-time police officer for HPD by Mayor
     Hamilton. (Deposition of Walker at pp. 35).

5.   Ms. Walker became a Sergeant in 2002. (Deposition of Walker at pp. 35).

6.   Ms. Walker's position with DEA was terminated n May of 2002 when she was
     promoted to Sergeant, and there were no complaints with DEA .(Deposition of Walker
     at pp. 36).

7.   Ms. Walker disagrees with Chief Scott, that DEA asked him to remove her from task
     force. (Deposition of Walker at pp. 37).

8.   Ms. Walker worked same shift as John Monaghan in 1994, 12:00 AM to 8:00 AM.
     (Deposition of Walker at pp. 38).

9.   Ms. Walker worked with Joseph Garcia on same shift (4 to 12) prior to being a sergeant.
     (Deposition of Walker at pp. 41).

10.  Ms. Walker took Sergeant exam and received a score of 80.

11.  On June 9, 1999, Ms. Walker notified she was bypassed when Mayor Szostkiewicz
     appointed Joseph Garcia to Sergeant. (Deposition of Walker at pp. 44-45).

12.  Walker appealed civil service bypass regarding Joseph Garcia. (Deposition of Walker at
     pp. 49).

---

[2] Deposition of Walker refers only to Vol. I (09/26/06).

13.   Walker and city agreed she would receive retroactive seniority to June 9, 1999.
      (Deposition of Walker at pp. 51).

14.   Walker had seniority over Joseph Garcia. (Deposition of Walker at pp. 51-52).

15.   Walker filed an MCAD complaint in 1999 as a result of being bypassed for police
      sergeant. (Deposition of Walker at pp. 52-53).

16.   Denise Duguay, a female, was bypassed for Sergeant position while two male officers
      (Daniel Fallon and Christopher Stevenson) were selected (Deposition of Walker at pp.
      52), even though they ranked lower than Duguay.

17.   Walker was appointed sergeant on May 5, 2002 by Mayor Sullivan. ( Deposition of
      Walker at pp. 67).

18.   After Walker gained seniority over Garcia is when the hostile environment started;
      Garcia refused to speak to Walker; and walker reported Garcia not speaking to her, to
      Sergeant Lenihan (Deposition of Walker at pp. 71), and to Whelihan (Deposition of
      Walker at pp. 74) in May to June 2002. (Deposition of Walker at pp. 74). John
      Monaghan became more hostile and negative after Walker became a Sergeant.
      (Deposition of Walker at pp. 76-77, 81-81).

19.   Monaghan verbally attacked Walker, by "going over the air after (Walker) spoke on the
      HPD frequency. Monaghan would say 'lick it, lick it good' on a different frequency."
      (Deposition of Walker at pp. 81).

20.   Monaghan told Walker to "start packing her bags", and "don't go sticking your tongue
      where it don't belong." (Deposition of Walker at pp. 81).

21.   Walker never had problems with patrol officers; the only individuals she had problems
      with after she became sergeant were John Monaghan and Joseph Garcia. (Deposition of
      Walker at pp. 84).

22.   Capt. Fletcher said that Walker's seniority date was incorrect and that any problems that
      Walker was having would go away if Walker would just change the date. (Deposition of
      Walker at pp. 84).

23. Previously, Walker had spoken to Capt. Fletcher about Monaghan and Garcia. She then went up to Chief Scott to talk to him about the discrimination (harassment), and hostile working environment of no communication that was happening on 12:00 AM to 8:00 AM shift with Sgt. Garcia and Sgt. Monaghan. Chief Scott told Walker to go back to Capt. Fletcher. (Deposition of Walker at pp. 85-87).

24. Nothing (discrimination, harassment, hostile environment) changed after Walker spoke with Captain Fletcher about Sgt. Monaghan and Sgt. Garcia not speaking to her and about them staying in the station for first 4 hours at the beginning of their shift, and Walker being the only Sgt. On the road. (Deposition of Walker 86-87).

25. Walker considers herself to be a "lesbian".

26. In August 2002, Walker dated a woman for six days, who was a matron at HPD, and HPD officers knew walker was a lesbian. (Deposition of Walker at pp. 101, 105).

27. Capt. Fletcher didn't want Walker to write report on Elizer's Pub incident. (Deposition of Walker at pp. 106).

28. Walker reported to Chief Scott that Sgt. Monaghan and Sgt. Garcia we at 7-Eleven intimidating the clerk about Walker's arrest of Lee Moran (they were investigating an October 15, 2002 arrest by their superior officer). (Deposition of Walker at pp. 124-126).

29. Walker filed an internal complaint on Oct. 25, 2002 about Sgt. Monaghan leaning over her desk and singing song on 10/17/02 "you shouldn't go sticking your tongue where it don't belong". (Deposition of Walker at pp. 133-135). Walker was embarrassed and humiliated by the song. (Deposition of Walker at pp. 136,138).

30. Sgt. Monaghan was referring to Walker's sexual orientation: being a lesbian (Deposition of Walker at pp. 140)

31. Sgt. Walker had asked Sgt. Lenihan to speak with Sgt. Garcia and Sgt. Monaghan, since Lenihan was her next chain in command, and he simply said he didn't want to get involved, and told Walker "don't make waves". (Deposition of Walker at pp. 73, 141).

32. On Oct. 25, 2002, Sgt. Walker filed an internal complaint alleging race and sex orientation discrimination dated Oct 24, 2002, that on or about Sept. 2002, Sgt

19

Monaghan referred to Walker as "Tyrone" which conjured up an "African American male". Walker presumed that "Monaghan" felt that she is a male instead of a female. (Deposition of Walker at pp. 141, 148).

33. Sgt. Walker attended meeting with Capt. Fletcher, Lt. Whelihan, and John Monaghan and requested that Monaghan stop "harassing" her. (Deposition of Walker at pp. 154).

34. WMLEC: after Sgt. Walker finished her conversation on WMLEC, Sgt. Monaghan would get on WMLEC and say "lick it, lick it good". (Deposition of Walker at pp. 155, 162).

35. Sgt. Walker heard "lick it good" once. (Deposition of Walker at pp. 162).

36. Sgt Walker "knows" Sgt. Monaghan's voice. She had ridden with Monaghan in the cruiser, and she had thousands of conversations with Sgt. Monaghan. (Deposition of Walker at pp. 162-163).

37. Sgt. Walker "knows" it was Sgt. Monaghan who said "lick it, lick it good" over WMLEC. (Deposition of Walker at pp. 169-170).

38. Walker verbally reported to Lt. Fournier of Internal Affairs, about the "lick it, lick it good" statement she knows Sgt. Monaghan made over WMLEC after she transmitted over the Holyoke Radio.(Deposition of Walker at pp. 172).

39. Sgt. Walker testified that the "lick it, lick it good" statement by Sgt. Monaghan was disgusting, vulgar, and humiliating. (Deposition of Walker at pp. 172).

40. Sgt. Monaghan made a disparaging remark around June 19, 2004, about chief Scott, "Uncle Charlie dun come wit anutter order", which to Sgt. Walker meant "uncle Tom, black man trying to be a white man." (Deposition of Walker at pp. 175-176).

41. Sgt. Monaghan stated in Sgt. Walker's presence that he would rather have the Pakistanis come and live in Holyoke than have Somalis come with 15 to 20 kids in each family. (Deposition of Walker at pp. 18).

42. Walker received her first Discipline ever in HPD after 11- 15 years. (Deposition of Walker at pp. 185-186).

43. Walker reported the Elizer's Pub incident of June 23, 2003 to Lt. Whelihan. (Deposition of Walker at pp. 186, 192).

44. Walker told Capt. Fletcher about the Elizer's Pub incident, and said she was going to be doing a report on it. (Deposition of Walker at pp. 193).

45. Capt Fletcher said: "If you do a fucking report you fucking sign it because I'm not fucking signing it." (Deposition of Walker at pp. 193).

46. Walker intended to write an incident report, not a discipline report, but Capt. Fletcher didn't want any thing in writing about the Elizer's Pub incident, of making a prank call to a police department, which is against the law. (Deposition of Walker at pp. 196).

47. Capt. Fletcher did not tell Walker to write report and give it to him. (Deposition of Walker at pp. 197).

48. Sgt. Walker called Chief Scott and asked him, "what do you want me to do with this?" (Elizer's Pub) Chief Scott told Sgt. Walker to do her job. (Deposition of Walker at pp. 198).

49. A couple of days later, Sgt. Walker wrote up an incident report, not a disciplinary report, and gave it to Chief Scott. (Deposition of Walker at pp. 199, 201).

50. Sgt. Walker received a reprimand from Chief Scott for disobeying a direct order and violating chain of command, as a result of giving the report on the Elizer's Pub incident to Chief Scott and not Capt. Fletcher. (Deposition of Walker at pp. 202-203).

51. Walker was 7 minutes late for court on April 6, 2004 and was suspended by Chief Scott for a day. (Deposition of Walker at pp. 207, 214).

52. Walker appealed the one day suspension which was upheld by Mayor Sullivan. (Deposition of Walker at pp. 214).

53. On July 23, 2004 dispatcher Brenda Therrin handed off to Sgt. Walker an "information call" regarding a woman wanting to know what she should do if she saw someone videotaping Holyoke Mall. (Deposition of Walker at pp. 225, 228).

54. Sgt Walker was suspended by chief Scott for the Holyoke Mall incident. (Deposition of Walker at pp. 250, 239).

55. Address is 131 Whiting Farms Road, Holyoke. (Deposition of Rodriguez at pp. 10).

56. Feb. 6, 2004 Patrolman Rodriguez retired because of nervous and physical condition. (Deposition of Rodriguez at pp. 10, 15-16).

57. Rodriguez worked the same shift as Walker: Midnight to 8:00 in '95 or '98 for more than one (1) year. (Deposition of Rodriguez at pp. 33-34, 38).

58. John Monaghan worked same shift as Walker. (Deposition of Rodriguez at pp. 35).

59. Monaghan and Walker seemed to get along until Tammy promoted to Sgt. (Deposition of Rodriguez at pp. 37).

60. Rodriguez worked same 12:00 AM (midnight) to 8:00 AM shift from 1995 until retirement; for 15 years. (Deposition of Rodriguez at pp. 39).

61. Both Sgt. Walker and Sgt. Monaghan worked four to twelve shifts before they became Sergeants. (Deposition of Rodriguez at pp. 40).

62. Rodriguez worked overtime, once per week, on the four to twelve shift with Monaghan and Walker. (Deposition of Rodriguez at pp. 41).

63. In 1995, Rodriguez worked together with John Monaghan as a partner on 12:00 AM to 8:00 AM;, riding in the same car together for more than a year. (Deposition of Rodriguez at pp. 45-46).

64. Rodriguez believed Sgt. Monaghan would not serve him gas because Monaghan knew Rodriguez had given statement in Sgt. Walker's Internal Affairs investigation about remark that went over the air on the WMLEC against Sgt. Walker. (Deposition of Rodriguez at pp. 53-54).

65. Day after Rodriguez testified in Sgt. Wagner's Federal Court case, someone left note in his mailbox that said "rat". (Deposition of Rodriguez at pp. 64).

66. Lt Fournier investigated "rat" note for Internal Affairs but didn't follow-up with Rodriguez. (Deposition of Rodriguez at pp. 64).

67. Lt. Fournier did not fairly work up the (IAD) cases. He goes to the Chief's side – he doesn't investigate. (Deposition of Rodriguez at pp. 65).

22

68. Rodriguez prepared an interoffice communication (IOC) as a result of receiving questionnaire about remarks he heard over WMLEC. (Deposition of Rodriguez at pp. 74).

69. Immediately after Sgt. Walker ended her transmission (talk) on HPD radio, heard over the WMLEC following comments:  someone singing rap song "lick it now, lick it real good, lick it real good (Deposition of Rodriguez at pp. 75-76); and I am freak-out, el freako. (Deposition of Rodriguez at pp. 75, 90).

70. It sounded like Monaghan's voice. (Deposition of Rodriguez at pp. 77, 91).

71. Rodriguez heard the lick it song over the WMLEC once or twice a night in 2002. (Deposition of Rodriguez at pp. 80-81).

72. Rodriguez testified that "lick it now. Lick it good song" had to do with Walker's sexual preference, being a lesbian. (Deposition of Rodriguez at pp. 83).

73. Rodriguez observed Sgt. Monaghan playing around on WMLEC once or twice. (Deposition of Rodriguez at pp. 84).

74. Rodriguez had heard Sgt. Monaghan's voice probably a thousand times, and heard Monaghan's voice 4 or 5 days a week for many years. (Deposition of Rodriguez at pp. 92).

75. Rodriguez thought he could recognize Sgt. Monaghans's voice. (Deposition of Rodriguez at pp. 92).

76. Rodriguez wrote in IOC that he couldn't say with certainty that Sergeant Monaghan did the talking (over WMLEC) but the voice sound like his. (Deposition of Rodriguez at pp. 93).

77. When Sgt. Walker was using the HPD radio to assist her in gassing up cars, or working a regular shift, Rodriguez heard someone going over WMLEC radio singing "lick it, lick it good; meowing like a fighting cat, and saying "el freako", after Sgt. Walker ended her transmission (over HPD radio). (Deposition of Rodriguez at pp. 89, 105).

78.  Rodriguez would hear officers  meowing like a fighting cat sound three times a night after Sgt. Walker finished her transmission. (Deposition of Rodriguez at pp. 95-96)

79.  The fighting cat meowing sound was heard by Rodriguez 3 or 4 times a month or more after Sgt. Walker ended a transmission. (Deposition of Rodriguez at pp. 96).

80.  Rodriguez observed many times that Emil Morales was meowing like a fighting cat after Walker ended a transmission a few times.  Morales did it over HPD radio. (Deposition of Rodriguez at pp. 96-97).

81.  Supervisors heard Emil Morales over HPD radio and would not say any thing. (Deposition of Rodriguez at pp. 98).

82.  Rodriguez noticed that Monaghan's attitude toward him changed after he wrote the IOC e.g. the gas incident where Monaghan refused to serve Rodriguez gas for more than 20 minutes, one to two weeks after Rodriguez prepared answers to the questionnaire. (Deposition of Rodriguez at pp. 50, 103-104).

83.  Lt. Fournier neither followed up or questioned Rodriquez again after he provided answers to the questionnaire concerning what he witnessed being said concerning Sergeant Walter. (Deposition of Rodriguez at pp. 107).

84.  Dec. 4, 2002 Sgt.  Lenihan stated during roll call to a group of officers "that we all had to stick together" referring to Sgt. Walkers charge of harassment (Deposition of Rodriguez at pp. 108-109) against Sgt. Monaghan.  This statement was made the same day that it became known Sgt. Walker had a complaint against Sgt. Monaghan. (Deposition of Rodriguez at pp. 108-109-110).

85.  During roll call, officers were saying that any officer that came foreword on behalf of Sgt. Walker should be fired.  The officers are supposed to stick together in a brotherhood. (Deposition of Rodriguez at pp. 111-112).

86.  Rodriguez heard officers refer to Chief Scott as "Uncle Charlie". (Deposition of Rodriguez at pp. 117).

87.  Rodriguez believed the "Uncle Charlie" comments were racist. (Deposition of Rodriguez at pp. 118).

88.  Rodriguez heard statement: "Uncle Charlie dun come out with another order."
     (Deposition of Rodriguez at pp. 120).

89.  Rodriguez believed that "[A]n atmosphere exists at the Holyoke Police Dept. that
     condones racism and encourages retaliation they take after someone…goes against
     their brotherhood." (Rodriguez Deposition Exhibit 6).

90.  It was a safety issue if an officer needed a radio for an emergency and the radio,
     WMLEC, was tied up. (Deposition of Rodriguez at pp. 136).

91.  It was a safety issue if assistance was needed concerning a member of the public.
     (Deposition of Rodriguez at pp. 136).

92.  Rodriguez connected the "El freako" comments over WMLEC to Walker's sexual
     identity, saying Ms. Walker was like a male. (Deposition of Rodriguez at pp. 138-
     139).

93.  Rodriguez heard Monaghan stated over (radio) the air "this ain't no San Juan"
     after Rodriguez filed IOC on behalf of Sgt. Walker.  Monaghan was contrasting
     officers in San Juan ratting on each other, unlike the HPD Brotherhood.
     (Deposition of Rodriguez at pp. 140).

94.  Supervisors:  Sgt. Monaghan and Sgt. Garcia worked same night shift and heard
     the "meowing" and/or "cat fighting" over the WMLEC and the radio, which was
     on all the time, and didn't do anything. (Deposition of Rodriguez at pp. 142).

95.  Also, Lt. O'Connell, Lt. Whelihan, Lt. Lenihan, and Capt. Fletcher were
     supervisors who would have been working third shift, when the radio and
     WMLEC were on, and the meowing cat fighting noises were coming over the
     WMLEC radio, and they didn't do anything. (Deposition of Rodriguez at pp. 143-
     144, 167-168).

96.  Other officers: Detective Egan, (Assault on Hispanic); Sgt. Monaghan (refused to
     serve Rodriguez gas, and Elizer's pub incident) did things which violated HPD
     rule or procedures and should have subjected them to discipline but they were not
     disciplined. (Deposition of Rodriguez at pp. 147-149).

97. Rodriguez heard officers trying to imitate a black dialect. (Deposition of Rodriguez at pp. 156-157).

98. Rodriguez knows that Sgt. Duguay and Lt. O'Connell made complaints about sex discrimination. (Deposition of Rodriguez at pp. 162).

99. Rodriguez was in the station and supervisors dispatchers laughed about Meowing over the radio. (Deposition of Rodriguez at pp. 167).

100. Sgt. Walker made Internal Office complaint (IOC) to Chief Scott regarding her conversation with Captain Fletcher regarding "IAD# 04-26 investigation not conducted properly and that crimes and misuse of NCIC had occurred". (Fletcher Deposition at pp. 47).

101. Chief Scott told Capt. Fletcher that Sgt. Walker had complained to the Attorney General or to the FBI concerning misconduct within the HPD. (Fletcher Deposition at pp. 51).

102. Sgt. Walker had complained to the Attorney General and FBI regarding misconduct within HPD, having to do with not recording or altering the tapes the record transmissions through National Crime Information Center (NCIC) and Criminal History Board. This federal and state (Registry) data included warrants and license plates record checks on individuals. (Fletcher Deposition at pp. 51-55).

103. Capt. Fletcher and all HPD officers knew of Sgt. Walker's sexual orientation (lesbian). (Fletcher Deposition at pp. 64-66).

104. Sgt. Walker reported to Capt. Fletcher that Monaghan referred to her a Tyrone. (Fletcher Deposition at pp. 65).

105. Capt. Fletcher told Walker that once she corrected her seniority date, which preceded some of the other Sergeants, he thought everything would work out. (Fletcher Deposition at pp. 70).

106. Capt. Fletcher never concluded that it was Sgt. Walker who was at fault for the June 9, 1999 seniority date. (Fletcher Deposition at pp. 74).

107. Chief Scott has been Chief since 2001. (Fletcher Deposition at pp. 93).

108. Sgt. Robert Wagner was suspended several times. Sgt. Wagner was suspended for many things on many occasions. (Fletcher Deposition at pp. 123-126).

109. Mayor Michael Sullivan can hold a hearing or appeal of suspensions. (Fletcher Deposition at pp. 127).

110. In September of 2002, Sgt. Walker told Capt. Fletcher that Sgt. Garcia and Monaghan were not talking to her. (Fletcher Deposition at pp. 136).

111. Sgt. Walker was the only black female Sgt. In September 2002. (Fletcher Deposition at pp. 143).

112. On October 21, 2002, Capt. Fletcher held a meeting with Sgt. Walker, Sgt. Monaghan, and Lt. Wheilan for the purpose of finding out what was gong on: whether or not there was any retaliation or racial harassment or sexual harassment against Sgt. Walker. (Fletcher Deposition at pp. 151).

113. Scott became Chief of Police in city of Holyoke on May 2nd, 2001. (Scott Deposition at pp. 8).

114. At the time of Tammy Walker's termination, the permanent police force was composed of the following:

> 93 officers, 4 Captains, 7 Lieutenants, 15 Sergeants, 1 Chief

Female police were as follows:

> 2 Uniform Officers, 2 Detectives, 2 Lieutenants, 1 Sergeant

(Scott Deposition at pp. 12 and 21-22).

115. After Sgt. Walker was terminated, the Mayor filled her position with a white male. (Scott Deposition at pp. 14 and 22.).

116. Only two of all police officers were female. (Scott Deposition at pp. 16).

117. Sgt. Joseph Garcia and Sgt. John Monaghan are white males. (Scott Deposition at pp. 21).

118. Rodriguez filed a complaint with the Police Department in 2003 alleging retaliation against him for having given information in support of Sgt. Walker's allegations of gender and race discrimination. (Scott Deposition at pp. 27).

119. Sgt. Monaghan was not promoted until after Sgt. Walker. The Civil Service Agreement between Walker and the City had nothing to do with Monaghan, but did affect Sgt. Garcia when Walker received more seniority than Sgt. Garcia did. (Scott Deposition at pp. 44).

120. Scott never evaluated Walker's job performance. (Scott Deposition at pp. 49-50).

121. In every suspension that Chief Scott issued to Walker, he included the past disciplinary actions. (Scott Deposition at pp. 61-62).

122. Ms. Walker complained to the state Criminal Justice Information System CJIS), the federal National Crime Information System (NCIS), and the FBI about Lt. O'Connell's making the dispatch calls via e-mail as opposed to radio. The FBI deferred their investigation to CJIS. (Scott Deposition at pp 73).

123. Walker filed her federal court complaint before she was terminated. (Scott Deposition at pp. 77).

124. Walker filed a complaint that there were occasions when after ending a radio transmission, Sgt. Monaghan would said "Lick it, lick it good." (Scott Deposition at pp. 80).

125. Sgt. Walker made a complaint that Sgt. Monaghan referred to her as "Tyrone". (Scott Deposition at pp. 85).

126. Sgt. Walker complained that Sgt. Monaghan sang in her ear, "You shouldn't go sticking your tongue where it don't belong." (Scott Deposition at pp. 86).

127. Rodriguez informed Chief Scott that he believed he was retaliated against for providing information favorable to Sgt. Walker. (Scott Deposition at pp. 95).

128. Chief Scott denied Walker's requests to have medical attention for injury described as scheduling book jerked from her hands on 02-25-05. (Scott Deposition at pp. 111).

129. Scott neither told Ms. Walker that she needed to provide some medical proof of injury nor M.D. statement. (Scott deposition at pp. 113).

130. Scott knew Walker reported Sgt. Monaghan singing into her ear: "You shouldn't be sticking your tongue where it doesn't belong." (Scott Deposition at pp. 126).

131. Scott knew Walker was a Lesbian. (Scott Deposition at pp. 127).

132. John Francis Monaghan: "Sgt. Monaghan is a Caucasian male." (Deposition of Sgt. Monaghan at pp. 9).

133. Officer Walker scored 80 points on the Civil Service Examination for Sergeant, and Joseph Garcia scored 78. Garcia was added to the April 15, 1999 certified list of candidates for promotion to Sergeant, and Walker was bypassed in favor of Garcia by the former mayor. (Defendant Exhibit 8 and 9).

134. Denise Dugay, a female officer who had scored the highest on five previous civil service certified lists for Sergeant, was bypassed on all five occasions, until she won her appeal and was promoted to Sergeant. (Defendant's Exhibit 10: Discrimination Complaint, and Exhibit 11: Civil Service Appeal marked as Exhibit 1 to Walker Deposition, Vol. I; and Plaintiff Exhibit 12).

135. Sgt. Monoghan and Sgt. Garcia refused to communicate with Walker; Garcia refused to give Walker training as a Sergeant On the streets, as well as inside paper work; Walker did not know what co-workers were doing; and Monaghan affected Walker's relation with her subordinates. (Plaintiff Exhibit 10, Walker's pro se Answers to Defendant's Interrogatories at ¶ 15).

136. In IAD case # 04-26, IOC finding dated January 11, 2005, from Lt. Fournier to Chief Scott: "Sgt. Walker expressed concerns that this [dispatching cruisers by computers rather than radio] involved officer safety because other officers could not hear them being dispatched." (Defendant Exhibit 76; and Plaintiff Exhibit 5 at pp. 93).

137. Lt. O'Connel monitored police radio communications in November, 2004 when on duty. (Plaintiff Exhibit 5 at pp. 119-120).

138. Sgt. Robert Wagner worked the same shift as Walker under Lt. O'Connell. (Plaintiff Exhibit 5 at pp. 118).

139. Sgt. Wagner filed an IOC on March 31, 2003 alleging that Mayor Sullivan, State Rep. Michael F. Kane, and Capt. Fletcher participated in ordering Sgt. Garcia to undo an arrest. All of Wagner's allegations against superior officers and officials were determined to be unfounded. (Plaintiff Exhibit 14). Sergeant Wagner filed three (3) complaints against Chief Scott, which resulted in Chief Scott being exonerated on all 3 complaints. (Plaintiff Exhibit 18).

140. Sgt. Wagner filed three(3) complaints against Chief Scott, which resulted in Chief Scott being "exonerated" on all 3 complaints. (Plaintiff Exhibit 18).

141. On August 19, 2003, Chief Scott suspended Wagner for five days without pay and recommended Mayor Sullivan to take additional disciplinary action concerning Wagner's "unfounded" complaints of March 31, 2003. (Plaintiff Exhibit 14). Mayor Sullivan declined to impose additional discipline on Sgt. Wagner. (Plaintiff Exhibit 15).

142. As of March 31, 2006, Sgt Wagner had amended 23 prior disciplinary actions on his record including 12 prior suspensions, one (1) for thirty (30) days. (Plaintiff Exhibit 19, and 13 through 18).

143. On December 03, 2005, Sgt Wagner asked Mayor Sullivan to vacate all his disciplines, to make him whole for lost wages, and allow him to retire. (Plaintiff Exhibit 13).

144. On March 07, 2006, Sgt. Wagner was allowed to voluntarily retire. (Plaintiff Exhibit 19).

145. Mayor Sullivan held a hearing on March 29, 2006, on two (2) disciplinary suspensions, of five (5) days each to Wagner, which arose out of an August 10, 2005 incident with Dennis Eagan, at Holyoke Credit Union. Mayor Sullivan found just cause to suspend Wagner for five (5) days, and without pay, and to discharge Sgt. Wagner. However Mayor Sullivan refused to impose a discharge since the City had accepted Wagner's voluntary retirement. (Plaintiff Exhibit 19).


III.    PLAINTIFF'S STATEMENT OF DISPUTED ISSUES ON MATERIAL FACT


Now comes the plaintiff, Tammy Walker, and asserts that the following issues of material fact are in dispute:


1. Whether Walker was subjected to disparate treatment because of her gender and sexual orientation? (See amended complaint at ¶ 18)

2. Whether Sgt. Monaghan told Walker that she didn't deserve to be a Sergeant since she was a lesbian? (Walker MCAD Complaint and Affidavit at ¶ 18, Plaintiff Exhibit 7)

3. Whether former Holyoke Police Department Sgt. Robert Wagner was similarly situated to Sgt. Walker, and treated more favorably? (Plaintiff Exhibits 13-19)

4. Whether pretext shown for discrimination against Walker based on gender (female) and sexual orientation is evidenced by the following: Respondents omitted reference to Jorge Rodriguez's IOC (Plaintiff Exhibit 9) responding to questionnaire from Internal Affairs of gender and sexual harassment (Plaintiff Exhibit 11)

IV.    MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A. **FACTS**

Plaintiff incorporates by reference the facts in her Amended Complaint Plaintiff's
Concise Statement of Additional Facts (hereinafter referred to as "Fact No.\_") and realleges the
same as though fully stated herein. Plaintiff was hired as a full time police officer by Defendant
in July 1993, Plaintiff was passed over for appointment to Sergeant in August 1999. Plaintiff
settled her Civil Service and Massachusetts Commission Against Discrimination (MCAD)
complaints in 2000, and was appointed to a Sergeant position on May 5, 2002, seniority from
June 9, 1999. From July 1993 through June 2002 Plaintiff had an exemplary work record,
including meeting Defendant's reasonable expectation for job performance. From May 30, 2002
through her termination on April 18, 2005 Plaintiff was targeted for discipline, and she was
subjected to several additional acts of harassment, discrimination, and retaliation because of her
gender, race and color, sexual orientation, and sexual stereotypes because of her on the job
behavior and appearance. Plaintiff reasonably complained of the discrimination and harassment
to her superiors, to the MCAD, and to the Equal Employment Opportunity Commission (EEOC).
Defendant responded to Plaintiff's complaints of discrimination by targeting her for unwarranted
discipline, suspension without pay, and ultimately terminating her employment. Sergeant Robert
Wagner (hereinafter "Sgt. Wagner") was similarly situated to Plaintiff in terms of performance,
qualifications, and conduct. Sgt. Wagner's misconduct was more serious, or as grave as the
Plaintiff's alleged misconduct. Sgt. Wagner had an inferior overall personnel records, and like
Plaintiff received several disciplinary suspensions without pay. (Plaintiff Exhibits 13 through
19).

However, unlike Plaintiff, Sgt. Wagner was not involuntarily terminated. Sgt, Wagner
was treated more favorably than the Plaintiff. Wagner was allowed to voluntarily resign even
though Mayor Sullivan found just cause to discharge Wagner. (Plaintiff Exhibit 19).

B. **ARGUMENT**

1. **SUMMARY JUDGMENT**

Summary judgment is appropriate only when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Thomas v. Eastman Kodak Co.</u>, 183 F.3d at 47. In deciding a motion for summary judgment, the Court must review the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. <u>Landrau-Romero v. Banco Popular De Puerto Rico</u>, 212 F.3d 607, 611 (1st Cir. 2000); <u>Hernandez-Loring v. Universidad Metropolitana</u>, 233 F.3d 49, 51 (1st Cir. 2000). The Court must "exercise particular caution before [sustaining] summary judgment[s] for employers on such issues as pretext, motive, and intent." <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 54 (1st Cir. 2000) (citing <u>Hodgens v. General Dynamics Corp.</u>, 144 F.3d 151, 167 (1st Cir. 1998)).

Summary judgment shall be granted where there exist no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. See Mass. R. Civ. P. 56(c); <u>Cassesso v. Comm'r of Corr.</u>, 390 Mass 419, 422 (1983); <u>Cmty. Nat'l Bank v. Dawes</u>, 369 Mass. 550. 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles it to judgment as a matter of law. <u>Kourouvacilis v. Gen. Motors Corp.</u>, 410 Mass. 706, 711 (1991). Once the moving party establishes the absence of a triable issue, the party opposing must respond and allege specific facts establishing the existence of a genuine issue of material fact. <u>Pederson v. Time, Inc.</u>, 404 Mass 14, 17 (1989). In ruling on a motion pursuant to Rule 56, the Court must make all inferences which logically are permissible in favor of the non-moving party. <u>Attorney Gen. V. Baily</u>, 386 Mass. 367, 371 (1982). For the purposes of summary judgment, the Court may consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. <u>Dawes</u>, 369 Mass. at 553.

Summary judgment is disfavored in discrimination cases based on disparate treatment because the question of the employer's state of mind and/or discriminatory motive is "elusive and rarely is established by other than circumstantial evidence." <u>Sullivan v. Liberty Mutual Ins. Co.</u>, 444 Mass. 34, 38 (2005), quoting <u>Blare v. Husky Injection Molding Sys. Boston, Inc.</u>, 419 Mass. 437, 439. This generally requires the jury to weigh the credibility of conflicting explanations of the adverse employment decision. <u>Sullivan</u>, 444 Mass. at 38. In reviewing a motion for summary judgment in such cases, a court should apply the traditional test and consider the facts in light most favorable to the nonmoving party, drawing all reasonable

inferences in her favor. See id. While the standard of review is the same in all other cases, here the Defendants, as the moving party, have the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if they would not have the burden to prove such if the case were going to trial. Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127 (1997).

2. **THIS COURT SHOULD DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BECAUSE PLAINTIFF HAS ESTABLISHED DISCRIMINATION BASED ON GENDER AND SEXUAL ORIENTATION IN VIOLATION OF M.G.L.c. 151B OR TITLE VII**

We start with the proposition that "[s]ummary judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment." Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 439 (1995), and cases cited. When there is conflicting evidence as to a defendant's discriminatory motive, courts may not dispose of such cases on the basis of affidavits. Id. at 439-446. The burden of persuasion rests at all times with the plaintiff. Wheelock College v. Massachusetts Comm. Against Discrimination, 371 Mass 130, 139 (1976). For summary judgment purposes, the shifting burden of production in a racial discrimination case follows the three-stage order of proof formula of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973), cited and discussed in Wheelock College, supra.

M.G.L.c. 151B § 4(1) provides in relevant part the following: "It shall be an unlawful practice for an employer, by himself or his agent, because of the race, color…national origin…or ancestry of an individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment, unless based upon a bona fide occupational qualification."

Thus to make out a prima facie case in stage one, the plaintiff must establish that he was a member of a protected class, that he was performing his job in an acceptable way, that he was fired, and that the defendants sought to fill the plaintiff's position by hiring someone else who was not more qualified than the plaintiff. See Blare, supra 441. The defendant in stage two must then rebut the presumption of discrimination by producing evidence of some legitimate, nondiscriminatory reason for the employee's termination.  See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116-117 (2000). Should the defendant satisfy the

requirement, the burden shifts back in stage three to the plaintiff who must produce evidence that the reason articulated by the employer is a mere pretext. Id. at 117-188. If the fact finder determines that one or more of the defendant's reasons for its employment decision is false, "it may (but need not) infer that the [defendant] is covering up a discriminatory intent, motive or state of mind." Lipchitz v. Raytheon Co., 434 Mass 493, 501 (2001).

To recover under c.151B for unlawful discrimination, the Plaintiff must also show evidence of discriminatory animus, causation, and harm. Id. at 502; G.L.c. 151B § 4(1). To show discriminatory animus in an indirect evidence case such as this, once the Plaintiff has met its burden of establishing a prima facie case, the employer bears the burden of offering a legitimate, non-discriminatory reason for the employment decision and producing credible evidence to show that the reason advanced was the real reason. Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997).

The Plaintiff bears the burden of persuasion on the ultimate issue of discrimination. Matthews, 426 Mass at 128. To provide a sufficient basis for a jury to find that unlawful discrimination has occurred, a Plaintiff may show that the articulated reasons were false. This can be established by a showing that persons similarly situated in all relevant aspects were treated differently. Id. Abramian v. President and Fellows of Harvard College, 432 Mass. 107, 117 (2000). The Plaintiff must identify other employees to whom he is similarly situated in terms of performance and qualifications, without such mitigating circumstances that would distinguish their situation. Id. The Plaintiff asserts that she was similarly situated with Sergeant Robert Wagner (a straight male) who shared the same job as Plaintiff. (Fact No. 138-145).

With the above principles in mind, Plaintiff shows that she was treated differently for her on air programming errors, than a similarly situated straight male Holyoke Police Sergeant. (Fact No. 138-145). Gender and sexual orientation alone accounts for this disparity. On April 18, 2005 Walker was terminated. Defendants accommodated a certain HPD Sergeant Robert Wagner, by not terminating him for same or greater errors then Walker. (Fact No. 138-145). The evidence of Defendant's favoritism toward straight male Sergeant Robert Wagner who was not terminated is more than sufficient to establish the requisite pretext, causation, and discriminatory animus. Plaintiff shows that the defendant demanded that she be terminated yet processed a voluntary retirement for similarly situated straight male Sergeant Wagner.

The analysis necessarily began with the Plaintiff's burden to establish a prima facie case vary with the circumstances of each case. Wheelock College v. MCAD, 371 Mass. 130, 134-136, citing McDonnell-Douglass v. Green, 411 U.S. 792, 36 L.Ed.2d 668,93 S.Ct 1817 (1973). Here, the Plaintiff asserts a right to relief on the ground that she was subjected to disparate treatment because of her gender and sexual orientation. The prima facie showing necessary in the particular disparate treatment case here is as follows:

    a.  Plaintiff is a member of a protected class;

    b.  Plaintiff met her employers reasonable expectations for job performance;

    c.  Plaintiff was targeted for discipline;

    d.  Plaintiff was suspended for five (5) days without pay;

    e.  Similarly situated straight male Sergeant Wagner who was no more qualified than the Plaintiff was not terminated.

The facts as recited above are more than sufficient to establish a prima facie case as to each of these elements. First, there is no dispute that Plaintiff Walker, a lesbian, is a member of a protected class. Second, the record is clear that the Plaintiff was actually terminated. Third, the facts as alleged in the Plaintiff's Complaint, affidavits and Facts 138-145 are sufficient to permit a reasonable fact finder to conclude that the Defendants did not terminate similarly situated Robert Wagner. At the same time, certain Sergeant Wagner had more compelling reasons for termination was not terminated. This act effectively resulted in the kind of gender and sexual orientation disparate treatment that is expressly forbidden by G.L.c. 151B.

Assuming the sufficiency of these facts to establish a prima facie case of disparate treatment Defendants are obliged to articulate non-discriminatory reason for not terminating Sgt. Robert Wagner while terminating Sgt. Walker. As to their failure to terminate Sgt. Wagner for similar errors, Plaintiff vigorously asserts and argues that the issue cannot be resolved in Defendants' favor at the summary judgment stage.

    a.  UNCONSCIOUS BIAS

An employer may not necessarily be aware of his or her bias. Employment decisions that are made because of stereotypical thinking about people because of their gender or sexual orientation, whether conscious or unconscious, violate the Massachusetts law prohibiting discrimination. Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Lipchitz v. Raytheon Co.,

434 Mass. 493 (2001); Riffelmacher v. Bd. of Police Comm'rs of Springfield, 27 Mass. App. Ct. 159, 163 (1989).

   b.   SUBJECTIVE CRITERIA

   Unlawful bias may be inferred from evidence that the employer used subjective criteria in making employment decisions. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 990-91 (1988); City of Salem, v. MCAD, 44 Mass. App. Ct. 627, 643 (1998)("uncontrolled subjectivity" in performance standards can be evidence of bias."); Harrison v. Boston Fin. Data Servs., Inc., 37 Mass. App. Ct. 133, 138 638 N.E. 2d 41, 44-45 (1994); Contardo v. Merrill Lynch, Pierce, Fenner & Smith, Inc. 753 F. Supp. 406, 410 (D. Mass. 1990).

   c.   EMPLOYER'S FAILURE TO FOLLOW POLICY OR GUIDELINES

   Unlawful bias may be inferred from an employer's failure to follow its own policies or guidelines in making the employment decision involved in this case. Martin v. Envelope Div. Of Westvaco Corp., 850 F. Supp. 83, 92 (D. Mass. 1994); see also Goden v. Runyon, 885 F. Supp. 1104, 1106 (W.D. Tenn. 1995).

   d.   STATISTICS

   See Fact No. 114 Circumstantial evidence may include statistical evidence showing a general pattern of discrimination in work force composition. Lipchitz v. Raytheon Co., 434 Mass. 493 (2001); Smith Coll. v. MCAD, 376 Mass. 221, 228 & n.9, 380 N.E. 2d 121, 125 & n.9 (1978); Springfield Police Comm'rs v. MCAD, 375 Mass. 782, 783, 375 N.E. 2d 710, 711 (1978) (rescript); Buckley Nursing Home v. MCAD, 20 Mass. App. Ct. 172, 176 n.4, 478 N.E. 2d 1292, 1296 n.4, cert. Denied, 395 Mass. 1103, 482 N.E. 2d 328 (1985).

Dated July 31, 2007

                                        /s/ *Ozell Hudson, Jr.*
                                        Ozell Hudson, Jr. Esq.
                                        BBO No. 556269
                                        434 Massachusetts Ave.
                                        Suite 402
                                        Boston, MA. 02118
                                        Tel: (617) 267-0662
                                        Fax: (617) 267-0663

**CERTIFICATE OF SERVICE**

I hereby verify that this document, filed through the ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on July 31, 2007.

_____ /s/ Ozell Hudson, Jr.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30074-MAP

_____

| | |
|---|---|
| TAMMY WALKER, | ) |
|      Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF HOLYOKE, | ) |
|      Defendant_____ | ) |

## AFFIDAVIT OF OZELL HUDSON JR.

I, Ozell Hudson, Jr., hereby state and affirm the following under oath:


I am the lead counsel for the plaintiff Tammy Walker in the above captioned civil action.
I am a member in good standing of the bar of the Commonwealth of Massachusetts and
the United States District Court, District of Massachusetts.


Attached hereto are the following:

1.  Exhibit 1 is Volume I of the transcript of the Deposition of Tammy Walker
    taken on Sept. 26, 2006.

2.  Exhibit 2 is the transcript of the Deposition of Jorge Rodriguez taken on Sept.
    20, 2006.

3.  Exhibit 3 is the transcript of the Deposition of Anthony Scott taken on Sept. 11,
    2006.

4.  Exhibit 4 is the transcript of the Deposition of Alan Fletcher taken on Sept. 12,
    2006.

5.  Exhibit 5 is the transcript (excerpt) of the "Arbitration Held Before Gary Alman,
    Arbitrator, June 13, 2006," including but not limited to the testimony of
    Anthony Scott and Eva O'Connel.

6.  Exhibit 6 is a true and correct copy of a document marked as Plaintiff Tammy
    Walker's <u>Verified</u> Holyoke District Court pro se "Complaint for Judicial Review

of Administrative Agency Proceedings," of the Commonwealth of Massachusetts Division of Unemployment Assistance dated June 1, 2006.

7.   Exhibit 7 is a true and correct copy of Plaintiff Tammy Walker's Massachusetts Commission Against Discrimination ("MCAD") Complaint and Affidavit (Docket No. 22304081) filed December 2, 2002, marked as Exhibit 8 to Anthony Scott Deposition).

8.   Exhibit 8 is a true and correct copy of the Affidavit of Jorge Rodriguez dated July 15, 2003, marked as Exhibit 6 of Jorge Rodriguez Deposition.

9.   Exhibit 9 is a true and correct copy of an Inter-office Memorandum ("IOC") from Officer Jorge  L. Rodriguez to Lieutenant David D. Fournier dated Dec. 4, 2004, marked as Exhibit 4 of Jorge Rodriguez Deposition.

10.   Exhibit 10 is a true and correct copy of Plaintiff Tammy Walker's pro se Answers to Defendant's Interrogatories in the above captioned civil action.

11.   Exhibit 11 is a true and correct copy of Respondents' (MCAD) Position Statement (Affirmation by Chief Anthony Scott, John Monaghan, and Joseph Garcia dated March 3, 2003).

12.   MCAD computer log of employment discrimination cases filed with the MCAD and EEOC by employees of the Holyoke Police Department through December 2, 2002.

13.   Exhibit 13 through 19 are true and correct copies of documents concerning Robert Wagner, produced by Defendant and Robert Wagner pursuant to this Court's Order of Dec. 7, 2006 allowing Plaintiff's motion to compel.

WHEREFORE, I have read the foregoing and state under the pains and penalties of perjury that the information provided above, contained in this Affidavit, is true and accurate to the best of my personal knowledge.

_/s/ Ozell Hudson, Jr._____
Ozell Hudson Jr.
BBO#556269

July 31, 2007                          434 Massachusetts Ave, Suite 402
Boston, MA   02118
(617) 267-0662

# EXHIBIT 1

**IN THE MATTER OF:**

```
TAMMY WALKER vs.
CITY OF HOLYOKE
```

**DEPOSITION OF:**

```
TAMMY WALKER
DATE: SEPTEMBER 2 6 , 2006
```

## PERLIK and COYLE REPORTING

Certified Professional Reporters

1331 Main Street

Spring,field, MA 01103

Tel.(413) 731-7931 Fax(413) 731-7451

**COMPRESSED TRANSCRIPT & WORD INDEX**

Case 3:05-cv-30074-MAP   Document 86-9   Filed 08/01/2007   Page 3 of 66

**TAMMY WALKER vs. CITY OF HOLYOKE**
TAMMY WALKER                                      SEPTEMBER 26, 2006

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30074-MAP
Pages 1-253

TAMMY WALKER

vs.

CITY OF HOLYOKE

DEPOSITION OF: TAMMY WALKER

Taken before Joanne Coyle, Certified
Shorthand   Reporter, Notary   Public,
pursuant
to the Federal Rules of Civil Procedure, at 500
Main Street, Springfield, Massachusetts on
SEPTEMBER 26, 2006, corn mencing at 10:10 a.m.

Joanne Coyle
Certified  Shorthand  Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified            Professional Reporters
1331                 Main Street
Springfield,                MA 01103
Tel          (413) 731-7931   Fax (413) 731-7451

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:

LAW OFFICE OF OZELL HUDSON, JR., ESQUIRE
434 Massachusetts Avenue
Boston, Massachusetts 02118
BY:  OZELL HUDSON, JR.

FOR THE DEFENDANT:

MORRISON MAHONEY, LLP
1500  Main Street
Springfield,  Massachusetts 01115
BY:  CAROLE SAKOW SKI LYNCH, ESQUIRE

FOR THE CITY OF HOLYOKE:

CITY OF HOLYOKE LAW DEPARTMENT
20 Korean Veterans Plaza, Room   204
Holyoke, Massachusetts 01040-5000
BY   KAREN T. BETOURNAY, ESQUIRE

**Page 3**

I N D E X

WITNESS          DIRECT CROSS REDIRECT RECROSS

TAMMY WALKER            5

E X H I B I T S

| N . | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 8/31/99 Amended Appeal to Civil Service | 48 |
| 2 | 10/15/99 MCAD Complaint | 52 |
| 3 | 7/16/02 Fitzgibbons to Walker Letter | 54 |
| 4 | 10/24/02 Complaint form | 132 |
| 5 | 10/28/02 Fournier to Walker IOC | 145 |
| 6 | 10/30/02 Walker to Fournier Complaint | 145 |
| 7 | 11/13/02 Fournier to Officer Questionnaire | 148 |
| 8 | 12/9/02 Fournier to Walker IOC | 149 |
| 9 | 8/7/03 Scott to Walker Official Letter of Reprimand | 202 |
| 10 | Court Sign-In  Sheet | 207 |
| 11 | 3/30/04 Monfette to Boyle  E-Mail | 208 |
| 12 | 4/7/04 Walker to Monfette To-From | 209 |
| 13 | 4/20/04 Scott to Walker IOC | 213 |
| 14 | 6/22/04 Sullivan to Walker Letter | 214 |
| 15 | Drawing of Desks | 223 |
| 16 | 7/23/04 Incident Report | 225 |
| 17 | D10/16/01 Scott to All Personnel IOC | 245 |
| 18 | 2/10/03 Scott IOC Re Terrorism  Threat Level | 247 |
| 19 | 8/17/04 Scott to Walker IOC | 249 |

**Page 4**

S T I P U L A T I O N S

It is agreed   by and between  the parties
that all objections,   except objections   as to the
form  of the question, are  reserved  to be raised at
the  time of trial for the  first time.

It is further agreed     by and between  the
parties that all motions to strike    unresponsive
answers are also reserved    to be raised  at the time
of trial for the  first time.

It is further agreed    that the deponent will
read and  sign the deposition  and that the sealing
of said  deposition  will be waived.

It is further agreed,   by and between  the
parties  that notification to all parties of the
receipt of the   original deposition  transcript is
also hereby waived.

# TAMMY WALKER vs. CITY OF HOLYOKE
Case 3:05-cv-30074-MAP    Document 56-3    Filed 09/01/2007    Page 4 of 66

## TAMMY WALKER                      SEPTEMBER 26, 2006

**5**

1    TAMMY WALKER, the Deponent, having been
2 satisfactorily identified by the production of her
3 driver's license and having been first duly sworn
4 by the Notary Public, deposes and says as follows:
5        MS. LYNCH:    Usual stipulations?
6        MR. HUDSON: Yes; the same ones that
7 we provided in writing before.
8              *****
9        DIRECT EXAMINATION BY MS. LYNCH
10  Q.        Ms. Walker, as you know my name is
11 Carole Sakowski Lynch and I represent the Holyoke
12 Police Department with respect to a lawsuit that
13 you filed.
14        I'm going to be asking you some
15 questions about your claim in general.    If you
16 don't understand my questions, please let me know
17 and I will be happy to rephrase them or if you'd
18 like me to repeat them, let me know and I'll be
19 happy to do that as well.
20        Please make sure that I finish the
21 question before you start to answer so that
22 there's a clear record.    Please keep your
23 responses verbal as opposed to shaking your head
24 or nodding your head, okay?

**6**

1    A.    Yes.
2    Q.    If you need to take a break at all, just
3 say so and we'll stop.
4    A.    Okay.
5    Q.    Have you ever had your deposition taken
6 before?
7    A.    I don't believe so.
8    Q.    Could you state your full name, please?
9    A.    Tammy Donoghue Walker.
10    Q.    Have you ever gone by any other name?
11    A.    Tammy Walker.
12    Q.    What is your date of birth?
13    A.    ███████.
14    Q.    Your Social Security Number?
15    A.    ███████.
16    Q.    Are you married?
17    A.    Yes.
18    Q.    Who are you married to?
19    A.    Kathleen Marie Donoghue.
20    Q.    When did you marry Ms. Donoghue?
21    A.    July 31st, 2006.
22    Q.    Have you been married any other time?
23    A.    No.
24    Q.    Do you have any children?

**7**

1    A.    Yes.
2    Q.    What are their names and ages?
3    A.    I have a son.   His name is Ian.
4    Q.    Ian?
5    A.    I-A-N Xavier Fortin Walker.
6    Q.    How old is he?
7    A.    Nineteen.
8    Q.    Any other children?
9    A.    Yes; I have a niece who I'm legal
10 guardian of, Naomi Lucille Walker.
11    Q.    How old is she?
12    A.    Age eleven.
13    Q.    Any other children?
14    A.    No -- stepchildren but not mine.
15    Q.    Ms. Donoghue's children?
16    A.    Stepchildren now.
17    Q.    Where do you reside?
18    A.    6 Clark Street.
19    Q.    How long have you lived there,
20 approximately?
21    A.    I lived at 6 Clark Street, I believe
22 December, 2003.
23    Q.    Did you grow up in Holyoke?
24    A.    Yes.

**8**

1    Q.    Going back to 2000, can you tell me
2 where you lived then?
3    A.    372 Hillside Avenue.
4    Q.    In Holyoke?
5    A.    In Holyoke.
6    Q.    Did you live there until you moved to
7 Clark Street?
8    A.    Yes.
9    Q.    Since the year 2000 who have you lived
10 with? Who has been in your household?
11    A.    Up until July 31st it would be my son
12 Ian and my daughter Naomi.
13    Q.    Where did you go to high school?
14    A.    Holyoke High.
15    Q.    What year did you graduate?
16    A.    I never graduated from Holyoke High.
17    Q.    You did go on to college, though, right?
18    A.    Correct.
19    Q.    Did you finish high school?
20    A.    No; I did not.
21    Q.    Did you get a GED?
22    A.    Yes; I did.
23    Q.    How far in high school did you go?
24    A.    I went to the ninth grade.

9

Q.    When did you get your GED?

A.    I believe it was 1985.

Q.    And then where did you go on to school after that?

A.    I went to night school to obtain my high school diploma, in Texas.

Q.    In addition to the GED, you mean?

A.    Yes; I wasn't satisfied with the GED. I wanted a high school diploma.

Q.    Which school did you go to?

A.    I don't remember what the name of that school was.

Q.    Where did you go after high school?

A.    After night school?

Q.    Yes.

A.    I attended Holyoke Community College.

Q.    Did you get a degree from there?

A.    I did.

Q.    What was that in?

A.    Criminal Justice Associate's Degree.

Q.    Do you remember what year you got that?

A.    I believe it was '91.

Q.    Did you get any other degrees?

A.    Yes; I went to Northeastern

10

University.

Q.    What did you study there?

A.    Criminal justice.

Q.    Did you get a degree there?

A.    Yes.

Q.    When was that?

A.    I believe in June of 1993 I graduated.

Q.    Was that a bachelor's degree?

A.    Bachelor's degree.

Q.    Any other education?

A.    Yes; I went to WNEC.

Q.    What did you study there?

A.    Criminal justice and business administration.

Q.    Did you get a degree?

A.    Yes; master's degree.

Q.    When did you get that?

A.    I believe I obtained that in 2000.

Q.    Any other education?

A.    Let's see. Before Holyoke Community College I did go to classes in Miami, Dade Community College and transferred those credits over to HCC.

Q.    Since you've been approximately twenty

11

2    A.    No.

3
4
5
6
7

8    Q.    So at one point you were not working?

9    A.    Correct.

10    Q.    Do you recall what your first job was?

11    A.    My very first job ever?

12    Q.    Well, after high school age.

13    A.    My very first job I believe was at the

14 Geriatric Authority I think it is called now.

15 It's a nursing home.

16    Q.    What did you do there?

17    A.    I was a nurse's aide.

18    Q.    What other employment positions did you

19 hold prior to the Holyoke Police Department?

20    A.    I was a cook at Friendly's. I was a

21 cashier at Mel's.

22            I'm going back pretty far. That's all I

23 can recall right now.

24    Q.    Did you become a reserve officer at the

2    A.    That's correct.

3    Q.    Why did you want to be a police officer?

4    Q.    Have you worked anywhere since your

5 employment was terminated with the Holyoke Police

6 Department?

7    A.    Yes. I worked at American Red Cross.

8    Q.    What did you do there?

9    A.    It deals with servicemen that are

10
11
12
13
14

15 overseas. If they need to come home they have to

16 verify it through Red Cross. It's called a case

17 worker.

18    Q.    In Springfield?

19    A.    Yes.

20    Q.    When did you work there -- from what

21
22
23
24

13

date to what date?

A. My end date was December, I believe 2005. My start date was October, 2005.

Q. Did you work anywhere between April 18, 2005, which was the date of the termination, until you worked at the Red Cross?

A. No.

Q. So you were totally unemployed?

A. Correct.

Q. Did you receive unemployment benefits during that time?

A. No.

Q. How were you supporting yourself during that time?

A. I had retirement which I -- I had savings and I withdrew my retirement. The ING retirement fund.

Q. The job with the American Red Cross, was it supposed to be for a limited period of time?

A. No; it was supposed to be until I decided to leave. It was regular employment.

Q. Did you leave voluntarily?

A. I left due to depression and anxiety.

Q. Did you voluntarily leave, though?

14

A. Yes.

Q. You voluntarily left because you said you had depression and anxiety?

A. Yes; I had depression and anxiety.

Q. Did any physician make that diagnosis?

A. Yes.

Q. Who was that?

A. Doctor Stephen Levine who is my primary care physician.

Q. The job at the Red Cross, was that a full-time job, meaning forty hours?

A. It was part time.

Q. How many hours would you work there per week?

A. It would vary. It would vary from twenty hours up to twenty-five hours.

Q. How much did you earn there?

A. I believe it was ten dollars an hour.

Q. Any benefits?

A. No.

Q. Such as health insurance, vacation, anything like that?

A. Yes; they have a limited insurance plan that I could buy into so I was under health plan

15

1 for a very short period of time.

2       Q. Was that a job that you physically
3 performed within their offices on Cottage Street?

4       A. Yes; it was an office with several
5 desks, several phones, several workers.

6       Q. Can you just describe what you would do
7 on that job?

8       A. A citizen would call and say that their
9 mother had passed away and that they needed a Red
10 Cross message sent stating that they needed the
11 serviceman to come home.

12       Q. Would you arrange for the
13 transportation?

14       A. No; we would verify it through the
15 commanding officer at the base -- whichever base
16 he was at or if it was over in Iraq, wherever the
17 serviceman was.

18       Q. Did you have any other duties in that
19 position?

20       A. No.

21       Q. Have you held any other employment since
22 your employment with the Holyoke Police Department
23 was terminated?

24       A. No.

16

2

3       A. No.

4       Q. Any particular reason why?

5       A. I suffer from post traumatic stress
6 disorder. That was part of the reason I left
7 American Red Cross.

8       Q. Anything in particular?

9       A. Particularly a fatality that happened on
10 September 17th in Holyoke -- actually it happened
11 in South Hadley.

12

13

14

15

16

17

18

19

20

21

22

23

24

---

**17**

1  A.    There was a fatality in South Hadley
2  where officers chased a woman from Holyoke to
3  South Hadley.   She lost control of her vehicle and
4  crashed into a tree.
5       I was the first sergeant on scene and
6  she was dead.
7  Q.    You were not involved in pursuing her
8  though, right?
9  A.    I was not involved in the pursuit; no.
10  Q.    Why do you believe that that incident
11  caused you post traumatic stress disorder?
12  A.    Due to the events that led up to the
13  crash.  I was on the road -- the only one on the
14  road as a supervisor. The other three sergeants
15  were in the station.
16       The officers called out for assistance.
17  I was out in West Holyoke. Our communications
18  system is kind of shaky if you're out that far.    I
19  could hear the officers asking for assistance from
20  a supervisor.
21       I started to roll into the area so I
22  could hear better communication. When I got close
23  enough and I could hear that they were in pursuit,
24  I was ready to call it off and Sergeant Garcia

---

**18**

1  called the pursuit off.
2       Being the only sergeant on the road I
3  asked where the officers were. I believe they
4  said they were in South Hadley.    I raced to the
5  scene in South Hadley and came upon the woman in
6  the car and the officers there.
7  Q.    Had you ever seen anyone killed at any
8  other time as a result of a car accident?
9  A.    Yes.
10  Q.    How many times do you think?
11  A.    Two.
12  Q.    Do you remember when those were?
13  A.    Not off the top of my head; no.
14  Q.    Did you ever see any other deaths in
15  carrying out your job duties?
16  A.    Yes.
17  Q.    Do you recall how many and how those
18  individuals died?
19  A.    I don't recall how many. One was a
20  suicide; some were just found dead; some were drug
21  overdose.
22       The particular one we're referring to is
23  a circumstances that led up to her death is why I
24  suffer from that event.

---

**19**

1  Q.    You're saying with regard to the other
2  deaths that you came upon you did not suffer from
3  but you did suffer from seeing the death that
4  occurred in South Hadley?
5  A.    The circumstances that led to the death
6  of this woman; yes.
7  Q.    What specifically are you referring to?
8  A.    The fact that the sergeants stayed in
9  the station all night and never came out on the
10  road.  I'm the only supervisor on the road.
11       Our policy is that the supervisor on the
12  road and that they supervise their men. We have
13  twenty men on the road at one time. That's why we
14  have three sergeants on the road instead of one on
15  the road. They were inside the station.
16       It was approximately three o'clock in
17  the morning.  I had assumed that they were on the
18  road supervising their area. That wasn't my area
19  particularly.   That was someone else's area.
20  Q.    You mean where the pursuit occurred?
21  A.    Where the pursuit started; yes.
22  Q.    If they had been out on the road what
23  would have been done differently?
24  A.    They would have heard the transmission

---

**20**

1  of the officers calling out for assistance. They
2  would have aborted the chase instantly instead of
3  while the chase was going on.
4  Q.    What difference would that have made to
5  you?
6  A.    What difference that would have made to
7  me?
8  Q.    Yes.
9  A.    Given the fact that the woman died
10  needlessly would have made a big difference.
11  Q.    Did you provide any medical assistance
12  to her at all?
13  A.    No, Ma'am.
14  Q.    You're a first responder, right, as a
15  police officer?
16  A.    Yes.
17  Q.    Any other medical training that you
18  have?
19  A.    No; we have our yearly CPR,
20  defibrillator.
21  Q.    In other words you're not an EMT?
22  A.    No.
23  Q.    Or a paramedic?
24  A.    No.

21

Q. Any reason why you didn't provide any medical assistance to her?

A. She was in the car, she was already dead. There were other officers on the scene. There was a sergeant from South Hadley.

Q. Do you know what his name was?

A. I believe his first name was Steven; I can't remember his last name.

Q. Are you on any medication today Ms. Walker?

A. Yes.

Q. What are you on?

A. I'm on Fentanyl patch.

Q. What do you take that for?

A. That's for pain.

Q. Pain where?

A. For my neck, shoulder, and elbow.

A. Celexa, which is an antidepressant.

Q. Any other medication?

A. No.

Q. Do you wear glasses or contact lenses at all?

22

A. Yes.

Q. What do you need corrective lenses for? In other words are you nearsighted or farsighted or do you need them for both?

MR. HUDSON: Objection. Go ahead and answer.

THE WITNESS: I need them for reading. Distances that are far away.

Q. (BY MS. LYNCH) Do you have any problems with your hearing at all?

A. No.

Q. Other than your attorney, did you speak with anyone to prepare for today's deposition?

A. No.

Q. Have you reviewed any documents to prepare for today's deposition?

A. Slightly, yes.

Q. What did you review?

A. I reviewed some notes that I had taken -- handwritten notes that I had taken while the events were happening.

Q. Have you produced those as part of discovery?

A. They're actually typed on a piece of

23

1 paper from a typewriter, from a computer. I
2 produced those -- the handwritten ones to Tani
3 Sapirstein.
4          Q. So what you reviewed were notes in a
5 typed version?
6          A. Correct; some of them.
7          Q. Have those been produced in discovery?
8          A. I believe they were. I'm not positive
9 but I believe they were.
10         Q. What was the subject matter of those
11 notes?
12             A. All the events that transpired -- all
13 the events that transpired.
14             MR. HUDSON: Excuse me a moment.
15 I'd like to take a break. She answered the
16 question.    Let's take a break.
17             (A recess was taken.)
18         Q. (BY MS. LYNCH) I think the last
19 question I asked you, Ms. Walker, was what was the
20 subject matter of the notes and you said the
21 events that transpired. Can you be more specific?
22         A. The harassment that happened at HPD.
23         Q. What do you mean when you say the
24 harassment that happened?

24

1             A. The name-calling by Sergeant Monaghan,
2 the same things that I filed the suit for.
3          Q. These notes that you reviewed, when did
4 you prepare the notes?
5          A. It's been a few years.
6          Q. In other words did you prepare them
7 contemporaneously or did you prepare them sometime
8 after the alleged events?
9             A. From memory. I had to go from memory
10 what I recalled, what time I recalled it and I put
11 them on the computer.
12         Q. They were prepared sometime after the
13 events then?
14         A. Yes; from memory.
15         Q. Did you produce those as part of the
16 discovery in this case? I'm asking because I
17 don't recall seeing anything like that.
18             A. It depends -- you have to clarify the
19 question.
20             MS. LYNCH: Well, Attorney Hudson,
21 have those been produced?
22             MR. HUDSON: I think you want -- the
23 witness will answer whatever she can. I don't
24 know what specific notes you are talking about.

25

1    There are notes, communications that
2 were prepared in anticipation of litigation that
3 was with her attorney.
4    MS. LYNCH: I'll review your
5 response but I don't think they have been
6 produced.
7    I don't recall seeing anything like that
8 and I know there was a request for those types of
9 things.
10    Q.    (BY MS. LYNCH) Anything else that you
11 reviewed, Ms. Walker, in preparation for this
12 deposition?
13    A.    No.
14    MR. HUDSON: Let me qualify. I
15 think also Ms. Walker responded to your document
16 request pro se if I'm not mistaken before I
17 entered an appearance.
18    MS. LYNCH: I think she did.
19    Q.    (BY MS. LYNCH) Since the events that
20 you referred to which you called harassment, have
21 you spoken to any former employees of the Holyoke
22 Police Department regarding issues pertaining to
23 your employment?
24    A.    If I understand the question, have I

26

1 spoken to any employees from the Holyoke Police
2 Department?
3    Q.    Any former employees of the Holyoke
4 Police Department since the time that you stated
5 that you were harassed?
6    A.    I don't know. I don't understand the
7 question.
8    Q.    Let me ask you a different question.
9 Since your employment was terminated have you
10 spoken to any current or former employees of the
11 Holyoke Police Department regarding issues
12 pertaining to your employment?
13    A.    That's a broad question. Have I spoken
14 to anyone?
15    Q.    Regarding issues pertaining to your
16 employment?
17    MR. HUDSON: Objection; what issues?
18    THE WITNESS: I don't understand the
19 question.
20    Q.    (BY MS. LYNCH) Well, have you had any
21 contact with any employees or former employees of
22 the Holyoke Police Department since your
23 employment was terminated other than just to say
24 hello or to exchange pleasantries?

27

1    A.    No.
2    Q.    After you were terminated.
3    A.    I saw him at Dunkin' Donuts prior to
4 my being terminated and we did the pleasantries,
5 hey, how are you doing.
6    Q.    Did you talk to him about your
7 employment as opposed to just exchanging
8 pleasantries?
9    A.    Not on that occasion; no.
10    Q.    At any time, have you?
11    A.    Not that I can recall; no.
12    Q.    Have you had any other type of
13 communication with him such as telephone calls,
14 e-mails, written correspondence about your
15 employment?
16    A.    Prior to my termination?
17
18
19
20
21
22
23
24

28

1    Q.    At any time with regard to the issues
2 that you're relating to your claim?
3    A.    No.
4    Q.    You didn't testify at his trial, did
5 you?
6    A.    No.
7    Q.    Have you had any type of communication
8 either in person, over the phone, e-mail or in
9 writing with Mr. Bennett?
10    A.    Yes.
11    Q.    What was the subject matter of that
12 contact?
13    MR. HUDSON: Objection as to when.
14    Q.    (BY MS. LYNCH) What was the subject
15 matter of that contact?
16    A.    I saw him at 7-Eleven. It was after I
17 was terminated. He just said sorry you're
18 terminated.
19    Q.    Did you discuss the reasons of your
20 termination with him?
21    A.    Yes; I told him that I was harassed and
22 I was terminated.
23    Q.    What was his response?
24    A.    Just in general, sorry.

29

Q. Did he offer you any advice?

A. Something like get them, "go get 'em."

Q. When you were employed at the Holyoke Police Department and Mr. Wagner was employed, what kind of a relationship did you have with him? In other words was it good, bad, neutral?

MR. HUDSON: Objection; you may answer if you know.

THE WITNESS: I believe it was good.

Q. (BY MS. LYNCH) You had a good relationship with him?

A. He was my boss; he was my chief.

Q. How about with regard to Mr. Bennett when you were both employed at the Holyoke Police Department? What kind of a relationship did you have with him?

A. Professional, the same.

Q. Did Mr. Bennett offer you any other advice besides "go get 'ern"?

A. Not that I can recall.

Q. Did you testify at his trial?

A. No.

MR. HUDSON: Objection to the form.

MS. LYNCH: I'm sorry?

30

MR. HUDSON: Object to the form of the question.

Q. (BY MS. LYNCH) Have you had any contact with Jorge Rodriguez since your employment terminated with the Holyoke Police Department with regard to the claims that you are making in this lawsuit?

MR. HUDSON: Objection.

THE WITNESS: No; not with Jorge. No.

Q. (BY MS. LYNCH) You were here when he testified the other day, correct?

A. Yes.

Q. Do you recall the contacts that he testified about?

A. I invited him to my wedding.

Q. Do you recall any other contacts with him?

A. No.

Q. Did you ask him to be a witness for you or to provide any statements for you with regard to your lawsuit?

MR. HUDSON: Objection.

THE WITNESS: When?

31

1    Q.    (BY MS. LYNCH) Well, at any time.

2    A.    Back in 2002 I believe he made a

3 statement.

4    Q.    Was that a statement that was given to

5 the MCAD?

6    A.    That's correct.

7    Q.    Any other statements that he gave to

8 you?

9    A.    No.

10    Q.    Or affidavits?

11    A.    No.

12    Q.    Did he ever testify at any hearing that

13 was held with regard to either allegations that

14 were made against you or claims that you brought

15 with respect to your employment?

16            MR. HUDSON: Objection.

17            THE WITNESS: I don't know.

18            MR. HUDSON: Objection. Counsel, I

19 don't want to keep making these objections but

20 they are really just to the form of the question

21 as to when, where, some time frame.

22            There are many different claims. I mean

23 if you just want to keep asking open-ended

24 questions I'm just going to keep doing my job and

32

1 objecting.

2    Q.    (BY MS. LYNCH) I'm talking at any

3 time at any of the hearings that were held either

4 with regard to your claims or allegations that were

5 brought against you, do you remember him ever

6 testifying?

7

8

9

10            MR. HUDSON: Objection.

11

12

13

14

15

16    A. I don't know.

17    Q. What was the address for it?

18    A. Define address?

19    Q. How do you get to it using the Internet?

20    A. You can put in www.penalizedfortruth.

21

22

23

24

33

Q. When did you have that Website?

A. When did I put it up?

Q. Is it still in existence?

A. Yes.

Q. It is?

A. Yes.

Q. Do you remember when you did start it then?

A. I believe it was May, 2005.

Q. Did you put any information on that Website that pertained to the Holyoke Police Department?

A. Yes.

Q. What types of information did you put on it?

A. My Internal Affairs investigation, part of it.

Q. Do you recall what the subject matter was?

A. No; there's too much to recall at this time.

Q. Why did you put that information on the Website?

A. Because it was pertinent to my story.

34

Q. Given that it was Internal Affairs, was it non-public information?

MR. HUDSON: Objection, that's a legal question.

THE WITNESS: I'm not a lawyer.

Q. (BY MS. LYNCH) When you say Internal Affairs investigation, can you describe what you're referring to?

A. A statement -- when Internal Affairs takes a statement.

Q. Do you remember whose statements you put on there?

A. I believe I put my statement on there.

Q. Anyone else's?

A. I believe Lieutenant O'Connell's statement is on there.

Q. Was this with regard to the laptop incident -- I'm sorry, the scheduling book incident?

A. I don't recall. I haven't looked at my Website in quite awhile.

Q. Do you recall anything else that you put on the Website?

A. No.

35

1     Q. Are these documents still on there now?

2     A. I don't know. I haven't looked at it in

3 quite awhile.

4     Q. Do you have any other Websites?

5     A. No.

6     Q. You were appointed a full-time police

7 officer for the Holyoke Police Department on

8 July 19, 1993, is that correct?

9     A. Full time, yes.

10     Q. Who appointed you?

11     A. That would be the mayor at the time.

12     Q. Do you remember who that was?

13     A. Mayor Hamilton.

14     Q. Up until the point when you became a

15 sergeant in 2002 do you recall what positions you

16 held other than a police officer with the Holyoke

17 Police Department?

18     A. What positions I held within the Police

19 Department before I was made sergeant?

20     Q. Right.

21     A. I was a rape investigator; I was a DARE

22 officer; I was a bike patrol officer; I was a

23 detective with the Detective Bureau. I was

24 assigned to the DEA task force.

36

1     Q. When were you assigned there -- from

2 what date to what date?

3     A. It was May, 2000 to May, 2002.

4     Q. What is your understanding as to why

5 your position with the DEA terminated in May of

6 2002?

7     MR. HUDSON: Objection.

8     THE WITNESS: I was promoted to

9 sergeant.

10     Q. (BY MS. LYNCH) Do you know whether the

11 DEA had made any complaints about you which led to

12 your being taken off of the DEA Task Force?

13     A. No; there was no complaints with DEA.

14     Q. Did Chief Scott ever speak with you at

15 all about removing you from the DEA task force?

16     A. No.

17     Q. Were you present at the Chief's

18 testimony on this issue -- Chief Scott's

19 testimony?

20     A. No.

21     Q. Do you recall what watches you worked

22 prior to becoming sergeant?

23     A. It's a very broad question but midnight

24 to eight.

TAMMY WALKER vs. CITY OF HOLYOKE

TAMMY WALKER                                          SEPTEMBER 26, 2006

---

**37**

Q. Is that what you usually worked?

MR. HUDSON: Can you clarify, please, the record?

I think she asked were you present -- previously, were you present on the issue when Chief Scott testified. I think that's correct, you weren't present when he testified but you did attend part of his deposition. You had to leave because of a medical appointment, isn't that correct?

THE WITNESS: That's correct.

MR. HUDSON: I just wanted to clarify the record so it's not like she wasn't here for his deposition at all.

MS. LYNCH: No; I know she was. I just didn't know if she heard that testimony.

MR. HUDSON: Thank you.

Q. (BY MS. LYNCH) Are you aware that Chief Scott testified that he was asked by the DEA to remove you from the task force?

A. I'm not aware of that.

Q. Do you disagree with that if, in fact, it was stated?

A. Yes; I do.

---

**38**

Q. Back to my last question: Before you became sergeant did you primarily work from midnight to eight?

A. Before I was sergeant I was with the DEA task force for two years.

Q. So you worked a different schedule then, is that correct?

A. That's correct.

Q. Prior to working at the DEA, what was your shift?

A. I was a detective in the Detective Bureau in the Holyoke Police Department.

Q. Did you work a particular schedule?

A. It was four-to-twelve watch.

Q. Four to twelve?

A. Yes.

Q. Prior to becoming a sergeant do you recall working on the same shift as John Monaghan?

A. Yes.

Q. Do you recall when that was approximately?

A. 1994, was twelve at night to eight in the morning.

Q. Do you recall approximately when you --

---

**39**

1  how long you worked with him?

2     A. Approximately one year.

3     Q. How did you get along with him then?

4     A. When you say then, twelve at night to

5  eight in the morning?

6     Q. Back in '94 when you worked with him for

7  about a year.

8     A. It was okay.

9     Q. Did you work with him again after that

10  up until the time that you became sergeant?

11     A. I don't recall.

12     Q. Meaning on the same shift?

13     A. I don't recall if we worked the same

14  shift after that.

15     Q. So from '94 to 2000 you don't recall if

16  you worked the same shift with him?

17     A. No; I know we did when we first got out

18  of the Academy.

19     Q. And that was back in '93?

20     A. I got out -- I went straight to the

21  Academy; Sergeant Monaghan didn't so there was a

22  lapse in time.

23     Q. Did you know him when you were younger,

24  when you were children or teenagers?

---

**40**

1     A. No; I didn't know John.

2     Q. You don't recall him being friends with

3  your brother Vincent?

4     A. No. He said he was friends with my

5  brother but I don't recall John growing up as a

6  child.

7     Q. How much of an age difference is there

8  between the two of you?

9     A. Between?

10     Q. You and John?

11     A. I don't know how old John is.

12     Q. How about you and Vincent?

13     A. Maybe four, five years.

14     Q. He is younger?

15     A. Yes.

16     Q. Were you all living in the same

17  household?

18     A. Yes.

19     Q. But have you no memory at all of John

20  Monaghan being at your house or being friends with

21  your brother?

22     A. No.

23     Q. Have you ever asked your brother Vincent

24  if he was friends with John Monaghan?

---

**PERLIK and COYLE REPORTING**

41

1   A.    No.
2   Q.    Is he around in the area?
3   A.    No; he's in Boston I believe.
4   Q.    In any event, prior to being an adult
5 you don't remember John Monaghan?
6   A.    No -- can I clarify that?   I don't
7 remember him being a friend of my brother's.
8   Q.    Do you remember seeing him around though
9 or having any contact with him?
10   A.    I never had any contact with John
11 Monaghan as a child.
12   Q.    You said that you worked with John
13 Monaghan you think about a year in 1994.
14        Did you work on the same shift with him
15 at any other time prior to becoming a sergeant?
16   A.    I don't recall if he worked four to
17 twelve with me or not when I was there.
18   Q.    How about Joseph Garcia? Did you work
19 with him on the same shift prior to being a
20 sergeant?
21   A.    Yes.
22   Q.    Do you remember when that was?
23   A.    I don't remember the year but it was
24 four-to-twelve watch.

42

1   Q.    Do you remember for approximately how
2 long?
3   A.    I don't know the amount of time.
4   Q.    Do you recall if it was the same time
5 period that you worked with John Monaghan?
6   A.    That would be two different watches. I
7 worked with John Monaghan twelve at night to eight
8 in the morning; and Garcia was four to twelve.
9   Q.    Was that because you changed shifts or
10 was it because at times you would work overtime?
11   A.    No; it would be because other officers
12 joined the force and you can bid to go down to a
13 different shift.
14   Q.    In other words you did work other shifts
15 besides four to twelve before you went to the DEA
16 in 2000?
17   A.    You have to rephrase the question; I'm
18 sorry.
19   Q.    I think earlier I asked you which shifts
20 you worked prior to going to the DEA and you said
21 four to twelve.
22        Did you also work other shifts prior to
23 2000?
24   A.    Yes; again in 1993 when I got out of the

43

1 Academy.
2   Q.    Which shift did you work then?
3   A.    Twelve at night to eight in the morning.
4   Q.    Any other shifts that you worked?
5   A.    Not that I was assigned to; maybe
6overtime.
7   Q.    How did you get along with Joseph Garcia
8prior to your becoming a sergeant?
9   A.    Fine.
10   Q.    Did you know him prior to being an
11adult?
12   A.    No.
13   Q.    When you were assigned to the DEA Task
14Force did you have any contacts with the Holyoke
15Police Department?
16   A.    Yes.
17   Q.    Under what circumstances?
18   A.    They were still my employer.   I was a
19liaison.
20   Q.    But in other words did your usual daily
21activities revolve around the DEA as opposed to
22the Holyoke Police Department?
23   A.    Around the DEA.
24   Q.    You took the Sergeant's examine in 1999

44

1and received a score of eighty, is that correct?
2        MR. HUDSON:   Objection.
3        THE WITNESS: I'm not sure what year
4I took the exam but, yes, it was a score of
5eighty.
6   Q.    (BY MS. LYNCH) Do you recall that the
7interview for the Sergeant's position was on
8June 9th, 1999?
9        MR. HUDSON:   Objection.
10        THE WITNESS: Yes.
11   Q.    (BY MS. LYNCH) Do you recall that on
12June 20, 1999 you were bypassed when Mayor
13Szostkiewicz appointed Joe Garcia to the position
14of sergeant?
15   A.    That's incorrect.
16   Q.    What is incorrect about it?
17   A.    I was bypassed June 9th, 1999.
18   Q.    Why do you say June 9, 1999 was the
19date?
20   A.    Because that's the day that I was
21bypassed. That's the day of the interview.
22That's the day that I was notified that I was not
23chosen for the position.
24   Q.    You were notified on the day of the

45

interview?

A. Yes.

Q. How do you define the date of a bypass?

MR. HUDSON: Objection.

THE WITNESS: I don't.

Q. (BY MS. LYNCH) I will represent to you that according to my records the date of the bypass was June 20, 1999 because that was the day that the Mayor appointed Sergeant Garcia.

Is that your understanding -- that that was the date that he appointed Sergeant Garcia?

A. I'm not familiar with the date that he was appointed.

Q. In other words are you saying that the date of the bypass is the date of the interview as opposed to the date that the individual is appointed?

MR. HUDSON: Objection.

THE WITNESS: The date I was notified that I was bypassed was June 9th, 1999.

Q. (BY MS. LYNCH) Did they tell you that during the interview?

A. No.

Q. When did they tell you?

46

A. Chief Cournoyer called me in the Detective Bureau.

Q. It was that day of the interview?

A. Yes.

Q. But you understood that the appointment to the Sergeant's position of Joe Garcia occurred on a date after the interview, is that correct?

A. I don't know when Joe -- when he got full time. He was already provisional. I don't know.

Q. Assuming that he was appointed on a date after the interview, are you saying that that's not the date of the bypass?

MR. HUDSON: Objection.

THE WITNESS: I don't assume anything regarding this date of bypass.

Q. (BY MS. LYNCH) Well, what relevance to you with respect to the issue of the bypass does the date of the appointment have?

A. Can you repeat that?

Q. Yes; with respect to the issue of the bypass for the Sergeant's position, what relevance does the date of the appointment have for you?

A. I have no idea.

47

1   Q. Does it have any relevance to you?

2   A. The relevancy is June 9th, 1999 when I

3 was notified that I was not selected for sergeant.

4   Q. But my question was: Did the date of

5 the appointment of the individual to the

6 sergeant's position have any relevance to you with

7 respect to the issue of the bypass?

8           MR. HUDSON: Objection; asked and

9 answered.

10          THE WITNESS: No.

11  Q. (BY MS. LYNCH) The term "bypass" refers

12 to the appointment of someone with a lower score,

13 is that correct?

14          MR. HUDSON: Objection.

15          THE WITNESS: Not to my knowledge;

16 no.

17  Q. (BY MS. LYNCH) What do you think the

18 term "bypass" means?

19          MR. HUDSON: Objection.

20          THE WITNESS: I don't have a

21 dictionary in front of me so I don't know.

22  Q. (BY MS. LYNCH) What's your

23 understanding of the term "bypass"?

24          MR. HUDSON: Objection; calls for a

48

1 legal conclusion.

2           THE WITNESS: I don't know.

3   Q. (BY MS. LYNCH) Well, you filed an

4 appeal on the grounds that you were bypassed for

5 the Sergeant's position, is that correct?

6   A. I filed an appeal; yes.

7           (Defendant's Deposition Exhibit

            No. 1 offered and marked.)

8

9   Q. (BY MS. LYNCH) Let me show you what's

10 been marked as Exhibit Number 1.

11          Is that the appeal that you filed as a

12 result of being bypassed by Joseph Garcia?

13 (Indicating.)

14          MR. HUDSON: Read it, please. Was

15 this a document that was produced in your

16 production?

17          MS. LYNCH: I believe so; yes.

18          THE WITNESS: I haven't seen it

19 before. (Witness examining document.)

20  Q. (BY MS. LYNCH) Is that your signature,

21 Ms. Walker?

22  A. This is my signature on the first copy

23 of this page.

24  Q. Is that your signature on the second

49

page of the left-hand bottom?

A. This is my signature on the left on the bottom of this page but if you look, this was prepared by my attorney at the bottom of the page, William J. Fennell.

Q. William Fennell was your attorney with regard to the bypass?

A. With regard to the Civil Service examination case G-9914.

Q. He was your attorney with respect to your claim that Joseph Garcia was improperly appointed to the sergeant appointment ahead of you?

A. He handled my appeal; yes.

Q. In any event, you signed these documents that are Exhibit Number 1, is that correct?

A. That's correct.

Q. On Exhibit Number 1 in the second paragraph it states the approval of the appointment as sergeant within the City of Holyoke on or about June 9, 1999 of Joseph Garcia, do you see that?

A. Yes.

Q. Did you provide that date, June 9, 1999?

50

A. I don't believe I provided that date. I haven't seen this document -- this document, the first document. I do recall the second document.

Q. But that is your signature?

A. That is my signature; yes.

Q. Do you know what Joseph Garcia's seniority date is as sergeant?

A. Do I know what it is now?

Q. Right.

A. No.

Q. Do you know whether its June 20, 1999?

MR. HUDSON: Objection.

THE WITNESS: I don't remember.

Q. (BY MS. LYNCH) Do you know whether it was later than the date that you were given, June 9, 1999?

A. I don't know what it is.

Q. Do you know if you had more seniority than he did as sergeant?

A. That's an open question. Say the question again?

Q. Do you know whether you had more seniority than he did as sergeant when you were both employed at the Holyoke Police Department

51

1 whether you were senior to him as sergeant?

2 A. For a period of time when I first made
3 sergeant, no, I was not senior to him.

4 Q. Eventually you did become senior to him,
5 though, is that correct?

6 A. Yes.

7 Q. What is your understanding as to how you
8 became senior to him?

9 A. The City honored part of the agreement
10 that we had.

11 Q. Which was what?

12 A. That I would be placed -- I would gain
13 my seniority back to the date of June 9th, 1999.

14 Q. And do you know what date he had as far
15 as seniority?

16 MR. HUDSON: Objection.

17 THE WITNESS: I don't remember the
18 date.

19 Q. (BY MS. LYNCH) Do you recall that it
20 was after June 9, 1999 which was the date that you
21 were given as part of the settlement?

22 A. I don't remember.

23 Q. But in any event as a result of that
24 settlement you became senior to Joseph Garcia, is

52

1 that correct?

2 A. I believe so.

3 (Defendant's Deposition Exhibit
No. 2 offered and marked.)

4

5 Q. (BY MS. LYNCH) Showing you what's been
6 marked as Exhibit Number 2, do you recognize that
7 as the MCAD complaint that you filed as a result
8 of being bypassed for the Sergeant's position by
9 Joseph Garcia? (Indicating.)

10 A. (Witness examining document.) I can
11 state that I did file an MCAD claim in 1999.

12 Q. As a result of the bypass for the
13 Sergeant's position?

14 A. And the result that I wasn't chosen,
15 yes, as a sergeant.

16 Q. And that's your signature on the third
17 page?

18 A. Yes; it is.

19 Q. You'll notice on paragraph nine -- I'm
20 sorry, paragraph ten, it says, "I received a
21 letter on July 9, 1999 informing me that the
22 appointing authority for the City of Holyoke had
23 bypassed me for selection of the position of
24 police sergeant on certification number 99-0205."

**TAMMY WALKER vs. CITY OF HOLYOKE**

TAMMY WALKER                              SEPTEMBER 26, 2006

---

53

1 Do you see that?
2       A.    "I received" -- on ten "I received a
3 letter dating," it says July 9. Then it is
4 scratched out and then it says "on July 9" --
5 number ten?
6       Q.    Right. What is the July 9, 1999 -- do
7 you know where that date comes from?
8       A.    No.
9       Q.    Do you believe that was a typo, that it
10 should have been June 9, 1999?
11              MR. HUDSON: Objection it.
12              THE WITNESS: I don't know.
13      Q.    (BY MS. LYNCH) On the date that you
14 were informed that you weren't chosen for the
15 Sergeant's position, did you also receive a
16 letter?
17      A.    A letter on that date?
18      Q.    Right.
19      A.    June 9? I recall a phone call from
20 Chief Cournoyer.
21      Q.    So you don't recall a letter that day?
22      A.    Not -- that's a long time ago. I don't
23 recall a letter that day.
24      Q.    Why do you believe that Joseph Garcia
25            (Defendant's Deposition Exhibit

---

54

1 was chosen over you for the Sergeant's position?
2              MR. HUDSON: Objection.
3              THE WITNESS: Because he was Mayor
4 Szostkiewicz's friend.
5       Q.    (BY MS. LYNCH) Did you provide the date
6 June 9, 1999 as the date of your bypass to the
7 MCAD?
8       A.    That's the date that I was informed that
9 I was bypassed.
10      Q.    That's the date that you provided to the
11 MCAD in filing this complaint?
12              MR. HUDSON: Objection.
13              THE WITNESS: According to this
14 "cause of discrimination based on" and then it
15 starts off on June 9, 1999.
16      I don't recall this document; it's been
17 several years.
18      Q.    (BY MS. LYNCH) I understand but is it
19 your memory that you gave the June 9, 1999 date to
20 the MCAD?
21      A.    According to this document, yes.
22
23
24      Q.    (BY MS. LYNCH) Ms. Walker, I'm showing

---

55

1 you what's been marked as Exhibit Number 3.
2 You'll notice that's an eight-page document.
3              Referring you to the first page, do you
4 recall receiving that letter dated July 16, 2002
5 from City Solicitor Stephen Fitzgibbons?
6 (Indicating.)
7              MR. HUDSON: Take your time to read
8 it thoroughly.
9              (Witness examining document.)
10      Q.    (BY MS. LYNCH) Do you recall receiving
11 the first page, Ms. Walker?
12      A.    I'm sorry?
13      Q.    Do you recall receiving that letter
14 dated June 16, 2002 which is the first page of
15 Exhibit 3?
16      A.    (Witness examining document.) I don't
17 recall this first page.
18      Q.    Do you recall receiving the assented
19 motion to amend decision which are the second and
20 third pages of Exhibit 3?
21              MR. HUDSON: Take your time to read
22 them, please.
23              THE WITNESS: (Witness examining
24 document.) I'm sorry, what was the question

---

56

1 again?
2       Q.    (BY MS. LYNCH) Do you recall receiving,
3 along with the letter, page one of Exhibit 3, the
4 Assented to Motion to Amend Decision?
5       A.    I remember seeing part of this document.
6 Like I say I don't remember the first page of this
7 document.
8       I do recall the second page of this
9 document.
10      Q.    Which is the Assented to Motion to Amend
11 Decision?
12      A.    Yes; I do recall seeing that.
13      Q.    Why didn't you sign that -- the Assented
14 to Motion to Amend Decision?
15      A.    From what I gathered, this was to give
16 up my seniority. The City Solicitor is asking me
17 to give up my seniority.
18      Q.    Well, he was asking you to change the
19 seniority date to June 20, 1999 from June 9, 1999,
20 is that correct?
21              MR. HUDSON: Objection.
22      Q.    (BY MS. LYNCH) Is that correct?
23      A.    I don't know.
24      Q.    Well, you just read it and you said you

---

57

1  recall seeing it before.
2      Do you recall that the purpose of the
3  Assented to Motion to Amend Decision was to change
4  your seniority date from June 9, 1999 until
5  June 20, 1999?
6           MR. HUDSON: Objection; asked and
7  answered.
8      Q.   (BY MS. LYNCH) Is that correct?
9      A.   My understanding is that this letter was
10 to have me change it.
11     Q.   Why didn't you agree to that?
12     A.   Because the City agreed to have it
13 June 9th, 1999, and I believe it is the fourth
14 page, Exhibit A.
15     Q.   Did anyone discuss with you that the
16 June 9, 1999 seniority date that you were given
17 was in error?
18     A.   No.
19     Q.   No one ever brought that to your
20 attention?
21     A.   What time frame?
22     Q.   I'm sorry?
23     A.   At what time frame?
24     Q.   When you were still employed at the

58

1  Holyoke Police Department?
2      A.   Captain Fletcher.
3      Q.   Anyone else?
4      A.   Nope.
5      Q.   What did he say to you -- Captain
6  Fletcher?
7      A.   He stated that the date was wrong,
8  June 9, 1999.   I was given the wrong date and that
9  I needed to change it.
10     Q.   What was your response?
11     A.   My response was that it's not a union
12 matter.   He was union president -- it's not a
13 union matter.   It's an agreement between the City
14 and myself.
15     Q.   Did you understand that by receiving the
16 June 9, 1999 date that you were actually given
17 seniority over other individuals who took the
18 sergeant examine who received a score either the
19 same or higher than you?
20           MR. HUDSON: Objection to the form
21 of the question.
22           THE WITNESS: When?
23     Q.   (BY MS. LYNCH) Well, when you received
24 the -- strike that.

59

1           When you stated that June 9, 1999 was
2  the seniority date that you should get did you
3  realize that you would be placed ahead of others
4  who scored the same score of eighty as you did on
5  the Sergeant's exam and others who received a
6  higher score?
7           MR. HUDSON:    Objection.
8           THE WITNESS:    I didn't suggest the
9  date of June 9, 1999 in this document.
10     Q.   (BY MS. LYNCH) Who did?
11     A.   I believe his name was -- the person
12 that wrote this text -- handwrote this text was
13 Alex Masters.
14     Q.   Is that Exhibit A?
15     A.   Yes.
16     Q.   Which is part of Exhibit 3?
17     A.   Yes.
18     Q.   Who is Alex Masters?
19     A.   I believe he was a City Solicitor as
20 well with the City of Holyoke.
21     Q.   Do you know whether he got the June 9,
22 1999 seniority date from Exhibit 1 which was the
23 appeal that you filed and listed June 9, 1999 as
24 the date?

60

1           MR. HUDSON:    Objection.
2           THE WITNESS: I don't know where he
3  got that date from.
4      Q.   (BY MS. LYNCH) While you were employed
5  at the Holyoke Police Department did you realize
6  that by having the seniority date of June 9, 1999
7  that you had seniority over individuals who
8  received the same score as you or who received
9  higher scores than you?
10           MR. HUDSON:    Objection.
11           THE WITNESS: When?
12     Q.   (BY MS. LYNCH) That's what I asked you,
13 while you were employed at the Holyoke Police
14 Department?
15     A.   Are you asking me when I learned?
16     Q.   Well, did you learn that by having the
17 June 9, 1999 seniority date that you had seniority
18 over individuals who had the same score as you or
19 a higher score on the Sergeant's exam?
20           MR. HUDSON:    Objection as to form.
21           THE WITNESS:    I believe the question
22 is did I know that this date was supposed to be
23 incorrect? Is that your question?
24     Q.       (BY MS. LYNCH)  Well, that's the gist of

61

1  it.

2  A.        The date of my bypass is June 9, 1999.
3  That's when I was informed by my chief that I was
4  not selected for this position.

5             That's what the City Solicitor handwrote
6  out.

7  Q.    But my question to you is, Ms. Walker,
8  while you were employed at the Holyoke Police
9  Department did you realize that by being given
10 that date of June 9, 1999 that you had seniority
11 over individuals who had the same exact score as
12 you or who had higher scores on the Sergeant's
13 exam?

14            MR. HUDSON:    Objection; asked and
15 answered.

16            THE WITNESS:    I'm not understanding
17 your question.   I'm not understanding the text of
18 the question.

19            MS. LYNCH: Can you repeat that
20 question, please?

21            (Reporter read back as
                requested.)

22

23            THE WITNESS: I was informed of
24 that; yes.

62

1  Q.    (BY MS. LYNCH) Who informed you of
2  that?

3  A.    I don't recall who informed me of it.

4  Q.    Do you remember when you were informed
5  of that?

6  A.    It was soon after I was made sergeant in
7  May.

8  Q.    Did you think that was fair?

9  A.    I think the agreement that the City
10 Solicitor wrote out is fair; yes, I do.

11 Q.    Do you think it was fair that you should
12 have seniority over individuals who had the same
13 score as you or a higher score?

14 A.    I think the agreement that the City
15 Solicitor agreed upon to have me drop my MCAD
16 Civil Service complaint, the one that's
17 handwritten Exhibit A is fair; yes.

18            MS. LYNCH: That's not the question
19 I asked you, though.   Could you repeat the
20 question, please?

21            (Reporter read back as
                requested.)

22

23            THE WITNESS: Yes.

24 Q.    (BY MS. LYNCH) And when the City

63

1  A.    Because of the agreement that the City
2  made with me in order for me to drop the MCAD suit
3  and the Civil Service appeal, yes.

4  Q.    The MCAD claim and the Civil Service
5  appeal was based on the fact that you were
6  bypassed by Joseph Garcia though, is that correct?

7  A.    That I was not selected for sergeant;
8  yes.

9  Q.    So because of the fact that you filed
10 those two claims you thought that you should have
11 seniority over others who had the same score as
12 you or a higher score?

13            MR. HUDSON:    Objection; asked and
14 answered.

15            THE WITNESS:    I can't answer that
16 question.

17 Q.    (BY MS. LYNCH) You can't answer?

18 A.    I can't answer that question.

19 Q.    Do you want the question repeated?

20 A.    No.

21 Q.    Why can't you answer that question?

22 A.    Because I've answered it already.

23            MS. LYNCH:    I don't think you have.
24 Could you repeat the question, please?

64

1            (Reporter read back as
                requested.)

2

3  Q.    (BY MS. LYNCH) Could you answer the
4  question, please?

5            MR. HUDSON:    Objection; asked and
6  answered several times.

7            MS. LYNCH:    It hasn't been.

8  Q.    (BY MS. LYNCH) Could you please answer
9  the question?

10            MR. HUDSON: If you know.

11            THE WITNESS: I don't know.

12 Q.    (BY MS. LYNCH) You don't know if it's
13 fair?

14 A.    I've answered that question.   I believe
15 it's fair that the City agreed to write this text
16 if I were to drop my suit -- my claim with MCAD
17 and Civil Service.   I believe that's fair.

18 Q.    So the fact that you filed the claim
19 with Civil Service and the fact that you filed the
20 MCAD claim you think entitles you to have -- or
21 entitled you to have seniority over individuals
22 who had the same score as you or a higher score,
23 is that correct?

24            MR. HUDSON:        Objection.

65

THE WITNESS: No.

MR. HUDSON:    I think it's argumentative.

MS. LYNCH:    Could you go back up?

(Scrolling back on computer.)

MR. HUDSON: Would you read it please because we can't see it.

Ms. Reporter, would you read whatever is on the screen, please?

(Reporter read back as requested.)

MS. LYNCH: And the answer was no; okay.

Q.    (BY MS. LYNCH) Ms. Walker, the Exhibit A which is part of Exhibit 3, that was a settlement agreement that you signed?

A.    Yes; Exhibit A is a handwritten agreement written by Alex Masters.

Q.    And that contained on the first paragraph the statement that the bypass for promotion to sergeant was on June 9, 1999, is that correct?

A.        That's what the text says; yes.

Q.    I think I asked you earlier if you knew

66

the date of the -- strike that.

I think I asked you earlier if you knew the date that Sergeant Garcia and Sergeant McCoy were promoted to sergeant and I think you did not recall.

Referring to Exhibit C, does that refresh your memory as to the date that you were given where it's listed as June 20, 1999?

A.    That's listed on Exhibit C.

Q.    Does that refresh your memory as to the date of seniority that they were given when they were appointed sergeant?

A.    It doesn't refresh my memory. It says here 6/20/99.

Q.    Do you recall that Sergeant McCoy had received a score of eighty on the Sergeant's exam which was the same score that you received?

A.    Yes.

Q.    Do you know why he had a different seniority date than you did then?

A.    I have no idea.

Q.    When you were bypassed for the position of sergeant, do you recall what you were told as the reason?

67

1    MR. HUDSON: Objection; told by
2 whom?
3    Q. (BY MS. LYNCH) By the individual that
4 told you that you were bypassed?
5    A. Chief Cournoyer called me in the
6 Detective Bureau and informed me that I wasn't
7 selected.
8    Q. Did he tell you why?
9    A. I don't believe he told me why.
10    Q. How was your relationship with Chief
11 Cournoyer at that time?
12    A. Fine.
13    Q. Do you have any contact with him at the
14 current time?
15    A. No.
16    Q. You were appointed sergeant on May 5,
17 2002, is that correct?
18    A. Yes.
19    Q. That was by Mayor Sullivan?
20    A. Yes.
21    Q. How would you describe your relationship
22 with Mayor Sullivan at that time?
23    A. Fine.
24    Q. When you were bypassed by Sergeant

68

1 Garcia for the Sergeant's position, were you angry
2 about that?
3    A. I wouldn't say angry; no. Not angry;
4 disappointed.
5    Q. Did you discuss that with him --
6 Sergeant Garcia?
7    A. When?
8    Q. After he was appointed over you?
9    A. No.
10    Q. After you were appointed to sergeant and
11 received seniority over Sergeant Garcia did you
12 discuss the issue of seniority with Sergeant
13 Garcia?
14    A. Yes.
15    Q. What was that discussion and when did it
16 occur?
17    A. The discussion occurred two weeks after
18 I was on the shift as sergeant. Sergeant Garcia
19 and I were at the gas pump and I asked Sergeant
20 Garcia, are you aware that my seniority will be
21 retroactive and that I will be placed above you in
22 seniority.
23    Q. And what was his response?
24    A. He said he wasn't aware of that.

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                                              SEPTEMBER 26, 2006

---

69

Q. Any other discussion?

A. We discussed both wanting to go to days as soon as we can because we both have children.

I informed him that I told him because I didn't want him to get a letter in his mailbox notifying him of the seniority change and do it behind his back like Sergeant Pratt had done.

Q. Any other discussion?

A. No.

Q. What are you referring to when you say that Sergeant Pratt had done something behind your back?

A. Sergeant Pratt had gone behind Joe Garcia's back and gained seniority over Joseph Garcia and didn't notify him that he was doing it and he received a letter in his mailbox stating that his seniority -- Joe's seniority was taken and replaced with Sergeant Pratt's.

Q. Sergeant Pratt had an eighty-seven, though, is that correct, which was higher than both you and Sergeant Garcia?

A. If you're asking -- I don't know what Sergeant Pratt's score was.

Q. Do you know that he got a higher score

---

70

than you and Sergeant Garcia?

A. I know that he topped the list; yes.

Q. Did you think there was anything improper about him going ahead of Sergeant Garcia in the seniority list?

A. I don't know how he did -- I don't know what his appeals were.

Q. But I mean given that he got a higher score than you and Sergeant Garcia did you think there was anything inappropriate about him going ahead of Sergeant Garcia on the seniority list?

A. I don't know what the text was with that situation. I can't comment on that. That's his appeal.

Q. As a result of your getting seniority over Sergeant Garcia, how did it affect the job duties of you and Sergeant Garcia?

A. After he was informed that the City put me in front of him, no more communication, became hostile, refused to show me any of the procedures that went on on the night shift as sergeants -- new sergeants.

Q. Had he been training you at all prior to your becoming a sergeant?

---

71

1    A. Not prior to me becoming a sergeant.

2    Q. Did you ever make the allegation that he
3 refused to train you after you became a sergeant?

4    A. When I made sergeant in 2002, the first
5 two weeks were fine with Sergeant Garcia. It was
6 after he learned that I was going to have
7 seniority over him is when the hostile environment
8 and everything started.

9        The first two weeks Sergeant Garcia did
10 show me the ropes of what the details were on the
11 dog watch -- twelve at night to eight in the
12 morning watch.

13    Q.    And then he wasn't showing you the ropes
14 as you put it?

15    A.    After the conversation we had at the gas
16 pumps regarding the seniority issue is when he
17 ceased to speak to me.

18    Q.    Did the two of you ever discuss why you
19 said he was being hostile or ceased to speak with
20 you?

21    A.    No.

22    Q.    In other words did you ever go up to him
23 and say why are you not talking to me? Why are
24 you not acting like you were before -- anything

---

72

1 like that?

2

3

4    Q. Any particular reason why?

5    A. He wasn't speaking to me.

6        A. He wasn't speaking to me, Ma'am.

7    A. When someone is speaking with you and
8 they're ignoring your words, they're not going to
9 talk to you. He would not talk to me.

10    Q. Did you bring that to the attention
11 of any of your supervisors, that you believed that
12 he was not speaking with you after you became a
13 sergeant and gained seniority over him?

14

15

16

17

18    A. Yes; I did.

19    Q. Who was that?

20    A. Sergeant Lenihan.

21    Q. Do you recall when that was?

22    A. Right around the time -- I don't have
23 exact dates -- but right around the time that I
24 informed Joe about the agreement that the City and

---

PERLIK and COYLE REPORTING

# TAMMY WALKER vs. CITY OF HOLYOKE

TAMMY WALKER                                    SEPTEMBER 26, 2006

---

73

I made.

MR. HUDSON: Can I have a clarification on that name, the spelling?

MS. LYNCH: I think it's L-E-N-I-H-A-N.

MR. HUDSON: Thank you.

Q. (BY MS. LYNCH) Can you tell us what that discussion was between you and Sergeant Lenihan?

A. I informed him that Joe had stopped talking to me and that he was a CO and that I wanted to make sure that we -- him and I continued to have a good working relationship; that I can understand that Joe was upset about the seniority and I wanted to make sure that him and I had a good working relationship and I needed more training on the shift -- on certain aspects of the shift.

Q. When you said that you could understand that Joe was upset, what did you mean by that?

A. I can understand that he had lost seniority again, for the second time.

Q. What was Sergeant Lenihan's response?

A. "I don't want to get involved."

---

74

Q. Is that an exact quote?

A. That's what he said, "I don't want to get involved."

Q. Did he say why?

A. No.

Q. Did you bring that to the -- this issue of Joe Garcia not talking with you to any other supervisor?

A. Yes.

Q. Who was that?

A. Lieutenant Whelihan.

Q. Do you remember when that was?

A. Maybe the very end of May and the beginning of June.

Q. Of 2002?

A. Correct.

Q. What do you recall about that discussion?

A. I had a discussion with Lieutenant Whelihan regarding Sergeant Garcia and Sergeant Monaghan.

First it was just basically wanted to know how things were run on the shift, that if they're not speaking to me that I don't have an

---

75

1  idea of who is supposed to be where. If you're
2  not communicating, the shift isn't going to run
3  properly.
4        Q. Are you saying that John Monaghan was
5  not talking with you as well?
6        A. Yes; that's -- the answer is yes.
7        Q. Was there a change in your relationship
8  with John Monaghan after you became sergeant?
9        A. Yes.
10       Q. Before we get to that, do you recall
11  anything else about your discussion with
12  Lieutenant Whelihan?
13       A. Depending on which discussion you're
14  referring to.
15       Q. The one that you said you had with him
16  in May or June of 2002 in which you told him that
17  Joe Garcia and John Monaghan weren't speaking with
18  you?
19       A. Yes; that it was difficult to do my job
20  if I didn't know what was going on in the shift.
21       Q. What was lieutenant Whelihan's response?
22       A. I don't recall what he said exactly.
23  "I'll talk to them."
24       Q. Do you know if he ever did?

---

76

1        A. I'm sure he did. Yes; I'm sure he did.
2        Q. Why do you say that?
3        A. Because we often talked and he said
4  he'll talk to them and he usually keeps his word.
5        Q. Did you have a good relationship with
6  Lieutenant Whelihan?
7        A. Yes.
8        Q. Have you continued to have any
9  communications with him since you left the Holyoke
10  Police Department?
11       A. We'll occasionally see each other at a
12  store and say hi.
13       Q. Other than pleasantries, have you had
14  communication with him with respect to your job
15  and your efforts to get your job back?
16       A. Just pleasantries, just how are you
17  doing, that's about it.
18       Q. Did he ever voice an opinion to you
19  about the issue of your termination?
20       A. I don't remember.
21       Q. You said that your relationship with
22  John Monaghan changed also after you became a
23  sergeant. How did that relationship change?
24       A. I would have to say it stepped up to be

---

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                                    SEPTEMBER 26, 2006

---

77

more hostile, more negative.

Q.        Well, when you say that it stepped up to be more hostile or negative, are you saying there was any sort of negativity or hostility before you became a sergeant?

A.        I would say jealousy.  It wasn't hostile at that point.

Q.        You think he was jealous of you?

A.        Yes.

Q.        Why do you say that?

A.        I moved up in the Department. I moved up, I was a rape investigator, DARE, bike patrol.

Q.        When do you think that he became jealous of you?

A.        I don't know the exact date that he became jealous.

Q.        Do you remember when you became a rape investigator?

A.        A short time after I was on the job, 1993, '94.

Q.        Do you remember when you became a DARE officer?

A.        It may have been in '95, '96.

Q.        I'm sorry, other than your being a rape

---

78

investigator and a DARE officer, was there any other reason that you said that you thought he was jealous?  I just don't recall what you said.

A.        Can you read it back?

MS. LYNCH:                    If you could just move back up and I could just reread it.

(Scrolling back on computer.)

Q.        (BY MS. LYNCH) You also mentioned bike patrol?

A.        Yes.

Q.        That you thought that he was jealous of you for that.  Do you recall when that was?

A.        I don't know the dates of when I became a bike patrol officer.  I don't know the dates.

Q.        Do you know whether or not John Monaghan ever became a rape investigator or a DARE officer or did bike patrol?

A.        No; he never moved from patrol officer.

Q.        He never held any of those positions?

A.        No.

Q.        What in particular leads you to believe that he was jealous because you had those three positions?

A.        Rumor in the station.

---

79

1    Q. What rumors did you hear?
2    A. Sergeant Monaghan is -- and I quote --
3  "pissing bricks because you were selected to go to
4  the Detective Bureau."
5    Q. Who told you that?
6    A. Paul Barkyomb.
7        MS. BETOURNAY: B-A-R-K-Y-O-M-B.
8        MR. HUDSON: The witness needs to
9  take a break.
10        (A recess was taken.)
11    Q. (BY MS. LYNCH) Ms. Walker, you
12  mentioned that Paul Barkyomb -- is that correct?
13  Is that the name of the person who you said told
14  you that John Monaghan was upset that you went to
15  the Detective Bureau? Is that the person's name?
16    A. Paul Barkyomb.
17    Q. Did he tell you anything else besides
18  what you already testified to?
19    A. No.
20    Q. Did anyone else tell you that John
21  Monaghan was upset because you had either been
22  appointed to be a rape investigator or a DARE
23  officer or on the bike patrol?
24        MR. HUDSON: Objection.

---

80

1        THE WITNESS: No.
2    Q. (BY MS. LYNCH) Why did you think then
3  that he was upset that you became a DARE officer
4  or went on bike patrol?
5        MR. HUDSON: Objection.
6        THE WITNESS: His mannerisms towards
7  me.
8    Q. (BY MS. LYNCH) Can you describe that?
9    A. No; I can't; just his mannerisms. Just
10  his mannerism.
11    Q. What do you mean by mannerisms?
12    A. Not speaking as freely as all the other
13  officers did to me.
14    Q. Do you mean he wasn't very talkative
15  with you?
16    A. Right; he wasn't friendly.
17    Q. Was it unfriendly, though?
18    A. He wasn't as friendly as the other
19  officers.
20    Q. Any other reason that you think that he
21  was jealous of you?
22    A. No.
23    Q. I know you said that after you became
24  sergeant that as you stated he stepped up to be

---

81

more hostile and negative.

Do you recall that testimony a few minutes ago?

A. Yes.

Q. What do you mean by that?

A. That he began verbally attacking me.

Q. Can you describe how you believe that he was verbally attacking you?

A. Well, what's in my complaint as far as going over the air after I speak.

On the HPD frequency after I'm finished, he would come on and say "lick it, lick it good" on a different frequency.

Q. Are you referring to the WMLEC?

A. WMLEC; yes.

Q. Anything else that he did that you believe was verbally attacking you?

A. The incident where he said "start packing your bags."

Q. Anything else?

A. "Don't go sticking your tongue where it don't belong."

Q. Anything else that you believe stepped up or constituted stepping up to be more hostile

82

and negative to you after you became a sergeant?

A. Not speaking to me at all when we were sergeants.

Q. Anything else?

A. Refusing to leave the bar on my first command.

Q. Are you talking about that Elizer's Pub incident?

A. That's correct.

Q. Anything else?

A. Not off the top of my head.

Q. Well go over those in more detail. You stated that you do believe that Donald Whelihan spoke to Sergeant Garcia and Sergeant Monaghan, is that correct?

A. Yes.

Q. Did anything change after he spoke to them?

A. Yes; I was assigned to gas up the -- I was assigned to review all the reports for the evening and Sergeant Garcia was instructed to gas the cruisers.

Q. Any other changes?

A. Yes; he was ordered not to change the

83

1  roster.

2  Q.  Garcia?

3  A.  Correct.

4  Q.  Any other changes?

5  A.  Define any other changes.

6  Q.  Let me ask you this: Did your

7  relationship with Sergeant Garcia improve at all

8  after you believe that Lieutenant Whelihan spoke

9  to him?

10  A. No.

11  Q. How about with respect to Sergeant

12  Monaghan? Did your relationship with him improve

13  after you believe that Lieutenant Whelihan spoke

14  to him?

15  A. No.

16  Q. Were there any changes with respect to

17  his job duties?

18  • A. His?

19  Q. John Monaghan's after Lieutenant

20  Whelihan spoke to him?

21  A. I guess they both gassed the cruisers.

22  I was just instructed to approve reports.

23  Q. Are you alleging that you began having

24  problems with officers -- patrol officers after

84

1  you became sergeant as well?

2  A. I never had problems with patrol

3  officers.

4  Q. The only individuals then that you had

5  problems with after you became sergeant were John

6  Monaghan and Joseph Garcia?

7  A. Yes.

8  Q. Do you recall having a conversation with

9  Captain Fletcher after you became sergeant and he

10  told you that he thought that any problems you may

11  have been having with Sergeant Garcia and Sergeant

12  Monaghan would self correct if you changed the

13  seniority date?

14  MR. HUDSON: Objection; you may

15  answer.

16  A. No.

17  Q. That's a different conversation?

18

19

20

21

22

23

24

**TAMMY WALKER vs. CITY OF HOLYOKE**

TAMMY WALKER                    SEPTEMBER 26, 2006

---

85

1      A.   Yes.

2      Q.   What else do you recall about that
3 conversation?

4      A.   That conversation you were talking
5 about, the one I just mentioned here about it
6 would go away if I changed my seniority?

7      Q.   Yes.

8      A.   That was me going to him with the
9 instruction from Chief Scott to talk to him about
10 the discrimination that was happening on twelve at
11 night to eight in the morning with Sergeant Garcia
12 and Sergeant Monaghan.

13     Q.   You're saying -- are you saying that you
14 went to Chief Scott and spoke to him about
15 Sergeant Garcia and Sergeant Monaghan?

16     A.   Yes.

17     Q.   Do you recall when that was?

18     A.   No; I don't recall the date.

19     Q.   Was it before you went to speak to
20 Captain Fletcher about Monaghan and Garcia?

21     A.   I had already spoken to Captain Fletcher
22 regarding Monaghan and Garcia. I then went up to
23 the Chief and he said to go back to Captain
24 Fletcher.

---

86

1      Q. Did he say why he wanted you to go back
2 to Captain Fletcher?

3      A. He says you shouldn't have to take the
4 harassment, go to Captain Fletcher and talk to
5 him.

6      Q. Did he say he wanted you to follow the
7 chain of command?

8      A. No; I did follow the chain of command.

9      Q. But my question is with respect to Chief
10 Scott telling you to go speak to Captain Fletcher?

       A. Again.

12     Q. Did he say it was because Captain
13 Fletcher was the person within the chain of
14 command that you should speak to?

15     A. No.

16     Q. Did he say why he wanted you to speak to
17 Captain Fletcher again?

18     A. Because he's head of operations.

19     Q. When you said that you spoke to Chief
20 Scott regarding discrimination, what were you
21 referring to?

22     A. The harassment that I was enduring from
23 Sergeant Monaghan and Sergeant Garcia.

24     Q. What specifically are you referring to?

---

87

1

2

3      Q.   Did you go back to Captain Fletcher?

4      A.   Yes.

5      Q.   Do you recall when that was?

6      A.   No.

7      Q.   What was discussed?

8      A.   That Sergeant Garcia and Sergeant
9 Monaghan were not speaking to me and that it was
10 difficult to perform my duties as a sergeant. We
11 spoke about them staying in the station
12 predominantly four hours in the beginning of the
13 shift and that I was the only sergeant on the
14 road.

15     Q.   You're saying that -- strike that. How
16 often would it be that you would be the only
17 sergeant on the road when you were working the
18 same shift as Garcia and Monaghan?

19     A.   Two nights a week.

20     Q.   What were they doing?

21     A.   Staying in the station.

22     Q.   Do you know what they were doing,
23 though?

24          In other words, do you know if there was

---

88

1 a particular reason why they were staying in the
2 station and not going on the road?

3      A. They were just talking to each other.

4      Q. You were senior to them though at that
5 point, isn't that correct?

6      A. That's correct.

7      Q. Couldn't you have ordered them to go on
8 the road?

9      A. I went to my CO and I did, in fact, tell
10 them -- tell Sergeant Lenihan that they cannot sit
11 in the station.

12     Q. What was his response?

13     A. "Don't make waves."

14     Q. Is that a quote?

15     A. That's a quote.

16     Q. Did he say anything else?

17     A. Not that I recall right now. I know he
18 said, "Don't make waves."

19     Q. Did you go to any other supervisor with
20 regard to the issue of Monaghan and Garcia
21 allegedly staying in the station while you were on
22 the road?

23     A. Yes; you pull it up the chain of
24 command. You go to Lenihan, you go to --

---

**PERLIK and COYLE REPORTING**

89

1    Q.    (Interposing) But did you?
2    A.    Yes; I did.
3    Q.    Okay; do you remember when you went to
4 Lenihan -- I'm sorry, you said you already went to
5 Lenihan.
6         My question is did you go to any other
7 supervisor above him?
8    A.    Yes; Lieutenant Whelihan.
9    Q.    Do you recall when it was that you spoke
10 to him?
11   A.    I don't recall the date.
12   Q.    What was the substance of that
13 conversation?
14   A.    Lieutenant Whelihan and I spoke quite
15 often.  I don't know which one you're referring
16 to.
17   Q.    I'm talking about the issue of you said
18 you were always on the road and Garcia and
19 Monaghan were always staying in the station. You
20 said that you spoke to Lenihan about that and he
21 said "don't make waves."
22        My question is:   Did you speak to any
23 other supervisor about that issue?
24   A.    Yes; Lieutenant Whelihan.

90

1    Q.    What was that discussion?
2    A.    That they're staying in the station
3 until three o'clock in the morning and there's no
4 supervisor on the road except me.
5    Q.    What was his response?
6    A.    I don't recall what his response was.
7    Q.    Do you know if anything changed after
8 you spoke to him?
9    A.    No; the situation didn't change.
10   Q.    Did you speak to any other supervisor
11 about that issue?
12   A.    Captain Fletcher.
13   Q.    Do you remember when you spoke to him?
14   A.    It was probably -- I'm not -- I'm not
15 positive of the exact date when I spoke to him
16 regarding that but it was in the same
17 conversation.
18        I know I spoke to -- it was in September
19 that I spoke to Lieutenant Whelihan so it had to
20 be in the same time frame.
21   Q.    This is September, 2002, right?
22   A.    It may have been 2003. It may have been
23 2003 but I'm not accurate on that.
24   Q.    You were appointed sergeant in May of

91

1 2002?
2    A.    2002.
3    Q.    But you think it might have been 2003?
4    A.    I'm not accurate on that date.  I don't
5 have the paperwork in front of me.
6    Q.    Either 2002 or 2003?
7    A.    I'm not accurate on that date.  I'm not
8 positive. I have to see a document to be
9 accurate.
10   Q.    Let me ask you this: Do you remember
11 when you were having this issue with Monaghan and
12 Garcia reportedly staying in the station while you
13 were on the road, do you remember approximately
14 how long it was after you became sergeant and had
15 more seniority over them?
16        MR. HUDSON:    Objection.
17        THE WITNESS: It was normal practice
18 for them to stay in the station, period, from A
19 to Z. I mean that was normal protocol for them.
20   Q.    (BY MS. LYNCH) But in terms of when you
21 went to speak to Lenihan, Whelihan, and Fletcher
22 about it, do you have any memory as to how long
23 that was after you became sergeant and gained
24 seniority over Garcia and Monaghan?

92

1    A.    No.
2    Q.    You said you then went to speak to
3 Captain Fletcher about that issue.   Can you tell
4 me what was discussed there?
5    A.    The same thing.
6    Q.    What was his -- in other words, you
7 conveyed that complaint to him?
8    A.    Yes.
9    Q.    What was his response?
10   A.    I don't recall verbatim what his
11 response was.
12   Q.    Just substantively what was his
13 response?
14   A.    I don't recall what his response was to
15 it.
16   Q.    Do you remember if he agreed with you
17 that that shouldn't be happening or if he told you
18 don't get involved?
19   A.    I don't.
20        MR. HUDSON: Objection.
21        THE WITNESS:    I don't recall.
22   Q.    (BY MS. LYNCH) You don't remember
23 anything?
24   A.    No.

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                                    SEPTEMBER 26, 2006

---

93

1       Q. Do you recall whether he said he was
2 going to do something about it?
3               MR. HUDSON: Objection.
4               THE WITNESS: No.
5               MR. HUDSON: Asked and answered.
6       Q. (BY MS. LYNCH) Did anything change
7 after you spoke with Captain Fletcher?
8       A. No.
9       Q. Did you speak to any other supervisor
10 regarding that issue of Garcia and Monaghan
11 allegedly staying in the station?
12      A. No; those are my commands. No.
13      Q. Did they both come on duty at twelve
14 o'clock?
15      A. They?
16      Q. Monaghan and Garcia?
17      A. Sometimes Sergeant Garcia would come in
18 at eleven because he was always an early
19 supervisor and we all have to be there by quarter
20 of to do roll call.
21      Q. Are you saying that they would both stay
22 in the station until three o'clock?
23      A. Yes.
24      Q. Would that be every single time that you

---

94

1 worked with them or how often?
2       A. I would -- our shifts are split so I
3 would only work with them two nights a week when
4 Lieutenant Whelihan is off.
5       Q. How often would they stay in the station
6 until three o'clock while you were out in the
7 road?
8       A. Quite often.
9       Q. Can you give me an estimate as to what
10 you mean by quite often?
11      A. No.
12      Q. Was it every day?
13      A. No; I only worked with them two days.
14      Q. But every day that you worked with them?
15      A. Yes.
16      Q. Did you ever speak to them about that?
17      A. Yes.
18      Q. What did they say?
19      A. Snickered.
20      Q. Did they ever say anything verbally to
21 you?
22      A. No.
23      Q. After they snickered did you ever say
24 anything?

---

95

1       A. I pulled it up to the chain.
2       Q. By that you mean you went and spoke to
3 your supervisors?
4       A. Correct.
5       Q. When Captain Fletcher told you -- strike
6 that.
7               Other than what you've already testified
8 to, do you recall having any other discussions
9 with Captain Fletcher or any other supervisor
10 about the issue of your seniority date?
11      A. Not that I recall; no.
12      Q. Did you ever -- before you were sergeant
13 did you ever work as a partner with either John
14 Monaghan or Joe Garcia?
15      A. Yes.
16      Q. When you use the term partner, does that
17 mean ride together in the car?
18      A. Yes.
19      Q. Do you remember approximately how many
20 times you had worked as a partner with them and if
21 you could divide it up between Monaghan and
22 Garcia?
23      A. No; I can't for either. No.
24      Q. Before you became a sergeant did

---

96

1 officers typically have a partner?
2       A. Not typically; no.
3       Q. So usually you worked by yourself?
4       A. There's usually one car that has two
5 people in it.
6       Q. Did you ever have any difficulties
7 getting along with either Monaghan or Garcia when
8 you did work as a partner with them?
9       A. Define "get along"?
10      Q. Did you have any difficulties with them?
11      A. No; we were professional.
12      Q. Before you became sergeant did you ever
13 socialize with either of them at work, such as
14 going to lunch, going for coffee breaks, anything
15 like that?
16      A. No.
17      Q. Did you ever socialize with them outside
18 of work before you became sergeant?
19      A. I attended Sergeant Monaghan's wedding.
20      Q. Any other socialization?
21      A. No.
22      Q. Did you invite him to your wedding or to
23 any wedding that you had planned?
24      A. Who?

---

**PERLIK and COYLE REPORTING**

97

1    Q.    You -- I'm sorry, Monaghan?
2    A.    No.
3    Q.    In other words, do you recall before you
4  married Ms. Donoghue that you were going to be
5  married on another occasion and then cancelled the
6  wedding?
7    A.    Yes; I was going to be married but we
8  didn't go forward with that.    No.  No invitations
9  or anything was sent out with that.
10    Q.    Ms. Walker, you consider yourself to be
11  a lesbian, is that correct?
12    A.    Yes.
13    Q.    Do you consider yourself to be bisexual
14  as well?
15    A.    I don't pretty much label myself so, no.
16    Q.    In other words, have you ever had
17  relationships with men?
18    A.    Yes.
19    Q.    Have you ever shared information --
20  other than this lawsuit where you're obviously
21  sharing that you're a lesbian, have you ever
22  shared with members of the Holyoke Police
23  Department when you were employed there that you
24  were a lesbian?

98

1    A.    I don't understand the question, did I
2  ever share that I was a lesbian.
3    Q.    Did you ever inform them?
4    A.    No; I never said, "I'm a lesbian," no.
5    Q.    Was there a time when you were having a
6  relationship with a female dispatcher at the
7  Holyoke Police Department?
8    A.    Yes -- you need to clarify.    She wasn't
9  a dispatcher at the time.    She was no longer
10  employed at the Holyoke Police Department. She
11  wasn't working as a dispatcher in the Holyoke
12  Police Department.
13    Q.    So when you were having a relationship
14  with this woman she was not employed at the
15  Holyoke Police Department?
16    A.    She was not working as a dispatcher.
17    Q.    Was she holding another position with
18  the Holyoke Police Department?
19    A.    I believe she was per diem as a matron.
20    Q.    Did your relationship end while you were
21  both employed there?
22    A.    It wasn't a relationship.    I dated her
23  for six days.
24    Q.    Well, when it ended was there some sore

99

1  feelings on the part of either of you?
2    A.    Yes; I dated her for six days and I
3  ended it and she wasn't happy.
4    Q.    Did one of you take out a restraining
5  order against the other?
6    A.    Yes.  I took a restraining order out on
7  her.
8    Q.    Was she terminated as a result of that?
9    A.    I don't believe she was terminated
10  because of the restraining order.
11          She was terminated because she didn't do
12  the work.
13    Q.    In other words, though, as a result of
14  you being an officer and you taking a restraining
15  order out against her do you recall if a decision
16  was made that she could no longer be employed
17  there?
18    A.    She was terminated due to the fact that
19  she didn't go to work when they called her to go
20  in was my understanding.
21    Q.    Do you know if that had anything to do
22  with the fact that you had a restraining order?
23    A.    Possibly.
24    Q.    Do you recall discussing that issue with

100

1  any other officers at the Department?
2    A.    What issue?
3    Q.    The relationship, albeit brief with the
4  matron and the taking out of the restraining
5  order?
6    A.    There was an Officer Morales.
7    Q.    He was aware of it as far as you know?
8    A.    He was aware.
9    Q.    Is that Emil Morales?
10    A.    That's correct.
11    Q.    Did you tell him about it?
12    A.    About the restraining order?
13    Q.    Or anything to do with that relationship
14  with the matron?
15    A.    Yes.
16    Q.    Why did he become involved in that?
17    A.    Because she was actually calling the
18  station giving her phone number over the air to
19  Officer Morales.
20    Q.    Just briefly what did that have to do
21  with it, as far as you know?
22    A.    I don't know the relationship.
23    Q.    Well, did you have any discussion with
24  Emil Morales regarding your relationship with the

101

1 matron?

2    A.    Yes.

3    Q.    You informed him of it?

4    A.    Yes.

5    Q.    Was there a court proceeding as well

6 involving that?

7    A.    Yes.

8    Q.    Do you know if any other officers

9 learned of the relationship besides Emil Morales?

10    A.    I don't know for sure.

11    Q.    When you were -- other than after you

12 filed the complaints in which you allege that you

13 were discriminated against because of your sexual

14 orientation, do you know if officers, whether

15 patrolmen, supervisors, knew that you were a

16 lesbian?

17        MR. HUDSON:    Objection.

18        THE WITNESS: To break the question

19 down, are you asking if the officers knew that I

20 was a lesbian that were in the Holyoke Police

21 Department?

22    Q.    (BY MS. LYNCH)   Right.

23    A.    Yes; they do.

24    Q.    How do you believe that they found out?

102

1    A.    I'm not sure how they found out.

2    Q.    You don't recall telling anybody besides

3 Emil Morales?

4    A.    No.

5    Q.    You did not?

6    A.    No.

7    Q.    Do you have a license plate that says

8 "Curved"?

9    A.    Yes.

10    Q.    What does that mean? What is the

11 significance of that?

12    A.    Curved -- my body is curved.

13    Q.    It doesn't signify that you're gay?

14    A.    How would that signify I'm gay? No.

15    Q.    That's not the reason you have a license

16 plate that says "Curved"?

17    A.    No.

118    0.    Meaning not straight?

19    A.    No; my body is curved.

20    Q.    That's why you have that license plate?

21    A.    Yes.

22    Q.    Did you ever discuss being a lesbian

23 with Captain Fletcher?

24    A.    I don't believe so.

103

1    Q.    Did anyone ever say anything to you

2 before you became a sergeant about your being a

3 lesbian?

4    A.    Say anything like what?

5    Q.    Either talk to you about it or say

6 anything derogatory to you about it?

7        MR. HUDSON: When? Objection.

8        MS. LYNCH: When?

9        MR. HUDSON: Yes.

10    Q.    (BY MS. LYNCH) I said before she became

11 a sergeant.

12    A.    Not that I can recall.

13    Q.    Are you saying then the first time

14 anyone did say anything to you about that was

15 after you became a sergeant?

16    A.    When you say "about that"?

17        MR. HUDSON: Objection.

18        THE WITNESS:    I don't understand

19 what you're asking.

20    Q.    (BY MS. LYNCH) About you being a

21 lesbian -- and why I'm asking you this, just so

22 you know, is because you're saying that you were

23 harassed in your complaint based on your sexual

24 orientation.

104

1    A.    Yes.

2    Q.    That's part of your claim, right?

3    A.    Yes.

4    Q.    When are you saying that that began?

5    A.    When Sergeant Monaghan started referring

6 to my sexual orientation.

7    Q.    Are you saying that that occurred after

8 you became a sergeant?

9    A.    From what I personally heard out of

10 Sergeant Monaghan's mouth, yes.

11    Q.    Do you know whether the matron that you

12 dated briefly had informed other officers or

13 supervisors about your relationship?

14    A.    I have no idea.

15    Q.    By the way, when did that occur -- the

16 relationship with the matron?

17    A.    Let's clarify relationship.   I dated her

18 for six days.

19    Q.    That's what I'm referring to.

20    A.    Okay; six days.

21    Q.    I understand.

22    A.    Okay.

23    Q.    I said albeit brief.

24    A.    Six horrible days but go ahead.

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER          SEPTEMBER 26, 2006

105

1    Q.    When did that occur?
2    A.    August, 2002; maybe that's it.   August,
3 2002.
4    Q.    How would you describe your relationship
5 with Chief Scott when you were employed at the
6 Holyoke Police Department?
7    A.    Fine.
8    Q.    How would you describe your relationship
9 with Captain Fletcher when you were employed at
10 the Police Department?
11    A.    Fine until I wouldn't change my
12 seniority date.
13    Q.    And then how did the relationship
14 change?
15    A.    He was very upset.
16    Q.    Why do you say he was very upset?
17    A.    Because he was.
18    Q.    In other words what did he do or say
19 that led you to believe that he was very upset?
20    A.    He was -- he pulled me aside in the hall
21 and was telling me that I have the wrong seniority
22 date and that it was incumbent upon me to change
23 it.
24    Q.    Do you recall that he said that after

106

1 you went and told him that Monaghan and Garcia
2 weren't talking to you?
3    A.    That was one time that he said it in our
4 office -- or his office.
5    Q.    Any other reason you say that you no
6 longer had a fine relationship with him?
7    A.    Yes; when I wanted to write the report
8 on the Elizer's Pub incident and he didn't want me
9 to write the report.
10    Q.    Any other reason?
11    A.    That's the only two that I can think of.
12    Q.    How was your relationship with
13 Lieutenant Fournier when you were employed at the
14 Police Department?
15    A.    I didn't have any relationship with him
16 or any conversations with him.
17    Q.    Before he was in the Internal Affairs
18 Bureau, did you work with him at all?
19    A.    He was always higher ranking than I. I
20 believe we worked together on four-to-twelve
21 watch.
22        I believe he was like a sergeant or
23 something at that time.
24    Q.    Did you get along with him okay?

107

1    A.    Fine.
2    Q.    How about Daniel McCavick? How was your
3 relationship with him when you were employed at
4 the Police Department?
5    A.    Fine.
6    Q.    And how was your relationship with Eva
7 O'Connell when you were employed at the Police
8 Department?
9    A.    Fine until.
10    Q.    Until what?
11    A.    The liaison between the DEA and the
12 Holyoke Police Department.
13    Q.    What are you referring to when you say
14 the liaison between the DEA and the Holyoke Police
15 Department?
16    A.    I worked under both umbrellas -- I
17 worked under her and DEA.
18    Q.    Why did that cause a problem?
19    A.    She didn't care for DEA working in
20 Holyoke.
21    Q.    Are you referring to the period of May,
22 2000 to May, 2002?
23    A.    That's when I was in the DEA, yes.
24    Q.    So you're saying that -- are you saying

108

1 that you had problems with her during that time?
2    A.    I personally didn't have problems with
3 her. She had problems with the DEA working in
4 Holyoke performing cases.
5    Q.    How did that affect you as far as you
6 know?
7    A.    I was in the middle.   I was the liaison
8 for DEA.
9    Q.    In other words are you saying that she
10 didn't treat you properly while you were
11 affiliated with the DEA?
12    A.    DEA wanted to work in Holyoke, the
13 Lieutenant didn't want them to work in Holyoke.   I
14 was stuck in the middle so I have to report to
15 both DEA and the lieutenant.
16        When DEA wants to work in Holyoke, we
17 have to notify the lieutenant and the lieutenant
18 would not allow DEA to come into Holyoke. There
19 was always some other -- something going on and
20 DEA wanted to go into Holyoke. There was a huge
21 drug atmosphere there and they wanted to make
22 cases there.
23    Q.    But I mean did she personally take
24 action against you or saying anything to you that

109

you thought was inappropriate during that time
period?

    A.    No.

    Q.    Other than that issue involving DEA, did
you have any other problems with Lieutenant
O'Connell?

    A.    When?

    Q.    When you worked at the Holyoke Police
Department?

    A.    Did I have any problems with Lieutenant
O'Connell while I worked at the Holyoke Police
Department before I made sergeant?

    Q.    No; at any time. You said before when I
asked you the question, you said your relationship
with her was fine until you became a liaison
between the DEA and the Holyoke Police Department.
My question to you is:    Is there any
other reason that you believe that you may have
had problems with her?

    A.    No.

        MR. HUDSON: Before she became a
sergeant, is that correct?

  MS. LYNCH:        No; I was talking about
the entire time.

110

        THE WITNESS: The entire time that I
worked at the Holyoke Police Department have I
ever had any problems with Lieutenant O'Connell?

    Q.    (BY MS. LYNCH) Right.

    A.    Not until I was a DEA liaison.

    Q.    And after that, did you have any other
problems -- given that that relationship ended in
May of 2002?

    A.    Yes; with the complaints that are set
forth.    Yes.

    Q.    Are you referring to the laptop and the
scheduling book incident?

    A.    All the complaints that are listed in
the complaint and whatever Internal Affairs
complaint I initiated.

    Q.    Okay; well go over those individually.
Do you recall going to a 7-Eleven store in Holyoke
on October 15, 2002 and having some involvement
with an individual by the name of Lee Moran?

    A.    Yes; I arrested him.

    Q.    Can you tell me what occurred on that
date with regard to him?

    A.    I pulled into 7-Eleven as I normally did
on my shift.    I walked into the store, the clerk

111

1 told me that a Blazer had pulled up and almost
2 struck a vehicle.

3        I proceeded to get my coffee. The
4 individual had already left the store. As we
5 were -- as I was coming in, he was going out so we
6 didn't have any interaction.

7        A few minutes later this vehicle came
8 back in, parked very closely to the cruiser. I
9 went out to talk to the driver of the vehicle; I
10 don't recall her name. As I was speaking with her
11 Mr. Moran was screaming and yelling. I asked him
12 to be quiet while I speak to her.

13    Q. And then what happened?

14    A. He attempted to get out of the vehicle
15 and I asked him to stay inside the vehicle. I
16 then called for backup.

17        While I'm calling for backup, he pushes
18 me and we get into a tussle.

19    Q. You're saying that he got out of the
20 vehicle and pushed you?

21    A. Yes.

22    Q. Who else was around when that happened?

23    A. Meaning customers or police officers at

24    the time?

112

1    Q. Let me ask you: Were there any police
2 officers around when that occurred?

3    A. No; they were on their way.

4    Q. Was that in the parking lot?

5    A. Correct.

6    Q. What happened after he -- strike that.
7 How did he push you? Can you describe that?

8    A. Push.

9    Q. But where on your body?

10    A. Upper part of my body.

11    Q. The front or the back?

12    A. Front.

13    Q. What happened next?

14    A. I tried to grab ahold of him and bring
15 him to the ground, which unfortunately I couldn't
16 do. We tussled and we wound up near the fence --
17 there was a fence there.

18        I could see the blue lights coming and I
19 used my hip and put him to the ground. As he was
20 going to the ground, that's when the officers
21 showed up.

22    Q. How tall was he and approximately how
23 much did he weigh?

24    A. I'm not sure how tall he was or what his

---

113

1  weight was.  Its on the booking sheet.
2      Q.    How did he compare to you?
3      A.    In weight?  I'm heavier than he is.
4      Q.    How about height?
5      A.    I'm taller than he is.
6      Q.    Do you have any training in terms of
7  anything like Karate or any type of martial art
8  training?
9      A.    I've taken martial arts many years ago.
10     Q.    What type of martial arts?
ii     A.    Ishin-Ryu.
12     Q.    Do you remember when you took that?
13     A.    Many years ago -- 1980s.
14     Q.    Did you get any kind of designation?
15     A.    No.
16     Q.    Are there designations in that, like
17  black belt?
is     A.    Yeah -- no.  I didn't go past the second
19  belt.  I think its a yellow.
20     Q.    Any other type of special training in
21  martial arts or that type of activity?
22     A.    In the Academy we have defensive
23  training.
24     Q.    Who were the officers that showed up?

---

114

1      A.    I believe the first two on the scene was
2  Officer Lambert -- Doug Lambert -- and John
3  Sevigne.
4      Q.    Was he the second?
5      A.    They rode together.
6      Q.    Okay.
7      A.    They actually secured the Defendant.
8      Q.    Mr. Moran?
9      A.    Yes.
10     Q.    Did any other officers show up?
11     A.    Officer Hart, Officer Joniec, I believe
12  Officer Tony Rubiero.
13     Q.    What role if any did they have with
14  regard to Mr. Moran and having physical contact
15  with him?
16     A.    As soon as I got Mr. Moran to the
17  ground, that's when Officer Sevigne and Officer
18  Lambert took over.  My radio had fallen out and I
19  recall Officer Sevigne saying go ahead and move
20  out, Sarg.
21           I grabbed my radio and I moved out.
22  Officer Hart was there as well and he had to get
23  on Mr. Moran as well so there was three on
24  Mr. Moran.

---

115

1      Q.    Did you strike Mr. Moran at all?
2      A.    No; I grabbed hold of Mr. Moran.  When
3  he pushed me I grabbed hold of him.
4      Q.    Where did you grab him?
5      A.    Like this. (Indicating.)
6      Q.    With his arms, you're saying?
7      A.    I grabbed like the shirt area to pull
8  him into me.
9      Q.    Did punch or kick him at all?
10     A.    No, Ma'am.
11     Q.    When he was on the ground, did you punch
12  or kick him at all?
13     A.    No; as I testified, as soon as he hit
14  the ground the two officers were there.  I grabbed
15  my radio and I moved away from Mr. Moran.
16     Q.    Did you damage Officer Lambert's cell
17  phone?
18     A.    No.
19     Q.    Have you heard that that has been stated
20  in the station, that you damaged Officer Lambert's
21  cell phone outside the 7-Eleven during this
22  incident?
23     A.    No; during the scuffle while he was with
24  Defendant Lee Moran his cell phone was damaged is

---

116

1  what I heard in the station.
2      Q.    So you never heard that it was stated
3  that you intentionally destroyed the cell phone?
4      A.    Have I heard that?
5      Q.    Yes.
6      A.    Yes; I've heard that.
7      Q.    But you're saying that's not true?
8      A.    No.
9      Q.    Did you buy Officer Lambert a new cell
10  phone?
11     A.    I gave Officer Lambert thirty dollars
12  for his cell phone.
13     Q.    Why did you do that?
14     A.    Because it was my arrest, he was coming
15  to help me and while he was scuffling with Lee
16  Moran with Officer Joniec and Officer Hart his
17  cell phone was damaged.
18     Q.    How exactly do you understand the cell
19  phone was damaged?
20     A.    I have no idea. Once I moved off of
21  Mr. Lee Moran and I was speaking with Jeff Joniec
22  I had nothing to do with that -- the handcuffing,
23  walking him to the car.  I knew my officers could
24  handle it.

117

Q. Are you aware that Mr. Moran alleges that he was beaten at the scene -- meaning at the 7-Eleven?

A. I'm aware of a report; yes.

Q. Was that a report that was prepared by Sergeant Garcia?

A. I'm aware of that report; yes.

Q. Are you aware that -- strike that. Did you ever speak to the clerk at the 7-Eleven regarding that incident?

A. Yes.

Q. Do you recall when that was?

A. I went into the store I believe it was the day after the arrest and the clerk pulled me aside.

Q. What did you two discuss?

A. He wanted me to know that two officers came into the store and was asking about the arrest.

Q. Did he give you any other information?

A. He said that there was a tall one and a short one and I said it might be IAD -- which is Internal Affairs -- and he said they were in uniform and that's when I told him to stop.

118

Q. You told him to stop?

A. I told him to stop talking and to put it in writing.

Q. Why did you tell him to do that?

A. Because the people that he described to me I knew was Sergeant Monaghan and Sergeant Garcia.

Q. How did you know that?

A. Because there's only two sergeants -- they have gold badges and gold stripes so I know it wasn't officers; it was another ranking officer.

Q. So you're saying that he said the officers that came in had stripes on their shoulders?

A. Had -- the uniform the guy had and a gold badge.

Q. A gold badge?

A. A gold badge.

Q. You're saying gold as in the gold?

A. Gold -- G-O-L-D.

Q. That's how he described them?

A. Yes; he described Sergeant Monaghan and Garcia.

119

1  Q. So this gold badge signifies a
2  sergeant's badge?
3      A. Gold badge signifies a ranking
4  officer. Q. So the captain can have the
5  same color? A. The people that he
6  described to me were
7  Sergeant Garcia and Sergeant Monaghan.
8      Q. But my question is with regard to the
9  gold badge, is that something that all officers
10 have?
11     Q. Meaning sergeant and up?
12     A. Correct -- well, lieutenants have
13 bars. Q. How tall is Joe Garcia,
14 approximately? A. I don't know.
15     Q. Did he give you any other
16 description
17
18
19 about them in terms of hair color or skin color,
20 anything like that?
21     A. No.
22     A. Because I'm not Internal Affairs. I'm
23
24

120

1 not Internal Affairs, Professional Standards
2 Division.
3     Q.   What do you mean by that?
4     A.   I'm not Internal Affairs. I don't
5 investigate other officers. That's for Internal
6 Affairs to do.
7     Q.   In other words you thought that Monaghan
8 and Garcia, assuming they were the ones that went
9 in, should be investigated?
10    A.   No. You asked me why I stopped the
11 clerk from speaking further on and just to put it
12 in writing.
13    Q.   Right.
14    A.   From what the clerk told me and the way
15 he felt, I told him to stop and put it in writing,
16 just put it in writing and I will give it to the
17 appropriate parties.
18    Q.   You were planning to give whatever he
19 wrote to Internal Affairs?
20    A.   I was planning on giving it to the
21 appropriate parties; yes.
22    Q.   I'm sorry, I'm just still trying to
23 understand your statement.
24        You told him to put it in writing

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                    SEPTEMBER 26, 2006

121

1 because you're not Internal Affairs?
2    A.    That's correct.
3    Q.    So you wanted -- did you think that
4 there was something inappropriate about Monaghan
5 and Garcia speaking to the clerk about the
6 incident?
7    A.    From what the clerk told me, yes.
8    Q.    And why was that?
9    A.    Because he said that these two gentlemen
10 came in and asked about the arrest and they
11 specifically asked this gentleman if I had struck
12 Lee Moran and when the clerk said no, the tall one
13 kept insisting, "are you sure, are you absolutely
14 sure."
15 The clerk felt intimidated.            I said
16 don't be intimidated, just put it in writing.
17 Whatever transpired with that conversation, put it
18 in writing.
19   Q.    Did he do so?
20   A.    Yes; he did.
21   Q.    What did you do with that?
22   A.    I gave it to Internal Affairs.
23   Q.    Did you give it to Internal Affairs
24 right after he wrote it -- you know meaning within

122

1 a day or so?
2    A.    No; that -- no; I did not.
3    Q.    Did you just hold onto it then for
4 awhile?
5    A.    No; it took him awhile to write it.
6 Then I gave it to Internal Affairs. There was a
7 letter that came out and I gave it to Internal
8 Affairs.
9    Q.    Do you remember how long it took him to
10 write it?
11   A.    By the time I picked it up, maybe four
12 or five days.
13   Q.    So then after you picked it up, did you
14 immediately turn it over to Internal Affairs,
15 meaning within a day?
16   A.    No.
17   Q.    You held onto it?
18   A.    Yes.
19   Q.    Why did you hold onto it?
20   A.    I don't know why I held onto it.
21   Q.    Do you remember how long after he
22 prepared it you did turn it in to Internal
23 Affairs?
24   A.    No.

123

1    Q.    Did you turn it in to Internal Affairs
2 after the incident was being investigated?
3    A.    I don't know the time frame.
4    Q.    Was there actually an investigation of
5 this incident with Lee Moran at the 7-Eleven on
6 October 15, 2002?
7          MR. HUDSON:    Objection.
8    Q.    (BY MS. LYNCH) If you know?
9    A.    Was there an investigation?
10   Q.    Right; do you know if there was an
11 investigation of that incident?
12   A.    Did I give a statement?
13   Q.    No; let me clarify.  Do you know if
14 either Chief Scott or the Internal Affairs Bureau
15 investigated that incident?
16          MR. HUDSON: Objection.
17          THE WITNESS: I have no knowledge of
18 them investigating that incident.
19   Q.    (BY MS. LYNCH) When you did give the
20 statement to Internal Affairs, what prompted you
21 to do that?
22   A.    I was given a letter saying to turn the
23 letter over to Internal Affairs.
24   Q.    Who asked you to do that?

124

1    A.    It was a letter from Sergeant McCavick.
2    Q.    Do you know how he knew that you had it?
3    A.    Yes.
4    Q.    How was that?
5    A.    How he -- I went to Chief Scott and told
6 him what had transpired and he said, I guess to
7 Sergeant McCavick, he wanted the letter.
8    Q.    What did you tell Chief Scott?
9    A.    I told Chief Scott that Sergeant
10 Monaghan and Sergeant Garcia are up to their
11 tricks and they were at the 7-Eleven intimidating
12 the clerk there and making him afraid.
13   Q.    What do you mean -- what did you mean
14 when you said that they were up to their tricks?
15   A.    Meaning why would you go in and
16 investigate an arrest of your superior officer.
17          I knew something wasn't good coming out
18 of this.
19   Q.    Had they ever done anything similar to
20 that prior to that day?
21   A.    Have they ever gone and checked on my
22 arrests before? Not to my knowledge.
23   Q.    I guess I just wondered why you said
24 they were up to their tricks --

PERLIK and COYLE REPORTING

**TAMMY WALKER**             **SEPTEMBER 26, 2006**

125

A. (Interposing) Because of the hostile work environment that I was being put under.

Q. But let me finish the question. Do you ever think they committed a so-called trick prior to that?

MR. HUDSON: Objection.

THE WITNESS: I don't know what you're saying. I didn't catch it. I don't know.

I was under what I would phrase as a hostile working environment with those two.

Q. (BY MS. LYNCH) What do you believe constituted intimidation of the clerk?

MR. HUDSON: Objection. You either know or you don't know.

You asked the witness what she believed. This is not a conversation.

MS. LYNCH: Let me just reask the question because I didn't follow what Attorney Hudson said.

Q. (BY MS. LYNCH) I believe you testified that you told Chief Scott that Monaghan and Garcia were up to tricks in that they intimidated the clerk. Do you recall that testimony?

A. Yes.

126

Q. How do you believe that they intimidated the clerk?

MR. HUDSON: Objection.

THE WITNESS: From what the clerk told me.

Q. (BY MS. LYNCH) Was there anything more besides what you've already testified to?

A. Anything more?

Q. Well, I believe you testified earlier that the clerk told you that they came in and inquired and asked whether you had struck Lee Moran and then said are you sure, are you absolutely sure.

A. That's what the clerk said.

Q. Do you believe that that constituted intimidation of the clerk?

A. It's what the clerk told me.

Q. Right.

A. The clerk told me how he felt.

Q. Did he tell you that he felt intimidated?

A. Yes.

Q. He did?

A. Yes; he said he felt it was an

127

1 interrogation.

2     Q.    When Sergeant Monaghan and Sergeant

3 Garcia were in the 7-Eleven speaking to the clerk

4 were you outside and did you see them speaking to

5 the clerk?

6     A.    No; I've never seen Sergeant Garcia and

7 Sergeant Monaghan in 7-Eleven ever on the whole

8 tour.

9     Q.    Do you recall anything else that the

10 clerk told you about their conversation with him

11 besides what you've already stated?

12     A.    He stated the tall one asked if there

13 was a camera outside.

14     Q.    What did he tell him as far as you know?

15     A.    I don't -- just from his statement; I

16 recall his statement.

17        I don't know what he said that night but

18 his statement says no.

19     Q.    Did he tell you anything else that he

20 discussed with Monaghan and Garcia?

21     A.    Not that he discussed. He just didn't

22 feel right, he said.

23     Q.    He said he just didn't feel right?

24     A.    It just didn't feel right.

128

1     Q. Did he say anything else besides what

2 you've already stated?

3     A. No.

4     Q. Did you know that particular clerk prior

5 to him giving you this information when you went

6 in there?

7     A. Just from 7-Eleven, going for coffee.

8     Q. So you had contact with him before?

9     A. Yes; I go and get my coffee.

10     Q. Do you know where he is now?

11     A. No.

12     Q. Is he still there, do you know?

13     A. No.

14     Q. Do you know how long they spoke to

15 him -- for how long?

16     A. No.

17     Q. Do you know if they ever had any other

18 contact with him about this Lee Moran incident?

19     A. Not that I'm aware of.

20     Q. Did you ever find out if there was a

21 camera that was working on the night of the

22 incident with Lee Moran?

23     A. Do I know if they have cameras there?

24     Q. Do you know if there was a camera that

129

was working that night and videotaped the incidents in the parking lot?

A. No; they don't have cameras there.

Q. They don't have cameras of the parking lot?

A. No.

Q. Do you know if they have cameras inside the store?

A. Yes; they do.

Q. Did you ever view any videotape that was taken that night?

A. No; I asked the clerk to save the videotape for IAD.

Q. Do you know if he did?

A. I believe he said he taped over it.

Q. But you, yourself, never watched a videotape?

A. No; I wanted the videotape.

MR. HUDSON: At this point, its approximately one-sixteen. Can we take a break until about two o'clock at least?

MS. LYNCH: Well, forty-five minutes should be enough, right?

MR. HUDSON: That's why I said about

130

two because I have a little bit after one-fifteen.

MS. LYNCH: Okay, we'll meet back here about two o'clock.

(A luncheon recess was taken.)

Q. (BY MS. LYNCH) Ms. Walker, did you ever speak to either Monaghan or Garcia about the fact that they had asked the clerk about the Lee Moran incident of October 15, 2002?

A. No.

Q. Any particular reason why you didn't?

A. No, I just wouldn't speak to them about that.

Q. You were at John Monaghan's deposition where he stated that the reason he went in and asked the clerk was because he had some I guess younger patrolman asking what they should do in terms of reporting the incident. Do you recall his testimony?

A. I recall John saying that Officer Sevigne questioned him about what he should do.

Q. Well, the testimony you heard, do you have any reason to dispute it?

A. I'm not sure what Officer Sevigne said to him.

131

1        Q. But with regard to what you heard John
2 Monaghan testify to at his deposition, do you have
3 any reason to believe that his testimony was not
4 truthful?
5        A. Whose testimony?
6        Q. John Monaghan's?
7            MR. HUDSON: Objection.
8            THE WITNESS: John Monaghan's
9 testimony was not truthful.
10       Q. (BY MS. LYNCH) Why do you believe that?
11       A. His whole testimony at the deposition
12 wasn't truthful.
13       Q. But what I'm referring to was the
14 testimony that he gave regarding why he was
15 talking to the clerk following the Lee Moran
16 incident.
17       A. I don't recall his exact testimony --
18 John Monaghan's exact testimony.
19       Q. Did you ever find out why the clerk
20 taped over the video from the October 15, 2002
21 incident?
22           MR. HUDSON: Objection.
23           THE WITNESS: I don't know why he
24 taped over -- was it October 15th?

132

1        Q. (BY MS. LYNCH) Yes.
2        A. No.
3        Q. Do you believe that John Monaghan and
4 Joseph Garcia did not have the right to ask the
5 clerk about the October 15, 2002 incident?
6            MR. HUDSON: Objection.
7            THE WITNESS: As a supervisor in the
8 Holyoke Police Department it's not protocol or
9 procedure for a uniform officer to question anyone
10 regarding an arrest.
11       Q. (BY MS. LYNCH) Is that written anywhere
12 in terms of any sort of orders or rules, policies
13 in the Police Department?
14       A. In our SOPs, if a supervisor feels that
15 there is an infraction of some sort, it is to be
16 given to the Internal Affairs Division.
17       Q. Do you happen to know which SOP that
18 was?
19       A. No.
20       Q. Which number?
21       A. No.
22           (Defendant's Deposition Exhibit
            No. 4 offered and marked.)
23
24       Q. (BY MS. LYNCH) Showing you what's been

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                                    SEPTEMBER 26, 2006

---

133

1 marked as Exhibit Number 4, is that the complaint
2 that you filed on October 25, 2002? (Indicating.)
3        A.    (Witness examining document.) Yes.
4        Q.    After John Monaghan reportedly sang the
5 song to you -- did he actually sing those words as
6 opposed to just state them?
7        A.    He sang them.
8        Q.    Sang them? Is that any kind of a song
9 as far as you know?
10       A.    As far as I know, no.
11       Q.    There was a supervising officer there,
12 Sergeant Lenihan, is that correct?
13       A.    Yes.
14       Q.    Did you say anything to him after
15 Sergeant Monaghan sang that song?
16       A.    Did I say anything to Sergeant Lenihan?
17       Q.    Yes.
18       A.    No.
19       Q.    Why didn't you?
20       A.    There were four men in the room
21 including Sergeant Monaghan and I never go in the
22 office with them anyway. I got caught in there
23 off guard and when it happened, I wanted to get
24 out of that room.

---

134

1        Q.    What do you mean, you were caught off
2 guard?
3        A.    I never went into the CO's office when
4 Lieutenant Whelihan was not working.
5        Q.    Why didn't you?
6        A.    Because I won't allow myself to be
7 caught by Sergeant Monaghan or Sergeant Garcia.
8 This day no one was in the office when I sat there
9 and retrieved my messages off of my voicemail. No
10 one was in the office. I was alone and then they
11 came in.
12       Q.    Did you proceed to leave?
13       A.    I was on the phone retrieving my
14 messages. While the messages were being played
15 they walked in, Chris sat down, Garcia sat down,
16 Lenihan sat down.
17             Monaghan came in, put something on the
18 back clipboard, came over while I was listening to
19 my messages, sang the message, the song in my ear
20 and put the roster in the clipboard.
21       Q.    How loud did he sing that song?
22       A.    Loud enough for me to hear it.
23       Q.    But you said it was in your ear?
24       A.    Yes.

---

135

1        Q.    Did he lean over you?
2        A.    He was leaning over, placing the roster
3 in the clipboard and as he was placing it in the
4 clipboard, he sang the song.
5             MR. HUDSON: Point of clarification.
6 Are we talking about the song in Exhibit 4?
7             MS. LYNCH: Yes.
8             MR. HUDSON: "You shouldn't go
9 sticking your tongue where it don't belong"? Is
10 that the song we're talking about?
11            MS. LYNCH: Yes; Exhibit 4.
12            MR. HUDSON: All right; I just
13 wanted to clarify. Thank you.
14       Q. (BY MS. LYNCH) Had he ever said
15 anything like that to you before?
16       A. Has he ever said anything, "you
17 shouldn't go sticking your tongue where it don't
18 belong"?
19       Q. Yes.
20       A. Not in those words -- not these words;
21 no.
22       Q.    Anything of a similar nature that you
23 considered to be offensive?
24       A.    Yes.

---

136

1        Q. What had he said prior to October 17,
2 2002 that you considered to be offensive?
3        A. Now you're saying prior?
4        Q. Right.
5        A. I don't recall anything prior at this
6 time.
7        Q. But there was something subsequent that
8 he said that was offensive to you?
9        A.    Yes.
10       Q. Just briefly what was that?
11       A. Well, the radio transmissions over
12 WMLEC.
13       Q. Okay; we'll get to that in a moment.
14 Anything else?
15       A. Not right now that I can think of.
16       Q. What was your reaction when he sang that
17 to you?
18       A. When he sang?
19       Q. What's in Exhibit 4.
20       A. "Don't go sticking your tongue where it
21 don't belong"?
22       Q. Right?
23       A. I was embarrassed, I was humiliated and
24 I got out of the room.

---

137

Q.    Did you say anything to him at all?

A.    No.

Q.    How far was Sergeant Lenihan from you when Sergeant Monaghan sang that song?

A.    Four feet away.

Q.    You were seated at one desk, is that correct?

A.    Correct.

Q.    Where was Sergeant Lenihan's desk?

A.    Seated four feet away to my right.

Q.    Were the desks adjacent to each other in the same row?

A.    They're across from each other in the same room, four feet apart.

Q.    Can you diagram it how the desks were -- where everyone was?

MR. HUDSON: Just a point of clarification.

Was your question Sergeant Monaghan's desk or Sergeant Lenihan's desk?

MS. LYNCH:    Lenihan.

MR. HUDSON: Okay.

Q.    (BY MS. LYNCH) If you could put where yours was and where the other officers were

138

located at the time that Sergeant Monaghan sang that song to you reflected in Exhibit 4?

A.    (Witness drawing.)

Q.    Can you put the approximate location where John Monaghan was? You can just put his initials, "J.M.," where he was at the point that he sang it to you?

A.    (Witness complying.)

Q.    Did you say that there's four feet between the desk that you were at and the desk that Sergeant Lenihan --

A.    (Interposing) Correct; approximately four feet between these two desks.

Q.    Do you know whether in fact Sergeant Lenihan heard Sergeant Monaghan sing that song to you?

A.    They all heard him sing the song because Chris Dunn started laughing.

Q.    Why do you believe that just because Chris Dunn started laughing that everyone heard him sing that song to you?

A.    Chris Dunn started laughing.  I in my embarrassed humiliated moment looked at Garcia, Garcia looked at Lenihan and I just put the phone

139

1  down and left the office.

2    Q. You said Chris Dunn started laughing, he
3  looked at Garcia.

4    A. And I put the phone done and put my head
5  down and left the office.

6    Q. And they started laughing?

7    A. Yes.

8    Q. And that's the reason you think they
9  heard it?

10    A. There was no other conversation going
11  on.

12    Q. Did anyone make any comment other than
13  Chris Dunn laughing after that song was sang?

14    A. No.

15    Q. Did you see the facial expression of
16  Sergeant Lenihan after --

17    A. (Interposing) No.

18    Q. -- after that song was sang?

19    A. No.

20    Q. Did you see the facial expression of
21  Sergeant Garcia after the song was sang?

22    A. He just looked over at Sergeant Lenihan.

23    Q. Did John Monaghan say anything else at
24  all?

140

1    A. No.

2    Q. When you say you know what Sergeant
3  Monaghan was referring to, are you saying that it
4  was a sexual reference -- the statement here where
5  you say "being a lesbian I know what Sergeant
6  Monaghan was referring to"?

7    A. Yes.

8    Q. Is the first time that you reported that
9  when you filed the complaint known as Exhibit 4
10  dated October 24, 2002?

11    A. I'm sorry?

12    Q. Is that the first time that you reported
13  the singing of the song to you on October 17,
14  2002?

15    A. It's the first time I put it in writing.

16    Q. Had you told anybody about it verbally
17  prior to that?

18    A. No.

19    Q. How did you get along with Officer Dunn
20  at that time?

21    A. A professional relationship. I was his
22  supervisor.

23    Q. You were his supervisor?

24    A. Yes.

**TAMMY WALKER v. CITY OF HOLYOKE**

**TAMMY WALKER**          **SEPTEMBER 26, 2006**

---

141

Q.   How about Sergeant Lenihan? How did you get along with him?

A.   Not well.

Q.   Not well?

A.   (Witness shaking head.)

Q.   Why do you say that?

A.   Sergeant Lenihan and I -- I have asked him to speak with Sergeant Garcia, Sergeant Monaghan since he was my next chain in command and he simply said he didn't want to get involved. When I went to him on another occasion, he said don't make waves.

He wasn't supportive in bringing it to my superior officer following the chain of command.

Q.   You also wrote in Exhibit 4 that "it has also been brought to my attention by several officers that Sergeant Monaghan refers to me as Tyrone rather than by my birth name Tammy."

First of all, who told you that?

MR. HUDSON: You need to just go ahead and answer the question. If you want to take a break --

MS. LYNCH: (Interposing) Well,

---

142

there's a question pending.

MR. HUDSON: I said you need to go ahead and answer the question.

THE WITNESS: I was asked this question before. For fear of retaliation against the parties being placed on them, if I give their names they will be retaliated against as well.

Q.   (BY MS. LYNCH) Well, I disagree with you, Ms. Walker and I'm asking you to answer the question.

A.   I don't recall at this time.

Q.   Was it Jorge Rodriguez?

A.   No.

Q.   You honestly don't recall who told you that?

A.   I honestly don't recall.

Q.   Did you write it down anywhere?

A.   No.

Q.   What significance does the name Tyrone have to you?

A.   It is not my name.

Q.   Right; other than that does the name Tyrone have any significance to you?

A.   It conjures up an African-American male.

---

143

1   Q.   Why do you say that?

2   A.   Because it does to me.

3   Q.   What do you base that upon?

4   A.   You don't find that many white males

5 with the name Tyrone.

6       The fact that he called me Tyrone and

7 not my birth name and I'm African-American, I

8 presume that he feels that I'm a male instead of a

9 female.

10   Q.   How many males do you know named Tyrone?

11   A.   Personally?

12   Q.   Yes.

13   A.   One.

14   Q.   What is their race?

15   A.   African-American.

16   Q.   Do you know any other Tyrones?

17   A.   Personally?

18   Q.   At all.

19   A.   No.

20   Q.   Do you know if they are another race

21 besides African-American or any white males?

22   A.   No.

23   Q.   How many do you know not personally, but

24 know of?

---

144

1   A.   I know one personal named Tyrone.

2   Q.   But other than knowing personally, do

3 you know of any other person with the name Tyrone?

4   A.   There was someone booked in our station

5 by the name of Tyrone.

6   Q.   Do you know what their last name is?

7   A.   No.

8   Q.   The one that you do know, what is his

9 last name?

10   A.   I don't know his last name.

11   Q.   The one that was booked, what was their

12 race?

13   A.   African-American.

14   Q.   Do you know any other Tyrones?

15   A.   No.

16   Q.   Did you ever hear Sergeant Monaghan

17 refer to you as Tyrone?

18   A.   No.

19   Q.   You said here in Exhibit 4, "It has been

20 brought to my attention by several officers."

21       How many officers told you that he

22 called you Tyrone?

23   A.   More than three.

24   Q.   More than three?

---

# TAMMY WALKER vs. CITY OF HOLYOKE

| TAMMY WALKER | SEPTEMBER 26, 2006 |
|---|---|

---

**145**

A. (Witness nodding.) Over the time, yes.

Q. And you can't remember any of the three?

A. Not at this time.

(Defendant's Deposition Exhibit No. 5 offered and marked.)

Q. (BY MS. LYNCH) You were given Exhibit 5 by Lieutenant Fournier with regard to this incident, is that correct? (Indicating.)

A. (Witness examining document.)

Q. In other words, you were ordered to provide the name of the officers who told you that Monaghan called you Tyrone?

A. Yes.

(Defendant's Deposition Exhibit No. 6 offered and marked.)

Q. (BY MS. LYNCH) And showing you Exhibit 6, is that the response that you wrote to Exhibit 5? (Indicating.)

A. (Witness examining document.)

Q. Is that the response that you made?

A. Yes.

Q. The word "rat" in quotes in Exhibit 6, is that your word or is that the word of the officers that gave you the information about

**146**

Tyrone?

A. That is a general word used by police officers that turn in other police officers.

Q. In other words you used that word on your own as opposed to they used that word?

A. All officers use that word referring to officers that turn in other officers.

Q. But I mean did they say to you, "I don't want to be called a rat," or did you use that term on your own that you thought if you turned them in they'd be called a rat?

A. They would be called a rat if I gave the names of the people that said that; that's why I wrote that.

Q. But I mean did they say to you that they were concerned that they'd be called a rat?

A. They would be concerned about the harassment that would follow.

Q. That's what they said to you?

A. Yes.

Q. Other than your attorney, have you told anyone the identity of these officers who told you that John Monaghan referred to you as Tyrone?

A. I never told my attorney the names of

**147**

1 the individuals.

2 Q. You're saying to this day you haven't
3 told anyone?

4 A. No one.

5 Q. These officers that told you that John
6 Monaghan called you Tyrone, did they tell you that
7 they considered it to be derogatory or anything
8 like that?

9 A. Yes; that's why they told me.

10 Q. What do you recall them saying to you,
11 other than John Monaghan called you Tyrone?

12 A. "John Monaghan refers to you as a black
13 male. "

14 Q. That's what they said?

15 A. Yes.

16 Q. Anything else that you recall them
17 saying?

18 A. No.

19 Q. Do you recall when it was that they told
20 you that he called you Tyrone?

21 A. November sometime.

22 Q. November?

23 A. November sometime.

24 Q. Of what year?

**148**

1 A. Maybe it was September -- September-ish.

2 Q. Of what year?

3 A. 2002.

4 Q. Your complaint is dated October 24, 2002
5 so you think it was September, 2002?

6 A. I believe so. I have to check the date
7 on here. What was the date here?

8 Q. Your complaint -- actually, it's right
9 there.

10 A. This is October 24th is the date of the
11 complaint. This was written October 30th, 2002 so
12 according to this, three weeks before.

13 Q. Okay; all right. As a result of your
14 not providing the names of the officers who told
15 you that Monaghan referred to you as Tyrone, do
16 you recall that the Internal Affairs Bureau
17 required all officers on the watch that you were
18 on to complete a questionnaire?

19 MR. HUDSON: Objection.

20 (Defendant's Deposition Exhibit No. 7 offered and marked.)

21

22 Q. (BY MS. LYNCH) Do you recall that -and
23 I'm showing you Exhibit Number 7. Do
24 you recall that that questionnaire

---

149

1 was circulated among the officers on the shift
2 that you were on?   (Indicating.)
3             MR. HUDSON: Which question are you
4 asking? The first one or the last one? The last
5 one?
6             MS. LYNCH: Yes.
7             MR. HUDSON: Okay.
8             THE WITNESS: This is a
9 questionnaire that was circulated, initiated by
10 Chief Scott.
11     Q.   (BY MS. LYNCH) Is it your understanding
12 that that questionnaire was circulated after you
13 would not identify the officers who told you
14 Monaghan called you Tyrone?
15     A.   I'm not sure of why it was circulated.
16             (Defendant's Deposition Exhibit
                No. 8 offered and marked.)
17
18     Q.   (BY MS. LYNCH) Were you subsequently
19 informed that based on the investigation that was
20 conducted that the Internal Affairs Bureau
21 considered the allegations made about John
22 Monaghan to be unfounded? (Indicating.)
23     A.   (Witness examining document.) Yes; I
24 was informed that it was unfounded. I'm not sure

150

1 why it was unfounded.
2     Q.   You were given a copy of Exhibit 8?
3     A.   I was given a copy of Exhibit 8.   I was
4 never given a copy of Exhibit 7.
5     Q.   You weren't asked to fill out the
6 questionnaire?
7     A.   No.
8     Q.   After you got Exhibit 8, why didn't you
9 come forward with the names of the officers who
10 told you that John Monaghan called you Tyrone?
11     A.   Why didn't I come forward?
12     Q.   Right.
13     A.   Because they were given a
14 questionnaire -- all the officers were given a
15 questionnaire and the officers that told me filled
16 it out.   I'm not sure which ones said they said it
17 or which ones said they didn't.
18             I know that Officer Rodriguez stated
19 that there was something to these allegations and
20 they never went back to him. I haven't yet seen
21 the answers to the officers that responded to this
22 questionnaire.
23     Q.   You weren't given a copy of any of those
24 documents following the investigation or during

151

1 the investigation?
2     A.   No; no. They may have said something in
3 here that I don't know of.   I have never seen the
4 answers.
5     Q.   And you're referring to the answers to
6 Number 7?
7     A.   Yes; I've never seen the answers to
8 Number 7.
9     Q.   The officers that told you that Monaghan
10 called you Tyrone, did they work on the same shift
11 as you and Monaghan?
12     A.   I don't know that.
13     Q.   You don't know?
14     A.   No.
15     Q.   Do you know the circumstances of how
16 they happened to be with Monaghan when he
17 allegedly called you Tyrone?
18     A.   Not that I can recall.
19     Q.   Given that you refused to identify the
20 officers that told you that Monaghan called you
21 Tyrone how did you expect the Internal Affairs
22 Bureau to do their investigation of that
23 allegation?
24             MR. HUDSON: Objection.

152

1             THE WITNESS: The questionnaire went
2 around to all the officers that worked on that
3 shift and it depends on what their answers are.
4             Again, I've never seen the answers.
5 Once I see the answers, I'll know if they are
6 willing to come forward.
7     Q.   (BY MS. LYNCH)   Do you recall attending
8 a meeting with Captain Fletcher, Lieutenant
9 Whelihan, and John Monaghan where there was a
10 discussion about the problems you said you were
11 having with John Monaghan?
12     A.   Yes.
13     Q.   Can you tell me what was said during
14 that meeting?
15     A.   Captain Fletcher and Lieutenant Whelihan
16 both wanted Sergeant Monaghan and myself to get
17 along, to not call me names.   He said he didn't
18 call me anything.
19     Q.   Monaghan?
20     A.   Monaghan.   He also stated -- Captain
21 Fletcher also stated that we're having this
22 meeting because there's friction on the dog
23 watch -- well, twelve at night to eight in the
24 morning watch and he didn't want it to turn into

TAMMY WALKER vs. CITY OF HOLYOKE

TAMMY WALKER                                    SEPTEMBER 26, 2006

153

a -- he phrased it a Wagner case.

Q.   That's what Captain Fletcher said?

A.       A Wagner case; yes.

Q.   What did you think he meant by that?

A.   Filing a lawsuit.

MR. HUDSON:                Objection.

Q.   (BY MS. LYNCH) You can answer.

A.   Filing a lawsuit is what I thought.

Q.   Do you recall what you said during that meeting?

A.   I pretty much stayed silent in the meeting, just listening to what the Captain had to say -- the Captain and the Lieutenant had to say.

Q.   Did you express during that meeting what you had either heard or had been told that Monaghan had stated to you that you found offensive?

A.   No; I pretty much wanted to hear what Monaghan and the Captain and the Lieutenant had to say.

Q.   Did Monaghan say anything to the effect of he wanted to be friends with you and get along with you?

A.   He did make a reference to that; yes.

154

Q.   Did you accept that?

A.   I said, "It's gone too far, John."

Q.   What did you ask to be done during that meeting, if anything?

A.   I didn't call for the meeting.

Q.   Right, but did you ask that anything be done?

A.   Just to have him stop harassing me.

Q.   Anything else that you recall that anyone said during that meeting?

A.   No.

Q.   How about Whelihan? Do you remember anything that he specifically said?

A.   No.

Q.   How did the meeting end? What was the outcome of it?

A.   We just all left the office.

Q.   Did you notice any improvement in your relationship with John Monaghan following that meeting?

A.   No; there was never any improvements.

Q.   Were there any other meetings of that nature held where you got together in the same place with Monaghan and any supervising officers

155

1 to discuss your concern that he was being
2 offensive to you?
3      A. No; I don't recall any other meetings.
4      Q. Any with Lieutenant O'Connell to that
5 effect?
6      A. No; not with Lieutenant O'Connell that I
7 can recall.
8      Q. Do you recall a meeting with Lieutenant
9 O'Connell either with you alone or with the two of
10 you -- meaning you and Monaghan present where she
11 said "I know" -- to the effect, and I'm
12 paraphrasing -- "I know that you two have had
13 problems and I want you to get along now that you
14 are on the same shift"? Do you recall anything
15 like that?
16      A. No.
17      Q. With regard to WMLEC, you mentioned it
18 earlier that you believe that offensive comments
19 were made over the WMLEC radio after you
20 transmitted information over the Holyoke internal
21 radio station, is that correct?
22      A. No; I don't believe. I know after I
23 finished my conversation, Sergeant Monaghan would
24 get on WMLEC and say "lick it, lick it good."

156

1      Q. Which radio station were you on? In
2 other words were you on WMLEC or were you on the
3 Holyoke?
4      A. I would speak over the Holyoke Police
5 Department's frequency and WMLEC is always on.
6      Q. Do you remember anything that you said
7 over the Holyoke radio station that preceded the
8 WMLEC transmission that you described?
9      A. No.
10      Q. Was it business-related, whatever you
11 said?
12      A. It's always business-related on the
13 police radio, the HPD radio.
14      Q. When you say it's always
15 business-related, do you mean you're always
16 speaking about business or do you mean in general
17 anything that's transmitted over the Holyoke radio
18 station is business-related?
19      A. When I speak on the Holyoke radio it's
20 for business purposes calling for a unit,
21 answering dispatch.
22      Q. Have you ever heard anyone say anything
23 that would be considered non-business-related over
24 the Holyoke radio?

PERLIK and COYLE REPORTING

157

```
        A.    When?
2       Q.    At any time when you were a police
3 officer?
4       A.    Yes.
5       Q.    What types of things would you hear?
6       A.    Several things. Some are professional;
7 some aren't, officers.
8       Q.    But would you hear any types of
9 statements made over the Holyoke radio that you
10 would consider to be offensive?
11      A.    To whom?
12      Q.    To anyone. Let me ask you a different
13 question.
14            While you were a police officer did you
15 ever hear any statements over the Holyoke radio
16 that you would consider to be not related to the
17 business of the Holyoke Police Department?
18      A.    Yes.
19      Q.    What types of things did you hear?
20      A.    If I worked overtime shift as a patrol
21 officer you'd hear an officer make a rude comment
22 about a pedestrian.
23      Q.    Can you give me an example?
24      A.    Not verbatim -- actually an order came
```

158

```
1 out from Chief Scott pertaining to this exact
2 conversation we're having right now.
3       Q.    What was the substance of the order?
4       A.    The order was to not say vulgar or
5 inappropriate things over the air. It was a
6 general order that he had put out that he would be
7 disciplining officers for using the radio for
8 non-professional reasons and to be courteous over
9 the radio.
10      Q.    Is it your understanding that that order
11 came out after you made a complaint?
12      A.    I don't know when the order came out.
13      Q.    Do you recall if the order came out as a
14 result of offensive statements made over the radio
15 as opposed to, say, an officer using the radio to
16 order a pizza or something like that, that would
17 be considered non-business-related?
18            MR. HUDSON: Objection.
19            THE WITNESS: No; the order came out
20 to act professional over the air.
21      Q.    (BY MS. LYNCH) What I just want to
22 clarify with you, though, when you say that there
23 were non-business-related topics discussed over
24 the Holyoke radio, were they offensive in nature
```

159

```
1 as opposed to being non-professional like can you
2 order me a pizza, something that wasn't
3 work-related?
4       A.    It would depend on who they were
5 targeted to. What's offensive to you may not be
6 offensive to me.
7       Q.    But do you understand the distinction
8 I'm making between something being
9 non-business-related between getting a pizza and
10 ostensibly not being offensive and calling someone
11 a derogatory name?
12            Do you understand the distinction I'm
13 making?
14      A.    Yes; they are not non-professional.
15      Q.    Right, so my question is when you have
16 heard non-professional statements over the Holyoke
17 radio, have they been derogatory in nature?
18            MR. HUDSON: Objection.
19            THE WITNESS: That would depend on
20 whom they're referring to. That's a question I
21 can't answer. You're not asking a personal
22 question.
23      Q.    (BY MS. LYNCH) Well, did you ever hear
24 a statement over the Holyoke radio that you
```

160

```
1 considered to be derogatory in nature?
2       A. Over the Holyoke radio or over WMLEC?
3       Q. Holyoke radio.
4       A. To me, no.
5       Q. Is it common for -- based on your
6 experience as a Holyoke police officer is it
7 common for non-professional statements to be made
8 over WMLEC in your experience?
9            MR. HUDSON: Objection.
10           THE WITNESS: It's not common.
11      Q. (BY MS. LYNCH) It's not?
12      A. No.
13      Q. How often would you listen to WMLEC?
14      A. I used to always listen to WMLEC.
15      Q. Is that something that when you're in
16 the cruiser you could hear both the Holyoke radio
17 and the WMLEC radio at the same time?
18      A. Yes.
19      Q. Is that something that you would listen
20 to when you were in the station?
21      A. What do you mean in the station? When I
22 was CO -- commanding officer?
23      Q. Any time when you were physically in the
24 station could you also listen to the Holyoke radio
```

161

and the WMLEC radio?

A.    It's only distributed to the dispatch room.

Q.    How often would you be in the dispatch room?

A.    Only if I had to go in there to speak to the people that were in there.

Q.    You didn't -- is it fair to say that you did not spend much time in the dispatch room when you were in the station?

A.    No; I never spent much time in there.

Q.    Other than when you were reassigned to be the booking officer, were you mainly in a cruiser when you worked?

A.    As a police sergeant?

Q.    Okay; let's just focus on when you were a sergeant.

A.    Yes; when I was a sergeant I was a street supervisor.

Q.    Are you claiming that the derogatory statements that you say were made over WMLEC were only made with reference to you when you were a sergeant?

A.    I can only make reference to the one I

162

heard, the one I heard about me.

Q.    Were you a sergeant?

A.    Yes.

Q.    What did you yourself hear that you believe was derogatory?

A.    "Lick it, lick it good" by Sergeant Monaghan.

Q.    Anything else?

A.    No.

Q.    How many times did you hear that?

A.    I heard it once.

Q.    Do you remember when that was that you heard it?

A.    No.

Q.    Why do you believe that it was Sergeant Monaghan who stated that?

A.    I know Monaghan's voice.

Q.    You didn't actually witness him say it, did you?

A.    No; I know Monaghan's voice. We got on the same time, I rode with him in a cruiser. I had thousands of conversations with him. I know his voice.

Q.    The fact that you believe that the "lick

163

1   it, lick it good" was stated by John Monaghan is
2   based on your recognition of his voice?
3       A.    I don't believe. I know it was Sergeant
4   John Francis Monaghan who said "lick it, lick it
5   good" over the air after I finished talking on the
6   HPD radio.
7       Q.    How long after you finished talking was
8   that said over the WMLEC?
9       A.    As soon as I finished my transmission.
10      Q.    So like within a few seconds?
11      A.    Yes.
12      Q.    How many other officers have access to
13  that WMLEC radio?
14      A.    WMLEC is located in every cruiser -- let
15  me correct that.
16          Generally every cruiser has WMLEC
17  attached to it. It depends on if there is a newer
18  cruiser that's down, you go to an old cruiser it
19  may not have WMLEC so most cruisers that are on
20  the road when I was working for the HPD had WMLEC.
21      Q.    But which other communities have access
22  to it?
23          In other words, is it throughout the
24  State of Massachusetts?

164

1       A.    I believe so.
2       Q.    How would you describe John Monaghan's
3   voice?
4       A.    I can't.
5       Q.    In other words do you consider it to
6   be
7   a deep voice, a loud voice, a high voice?
8           Can you give me any terms, any
9   characteristics to describe it?
10      A.    It's not high-pitched; it's not
11  high-pitched.
12      Q.    The statement "lick it, lick it good,"
13  when you heard that over the radio was it sang or
14  was it stated?
15      A.    Stated.
16      Q.    Is there any song that you know of with
17  those words in it?
18      A.    No.
19      Q.    Did anyone else ever tell you that they
20  heard someone go over WMLEC after you transmitted
21  over the Holyoke radio and make derogatory
22  statements over WMLEC?
23      A.    Did anyone else ever tell me?
24      Q.    Right; that they heard someone make
derogatory statements over WMLEC after you had

165

1 transmitted over the Holyoke radio?
2     A.    No.
3     Q.    Did you ever talk to Jorge Rodriguez
4 about that issue?
5     A.    Yes.
6     Q.    What did he tell you?
7     A.    He stated he filled out the
8 questionnaire.
9     Q.    Did he tell you anything else about what
10 he may have heard on WMLEC?
11     A.    He referred to a freak out, el freako
12 that he heard.
13     Q.    Anything else that you recall him
14 saying?
15     A.    No.
16     Q.    Do you believe that that statement, el
17 freako or el freak out had any reference to you?
18         MR. HUDSON:    Objection.
19         THE WITNESS:    I don't know. I
20 didn't hear that one.
21     Q.    (BY MS. LYNCH) But based on what
22 Mr. Rodriguez or anyone else told you, if that
23 statement were made over WMLEC, do you think it
24 had any reference to you?

166

1     A.    I couldn't answer that.
2     Q.    Are there any other statements that were
3 made either over the WMLEC radio or the Holyoke
4 radio that you believe were directed to you that
5 you considered to be offensive besides what you've
6 already testified to today?
7     A.    Define offensive?
8     Q.    Well, that you consider to be
9 offensive -- that you ,believe?
10     A.    Disrespectful?
11     Q.    That you believe was directed to you?
12     A.    Over the HPD or over WMLEC?
13     Q.    Either one.
14     A.    Over the HPD radio there was one
15 officer, I instructed him to write a report on a
16 loud music call I believe, and in his frustration
17 made a large sigh, "ahhhh," right as he was
18 displeased that I told him to write a word on a
19 loud music call.   That's disrespectful.
20     Q.    How about derogatory with respect to
21 having to do with your race, gender, or sexual
22 orientation? I'm sorry, what was your answer?
23     A.    I was waiting for you to finish.
24     Q.    Why don't I rephrase it.   Have you

167

1 either heard or has anyone else told you that
2 there were statements made over either the Holyoke
3 radio station or WMLEC that were derogatory with
4 respect to gender, race or sexual orientation
5 which you believe were related to you?
6         MR. HUDSON:    Objection.
7         THE WITNESS: The first part of your
8 question is did anyone else tell me?   No.
9     Q.    (BY MS. LYNCH) I asked you if either
10 anyone told you or you heard.
11     A.    The first question did anyone tell me;
12 no one told me.
13     The second part of the question is did I
14 hear anything other than "lick it, lick it good"?
15     Q.    Let me ask the question again.   First of
16 all, other than what you've already testified to
17 have you, yourself, heard any other statements
18 over either the Holyoke radio station or the WMLEC
19 radio station pertaining to derogatory references
20 to gender, sexual orientation or race which you
21 believe were made with respect to you?
22         MR. HUDSON:    Objection.
23         THE WITNESS:    It's a long question.
24 I think the question is besides what I've

168

1 testified to here, "lick it, lick it good," have I
2 heard any more from any other officer besides John
3 Monaghan?
4 That answer would be no.       I only heard
5 John Monaghan say that over WMLEC after I finished
6 my transmission.
7     Q.    (BY MS. LYNCH) And that's the only
8 statement that you believe John Monaghan made over
9 either radio transmission?
10     A.    I don't believe John Monaghan said it; I
11 know he said it.   I heard him.
12     Q.    But my question is are there any other
13 statements that you attribute to him of a
14 derogatory nature that we've been discussing?
15     A.    Not that I personally have heard.
16     Q.    Other than what you've already testified
17 to that you've been told by other officers, are
18 there any other statements that you attribute to
19 John Monaghan of a derogatory nature related to
20 you?
21     A.    That's a long question; I got lost in
22 it.
23         MR. HUDSON:    Is that in general or
24 over WMLEC?

169

1   Q.   (BY MS. LYNCH) I'm referring to both
2 radio stations.
3        Other than what you've already testified
4 to, has any other officer told you that statements
5 were made over either the Holyoke radio station or
6 WMLEC of a derogatory nature that were related to
7 you?
8   A.   I don't understand the question.   Sorry;
9 I don't mean -- I'm sorry; I really don't
10 understand the question.   It's just a little
11 long-winded.
12  Q.   Let me just go back. You testified that
13 you heard a voice that you believe was John
14 Monaghan's say "lick it, lick it good" over the
15 WMLEC, correct?
16       MR. HUDSON: Objection.
17       THE WITNESS:   Not correct.
18  Q.   (BY MS. LYNCH) Well I know you say you
19 know it's him for sure.
20  A.   You said I testified that I believe.   I
21 did not testify that I believe.   I said I know it
22 was John Francis Monaghan --
23  Q.   (Interposing) I understand --
24       MR. HUDSON:   (Interposing) Let her

170

1 finish.
2        THE WITNESS:   Who said "lick it,
3 lick it good" over the WMLEC radio after I made my
4 transmission over the Holyoke police radio.   I do
5 not believe; I know.
6   Q.   (BY MS. LYNCH) I understand your
7 testimony.
8        Did any other officer tell you that they
9 heard John Monaghan make derogatory statements
10 over either the Holyoke radio or the WMLEC radio
11 after you transmitted over the Holyoke radio
12 station?
13  A.   No.
14  Q.   How about meowing like a cat? Did
15 anyone ever tell you that they heard meowing like
16 a cat or a fighting cat over WMLEC after you
17 transmitted over the Holyoke radio?
18  A.   No one ever told me that.
19  Q.    Did you ever hear that?
20  A.   Over Holyoke radio or the WMLEC?
21  Q.   After you transmitted over the Holyoke
22 radio, did you ever hear meowing like a cat or a
23 fighting cat over WMLEC?
24  A.   I never heard that.

171

1   Q.   After you said that you heard John
2 Monaghan say "lick it, lick it good" over WMLEC
3 after you transmitted over the Holyoke radio did
4 you ever report that to any supervisor?
5   A.   I may have reported that to Lieutenant
6 Whelihan; I may have reported it to him.
7   Q.   But you're not sure?
8   A.   I'm not sure if I told him about that
9 one or not.
10  Q.   Is there anyone that you do recall for
11 certain reporting that to?
12  A.   Internal Affairs.
13  Q.    When did you report it to Internal
14 Affairs?
15  A.   In the conversation with David Fournier.
16  Q.   What specifically did you report?
17  A.   In the conversation I said David, you
18 know he's going on WMLEC, he's -- the allegations
19 aren't false.
20  Q.   Ms. Walker, showing you what was marked
21 as Exhibit 4, did you report anything to Internal
22 Affairs about statements you attribute to Monaghan
23 other than what's indicated in Exhibit 4?
24 (Indicating.)

172

1   A.   (Witness examining document.) I
2 reported a lot to Internal Affairs.   Give me a
3 time frame as your basis.
4   Q.   In terms of the WMLEC statements, did
5 you ever report that to Internal Affairs?
6   A.   I had a conversation with David
7 Fournier -- Lieutenant Fournier regarding John
8 Monaghan.
9   Q.   Did you ever give him a written
10 complaint about the WMLEC statement that you said
11 you heard, "lick it, lick it good," after you
12 transmitted over the Holyoke radio?
13  A.   No; it was a verbal conversation I had
14 with David D. Fournier.
15  Q.   Do you recall when that conversation was
16 in relation to the statement that Jorge Rodriguez
17 gave about WMLEC?
18  A.   No.
19  Q.   Why didn't you put that complaint in
20 writing about the "lick it, lick it good" that you
21 said you heard over WMLEC?
22  A.   It is disgusting, it's vulgar.   I didn't
23 want to be humiliated any more.
24  Q.   The song that Mr. Rodriguez referenced

TAMMY WALKER vs. CITY OF HOLYOKE
TAMMY WALKER                                              SEPTEMBER 26, 2006

---

173

at his deposition the other day, do you recall
  that -- the rap song that he referenced?
  A. No.
  Q. You don't recall that testimony?
  A. He said there was a rap song?
  Q. Right.
  A. I don't know what that rap song is.
  Q. That's what I was asking you -- do you
know what that rap song was that he was referring
to?
  A. Right now, no.
  Q. Or who the singer was?
  A. Right now at this moment, no.
  Q. Do you know how often prior to December
2002 you worked on the same shift with John
Monaghan and Jorge Rodriguez?
  A. I'm sorry, can you ask that again?
Prior to 2002?
  Q. Prior to December, 2002 do you know how
often you worked on the same shift as John
Monaghan and Jorge Rodriguez?
  A. When I first got out of the Academy I
worked twelve at night to eight in the morning.
That would be in 1993.

---

174

  Q. Actually, let me ask you the question in
a different way.
          After you became sergeant and prior to
December of 2002 --
  A. (Interposing) Okay.
  Q. -- do you know how often you worked the
same shift as John Monaghan and Jorge Rodriguez?
  A. If I understand the question correctly,
2002 I became sergeant and Sergeant Monaghan came
two weeks later and we were all on the same shift
in 2002 -- May 2002 to December, 2002.
  0. Was Jorge Rodriguez also on that same
shift?
  A. Yes, Ma'am.
  Q. Was there any period of time between May
and December 2002 that you recall being out of
work for an extended period of time?
  A. Yes.
  Q. When was that and why?
  A. It probably started in June or July. I
think I was injured at one point in -- are you
just stating 2002?
  Q. Right; between May and December of 2002.
  A. I can't recall at this time. I have to

---

175

1 see a document as to my work schedule.
2      Q. You have alleged that officers have made
3 disparaging remarks about Chief Scott, is that
4 correct? That's part of your complaint?
5          A. I stated that Sergeant Monaghan made a
6 disparaging remark against Chief Scott on
7 June 19th, when I was a CO.
8      Q. On June 19th?
9      A. I believe it was June 19th, around that
10 time.
11     Q. Of what year?
12     A. 2004, I believe. I believe. I have to
13 see a document.
14     Q. What did you hear him say?
15     A. "Uncle Charlie dun come out wit anutter
16 order. "
17         Q. Was anyone else present when he made
18 that statement?
19         A. No; I don't believe -- I don't know who
20 else was in the room. I was CO. I was given
21 paperwork to go upstairs.
22         Q. What is your understanding as to why he
23 made that statement?
24         A. Because he was tired of Chief Scott

---

176

1 coming out with orders.
2      Q. What do you think the term Uncle Charlie
3 pertains to? What significance does that have?
4      A. To me?
5      Q. Yes.
6      A. In the text that John was saying it in
7 it was more of an Uncle Tom, black man trying to
8 be a white man, Uncle Tom. Instead of Tom, he
9 says Uncle Charlie.
10         Q. Did he ever refer to him as Uncle Tony
11 or Uncle Anthony?
12         A. In front of me?
13         Q. Right.
14         A. No; the only time I've heard him refer
15 to Chief Scott as Uncle Charlie is on that day.
16         Q. Assuming that it was with respect to the
17 Uncle Tom reference, does the name Charlie have
18 any significance?
19         A. You asked me what Uncle Charlie means to
20 me.
21     Q. Right.
22     A. I'm not assuming. In the text that it
23 was said, in the black dialect that it was
24 uttered, that verbiage, that is what I took

---

PERLIK and COYLE REPORTING

177

1 reference to.
2    Q.    But Charlie, the name Charlie itself
3 doesn't have any significance to you with respect
4 to a black man?
5    A.    No; but when you put the text together,
6 "Uncle Charlie dun come out wit anutter order,"
7 that would mean Uncle Charlie would be Chief
8 Scott, since I was handing him a document where
9 Chief had come out with yet another order.
10    Q.    Had anyone else ever referred to Chief
11 Scott as Charlie?
12    A.    Not in my presence.
13    Q.    You said that you were the commanding
14 officer that night?
15 A.       Correct.
16    Q.    Did you say anything to John Monaghan
17 after he said that?
18    A.    I just shot him a look.
19    Q.    Why didn't you say something to him,
20 given that you were the commanding officer?
21    A.    Because I don't say much to John
22 Monaghan.
23    Q.    But you considered that to be
24 disrespectful to Chief Scott, is that right?

178

1    A.    Correct.
2    Q.    Do you think that you had the authority
3 to discipline him for saying something
4 disrespectful about the Chief?
5    A.    It wasn't directed towards me.
6    Q.    But it was directed toward the Chief who
7 was your boss, correct?
8    A.    Yes.
9    Q.    Do you think you had the authority to
10 take disciplinary action against John Monaghan for
11 making that statement?
12    A.    Could I have --
13    Q.    (Interposing) Yes.
14    A.    -- written him up for saying that?
15    Q.    Yes.
16    A.    Possibly.
17    Q.    So why didn't you, then?
18    A.    If I wrote up John Monaghan for
19 everything, he'd have a stackful of papers in his
20 file.
21    Q.    Have you ever heard him say anything
22 else of an offensive, derogatory or disrespectful
23 nature towards Chief Scott other than that
24 statement?

179

1    A.    No; not towards Chief Scott.   No.
2    Q.    Did you ever hear any other officers
3 make derogatory statements about him?
4    A.    No.
5    Q.    No?
6    A.    No.
7    Q.    Did you ever hear anyone -- John
8 Monaghan or otherwise -- state that they didn't
9 think he should be the Chief of the Holyoke Police
10 Department because he was black?
11    A.    Not because he was black.
12    Q.    Did you ever hear anyone state that he
13 shouldn't be chief because he was considered to be
14 an outsider, meaning not from the Department?
15    A.    Yes.
16    Q.    Overall, was it your experience that
17 Chief Scott was respected as a chief?
18    A.    Excuse me?
19    Q.    Based on what you observed or heard, was
20 Chief Scott was respected as the Chief when you
21 were at the Department?
22    A.    Respected by whom?
23    Q.    By the officers, by the other members of
24 the Police Department?

180

1    A.    No.
2    Q.    You don't think he was respected?
3    A.    I know he is not.
4    Q.    Why do you say that?
5    A.    Because I've heard ranking officers have
6 issue with him.
7    Q.    Just briefly what are you referring to?
8    A.    Captain Fletcher has an issue with him;
9 Lieutenant O'Connell has an issue with him.
10    Q.    What do you think their issues are?
11    A.    I don't think their issues are; I've
12 heard their issues. They don't like him, period.
13    Q.    Did they say why?
14    A.    He's an outsider; he's not fit for duty;
15 he doesn't carry a gun in Massachusetts; he's a
16 publicity hound.
17          I could go on for days. They just don't
18 like him.
19    Q.    Did you ever hear John Monaghan make a
20 derogatory racial remark about anyone else besides
21 the statement you said you heard him make about
22 Chief Scott and the statement that you said you
23 heard over the WMLEC -- and right now I'm
24 referring to other police officers or citizens in

181

general?

A. He had great issue with the Somalia people coming to Holyoke, Mass. to come and live when Mayor Sullivan was going to have them come and live in our city.

Q. What do you base that statement on?

A. I was sitting in the CO's office and he was sitting in the dispatch or standing in the dispatch office and he stated that he'd rather have the Pakistanis here than have the Somalis come here with fifteen to twenty kids in each family.

On an occasion we were booking a Russian prisoner and his comment was that the Russians are taking over Westfield.

Q. Anything else that you ever heard him say of a derogatory nature with regard to a particular race, national origin?

A. He doesn't like fags.

Q. What do you base that statement upon?

A. There was an incident I think when we were patrol officers that some gay person, male, said something to him out of the window and he allegedly punched him in the head. I'm not sure

182

what the gay man said to him but he didn't like it.

Q. Was that something that you witnessed?

A. No; that was something I heard. I believe there was an internal investigation regarding that incident.

Q. Any other derogatory statements made about race, national origin, sexual orientation or gender that you attribute to John Monaghan?

MR. HUDSON: Objection.

THE WITNESS: Not this present second.

MS. BETOURNAY: Can we take a short break?

MS. LYNCH: Sure.

(A recess was taken.)

Q. (BY MS. LYNCH) Did you want to clarify an answer, Ms. Walker?

A. No; when you asked about Uncle Charlie, in the black community -- how can I phrase this?

In the black community if you aren't considered black black, white people will call you an Uncle Tom and they will call a black woman like myself -- I was raised around white people and not

183

1 around the black community; I speak more white
2 than I do in a black dialect so I'm referred to
3 like a Ms. Ann.
4        Charlie can be referred to as The Man --
5 the white man.
6        Q.    Charlie?
7        A.    Yes; Charlie. It's something
8 African-Americans are pretty much aware of.
9 Charlie is defined as The Man; Uncle Charlie, same
10 reference. Uncle Tom is a black man who thinks
11 he's white according to certain black people and
12 certain white people.
13        I'm considered like an Ann -- a Ms. Ann
14 because I'm black but I was raised in a white
15 environment around white people instead of black
16 people and if you spoke to me on the telephone
17 you'd think I was white instead of being black. I
18 don't have a black dialect or southern drawl.
19 It's just a little education.
20        Q.    Okay; I appreciate that. So who would
21 use these terms, blacks or whites?
22        A.    Both but more is she a Ms Ann. Am I
23 trying to be white although I'm black.
24        Q.    You're saying blacks and whites would

184

1 say that?
2        A.    Depending on your context.
3        Q.    Would it be a mixed neighborhood?
4        A.    I couldn't say if it was a mixed
5 neighborhood.
6        I'm just telling you what it means. I'm
7 trying to clarify what it means.
8        Q.    I've never heard that?
9        A.    Uncle Charlie, Ms. Ann, and Uncle Tom.
10        Q.    Have you ever heard this stemming from a
11 book such as *Uncle Tom's Cabin* or anything like
12 that?
13        A.    No; just what you learn when you grow
14 up.
15        Q.    I just want to go back over a moment,
16 you said that you thought that John Monaghan had
17 an issue with the Somalis, that he said he would
18 rather have the Pakistanis.
19        Is there a Pakistani group at all in
20 Holyoke?
21        A.    What he was referring to and what he
22 said was I'd rather have Pakistanis that ran
23 7-Elevens rather than a group of Somalis popping
24 babies that don't work.

Case 3:05-cv-30106 Document 73-3 Filed 08/13/2007 Page 49 of 66

### 185

1       I think he was referring to when the
2 Mayor was going to bring them in and we do have a
3 Somali family and I think they do have about
4 fourteen kids.
5     Q.  Any other statements that you attribute
6 to John Monaghan that you consider to be
7 derogatory towards someone's race, sexual
8 orientation or gender besides what you've already
9 stated?
10       MR. HUDSON: Objection to form.
11       THE WITNESS: Not that I can recall
12 at this second.
13     Q.  (BY MS. LYNCH) Did the Holyoke Police
14 Department have a progressive discipline policy
15 when you were there?
16     A.  I was never privy to the disciplinary
17 policies of the HPD until my first discipline
18 after fifteen years so there was never a
19 progressive discipline policy that I was aware of
20 until my first discipline ever in the Holyoke
21 Police Department.
22     Q.  Do you know the progressive discipline
23 policy, what that means?
24     A.  Yes.

### 186

1     Q.  And you're saying that the first time
2 you were disciplined was when you heard that?
3     A.  The first time I was ever disciplined
4 was eleven years after being on the job.
5     Q.  Right; but is that the first time you
6 heard that there was a progressive discipline
7 policy?
8     A.  Yes -- I'm sorry; let me rephrase that.
9 I heard that after I was suspended for being five
10 minutes late for court.
11     Q.  There was an incident involving Elizer's
12 Pub?
13     A.  Correct.
14     Q.  I believe that was June 23, 2003, is
15 that correct?
16     A.  Yes.
17     Q.  When you got to Elizer's Pub what did
18 you observe in terms of the Holyoke police
19 officers that were there?
20     A.  The call came out over the air that
21 there was four guys refusing to leave Elizer's
22 Pub.
23     I was at 7-Eleven which was around the
24 corner from Elizer's Pub. I pulled into the rear

### 187

1 of Elizer's Pub, I got out of the cruiser and
2 walked in the door.
3     As soon as I walked in the door, the
4 first person that I took notice of that I could
5 say was Officer McCay was five steps in to the
6 left, John Monaghan was at the bar, the very end
7 of the bar. Thomas Dore was right behind Sergeant
8 Monaghan and Joseph, I believe his last name is
9 Wilson, was to the left of the Thomas Dore.
10     Q.  What were they doing?
11     A.  They were standing there in the spots I
12 just indicated.
13     Q.  In other words were they drinking? Were
14 they just standing there?
15     A.  Sergeant Monaghan was at the bar. There
16 was beers on the bar.
17     Q.  Meaning glasses that had some beer in
18 them as opposed to empty beer glasses?
19     A.  No; beer bottles.
20     Q.  Beer bottles?
21     A.  Fresh beer bottles with condensation on
22 the outside of the bottle.
23     Q.  Is that something you observed?
24     A.  Yes.

### 188

1     Q.  What time was it that you got there?
2     A.  I asked the bartender and she said it
3 was two-seventeen or two-eighteen.
4     Q.  What did you do when you got there and
5 you saw them?
6     A.  I first said what's going on. No one
7 replied.
8     Q.  Then what happened?
9     A.  I asked who called this in. No one
10 replied.
11     Q.  And then what happened?
12     A.  I specifically asked the bartender if
13 she called this call in.
14     Q.  And what was her response?
15     A.  She said no. I asked the owner of the
16 bar, Steve, did you call this in and he said no.
17 I said let's go, guys.
18     Q.  And then what was the response?
19     A.  They stood there with blank looks on
20 their faces. Sergeant Monaghan took a sip of the
21 beer, slid it down the bar, and he asked -- I'm
22 paraphrasing -- is my tab all set and I said let's
23 go with a more stern voice.
24     I want to back up. The first time I

189

said let's go, one officer did start walking out the door -- the front door.

Q. Which one was that?

A. Joe Wilson. He did start heading for the front door.

Q. Okay.

A. The other three just stood there.

Q. Did you think that they were doing something that was against the law?

A. I thought the -- they shouldn't be in the bar after hours drinking.

Q. Because it was after two o'clock?

A. Yeah; it was after two.

Q. You said that John Monaghan took a sip and then slid -- you said he slid the beer down the bar?

A. He slid it towards the bar. Here's the bar, he slid it like that. (Indicating.)

Q. In other words away from himself?

A. Right.

Q. Then you said he said the tab is all set.

Did you understand that to mean he wanted to make sure they had paid for the beers?

190

A. I guess he was asking if the tab was all set.

Q. And then you said let's go and then what happened?

A. Thomas Skwira came inside the bar. He just stood there.

Q. Then what happened?

A. I told the guys to leave. I turned around and Thomas and I -- Officer Skwira and I walked out the back door together.

Q. Was that the end of it as far as in the bar?

A. Meaning?

Q. Meaning you didn't have any further communication with the officers that were in the bar and they left?

A. Yes; I asked them to leave once. One officer began to leave and then I raised my voice and I said "let's go."

From my recollection without the report in front of me I did call out to dispatch and say that these four will be leaving the bar.

Q. Did any of them have a uniform on?

A. No.

191

1    A. They were not on the schedule; no.

2    Q. Do you remember if John Monaghan

3  actually was working at the time, meaning not at

4  that moment but at that time period as opposed to

5  being out on leave or out of work?

6    A. He was on injured-on-duty status

7  actually and so was Officer McCay.

8    Q. When you went back to the station did

9

10

11

12

13

14  you speak with any supervisors about that incident

15  at Elizer's?

16    A. Before I got back to the station I

17  stopped at another -- there was a situation I had

18  to take care of as a supervisor. There was a big

19  Mac truck parked the wrong way.

20

21

22

23

24

192

1    Q. What was that discussion?

2    A. That there were four officers in the

3  bar; that the call came in was actually not a real

4  call, it was one of the officers. It wasn't the

5  call that I thought that came over the air. It

6  was a prank.

7    Q. Did you have any discussion

8  with  Whelihan about whether or not these

9  officers had violated the law by being in the bar at

10  that time?

11

12

13

14

15

16

17

18    Q. You told Whelihan that?

19    A. Yes.

20    Q. What was his response?

21

22

23

24

193

1    A.    Talk to Captain Fletcher in the morning,
2  which I did.
3    Q.    Did he tell you he didn't want you to do
4  a report?
5    A.    No; a supervisor can't do that.
6    Q.    So you told him you were going to do a
7  report and he said for you to talk to Captain
8  Fletcher in the morning?
9    A.    Yes.
10    Q.    Anything else you recall about the
11  conversation with Whelihan?
12    A.    No.
13    Q.    Did you talk to Captain Fletcher in the
14  morning?
15    A.    Yes.
16    Q.    What was that discussion?
17    A.    I went to Captain Fletcher's office and
18  I told him what transpired and I said that I was
19  going to be doing a report on it.
20         Captain Fletcher said, quote, "If you do
21  a fucking report you fucking sign it because I'm
22  not fucking signing it," and he threw his pencil
23  on the desk. (Indicating.)
24         I said, "Captain, I need to do a report

194

1  on this."
2    Q.    What was his response?
3    A.    After he said "if you write a fucking
4  report you sign the fucking report, I'm not
5  signing it"?
6    Q.    You said after that you said I'm doing a
7  report and then what did he say?
8    A.    "Captain, I'm doing a report on this."
9  I backed up out of his office and I proceeded to
10  go home.
11    Q.    Did he say anything else?
12    A.    Basically that was basically it.
13    Q.    Why do you believe that he said that he
14  wasn't signing it?
15    A.    Again --
16         MR. HUDSON:    (Interposing)
17  Objection.
18         THE WITNESS: Say the question
19  again?
20    Q.    (BY MS. LYNCH) Well, what is your
21  understanding as to why he stated that he wasn't
22  going to sign it?
23    A.    You'd have to ask him.
24    Q.    Does a supervisor have to sign a report

195

1  that you wrote?
2    A.    Depends on how you write it up.  If I
3  were going to write them up, each of them
4  individually as a supervisor, then I would pull it
5  up to the chain of command that way.
6         If I simply write an incident report as
7  to what happened on that particular call, no, he
8  doesn't have to sign it.
9    Q.    Well, when you said that you were going
10  to write a report, did you mean that you were
11  going to write an incident report or that you were
12  going to write them up for discipline?
13    A.    Incident report.
14    Q.    It's your understanding he didn't want
15  you to do that?
16    A.    He didn't want anything in writing.
17    Q.    Did he say why?
18    A.    No.
19    Q.    Why did you think -- well, you thought
20  he was upset, is that fair to say?
21    A.    No; I knew he was upset.
22    Q.    Why did you think he was upset?
23    A.    It's a code of silence, blue code of
24  silence.  You just keep stuff like that...

196

1    Q.    At that time did you believe that they
2  had broken the law by being in the bar at that
3  time?
4    A.    I believe that making a prank phone call
5  to a police department is against the law and
6  that's what transpired.
7    Q.    Did you think -- notwithstanding the
8  prank law did you think it was against the law for
9  them to be in the bar drinking after two o'clock?
10    A.    Past two o'clock you're not supposed to
11  have beer on the bar.  Past two o'clock there's
12  not supposed to be patrons in the bar under Mass.
13  General Law.
14    Q.    Which law do you base that upon?
15    A.    Off the top of my head I don't have the
16  law book but Mass. General Law says you're not
17  supposed to be in a bar after two a.m.
18         There's a certain hour you're supposed
19  to clear the alcohol off.  You're not supposed to
20  serve after two.
21    Q.    Did you hear the outcome of the
22  investigation whereby it was reported that a call
23  was made to the ABCC which said that it was not
24  against the law to be in a bar after two o'clock,

197

1  that a patron who ordered a drink prior to
2  two o'clock had a reasonable amount of time to
3  consume it?
4       MR. HUDSON:    Objection.
5    Q.   (BY MS. LYNCH) Did you hear that?
6       MR. HUDSON:    Objection.
7       THE WITNESS: No.
8    Q.   (BY MS. LYNCH) Do you disagree with
9  that?
10      MR. HUDSON:    Objection.
11      THE WITNESS: From my drinking days,
12  yes.
13   Q.   (BY MS. LYNCH) Did you have any other
14  conversations with Captain Fletcher about the
15  report?
16   A.   No; that's all he said.
17   Q.   At any time before you submitted your
18  report did Captain Fletcher tell you to write a
19  report and to give it to him?
20   A.   Absolutely not.
21   Q.   When you wrote your report of that
22  incident you did not include Joseph Wilson in it,
23  is that correct?
24   A.   That's correct.

198

1    Q.   Why didn't you include him?
2    A.   The night of the incident I asked for a
3  number which would indicate that I want to write a
4  report -- an incident number to write a report.
5       After speaking with Lieutenant Whelihan
6  and being screamed at by Captain Fletcher I went
7  home.  I tried to sleep; I couldn't.  I called the
8  Chief and I asked him what do you want me to do
9  with this.  He said I can't give you any advice on
10  this.  I said, quote, "Chief, I don't want my ass
11  sticking out on this, what do you want done?"  He
12  said, "Sergeant, do your job."
13       I went in and wrote a report on an
14  incident that transpired.  I did not write the
15  officers up.  I wrote an incident report.
16   Q.   Right.
17   A.   I had the power to write each and every
18  one of them up and have them disciplined.  I did
19  not do that.  I just wrote an incident report of
20  what transpired.
21   Q.   Why didn't you mention Joe Wilson in it?
22   A.   Because I couldn't -- I didn't know who
23  Joe Wilson was. I knew he was a reserve officer
24  but I didn't know who he was.

199

1    Q.   So you're saying at the time you didn't
2  know his name?
3    A.   I didn't know his name.  I had mistaken
4  him for another reserve officer and I wasn't
5  positive if that was him so I didn't know -- I
6  knew it was an officer but I didn't know who it
7  was, his name, so I wasn't going to put a name
8  that I didn't know.
9    Q.   Why didn't you mention that there was
10  another officer who you couldn't identify there?
11   A.   I put an individual -- do you have the
12  report?
13   Q.   No; I don't.
14   A.   I believe I put another individual.
15   Q.   You think you made a reference to him?
16   A.   I made a reference to him; yes.  I think
17  I put unidentified male because I didn't know who
18  he was.
19   Q.   Where did you call the Chief when you
20  got home?
21   A.   What do you mean, where did I call him?
22   Q.   In other words did you call him at home
23  or at the office?
24   A.   I worked twelve at night to eight in the

200

1  morning.  I got home and went to bed.  I couldn't
2  sleep.  I got up about one and I called the
3  Chief's office.
4    Q.   Did he say anything else besides what
5  you have already testified to during that call?
6    A.   "Sergeant, do your job."
7    Q.   Why didn't you write up those officers
8  for being in the bar after two o'clock given that
9  you believed that wasn't lawful?
10   A.   I didn't want to stick it to them.  I
11  knew I needed the incident to be documented.
12   Q.   When did you write the report?
13   A.   I don't recall.  A couple of days after,
14  maybe.
15   Q.   Why did you wait that long?
16   A.   Because I was grappling with even
17  writing an incident report.  I just didn't want it
18  to come back on our sergeant.
19       In our SOP there is a violation that if
20  your supervisor sees misconduct by another
21  officer, we are bound to report it.  If we don't,
22  we get in trouble and I can't pull -- I'll find
23  the SOP, which one it is, but I was putting myself
24  out on the hook if I didn't at least write an

**201**

1 incident report. That's in our SOPs, you're bound
2 to.

3    Q.    When you did write it, who did you give
4 it to?

5    A.    I wrote the report and I gave it to
6 Chief Scott. I knocked on his door and I gave him
7 the report.

8    Q.    Why did you give it to him?

9    A.    Because after Captain Fletcher's
10 swearing at me in the office and throwing his pen
11 saying if you wrote the f'ing report you ring
12 sign it, I'm not fling signing it, I didn't think
13 he really wanted it.

14    Q.    Was it the chain of command that you
15 should have given it to him?

16    A.    It was -- no; that's where everyone is
17 wrong. It's an incident report. It is not a
18 disciplinary action I was seeking; it was an
19 incident report.

20        Incident reports stay in the system and
21 they can be printed out at any time.

22    Q.    In other words they're not public
23 records?

24    A.    No; they're not public records. Now if

**202**

1 I hadn't done a report at all I would be in
2 violation of our SOP and I would be in trouble so
3 I at least was going to do an incident report on
4 this.

5        Since I had called Chief Scott and asked
6 him after going up the chain of command to
7 Lieutenant Whelihan and Captain Fletcher and the
8 response I got from Captain Fletcher I went to
9 Chief Scott. I was a new sergeant looking for
10 guidance as to what I should do in this situation.

11        I was instructed to do my job, which I
12 did my job.

14

15    Q.    (BY MS. LYNCH) Ms. Walker, showing you
16 what's been marked as Exhibit Number 9, is that
17 the letter of reprimand that you received as a
18 result of giving the report on the Elizer's Pub
19 incident to Chief Scott? (Indicating.)

20    A.    (Witness examining document.) The
21 question?

22    Q.    Is that the letter of reprimand that you
23 gave after -- I'm sorry; that you were given after
24 you gave the incident report regarding the

**203**

1 Elizer's Pub incident to Chief Scott?

2    A.    Yes; it is.

3    Q.    Did you appeal that in any way?

4    A.    I went to the union president, Captain
5 Alan Fletcher saying I want to appeal this.

6        He pulled me in his office and actually
7 he told all of us not to appeal this, to let it
8 go.

9    Q.    When you say all of us, who are you
10 referring to?

11    A.    Sergeant Monaghan, myself -- I wasn't at
12 the same time with him, obviously -- but I said I
13 want to appeal this and Captain Fletcher said it
14 is a letter of reprimand, Tam, don't worry about
15 it. As soon as Chief Scott leaves we're going to
16 pull it out of your file anyway so I didn't follow
17 my gut and I didn't appeal it.

18        It was my very first reprimand in the
19 Department after eleven, twelve years. It was
20 just one letter of reprimand through twelve years
21 of good service. I let it go.

22    Q.    Do you know whether or not you could
23 have appealed a letter of reprimand?

24    A.    I've never been involved in the union or

**204**

1 any disciplinary action. I have no idea if I
2 could have appealed it or not.

3        I went to Captain Fletcher and told him
4 I wanted to fight this. I said you didn't tell me
5 to write a report, Captain. You told me the
6 opposite. You told me if I write a report, I have
7 to ring sign it.

8    Q.    Did you say that to him when you went to
9 speak to him about appealing it?

10    A.    Yes.

11    Q.    What was his response?

12    A.    "I told you to write a report." I
13 looked at him like he was green. "Captain, you
14 didn't tell me to write a report. If you told me
15 to write a report, I wanted to write a report. I
16 already grabbed the number for the report so if
17 you wanted me to write a report, Captain, I would
18 have wrote the report and gave it to you. You
19 didn't want me to write a report, 'that's why I
20 didn't give it to you and gave it to the Chief."

21        It doesn't make any sense logically if I
22 want to write a report and he wants me to write a
23 report, why didn't I just write a report and give
24 it to him?

205

He was cursing at me in his office, throwing his pencil on the desk. No; he didn't want me to write the report. I had to cover my own situation here because I know the SOP says if you find something wrong, you write a report.

Q. Is it your understanding that the other officers, the ones that were in the bar that night, that they were disciplined as well?

A. I was told they were disciplined.

Q. And they wanted to file an appeal and they were told not to?

A. I just know about Sergeant Monaghan. Sergeant Monaghan wanted to appeal it as well.

Q. How do you know that?

A. I heard him saying he wants to appeal it. I heard him saying it in the hall, "I want to appeal this."

Can I make note on something here, actually?

Q. Sure.

A. The second page, Chief Scott, "you subsequently wrote a report and turned the report directly in to me as Chief of Police."

Q. Right.

206

A. I turned the report in to Chief Scott. I knocked on his door and handed it to him.

Q. What did he say when you gave it to him?

A. Thank you; that was it but I handed it to him. He said, "Thank you, Sergeant." That was it.

Q. How long after you gave him the report was it that you received Exhibit 9?

A. I would have to see the actual report because it has on it the date of when I actually wrote the text and when it was printed. It's on the top of the page so I don't really know how many days after.

Q. After you got Exhibit 9 did you speak to either Chief Scott or Captain Fletcher?

A. Yes; I spoke to Captain Fletcher.

Q. I'm sorry, with regard to the appeal?

A. Yes.

Q. I'm sorry. Do you recall being late for court on April 6, 2004?

A. Yes, Ma'am.

Q. Were you ten minutes late?

A. No.

Q. Did you arrive at eight-forty instead of

207

1 eight-thirty?
2     A.    No.
3              (Defendant's Deposition Exhibit
              No. 10 offered and marked.)
4
5     Q.    (BY MS. LYNCH) You have in front of you
6 Exhibit 10. Do you see your name listed on the
7 left-hand side? (Indicating.)
8     A.    (Witness examining document.) Yes; I
9 do.
10    Q.    Did you fill that out yourself?
11    A.    Did I fill?
12    Q.    Where it has your name and time?
13    A.    No; that's already filled out. The
14 officer's name is already filled out; the
15 Defendant's name is already filled out.
16    Q.    How about the time where it says
17 eight-forty -- time in, eight forty, did you fill
18 that out?
19    A.    I rounded it out, yes.
20    Q.    And you had to sign it as well?
21    A.    Yes.
22    Q.    So were you ten minutes late that day?
23    A.    No; I was seven minutes late that day.
24    Q.    Seven minutes late?

208

1     A. According to Lieutenant Monfette's
2 watch.
3     Q. Do you recall there being an issue prior
4 to April 6, 2004 where all police officers were
5 advised that they could not be late to court
6 because of a complaint made by the District Court?
7     A. I believe an e-mail came out regarding
8 to make sure you're on time for court.
9              (Defendant's Deposition Exhibit
              No. 11 offered and marked.)
10
11    Q. (BY MS. LYNCH) Showing you what has
12 been marked as Exhibit 11, did you receive that
13 e-mail? (Indicating.)
14    A. (Witness examining document.) I'm sure
15 if it was sent out to everyone, I'm sure I
16 received it on the computer.
17    Q. Other than that e-mail Exhibit 11, had
18 anyone else brought it to your attention that
19 officers coming to court late was creating a
20 problem for the prosecution of cases?
21    A. No one ever brought it to my personal
22 attention that there was an issue about being late
23 for court other than this e-mail being sent out.
24    Q. After you were late on April 6th, 2004

209

1 were you asked to write a statement as to why you
2 were late?
3        A.    Its called a To-From. Yes, I was asked
4 to write a To-From.
5              (Defendant's Deposition Exhibit
               No. 12 offered and marked.)
6
7        Q.    (BY MS. LYNCH) Did you write the
8 To-From statement which is Exhibit 14?
9 (Indicating.)
10       A.    (Witness examining document.)
11             MR. HUDSON: I'm missing something
12 here. You say this is Exhibit 14?
13             MS. LYNCH: I'm sorry, I took the
14 wrong number.
15             MR. HUDSON: So this should be 12?
16             MS. LYNCH: I'll put that on the
17 record.
18       Q.    (BY MS. LYNCH) Ms. Walker, I'm showing
19 you what I've marked as Exhibit 12 which I
20 incorrectly marked as Exhibit 14.
21             Is that the To-From statement that you
22 wrote? (Indicating.)
23             MR. HUDSON: Excuse me, I don't
24 understand what's going on here. Are you marking

210

1 the exhibits or is she marking the exhibits? Is
2 counsel marking the exhibits? I just want to be
3 clear on what's going on.
4              Who is putting the stickers on the
5 exhibits.
6              MS. LYNCH: I am.
7              MR. HUDSON: Let's let the court
8 reporter put the stickers on the exhibits, please?
9 Okay, please. This is highly unusual from my
10 practice.
11             MS. LYNCH: Just so you know, the
12 only reason I'm doing this is to save time.
13             MR. HUDSON: If they are pre-marked,
14 that would be better. I wouldn't have a problem
15 if they were pre-marked.
16             MS. LYNCH: I apologize for the
17 mistake that I made in taking the wrong sticker
18 but I'm just trying to save time.
19             MR. HUDSON: We also had a mistake
20 like this in one of your other depositions.
21             MS. LYNCH: You're correct.
22             MR. HUDSON: I would appreciate it
23 if the reporter would go ahead and that way I feel
24 a lot more -- I think she's probably more

211

1 experienced in marking those documents.
2              MS. LYNCH: You're challenging my
3 sticker abilities? We can have the stenographer
4 mark it.
5              MR. HUDSON: As long as she approves
6 it.
7        Q.    (BY MS. LYNCH) Ms. Walker, you have in
8 front of you what's been marked as Exhibit 12?
9        A.    Yes.
10       Q.    Is that the statement that you prepared
11 following being late for court?
12       A.    Yes; this is a To-From that I went to
13 Captain Monfette's office.
14       Q.    Did he ask you to prepare that?
15       A.    Yes; he did but when I prepared this
16 statement I had it in an envelope and I looked at
17 Captain Monfette and I said, "Captain Monfette, am
18 I going to be in trouble over this?" And Captain
19 Monfette said, "No, you are not going to be in
20 trouble over this. It is not you we're looking at
21 or targeting. You rarely have court. We're
22 targeting people that are forty-five minutes late
23 for court that are affecting the Court's preparing
24 for a case."

212

1              I asked him for -- I asked him this
2 because if you are going to be reprimanded or in
3 any trouble whatsoever, you are warranted to have
4 a union representative with you so before I handed
5 this To-From to Captain Monfette I specifically
6 asked him am I going to be in any trouble
7 regarding being -- which was really seven minutes
8 late for court and I rounded it off to ten
9 minutes, am I going to be in any trouble. He
10 basically said no, that he wasn't targeting me.
11 After he said that, I handed it to him.
12             If I thought there was going to be a
13 disciplinary action regarding it I would have
14 never handed it in, I would have waited for union
15 representation.
16       Q.    The language, though, that you used in
17 Exhibit 12, that's your own, is that correct?
18       A.    Yes.
19       Q.    Are you aware that other officers
20 received some sort of discipline for being late on
21 April 6th, 2004?
22       A.    I'm aware that Officer Jan Saj. I don't
23 believe Ronnie Mahalak was reprimanded although I
24 believe he was late. I was reprimanded for being

**213**

1  late.
2       I don't have a list of who others were
3  reprimanded on the same day that signed this
4  docket.   Is that the same docket?
5       Q.    I just have this page of it.   I don't
6  know if there's more or not.
7       Did you have any discussion with Chief
8  Scott about the issue of your being late and the
9  issue of discipline related to it?
10      A.    Not that I recall at this time.
11      Q.    After you turned in Exhibit 12 to
12 Captain Monfette was the next thing that happened
13 that you received a notice of discipline?
14      A.    I believe I was suspended for a day if
15 I'm not mistaken.
16      Q.    Was there any communication between the
17 time that you prepared Exhibit 12 and you got a
18 notice of discipline?
19      A.    I don't recall; I'm sorry.   I don't
20 recall.
21            MS. LYNCH: Would you mark this,
22 please?
23            (Defendant's Deposition Exhibit
               No. 13 offered and marked.)
24

**214**

1       Q.    (BY MS. LYNCH) Showing you what's
2  marked as Exhibit Number 13, is that the notice of
3  discipline that you received with regard to the
4  punctuality issue? (Indicating.)
5       A.    (Witness examining document.) Yes,
6  Ma'am.
7       Q.    Did you appeal that?
8       A.    Yes, Ma'am.
9       Q.    Did you give any kind of testimony? In
10 other words was there any kind of hearing,
11 anything like that?
12      A.    Yes.
13            (Defendant's Deposition Exhibit
               No. 14 offered and marked.)
14
15      Q.    (BY MS. LYNCH) Showing you what's been
16 marked as Exhibit Number 14, is this the
17 correspondence that you received from the Mayor
18 following the appeal? (Indicating.)
19      A.    (Witness examining document.) This is a
20 letter from Mayor Sullivan.
21      Q.    Was that affirming the one-day
22 suspension following the appeal regarding the late
23 for court issue?
24      A.    Yes.

**215**

1       Q.    I just want to go back over one thing.
2  With regard to when you worked between May of 2002
3  and December of 2002 with Jorge Rodriguez and John
4  Monaghan were you all on the same line?
5       A.    Meaning?  Line?
6       Q.    Meaning the same schedule with regard to
7  the watch that you were on? Like you worked the
8  same days and had the same days off?
9       A.    No; I believe I was in A group and I
10 believe they were in C group.
11            MR. HUDSON: You either know or you
12 don't know.
13            ▮
14 know that.
15      Q.    (BY MS. LYNCH) You think that Monaghan
16 ▮
17      A.    I know I was in A group.
18      Q.    But you don't recall them being in A
19 group?
20      A.    I don't recall.   I know that I was in A.
21 I don't know if they switched groups or not.    I
22 just know I was in A group.
23      Q.    What's the difference between A and C?
24      A.    We're on a four-on-two-off schedule.

**216**

1  There's three groups -- A group, B group and C
2  group.
3       Group A always works their four days
4  together, group B always works their four days
5  together, group C always works their four days
6  together so I will work two with B and two with C.
7       Q.    How did you learn the correct way to
8  write reports as a police officer with the Holyoke
9  Police Department in terms of what information
10 should go in a report?
11      A.    There's a class at the Academy where
12 there's basic writing.
13      Q.    In a nutshell, what do they teach you in
14 terms of what should go in a report?
15
16            MS. LYNCH:   In the Academy.
17            ▮
18 in 1993.
19            MS. LYNCH:   Right.
20            MR. HUDSON:    So if you're talking
21 about that period of time.
22            MS. LYNCH:   Right.
23            THE WITNESS: It was a one-week
24 course on writing a report.   It depends on the

217

1  report, actually.   It really depends on the
2  report.
3    Q.      (BY MS. LYNCH) Other than the course
4  that you took at the Academy, did you receive any
5  other training in terms of what should be put in a
6  report that you prepare as a police officer?
7    A.    Not to my knowledge; no.
8    Q.      Going back then to the training that you
9  received at the Academy, when you were taught to
10 write reports based on reports made by citizens of
11 incidents, what were you taught?
12 A.        We weren't really taught how to write a
13 text report. They wanted to make sure we knew
14 grammar, punctuation.
15        It was a one-week course.    Basically it
16 was a one-week course to make sure you could
17 write, period.
18 Q.        Do you recall being taught that you
19 should include the name of the individual
20 providing the information to the Police
21 Department?
22   A.    No.
23   Q.       Do you recall being taught that you
24 should provide identifying information about the

218

1  individual making the report to the Police
2  Department such as their address, phone number,
3  any information you have about them?
4          MR. HUDSON:   Objection.
5          THE WITNESS: That's if you're going
6  on a call.   If you're going on a call and you're
7  taking down a person's information -- if I'm going
8  out on a call and I'm taking down information, I
9  want to know your name, date of birth, Social
10 Security Number, what your problem is. That's
11 different than being shipped a call in the office.
12        The dispatchers have a job to take down
13 the information when they pick up that phone.    It
14 is in their manual, their handbook that they
15 identify who they are speaking to, name, phone
16 number to contact them back.
17        When you're doing a general report, a
18 regular incident report and you're out in the
19 field you would take pertinent information.    When
20 you're shipped a call from the dispatcher who
21 throws a call to you, you are under the impression
22 that this dispatcher has already done her job in
23 taking the pertinent information.
24        They go to school for that for more than

219

1  a week.
2    Q.      (BY MS. LYNCH) How about in the instance
3  where the dispatcher tells you that they have not
4  taken any information from the caller as to their
5  identity?
6    A.    If a dispatcher were to relay that to a
7  supervisor, that would be one story.    If a
8  dispatcher says informational call, you know,
9  someone wants some information, that's a different
10 story, depending on what the dispatcher states.
11        Regardless of what the dispatcher
12 states, their job is to pick up the phone and say
13 "Holyoke Police Department, your call is being
14 recorded" and therefore they take all information
15 pertaining to the person that they are speaking to
16 on that line.
17        If they need to ship that call anywhere
18 else and say it gets dropped for some reason in
19 transferring it, how are you going to get that
20 person back if the dispatcher didn't do their job
21 in gaining the information of that party.    That is
22 their job.   It is in their manual.
23 Q.        With respect to the telephone call that
24 you received on July 23, 2004 from a citizen who

220

1  reported viewing an individual at the Holyoke
2  Mall, can you describe first of all what was
3  stated to you by the dispatcher before you took
4  the call?
5    A.    I was sitting at the CO's desk, the
6  phone was ringing off the hook at dispatch. The
7  next thing I hear is Brenda Therrien yelling from
8  across the room, "Sarg, informational call."
9          I pick it up, start talking to
10 individual on the phone.   I knew nothing about --
11 anything about this call whatsoever.    I pick up
12 the phone.
13 Q.        Did she tell you before she gave you the
14 call that she had not taken any identifying
15 information from the person who called?
16   A.    The only thing that dispatcher Brenda
17 Therrien said, yelling from across the room, from
18 what I recall, the phone is ringing in the office,
19 dispatch office, is "informational call, Sarg."
20 That's all I heard.
21        My phone rang in the CO's office and I
22 picked it up and started speaking to an
23 unidentified female.
24 Q.        Was anyone else present when you took

221

the call?

A.    No, Ma'am.

Q.    Where was Brenda Therrien in relation to where you were?

A.    In the dispatch office.

Q.    But I mean --

A.    (Interposing) I was in the CO's office.

Q.    How far apart are they?

A.    I'm not sure. Are you going to use this as an exhibit of what I drew? If so, I might as well put that on there.

Q.    Actually don't mark on that one because that pertained to another incident but can we have you just sign it and put today's date which I think is the twenty-sixth?

A.    (Witness complying.)

MS. LYNCH:    Don't put anything else down on that, Ms. Walker.

MR. HUDSON:    We're only going to sign it if it is an exhibit.

MS. LYNCH: I want to mark it as an exhibit.

MR. HUDSON:    Let's mark it as an exhibit.

222

THE WITNESS:            Sign it or mark it first?

MR. HUDSON:    Mark it and then she'll sign it.

MS. LYNCH:    No; put today's date and sign it and then we'll mark it.

MR. HUDSON: You testified to the document?

THE WITNESS: Yes, sir.

MR. HUDSON: Let's have the document marked as an exhibit, please, and if you're going to use it now as Exhibit 15?

MS. LYNCH:    It's the next exhibit but I would like the witness to sign it and date it.

MR. HUDSON:    She can sign it and date it.    You go ahead and sign it and date it. We're going to mark it as an exhibit. Where is your name?

THE WITNESS: I'm here, this is my desk.

MR. HUDSON:    Let me ask you to write your name clear.    Is it clear?

MS. LYNCH: You can fix it if you'd

223

1  like.

2           MR. HUDSON: As long as you
3  recognize it.

4           THE WITNESS: Yes.

5           MS. LYNCH: We'll have that marked
6  as the next exhibit.

7                (Defendant's Deposition Exhibit
              No. 15 offered and marked.)

8

9           MS. LYNCH: Just for the record
10 since it's a little out of order we have just
11 marked Exhibit Number 15 the diagram that
12 Ms. Walker drew earlier with regard to the
13 incident that is the subject of Exhibit 4.

14          MR. HUDSON: Just so we can be clear
15 about this, Exhibit 4 specifically regarding the
16 office diagram concerning where she was located
17 when Sergeant Monaghan is alleged to have sung
18 "you shouldn't go sticking your tongue where it
19 don't belong," is that right.

20          THE WITNESS: That's correct, sir.

21          MR. HUDSON: Thank you.

22    Q. (BY MS. LYNCH) Ms. Walker, I was asking
23 you where you were in relation to the dispatcher
24 when you took the phone call and I think you were

224

1  looking at Exhibit 15.

2           Looking at Exhibit 15, can you -- does
3  that show where the two of you were --

4     A. (Interposing) No.

5     Q. -- when you took the call from the
6  person reporting the Holyoke Mall incident?

7     A. I was sitting here; she's way over here,
8  outside of this area. There's another room here.

9     Q. You're saying she was in a room adjacent
10 to the room that you drew in Exhibit 15?

11    A. Yes; with a plate glass wall and a
12 cement half wall and a plate glass wall.

13    Q. So you couldn't hear each other, then?

14    A. No; you have to scream.

15    Q. Can you relay what was discussed between
16 you and the citizen who called regarding the
17 Holyoke Mall?

18    A. What was discussed with the citizen that
19 called?

20    Q. Right; between you and the citizen?

21    A. Off the top of my head, that was a few
22 years ago. Do you have the report?

23    Q. The report that you did?

24    A. The report or the statement that they

225

1  said I did.
2  MS. LYNCH:              I've got the report that
3  you did, I think.
4           If you'd like to see that, why don't we
5  have that marked as the next exhibit.
6                    (Defendant's Deposition Exhibit
                     No. 16 offered and marked.)
7
8      Q.    (BY MS. LYNCH) Ms. Walker, showing you
9  what has been marked as Exhibit 16, do you
10 recognize that? (Indicating.)
11     A     Yes.
12     Q.    Is that the report that you wrote?
13     A.    (Witness examining document.) Yes.
14     Q.    Do you recall any other information that
15 you received from the individual besides what is
16 written there?
17     A.    At this time, no.   I received this call
18 shipped from Brenda Therrien -- Dispatcher
19 Therrien.
20          The caller wanted to know information as
21 to what she should do if she had seen someone
22 videotaping in the Mall.    I believe I instructed
23 this woman to contact Mall security, without
24 giving her any information as to why to contact

226

1  Mall security.
2           The Mall has massive cameras all over
3  the place in that Mall but I wouldn't tell her
4  that.   I told her to contact Mall security.    Mall
5  security would contact us, knowing that there's
6  massive cameras all over the Mall.
7      Q.    Had you ever done any work at the
8  Holyoke Mall?
9      A.    Yes.
10     Q.    In other words -- well, how do you know
11 that there are massive cameras around the Mall?
12     A.    I've used the Mall security team in my
13 DEA work.   I've been in the office where all the
14 cameras are.   I know what -- I should say back
15 then I knew what parking lots the cameras were,
16 how extensive they can zoom in.
17          I've used them to secure a drug dealer
18 and follow him throughout the Mall for an hour or
19 more, see exactly where he goes.
20     Q.    Why didn't you get the name and
21 identifying information of the woman that called?
22     A.    Because I'm assuming that the dispatcher
23 had gotten all of the information from the person
24 that called.   She said "information call, Sarg."

227

1  I picked up the phone and started speaking with
2  the woman.
3           The woman appeared to be pretty young.
4  She stated that she was at the Mall earlier and
5  that she was just wondering if this ever happened,
6  what would I do and I said you'd call the Mall
7  security and get ahold of Mall security.    I didn't
8  tell her about the cameras that are all inside the
9  Mall.
10          I let her know that if she thought she
11 saw someone with a video camera inside the Mall
12 that shouldn't have a video camera or she feels
13 that they were doing something wrong, that that's
14 what you would do
15     Q.         Did she say what the person was
16 videotaping?
17 A.            She didn't mention that to me.    None of
18 this information came out to me about this person
19 videotaping anything until after I had a brief
20 conversation with this woman and then and only
21 then did all of this information start coming out
22 about what Brenda Therrien said, what's on the
23 tape and what Brenda Therrien said.
24          It is like when you go fishing, the fish

228

1  gets bigger and bigger and bigger as the story
2  grows. Brenda Therrien expounded on the story and
3  shipped the call to a sergeant that was sitting in
4  there saying "informational, Sarg."
5           You get thousands of calls of nuts
6  saying that I'm drunk and I can't get up, you
7  know.   If you're really busy in there and the
8  phone is ringing off the hook, you don't have time
9  to play around with a drunk person so they'll ship
10 it out.
11     Q.    When you just said a moment ago that
12 what Brenda Therrien said and what's on the tape
13 is different, what are you referring to?
14     A.    What Brenda Therrien stated to me after
15 this whole incident was -- after the phone was
16 hung up was that she said that the woman called
17 and stated to her that there was a man in the Mall
18 videotaping.
19          That call never came to me in that
20 manner.   Brenda Therrien never said anything about
21 a man in a Mall, a woman reporting a man in the
22 Mall.   None of that came to me until well after
23 the fish had gotten to be eight feet did I learn
24 of any of this information.

**PERLIK and COYLE REPORTING**

# TAMMY WALKER vs. CITY OF HOLYOKE

## TAMMY WALKER                    SEPTEMBER 26, 2006

229

1          The person I spoke to on the phone
2 wanted to know what she would do in a situation if
3 it were to happen. After the call is hung up and
4 it was maybe an hour after, this turns into a big
5 story. Sergeant Walker is sitting there and not
6 knowing what transpired.
7     Q.    When she mentioned to you that it was a
8 Middle Eastern man videotaping, did you have any
9 concern about that?
10          MR. HUDSON: Objection.
11          THE WITNESS: She said there was an
12 olive complexion person in the Mall with a video
13 camera. I asked her is she aware that we have a
14 large Hispanic population in Holyoke.
15          This wasn't a woman that was concerned
16 about a Middle Eastern man allegedly videotaping
17 structured buildings in the Mall. I've been a
18 police officer for way too long to fall for
19 something like that.
20          Listen, the woman called. She simply
21 wanted to know what she should do if. I gave her
22 the information, if you ever think you see
23 something like that, you call Mall security,
24 they're right there, they've got video cameras

230

1 everywhere.
2          Have you ever -- were you ever able to
3 find this woman that called? You can ask her what
4 she said to me.
5          MS. LYNCH: I'm going to ask the
6 court reporter just to read that answer back. I
7 kind of missed something.
8          (Reporter read back as
        requested.)
9
10     Q.    (BY MS. LYNCH) A couple of things,
11 Ms. Walker.
12          When you said "I've been a police
13 officer way too long to fall for something like
14 that," what do you mean?
15     A.    When I say fall for this, I'm talking
16 about Brenda Therrien. Brenda Therrien said that
17 she told me it was an information call --
18 information, that's what she said. That's not
19 what she said to me.
20          When the fish got bigger after she
21 expanded on this story and what she told one
22 supervisor and what she told another supervisor
23 was totally different so once this big story
24 started coming out, Brenda Therrien took the high

231

1 road and said well, I told her it was an
2 information call.
3     Q.    What did she tell you, then?
4     A.    Exactly what I told you.
5          MR. HUDSON: Asked and answered.
6     Q.    (BY MS. LYNCH) I thought you did say
7 she said it was an information call?
8     A.    Information call, Sarg. We need some
9 information, like not information call. I believe
10 I read somewhere that she said informational call,
11 Sarg, and I'm not taking it.
12          That never came to my ears, ever, but
13 it's written somewhere in text.
14     Q.    I just need to clarify this. Are you
15 saying that the distinction you're making is that
16 she said to you it's an information call as
17 opposed to an informational call?
18     A.    What said to me was information
19 call -- what I heard her say was information call,
20 Sarg. That could be meaning --
21     Q.    (Interposing) What did she say after?
22     A.    What's in the text of what she said --
23 what's in the text is that "I'm not taking" --
24 that was in one of my suspensions -- "I remember

232

1 saying I'm not taking it," yelling across the room
2 and I'm here and she's over here and the phones
3 are ringing, "informational call, Sarg," that's
4 all I got.
5     Q.    I want to make sure I understand this.
6 You're saying that she just said information call
7 and that you didn't hear her say I'm not taking
8 the information?
9     A.    Absolutely not.
10     Q.    That's the distinction you're making
11 between what you say happened and what she says
12 happened?
13     A.    I know what happened. I know what I
14 heard.
15     Q.    Right, but is that the distinction
16 you're making?
17     A.    Is what she said. You have the text.
18 You should have the text. You have her text.
19     Q.    But I'm just asking you what you recall,
20 what distinction you're making between what you
21 heard her say and what you say she later said?
22     A.    What she said to me was "information,
23 Sarg."
24          What transpired after that was a whole

TAMMY WALKER                                    SEPTEMBER 26, 2006

---

233

1 other text of a Middle Eastern man called about --
2 or Middle Eastern man was at the Mall videotaping.
3 Then I heard he was videotaping the structures;
4 then I heard he was videotaping the escalators.
5          None of this came to Sergeant Walker
6 when that call was shipped to me; nothing.
7      Q.    Did she say she had told you that,
8 meaning that it was a Middle Eastern man
9 videotaping the structures?
10      A.    No; I don't believe she ever said that
11 in the text. She never said that; no.
12          Again I ask, have we he ever found this
13 woman that made the phone call?
14      Q.    I don't know.
15      A.    Did we investigate to find her to ask
16 her?
17      Q.    I'm really not here to answer questions,
18 you are, but I don't know the answers to those
19 things.
20      A.    I'd like to find out; thank you. I just
21 wanted to know.
22      Q.    You said that she described the person
23 as having an olive complexion.
24 _____Are you saying that she didn't mention

---

234

1 Middle Eastern man?
2      A.    Not to me; not to Sergeant Tammy Walker.
3 She didn't say Middle Eastern man. She said olive
4 complexion.
5          As we continued on the conversation --
6 as we continued on the conversation she asked what
7 would she do if she saw a Middle Eastern man at
8 the Mall. The man that she described had olive
9 complexion skin.
10          MR. HUDSON: For clarification are
11 we talking about Brenda Therrien or the
12 unidentified caller?
13          THE WITNESS: The unidentified
14 female.
15      Q.    (BY MS. LYNCH) So on Exhibit 16 when
16 you wrote down Middle Eastern, you're saying that
17 she actually said olive complexion for the person?
18      A.    What I put was what she thought was a
19 Middle Eastern videotaping.
20          What she thought was a Middle Eastern
21 when she said olive complexed skin, what would she
22 do if she saw a Middle Eastern man, what would she
23 do in that situation.
24      Q.    But you wrote on Exhibit 16 she wanted

---

235

1 to report what that she saw a man who she thought
2 was Middle Eastern who was videotaping in the
3 Holyoke Mall?
4      A.    No; I just told you two seconds ago that
5 she described to me there was a man in the Mall,
6 olive complexion.
7          I asked her was she aware that we have a
8 large Hispanic population in the City. What would
9 I do in a situation if I saw a Middle Eastern man
10 videotaping at the Mall. I said you would contact
11 Mall security, not giving her the information that
12 Mall security has cameras everywhere in there and
13 can spot tracking everywhere you are.
14          As a matter of fact, they went over the
15 taping for the whole day and there was no Middle
16 Eastern man who was videotaping. Sergeant Albert
17 who was with the FBI went to the Holyoke Mall and
18 went through the entire tape of the Mall. There
19 was no Middle Eastern man at the Mall on this
20 date.
21          The entire day was looked at by the
22 supervisor and at the Mall, heads of security.
23      Q.    If she didn't say she saw a Middle
24 Eastern person then why in the second sentence on

---

236

1 Exhibit 16 did you say that she wanted to report
2 that she saw a man she thought was Middle Eastern
3 videotaping in the Holyoke Mall?
4      A. Because she thought she saw a Middle
5 Eastern man. When I said did he have an olive
6 complected skin that you described, could he have
7 been Hispanic; could he have been Hispanic, yes.
8      Q. But she did use the term Middle Eastern?
9      A. What should I do if I saw a Middle
10 Eastern man in the mall. What should I do if I
11 ever see that, period.
12      Q. You don't have to repeat that again.
13      A. The entire Mall. There was no Middle
14 Eastern man at the Mall according to Mall
15 security.
16
17
18
19      Q. I've heard you.
20      Q. You'll agree that the way that
21 you wrote the second sentence in Exhibit 16
22 infers that she reported seeing a man that she
23 thought
24

---

**237**

was Middle Eastern videotaping in the Holyoke Mall?

A. An olive complexion male.

Q. Why didn't you write that, that she reported seeing an olive complected male as opposed to a Middle Eastern male?

A. I don't know; I don't know.

Q. Do you know if she was from Holyoke -- the Holyoke area at all so that she would know there was a large Hispanic population in Holyoke?

A. I asked her if she was aware there was a large Hispanic population in the City.

Q. What was her response?

A. No; she wasn't aware. So I would assume she's not from Holyoke.

Q. How long did you speak to the female?

A. Two minutes, maybe three and a half.

Q. Why didn't you tape record the call?

A. I don't tape record the calls. I never tape record a call since I've been at the Police Department in twelve years, ever.

Q. Did you have that capacity on the phone that you were in, in the CO's office -- was it the CO's office that you were in?

**238**

A. That's correct.

Q. Did you have that capacity to tape the call?

A. Yes; but why would I tape a call that's -- the woman is asking a question about what she should do, not that she saw but what should she do if she did see something. Why would I tape that?

If someone called the station and said Sergeant Tammy Walker I'm calling because I see a Middle Eastern man with a video camera and he's taping structures, then you would probably tape it and go ahead with it. This is not the call that came through.

Q. Also in Exhibit 16, the last sentence up said, "I then spoke to Sergeant Albert" -- next to last sentence, "I then spoke to Sergeant Albert regarding this matter."

Can you recall what you stated to Sergeant Albert?

A. Yes; I spoke to Sergeant Albert regarding this situation. He came to me the next night and he said, "Sarg, I checked out and had the Mall security do the entire scan of the Mall

**239**

1  and there's nothing to this call." I said, "I
2  check it out.
3      A. The next night. He just wanted to let
4  me know. He said, quote, "Sarg, there was nothing
5  to that call." I said, "I know, Jimmy, there was
6  nothing to it. I know." He said I just wanted to
7  let you know.
8      Q. Did you ever discuss this issue
9  involving the Holyoke Mall with Chief Scott?
10     A. Through a suspension. Yes; I was
11 suspended on this as well.
12
13
14
15
16
17
18
19
20
21
22     A. No.
23     Q. Do you know what time of day it was that
24 the woman observed the man videotaping at the

**240**

1  Mall?
2      A. The woman didn't say she observed the
3  man videotaping at the Mall.
4      Q. Well, your second sentence says, "She
5  wanted to report she saw a man who she thought was
6  Middle Eastern videotaping in the Holyoke Mall."
7          My question is what time did she say she
8  saw him videotaping?
9      A. I don't know what time it was but
10 according to the other text, the dispatch, he
11 wasn't videotaping in the Mall -- according to
12 Brenda's dispatch log.
13     Q. Her dispatch log?
14     A. Yes; her dispatch logs of the call that
15 she took from this woman.
16     Q. You've seen that in writing?
17     A. I've seen it in writing; yes.
18     Q. Did you have a discussion with
19 Lieutenant Denise Duguay about this incident at
20 the Holyoke Mall?
21     Q. When?
22     Q. After you took the call?
23     A. I was only in the station for half an
24 hour relieving another sergeant for lunch. I

241

1 believe after I came back into the station she
2 said that Jimmy Albert would like you to do a
3 report and put it on the clipboard.
4     Q.    Any other discussion that you recall
5 about it with Lieutenant Duguay?
6     A.    No.
7     Q.    How soon after she told you to write the
8 report did you write the report?
9     A.    I don't know but usually on the text of
10 these reports its usually the right-hand corner.
11 Let me see if it's here.
12     Q.    Actually that indicates, is it July 23,
13 2004 that you prepared this report based on the
14 first page of Exhibit 16?
15     A.    The first page I believe it was 23:10 --
16 the second line, 23:10.
17     Q.    Did you have any other discussion with
18 her besides her telling you to write the report?
19     A.    Not that day.
20     Q.    How about after with regard to this
21 incident at the Holyoke Mall?
22     A.    I really don't know.  I'm sure we talked
23 about it but I couldn't tell you when, what we
24 discussed or who was there.

242

1     Q.    Did you ever refuse to write the report?
2     A.    No.
3     Q.    In other words -- well, strike that.
4 Was Denise Duguay the first person that told you
5 to write the report?
6     A.    I don't know.  I really -- it's been so
7 long ago, I don't know.
8         All I know is they asked me to write a
9 report.  I think I was going to do a To-From to I
10 think it was Sergeant Albert but a report was
11 generated, handed in.
12     Q.    Let me ask you this:  Did you write the
13 report before Lieutenant Duguay told you to write
14 the report?
15     A.    No; I write my reports at the very end
16 of my shift, my watch, the very end.    I think I
17 was on a call with a lady who was turning blue in
18 the bathroom for awhile.    I think she was dying.
19 I was on that call.
20     Q.    Did you ever make a statement to the
21 effect that it's not --
22     A.    (Interposing) I coughed while you were
23 talking, I missed part of that, sorry.
24     Q.    I'll repeat it.  Did you ever make a

243

1 statement to the effect that it is not against the
2 law to videotape at the Mall?
3     A.    Yes.
4     Q.    Who did you make that statement to?
5     A.    I made it to several people.  It's not
6 against the law to videotape at the Mall.
7     Q.    With regard to this incident, though,
8 that's on Exhibit 16, do you recall making that
9 statement that night?
10     A.    I do recall making that statement that
11 night but I'm not sure who I made it to that
12 night.
13     Q.    Based on the information that this woman
14 relayed to you in the phone call that's reflected
15 in Exhibit 16, did you have any concern about
16 possible terrorism --
17     A.    (Interposing) No.
18     Q.    -- at the Holyoke Mall?
19     A.    No; the way the woman's voice on the
20 phone, what she was seeking from me and realizing
21 she was in Holyoke, Massachusetts with a high
22 population of Hispanic people who wasn't doing
23 anything out of the ordinary with this video
24 camera, no.

244

1     Q.    Did she ever tell you -- I can't recall
2 if I asked you this or not.    Did she ever tell you
3 what he was videotaping at the Mall?
4     A.    No.
5     Q.    Did you ever ask her what he was
6 videotaping?
7     A.    I don't know. There's a whole
8 statement.
9         At this present second I can't tell you
10 what transpired back in 2004 in July. That was
11 two years ago.    I can't give you anything
12 verbatim.
13     Q.    Obviously you're familiar with
14 September 11, 2001, is that correct?
15     A.    That is correct.
16     Q.    After that date do you recall receiving
17 any training with regard to things to look for
18 within the City of Holyoke that could possibly be
19 related to terrorist plots or -- do you recall
20 receiving any training on that issue in general?
21         MR. HUDSON: Objection.
22         THE WITNESS: Not to my knowledge on
23 this date I can't tell you.    I'd have to go
24 through my notes and see -- two years ago, no.    It

245

was two years ago.

I can't answer that question right now without looking at some notes I made.

Q. (BY MS. LYNCH) When you say two years ago, what do you mean? September 11, that occurred five years ago.

A. You're asking me about this date here, right?

Q. No; actually I'm asking you after September 11, 2001 do you recall receiving any training on September 11, 2001 issues?

A. I was in DEA until May of 2002. I don't recall at this time; no.

(Defendant's Deposition Exhibit No. 17 offered and marked.)

Q. (BY MS. LYNCH) Ms. Walker, showing you what's been marked as Exhibit 17, do you recall receiving that memo? (Indicating.)

A. (Witness examining document.) No.

Q. Are you saying that you don't recall receiving it or you never received it?

A. I've never seen this document before.

Q. Have you ever seen anything similar to that, meaning a discussion of September 11, 2001

246

and precautions that should be taken as a result of that as affecting the City of Holyoke?

A. I'm sorry, the first, have I ever seen any documents?

Q. Right; have you ever seen a memo similar to Exhibit 17?

MR. HUDSON: I'm going to ask you to read that, please. Take your time and read it.

THE WITNESS: (Witness examining document.) I've never seen this document before but on D, any supervisor, officer, civilian members of the Department.

It goes on to say to forward it to the Criminal Investigation Bureau. That's not Jimmy Albert. Sergeant Albert is Homeland Security liaison. I wasn't in the department at this time. I've never seen this.

Q. (BY MS. LYNCH) When you were affiliated with the DEA, did you still get correspondence from the Holyoke Police Department?

A. No. I spent all my time at the DEA office over here in Springfield. I rarely went into the station at the Holyoke Police Department. We had a new computer system that I wasn't trained

247

1 on.

2       Again, Lieutenant O'Connell didn't want
3 DEA in Holyoke so I stayed away from Holyoke as
4 far as I'd go in the station, check my voicemail
5 and pretty much leave.

6       If you're not there, you're not targeted
7 for something. She didn't want us there and we
8 didn't go there.

9   Q. Prior to July 23, 2004 do you recall
10 receiving any memos from Chief Scott or any other
11 supervisors at the Department that discussed
12 September 11, 2001 related terrorist issues as
13 possibly affecting Holyoke?

14   A. Not this second. If you have a document
15 I can look at.

16             (Defendant's Deposition Exhibit
                No. 18 offered and marked.)
17

18   Q. (BY MS. LYNCH) Showing you what's been
19 marked as Exhibit 18, have you ever seen that --
20 had you ever seen that prior to July 23, 2004?
21 (Indicating.)

22   A. (Witness examining document.) Are you
23 asking me if I've ever seen this document?

24   Q. Yes.

248

1   A. No.

2   Q. Have you ever seen any other documents
3 of a similar nature regarding terrorism issues as
4 related to September 11?

5   A. I believe Officer Albert did a training
6 class of some sort at the Department but that's
7 all I recall about terrorism.

8   Q. Do you remember when that was?

9   A. No; but I remember he was the liaison
10 and I remember that we had some type of short
11 class on it.

12   Q. Do you recall any discussion within the
13 Department -- and again we'll focus on the time
14 prior to July 23, 2004 -- about particular
15 locations within the City that could possibly be
16 terrorist targets?

17             MR. HUDSON: Objection.

18             THE WITNESS: Say that question
19 again.

20   Q. (BY MS. LYNCH) Do you recall any
21 discussion within the Department prior to July 23,
22 2004 about the issue of possible terrorist targets
23 within the City of Holyoke?

24   A. No; not to my knowledge. No.

249

1        0    For example, the Holyoke Mall or other
2  large locations where  people would  gather,
3  synagogues, anything  like that?
4        A.   That discussion  would take place between
5  whom
6        Q.   Well, you were a supervisor?
7        A.   That's correct.
8        O.   Do you recall being involved in any
9  discussion  like that?
10       A.   Meaning the supervisors that weren't
11 speaking to me?  No.
12       MR. HUDSON:    I think we've been at
13 this for a  couple of hours now.  Can we take a
14 break?
15       MS. LYNCH:  Well, actually --
16       MR. HUDSON:    (Interposing) It's ten
17 minutes  after five.
18       MS. LYNCH:    Let's go off the record
19 for a second.
20 (Discussion            off the record,)
21       Q.   (BY MS. LYNCH)  Just regarding to one
22 topic.
23 (Defendant's              Deposition Exhibit
   No.            19 offered and  marked.)
24

250

1        Q    (BY MS. LYNCH)  Ms. Walker, showing you
2  what's been  marked as Exhibit Number 19, is that
3  the suspension  notification that you received from
4  Chief Scott as a  result of the Holyoke Mall phone
5  call incident that we've  been discussing that
6  occurred  on July 23, 2 0 0 4?   (Indicating.)
7        A.   (Witness examining document.)  I would
8  have  to read this entire text.
9        You're missing some pages off this
10 suspension  that I received.  This isn't the full
11 suspension  that I received, I can tell you right
12 now  by the weight of it.
13       MS. LYNCH:  Well, we'll just
14 continue  this next time.  I'll follow up with you
15 on that.
16       THE WITNESS:    There's a couple of
17 pages missing  here.
18       MS. LYNCH:  We'll continue with that
19 when  we reconvene.  We'll continue with  Exhibit 19
20 when  we reconvene.
21       1 just want to put on  the record that
22 obviously  I am not done with  Ms. Walker's
23 deposition  and I would  like to suspend  to another
24 day  as mutually  convenient.

251

1        MR. HUDSON:    We are not
2  automatically agreeing  to a suspension  but we are
3  amenable to mutually agreeing to accommodate the
4  Defendant's need  or request to continue deposing
5  Ms. Walker provided  that our request to continue
6  the suspended  depositions of Chief Scott, Captain
7  Fletcher.  Monaghan  are also allowed.
8        MS. LYNCH:    I already told you I
9  would agree to that based  on your representation
10 that you  didn't finish the other depositions.
11       MR. HUDSON:    Yes.
12       MS. LYNCH:    And this one clearly has
13 not been seven  hours but I'm telling you now I
14 know I'm  going to need more than seven hours.   Can
15 I
16       MR. HUDSON:    We can agree.  We just
17 need to agree upon scheduling.
18       MS. LYNCH:  Right. That's fine.
19       MR. HUDSON:    And including the
20 Mayor's deposition.
21       (The deposition   was Concluded_)
22
23                         •  • "*1* "
24

252

1        SIGNATURE PAGE - ERRATA SHEET
2        To be signed by deponent and returned to
3  counsel within  thirty (30) days.
4        I, the undersigned, TAMMY WALKER, do hereby
   certify that I have  read the foregoing transcript
5  WALKER vs. CITY OF HOLYOKE, on SEPTEMBER 26. 2006
6  and  that, to the best of my knowledge, said
   transcript is true and  accurate (with the
7  exception  of the following corrections listed
   below:)
8
9
   PAGE : LINE:   CHANGE AND REASON
10
11        .    .
12
13             .
14  .    .
15
16
17
18        .
19
20 DEPONENT'S SIGNATURE:
21 Signed  under the pain and penalties of perjury
   this    of           2006.
22
23 NOTARY PUBLIC.
24 My Corn mission expires:

253

1    COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF HAMPDEN
2
          I, JOANNE COYLE, a Notary Public within and
3    for the Commonwealth of Massachusetts at large, do
     hereby certify that I took the deposition of TAMMY
4    WALKER, pursuant to the Federal Rules of Civil
     Procedure, at the offices of Morrison Mahoney,
5    LLP, 1500 Main Street, Springfield, Massachusetts,
     on SEPTEMBER 26, 2006.
6
          I further certify that the above-named
7      deponent was by me first duly sworn to testify to
       the truth, the whole truth and nothing but the
8     truth concerning her knowledge in the matter of
     the case of TAMMY WALKER vs. CITY OF HOLYOKE, now
9    pending in the United States District Court,
     District of Massachusetts.
10
          I further certify that the within testimony
11    was taken by me stenographically and reduced to
     typewritten form under my direction by means of
12    COMPUTER ASSISTED TRANSCRIPTION; and, I further
     certify that said deposition is a true record of
13    the testimony given by said witness.
14    I further certify that I am neither counsel
     for, related to, nor employed by any of the
15    parties to the action in which this deposition was
     taken; and further, that I am not a relative or
     16    employee of any attorney or counsel employed by
       the parties hereto, nor financially or otherwise
17    interested in the outcome of the action.

18    WITNESS my hand and seal this _____ day of
     OCTOBER, 2006.
19

                    _____
20                  Joanne Coyle
Notary Public
21                  Certified Shorthand Reporter
                    License No. 106693
22
     My Commission Expires
23    May 12, 2011
24

254
TO:        OZELL HUDSON, JR., ESQUIRE


COPY TO. CAROLE SAKOWSKI LYNCH, ESQUIRE


FROM: JOANNE COYLE, Certified Shorthand Reporter


RE:        TAMMY WALKER vs. CITY OF HOLYOKE


DEPOSITION OF: TAMMY WALKER


TAKEN ON:        SEPTEMBER 26, 2006


INSTRUCTIONS        _____


Please forward the attached original Signature Page-
Errata        Sheet, along with a copy of the
deposition transcript, to the deponent, TAMMY WALKER, for
her deposition taken on SEPTEMBER 26, 2006 in the above-
captioned case.

According to the Rules of Civil Procedure, the deponent has
thirty (30) days in which to make these corrections to the
transcript.

when the deponent has signed and noted her corrections on
the Signature Page-Errata Sheet, indicating the page number,
line number, and the desired correction, please return the
original Signature Page-Errata Sheet to Ms. Lynch.

# EXHIBIT 2

**IN THE MATTER OF:**

TAMMY WALKER vs.

CITY OF HOLYOKE

_____

**DEPOSITION OF:**

JORGE RODRIGUEZ
DATE: SEPTEMBER 20, 2006

_____

PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931 Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
C.A. No. 05-30074-MAP
Pages 1-178

TAMMY WALKER

vs.

CITY OF HOLYOKE

**DEPOSITION OF: JORGE RODRIGUEZ**

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Morrison Mahoney, LLP, 1500
Main Street, Springfield, Massachusetts on
SEPTEMBER 20, 2006, commencing at 10:40 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified  Professional Reporters
1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931            Fax (413) 731-7451

**2**

APPEARANCES:

FOR THE PLAINTIFF:

LAW OFFICE OF OZELL HUDSON, JR., ESQUIRE
434 Massachusetts Avenue
Boston, Massachusetts 02118
BY:  OZELL HUDSON, JR.

FOR THE DEFENDANT:

MORRISON MAHONEY, LLP
1500 Main Street
Springfield, Massachusetts 01115
BY:  CAROLE SAKOW SKI LYNCH, ESQUIRE

FOR THE CITY OF HOLYOKE:

CITY OF HOLYOKE LAW DEPARTMENT
20 Korean Veterans Plaza, Room 204
Holyoke, Massachusetts 01040-5000
BY:  KAREN T. BETOURNAY, ESQUIRE

Also Present:  Tammy Walker

**3**

I N D E X

WITNESS         DIRECT CROSS REDIRECT EECROSS

JORGE RODRIGUEZ      5    135    164    171
                                 174

E X H I B I T S

NO.       DESCRIPTION              PAGE

1         Deposition Subpoena         10
2         11/13/02 Fournier to W helihan IOC   66
3         Questionnaire              67
4         12/02/02 Fournier to Rodriguez IOC  74
5         12/04/02 Rodriguez to Fournier IOC  74
6         Rodriguez Affidavit         106
7         3/27/03 Rodriguez Disciplinary Action
          Notice                    124
8         5/15/03 Fournier to Rodriguez IOC  124
9         5/15/03 Rodriguez Complaint Form   126
10        Drawing of Gas Pumps        171

**4**

S T I P U L A T I O N S

It is agreed by and between the parties

that all objections, except objections as to the

form  of the question, are reserved to be raised at

the time of trial for the first time.

It is further agreed by and between the

parties that all motions to strike unresponsive

answers are also reserved to be raised at the time

of trial for the first time.

It is further agreed that the deponent will

read and sign the deposition and that the sealing

of said deposition will be waived.

It is further agreed by and between the

parties that notification to all parties of the

receipt of the original deposition transcript is

also hereby waived.

. . . "

**5**

1        JORGE RODRIGUEZ, the Deponent, having been
2  satisfactorily identified by the production of his
3  driver's license and having been first duly sworn
4  by the Notary Public, deposes and says as follows:
5                    *****
6            DIRECT EXAMINATION BY MR. HUDSON
7     Q.    Mr. Rodriguez, my name is Carole
8  Sakowski Lynch and I represent the Holyoke Police
9  Department with regard to a lawsuit that Tammy
10 Walker has filed.
11 I have a Spanish interpreter here.              If
12 you would like to utilize his services if you're
13 having any trouble understanding me, just say so
14 and then he can interpret.
15          Also, I'd like to advise you that you
16 are not represented by an attorney here today, is
17 that correct?
18 MR. HUDSON: That's incorrect.              He
19 has requested that I represent him for purposes of
20 this deposition.
21  MS. LYNCH:          I guess I'm unclear as
22 to whether that's appropriate or not given that
23 he's supposed to be an independent witness.     It's
24 not like he is some sort of agent of Ms. Walker.

**6**

1  MR. HUDSON:              He has -- he has simply
2  asked me to represent him for purposes of this
3  deposition so I am serving as his attorney.
4  That's why I'm sitting here in this particular
5  spot.   The witness is certainly entitled to
6  counsel.
7  MS. LYNCH:              I understand that he's
8  entitled to counsel.   I'm just not sure he's
9  entitled to the same counsel as Plaintiff.
10         In any event, I noted my concern about
11 that in the record so let's just move on.
12 MR. HUDSON:              Yes; let's, please.
13    Q.   (BY MS. LYNCH) Mr. Rodriguez, you have
14 the right to read over the deposition transcript
15 that is made as a result of this deposition in
16 order just to make sure that your responses are
17 accurate or, if you'd like, you can waive it.
18 It's completely up to you.    What would you like to
19 do?
20         If you want to read it over we would
21 make arrangements either for you to go to the
22 stenographer's office or to get a copy somehow or
23 if you'd like to waive it?
24           MR. HUDSON: You'd like to read the

**7**

1  transcript of your testimony to make sure that
2  its accurate.
3            THE WITNESS: Yes.
4     Q.   (BY MS. LYNCH) Before we go on, you had
5  a discussion with Tammy Walker out in the hallway.
6  Can you tell me what she said to you?
7     A.   I can't recall.
8     Q.   I'm just talking about five minutes ago
9  when we were walking down the hallway. Tammy
10 Walker and you just discussed something. Can you
11 tell me what she said to you and what you said to
12 her?
13    A.   I don't remember.   I didn't put too much
14 importance.
15    Q.   You don't remember what she just said to
16 you two minutes ago?
17    A.   No.
18    Q.   You realize you've taken an oath to tell
19 the truth here today?
20    A.   Yes; I'm telling the truth.    I don't
21 remember.
22    Q.   Did she talk to you about her attorney
23 representing you at this deposition?
24    A.   Yes; something like that.

**8**

1     Q.   Can you tell me everything that she
2  said?
3     A.   She said he could represent -- if I
4  needed counsel he could represent me.
5     Q.   What else did she say to you?
6     A.   That's it.
7     Q.   What did you say to her?
8     A.   For me it was okay.
9     Q.   Are you paying for Attorney Hudson's
10 services today?
11    A.   No.
12    Q.   Have you now told me everything that
13 Tammy Walker said to you?
14    A.   Yes.
15    Q.   Did she recommend that her attorney
16 represent you?
17    A.   No; she just asked me if I had a lawyer
18 with me.   I said no and she said that he could
19 represent me.
20    Q.   I just want to make sure that you
21 understand that you have to answer all the
22 questions truthfully.
23    A.   Mmm-hmm.
24    Q.   You've testified in court before as a

# TAMMY WALKER vs. CITY OF HOLYOKE
## JORGE RODRIGUEZ          SEPTEMBER 20, 2006

**9**

1 police officer, right?
2    A.    Yes.
3    Q.    And you've taken an oath there so you
4 understand that you need to tell the truth, is
5 that correct?
6    A.    I know it.
7 Q.        I'm sorry?
8    A.    Yes.  I'm kind of confused.  I don't
9 know what to say.  Go ahead.
10    Q.    Before we go on, please make sure that I
11 finish the questions before you start to answer.
12 Please make sure that you keep your responses
13 verbal as opposed to shaking your head or nodding
14 your head and if you need to take a break to use
15 the restroom, let me know and we can stop, okay?
16    A.    Mmm-hmm.
17    Q.    You need to keep your responses verbal.
18    A.    Yes.
19    Q.    Can you state your full name, please?
20    A.    First, am I getting charged for being
21 represented?
22 MR. HUDSON:            No; not from me, sir.
23    Q.    (BY MS. LYNCH) Can you state your full
24 name, please?

**10**

1    A.    Jorge L. Rodriguez.
2    Q.    Have you ever gone by any other names?
3    A.    No.
4    Q.    Where do you live -- what is your
5 address?
6    A.    131 Whiting Farms Road in Holyoke.
7    Q.    How old are you?
8    A.    Fifty-one.
9              (Defendant's Deposition Exhibit
              No. 1 offered and marked.)
10
11    Q.    (BY MS. LYNCH) Mr. Rodriguez, I'm
12 showing you what has been marked as Exhibit
13 Number 1.
14         Is that a copy of the subpoena that you
15 received to come to this deposition today?
16 (Indicating.)
17    A.    I have to get my glasses.  I didn't
18 sleep too well last night.  I'm kind of nervous.
19 The reason I'm retired is because of my nervous
20 condition and my physical condition.
21    Q.    What's in front of you, Mr. Rodriguez,
22 is Exhibit Number 1.
23         Did you receive a copy of that from a
24 sheriff or a constable?

**11**

1    A.    Yes.
2    Q.    You'll notice that it asked you to bring
3 some documents.
4         First of all it asked for "all documents
5 regarding all issues pertaining to Tammy Walker's
6 employment with the Holyoke Police Department."
7 Did you bring any documents with you?
8    A.    I have no documents with me.
9    Q.    Do you have any documents that respond
10 to the first request?
11    A.    After I retired from the Department I
12 destroyed all the documents that I had from the
13 Holyoke Police Department.
14    Q.    Did you ever have any documents
15 pertaining to Tammy Walker's employment with the
16 Holyoke Police Department?
17    A.    I did.
18    Q.    What did you have?
19    A.    Some paperwork from the MCAD,
20 statements.
21    Q.    Can you be more specific as to what you
22 had from the MCAD?
23    A.    Probably the statement that she gave to
24 the MCAD and the statement that I made to the MCAD

**12**

1 based on the case.
2    Q.    Who did you give copies of those to?
3    A.    I can't recall.
4    Q.    Did you give copies to Tammy Walker?
5    A.    I don't know if I did or the agency did.
6 I can't recall.
7    Q.    Any other documents that you once had in
8 your possession that are responsive to request
9 number one?
10    A.    No.
11    Q.    Request number two asks for "all
12 documents that you gave to Tammy Walker regarding
13 issues pertaining to the Holyoke Police Department
14 h
15         p
16 that request?
17    A.    No.
18    Q.    Did you ever have any responsive
19 documents to that request?
20    A.    I believe so.
21    Q.    What did you have?
22    A.    The statement that she gave probably to
23 the MCAD.
24         I'm not sure if it was my statement or

13

her statement; I can't recall but I have something with her name on it.

Q. But you no longer have it?

A. No.

Q. Has it been destroyed?

A. Yes.

Q. Number three, "All documents that you gave to or received from Tammy Walker that related to any member of the Holyoke Police Department or to Mayor Michael Sullivan."

Do you have any responsive documents in response to that request?

A. Not at all.

Q. I'm sorry?

A. I don't have any statements or documents.

Q. Did you ever have any documents responsive to number three?

A. Yes.

Q. What did you have?

A. The statement that the MCAD gave me about the case of Tammy Walker.

Q. The one that you've already mentioned?

A. Yes.

14

Q. Anything else?

A. No.

Q. At this time do you have any documents either with you today, at your home or accessible to you regarding Tammy Walker's employment with the Holyoke Police Department?

A. Nothing related to the Holyoke Police Department or Tammy Walker.

Q. Can you tell me about your educational background in terms of how far you went to school?

A. I went -- I finished high school and I went one year to the Holyoke Community College Bridge Program.

Q. Which program?

A. Bridge.

Q. Bridge Program?

A. Yes.

Q. Which high school did you go to?

A. In Puerto Rico, Bayamón High School.

Q. Did you grow up in Puerto Rico?

A. Yes.

Q. When did you come to the States?

A. *When* I joined the Army. I was twenty-one years old.

15

1  Q. Where did you primarily live when you
2  came to the States?
3     A. Comerio, Puerto Rico.
4     Q. That's where you lived in Puerto Rico?
5     A. Yes.
6     Q. Where did you live when you came to the
7  States?
8     A. There.
9     Q. Meaning to the mainland?
10    A. Here?
11    Q. Yes.
12    A. In Holyoke.
13    Q. In Holyoke?
14    A. Yes.
15    Q. Is that where you've always lived?
16    A. Yes.
17    Q. Do you remember what year you came to
18  Holyoke to live?
19                                        A. 1979.
20    Q. You stated a few moments ago that you
21  retired because of a nervous condition and a
22  physical condition?
23    A. Yes.
24    Q. Can you describe that?

16

1     A. In February 6th, 2004 I was
2  investigating an accident when I was on duty and I
3  got struck by a motor vehicle.
4        Due to that I was under stress,
5  depression, and my physical pain and all that was
6  affecting my nerves and my condition.
7     Q. Have you not worked at the Holyoke
8  Police Department since February 6th, 2004?
9     A. Right.
10    Q. Are you on a disability?
11    A. Involuntary retirement. I didn't want
12  to retire but due to my condition I had to retire.
13    Q. Have you worked anywhere since the
14  Holyoke Police Department?
15    A. Yes; I'm recently working part time at
16  American International College.
17    Q. What do you do there?
18    A. It's like police work.
19    Q. Security guard?
20    A. Yes; special police.
21    Q. Special police?
22    A. Mmm-hmm.
23    Q. That's a yes?
24    A. Yes.

17

Q. How long have you been doing that there?

A. Ten months.

Q. I notice you have glasses on. What do you wear glasses for -- meaning for distance, for close work or both?

A. Just for reading.

Q. Just for reading?

A. Yes; and writing.

Q. Do you have any problems with your hearing at all?

A. No.

Q. Are you on any medication today?

A. No.

Q. When did you first start working at the Holyoke Police Department?

A. 1985 I was a reserve police officer.

Q. When did you become a full-time police officer?

A. Like a year later.

Q. A year later?

A. Yes.

Q. So 1986?

A. Approximately; yes.

Q. Have you held any other positions other

18

than patrolman?

A. Before or?

Q. Since you were on the Holyoke Police Department?

A. Yes; I worked -- in 1990 I retired from the Police Department and I went to Puerto Rico and then two years later I decided to come back here and I started working for Mount Holyoke College, like a year later, in 1993 sometime to 1995.

Q. 1993 to '95 you were at Mount Holyoke College?

A. Yes.

Q. What did you do there?

A. Same thing; police work.

Q. And then after '95 what did you do?

A. I was reinstated as a police officer in Holyoke.

Q. Did you stay there until your retirement on February 6th, 2004?

A. Yes.

Q. Or thereafter?

A. Mmm-hmm.

Q. Yes?

19

1    A. Yes.

2    Q. Did you ever get beyond the rank of

3  patrolman?

4    A. No.

5    Q. In other words, you haven't been a

6  sergeant or a lieutenant or anything like that?

7    A. No.

8    Q. Were you ever disciplined at all at the

9  Holyoke Police Department?

10    A. Yes.

11    Q. Do you recall when and for what reason?

12    A. October -- I don't know if it was 2002

13  or 2003 I failed to pick up a code of conduct book

14  in the Chief's office by the date that they gave.

15    Q. As a result of failing to pick that up

16  were you disciplined?

17    A. Yes.

18    Q. What discipline did you receive?

19    A. A written reprimand.

20    Q. I'm sorry?

21    A. A written reprimand.

22    Q. Did anyone else get one for the same

23  thing or any kind of discipline for the same

24  thing?

20

1    A. Probably, yes but they don't say. I

2  don't know. I'm sure that somebody else forgot

3  like me to pick it up on time.

4    Q. Did you ever receive any other

5  discipline at the Holyoke Police Department?

6    A. Yes.

7    Q. For what and when?

8    A. On March 7 or close to that of 2004 when

9  I was injured I was supposed to be in court at

10  eight-thirty and I arrived at eight thirty-five

11  and I was suspended for a day -- a day without

12  pay.

13    Q. You were five minutes late that day?

14    A. Yes; I was using a cane because I got

15  injured on my knee, my back, and my arm.

16       It was a snowy day and I couldn't be

17  there on time but they still gave me a day

18  suspension for that.

19    Q. Did you explain that that was why you

20  were late?

21    A. Also I was under medication and I

22  explained that I was under medication and I wake

23  up late that day also.

24    Q. You did explain that to someone, though?

21

A. Yes.

Q. Who did you tell, do you remember?

A. Lieutenant Monfette. I was supposed to make a To-From and I explained the situation I was having and he also saw me with a cane and when I arrived in the station I had a cast on my arm. It was snowy out.

Q. When you say you were supposed to do a To-From, do you mean an IOC?

A. Yes.

Q. I guess, what is it --

A. (Interposing) A To-From is from the officer to whoever is going to receive it.

Q. Did you do one explaining why you were late?

A. Yes.

Q. But you still got a suspension?

A. Mmm-hmm.

Q. Yes?

A. Yes.

Q. Were you ever disciplined any other time?

A. Years back but they took that out because it was like -- I don't know how to explain

22

it.

It was a time that I was having problems with some officers and some officers from the rank and they tried to discipline me different -- they tried to discipline me in different ways like writing me for whatever they want. I don't know how to explain it.

Like for example I was disciplined for not calling a supervisor when I was in Puerto Rico on vacation. I was supposed to be in some court or something and they went to my house and knocked on the door and my son was there and they told my son that -- and asked him if I was hiding under the bed and things like that.

Q. From what you're saying you were on vacation in Puerto Rico but you were supposed to be in court in Holyoke, was it, and they came to your house looking for you because you didn't come to court? Is that what you're saying?

A. Yes.

Q. How did that -- I'm sorry, are you done with your answer?

A. Yes.

Q. How did that turn out? Were you ever

23

1  disciplined?

2      A.  No. They tried like three different

3  disciplines but they had to drop them all. Three

4  different supervisors tried at the same time to

5  discipline me for each for something related to

6  the case but not -- they were all dropped.

7      Q.  Do you remember who the chief was at the

8  time?

9      A.  Cournoyer.

10     Q.  Do you remember what year that was?

       A.  I believe the year 2000.

12     Q.  Do you remember who the supervisors

13  were?

14     A.  Lieutenant Eva O'Connell, Sergeant

15  Fallon, and Sergeant Cournoyer.

16     Q.  Had you told anyone that you were going

17  on vacation before you went?

18     A.  They have it in the books. I'm working

19  there, they have the books. They know I was not

20  working.

21         If I was not working, I was on vacation.

22  I could be in Puerto Rico or anywhere in the

23  world. They went to my house and then they

24  started harassing my kids if I was hiding under

24

1  the bed and stuff like that.

2      Q.  Did you ever file any claims with

3      A.  Claims?

4      A.  Yes.

5      A.  Yes; in 1997.

6      Q.  What did you claim?

7      A.  I was working as a house

8  officer.

9

10

11

12

13

14

15

16

17

18

19  That's the person that takes care of the cells

20  the prisoners and the booking -- assist the

21  booking to the commanding officer.

22

23

24

25

like that.

Q. You were one of the officers involved in the booking process?

A. Yes.

Q. Okay.

A. One of the -- a mother of one of the prisoners gave twenty-five dollars to put away for the clerk and the clerk was called and the twenty-five dollars was given to him to release the person but that person has a warrant for somewhere else for -- he was a juvenile and he has like a DSS warrant and when he was released, DSS or whoever -- the juvenile officer came to pick him up and took him to the juvenile place to have him go to court the next day for that case.

Then the mother came back the next day in the morning. I was already out because I worked midnight to eight. The mother came back and claimed that she gave twenty-five dollars for her son to be released and her son was never released and that she wanted the money back.

Lieutenant Cournoyer -- he was a lieutenant before he was chief; he was the commanding officer of the day shift -- he called

26

up my house and he asked me what I did with the twenty-five dollars; why I took the twenty-five dollars of that person.

I explained to him that that was given to the clerk and I explained the situation of the case; and then he said that he claimed that he couldn't understand what I was saying and that he was coming to my house.

Then he came to my house with a sergeant and then he started screaming at me and telling me that I was a thief and why I took the twenty-five dollars. I tried to explain to him again that the clerk already had that money and he just kept saying that I took the money, that he won't leave my house without the twenty-five dollars.

Then when I closed the door he told me to come outside and fight with him.

Q. Lieutenant Cournoyer said that?

A. Yes; mmm-hmm.

Q. What exactly did he say?

A. He said why you don't come out and we can arrange this or we may go to a gym.

Q. What did you say? How did that situation end?

27

1 Then they left and that was it.

2

3

4

5

6

7

8

9

10

11 A. Yes; with the MCAD.

12 Q. What did the claim allege?

13 A. First, he made fun of my accent when I

14 was talking to him on the phone. Then for

15 inviting me to fight and saying that I was a

16 thief.

17 Q. That you were deaf?

18 A. A thief -- that I stole the money.

19 Q. What happened with that MCAD claim?

20 A. Well, the lawyer and the City came to an

21 accord -- we came to an accord.

22 Q. Did you settle it?

23 A. Yes.

24 Q. Did you ever file any other type of MCAD

28

1 claim when you were at the Holyoke Police

2 Department?

3 A. Yes; against the union.

4 Q. Against the union?

5 A. Yes, because the union wasn't backing me

6 up and was laying on the City instead of

7 protecting me.

8 Q. Did you file an MCAD claim against the

9 union?

10 A. Yes; I did. At the same time that I had

11 the claim against the City I had the claim against

12 the union.

13 Q. Was it the same claim, you mean -- the

14 same incident?

15 A. The same incident; yes, as retaliation.

16 I was getting retaliation from the union and from

17 the City.

18 Q. But it had to do with that incident with

19 Lieutenant Cournoyer at your house?

20 A. Yes.

21 Q. What happened with the union claim?

22 A. Well, the union president was very

23 friendly of Lieutenant Cournoyer and he wanted me

24 to try to come to peace with him and trying to

Case 3:05-cv-30074-MAP    Document 56-4    Filed 08/31/2007    Page 10 of 47

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ                    SEPTEMBER 20, 2006

29

arrange things without getting any further or out
of the police station.

    Also a few rank officers tried the same
thing and when I didn't go to what they wanted
they started retaliating against me.

    Q. Was that case settled?

    A. Yes.

    Q. With the union?

    A. Mmm-hmm; the union decided that if I
drop the case that the three disciplinary actions
will be put under the rug and forget about it --
the three disciplinary actions from the three
supervisors that they wrote disciplines when I was
in Puerto Rico.

    Q. Is that how it was settled?

    A. Yes.

    Q. They were dropped?

    A. Mmm-hmm.

    Q. Yes?

    A. Yes.

    Q. You just have to respond verbally as
opposed to nodding your head or shaking your head.

    Have you filed any other MCAD claims
involving the Holyoke Police Department?

30

    A. I went back for -- when they disciplined
me for a day without pay.

    Q. That was for being late for court?

    A. Yes; but in that time I was under
medication and I didn't follow it.

    They told me that -- they gave me the
paperwork to do a report and take it home with me
and fill it out and then bring it back but I just
didn't follow through.

    Q. Did you file any other types of lawsuits
in court against the Holyoke Police Department?

    A. Can I go back to that?

    Q. Sure.

    A. The union tried to represent me in that
incident of the one-day suspension but it never
ended because it was in the process when I had my
accident so I still have that in my record but the
union found that there was enough evidence for me
to come out of that discipline -- that it wasn't
appropriate for them to discipline me for that. I
had to go to Boston.

    That's when I was injured and didn't
follow through.

    Q. Other than the MCAD claims did you file

31

1 any lawsuits in court against the Holyoke Police
2 Department?
3     A. No.
4     Q. Or the City of Holyoke in general?
5     A. No.
6     Q. Did you ever file any type of grievance
7 regarding your employment with the Holyoke Police
8 Department?
9     A. The only grievance was the one-day
10 suspension.
11     Q. You filed a grievance as a result of
12 that?
13     A. Yes.
14     Q. Any other type of internal complaints or
15 citizen's complaints -- any other complaints in
16 all involving your employment with the Holyoke
17 Police Department?
18     A. Yes; in 19 -- before I retired, in 1989.
19     Q. 1989?
20     A. No. Well, 1989 or 1990 -- either the
21 end of 1989 or the beginning of 1990.
22     Q. Or the beginning of 1990?
23     A. Yes.
24     Q. Are you talking about before you retired

32

1 and went back to Puerto Rico?
2     A. Right; yes.
3     Q. Briefly, what did you file a claim for
4 there?
5     A. No; someone filed a claim that I used a
6 gun against a kid. It was all a lie but the
7 Police Department wanted to follow through and I
8 just decided to retire and go to Puerto Rico and
9 forget about it.
10     They told me you're going to get a
11 one-year suspension.
12     Q. That's not a claim that you filed?
13     A. No.
14     Q. That was a claim that was filed against
15 you?
16     A. Right; that's what you asked me.
17     Q. No; I'm actually asking you if other
18 than the MCAD complaints and the grievance that
19 you already testified to, have you filed any other
20 complaint of any nature involving your employment
21 with the Holyoke Police Department[7]
22     A. No.
23     Q. When did you first meet Tammy Walker?
24     A. Since she started working.

Case 3:05-cv-XXXX-XXX Document X Filed XX/XX/2007    Page 11 of 47

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ                SEPTEMBER 20, 2006

33

1    Q.    That's when you first met her?
2    A.    Yes.
3    Q.    So approximately 1995, around that time?
4    A.    Yes.
5    Q.    How would you describe your relationship
6  with her?
7    A.    As two persons that work in the same
8  place.
9    Q.    Did you get along with her?
10    A.    Yes.
11    Q.    Did you consider her to be a friend?
12    A.    You know, police officers -- it is like
13  a brotherhood, everybody is your friend.
14    Q.    But I mean you got along with her as
15  opposed to not liking her?
16    A.    We worked together and we had been
17  working the same shift for some time.
18         It's just as a regular companionship of
19  how you call it -- a person that works with
20  another person, just a regular -- I don't know how
21  to explain it.
22    Q.    Did you get along with her, though?
23    A.    Yes.  I believe everybody -- most of the
24  Department did.

34

1    Q.    Did you socialize with her outside of
2  work?
3    A.    No.
4    Q.    Did you socialize with her inside of
5  work such as going to lunch or dinner together,
6  anything like that while you were working?
7    A.    No.
8    Q.    How long did you work the same shift
9  with her? From what date to what date?
10    A.    I can't recall.
11    Q.    Do you recall approximately how long you
12  worked the same shift?
13    A.    I was working midnight to eight.  I know
14  she worked that shift probably at the beginning
15  during '95 but I can't recall if it was '95
16  or '98.
17    Q.    Do you remember how many years you
18  worked that shift together?
19    A.    No.
20    Q.    Was it more than one year?
21    A.    Probably.
22    Q.    Probably?
23    A.    Yes.
24    Q.    When you both worked that shift, how

35

1  many days per week did you usually work together?
2    A.    If she's in a different group, like I
3  would say two days a week.
4    Q.    Two days a week?
5    A.    Yes.
6    Q.    Do you remember if John Monaghan worked
7  the same shift during that time period?
8    A.    Yes.
9    Q.    He did?
10    A.    Mmm-hmm.
11    Q.    Did you observe how he got along with
12  Tammy Walker during that time period, meaning
13  around 1995 moving forward?
14    A.    Well, they didn't have not too well.
15    Q.    I'm sorry, I didn't hear what you said?
16    A.    They didn't have a good relationship.
17    Q.    Back in 1995?
18    A.    '95? I don't know when he started.   I
19  don't know if he started in '95.
20    Q.    Actually, I think he started on the same
21  day.
22    A.    Yeah.
23    Q.    Right now I just want to focus your
24  attention to the time period when Ms. Walker

36

1  started, which I believe was in 1995.
2         You said you worked together with her
3  and John Monaghan also worked that shift?
4    A.    Yes.
5    Q.    Do you recall --
6         MR. HUDSON:   (Interposing)
7  Objection; let's clarify.   Ms. Walker was
8  appointed a full-time officer in July 19th,
9  1993 -- a full-time police officer; not '95.
10         MS. LYNCH:   I'll be right back.
11         (A recess was taken.)
12    Q.    (BY MS. LYNCH) Mr. Rodriguez, I'm going
13  to go back.   Attorney Hudson is correct. They
14  both started on July 19, 1993, okay?
15    A.    Okay.
16    Q.    So let me ask you again --
17    A.    (Interposing) So they were there when I
18  was reinstated in 1995.
19    Q.    So you came back in 1995?
20    A.    Yes.
21    Q.    So actually 1995 is correct?
22    A.    Yes.
23    Q.    So in 1995 did you see the two of them
24  working together?

# TAMMY WALKER vs. CITY OF HOLYOKE
## JORGE RODRIGUEZ    SEPTEMBER 20, 2006

---

37

1   A.   Yes.

2   Q.   How did they seem to get along to you?

3   A.   I think that they were getting along
4 well in 1995.

5   Q.   At some point did that change?

6   A.   I think when Tammy was given the
7 sergeant spot.

8   Q.   When she was promoted to sergeant?

9   A.   Promoted to sergeant.

10   Q.   That's when you noticed the change in
11 their relationship?

12   A.   Yes.

13   Q.   I believe she was promoted to sergeant
14 on May 5, 2002?

15   A.   Mmm-hmm.

16   Q.   Is that --

17   A.   (Interposing) Yes.

18   Q.   Is that what you recall?

19   A.   Yes.

20   Q.   Prior to that when you observed John
21 Monaghan and Tammy Walker, did they seem to get
22 along?

23   A.   I didn't put too much attention but I
24 never saw anything out of place between them.

---

38

1   Q.   Do you recall how long you continued to
2 work the same shift as Ms. Walker and
3 Mr. Monaghan?

4   A.   Well, I don't know for how long but we
5 were on the same shift probably a couple of years
6 at most but I cannot recall the length of time.

7   Q.   Do you remember if you were still
8 working the same shift with Ms. Walker and
9 Mr. Monaghan when Ms. Walker was promoted to
10 sergeant in May of 2002?

11   A.   I'm not sure. I'm not sure because he
12 was working I believe four to twelve and then when
13 he was promoted to sergeant then he came to our
14 shift.

15       I'm not sure how -- I cannot put him in
16 place in a definite time.

17   Q.   Let me ask you this. I realize it's
18 difficult with the time but prior to Ms. Walker
19 and Mr. Monaghan getting promoted to sergeant did
20 the three of you all work the same shift?

21   A.   Yes.

22       MR. HUDSON: Objection.

23   Q.   (BY MS. LYNCH) Yes?

24   A.   Yes.

---

39

1   Q.   And then when Ms. Walker became promoted
2 to sergeant did she go to a different shift?

3   A.   No; she stayed on the same shift.

4   Q.   She stayed on the same shift?

5   A.   Mmm-hmm.

6   Q.   When was the four to twelve --

7   A.   (Interposing) No; I'm not really sure if
8 she was in the four to twelve and then when they
9 were promoted they changed.

10       The senior sergeants have preference
11 what shift they want and the new sergeants have to
12 go to midnight to eight.

13   Q.   Let me ask you this:  Did you work the
14 same shift when you were at the Holyoke Police
15 Department?

16   A.   With?

17   Q.   Meaning did you stay on the same shift?

18   A.   Yes; for fifteen years.

19   Q.   From 1995 until the time of your
20 retirement you worked the same shift?

21   A.   Yes; even since 1985 to 1990, all of
22 that.

23   Q.   And that shift was?

24   A.   Midnight to eight.

---

40

1   Q.   Midnight to eight?

2   A.   Yes.

3   Q.   Is that called the third watch?

4   A.   The dog watch.

5   Q.   You were always on that shift?

6   A.   Yes.

7   Q.   For at least some period of time, 1995
8 forward Ms. Walker and Mr. Monaghan also worked
9 that shift, is that correct?

10   A.   But I don't know when they started or --
11 I know that in 2003 they were working together on
12 the same shift with me but I can't recall.  Before
13 that, Sergeant Monaghan was working four to twelve
14 before he was promoted and I believe Sergeant
15 Walker worked four to twelve, too.

16       I cannot put a time when they came to
17 the dog watch or for how long I was with them on
18 the same shift.

19   Q.   After Ms. Walker became promoted though,
20 were you working the same shift as she was, the
21 twelve to eight?

22   A.   Yes.

23   Q.   And then at some point did Sergeant
24 Monaghan get on that shift as well?

---

41

A.   Mmm-hmm.

Q.   That's a yes?

A.   Yes.

Q.   I realize you said that you always worked the twelve-to-eight shift but was there ever a time when you worked the four-to-twelve shift with Sergeant Monaghan and Ms. Walker?

A.   Many times.  I used to work a lot of overtime.

Q.   Any idea how many times before the two of them got promoted that you had worked the same shift as Ms. Walker and Mr. Monaghan?

A.   I will say like once a week, average.

Q.   How did you get along with Ms. Walker after she became promoted to sergeant and she was your supervisor?

A.   The same relationship with any other officer.

Q.   Did you think you had a good relationship with her?

A.   You mean me?

Q.   Yes.

A.   Yes.

Q.   Did you ever socialize with her at work

42

such as going out to dinner, lunch, whatever?

A.   No; not that I recall.   Probably going for coffee, like everybody else does.

Q.   To this day have you ever socialized with Ms. Walker outside of the workplace?

A.   No.

Q.   Has she ever been to your house?

A.   After the incident; yes.

Q.   After what incident?

A.   After the complaint that she put in the MCAD.

Q.   For what purpose did she come to your house?

A.   Probably to tell me the date that I had to present myself at the MCAD.

Q.   Did you ever go to the MCAD?

A.   Yes.

Q.   For what purpose?

A.   They called me to give a statement of what happened.

Q.   Did you ever go there at any other time for Ms. Walker's complaint other than to give a statement?

A.   No.

43

1   Q. In other words you didn't go there to
2  testify or anything at a hearing?
3   A. I'm not sure. I can't recall but I
4  don't think that they never took the case there.
5  I can't recall.
6   Q. Other than Ms. Walker going to your
7  house regarding her MCAD complaint, did she ever
8  come to your house for any other reason?
9   A. No.
10   Q. Have you ever been to her house?
11   A. No.
12   Q. Have you had any communication with her
13  either in person, by phone, by letter, by e-mail
14  or any other way since you left the Holyoke Police
15  Department?
16       MR. HUDSON: Objection. You may
17  answer; I'm objecting for the record.
18       THE WITNESS: What was that
19  question?
20   Q. (BY MS. LYNCH) Have you had any
21  communication, whether it's in person, over the
22  phone, in writing, e-mail or any other way -- have
23  you had any communication with Ms. Walker since
24  you left your employment with the Holyoke Police

44

1  Department?
2       MR. HUDSON: Objection to the form
3  of the question.
4       THE WITNESS: No.
5   Q. (BY MS. LYNCH) Has she made any effort
6  to try to contact you, again since you left the
7  Holyoke Police Department?
8   A. I believe she came to my house when I
9  had the accident. She visited me.
10   Q. She visited you?
11   A. Yes, to see how I was doing.
12   Q. Did she talk to you about her cases at
13  all?
14   A. No.
15   Q. Do you remember when that was that she
16  went to your house?
17   A. I believe like two days after the
18  accident, when I was released from the hospital.
19   Q. Has she come to your house or attempted
20  to contact you in any other way since you left the
21  Holyoke Police Department?
22   A. I believe she came once to bring me an
23  invitation for a wedding or something like that.
24   Q. For her wedding?

45

1    A.    Yes.
2    Q.    Did you go to her wedding?
3    A.    No.
4    Q.    Do you remember when that was?
5    A.    Like less than six months ago; I don't
6 know.
7    Q.    Did she contact you in any other way
8 since you left the Holyoke Police Department?
9    A.    No.
10    Q.    Have you made any effort to contact her
11 since you left the Holyoke Police Department?
12    A.    No; I don't even have her phone number.
13    Q.    When did you first meet John Monaghan?
14    A.    For some time I was the training
15 officer.   In '93 he was already an officer.   We
16 worked together as a partner, midnight to eight.
17    Q.    When you say partner, does that mean
18 riding in the same car together?
19    A.    Yes.
20    Q.    Do you remember when you worked with him
21 as a partner from midnight to eight?
22    A.    I don't know the length of time but I
23 would say more than a year.
24    Q.    Do you have any idea when that was --

46

1 what time period, what date?
2    A.    Probably in '95.
3    Q.    How did you get along with John
4 Monaghan?
5    A.    As any other officer.
6    Q.    So your relationship was okay?
7    A.    Yeah.  When he was an officer, it was.
8    Q.    When he became a sergeant and a
9 supervisor did you have any trouble getting along
10 with him then?
11    A.    Yes.
12    Q.    Could you describe the difficulty you
13 had?
14    A.    He was kind of arrogant. One time I
15 went to gas up the cruiser and he was facing me
16 and he kept me at the pump for twenty minutes.
17    Then when he didn't put attention
18 because he was in charge to press the key for the
19 gas pump -- supervisors do that -- he just kept
20 conversing with another officer and disregarded my
21 presence there at the pump.   He took care of
22 everybody else but when I arrived he just kept
23 talking and talking with that officer for twenty
24 minutes.

47

1    When he didn't put attention that I was
2 there, I just left and I told the dispatcher that
3 I couldn't gas up the cruiser because the Sergeant
4 didn't want to turn the pump for me.
5    Q.    Can you describe what the area looks
6 like in terms of where you were in relation to
7 him -- and if you'd like to sketch it I can give
8 you a piece of paper and a pen if that would help?
9    A.    Yeah.
10    Q.    Would that help?
11    A.    Mmm-hmm.
12    Q.    Okay.
13    A.    (Witness drawing.) Okay; I was here at
14 the gas pump. This is the gas pump, my car, the
15 cruiser.
16    Q.    Which way was your car facing?
17    A.    This way.
18    Q.    To the left?
19    A.    Yes.
20    MR. HUDSON: To whose left?
21    THE WITNESS: Yes; to the left.
22    Q.    (BY MS. LYNCH) Do you know who was
23 behind you where you wrote "officer"?
24    A.    Officer Narey.

48

1    Q.    And then Sergeant Monaghan's vehicle was
2 I guess diagonally across from yours facing to the
3 right?
4    A.    Yes.
5    MR. HUDSON: Objection.
6    Q.    (BY MS. LYNCH)  Is that right?
7    A.    Mmm-hmm.
8    Q.    Yes?
9    A.    Yes.
10    Q.    Do you know who -- what are these
11 squares?
12    A.    The gas pumps.   I think -- when I
13 arrived, I came this way, facing Sergeant Lenihan
14 and then after I arrived, the other officer
15 arrived and then he just kept talking with the
16 other officer and I was at the gas pump.
17    Q.    Actually, you said Sergeant Lenihan.
18 Did you mean Sergeant Monaghan?
19    A.    Yes; Sergeant Monaghan.
20    Q.    Can you put an arrow to the way you
21 pulled in?
22    A.    This was the entrance here and I came
23 this way.   I just passed by him.   He was waiting
24 for the officers to gas up the units.

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ                SEPTEMBER 20, 2006

Case 3:05-cv-30024-MAP    Document 56-4    Filed 08/01/2007    Page 15 of 47

49

1   Q.    So you're saying Sergeant Monaghan was
2   already there?
3   A.    Yes.
4   Q.    Was he in the position where you have
5   him shown on that diagram?
6   A.    Yes; right here and he was facing when I
7   entered.
8   Q.    Do you know whether he saw you? In
9   other words, did you make eye contact with each
10  other?
11  A.    For me I did; yes.  He was waiting there
12  and I arrived first and then the other officer
13  arrived after me; and then he kept talking with
14  the officer there.
15        I was waiting at the pump there for
16  twenty minutes and I could see him watching
17  through the mirror, because you can see the face
18  watching but he just kept talking there.
19  Q.    Did you actually make eye contact with
20  him when you first arrived?
21  A.    I can't recall.
22  Q.    Who was the officer that he was talking
23  to?
24  A.    Officer Narey.

50

1   Q.    Do you know what they were talking
2   about?
3   A.    No.
4   Q.    When you say twenty minutes, was that an
5   estimate?
6   A.    No; I know the time that I arrived and
7   then I kept watching -- looking at my watch and I
8   say twenty minutes, he's not going to pay
9   attention to me so I just left and I told the
10  dispatcher that I couldn't gas up because it was
11  almost time to go home.
12  Q.    Do you remember what date that was?
13  A.    I'm not sure.  I think it was in the
14  month of August.
15  Q.    August?
16  A.    From August to October.
17  Q.    It was between August and October?
18  A.    I'm not too sure but I would say that.
19  Q.    That's your best memory?
20  A.    Yes.
21  Q.    Did anyone else come to the gas pumps
22  while you were waiting?
23  A.    Everybody else had gassed up. It was
24  almost time to go home. I was probably on a call

51

1   and I was the last one gassing up.
2   Q.    But my question is while you were
3   waiting, do you remember any other officers coming
4   to the gas pumps to gas up?
5   A.    Everybody was already served.
6   Q.    So no one else came then while you were
7   there?
8   A.    No.
9   Q.    That's correct?
10  A.    Right.
11  Q.    What happened after you reported it to
12  dispatch that you couldn't gas up?
13  A.    I think he said that he didn't see me or
14  something or he went to complain to the commanding
15  officer that -- because I went over the air to say
16  that to the dispatcher.
17        I think he put how you call it -- a
18  complaint against me for that.
19  Q.    He filed a complaint against you?
20  A.    Right; I didn't file any complaint
21  against him but he filed a complaint against me
22  for saying that -- for saying over the air that I
23  wasn't served by the Sergeant at the gas pump.
24  Q.    What happened as a result of his

52

1   complaint?
2   A.    I think they took it to Internal Affairs
3   and they were going to discipline me or -- I don't
4   know what happened to that.   I can't recall.
5   Q.    Were you disciplined?
6   A.    I was interviewed by a lieutenant
7   because -- by my commanding officer and they
8   recorded it and everything.
9   Q.    Okay.
10  A.    But I don't know what happened, to tell
11  you the truth. They never came back to me and
12  said you're okay, he was okay or nothing.
13  Q.    In terms of the gas pumps, do they look
14  like the gas pumps that are at a regular
15  commercial gas station?
16  A.    Yes; just like a regular gas station.
17  Q.    Do you know whether there was anything,
18  I guess other than -- well, strike that.
19        From where Sergeant Monaghan was, was
20  there anything blocking his view as far as you
21  know of your vehicle?
22  A.    No; I came just -- I drove by his
23  vehicle and the other officer arrived.
24        I was there waiting at the pump for him

53

to step out of the vehicle and turn on the key and when the other officer parked there he just kept talking to the other officer.

Q. Did you ask him while he was talking to that officer to just take care of you?

A. No; I didn't.

Q. Any particular reason why you didn't?

A. Well, for that time he knew that Sergeant Walker had a complaint against him and somehow he knew that I made a statement in regard to what happened between them and I thought that was the reason why he wasn't serving me the gas, just for retaliation of what I wrote about their incident.

Q. You said you thought he was retaliating against you because you filed a statement?

A. Right, an Internal Affairs investigation.

Q. Do you know for certain that he knew that you filed a statement for Ms. Walker?

A. Well, all the officers knew so I'm very sure that he knew better than anybody else because when you're confronted with a complaint they have to show you who was complaining about or what was

54

written about.

Q. In terms of the statement that you gave, can you just describe what it was that you gave?

A. It was about some remark that went over the air.

Q. On the WMLEC?

A. On the WMLEC against Sergeant Tammy Walker.

Q. Do you know for sure that he knew that you gave that statement regarding WMLEC?

A. I'm not really sure. If other officers knew and it was an Internal Affairs investigation, he knew that and there was a complaint and they showed him what was written.

Q. But do you know for certain that he was shown the statement that you gave regarding the WMLEC Internal Affairs investigation?

MR. HUDSON: Objection.

THE WITNESS: I cannot say for certain.

Q. (BY MS. LYNCH) Did you ever go back that night and get gassed up?

A. No; on the day shift they have to gas it up.

55

1   Q. Did Sergeant Monaghan ever speak to you
2  about that incident involving the gas pumps?
3       A. No; we didn't talk about it.
4       Q. Other than your belief that he didn't
5  gas you up because you had given a WMLEC -- a
6  statement to Internal Affairs regarding the WMLEC
7  investigation, do you have any other reason to
8  believe that he didn't intentionally gas you up?
9            MR. HUDSON: Objection.
10           THE WITNESS: Well, for me he did it
11  intentionally.
12      Q. (BY MS. LYNCH) Are you basing that on
13  the fact that you had been waiting for twenty
14  minutes?
15      A. Right; and that I drove by him and he
16  was there and he's there to serve the officers
17  that arrive there to be served the gas and
18  everybody else was served.
19           I was on a call and I was the last one
20  to come in and he didn't serve me. He was there
21  just waiting for all the units to be served.
22      Q. Other than that incident did you have
23  any other difficulties with Sergeant Monaghan?
24      A. Not that I recall.

56

1       Q. Have you ever socialized with him
2  outside of work?
3       A. No; just like any other -- we worked
4  together as partners and probably went out for a
5  coffee or something like that or when he was
6  taking his break I drove him to his house and then
7  we'd pick him up later on.
8       Q. You mean when you were partners?
9       A. Yes.
10      Q. Did Tammy Walker ever talk to you about
11  John Monaghan?
12      A. In regard?
13      Q. As to how she felt about him, what kind
14  of a relationship she had with him, that type of
15  thing?
16           MR. HUDSON: Objection; can we have
17  a time frame?
18           MS. LYNCH: Well, at any time.
19           THE WITNESS: No; not that I can
20  recall.
21      Q. (BY MS. LYNCH) She's never to this day
22  talked to you about John Monaghan in terms of her
23  relationship with him, her opinion of him?
24      A. I can't recall too well. There was

probably something going on between seniority in regards to the sergeant position but other than that, nothing else.

I think they were made sergeant about the same time and she had more -- I don't know how that happened but there was something related to the position of the sergeant and who had more seniority or less.

Q. You recall Ms. Walker talking about John Monaghan with regard to that issue?

A. I don't know if I heard it from her or probably some -- from other officers but I'm not sure.

Q. Do you know whether Ms. Walker liked Sergeant Monaghan?

A. Well, they were working together for years. I never heard of any problem between them other than after they were promoted.

Q. Did she ever tell you that she didn't like Sergeant Monaghan?

A. No; never.

Q. Did Sergeant Monaghan ever tell you he didn't like Tammy Walker?

A. No.

1   the office. We don't have access to that.
2       Q.   Did Tammy Walker ever discuss Joseph
3   Garcia with you?
4           MR. HUDSON: Objection as to time
5   frame.
6           THE WITNESS: No.
7       Q.   (BY MS. LYNCH) Just wide open.
8       A.   No.
9       Q.   She did not?
10      A.   No.
11      Q.   Do you know whether Ms. Walker liked
12  Mr. Garcia?
13      A.   I don't know.
14      Q.   Do you know whether she disliked him?
15      A.   I don't know that, either.
16      Q.   How about Captain Fletcher? Did you
17  ever see Ms. Walker interact with him?
18          MR. HUDSON: Objection as to time
19  frame.
20          MS. LYNCH: The entire time that the
21  two of them were working together.
22          THE WITNESS: I have never seen
23  anything wrong between Captain Fletcher.
24      Q.   (BY MS. LYNCH) That was going to be my

58

Q. Did Tammy Walker ever tell you she liked Sergeant Monaghan?

A. No.

Q. Joseph Garcia -- did you ever observe Ms. Walker interact with Joseph Garcia at work?

A. Yes.

Q. Based on what you observed did you notice any difficulties that they seemed to be having with each other?

A. Well, they both were supervisors and sergeants. I didn't notice nothing.

Q. You didn't notice any problems between the two of them or difficulties getting along?

A. I probably heard --

MR. HUDSON: (Interposing) Objection.

THE WITNESS: -- but I don't know. I can't recall. I cannot say.

Q. (BY MS. LYNCH) Based on your own observations, your own firsthand observations, you didn't notice any difficulties between Ms. Walker and Mr. Garcia[7]

A. No. I was most of the time out in the streets. The supervisors are probably together in

60

1   next question.
2           You did not observe any difficulties
3   between Ms. Walker and Captain Fletcher?
4       A.   No.
5       Q.   Did you ever observe Ms. Walker with
6   Chief Scott?
7       A.   No.
8       Q.   You didn't observe them together?
9       A.   No.
10      Q.   Do you know whether they had any
11  difficulties?
12      A.   No.
13      Q.   Did you ever observe Ms. Walker with Eva
14  O'Connell?
15      A.   No.
16      Q.   Do you know whether they had any
17  difficulties?
18      A.   I heard rumors from other officers but
19  that was it.
20      Q.   Briefly what were the rumors that you
21  heard?
22          MR. HUDSON: Objection.
23          THE WITNESS: I was not too sure
24  about that.

61

1    Q.    (BY MS. LYNCH) Just what you recall.
2    A.    That they were not getting along too
3 well.
4    Q.    Do you know when that was -- what time
5 frame?
6    A.    No.
7    Q.    Did Ms. Walker ever --
8    A.    (Interposing) I think it was after she
9 put a complaint against Sergeant Monaghan.
10   Q.    It was after Ms. Walker filed a
11 complaint against Sergeant Monaghan?
12   A.    Mmm-hmm.
13   Q.    Yes?
14   A.    Yes.
15   Q.    Do you know what that particular
16 complaint was?
17   A.    About the WMLEC incident.
18   Q.    Regarding WMLEC?
19   A.    Yes.
20   Q.    Do you know if Ms. Walker was working
21 the same shift as Lieutenant O'Connell?
22   A.    No; they worked different shifts but
23 Lieutenant O'Connell sometimes would work the
24 midnight to eight as a supervisor in overtime.

62

1    Q.    Do you remember who you heard the rumors
2 from?
3    A.    No.
4 Q.      Did Ms. Walker ever discuss Lieutenant
5 O'Connell with you?
6    A.    No.
7    Q.    Did you ever observe Ms. Walker interact
8 with Lieutenant Fournier?
9 A.      No.
10   Q.    Did she ever express any opinions about
11 Lieutenant Fournier as to whether she liked him or
12 not?
13   A.    I don't know. I can give you my own
14 opinion about him but I cannot give you anybody
15 else.
16   Q.    What's your opinion about him?
17   A.    Well, he works for the Chief and -- for
18 the Chief and whoever -- and Internal Affairs.
19       I don't think he fairly worked the cases
20 the way that -- it's my own opinion.
21   Q.    When you say you don't think he fairly
22 worked the cases, which cases are you referring
23 to?
24   A.    To mine -- my cases and my discipline

63

1 actions.
2        They're in charge of investigating the
3 Internal Affairs or any discipline that is
4 forwarded by the Chief. They are the ones that...
5    Q.    When you say your cases, are you talking
6 about the being late for court and the not picking
7 up the operations manual?
8        MR. HUDSON:    Objection.
9        THE WITNESS:    Right.
10   Q.    (BY MS. LYNCH) That's what you're
11 referring to?
12   A.    Yes.
13   Q.    Any other reason you think that he
14 didn't fairly work the cases as you stated?
15   A.    Yes.
16   Q.    What is that?
17   A.    One time I had another complaint because
18 someone wrote a note and left it in my mailbox.
19 The note that they left in my mailbox, it was the
20 date that I -- the day after I testified in
21 federal court in Sergeant Wagner's case.
22   Q.    Wagner's case?
23   A.    Yes.
24   Q.    What was the note in your mailbox?

64

1    A.    Someone wrote down "a rat" and something
2 else.  I cannot recall the other things.
3    Q.    Do you have any idea who did that?
4    A.    No.
5    Q.    Somebody left a note in your mailbox
6 that said "rat"?
7    A.    Yes.
8    Q.    Just the word "rat"?
9    A.    I don't know if there was something else
10 but that's the word I can recall.
11   Q.    Were you a witness for Mr. Wagner?
12   A.    Yes.  I testified during the day and
13 then when I went to work in the night that was in
14 the mailbox.
15   Q.    Was that investigated by Lieutenant
16 Fournier?
17   A.    Yes.  He never came back to me. He just
18 said that that was sent to the state police lab
19 for fingerprints and stuff like that but -- and
20 any other complaint, he never followed it -- he
21 never came back to me to say...
22   Q.    You're saying he didn't follow up with
23 you?
24   A.    Yes; and I have nothing positive to tell

65

1 about Lieutenant Fournier.

2    Q.        Any other reason you believe that he
3 didn't fairly work up the cases, besides what
4 you've already testified to today?

5    A.        My belief is that if he does it with me,
6 he just goes -- everything goes to the Chiefs
7 side and the Chiefs way.

8            Everything that the Chief decided,
9 that's the last decision.   He doesn't investigate
10 or -- that's my own opinion.

11    Q.    Other than what you've already testified
12 to, do you have any other reason to believe that
13
    he didn't fairly work the cases?

14    A.        Yes; I believe that he doesn't fairly
15 work the cases.

16    Q.    For any other reason besides what you've
17 already stated?

18    A.    Right.

19    Q.    What are the other reasons?

20    A.    No; just for the reasons that I already
21 stated.

22    Q.    How about Daniel McCavick? Have you
23 ever observed him interact with Ms. Walker while
24 she was employed?

66

1    A.    No.

2    Q.    Did she ever discuss with you either
3 that she didn't like him or that she did like him?

4    A.    No.

5    Q.    With regard to the issue of the WMLEC,
6 does that stand for Western Massachusetts Law
7 Enforcement Channel?

8    A.    Yes.

9    Q.    You did make a report with regard to
10 that and Ms. Walker, is that correct?

11    A.    Mmm-hmm.

12    Q.    Yes?

13    A.    Yes.

14    Q.    Can you tell me what it is that you
15 reported and who you reported it to?

16    A.    They did an Internal Affairs
17 investigation and Lieutenant Fournier called me to
18 the office to make a statement about what I
19 heard -- or they gave a note to everybody after
20 she made a complaint and then I filed --

21 MS. LYNCH:                (Interposing) Let me
22 stop you for a minute.

23            (Defendant's Deposition Exhibit
                No. 2 offered and marked.)

24

67

1    Q.    (BY MR. HUDSON) I'm going to show you
2 what's been marked as Exhibit Number 2,
3 Mr. Rodriguez.

4            Is that the document that you received
5 with regard to the WMLEC investigation?
6 (Indicating.)

7    A.    Yes.

8    Q.    Do you know __ do you have any
9 information as to what prompted that questionnaire
10 ▌

11    A.    No.

12    Q.    After you got that questionnaire did you
13 respond to it?

14    A.

15            (Defendant's Deposition Exhibit
                No. 3 offered and marked.)

16

17    Q.    (BY MS. LYNCH) Showing you what's been
18 marked as Exhibit 3, can you identify that,
19 please?   (Indicating.)

20    A.    (Witness examining document.) Yes.

21    Q.    Can you identify that?

22    A.    Yes.

23    Q.    What is it?

24    A.    This is the response for the internal

68

1 investigation.

2    Q.    Is that your response?

3    A.    Yes.

4    Q.    Did you type that out yourself?

5    A.    Yes.

6    Q.    You signed it?

7    A.    Yes.

8    Q.    I just want to draw your attention to
9 this bottom paragraph.   It says, "I have noticed
10 some tension in the air since all this incident
11 started which I have never seen before happening
12 in this shift in the many years that I have been
13 working on it. "

14    A.    Mmm -hmm.

15    Q.    Can you tell me what you meant when you
16 ▌

17    A.    Yeah; you know, the comments that have
18 been done in the WMLEC and things like that.

19    Q.    When you said the comments that had been
20 done in the WMLEC, can you describe what you're
21 referring to?   Right now I can't recall, when you
22 say comments on WMLEC.

23    A.    That was said.

24    Q.    Things that were stated over the radio?

69

A. Yes.

Q. Incidentally, who would have access to WMLEC?

A. All officers.

Q. Would any civilians?

A. No.

Q. Just the officers?

A. All the officers.

Q. Officers in the Police Department, as far as you know?

A. In the whole state.

Q. In other words officers from all the police departments in the state?

A. Yes; they can communicate.

Q. Over WMLEC?

A. Yes.

Q. At this point do you have any memory of what the comments were that you heard that caused you concern?

A. Right now, I can't recall. I don't have it.

Q. Did you ever write it down?

A. Yes.

Q. Do you know where you wrote it down?

70

A. I think it was for Lieutenant Fournier.

Q. Just drawing your attention again to Exhibit Number 3 where it says "this incident," it says, "I have noticed some tension in the air since all this incident started." Which incident are you referring to?

A. What was that question again?

Q. Where you wrote, "I have noticed some tension in the air since all this incident started," what is "this incident" referred to -- "this incident"?

A. In regard to the investigation of some things said over the WMLEC.

Q. Then it says, "I have heard some sexually derogatory comments over the WMLEC radio directed to Sergeant Tammy Walker especially when she is working."

Can you describe the sexually derogatory comments?

A. I cannot remember.

Q. Why did you think that they appeared to be directed to Sergeant Tammy Walker?

A. I have to see my statements. I cannot recall.

71

1    Q. At this time you can't recall?

2    A. Yes.

3    Q. And then you wrote, "I have no idea of

4 who is doing it," was that correct?

5        A. Yes; the voice sounded familiar but I

6 couldn't say for certainty who was that person.

7    Q. Can you describe the voice?

8    A. It was kind of a like rough spoken --

9 you know, the person that has a...

10        Q. Do you recall hearing that voice over

11 WMLEC prior to the statement that you gave on

12 November 20, 2002?

13    A. Prior to that? I'm not sure.

14    Q. I can't recall if I asked you this or

15 not -- why did you think they were directed to

16 Sergeant Tammy Walker?

17        A. I got to see the statement because I

18 cannot recall.

19        Q. With regard to WMLEC, how did Holyoke

20 police officers access it?

21        A. Just by pressing the button on the

22 radio.

23    Q. In the cars?

24    A. Yes.

72

1    Q. Could you also access --

2    A. (Interposing) Like a walkie-talkie, you

3 just click the bottom and talk.

4        Q. Was that something that was attached to

5 the dashboard of the car?

6    A. Yes.

7     Q. Do you know if any handheld radio could

8 access it?

9    A. No.

10    Q. It could not?

11    A. No; only the car radios.

12    Q. How often would you listen to WMLEC?

13    A. All the time because it's already on in

14 the cruiser. Anybody that would speak, every

15 officer is listening.

16        Q. So if you're riding around in your

17 cruiser you would hear it the whole time?

18        A. Yes; even the dispatcher hears it all

19 the time. They also have WMLEC in the police

20 station.

21        Q. Is there another radio then that just

22 handles internal Holyoke Police Department calls?

23    A. Yes; there are two separate radios.

24    Q. Two separate radios?

73

1   A.   Yes.
2   Q.   Are they both on at the same time?
3   A.   Yes.
4   Q.   From your experience when you were at
5 the Holyoke Police Department around this time
6 frame of November 20, 2002, how often would
7 Holyoke police officers communicate over WMLEC?
8   A.   Just to communicate with the state
9 police or Springfield or -- like if we have a hot
10 pursuit of a motor vehicle, we notify all the
11 cities where we are going, our location, what's
12 going on.
13   Q.   Is it fair to say -- I'm sorry, are you
14 done with your answer?
15   A.   Yes.
16   Q.   Is it fair to say that the reason that
17 Holyoke police officers would communicate over
18 WMLEC is if the issue would involve other
19 communities outside of Holyoke?
20   A.   Yes; or sometimes we have two
21 frequencies and if we are out of frequencies, we
22 will go over WMLEC or if the officer is not
23 responding, go over the local radio.
24

74

1            (Defendant's Deposition Exhibit
             No. 4 offered and marked.)
2
3   Q.   (BY MS. LYNCH) Mr. Rodriguez, showing
4 you what's been marked as Exhibit 4, do you recall
5 receiving that document? (Indicating.)
6   A.   Yes.
7   Q.   As a result of receiving that document
8 did you prepare a statement?
9   A.   Yes.
10   Q.   Or I guess an IOC?
11   A.   Mmm-hmm; yes, I did.
12   Q.   Does IOC stand for interoffice
13 communication?
14   A.   Yes.
15            (Defendant's Deposition Exhibit
             No. 5 offered and marked.)
16
17   Q.   (BY MS. LYNCH) Mr. Rodriguez, showing
18 you what's been marked as Exhibit Number 5, is
19 that the statement that you prepared in response
20 to receiving Lieutenant Fournier's correspondence
21 of December 2, 2002? (Indicating.)
22   A.   Mmm-hmm.
23   Q.   Is that a yes?
24   A.   Yes.

75

1   Q.   Why don't you just take a moment and
2 read that to yourself to refresh your memory.
3   A.   (Witness examining document.) Okay.
4   Q.   Okay?
5   A.   Yes.
6   Q.   You've read that through?
7   A.   Yes.
8   Q.   Does that refresh your memory as to the
9 comments that you heard over WMLEC that caused you
10 concern?
11   A.   Yes.
12   Q.   What were those comments?
13   A.   What it says here, like someone is
14 singing a rap song over the WMLEC, "lick it now,
15 lick it good, lick it real good."
16   Q.   Is that an actual song?
17   A.   Yes.
18   Q.   It is?
19   A.   Yes.
20   Q.   Do you know who sang it?
21   A.   No; I don't.  It is some kind of a rap
22 song.
23   Q.   Is it "leak it" or "lick it"?
24   A.   I probably spelled it wrong but it's

76

1 "lick it."
2   Q.   "Lick it"?
3   A.   Yes.
4   Q.   Like with your tongue?
5   A.   Yes.
6   Q.   Had you heard that song over the
7 radio     -the AM or FM radios?
8   A.   Yes; many times.
9   Q.   So it's definitely a song by a singer?
10   A.   Mmm-hmm. Most of the time that someone
11 came out singing that song was when she was
12 finishing any transmissions over our radio and
13 then someone would go over WMLEC singing the song.
14   Q.   Why did you think that was related to
15 her?
16   A.   Because every time she finished a
17 conversation over the air someone was coming over
18 WMLEC saying something
19   Q.   Singing that song?
20   A.   Yes; either singing that or other
21 comments like -- I wrote down "el freako."
22   Q.   Let's just talk about the rap song.  Why
23 did you think that that was related to Ms. Walker?
24   A.   Because the interruption of every time

77

1 she talks over the air and then they came over
2 WMLEC talking about with this remark.
3    Q.       How often would she say something over
4 the air?
5    A.      When a dispatcher is calling or to
6 respond to a call and she's got to answer back or
7 if she finishes investigating an incident, she's
8 got to transmit -- any regular transmission over
9 the air.
10   Q.      Let me clarify then. Would she be
11 saying something over the Holyoke police radio,
12 the internal radio, or over WMLEC?
13   A.      The internal radio.
14   Q.      You're saying that after she would say
15 something over the Holyoke Police Department
16 radio, someone would sing that song on WMLEC?
17   A.      Yes.
18   Q.      Why did you think that was connected to
19 her then?
20   A.      Because the voice sounded familiar.   It
21 sounds like Sergeant Monaghan's but I didn't
22 specify that it was him but it sounds like it was
23 his voice.
24   Q.      You thought it sounded like his voice?

78

1    A.      Yes.
2    Q.      Back to my other question:   Given that
3 she was saying something over the Holyoke police
4 radio and the lick it song was over WMLEC why did
5 you think it was any connection to Ms. Walker?
6               MR. HUDSON: Objection; asked and
7 answered.
8               THE WITNESS: Because of the
9 friction that was going on between them during
10 that time.
11   Q.      (BY MS. LYNCH) I'm sorry, I guess I'm
12 not understanding the connection.
13         Given that they were on two different
14 frequencies, meaning the Holyoke internal and
15 WMLEC, why did you think there was a connection to
16 Ms. Walker?
17              MR. HUDSON: Objection; asked and
18 answered. You may answer if you know.
19   THE WITNESS:       Well, the same thing
20 that I told you -- that I connected with the
21 friction that was going between you and every
22 time that she communicated, this was going over
23 the air or something else. The voice sounded
24 familiar.

79

1         Sergeant Monaghan wasn't the only one
2 playing around with the WMLEC because when I ride
3 with other officers, they were doing the same
4 thing. They were using the WMLEC just to play
5 around, singing songs over the air that wasn't
6 related to the job.
7    Q.      (BY MS. LYNCH) Who were those officers
8 and what would they say over WMLEC?
9    A.      I cannot recall what they were saying
10 but it's like -- even in different cities, just go
11 over the air and go with something -- some
12 stupidity -- something not related with the job.
13   Q.      Would it be sexual in nature at all?
14   A.      Sometimes.
15   Q.      Sometimes?
16   A.      Yes.
17   Q.      Or just topics that had no relation to
18 work?
19   A.      Yes.
20   Q.      Any examples?
21   A.      Like -- I don't want to say it.
22              MR. HUDSON:    Tell the truth, sir.
23              THE WITNESS:      Like someone having
24 sex and the woman responding to what they are

80

1 feeling, things like that, the noise.
2    Q.      (BY MS. LYNCH) So you'd hear things
3 like that over WMLEC?
4    A.      Yes.
5    Q.      Any idea who would say those types of
6 things?
7    A.      No.
8    Q.       How often did you hear someone sing that
9 lick it song over the radio other than an actual
10 singer?
11   A.      A few times after she ended
12 communication.
13   Q.      What do you mean by a few times?
14   A.      During the night or different dates.
15   Q.      But I mean when you said a few times, do
16 you mean two times? Do you mean three times?
17 What do you mean?
18   A.      Like once a night or twice or if the
19 radio -- if the song is over the radio, they will
20 put the mic close to the radio to have it.
21   Q.      You're saying that a cruiser would have
22 the song come over an AM/FM radio and they would
23 put the mic up to it so it would be broadcast over
24 WMLEC?

81

A. Mmm-hmm.

Q. Yes?

A. Yes.

Q. Any idea when that song came out?

A. Well, it was very heard many times. That year was kind of a -- they were playing it on the radio a lot of times.

Q. In 2002?

A. Yes.

Q. Did it seem to be a popular song on the radio?

A. Yes; a popular song.

Q. You said that you would hear it once or twice a night, is that correct?

A. Not every night but every time she would converse on the radio, someone would come up with something behind it over the WMLEC.

Q. Just focusing on this lick it song right now, any idea how many times you heard it altogether after she said something over the radio?

MR. HUDSON: Objection.

THE WITNESS: No; probably two or three times out of altogether.

82

Q. (BY MS. LYNCH) How long after Ms. Walker would say something on the Holyoke internal radio would it be -- strike that.

How much time was there between the time that Ms. Walker said something and someone said that lick it song?

A. Like between a minute -- just after she communicated it would come on over the air, right away.

Q. What is your understanding as to what the connection would be to the lick it song and Ms. Walker?

MR. HUDSON: Objection; asked and answered.

Q. (BY MS. LYNCH) I haven't heard the song so really I would have no idea.

What is your understanding as to what the connection would be between that song and Ms. Walker?

MR. HUDSON: Objection; asked and answered.

THE WITNESS: Do I answer it?

MS. LYNCH: You can answer; yes.

MR. HUDSON: You can answer if you

83

1 know.

2            THE WITNESS: I would say it's by

3 the sexual preference.

4     Q.    (BY MS. LYNCH) Do you think the song

5 has to do with being a lesbian?

6     A.    Yes.

7     Q.    You do?

8     A.    Yes.

9     Q.    Why do you think that?

10     A.    Well, it can be connected with many

11 things but I would say that was the reason why

12 they would communicate that.

13     Q.    Did the song have to do with a lesbian

14 relationship?

15     A.    It depends on the way that people hear

16 and connect it with whatever they...

17     Q.    I don't know the song, that's why I'm

18 asking you.

19            Do you know what the song is about? Do

20 you know any other words to it?

21     A.    No; "lick it now, lick it good."

22     Q.    Based on your understanding of that

23 song, could it be relevant to a heterosexual

24 relationship as well?

84

1     A. Yes; could be.

2     Q. You don't have a copy of that song, do

3 you?

4     A. No.

5     Q. Did you ever observe Sergeant Monaghan

6 playing around on the WMLEC as you describe?

7     A. I probably did. Almost every officer

8 was doing that, just playing with the WMLEC and

9 saying things over the air with WMLEC.

10     Q. Did you ever do that?

11     A. I probably did once or twice; I can't

12 recall.

13     Q. What's the attraction to do doing that

14 over WMLEC?

15     A. I don't know. Probably nobody is

16 catched doing it.

17     Q. Probably nobody is what?

18     A. Nobody will know who is doing the

19 transmission over the air.

20     Q. Did you ever observe that Ms. Walker

21 would play around with WMLEC?

22     A. No; never.

23     Q. How often would you hear someone playing

24 around with it as you described, meaning

85

1 broadcasting information that would have nothing
2 to do with police business?
3     A.    I think every night.
4     Q.    Every night?
5     A.    Yes; more than five or six times a night
6 or probably more.
7     Q.    Any idea which officers would do it or
8 from which police departments?
9     A.    Sometimes I recognize a few voices over
10 the -- people that I work with but its hard to
11 say which department is doing it.
12    Q.    Okay.
13    A.    And then sometimes a city will blame
14 Holyoke.   Stop that, Holyoke or blame other
15 cities.
16    Q.    Did you consider it something that was
17 fun to do during the course of the night?
18    A.    No; I think it was putting the officers
19 in the line of -- if probably an officer needing
20 the radio for an emergency probably would be tied
21 up -- the radio would be tied up by some stupidity
22 by other officers.
23    Q.    Did you do anything to stop that conduct
24 over WMLEC that was non-work related?

86

1     A.    No; it's hard to control it for my own
2 idea.
3     Q.    By the way, this Exhibit 5, did you type
4 this out yourself?
5     A.    Yes.
6     Q.    That's your signature on the bottom?
7     A.    Mmm-hmm.
8     Q.    Yes?
9     A.    Yes.
10    Q.    You stated here, "I started noticing the
11 communications about three weeks ago around 0630
12 hours," do you see that?
13    A.    Yes; it was always about the same time
14 when all the units were gassing up.
15    Q.    That's usually when it happened?
16    A.    Yes; most of the time when she was in
17 charge of the gas pumps.
18    Q.    That's when you noticed it?
19    A.    Yes.
20    Q.    Did that have -- that time frame have
21 any significance to you?
22    A.    Yes; I related that with the time that
23 she was there and the units were all there too and
24 this going over the air so I put things together

87

1 and voices.
2     Q.    Why would you be gassing up at
3 six-thirty given that your shift didn't end until
4 eight o'clock?
5     A.    Because some units end the shift earlier
6 so they call all of them together so they gas up
7 on time.
8         A few units end the shift like fifteen
9 minutes to a half hour before, like seven-fifteen
10 to seven-thirty because they start earlier and
11 they end earlier.   In the shift change they need
12 units in the road so they have a few units
13 starting earlier so that's why they have the
14 six-thirty hour for gassing up.
15    Q.    Are you saying that some units did not
16 work twelve to eight?
17    A.    No.
18    Q.    They worked a different time?
19    A.    Right; like about a half hour before.
20    Q.    But if you were working the
21 twelve-to-eight shift, you worked until eight
22 o'clock, right?
23    A.    Right.
24    Q.    In other words if you were gassing up at

88

1 six-thirty you still had another hour and a half
2 to work?
3     A.    Right; but everybody has to gas up
4 because they can't serve all the units at the same
5 time.
6     Q.    You indicated here that you started
7 noticing these communications about three weeks
8 before.
9         Had you taken any kind of notes or
10 anything like that, documented it at all?
11    A.    No.  I never thought it to be
12 appropriate of any use at that time until things
13 came and this investigation came up.
14    Q.    Given that that was occurring when
15 Sergeant Tammy Walker was gassing up the cars, how
16 would it be that she would be using the radio?
17    A.    Well, she will be calling the units
18 because if there is units that haven't been
19 gassed -- served at that time, she called them to
20 come to be served.
21    Q.    Are you saying units that weren't
22 already on the premises?
23    A.    Right -- no; some would be at the
24 premises, some will be at different calls or tied

89

up and she tried to find out where are they or if they are still tied up or if they forgot to be on time there to gas up.

Q. In other words other than the cars that were there to be gassed up, she would call out and look for other ones?

A. Right.

Q. To come in to be gassed up?

A. Or asking who has been served and who not.

Q. Is that normal practice?

A. Yes.

Q. Did anyone else gas up the vehicles besides Sergeant Tammy Walker?

A. Sergeant Monaghan. All the supervisors -- Sergeant Garcia.

Q. How often would you hear someone take the FM radio when that lick it song was on and place it up to the WMLEC radio to transmit the song?

A. About two or three times.

Q. Was that a song that officers would be singing around the station?

A. I never heard.

90

Q. You just heard it when it was on the radio?

A. Yes.

Q. Then you wrote here on Exhibit Number 5, "In one other occasion Sergeant Tammy Walker end radio transmission, someone spoke over WMLEC saying, 'I am freak out, el freako.'"

Do you recall what Ms. Walker's radio transmission was prior to that statement being made?

A. I don't know the radio transmission that she made but that was said after she ended communication and the conversation that came, it sounds like coming from Sergeant Monaghan.

Q. What was said was "I am freak out, el freako"?

A. Mmm-hmm.

Q. Yes?

A. Yes.

Q. What did that mean to you?

A. Like saying that he was afraid or something, like you know when someone is afraid of somebody else of something that he is doing or in the process of doing it -- you know, freak out.

91

1 He's scared.

2    Q.    You thought that that meant that whoever
3 the speaker was, was scared?

4    A.    Yes; you know like playing around, I'm
5 freak out. Like if you come tough to me and I
6 respond "you freak me out" or something like that.

7    Q.    Why did you relate that statement to
8 Ms. Walker?

9    A.    Because it was done after she finished
10 conversation and the voice on the other radio
11 sounds like Sergeant Monaghan.

12    Q.    Why did you think it sounded like
13 Sergeant Monaghan? What was it about the voice?

14    A.    It was kind of a rough voice, like -- it
15 can be distinguished.

16        There's probably other people that can
17 talk like him but you can hear that person's
18 voice.

19    Q.    I'm sorry, but you said you can hear
20 that person's voice, what did you mean?

21    A.    When you can describe a person by voice.
22 Like if you hear me talking and you say this is
23 Officer Rodriguez.

24    Q.    How often had you heard Sergeant

92

1 Monaghan's voice prior to doing Exhibit 5?

2    A.    You mean in regards to this?

3    Q.    No; just in general how often did you
4 hear him talk?

5    A.    Probably a thousand times.

6    Q.    Under what circumstances?

7    A.    You know, business related, police work.

8    Q.    How often would you work with him that
9 you'd hear his voice?

10    A.    Almost every day. We were in the same
11 group so we were working like four days a week or
12 five days a week, the same.

13    Q.    For how long of a period?

14    A.    Many years. Even when he was working
15 four to twelve I used to work four to twelve too.
16 When I could hear his voice over the air in
17 regular police work, I can describe, yes, this is
18 Officer Monaghan. He's a familiar voice that you
19 hear often.

20    Q.    You thought that you could recognize his
21 voice?

22    A.    Mmm-hmm.

23    Q.    That's a yes?

24    A.    Yes.

93

1    Q.    The "I am freak out, el freako."   I just
2 want to clarify, you interpreted that the person
3 who said that was afraid?
4    A.    I don't know how to describe it but its
5 like when someone is playing around like saying
6 oh, yeah, you're freaking me out, I'm scared of
7 you.
8    Q.    Based on the statement you heard, you
9 thought Sergeant Monaghan was afraid of
10 Ms. Walker?
11    A.    Yes; because she put an incident against
12 him, the complaint.
13    Q.    By the way, this "I am freak out, el
14 freako," that's not a song, is it?
15    A.    No.
16    Q.    Your next statement is, "I can't say
17 with certainty that Sergeant Monaghan did the
18 talking but the voice sounds like his."
19         Is that statement accurate that you
20 made?
21    A.    Yes.
22    Q.    In other words you couldn't say with
23 certainty that it was him?
24    A.    I cannot prove that it's him. There is

94

1 even people that can talk like me or talk like
2 her, even a male person can talk like any woman.
3 Anybody else can be making voice sounds like
4 anybody else.
5    Q.    You're saying that individuals from your
6 experience are capable of imitating other voices?
7    A.    Right; by experience, by seeing other
8 officers doing it.   I've seen officers imitating
9 other officers.
10    Q.    Can you think of anyone that might have
11 had a motivation to imitate Sergeant Monaghan's
12 voice?
13    A.    I'm not sure.
14    Q.    Then it says, "In few other occasions
15 someone goes over WMLEC radio meowing like a
16 fighting cat after she end transmission."
17         Can you describe that -- meowing like a
18 fighting cat?
19    A.    Yes.
20    Q.    Can you do it?
21    A.    Like meow, meow -- like cats start
22 fighting.
23    Q.    Who do you believe was doing that?
24    A.    Well personally I've seen officers doing

95

1 that in the Department.
2    Q.    Under what circumstances?
3    A.         Just when someone goes over the air, if
4 it's a female or something, they would do it.
5    Q.    I'm sorry, did you finish your answer?
6    A.    Yes.
7    Q.    From your experience you'd hear male
8 officers meowing over WMLEC if a female spoke?
9    A.    Mmm-hmm.
10    Q.    Yes?
11    A.    Yes.
12    Q.    What do you think the connection is
13 there?
14    A.    I don't know.   I would say
15 discriminatory against a woman.
16    Q.    Do you believe that that meowing like a
17 fighting cat had any connection with Ms. Walker?
18    A.    Yes.
19    Q.    Why do you say that?
20    A.    Because a few times after she finished
21 the conversation this came over the air.
22    Q.    How often did you hear that?
23    A.    A lot; like sometimes three times a
24 night.

96

1    Q.    With regard to Ms. Walker?
2    A.    Mmm-hmm.
3    Q.    That's a yes?
4    A.    Yes.
5    Q.    You're saying that three times on a
6 night after you would hear her speak on the
7 Holyoke radio you would hear a fighting cat sound?
8    A.    Yes.
9    Q.    On the WMLEC?
10    A.    Mmm-hmm.
11    Q.    Yes?
12    A.    Yes.
13    Q.    How often other than the three times a
14 night, how many times, how many days did you hear
15 that?
16    A.    I don't recall how many times.   More
17 than a few nights.
18    Q.    What's your best estimate?
19    A.    Three or four times a month or more.
20    Q.    For how many months?
21    A.    I cannot recall.
22    Q.    Who do you believe was meowing like a
23 fighting cat after she ended a transmission?
24    A.    Well, one time I remember Emil Morales

97

1  doing it a few times.
2     Q.    Emil Morales?
3     A.    Yes.
4     Q.    You said he did that after Ms. Walker
5  made a transmission?
6     A.    Yes.
7     Q.    Why do you think he did that?
8     A.    I don't know. A few officers are like
9  jokers.
10    Q.    You think he was joking around?
11    A.    Yes.
12    Q.    Is he Hispanic?
13    A.    Yes.
14  Q.        Do you know what his relationship was
15  like with Ms. Walker?
16    A.    I would say normal.
17    Q.    In other words you thought they got
18  along?
19    A.    Yes.
20    Q.    Any other officers that you witnessed
21  doing that?
22    A.    I'm not going to mention all the
23  officers that I ride with and say he did this and
24  this one did that.

98

1     Q.    Well I mean --
2     A.    (Interposing) Almost every officer goes
3  over WMLEC and plays around with the radio.
4     Q.    I'm asking about the meowing and
5  sounding like a fighting cat.
6           What officers other than Morales did you
7  observe doing that?
8     A.    He didn't do it over the air but over
9  our radios so I figured out he is the one doing it
10  over WMLEC, too.
11    Q.    You're saying you observed him doing
12  that over the Holyoke internal radio?
13    A.    Yes.
14    Q.    Really?
15    A.    Yes.
16    Q.    Any idea when he did that?
17    A.    Many times.
18    Q.    Which time frame?
19    A.    Even the supervisors hear him, they
20  wouldn't say nothing.
21    Q.    Do you recall which dates, which time
22  frame?
23    A.    No.
24    Q.    Do you recall when it was in relation to

99

1  Exhibit 5 dated December 4, 2002?
2     A.    No.
3     Q.    Do you remember what Ms. Walker had said
4  over the radio prior to the meowing like a
5  fighting cat?
6     A.    What was that question again?
7     Q.    Do you recall what it was that
8  Ms. Walker had said over the radio before you
9  heard the meowing like a fighting cat?
10    A.    Normal police communication.
11    Q.    How long after you heard her transmit
12  over the radio did you hear the meowing like a
13  fighting cat?
14    A.    Right after she finished.
15    Q.    When you say right after, how much time?
16    A.    Right after she finished the
17  communication.
18    Q.    So a few seconds?
19    A.    A few seconds; yes.
20    Q.    I think I forgot to ask you earlier,
21  before you heard the lick it song do you recall
22  what Ms. Walker had been saying over the radio?
23    A.    No; just regular transmissions.
24    Q.    Did you ever discuss your observations

100

1  of the WMLEC radio with Ms. Walker?
2     A.    Yes.
3     Q.    What did you discuss with her?
4     A.    About what I heard and -- because I can
5  be hearing WMLEC and she can have WMLEC shut off
6  on the radio if she doesn't want to get disturbed
7  with our regular radio but I keep both radios on
8  in my cruiser.
9           I don't know about everybody else but
10  most of the other officers keep -- have the WMLEC,
11  having both radios at the same time.
12    Q.    In terms of what you discussed with
13  Ms. Walker, what did you discuss?
14    A.    About what I had been hearing over
15  WMLEC.
16    Q.    Anything besides what's indicated on
17  Exhibit 5?
18    A.    No; just --
19    Q.    (Interposing) Just what's there?
20    A.    Yes.
21    Q.    Does Exhibit 5 fully explain or describe
22  what it was that you heard over WMLEC?
23    A.    Yes.
24    Q.    In other words, there was nothing else

101

1 besides what's indicated there?
2     A.    No.
3     Q.    You write here, "We have a natural duty
4 and obligation to comply with the duty of justice
5 and the principle of fairness."    Why did you write
6 that?
7     A.    Because our job is to be fair and
8 protect all the people.    It is part of our duty as
9 a police officer to -- if we see anything wrong to
10 come forward and put it in light and bring it to
11 light.
12     Q.    You were asked to prepare this by
13 Lieutenant Fournier, is that correct?
14     A.    Right.
15     Q.    To this day --
16          MR. HUDSON:    (Interposing) Excuse
17 me, when you say "prepare this"?
18          MS. LYNCH:    Exhibit 5.
19          MR. HUDSON:    Thank you.
20     Q.    (BY MS. LYNCH) To this day can you
21 state with certainty whether or not Sergeant
22 Monaghan was the voice that you heard over WMLEC?
23          MR. HUDSON:    Objection.
24          THE WITNESS:    Not for sure.

102

1     Q.    (BY MS. LYNCH) Any ideas as to anyone
2 else who might have made those statements over
3 WMLEC?
4          MR. HUDSON: Objection as to which
5 statements and what time period?
6          MS. LYNCH: The statements that have
7 been referenced in Exhibit 5 and to which have
8 been testified to today.
9          MR. HUDSON:    Objection; asked and
10 answered. You may answer.
11          THE WITNESS: I can't say for
12 certainty but the voice sounded like he was the
13 one saying it.
14     Q.    (BY MS. LYNCH) Do you know whether in
15 fact he was working on the days that these
16 statements were made?
17     A.    Yes.
18     Q.    How do you know that?
19     A.    Because I see him during the night --
20 the days that these incidents happened.
21     Q.    Did you ever do any investigation of
22 your own in terms of listen to any WMLEC tapes,
23 check any schedules, things like that?
24          MR. HUDSON:    Objection as to form.

103

1 You may answer if you know.
2          THE WITNESS: I'm not sure if WMLEC
3 is recorded.
4          I know our own radio frequency is
5 recorded but I don't know about WMLEC.
6     Q.    (BY MS. LYNCH) But my question is did
7 you do any type of investigation yourself such as
8 listening to any WMLEC tapes or checking schedules
9 to see who was working when?
10          MR. HUDSON:    Objection as to form.
11          THE WITNESS: No.
12     Q.    (BY MS. LYNCH) Do you know who -- do
13 you know whether or not Sergeant Monaghan ever saw
14 Exhibit 5 after you prepared it?
15     A.    It is my belief that he did.
16     Q.    What do you --
17     A.    (Interposing) Because he is very
18 friendly with Lieutenant Fournier and Sergeant
19 McCavick.
20          They are both Internal Affairs officers
21 and I notice his attitude towards me changed after
22 I wrote that complaint -- I mean the IOC.
23     Q.    But do you know if in fact he did see
24 Exhibit 5 after you prepared it?

104

1     A.    No; I don't.
2     Q.    When you say that Sergeant Monaghan was
3 very friendly with Lieutenant Fournier and
4 Sergeant McCavick, what do you mean?
5     A.    You know, that they are about -- you
6 know -- I cannot say with certainty that they are
7 friends but they are about the same age, they talk
8 often, they are rank officers.
9     Q.    Do you know whether they socialize
10 outside of work?
11     A.    No; I cannot say.
12     Q.    When you say that Sergeant Monaghan's
13 attitude toward you changed, can you describe what
14 you mean?
15     A.    Well, after I wrote this IOC the gas
16 incident where I was gassing up happened like one
17 week or two weeks after I wrote the IOC.
18     Q.    The gas incident you said happened about
19 one or two weeks after you prepared Exhibit 5?
20     A.    Yes.
21     Q.    Any other reason you think his attitude
22 changed?
23     A.    No.
24     Q.    Do you know if any other officers ever

---

**105**

reported that they heard comments over WMLEC that they believed were related to Ms. Walker?

A. I think nobody else did.

MR. HUDSON: Counsel, it's one o'clock.

MS. LYNCH: It's one o'clock?

MR. HUDSON: Yes; it is.

(A recess was taken.)

Q. (BY MS. LYNCH) Mr. Rodriguez, you indicated before that at times when you heard the transmissions that are described in Exhibit 5 over WMLEC that Ms. Walker was gassing up the vehicles, is that correct?

A. Mmm-hmm.

Q. Yes?

A. Not all the time. She could be like working a regular shift.

Q. That was my question. What was she usually doing when you heard that?

A. Like supervising in the streets.

Q. It's your understanding that she would be riding around in a cruiser?

A. Yes.

Q. She would be doing that at times?

---

**106**

A. Yes.

Q. Anything else that you know that she was doing?

A. Probably working in the office in the station.

Q. Anything else?

A. No.

Q. I just want to make sure; I can't recall what you said.

Other than Exhibit 5 and Exhibit 3 you didn't prepare any written documentation regarding what you heard over WMLEC, is that correct?

A. No; just that.

(Defendant's Deposition Exhibit
No. 6 offered and marked.)

Q. (BY MS. LYNCH) Mr. Rodriguez, I'm showing you what has been marked as Exhibit Number 6.

If you could just take a look at that and identify that for the record, please? (Indicating.)

A. (Witness examining document.)

Q. Have you reviewed that?

A. Yes.

---

**107**

1  A. Yes.
2  A. Yes.
3  Q. Why did you say that?
4
5
6
7
8
9
10
11
12
13      Like for the last -- the
14 investigation they were doing about the rat
15 incident, the note, two or three years had passed
16 and I never heard that they have done nothing or
17 come back to me and say we did this.
18      Q. You wrote that because you felt that
19 someone should have told you the outcome of the
20 investigation?
21
22
23
24

---

**108**

1      A. Right.
2      Q. By the way, who prepared this affidavit?
3 Who typed it out?
4      A. I'm not sure if the person in the MCAD
5 did it or not.
6      Q. In other words, you didn't type it out,
7 Mr. Rodriguez?
8      A. I was probably saying the things and
9 somebody else was typing.
10      Q. But it was given at the MCAD office in
11 Springfield?
12  A. Yes.
13      Q. In paragraph six you said, "On or about
14 December 4, 2002 Sergeant Lenihan stated to a
15 group of officers that we all had to stick
16 together." And you said, "I believe he was
17 referring to Sergeant Tammy Walker's charge of
18 harassment." Why did you believe that?
19      A. Because I think this was the same week
20 that the incident -- the complaint came to light.
21      Q. Which complaint?
22      A. The complaint of Sergeant Tammy Walker.
23      Q. But which complaint are you referring
24 to?

---

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ                    SEPTEMBER 20, 2006

109

A. The one that she made against Sergeant Monaghan.

Q. She's actually had a few. Do you recall which one it was?

A. This incident.

Q. Are you talking about the WMLEC?

A. Yes.

Q. That's what you're referring to?

A. Mmm-hmm.

Q. Any other reason that you believe his statement pertained to Ms. Walker's complaint?

A. Other than that, just that. I think it was the same day that it came out that Sergeant Tammy Walker had a complaint against Sergeant Monaghan.

Q. Did he say anything else besides "we all had to stick together"?

A. No.

Q. When you said he stated it to a group of officers --

A. (Interposing) In the way that he said it and the time frame that the incident -- that the complaint went on I relate both together, my sixth sense.

110

Q. When you said he stated it to a group of officers, do you remember what the circumstances were that the officers were all there?

A. Right when we started roll call.

Q. Roll call?

A. Yes.

Q. Do you recall if there were any other issues involving the Police Department that all officers were involved in?

A. I was thinking about this. Sergeant Garcia -- this was another incident and it was in roll call that he said that.

Q. You're referring to paragraph ten?

A. Yes.

Q. But with regard to paragraph six do you recall if there were any issues pertaining to the Police Department as a whole that were going on at that time?

A. No; just that.

Q. Just Ms. Walker's complaint?

A. Mmm-hmm.

Q. Paragraph seven. You said, "Upon my best information and belief other officers learned that I supported Sergeant Tammy Walker's

111

1 allegations of discrimination."

2       Why do you believe that other officers
3 learned that you supported her?

4       A.    Because they were commenting that in
5 roll call and they were saying that any officer
6 that comes forward in behalf of Sergeant Tammy
7 Walker should be fired.

8       Q.    Who said that?

9       A.    I cannot recall but someone during the
10 roll call.  I don't know if it was the Sergeant or
11 one of the officers.

12      Q.    Do you remember when that was said?

13      A.    But they were talking about the case at
14 that time -- about the complaint.

15      Q.    Do you remember when that was said --
16 what date?

17      A.    No; I don't have any -- I don't know.

18      Q.    Did they say that because they believed
19 that the complaint was not legitimate?

20            MR. HUDSON: Objection.

21            THE WITNESS: No; because usually
22 officers, they are supposed to stick together in a
23 brotherhood and nobody should go against other
24 officers, testifying against other officers, even

112

1 when it's related to other officers being a
2 victim.  You know, like we got to stick together,
3 brotherhood.

4       I have heard this so many times in the
5 Holyoke Police Department that it is familiar.

6       Q.    (BY MS. LYNCH) But Sergeant Tammy
7 Walker was an officer too, so she was part of the
8 brotherhood, isn't that correct?

9       A.    Right; but at that time she was the
10 victim. Like I have been a victim but if someone
11 testified in my favor they would be out of the
12 brotherhood, even when we are all officers.

13      It depends who is in the game and who is
14 not -- who is in the play game.

15      Q.    But with regard to Sergeant Lenihan's
16 statement in paragraph six, we have to stick
17 together, did he ever reference Ms. Walker's
18 complaint?

19      A.    No; but it came about the same -- I
20 would say -- I don't know if it was the same day
21 that it came to light that she had a complaint but
22 it was close to that.

23      Q.    In paragraph eight -- I'm sorry, were
24 you done with your answer?

**TAMMY WALKER vs. CITY OF HOLYOKE**
JORGE RODRIGUEZ                                    SEPTEMBER 20, 2006

---

113

A. It was about the time frame was all related.

Q. In paragraph eight you make reference to the fact that you were reprimanded for the operations manual.

Why do you believe that that was retaliation for supporting Ms. Walker's allegations?

A. Because during that time they were still handling the investigation in this issue and my belief I thought it wasn't fair that just because I forgot to pick up an item after the date that it was supposed to be picked up that they gave -- there has been other officers that have done things worse and they haven't been reprimanded.

Q. Who are you referring to and what are you referring to?

A. Like the Egan incident when I made a complaint that she abused a Hispanic female.

Q. Who is Egan?

A. It's a detective. He was a detective.

Q. Detective Egan?

A. Yes; he retired.

Q. What did he do?

---

114

A. He committed an abuse against an Hispanic female by grabbing her by her hair and putting her head over a car and slamming her.

Q. How do you know that?

A. Because I was there present.

Q. I'm sorry, you were what?

A. I was present at that location.

Q. Did you observe that happen?

A. Yes.

Q. Did you report him?

A. Yes.

Q. What happened?

A. He put a complaint against me that I was lying and the Internal Affairs went forward with the complaint.

The union went forward against me because I put that complaint and nine officers were present and they all testified that Detective Egan acted in a professional manner. I was the only officer that said that he acted inappropriately.

Q. And what happened? Anything?

A. Well, they didn't do nothing to Detective Egan against him. He was cleared of the

---

115

1  charges because no other officers came forward
2  against him. They all stick together the way they
3  want.
4      Q. Were you disciplined -- I'm sorry, were
5  you done with your answer?
6      A. Yes.
7      Q. Were you disciplined at all?
8      A. They tried. Even the union was against
9  me because I spoke.
10     Q. With regard to that issue with Officer
11 Egan, who was the Chief then -- and do you recall
12 the date of the incident?
13     A. I think that the new chief was already
14 there.
15     Q. Chief Scott?
16     A. Yes.
17     Q. Any other example of why you think you
18 were harshly disciplined for forgetting to pick up
19 your manual but yet other officers did worse
20 offenses and were not reprimanded, as referenced
21 in paragraph eight?
22     A. There has been officers drinking at
23 different -- at the bar after they close and they
24 were -- they filed a complaint against them. They

---

116

1  were cleared of that.
2      Q. Are you referring to the Elizer's Pub
3  incident that Ms. Walker was present at?
4      A. Yes.
5      Q. Any other examples?
6      A. Right now I cannot recall.
7      Q. Paragraph nine. You talked about the
8  note regarding a rat in your mailbox. Have you
9  now already told us everything you know about
10 that?
11     A. Mmm-hmm.
12     Q. Yes?
13     A. Yes.
14     Q. You just have to answer verbally,
15 Mr. Rodriguez.
16     A. Yes.
17     Q. Paragraph ten. You say, "I have heard
18 Sergeant Joe Garcia state on several occasions
19 during roll call that he was not afraid of anyone
20 coming forward to sue him. I understood his
21 comment as referencing Sergeant Tammy Walker's
22 charge of discrimination."
23     Do you recall when it was that he stated
24 that?

---

TAMMY WALKER VS. CITY OF HOLYOKE
JORGE RODRIGUEZ          SEPTEMBER 20, 2006

117

A.    It was close to that December 4 when
2 Sergeant Lenihan made the comment of stick
3 together -- by sticking together.
4      Q.        Why did you believe he made that
5   statement in relation to Ms. Walker's complaint?
6      A.    Because at the time frame and -- I don't
7 know if I heard rumors of something going between
8 them.
9           I know that there was some issues
10 between them at that time.
11     Q.    Paragraph eleven. You state that you
12 have heard officers refer to Chief Anthony R.
13 Scott as Uncle Charlie during roll calls.
14          Who were the officers that you heard say
15 that?
16     A.    I heard a few officers saying that but I
17 didn't put any emphasis in noticing who was saying
18 it or to recall that officer because it was like
19 ten to twelve officers at the time.
20     Q.    You're saying ten to twelve officers
21 said that?
22     A.    No; that were present. At this time I
23
24 cannot recall.
       Q.    You don't recall who said it?

118

1      A.    Right; but I heard it.
2      Q.    You said, "Chief Scott is a black
3 individual.    I believe the comments were racist."
4 Why do you believe calling Chief Scott Uncle
5 Charlie is racist?
6      A.    As far as I know Uncle Charlie comes
7 from a character playing a black person.
8      Q.    Which character is that?
9      A.    Something -- Uncle Charlie sounds like
10 when you talk a story about a black person.
11     Q.    But Chief Scott's name is Anthony so why
12 do you believe that calling him Uncle Charlie --
13 why do you think that is related to his race?
14     A.    In the way they said it -- Uncle
15 Charlie.
16     Q.    But why do you think they'd be calling
17 him Charlie when his name is Anthony or Tony?
18 MR. HUDSON:                Objection; asked and
19 answered.
20          THE WITNESS: I don't know.
21     Q.    (BY MS. LYNCH) You don't know?
22     A.    No.
23     Q.    Did you ever hear any other officer make
24 a statement with regard to Chief Scott that you

119

1 thought was racist?
2      A. I heard a few but I cannot put it
3 together or recall at this time but at the
4 beginning that he started, it was kind of
5 unacceptable to have a black chief in the Police
6 Department.
7      Q. You think that to the extent any
8      A. Yes.
9      Q. Did you think that to the extent any
10 negative statements were made with regard to Chief
11 Scott, it was because he was a so-called newcomer
12 to the Police Department?
13
14
15     A.    Yes.
16     Q.    You thought that too?
17     A.    (Witness nodding.)
18     Q.    Is that a yes?
19     A.    Yes; because he was black and the top of
20 the Police Department.
21     Q. Do you think that Chief Scott was
22 respected?
23     A. Yeah, by many. Even since he started.
24     Q. Did you respect him?

120

1      A. Yes.
2      Q. Can you tell us any officer who made
3 statements that you considered negative about
4 Chief Scott?
5      A. You mean at the beginning when he
6 started?
7      Q. At any time.
8      A. At the beginning officers were talking
9 about his coming to the Police Department but
10 after that, they were getting used to him and the
11 way he works. I think everybody got to like him.
12     Q. So by the time you left, the overall
13 sentiment was that he was liked and respected?
14     A. Yes.
15     Q. Back to my question: Can you identify
16 anyone that you heard making negative statements
17 about him that you considered to be racist?
18     A. No; not that I can recall.
19     Q. Did you ever hear something like "Uncle
20 Charlie dun come out wit anutter order?"
21          Did you ever hear someone say something
22 like that?
23     A. Yes; because he was changing all the
24 code of conduct, even made another book. That's

PERLIK and COYLE REPORTING

**TAMMY WALKER VS. CITY OF HOLYOKE**
**JORGE RODRIGUEZ**                    **SEPTEMBER 20, 2006**

---

121

why we have to pick up the other -- this is almost in every roll call was a new note for us to keep and different changes coming to the Department.

Some officers were not too happy with it -- too many changes at the same time and things like that.

Q. But did you hear anyone sort of imitating his dialect or his accent?

A. No; not that I can recall.

a    Does he have an accent -- a southern accent?

A. No.

Q. Then you indicated here in paragraph eleven, "I believe an atmosphere exits at the Holyoke Police Department that condones racism and encourages retaliatory conduct towards individuals who oppose discrimination."

Can you please tell me what you base that statement upon?

A. That the times that I have complained -- my own complaints and complain about abuses that have been committed against other people and the retaliation they take after someone comes forward for anything that goes against their brotherhood.

---

122

They stick together and stuff like that.

Q. You're referring to the complaints that you, yourself made, that you felt that you were retaliated against?

A. Right; and other complaints that other people gave and if any of that exists, they would get retaliation.

Q. Who are you referring to besides you, yourself?

A. Like Sergeant Tammy Walker's case, complaint.

Q. Anybody besides you and Sergeant Tammy Walker that you're referring to?

A. The complaint that I made against Detective Egan.

Q. We already talked about that?

MR. HUDSON: Excuse me, please let the witness finish.

Q. (BY MS. LYNCH) Are you done?

A. Yes.

Q. I apologize, Mr. Rodriguez. Other than what you've testified to, is there any basis for that statement in paragraph eleven?

A. Yes; any complaint brought to the

---

123

1    Internal Affairs or investigation, if it is done
2    by a Hispanic person or a black person it is taken
3    differently than a white person taking a complaint
4    to the Internal Affairs.
5        Q. Who are you referring to?
6        A. Lieutenant Fournier and Sergeant
7    McCavick.
8        Q. Who are you referring to in terms of a
9    Hispanic or a black person that made a complaint
10   that you said was treated differently?
11       A. I would say myself, other officers that
12   has brought a complaint to be investigated by
13   Internal Affairs.
14       Q. That's what I'm asking you. Who are you
15   referring to?
16       A. Nelson Vasquez, myself, Sergeant Tammy
17   Walker. I can't recall other names. I think that
18   is all.
19       Q. Just briefly, what was Nelson Vasquez'
20   complaint?
21       A. Against a lieutenant.
22       Q. Which lieutenant?
23       A. Lieutenant Whelihan.
24       Q. Whelihan?

---

124

1        A. Yes.
2        Q. Were you a part of that case at all in
3    terms of being a witness?
4        A. No.
5            MR. HUDSON: Excuse me.
6            MS. LYNCH: I don't have much more.
7            MR. HUDSON: Can we go off the
8    record just for a minute here?
9            (Discussion off the record.)
10           (Defendant's Deposition Exhibit
                No. 7 offered and marked.)
11
12       Q. (BY MS. LYNCH) Showing you what's been
13   marked as Exhibit Number 7, Mr. Rodriguez, is that
14   the reprimand or the disciplinary action that was
15   taken as a result of you not picking up the
16   operations manual? (Indicating.)
17       A. Yes.
18           (Defendant's Deposition Exhibit
                No. 8 offered and marked.)
19
20       Q. (BY MS. LYNCH) Mr. Rodriguez, showing
21   you what's been marked as Exhibit Number 8, is
22   that a memorandum that you received from
23   Lieutenant Fournier following your complaint that
24   you had received correspondence in your mailbox?

---

**PERLIK and COYLE REPORTING**

125

1 (Indicating.)
2    A.    Yes.
3    Q.    Is that -- you'll see in paragraph two
4 it references submitting a paper that was left in
5 your mailbox.   Is that the "rat" note that you
6 got?
7    A.    Yes.
8    Q.    Then you indicate -- I'm sorry, not you,
9 but Lieutenant Fournier indicates in the third
10 paragraph, "You further state in your complaint
11 that as you were getting into your cruiser an
12 officer said to you 'are you getting a wooden pen
13 for this?"   Do you see that?
14    A.    Yes.
15    Q.    Who said that to you?
16    A.    I forgot his name.
17    Q.    It wasn't Sergeant Monaghan, was it?
18    A.    No.
19    Q.    What does that mean to you, "are you
20 getting a wooden pen for this?"
21    A.    That was the same day I testified in
22 federal court in regard to Sergeant Wagner's case.
23    Q.    What significance does -- what does that
24 mean to you, "are you getting a wooden pen for

126

1 this?"
2    A.    Because during that time, like weeks
3 before, I got a wooden pen for officer of the
4 month.
5    Q.    There is such a thing as a wooden pen?
6    A.    Yes. The new chief was giving a
7 certificate of officer of the month whoever it is
8 given for that month -- that particular month --
9 and they were given a wooden pen.
10         I took it like I testified against the
11 Police Department so the person saying hey, are
12 you getting a wooden pen for this.
13              (Defendant's Deposition Exhibit
   No. 9 offered and marked.)
14
15    Q.    (BY MS. LYNCH) Showing you
16 Mr. Rodriguez Exhibit Number 10?   (Indicating.)
17    A.    Like if I was getting a certificate for
18 being officer of the month again for being a rat.
19    Q.    Well, the wooden pen, was that a gift --
20 the first one or when you received it, was it a
21 gift?
22 A.         It was because I did a good arrest of a
23 person that committed an armed robbery and I was
24 able to detain that person and he was still armed

127

1 and he had all the evidence with him.
2    Q.    In other words it was to recognize your
3 work?
4    A.    Yes; my work.
5    MR. HUDSON:              For clarification, you
6 mentioned Exhibit 10 and I don't recall Exhibit 9.
7         Would you let the record show that there
8 was a correction made with regard to what is now
9 Exhibit 9 that was previously referenced as
10 Exhibit 10 and that is the document Holyoke Police
11 Department Citizen/Employee Complaint Form dated
12 05-15-03, Bates number 00046 which is correctly
13 now labeled Exhibit 9. Thank you.
14    Q.    (BY MS. LYNCH)  Mr. Rodriguez, I've
15 placed in front of you what has now been remarked
16 as Exhibit Number 9.
17         Is that the complaint that you filed?
18 (Indicating.)
19    A.    This one?
20    Q.    Yes.
21    A.    Yes.
22    Q.    You've already testified about the rat
23 note in your mailbox, the wooden pen, your
24 testimony about Mr. Wagner and the Egan incident,

128

1 is that correct?
2    A.    Yes.
3    Q.    Anything else that you want to add to
4 what you've already testified to or what's written
5 in Exhibit Number 9?
6    A.    Yeah, I'm still trying to recall the
7 name of the officer but it's not coming to my mind
8 at this time.
9    Q.    Have you ever heard anyone refer to
10 Ms. Walker as Tyrone?
11    A.    I heard conversations in roll call
12 mentioning that name but I don't know who they
13 were referring
14    Q.    Does the name Tyrone have any
15 significance to you?
16    A.    It is a name that    for a black male.
17    Q.    Why do you say that?
18    A.    Because it's the name that I usually
19 hear for a black male.
20    Q.    In other words you've known black males
21 that have the name Tyrone?
22    A.    Yes.
23    Q.    Other than that, does it have any
24 significance to you?

129

1    A.    No.
2    Q.    Did you ever hear anyone say to
3  Ms. Walker,  You shouldn't go sticking your tongue
4  where it don't belong"?
5    A.    I believe I heard it but I cannot recall
6  where or how the circumstances.
7    Q.    Do you know who said it?
8    A.    I don't know if it was Sergeant Garcia
9  or Sergeant Monaghan.
10    Q.    You think they said it to Ms. Walker?
11    A.    I'm not sure if they were in some kind
12  of discussion and I walked by and I heard it or
13  how the circumstances but I heard something like
14  that.
15    Q.    When you heard it did you hear it said
16  to Ms. Walker or did you just hear someone in
17  conversation say it?
18    A.    I believe I heard it when they were
19  discussing.
20    Q.    By the way, did you ever complain about
21  getting junk mail belonging -- strike that.
22          Did you ever complain about getting junk
23  mail in your mailbox that had John Monaghan's name
24  on it?

130

1    A.    Yes.
2    Q.    When did that happen?
3    A.    That was after he became a sergeant.   It
4  was about the same time frame that the complaint
5  against him by Sergeant Tammy Walker was going
6  on -- was being investigated.
7          The whole stack of books for sergeants
8  or how to be a sergeant and stuff like that or
9  supervisor and -- the whole stack was put in my
10  mailbox that belonged to him.
11    Q.    Who do you think put it in your mailbox?
12    A.    I don't know if he did it himself.  I
13  cannot accuse him because I didn't see him do it
14  but it was done that way.
15    Q.    Where is your mailbox in relationship to
16  his mailbox?
17    A.    In the same board.
18    Q.    But in other words is it next to yours,
19  above or below yours?   How close is it to yours?
20    A.    It's below mine a few blocks away.
21    Q.    Do you have any idea who did that?
22    A.    No.
23    Q.    Do you have any idea --
24    A.    (Interposing) In my thinking --

131

1    Q.    -- why?
2    A.    What it came to in my mind was that he
3  did it himself but then it came to my mind that
4  who would do that, having his own name.
5          I don't know if another officer did it
6  because what was going on in the complaint and the
7  investigation and my involvement with the issue to
8  bring more friction.   I don't know.
9          I cannot accuse him directly or say that
10  he did it.
11    Q.    Why would you think he would do it
12  himself?
13    A.    In my opinion I don't believe he did it.
14    Q.    To this day do you know who did it?
15    A.    No.
16    Q.    Did Ms. Walker ever discuss with you the
17  incident of Elizer's Pub on June 23, 2003?
18    A.    No.
19    Q.    Did she ever discuss with you the fact
20  that she was disciplined for being late for court
21  on April 6, 2004?
22    A.    That was the same day that I was also
23  reprimanded for being five minutes late.
24    Q.    Right; did she ever discuss with you the

132

1  fact that she was disciplined?
2    A.    No; but I was present when she was
3  called and told you are late, you are late.   I
4  think we arrived about the same time.
5    Q.    Did she ever discuss with you an
6  incident involving the Holyoke Mall on July 23,
7  2004?
8    A.    Never heard it.
9    Q.    Did she ever discuss with you an
10  incident that occurred on September 6, 2004 where
11  she and Sergeant Monaghan were at a murder scene?
12    A.    At a murder scene?
13    Q.    Right.
14    A.    No.
15    Q.    Did she ever discuss an incident with
16  you of November 4, 2004 -- strike that.
17          Did she ever discuss with you her belief
18  that orders were being issued over a laptop
19  instead of over the radio?
20    A.    No; never heard.
21    Q.    Did she ever discuss with you the
22  circumstances of her being terminated?
23    A.    No.
24    Q.    Did you ever witness her get injured on

133

1 duty while working as a police officer for the
2 Holyoke Police Department?
3    A.    Not that I can recall.
4    Q.    Did she ever discuss with you an
5 incident that occurred on October 15, 2002
6 regarding an individual by the name of Lee Moran
7 at a 7-Eleven store?
8    A.    No.
9    Q.    Other than the complaints that you've
10 already testified to today, are you aware of any
11 other complaints being filed against the Holyoke
12 Police Department or any of its officers regarding
13 race, national origin, or gender?
14    A.    No.
15    Q.    Are you aware of any complaints as I
16 just described involving allegations of sexual
17 orientation or retaliation besides what you've
18 already testified to?
19    A.    No.
20    Q.    Are you aware of any complaints being
21 filed against the Holyoke Police Department or its
22 officers alleging either hostile work environment
23 or whistleblower besides what you already
24 testified to?

134

1    A.    Sergeant Bennett's case.
2    Q.    Anything else?
3    A.    No.
4    Q.    Did you testify for him?
5    A.    Yes.
6    Q.    You did?
7    A.    Yes.
8    Q.    At trial?
9    A.    Yes.
10    Q.    With regard to Ms. Walker's complaint,
11 you testified that you did give an affidavit to
12 the MCAD and you gave statements to the Internal
13 Affairs Bureau.
14        Have you given any other type of
15 statement or given any testimony on behalf of
16 Ms. Walker?
17        MR. HUDSON: Objection to the form
18 of the question.
19        THE WITNESS:    Not that I recall.
20    Q.    (BY MS. LYNCH) No?
21    A.    No.
22    Q.    In other words you didn't testify at any
23 of her disciplinary hearings?
24    A.    Not that I can recall.

135

1    Q.    Have you spoken to Attorney Hudson prior
2 to today?
3    A.    No.
4    Q.    Is the first time that you spoke to him
5 as you were walking down the hall coming into this
6 room?
7    A.    Yes.
8        MS. LYNCH:    Okay; thank you, sir.  I
9 have no further questions.
10        MR. HUDSON:    Sir, I have a couple of
11 questions for you.
12            *****
13        CROSS-EXAMINATION BY MR. HUDSON
14    Q.    Does the name Tony Rebello mean
15 anything? Does that mean anything to you?
16    A.    No.
17    Q.    Do you know whether or not that person
18 was in any way -- do you remember -- do you know
19 whether or not he was an officer that in any way
20 was connected with the wooden pen incident?
21    A.    Tony Rebello -- I don't think we have an
22 officer with that name.
23    Q.    You don't recall; okay.   Thank you.
24 Sir, you testified when you go out with other

136

1 officers they did the same thing -- played around
2 with WMLEC not related to the job, is that
3 correct?
4    A.    Mmm-hmm.
5    Q.    Was Sergeant Monaghan one of those
6 officers that you rode with before he became a
7 sergeant?
8    A.    Yes.
9    Q.    To clarify, did you personally see him
10 playing around with the WMLEC?
11    A.    Not that I can recall. Almost every
12 officer played around with the WMLEC, just playing
13 around with the radio.
14    Q.    Sir, did you consider it a safety issue
15 if an officer needed a radio for an emergency and
16 the radio, WMLEC, was tied up?
17    A.    Yes.
18    Q.    A safety issue for the officer
19 involved -- safety issue for the officer needing
20 the assistance?
21    A.    Needing the assistance.
22    Q.    Did you also consider it a safety issue
23 if the assistance was needed concerning a member
24 of the public?

JORGE RODRIGUEZ                                    SEPTEMBER 20, 2006

---

137

A. Right.

Q. In other words, a member of the public needed police assistance?

A. Yes; I understand.

Q. The answer is yes?

A. Yes.

Q. Thank you. Sir, you testified that the officers used the WMLEC and/or the radio at around zero six-thirty when all units were gassing up?

A. Mmm-hmm -- yes.

Q. And that when Tammy Walker was in charge of the gas pumps the units were there?

A. Mmm-hmm.

Q. And that you put it all together and that's how you came to the conclusion that they were connecting it to her -- that that's how you came to the conclusion that the lick it comment was referencing Sergeant Tammy Walker?

        MS. LYNCH: Objection; you can answer.

        THE WITNESS: Mmm-hmm.

Q. (BY MR. HUDSON) Is that yes?

A. Yes.

Q. Thank you. Sir, you testified -- do you

---

138

recall testifying here today that you interpreted the el freako comment to mean that whoever said it was afraid -- that it meant to you that the person was scared or freaked?

A.    Yes.

Q.    Freaked them out?

A.    Yes, sir.

Q.    Did you make any connection between the
el freako or being freaked out --

A.    (Interposing) I'm saying it like in Spanish. It means like -- it is a mix of English and Spanish.

Q.    The el freako comment, sir, did you make any connection of that to Ms. Walker's sexual identity?

        MS. LYNCH: Objection; you can answer.

        THE WITNESS: Yes.

Q.    (BY MR. HUDSON) What connection did you make?

A.    That he was making -- in the way -- like saying that he was like a male person.

Q.    In other words saying that Ms. Walker

---

139

1    A.    Yes.

2    Q.    That's what was either freaking --

3            MS. LYNCH: (Interposing) Just note
4 my objection to the last question.

5    Q.    (BY MR. HUDSON) And you connected the
6 el freako comment with the person commenting on
7 Ms. Walker's sex?

8    A.    On the recognizing of the voice -- the
9 recognition of the voice also.

10           I put it all together and say this is
11 Sergeant Monaghan.

12   Q.    Thank you. Do you recall hearing
13 Sergeant Monaghan state over the air, "this ain't
14 no San Juan"?

15   A.    Yes; I did once.

16   Q.    When did that happen?

17   A.    After I filed the IOC statement in
18 behalf of Sergeant Tammy Walker.

19           MS. LYNCH: What was the question
20 before? Can you repeat that question?

21           (Reporter read back as
                 reauested.)

22

23           THE WITNESS: Yes.

24   Q.    (BY MR. HUDSON) Was this comment

---

140

1 made -- did you hear Sergeant Monaghan state this
2 over the internal Holyoke Police Department radio?

3    A.    It was over the radio but I'm not sure
4 if it was WMLEC or -- I cannot recall if it was.

5            If it was done on WMLEC I would
6 recognize it but I cannot recall at that time how
7 it was done.

8    Q.    What makes -- why do you testify that it
9 was Sergeant Monaghan who said over the air "this
10 ain't no San Juan"?

11   A.    Because it was describing the officers
12 in San Juan like ratting one against the other
13 different to here that they have the brotherhood.

14   Q.    But how do you know it was Sergeant
15 Monaghan making this comment?

16   A.    His voice.

17   Q.    You testified earlier that you had heard
18 Mr. Monaghan talk thousands of times?

19           MS. LYNCH: Objection.

20           THE WITNESS: Yes.

21   Q.    (BY MR. HUDSON) Did you happen to hear
22 officers -- were there any other females who were
23 speaking over the air that you can identify and a
24 male officer would go meow?

---

PERLIK and COYLE REPORTING

141

1    A.    Officer Clement.
2    Q.    Any others?
3    A.    Sergeant -- its a female sergeant but I
4 forgot her name.   I cannot recall her name.
5    Q.    But these would be male officers that
6 would be making the meowing sound?
7    A.    Yes.
8    Q.    Would it just be -- would you also
9 describe it as the cat fighting?
10    A.    They do it both ways, meowing, meowing,
11 meowing and cat fighting.
12    Q.    Who is Emil Morales? Is he an officer?
13    A.    Yes.  He's like a joker.  He is always
14 joking around and stuff like that.
15    Q.    What supervisors do you know have heard
16 this meowing or cat fighting over the radio?
17    A.    I have heard the voice as Sergeant
18 Monaghan but I cannot say for sure that he has
19 done it.
20    Q.    But do you know of any -- were you ever
21 in the presence of any other supervisor --
22 sergeant or lieutenant -- while the meowing
23 occurred over the radio?
24    A.    Yes.

142

1    Q.    Who were you in the presence of?
2    A.    You mean if they heard it?
3    Q.    Yes; who you know heard it.
4    A.    Well, they have been working in the same
5 shift and -- the night -- and they hear this on
6 the radio and no one takes action about it.
7    Q.    Who would you say was working the same
8 shift and heard it and didn't do anything?
9    A.    Sergeant Garcia.
10 MS. LYNCH:                Objection.
11    Q.    (BY MR. HUDSON) Who you say heard it,
12 sir?
13    A.    Sergeant Garcia.
14    Q.    Anyone else that you know of?
15    A.    Sergeant Monaghan, when he heard other
16 officers doing it.
17    Q.    Were you present with Sergeant Monaghan
18 when he heard other officers doing it?
19    A.    No, but he has been working some of
20 those nights.
21    Q.    Is the radio on all the time?
22    A.    Yes.
23    Q.    He would have been -- Sergeant Monaghan
24 was on duty?

143

1    A.    Yes.
2         MS. LYNCH:   Objection.
3    Q.    (BY MR. HUDSON) When you know the
4 comments were being made?
5         MS. LYNCH:   Objection.
6         THE WITNESS: Yes.
7    Q.    (BY MR. HUDSON) Your answer is yes, is
8 that correct?
9    A.    Yes; even the supervisors in the police
10 station, they hear this because they have WMLEC
11 and they have the regular radio there.
12    Q.    When you refer to supervisors, who are
13 you referring to?
14    A.    Lieutenants, captains, whoever works
15 there.
16    Q.    Would Lieutenant O'Connell have been one
17 of those lieutenants?
18         MS. LYNCH:   Objection.
19         THE WITNESS: Yes.
20    Q.    (BY MR. HUDSON) That would have been
21 working when the radio was on?
22    A.    Yes.
23         MS. LYNCH:   Objection.
24    Q.    (BY MR. HUDSON) Would Captain Fletcher

144

1 have been working when you knew these comments --
2 the meowing cat fighting noises were coming over
3 the radio?
4         MS. LYNCH:   Objection.
5         THE WITNESS:   He hasn't worked the
6 shift too often but he has worked overtime on that
7 shift.
8    Q.    (BY MR. HUDSON) Do you know whether or
9 not Lieutenant Fournier worked one of the
10 shifts -- that third shift when the meowing was
11 occurring over the radio -- or the cat fighting
12 occurred over the radio?
13    A.    No; because he works in administration
14 during the eight-to-four shift.
15    Q.    Would Lieutenant Whelihan have been
16 working that third shift --
17    A.    (Interposing) Yes.
18    Q.    -- when the cat fighting noises were
19 coming in over the radio?
20    A.    Yes.
21    Q.    Would Lieutenant Lenihan have been
22 working that third shift when the cat fighting
23 noises were coming in over the radio?
24 MS. LYNCH:                Objection.

**TAMMY WALKER VS. CITY OF HOLYOKE**
JORGE RODRIGUEZ                    SEPTEMBER 20, 2006

---

145

THE WITNESS: Yes.

Q. (BY MR. HUDSON) The answer is yes?

**A.** Yes.

Q. Please speak up.

A. Yes.

Q. Do you know, who was conducting -- was a supervisor conducting the roll call when someone stated that anyone who comes forward in support of Sergeant Tammy Walker should be fired?

MS. LYNCH: Objection.

THE WITNESS: Yes.

Q. (BY MR. HUDSON) Was that a sergeant?

MS. LYNCH: Objection.

Q. (BY MR. HUDSON) Was that a sergeant conducting the roll call?

MS. LYNCH: Objection; and I'm objecting because I don't believe that's been his testimony in addition to the fact that it is leading.

Q. (BY MR. HUDSON) Do you recall, sir, testifying that during roll call someone said that anyone who comes forward in support of Sergeant Tammy Walker should be fired? Do you remember testifying to that?

---

146

A. Yes.

Q. Do you recall who was conducting the roll call when that happened?

A. No.

Q. Is the roll call -- is it the normal policy or procedure for roll calls to be conducted by a sergeant?

A. All of them.

Q. During the time you heard this comment, sir, what shift were you working?

A. Midnight to eight.

Q. Who are the sergeants who normally conduct roll call when you were working the midnight-to-eight shift after April, 2002?

A. Sergeant Tammy Walker, Sergeant Monaghan, and Sergeant Garcia -- or Sergeant Lenihan.

Q. Sir, you testified that other officers had done things and were not disciplined or reprimanded, is that correct?

A. Yes.

Q. You did identify one of those officers as being Detective Egan, is that correct?

A. Yes.

---

147

1    Q. Did you ever have any opinion about
2 whether or not Sergeant Monaghan's mail found in
3 your mailbox should have been a subject of
4 discipline or -- discipline?
5        MS. LYNCH: Objection.
6    Q. (BY MR. HUDSON) Did you ever complain
7 about Sergeant Monaghan's mail being found in your
8 mailbox?
9    A. Yes.
10    Q. Who did you complain to?
11    A. I believe it was -- I'm not sure, either
12 Sergeant Garcia or Lieutenant Whelihan; I cannot
13 recall.
14    Q. If you complained to Lieutenant Whelihan
15 that Sergeant Monaghan's mail was placed in your
16 box, do you have any idea what he told you to do?
17        MS. LYNCH: Objection. You can
18 answer.
19        THE WITNESS: I cannot recall.
20    Q. (BY MR. HUDSON) Did anyone ever tell
21 you to bring the mail back to the station?
22    A. No; the mail was all the time in the
23 station. I think I gave it to Lieutenant
24 Whelihan.

---

148

1    Q.    What was your complaint about the mail
2 being in your box? Why was that of concern to
3 you?
4        Why was Sergeant Monaghan's mail being
5 found in your mailbox of concern to you?
6    A.    I took it as some offensive -- like
7 undermining me for being an officer and him as
8 sergeant because all the pamphlets were,
9 sergeants' booklets.
10    Q.    Thank you. Did you feel that Sergeant
11 Monaghan was trying to intimidate you?
12        MS. LYNCH: Objection.
13        THE WITNESS: Yes.
14    Q.    (BY MR. HUDSON) Did you ever have the
15 occasion to believe -- after you supported -- did
16 you ever have the occasion to believe that you
17 were retaliated against by not getting timely help
18 when you requested it?
19        MS. LYNCH: Objection.
20        THE WITNESS: In what case?
21    Q.    (BY MR. HUDSON) Well, back up. Did you
22 ever have the occasion to believe that backup was
23 slow to respond -- a request for assistance was
24 slow to respond when you asked for help?

---

149

MS. LYNCH: Objection.

THE WITNESS: No; not that I can recall.

Q. (BY MR. HUDSON) Do you know of any other sergeants who violated any police rules or procedures and were not -- do you know any other sergeants other than Tammy Walker who violated any Holyoke Police Department rules or procedures and were neither disciplined or punished in any way?

A. Sergeant Monaghan.

Q. What rules or procedures that you know Sergeant Monaghan violated and was not punished?

A. The incident at the bar where he was drinking.

Q. Any other incidents related to Sergeant Monaghan involving violations of Holyoke Police Department rules and procedures and he was not punished?

A. (No response.)

Q. You can't recall?

A. When I -- when they were investigating the gas pump incident nothing happened to him but they were trying to discipline me.

Q. You're speaking of the gas pump incident

150

where you had to wait twenty minutes or so and didn't get any service?

MS. LYNCH: Objection.

THE WITNESS: Yes.

Q. (BY MR. HUDSON) Was that the incident where Sergeant Monaghan was the person in charge of the gas pump?

A. Yes, sir.

Q. Was the supervisor in charge?

A. Yes.

Q. Do you recall who called Chief Scott Uncle Charlie during roll call?

A. I cannot say with certainty which officer.

I heard it in roll call but I cannot say he did it or -- I was kind of behind the other officers.

Q. Are you afraid that members of the Holyoke Police Department will retaliate against you for giving testimony here today?

MS. LYNCH: Objection.

THE WITNESS: Yes. I'm in involuntary retirement and I'm planning to go back to police work again and I think this will

151

1 my comeback to my work.

2       Q. (BY MR. HUDSON) Did you ever have the

3 occasion to know of -- your partner is Sergeant

4 Monaghan, is that correct -- I mean you rode in

5 the same car?

6       A. Yes.

7       Q. Before he became a sergeant?

8       A. Yes.

9       Q. When he was a patrolman?

10      A. Yes.

11      Q. So that would have been before 2002?

12      A. Mmm-hmm.

13      Q. Do you recall any incident when Sergeant

14 Monaghan was caught swimming at his house while on

15 bike patrol duty?

16          MS. LYNCH: Objection.

17          THE WITNESS: (Witness shaking head.)

18      Q. (BY MR. HUDSON) The answer is no?

19      A. No.

20      Q. Do you recall any incident where Officer

21 Herbert Spafford put spaghetti sauce on the door

22 to the Detective Bureau?

23          MS. LYNCH: Objection.

24          THE WITNESS: No.

152

1       Q. (BY MR. HUDSON) Do you recall any

2 incident where Sergeant Monaghan stated something

3 to a Spanish male about why aren't you out robbing

4 a bank?

5          MS. LYNCH: Objection.

6          THE WITNESS: Yes.

7       Q. Was the Spanish male under arrest?

8       A. No; he was -- they were under

9 investigation about shots fired in the area.

10      A. Yes. I was the first officer with

11

12

13

14

15

16

17

18

19

20

21

22      A. Yes, sir.

23      Q. Do you recall when this was?

24      A. I think it was after I put -- after the

153

gas incident.

Q. After the gas incident?

A. Or around that time.

Q. And Sergeant Monaghan was the second officer to arrive?

A. Yes.

Q. Was this individual ever -- was this individual arrested that night -- the Spanish male?

A. No.

Q. You had arrived at the scene to investigate some shots being fired?

A. Yes, sir.

Q. Did you arrive at the scene to investigate a bank robbery?

A. No.

Q. Was there a call out at the time about a bank robbery?

A. No.

Q. Was there a call from the Holyoke Police Department dispatcher about a bank robbery?

A. No.

154

Q. No, is that your answer?

A. No.

Q. Okay; thank you.

A. Did I put a complaint about that?

Q. Did you?

A. I don't believe so.

Q. You don't think so?

A. But I don't know how this came to light but this happened.

Q. It did happen?

A. Yes, sir.

Q. What were some of the -- at the beginning when Chief Scott -- do you remember when Chief Scott became chief?

A. Yes, sir.

Q. It was around 2001?

A. Yes, sir.

Q. What were -- you testified earlier that there were some negative statements made at the beginning, is that correct?

A. Yes; at the beginning.

Q. What were some of those negative statements that were made about Chief Scott?

A. He being black and being the top man for

155

1 the police headquarters, the Chief.

2     Q.   Were the statements that he was not --
3 did you interpret -- was it your understanding
4 that the statements were that he wasn't qualified
5 to be the top man or chief because he was black?

6          MS. LYNCH: Objection.

7          THE WITNESS: Part of it.

8     Q.   (BY MR. HUDSON) What is your answer,
9 sir?

10    A.   Yes.

11    Q.   Were there any other negative statements
12 that you can recall that were made at that time?

13    A.   The changes that he was making, too many
14 too soon and things like that.

15    Q.   Do you recall who made any of the
16 statements about the Chief being -- about the
17 chief being black and the top man?

18    A.   I don't recall but a few officers.

19    Q.   Were any of these officers supervisors?

20    A.   I can't recall but I believe they were
21 also involved.

22    Q.   Were these statements made over the
23 radio?

24    A.   No; in roll call.

156

1     Q.   It was made during roll call?

2     A.   Yes.

3     Q.   Were these statements made before the
4 Chief actually took -- assumed the job or after he
5 had assumed the job?

6     A.   After he assumed the job.

7     Q.   Do you know of any statements that
8 were -- that you thought were racist that were
9 made by officers of the Holyoke Police Department
10 concerning the Chief?

11          MS. LYNCH: Objection.

12          THE WITNESS: When they called him
13 Uncle Charlie.

14    Q.   (BY MR. HUDSON) Now you testified
15 earlier that you did not hear officers imitating
16 the Chief's dialect but did you hear officers
17 trying to imitate a black dialect?

18          MS. LYNCH: Objection.

19          THE WITNESS: Yes.

20    Q.   (BY MR. HUDSON) Do you consider the
21 statement "Uncle Charlie dun come out wit
22 anutter"    A-N-U-T-T-E-R -- "order" as an example
23 of an imitation of the black dialect?

24          MS. LYNCH: Objection.

157

1    Q.    (BY MR. HUDSON) That you heard?
2    A.    (No response.)
3    Q.    Do you understand my question, sir?
4    A.    No; could you repeat it?
5    Q.    Do you recall anything that in your mind
6 was mimicking a black dialect?
7    A.    I know someone was using like the
8 accent, trying to talk about like a black person
9 like from New Orleans or something like that but I
10 cannot put it together with -- but it happened in
11 the police station.
12    Q.    Thank you. Are you aware of any -- do
13 you know a Sergeant Wagner?
14    A.    Yes.
15    Q.    Did he complain to Internal Affairs?
16    A.    Yes.
17    Q.    Do you know, was there any difference in
18 the way his complaint was handled versus other
19 white officers?
20    A.    Yes.
21        MS. LYNCH:    Objection.
22    Q.    (BY MR. HUDSON) What did Sergeant
23 Wagner complain about?
24    A.    Some incidents with Detective Egan, one

158

1 of them happening in a bank and some other
2 occasions where they had confrontations.
3    Q.    In what way do you believe Sergeant
4 Wagner's complaint was handled differently by
5 white officers by Internal Affairs or the
6 Professional Standards Department?
7        MS. LYNCH:    Objection.
8        THE WITNESS: Very different.
9    Q.    (BY MR. HUDSON) But in what way, sir?
10    A.    Like my complaints, they were never
11 followed up or never came to an end of the
12 investigation or they will -- it would be like a
13 kickback to the person making the complaint.
14    Q.    Sir, are you saying that there was no
15 end -- like your complaints, there was no end or
16 follow-up or conclusion with regard to Sergeant
17 Wagner's complaint?
18    A.    Yes, sir; its like in the same way that
19 I made complaints, they would kickback to me
20 instead of going towards them.
21        I made many complaints against the union
22 or different officers and they would -- they will
23 be fine but everything would come back to me and I
24 would be threatened with --

159

1    Q.    (Interposing) With a discipline?
2    A.    Discipline.
3    Q.    Is it your testimony that when -- that
4 Sergeant Wagner's complaints, like yours, would
5 not be followed through with by Internal Affairs?
6    A.    Yes.
7    Q.    And that after you and Sergeant Wagner
8 made complaints, you would be threatened or
9 retaliated against?
10        MS. LYNCH:    Objection.
11        THE WITNESS: Yes.
12    Q.    (BY MR. HUDSON) Sergeant Wagner -- do
13 you know if he was threatened or retaliated
14 against?
15        MS. LYNCH:    Objection.
16    Q.    (BY MR. HUDSON) Do you know if Sergeant
17 Wagner complained that he was threatened or
18 retaliated against?
19        MS. LYNCH:    Objection.
20        THE WITNESS: Yes.
21    Q.    (BY MR. HUDSON) You testified regarding
22 Exhibit 9 that there was a complaint you filed
23 where you mentioned the rat note, the wooden pen
24 and the Egan incident.    What type of complaint was

160

1 that, sir?
2        MS. LYNCH:    Why don't we look at the
3 actual exhibit.
4        THE WITNESS: This one?
5 (Indicating.)
6    Q.    (BY MR. HUDSON) Yes, sir; that's it.
7    A.    (Witness examining document.)
8    Q.    This was an internal complaint, is that
9 correct?
10    A.    Yes.
11    Q.    Exhibit 9 is a complaint that was made
12 to -- well, it was submitted to -- you see on the
13 second page, page number 467, I draw your
14 attention to the -- it says, "Print or type name
15 of receiving supervisor."
16        Did you deliver this to a Sergeant
17 John T. Lenihan?
18    A.    Yes.
19    Q.    You delivered Exhibit 9 to Sergeant
20 Lenihan?
21    A.    Yes.
22    Q.    Was that going through your chain of
23 command at the time?
24    A.    I believe so.

161

1   Q.    Do you know whether or not -- was this
2  complaint ever investigated by Internal Affairs?
3  MS. LYNCH:                 Objection.
4   Q.    (BY MR. HUDSON) Do you know?
5   A.    Yes.
6   Q.    Do you know if there was --
7   A.    (Interposing) It was submitted to
8  Internal Affairs but they never...
9   Q.    It was submitted to Internal Affairs?
10  A.    Yes.
11  Q.    Did they ever tell you that it was --
12  inform you that it was sustained, that they found
13  your complaint to be valid?
14  A.    No.
15  Q.    Did they he ever tell you that they
16  found it not to be valid?
17  A.    No.
18  Q.    Counsel asked you if you were aware of
19  any other complaints I believe involving racial or
20  sexual discrimination or harassment.
21        Were you -- did Sergeant Wagner's
22  complaint involve discrimination?    Do you know if
23  Sergeant Wagner alleged discrimination?
24  A.    Yes.

162

1   Q.    Was it racial discrimination?
2   A.    Yes; because he was involved in the
3  complaint that I made against Lieutenant Cournoyer
4  back in '96.
5   Q.    Do you know if -- do you know if
6  Lieutenant O'Connell ever made a complaint about
7  gender discrimination -- about sex discrimination
8  against her?
9   A.    I heard something about that and the
10  other sergeant, too.
11  Q.    What other sergeant?
12  A.    I don't recall her name but its a
13  sergeant.
14  Q.    Do you know a Sergeant Duguay?
15  A.    Yes.
16  Q.    Do you know that she made a complaint of
17  sexual discrimination?
18  A.    Yes.
19  Q.    Do you know who she -- do you know what
20  officer or supervisor she complained about --
21  Duguay -- who she complained about?
22  A.    No; I think it was a promotional -- a
23  promotion.
24  Q.    You think she was denied a promotional

163

1  opportunity?
2   A.    Right.
3   Q.    And Lieutenant O'Connell, do you know --
4  do you remember when you heard about her
5  complaint?
6   A.    No -- and also Debbie Clement made a
7  complaint for sexual harassment against the union
8  president.
9   Q.    Debbie?
10  A.    Clement.
11  Q.    Was Ms. Clement a civilian or police
12  officer?
13  A.    Police officer.
14  Q.    The union president, was this the union
15  president of the patrolman association or of the
16  supervisors association?
17  A.    No; the officers.
18  Q.    The officers.  Do you recall that
19  person's name -- the president?
20  A.    Officer Therrien.
21  Q.    You testified that you testified at
22  Sergeant Bennett's trial?
23  A.    Yes.
24  Q.    What is the race or national origin of

164

1  Sergeant Bennett? What's his race?
2   A.    White.
3   Q.    What did he -- what was his trial about?
4        MS. LYNCH:    Objection.
5   Q.    (BY MR. HUDSON) What rights did he
6  claim were violated?
7   A.    He was fired because he also was
8  involved in my case.   He tried to protect and
9  assist in my complaint against Lieutenant
10  Cournoyer.
11        MR. HUDSON: Thank you, sir. I have
12  no further questions.
13  MS. LYNCH:                 I just have a couple of
14  follow-up ones.
15                *****
16        REDIRECT EXAMINATION BY MS. LYNCH
17  Q.    You made a statement earlier that you
18  heard over the radio, "this ain't no San Juan"?
19  A.    Yes.
20  Q.    What significance does that have to you?
21  A.    This was about the time frame that this
22  complaint was going on against Sergeant Monaghan
23  and I recognized his voice when he said this and
24  it was said right when I was coming to the gas

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ          SEPTEMBER 20, 2006

165

1  pump to gas up my car and he was in charge of the
2  pumps.
3      Q.    You're saying that you think Sergeant
4  Monaghan made that statement as you were driving
5  to the gas pumps?
6      A.    Yes.
7      Q.    You're saying that was the day that you
8  weren't gassed up?
9      A.    No; that wasn't the same day.   It was a
10  different day.
11      Q.    What significance does "this ain't no
12  San Juan have to you?
13      A.    For me it was describing like officers
14  in San Juan can talk about other officers but not
15  here in Holyoke.   He just said this is not San
16  Juan, you know.
17      Q.    I'm sorry, I just don't understand the
18  significance.
19      A.    I can understand because I know it came
20  from him and towards me and the meaning that why
21  he said it.
22          This is not San Juan like in San Juan an
23  officer can talk or rat other officers but not
24  here.   Here is different.

166

1      Q.    You're saying --
2      A.    (Interposing) This is not San Juan.
3      Q.    You're saying you think in San Juan the
4  officers have a reputation of ratting against
5  officers?
6      A.    That's probably what he thinks in my
7  opinion.
8      Q.    Have you ever heard such a thing?
9      A.    No.
10      Q.    What did you think he --
11      A.    (Interposing) Like saying you're Puerto
12  Rican and you're not going to come here and run
13  our department in your way, you know. That's the
14  way I took it.
15      Q.    Do you know if in fact it was Sergeant
16  Monaghan that made that statement over the radio?
17      A.    It was his voice.
18      Q.    Do you know for a fact that he made the
19  statement?
20      A.    I would say yes.
21      Q.    Did you hear him -- meaning see him make
22  the statement over the radio?
23      A.    No; I didn't see him.
24      Q.    But you think it sounded like him?

167

1      A.    Yes.
2      Q.    With regard to the ratting, what did you
3  think that referred to -- ratting against other
4  officers?
5      A.    Like this is not San Juan, that --
6      Q.    (Interposing) But which --
7  MR. HUDSON:          (Interposing) Please
8  let the witness finish.
9      Q.    (BY MS. LYNCH) Which incident?
10      A.    When he said that this is not San Juan,
11  is that what you're talking about?
12      Q.    When you referenced before that it was a
13  reference to officers ratting against other
14  officers, my question is what was the subject
15  matter of the ratting?
16      A.    Because it was the time when the
17  complaint was made by Sergeant Tammy Walker and he
18  knew that I was involved in the Internal Affairs
19  submitting a letter.
20      Q.    So that's what you think he was
21  referring to?
22      A.    Yes.
23      Q.    Do you know for a fact that supervisors
24  heard meowing over the radio?

168

1      A.    But that's going on almost all the time.
2      Q.    But do you know in fact that they did
3  hear that?
4      A.    Yes; I have been in the station and they
5  laugh about it, dispatchers, supervisors.
6      Q.    And this is over the internal radio as
7  well as WMLEC?
8      A.    Yes; they are both connected on the
9  station.
10      Q.    But just to be clear, do you know for a
11  fact that supervisors heard officers from the
12  Holyoke Police Department meowing over the
13  internal radio?
14      A.    Yes.
15      Q.    Is that something that you observed?
16      A.    Yes, for a fact because all the radios
17  are on and this went even in the police radio.
18      Q.    You said that during roll call someone
19  stated that officers should be fired for
20  supporting Ms. Walker.
21          Do you know if in fact that was
22  overheard by supervisors of the roll call?
23      A.    I'm not sure if his presence was already
24  there because we arrive first and then the

169

1 supervisor arrives.
2     Q.     You stated that when you got the
3 documents in your mailbox that you thought it was
4 an attempt to try to intimidate you. What do you
5 base that upon?
6     A.     Because it was the same day that I
7 testified in federal court and then this officer
8 approached me and said if I was getting a wooden
9 pen for what I did.
10     Q.     That all happened on the same day?
ii     A.     Yes.
12     Q.     Mail and wooden pen?
13     A.     Yes.
14     Q.     And then you mentioned something about a
15 statement about robbing a bank when you said you
16 were investigating shots fired in the air?
17     A.     Yes.
18     Q.     I didn't quite hear what you said
19 before.  Can you repeat it?
20     A.     There was an incident of shots fired in
21 the air.  I responded to an alley between Maple
22 and Elm Street.
23     I was the first officer at the scene and
24 then Sergeant Monaghan arrived as a backup and

170

1 then other officers also arrived.     Emil Morales
2 was there, some other officers. There were about
3 four or five officers all together.
4          Sergeant Monaghan, when he checked this
5 guy, he told him, "Why you don't carry a weapon?
6 Why you don't go and rob a bank so we can arrest
7 you or something." That was the comment that he
8 made.
9          He found it strange that they called for
10 shots fired in the air and he couldn't find a
11 weapon on him so he said why you don't do
12 something. Go rob a bank or something or get a
13 weapon.
14     Q.     Did anyone say anything in response?
15     A.     They just laughed.
16     Q.     Did you say anything in response?
17     A.     No, but I took it as an offense.
18     Q.     Wagner is white, right?
19     A.     Yes.  When I say discrimination, it was
20 because he was protecting me. That's how I got a
21 discriminating action against him.
22 MS. LYNCH:                    Thank you. That's all I
23 have.
24 MR. HUDSON:                    No further questions.

171

1 Hold on, we need to have this marked as an
2 exhibit.
3 MS. LYNCH:                    I forgot.
4     MR. HUDSON:                    We'll mark this as
5 
6                                            (
                                   No. 10 offered and marked.)
7
8                              *****
9
10     Q.     Mr. Rodriguez, would you please write
11 with an alphabet A by the gas tank that your car
12 was parked at, if you could put an A by that?
13     A.     (Witness complying.)
14     Q.     And there was another gas tank, put a B
15 by that one?
16     A.     (Witness complying.)
17     Q.     Then with regard to where your car was
18 located, sir, would you write the number 1?
19     A.     (Witness complying.)
20     Q.     How about put a circle around that 1 so
21 we distinguish it?
22     A.     (Witness complying.)
23     Q.     Thank you. With regard to the car of
24 Officer Narey, would you write the number 2?

172

1     A.     (Witness complying.)
2     Q.     And with regard to where Sergeant
3 Monaghan was located, would you write the
4 number 3?
5     A.     (Witness complying.)
6     Q.     Are there any other gas tanks other
7 than A and B, sir?
8     A.     Yes; over here.
9     Q.     Would you write C?
10     A.     (Witness complying.)
11     Q.     You're adding C and D?
12     A.     These are not used. We use these -- the
13 first two in the front.
14     Q.     Is it your testimony that gas tank C
15 and D are not used?
16     A.     No.
17     Q.     The arrow that -- would you write an X
18 at the entrance to the gas tanks? Would you make
19 that X a little bit larger, please?
20     A.     (Witness complying.) This is Commercial
21 Street.
22     Q.     That X represents the entrance?
23     A.     Yes.
24     1 indicates where your car ended up

TAMMY WALKER vs. CITY OF HOLYOKE
JORGE RODRIGUEZ                    SEPTEMBER 20, 2006

173

```
1  being  parked, is that correct?
2      A.    Yes.
3      Q.    And the X to the point of the arrow
4  indicates the direction  that you came to  park your
5  car?
6      A.    Right.
7            MR. HUDSON:    Thank you very much.
8            THE WITNESS:    And he was already
9  parked  here.
10     Q.    (BY MR. HUDSON)  When you say he was
11 already parked here, do you mean Sergeant
12 Monaghan?
13     A.    Yes.
14     Q.    So Sergeant Monaghan actually had a car
15 parked there?
16     A.    Yes.
17     Q.    So the number 3 actually represents
18 Sergeant Monaghan's car?
19     A.    Right.
20     Q.    And he was standing next to his car?
21     A.    Sitting in his car.
22     Q.    He was sitting in  his car?
23     A.    Yes; and  this was the driver's side,
24 this is the  front of his cruiser so  he was facing
```

174

```
1  me when I entered to the gas pump.
2      Q.    In order to get the gas, does Sergeant
3  Monaghan actually pump the gas or do you -- do the
4  officers pump their gas?
5      A.    We pump the gas but he had to come out
6  of the cruiser and present a key or something.
7      Q.    He has to turn  it on, he has to give
8  authorization   for the officers to pump the gas?
9      A.    Right.
10     Q    And he never got out of his car even
11 though he saw your car there?
12            MS. LYNCH: Objection.
13     Q.    (BY MR. HUDSON)  Is that right?
14     A.    Yes.
15            MR. HUDSON:  Thank you.  Sir.
16            MS. LYNCH:  Just quick.
17            . . . . . .
18       REDIRECT EXAMINATION BY MS. LYNCH
19     Q.    Officer Narey's vehicle which was marked
20 as number 2, was he seated when you got there?
21     A.    Yes; I was here.
22            MR. HUDSON:  Objection.
23            THE WITNESS:   For the first five
24 minutes and then he arrived and he parked next to
```

175

```
1  Sergeant Monaghan and they started talking but
2  that was after I was already parked that Officer
3  Narey entered   and they just started a conversation
4  there.
5            I also had my gas cap open for him
6  to get the pump ready to serve.
7      Q.    (BY MS. LYNCH)  You're saying when you
8  arrived Officer Narey's vehicle was not there?
9      A.    No.
10     Q.    It was not?
11     A.    No.
12     Q.    It came later?
13     A.    It came later.
14 MS. LYNCH:              Okay; I think we're all
15 set, thank you.
16        (The deposition was concluded.)
17            . . . . .
18
19
20
21
22
23
24
```

176

```
1       SIGNATURE PAGE - ERRATA SHEET
2
3  To be signed by deponent and returned to
   counsel within   thirty (30) days.
4       I, the undersigned, JORGE RODRIGUEZ, do
5  hereby certify that I have read the foregoing
   transcript of my testimony given   in the matter of
6  TAMMY WALKER vs. CITY OF HOLYOKE, on SEPTEMBER   20,
   2006 and that, to the best of my knowledge, said
7  transcript is true and accurate (with     the
   exception  of the following  corrections listed
   below:)
8
9
10 PAGE : LINE:   CHANGE AND REASON
11
12
13
14
15
16
17
18
19
20 DEPONENT'S SIGNATURE:
21 Signed   under the  pain and penalties of perjury
   this    of           2006
22
23 NOTARY PUBLIC
24 My Commission  expires:
```

PERLIK and COYLE REPORTING

177

1      COMMONWEALTH OF MASSACHUSETTS
                COUNTY OF HAMPDEN

2

        I, JOANNE COYLE, a Notary Public within and
3    for the Commonwealth of Massachusetts at large, do
     hereby certify that I took the deposition of JORGE
4    RODRIGUEZ, pursuant to the Federal Rules of Civil
     Procedure, at the offices of Morrison Mahoney,
5    LLP, 1500 Main Street, Springfield, Massachusetts,
     on SEPTEMBER 20, 2006.

6

        I further certify that the above-named
7    deponent was by me first duly sworn to testify to
     the truth, the whole truth and nothing but the
8    truth concerning his knowledge in the matter of
     the case of TAMMY WALKER vs. CITY OF HOLYOKE, now
9    pending in the United States District Court,
     District of Massachusetts.

10

        I further certify that the within testimony
11   was taken by me stenographically and reduced to
     typewritten form under my direction by means of
12   COMPUTER ASSISTED TRANSCRIPTION; and, I further
     certify that said deposition is a true record of
13   the testimony given by said witness.

14   I further certify that I am neither counsel
     for, related to, nor employed by any of the
15   parties to the action in which this deposition was
     taken; and further, that I am not a relative or
16   employee of any attorney or counsel employed by
     the parties hereto, nor financially or otherwise
17   interested in the outcome of the action.

18   WITNESS my hand and seal this _____day of
     OCTOBER, 2006.

                                                     19

20          Joanne Coyle
            Notary Public
21          Certified Shorthand Reporter
            License No. 106693
                                                     22
     My Corn mission Expires
23   May 12, 2011
24

178

TO:         OZELL HUDSON, JR., ESQUIRE


COPY TO CAROLE SAKOWSKI LYNCH, ESQUIRE


FROM: JOANNE COYLE, Certified Shorthand Reporter


RE:         TAMMY WALKER vs. CITY OF HOLYOKE


DEPOSITION OF: JORGE RODRIGUEZ


TAKEN ON:        SEPTEMBER 20, 2006


                 INSTRUCTIONS


Please forward the attached original
Signature Page-Errata     Sheet, along with
a copy of the
deposition transcript, to the deponent, JORGE
RODRIGUEZ, for his deposition taken on
SEPTEMBER 20, 2006 in     the above-captioned case.

According to the Rules of Civil Procedure,
the deponent has thirty (30) days in which
to make these corrections to the transcript.

When the deponent has signed and noted his
corrections on the Signature Page-Errata
Sheet, indicating the page number, line
number, and the desired correction, please
return the original Signature Page-Errata Sheet
to Ms. Lynch.

# EXHIBIT 3

**IN THE MATTER OF:**

TAMMY WALKER vs.

CITY OF HOLYOKE

_____

**DEPOSITION OF:**

ANTHONY SCOTT
DATE: SEPTEMBER 11, 2006

_____

PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931 Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30074-MAP
Pages 1-197

TAMMY WALKER

vs.

CITY OF HOLYOKE

**DEPOSITION OF: ANTHONY SCOTT**

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Perlik and Coyle Reporting,
1331 Main Street, Springfield, Massachusetts
on SEPTEMBER 11, 2006, commencing
at 10:10 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified            Professional Reporters
1331                 Main Street
                     Springfield, MA 01103
Tel.        (413) 731-7931    Fax (413) 731-7451

---

2

APPEARANCES:

FOR THE PLAINTIFF:

LAW OFFICE OF OZELL HUDSON, JR., ESQUIRE
434 Massachusetts Avenue
Boston, Massachusetts 02118
BY:  OZELL HUDSON, JR.

FOR THE DEFENDANT:

MORRISON MAHONEY, LLP
1500 Main Street
Springfield, Massachusetts 01115
BY:  CAROLE SAKOWSKI LYNCH, ESQUIRE

Also Present:  Tammy Walker

---

3

I N D E X

WITNESS          DIRECT CROSS REDIRECT RECROSS

ANTHONY SCOTT

E X H I B I T S

NO.                                                    PAGE

1    Renotice of Deposition of Scott          6
2    Rodriquez Affidavit                      26
3    Walker Settlement Agreement              45
4    2/15/05 Sapirstein to Scott Letter       53
5    5/4/05 Sapirstein to Scott Letter        74
6    2/27/05 Walker to Scott Injury Report    110
7    Walker Statement Re 10/17/02             125
8    12/2/02 MCAD Complaint                   142
9    6/7/05 MCAD Complaint                    147
10   12/29/04 Scott to Walker Letter &
Attachments                                   153
11   12/20/04 Grievance Complaint Form        163
12   1/5/05 Scott Memo to File                168
13   12/13/04 Grievance Complaint             168

---

4

S T I P U L A T I O N S

It is agreed      by and between the parties
that all objections, except objections as to the

form of the question, are reserved to be raised at
the time of trial for the first time.

It is further agreed      by and between the
parties that all motions to strike unresponsive
answers are also reserved  to be raised at the time
of trial for the first time.

It is further agreed  that the deponent will
read and sign the deposition and that the sealing
of said deposition will be waived.

It is further agreed  by and between the
parties that notification to all parties of the
receipt of the original deposition transcript is
also hereby waived.

** N°..

ANTHONY SCOTT, the Deponent, having been
2 satisfactorily identified by the production of his
3 Police Department identification and having been
4 first duly sworn by the Notary Public, deposes and
5 says as follows:
6
7          MR. HUDSON: Good morning. Let the
8 record show that I'm Ozell Hudson appearing as
9 attorney for the Plaintiff Tammy Walker in the
10 matter of Walker versus City of Holyoke. Also
11 present is the Plaintiff, Ms. Tammy Walker, who
12 will have to leave around eleven-thirty or shortly
13 before for another appointment.
14          Counsel Lynch is here representing the
15 deponent, the Chief of the Police for the Holyoke
16 Police Department.
17
18     DIRECT EXAMINATION BY MR. HUDSON
19     Q.   Sir, would you state your full name?
20     A.   Anthony R. Scott -- S-C-O-T-T.
21          MR. HUDSON: I'd like to have marked
22 as Plaintiff's Exhibit 1 the notice of deposition
23 for -- renotice, rather, for Chief Scott.
24

1 versus the City of Holyoke in the U.S. District
2 Court?
3     A.   Yes.
4     Q.   You have mentioned that you have talked
5 with your attorney about a deposition. Has your
6 attorney explained to you what a deposition would
7 be like?
8     A.   Yes.
9     Q.   You understand what an oath is and that
10 you -- that an oath is primarily a promise to tell
11 the truth?
12     A.   Sir, I've been a police officer for
13 forty years. I've given numerous depositions,
14 testified in criminal and in federal court. I am
15 quite familiar with an oath.
16     Q.   Very good, sir. I would expect you are;
17 we just want that on the record.
18          Basically you understand that a
19 transcript of your testimony here may be used at
20 trial?
21     A.   Yes.
22     Q.   Sir, what is your present occupation?
23     A.   I'm the Chief of Police in the City of
24 Holyoke.

6

(Plaintiffs Deposition Exhibit
No. 1 offered and marked.)
2
3     Q.   (BY MR. HUDSON) Just a couple of
4 preliminary statements, sir.
5          Have you had the opportunity to go over
6 this case with your counsel, without telling me
7 what was said?
8     A.   Yes.
9     Q.   Do you understand the nature of a
10 deposition?
11     A.   Absolutely.
12     Q.   Do you understand that any question that
13 I put to you, you will have an opportunity -- if
14 you don't understand it you will have an
15 opportunity to have me rephrase it or repeat it,
16 just let me know?
17     A.   Yes.
18     Q.   Do you also understand, sir, that verbal
19 responses are required, that gestures and -- or
20 hand gestures or head gestures will not make it
21 into the recorded transcript?
22     A.   Yes, sir.
23     Q.   Thank you. Sir, are you familiar with
24 the occurrences of this lawsuit of Tammy Walker

8

1          Q. When did you become Chief of Police in
2 the City of Holyoke?
3     A. May 21st, 2001.
4     Q. Were you appointed by the present mayor
5 or selected by the present mayor and council?
6     A. I was appointed by Mayor Michael
7     A. I'm sixty years old.
8
9
10
11
12
13
14
15
16
17          Q. Do you have children?
18     A. Yes.
19     Q. Are they adults, sir?
20
21
22
23
24

**9**

1    A.    Yes.

2    Q.    Do your children live in Holyoke or the
3 Hampden County area?

4    A.    No.

5    Q.    Sir, what's the highest level of
6 education you received?

7    A.    I have a bachelor's degree in business
8 administration from Loyola University in New
9 Orleans.   I'm a Jesuits product.

10    Q.    What was that last?

11    A.    Jesuits -- Catholic priests.

12 Q.       Where did you go to high school?

13    A.    New Orleans.

14    Q.    Sir, when did you graduate from Loyola
15 University?

16    A.    1975.

17    Q.    Prior to graduating from Loyola
18 University, did you have military service?

19    A.    Yes.

20    Q.    Where did you serve?

21    A.    In the United States Navy.

22    Q.    What period of time were you in the U.S.
23 Navy?

24    A.    I was in the Navy from the time I got

**10**

1 out of high school until I went to the New Orleans
2 Police Department, from 1964 to 1967.

3    Q.    In 1967, its your testimony you went on
4 the Holyoke Police Department?

5    A.    No; I went to the New Orleans Police
6 Department.

7    Q.    How long did you serve on the New
8 Orleans --

9    A.    (Interposing) Twenty-two years.

10    Q.    So around 1989 you left the New Orleans
11 Police Department and what position did you take
12 at that time?

13    A.    Became Chief of Police in Athol,
14 Massachusetts.

15    Q.    When you left the New Orleans force,
16 what rank did you hold?

17    A.    I had -- I was a sergeant.

18    Q.    How long did you remain at Athol?

19    A.    I was there three years.

20    Q.    So around 1992, sir, what position did
21 you move on to?

22    A.    Chief of Police.

23    Q.    For?

24    A.    Rock Island, Illinois.

**11**

1    Q.    How long were you in that position?

2    A.    Ten years.

3    Q.    Would that have been about 2002, sir?

4    A.    2001 -- May, 2001.

5    Q.    What was your next position after that?

6    A.    Chief of Police in Holyoke.

7    Q.    Have you had uninterrupted service in
8 Holyoke as chief since 2001?

9    A.    Yes.

10    Q.    When you went to Loyola University, were
11 you employed as a police officer?

12    A.    Yes; I was.

13    Q.    Was that full time or part time when you
14 were attending Loyola University and working for
15 the New Orleans Police Department?

16    A.    Yes; I was attending school part time,
17 working full time, eight hours a day.

18    Q.    Sir, what's the -- is the Chief of
19 Police, does that mean you are actually the head
20 person in charge of the Holyoke Police Department?

21    A.    Yes. The Mayor is the appointing
22 authority.

23    Q.    Sir, with regard to the Holyoke Police
24 Department, what's the total number of police

**12**

1 officers under your command?

2    A.    We have ninety-three police officers
3 with five vacant positions, so authorized a
4 hundred and three but we have ninety-eight -- four
5 captains, seven lieutenants, fifteen sergeants.

6         We are authorized twenty-four reserves.
7 I think we have fourteen filled positions now.

8    Q.    The reserves, are these part time?

9    A.    They are part-time police officers but
10 by statute we have to hire full-time members of
11 the Department from the reserve list. They are
12 actual police officers.

13    Q.    You indicate -- you testified that you
14 were authorized, as I recall, a hundred and three
15 police officers?

16    A.    Yes.

17    Q.    Does that include any of these captains
18 and lieutenants?

19    A.    No; that's just police officers.

20    Q.    Sir, of your police officers, what's --
21 how many of your police officers are female?

22    A.    Two uniform officers, one detective --
23 two detectives; I'm sorry, two lieutenants.

24    Q.    Is this presently -- is this the present

1 composition?
2     A.     Yes; that's not counting the one female
3 officer who is a member of the reserves.
4     Q.    With regard to -- you know the
5 Plaintiff, Ms. Tammy Walker?
6     A.    Yes.
7     Q.    Do you recall whether or not Ms. Walker
8 was a former sergeant with the Holyoke Police
9 Department?
10     A.    Yes.
11     Q.    Do you recall whether or not she was
12 terminated from that position?
13     A.    She was terminated as a sergeant.
14     Q.    Terminated from employment, is that
15 correct?
16     A.    Yes.
17     Q.    Would April 18th, 2005 be about the date
18 of her termination?
19     A.    I'm not sure.
20     Q.    Basically, sir, just to refresh your
21 recollection, this is just a mark-up of the MCAD
22 complaint, one of them, the 4/8/05 date.
23         I'm not offering it right now, but if
24 Ms. Walker signed this stating that she was --

---

1         Q. (BY MR. HUDSON) With regard to the
2 present population of the Holyoke Police
3 Department, do you know how many of the
4 officers -- that is uniformed officers,
5 detectives, lieutenants, sergeants -- in other
6 words total police officers on the force, how many
7 of those are African-American?
8         A. I would say five, maybe six.
9         Q. How many of those would be
10 African-American female?
11         A. None.
12         Q. At the time of Ms. Walker's termination,
13 was she the only African-American female?
14         A. Yes; I believe so.
15         Q. Would she have also been the only
16 African-American female sergeant?
17         A. Yes.
18         Q. Other than yourself, sir -- first of
19 all, did you include yourself in the five --
20         A. (Interposing) No; I didn't.
21         Q. With you, it would be six plus -- it
22 would be six or seven, including yourself?
23         A. Yes.
24         Q. Are there any African-Americans other

---

14

1 would this refresh your recollection?
2     A.     No; the actual termination letter would
3 help me.
4     Q.    But you recall that she was terminated?
5     A.    Yes; I do.
6     Q.    At the time of Ms. Walker's termination
7 how many of your police officers were female?
8     A.     It would have added to that number, one.
9 One sergeant and she was a sergeant.
10     Q.    Did you ever fill her position?
11     A.    The Mayor did appoint somebody to fill
12 that position, the next person off the Civil
13 Service list.
14     Q.    Was the next person off the Civil
15 Service list a male or female?
16     A.    It was a male.
17     Q.    So your testimony is that Ms. Walker's
18 position was filled by a male?
19     A.    Yes. Can I speak with the attorney for
20 a minute, please?
21         MR. HUDSON: Certainly.
22         (A recess was taken.)
23         THE WITNESS: Thank you, sir.
24         MR. HUDSON: You're welcome.

---

16

1 than yourself, sir, in a position above patrolman?
2         A. You have detectives, but that's not a
3 supervisory rank, no.
4         Q. So there are no African-Americans -- no
5 black African-Americans in a supervisory position
6 other than yourself?
7         A. Other than me, no.
8         Q. At the time of Ms. Walker's -- well
9 immediately prior to her termination, was she the
10 only African-American in a supervisory position
11 other than yourself?
12         A. Yes.
13         Q. With regard to females, sir, of your
14 entire staff how many of the females under your
15 command are in a supervisory position?
16         A. Police officers or civilians and police
17 officers?
18         Q. Police officers -- those who can perform
19 the arrest function?
20         A. Lieutenant Eva O'Connell and Lieutenant
21 Denise Duguay.
22         Q. Sir, did you ever have the opportunity
23 to acquire any information regarding the racial
24 demographics of Holyoke?

19

A. Holyoke is approximately forty -- I want to say forty-two or forty-three percent Hispanic, less than a percent African-American and Asian, and the rest, Caucasian.

Q. Now sir, what are your primary duties as Chief of Police?

A. To administer the operations of the Police Department.

Q. What are those operations?

A. There's a myriad of things but that's my duty, to administer the operations of the Police Department.

Q. Sir, let's back up to with regard to as an administrator.

Within your department, you are the person in charge, right?

A. Absolutely.

Q. What are the positions immediately under you -- under the chief?

A. Going by my table of organization?

Q. Yes; your table.

A. Is my Internal Affairs Division which we call Professional Standards; the Budget and Fiscal Control. Those two divisions answer directly to

18

me.

Then there is my four captains who are in charge of FOB -- Field Operations Bureau; CIB, Criminal Investigations Bureau; TSB, Technical Services Bureau; and School Safety and Security.

Q. Within your Internal Affairs, sir, who is the officer in charge?

A. Lieutenant David D. Fournier -- F-O-U-R-N-I-E-R.

Q. Does he have a second in command there?

A. Yes; a Sergeant Daniel P. McCavick.

Q. Who is charge of your Budget and Fiscal Control?

A. Ms. Melinda J. Lane.

Q. Is she a civilian?

A. She is a civilian.

Q. Are there any officers -- any supervisory officers?

A. No.

Q. Of the four captains, Field Operations Bureau you stated, sir?

A. Yes.

Q. Who is the captain in charge of the Field Operations Bureau?

20

1    A. Captain Alan G. Fletcher --
2   F-L-E-T-C-H-E-R.
3    Q. Is Captain Alan Fletcher, is he a white
4   male?
5    A. Yes.
6    Q. Is Lieutenant David D. Fournier, is he a
7   white male?
8    A. Yes.
9    Q. And Sergeant Daniel McCavick, a white
10  male?
11   A. White male.
12   Q. The captain in charge of your CIB unit?
13   A. White male.
14   Q. Who is that person?
15   A. Arthur R. Monfette M-O-N-F-E-T-T-E.
16   Q. The TSB, who is the captain in charge
17  there?
18   A. Frederick 3. Seklecki
19  S-E-K-L-E-C-K-I.
20   Q. The school safety and security?
21   A. Captain William McCoy -- M-C-C-O-Y.
22   Q. Is Captain McCoy a white male?
23   A. Yes.
24   Q. Is Captain Frederick Seklecki a white

20

1   male?
2    A. Yes.
3    Q. Do you have lieutenants in the FOB, sir?
4    A. Yes.
5    Q. Who are the lieutenants in FOB?
6    A. Lieutenant Michael Higgins, Lieutenant
7   Eva O'Connell, Lieutenant Brian Cassidy,
8   Lieutenant Donald Whelihan W-H-E-L-I-H-A-N.
9    Q. Is Michael Higgins a white male?
10   A. Everybody on that list is a white male
11  expect for Lieutenant Eva O'Connell is a white
12  female.
13   Q. Is there any sergeants in the FOB?
14   A. Yes.
15   Q. Who are the sergeants, sir?
16   A. First watch, Sergeant George Gerard --
17  G-E-R-A-R-D.
18   Q. Is he white male?
19   A. Yes. All of the sergeants are white
20  male. Sergeant Robert Laramie, Sergeant Mike --
21  Michael McMullan -- M-C-M-U-L-L-A-N; Sergeant
22  Michael Sheedy S-H-E-E-D-Y.
23        Second watch: Sergeant Joseph Garcia,
24  John Monaghan, and David O'Connell.

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT         SEPTEMBER 11, 2006

21

1  Third watch:       Sergeant Isaiah Cruz,
2  Sergeant Steven Loftus -- L-O-F-T-U-S; Matthew
3  Moriarty; John Hart.
4      Q.   Sir, are all these sergeants --
5      A.   (Interposing) White males.
6      Q.   White male?
7      A.   Garcia is Hispanic; Cruz is Hispanic.
8      Q.   Is Garcia a white Hispanic?
9      A.   All Hispanics are classified as white
10  males.  Ethnicity is Hispanic.
11      Q.   Monaghan and David O'Connell are white
12  males?
13      A.   Yes.
14      Q.   Steven Loftus, John Monaghan, and
15  Moriarty are white males?
16      A.   White males.
17      Q.   And Michael Sheedy is a white male?
18      A.   Yes.
19      Q.   Did Tammy Walker work in the FOB?
20      A.   Yes.
21      Q.   Who is the sergeant that was appointed
22  from the Civil Service list to replace Ms. Walker
23  to fill the position vacated by Ms. Walker when
24  she was terminated?

22

1      A.   Manuel Febo -- F-E-B-O -- Hispanic.
2      Q.   He is also identified as a white male?
3      A.   He is classified as a white male, ethnic
4  background Hispanic.
5      Q.   Sir, is there a public record or listing
6  of the staff of the Holyoke Police Department?
7      A.   Is there a public listing?
8      Q.   A public -- yes, is there a listing that
9  is available to the public -- the general
10  public -- of every employee of the Holyoke Police
11  Department?
12      A.   Its a public entity.  I guess there is.
13  I list the supervisors on the Website.
14      Q.   What is your Website, sir?
15      A.   Www.holyokepd.org but every police
16  officer is not listed.
17      I guess you can get a listing from the
18  City Clerk's office.
19      Q.   In your budget, sir, does your budget
20  include the names and positions of your staff?
21      A.   No; it lists positions.
22      Q.   But to save some time, sir, were going
23  to move on and try to get that from another
24  source; thank you. The City Clerk's would have it

23

1  and its on your Website.
2      Any other -- would you have a listing,
3  sir?
4      A.   Yes.
5      Q.   A listing of all staff?
6      A.   A listing of all of the police officers
7  and reserve officers.
8      Q.   Does your list also provide the
9  information by race and gender?
10      A.   No; the list I keep goes by seniority.
11      Q.   Who would maintain a list by race and
12  gender?
13      A.   The bookkeeper.
14      Q.   Is that the bookkeeper for the Police
15  Department or the bookkeeper for the City?
16      A.   No; the bookkeeper for the Police
17  Department who works under the supervision of
18  Ms. Lane in Budget and Fiscal Control but any
19  request would have to go through me because I am
20  the keeper of the records by statute for the
21  Holyoke Police Department.
22      Q.   Sir, are you aware of any -- are you
23  aware of what the Equal Employment Opportunity
24  Commission is?

24

1      A.   MCAD?
2      Q.   No, sir, the federal Equal Employment
3  Opportunity Commission?
4      A.   Yes.
5      Q.   They administer federal discrimination
6  laws?
7      A.   Yes.
8      Q.   And the MCAD?
9      A.   That's Massachusetts Commission Against
10  Discrimination.
11      Q.   Administers the state anti-
12  discrimination law and employment law?
13      A.   Yes.
14      Q.   Sir, are you aware of anyone who has
15  filed any equal opportunity claims during your
16  tenure against the Holyoke Police Department?
17      A.   Yes.
18      Q.   Who has filed employment discrimination
19  claims?
20      A.   Sergeant Garcia -- Joseph Garcia filed a
21  complaint with MCAD.
22      Q.   Do you recall what was the basis of his
23  complaint?
24      A.   Promotion.

**TAMMY WALKER VS. CITY OF HOLYOKE**
**ANTHONY SCOTT          SEPTEMBER 11, 2006**

25

1    Q.    Was it based on race or gender?

2    A.    Yes.

3    Q.    Which one?

4    A.    Race.

5    Q.    Anyone else file a complaint other than

6 the Plaintiff Tammy Walker and Mr. Garcia?

7    A.    That's the only ones that I'm familiar

8 with.

9    Q.    Do you know Jorge Rodriguez?

10    A.    Yes; that was before I became chief,

11 anything to do with Rodriguez.

12    Q.    But you're aware of his complaint?

13    A.    I'm not totally aware of his complaint.

14 I know he did file a complaint. What it was

15 about, I don't have the slightest idea. That was

16 before my time.

17    Q.    Are you sure you don't have any -- well,

18 sir, just to refresh your recollection, do you

19 recall signing an affirmation in Ms. Walker's case

20 while it was pending at the MCAD affirming,

21 basically, that the position statement was true

22 and correct?

23    A.    For her MCAD complaint?

24    Q.    Yes.

26

1    A.    I did sign an affidavit I believe.

2    Q.    Do you recall whether or not there was

3 an affidavit from Mr. Jorge Rodriguez in that

4 filing?

5    A.    No; I don't.  I don't remember.

6    Q.    What year was it, sir, that you said you

7 became chief?

8    A.    May 21st, 2001.

9 MR. HUDSON:          Sir, I'm going to show

10 you a copy -- let's mark this one.    I'd like to

11 have this marked as Exhibit 2, the affidavit of

12 Mr. Rodriguez.

13          (Plaintiffs Deposition Exhibit
          No. 2 offered and marked.)

14

15    Q.    (BY MR. HUDSON) Sir, if you'd take a

16 moment to look at that. (Indicating.)

17    A.    (Witness examining document.) Okay.

18    Q.    Sir, I draw your attention to Exhibit 2

19 and paragraph four where Mr. Rodriguez writes that

20 "on or about November 13th, 2002 Lieutenant

21 Fournier distributed a questionnaire to officers

22 regarding Sergeant Tammy Walker's allegations of

23 harassment."    Do you see that, sir?

24    A.    Yes.

27

1    Q.    So that would have occurred after the

2 beginning of your employment?

3    A.    Yes, sir; but you asked me about MCAD

4 complaints or discrimination complaints filed by

5 Mr. Rodriguez.

6 Q.        Yes.

7    A.    There was no complaint of discrimination

8 to the MCAD or to the feds filed by Mr. Rodriguez

9 while I was chief. This doesn't say that.

10    Q.    To your knowledge, sir, has

11 Mr. Rodriguez filed any complaint alleging

12 retaliation against him for having given -- having

13 provided information in support of Ms. Walker's

14 allegations of gender and race discrimination?

15    A.    Yes; he filed a complaint with the

16 Police Department in 2003.

17    Q.    So he filed an internal complaint?

18    A.    An internal complaint.   He filed

19 nothing, as far as my knowledge, nothing with the

20 MCAD, nothing with the Justice Department. He

21 filed a complaint with the Holyoke Police

22 Department.

23    Q.    Alleging retaliation?

24    A.    Alleging retaliation.   That's what he

28

1 said here.

2    Q.    For giving information in Ms. Tammy

3 Walker's --

4    A.    (Interposing) That's what he said here.

5    Q.    And "here" you're referring to?

6    A.    I'm referring to HPD Form 6.20 revised

7 08 of '01 dated 5/15/03.

8          This is an internal complaint form.

9 This is not a form that's submitted to the MCAD or

10 to the U.S. Justice Department so my answer was

11 true and accurate.

12    Q.    Thank you, sir.

13    A.    You're welcome

14    Q.    We would like to further identify the

15 form as bearing a Bates Stamp number 0466 which is

16 a composite to Plaintiff's Exhibit Number 2, I

17 believe?

18    A.    Yes.

19    Q.    Thank you. Sir, when did Sergeant

20 Garcia file an MCAD complaint?

21    A.    I don't remember the date when he filed

22 it.

23    Q.    Have you received a copy of it?

24    A.    The City received a copy and it went

**PERLIK and COYLE REPORTING**

before the MCAD and it was dismissed by the MCAD.

Q. Did you participate in filing or position statement, a response to his complaint?

A. Yes.

Q. You saw a copy before it was dismissed?

A. Yes.

Q. Would you have a record?

A. The City Solicitor would have that information.

Q. Do you recall what year Mr. Garcia filed his MCAD complaint?

A. Don't hold me to this but I believe it was 2005, but I'm sure if you contact the City Solicitor's office, they'll supply you all of the copies.

MS. LYNCH: Actually any requests should go through me, not the City Solicitor's office.

THE WITNESS: I'm sorry.

MS. LYNCH: That's okay.

MR. HUDSON: I think we've already made some requests through your counsel.

Q. (BY MR. HUDSON) Sir, before you became chief, are you -- let me back up.

---

**30**

Are there any other complaints that you are aware of that were filed with the MCAD or the EEOC other than Joseph Garcia and Ms. Tammy Walker's?

A. None that I'm aware of.

Q. Are you aware of any other internal complaints alleging race or gender or disability discrimination filed?

A. No; I'm not.

Q. Have you had the opportunity to participate in any settlements of EEOC or MCAD complaints -- employment discrimination complaints -- since you have been chief?

A. No. I don't recall any -- participating in any settlements.

Q. Are you aware of any whistleblower claims involving the Holyoke Police Department filed in court or with any governmental agency during your tenure?

A. Yes.

Q. What whistleblower?

A. No; not during my tenure.

Q. What about before your employment?

A. Yes.

---

1    Q.    Which ones are you aware of, sir? Which
2  whistleblower complaints are you aware of?
3    A.    Sergeant Robert Wagner.
4    Q.    Is he a former employee or a current
5  employee?
6    A.    Former.
7    Q.    How is it that you've become aware of
8  his whistleblower complaint?
9    A.    Because it was ongoing -- I think it
10  started in 1995 and finally it was heard by the
11  federal court sometime in 2004 or 2003.
12    Q.    Do you have any information as to the
13  outcome of that case?
14        Did Mr. Wagner win or did the Holyoke
15  Police Department prevail -- the City?
16    A.    The courts gave him a dollar -- at least
17  not the Court, the jury awarded him one dollar.
18    Q.    So the jury found in his favor but found
19  only one dollar worth of damages?
20    A.    On I think one issue out of the myriad
21  of issues that was there.
22        It was so entangled and involved I
23  couldn't tell you on what issue it was. All I
24  know is that they awarded him one dollar.

---

**32**

1    Q.    Are you familiar with a former sergeant
2  named Gary Bennett?
3    A.    Gone before I came.
4    Q.    Are you familiar with the fact that he
5  filed a whistleblower complaint?
6    A.    Him and Sergeant Wagner together.
7    Q.    Do you know whether or not Mr. Bennett
8  received any --
9    A.    (Interposing) I haven't the slightest
10  idea.
11    Q.    Isn't it true that Mr. Bennett was
12  awarded a hundred thirty-one thousand dollars in
13  damages plus interests and attorney's fees?
14    A.    That you would have to get from the City
15  Solicitor or Ms. Lynch -- Attorney Lynch.
16        As I told you, that was handled I
17  believe before I came on. It wasn't handled
18  through my office.
19    Q.    So your office never was responsible in
20  any way in seeing that a judgment was paid to
21  Mr. Bennett?
22    A.    No.
23    Q.    Do you know a Eagen E-A-G-E-N?
24    A.    I know there is a Billy Eagen who was on

Case 3:05-cv-30074-MAP Document 61-5 Filed 06/01/2007 Page 11 of 50

11

TAMMY WALKER vs. CITY OF HOLYOKE
ANTHONY SCOTT                    SEPTEMBER 11, 2006

---

**33**

1 the Department and there's a Dennis Eagen who is
2 on the Department.   If you're talking about either
3 one of them, I don't know.

4    Q.    Do you know whether Jorge Rodriguez ever
5 gave any information concerning either one of the
6 Eagens?

7    A.    Gave it to who?

8          MS. LYNCH: Would you mind going
9 back to the original question about Eagen?

10          (Reporter read back as
            requested.)

11
12          MR. HUDSON:   I'd like to show that
13 Ms. Walker is leaving at approximately
14 eleven-fifteen.

15    Q.    (BY MR. HUDSON) Sir, do you know
16 whether or not an Eagen was ever a participant in
17 a whistleblower claim involving the Holyoke Police
18 Department?

19    A.    In Mr. Wagner's complaint he listed
20 several police officers and I believe that Dennis
21 Eagen, who is now retired, was named.

22          Once again, sir, this all began back in,
23 I believe, 1995.   I came on as Chief in May in
24 2001 and I think it went to trial, as I told you,

---

**34**

1 sometime in 2003 or 2004.

2    Q.    Thank you; I understand.   I appreciate
3 the clarification, sir.

4          Its your testimony, sir, as I recall --
5 it is your testimony that the only EEOC claims
6 that you are aware of during your tenure is that
7 of -- EEOC, MCAD -- is Joseph Garcia and the
8 present complaint, Ms. Tammy Walker's?

9    A.    That's it.

10    Q.    And the only internal complaint alleging
11 employment discrimination is that of Jorge
12 Rodriguez?

13    A.    He wasn't alleging employment
14 discrimination.

15    Q.    Retaliation?

16    A.    Yes.

17    Q.    Retaliation for having provided
18 information in connection with Ms. Walker's
19 employment discrimination case?

20    A.    That's what he was alleging.

21          MS. LYNCH:   I'm just going to object
22 for the record but you can go ahead and answer.

23          THE WITNESS: That's what he was
24 alleging.

---

**35**

1    Q.    (BY MR. HUDSON) Mr. Rodriguez?

2    A.    Mr. Rodriguez.

3    Q.    And Mr. Jorge Rodriguez -- that's
4 spelled J-O-R-G-E?

5    A.    Yes.

6    Q.    Rodriguez -- R-O-D-R-I-G-U-E-Z?

7    A.    Yes; he is -- I think he got a
8 disability.   He got hit by a car.

9    Q.    But he is not complaining disability
10 discrimination, is he?

11    A.    No; I'm saying he is no longer in the
12 Department. He got hit by a car and took a
13 disability retirement.

14    Q.    Thank you for that clarification.   Sir,
15 now with regard to record keeping, as far as
16 personnel files, are those maintained by you as
17 i
18 personnel?

19    A.    If it's Police Department records -- I
20 mean a Police Department personnel file, I'm the
21 keeper of those records but I have authorized them
22 to be locked up in the Internal Affairs Division.

23          They maintain those records for me.
24 They are kept under lock and key.

---

**36**

1    Q.    But you are the official custodian, is
2 that correct?

3    A.    Yes; by contract and by statute I can
4 designate someone so I designated those two
5 individuals and I moved the records out of my
6 office into their office.

7    Q.    Sir, what was your first contact with
8 the Plaintiff, Tammy Walker?

9    A.    When I became chief -- it wasn't a
10 face-to face contact.

11          It's when I became aware of her, is that
12 what you're looking for her.

13    Q.    Yes; how is it that you came to know
14 Ms. Walker?

15    A.    When I took over the Police Department
16 in May, shortly after I took over -- I'm going to
17 say within a couple of weeks -- the assistant, the
18 special agent in charge of the DEA -- Drug
19 Enforcement Administration -- came to see me and
20 asked me please to take her out of that unit.

21    Q.    Did you take her out of the unit?

22    A.    Well, I asked why because I didn't know
23 anybody on the Department as of yet and they said
24 that Ms. Walker was causing a problem, they didn't

---

1 trust her, wasn't productive, and they wanted her
2 out.
3        Q.    But you didn't have any firsthand
4 knowledge, yourself?
5        A.    No.
6        Q.    This was just a report -- a verbal
7 report, was it?
8        A.    A request; yes.
9        Q.    A verbal request from?
10       A.    The agent in charge of the Drug
11 Enforcement Administration out of Springfield, the
12 Springfield office.
13             Each department has an individual detail
14 to the DEA as the Drug Enforcement Task Force.
15       Q.    That's the federal?
16       A.    Yes.
17       Q.    Was Ms. Walker the --
18       A.    (Interposing) She was the individual who
19 was detailed there prior to me becoming chief.
20       Q.    Did you investigate the matter?
21       A.    I honored their request.
22       Q.    Without any investigation?
23       A.    No; I'm going to -- I don't investigate
24 those type of personnel matters.

1        Q.    A request?
2        A.    By the federal agency.
3        Q.    A verbal request?
4        A.    Yes; and I've done that several times
5 since I've been here.
6        Q.    But they didn't provide any specific
7 cases or data, did they?
8        A.    No; and I didn't think they had to.
9        Q.    In other words, there were no specific
10 indications or data that they specifically pointed
11 to where alleging Ms. Walker was not doing her
12 job? Was there a specific case or
13 investigation --
14       A.    (Interposing) I relied on the supervisor
15 of that task force, his judgment.
16             They came to me, they made a request. I
17 honored that request.
18       Q.    I understand your response, sir. I'm
19 just trying to clarify that even though you
20 honored the request because the request was made,
21 the supervisor or the DEA person who made the
22 request did not provide you with any specific
23 facts, case data?
24       A.    I don't recall what they provided me. I

38

1             When a federal agent outside of the
2 Department comes to me and said that they don't
3 want somebody assigned to their office, I grant
4 that request and I give the federal agencies --
5 outside agencies -- their choice, their say in the
6 selection of who is to come to work for them
7 because they have to get along with the people
8 that's there. I honored the request.
9             Under the contract, assignments are my
10 prerogative.
11       Q.    Which contracts are you referring to?
12       A.    I'm referring to the unit contracts.
13 Its a management right; assignments is a
14 management right so I have the right to assign
15 anyone to anyplace.
16       Q.    But the fact -- but it is your
17 testimony, is it not, sir, that you did not have
18 any firsthand knowledge that Ms. Walker was or was
19 not doing any of the things that the DEA agent
20 said?
21       A.    No.
22       Q.    You just acted basically just on what
23 they reported?
24       A.    I acted upon a request.

40

1 know that they did make a request and I honored
2 the request.
3             That was the first I ever heard of
4 Ms. Walker.
5        Q.    But the request was verbal?
6        A.    Yes; it was verbal. There was nothing
7 in writing.
8        Q.    Thank you.
9        A.    And every time they make a request of
10 me -- the FBI task force, the DEA task force, the
11 state police task force -- any time they make a
12 request to me, it's verbal.
13       Q.    Thank you, sir. Now when you were
14 employed -- excuse me, when Ms. Walker was
15 employed by the Holyoke Police Department under
16 your watch, under your command --
17       A.    (Interposing) No; she wasn't employed
18 under me. She was on the Department long before I
19 came, she was employed.
20       Q.    I understand. Sir, let me rephrase the
21 question.
22             During Ms. Walker's employment while you
23 were in command, what was her job title?
24       A.    Police officer.

Q. Did she ever have the position of sergeant while you were in charge?

A. Yes; the Mayor promoted her to sergeant, over my objection.

Q. Isn't it true that Ms. Walker was promoted to sergeant because of a prior Civil Service settlement?

A. No.

Q. Do you know that Ms. Walker was bypassed for a promotion to sergeant?

A. Yes.

Q. Are you aware that she had filed a prior MCAD complaint?

A. I don't know about an MCAD complaint. I know she filed a complaint with the Department of Civil Service.

Q. As a result of that Civil Service complaint -- do you recall what Ms. Walker complained about with Civil Service?

A. That she was bypassed on the list and the settlement was that she would be placed at the top of the list. It didn't guarantee her a position. Civil Service cannot make you promote someone.

42

Q. But in fact she was bypassed by Joseph Garcia, is that correct?

A. No; Joseph Garcia did not have the authority to bypass her.

Q. The appointing authority?

A. Was Mayor Daniel Szostkiewicz.

Q. And he appointed someone else to sergeant, correct?

A. That was before I became chief but I think he appointed two people ahead of her because he could bypass on the list. The Mayor has the ability to bypass an individual on the list.

Why they bypassed her, I have no knowledge. All I remember, sir, is that there was something with Civil Service or something filed with Civil Service and she was placed at the top of the next list.

Q. In any event, that was pursuant to a settlement, is that your understanding?

A. The settlement from my understanding is that she was to be placed at the top of the next list.

Q. And that settlement would have involved the Mayor's office?

A. The Mayor and the City Solicitor.

2    Q. It was also, as part of that settlement,
3 Ms. Walker was to receive a retroactive seniority
4 date?

5    A. Yes; but there was some error in the
6 calculation by Civil Service but she was supposed
7 to receive -- I don't know if she was supposed to
8 receive -- I don't know if that was part of the
9 settlement but I know she did get a retroactive
10 seniority.

11    Q. How do you know, sir, that it was an
12 error in the calculations by Civil Service?

13    A. Because the dates that were given were
14 wrong.

15       The dates that Ms. Walker gave Civil
16 Service was the date of the test instead of the
17 date of promotion so there was some error in that
18 and there was litigation back and forth and a
19 decision was made and I think she ended up being
20 senior to Sergeant Garcia.

21    Q. She also ended up being senior to
22 Sergeant Monaghan, is that correct? Do you know
23 Mr. Monaghan?

24    A. Mr. Monaghan wasn't promoted until after

44

1 Sergeant Walker so the Civil Service agreement had
2 nothing to do with Sergeant Monaghan; it was
3 Sergeant Garcia, Sergeant McCoy and I think
4 Sergeant Pratt. Sergeant Pratt and Sergeant McCoy
5 are now lieutenants.

6       I didn't think it had anything to do
7 with Sergeant Monaghan. Sergeant Monaghan was
8 promoted way after Ms. Walker was promoted to
9 sergeant so Civil Service had nothing to do with
10 that.

11       She was promoted and several months
12 later, a year later, he was promoted so it had
13 nothing to do with any settlement of Civil
14 Service.

15    Q. The fact of the matter was she was
16 senior to Mr. Monaghan?

17    A. Yes.

18    Q. Thank you. Sir, how do you know that
19 Ms. Walker provided an incorrect date?

20    A. Because this matter was still going on
21 when I became chief and I had to go back and
22 research and write letters to Civil Service and
23 trying to get Civil Service to come out with
24 something affirmative.

45

1        I don't think it was until I was here
2   that Civil Service finally sent the letter
3   clearing this matter up. That's how I know so
4   much about it.
5            MR. HUDSON: Well sir, I show you a
6   document. We'd like to have this marked as
7   Exhibit 3.
8            (Plaintiff's Deposition Exhibit
                 No. 3 offered and marked.)
9
10       Q.   (BY MR. HUDSON) If you would take a
11  moment to look at that. (Indicating.)
12       A.   (Witness examining document.) The
13  document that's Bate-stamped 000348 was a document
14  that I went back and forth with Civil Service to
15  finally get and if you notice, that's May 9th of
16  2002. That's a year after I became the Chief of
17  Police.
18       I had to go back and deal with the
19  problems that Civil Service had created when it
20  came down to the seniority and that wasn't -- it
21  had nothing to do with Sergeant Monaghan but it
22  had to do with Sergeant Garcia, Sergeant Michael
23  McCoy and Sergeant David Pratt.
24       Q.   Sir, first of all I want to draw your

46

1   attention to the Exhibit 3 settlement agreement.
2   Do you recognize this, sir?
3       A.   Yes; this was before I became chief.
4       Q.   But you had a chance -- have you seen
5   this document before?
6       A.   Yes.
7       Q.   Sir, Exhibit 3, is that the settlement
8   agreement in the Civil Service bypass appeal for
9   Ms. Walker?
10      A.   Yes; it says settlement agreement but --
11  its signed, I think, by the City Solicitor.
12      Q.   That's right, sir.  With regard to this
13  exhibit, Ms. Walker at the very beginning, it
14  states, "Whereas the appellant Tammy Walker was
15  bypassed for promotion to sergeant on June 9th,
16  1999."
17      Let me stop right there.        Sir, do you
18  see that?
19      A.   Yes.
20      Q.   That's on Exhibit 3. Then also in
21  paragraph two at the bottom of the Exhibit 3 with
22  the Bate Stamp 346, would you read that, sir?
23      A.   It says, "In the event the appellant is
24  appointed to the rank of sergeant within the

47

1   Holyoke Police Department, the appellant's
2   effective date of appointment for the purposes of
3   determining actual service time as sergeant shall
4   be adjusted to the date of her original bypass,
5   June 9th, 1999."
6       Q.   And on the following page, 347, you
7   see -- do you recognize the signatures there?
8       A.   I believe that is Sergeant Walker's
9   signature.   Whoever the City Solicitor is, I
10  haven't the slightest idea.
11      The City Solicitor: okay.   So basically
12  the City was represented by an attorney in this
13  f
14  your knowledge?
15      A.   To the best of my knowledge.
16      Q.   Thank you, sir.   Do you recall now that
17  it was in May, now, that Ms. Walker actually
18  received her appointment as sergeant -- May of
19  2002?
20      A.   May 5th, 2002.
21      Q.   That appointment was by the Mayor, is
22  that correct?
23      A.   By Mayor Michael 3. Sullivan, he's the
24  appointing authority for the City.

48

1       Q.   Wasn't that after an interview with both
2   the Mayor, the City Solicitor, and you?
3       A.   Yes.
4       Q.   An interview of Ms. Walker?
5       A.   Yes; and not only of Ms. Walker but I
6   think the first five people on the list.
7       At that meeting I opposed Sergeant
8   Walker being promoted -- and that opposition had
9   nothing to do with race.
10          MS. LYNCH: Okay; you've answered
11  the question.
12      Q.   (BY MR. HUDSON) During Ms. Walker's
13  employment under your command, sir, did she ever
14  seek any other promotion or transfer?
15      A.   I don't know if she sought to take
16  promotional exams. That's not handled by the
17  Police Department. Transfers, yes.
18      Q.   Did Ms. Walker seek a transfer?
19      A.   Yes.
20      Q.   What transfers did Ms. Walker seek?
21      A.   She wanted to be moved from the third
22  watch to the second watch.
23      Q.   Did you approve that?
24      A.   No.                                        1

TAMMY WALKER vs. CITY OF HOLYOKE
ANTHONY SCOTT          SEPTEMBER 11, 2006

49

1    Q.    When was this?
2    A.    I don't remember the exact dates but it
3  would have been a violation of the contract.
4    Q.    Didn't you testify earlier that you have
5  the authority to make assignments?
6    A.    I can make any assignments but I cannot
7  violate the contract.
8           The contract has in it a seniority
9  clause that to move from one watch to another
10 watch, you have to have seniority, but I can move
11 you anywhere on that watch and I don't have to
12 worry about anybody else because I have that
13 authority.
14          To move her from the third watch to the
15 second watch I had to violate seniority and I
16 could not violate the contract.
17   Q.    Thank you, sir. During your command,
18 sir, did you ever conduct any evaluations of
19 Ms. Walker?
20   A.    No; I'm not permitted by contract. We
21 have no job evaluations by contract. The only
22 person on the Holyoke Police Department who has a
23 job evaluation is me.
24   Q.    By that I guess we're referring to like

50

1  a performance review?
2    A.    Yes.
3    Q.    Ms. Walker nor the police officers --
4    A.    (Interposing) No police officer,
5  supervisor, no police officer has a job
6  evaluation, an employment evaluation or
7  performance evaluation based on contract.
8    Q.    Did you ever have the occasion to take
9  any disciplinary action against Ms. Walker?
10   A.    Oh, yes.
11   Q.    What was the first occasion that you
12 recall?
13   A.    I'd have to see her disciplinary record.
14   Q.    Do you recall any disciplinary action at
15 all that you took against Ms. Walker?
16   A.    Yes; it would have began with documented
17 verbal reprimands.
18   Q.    For what, sir?
19   A.    I don't recall but that's how it would
20 have begun because we have progressive discipline,
21 then written reprimands, then suspensions.
22   Q.    But you don't recall any particular
23 actions?
24   A.    Oh, I recall her being late for court; I

51

1  recall her not following orders; I recall her
2  failing to take proper report; I recall her being
3  untruthful on many occasions; I recall her
4  threatening a supervisor.
5           The most egregious, I believe, was her
6  failure to document a report of a suspicious
7  behavior of an individual of Middle Eastern
8  descent taking photographs of the Mall -- not of
9  the people in the Mall but of the Mall structure
10 after 9/11 when we had been trained to take those
11 matters seriously.
12          She did not take a report nor get the
13 name of the complainant nor follow up with the
14 complainant nor report it to the representative of
15 the JTTF -- the joint -- Federal Joint Terrorism
16 Task Force.
17   Q.    Sir, isn't it true that Ms. Walker did
18 supply a written report regarding this matter that
19 you were just talking about?
20   A.    Ms. Walker only did a report of this
21 incident after we found out about it and she had
22 to be ordered -- she went back and made up a
23 report because she didn't get the name of the lady
24 who called -- and I get upset about this.

52

1  Whenever I think about it, it upsets me, okay?
2           She didn't get the name of the lady who
3  called, didn't take the time -- she thought it was
4  funny.  She didn't get a date of birth, a
5  telephone number, a description of anything the
6  lady saw. She laughed it off.    She laughed it
7  off.
8           She thought it was funny and didn't take
9  a report until she was ordered to write a report
10 and then when she did, she wrote a report
11 consisting of five lines -- five lines.
12   Q.    Sir, what discipline did you impose?
13   A.    I suspended her for five days and I
14 asked the Mayor to fire her. That's because I can
15 only suspend for five days.
16   Q.    What action if any did the Mayor take at
17 that point?
18   A.    I don't know.  I don't remember exactly
19 what the Mayor did but I can tell you what he
20 didn't do -- he didn't fire her.
21          I think she jeopardized the lives of the
22 citizens of Holyoke for what she did.    Excuse me,
23 I'm sorry.  I apologize to both you and --
24 MR. HUDSON:              (Interposing) Would you

---

**53**

1 like to take a break, sir?

2          THE WITNESS: Yes.

3          (A recess was taken.)

4    Q.    (BY MR. HUDSON) Sir, with regard to
5 these -- with regard to the various incidents that
6 you testified that Ms. Walker was disciplined for,
7 you don't have any specific dates?

8    A.    No; she was given a letter on each date,
9 each suspension and an outline of what the
10 suspensions were for and I didn't bring copies
11 with me.

12 MR. HUDSON:          Sir, do you recall
13 receiving -- can I have this document marked?

14          See if these will help refresh your
15 recollection here.   Let's mark this Exhibit 4,
16 please.

17          (Plaintiff's Deposition Exhibit
              No. 4 offered and marked.)

18

19    Q.    (BY MR. HUDSON) If you could take a
20 moment and look at that? (Indicating.)

21    A.    (Witness examining document.) Oh, yes.
22 This is to do -- I'm just reading the first page,
23 this is to do with the incident at the Elizer's --
24 that's a pub.

---

**54**

1    Q.    First of all, sir, let me -- I draw your
2 attention to the -- do you recognize this
3 document?

4    A.    This was sent to my office; yes, by
5 Sapirstein & Sapirstein.

6    Q.    Do you recall them being Ms. Walker's
7 previous attorneys?

8    A.    Yes.

9    Q.    In what came to be her federal court
10 case?

11    A.    Yes.

12    Q.    U.S. District Court?

13    A.    Yes.

14    Q.    Against the City of Holyoke?

15    A.    Against the City of Holyoke and the
16 Holyoke Police Department.

17    Q.    Now sir, I draw your attention to the
18 second paragraph on page one of Exhibit 4.

19    A.    Mmm-hmm.

20    Q.    Is it true that Ms. Walker reported that
21 there was several officers who. had refused to
22 leave a pub after closing?

23    A.    Yes; she reported it.

24    Q.    And she reported it to whom?

---

**55**

1    A.    She reported it first to her lieutenant.

2    Q.    That would have been her supervisor?

3    A.    Yes; then she came up and reported it to
4 me.

5    Q.    Is it true also, sir, that in or around
6 August of 2003 you issued a written reprimand to
7 Sergeant Walker?

8    A.    Yes.

9    Q.    In that written reprimand you indicated
10 that Sergeant Walker had been insubordinate when
11 she filed her written report of the alleged
12 illegal activity?

13    A.    No. Would you care for me to tell you
14 how it happened -- as it would be said on the
15 radio, to give you the rest of the story that's
16 ∎

17    Q.    Did you give Ms. Walker a written
18 reprimand?

19    A.    Yes.

20    Q.    Concerning her report?

21    A.    No.

22    Q.    Involving her report of officers
23 drinking after hours?

24    A.    No.

---

**56**

1    Q.    Then what happened, sir?

2    A.    Thank you.  Ms. Walker reported that
3 some officers were in a bar after the closing.
4 She reported it to her supervisor, Lieutenant
5 Whelihan.

6          Lieutenant Whelihan called all of the
7 individuals in and he chewed their butts.   He
8 disciplined them, he gave them all verbal
9 reprimands, he spoke to every one of them.

10          Sergeant Walker came up to my office and
11 told me that she reported this and nobody did
12 anything.   She said she reported it to her
13 lieutenant, he didn't do anything.   She reported
14 it to her captain and he didn't do anything.
15 That's what she came to my office and told me.
16 Subsequently I called in the captain.             I
17 said did you talk to Sergeant Walker about this
18 incident at the bar.   He said yes; not only did I
19 talk to her and the Lieutenant talked to her and
20 the Lieutenant told her what he was going to do.
21 Captain Fletcher told her to write a report and
22 give it to me -- give it to him as the captain.   I
23 said okay.

24          I think the next day or a couple of days

1 later Sergeant Walker comes up and gives me a
2 report. I said what is this? She said, "This is
3 my report of the incident." So I took the report
4 and I in turn called Captain Fletcher. I said,
5 "What's this?" He said, "That's a report from
6 Sergeant Walker." I said, "But why is she giving
7 it to me?" "I told her to write a report and give
8 it to me and I was going to look into it
9 further" -- Captain Fletcher told her this.
10          So I in turn conducted an investigation
11 into the matter. I took statements from everyone
12 involved.
13          I also contacted the state's Alcohol and
14 Beverage Control Board to ascertain what was the
15 statute or the policies regarding an individual
16 purchasing some alcohol about ten minutes before
17 closing, what would be done. I was advised by the
18 chief investigator that they're given about thirty
19 minutes to finish that, even after the bar closes
20 but they couldn't buy anything else.
21          I in turn issued discipline to everyone
22 who was in that bar and I issued discipline to
23 Sergeant Walker for not obeying orders. She was
24 told to write a report and give it to the captain.

58
1 She didn't do that. She wrote a report and gave
2 it to me and bypassed her captain, bypassing the
3 chain of command.
4          That's why she was disciplined --
5 because she didn't follow orders; not because she
6 wrote a report, not because she reported the
7 incident, because she plain and simple didn't
8 follow orders.
9          I disciplined everybody who was involved
10 and actually there was no violation of any state
11 statute, there was no violation of any city
12 ordinance.
13     Q.   Now sir, when you say you disciplined
14 everyone involved, what kind of discipline?
15     A.   I gave Sergeant Walker I think a written
16 reprimand. I gave Sergeant Monaghan a written
17 reprimand.
18          I gave all of the police officers who
19 were there all written reprimands except for one
20 reserve officer who I suspended from working any
21 tours of duty for thirty days.
22     Q.   But it is true that Sergeant Walker did
23 report to you and her supervisor that several
24 members of the Holyoke Department had refused to

1 leave a pub after closing?
2     A.   She reported that; yes. She reported it
3 to her supervisor and then she came right up to my
4 office after reporting it to two of her
5 supervisors -- a lieutenant and captain -- that
6 she bypassed them and came directly up to me.
7          She was not disciplined for reporting
8 it. Even the captain told her to write a report
9 on it.
10     Q.   But the fact -- but you gave her
11 discipline because she actually gave you a written
12 report?
13     A.   No; I disciplined her -- despite what
14 Ms. Walker says -- or Ms. Sapirstein says in this
15 letter and I'm not going to let you put words in
16 my mouth.
17          I issued her discipline for not
18 following the chain of command and following an
19 order that was given to her. That's the only
20 reason I disciplined her.
21     Q.   And that was after she had complained to
22 you, the captain and the lieutenant about what she
23 perceived to be illegal activity of four officers
24 drinking after hours, is that correct?

60
1     A.   No; its not correct.
2     Q.   You did not discipline her for failing
3 to follow the orders and chain of command after
4 she filed a written report with you and made
5 verbal reports to her lieutenant and captain about
6 the four officers drinking after hours at the pub?
7     A.   No, sir; I did not. I gave you in great
8 detail why I disciplined Sergeant Walker.
9     Q.   Sir, do you recall that -- I want to
10 draw your attention --
11     A.   (Interposing) I have to take this,
12 excuse me.
13          MR. HUDSON: Let's take a break.
14          (A recess was taken.)
15     Q.   (BY MR. HUDSON) I draw your attention
16 to the second page.
17          Sir, do you recall that in or around
18 April, 2004 you suspended Sergeant Walker from
19 work for one day?
20     A.   Yes.
21     Q.   For appearing fifteen minutes late for
22 court?
23     A.   Yes; am I permitted to explain that?
24     Q.   Well, yes, you may but let me just ask

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT          SEPTEMBER 11, 2006

61

1 you a couple of questions before you explain.

2     A.    Go right ahead.

3     Q.    Were there any other officers who were

4 late for court?

5     A.    That day?

6     Q.    That day or any other day during your

7 tenure?

8     A.    Yes; and I disciplined every one of

9 them.

10     Q.    What other officers did you --

11     A.    (Interposing) I don't remember but there

12 was six officers that I disciplined that day and

13 if I'm permitted I can explain my actions.

14     Q.    Sir, let me just ask the questions,

15 please.

16          You gave her a written -- you gave

17 Ms. Walker a written notice of suspension, is that

18 correct?

19     A.    Yes.

20     Q.    In that written notice, did you state in

21 any way that that suspension was in any way

22 related to the previous written reprimand for

23 insubordination, if you recall?

24     A.    In every suspension that I issue I put

62

1 past discipline that was taken.

2     Q.    So in fact you did, in April -- on or

3 about April of 2004 reference the insubordination

4 of not following orders of Ms. Walker?

5     A.    Yes; every person on the job, I put in

6 background on every suspension that I issue -- not

7 suspension -- on any disciplinary action that I

8 take I put background information in -- past

9 disciplinary records.

10     Q.    Do you recall -- I draw your attention

11 to paragraph two on page two of Exhibit 4.

12          Do you recall, sir, whether Ms. Walker

13 ever made a report that officers that were

14 subordinate to her were ignoring her while they

15 were performing their duties and verbally

16 assaulting her?

17     A.    May I speak with my attorney for a

18 minute, please?

19     Q.    Why don't you answer the question and

20 then you can speak with your attorney?

21          MS. LYNCH: Can you answer the

22 question without speaking to me?

23          THE WITNESS: No.

24          MR. HUDSON:    Unless it's privileged

63

1 then the witness should answer.   Otherwise counsel

2 should not direct the witness as to his answer.

3          Again, if its a matter of

4 attorney-client privilege or statutory privilege

5 the witness should proceed with answering the

6 question and then he may consult with counsel.

7          MS. LYNCH:    Well, I guess I have no

8 way of knowing if that's what it is without

9 talking to him.

10          MR. HUDSON: The question, there is

11 nothing in this question that's asking -- that I

12 see as --

13 THE WITNESS:          (Interposing) I can

14 answer this question, sir, if I'm permitted to

15 actually answer the question because what

16 Ms. Sapirstein has put in here is not based

17 entirely on facts.

18          This is a compilation of whatever that

19 was put into this letter so you're referring --

20 this is a letter -- this is not an affidavit or

21 anything else. This is a letter that was sent by

22 Mrs. Sapirstein to myself, the Mayor, and the

23 entire City Council.   This is a letter.  This is

24 not a statement of facts.

64

1          I'm trying to answer your question but

2 I'm also trying to give you the real answer to

3 your question and I can't answer it yes or no so

4 if you want a yes or no answer, I can't give you

5 any answer at all.

6          MR. HUDSON:    Let's first of all,

7 would you repeat my question, please?

8          (Reporter read back as

requested.)

9

10     Q.    (BY MR. HUDSON) Sir, did she file a

11 written complaint or report that subordinate

12 co-workers --

13     A.         (Interposing) Ms. Walker filed several

14 complaints --

15     Q.    (Interposing) Let me finish, please.

16 I'm going to tie it directly here and I'll preface

17 it by saying, sir, I'm also trying to pin down the

18 approximate dates.

19          In or around September of 2004 did

20 Ms. Walker file a written complaint with her

21 supervisor that a subordinate co-worker was

22 ignoring her while performing duties and ignoring

23 her?  Did she file anything?

24     A.         She filed a complaint. The exact date

1 I'm not sure but she filed a complaint.

2     Q.   Did she file a complaint on or about
3 September, 2004 that she feared for her own safety
4 and safety of others as a result of the
5 subordinate's conduct?

6     A.   She filed a complaint.

7     Q.   Do you know what subordinates she was
8 complaining of?

9     A.   At this particular point in time, no, I
10 don't.

11         MS. LYNCH: By the way, did you
12 still want to speak with me or not?

13         THE WITNESS: No; it's not
14 necessary.

15     Q.   (BY MR. HUDSON) Is it true that
16 approximately two weeks or less than two weeks
17 after filing the complaint referenced in paragraph
18 two, Mayor Sullivan increased a five-day
19 suspension issued to Sergeant Walker?

20     A.   I'm not sure.

21     Q.   Do you recall giving Ms. Walker a
22 ten-day suspension?

23     A.   I can't give her a ten-day suspension.
24 By statute I can only give her five.

66

1     Q.   So did you give her five days and do you
2 recall whether or not the Mayor added an
3 additional five days?

4     A.   No; I don't.

5     Q.   But do you recall on any other occasion
6 where the Mayor may have added or increased a
7 suspension that you gave Ms. Walker?

8     A.   He increased the suspensions but as to
9 it being related to this particular incident I
10 don't know.

11     Q.   Do you recall whether or not
12 Ms. Walker -- I draw your attention to the third
13 paragraph on page two of Exhibit 4.

14         Do you recall whether or not Ms. Walker
15 ever complained about not hearing any dispatch
16 calls over the radio and that the calls were being
17 placed perhaps by e-mail to officers?

18     A.   She made that allegation.

19     Q.   Did you recall that she made that
20 allegation against Lieutenant Eva O'Connell?

21     A.   She made that allegation.

22     Q.   Against Lieutenant O'Connell -- that
23 Lieutenant O'Connell authorized those -- allegedly
24 authorized those calls over e-mail instead of over

1 the radio?

2     A.   She made that complaint.

3     Q.   Do you recall that being around November
4 of 2004?

5     A.   I don't remember the exact dates unless
6 I look at the suspensions but she made that
7 allegation.

8     Q.   She in fact filed a written report to
9 you concerning this, didn't she?

10     A.   Yes; and it was investigated.

11     Q.   Do you recall whether or not Lieutenant
12 O'Connell reprimanded Sergeant Walker about not
13 following the chain of command concerning the
14 complaint or allegation in paragraph three of
15 Exhibit 4 -- in Exhibit 4, page two, paragraph
16 three?

17     A.   No; Lieutenant O'Connell can't issue
18 discipline. I'm the person that issues discipline
19 on the Department.

20     Q.   Well, Lieutenant O'Connell can
21 reprimand, can she not?

22     A.   She can counsel, she can give verbal
23 reprimands.

24     Q.   Do you know whether or not Lieutenant

68

1 O'Connell reprimanded Sergeant Walker about not
2 following the chain of command?

3     A.   No; I do not recall that.

4     Q.   Do you recall whether or not Lieutenant
5 O'Connell assigned Plaintiff Tammy Walker to
6 booking or desk duty?

7     A.   Yes; and that was not discipline. That
8 was an assignment change. Assignments are
9 management prerogative and does not have to be
10 explained.

11     Q.   In fact Lieutenant O'Connell did not
12 explain, is that correct?

13     A.   That's correct; and I told her she
14 didn't have to explain.

15         She's the Lieutenant on the watch, she
16 moved her on that watch. It did not affect
17 payroll, did not affect salary, did not violate
18 contract.

19     Q.   This was after sergeant Tammy Walker had
20 made a written complaint to you alleging that
21 Lieutenant O'Connell was I guess -- not I guess,
22 but alleging that dispatch calls were being sent
23 by e-mail as opposed to radio, is that correct?

24     A.   No; I do not think so. No.

TAMMY WALKER VS. CITY OF HOLYOKE
ANTHONY SCOTT                    SEPTEMBER 11, 2006

73

1    A.    (Interposing) The investigation by
2  Lieutenant Fournier focussed on the days that
3  Sergeant Walker was working.
4         The investigation by CJIS -- she
5  complained to CJIS also; she complained to the
6  FBI. That went -- we sent them two years worth of
7  data and if they found five instances in two
8  years, I think that's pretty good.
9    Q.    Again, that's Criminal Justice --
10   A.    (Interposing) Criminal Justice
11 Information System -- CJIS.
12   Q.    They are part of the U.S. Department --
13   A.    (Interposing) No; CJIS is the state
14 entity; NCIC -- National Crime Information Center
15 is the federal.
16        The FBI deferred their investigation to
17 CJIS; CJIS conducted the investigation.
18        MR. HUDSON: At this time let the
19 record show that Ms. Walker just re-entered but at
20 this time I'd also -- let's go off the record,
21 please?
22 _____(Discussion off the record.)
23   Q.    (BY MR. HUDSON) Sir, do you recall --
24 with regard to -- let me back up.

74

1         I want to draw your attention to --
2  let's mark this as Exhibit 5, please.
3         (Plaintiff's Deposition Exhibit
          No. 5 offered and marked.)
4
5    Q.    (BY MR. HUDSON) If you would take a
6  moment to look at that. (Indicating.)
7    A.    (Witness examining document.) I'm
8  familiar with it.
9    Q.    What is it, sir?  Is it a letter
10 addressed to you and the Mayor?
11   A.    Yes; it is.
12   Q.    From?
13   A.    Attorney Sapirstein.
14   Q.    Do you recall it being Ms. Walker's
15 notice under the whistleblower statute?
16   A.    I didn't hear your question; I'm very
17 sorry.
18   Q.    Do you recall that the letter represents
19 itself as a notice of a claim of Ms. Walker's
20 under the whistleblower statute?
21   A.    Yes; it was subsequent to the
22 February 15th, 2005 letter.
23   Q.    In the letter it references the
24 February 15th, 2005 letter, does it not?

75

1    A.    Yes; it does.
2    Q.    Do you recall whether or not on
3  March 7th, 2005 Mayor Sullivan held a hearing on a
4  five-day suspension without pay that you issued to
5  Ms. Walker?
6    A.    Yes.
7    Q.    Do you recall what that five-day
8  suspension was for, sir?
9    A.    I believe it was the actions of Sergeant
10 Walker -- then Sergeant Walker -- against
11 Lieutenant O'Connell but I don't agree with
12 paragraph five of this letter -- I mean paragraph
13 two of this letter.
14   Q.    Do you recall that following the hearing
15 on May 18th, Mayor Sullivan not only affirmed the
16 five-day suspension that you issued but added an
17 additional suspension of fifteen days?
18 MS. LYNCH:              I'm sorry, did you say
19 May 18th?
20 MR. HUDSON:            March -- March 18th.
21        THE WITNESS: I don't remember if it
22 was March 18th and I don't agree with the contents
23 of that first paragraph.
24   Q.    (BY MR. HUDSON) Well the question, sir,

76

1  is:  Do you recall whether or not after the
2  hearing on March 18th that the Mayor increased
3  Ms. Walker's suspension from five days by adding
4  fifteen days?
5    A.    I believe he did but I don't know --
6  once again I don't know if it was March 18th.
7    Q.    Do you recall whether or not on or about
8  February 25 Ms. Walker complained about Lieutenant
9  O'Connell's actions towards her?
10   A.    Once again I know she complained about
11 Lieutenant O'Connell but I don't know if it was
12 around or about February the 25th, 2005.
13   Q.    What about on or around February 27th
14 she filed a complaint with you, Chief Scott,
15 alleging that Lieutenant O'Connell engaged in
16 retaliatory behavior and injured Ms. Walker in a
17 physical confrontation.
18        Do you recall her filing such a
19 complaint with you?
20   A.    Not about retaliations, alleging a
21 physical confrontation.
22 She filed a complaint.          I don't remember
23 exactly what it is about and I'm not going to base
24 it on what Ms. Sapirstein has written in here --

77

1 written in this document.
2      Q.    Are you aware that on or about
3 March 29th, 2005 Ms. Walker filed a complaint
4 against the City in United States District Court?
5      A.    I know she filed a complaint.   I don't
6 know if it was on February 15th or the date that
7 you mentioned in May of 2005.    I know a complaint
8 was filed.
9      Q.    And do you know that she filed a
10 complaint before she was terminated, isn't that
11 correct?
12      A.    She may have.
13      Q.    She filed a complaint -- a Federal Court
14 complaint -- she may a filed a Federal Court
15 complaint before she was terminated?
16      A.    She may have filed it before she was
17 terminated.
18      Q.    In fact isn't it true that Ms. Walker
19 was terminated on or around April 18th, 2005?
20      A.    I can't recall the exact date.   I do
21 know she was terminated.
22      Q.    Do you recall the year?
23      A.    It was in 2005.
24      Q.    Do you recall the month?

78

1      A.    No, sir; I don't.   I had asked the Mayor
2 to fire her some time back.
3      Q.    Sir, you just testified that you asked
4 the Mayor to fire her some time back -- excuse me
5 counsel?
6            THE WITNESS: Go ahead, sir -- way
7 before the suit was filed.
8      Q.    (BY MR. HUDSON) What did you ask the
9 Mayor to fire her for?
10      A.    The incident that occurred at the Mall.
11      Q.    And that's the incident that you gave a
12 five-day suspension?
13      A.    That's all I could give.   If I could
14 have fired her personally then, I would have fired
15 her; and if I could have figured out a way to
16 charge her, I would have had her charged
17 criminally.
18      Q.    Sir, with regard to complaints of
19 discrimination by Ms. Walker, do you recall
20 whether or not Ms. Walker ever complained to you
21 verbally or to her supervisors about being
22 discriminated against by Sergeant Garcia and
23 Sergeant Monaghan?
24      A.    Ms. Walker made complaints about things

79

1 that were said to her, what she alleged to be
2 racially or sexually charged statements and those
3 were investigated.
4      Q.    And did Ms. Walker complain to you, sir,
5 that after she was given a retroactive seniority
6 of June 9th, I believe -- June 9th, 1999 I
7 believe -- that she was subjected to
8 discrimination by Sergeant Monaghan and Sergeant
9 Garcia?
10      A.    Sir, could you tell me, what do you mean
11 by discrimination?
12      Q.    Well sir, let's say did Ms. Walker
13 complain to you that -- first of all, on or about
14 May 5, 2002 when Ms. Walker was promoted to
15 sergeant and her seniority was adjusted to
16 June 9th, 1999, did she complain to you about any
17 problems that she was having with Officers John
18 Monaghan and Sergeant Garcia?
19      A.    It was sometime after that -- way after
20 that.
21      Q.    Do you recall whether or not Ms. Walker
22 complained to you that Sergeant Monaghan made
23 comments with sexual and racial connotations over
24 the police radio?

80

1      A.    Yes; she filed a complaint to that
2 effect and that was investigated.
3      Q.    Did she file a complaint that whenever
4 she ended a radio transmission -- there were
5 occasions when she ended a radio transmission that
6 she could hear Sergeant Monaghan change his
7 pronunciation to imitate an African-American
8 dialect and said "lick it, lick it good"?
9      A.    All of those allegations, sir -- she
10 made those allegations.
11          We went back and listened to the tapes
12 when Sergeant Walker and Sergeant Monaghan were
13 working together.   We could find none of what she
14 alleged on the tapes -- and all of the radio
15 conversations are taped.   We could find none of
16 those statements, none of those allegations.
17          All of the witnesses, sir -- all of the
18 witnesses she pointed out she alleged heard these
19 things were questioned.    Written, signed
20 statements was taken from everyone who worked on
21 the watch -- sergeants, lieutenants, police
22 officers. We questioned everyone. We got the
23 tapes, we went over the tapes and the allegations
24 could not be substantiated.

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT                    SEPTEMBER 11, 2006

1    Q.   First of all, sir, let's see if we can
2    identify the allegations.
3         Now was one of the allegations that she
4    complained of was hearing over the radio from
5    Sergeant Monaghan saying "lick it, lick it good"?
6    A.   I do not remember any of the exact
7    allegations she made but they are contained in her
8    complaint form.
9         If you produce the complaint form, I
10   have the complaint form here, I could go over it
11   but I don't recall offhand at this particular
12   point in time exactly what her allegations were
13   but I can say emphatically that all of the
14   complaints that she alleged, they were
15   investigated, sir, and documented and we still
16   have the tapes.
17   Q.   I hear you. Sir, do you recall whether
18   or not Ms. Walker complained that Sergeant
19   Monaghan made a racist remark by referring to you
20   as Uncle Charlie?
21        Do you remember whether or not she made
22   that complaint?
23   A.   No; she did not make a complaint. She
24   came up to the office -- no; she did not make a

82

1    complaint, sir.
2         Sergeant Walker came up to my office. I
3    get in around five-thirty a.m., in the morning.
4    Sergeant Walker came up to my office damn near
5    every morning she worked and knocked on my door,
6    because I kept it locked.
7         Every morning she had something
8    different to tell me, some allegation, like a
9    five-year-old complaining about they did this,
10   they did that; this happened, they're calling you
11   Uncle Charlie; they're saying this about you,
12   they're saying that about you.
13   Q.   So she did tell you that?
14   A.   She came up to my office -- she said
15   Uncle Charlie or Uncle Tony, I don't remember.
16   Why? Because I personally did not care because as
17   long as anybody respected me to my face, I don't
18   care what they say behind my back. I was the
19   Chief of Police and they gave me the respect of
20   that office. Now, what did their little
21   whispering between each other, I could personally
22   care less.
23        She was up there every day, sir. It got
24   to the point where I would come in in the morning

1    and close my office door which I kept open. Let
2    me explain, please.
3         It got to the point where it was so
4    aggravating her coming up in the morning at that
5    time tattletaling on everybody that I would close
6    my door and pretend I wasn't in when I heard
7    people knocking.
8    Q.   Sir, what I simply want to ask you --
9    A.   (Interposing) No; I did not hear her
10   make that statement.
11   Q.   Please. Let me ask the question first
12   before you answer it, please, with all due
13   respect.
14   A.   I do respect you also, sir, but there's
15   a lot of things I can't answer with a yes or no
16   and if you prefer I give you a yes or no answer
17   I'm not going to answer the question.
18   Q.   Number one, I didn't ask you to give me
19   a yes or no answer.
20        Number two, my question is, sir: Did
21   Ms. Walker ever inform you that officers under
22   your command like Sergeant Monaghan referred to
23   you as Uncle Charlie?
24        MS. LYNCH: Well, objection. I

84

1    think it's been asked and answered but go ahead
2    and answer it again.
3         THE WITNESS: I remember her saying
4    Uncle Tony and if she was a supervisor being in
5    charge and she felt that it was a violation of the
6    Department rules and regulations it was up to her
7    as a supervisor to take some action.
8         If she didn't feel that it was a
9    violation of the rules and regulations of the
10   Department and she witnessed this and she heard it
11   and she didn't take any action, that's on her.
12   Reporting it to me, it did not matter to me. I've
13   been called worse to my face.
14   Q.   (BY MR. HUDSON) It mattered -- sir, do
15   you know whether it mattered to her, Ms. Walker?
16   A.   She was carrying it to me.
17   Q.   Let me move on, sir. Do you know -- do
18   you recall whether or not Ms. Walker ever informed
19   you that she heard Sergeant Monaghan say in a
20   so-called African-American dialect, Uncle Charlie
21   "done come out wit anutter order," something to
22   that effect?
23   A.   I don't recall that, sir. I really
24   don't.

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT              SEPTEMBER 11, 2006

---

85

Q.    Do you recall whether or not Ms. Walker informed you that Sergeant Monaghan regularly referred to her as Tyrone?

A.    She made that in a complaint which we investigated.

Q.    Do you recall whether or not Ms. Walker ever informed you that Sergeant Monaghan stated that she should not be a sergeant because of her gender or sexual orientation?

A.    No.

Q.    She never informed you of that?

A.    No; I do not recall her saying that to me at all.

Q.    Do you recall whether or not Ms. Walker ever reported to you -- well, excuse me, let me back up.

Do you recall whether or not Ms. Walker ever reported that to another supervisor --

A.    (Interposing) No; I don't.

Q.    -- about Sergeant Monaghan saying she shouldn't be a sergeant because of her gender or sexual orientation?

A.    No, sir, I don't.  All of the complaints that Sergeant Walker made were in writing and

86

those complaints you may have or they are on file in my office and all of her allegations were contained in those complaints.

I didn't read up on every complaint Ms. Walker filed.   She filed a lot of complaints and we investigated them all.

Q.    Didn't Ms. Walker inform you that Sergeant **Monaghan** on or **about October, 2002 saying** in her ear that "you shouldn't go sticking your tongue where it don't belong"?

A.    I don't know the exact words but I know that she alleged that Sergeant Monaghan sang some kind of song to her which a complaint was taken and once again, it was investigated.

I believe, sir, that she said someone overheard this and we went to that individual and we took a statement from that individual.   I think, once again, we questioned everybody on the watch.

Q.    Do you recall that Ms. Walker was offended by this song?

A.    She made a complaint.

Q.    And to you that means that she was offended by it?

87

1    A. She made a complaint about it so
2  evidently she was offended by it and we
3  investigated it.
4    Q. In fact you also referred her to
5  someone, didn't you, sir?
6    A. (No response.)
7    Q. Did you ask her to go to talk to one of
8  the captains under her command?
9    A. I told her I think that she should be
10 reporting this to her immediate supervisor instead
11 of coming directly to me. There's a chain of
12 command.
13       Could I explain something about chain of
14 command in the Police Department, sir, to you?
15   Q. Well -- excuse me --
16   A. (Interposing) It relates to how you
17 handle things in a law enforcement agency. She
18 worked under a lieutenant who works under a
19 captain.
20       If you have a complaint you go to your
21 lieutenant -- and this was told to the sergeant by
22 me on more than one occasion.
23   Q. Let me ask you --
24   A. (Interposing) You go through the chain

88

1  of command to me.
2    Q. Thank you, sir, but did you refer her to
3  Captain Fletcher?
4    A. I can't say it was Captain Fletcher
5  directly but I referred her back to her captain.
6    Q. Thank you, sir. Did you ever have any
7  conversation with Captain Fletcher about
8  Ms. Walker's allegations of discrimination or
9  sexual harassment?
10   A. Other than the fact that the complaints
11 were made or either I called him and said
12 Captain, I referred Sergeant Walker back to you
13 with these allegations or advised him that I was
14 passing it on to Internal Affairs.
15       Q. These allegations -- those were
16 allegations of sexual harassment, was that it?
17   A. No; I don't know if the comment -- the
18 song that was sang, I don't remember exactly what
19 it was about, whether it had sexual overtones or
20 racial overtones, I don't remember which one but I
21 did refer it to Internal Affairs. Basically all
22 of her complaints were referred to Internal
23 Affairs.
24   Q. So Ms. Walker's complaints, though,

---

## PERLIK and COYLE REPORTING

Case 3:05-cv-30074-MAP    Document 56-5    Filed 08/01/2007    Page 24 of 50

99

TAMMY WALKER vs. CITY OF HOLYOKE
ANTHONY SCOTT                SEPTEMBER 11, 2006

involved either race or sexual harassment or both?

A. It could have been either/or, or both. I haven't sat down and read over all of the complaints that were filed but I can tell you this: All of the complaints that she made were investigated.

Q. Sir, let me just ask you: Do you know, when you say complaints, did that also include grievances?

A. Sergeant Walker filed complaints which was a complaint against another officer. She also filed grievances.

The grievances came directly to me. I handled the grievances. By contract I have to handle the grievances.

The complaints I had either Internal Affairs handle them or I handled them but everything she filed was investigated.

Q. Sir, with regard to at least one key grievance -- one grievance -- strike that.

I want to draw your attention again to Exhibit -- Mr. Jorge Rodriguez's affidavit and I can't make out the exhibit number?

A. 2.

---

90

Q. Exhibit 2. You stated that every complaint Ms. Walker -- is it your testimony that every complaint Ms. Walker filed, it was investigated and you could not substantiate it?

A. Formal complaint that she made -- any formal complaint, formal grievance that she made was investigated.

Q. And that you also stated that you had interviewed -- with regard to some of her complaints you had interviewed witnesses, other officers and there was no --

A. (Interposing) Substantiation.

Q. -- no substantiation?

A. Correct.

Q. I draw your attention to -- excuse me just a minute please.

I draw your attention to page two of Exhibit Number 2, paragraph six where Officer Jorge Rodriguez stated -- submitted an affidavit that Sergeant Lenihan -- on or about December 4th, 2002 Sergeant Lenihan stated to a group of officers that "we all had to stick together" and I believe he was referring to Sergeant Walker's charge of harassment. Was that ever brought to

---

1 your attention?

2    A.    No; this affidavit was taken July 15th, 3 2003 and the investigation was being conducted 4 into Sergeant Walker's allegation November 13th, 5 2002.

6         We took a statement from Sergeant 7 Rodriguez -- I mean Officer Rodriguez. We had 8 sent him a list of questions for him to answer and 9 that was in 2002.

10        The allegations that he's making here in 11 2003 he's making these to her attorney and I don't 12 know -- I didn't get this until -- receive this or 13 see this, I don't recall seeing this until the day 14 it was passed on to the Police Department after it 15 was sent to the City.

16        I do not recall this statement being 17 made by Officer Rodriguez during the investigation 18 in November of 2002.

19    Q.    Sir, thank you. Let's look at Bates 20 number 462 in that same Exhibit Number 2. I 21 believe that's the typed -- you see Bates 22 number 462, sir, at the bottom of the page?

23    A.    Yes.

24    Q.    Do you see where Officer Rodriguez is

---

92

1 responding to a request to submit an IOC?

2    A.    Yes.

3    Q.    What's an IOC?

4    A.    An interoffice correspondence.

5    Q.    To describe in detail comments that he 6 heard over the WMLEC radio -- what's the WMLEC 7 radio?

8    A.    Yes.

9    Q.    "On one occasion after she went over 10 the air someone started singing a rap song over 11 WMLEC, "leak it now, leak it good, leak it real 12 good." Do you see that?

13    Q.    Then also you see where Officer 14 Rodriguez also reported that someone was saying, 15 "I'm a freak-o" on the WMLEC after Sergeant Walker 16 had gone on the radio.

17

18

19

20

21

22

23

24

A. Yes; and once again there is nothing on the tape to substantiate this.

Q. Do you recall sir, that after -- do you recall, sir, that after -- pardon me.

I draw your attention to paragraph eleven, page 0458. At that last paragraph eleven there, do you read where Officer Rodriguez states that he had also heard officers refer to Chief Scott as Uncle Charlie during roll calls?

A. Yes.

Q. And that he believed those comments were racist?

A. That was his belief.

Q. But he did write that?

A. He wrote that in there. I don't care whatever they called me at roll call. I get the respect when I walk through that station.

Being raised down South I know what discrimination is a lot better than a lot of people and this does not bother me because when I give an order its carried out.

They may have -- if this was done at roll call and it wasn't reported to me, I could care less. There's people in this room who have

94

said some worse things about me.

Q. Didn't Sergeant Walker report it to you that officers were saying or calling you Uncle Charlie?

A. It did not mean anything to me, sir, okay? I've been called a racist in this community and that still doesn't mean anything to me.

Whether or not they call me anything is the fact that I am the chief; I still give the orders and I get the respect when I walk into a room.

Q. Sir, do you recall that Officer Rodriguez believed that he was retaliated against for giving the statements in support of Ms. Walker's complaint?

MS. LYNCH: Objection; you can answer.

Q. (BY MR. HUDSON) Let me rephrase the question.

Do you recall Officer Rodriguez informing the Holyoke Police Department that he believed he was retaliated against?

A. Yes; he came up -- I think he came up to my office with a supervisor.

1    Q.   Let me --

2    A.   (Interposing) You asked me the question;
3 do you want me to answer it?

4    Q.   Yes, but he was retaliated against for
5 giving up information favorable to Ms. Walker?

6    A.   He said that he felt he was being
7 retaliated against. I don't remember all of the
8 circumstances.

9        He came up to my office with his
10 supervisor -- I think he came up with the union
11 president; I'm not sure -- and we asked: Do you
12 feel like you're being retaliated, what happened,
13 put it in writing and let's investigate it.

14    Q.   Did Officer Rodriguez submit something
15 in writing?

16    A.   I don't remember if he put anything in
17 writing.   If he did put it in writing, it was
18 investigated. I don't remember.

19        MR. HUDSON: Why don't we take a
20 break now.

21        (A luncheon recess was taken.)

22    Q.   (BY MR. HUDSON) Chief Scott, I would
23 like to draw your attention back to some of your
24 earlier testimony and at that point I had -- you

96

1    were testifying about reasons why -- reasons that
2    you recall Ms. Walker was disciplined. One of
3    those reasons you testified she was late for
4    court.

5        Was that one occasion or several
6    occasions that you disciplined her for being late
7    to court?

8    A.   Once.

9    Q.   As I recall -- do you recall that was
10    about - was it five or ten minutes late, do you
11    recall?

12    A.   I believe it was fifteen.

13    Q.   And that there were other officers that
14    were also late, is that your testimony?

15    A.   Yes.

16    Q.   And that all officers were given some
17    type of discipline, is that correct?

18    A.   Yes.

19    Q.   That discipline was -- was it verbal or
20    written reprimands, do you recall?

21    A.   I believe everybody was issued a written
22    reprimand. Some was issued a verbal. I think one
23    or two were issued a verbal but it was documented.

24    Q.   These reprimands, they go into the

1 employee's file -- personnel file?
2    A.   Yes.
3    Q.   Sir, you also testified that you recall
4 Ms. Walker being disciplined for not following
5 orders?
6    A.   Yes.
7    Q.   Do you recall any specific instances
8 that Ms. Walker did not follow orders?
9         MS. LYNCH: Besides what he's
10 already testified to today?
11        MR. HUDSON: I want him to be --
12 excuse me.  I'm referring to any specific
13 instances that you can recall because at the time
14 you testified about not following orders, you
15 didn't give any specific examples.
16        MS. LYNCH: Well, I just want to
17 object to the extent that he did testify to an
18 instance of not following orders with regard to
19 the Elizer's Pub incident.
20    Q.   (BY MR. HUDSON) Let's clarify. Were
21 there any other instances other than the Elizer's
22 Pub of not following orders?
23    A.   Yes; she was ordered to produce a copy
24 of a tape that she made during one investigation

98

1 and to this day she hasn't produced that tape.
2 She was also ordered to write a report on the Mall
3 incident and had to be finally ordered to write
4 the report.
5        Those are the ones I can remember
6 offhand.
7    Q.   She finally produced a -- something in
8 writing, a report after being ordered -- finally
9 ordered to, is that what you said?
10    A.   For which incident now?
11    Q.   The Mall incident?
12    A.   She did. She finally wrote a report
13 and -- never mind; she wrote a report.
14    Q.   Sir, with regard to -- you testified
15 that Ms. Walker was untruthful on many occasions.
16 What occasions do you recall Ms. Walker not being
17 truthful?
18    A.   I wish I had the reports to front of me
19 but I can give you one. The complaint that she
20 made against Lieutenant O'Connell as it relates to
21 the incident with the book, the duty book or
22 whatever they call that book that they keep
23 downstairs.
24        Number two in her statement alleging

1 that Lieutenant O'Connell gave an order about the
2 calls being dispatched over the teletype; number
3 three was in describing the incident that occurred
4 at the Mall.
5        Offhand those are the basic ones I can
6 remember but I know there were other instances.
7    Q.   I think you used the word teletype. Is
8 that e-mail?
9    A.   E-mail.
10    Q.   Regarding the calls being dispatched?
11    A.   Yes; being sent by e-mails.
12    Q.   And then the last incident you mentioned
13 was the Mall, you said?
14    A.   Yes; the incident that involved the
15 individual of Middle Eastern descent taking
16 pictures at the Mall.
17    Q.   What was untruthful?
18    A.   It was something to do with that
19 investigation.
20        I would have to go back to the
21 investigation to find out the exact reasons but I
22 believe there was untruthfulness in that --
23 determined in that investigation.
24    Q.   The paperwork concerning these

100

1 investigations, was that Internal Affairs?
2    A.   Yes; we document everything and that's
3 in the Internal Affairs records and the Sergeant
4 is provided a copy of the disciplinary action
5 taken against her where the charges are outlined
6 and a brief synopsis of everything that was in
7 those charges.
8    Q.   So this is all officers who have charges
9 brought against them with discipline, they are
10 provided with a written copy?
11    A.   Yes; I provide you with the reasons
12 why -- it's by statute.
13        I've got to provide you the reasons and
14 then I have to provide you copies of the General
15 Law, which is -- I think it's five or six copies
16 of the General Law has to be attached to the
17 discipline.
18    Q.   If we requested the information through
19 your attorney, then that information -- your
20 attorney would be -- you'd give it to your
21 attorney?
22    A.   Yes; I would give it to Attorney Lynch.
23        MS. LYNCH: Whatever requests you
24 have, just direct them to me.

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT                    SEPTEMBER 11, 2006

101

MR. HUDSON: We have already submitted a production of document request.

MS. LYNCH:                    Right; and I'm working on them. I hope to get them done shortly.

Q.    (BY MR. HUDSON) Sir, you didn't do the investigation in these incidents yourself, did you?

A.    Some of them I did do.

Q.    With regard to -- let's back up.   On the untruthfulness one with regard to the O'Connell incident concerning the off-duty book, I believe, did you investigate that yourself?

A.    That was investigated I believe by Internal Affairs but I review all investigations because I'm the one that has to take the discipline.   If there's questions that I have

Q.    (Interposing) You mean give the discipline not take the discipline?

A.    Give the action.

Q.    When you say Internal Affairs, would that be Lieutenant Fournier?

A.    Lieutenant Fournier and Sergeant McCavick.

Q.    Did Lieutenant Fournier or Sergeant

102

McCavick tell you verbally or in writing that Ms. Walker was not being truthful with regard to the O'Connell incident regarding the book?

A.    The statements that were taken after I read all of the reports and all of the statements, I determined that based on the statements that Ms. Walker was not being truthful.

Q.    Would these have been statements from Lieutenant Fournier or Sergeant McCavick?

A.    No; it would be taking statements from people that the Sergeant was making complaints against and also witnesses that allegedly witnessed the incident.

Then they compile the statements and they do an investigative report and then I read the investigative report and if necessary, I go to each statement and read each statement, what's contained in each statement. Then I make my decision on what Department rule or regulation was or wasn't violated.

Q.       Thank you, sir.  With regard to the statement alleging that Lieutenant O'Connell gave an order that caused dispatch to be over e-mail, upon what basis do you claim that that allegation

103

1  is untrue?
2
3
4
5
6        Q. Sir, did Ms. Walker state or allege for
7  a fact that she knew Lieutenant O'Connell was
8  giving orders or did she say that she believed
9  that Lieutenant O'Connell was giving the orders
10  that these --
11        A. (Interposing) She said Lieutenant
12  O'Connell gave that order to the dispatchers to
13  dispatch calls using the Departmental e-mails -that
14  you e-mail from headquarters to the laptop -rather
15  than use the radio.
16        That was her allegation; that was not
17
18
19
20
21
22  true.
23      Q. Do you recall if there was any reason
24  why -- do you recall why -- whether there was any

104

1      A. To keep her, Sergeant Walker,
2  from finding out what was going on on the
3  watch.
4      Q. Didn't Sergeant Walker also inform
5  you or the investigators that Lieutenant O'Connell
6  had denied sending the calls out by e-mail?
7      Q. Sir, isn't it true that -- didn't
8  Sergeant Walker say she believed that Lieutenant
9  O'Connell was sending out the dispatchers -- the
10  calls by e-mail to keep her from being informed?
11      A. She alleged that Lieutenant
12  O'Connell was having the dispatchers dispatch
13  calls on the cars out on the street over the
14  laptop instead of over the radio.
15
16
17
18
19
20
21
22
23
24

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT          SEPTEMBER 11, 2006

---

105

Q.   I hear that, sir; and what I'm trying to get at is this:   The distinction is did she state that she believed it or that she knew this was what was Lieutenant O'Connell was doing?

A.   She said Lieutenant O'Connell gave orders to the dispatchers to dispatch calls over the laptops instead of over the radio.

She didn't say "I believed" it; she said that's what the Lieutenant did in actuality.

Q.   I don't want to quibble with you on this, sir.   I hear you loud and clear; I just want to acknowledge that.

With regard to the reason, didn't Sergeant Walker state that she believed Lieutenant O'Connell did this to keep Sergeant Walker from being informed?

MS. LYNCH:   Objection; I think it's been asked and answered a couple of times now but you can answer it one last time.

THE WITNESS: No; she said that she was doing it; not that she believed that she was doing it, that she was doing it to keep her from finding out about calls.

Q.   (BY MR. HUDSON) Didn't she also report

---

106

to the investigator that Lieutenant O'Connell denied doing it?

A.   I don't know if she reported that but I know that Lieutenant O'Connell -- when I said "she," I mean Sergeant Walker -- I know that Lieutenant O'Connell told Sergeant Walker that she did not issue any such order.

Q.   With regard to -- what was the -- oh, we already covered that.

Now when you mentioned that you testified that Sergeant Walker threatened a supervisor, what supervisor did Sergeant Walker threaten?

A.   Lieutenant O'Connell.

Q.   When did Sergeant Walker threaten Lieutenant O'Connell?

A.   I don't remember the exact dates or times of it but it was the incident that occurred in the watch commander's office when then Sergeant Walker came into the office with her son.

I base what I just said about the threats on all of the statements that were taken from the police officers who were present.

Q.   These police officers that were present,

---

107

1 do you recall their names?

2   A. It was dispatcher -- I'm sorry, Police
3 Officer John Craven who was summoned into the
4 office by Sergeant Walker, Officer Sean Shattock.
5 There was another officer; he was the house
6 officer, he was standing in the door. I want to
7 say Officer Cruz; I may be wrong, was standing in
8 the doorway.

9   He didn't want to leave because, in his
10 statement which is all part of the
11 investigation -- signed statement -- do I have to
12 put up with this? Its been going on for quite a
13 while now and I've been ignoring it.

14   Q. Excuse me, sir. You are the only one
15 who is supposed to being testifying, I'm the only
16 one asking questions, with all due respect?

17   A. With all due respect to you, sir, could
18 you ask your client to make her comments directly
19 to you out of the room while I'm giving my
20 deposition. Could I ask that you of you, sir, as
21 a courtesy?

22   Q. Yes, sir.

23   A. Thank you very much Sir.

24     MR. HUDSON: May we go off the

---

108

1 record?

2     (Discussion off the record.)

3     THE WITNESS: Could I get the last
4 question repeated, please?

5     MR. HUDSON: Please, would you
6 kindly repeat the last question for the Chief?

7 (Reporter read back as
       reouested.)

8 A

9     THE WITNESS: It may have been
10 Daniel Escobar but I don't recall exactly, the
11 exact name of the officer. Every officer who was
12 there was afraid for the Lieutenant's safety
13 because of Ms. Walker's actions.

14   I read each one of those statements and
15 I based my discipline on those statements because
16 those individuals were there; I was not.

17   Q. (BY MR. HUDSON) But you testified that
18 Ms. Walker's son was there, is that correct?

19   A. Yes.

20   Q. Did the interview or investigation
21 include --

22   A. (Interposing) I don't remember if a
23 statement was or was not taken from her son. It
24 may have been. He may have refused to take a

---

---

**109**

1 statement, I don't recall.

2      Q.      You know that Mr. Walker's son is a
3 college person -- attends Northeastern?

4      A.      I knew her son was attending college.
5 What university, I did not know.

6      Q.      I was just trying to establish his
7 approximate age level.

8            Is there anyone else you remember that
9 was present when Ms. Walker had allegedly
10 threatened Lieutenant O'Connell?

11      A.      There was another dispatcher. I don't
12 recall whether or not that dispatcher heard what
13 was actually transpiring in the room but I think a
14 statement was taken from him and I don't remember
15 the dispatcher's name.

16      Q.      Sir, with regard to the other
17 allegations that -- oh, was Lieutenant O'Connell
18 injured in any way?

19      A.      No.

20      Q.      Isn't it true that Ms. Walker filed an
21 injury report concerning this incident when she
22 was alleged to have threatened Lieutenant
23 O'Connell?

24      A.      She alleged an injury; yes.

---

**110**

1      Q.      She filed something in writing, didn't
2 she?

3      A.      She filed a first report of injury and I
4 disapproved it.

5      Q.      That first report was written?

6      A.      It was a short narrative -- I don't know
7 how many lines or anything was in the report but
8 she alleged that the Lieutenant had snatched a
9 book from her so violently that she injured her
10 shoulder.

11            Based on the statements of everybody
12 that was there, that wasn't the truth.

13 MR. HUDSON:            Let's do this as a
14 composite exhibit.     Please mark that as Exhibit 6.

15            (Plaintiff's Deposition Exhibit
                No. 6 offered and marked.)

16

17      Q.      (BY MR. HUDSON) If you could take a
18 look at those, sir? (Indicating.)

19      A.      (Witness examining document.) Okay.

20      Q.      I draw your attention to the third page
21 of this exhibit.     Is this the date of injury
22 reporting February 25, '05?

23      A.      This is the injury form.

24      Q.      And the injury was described as

---

**111**

1 "scheduling book being jerked from hands."     Is
2 that what's described in here?

3      A.            Yes. There's something missing in here.
4 There's something missing in all of this.

5      Q.      Also, sir, in addition to that, the
6 first page --

7      A.      (Interposing) Yes; and once again
8 there's something missing.

9      Q.      But do you recognize this document
10 addressed to you?

11      A.      Yes.

12      Q.      This also reflects where you denied
13 Ms. Walker's request to have medical attention?

14      A.      Yes; this is my denial or a disapproval
15 is on the page that's marked 0 0 003 2.

16            Once again, there's something missing
17 from the first page.

18      Q.      What is missing?

19      A.      How this starts.   It should have began
20 "once upon a time."

21 MR. HUDSON:                  Excuse me, please.

22 THE WITNESS:                  Because this is a
23 fairy tale.   This document is a fairy tale.

24      Q.      (BY MR. HUDSON) Sir, the question is

---

**112**

1 you did receive this, is that correct?

2      A.      Yes; and I disapproved it.

3      Q.      What you disapproved -- what you're
4 saying you disapproved is that medical attention,
5 medical care? What are you disapproving here?

6      A.      I'm disapproving this entire report
7 because this is a fabrication. This did not
8 happen as Ms. Walker says.

9            There was no such injury, based on the
10 information that I learned.     This is a
11 fabrication.

12      Q.      Did you ask Ms. Walker for any medical

13

14            Did you ask her to submit any medical
15 documentation or do you know whether or not she
16 submitted any medical documentation?

17      A.      Ms. Walker submitted this first report
18 of injury.

19            What you see here, this is what I got
20 and I already had an investigation and what she
21 alleged did not occur.

22      Q.      My question, sir, is -- I see down here
23 on the third page -- the third page of Exhibit 6.

24            It looks like some of these documents

---

113

may have been actually Bate-stamped by someone else in some other proceeding but nevertheless, in Exhibit 6 it says, "See attached IOC."

A.    That's this page here. (Indicating.)

Q.    The first two pages?

A.    Yes.

Q.    My question again, sir, is:    Before disapproving -- first let me draw your attention on 032 -- Bates number 032, the very last, it looks like a paragraph but it could be the last two sentences.

        "I have not sought medical attention for my elbow hoping it's just a strain but would like to have it looked at by a medical professional.    I will wait to her    -- I believe that's a typo -- "from you regarding this matter."

        Having read that, sir, did you at any time tell Ms. Walker that she needed to provide some medical proof of injury or a statement from a medical doctor or something?

A.    I don't recall but I know I disapproved this.

        If she wanted to go to her own doctor she could have went to her doctor but I wasn't

114

going to allow the City to pay for this.

Q.    In fact, there are several disapprovals here, isn't that correct, sir?

A.    Yes.

Q.    The first one we see where there's Lieutenant Eva O'Connell -- well, at the top column on the left of the signatures, Lieutenant Eva O'Connell, right?

A.    Yes.

Q.    Second watch commander?

A.    Right.

Q.    And she disapproved?

A.    Yes.

Q.    Did she disapprove before you or after you?

A.    This goes up the chain of command. It was disapproved by her before it got to me.

Q.    In fact the allegation is against Lieutenant O'Connell, isn't that correct?

A.    That's correct.

Q.    Then would the next person in the chain of command be Captain Alan Fletcher?

A.    Yes; the Bureau commander.

Q.    And he disapproved?

115

1    A. Yes.

2    Q. And then we have I believe at the

3 bottom -- or the top, Anthony R. Scott, Chief of

4 Police, do you see that?

5    A. Yes.

6    Q. That's a date 2/28/05?

7    A. Yes.

8    Q. You have written "disapproved" across,

9 is that correct?

10    A. Yes.

11    Q. You or someone deleted approved and

12 wrote disapproved?

13    A. I did.

14    Q. Why was that?

15    A. Because when I was writing this out, the

16 original one, I had drawn a line through

17 disapproved and it would have meant that it would

18 have been approved so I drew a line through both

19 of them and wrote "disapproved" on it.

20    Q. Thank you, sir. This allegation of

21 threatening a supervisor, in your investigation or

22 the investigation that was conducted by Internal

23 Affairs, were there any reports of threatening

24 words?

116

1    A. Yes.

2    Q. What were those threatening words?

3    A. The Sergeant -- the then Sergeant Walker

4 leaned forward and said to the Lieutenant either

5 "F-U" or words to that effect right up in her

6 face -- the Lieutenant's face.

7    Q. However, do you know whether or not

8 there was any allegation that Sergeant Walker said

9 anything to the effect that, "I'm going to beat

10 your ring behind" or anything like that?

11    A. No; it was her physical actions that was

12 reported in the statement of Officer Craven,

13 Officer Shattock and that might have been Officer

14 Escobar. I really wish I could remember his name.

15    Q. Isn't it true that the only physical

16 action was Sergeant Walker is alleged to have

17 grabbed or seized or reached or touched a book

18 that was on the desk?

19        MS. LYNCH: Objection; you can

20 answer.

21    Q. (BY MR. HUDSON) Let me repeat the

22 question, then.

23        Describe the physical action involving

24 the book?

1    A.    Based on the statements that were taken,
2 Lieutenant O'Connell was at her desk speaking to
3 Officer Shattock going over some training because
4 Officer Shattock is our firearms instructor. She
5 had a ring binder in front of her with her arms
6 similar to this -- laying across the book --
7 talking to Officer Shattock.
8         When Sergeant Walker came in, did not
9 ask, reached for the book and was lifting the book
10 up to take it off the desk, not even asking the
11 Lieutenant could she have the book and the
12 Lieutenant pushed the book back down. It couldn't
13 have been no more than a half an inch or an inch
14 off the desk and said, "Excuse me, Sergeant."
15 This is from statements from Officer Shattock who
16 was in there across the desk from the Lieutenant.
17 She then reached for the book a second time. She
18 said "Excuse me, Sergeant," putting both of her
19 hands on top of the notebook.
20        When the Lieutenant got up to go around
21 the desk to tell the officer to go outside so the
22 Lieutenant and Sergeant Walker could discuss this
23 matter without getting subordinates involved was
24 when the Sergeant, according to statements, walked

118

1 up on the Lieutenant's face and made the comment
2 about F-U with her fists clenched and her arms at
3 her side in a manner to attack.
4         Once again this is based on statements
5 from three individuals. I was not there.
6    Q.    You said with her fists at her side?
7    A.    Well, they were kind of at her side.
8 The statements said they believed that she was
9 going to strike the Lieutenant and that's why the
10 police officers did not want to leave the room.
11 They were afraid that the Sergeant was going to
12 attack the Lieutenant.
13   Q.    The Sergeant never touched the
14 Lieutenant, is that correct?
15   A.    No; she did not touch the Lieutenant but
16 it was a threat.
17   Q.    Based upon the hearsay information that
18 you obtained?
19   A.    Not hearsay; firsthand knowledge.
20 People were in the room. I would arrest people
21 for less than that.
22        To get one statement I would have
23 arrested somebody. I got three statements. If it
24 would have been a civilian I would place them

1 under arrest.
2    Q.    And convicted them as well?
3    A.    I would have taken them to court and
4 gave it a damn good try.
5    Q.    In fact, sir, does that kind of reflect
6 your philosophy about law enforcement?
7         MS. LYNCH: Objection; you can
8 answer if you can.
9         THE WITNESS: My philosophy on law
10 enforcement is to be fair, use community policing,
11 but put people in jail when they violate the law.
12        Crime -- excuse me sir; I'd also like to
13 say since I've been Chief in the City of Holyoke,
14 major crime has dropped seventeen percent. You
15 can't tell the last time they had a drive-by
16 shooting in the City of Holyoke.
17        Before I came here, the homicides were
18 running amok, the drive-by shootings were running
19 amok. It happened every night. We were in the
20 paper every day for shootings in the City of
21 Holyoke. That isn't going on now and that's my
22 philosophy of policing.
23   Q.    (BY MR. HUDSON) Sir, do you recall ever
24 making this quote since you've been police chief,

120

1 that "the judiciary don't give a good damn about
2 the public that it's supposed to be serving?
3    A.    I don't know if I said exactly that but
4 I say it over and over again that the judiciary
5 doesn't care about the citizens of Holyoke. Why?
6 Because they continually release people back out
7 on the street to plague the poor neighborhoods
8 that we're arresting them out of, over and over
9 again.
10        I said it once; I said it twice, and I'm
11 going to continue saying it as long as they keep
12 doing it.
13   Q.    In fact you blame the City's plight on
14 judges?
15        MS. LYNCH: Objection; what does
16 that have to do with this case? What is the
17 relevancy?
18        MR. HUDSON: The relevancy is -- let
19 me withdraw that.
20   Q.    (BY MR. HUDSON) The question is: Would
21 you have judges act as prosecutors, factfinders
22 and impose sentences based on arrests alone?
23        MS. LYNCH: Objection; I don't
24 understand what that has to do with this case.

TAMMY WALKER vs. CITY OF HOLYOKE
ANTHONY SCOTT      SEPTEMBER 11, 2006

121

1 We've got a lot of material here.
2    Q.   (BY MR. HUDSON) Basically I'm trying
3 to -- just for clarification, because of your
4 comments that you would have a citizen arrested on
5 less information than you had with Ms. Walker?
6    A.   I had three statements on Sergeant
7 Walker.
8    Q.   This is what I'm trying to say.   May I
9 ask a question here?
10       I'm just simply asking the question,
11 just based upon those three statements, that's
12 consistent with your policy that you would
13 actually have someone arrested based on that type
14 of information?
15    A.   No; I was talking about the incident
16 that occurred with Sergeant Walker.
17       My position on the judiciary -- it's a
18 three-legged stool.   Just like in finances, in
19 order to have justice in the community, the stool
20 has to have three legs working -- the district
21 attorney, the Police Department, and the
22 judiciary.   You have a weak leg on that stool,
23 have you a serious problem. I back up everything
24 I say with facts.

122

1    Q.   Well if you --
2    A.   (Interposing) You opened the door here.
3 MS. LYNCH:          I'm going to say,
4 though, there's a lot to answer just about this
5 case. You don't want to spend your time talking
6 about that when it's not relevant.
7    Q.   (BY MR. HUDSON) Sir, it's not about
8 judges, just for clarification.
9       The point that I was trying to get here
10 is that there was -- someone is of the opinion
11 that -- that you -- I'm going to ask you if you
12 disagree with this:   Do you agree or disagree that
13 you dismissed the presumption of innocence?
14    A.   I disagree with that.
15    Q.   The right to counsel?
16    A.   I disagree.  Everyone has a right to
17 counsel.  It's under the Constitution.
18    Q.   Due process?
19    A.   I agree with that one hundred percent.
20 It's in the Constitution.
21       I believe that you could have a fair
22 trial and if you are found guilty I believe that
23 you should be sentenced according to the crime
24 that you commit and not released back out to poor

123

1 people to plague them in poor neighborhoods and
2 that's what happens a lot.
3       We get people who citizens complain
4 about in poor neighborhoods. We arrest that
5 individual.   In several hours they are back out
6 plaguing that poor neighborhood again and then we
7 arrest them again and they are back out plaguing
8 that same poor neighborhood and I think its
9 wrong.
10    Q.   Do you believe that -- do you believe in
11 the right for Ms. Walker to have due process?
12    A.   Absolutely.
13    Q.   Do you believe in the right for
14 Ms. Walker to have an opportunity to present
15 information in support of her position concerning
16 the alleged threats against Lieutenant O'Connell?
17    A.   She was given that opportunity. We took
18 a statement from Sergeant Walker.
19       I don't know if Sergeant Walker got up
20 and walked out of the room -- I don't know what
21 occasion it was, what investigation we were
22 investigating but I know at one time the Sergeant
23 just got up and walked out of where the statement
24 was being taken.

124

1    Q.   Wasn't that the appeal before the Mayor
2 and she asked for a continuance to get counsel?
3    A.   No; I'm not talking -- that's with the
4 Mayor.   I don't run that.  That's with the Mayor's
5 hearings.
6       I'm talking about a statement where she
7 made a complaint. She was at police headquarters
8 and I think a statement was being taken.   I don't
9 know which complaint it was; it may have been this
10 complaint where she was given the opportunity but
11 she got up and left without making a statement.   I
12 think it was at that time that we asked her for a
13 copy of a tape that she had going on at that time
14 and she has not produced that copy of that tape
15 even though we have requested it in writing from
16 her.
17       The attorney had a hearing -- the Mayor
18 has asked for a copy of that tape and she still
19 hasn't produced it.
20    Q.   Isn't it true that the matter was
21 actually being recorded by your internal
22 investigators at the time -- your internal
23 investigators had their own tape?
24    A.   But it was not on because they were

# TAMMY WALKER VS. CITY OF HOLYOKE
## ANTHONY SCOTT                    SEPTEMBER 11, 2006

125

walking down the hallway and hers was on, to the conference room where a statement was going to be taken and that's why we wanted a copy of her tape because she allegedly turned this tape on when she began to walk down the hall or when she walked in the office.

She was asked for a copy of that tape and she didn't produce it.

MR. HUDSON: Thank you, sir. We do have a lot of ground to cover and I'll try to move things along. Thank you again.

Sir, I want to show you a document here and I would like to have this marked as Exhibit 7.

(Plaintiffs Deposition Exhibit
No. 7 offered and marked.)

Q. (BY MR. HUDSON) Sir, did you have a chance to look at that document? (Indicating.) A. Yes.

Q. Do you recall having ever seen this document before?

A. No; I don't recall but if it was to do with an investigation that we conducted it's probably in the file along with the statements on anything that was taken.

126

Q. This is the allegation, the second paragraph -- first of all on October 17th, 2002 in the commander's office?

A. Oh, yes.

Q. Then the second paragraph, "Sergeant Monaghan had the paperwork from doing roll call. Sergeant Monaghan then placed some paperwork back on the clipboard. He then walked over to the desk when I was seated. He leaned over my desk to place the roll call lists in its slot. While leaning over to do this, Sergeant Monaghan began to sing a song. The words to the song were as follows. "You shouldn't be sticking your tongue where it don't belong." Do you recall that allegation?

A. I told you earlier today I remembered there was a song. I didn't remember what it was exactly about.

This was part of the investigation and Officer Dunn, Sergeant Monaghan, Sergeant Garcia, Sergeant Lenihan I believe were all questioned as it relates to these allegations. I don't know if the IAD number is on this but I know this was investigated.

127

1    Q. You also know that Sergeant
2  Walker reported that she basically -- this has
3  special meaning to her because of her sexual
4  orientation, being lesbian?
5    A. She states that in here.
6    Q. In Exhibit 7?
7
8    Q. Then also she reports in the last
9    A. Yes.
10   Q. Rather than her birth name,
11  Tammy? A. That's what she was reporting
12  and we investigated this.
13   Q. And she felt these were personal attacks
14  based on her race and sexual orientation? That's
15  what she states?
16
17
18
19
20
21   A. That's what she states.
22   Q. Thank you.
23   A. You're welcome, sir.
24   Q. Chief Scott, who has the keys to the

128

1  Professional Standards Division office?
2    Q. When there is an Internal Affairs
3  investigation -- during your tenure when there was
4  an Internal Affairs investigation of Ms. Walker's
5  complaints -- allegations -- who transcribed those
6  taped statements?
7
8
9    A. The taped statements?
10   Q. Taped statements.
11   A. My secretary.
12   Q. Who is that?
13   Q. Did you fax or assign anyone to
14  fax Tammy Walker's medical records to Gil
15  Barrett?
16   0. Who is Mr. Barrett?
17   A. He is the third-party administrator
18  for sick and injured-on-duty for the City of
19  Holyoke.
20
21
22
23
24

# TAMMY WALKER vs. CITY OF HOLYOKE

## ANTHONY SCOTT

## SEPTEMBER 11, 2006

It's Meditrol, Inc.

Q. Do you recall faxing a letter to the union lawyer, Michael Clancy -- do you know Mr. Clancy?

A. Yes; I do know Mr. Clancy.

Q. Do you recall faxing a letter to Mr. Clancy stating you were not going to begin an investigating in the NCIC tampering case?

A. I don't remember if I sent to letter to him but I may have.

Q. Do you recall a case number IAD 0426?

A. No. If you have a copy of it.

Q. But do you recall stating that you were not going to ask for an investigation into the NCIC tampering?

A. No; I don't remember.

Q. Do you know what NCIC stands for?

A. National Crime Information Center.

Q. Does that in any way have to do with a databank with regard to license plates, tags, identity?

A. No; you go through procedures in the Registry to run a license plate but all of those computers are hooked up to CJIS.

---

1 complaint was filed in court.

2    Q.    Do you recall whether or not that tenant
3 wanted a complaint filed -- the citizen?

4    A.    The tenant made complaints against the
5 Sergeant.

6    Q.    So did the tenant actually filed the
7 complaint or Lieutenant O'Connell?

8    A.    Lieutenant O'Connell being called out
9 there and talking to the parties involved. We do
10 this on a continual basis.

11    Q.    This the same Lieutenant O'Connell who
12 had denied Ms. Walker's request concerning
13 on-the-job injury?

14    A.    It's the same lieutenant.

15    Q.    It's the same Lieutenant O'Connell who
16 alleged that Ms. Walker threatened her?

17    A.    She didn't allege that Ms. Walker
18 threatened her; the police officers did.

19    Q.    So Lieutenant O'Connell never alleged
20 that Ms. Walker threatened her, is that your
21 statement? Is that your testimony?

22    A.    My testimony is that the three
23 officers -- I know their statements allege that
24 Ms. Walker acted in a threatening manner. Whether

---

130

Q. CJIS again is?

A. Criminal Justice Information System which works in conjunction with NCIC.

Q. Do you recall ever receiving an IOC from Captain Fletcher on March 3rd and March 9th regarding Ms. Walker?

A. No.

Q. Or March 3rd and March 9th, 2005 regarding Ms. Walker?

A. I receive so much stuff, so many pieces of paper come up regarding Ms. Walker and the paperwork she was generating on the Department so if you produce it and show it to me and let me look at it, I'll be able verify.

Q. Are you aware that as recently as August 23rd, 2006, Lieutenant O'Connell filed a complaint against Tammy Walker --

A. (Interposing) Yes.

Q. -- regarding her tenant, warning an officer to speak -- regarding Tammy Walker's tenant warning an officer to speak with Ms. Walker?

A. Based on a citizen's complaint against Ms. Walker from her tenant that a criminal

---

132

1 or not the Lieutenant had that in her statement, I
2 don't recall but I know the three independent
3 officers did.

4    Q.    Well sir --

5    A.    (Interposing) I don't remember the
6 Lieutenant's statement.

7    Q.    But sir, you are required -- in your
8 position you're required to know some of the
9 elements of a crime such as making threats, isn't
10 that correct?

11    A.    Yes.

12    Q.    Isn't one of those elements instilling
13 fear in the alleged victim?

14    A.    One of the elements of a crime whether
15 or not the individual felt fear? But I don't
16 remember if the Lieutenant made that in her
17 statement unless I look at the Lieutenant's
18 statement again.

19    Q.    The three officers cannot provide
20 evidence as to whether or not the Lieutenant was
21 afraid, isn't that correct?

22    A.    No; they cannot give testimony as to the
23 Lieutenant being afraid.

24        They can give testimony as to what they

133

1 saw and what they observed based on the fact that
2 they are police officers trained to be observant.
3    Q.   This is the same Lieutenant O'Connell --
4 this is the same lieutenant whom Ms. Walker is
5 alleging was issuing car dispatches through e-mail
6 and not through radio?
7    A.   Yes; same lieutenant.
8    Q.   Thank you.  Now sir, did you at any time
9 consider whether or not there may be a conflict of
10 interest on the part of Lieutenant O'Connell in
11 processing a complaint against Ms. Walker?
12    A.   You're speaking of the last complaint?
13    Q.   The complaint about Ms. Walker's tenant?
14    A.   As long as she had the elements of the
15 crime that she can articulate in the report that
16 she gave to the clerk.
17       The clerk issues a complaint, not the
18 Lieutenant.
19    Q.   Based upon the police officer's report?
20    A.   No; the clerk has -- calls for a
21 show-cause hearing before they issue a complaint.
22    Q.   Sir, isn't it true that your department
23 probably had -- doesn't your department have
24 officers that appear -- that go to the clerk

134

1 magistrate and file an application for a criminal
2 complaint?  Isn't that the official name?
3    A.   Yes; but that's not the complaint.
4 That's an application for complaint.
5    Q.   That's correct; that starts the process?
6    A.   Yes.
7    Q.   Does your department actually have an
8 officer assigned to do that for the Police
9 Department?
10    A.   We have a court officer but we also have
11 a number of officers who go over and have their
12 own complaints filed so it's not just the court
13 officer that files the complaints.
14       My narcotics officers go over all the
15 time and file complaints.   My detectives go over.
16 The traffic officer will go over. The officer on
17 the street will go over sometimes so it's not
18 always the court officer.
19    Q.   Is it customary for Lieutenant O'Connell
20 to file applications for criminal complaints?
21    A.   It's customary for anybody to file a
22 complaint.
23       I have filed, within the last year and a
24 half, maybe twenty thousand dollars worth of court

135

1 complaints -- me, the Chief of Police.   I've filed
2 the complaints personally.
3    Q.   That's important but in any event, sir,
4 did Lieutenant O'Connell consult with you before
5 filing an application for a criminal complaint
6 against Ms. Walker?
7    A.   She consulted -- I believe she talked
8 with Captain Fletcher and she did come up and
9 speak to me.
10    Q.   Before filing?
11    A.   And told me that she would be putting
12 together a complaint.
13    Q.   Against Ms. Walker?
14    A.   Against Ms. Walker.
15    Q.   Is there any documentation to that
16 effect?
17    A.   No; she came up to my office and spoke
18 with me about it.   I told her if she had the
19 facts, do her job.
20    Q.   This was recent within the last month?
21    A.   Sometime in August.
22    Q.   Of 2006?
23    A.   When she received a complaint from
24 Ms. Walker's tenant.

136

1    Q.   Do you know the name of Ms. Walker's
2 tenant?
3    A.   Don't have the slightest idea.
4    Q.   Do you keep a log or a record or a
5 journal -- do you keep a log, record or a journal
6 of conversations you have with officers or --
7 specifically with Lieutenant O'Connell?
8    A.   No.
9    Q.   Do you keep any log or journal regarding
10 your conversations, directives with your
11 personnel?
12    A.   When I issue an order, I issue written
13 orders but sitting down and meeting with my
14 subordinates or with citizens, I do not sit down
15 and make notes.   It's only in certain cases that I
16 do.
17       What I've learned is every time I speak
18 with Ms. Walker it does me good to write something
19 down; not on every occasion but I have documented
20 notes to the file.   Why?  Because I don't trust
21 her.
22    Q.   Now sir, the document notes to the file
23 for Ms. Walker, are they in her personnel file?
24    A.   No.

137

1    Q.    Where are they located?
2    A.    They are in the -- if they are to do
3with an investigation, they are in the
4investigative file.
5    Q.    Have you turned this material over to
6your lawyer?
7    A.    I don't know.  If it was in the Internal
8Affairs file, it would have been turned over to
9the attorney but they weren't on every occasion.
10    Q.    What would have been some occasions that
11you would have made documentations concerning
12Ms. Walker?
13    A.    I think when she came up to me to talk
14to me once about whether or not she should resign
15from the Police Department.
16         I didn't give her advice one way or the
17other but I think when she left the office I
18documented that conversation.
19    Q.    Any other instances that you recall that
20you documented?
21    A.    There may have been one other that I
22documented.   I can't recall but they would be in
23the file.   I'm not going to hide anything.
24    Q.    Did you ever have the occasion to

138

1document any conversations with Captain Fletcher?
2    A.    No; I don't think so.  I may have and it
3would be in the investigative file.
4         I don't make it a habit of documenting
5my conversations with people. I have
6conversations; I don't make that a habit but I
7thought it was necessary on some occasions that I
8did it.
9    Q.    Did you document any conversations with
10Lieutenant O'Connell?
11    A.    I don't think so.
12    Q.    What about did you document any
13conversations with Sergeant Monaghan -- did you
14have any conversations with Sergeant Monaghan
15during your tenure as chief?
16    A.    Yes; I've had conversations with him
17about -- nothing about Sergeant Walker.
18    Q.    Did you have any conversations with
19Sergeant Garcia about Sergeant Walker?
20    A.    No.
21    Q.    Did you have any conversations with
22Jorge Rodriguez about Sergeant Walker?
23    A.    I don't think so.
24    Q.    But you're not certain?

139

1    A.    I'm going to say no.
2    Q.    Is there anyone else other than Sergeant
3Walker and maybe Captain Fletcher that you would
4have kept a journal or documents of conversations?
5         MS. LYNCH: Can you just read back
6that question?
7              (    requested.)
8
9
10be certain because as I said, I'm not in the habit
11of doing that.
12    Q.    (BY MR. HUDSON) These journals -- it is
13your testimony these journals --
14    A.    (Interposing) It's not a journal.
15    Q.    Or documents -- what are they?
16    A.    It's an IOC -- an interoffice
17correspondence to the file that on such and such a
18date had conversation with this -- Captain
19Fletcher, Sergeant Walker, when this was said.
20I'd sign it and put it in the file.
21         It's usually to do when there's an
22investigation going on and I put it right in the
23file.
24    Q.    Do you know whether -- do you know a Tom

140

1Sapirstein -- Tani Sapirstein?
2    A.    Yes.  I don't know her personally but I
3know her from the --
4    Q.    (Interposing) Do you know whether -- I'm
5sorry, go ahead?
6    A.    I know her from sending the letters.
7    Q.    Do you know whether or not Attorney
8Sapirstein was provided these IOCs?
9    A.    No; I don't.
10    Q.    Do you know whether or not Attorney
11Sapirstein was provided with the Internal Affairs
12investigative files?
13    A.    No; I don't.
14    Q.    Do you recall whether or not you ever
15authorized anyone to copy the investigative files
16for delivery to your attorney?
17    A.    We copied a lot of files based on the
18request we got from the attorneys and turned it
19over to either the City Solicitor or Attorney
20Lynch, a lot of files.
21    Q.    What kind of files were these?
22    A.    Personnel files.  I don't know if there
23was Internal Affairs files but we were copying so
24many files, sending them out to not only to

141

1 Attorney Lynch, the City Solicitor, but to Mr. --
2 the union -- Clancy -- and to Attorney Dan
3 Sheridan.
4     Q.    Were these all files concerning
5 Ms. Walker?
6     A.    It's based on her appeals. When she did
7 her appeals of discipline to the Mayor we had to
8 supply copies of the files to the labor attorney
9 representing the City and we had to supply files
10 to the union attorney so there was a lot of
11 copying of files.
12          Who all got them, what was copied, I
13 don't remember.    I don't do the copying.
14     Q.    Who does the copying, sir?
15     A.    Either my secretary or Lieutenant
16 Fournier or Sergeant McCavick.
17          I don't think the City pays me to stand
18 at the copier to make copies of the files. They
19 pay me too much to be a file copier.
20     Q.    I'm sure they do, but not enough I'm
21 sure.
22          MR. HUDSON: Can we mark this, I
23 believe it's Exhibit 8.
24

142

1          (Plaintiff's Deposition Exhibit
            No. 8 offered and marked.)
2
3     Q.    (BY MR. HUDSON) If you would look at
4 that. (Indicating.)
5     A.    (Witness examining document.)
6     Q.    Sir, do you recognize this document?
7     A.    This is the complaint to the
8 Massachusetts Commission Against Discrimination
9 filed by Ms. Walker.
10    Q.    Do you see the filing date on that, on
11 Exhibit 8?
12    A.    12/2 of '02.
13    Q.    In the introductory  paragraph under
14 cause of discrimination, in that paragraph do you
15 see where it says, "In or beginning around May of
16 2002 and continuing up to most recently October
17 21, 2002 Holyoke Police Department discriminated
18 against me by subjecting me to a hostile work
19 environment, by harassing me based on my gender,
20 female; my color, back; and my sexual orientation,
21 lesbian and interfering with," et cetera?
22    A.    Mmm-hmm.
23    Q.    You see that? Okay.    Do you see in
24 paragraph two where the complainant alleged that

143

1 she -- since her promotion to sergeant she has had
2 a problem with other sergeants who are less
3 senior, specifically John Monaghan and Joseph
4 Garcia?
5     A.    Yes.
6     Q.    You have seen this document before,
7 isn't that correct?
8     A.    I think the first time I saw this
9 document was when Ms. Sapirstein filed this
10 document.
11    Q.    When you're saying "this document," are
12 you talking about the notices of whistleblowing?
13    A.    Yes.
14    Q.    Do you know whether or not -- do you
15 recall whether or not you knew whether or not --
16 who is Sergeant Lenihan? Do you know a Sergeant
17 Lenihan?
18    A.    Yes.
19    Q.    Who is Sergeant Lenihan?
20    A.    Sergeant Lenihan was the senior sergeant
21 on the third watch midnight to eight in the
22 morning, the watch that former Sergeant Walker was
23 assigned to and Sergeant Monaghan and Garcia. I
24 think they were all assigned to the third watch.

144

1     Q.    Sir, are you aware that Ms. Walker --
2 Sergeant Walker had spoken with Sergeant Lenihan
3 twice about her concerns about Sergeant Monaghan
4 and Garcia?
5     A.    No; I'm not aware. Could she have?
6 Probably, because that was her senior sergeant.
7     Q.    This was a complaint -- you said you
8 became aware --
9     A.    (Interposing) I believe I became aware
10 of it.
11    Q.    But that would have been when Ms. Walker
12 was represented by Ms. Sapirstein and those
13 whistleblower letters -- notices -- were mailed
14 out. That was around --
15    A.    (Interposing) 2005.
16    Q.    February 15th and May 4th, 2005?
17    A.    Yes.
18    Q.    According to Exhibits 4 and 5, is that
19 correct?
20    A.    Yes.
21    Q.    Sir, it is your testimony that even
22 though there was an MCAD complaint filed in
23 December, 2002 --
24    A.    (Interposing) They don't come to my

TAMMY WALKER vs. CITY OF HOLYOKE
ANTHONY SCOTT                                    SEPTEMBER 11 2006

145

1 office. They go to the City Solicitor. All legal
2 action goes to the City Solicitor and I'm not sure
3 I was aware of this.
4        I could have been made aware of it when
5 it occurred and supplied information; I don't
6 remember.
7        Q.    But it is clear that the Holyoke Police
8 Department is listed as a respondent as well as
9 John Monaghan and Joseph Garcia?
10       A.    Yes.
11       Q.    But you're not sure whether you were
12 aware of this?
13       A.    No; I'm not sure that I was made aware
14 of it at the time this was filed. I could have
15 been.
16       Q.    Do you know whether or not any City
17 Solicitor -- strike that.
18        But you were aware of the allegations in
19 paragraph six that Ms. Walker had complained that
20 Sergeant Monaghan had referred to her as Tyrone?
21       A.    That was made in the complaint and I
22 think the complaint could have been in 2002. That
23 was an interdepartmental complaint, not an MCAD
24 complaint.

146

1        Q.    I understand, sir. So whether or not
2 she received the complaint you were at least aware
3 of those allegations?
4        A.    Yes; and we had -- I think this was one
5 of them we had investigated, too, along with the
6 alleged song.
7        Q.    The one about "you shouldn't go sticking
8 your tongue where it doesn't belong"?
9        A.    Yes; in number seven. We did
10 investigate that.
11       Q.    There's a paragraph ten. Would you read
12 that, sir?
13       A.    "I spoke to Chief Scott about the
14 discrimination I feel I have been subjected to.
15 He stated to me that he felt this conduct should
16 stop and I should also go and speak with Captain
17 Fletcher."
18        I don't remember saying anything like
19 that. I remember that the investigation -- I
20 ordered an investigation.
21       Q.    Did your investigation also include --
22 did your investigation include the specific
23 questions that were asked of various officers
24 under your command through Lieutenant Fournier, I

147

believe?
2        A.    Yes; I think we took statements from
3 everybody on the watch -- I mean everybody
4 assigned to the watch. I think we even took
5 statements from the dispatchers regarding these
6 allegations.
7        Q.    Were you aware, sir, that there was
8 another complaint of discrimination filed by
9 Ms. Walker in addition to Exhibit 8?
10       A.    I don't know.
11        MR. HUDSON: If you would mark this
12 as Exhibit 9, please?
13        (Plaintiffs Deposition Exhibit
          No. 9 offered and marked.)
14
15       Q.    (BY MR. HUDSON) Have you seen this
16 document, sir, Exhibit 9? (Indicating.)
17       A.    (Witness examining document.) I don't
18 know about this specific document but I know that
19 she made complaints she filed against the Captain
20 Fletcher, Captain Seklecki, Lieutenant O'Connell,
21 Lieutenant Fournier, Sergeant McCavick.
22       Q.    And this is the second MCAD complaint
23 with the date of June 7, 2005 in the top
24 right-hand corner?

148

1        A.    Yes.
2        Q.    And this would have been after
3 Ms. Walker's termination, is that correct?
4        A.    I don't know. I don't remember exactly
5 when Ms. Walker was terminated but this could have
6 been filed right after that.
7        Q.    Do you recall whether or not -- look at
8 the second page, sir, and you see paragraph
9 eleven, "On April 12th, 2005 there was a hearing
10 before Mayor Sullivan." Do you see that?
11       A.    Mmm-hmm.
12       Q.    And that Ms. Walker -- that was the
13 hearing that was continued basically in her
14 absence, one of them with the Mayor.
15        Then do you see the next, I believe in
16 that same paragraph, "I was subsequently
17 terminated on April 18th, 2005." Do you have any
18 reason to doubt that -- to doubt that she was
19 terminated on April 18th, 2005?
20       A.    I don't know. I have a problem
21 believing anything that comes out of Ms. Walker's
22 mouth.    If I saw the document of termination I
23 could tell you but I have a problem believing
24 anything that Ms. Walker says.

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT          SEPTEMBER 11, 2006

149

1    Q.    Well sir, do you have any
2  recollections --
3    A.    (Interposing) Of the termination date.
4    Q.    Approximately when it happened that
5  Ms. Walker --
6    A.    (Interposing) When she was terminated?
7  No; I don't but there was a termination letter
8  written and she was provided a termination letter.
9  If I could see that letter that was filed by the
10  Mayor and given to her then I would know.
11        Anything where Ms. Walker is alleging
12  the facts and putting the facts in a document,
13  I've got some problems with it because I have a
14  problem believing the things that Ms. Walker says.
15    Q.    But sir, as Chief of Police you don't
16  have any recollection as to the date or season --
17  let's say the season or year that Ms. Walker was
18  terminated?
19    A.    It was in 2005.  Ms. Walker is a blip on
20  my radar screen.
21        I have a lot of things -- my world does
22  not revolve around Ms. Walker.   I have a lot of
23  things to do as Chief of Police other than
24  concentrate on Ms. Walker.

150

1    Q.    Obviously you're very busy, sir.  I
2  understand.   I understand you're very busy.
3    A.    I can't recall.
4    Q.    In any event, sir, you do recall that
5  there was a complaint filed with the MCAD against
6  the Holyoke department and these various officers
7  listed?
8    A.    Yes.
9    Q.    Sometime --
10    A.    (Interposing) Sometime in 2005. The
11  filing date, I guess the EEOC put that on there
12  but the facts and circumstances, that was put
13  together by Ms. Walker and I have a problem
14  believing the things Ms. Walker says based on the
15  investigations and the fact that she has a
16  tendency, which was substantiated in
17  investigation, she doesn't tell the truth.
18    Q.    So in addition to Ms. Walker having --
19  so Lieutenant O'Connell is named as a
20  respondent --
21    A.    (Interposing) Yes.
22    Q.    -- in Exhibit 9, is that correct?
23    A.    Yes.
24    Q.    And that's the same Lieutenant O'Connell

151

1  who requested an application for a criminal
2  complaint concerning Ms. Walker on or about
3  2006 -- in the year 2006?
4    A.        Sometime in August, 2006, yes. That's
5  the only -- we only have one Lieutenant O'Connell.
6    Q.    This was after -- and Lieutenant
7  O'Connell sought this complaint after the
8  application for a criminal complaint after
9  consulting with you?
10    A.    The Lieutenant didn't consult --
11    Q.    (Interposing) After mentioning to you?
12    A.    She didn't come up to me and say,
13  "Chief, I need your permission" because you don't
14  have to have my permission as a police officer to
15  file a complaint.
16        The Lieutenant came up to inform me what
17  had happened and what she was going to do. As far
18  as I was concerned, if she had the facts and could
19  substantiate it I was not going to say,
20  Lieutenant, no, don't do that.
21    Q.    Did Lieutenant O'Connell ever tell you
22  that she was named in an MCAD complaint by
23  Ms. Walker?
24    A.    Didn't have to. I knew about the MCAD

152

1  complaint. The one --
2    Q.    The one --
3    A.    (Interposing) I didn't see this.  I
4  think it was filed over in the City Solicitor's
5  Office and I was informed who the complaint was
6  against.
7    Q.    This is with regard to Exhibit 9?
8    A.    Yes.
9    Q.    Was Lieutenant O'Connell informed that
10  she had been named as a respondent or included in
11  a complaint filed by Ms. Walker with the MCAD?
12    A.    I think notified everybody.
13    Q.    Would it be safe to say that when
14  Ms. O'Connell applied for this application for a
15  criminal complaint against Ms. Walker that she
16  knew that Ms. Walker was suing her at the MCAD?
17    A.    I would be speculating but I'm going to
18  say yes because I had notified everyone who was
19  named in this MCAD complaint and who was named in
20  the complaint that was filed by Ms. Sapirstein.
21    Q.    Thank you.  Sir, do you recall that even
22  prior to the denial of the injury-on-duty request
23  in Exhibit 6 dated February 27, 2005 -- prior to
24  Exhibit 6 do you recall whether or not Ms. Walker

## PERLIK and COYLE REPORTING

153

1 had requested injury-on-duty status in
2 November 29, 2004?
3    A.    She was -- she had recurrence, she had
4 injury -- alleged reinjury of an injury that
5 occurred before I took over so she may have.
6 MR. HUDSON:    I would like to request
7 this be marked as Exhibit 10.
8    (Plaintiffs Deposition Exhibit
   No. 10 offered and marked.)
9
10    Q.    (BY MR. HUDSON) Please take a moment to
11 look at that  sir. (Indicating.)
12    A.    (Witness examining document.) Yes; I
13 remember this.
14    Q.    Sir, with regard to the last page on
15 this composite exhibit there was an application or
16 a report -- it's an Officer Injury Report, is that
17 correct, dated November 29, '04, on the last page
18 of that form?
19    A.    Yes.
20    Q.    Was there an IOC, an interoffice
21 correspondence from Ms. Walker to you, is that
22 correct, sir?
23    A.    Yes.
24    Q.    Dated November 29, '04?

154

1    A.    Yes.
2    Q.    Attached to that, do you recall this
3 listing of medicals?
4    A.    Yes.
5    Q.    So you actually -- but you actually
6 received the medicals, is that correct?
7    A.    I received all of this information.  She
8 submitted a packet of information regarding this
9 injury and I disapproved it.
10    Q.    This disapproval, sir, do you know if
11 this happened before or after Ms. Walker
12 complained about Sergeant Monaghan making the
13 statement about the song?
14    A.    This had nothing to do with that. There
15 was no precipitating incident.
16    Q.    Sir, thank you, sir.  I understand.  My
17 question, though, sir --
18    A.    (Interposing) Go ahead with your
19 question.  I'm sorry, I apologize, sir.  Go ahead.
20    Q.    The question is simply the timing.  Did
21 it happen after Ms. Walker had complained about
22 Sergeant Monaghan making the -- singing the song
23 in her ear, "don't stick your tongue where it
24 don't belong."

155

1    A.    I just want to go back.
2    MS. LYNCH:    Just for clarification,
3 the question is did it occur after, meaning the
4 work -- the claimed injury, is that the question?
5    MR. HUDSON:    Did the denial of the
6 injury --
7    MS. LYNCH:    (Interposing) Related to
8 the injury?
9    MR. HUDSON:    Related to the injury
10 occur after Ms. Walker had complained about
11 Sergeant Monaghan's alleged discriminatory
12 th
13    THE WITNESS: Two years after. This
14 was in 2004; the complaint against Sergeant
15 th
16 were made happened in 2002 so it was two years
17 t
18    Q.    (BY MR. HUDSON) Then sir, didn't
19 Ms. Walker start making the complaints about
20 Lieutenant O'Connell on or about October 2004 --
21 the complaints about not receiving her radio calls
22 and that Lieutenant O'Connell was directing those
23 over the e-mail?
24    A.    It could have been.

156

1    Q.    In fact isn't it true that Ms. Walker
2 filed an internal complaint with you against
3 Lieutenant O'Connell on November 4, 2004 and she
4 was suspended for five days for filing a false
5 allegation against a superior officer.    Do you
6 recall that?
7    A.    Yes.
8    Q.    Approximately twenty-five days after
9 Ms. Walker complained against Lieutenant O'Connell
10 made to you, her November 29th report of a
11 work-related injury to her neck and shoulder were
12 denied, is that correct?
13    A.    No; I don't think that's correct.  I
14 believe that Sergeant Walker was running out of
15 sick time and her sick time was going to expire --
16 well, expired on the -- I want to say the
17 seventeenth or the eighteenth of November and
18 lo and behold I get an injury report.    No more
19 sick time, holiday time personal time.
20    Now there's no time left. You have to
21 come back to work and lo and behold we get an
22 injury report.
23    Q.    Even though you got the injury report,
24 isn't it true, sir, that the injury report is --

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT                    SEPTEMBER 11, 2006

that Sergeant Walker on or about November 4 had reported her concerns -- November 4, 2004, her concerns about Lieutenant O'Connell using -- issuing an order to have dispatchers send units to calls by e-mail and in fact -- excuse me, that's the question.

Isn't it true that on or about that time, 2004 Sergeant Walker -- November of 2004 Sergeant Walker had complained, made allegations about Lieutenant O'Connell?

A. Yes; Sergeant Walker made complaints about Lieutenant O'Connell.

Q. On or about November, 2004?

A. I don't know what the date it was but she had made complaints. It was in 2004.

My disapproval, sir, had nothing to do with her making a complaint about the Lieutenant. There was no precipitating incident. The last time she reported an injury to her shoulder, she alleged that a door had opened and the steel door had hit her in the shoulder. That was the precipitating incident. There was no precipitating incident that led up to this and I disapproved it.

1 the investigation.

2        Q. I'm not introducing this into evidence,
3 sir, but if you want to take a look at this, I
4 believe it's the copy of something that says "as
5 of November 8th"? (Indicating.)

6        A. I told you I took your word for it, sir.

7        Q. Thank you. Sir, with regard to -- let's
8 see, on or about December 20th do you recall --
9 December 20, 2004 do you recall receiving a
10 grievance from Sergeant Walker?

11        A. I received several grievances from
12 Sergeant Walker.

13        Q. A grievance from Sergeant Walker
14 involving Lieutenant O'Connell and being
15 reassigned to in-house duty, desk duty?

16        A. Yes; she did file a grievance. Exactly
17 when her grievance was, I don't know.

18        Q. Did you investigate that yourself or did
19 you authorize someone else to investigate that?

20        A. Grievances -- I have to look into
21 grievances.

22        Q. Do you recall whether or not you were
23 able to substantiate Ms. Walker's I guess
24 allegations?

158

I was asked to, could I relook at this so what I did was I got Meditrol to look at all of the documents that she had given me and all of the documents that she had given them and I asked them, look, I want to have you review this. They reviewed it and they came to the same conclusion I did, that there was no precipitating incident that led to this mysterious injury and she was told that she could seek remedy under Chapter 41, Section 100.

Q. Thank you, sir. My question is really quite simple and that is whether or not as of November 4, 2004 Sergeant Walker had complained and in fact an IOC had been issued concerning Lieutenant O'Connell being accused of sending out dispatches over the e-mail instead of radio?

A. That was in November, 2004.

Q. Thank you. Also by November 8th isn't it true that you had authorized an internal investigation into Sergeant Walker's allegations?

A. Yes; it may have been. I don't know if it was November the 8th. If you say so, it was, okay, because I don't think you would lie to me about that but I don't remember when I authorized

160

1        A. I would have to see my report on it
2 because I respond to all grievances that are
3 filed.

4        Q. Do you recall whether or not Sergeant
5 Walker complained about other officers reviewing
6 her personnel records?

7        A. Once again if I was permitted to review
8 the report I made and the grievance that she filed
9 I would be able to answer your question
10 intelligently.

11        Q. Is it customary to restrict an officer
12 who is assigned to booking from going to other
13 areas of the Police Department, like to restrict
14

15        Q. Under what circumstances?

16        A. That's because we don't want the
17

18 officers hanging in those locations. I put out an
19 order to that, myself. I don't want the officers
20 hanging in the record room or hanging in the
21 dispatch center.

22        A. (Interposing) I issued it to the whole
23
24

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT                 SEPTEMBER 11, 2006

department and I know what you're referring to -- Lieutenant O'Connell's directive to Sergeant Walker that she did not want the Sergeant going into the communications center or into the record room.

    If that's what the Lieutenant wants, the Lieutenant can do that.

Q. It was your testimony earlier that on or about November 4, 2004 Ms. Walker had made allegations against Lieutenant O'Connell about issuing orders via e-mail, is that correct?

A. You said it was November the 4th and -Q. (Interposing) 2004?

A. 2004 and I agreed with you because you are evidently reading it in some report so I agreed with you.

Q. You want to change your testimony?

    MS. LYNCH: I'm just going to interject I think what you agreed to was something to do with November 8th, not November 4th.

    THE WITNESS: If it's in the records, it's in the records. I'm sure that if you can produce -- if you produce something, you're reading from something, evidently it's

162

November 4th so, okay, it's November 4th, 2004. I agree with you.

Q. (BY MR. HUDSON) Let me clarify; November 4th was the -- 2004 -- was the date that I asked whether or not you agreed Ms. Walker had made her allegations against Lieutenant O'Connell. November 8th was the date that I asked you whether or not you had authorized an internal investigation?

A. Okay; I remember that.

Q. November 4th and November 8th, 2004, okay?

A. Okay.

Q. All right; now do you recall that as of November 10th, 2004 Lieutenant O'Connell had issued a written directive to Ms. Walker that she not enter the dispatch or Records Bureau, two days after there had been the initiation of an internal investigation into Ms. Walker's allegations about Lieutenant O'Connell?

A. I don't know. Sir, if you have those records there, wouldn't it be easier if you just present them to me and ask me if I know about those documents rather than test my memory?

1    Sir, I have a lot going on but if you
2 have the documents I'll look at them. I'm not
3 trying to be argumentative. I'm just trying to
4 save some time here. If you have the records, I'm
5 not going to lie about them. I'll tell you what I
6 remember.
7    MR. HUDSON: So we're clear on
8 November 4th and November 8th. I just want to ask
9 you, sir -- let's get this into evidence here.
10 This is Exhibit 11, I believe.
11    (Plaintiff's Deposition Exhibit
      No. 11 offered and marked.)
12
13    THE WITNESS: Yes; Sergeant Walker
14 filed a grievance. It was received in my
15 office -- I can't read the date, but you see where
16 it says "received by the Chief."
17    I can't read the date so I don't know
18 what date I got it.
19    Q.   (BY MR. HUDSON) There is a date -- I
20 don't know what that is. This is when it went to
21 the -- okay; December 20th, 2004?
22    A.   Was the date of the grievance but that's
23 not necessarily the date I received it and the
24 date I received it, I stamped it on here but it's

164

1 not clear.
2    Q. Then there's a date of an alleged
3 violation of contract, November 10th, 2004. Do
4 you see that?
5    A. Yes; December 8, 2004.
6    Q. There are two dates; okay. Is that
7 correct?
8    A. Yes; there's November 10, 2004 slash
9 December 8, 2004.
10    Q. Now sir, I draw your attention to the
11 second page where Ms. Walker references an IOC she
12 received on November 10th, 2004 from Lieutenant
13 Eva O'Connell?
14    A. Yes.
15    Q. You testified earlier that you were
16 aware of this matter basically where Ms. Walker
17 was assigned to booking and Lieutenant O'Connell
18 had the authority to do that?
19    A. Yes.
20    Q. And that you were also aware of where
21 officers are restricted from going into dispatch
22 or Records Bureau because you didn't want them
23 hanging around?
24    A. Yes.

**TAMMY WALKER vs. CITY OF HOLYOKE**
**ANTHONY SCOTT                    SEPTEMBER 11, 2006**

165

Q.    I'm simply trying to establish a date here.

Do you agree or disagree that Ms. Walker received an IOC from Lieutenant O'Connell on November 10th, 2004?

A.    (Witness examining document.)

Q.    Sir, there is obviously attached to this document I guess your memo to the file which is addressing a lot of other matters but I am simply asking only about the date, November 10th, 2004.

Do you agree or disagree that Ms. Walker received an IOC from Lieutenant O'Connell?

A.    I agree that Sergeant Walker received a memo from Lieutenant O'Connell. I don't know what date it was. That's what I was trying to look through this and find the date.

I don't know if it was on November 10th but I do know that Sergeant Walker was issued an order in writing by Lieutenant O'Connell and provided a copy of that order. Sergeant Walker has in her files or in her possession a copy of that order. That order has on the top of it a date.

I don't know if it's November the 10th.

166

Ms. Walker is saying it's November the 10th.    I don't know if it's November the 10th until I see the order, itself.

Q.    But you did receive this --

A.    (Interposing) This grievance; yes.

Q.    Exhibit 11?

A.    11, I received this grievance.   I subsequently conducted an investigation into the grievance.

This is not -- this is one of those memos I told you I did to file but this is not my -- hold on.  My response to the grievance believe is the last two pages of this Exhibit 11.

Q.    In any event, I think we can assume that -- let's not assume.

Isn't it true then that Ms. Walker made the allegation before January 5, 2005?

A.    She made the allegation some time between December the 20th, 2004 and January the 5th, 2005.

I could tell you when, if this date -- when I got it but the date is not clear on there.

Q.    When you investigated this, did you review the IOC from Lieutenant O'Connell?

167

1    A. I reviewed everything associated with
2 the allegations.
3    Q. If in fact you did that review and you
4 had realized that Ms. Walker had misstated the
5 date or that the date of November 10th was
6 inaccurate, you would have pointed that out, would
7 you not?
8        I mean you don't miss anything, do you,
9 sir?
10    A. I'm going to say that I can't say when
11 she filed this grievance. It was sometime between
12 December the 20th and January the 5th and I keep
13 track of those dates.
14    Q. But I'm not talking about when she filed
15 it now.
16    A. When I received it?
17    Q. No, sir; I'm questioning the date of
18 November 10th, 2004 when the IOC was received
19 from -- when Ms. Walker claims it was received
20 from Lieutenant O'Connell.
21        I'm simply asking you if you had -- if,
22 during the course of your investigation you
23 determined that Ms. Walker had misstated or was
24 wrong about the date of the IOC, wouldn't you have

168

1 pointed that out in your -- in one of your two
2 responses attached, included in Exhibit 11?
3    A. Not necessarily because that wasn't the
4 grievance.
5        The grievance was to do with the order,
6 not the date that the order was issued and the
7 fact that she was to remain inside the station as
8 the booking sergeant.
9        MR. HUDSON: Thank you, sir. Can we
10 have Exhibit 12 marked, sir?
11        (Plaintiff's Deposition Exhibit
             No. 12 offered and marked.)
12
13    Q. (BY MR. HUDSON) I'd like you to take a
14 look at that document, please, and please look at
15 paragraph two specifically after you've had a
16 chance to look at it. (Indicating.)
17    A. (Witness examining document.) Okay; it
18 was November the 10th.
19        MR. HUDSON: Thank you. Sir, I show
20 you also another grievance -- let's mark this one
21 Exhibit 13.
22        (Plaintiffs Deposition Exhibit
             No. 13 offered and marked.)
23
24        MR. HUDSON: Excuse me just a

**PERLIK and COYLE REPORTING**

171
Case 3:05-cv-30074-MAP    Document 56-5    Filed 08/07/2007    Page 44 of 50

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT          SEPTEMBER 11, 2006

minute.

(Discussion off the record.)

Q. (BY MR. HUDSON) Sir, do you recognize this document, Exhibit 13? (Indicating.)

A. (Witness examining document.) Yes.

Q. What is it?

A. It's another grievance filed by Sergeant Walker against Lieutenant Fournier.

Q. Is this the same Lieutenant Fournier who is in Internal Affairs who does most of the investigations of non-grievance matters?

A. Yes.

Q. What's the date of the grievance, sir?

A. December the 13th.

Q. 2004, is that correct?

A. Yes.

Q. It's alleging a violation occurring on what? November 18th, 2004 -- on the first page?

A. Yes.

Q. Sir, at the time Ms. Walker or at the time of her termination, do you know what her wages were?

A. No.

Q. Did she have the opportunity to earn

---

170

overtime? Did Ms. Tammy Walker have the opportunity to earn overtime up until her termination?

A. Just like any other supervisor.

Q. What is that?

A. I don't know.

Q. How does it work?

A. I don't know. If a supervisor was needed on a watch, they would put in for it and based on some type of formula that the union has on how much overtime each individual has, you're given overtime; or if we run a special operation and we need supervisors, you get overtime.

Q. Are sergeants and -- is there any such thing as a shift differential?

A. No; that was taken away at the last contract.

Q. Is there any such thing as premium pay?

A. No. Overtime is overtime. That was taken out of the contract I think two contracts ago.

If you worked as a -- a lieutenant is necessarily in charge of the watch. If the lieutenant is off and the sergeant was working in

---

1  that slot, the sergeant would get paid the
2  difference between their salary and the
3  lieutenant's salary. That was taken out of the
4  contract I think two contracts ago.
5      Q.  Did Ms. Walker get paid for vacation
6  pay? Is there vacation pay?
7      A.  I can't give you an answer that's going
8  to help you. I don't know what she was paid.
9      Q.  Do employees under your -- do police
10 officers under your command receive any type of
11 vacation pay?
12     A.  No; when they go on vacation, they are
13 paid. You don't receive special pay for vacation.
14         If you take vacation you're still
15 paid -- your salary still continues because you're
16 on vacation.
17     Q.  Do any police officers under your time
18 get sick pay or just the time?
19     A.  No; if you're out sick, validly sick you
20 get paid your regular salary. There's no special
21 sick pay.
22     Q.  Do any police officers receive any type
23 of temporary housing allowance?
24     A.  Not to my knowledge.

---

172

1      Q.  Do they get any bonuses that you know
2  of?
3      A.  Not to my knowledge.
4      Q.  Are there contributions by the City to
5  any pension or retirement?
6      A.  Absolutely; yes.
7      Q.  Is that operated by the City or by the
8  State?
9      A.  That's operated by the City. You're
10 paid by the City. So much money is taken out of
11 your check for retirement. It's matched I think
12 by the City. That's handled by the Retirement
13 Board.
14     Q.  Do officers receive any funds for
15 uniform cleaning allowance?
16     A.  No; no cleaning but you do get a uniform
17 allowance.
18         Actually you don't get a check. Money
19 is put in the budget so if you go over to buy a
20 uniform, you come up to the Chief's office and
21 they will issue you a slip to go -- so you can go
22 purchase a uniform part, some kind of clothes or
23 whatever. You bring that slip back -- you give
24 that slip where you bought the uniform from, they,

ANTHONY SCOTT                                    SEPTEMBER 11, 2006

173

in turn, will attach a bill to that slip and send
it back into the Department and the comptroller
will then submit a requisition to pay that vendor.

Q. Do you or the City contend that
Ms. Walker did not mitigate her losses or damages
by getting other employment?

A. I don't have the slightest idea what
you're speaking of, sir.

Q. Do you or the City -- does the Holyoke
Police Department or the City of Holyoke take the
position that Ms. Walker should have found other
employment once she was terminated?

A. Ms. Walker filed an action with the
Massachusetts employment office. There was a
hearing and I believe they found against
Ms. Walker.

Q. Do you know whether or not she appealed?

A. Don't have the slightest idea.

Q. In any event, my question, sir, is -- do
you understand what mitigation means?

A. Yes.

Q. To mitigate?

A. Yes; she was -- she filed for
unemployment.

174

Q. No, sir.

A. You're not talking about unemployment?

Q. I'm talking -- unemployment benefits
could include mitigation -- or mitigation could
include unemployment but what I'm asking you, sir,
is do you or does the City of Holyoke claim that
Ms. Walker is able to work and should be working
after she was terminated from the City?

A. I haven't the slightest idea.

Q. Thank you. Is there only one individual
who now holds the position which Ms. Walker
previously held, sergeant -- her position?

A. There's no position that's guaranteed to
anyone.

Q. But the position she previously occupied
has been filled by Civil Service, is that correct?

A. Yes.

Q. It's only been filled once since she was
terminated, is that correct, and that was by a
white Hispanic male?

A. The position that the -- the sergeant's
position that Ms. Walker held, once she left
Manuel Febo was promoted to that position.

Q. And he's still in that position?

175

1     A.   Yes; he is.
2     Q.   Thank you. Do you know of any other
3 officers who have been accused of any misconduct
4 like Ms. Walker and who have been -- let me strike
5 that.
6          With the exception of the officers you
7 identified as arriving late for court and the
8 officers who were written up for being in the bar
9 after hours -- with those two exceptions, are you
10 aware of any other officers who have been
11 disciplined by you or the City for untruthfulness?
12    A.   Yes.
13    Q.   What officers have been disciplined for
14 untruthfulness?
15    A.   Former Sergeant Robert Wagner.
16    Q.   How was he disciplined?
17    A.   He was -- I believe he was suspended.
18    Q.   Was he eventually terminated or did he
19 retire?
20    A.   Retired.
21    Q.   Is he a white male?
22    A.   White male. Officer I think Jimmy
23 Bryant.
24    Q.    What's his race?

176

1     A. White male.
2     Q. Are there any others, sir?
3     A. I don't recall offhand.
4     A. Yes.
5     Q. Who are those, sir?
6     A. I think Jorge Rodriguez.
7     Q. What's his race and ethnicity?
8     A. Hispanic.
9     Q. Hispanic male?
10        A. Yup. I think Jimmy Bryant, white male.
11    Q. With Mr. Bryant is this a different
12 offense or the same as before? Is it related to
13 untruthfulness?
14    A. No; it's separate.
15    A. No.
16    Q. Jimmy Bryant?
17    A. No.
18        Q. Any approximate date or time for Robert
19
20
21
22
23
24 Wagner?

PERLIK and COYLE REPORTING

# TAMMY WALKER vs. CITY OF HOLYOKE
### ANTHONY SCOTT     SEPTEMBER 11, 2006
Case 3:05-cv-30074-MAP    Document 56-5    Filed 08/01/2007    Page 46 of 50

179

**177**

A. No; it was before he retired.

Q. What discipline did Mr. Rodriguez receive?

A. I think he got a letter of reprimand.

Q. What about Jimmy Bryant, what discipline did he receive?

A. I think I gave him five days.

Q. Did the Mayor increase any of the suspensions that -- increase any of the discipline that you gave to -- let's say to Jimmy Bryant?

A. I think he did.

Q. You're not sure?

A. I'm not sure but I think he did.

Q. What about for Jorge Rodriguez? Do you know if the Mayor increased that time at all -- it was a letter of reprimand?

A. A letter of reprimand so that didn't go to the Mayor.

Q. Let's see. With regard to Robert Wagner, he was suspended. Did the Mayor give any additional time?

A. I don't recall.

Q. With regard to Jimmy Bryant, did the Mayor give more time?

**178**

A. I think he did; I'm not sure.

Q. What kind of discipline did Mr. Bryant receive?

A. I think I gave him five days.

Q. Five days suspension?

A. Yes; but it was -- it involved more than just being untruthful.

Q. Let me ask you this, sir: These suspensions where you gave suspensions, were they with pay or without?

A. Without.

Q. All instances?

A. Yes.

Q. With regard to Jimmy Bryant, you say that involved much more than just being untruthful?

A. Yes; it was other charges of violations of department rules and regulations. Untruthful I think was one of them -- of the charges.

Q. Sir, with regard to failing to take a proper report, were there any officers you disciplined for failing to take a proper report?

A. I don't recall.

Q. Any other instances of disciplining an

**179**

1   officer for threatening a supervisor?

2     A. I definitely -- I'm going to say no.

3     A. No; I don't recall any case like

4   that. Q. Any instances of disciplining an

5   officer

6

7

8

9

10

11

12

13

14

15

16

17

18     A. Yes.

19

20

21

22

23

24

**180**

1     A.   I gave everybody involved written

2 reprimands except for the reserve officer -- and I

3 don't remember that reserve officer's name.

4     I suspended that reserve officer from

5 working on the Department for thirty days.

6     Q.   Sir, do you have any knowledge of any

7 other instances of statements -- of racist

8 statements made in your business -- made at the

9 Holyoke Police Department by officers?

10     A.   The only statements that I'm aware of is

11 the statements in this case.

12     Q.   Those that were brought to your

13 attention by Plaintiff Walker?

14     A.   Yes.

15     Q.   Which of those statements do you

16 consider to be racist?

17     A.   To tell you the absolute truth, I don't

18 know of any one of those statements that were

19 racist.

20     Q.   Are you aware of any racist acts under

21 your command?

22        MS. LYNCH: Did you say acts?

23        MR. HUDSON: Acts -- A-C-T-S.

24        THE WITNESS: I understood him. I

181

1 don't know, not off the top of my head, no.

2    Q.    (BY MR. HUDSON) I'm not just talking

3 about -- excuse me.

4         My question is not limited to acts of

5 racism against blacks and African-Americans but are

6 you aware of any racist acts against white, Jewish

7 or Hispanics -- any at all?

8    A.    I don't think there were -- off the top

9 of my head I don't think that we received a

10 complaint other than Sergeant Walker's

11 allegations.

12    Q.    Are you aware of any other allegations

13 of sexual harassment other than Sergeant Walker's

14 allegations?

15    A.    No.

16    Q.    Are you aware of -- do you have -- does

17 the City of Holyoke Police Department have written

18 policies and practices governing racial

19 harassment?

20    A.    Regarding -- I know specifically we have

21 a sexual harassment policy on the books and I

22 believe that that policy also covers race.

23    Q.    Where is that policy?

24    A.    Its in the operations manual that

182

1 everybody is issued.

2    Q.    Is it posted?

3    A.    No; it's not posted.  It may be posted;

4 I'll stand corrected.    It may be posted on the

5 bulletin board in the station but I know that I've

6 issued everyone on that department a policies and

7 procedures manual that's about this thick and that

8 policy is in that manual and everybody had to sign

9 for that manual.

10    Q.    Are you aware of any prior complaints of

11 sexual harassment within the Holyoke Police

12 Department other than Ms. Walker's?

13    A.    Not to my knowledge; no, sir.

14    Q.    During your tenure are you aware of any

15 prior complaints of racial harassment in the

16 Holyoke Police Department other than Ms. Walker's?

17    A.    Not off the top of my head, sir, no.

18    Q.    Does your sexual harassment policy, does

19 it cover sexual orientation?

20    A.    Yes; it covers -- it was in existence

21 long before I came to the Holyoke Police

22 Department.

23    Q.    Are you aware of any other complaints

24 involving sexual orientation other than

183

1 Ms. Walker?

2    A.    No; I'm not.

3    Q.    Are you aware of any female employees

4 complaining about any unwanted touching?

5    A.    Not to my knowledge, sir.

6    Q.    Any unwanted pats, pinches?

7    A.    Not to my knowledge, sir.

8    Q.    Rubbing against unnecessarily?

9    A.    Not to my knowledge, sir.

10    Q.    Forcibly holding?

11    A.    Not to my knowledge, sir.

12    Q.    Grabbing?

13    A.    Not to my knowledge, sir.

14    Q.    Do you recall that when Plaintiff made

15 her report of sexual harassment it regarded any

16 suggestive or derogatory language?

17    A.    Only what she stated in her complaint.

18    Q.    Do you recall whether or not within her

19 complaint Plaintiff alleged that she was the

20 subject of jokes because of her gender or sexual

21 orientation?

22    A.    Only what was in her complaint.

23    Q.    Did you consider that to be -- did you

24 consider the allegations in her complaint to be

184

1 that she was made the subject of a joke because of

2 her sexual orientation or gender?

3    A.    No, sir; only based on what she had in

4 her complaint.    I didn't speculate or anything

5 else.

6         I based the investigation and everything

7 solely on what she alleged in her complaint.

8    Q.    Taking Plaintiff's complaint -- looking

9 at -- recalling Plaintiff's complaint did you

10 consider that Plaintiff was actually making an

11 allegation of sexual harassment?

12    A.    I considered that the complaint was

13 making a complaint that the remarks that were made

14 she took to be sexual in nature.

15    Q.    Unwanted --

16    A.    (Interposing) And we investigated it.

17    Q.    Did you investigate that these acts

18 alleged by Plaintiff were designed to make fun of

19 her?

20    A.    I didn't speculate into anything.  I

21 didn't assume anything.

22         I based -- I had the Internal Affairs

23 base their investigation solely on the

24 allegations.  I did not assume anything.

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT                    SEPTEMBER 11, 2006

185

1    Q.    Do you know whether or not Internal
2 Affairs investigated Plaintiff's allegations based
3 on Plaintiff being made fun of because of her sex
4 or sexual orientation?
5    A.        They based the investigation on what the
6 Sergeant alleged in her complaint.
7    Q.    Well, the allegation -- one of the
8 allegations, sir, was that there was a song, "lick
9 it, lick it good."
10         Do you know whether or not that was --
11 that the investigation of sexual harassment was
12 based upon that allegation?
13    A.    That was the allegation that she made so
14 when they investigated it, they based their
15 investigation on that allegation, sir.
16         I didn't speculate on anything.    I went
17 by the facts in the complaint.
18    Q.    That's what I'm asking you, sir.    Given
19 the facts that were in the complaint did an
20 investigation of sexual harassment occur?
21    A.    An investigation into her allegations
22 occurred. Whether it was sexual harassment or
23 whether it was racial harassment, it was based on
24 her complaint.

186

1         Now if those racial terms that she
2 alleged was in there, then the investigation was
3 based on those allegations that she claimed
4 occurred.   If they were sexual in nature then the
5 investigation was sexual in nature.    If they were
6 racial in nature, then the investigation was based
7 on that.
8    Q.    Even though the investigation was based
9 on those allegations, you today would not testify
10 that the investigation was one of sexual
11 harassment?
12    A.    I would testify that the investigation
13 was based on Sergeant Walker's -- then Sergeant
14 Walker's complaint.
15         Whether it was sexual, racial, or
16 whatever, it was based on her complaint.
17    Q.    What would have been the first time that
18 you became aware or knowledgeable of Plaintiff's
19 complaint of sexual harassment?
20    A.    When she filed her complaint.
21    Q.    Which complaint, sir?
22    A.    One of these complaints she listed her
23 allegations.
24    Q.    Are you speaking of which complaint, the

187

1 sir, or the internal complaint?
2    A.        There was so many complaints filed by
3 Ms. Walker.
4         In one of those complaints she made
5 allegations that there were comments that she
6 considered sexual in nature as related to her
7 sexual orientation. There was comments in there
8 that she made about race so the investigation
9 covered those allegations as made by Ms. Walker.
10    Q.    But you don't have -- you're saying that
11 you don't recall when you first became aware of
12 her allegations of sexual harassment?
13    A.    No, sir; I do not know when they first
14 came to my attention. The complaints are there,
15 we can go back to the dates.
16    Q.    Was there any -- when Sergeant Monaghan,
17 did he submit any written statements concerning
18 Ms. Walker's allegations of sexual harassment
19 other than the affidavit attached to his MCAD --
20 attached to the City's MCAD position statement?
21    A.    The investigations that were conducted
22 by Internal Affairs, I believe that statements
23 were taken.
24    Q.    That would have included statements from

188

1 Monaghan -- Sergeant John Monaghan and maybe
2 Sergeant Garcia?
3    A.    It was statements from the whole watch.
4 Every person who was on the watch. I think
5 there's -- when she made these allegations I think
6 she was on the last watch, midnight to eight in
7 the morning.
8         I believe there was either seventeen or
9 eighteen police officers and four sergeants and a
10 lieutenant and I think statements were taken from
11 everyone.
12    Q.    All of those statements are in the
13 internal investigative file?
14    A.    Yes; if the statements were taken -- and
15 I believe they were -- they'd be in the
16 investigative file.
17    Q.    And those would be files that you've
18 turned over to either the City attorney or your
19 attorney?
20    A.    It would either be turned over to the
21 City Solicitor or Ms. Lynch.    I didn't make copies
22 of any of that so if they're copies made, it
23 wasn't made by me but if a request was put in,
24 they would get the copies and forwarded them to the

189

1 City Solicitor or to Ms. Lynch -- Attorney Lynch,
2 I'm sorry.
3     Q.   Thank you.  All the reports of the
4 investigation --
5     A.      (Interposing) That would have been
6 turned over to Attorney Lynch, City Solicitor or
7 let me say also there may have been -- if they
8 involved discipline against Ms. Walker or against
9 one of the individuals, they would have been
10 turned over to the union attorney, Mr. Clancy.   If
11 it was -- if Mr. Clancy wasn't the attorney,
12 Mr. Browne -- Attorney Browne.
13    Q.   Sir, have you, yourself, encountered any
14 acts that you personally would consider racist?
15    A.   On the Holyoke Police Department?
16    Q.   On the Holyoke Police Department.
17    A.   I've been called a racist by some
18 civilians.  I've been called a racist more since
19 I've been the Chief of Police in Holyoke than
20 anyplace I've ever been.
21    Q.   Have you encountered any acts -- have
22 you experienced any acts of intentional racism?
23    A.   No, sir.
24    Q.   Are you aware of anyone else in the

190

1 Holyoke Police Department who has complained of
2 any racism other than Ms. Walker?
3     A.   No.
4     Q.   Do you know of any other employee who
5 has alleged -- other than Jorge Rodriguez who
6 claims that they have been retaliated against for
7 either their complaints about race discrimination
8 or participating in an investigation of race
9 discrimination?
10    A.   Not to my knowledge; no. I don't
11 recall.
12    Q.   Are you aware of any employee in the
13 Holyoke Police Department who claims that they
14 have been retaliated against because of sexual
15 harassment -- their complaints about sexual
16 harassment or sex discrimination?
17    A.   No, sir; I don't recall.
18    Q.   Do you know of any expert witnesses
19 which the Defendants plan to offer at a trial of
20 this matter -- this case involving Tammy Walker
21 versus the City of Holyoke?
22    A.   No, sir; I don't.            .
23    Q.   Do you know of any individuals who have
24 been employed by the City of Holyoke or who the

191

1 City of Holyoke plans to employ in trial
2 preparation?
3 A.        I don't know.  I think you should ask
4 Ms. Lynch because I'm not planning this defense.
5 Attorney Lynch is.
6           MR. HUDSON:   Excuse me. If we can
7 go off the record for a moment.
8           (Discussion off the record.)
9           MR. HUDSON:   We'll pass -- I'd like
10 to qualify that, excuse me.   Can we go off the
11 record for a moment?
12           (Discussion off the record.)
13           MR. HUDSON:   At this point counsel
14 for the Plaintiff will, given the lateness of the
15 hour, approaching quarter to five, will suspend
16 the deposition subject to continuing it for
17 purposes of examining the deponent, Chief Scott,
18 if need be regarding documents which Plaintiff has
19 requested and has not yet received.
20           I am not stating that the documents are
21 overdue at this point in time because I don't have
22 my calendar with me but I know it's close in time
23 for the production of the documents. We simply
24 are suspending the deposition, not passing the

192

1 witness.
2           MS. LYNCH:   I just want to state the
3 Defendant's position that at this time I can't
4 agree to a suspension.   We'll need to revisit the
5 issue later.
6           At this point I'm not aware that the
7 document response is overdue and also I believe
8 that either Ms. Walker or her attorneys have
9 either received or have been given the opportunity
10 to receive -- to review, rather -- most if not all
11 the documents that are outstanding.
12           We can revisit the issue at a later
13 date.
14           MR. HUDSON:   Let me just ask
15 counsel:   In addition to the documents that have
16 been requested through the requests for
17 production, is it counsel's position that the
18 automatic disclosure compliance was made with the
19 actual production of documents to Ms. Walker's
20 prior attorneys?
21 MS. LYNCH:              No.
22           MR. HUDSON:   Or was it just a
23 listing?
24 MS. LYNCH:              It was a listing a long

# TAMMY WALKER vs. CITY OF HOLYOKE
## ANTHONY SCOTT                    SEPTEMBER 11, 2006

193

1  time ago.

2           MR. HUDSON:   So Plaintiff's attorney

3  didn't actual receive the documents?

4           MS. LYNCH:   No; it was a listing.

5           MR. HUDSON:   So those we certainly

6  don't have

7           MS. LYNCH:   My position is also that

8  were getting late in the discovery.   This has

9  been an all day deposition already so I'm not

10 going to voluntarily agree to anything in terms of

11 extending it at this time.   We can revisit it

12 later.

13           MR. HUDSON:   I understand and I

14 would imagine that we have probably at least under

15 the rules one or two hours.

16           We started around ten and It's about

17 five and we took an hour off so I think we have at

18 least seven hours under the rules to depose

19 without getting the Court's permission so I think

20 we've got at least one hour left.   We'll have to

21 figure it out.

22           MS. LYNCH:   Like I said, we can

23 revisit it later if necessary.

24  MR. HUDSON:            Thank you very much,

194

1  Chief.

2           (The deposition was concluded.)
                        Ma...*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

195

SIGNATURE PAGE - ERRATA SHEET

1

2      To be signed by deponent and returned to

3  counsel within   thirty (30) days.

4      I, the undersigned, ANTHONY SCOTT, do
   hereby certify that I have read the foregoing

5  transcript of my testimony given in the matter of
   TAMMY WALKER vs. CITY OF HOLYOKE, on SEPTEMBER

6  2006 and that, to the best of my knowledge, said
   transcript is true and accurate (with      the

7  exception of the following corrections listed
   below:)

8

9  PAGE : LINE:   CHANGE AND REASON

10  .

11      .   .

12      .   .

13      .   .

14

15

16

17

18

19

20  DEPONENT'S SIGNATURE:

21  Signed under the pain and penalties of perJury
   this     of          , 2006.

22

23  NOTARY PUBLIC

24  My Commission expires:

196

1  COMMONWEALTH OF MASSACHUSETTS
      COUNTY OF HAMPDEN

2

3      I, JOANNE COYLE, a Notary Public within and
   for the Commonwealth of Massachusetts at large, do
   hereby certify that I took the deposition of

4  ANTHONY SCOTT, pursuant to the Federal Rules of
   Civil Procedure, at the offices of Perlik and

5  Coyle Reporting, 1331   Main Street, Springfield,
   Massachusetts, on SEPTEMBER 11, 2006.

6

7      I further certify that the above-named
   deponent was me first duly sworn to testify to
   the truth, the whole truth and nothing but the

8  truth concerning his knowledge in the matter of
   the case TAMMY WALKER vs. CITY OF HOLYOKE, now

9  pending in the United States District Court,
   District of Massachusetts.

10

11      I further certify that the within      testimony
   was taken by me stenographically and reduced to
   typewritten form  under my direction by means of

12  COMPUTER ASSISTED TRANSCRIPTION; and, I further
   certify that said deposition   is a true record of

13  the testimony given by said witness.

14      I further certify that I am  neither counsel
   for, related to, nor employed by any of the

15  parties to the action in  which this deposition was
   taken; and  further, that I am not a relative or

16  employee of any attorney or counsel employed by
   the parties hereto, nor financially or otherwise

17  interested in the outcome of the action.

18   WITNESS my hand and seal this          day of
   OCTOBER, 2006.

19

20           Joanne Coyle
             Notary Public

21           Certified Shorthand Reporter
             License No. 106693

22

23  My Commission Expires
   May 12, 2011

24

## PERLIK and COYLE REPORTING

# EXHIBIT 4

## IN THE MATTER OF:

TAMMY WALKER vs.

CITY OF HOLYOKE

---

## DEPOSITION OF:

ALAN FLETCHER
DATE: SEPPTEMBER 12, 2006

---

PERLIK and COYLE REPORTING

*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931 Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

---

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30074-MAP
Pages 1-182

TAMMY WALKER

vs.

CITY OF HOLYOKE

**DEPOSITION OF:**            **ALAN FLETCHER**

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Perlik and Coyle Reporting,
1331 Main Street, Springfield, Massachusetts
on SEPTEMBER 12, 2006, commencing
at 10:05 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified            Professional Reporters
1331            Main Street
Springfield, MA 01103
Tel (413) 731-7931  Fax (413) 731-7451

---

**3**

I N D E X

WITNESS            DIRECT CROSS REDIRECT
ALAN FLETCHER            5

E X H I B I T S

| i■L_O, | DESCRIPTION | |
|---|---|---|
| 1 | Notice of Deposition | 5 |
| 2 | 11/29/04 Officer Injury Report & Attachments | 7 |
| 3 | 11/23/04 Walker to Scott IOC | 21 |
| 4 | 11/26/04 Fletcher to Scott IOC | 24 |
| 5 | 11/29/04 Scott to File IOC | 34 |
| 6 | 3/16/05 Walker to Scott IOC | 38 |
| 7 | 12/29/04 Scott Investigation & Questions of Fletcher | 39 |
| 8 | 3/2/05 Walker to Scott IOC | 44 |
| 9 | 4/19/05 Attorney General's Office to Walker Letter | 55 |
| 10 | 11/10/04 O'Connell to Walker IOC | 78 |
| 11 | 11/10/04 O'Connell to Walker IOC | 82 |
| 12 | Newspaper Article | |
| 13 | 12/28/04 Fletcher to fournier Statement | |
| 14 | Fletcher Affidavit | |
| 15 | 5/5/04 Newspaper Article | |

---

**2**

APPEARANCES:

FOR THE PLAINTIFF:

LAW OFFICE OF OZELL HUDSON, JR., ESQUIRE
434 Massachusetts Avenue
Boston, Massachusetts 02118
BY: OZELL HUDSON, JR.

FOR THE DEFENDANT:

MORRISON MAHONEY LLP
1500 Main Street
Springfield, Massachusetts 01115
BY: CAROLE SAKOWSKI LYNCH, ESQUIRE

FOR THE CITY OF HOLYOKE:

CITY OF HOLYOKE LAW    DEPARTMENT
20 Korean Veterans Plaza, Room 204
Holyoke, Massachusetts 01040-5000
BY: KAREN T. BETOURNAY, ESQUIRE

Also Present  Tam m y Walker

---

**4**

S T I P U L A T I O N S

It is agreed by and between the parties
that all objections, except objections as to the
form of the question, are reserved to be raised at
the time of trial for the first tim e.

It is further agreed by and between the
parties that all motions to strike unresponsive
answers are also reserved to be raised at the t me
of trial for the first time.

It is further agreed that the deponent will
read and sign the deposition and that the sealing
of said deposition will be waived.

It is further agreed by and between the
parties that notification to all parties of the
receipt of the original deposition transcript is
also hereby waived.

*****

---

5

1    ALAN FLETCHER, the Deponent, having been
2 satisfactorily identified by the production of his
3 driver's license and having been first duly sworn
4 by the Notary Public, deposes and says as follows:
5              MR. HUDSON: Can we have the usual
6 stipulations, the same ones that we used
7 yesterday?
8              MS. LYNCH: Yes; and Captain
9 Fletcher will read and sign.
10             MR. HUDSON: Just to make sure that
11 we are in accord with that, these are the same
12 ones from yesterday.   (Indicating.)
13             MS. LYNCH: That's fine.   Out here
14 in Western Mass. those are the usual stipulations.
15             MR. HUDSON:   No problem. I usually
16 think so myself but I don't like to take anything
17 for granted.
18              (Plaintiffs Deposition Exhibit
                 No. 1 offered and marked.)
19
20                        *****
21        DIRECT EXAMINATION BY MR. HUDSON
22   Q.   Captain Fletcher, good morning.   I'm
23 Ozell Hudson. I'm counsel for Ms. Tammy Walker.
24 Thank you for coming today.

6

1 MR. HUDSON:                   Please let the record
2 show that Ms. Walker is present and that Captain
3 Fletcher is being represented by Attorney Carole
4 Lynch and also present is the City Solicitor,
5 Karen Betournay.
6    Q.   (BY MR. HUDSON) Just a couple of brief
7 introductory matters.   Sir, I'd like to ask you
8 whether or not you've had the opportunity to go
9 over this case with your attorney prior to coming
10 in today?
11   A.   I have.
12   Q.   Do you understand the nature of a
13 deposition?
14   A.   I do.
15   Q.   Do you understand that any question that
16 I put to you, that if you don't understand it and
17 would like for me to either repeat it or clarify
18 it, just let me know and I'll be glad to do that?
19   A.   Okay.
20   Q.   Also, verbal responses are required.
21 Hand gestures or head gestures just simply don't
22 get recorded, okay?
23   A.   Okay.
24   Q.   Did you have an opportunity to look at

7

1 any documents in preparation for your testimony?
2    A.   No.
3    Q.   Captain Fletcher, I'd like to draw your
4 attention to an Injured-On-Duty Report or request
5 dated November 29th, 2004 from Sergeant Walker --
6 former Sergeant Walker.
7         Did Sergeant Walker give you an
8 Injured-On-Duty Report of November 29th, 2004?
9    A.   It came to me; yes.
10 MR. HUDSON:                   I'd like to have this
11 marked as Exhibit 2.
12          (Plaintiff's Deposition Exhibit
             No. 2 offered and marked.)
13
14   Q.   (BY MR. HUDSON) If you would take a
15 look at that? (Indicating.)
16   A.   (Witness examining document.)
17   Q.   This document, do you recognize
18 Exhibit 2, sir?
19   A.   This is Exhibit 2?
20   Q.   Yes; it's a composite?
21   A.   Okay.
22   Q.   Okay meaning you do recognize it?
23   A.   I signed it.
24   Q.   Do you know Chief Anthony Scott?

8

1    A.   Yes.
2    Q.   Do you know Sergeant Walker?
3    A.   Yes.
4    Q.   What is your position, sir, at the
5 Holyoke Police Department?
6    A.   I'm a captain in charge of -- bureau
7 commander of Operations.
8    Q.   How long have you been a captain?
9    A.   Since 1992.
10   Q.   Before that, what position did you hold?
11   A.   I was in charge of a drug unit as a
12 lieutenant.
13   Q.   In the Holyoke Police Department?
14   A.   I was; yes.
15   Q.   Before you were a lieutenant, what
16 position did you hold?
17   A.   Several, but I was mostly a uniform
18 sergeant on the midnight-to-eight shift.
19   Q.   When did you begin your employment with
20 the Holyoke Police Department?
21   A.   1968.
22   Q.   Before that, what position did you hold?
23   A.   I was a uniform officer. Then I did
24 undercover work with the Holyoke Police Department

9

while I was detached -- but I was on a regional squad. Then I came back and I was in a drug unit.

Q.    Prior to 1968 when you were with the drug unit or undercover work, et cetera, what work did you do?

A.    I was in the U.S. Army. I was drafted for two years.   I spent two years overseas.

Q.    What was the highest ranking that you held in the U.S. Army?

A.    I was an E-5.

Q.    Which is?

A.    Sergeant.

Q.    Before that, sir -- before you entered the U.S. Army, did you attend school or go to work?

A.    I worked and I attended the University of Hartford.

Q.    What years -- University of Harvard?

A.    Hartford. You went to Harvard; I didn't.

Q.    I didn't go to Harvard; my wife did. Did you graduate, sir?

A.    No; I got drafted.  I didn't graduate.

Q.    Did you have an opportunity to continue

10

your schooling?

A.    I did when I got out of the service; yes.

Q.    Where did you continue your education?

A.    I got an associate degree from Holyoke Community College in arts and science and then I got a four-year degree from Western New England College in law enforcement.

Then I have a master's from Springfield College in education with an emphasis in counselling. Then I got a master's degree from AIC in criminal justice.

Q.    What is NIC?

A.    AIC -- American International College.

Q.    And that's in Springfield?

A.    All in Springfield; yes.

Q.    Extensive education, sir.  Sir, are you married?

A.    Yes -- well widow now.

Q.    Sorry for that.  Do you have children?

A.    No.

Q.    Do you live in the Holyoke community or Springfield?

A.    Holyoke.

11

Q. As a child growing up, what community did you live in?

A. Holyoke, in the Highlands.

Q. Now I draw your attention back to Exhibit 2.

Do you recall giving that report to Chief Scott?

A. I don't really recall; no.

Q. Well, do you recall -- I want to draw your attention to the last page of that composite and there is a memo -- I guess an IOC from you so even though -- but do you recall providing Chief Scott with notice that Sergeant Walker had requested injury on duty that is referenced in Exhibit 2?

A. Best way to explain it to you, counselor, is that in Exhibit 2 there's really two different requests for injured on duty and I don't know which one you're referring to.

Q. Well, let's first look at the one that has the earlier date which is --

A. (Interposing) November.

Q. November. November 29th, '04?

A. Mmm-hmm.

12

Q. You signed this one?

A. I did.

Q. Do you recall whether this is the one that you gave or referred it to Captain Fletcher? A. I'm Captain Fletcher.

Q. I'm sorry; to Chief Scott?

A. I don't know if I did or not. I received it on the thirtieth. I reviewed it on the thirtieth.

Q. Then there is another injury on duty, February 25, 2005. Is that the last page of that exhibit?

A. That's correct.

Q. Do you recall whether or not you referred any other written document other than this IOC to Chief Scott?

A. I think this is the only document I referred to Chief Scott.

Q. That would be the last page of Exhibit 2 bearing the Bates stamp number 033 at the bottom? A. That's correct.

Q. Thank you. You did testify that you signed that -- the Exhibit 2, is that correct, sir?

13

1    A.    I received it on the thirtieth and I
2 did.
3    Q.    Do you know whether or not under the --
4 let me ask you:   Are you affiliated with any
5 union?
6    A.    I am.
7    Q.    What union is that?
8    A.    International Brotherhood of Police
9 Officers, Local 409.
10   Q.    Do you hold any office in that union?
11   A.    I'm the president.
12   Q.    Does that union represent supervisory
13 personnel or --
14   A.    (Interposing) Supervisory personnel.
15   Q.    Only?
16   A.    Only.
17   Q.    No patrolmen?
18   A.    No patrolmen.
19   Q.    Are sergeants considered supervisory
20 personnel?
21   A.    They are.
22   Q.    What union represents the patrolmen?
23   A.    International Brotherhood Of Police
24 Officers, Local 388.

14

1    Q.    How long have you been the president of
2 the Local 409?
3    A.    I don't know.  Many years.
4    Q.    More than ten years?
5    A.    Maybe just a little less than ten years.
6    Q.    I guess we could say for almost ten
7 years?
8    A.    Probably.
9    Q.    That was a yes, I believe?
10   A.    (Witness nodding.)
11   Q.    In your capacity as president of the
12 Local 409 do you know whether or not under the
13 union contract Chief Scott was supposed to sign
14 the Injured-On-Duty Report, the Exhibit 2, the
15 first page of Exhibit 2?
16   A.    The best way for me to answer that
17 question is I don't think there's any specific
18 article or chapter or section in our contract that
19 mandates the Chief to sign any correspondence.
20   Q.    But there's a provision for the Chief to
21 sign off on, is that correct -- there's a line
22 item?
23   A.    There's a provision for him to review
24 this report; yes.

15

1    Q.    As we continue to look through
2 Exhibit 2, do you see the IOC -- Interoffice
3 Memorandum, second page of Exhibit 2 addressed to
4 you from Tammy Walker?
5    A.    Yes.
6    Q.    Did you receive this document, sir?
7    A.    I probably did.
8    Q.    Also, the third page of Exhibit 2, do
9 you recall whether or not you received this IOC
10 that's addressed to you?
11   A.    I don't recall but I could have received
12 it.
13   Q.    I draw your attention to the fourth
14 page, a document labeled Certificate to Return to
15 Work.
16          Would that have been a required document
17 for Ms. Walker to return to work?
18   A.    If she was out, it would have been
19 required.
20   Q.    Who would receive this document, sir?
21   A.    It wouldn't be me.  It would be her
22 commanding officer.
23   Q.    Do you know who her commanding officer
24 was on or about November 29, 2004?

16

1    A.    I believe it was Officer O'Connell.
2    Q.    Even though there are no rules or
3 regulations requiring Chief Scott to sign a
4 particular correspondence, do you know whether or
5 not it would be a violation of the contract if he
6 did not review and sign the injured-on-duty
7 request?
8    A.    No; it wouldn't be.
9    Q.    And he can delegate that to any
10 supervising officer?
11   A.    Delegate what?
12   Q.    The authorization to review and sign off
13 on the Injured-On-Duty Report?
14   A.    The reason I review it is because I'm
15 the Bureau commander.   I have to review all the
16 injured-on-duty reports in the division.
17          That includes not just the day shift or
18 the four-to-twelve shift, but the midnight shift
19 also.  All the injured-on-duty reports, I review.
20   Q.    That is for all the employees within
21 your division?
22   A.    Yes; and that's a substantial amount of
23 employees. It's over a hundred.
24   Q.    I understand there's about four or five

Case 3:05-cv-30074-MAP    Document 56-2    Filed 09/01/2007    Page 7 of 48

TAMMY WALKER vs. CITY OF HOLYOKE
ALAN FLETCHER          SEPTEMBER 12, 2006

17

1 captains?
2      A.    There's four captains and I'm the -- in
3 charge of the Uniform Division.
4      Q.    Is that Bureau of Field Operations?
5      A.    Right; Field Operations.
6      Q.    Did you ever have the occasion to
7 actually instruct Sergeant Walker to fill out an
8 IOD -- first of all, what is an IOD?
9      A.    Injured on duty.
10      Q.    Did you ever have an occasion to
11 instruct Sergeant Walker to fill out an IOD?
12      A.    I did.
13      Q.    Do you recall what date that was?
14      A.    No; I don't.
15      Q.    Would that have been February 27th,
16 2005?
17      A.    It could have been.
18      Q.    I draw your attention to the Exhibit 2,
19 again, the last page, Bates 033.
20      A.    Okay.
21      Q.    Does that refresh your recollection --
22 if you look at the last sentence of the second
23 paragraph?
24      A.    Yes.

19

1 procedure; that's what I told her.
2      A. Which one?
3      Q. On November 29th -- her request was
4 dated November 29th and I believe you signed
5 having reviewed it on November 30th?
6
7
8
9      A.  I did.
10      Q. You denied it?
11      A.  I did.
12      Q. Why did you deny it, sir?
13
14
15
16
17
18
19
20
21
22
23
24

18

1      Q.       What is your recollection? The question
2 originally was did you instruct her to fill out an
3 IOD?
4      A.    I don't know if I instructed her to fill
5 out an IOD on this occasion.
6      Q.    You did state that "I informed Sergeant
7 Walker to file her request for injured on duty
8 with her commanding officer."
9      A.    Right; I had a telephone conversation
10 with Sergeant Walker at my residence and she
11 claimed that she was assaulted by the Lieutenant.
12      Q.    Lieutenant O'Connell?
13      A.    That's correct; and I had no knowledge
14 of anything except for what she was saying to me.
15      Q.    But you did write here, "I informed
16 Sergeant Walker to file her request" --
17      A.    (Interposing) Her request. I said she
18 could request injured on duty but I didn't know
19 for a fact whether she was working or not working.
20 I told her to file -- the procedural way is
21 through her commanding officer.
22      Q.    So you did direct her to file a request
23 for injured on duty if she wanted to?
24      A.    I told her to follow operating

20

1 to.
2         I got up from my desk and we went over
3 and asked the Police Chief if she in fact did.
4 She didn't.
5      Q.    She didn't report it to the Chief of
6 Police?
7      A.    No.
8      Q.    And you're talking about the injury on
9 duty of November 29th, 2004?
10      A.    That's correct.
11      Q.    Sir, I draw your attention to the same
12 Exhibit 2 and second page from the rear.
13      A.    (Witness examining document.) Mmm-hmm.
14      Q.    There is a correspondence of
15 November 29th, 2004 from Tammy Walker to Chief
16 Anthony Scott. Do you see that?
17      A.    I do, sir.
18      Q.    Do you see where Ms. Walker in detail
19 explains how she injured her shoulder -- her left
20 shoulder in the line of duty, et cetera?
21      A.    That's on the twenty-ninth; yes.
22         MR. HUDSON: I also show you, sir --
23 let's mark this Exhibit 3.
24

**21**

(Plaintiff's Deposition Exhibit
No. 3 offered and marked.)

Q.      (BY MR. HUDSON) Do you see Exhibit 3, sir?  (Indicating.)

A.      I do, sir.

Q.      Have you had a chance to review it?

A.      I did.

Q.      What is it, sir?

A.      It's an interoffice correspondence from Sergeant Walker to Chief Scott.

Q.      Do you see the date on it?

A.      I do.

Q.      What's the date, sir?

A.      It says 11/23/04.

Q.      In the middle of that paragraph -- well first at the beginning, do you see where she states, "Chief Scott, I'm requesting a meeting with you regarding my health."   Do you see that?

A.      I do.

Q.      And then in the middle of the document there, a little bit more than the middle, she specifically says that "the stress has now moved to my shoulder and neck area. I have been under doctor's care."   Do you see that?

**22**

A.      I do.

Q.      Do you deny that this document was provided to Chief Scott?

A.      I don't have any knowledge of this document, if he received or when she gave it to him or anything.   I have no knowledge of it.

Q.      So if in fact you don't have any knowledge of that document as having been received by Chief Scott, then it would be safe to say that you don't know whether or not Ms. Walker was lying or not about having reported it to Chief Scott, is that correct, sir?

A.      That is not correct.

Q.      Why is that not correct, sir?

A.      When I asked her, as the bureau commander I asked her how she got injured, she said she didn't know how. I asked her when she got injured and she didn't know when; and I asked her what she had been doing when she got injured and she didn't respond.   She hadn't been working; she had been out.

When I asked her the questions where, when, how, what took place when you got injured, she didn't answer me but she did say that she

**23**

1  reported it to the Chief of Police when I
2  questioned her about it.
3      Q.    That's what I'm asking you, whether or
4  not it's safe to say that she was not lying about
5  having reported it to the Chief of Police if you
6  have no knowledge that Chief Scott got this
7  document marked Exhibit 3?
8          MS. LYNCH: Objection; you can
9  answer. You can answer.
10     Q.    (BY MR. HUDSON) Let me rephrase the
11  question.
12     A.    No; I understand the question. All I
13  can say to you is that myself, Sergeant Walker
14  went down to the Police Chief after she told me
15  she told the Police Chief that she was injured.
16  We went down and in front of the Police Chief I
17  asked him did she report an injury to you. He got
18  up from his desk and said no, she did not and then
19  she said no; I did not report this injury to the
20  Police Chief but I did ask for a meeting.
21          She referred to something like that but
22  she acknowledged in front of me that she did not
23  in fact report an injury on duty to the Police
24  Chief, in front of me.

**24**

1          MR. HUDSON: Thank you. I want to
2  have this document marked. I believe that is now
3  Exhibit 4.
4              (Plaintiff's Deposition Exhibit
                No. 4 offered and marked.)
5
6      Q.    (BY MR. HUDSON) Would you review that
7  document, sir? (Indicating.)
8      A.    (Witness examining document.)
9      Q.    Have you had a chance to review that
10  document, sir?
11     A.    I did.
12     Q.    Isn't it true, sir, that Ms. Walker
13  actually informed you on November 26th at your
14  office that she was having discomfort in her
15  shoulder?
16     A.    The purpose of the meeting was not -- we
17  had that conversation also.
18          The purpose of the meeting was her
19  attendance. I wanted to know when she was coming
20  back to work.
21     Q. But I didn't ask you, sir, the purpose
22  of the meeting. I'll ask you if you would be so
23  kind as to answer my question.
24     A.    Okay.

25

Q.   Which is did she inform you about discomfort in her shoulder?

A.   Right.

Q.   And that's what you wrote in Exhibit 4, isn't that correct?

A.   That's correct.

Q.   And Ms. Walker requested to go to occupational health, isn't that correct?

A.   That's correct.

Q.   And consistent with your earlier testimony, you asked her when she reinjured her shoulder?

A.   That is correct; and I asked her how and where and when.

Q.   And you asked her who she also reported it to?

A.   That's correct.

Q.   And you wrote here that she said she reported it to the Chief?

A.   The Police Chief.

Q.   Chief of Police?

A.   That's correct.

Q.   And at that point you advised her to fill out an Injured-On-Duty form?

26

A.   If that's what happened; yes.

Q.   That's what you wrote, sir?

A.   That's right.

Q.   In Exhibit 4.  In addition to some other issues, she also informed you that she was having problems with Sergeant John Monaghan?

A.   That's correct.

Q.   Who is Sergeant Monaghan?

A.   A sergeant that's on her watch that works with her.

Q.   Is he a less senior person?

A.   I don't know.

Q.   She had also complained to you about Lieutenant O'Connell, didn't she?

A.   She did.

Q.   And you voiced your support for Lieutenant O'Connell, is that correct?

A.   That's correct; we had a meeting, the three of us and we went over her deficiencies and she was aware of my feelings.

Q.   What problems did Sergeant Walker inform you that she was having with Sergeant Monaghan?

A.   She wasn't specific with any problems. She just doesn't like him.

27

Q.   What problems if any or what disagreement about deficiencies did she have concerning Lieutenant O'Connell?

A.   She didn't like what Lieutenant O'Connell wrote about her deficiencies in the performance of her duties.

Q.   What were those deficiencies sir?

A.   One, I remember very particular and it stood out was that a man was banging on a window on Sergeant Street by an alley, he forgot his keys to his apartment.

Sergeant Walker came upon him, pulled her service weapon out and ordered the man to the ground. Then she proceeded to arrest him for disorderly conduct or something and he just forgot his keys and wanted to get into his apartment.

I don't know what the outcome of the case was but surely it wasn't judicial use of deadly force when a man is banging on his window to get his keys. I thought that was an outrageous act for the Sergeant to do.

Q.   Was she alone or did she have backup?

A.   I don't know, sir. I wasn't there.

Q.   If she was alone and she had gotten

28

stabbed or shot?

A.   All I can say --

MS. LYNCH: (Interposing) Objection; you can answer if you can.

THE WITNESS: The only thing I can tell you is as a supervisor, a man banging on a window, no weapon showing, she has no business drawing her service revolver for that individual or anybody.

It's judicial use of deadly force and she obviously didn't -- doesn't know what that is, I guess, but that was one of the deficiencies that the Lieutenant brought to my attention.

Q. (BY MR. HUDSON) Thank you, sir. Well, this is not the report of that particular incident, is it, sir -- the actual report of that so-called deficiency around use of deadly force or arrest -- the Exhibit 4? That's not --

A.   (Interposing) You just asked me to comment -- what Lieutenant O'Connell brought about her deficiencies. It's not in this report.

Q.   Did you actually see the report of the deficiencies?

A.   I did.

TAMMY WALKER vs.    CITY OF HOLYOKE
ALAN FLETCHER         SEPTEMBER 12, 2006

29

Q. Where is that report maintained?

A. I don't know.

Q. When there are deficiencies concerning an officer's conduct during the performance of their duties and a written report is developed, who is responsible for maintaining those records in your bureau?

A. It could be possibly in the personnel file.

Q. Thank you. I draw your attention back to Exhibit 4, the last paragraph. You write that as a result we finally went to the Chief's office and the Chief ordered Sergeant Walker to complete an IOC immediately as to how she reinjured her shoulder and to be specific before he left the building for the day," is that correct?

A. That's what he ordered her to do; yes.

Q. Then also the Chief had ordered you -- or asked you, excuse me -- to complete an IOC to him outlining the discussions you had with the Sergeant and her injury claims?

A. That's correct.

Q. You wrote Sergeant Walker claimed two things -- stress and this shoulder?

31

1    A. I don't know. Is it in there?

2    Q. I'm asking you, sir?

3    A. I have to read it.

4    Q. Please do. I thought you already read

5

6

7

8

9

10

11  it?

12    A. I'll have to read it again.

13    Q. Please do, sir. No rush.

14    A. We did.

15

16

17

18

19

20

21

22

23

24

30

A. That's what she said.

Q. Now even though the Chief had asked you to complete an IOC outlining the discussion you had with the Sergeant, do you state in here, sir, that -- is that report that you wrote pursuant to the Chief?

A. Yes.

Q. So in fact you were stating -- you testified earlier that she didn't know how she injured herself but then you wrote she reinjured her shoulder?

A. That's what she said.

Q. So she reported to you that she reinjured --

A. (Interposing) After I questioned her on when she was coming back to work. She was out of time.

Q. Did you write in Exhibit 4, sir, that the Chief disavowed any knowledge of Sergeant Walker having informed him of her injury?

A. The Chief told me in front of Sergeant Walker that she never ever reported injured on duty to him and she admitted she didn't tell the Chief.

32

1  on November 29th," what is "this"?

2    Q.    (BY MR. HUDSON) The conversation that

3  you had with the Chief of police?

4    A.    I don't believe so. I think it was on

5  the twenty-sixth or the twenty-seventh. I don't

6  remember.

7    Q.    (BY MR. HUDSON) Thank you. Sir, why

8  did you in fact deny Ms. Walker's injury on duty

9  when you had asked her to write up a report?

10    A.    Because she didn't tell me when she did

11  it, how she did it or where she did it. There was

12  no event that led up to this particular incident

13  that would say that she reaggravated an old

14  injury.

15          Usually there's some kind of an event

16  that would take place to precipitate the

17  recurrence of an injury and she had no evidence of

18  that.

19    Q.    Didn't Ms. Walker, on November 29th come

20  to the police headquarters and drop off another

21  series of notes from her physician which, number

22  one, stated shoulder bursitis, history of rotator

23  cuff tear, 7/98 work injury?

24    A.    I have no knowledge of that.

33

1    Q.    This was from her doctor, Doctor Stephen
2 Levine?
3    A.    He could have wrote that.
4    Q.    Then on that same day, November 29th,
5 you got a message from her doctor, Doctor Stephen
6 Levine, regarding Sergeant Walker.    Do you recall
7 that, sir?
8    A.    I don't believe I worked on
9 November 29th.
10    Q.    But in fact even though -- excuse me,
11 please.
12        (A recess was taken.)
13    Q.    (BY MR. HUDSON) Sir, do you recall
14 whether or not on November 29th, 2004, a day that
15 you were not working -- is that your testimony,
16 you were not working?
17    A.    I don't believe I was working.
18    Q.    But that you received a call -- do you
19 recall whether or not you received a call from
20 Chief Scott on November 29th directing you to
21 place a call to Sergeant Walker's home from his
22 office?
23    A.    I don't recall that.
24    Q.    Sir, I don't have copies of this

34

1 document -- oh, yes; I do.    Let's mark this one,
2 please, Exhibit 5.
3        (Plaintiff's Deposition Exhibit
        No. 5 offered and marked.)

5    Q.    (BY MR. HUDSON) Why don't you take a
6 look at that one. (Indicating.)
7    A.    (Witness examining document.)
8    Q.    Sir, basically do you recognize this --
9 why don't you take a look at this document marked
10 Exhibit 5, the second page. You see where it says
11 Anthony R. Scott, Chief of Police?
12    A.    Yes.
13    Q.    And a signature?
14    A.    Yes.
15    Q.    Do you recognize the signature?
16    A.    I recognize the signature.
17    Q.    As Chief Scott's?
18    A.    It is.
19    Q.    Thank you. Now I draw your attention to
20 the third paragraph?
21    A.    Yes.
22    Q.    Do you see where Chief Scott writes this
23 memo to the file that Sergeant Walker came to
24 the -- I'm paraphrasing but on November 29th

35

1 Sergeant Walker came to headquarters and dropped
2 off another series of notes from her position
3 which showed the bursitis history of rotator cuff
4 tear 7/98 work injury, do you see that?
5    A.    I see it.
6    Q.    This was from her Doctor Levine --
7 Stephen J. Levine?
8    A.    Am I supposed to say yes or no?
9    Q.    I mean, you see -- I'm asking do you see
10 where the Chief wrote that?
11    A.    He wrote that.
12    Q.    Yes; that's all.  I draw your attention
13 to the next paragraph following, "on Monday,
14 November 29th, 2004 at approximately two
15 forty-five I had Captain Alan Fletcher, Commander,
16 Field Operations Bureau place a telephone call to
17 Sergeant Walker's home from his office on the
18 speaker phone." Do you see that?
19    A.    I do.
20    Q.    Did you in fact make a telephone call to
21 Sergeant Walker on November 29th?
22    A.    I don't know if I did or not.
23    Q.    Well now the Chief says, "When the
24 Sergeant answered, the Captain informed her that

36

1 he was calling and I was present," meaning that --
2 do you interpret that mean that the Chief was
3 present when you called Sergeant Walker, according
4 to this memo?
5    A.    I have a lot of doubts with the accuracy
6 of the date and this memo as far as what I did.
7        I don't believe I was around on
8 November 29th as I stated before earlier in this
9 deposition and I just would like to point to you,
10 counselor, since you said that I did something on
11 Monday the twenty-ninth, let's go to the next page
12 and go to the last paragraph.
13        It says, "On Monday, November 29th," so
14 we've got Monday, November 29th, we've got Monday,
15 November 29th again.    I still don't know if I was
16 around those two days. Then it says Monday, but
17 if you go to the top of this memorandum on the
18 first page, it says this date was Wednesday,
19 November 29th so you got Monday, you got Wednesday
20 and so I'm totally confused as probably you are.
21    Q.    The only consistent date is
22 November 29th?
23    A.    But I don't know what day that is.
24 You're asking did I say this on a certain date.

37

1  I'm not going to respond because --
2      Q.       (Interposing) No; I'm asking whether or
3  not you took the action that the Chief wrote that
4  you took?
5  A.       We could have done that, yes; but I'm
6  very nervous about the date.
7      Q.    Yes; I agree, okay.
8      A.    I believe we did do it but I don't know
9  what date we did it on.
10     Q.    At the bottom of that last paragraph
11 there, do you see where the Chief wrote that on
12 November -- on Monday, November 29th he received a
13 return call from Doctor Levine, the last paragraph
14 at the beginning?
15     A.    I see it; yes.
16     Q.    And "Doctor Levine began to outline the
17 Sergeant's injury informing me that it related to
18 a previous injury that she had on the job in
19 1998."  Do you see that?
20     A.    I see it.
21     Q.    And basically he would not approve her
22 going back to work until she complied with this
23 order to write out a full on-the-job injury
24 report, is that correct?

38

1      A.    That's correct.
2  MR. HUDSON:              I'd like to have this
3  document marked, please.
4           (Plaintiff's Deposition Exhibit
                  No. 6 offered and marked.)
5
6      Q.    (BY MR. HUDSON) Sir, I'll show you
7  what's marked Exhibit 6.
8      Have you had the occasion to see this
9  document before? (Indicating.)
10     A.    (Witness examining document.)
11     Q.    Exhibit 6.
12     A.    (Witness examining document.) I don't
13 think I ever received this.
14     Q.    Are you aware that Sergeant Walker filed
15 grievances against Lieutenant O'Connell and
16 Lieutenant Fournier?
17     A.    I heard she did.
18     Q.    Did you ever review the grievances?
19     A.    No, sir.
20     Q.    But you did hear. Who did you hear it
21 from?
22     A.    The Police Chief.
23     Q.    What did the Chief tell you?
24     A.    He said he received two grievances from

39

1  Sergeant Walker and asked me what I had to say
2  about it and I said I never received the
3  grievances.
4      Q.    Did he tell you what the contents of the
5  ?
6      A.    He did not.
7      Q.    Do you recall giving a statement to
8  Chief Scott on or about December 28th, 2004
9  regarding Sergeant Walker's personnel file?
10         MS. LYNCH:   I'm sorry, what was the
11 ?
12         MR. HUDSON:   Yes; I believe
13 December 28th, 2004.
14     Q.    (BY MR. HUDSON) Regarding Sergeant
15 Walker's personnel file?
16     A.    I have no recollection of that.
17     Q.    May I see this document, sir?
18     A.    (Witness handing document.)
19         MR. HUDSON:   I'd like to have this
20 document marked Exhibit 7, please?
21         (Plaintiff's Deposition Exhibit
                  No. 7 offered and marked.)
22
23     Q.    (BY MR. HUDSON) If you would take a
24 look at Exhibit 7, sir? (Indicating.)

40

1      A.    (Witness examining document.)
2      Q.    Does that refresh your recollection sir?
3      A.    I was interviewed by the Chief on the
4  twenty-eighth at just about ten o'clock in the
5  morning.
6      Q.    Yes, sir.
7      A.    December 28th.
8      Q.    Why were you interviewed by the Chief?
9         MS. LYNCH:    Objection; you can
10 answer if you know.
11     Q.    (BY MR. HUDSON) What did you tell the
12 Chief during the course of your interview?
13     A.    I guess the document speaks for itself.
14 I guess he called me in and asked me these
15 questions.
16     Q.    He asked you questions about whether or
17 not you had ever -- whether you worked as an
18 assistant for Chief Donoghue and had access to the
19 Department's personnel files, is that correct?
20     A.    I did have access to the personnel
21 files -- all of them -- when I worked for Chief
22 Donoghue.
23     Q.    So the testimony is that you did give a
24 statement to Chief Scott on December 28th, 2004

# TAMMY WALKER vs CITY OF HOLYOKE
## ALAN FLETCHER        SEPTEMBER 12, 2006

**41**

1  regarding Sergeant Walker's personnel files?
2      A.      (No response.)
3      Q.      Let me draw your attention to the
4  beginning of the statement, sir.    "Captain Alan
5  Fletcher, I am conducting an inquiry into a
6  complaint filed by Sergeant Walker against
7  Lieutenant David Fournier and Lieutenant Eva
8  O'Connell in that she alleges that these
9  lieutenants abused their authority," right?
10      A.      Mmm-hmm.
11      Q.      So this statement was given -- isn't it
12  true, sir, that the interview you had with the
13  Chief was in the context of an investigation the
14  Chief was conducting about a grievance or a
15  complaint filed by Sergeant Walker?
16      A.      I think the best person to ask about
17  this is the Chief; not me.    I was just -- he asked
18  me some questions.    I wasn't conducting an
19  investigation.
20      Q.      Didn't he tell you, sir, why he was
21  asking you those questions?
22      A.      Because she filed a complaint against
23  two lieutenants. That's what he says.
24      Q.      Thank you, sir.   Sir, does the union

**42**

1  contract require that -- as president of the union
2  you have an obligation to fairly represent the
3  union members, is that correct?
4      A.      I do.
5      Q.      In collective bargaining?
6      A.      I do.
7      Q.      And matters that are the subject of
8  collective bargaining, is that right?
9      A.      That's correct.
10      Q.      Has the accessibility of employee
11  personnel records ever been a subject of the
12  collective bargaining agreement of Local 409?
13      A.      My recollection of the contract, I don't
14  think there's any reference to personnel files in
15  the contract.
16      Q.      Is there -- under the supervisors'
17  contract, the keeper of the records like Chief
18  Scott -- is Chief Scott the keeper of the records
19  under the contract, officially?
20      A.      I don't know if it's in the contract,
21  sir, but Chief Scott is the keeper of the records
22  and he can designate who he wants to have control
23  over the records.
24      Q.      Must he designate a specific person, do

**43**

1  you recall?
2      A.      Well, in my case I was the
3  administrative captain; I was in control of the
4  records because I'm the administrative captain,
5  that was my responsibility.    Chief Donoghue
6  designated me as keeper of the records in that
7  capacity.
8          In Chief Scott's administration, his
9  table of organization, his keeper of the records
10  is the Internal Affairs group -- he calls it
11  Professional Standards. They're the keeper of the
12  records for him under his table of organization.
13  That's the best way I can answer it, sir.
14      Q.      Is there a requirement that before
15  someone can go into the personnel files they have
16  to provide any type of notice?
17      A.      That's correct. That's someone outside
18  of the Department that goes into the personnel
19  file, not the Police Chief.
20          The Police Chief can go into the record
21  any time he wants to.    He doesn't have to notify
22  anyone.
23      Q.      When you say outside the Department?
24      A.      Say the City Solicitor, she wants to

**44**

1  come in and review one of the files, they have to
2  let me know that she wanted to come in and review
3  my file.
4          MS. LYNCH:    Could we just take a
5  one-minute break?
6          MR. HUDSON:    Certainly.
7  _____
8              ▮
9  here now.    Let's mark this, I believe this is
10  Exhibit 8, please?
11          (Plaintiff's Deposition Exhibit
12  _____
13      Q.    (BY MR. HUDSON) Let me show you this
14  exhibit, sir. (Indicating.)
15      A.      (Witness examining document.)
16      Q.      Sir, have you had a chance to read that?
17      A.      I'm still reading it.
18      Q.      Continue, sir.
19      A.      (Witness examining document.) Okay;
20  I've read it.
21      Q.      Have you ever seen this document before
22  marked Exhibit 8, sir?
23      A.      No.
24      Q.      Even though it was -- on the -- was it

# TAMMY WALKER vs. CITY OF HOLYOKE
## ALAN FLETCHER    SEPTEMBER 12, 2006

### 45

1 not cc'd to you?
2    A.        To the best of my recollection I never
3 received this copy.   I think this is the first
4 time I've read it.
5    Q.        Let me ask you, sir:  Do you recall
6 whether or not on or about -- do you recall
7 whether or not this document was actually given to
8 you on March 3rd at approximately nine-thirty a.m.
9 when you picked it up from Ms. Walker's home?
10    A.        I don't recall.
11    Q.        Did you ever have the occasion to go to
12 Ms. Walker's home?
13    A.        I have.
14    Q.        Did you ever have the occasion to go to
15 her home and actually pick up documents?
16    A.        I don't recall that.
17    Q.        Well, let's talk about some of the
18 substance of this, sir.
19          With regard to the first paragraph, do
20 you recall whether or not Ms. Walker -- well,
21 Exhibit 8, it is addressed to Chief Anthony Scott,
22 is that correct?
23    A.        That's correct.
24    Q.        And it's from Sergeant Tammy Walker?

### 46

1    A.        That's correct.
2    Q.        Dated March 2nd, 2005?
3    A.        That's correct.
4    Q.        And the subject of it is -- in the
5 heading is, "Conversation with Captain Fletcher
6 regarding IAD 04-26?
7    A.        That's correct.
8    Q.        Do you recall what IAD dash --
9    A.        (Interposing) Internal Affairs
10 investigation.
11    Q.        Ms. Walker is reporting in this document
12 that she spoke with you in the morning and
13 requested he ask the Chief to call me -- let me
14 rephrase that.
15          You see the first sentence, "I spoke to
16 Captain Fletcher on this date at approximately
17 eleven-twenty a.m.   I requested he ask you" -- and
18 I believe "he" means the Captain and "you" the
19 Chief -- to call me or Mr. Curtis Wood," open
20 parenthesis, "Deputy Director of NCIC," close
21 parenthesis, "to request an off-line search."   Do
22 you see that, sir?
23    A.        I see that.
24    Q.        Then it says "Captain Fletcher left a

### 47

1 message on my cell phone at eleven-fifty a.m.
2 stating that he went to your office and stated
3 that you were not there and you were at a meeting.
4 In our conversation before you went to his
5 office," et cetera.
6          Do you recall a message left on
7 Ms. Walker's cell phone regarding NCIC?
8    A.        I don't recall.
9    Q.        Do you deny it or you just don't
10 remember?
11    A.        I don't know if this took place or not.
12 I don't know.
13    Q.        Thank you.  Do you recall whether or not
14 Ms. Walker ever explained to you that she believed
15 the investigation -- the IAD investigation was not
16 conducted properly and that crimes and misuse of
17 NCIC had occurred?
18    A.        I don't think I ever discussed the
19 Internal Affairs investigation with Sergeant
20 Walker but I did discuss with her -- not on this
21 occasion but on another occasion where she thought
22 somebody was giving orders over a laptop computer.
23    Q.        On what occasion did you discuss with
24 her something about giving orders over a laptop

### 48

1 computer? Do you recall when that happened?
2    A.        It was probably around November when she
3 came to my office and we talked.
4    Q.        Would that be November of 2004?
5    A.        Well, yeah, it would.
6    Q.        Do you know what her concerns were?
7    A.        Yes; safety.
8    Q.        Do you know what kind of safety? Safety
9 in her division or under her command?
10    A.        Her safety.
11    Q.        What about the safety of the public?
12    A.        I don't think she was worried about
13 that.
14    Q.        Do you recall ever communicating to
15 Ms. Walker that you had spoken with the Chief
16 about her concerns concerning the Internal Affairs
17 investigation?
18    A.        No; I don't.
19    Q.        Do you recall any knowledge of ever
20 having reported to her that the Chief didn't care
21 about what she thought about the investigation?
22    A.        I don't -- I wasn't part of this
23 investigation so I don't know.
24    Q.        Thank you. Let me ask you: Do you know

## PERLIK and COYLE REPORTING

49

whether or not Chief Scott ever informed you that he faxed Exhibit 8 to Mr. Clancy, the union attorney?

A.    I don't recall.

Q.    Did you have -- do you recall having a conversation with Ms. Walker on or about March 15th, 2005?

A.    About what?

Q.    Did you ever inform Chief Scott that Sergeant Walker secretly taped your conversation with her on March 15th, 2005?

A.    She said she taped me; yes.

Q.    Yes, you were informed?

A.    Yes; she told me that she taped me and I told the Chief that she taped me in a conversation.

Q.    So does that refresh your recollection about what you talked about on March 15th, 2005?

A.    I don't know what we talked about on March 15th, 2005 but she did say she reported it.

Q.    Did the Chief take any action concerning that?

A.    I don't know.

Q.    Do you recall on March 3rd calling

50

Ms. Walker's home and leaving a message informing her that the chief was not in his office?

A.    I don't recall.

Q.    Do you recall whether or not --

MS. LYNCH:    (Interposing) By the way, what year was that, March 3rd?

MR. HUDSON:    March 3rd, 2005.

Q.    (BY MR. HUDSON) Do you recall whether or not Chief Scott in connection with Exhibit 8, I believe -- Chief Scott stated he didn't care about misconduct within the Internal Affairs Division?

A.    I have no recollection of that.

Q.    You were not present when -- were you present when Chief Scott faxed a copy of the IOC Exhibit -- the IOC of March 2nd, 2005 from Tammy Walker to the Chief regarding IAD 04-26.

Were you present when the Chief faxed that to the attorney?

A.    I don't recall that.

Q.    Mr. Clancy?

A.    I don't recall that.

Q.    Are you aware that the Attorney General's Office wrote or communicated with Sergeant Walker regarding misconduct within the

51

Holyoke Police Department?

A.    I'm unaware of that.

Q.    Are you aware that there was -- that Ms. Walker had complained to the Attorney General or to the FBI regarding misconduct within the Holyoke Police Department?

A.    I heard that.

Q.    Who did you hear that from, sir?

A.    The Chief of Police told me.

Q.    Did he also share with you what the allegations of misconduct Ms. Walker -- what allegations -- what specific allegations of misconduct Ms. Walker alleged?

A.    Something to do with not recording or altering the tapes that record transmissions through NCIC and criminal history board in probably the listings and things like that.

Q.    What is the -- again, sir, what is the NCIC?

A.    National Crime Information Center.

Q.    That's federal or state?

A.    It's both.

Q.    What are the duties or functions of the NCIC?

52

A.    I have no idea.

Q.    What relationship do they -- would they have to a local police department?

A.    I have no idea.

Q.    Have you ever had the occasion, yourself, to utilize their resources or data?

A.    I have.

Q.    In what form?

A.    Record checks on individuals.

Q.    They provide record checks? What kind of record checks, sir?

A.    Depends what type you request.

Q.    What type did you request, sir?

A.    I just wanted to know if there was a warrant.

Q.    They have information about warrants?

A.    That's correct.

Q.    At the state level? National level?

A.    Both levels. The federal government gives data to the state and the state has their own data that they give to the local community so you get both federal data and state data through the system.

Q.    One of those would be warrants -- one

**53**

1  form of data is warrants.

2          Would license plates be another kind of

3  data?

4  A.          That would probably be from the state

5  system though.   Then again, if it is out-of-state,

6  it would go probably to the federal system.

7  Q.   Just explain to me again, sir, now the

8  Chief explained to you that Ms. Walker had alleged

9  that there had been some tampering with the NCIC

10  databank?

11  A.   I was -- it was very confusing as to

12  what she was alleging.

13  Q.   What did the Chief say?

14  A.   He said that she alleged that we did

15  something wrong -- we misused the system, that's

16  what he basically said.

17  Q.   Misused which system?

18  A.   Both systems.

19  Q.   Which are?

20  A.   The NCIC and the Registry, the state

21  system.

22  Q.   The Registry?

23  A.   They are both intertwined but one is

24  controlled from a database out in West Virginia

**54**

1  and the other one is controlled out of Chelsea,

2  Massachusetts.

3  Q.   When you say Registry, you're speaking

4  of state?

5  A.   Again, it's the record system out of

6  Chelsea, Massachusetts.

7          Again I'm not an expert in this and I

8  don't want to be confusing but I...

9  Q.   NCIC is out of West Virginia?

10  A.   The National Crime Information Center.

11  Q.   So the allegation was there was some

12  misuse.

13          Did the Chief say who Ms. Walker alleged

14  was misusing the system?

15  A.   No.

16  Q.   Do you know if there was ever any

17  investigation conducted into Ms. Walker's

18  allegations regarding the misuse?

19  A.   There was an investigation.

20  Q.   Were you actually -- were you

21  interviewed or interrogated or questioned about

22  this?

23  A.   I don't recall.

24  Q.   Were any officers under your command

**55**

1  interviewed or questioned about this allegation?

2  A.   I think so.

3  Q.   What officers were actually questioned?

4  A.   Probably Lieutenant O'Connell.

5  Q.   Any others?

6  A.   I don't know.

7  Q.   Would they have been questioned by the

8  

9  A.   I don't know.

10  Q.   Do you know if any officers under your

11  command were questioned by the Attorney General's

12  Office?

13  A.   I don't know.

14  Q.   Do you know if any of them were

15  questioned by the FBI?

16  A.   I don't know.

17  MR. HUDSON:          I'd like to have this

18  document marked as Exhibit 9, please?

19          (Plaintiffs Deposition Exhibit

              No. 9 offered and marked.)

20  

21  Q.   (BY MR. HUDSON) Sir, did you receive a

22  copy of this document, Exhibit 9? (Indicating.)

23  A.   (Witness examining document.) You just

24  gave it to me.

**56**

1  Q.   I mean before today?

2  A.   No.

3  Q.   Has the Holyoke Police Department ever

4  been investigated by the Attorney General's

5  Office?

6  A.   Yes, sir.

7  Q.          Under what circumstances?

8  A.   A complaint by an employee.

9  Q.   Which employee?

10  A.   Personal knowledge?

11  Q.   Yes.

12  A.   Sergeant Wagner.

13  Q.   Do you recall what his complaint was

14  about, sir?

15  A.   No; I never had a copy of the specific

16  complaint.

17  Q.   But it led to an investigation by the

18  AG's office?

19  A.   That's correct.

20  Q.   Do you know whether or not there is --

21  what was the result of that investigation

22  involving Sergeant Wagner?

23  A.   There was a lieutenant who was indicted

24  and he was brought to trial and he was acquitted

# TAMMY WALKER vs. CITY OF HOLYOKE
## ALAN FLETCHER                    SEPTEMBER 12, 2006

---

**57**

of the charges.

Q.   What lieutenant was that?

A.   Valentine. He's deceased.

Q.   Do you know what he was accused of?

A.   Initially, no, I don't.

Q.   But he was acquitted. But you have no knowledge of what Sergeant Wagner's allegations were?

A.   There were many but I don't know. Just what I read and stuff.

Q.   There were many but you don't recall any of the specifics concerning any of those?

A.   Well, money. Money was missing, he alleged.

Q.   When was Sergeant Wagner's complaint?

A.   I don't know.

Q.   Was it before Chief Scott or during Chief Scott's tenure?

A.   Before.

Q.   But you were on staff at that time?

A.   I was.

Q.   Chief Scott came on board in the year 2001?

A.   That's correct.

---

**58**

Q. Do you recall whether or not there was any investigation -- do you recall -- I'm sorry; strike that.

I draw your attention to the exhibit we just marked, I believe that was Exhibit 9. Do you see the last sentence there where it says -- not the last sentence but the last sentence in the second paragraph on the bottom beginning with the words "however" -- and I read that "However, for the reasons stated above, this decision should not be construed as a comment on the lawfulness or the appropriateness of the conduct about which you complained." Do you see that?

A. I see it.

Q. What's your interpretation of that?

A. I have no knowledge of what this is about.

Q. Thank you. Do you know an Agent Susan Kossler?

A. Personally do I know her?

Q. Personally or otherwise?

A. Professionally there's an Agent Kossler from the FBI assigned to the Springfield office, an agent with the FBI, female.

---

**59**

1       Q. Do you know an Agent Kevin O'Regan?

2       A. I don't know him. I've heard of him but
3 I don't know him.

4       Q. Under what context have you heard of
5 him?

6       A. Because I know Agent O'Reilly and we're
7 friends and I met O'Regan once and I met the other
8 agent.

9       Q. Kossler?

10      A. Yes.

11      Q. And as you understand it, O'Regan is an
12 FBI agent?

13      A. Yup.

14      Q. Are you aware that Agent Kossler and
15 O'Regan received a statement of any type
16 concerning the Holyoke Police Department on or
17 about March 29th, 2005?

18      A. I'm not aware of that.

19      Q. Are you aware of any communications from
20 the FBI concerning a statement that was given to
21 them on or about March 29th, 2005?

22      A. To the best of my knowledge, no, I have
23 no knowledge of any.

24      Q. Are you aware whether or not Lieutenant

---

**60**

1 Eva O'Connell has ever voiced an opinion that she
2 felt Sergeant Walker had some kind of type of
3 emotional problems or issues?

4       A. I don't know what Lieutenant O'Connell
5 thinks about Ms. Walker's mental or physical state
6 of being

7       Q. Have you formed an opinion --

8       A. (Interposing) I have.

9       Q. -- about Ms. Walker's emotional or
10 mental state of being?

11      A. (Witness nodding.) Yes; from
12 conversations with her, yes.

13      Q. What's your opinion about Ms. Walker's
14 emotional problems, if any, or state of being --
15 mental state of being?

16      A. When?

17      Q. Well, sir --

18      A. (Interposing) What time period? We've
19 been all over the park here for three years.

20      Q. That's a bad question, sir. Are you
21 aware that Ms. Walker had complained about some
22 harassment by Sergeant Monaghan and Garcia?

23      A. No; not personal knowledge. No.

24      Q. Have you heard that Ms. Walker

---

TAMMY WALKER vs. CITY OF HOLYOKE

ALAN FLETCHER                                      SEPTEMBER 12, 2006

---

**61**

1 complained that Mr. Monaghan had called her
2 Tyrone, had sung a song in her ear of "lick it,
3 lick it good"?
4       A.    That's what she said.
5       Q.    But you heard that?
6       A.    We talked about it right in front of the
7 Sergeant and he denied ever saying those things
8 about her. He said he wanted to get along with
9 her.
10             We had this conversation in my office
11 with her commanding office and Mr. Monaghan with
12 me so that was addressed.
13      Q.    Do you remember about when that
14 happened, sir?
15      A.    Right when it happened, whenever she
16 reported it, immediately when she reported it,
17 immediately it was brought to my attention.
18 Immediately when she brought it to my attention it
19 was addressed.
20      Q.    Sir, on or about -- do you know whether
21 or not on or about June 18th, 2002 Ms. Walker --
22 sometime around that time Ms. Walker brought to
23 your attention that Sergeant Monaghan had referred
24 to the Chief as Uncle Charlie?

**62**

1       A.    No; I don't recall that.
2       Q.    Or made reference to something like
3 "Uncle Charlie, the Chief dun come out wit
4 a nutter" A N U T T E R in other words,
5 Monaghan trying to speak in a so-called black
6 dialect?
7       A.    No.
8       Q.    Did you ever hear Monaghan --
9             MS. LYNCH: (Interposing) Did you
10 respond?
11            THE WITNESS: No; I never heard
12 this. This is the first I heard this.
13      Q.    (BY MR. HUDSON) What about on or about
14 June 20th, 2002 whether or not Ms. Walker reported
15 that Monaghan -- after she signed off the radio or
16 went off the radio he -- she heard him say things
17 like "lick it good"?
18      A.    I never heard that.
19      Q.    Did she ever tell you that at all?
20 Never reported that he said something like that?
21      A.    She complained that he made remarks to
22 her.
23      Q.    Like that?
24      A.    Not like that. She never said that.

**63**

1       Q.    Did you have -- who was the former chief
2 the police?
3             MS. LYNCH: When?
4       Q.    (BY MR. HUDSON) Before -- I said
5 former, sir. I mean before Chief Scott?
6       A.    Chief Mark Cournoyer.
7       Q.    How long was he chief?
8       A.    Thirty-nine months.
9       Q.    Did you have a personal relationship or
10 a friendship relationship with him?
11      A.    I would say it would be adversary.
12      Q.    Before him, who was chief?
13      A.    Steve Donoghue.
14      Q.    Did you have a relationship with
15 Mr. Donoghue?
16      A.    Positive.
17      Q.    Friends?
18      A.    Friends.
19      Q.    Knew his family?
20      A.    Very much so.
21      Q.    Did he have a daughter?
22      A.    Yes.
23      Q.    Who is his daughter?
24      A.    He has two daughters.

**64**

1       Q.    One of his daughters was in the
2 military. Do you know her?
3       A.    Kathy.
4       Q.    Did you know that Kathy and Sergeant
5 Walker were close friends?
6       A.    Yes.
7       Q.    Did you know that they may have been
8 even more than close friends?
9       A.    Yes.
10      Q.    In fact that they dated each other?
11      A.    Yes.
12      Q.    In other words you had knowledge of
13 Ms. Walker's sexual orientation?
14      A.    Yes.
15      Q.    Isn't it a fact that other officers had
16 knowledge of Ms. Walker's sexual orientation?
17            MS. LYNCH: Objection; you can
18 answer if you know.
19      Q.    (BY MR. HUDSON) Other Holyoke Police
20 Department officers?
21      A.    I would say they all did.
22      Q.    Would you understand how, if Sergeant
23 Monaghan had stated publicly "lick it, lick it
24 good," how that may have some negative effect upon

---

PERLIK and COYLE REPORTING

Ms. Walker?

MS. LYNCH: Objection; you can answer.

THE WITNESS: I have no opinion to answer that question.

Q. (BY MR. HUDSON) Thank you. Didn't Ms. Walker -- did Ms. Walker ever tell you that Sergeant Monaghan said she shouldn't be a sergeant because of her sexual orientation?

A. No.

Q. Did Ms. Walker report to you that Mr. Monaghan referred to her as Tyrone?

A. She did.

Q. When you talked with Sergeant Monaghan, he denied calling her Tyrone?

A. Right in front of her.

Q. Did Ms. Walker also report to you that Mr. Monaghan made a statement, "you shouldn't go sticking your tongue where it don't belong"?

A. No; I never heard that.

Q. Do you recall whether or not on or about October 21, 2002 Ms. Walker spoke with you about the sergeants didn't like her seniority -- the other sergeants didn't like her seniority because

---

discourse with either party.

2    As a matter of fact, I was
3    involved socially with both of them so it's not
4    a case that I walked the other way. That's their
5    business; not my business.
6        A. I don't think I am. I don't think I
7    am but would I go out socially with them? Yeah.
8    Had I been at family events? Yeah. I'm very
9    close with the family.
10
11
12
13
14
15        Q. How do you feel about that?
16
17
18
19        Q. Do you know -- have any other officers
20    made any comments about Ms. Walker and her
21    relationship with Kathy?
22        A. Not that I know of.
23        Q. Are you aware that on or about
24

---

66

she is a woman and black?

A. I don't recall that.

Q. You don't recall -- do you recall whether or not you discussed with her the possibility that she might be retaliated against if charges were brought by her concerning officers or sergeants opposing her seniority because she was a woman or black?

A. No; never.

Q. Tell me, how did you feel about Ms. Walker's relationship with the daughter of your former chief?

A. How I felt?

Q. How you felt about the fact that Ms. Walker had a sexual lesbian relationship with the daughter of the former chief?

A. I have no personal opinion whatsoever on that topic.

Q. Did you approve of it?

A. No.

Q. No, you did not approve of it?

A. I'm indifferent about it. That's her life, they want to do it, that's fine with me. I never expressed any dissatisfaction or any

---

68

1 April 15th, 1999 there was a sergeant's
2 examination list that was issued?
3        A. Personally -- there could have been. Do
4 I know personally? No; I don't.
5        Q. Are you aware that on or about June,
6 1999 Officers Garcia and McCoy were appointed
7 full-time sergeants?
8        A. I don't know that.
9        Q. But you know --
10        A. (Interposing) I know they are sergeants
11 but I don't know when they were appointed. I have
12 no idea.
13        Q. Are you aware that Ms. Walker filed both
14 an MCAD complaint and a Civil Service bypass
15 complaint about being passed over for sergeant?
16        A. The best way for me to answer that
17 question is I'm aware of it but I'm not personally
18 aware of it.
19        Q. But you know about it?
20        A. Yes; through conversations with the
21 Sergeant.
22        Q. Are you aware that Ms. Walker and the
23 City of Holyoke settled their Civil Service
24 complaint and MCAD complaint?

Case 3:05-cv-30074-MAP   Document 75-6   Filed 08/10/2007   Page 20 of 48

TAMMY WALKER vs. CITY OF HOLYOKE
ALAN FLETCHER                    SEPTEMBER 12, 2006

71

A. That's what she told me; yes.

Q. Are you aware that as a result of that settlement Ms. Walker was appointed a full-time sergeant?

A. That's correct.

Q. Basically permanent under Civil Service at that time?

A. I believe so; yes. She was a permanent sergeant; yes.

Q. Are you aware that she received a retroactive seniority date effective June 9th, 1999?

A. I know she did but I don't know the dates. I'm not personally aware of it.

Q. Are you aware that the date -- the seniority date she received was a date that preceded some of the other sergeants on the watch?

**A.** I am aware of that; yes.

Q. Do you know of names of those sergeants?

A. No; I don't.

Q. Would one of them have been Sergeant Garcia?

A. Could have been.

Q. In fact, didn't you have the occasion to

70

counsel or talk with Ms. Walker about some of the problems or concerns she was experiencing as a result of your belief or understanding that she got an incorrect seniority date?

A. Sergeant Walker and I did converse; yes.

Q. What did that -- do you remember when that conversation happened?

A. I recall that it was late at night -- it was early in the morning. I was on an extra detail.

We have -- we conversed for several, several minutes and we talked about a lot of things. That was one of them.

Q. Would that have been as far back as October 21, 2002?

A. I don't recall dates.

Q. Do you remember telling her that you knew other sergeants didn't like her having the retroactive seniority that preceded theirs or having a seniority that they considered to be incorrect?

A. I don't recall the specific conversation but it was -- I did say that once that was corrected I thought everything would work out.

1        The dates were not consistent with what
2 took place and I'm not really sure what the dates
3 were but there was an announcement date and an
4 appointment date or something. They weren't
5 consistent, they were off by a week or so or
6 whatever.
7        Q.    Are you aware whether or not the
8 sergeants -- other sergeants were blaming
9 Ms. Walker for the dates being off -- the
10 seniority dates?
11       A.    The best of my recollection this
12 conversation I had with her, she entered into an
13 agreement with the City and she supplied the City
14 with the dates and they accepted this agreement.
15       Q.    How do you know that she supplied the
16 City with the dates?
17       A.    Because she told me she did.
18       Q.    Was the City represented by an attorney,
19 do you know?
20       A.    I have no idea who the City was
21 represented by.
22       Q.    Sir, I'm going to show you -- because
23 I'm not offering this into evidence, it's already
24 been offered with Chief Scott's deposition. I

72

1 believe it was marked as Exhibit Number 3 with
2 Chief Scott.
3        I show you, sir, what has been marked as
4 Deposition Exhibit Number 3 from the deposition of
5 Chief Scott taken yesterday in this same action,
6 okay? I would ask you to look at page two where
7 it's the Bate stamp marked 0347.
8        First of all, have you ever seen this?
9 (Indicating.)
10       A.    No; you just gave it to me.
11       Q.    In any event, sir, do you see where it
12 says on the first page Bates number 0346 where it
13 says "Settlement Agreement"?
14       A.    That's what it says.
15       Q.    It's between Tammy Walker and the City
16 of Holyoke, Civil Service docket number?
17       A.    It does say that.
18       Q.    G-9914?
19       A.    Yes.
20       Q.    Do you see in the very first paragraph
21 where it says, "Whereas the appellant Tammy Walker
22 was bypassed for promotion to sergeant on
23 June 9th, 1999." Do you see that?
24       A.    I do.

73

1    Q.    Then at the end of the second paragraph,
2 number two, do you see where it says, at the very
3 end of that paragraph, her original bypass, i.e.
4 June 9th, 1999? Do you see that at the bottom?
5    A.    I do.
6    Q.    On the second page of this Exhibit
7 Number 3 in Chief Scott's deposition there is a
8 date, May 23rd, 2000, do you see that?
9    A.    I do.
10    Q.    Do you see where -- can you recognize --
11 have you ever had the occasion to recognize Tammy
12 Walker's signature?
13    A.    Yeah, I guess I've seen it.
14    Q.    But do you also see on that second page
15 marked 347 that there purports to be a signature
16 of someone representing the City Solicitor's
17 office?
18    A.    I can't read it.
19    Q.    But do you see the word "City
20 Solicitor"?
21    A.    I see that.
22    Q.    And do you see a signature line above
23 those handwritten words "City Solicitor"?
24    A.    I see something there.

74

1    Q.    From looking at that, sir, and given
2 your years of experience, would you conclude that
3 the City Solicitor's office participated in this
4 agreement marked Exhibit 3?
5    A.    I have no opinion.
6    Q.    Okay, sir; thank you. Again sir, do you
7 recall whether or not -- it was your testimony
8 that you thought that this matter -- the problem
9 Ms. Walker was having with the other sergeants
10 around the seniority, that it would be resolved
11 once she took care of that?
12    A.    I think we both had that opinion.
13    Q.    Did you conclude that it was Ms. Walker
14 who was -- do you conclude that it was Ms. Walker
15 who was at fault for the date?
16    A.    No; I never did that. No.
17    Q.    Thank you. But do you know whether or
18 not the other sergeants blamed Ms. Walker for
19 having the -- for being fortunate enough to have
20 an earlier seniority date?
21    A.    She suspected that.
22    Q.    You had no reason to disagree with that,
23 did you?
24    A.    I didn't disagree with her.

75

1            MR. HUDSON: Thank you. Can we take
2 a five-minute break?
3        (A recess was taken.)
4    Q.    (BY MR. HUDSON) Sir, I guess my
5 question is on or about the time that Sergeant
6 Walker was reporting to you the problems that she
7 was having with Sergeant Monaghan, what was your
8 opinion about her emotional state at that time?
9    A.    I thought she was all right at that
10 time.
11    Q.    Do you know whether or not her feeling
12 that these issues -- well, subsequent to that
13 time, let's say approximately a year later -- and
14 I think I stated that she had -- Ms. Walker has
15 alleged on or about June 20th, 2002 Monaghan had
16 said "lick it, lick it good."
17        This is what she alleged; and that in
18 October, Monaghan called her Tyrone -- October of
19 2002; and that in October, 2002 she reported that
20 Monaghan said "you shouldn't go sticking your
21 tongue where it don't belong."
22        The question is, sir, approximately a
23 year after -- around a year after October, 2002
24 did you have any idea whether Ms. Walker felt that

76

1 her concerns had gone unaddressed or still
2 remained?
3    A.    The only thing I knew about was this
4 Tyrone business.   I had them in my office with her
5 commanding officer.   He denied he said it.   She
6 said so and so said he said it.   He asked who said
7 he said it.   She wouldn't say who said it so it
8 was her word against his word.
9        He said he wanted to get along with her.
10 She was adamant she didn't like him.   She made it
11 quite clear that she didn't like him.   I told them
12 they had to get along together and they better
13 like each other while they were working.
14        That was the conversation I had with her
15 lieutenant who at the time was Whelihan, the
16 Sergeant and herself but it was addressed.   He
17 denied saying it.   He denied it right to her face
18 and there was -- and he said he wanted to get
19 along with her.
20        That's the only thing I can recall about
21 racial if, in fact, the name "Tyrone" is racial.
22 She thought it was.   I thought it was important
23 that I had them up in my office and talk about it.
24    Q.    Do you know whether or not Ms. Walker

**77**

1  exhibited any signs of emotional distress?

2  A.          No; she's a pretty strong individual, at
3least she -- the only time she had stress is when
4she had family problems but this one, she seemed
5to be pretty strong.

6  Q.    Didn't she submit a request for medicals
7because of stress?

8  A.    I don't have any idea -- well, when?

9  Q.    Even, let's go back to -- good question,
10sir.

11       As early as -- not early but let's say
12on or about November 29th, '04. I draw your
13attention to Exhibit Number 2.

14       Didn't she report that there was stress
15related to work? (Indicating.)

16  A.    That's what she says.

17  Q.    Sir, did you ever have the occasion to
18receive an IOC from Lieutenant O'Connell regarding
19Sergeant Walker's movements in the police station
20or headquarters on or about November 10th, 2004?

21  A.    I don't recall.

22 MR. HUDSON:          If I could have this
23document marked as Exhibit 10.

24

**78**

1               (Plaintiff's Deposition Exhibit
                 No. 10 offered and marked.)

2

3  Q.    (BY MR. HUDSON) Sir, please take a
4moment -- have you had a chance to look at that
5document marked Exhibit 10? (Indicating.)

6  A.    (Witness examining document.) Yes; I
7see that.

8  Q.    What does this purport to be sir -- did
9you see this before today?

10  A.    I did -- well, I must have.   It says on
11the tenth of November of 2004.

12       Q.    Its a document from Lieutenant Eva
13O'Connell to Sergeant Walker?

14  A    That's correct.

15  Q.    Regarding assignment?

16  A.    That's correct.

17  Q.    And amongst the cc's is Captain Alan
18Fletcher?

19  A    That's correct.

20  Q.    So it's your recollection that you did
21receive it?

22  A.    I did.

23  Q.    Is that your approved and received, is
24that your signature at the bottom?

**79**

1  A.    That's correct; it is.

2  Q.    Do you see where -- what was your
3 understanding that you were approving?

4       Were you approving the item of this
5 assignment as a booking officer that Sergeant
6 Walker is no longer engaged in patrol duties but
7 will be working in-house?

8  A.    That's correct.

9  Q.    As a booking officer?

10  A.    That's correct.

11  Q.    And performing these duties that are
12 bulleted here, the three duties?

13  A.    Correct.

14  Q.    Sir, in your career as a police officer
15 and now a captain, when a patrolman or a patrol
16 person, police officer is taken off of street duty
17 and assigned booking, how do other officers
18 perceive that?

19       MS. LYNCH:    Objection.

20       THE WITNESS: I don't know.

21  Q.    (BY MR. HUDSON) If you were -- when you
22 were a sergeant or a patrolman, how did you
23 perceive other officers who were removed from
24 street duty and assigned book being duty? Did you

**80**

1 form an opinion?

2  A.    No.

3  Q.    Do you know whether or not it is just
4 generally understood to be -- that the officer did
5 something wrong or they are being punished?

6 MS. LYNCH:            Objection; you can
7 answer if you can.

8       THE WITNESS: Its not punishment, I
9 know that. I've been inside. They took me off a
10 cruiser and put me inside.    I was inside for a
11 year.

12  Q.    (BY MR. HUDSON) Did you request to be
13inside?

14  A.    No; I didn't request to be inside.

15  Q.    Did you like it?

16  A.    No; but I made the dean's list twice so
17 I did all right.

18  Q.    When you were assigned inside to the
19 booking, did you view it as a less preferable
20 position?

21       You said you didn't like it; less
22 preferable to being a patrol officer?

23  A.    Well, usually when things like that
24 happen I try -- if I really don't like an

---

81

assignment I try to make the best of a bad situation.

In my case I worked it actually to my advantage. At first I thought it was bad but then I said this is great. When they realized I enjoyed it, they put me back out on the street.

Q. I draw your attention to the last paragraph of Exhibit 10.

Do you see where Lieutenant O'Connell writes "Unless your duties take you into Dispatch or Records Bureau, you will refrain from hanging around those offices"?

A. Mmm-hmm.

Q. What's your interpretation of that?

A. Well, my interpretation is that I'm a bureau commander for Operations and those two divisions right there are not Operations. They're under a different commander. They're not under our command. They're under another supervisor's, Captain Seklecki's command. Those personnel are not assigned to our division. They are separate.

My interpretation is that she doesn't want the officers in our division, Operations, getting involved in -- with another division.

---

82

MR. HUDSON: I'd like that mark Exhibit 11.

(Plaintiffs Deposition Exhibit No. 11 offered and marked.)

Q. (BY MR. HUDSON) Would you look at Exhibit 11? (Indicating.)

A. (Witness examining document.)

Q. Have you had a chance to look at that?

A. I did.

Q. Do you recall receiving this document?

A. I don't know if I did or not.

Q. Do you recognize the signature as being that of Lieutenant O'Connell?

A. It is.

Q. I'd like for you to compare Exhibit 10 with Exhibit 11?

A. Mmm-hmm.

Q. I'd like for you to look at the last paragraph?

A. Yes.

Q. Do you see a difference in the wording?

A. I do.

Q. What difference do you note, sir?

A. It says "refrain from hanging around

---

83

1 those offices" to "refrain from visiting those
2 offices."
3       Q. So Exhibit 10 states that "refrain from
4 hanging around those offices" and that's the one
5 that you signed and authorized, is that correct?
6       A. I don't --
7       Q. (Interposing) That's the one that you
8 actually signed, okay?
9       A. Right.
10      Q. Then Exhibit 11, which is -- Exhibit 11
11 is essentially the same as Exhibit 10 except for
12 the difference in the wording "refrain from
13 visiting those offices"?
14      A. That's correct.
15      Q. Do you have any knowledge as to why --
16 do you have any knowledge that -- do you have any
17 knowledge why Lieutenant O'Connell gave you one
18 version of the document and gave Ms. Walker
19 another -- why she gave you Exhibit 10 and gave
20 Ms. Walker Exhibit 11?
21      A. You would have to ask her; I don't know.
22      Q. In other words you approved the
23 document, Exhibit 10 which basically states
24 Ms. Walker should not hang around offices and then

---

84

1  Lieutenant O'Connell is giving Ms. Walker a
2  document telling her not to even visit the
3  offices?
4       A. Quite frankly they say the same thing,
5  sir.
6       Q. There's a difference in wording, isn't
7  there, sir? "Refrain from visiting" versus
8  "refrain from hanging around"?
9       A. We're playing with words, I think.
10      Q. But they are two different documents
11  with that language, that's your understanding?
12      A. I testified to that.
13      Q. Yes; thank you very much, sir. Do you
14  know when Chief Scott started his vacation during
15  the week of November 10th, 2004?
16      A. No; I don't.
17      Q. Well, while Chief Scott was on vacation
18  during the week of November 10th, 2004 were you
19  the acting chief?
20      A. I don't know.
21      Q. Have you on occasion, sir, served as
22  acting chief?
23      A. Very seldom.
24      Q. Is that because -- is there anyone else

---

---

85

1 that Chief Scott appoints or designates as acting
2 chief other than you?
3    A.    The other captains. There's a reason
4 for that.  Do you want me to explain it?
5    Q.    Oh, yes, by all means.
6    A.    It's not that he hasn't any confidence
7 in me but usually I'm away when he's away.
8    Q.    Are you aware that Sergeant Walker filed
9 a grievance against Lieutenant O'Connell --
10 restrictions of her movements? In other words
11 concerning Exhibit 10 and 11?
12    A.    I can only say that Sergeant Walker
13 never filed a grievance with me.
14    Q.    But are you aware that there was a
15 grievance filed by Sergeant Walker against
16 Lieutenant O'Connell?
17    A.    I'm not -- I don't have any copy of it.
18 I don't think it was ever given to me or anything
19 like that; no.
20    Q.    Well, isn't it the union president's
21 responsibility to assist supervisory personnel,
22 its members, in filing grievances -- meritorious
23 grievances?
24    A.    We have bylaws in our union and an

---

86

1 employee who is aggrieved, they are supposed to
2 file a grievance with the president, the vice
3 president. Then we have a grievance review
4 committee that goes over all the grievances.
5         Sergeant Walker chose not to go through
6 our process.  When she grieved, she went directly
7 to the Police Chief to grieve and she never gave
8 me a copy of any of her forms of her grievances --
9 and she had several -- and I never received a one
10 of them.
11         I can't help an individual if they don't
12 advise me as to what their grievance is.
13    Q.    Do you know whether or not Sergeant
14 Walker ever requested you or an official of the
15 union to assist her with processing any grievance?
16    A.    All I can say --
17    Q.    (Interposing) Any of her grievances?
18    A.    All I can say I know from the union
19 attorney that they have assisted her in every
20 grievance that she has presented to their staff.
21 She was represented by counsel.
22    Q.    How many grievances have you filed in
23 your career as union president?
24 MS. LYNCH:         Objection; I don't

---

87

1 understand how that's relevant.
2    Q.    (BY MR. HUDSON) You may answer.
3    A.    Quite frankly, maybe one or two.  Most
4 of the time I try to work with the City Police
5 Chief to resolve issues before they are into a
6 grievance stage.
7         I have filed unfair labor practices
8 which is a little beyond a grievance but in-house
9 grievances we try really to resolve the issues
10 with the Chief before we spend a lot of time and
11 money in processing them. We try to get them
12 taken care of. We try to make sure that the
13 employee is happy and management is happy with the
14 outcome.
15    Q.    Therefore it is your testimony that you
16 have only filed -- you've never filed a grievance
17 on behalf of Ms. Walker?
18    A.    No.
19    Q.    And only one or two in your almost
20 ten-year career as union president?
21    A.    That's correct.
22    Q.    Are you aware of any union
23 representative ever assisting Ms. Walker or
24 Sergeant Walker with filing her grievances?

---

88

1    A.    I don't have knowledge because she never
2 brought it to my attention. Someone could have
3 helped her; I don't know.
4         MS. LYNCH:    Do you want to take a
5 lunch break? In other words, are you not going to
6 be done by then?
7         MR. HUDSON: Can you give me five
8 minutes and then we can take a break?
9         MS. BETOURNAY: Sure.
10    Q.    (BY MR. HUDSON)  Lieutenant O'Connell is
11 under your command, is that correct, sir?
12    A.    She is.
13    Q.    Lieutenant Fournier heads up the
14 Professional Standards?
15    A.    He works directly for the Chief.
16    Q.    Sir, I want to show you what is from
17 Chief Scott's deposition yesterday, Exhibit 11.
18 It's a composite exhibit and I specifically want
19 to reference page -- the says P 043 and P 044, the
20 last two pages and specifically ask you to look at
21 the cc of that document? (Indicating.)
22    A.    Yes.
23    Q.    Who is the originator of that document?
24    A.    Chief Scott.

---

89

Q.    Is it cc'd to you?

A.    It is.

Q.    If Chief Scott cc'd a document to you, would you have received it?

A.    I would.

Q.    Isn't it Exhibit 11 -- what is Exhibit 11, sir?

A.    I don't know.  It says a grievance filed by Tammy Walker against the Lieutenant David Fournier and Lieutenant Eva O'Connell.

Q.    So if you received it, you would have had knowledge of Ms. Walker's grievance or grievances against Lieutenant O'Connell and Fournier?

A.    No.

Q.    It doesn't --

A.    (Interposing) No; the document doesn't mean anything to me. I gave that document to the union attorney.

Q.    You gave the document?

A.    To the attorney and he already had a copy of it.

Q.    But this document was cc'd to you as the union president, is that correct -- Captain Alan

90

Fletcher, Union President?

A.    That's correct.

Q.    And you would have just simply given it to the union attorney without even reading it?

A.    She didn't file the grievance with me, she filed it with the Chief.   She's supposed to give it to me.   I'm supposed to file the grievance.

        She bypassed our rules and regulation and our policies and procedures and our bylaws of our union.   She took it upon herself to do something and she did it.

Q.    Sir, the question is simply whether or not you had knowledge?

A.    I had no knowledge of anything except what was sent to me.

Q.    What was sent to you was this letter addressed to Ms. Walker which is signed by Chief Scott, is that correct?

A.    That's correct.

Q.    Cc'd to you as union president?

A.    Right.

Q.    Included in Plaintiff's Exhibit Number 11 of Chief Scott's deposition?

91

A. That's correct.

Q. And he specifically states that the two grievances you filed -- "Dear Sergeant Walker, the two grievances you filed were handled in accordance with Article XX," et cetera "in that the allegation is made against Lieutenant Fournier and Lieutenant O'Connell" et cetera, et cetera.

My judgment, sir, isn't it true that you would have at least had knowledge that Ms. Walker had filed these grievances based upon simply --

A. (Interposing) The only knowledge I have is that the Chief acknowledged that he received grievances from her through a cc to me.

MR. HUDSON: Why don't we -- you want to keep going until one or you want to take a break now?

MS. BETOURNAY: Yes; please.

(A luncheon recess was taken.)

Q. (BY MR. HUDSON) Do you recall ever having an occasion to perform a spot check at the court on April 6, 2004?

A. I do spot checks of the court but I don't know the dates. As a matter of fact, I did

92

one today.

Q. You're very busy.

A. Well, I get paid a lot.

Q. How much do you get paid?

MS. LYNCH: Objection.

THE WITNESS: You would cry.

Q. (BY MR. HUDSON) I'm serious, sir.

A. I'm the highest paid city employee, I think -- about a buck seventy-five, a buck eighty. This year I'll do about two.

Q. Two hundred thousand?

A. Yes.

Q. I'm sure you deserve every dime you get, sir.

A. Well, I've got a hard boss. He works me hard.

Q. You would not want to do anything that would jeopardize your job, do you, sir?

A. No; I wouldn't.

Q. In the history of the Holyoke Police Department -- what do you do a spot check for at the Courthouse?

A. Attendance.

Q. Attendance by whom?

93

1    A.    The officers assigned to court that day.
2    Q.    How do you perform the spot checks
3 regarding attendance?
4    A.    I go in and see if they've signed in.   I
5 come in unannounced. They don't know what day I'm
6 going to be there.
7          Another captain does it, too, Captain
8 Monfette.
9    Q.    How long have you been doing spot
10 checks?
11   A.    I don't know.
12   Q.    Have you been doing them in -- did you
13 do any before 2004?
14   A.    I can't answer the question.   I don't
15 know. We were directed by the Chief to do spot
16 checks.   I don't know the date of the order.
17   Q.    Which chief was this?
18   A.    Scott.
19   Q.    Had he been around --
20   A.    (Interposing) He's been around since
21 2001.
22   Q.    Did he impose that order immediately
23 upon his hiring or within a couple of years later?
24   A.    I guess there was some officers late for

94

1 court one day and -- a lot of them -- and he
2 wanted to correct it.
3    Q.    So there have been spot checks performed
4 since April of 2004?
5    A.    I would think so.
6    Q.    Since you did one yesterday, I guess --
7    A.    (Interposing) I did one today.
8    Q.    Do you recall whether or not you did a
9 spot check involving Ms. Walker being late?
10   A.    No; I do not.
11   Q.    Do you know of any officers that have
12 been reprimanded since April of 2004 for being
13 late to court?
14   A.    Since?
15   Q.    Since April of 2004?
16   A.    Not to my knowledge.
17   Q.    Do you know if any officers have been
18 suspended since April of 2004 for being late to
19 court?
20   A.    I have no knowledge.
21   Q.    Are you aware that Ms. Walker was
22 reprimanded for being late five to -- I believe
23 it's five to ten or five to fifteen minutes late
24 to court?

95

1    A.    She was.
2    Q.    Who reprimanded her?
3    A.    I believe it was the Chief.
4    Q.    Do you know who did the spot check that
5 informed the Chief that Ms. Walker was late?
6    A.    I believe it was Captain Monfette.
7    Q.    Were there other officers that were also
8 found to be late to court?
9    A.    Yes.
10   Q.    When Captain Monfette did the spot
11 check--
12   A.    (Interposing) Yes, sir.
13   Q.    -- do you know who those officers were?
14   A.    No, sir.
15   Q.    Are you familiar with the Elizer's Pub?
16   A.    Yes, sir.
17   Q.    Are you aware that Sergeant Walker filed
18 a complaint -- filed allegations of misconduct
19 involving the Elizer's Pub?
20   A.    I'm not personally aware of that.
21   Q.    Did you ever instruct Sergeant Walker to
22 write a report on the Elizer's Pub incident?
23   A.    I did.
24   Q.    Why did you instruct her to write a

96

1 report?
2    A.    Because she didn't do one.
3    Q.    Why did you determine it was needed?
4    A.    Because when an officer writes an
5 incident and leaves it blank and has a complaint
6 number I'm entitled to that report and I wanted
7 it.
8 She said she'll give it to me later.          I
9 said you give it to me now.   I said I wanted that
10 report.   She reported it to me verbally and I said
11 I wanted it in writing.
12   Q.    What did she report to you verbally?
13   A.    That people were in there drinking after
14 hours.
15   Q.    Did she report to you that these people
16 involved police officers?
17   A.    Yes, sir.
18   Q.    Did you think that she was trying to get
19 your guidance about what to do under that
20 circumstance -- in that situation?
21   A.    No; I didn't think that at all.
22   Q.    But you did give it to her?
23   A.    Give her what?
24   Q.    Guidance?

# TAMMY WALKER vs. CITY OF HOLYOKE
## ALAN FLETCHER
## SEPTEMBER 12, 2006

97

1      A.   I gave her an order.
2      Q.   An order, excuse me.
3      A.   I don't know if that's guidance but I
4 gave her an order.
5      Q.   To write up an incident report?
6      A.   That's right; and give it to me.
7      Q.   Did she write a report?
8      A.   Not right away.
9      Q.   Did she ultimately write a report?
10     A.   She did.
11     Q.   This incident -- do you remember when
12 this incident occurred?
13     A.   No; I don't.
14     Q.   Around June 23rd, do you know what year?
15     A.   I don't know.
16     Q.   June 23rd, 2003, does that sound maybe
17 right?
18     A.   I don't know.
19     Q.   Under state law is it a crime to be in a
20 bar past two a.m.?
21     A.   No.
22     Q.   Is it a crime to be in a bar consuming
23 alcohol past two a.m.?
24     A.   No.

98

1      Q.   Is it a crime to order or purchase
2 alcohol in a public facility like a bar that you
3 are consuming well past two a.m.?
4      A.   Yes.
5      Q.   Was Sergeant John Monaghan one of those
6 officers involved?
7      A.   Yes, sir.
8      Q.   And that's the same Sergeant Monaghan
9 that Ms. Walker had made allegations of racial and
10 gender discrimination and harassment against?
11     A.   Yes, sir.
12     Q.   In fact Ms. Walker had made her
13 allegations against Mr. Monaghan prior to
14 June 23rd, 2003, isn't that correct?
15     A.   I don't understand the question.
16     Q.   The allegations involving the racial
17 discrimination --
18     A.   (Interposing) Oh, yes, they were prior
19 to that.   Yes, sir.
20     Q.   And also the allegations involving the
21 gender discrimination, that is the "lick it good"
22 and "don't put your tongue" -- those types of
23 things?
24     A.   I guess.

99

1      Q.   And the Tyrone that you were familiar
2 with?
3      A.   That's the only one I'm familiar with.
4 I'm not familiar with the other ones you mentioned
5 today.
6      Q.   Was there a Phillip J. McCay?
7      A.   Yes; he was.
8      Q.   Mr. Monaghan, is he a white male?
9      A.   Yes; he is.
10     Q.   Mr. McCay, is he a white male?
11     A.   Yes; he is.
12     Q.   He's a patrolman?
13     A.   Yes, sir.
14     Q.   And there was a reserve patrolman Thomas
15 Dore?
16     A.   Yes, sir.
17     Q.   Is he a white male?
18     A.   Yes, sir.
19     Q.   Approximately when did Ms. Walker write
20 up that report, sir?
21     A.   I don't know when she did.
22     Q.   Did you ever receive a report?
23     A.   No; I didn't.
24     Q.   Do you know if in fact she ever gave a

100

1 report to the Chief or anyone else?
2      A.   She did. She gave it to the Chief.
3      Q.   Chief Scott?
4      A.   That's correct.
5      Q.   Did you write Ms. Walker up for
6 violating the chain of command?
7      A.   I did.
8      Q.   In other words for giving the report to
9 Chief Scott and not to you?
10     A.   That's correct.
11     Q.   Did you counsel her before you wrote her
12 up?
13     A.   Counsel?
14     Q.   Yes; did you talk with her about why you
15 were giving her this write-up?
16     A.   No.
17     Q.   In your I guess discipline -- was it a
18 reprimand or a suspension? What was it?
19     A.   I don't know what discipline she
20 received.
21     Q.   Did you recommend discipline to be
22 administered by the Chief?
23     A.   I recommended that disciplinary action
24 be taken for violating the chain of command; yes.

101

1  Q.  And you made that recommendation to who?
2  A.  The Police Chief.
3  Q.  Scott?
4  A.  That's correct.
5  Q.  Did he act on your recommendation?
6  A.  I believe he did.
7  Q.  Did he give you any type of written
8  confirmation of what conduct he may have taken or
9  discipline imposed?
10  A.  He gave it out to the Department in a
11  special order; yes, he did.
12  Q.  So he broadcast it -- I mean he informed
13  the entire --
14  A.  (Interposing) That's correct.
15  Q.  -- staff --
16  A.  (Interposing) That's correct.
17  Q.  -- what action was being taken?
18  A.  That's correct.
19  Q.  Is that customary?
20  A.  Yes, sir.
21  Q.  That any time disciplinary action is
22  taken against a police officer it's not just
23  between the supervisors and that officer but it's
24  communicated to the entire -- to all the

102

1  employees?
2  A.  When discipline is issued; yes, sir.
3  Q.  Is that consistent with the union
4  contract?
5  A.  I don't think the union contract has
6  anything to say about it.
7  Q.  Are you aware of any officer causing a
8  prank call to be made to the station on the night
9  of June 23rd, 2003?
10  A.  Which June 23rd, 2003?
11  Q.  June 23rd, 2003, the night that these
12  officers were found to be drinking in Elizer's Pub
13  after two a.m. in the morning?
14  A.  What do you mean by a crank call.
15  Q.  A prank phone call; a false call, a
16  prank?
17  A.  I wouldn't have knowledge of that.
18  Q.  So you wouldn't have any knowledge of
19  any officer to made a prank call?
20  A.  They said Officer Dore made a call from
21  that place.
22  Q.  Who said Officer Dore made a call from
23  Elizer's Pub?
24  A.  I don't know.  I just heard that.

103

1  Q.  Do you know whether or not Reserve
2  Patrolman Thomas Dore lied, told a falsehood?
3  A.  No.
4  Q.  During the internal investigations
5  regarding the --
6  A.  (Interposing) I have no idea.
7  Q.  Investigation of the Elizer Pub
8  incident?
9  A.  I have no idea.
10  Q.  Of June 23rd, 2003?
11  A.  I have no idea.
12  Q.  When did you inform Sergeant Walker to
13  write a -- former Sergeant Walker to write a
14  report regarding the Elizer Pub incident?
15  A.  Right after it happened, the day it
16  happened.
17  Q.  So if it happened on June 23rd,
18  two-fifteen in the morning, 2003?
19  A.  I asked her for a report right then.
20  Q.  Are you aware that the License
21  Commission held a hearing on the allegation that
22  three officers were drinking -- Officers Monaghan,
23  Dore, and McCay -- Phillip McCay?
24  A.  I'm not aware of that.

104

1  Q.  I believe a hearing on August 7th,
2  you're not aware of a hearing being held on
3  August 7th, 2003?
4  A.  I'm not aware of that.
5  Q.  Do you recall how it is that former
6  Sergeant Walker went to Elizer's Pub?
7  A.  I don't know.
8  Q.  Did you read Ms. Walker's report -- the
9  one she finally wrote up and gave to you?
10  A.  Probably did; yes.
11  Q.  Did Ms. Walker's report say the
12  dispatcher sent her to a bar after a caller said
13  patrons refused to leave?
14  A.  I don't recall.
15  Q.  When you say that Officer Dore was
16  reported to have made the telephone call from the
17  pub are you speaking -- are you referencing that
18  it was Officer Dore who was reported to have
19  actually called the Police Department?
20  A.  I have no knowledge of it.
21  Q.  What do you --
22  A.  (Interposing) Just scuttlebutt in the
23  station that he made the phone call.
24  Q.  He made the phone call about what?

105

1    A.    I don't know.

2    Q.    In connection with the Elizer Pub
3 incident?

4    A.    Probably.

5    Q.    Is he still a reserve officer?

6    A.    No.

7    Q.    Is he a permanent officer?

8    A.    Yes, sir.

9    Q.    When did he get to be a permanent
10 officer?

11    A.    I have no knowledge of that.

12    Q.    In what bureau is he assigned --
13 Mr. Dore?

14    A.    I think he works the midnight-to-eight
15 shift, Uniform Division.

16    Q.    Do you know whether or not there was an
17 Internal Affairs probe into this incident?

18    A.    There was.

19    Q.    Would that have been -- that
20 investigation, would that have been conducted by
21 Chief Scott or by Lieutenant Fournier or Sergeant
22 McCavick?

23    A.    To answer your question, I don't know
24 who investigated it.

106

1    Q.    Do you have any knowledge as to whether
2 or not any of the other officers -- do you have
3 any knowledge as to what if any discipline
4 Sergeant Walker received for bypassing the chain
5 of command?

6    A.    I don't know what she got.

7    Q.    Do you have any knowledge of what
8 discipline Sergeant Monaghan received for
9 committing a crime?

10        MS. LYNCH:    Objection.

11    Q.    (BY MR. HUDSON) Or allegedly committing
12 a crime?

13        MS. LYNCH:    Objection; you can
14 answer.

15    Q.    (BY MR. HUDSON) For being in a pub
16 after two a.m. drinking alcohol?

17    A.    That's not a crime as I testified
18 before.

19    Q.    I'm sure you know but in any event do
20 you know whether or not Sergeant Monaghan received
21 any discipline?

22    A.    I don't know.  I answered that before.

23    Q.    Do you know whether or not Officer Dore
24  received any discipline in connection with the

107

1 Elizer Pub?

2    A.    I don't know.

3    Q.    Do you know whether or not Phillip McCay
4 received discipline?

5    A.    I don't know.

6 MR. HUDSON:             I'd like to mark this
7 .

8             (Plaintiff's Deposition Exhibit

10    Q.    (BY MR. HUDSON) Sir, I show you this
11 newspaper article.  (Indicating.)

12    A.    (Witness examining document.)

13    Q.    Sir, have you ever seen this article
14 before?

15    A.    I don't recall.

16    Q.    Have you ever read in the newspaper --

17    A.    (Interposing) I don't recall reading
18 this.

19    Q.    Does this in any way refresh your
20 recollection as to whether or not the License
21 Commission held a hearing concerning those three
22 officers?

23    A.    It says they're going to hold a hearing.
24 It doesn't say they did.

108

1    Q.    I'm just asking you --

2    A.    (Interposing) Just whatever you gave me.

3    Q.    I'm just asking you, sir, does it
4 refresh your recollection?

5    A.    It doesn't refresh my recollection.   I
6 just told you.

7        MS. BETOURNAY: We have a page
8 missing.

9    Q.    (BY MR. HUDSON) Do you have that, sir?

10    Q.    What?

11    Q.    Page three?

12    A.    This?

13    Q.    Yes.  Looking at page three, does that
14 refresh your recollection in any way that
15 Lieutenant David Fournier would be the one
16 investigating this matter?

17    A.    That's what it says.

18    Q.    What's a captain's mast for captains and
19  lieutenants to evaluate evidence?

20    A.    A citizen's complaint, it's reviewed by
21 the captains.

22    Q.    How does it get to the point -- is there
23  a process?

24    A.    The Chief would submit it to them.

109

Q.   And it bypasses -- does it include IAD
2 as well?
3      A.   They're the ones that present it to the
4 captains.
5      Q.   Do you recall whether or not a captain's
6 mast was ever held?
7      A.   I don't recall.
8      Q.   The Captain's mast would be four or five
9 captains?
10     A.   Three.
11     Q.   In the same room?
12     A.   That's correct.
13     Q.   And discussing this matter?
14     A.   That's correct.
15     Q.   And you don't have any recollection?
16     A.   I don't recall this.
17     Q.   You don't recall it?
18     A.   No.
19     Q.   You don't deny it happened but you don't
20 recall it?
21     A.   I don't deny it and I don't recall it.
22     Q.   Did you ever instruct Sergeant Walker

110

1      A.   No, sir.
2      Q.   Did you ever threaten her in any way
3 about -- did you ever threaten, intimidate or
4 coerce her -- let me break that down.
5           Did you ever threaten Sergeant Walker in
6 any way to not file a report concerning these
7 three officers regarding the Elizer Pub?
8      A.   I never threatened Officer Walker on
9 anything.
10     Q.   Did you ever intimidate --
11     A.   (Interposing) I never --
12     Q.   (Interposing) Let me finish. Did you
13 ever intimidate Sergeant Walker in any way by --
14 in any way not to file a report or an incident
15 concerning the three officers involved in the
16 Elizer Pub?
17     A.   The only communication I had with
18 Sergeant Walker, she said to me, "No good deed
19 goes unpunished" and I said what do you mean by
20 that. She was referring to Monaghan.
21           I said I want a report. I said I want a
22 report. She said, "I'll figure out what I'm going
23 to do." She said, "I'll figure it out" and I
24 said, "No, I want a report" -- and that's just

111

1 what I told her.
2      A.   I don't know if I was jabbing my finger.
3      Q.   Right when you were testifying
4 here today you were jabbing your finger. Did
5 you do that?
6      A.   I don't recall.
7      Q.   Let the record show that I saw you
8 do a jab with your finger while you're saying what
9 you told Ms. Walker. You're denying that?
10     Q.   Sir, you're the witness.
11
12
13
14
15
16
17
18     Q.   That's not the issue, sir.
19     A.   What is the issue?
20
21     Q.   The issue is -- my question is to you
22 that when you just described your conversation
23 with Sergeant Walker --
24     A.   (Interposing) Right.

112

1      Q.   -- did you take your finger and jab your
2 index finger of your right hand and jab it two or
3 three times in my direction? Did you do that?
4      A.   Just now, you mean?
5      Q.   Yes, sir; just now.
6      A.   Jab my finger where?
7      Q.   Just pointing it towards me?
8      A.   I didn't point my finger toward you.
9      Q.   You did it, pointing down toward the
10 table?
11     A.   At the exhibit that you gave me I did,
12 yes.
13     Q.   So you did point your finger in a
14 jabbing motion towards the paper, is that correct,
15 sir?
16     A.   Yes, sir.
17     Q.   Thank you, sir.
18     A.   Okay.
19     Q.   And while you were doing that you were
20 talking about your conversation -- recalling your
21 conversation you had with Ms. Walker?
22     A.   I don't recall saying that. I was
23 recalling my conversation I had with you where you
24 were pointing at me.

# TAMMY WALKER v. CITY OF HOLYOKE
## ALAN FLETCHER          SEPTEMBER 12, 2006

---

**113**

1  Q.  Thank you, sir.
2  A.  You're welcome.
3  Q.  Did you at any time take any action that
4  would be perceived as intimidating towards
5  Ms. Walker with regard to filing or not filing an
6  incident report or write-up about the officers
7  involved in the Elizer Pub incident?
8  A.  No, sir.
9  Q.  Do you recall -- did your conversation
10 with Ms. Walker, did it occur in your office or
11 did it occur in the hallway?
12 A.  I don't recall.  I think it occurred in
13 my office.
14 Q.  In fact were you sitting at your desk?
15 A.  I was.
16 Q.  You were not standing and you were not
17 in Ms. Walker's face?
18 A.  No; I wasn't.
19 Q.  Do you harbor or do you -- you were --
20 you recommended disciplinary action against
21 Ms. Walker for violating the chain of command as
22 you saw it when she took a report to Chief Scott,
23 is that correct?
24 A.  That's correct.

---

**114**

1  Q.  And not to you?
2  A.  Correct.
3  Q.  Isn't it true that Ms. Walker didn't
4  take a report to you because you ordered her not
5  to take one?
6  A.  That isn't true.
7  Q.  Isn't it true that you directed or
8  recommended Ms. Walker be written up because
9  you -- strike that.  I withdraw the question.
10     Sir, you had Ms. Walker written up
11 because she basically sided with the Chief of
12 Police in writing up a report on those three
13 officers and went against you, isn't that correct?
14     MS. LYNCH: Objection; you can
15 answer.
16     THE WITNESS: That's absolutely not
17 true.
18 Q.  (BY MR. HUDSON) You in essence sought
19 to punish Ms. Walker because she didn't follow
20 your position on the matter?
21     MS. LYNCH: Objection; you can
22 answer.
23     THE WITNESS: I don't give out
24 punishment in the Holyoke Police Department.

---

**115**

1  Q.  (BY MR. HUDSON) You recommend it?
2  A.  I recommend discipline action, yes, due
3  to violation of the chain of command.
4  Q.  Do you have any knowledge of when Chief
5  Scott received a copy of the report -- of the
6  report concerning the Elizer Pub incident?
7  A.  I don't remember the time of day, no.
8  Q.  Are all incident reports from Holyoke
9  Police Department officers saved in the HPD's
10 computer system?
11 A.  I believe they are.
12 Q.  Do you know what period of time?
13 A.  I don't know.
14 Q.  Are there any circumstances under which
15 incident reports are destroyed or removed from the
16 system?
17 A.  Not to my knowledge.
18 Q.  Do you know who authorizes reports to
19 be -- incident reports to be produced say to a
20 union officer involved in a grievance proceeding?
21 A.  I don't understand the question.
22 Q.  If in fact an incident report was
23 relevant to some legal proceeding such as a union
24 initiated or grievance proceeding or arbitration,

---

**116**

1  who on the force has the authority to authorize a
2  particular police incident report be produced to,
3  say, the union attorney or the City Solicitor's
4  office?
5      MS. LYNCH:   Objection; you can
6  answer if you understand.
7      THE WITNESS:   I still don't
8  understand the question.
9  Q.  (BY MR. HUDSON) Let's see if we can
10 rephrase it.
11     Who has the authority on the Holyoke
12 Police Department to authorize the release of a
13 specific police incident report for purposes of
14 utilization in a legal proceeding?
15 A.  The best way to answer that would be if
16 it was in a legal proceeding the attorney who
17 would request the report would file what we would
18 call discovery and then it would be released.
19 Q.  Would it be released to the City's
20 attorney or to the adversarial attorney?
21 A.  I don't know.  It depends who filed for
22 the discovery.
23 Q.  Who has the authority, though, to order
24 the release?

---

## PERLIK and COYLE REPORTING

117

1    A.    I think its statutory that the City has
2 to release it.  It would come through the Records
3 Division.
4    Q.    Who heads up the Records Division? Who
5 is in charge of the Records Division?
6    A.    Overall charge is Captain Seklecki.  I
7 don't know who the keeper of the records is. I
8 don't know how to answer that. I don't know who
9 it is.
10    Q.    If the police incident report is
11 relevant to a personnel matter wouldn't Chief
12 Scott be the keeper of the records?
13    A.    He could be; he's the Chief of Police.
14    Q.    And then he can designate whoever he
15 chooses?
16    A.    That's correct.
17    Q.    As far as personnel records, is it your
18 understanding that he has designated the
19 Professional Standards Division, Lieutenant
20 Fournier?
21    A.    That's correct.
22    Q.    And the other assistant there -- what's
23 the name of the other person?
24    A.    Sergeant McCavick.

118

1    Q.    It's your testimony that you, Captain
2 Fletcher, did not tell Sergeant Walker to write a
3 report on this incident?
4    A.    Say that again?
5    Q.    It is your testimony that you did not
6 tell Sergeant Walker to write a report on the
7 Elizer Pub incident?
8    A.    I told her to write a report on it; yes,
9 I did.
10    Q.    As a result of looking -- of reviewing
11 Exhibit 12 are you aware -- does that refresh your
12 recollection in any way that there was a hearing
13 with the Liquor License Commission?
14    A.    It says there was going to be.
15    Q.    And you have no knowledge as to the
16 outcome of that hearing?
17    A.    I wasn't there.
18    Q.    You didn't give any testimony --
19    A.    (Interposing) No; I did not.
20    Q.    -- in the so-called hearing?
21    A.    No.
22    Q.    Do you know any officer who gave
23 testimony?
24    A.    I don't.

119

1    Q.    Are you aware that the License
2 Commission issued a five-thousand-dollar fine to
3 the owner of Elizer?
4    A.    I'm not aware of that.
5    Q.    Excuse me, a five-hundred-dollar fine.
6 Are you aware of that?
7    A.    I'm not aware of that, either. They
8 could have been fined; I'm not aware of it.
9    Q.    Did you ever suggest that Sergeant
10 Garcia -- do you know Sergeant Garcia?
11    A.    Sergeant Garcia from the Holyoke Police
12 Department?
13    Q.    Yes.
14    A.    Yes.
15    Q.    Isn't Sergeant Garcia the individual who
16 became less senior to Sergeant Walker as a result
17 of her Civil Service bypass?
18    A.    I'm not aware of that.
19    Q.    Sir, did you suggest or recommend in any
20 way that on or about March 21, 2003 that Sergeant
21 Garcia unarrest -- retract an arrest of a person?
22    A.    We had a conversation about an
23 individual that was placed in custody for
24 drunkenness and his parents were at the station

120

1 and we released the individual to his parents.
2    Q.    And in fact Sergeant Garcia acted on
3 your suggestion and changed an arrest to a charge
4 of protective custody?
5    A.    That's correct.
6    Q.    So if the individual had been
7 arrested -- was actually arrested, they would have
8 to be in jail until they were either bonded or
9 released?
10    A.    The proper charge was protective custody
11 for this individual.
12    Q.    But initially Sergeant Garcia arrested
13 the person, is that correct?
14    A.    That's right.
15    Q.    He seized the person, took him into
16 custody?
17    A.    That's right.
18    Q.    Was the person actually brought to the
19 Holyoke Police Department?
20    A.    He was.
21    Q.    And there was a person confined in a
22 jail?
23    A.    That is correct; he was.
24    Q.    Booked and all of that?

121

A. He was.

Q. It was based upon your suggestion that it was -- that -- based upon your suggestion to Sergeant Garcia that the person be placed into protective custody?

A. I don't know if it was my suggestion. We had a conversation about the arrest.

Q. Was that person -- who was the person, sir?

A. I don't know.

Q. You said the person was arrested. Was it for drunkenness?

A. Drunkenness.

Q. Was it a teenager?

A. Teenager.

Q. About how old?

A. Seventeen.

Q. It was a he?

A. It was a he.

Q. Was he a white male -- white?

A. I don't know. I didn't see him.

Q. You didn't see him. Did you talk with his parents?

A. No.

122

Q. Did you look at the booking sheet?

A. No.

Q. How did you make your decision? Just based upon a conversation that you had with Sergeant Garcia?

A. Yup.

Q. Sir, are you aware of any black teenager or Hispanic teenager in the City of Holyoke that has ever been arrested for drunkenness and then released in protective custody?

A. Black? Hispanic?

Q. Black or Hispanic?

A. I mean, I don't know. I can't answer that. I don't know if that ever happened.

Q. Sir, are you aware that there was a state Ethics Commission investigation concerning this matter that you just testified to?

A. Yes, sir.

MS. LYNCH: I'm going to object. I don't see how this is relevant to Tammy Walker's claim.

MR. HUDSON: It's relevant to -- your objection is noted.

MS. LYNCH: Just that there's an

123

1  awful lot here and we've been here for a long time
2  so I would like to know how it is relevant before
3  you ask any more questions about it.
4        MR. HUDSON: It goes to the witness'
5  credibility.
6        MS. LYNCH: The incident doesn't
7  have anything to do with this case.
8        MR. HUDSON: I'm not going to argue
9  with you. You can bring that before a judge.
10       MS. LYNCH: Well, if it goes any
11 further, I will.
12       Q. (BY MR. HUDSON) Do you know a Thomas
13 Monahan -- M-O-N-A-H-A-N?
14       A. No. I mean...
15       Q. Do you know a Sergeant Robert Wagner?
16       A. Okay; I do know Monahan.
17       Q. Who is Thomas Monahan?
18       A. Sergeant Wagner's father-in-law.
19       Q. He's related to Sergeant Wagner, is that
20 correct?
21       A. His father-in-law.
22       Q. Isn't it true that -- do you know
23 whether or not Mr. Monahan is alleged to have --
24 strike that.

124

1        A. He was suspended; I don't know what for.
2        A. That's the name; correct.
3        Q. Do you recall whether or not --
4              MS. WALKER: No.
5        Q. (BY MR. HUDSON) Do you recall
6  whether or not anyone ever wanted Sergeant
7  Michael McCoy to do something about the arrest of
8  Mr. Peetz?
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# TAMMY WALKER vs. CITY OF HOLYOKE
## ALAN FLETCHER                    SEPTEMBER 12, 2006

125

A.  I don't know.

Q.  And that arresting officer was Sergeant Garcia?

A.  That's correct.

Q.  Whom you had a discussion with?

A.  I did.

Q.  And whom you ordered to change the arrest?

A.  I didn't order him to change anything.

Q.  Are you aware that a memorandum -- that Sergeant Wagner was suspended for five days without pay for a memo he sent to Chief Scott detailing alleged misuse of political influence?

A.  Was he suspended? Sergeant Wagner was suspended several times.

Q.  On April 8th, 2003?

MS. LYNCH: I'm going to object. I don't see the relevance here. There's so much here. We've got so much to go over.

Can you please tell me the purpose of this in terms of the case, otherwise I'm going to object and tell him not to answer.

MR. HUDSON: You can object, counsel. I stated to you that I'm concerned about

126

the witness' credibility in this deposition and basically the question is whether or not -- the issue is whether or not Captain Alan Fletcher ordered or in any way directed Sergeant Garcia to unarrest Mr. Peetz.

MS. LYNCH: He has already answered that.

MS. BETOURNAY: He said no, twice.

Q. (BY MR. HUDSON) You're not aware that Mr. Wagner was suspended for five days?

A. Mr. Wagner was suspended several times. I don't have a document in front of me that says what day it was or for what.

He was suspended for many things on many occasions. I don't know what you're -- where you're going with it. I just don't know what it's about.

Q. Do you know whether or not -- but you do acknowledge having a conversation with Sergeant Garcia about that?

A. Yes; I testified to that.

Q. And after that conversation Mr. Peetz was placed *in* protective custody?

MS. LYNCH: Objection.

127

1       THE WITNESS: Yes.
2       Q.  (BY MR. HUDSON) Were you the subject of
3   a state Ethics Commission?
4       A.  I was.
5       Q.  Was mayor Michael Sullivan a subject of
6   that commission?
7       A.  He was.
8       Q.  And Michael Sullivan is the person who
9   reviews suspensions, is that correct -- five-day
10  suspensions given my Chief Anthony Scott?
11      Doesn't the Mayor review those or have a
12  hearing?
13      A.  The Mayor can have a hearing; that's
14  correct.
15      Q.  Was a Michael Kane a subject of that
16  investigation?
17      A.  He was.
18      Q.  Do you know the outcome of the state
19  Ethics Commission investigation?
20      A.  For me I do.
21      Q.  What happened as far as you were
22  concerned?
23      A.  They found no cause to further pursue
24  it.

128

1       A.  I don't know anything about that.
2       Q.  And as far as State Representative Kane?
3       A.  I don't know anything about that.
4       A.  I don't recall.
5       Q.  Do you recall whether or not Sergeant
6   Walker ever brought this matter to your attention?
7       A.  What's that?
8       Q.  And jeopardizing safety?
9       A.  We definitely had a conversation.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## PERLIK and COYLE REPORTING

# TAMMY WALKER VS. CITY OF HOLYOKE
## ALAN FLETCHER          SEPTEMBER 12, 2006

129

1    A.    We don't do that.  We use radio.

2    Q.    You don't ever do it?

3    A.    I didn't say that; no.  I didn't say

4 that.  You just said that.

5    Q.    You do it sometimes but a majority of

6 times --

7    A.    (Interposing) When someone has a

8 scanner --

9    MS. LYNCH:          (Interposing) You need

10 to let him finish his question.

11          THE WITNESS: We would probably do a

12 laptop.  We would do a laptop probably to order

13 food or something like that for someone inside,

14 things like that.

15          We don't -- it's not a common practice

16 in the Holyoke Police Department to dispatch

17 cruisers through the laptop.

18    Q.    (BY MR. HUDSON) Your source of

19 information about this was Ms. Walker having a

20 conversation -- about the allegation was

21 Ms. Walker's conversation with you?

22    A.    We had a conversation.

23    Q.    And that's how you found out about it?

24    A.    That's right.

130

1    Q.    Did Sergeant Walker ever request your

2 permission to speak with any other supervisor

3 about this matter -- about the matter of dispatch

4 calls going out over e-mail as opposed to the

5 radio?

6    A.    I think she did talk to other

7 supervisors.

8    Q.    Did she ever ask you was it okay or did

9 you suggest that she speak to other supervisors?

10    A.    I could have but I don't think I did.  I

11 could have.

12    Q.    You didn't tell her to follow the chain

13 of command?

14    A.    She did; she spoke to her supervisor.

15    Q.    That would have been Lieutenant

16 O'Connell?

17    A.    That's correct.

18 MR. HUDSON:          I'd like to have this

19 document marked, please, Exhibit 13.

20          (Plaintiff's Deposition Exhibit
            No. 13 offered and marked.)

21

22    Q.    (BY MR. HUDSON) Sir, let me show you

23 this document. (Indicating.)

24    A.    (Witness examining document.)

131

1    Q.    Isn't it true, sir, that on or about

2 December 28th, 2004 you gave an interview to

3 Lieutenant David Fournier concerning Sergeant

4 Walker's allegations of reporting dispatchers were

5 sending units to calls using laptops and e-mails?

6    A.    That's correct.

7    Q.    Thank you, sir.  That's all I have about

8 that document.

9          Sir, do you recall giving an affidavit

10 in this matter when the case was pending before

11 the -- when Ms. Walker's case was pending before

12

13    A.    I don't recall.

14    Q.    You do or you don't?

15    A.    I don't recall; I could have.

16 MR. HUDSON:          I'd like to mark this

17 Exhibit 14.

18          (Plaintiff's Deposition Exhibit
            No. 14 offered and marked.)

19

20    Q.    (BY MR. HUDSON) Sir, would you take a

21 moment to look at this document? (Indicating.)

22    A.    (Witness examining document.)

23 MR. HUDSON:          Let's take a break for

24 a moment.

132

1          (A recess was taken.)

2    Q.    (BY MR. HUDSON) Sir, have you had a

3 chance to examine or read Exhibit 14?

4    A.    That's the affidavit; yes.

5    Q.    Is that your affidavit?

6    A.    That's correct.

7    Q.    On the page Bate-stamped 0518, the

8 signature page -- is there a third page?

9    A.    Yes, sir.

10    Q.    That's your signature, is that correct?

11    A.    Yes, sir.

12    Q.    And the date above your signature, is it

13 February 27, 2003?

14    A.    Yes, sir.

15    Q.    This is an affidavit that you -- is this

16 an affidavit that you submitted in connection with

17 the City's position statement response to

18 Ms. Walker's MCAD complaint?

19    A.    I think so.

20    Q.    In response -- since Ms. Walker has had

21 several MCAD complaints, is the docket number

22 02SEM04081, is that the one?

23    A.    That's what it says here.

24    Q.    That was just for clarification.  Now

133

1 sir, I draw your attention to paragraph one.
2        You state -- you write that "I have been
3 a member of the Holyoke Police Department since
4 1968"?
5    A.    That's correct.
6    Q.    "I have been a captain since 1992."
7    A.    That's correct.
8    Q.    So you have extensive experience with
9 the Holyoke Police Department, is that safe to
10 say?
11    A.    Yes, sir.
12    Q.    Is it safe to say that you know all of
13 the operating procedures and policies and the way
14 things are done at the Holyoke Police Department?
15    A.    I should know them all but...
16    Q.    Would you ordinarily under most
17 circumstances be the go-to guy because of your
18 vast array of knowledge of the Holyoke Police
19 Department?
20    A.    I wouldn't say that but I'm pretty
21 knowledgeable.
22    Q.    Are you motivated in any way, sir, by
23 any feelings of being bypassed yourself for the
24 Chief of Police position at the Holyoke Police

134

1 Department?
2    A.    That's an appointed position but I've
3 been bypassed on sergeant's lists and stuff like
4 that; yes.
5    Q.    Do you feel that you deserved to have
6 been appointed Chief of Police?
7    A.    I'm qualified.
8    Q.    Do you feel that Chief Scott was
9 appointed based on affirmative action and not
10 qualification?
11    A.    No; I really don't feel that way.   I
12 think he was qualified.
13    Q.    Do you feel that you are more qualified?
14    A.    Equally.  He has slightly stronger
15 points than I have in areas.    He's computer
16 literate and I'm probably not so he's -- he has a
17 lot of strong points.
18    Q.    In your capacity as union president do
19 you negotiate directly with the Chief or do you
20 negotiate with the -- on matters of collective
21 bargaining do you negotiate with the City's
22 designee?
23    A.    We negotiate with the City's designee,
24 not with the Chief of Police.

135

1    Q.    I draw your attention to paragraph two.
2 Sir, you write that in approximately September,
3 2002 you had a conversation with Sergeant Walker.
4 Do you recall that?
5    A.    I do.
6    Q.    Do you know what that conversation was
7 about?
8    A.    We were talking about seniority and the
9 sergeant's list and stuff like that; yes.
10    Q.    Furthermore you write that "for the most
11 part Sergeant Walker came to see me regarding some
12 personal problems that she was having."
13        What personal problems was Sergeant
14 Walker -- did Sergeant Walker come to see you
,15 about other than seniority issues?
16    A.    We talked for a long time.   You know I
17 think she had a problem with her brother and the
18 kids and things like that.
19        For the job, she talked about getting
20 along with the other sergeants.
21    Q.    You say you spoke for a long time so an
22 hour or so?
23    A.    Or less but...
24    Q.    And toward the end of the conversation

136

1 you write -- is there something you wanted to say,
2 sir?
3    A.    Sir?
4    Q.    Were you finished? I didn't want to
5 interrupt you.
6    A.    No; I'm listening to what you are
7 saying.
8    Q.    "Toward the end of the conversation I
9 asked her how things were going at work. In
10 response she stated that she thought Sergeant
11 Garcia and Sergeant Monaghan were mad at her
12 because they were reportedly not talking to her??
13    A.    That's what she said.
14    Q.    Did she at any time say to you that
15 Sergeant Monaghan and Garcia were doing -- were
16 taking actions or saying things that she
17 considered to be discriminatory?
18    A.    No; she didn't say that.
19    Q.    That was September, 2002, correct?
20    A.    That's what I think, I guess.
21    Q.    Prior to September, 2002 would Garcia
22 and McCoy have been appointed sergeants
23 provisionally before becoming permanent?
24    A.    They could have. I think they were

**137**

appointed before her.

Q. And provisionally means basically under Civil Service temporary?

A. I would think so; yes.

Q. You don't have real Civil Service protection as a provisional, is that correct?

A. You come off a list.

Q. Also Pratt had been appointed provisionally. Do you know a Sergeant Pratt?

A. I know him but Urn not clear on that.

Q. And then somewhere around April, 1999 a sergeant's examination list was issued.

A. Um not familiar with the list.

Q. Has it ever been brought to your attention that the scoring -- that was Pratt, McCoy, Monaghan, Denise Duguay -- she was already appointed and they were on this exam list and then Garcia's name was added?

A. Urn not familiar with that.

Q. At some point, though, Garcia and McCoy were appointed full-time sergeants before -A. (Interposing) Ahead of her. (Indicating.)

Q. And we mean Ms. Walker, correct?

**138**

A. That's correct.

Q. Whom you just pointed to, correct?

A. I'm sorry. I didn't mean to point.

Q. And then after Garcia and McCoy were appointed full-time sergeants, Pratt was appointed, is that correct?

A. I'm not sure.

Q. Then do you recall now that Ms. Walker filed her first MCAD complaint and bypass because of those appointments?

A. That's right; she did.

Q. Then at some point later on in April of -- excuse me.

At some point in May of 2002 there had been a settlement of the Civil Service, right?

A. I'm not familiar -- I know there was a settlement but I don't know the dates.

Q. I believe we looked at that. Maybe it was Chief Scott's.

A. You showed me one.

Q. We looked at Exhibit 3 from Chief Scott? (Indicating.)

A. It was a handwritten thing; yes, I remember that.

**139**

1  Q. What was a settlement?

2  A. Right.

3       MS. LYNCH: And you're referring to
4 Ms. Walker's settlement?

5       MR. HUDSON: Yes.

6       MS. LYNCH: For the record I have
7 May, 2000.

8       MR. HUDSON: You're right.

9       THE WITNESS: The dates are
10 confusing.

11       MR. HUDSON: Hold on just a minute.

12       MS. LYNCH: I have May 23, 2000.

13       MR. HUDSON: Yes; you're absolutely
14 right; May, 2000.

15       THE WITNESS: All right. I'm
16 agreeing with you but I know what we're talking
17 about.

18       Q. (BY MR. HUDSON) There was a settlement
19 of the Civil Service?

20       A. That's correct.

21       Q. As a result of that settlement
22 Ms. Walker received a seniority date that was
23 retroactive, do you recall that?

24       A. She got ahead; right.

**140**

1       Q. She got ahead of Garcia, is that
2 correct?

3       A. Well, whoever she was -- whoever
4 bypassed her she went ahead of them, I think. I'm
5 not sure what the names were because there was
6 four or five people on the list.

7       Q. In fact she even got ahead of some of
8 the officers who may have tested one or two points
9 higher than her, isn't that correct? Do you
10 recall?

11       A. I don't know what she scored. I have no
12 idea.

13       Q. Then Mr. Monaghan was appointed sergeant
14 after Ms. Walker, isn't that correct?

15       A. I don't know but he could have been;
16 yes.

17       Q. So when we talk about the -- when
18 Ms. Walker was complaining about she thought
19 Sergeant Garcia and Sergeant Monaghan were mad at
20 her and they weren't talking to her, that's what
21 you wrote, isn't that correct?

22       A. That's correct.

23       Q. Your response, right, is "I told her" --
24 and we're referring to Exhibit 14 -- your response

141

1  is "I told her that she may be having problems
2  because she was giving an incorrect seniority
3  date."
4         So you told her that
5  specifically in response to her identifying
6  Garcia and Sergeant Monaghan?
7      A. We both thought that was the problem.
8      Q. And that they were the ones who had the
9  problem with seniority -- Garcia and Monaghan at
10  least were included in the ones that had the
11  problem with seniority, is that correct?
12     Q. You go on to state specifically that
13  "she was given a date ahead of some of the other
14  sergeants even though they had all taken the Civil
15  Service exam on the same date."
16     A. I asked her how it happened and she
17  said that there was an agreement and one of the
18  dates was changed. I said how did it change. She
19  said well, it was in the agreement. I had no
20  knowledge of the agreement.
21     Q. But then you told her it was
22
23
24  incumbent -- what do you mean, "incumbent upon her

142

1  to correct the date"?
2      A. I said to her the solution to it is just
3  correct the date, change the date to what it was
4  supposed to be.
5      Q. But you wrote, "I told her it was
6  incumbent upon her"?
7      A. Because she had the agreement. I didn't
8  have the agreement.
9      Q. What do you mean by the word
10  "incumbent"?
11     A. She was in the position to change it;
12  that's what I meant.
13         She knew the agreement. I didn't know
14  the agreement.
15     Q. Then you wrote that "her problems" -- "I
16  indicated that I thought her problems would
17  self-correct"?
18     A. I thought that was the issue, was the
19  date.
20     Q. Once the date was changed?
21     A. That's what I thought. I mean in the
22  way she explained it to me that's what I thought.
23     Q. Are there any other black sergeants on
24  the Holyoke Police Department back in September,

143

1  2002 other than Ms. Walker?
2      A. I don't know. There was an officer
3  Stevenson was a black sergeant. I don't know if
4  he was still there or not. There was one but I
5  don't know.
6      Q. Do you know whether or not there was any
7  black female sergeants other than Ms. Walker --
8      A. (Interposing) No; she was the only one.
9      Q. Please let me finish -- other than
10  Ms. Walker in September, 2002?
11     A. She was the only one.
12     Q. Thank you. Did you ever call Sergeant
13  Monaghan and Garcia or speak with Sergeant
14  Monaghan and Garcia about they ought to get over
15  it and accept the fact that Ms. Walker has gotten
16  a sergeant position and has seniority?
17     A. I don't know if I ever did that. The
18  only thing I know I did was I talked to Monaghan
19  about the other issue we brought up today in front
20  of the sergeant.
21     Q. And that issue was the Tyrone?
22     A. That's correct, sir.
23     Q. That matter?
24     A. Yes, sir.

144

1      Q. But you never told them that it was
2  incumbent upon --
3      A. (Interposing) I don't recall.
4      Q. Please let me finish, sir. Did you
5  indicate or write or communicate in any way to
6  Sergeant Monaghan and/or Sergeant Garcia that
7  Ms. Walker has received a Civil Service
8  appointment to sergeant and she has whatever
9  seniority Civil Service gave her?
10     A. I could have had a conversation with
11  them but I don't recall it.
12     Q. Did you ever offer any support to
13  Ms. Walker other than -- around the seniority
14  issue other than that she ought to give up the
15  seniority that she achieved through the Civil
16  Service settlement?
17     A. No; I never said that to her, never.
18  What I suggested was we get the date corrected and
19  that should resolve the issues if there was
20  issues.
21     Q. With regard to paragraph three you write
22  that "Sergeant Walker never alleged that Sergeant
23  Monaghan or Sergeant Garcia were calling her
24  derogatory names," is that correct?

**ALAN FLETCHER**                          **SEPTEMBER 12, 2006**

---

145

1    A.    During this conversation I had with her
2 in September, no, she never said that.
3    Q.    The only thing that she reported was the
4 Tyrone name calling, is that correct?
5          Is that what you wrote on the bottom of
6 this page Bates number 516 on Exhibit 14 starting,
7 "Sergeant Walker stated that she had witnesses who
8 informed her that Sergeant Monaghan had called her
9 Tyrone"?
10   A.    That happened in October.
11   Q.    October?
12   A.    Well, it was after the time we're
13 talking about.
14   Q.    Regarding an alleged incident on
15 October 17th.
16         What alleged incident on October 17th,
17 2002 are you referring to, sir?
18   A.    The one where she complained about
19 Monaghan was calling her names. I believe that's
20 the incident. I'm not clear on that but I thought
21 that was it.
22   Q.    By October 17th -- as of October 17th
23 Sergeant Walker has alleged that Monaghan was
24 calling her Tyrone.

---

146

1          Did she also talk with you about the
2 fact that Monaghan and Garcia, the individuals
3 whom were -- whom you knew were concerned about
4 her seniority had actually gone and questioned a
5 witness to an arrest that Sergeant Walker was
6 involved in with several other officers on or
7 about October 16th?
8    A.    I don't know if she told me that or not.
9    Q.    In fact, the clerk that witnessed that
10 says, in an affidavit -- did you ever find out or
11 come to your attention that a clerk at the
12 7-Eleven where the arrest took place or said in an
13 affidavit that Garcia and Monaghan tried to
14 intimidate him to say Sergeant Walker abused the
15 arrested individual, Moran?
16   A.    The only thing I know about that
17 incident was the cell phone. There was a cell
18 phone damaged that morning but I don't know about
19 Monaghan -- unless she told me but I don't recall
20 that.
21   Q.    So she didn't actually speak with you
22 until about October 21, isn't that correct?
23   A.    I don't know when we spoke. I know we
24 had a conversation because I -- we -- I think we

---

147

1 talked that morning about the incident. I'm sure
2 we did.
3    Q.    What morning, sir? What date?
4    A.    The incident that this thing at 7-Eleven
5 happened but I don't know the date.
6    Q.    Did you ever follow up, sir, and request
7 to look at the incident report -- I guess we call
8 them the detainee -- Mr. Moran's arrest and
9 beating on October 16th, 2002?
10   A.    I had nothing to do with that incident.
11   Q.    Sir, if someone -- if a person who is
12 arrested by officers in your command --
13   A.    (Interposing) Yes.
14   Q.    -- claims that those officers you
15 supervise during an arrest beat him up?
16   A.    There would be an investigation; yes.
17   Q.    By whom?
18   A.    Professional Standards.
19   Q.    Would they in any way let you know the
20 outcome of the investigation or seek your input?
21   A.    I don't think they would seek my input.
22 We would probably know the outcome of the
23 investigation eventually I guess.
24   Q.    Who would have been responsible for

---

148

1 directing two sergeants that you supervise to go
2 the following day to the business, 7-Eleven -- let
3 me rephrase that.
4          Who would have authorized Sergeant
5 Monaghan and Sergeant Garcia to return to the site
6 of the arrest of Mr. Moran and question the clerk
7 on October 16th about whether or not Sergeant
8 Walker abused Mr. Moran, the arrested individual?
9    A.    I don't know.
10   Q.    Would they have needed authority to do
11 that inquiry or just go out on their own?
12         I mean would Sergeant Garcia and
13 Sergeant Monaghan have needed any authority from
14 their superiors to undertake an investigation of
15 an arrest made by Sergeant Walker and several
16 other officers?
17   A.    I don't know what they did. I have no
18 knowledge.
19   Q.    Sir, did you ever see a copy of the
20 MCAD -- okay; I'll withdraw that.
21         Following Officers Monaghan and
22 Garcia's, whom had the seniority issues, alleged
23 questioning the clerk on October 16th, Ms. Walker
24 has alleged that on October 17th Monaghan made the

---

149

1 statement "you shouldn't go sticking your tongue
2 where it don't belong."
3        You refer to an incident on
4 October 17th, 2002 in your affidavit at paragraph
5 four.  Do you see that, sir?
6    A.   Yes, sir.
7    Q.   Do you recall whether or not Sergeant
8 Walker complained or made any grievance or
9 complaint about Sergeant Garcia changing the
10 roster and refusing to obey her orders on or about
11 October 19th?
12    A.   I don't know about any dates but she was
13 saying that she didn't get along with him.
14    Q.   The date that -- on or about
15 October 19th, 2002, do you have any knowledge of
16 Ms. Walker?
17    A.   The knowledge I have sir is what she
18 told me.
19    Q.   Are you aware that on October 20th, 2002
20 a Khuram Shahzad -- K-H-U-R-A-M, S-H-A-H-Z-A-D --
21 submitted a letter on behalf of Ms. Walker
22 regarding the Moran complaint that she had
23 allegedly been abused by Ms. Walker?
24        Did you know that this person Khuram

150

1 Shahzad was the 7-Eleven clerk?
2    A.   I don't know.
3    Q.   Did you know that as of October 20th,
4 2002 Ms. Walker had spoken with Lieutenant
5 Whelihan about the tongue song and being called
6 Tyrone?
7    A.   The Tyrone, I recall that. The other I
8 don't recall but we did meet -- myself, Whelihan,
9 and Tammy and Sergeant Monaghan.
10    Q.   Did you know that as of October 20, 2002
11 Ms. Walker had written a memo to Lieutenant
12 Whelihan regarding Sergeant Garcia changing the
13 roster?
14    A.   She could have. You know we could have
15 discussed it but I'm not sure.
16    Q.   And that in fact the meeting that you
17 had with Ms. Walker was on October 21, 2002?
18    A.   I don't know the date.
19    Q.   Even though all of these other -- she
20 had written a memo to Lieutenant Whelihan.
21 Lieutenant Whelihan was in the meeting with you?
22    A.   Right.
23    Q.   And Ms. Walker and Sergeant Monaghan?
24    A.   Right.

151

1    Q.   She had previously complained about
2 Garcia changing a roster.   She had obtained -- she
3 had somehow managed to obtain an affidavit from
4 the clerk at the 7-Eleven to support her position
5 about the arrest, that Ms. Walker met with you and
6 none of these things came up?
7    A.   I didn't question the arrest.
8    Q.   You didn't question whether or not there
9 was any retaliation or racial harassment or sexual
10 harassment against Ms. Walker?
11    A.   That was the purpose of the meeting that
12 we had. We wanted to find out what was going on.
13    Q.   Sir, again in paragraph five you write
14 that you did have a conversation with Sergeant
15 Walker about the seniority issue, is that correct?
16    A.   That is correct.
17    Q.   Paragraph five of Exhibit 14?
18    A.   That's correct.
19    Q.   And the fact that she had been bypassed
20 for the Sergeant position by Sergeant Garcia?
21    A.   She was bypassed.
22    Q.   By Sergeant Garcia, that's what you
23 wrote, isn't that true, sir?
24    A.   That's what I wrote but she was

152

1 bypassed; right.
2    Q.   I understand but we're just simply
3 trying to refresh your recollection about who was
4 one of the individuals who was bypassed?
5    A.   He was one of a couple, I think.
6    Q.   Sir, I believe you testified earlier
7 that in connection with Ms. Walker's
8 September 29th report of injury on duty -- there
9 was an acronym that was used that I'm trying to
10 remember but in any event, I think this is it.
11 Officer injury report -- it's IOD. (Indicating.)
12    A.   I've got it; yes.
13    Q.   I'm going to withdraw that proposed
14 question, sir.
15        Sir, is it your -- when you held that
16 meeting with Lieutenant Whelihan, Sergeant
17 Monaghan, and Sergeant Walker on October 21, 2002
18 was there anyone else present other than the four
19 of you?
20    A.   I don't recall anybody present.
21    Q.   Where did the meeting take place?
22    A.   My office.
23 MS. LYNCH:                Just as a point of
24 clarification, the affidavit indicates October 17.

TAMMY WALKER vs. CITY OF HOLYOKE
ALAN FLETCHER                                    SEPTEMBER 12, 2006

153

1            THE WITNESS: I don't know the date
2 but we did have a meeting.
3            MR. HUDSON: Which affidavit are you
4 referring to?
5            MS. LYNCH: Exhibit 14.
6            THE WITNESS: This one here. I
7 don't know the date.
8            MS. LYNCH: I'm sorry.
9            MR. HUDSON: The incident occurred
10 on October 17th.
11           MS. LYNCH: Yes; I'm sorry. I made
12 a mistake on that. This doesn't indicate a date.
13      Q.    (BY MR. HUDSON) Ms. Walker alleges
14 October 21.
15           In any event, what if anything did
16 Lieutenant Whelihan say during the meeting?
17      A.    Well, he just said he never heard
18 Monaghan say anything derogatory about the
19 Sergeant and he just want to clear the air.
20 Monaghan denied he said anything derogatory to
21 her.   She said she didn't hear it -- it was
22 hearsay on her part as far as someone told her he
23 said it.
24_____What we were trying to do as supervisors

154

1 was to try to get these two subordinate
2 supervisors to work together on their shift
3 assignments and resolve their differences if they
4 had them. That's what the purpose of the meeting
5 was for.
6      Q.    Did Mr. Whelihan or Lieutenant Whelihan
7 inform you that a day or so before this meeting
8 Sergeant Walker had given him a memo complaining
9 about Sergeant Garcia changing the roster?
10     A.    That could have been brought up there.
11 I was more concerned about the other issues that
12 were discussed that day.
13     Q.    Did Officer Walker mention that she was
14 also concerned about Garcia refusing to obey her
15 orders?
16     A.    She could have brought that up to
17 Lieutenant Whelihan. I think we focussed on
18 Monaghan at the time of this meeting. I think
19 that was my focus.
20     Q.    Are you aware that on or about
21 October 22nd Sergeant Garcia gave a memorandum the
22 day following the meeting with Sergeant Walker,
23 Lieutenant Whelihan, and Monaghan?
24     A.    Yes.

155

1      Q.    And you?
2      A.    Yes.
3      Q.    Sergeant Garcia gave a memorandum to the
4 Chief concerning the booking of Mr. Moran and
5 noting that there was evidence that Moran had
6 injuries and he claimed that he was beaten by the
7 police. Are you aware of that?
8      A.    I know there was something -- there was
9 an incident report on that but I think that's
10 required by law.
11           If a prisoner is injured we have to
12 notify the Chief in writing of the injuries, the
13 type of injuries if they're visible and stuff like
14 that. I don't know --
15     Q.    (Interposing) Well, if the arrest
16 occurred on October 15th, 2002 and Monaghan and
17 Garcia go back and question the clerk on
18 October 16th, 2002 and the clerk provides a letter
19 on October 20th, 2002 on behalf of Ms. Walker and
20 Garcia waits until the twenty-second of October,
21 2002 to file a report of this Mr. Moran having
22 been injured, is there -- is that normal, sir, for
23 that much time to go by?
24           MS. LYNCH: Objection; you can

156

1 answer.
2      Q.    (BY MR. HUDSON) In your years of
3 experience?
4      A.    All I can say is I was unaware of the
5 timeline of these events.
6           I don't know -- some of this stuff is
7 the first I heard today and others I knew about
8 but I don't know about the Garcia thing where he
9 wrote -- or what he wrote.
10           Who did he give this to? The Chief?
11     Q.    Yes.
12     A.    Oh.
13     Q.    If you don't remember, that's fine.
14     A.    I didn't see it. Maybe I did but I
15 don't recall it. I don't think I approved it.
16     Q.    Sir, you do recall that by November 13,
17 2002 the entire third shift was given a
18 questionnaire about Ms. Walker's claims?
19     A.    That's correct; everybody had to go give
20 a statement.
21     Q.    So in between the -- excuse me -- so as
22 of that date when the questionnaire was delivered
23 to all of the entire third shift, November 13,
24 2002 and by February 27th, 2003 you were providing

157

1 an affidavit at the MCAD, isn't that correct?

2    A.   That's correct.

3    Q.   So you were aware then that between the
4 circulation to the entire third shift of the
5 questionnaire on November 13th and by
6 February 27th, Ms. Walker had filed an MCAD
7 complaint?

8    A.   I don't know the dates.

9    Q.   But you know you were providing an
10 affidavit to her complaint?

    A.   I was but I don't know all these dates
12 that you're mentioning. They're confusing.

13    Q.   Well sir, do you know whether the entire
14 third shift was given a questionnaire about
15 Ms. Walker's claims before she filed an MCAD
16 complaint?

17    A.   I don't know what the questionnaire was.
18 I wasn't part of that investigation so I don't
19 know what questions they asked.

20        I just know they interviewed everybody
21 on the third shift.

22    Q.   Did they interview you?

23    A.   No; I don't think so. I gave an
24 affidavit but I don't know if that was in

158

1 reference to that. I don't think it was. I think
2 this had to deal with an MCAD complaint.

3    Q.   Did you talk with Sergeant Garcia about
4 any affidavit that he may have given in connection
5 with --

6    A.   (Interposing) I don't recall.

7    Q.   -- in connection with the response to
8 Ms. Walker's MCAD complaint?

9    A.   I don't recall.

10    Q.   Did you talk with Sergeant Monaghan
11 about what he should have included in his
12 affidavit in response to Ms. Walker's MCAD
13 complaint?

14    A.   I really don't talk to Monaghan so I
15 don't recall ever having a conversation with him.

16    Q.   Why don't you talk to Monaghan?

17    A.   I just don't.

18    Q.   You don't like him?

19    A.   (No response.)

20    Q.   What does that mean, sir? You shook
21 your head?

22    A.   *We* don't have anything in common, put it
23 that way.

24    Q.   Is he a supervisor under your command?

159

1    A.   He is one of my supervisors; that's
2 correct.

3    Q.   What is it you don't have in common,
4 sir?

5    A.   I don't know.

6    Q.   You're both police officers in law
7 enforcement?

8    A.   I think the biggest thing is our age
9 difference.

10    Q.   How old is he?

11    A.   I think he's in his thirties.

12    Q.   Did any of the -- did Sergeant Garcia
13 ever consult with you about his affidavit to the
14 MCAD?

15    A.   The best of my recollection; no.

16    Q.   Did Lenihan consult with you about his
17 affidavit to the MCAD?

18    A.   Lenihan?

19    Q.   Lenihan        L-E-N-I-H-A-N -- do you know
20 that person?

21    A.   He's a sergeant but, no.

22    Q.   Did Whelihan consult with you about
23 his --

24    A.   (Interposing) I don't recall having a

160

1 conversation with him.

2        MS. LYNCH: You have to let him
3 finish the question, okay?

4    Q.   (BY MR. HUDSON) Did the Chief consult
5 with you -- did Chief Scott consult with you about
6 his affirmation to the MCAD -- his statement to
7 the MCAD?

8    A.   I don't think -- he probably ordered me
9 to give an affidavit to the City Solicitor.

10    Q.   Did he order or request it?

11    A.   I think he orders us.

12    Q.   Do you know Jorge Rodriguez?

13    A.   Yes; I do.

14    Q.   Do you know if Jorge Rodriguez was ever
15 given a formal reprimand for failing to pick up an
16 operations manual?

17    A.   Personally, no, I don't know that.

18    Q.   Do you know whether in the history of
19 the Holyoke Police Department any officer has been
20 given a formal reprimand for something akin to
21 failure to pick up an operations manual?

22    A.   I think there has been; yes.

23    Q.   Who?

24    A.   I don't know who but they have been.

# TAMMY WALKER vs. CITY OF HOLYOKE
## ALAN FLETCHER          SEPTEMBER 12 2006

**161**

1 People that didn't pick them up, they got a
2 reprimand.
3    Q.    Do you know when the last time you
4 recall, when?
5    A.    I would say the last time they issued a
6 manual. The ones who didn't pick them up got a
7 reprimand.
8    Q.    Who issues the reprimand?
9    A.    Chief of Police.
10    Q.    Do you know whether or not Chief Scott
11 has ever given a reprimand for failure to pick up
12 a manual?
13    A.    I think he has.
14    Q.    To anyone other than Jorge Rodriguez?
15    A.    I don't know, besides Jorge Rodriguez.
16 I think so.
17    Q.    But you don't know?
18    A.    I don't know. There's a hundred and
19 some of us.
20    Q.    You don't know the name of any of the
21 officers?
22    A.    You mentioned Jorge Rodriguez. You
23 mentioned his name. You're saying that he got
24 one.   I don't know for a fact that he got one.

**162**

1    Q.    My question is:  Did you know whether
2 any other officers other than Mr. Rodriguez got
3 one for the same conduct?
4    A.    I don't know that Mr. Rodriguez got one
5 but I have heard that officers who failed to pick
6 up their manuals have received reprimands.
7    Q.    You have heard that. Does that mean
8 that you have heard it or do you know of your own
9 personal knowledge?
10    A.    I don't know of my own personal
11 knowledge; no.
12    Q.    Are you aware that Officer Rodriguez --
13 is Officer Rodriguez under your command?
14    A.    He's retired.
15    Q.    When he was active?
16    A.    He was assigned the midnight-to-eight
17 shift I believe.
18    Q.    Who was his immediate supervisor?
19    A.    The immediate supervisor would be
20 Lieutenant Whelihan.
21    Q.    Was there a line sergeant or a sergeant
22 in between?
23    A.    It would be Sergeant Walker if she was
24 on the shift at the time he was.    Garcia,

**163**

1 Monaghan, and I don't know who the other sergeant
2 was.
3    Q.    Garcia?
4    A.    I said Garcia.
5    Q.    Are you aware that Jorge Rodriguez, in
6 response to that survey, gave confirmation that he
7 had heard someone sounding like Monaghan saying
8 things like "lick it, lick it" over the radio
9 after Sergeant Walker quit the radio?
10    A.    I have no personal knowledge of that;
11 no.
12    Q.    That was never reported to you?
13    A.    No; not to my knowledge, not to my
14 recollection.
15    Q.    It was never reported to you that Jorge
16 Rodriguez supported Ms. Walker's claims of racial
17 and sexual harassment and discrimination in any
18 manner?
19    A.    I have no personal knowledge of that.
20    Q.    Was it ever reported to you?
21    A.    Jorge had problems -- his own.   I don't
22 know.
23    Q.    The question, sir, is did Mr. Rodriguez
24 ever report --

**164**

1    A.    (Interposing) Not to me; no.
2    Q.    -- to you directly?
3    A.    No.
4    Q.    Did the Chief ever report it to you that
5 Mr. Rodriguez had supported Ms. Walker's claims of
6 racial and sexual harassment?
7    A.    Not specifically that.   I think we had
8 discussions about Officer Rodriguez but I don't
9 think it entailed Tammy.
10    Q.    Who is "we had discussions"?
11    A.    The Chief and I. You were referring to
12 me and the Chief.
13    Q.    You had discussions with Officer
14 Rodriguez?
15    A.    Not with, about.
16    Q.    You had discussions about Officer
17 Rodriguez?
18    A.    Right.
19    Q.    Did any of those discussions include
20 what he viewed as discriminatory conduct against
21 former Sergeant Walker?
22    MS. LYNCH:               Objection; you can
23 answer.
24 THE WITNESS:               I don't believe they

## PERLIK and COYLE REPORTING

165

1 were.
2       I think there were other issues with
3 him.   I don't recall that.
4       Q.    (BY MR. HUDSON) What other issues were
5 involved with Sergeant Rodriguez?
6       A.    I guess when he went to the fuel depot
7 once and they said that they wouldn't gas his car,
8 one of the sergeants -- and I don't know if it was
9 Garcia or Monaghan -- and he drove off without gas
10 in his car.
11       He reported that they refused to gas his
12 car and that was looked into.
13       Q.    Do you know whether or not Jorge
14 Rodriguez ever reported that he found a, quote,
15 "rat note," in his mailbox after he had testified
16 in connection with the Wagner case?
17       A.    I think I heard that but do I have
18 personal knowledge? No; I don't.
19       Q.    Do you know that -- excuse me. Are you
20 familiar with a Holyoke Mall incident on or about
21 July 23rd, 2004 involving Ms. Walker?
22       A.    (No response.)
23       Q.    Are you familiar with a report, verbal
24 or written, that Ms. Walker responded to a call of

166

1 someone of Middle Eastern descent photographing
2 the structure of the Holyoke Mall?
3       A.    I'm familiar with the incident; yes.
4       Q.    Do you know whether or not there's a
5 telephone transcript of --
6       A.    (Interposing) I know nothing about the
7 investigation.
8       Q.    How is it you're familiar with the
9 incident?
10       A.    I think I read a disciplinary special
11 order on it.
12       Q.    A disciplinary special order from who to
13 whom?
14       A.    It would be from the Chief to her.
15       Q.    Meaning Ms. Walker?
16       A.    Ms. Walker; yes.
17       Q.    Do you have a copy of that?
18       A.    I do not.
19       Q.    Who possessed the report?
20       A.    Chief of Police would.
21       Q.    When you saw it were you in the Chief's
22 office?
23       A.    I don't know where I read it. It could
24 have been when she got disciplined for it, I

167

1 think.
2       Q.    Did you possess your own copy?
3       A.    No, sir; I did not.
4
5       A.    The main operations office.
6       Q.    And that's available to anyone and
7
8
9
10
11
12
13 everyone?
14       A.    Police officers.
15       Q.    To any police officer?
16       A.    That's correct.
17       Q.    Did you ever have the occasion to read
18 Ms. Walker's report concerning that?
19       A.    The best of my recollection I don't
20 think I did.
21       Q.    Well again, I'll draw your attention
22 back to the telephone transcript. Do you know a
23 Brenda Therrien?
24       A.    She's a dispatcher.

168

1       Q.    Do you know a Lieutenant Duguay?
2       A.    Yes.
3       Q.    Do you know a Sergeant Albert?
4       A.    Yes, sir.
5       Q.    Who is Sergeant Albert?
6       A.    He's a detective who works -- and he's
7 also our liaison with the Homeland Security and
8 the FBI.
9       Q.    And Lieutenant Duguay, who is she?
10       A.    She signs the records. She's the
11 supervisor in the Records Division.
12       Q.    Different bureau than yours?
13       A.    That's right. And the dispatchers, she
14 does both.
15       Q.    If there was a telephone transcript
16 involving these individuals about the Holyoke
17 Mall, where would that transcript be maintained?
18       A.    I don't know. That would be
19 Professional Standards.
20       Q.    And that's Internal Affairs?
21       A.    Yes, sir.
22       Q.    The phone log of dispatcher Therrien's
23 Mall call, would that be Internal Affairs or would
24 that be separate?

# TAMMY WALKER vs. CITY OF HOLYOKE

**ALAN FLETCHER**                    **SEPTEMBER 12, 2006**

---

169

A.    It would be in two of them. It could be under the dispatch log. It is all recorded electronically -- they got to type it in but, yes, its reported.

Q.    Would it be the verbal message or just the digital typed --

A.    (Interposing) It would be what they typed in and the original thing would be on a tape.

It would be taped, if it was taped. I don't know.

Q.    What's the life expectancy of those particular conversations or the dispatch report?

A.    Again, I'm not in charge of that. I think -- this is what I think; I don't have any personal knowledge -- ninety days.

Q.    If the City had reasons to know -- if the City has reason to know that these matters would be part of an investigation or complaints involving Ms. Walker, would there be any -- do you know whether or not the Holyoke Police Department would take any specific action to preserve certain

---

170

A.    I would think so but I'm not sure.

MS. LYNCH: Can we have a one-minute break?

MR. HUDSON: Yes.

(A recess was taken.)

Q.    (BY MR. HUDSON) Sir, skipping forward a few months, I'll bring your attention to a time period of on or about September 10th, 2004. Were you aware that former Sergeant Walker complained to Lieutenant O'Connell again about Sergeant Monaghan?

Are you aware of any complaints to Lieutenant O'Connell about that time -- September 10th, 2004?

A.    Was that an incident in a homicide investigation? I don't know.

Q.    Yes, sir. Were you aware that on or about that time Sergeant Walker complained to Lieutenant O'Connell that Sergeant Monaghan deliberately ignored her communication at a murder scene?

A.    That's correct.

Q.    Are you also aware that she complained that Sergeant Monaghan said, quote, "start packing

---

171

your bags" to her -- to Sergeant Walker?

A.    I don't -- I'm not aware of that.

Q.    Are you aware that Sergeant Walker complained that she had been the victim of two years of verbal assault and she did not feel safe and she feared being further verbally assaulted in her complaint to Lieutenant O'Connell?

A.    I don't know what she said to Lieutenant O'Connell. I would have to read her report.

I mean I don't know but there was -- she did say that he didn't do what he was told at a murder scene.

Q.    Do you know whether or not Lieutenant O'Connell or you or Chief Scott or Internal Affairs caused an investigation into Sergeant Walker's complaint?

A.    I think there was an inquiry; yes.

Q.    Do you know the outcome of that?

A.    I don't recall.

Q.    Well sir, don't you think -- is it that you were not informed or you just don't recall?

A.    I didn't say I wasn't informed. I just don't recall.

If I can see a document, if you show me

---

172

something, I could refresh my recollection and that would refresh my recollection.

Q.    Well sir, I'm trying to -- with all due respect I'm trying to ascertain that although you're a very busy person but when an officer -- when a sergeant complains about another officer's conduct involving a homicide, that doesn't involve you in any way?

MS. LYNCH: Objection; you can answer.

THE WITNESS: I'd like to answer that. It has nothing to do with a homicide. It was what the officer was doing at the scene of the homicide. I believe it was putting up some crime scene tape.

The officer was putting up the -- he did in fact put the crime scene tape up. It was a question of did he hear her say something else. That was that issue. It had nothing to do with the actual investigation of the homicide.

The uniform officers, whoever was preserving the crime scene, the detectives or whoever was called so it wasn't an investigative problem here; it was a communication problem

---

173

1 between the two sergeants and it was looked into.
2 That's what I'm trying to say.
3           I don't think it was as major as you're
4 saying.
5      Q.    (BY MR. HUDSON) Thank you for that
6 clarification.
7           Do you know that Sergeant Walker also
8 made the same complaint to Chief Scott?
9      A.    I don't know that.
10     Q.    The complaint about failure -- being
11 ignored at the murder scene?
12     A.    I don't know that.
13     Q.    Sergeant Monaghan says "start packing
14 your bags"?
15     A.    I'm not aware of that.
16     Q.    Two years of verbal assaults -- you're
17 shaking your head no?
18     A.    I don't know what she told Chief Scott.
19 I have no knowledge of what she told Chief Scott.
20     Q.    Are you aware that let's say
21 approximately -- that two weeks after Ms. Walker
22 complained to Lieutenant O'Connell and Chief Scott
23 the Mayor affirmed the Chief's five-day suspension to
24 and added an additional five days of suspension to

174

1 Ms. Walker's discipline regarding the Mall
2 incident?
3      A.    I'm not aware of the time period, sir.
4      Q.    When officers under your command, even
5 though they have direct supervisors are suspended
6 for five days, it's not brought to your attention
7 that they're not available for duty or you have to
8 get somebody else to cover their shift? Excuse my
9 ignorance but please explain.
10     A.    You're asking me about time periods and
11 this happened two or three years ago.
12           I don't know the time periods.   Do I
13 know that she was suspended? Yes; I do. Do I
14 know that the Mayor gave her additional days?
15 Yes; I do.
16           When that happened, the dates, I don't
17 have that knowledge but are we informed; we are.
18 I explained it earlier today on several occasions
19 it's done through special orders.    When someone is
20 suspended a special order goes out and the whole
21 department knows why a person is suspended and not
22 working.
23     Q.    Are those special orders placed in
24 personnel records?

175

1      A.    I would think so.
2      Q.    Is there another file or anything just
3 for special orders at the Holyoke Police
4 Department?
5      A.    The Chief would have it; yes.
6      Q.    This would be all special orders because
7 he's the only one that issues special orders, is
8 that what it is, the Chief?
9      A.    Yes, sir.
10     Q.    Thank you. So you have no knowledge,
11 then, that -- well, that's not true.
12           With regard to Ms. Walker getting a
13 suspension increased by September 24th, 2004 are
14 you aware that she made a complaint to the Chief
15 by November 5, 2004 about those dispatches going
16 out over their laptops and that Lieutenant
17 O'Connell was keeping her from doing her job?
18     A.    What's the question?
19     Q.    I'm just asking whether you were aware
20 that after Ms. Walker received an increase in her
21 suspension without leave on or about
22 September 24th, 2004, by November 5, 2004 she had
23 complained to the Chief in writing about
24 Lieutenant O'Connell interfering with her ability

176

1 to perform her job by allegedly sending out
2 dispatches over e-mail and not radio?
3      A.    I'm aware of that.  I don't know how I'm
4 aware of it, if she told me herself or if the
5 Chief told me but I was aware of it.
6      Q.    Then as of November 10th, 2004
7 Lieutenant O'Connell is sending out two versions
8 of an assignment restricting Ms. Walker to
9 booking. Are you aware of that?
10     A.    We discussed that earlier today.
11     Q.    And that would be referenced in
12 Exhibit 11 and 12, is that correct?
13     A.    I wouldn't know.
14     Q.    Let's take a look, sir, just to refresh
15 everybody's recollection.
16     A.    It's 10 and 11, sir.
17     Q.    November 10?
18     A.    No; Exhibit 10 and 11.
19     Q.    And the dates on those, sir, just to
20 refresh your recollection?
21     A.    November the 10th, 2004.
22     Q.    Thank you, sir.
23     A.    That's what it says.
24     Q.    Then are you aware, sir, that also on

# TAMMY WALKER vs. CITY OF HOLYOKE
## ALAN FLETCHER          SEPTEMBER 12, 2006

177

1  November 10th, 2004 Lieutenant O'Connell gave I
2  guess a reprimand to Ms. Walker about violating
3  the chain of command, that her chain -- do you
4  recall any writing cc'd to you from Lieutenant
5  O'Connell to Ms. Walker on or about November 10th,
6  2004 stating to Ms. Walker that Sergeant Wagner

7  and/or Sergeant Fallon is her chain of command and
8  that she was to complain to them?
9  Do you          recall receiving any
10  communication    like that?
11      A.    I could have.
12      Q.    And that if she had a complaint they
13  needed  to bring it to Lieutenant O'Connell?
14      A.    I could have received that.  I don't
15  recall  it.
16      Q.    And that she would bring it to you,
17  Captain  Fletcher?
18      A.    That's the chain of command; that's
19  correct.
20          MS. LYNCH:    Do you say Officer
21  Fallon?
22          THE WITNESS:    He's a sergeant.
23          MS. BETOURNAY:    He's retired.
24      Q.    (BY MR. HUDSON)  And that Lieutenant

178

1  O'Connell actually told  -- well, wrote to Sergeant
2  Walker that she had violated chain of command and
3  that was going  to go in her personnel record  if it
4  was done again and that document was cc'd to you?
5      A.    I don't know if we have it.  Do you want
6  me to look at it?
7      Q.    If we can find it we'll share it with
8  you.
9      A.    Okay.
10  MR. HUDSON:            May I have a break here
11  for a  minute
12 (A recess was taken.)
13  MR. HUDSON:            Just one last
14  housekeeping   chore.  I'd like to have this
15  document marked as Exhibit 15.
16  (Plaintiff's          Deposition  Exhibit
        No. 15 offered and marked.)
17
18      Q.    (BY MR. HUDSON)  Sir, would you take a
19  moment to look at Exhibit 15? (Indicating.)
20      A.    (Witness examining document.)
21      Q.    To save      some time, sir, I simply
                    you
22  want to ask you whether or not you have ever seen
23  this article and  then the second question  is
24  whether you know that your name was mentioned on

179

1  the first page, second column at the bottom"'
2  A.        I don't know  if I've read this
3  particular article  but my name  is in it.
4          MR.        HUDSON:  That's all.
5  MS. LYNCH:            Thank you.
6          (The deposition was concluded,)
7                      ,,,,,,:,

180

1          SIGNATURE PAGE - ERRATA SHEET
2
      To be signed by deponent and returned to
3  counsel within thirty (30) days.
4      I, the undersigned, ALAN    FLETCHER, do
  hereby certify that I have read the foregoing
5  transcript of my testimony given in the matter of
  TAMMY WALKER vs. CITY OF HOLYOKE, on SEPTEMBER  12,
  2006 and that, to the best of my knowledge, said
6  transcript is true and   accurate (with the
7  exception of the following corrections listed
  below:
8
9  PAGE · LINE·   CHANGE AND REASON
10      · _____
11  • _____
12      · _____
13  · _____
14      · _____
15  _____
16  _____
17  _____
18  · _____
19  _____
20  DEPONENT'S SIGNATURE: _____
21  Signed under the pain and   penalties of perjury
  this   of         2006
22  _____
23  NOTARY PUBLIC _____
24  My Commission expires: _____

Case 3:05-cv-30074-MAP   Document 54-4   Filed 08/01/2007   Page 13 of 48

TAMMY WALKER vs. CITY OF HOLYOKE
ALAN FLETCHER                        SEPTEMBER 12, 2006

181

1        COMMONWEALTH OF MASSACHUSETTS
                        COUNTY OF HAMPDEN
2

         I, JOANNE COYLE, a Notary Public within and
3  for the Commonwealth of Massachusetts at large, do
   hereby certify that I took the deposition of ALAN
4  FLETCHER, pursuant to the Federal Rules of Civil
   Procedure, at the offices of Perlik and Coyle
5  Reporting, 1331 Main Street,
   Springfield,
   Massachusetts, on SEPTEMBER 12, 2006.
                                                    6

       I further certify that the above-named
7    deponent was by me first duly sworn to testify to
     the truth, the whole truth and nothing but the
8    truth concerning his knowledge in the matter of
   the case of TAMMY WALKER vs. CITY OF HOLYOKE, now
9    pending in the United States District Court,
   District of Massachusetts.
10

       I further certify that the within testimony
11  was taken by me stenographically and reduced to
   typewritten form under my direction by means of
12  COMPUTER ASSISTED TRANSCRIPTION; and, I further
   certify that said deposition is a true record of
13  the testimony given by said witness.
     14        I further certify that I am neither counsel
            for, related to, nor employed by any of the
15  parties to the action in which this deposition was
   taken; and further, that I am not a relative or
     16    employee of any attorney or counsel employed by
          the parties hereto, nor financially or otherwise
17  interested in the outcome of the action.

18  WITNESS my hand and seal this _____ day of
   OCTOBER, 2006.
                                                    19
        _____
20            Joanne Coyle
            Notary Public
21        Certified Shorthand Reporter
License No. 106693
22
   My Commission Expires
23  May   12, 2011
24

                                               182
   TO        CAROLE SAKOW SKI LYNCH, ESQUIRE


   COPY TO OZELL HUDSON, JR., ESQUIRE


   FROM: JOANNE COYLE, Certified Shorthand Reporter


   RE:        TAMMY WALKER vs. CITY OF HOLYOKE


   DEPOSITION OF: ALAN FLETCHER


   TAKEN ON:        SEPTEMBER 12, 2006


              INSTRUCTIONS


   Please forward the attached original
   Signature Page-Errata      Sheet, along with
   a copy of the
   deposition transcript, to the deponent,
   ALAN FLETCHER, for his deposition taken on
   SEPTEMBER        12, 2006 in the above-captioned case.

   According to the Rules of Civil Procedure,
   the deponent has thirty (30) days In which
   to make these corrections to the transcript.

   When the deponent has signed and noted his
   corrections on the Signature Page-Errata      Sheet,
   indicating the page number, line number, and
   the desired correction, please return the
   original Signature Page-Errata Sheet to Mr.
   Hudson.

PERLIK and COYLE REPORTING

EXHIBIT 5

VOLUME:    II

PAGES:    1-199


COMMONWEALTH OF MASSACHUSETTS

AMERICAN ARBITRATION ASSOCIATION

No. 113900018505


IBPO LOCAL 409 and TAMMY WALKER

and

CITY OF HOLYOKE



ARBITRATION HELD BEFORE GARY ALTMAN,

ARBITRATOR

TUESDAY, JUNE 13, 2006

CITY HALL OF HOLYOKE

HOLYOKE, MASSACHUSETTS 01040




-------------------- Sandra A. Deschaine, RPR ...........................

I N D E X

WITNESSES:                                    PAGE

TAMMY WALKER

  By Mr. Sheridan                          5/55

  By Mr. Clancy                            6/70

ALAN FLETCHER:

  By Mr. Sheridan                       72/86/89

  By Mr. Clancy                           79/88

ANTHONY SCOTT

  By Mr. Sheridan                            90

  By Mr. Clancy                             109

EVA O'CONNELL

  By Mr. Sheridan                       117/145

  By Mr. Clancy                             141

**REBUTTAL WITNESSES:**

TAMMY WALKER

  By Mr. Clancy                             146

  By Mr. Sheridan                           151

SHAWN SHATTUCK

  By Mr. Sheridan                       157/166

  By Mr. Clancy                             164

point?

Q.    November of 2004, prior to him learning that she was claiming she was injured.

A.    She had problems with just doing her job.  It got to the point that when I arrived at  work, I would close my door, because the sergeant was constantly coming up to my office complaining about one thing or another, going outside the chain of command, even though I did have an open-door policy.

Q.    Are you aware that at some point a complaint was raised by Sergeant Walker alleging that Lieutenant O'Connell had given an order for dispatch sending out dispatches via e-mail  -- by the computer as opposed to by radio?

A.    The sergeant came to my office and told me that.

Q.    And when you received that complaint,  what did you do about that?

A.    She alleged that it was an officer safety issue, so I ordered an

A.    Thirty-seven years.

Q.    And how long have you been a lieutenant?

A.    Since May of '98.

Q.    In November of 2004, you were a lieutenant on the second watch, correct?

A.    That's right.

Q.    Can you give the arbitrator the hierarchy in terms of officers in the second watch, and how they fell command-wise?

A.    I'm the senior lieutenant and there's Lieutenant Cassidy, Sergeant Wagner, Sergeant Fallon, Sergeant Walker, and I believe Sergeant Monahan.

Q.    Is that the order of rank?

A.    Yes.

Q.    In other words, a senior sergeant takes precedence over a junior sergeant?

A.    That's right.

Q.    So if you were not on duty and Lieutenant Cassidy was not on duty, Sergeant Wagner would become the watch commander?

A.    That's right.

Q.    If you were on duty, you would be

the watch commander of the second -

    A.    That's right.

    Q.    And therefore Sergeant Walker working the second shift at that time would report to you?

    A.    Yes.

    Q.    There's been an allegation that you gave an order to change the method by which calls were issued by dispatch to officers from being radio calls to being laptop or computer generated. Did you ever issue such an order?

    A.    No.

    Q.    Do you have occasion, in the course of your duties, and did you in November of 2004, to monitor radio communications?

    A.    Yes, I do.

    Q.    And why do you do that?

    A.    So I know what's going on and where the people are on the street and where the problems are.

    Q.    Did you notice any difference in the way calls were dispatched in the fall of

2004 from how they were previously
dispatched?

      A.     No.

      Q.     And you were monitoring the radio
during those times you were on duty?

      A.     Yes.

      Q.     Was Sergeant Walker having
performance issues in the summer and fall of
2004?

      A.     Yes.

      Q.     Did you address those issues?

      A.     I did.

      Q.     How did you address them?

      A.     I wrote to  -- first of all, let
me back up. When  there was an issue, I
spoke to Sergeant  Walker about it. We would
talk about  the issue.  Then in August I just
didn't feel I was  getting anyplace, so I
wrote an IOC to  Captain Fletcher.  I listed
the  incidents. I believe  I attached  other
documentation to it, such as copies of the
law which would pertain to the separate
incidents,  which I had previously given to
Sergeant Walker.  I asked Captain Fletcher

**COURT REPORTING SERVICES**
P.O. BOX 15272          SPRINGFIELD, MA 01115
413.786.7233           413.786.0299

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, SS


        I, Sandra Deschaine, Registered

Professional Reporter, hereby certify that

the foregoing is a true and accurate

transcription of the Arbitration held on

June 13, 2006 to the best of my knowledge

and ability.



                Sandra Deschaine
                 Registered Professional Reporter

# EXHIBIT 6

# COPY

COMMONWEALTH OF MASSACSETTS

Hampden

Holyoke District Court
Department of the Trial Court
Civil Action No. _____

Tammy Walker,                                   )

    Plaintiff                                   )

                                     )

V

Commissioner, Commonwealth
of Massachusetts
Division of Unemployment Assistance
Board of Review; City of Holyoke

    Defendants                                   )

_____

## Compliant for Judicial Review of Administrative Agency Proceedings

To The Honorable Judge of The Said Court, Commonwealth of Massachusetts, County of Hampden, District Court Department of the Trial Court, The Plaintiff, Tammy Walker, Respectfully Files This Civil Action Seeking Judicial Review.

In support of said complaint, Plaintiff alleges errors, with respect to the 5/3/2006 Commissioner's decision on application for further review by the Board of Review, as follows:

## The Decision by the Commissioner on the Board of Review was unsupported by substantial evidence.

The Board of Review's decision that Walker acted insubordinately towards a superior officer on February 25, 2005 was unsupported by substantial evidence. In addition, the Board of Review's decision that "(a)11 disciplinary actions were due to violations or misconduct of her own doing..." was unsupported by substantial evidence.

## PARTIES

1. Plaintiff, Tammy Walker ("Walker"), is a natural person with a residence in Holyoke, Hampden County, Massachusetts.

2. Defendant, City of Holyoke (the "City") is a municipality located in, and existing under the laws of, the Commonwealth of Massachusetts, with municipal offices at 536 Dwight Street, Holyoke, Hampden County, Massachusetts. Defendant Commissioner, Commonwealth of Massachusetts Division of Unemployment Assistance Board of Review is a state agency, which issued the final decision on Plaintiff's claim for unemployment benefits.

## FACTS

3. Walker is an African American.

4. Walker is a lesbian.

5. Walker is a female.

6. In or around April of 1993, Walker was hired by the City's Police Department (the "Department").

7. On or around June 20, 1999, the former Mayor of Holyoke, Daniel Szostkiewicz, bypassed Walker and selected Joseph Garcia for promotion to the position of permanent full-time sergeant.

8. On or around October 15, 1999, Walker filed a charge of discrimination against the City with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC"), alleging that the City discriminated against her when it bypassed her for promotion to sergeant. Walker also appealed her bypass to the Civil Service Commission.

9.  In or around May of 2000, Walker and the City entered into an agreement to settle the MCAD and EEOC charge of discrimination and the civil service appeal ("Settlement Agreement"). In the Settlement Agreement, the City agreed to place Walker at the top of the eligibility list for the next promotion to sergeant. Additionally, the City agreed that upon Walker's appointment to sergeant, her seniority date would be adjusted to June 9, 1999.

10. On or around May 5, 2002, Walker was promoted to the position of full-time permanent sergeant. Pursuant to the Settlement Agreement, Walker's seniority date was to be adjusted to June 9, 1999.

11. Soon after her promotion to sergeant, Walker began having problems with other officers, including but not limited to Sergeant John Monaghan and Sergeant Garcia.

12.    For instance, Sgt. Monaghan made comments with sexual and racial connotations over the police radio when Walker ended a radio transmission. During one such incident, Sgt. Monaghan changed his pronunciation to imitate an African American dialect and said, "lick it, lick it, good."

13. Walker also heard Sgt. Monaghan make racist remarks about others. For example, Sgt. Monaghan referred to Chief Anthony Scott, an African American, as "Uncle Charlie."

14.    Additionally, Walker observed Sgt. Monaghan change his grammar and pronunciation to imitate an African American dialect when speaking about African Americans. For instance, Walker heard Sgt. Monaghan say "Uncle Charlie done come out wit (with) anutter (another) order."

15. In or around June of 2002, Walker began to make complaints to her superiors about the discriminatory and harassing behavior of Sgt. Monaghan and Sgt. Garcia.

16. Despite Walker's complaints, Sgt. Monaghan continued engaging in discriminatory and harassing behavior.

17. For instance, Sgt. Monaghan regularly referred to Walker as "Tyrone," a stereotypical African American, male name.

18. Sgt. Monaghan also stated that Walker should not be a sergeant because of her lesbian lifestyle.

19. In or around October of 2002, Sgt. Monaghan leaned over Walker and sang "You shouldn't go sticking your tongue where it don't belong."

20. After Sgt. Monaghan sang this offensive song, Walker complained again to her superiors.

21. Walker also complained to Chief Scott about the discriminatory and harassing behavior of Sgt. Monaghan on several occasions.

22. At Chief Scott's suggestion, Walker spoke to Cpt. Fletcher about the discriminatory and harassing behavior of Sgt. Monaghan. During this conversation, Cpt. Fletcher acknowledged that he was aware that other officers were unhappy about Walker's seniority because of her gender and race. Cpt. Fletcher told Walker that if she pursued any action against Sgt. Monaghan, others in the department might retaliate against her for bringing an action against a fellow officer.

23. Cpt. Fletcher also said that Walker's problems with Sgt. Monaghan were brought about because she obtained an "incorrect" seniority date through the settlement of her charge of discrimination and civil service appeal. Cpt. Fletcher told Walker that she could end the problems by "correcting" her seniority date.

24. On or around October 24,2002, Walker filed a complaint with the Department regarding the discriminatory and harassing behavior of Sgt. Monaghan.

25.     On or around December 2, 2002, Walker filed a charge of discrimination with the MCAD and EEOC, against the Department regarding the actions of Monaghan and other employees of the Department. Walker complained that the Department had discriminated against her based on her gender, color, and sexual orientation, and interfered with her exercise and enjoyment of her civil rights.

26. On or around December 4, 2002, the Department received a statement from another officer who heard some of the discriminatory comments made by Sgt. Monaghan. Nevertheless, the Department decided that Walker's complaints against Sgt. Monaghan were "unfounded."

27. In or around June of 2003, Walker verbally reported to her supervisor that several members of the Department had refused to leave a pub after closing, in violation of the law ("Pub Incident Report").

28. After no action was taken as a result of her Pub Incident Report, Walker notified Chief Scott of what she believed was the illegal conduct that she reported in the Pub Incident Report.

29. In or around August of 2003, Chief Scott retaliated against Walker for notifying him about the possible illegal activity she reported in the Pub Incident Report. Chief Scott issued a written reprimand stating that Walker had been insubordinate when she notified him of the Pub Incident report.

30. In or around April of 2004, Chief Scott suspended Walker from work for (1) one day for appearing five to fifteen minutes late for court. Chief Scott partially justified this suspension based on the retaliatory written reprimand that he issued in August of 2003.

Other employees of the Department were not similarly disciplined for arriving at court five to fifteen minutes late.

31. In upholding the one (1) day suspension, the Mayor of Holyoke, Michael Sullivan, also mentioned the retaliatory written reprimand for insubordination in August, 2003.

32. In or around September of 2004, Walker filed a written complaint with her supervisor, which stated that Sgt. Monaghan was ignoring her while they are performing their duties and verbally assaulting her. Walker stated that she believed that Sgt. Monaghan's insubordinate conduct posed a risk to her own safety and the safety of others.

33. Less than two (2) weeks after Walker complained about Sgt. Monaghan and her safety concerns, Mayor Sullivan doubled a five (5) day suspension that had been issued earlier to Walker by Chief Scott.

34. In or around November of 2004, Walker noticed that she was not hearing any dispatch calls over her car radio or hand held radio and, as a result, did not know where her subordinates were in the field.

35.    Walker believed that her supervisor, Lieutenant Eva O'Connell, had ordered the dispatchers to send calls via email, which would preclude Walker from hearing them. Walker believed that this practice posed a serious risk to the health and safety of the police officers and the public as well as herself.

36. On or around November 4, 2004, Walker made a report to Chief Scott regarding the practice of sending dispatch calls via email (the "Dispatch Email Report"). Walker expressed her belief that such a practice was unsafe for the police officers and the public as well as herself.

37. On or around November 10,2004, within days of Walker's report to Chief Scott about the dispatch calls, Lt. O'Connell retaliated against Walker by reprimanding her about her failure to utilize the chain of command and reassigning her to inside duty.

38. On or around November 20,2004, Lt. O'Connell denied a request for a day off which Walker had submitted several days earlier so that she could care for an ill family member.

39. Additionally, on November 20,2004, Lt. O'Connell requested that Chief Scott place Walker on the sick leave abuser's list.

**40. In** or around the end of November of 2004, Chief Scott suspended Walker for five (5) days for sick leave abuse. At the end of December of 2004, Mayor Sullivan increased this five (5) days suspension issued to ten (10) days.

41. On or around December 20,2004, Walker filed a complaint with Chief Scott about Lt. O'Connell's November 10th order that reassigned Walker to inside duty (the "Retaliatory Inside Assignment Complaint").

**42. In** the Retaliatory Inside Assignment Complaint, Walker indicated that she believed that Lt. O'Connell had violated. the law.

43. Walker requested and obtained a right to sue letter from the EEOC on January 11,2005.

44. On or around January 18, 2005, Chief Scott retaliated against Walker for making complaints, including the Dispatch Email Report and the Retaliatory Inside Assignment Complaint, by suspending Walker for five (5) days. Chief Scott also requested that Mayor Sullivan consider additional disciplinary action against Walker.

45. On or around February 15, 2005, Walker provided the City with written notice that it's retaliatory activities, policies, and/or practices were in violation of the Massachusetts

Whistleblower Statute, Massachusetts General Laws, Chapter 149, Section 185. See

Whistleblower Notice, dated February 15, 2005, attached hereto as Exhibit "A".

46.    On or around February 25, 2005, Lt. O'Connell, acted in a hostile and aggressive

manner towards Walker. Lt. O'Connell abruptly and vigorously pulled a book out of

Walker's hands, exacerbating an injury in Walker's shoulder. Additionally, Lt. O'Connell

stood up and took steps toward Walker in an aggressive, intimidating and hostile

manner.

47. On or around February 27, 2005, Walker filed a complaint with Chief Scott alleging that

Lt. O'Connell engaged in retaliatory behavior and injured Walker in a physical

confrontation. Walker also expressed concern for her physical safety.

48.    On or about March 7, 2005, Mayor Sullivan held a hearing on a retaliatory five (5)

days suspension that was issued by Chief Anthony Scott to Walker on January 18, 2005 in

connection with Walker's complaints, including the Dispatch Email Report and the

Retaliatory Inside Assignment Complaint.

49. On or about March 18, 2005, Mayor Sullivan affirmed the retaliatory five (5) days

suspension issued by Chief Scott on January 18, 2005 and added an additional

suspension of fifteen (15) days without pay.

50. On or around March 29, 2005, Walker filed her original complaint against the City in the

United States District Court for the District of Massachusetts, alleging various claims

including violations of Mass. Gen. Laws Ch. 151 B, the Whistleblower Statute, Title VII

of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), and violations of her rights

under the First Amendment of the United States Constitution ("Original Complaint").

51. One week after Walker filed her Original Complaint, Chief Scott again suspended Walker for five (5) days, this time in connection with Walker's complaint of February 27, 2005 regarding Lt. O'Connell retaliatory and abusive behavior.

52. On or around April 12, 2005, Mayor Sullivan held a hearing on this suspension despite Walker's request for a continuance.

53. On or around April 18, 2005, Mayor Sullivan affirmed Chief Scott's five (5) day suspension in connection with Walker's complaint regarding Lt. O'Connell retaliatory and abusive behavior. Additionally, Mayor Sullivan terminated Walker's employment. Mayor Sullivan's termination of Walker occurred less than three weeks after Walker filed her Original Complaint against the City.

54. On May 4, 2005, Walker provided the City of Holyoke with her second written notice that the City's additional retaliatory activities, policies, and/or practices were in violation of the Massachusetts Whistleblower Statute, Massachusetts General Laws, Chapter 149, Section 185. See Whistleblower Notice, dated February 15, 2005, attached hereto as Exhibit "8".

Wherefore, Plaintiff plays this honorable court to reverse the decision of the Commissioner to the Board of Review. Further, Plaintiff reserves the right to amend this omplaint For Judicial Review and to submit any memorandum of law and exhibits in support thereof.

Signed under the pain and penalties of perjury this ___ Day of June,
ctfully S        ted,

my Walker
Pro Se
6 Clark Street
Holyoke, Ma. 01040
(413)297-2852

SAPIRSTEIN & SAPIRSTEIN, P.C.
ATTORNEYS AT LAW
**1341** MAIN STREET, 3RD FLOOR
SPRINGFIELD, MASSACHUSETTS 01103
TELEPHONE (413) 827-7500

C 5',T.:?.5.7EIN-

7'-.Ni

CA.R''' L. '...SSEY

7 ?,,"4:5A.".C.S._,...=•.'

February 15, 2005

Anthony R. Scott
Chief of Police, Holyoke Police Department
138 Appleton Street
Holyoke, MA 01040
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* **7002-0860-0004-9485-2186**

Michael J. Sullivan
Mayor, City of Holyoke
536 Dwight Street
Holyoke, MA 01040
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED*
*RECEIPT NO.* **7002-0860-0004-9485-2179**

### Re: Sergeant Tammy Walker

Dear Sirs:

Please be advised that this office represents Sergeant Tammy Walker, a sergeant in the Holyoke Police Department. Pursuant to the Massachusetts Whistleblower Statute, Massachusetts General Laws, Chapter 149, Section 185 (c)(1) (the "Whistleblower Statute"), and the case of <u>Dirrane v. Brookline Police Department, et al,</u> 315 F 3d. 65 (1' Circuit 2002) to the extent it applies, Sgt. Walker is hereby providing written notice of activities, policies, and/or practices which violate the Whistleblower Statute and a reasonable opportunity to correct such activities, policies, and/or practice.

In or around June of 2003, Sgt. Walker reported to her supervisor that several members of the Holyoke Police Department had refused to leave a pub after closing, in violation of the law. After no action was taken as a result of her report, Sgt. Walker filed a <u>written</u> aort regarding this possible illegal conduct with the Chief of Police, Anthony R. Scott. In or around <u>August of 2003, Chief Scott issued a written</u> reprimand to Sgt. Walker. In the written reprimand, Chief S··ott indicated that Sgt. Walker had been insubordinate when she filed her written report of the possible illegal activity with him. By rephmanding Sgt. Walker in retaliation for reporting possible illegal activity, the City of Holyoke violated the Whistleblower Statute.

In or around April of 2004, Chief Scott suspended Sgt. Walker from work for one f I ; day for appearing five to fifteen minutes late for court. In his notice of suspension, Chief Scott indicated that the suspension was justified partially because Sgt. Walker had been given a written reprimand in August of 2003 for insubordination. In upholding Chief Scott's one (1) day suspension, the Mayor of Holyoke, Michael Sullivan, also mentioned the written reprimand for insubordination of August, 2003. By using the retaliatory reprimand as a basis for imposing unusually severe disciplinary action, the City of Holyoke violated the Whistleblower Statute.

In or around September of 2004, Sgt. Walker filed a written complaint with her supervisor that a subordinate co-worker was ignoring her while they were performing their duties and verbally assaulting her. She complained that she feared for her own safety and the safety of others as a result of the subordinate's conduct. Less than two (2) weeks after filing this complaint, Mayor Sullivan increased a five (5) day suspension issued to Sgt. Walker by Chief Scott to ten (10) days. It appears that Mayor Sullivan increased the severity of Sgt. Walker's discipline because she complained about activity which she reasonably believed was posing a risk to public health and safety. Such retaliatory actions violate the Whistleblower Statute.

In or around November of 2004, Sgt. Walker noticed that she was not hearing any dispatch calls over her radio and, as a result, did not know where her men were in the field. Sgt. Walker suspected that her supervisor, Lieutenant Eva O'Connell, had ordered that dispatch calls be sent to officers via email, precluding Sgt. Walker from hearing them. On or around November 5, 2004, Sgt. Walker filed a written report to Chief Scott regarding this situation. Sgt. Walker complained to Chief Scott that this situation was unsafe for the officers and the public. Within days of these complaints, Lt. O'Connell reprimanded Sgt. Walker about the chain of command and reassigned Sgt. Walker to inside duty. Soon after that, Lt. O'Connell denied Sgt. Walker's time off request at the last minute and requested that Sgt. Walker be placed on the sick leave abusers list. At or around the end of November of 2004, Chief Scott suspended Sgt. Walker for five (5) days for sick leave abuse. At the end of December of 2004, Mayor Sullivan increased the five (5) days suspension issued by Chief Scott to ten (10) days. It appears that the City of Holyoke has taken retaliatory actions against Sgt. Walker because she complained about activity which she reasonably believed was posing a risk to public health and safety. Such retaliatory actions violate the Whistleblower Statute.

Sgt. Walker requests that the City of Holyoke promptly correct these violations of the Whistleblower Statute. Please be advised that if the City fails to correct these violations of the Whistleblower Statute within thirty (30) days from the date of this letter, Sgt. VVa:ker may elect to pursue a lawsuit against the City of Holyoke. If suit is filed against the City of Holyoke pursuant to the Whistleblower Statute, Sgt. Walker will seek any and all remedies available to her under statute or at common law.

12

Very truly yours,


Tani E. Sapirstein, Esq.

TES/ag

cc:     Ms. Tammy Walker

Members of Holyoke City Council:

John P. Brunelle
131 Vermont Street
Holyoke, MA
*CERTIFIED MAIURETURN RECEIPT REQUESTED
RECEIPT NO,* 7002-0860-0004-9485-2162

Raymond H. Feyre
33 Longfellow Road
Holyoke, MA
*CERTIFIED MAIURETURN RECEIPT REQUESTED
RECEIPT NO.* 7002-0860-0004-9485-2155

Kevin A Jourdain
357 Jarvis Avenue
Holyoke, MA
*CERTIFIED MAIURETURN RECEIPT REQUESTED
RECEIPT NO.* 7002-0860-0004-9485-2148

Marc E. Joyce
41 George Street
Holyoke, MA
*CERTIFIED MAIL/RETURN RECEIPT REQUESTED
RECEIPT NO.* 7002-0860-0004-9485-2131

Following the hearing, on or about March 18, 2005, Mayor Sullivan affirmed a retalia'.ory five (5) days suspension issued by Chief Scott and added an additional unpaid suspension of fifteen (15) days. Thus, the City of Holyoke ("City") took retaliatory actions against Walker because she complained about activity which she reasona believed was violating the law and posing a risk to public health and safety. Additionally, the close proximity of this harsh disciplinary action to Walker's February 15, 2005 written notice, strongly indicates that the disciplinary action was taken in retaliation for Walker's exercise of her rights under the Whistleblower statute. Such retaliatory action violates the Whistleblower Statute.

Or or around February 25, 2005, Lieutenant Eva O'Connell, Walker's direct supervisor, acted in a hostile and aggressive manner towards Walker. As Walker has recently made complaints about Lt O'Connell, Walker believed that O'Connell's actions were retaliatory. On or around February 27, 2005, Walker filed a complaint with Chief Anthony Scott alleging that Lieutenant Eva O'Connell engaged in retaliatory behavior and injured Walker in a physical confrontation. Walker expressed concern for her physical safety.

On or around March 29, 2005, Walker filed a complaint against the City in the United States District Court for the District of Massachusetts, alleging various claims including vio'ations of Mass. Gen. Laws Ch. 151B, the Whistleblower Statute, Title VII of the Civil Richts Act of 1964 (42 U.S.C. § 2000e et seq.), and violations of her rights under the First Amendment of the United States Constitution. One week later, Chief Scott suspended Walker for five (5) days regarding Walker's February 27, 2005 complaint-On or around April 12, 2005, Mayor Sullivan held a hearing on this suspension despite Walker's request for a continuance. On or around April 18, 2005, Mayor Sullivan terminated Walker's employment. Mayor Sullivan's termination of Walker occurred less than three weeks after Walker filed her complaint against the City with the U.S. District Court. It appears that the City took retaliatory action against Walker in violation of several laws, including but not limited to the Whistleblower Statute.

Sgt. Walker requests that the City promptly correct these violations of the Whistleblower Statute. Please be advised that if the City fails to correct these violations of the Whistleblower Statute within thirty (30) days from the date of this letter, Walker may elect to amend her lawsuit against the City to include these allegations.

Very truly yours,


Tani E. Sapirstein, Esq.


TES,'ag

# EXHIBIT 7

DISCRIMINATION COMPLAINT
MASSACHUSETTS COMMISSION AGAINST DISCRIIVEINATION

FEPA:                                    HUNG DATE:
EEOC NO.:                                VIOLATION DATE: 10/21/02

NAME OF AGGRIEVED PERSON OR ORGANIZATION:

Tammy Walker                            TELEPHONE NUMBERS:
372 Hillside Avenue                     HOME: (413) 533-1216
Holyoke, Ma 01040                       BUSINESS:

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY OR
STAT.FILOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

Holyoke Police Department-              TELEPHONE NUMBER:
138 Appleton Street                     (413) 536-6431
Holyoke, Ma 01040                       NO. OF EMPLOYEES: 25+

John Monaghan
Holyoke Police Department

Joseph Garcia
Holyoke Police Department

CAUSE OF DISCRIMINATION BASED ON: Sex (Female), Color (Black), and Sexual
Orientation (Lesbian)

Beginning on or around May 8, 2002 and continuing up to and most recently on October 21,
2002, Holyoke Police Department, discriminated against me by subjecting me to a hostile work
environment by harassing me based on my gender (female), my color (black), and my sexual
orientation (lesbian) and by interfering with the exercise and enjoyment of my civil rights
granted and protected by law, in violation of M.G.L. c.151B § 4(1) & (4A) and Title VII of the
1964 Civil Rights Act, as amended.

THE PARTICULARS ARE:

1.  I was hired at the Holyoke Police Department in June of 1993. I was promoted to
    sergeant on May 5, 2002.

2.  Since I was promoted as sergeant, I have had a problem with the other sergeants who are
    less senior than I, John Monaghan and Joseph Garcia. These two sergeant do not respect
    my orders and or that I am senior to them.

3. I have spoken with Sgt. Lenihan about this problem twice. I feel that Sgt. Monaghan and Sgt. Garcia have a problem accepting my authority because I am black, female, and a lesbian.

4. I was reassured of this idea when I was notified in the end of September 2002, that Sgt. Monaghan made a comment that he feels that I should not be a sergeant because of my lifestyle: my sexual orientation.

5. I have also been speaking with Lt. Whelihan since in or around the end of May 2002. I have been speaking with him about how Sgt. Monaghan and Sgt. Garcia are treating me. He has been very cooperative and he has had conversations with them about their conduct, but their insubordination has continued.

6. In the beginning of October 2002, I was notified by several officers that Sgt. Monaghan has been referring to me as "Tyrone." The officers stated that whenever he speaks of me, he calls me this "black" "male" name. I feel that by him calling me by this name, he is offending me as a black, lesbian female.

7. On October 17, 2002 at approximately 12:00am I was in the office with Officer Christopher Dunn, Sgt. Joseph Garcia, Sgt. Lenihan, and Sgt. Monaghan. Sgt. Monaghan had the paperwork from doing roll call. He placed some paperwork back on the clipboard and then walked over to the desk where I was seated. He leaned over my desk to place the roll call list into it slot. As he leaned over, he sang the following words, "You shouldn't go sticking you tongue where it don't belong." At this comment, Officer Dunn began to laugh. Being a lesbian, I knew what Sgt. Monaghan was referring to. I gave no response when this occurred and left the office. I was deeply insulted by this song that Sgt. Monaghan sang.

8. The fact that someone I am senior to is degrading me as a black, female lesbian is affecting my work. The workplace has become very uneasy for others and me. I do not feel comfortable at work with the comments that are being made.

9.- On October 20, 2002, 1 spoke with Sgt. Whelihan about the name-calling (Sgt. Monaghan calling me Tyrone) and about the song that Sgt. Monaghan made up. Sgt. Whelihan was taken aback by what has been occurring. I know that he has spoken with Sgt. Monaghan about the situation, but the uneasiness at work has continued.

10. On October 21, 2002, I spoke with Chief Scott about the discrimination I feel I have been subjected to. He stated to me that he felt this conduct should stop and I should also go and speak with Capt. Fletcher.

11. When I spoke with Capt. Fletcher on October 21, 2002, he stated that he knew the other sergeants did not like my seniority to them because I am a women and because I

black, but he did not know of the harassment. I then told him that I want to pursue some action against him. We discussed how others in the department may retaliate against me for going against a fellow, officer, but I told him that I knew that it may make things worse before it got better. Capt. Fletcher then told me that he would speak with Sgt. Monaghan and Sgt. Garcia.

13. Also, for the past several months, when I am finished speaking over the radio, I hear Sgt. Monaghan saying nasty sexual comments on another frequency. Sgt. Monaghan will say, (using a black dialect) "Lick it, Lick it, good." I have stopped listening to this frequency so that I do not have to hear these comments any longer. As a Sgt., this is a frequency that is important for me to monitor, but do not because I fear what is being said about me.

14. I feel that the Holyoke Police Department has subjected me to a hostile work environment due to the harassment based on my race/ color (black), my gender/sex (female) and on my sexual orientation.

I ALSO WANT THIS CHARGE FILED WITH EEOC:        XX
I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.

SWORN TO AND SUBS REI3ED BEFORE ME THE  9dDAY OF  251-421711 , 2002.

Notary Public

MY COMMISSION EXPIRES:

# EXHIBIT 8

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

RECEIVED

***************************************************

TAMMY WALKER
Complainant
V.

CITY OF HOLYOKE
POLICE DEPT., ET AL.
Respondents

***************************************************

Commission Against
Discrimination
**Springfield Office**

Docket No: 022304081

AFFIDAVIT OF JORGE RODRIGUEZ

1.      My name is Jorge Rodriguez and I am over eighteen years of age. I
        understand the meaning of an oath.

2.      Presently I reside at 131 Whiting Farms Road, Holyoke, MA 01040.

3.      I am a police officer at the Holyoke, MA Police Department. I have
        worked in this job since 1985.

4.       On or about November 13, 2002 Lieutenant Fournier distributed a
        questionnaire to officers on the Holyoke Police Force regarding
        Sergeant Tammy Walker's allegations of harassment. (See Exhibit 1).

5.      I responded in writing that I witnessed some of the events that
        occurred. Lieutenant Fournier then wrote back to me, asking for more
        specifics to my response. I sent a memo in response to his request for
        more specific information (See Exhibit 2). Lieutenant Fournier did not
        question me again regarding what I witnessed. No other inquiries
        were made regarding my knowledge of Sergeant Walker's allegations
        of harassment.

6.     On or about December 4, 2002 Sergeant Lenihan stated to a group of officers that we all had to 'stick together.' I believe he was referring to Sergeant Walker's charge of harassment.

7.     Upon my best information and belief, other officers learned that I supported Sergeant Walker's allegations of discrimination. Comments were repeatedly made such as anyone who gave up information should be fired.

8.     On March 27, 2003, I was formally reprimanded for a minor infraction of failing to collect an operations manual (See Exhibit 3). I believe the reason for reprimanding me was retaliation because I supported Sergeant Walker's allegations. I believe other officers who have not assisted another in her civil rights and opposed discrimination have committed worse offenses than this and they were not reprimanded.

9.     On May 13, 2003 I testified in federal court on the *Wagner v. Ho/yoke Police Department* case. On May 14, 2003 there was an article in the newspaper regarding the trial. On May 14, 2003 an individual left a note in my mailbox, referring to a "rat" (See Exhibit 4).

10.    I have heard Sergeant Joe Garcia state on several occasions during roll call that he was not afraid of anyone coming forward to sue him. I understood his comments as referencing Sergeant Walker's charge of discrimination.

11.    I have also heard officers refer to Chief Anthony R. Scott as "Uncle Charlie" during roll calls. Chief Scott is a Black individual. I believe the comments were racist. I believe an atmosphere exists at the Holyoke Police Department that condones racism and encourages retaliatory conduct toward individuals who oppose discrimination.


I UNDERSTAND THAT I MADE THIS STATEMENT OF MY OWN FREE WILL AND THAT IT IS UNLAWFUL FOR ANY PERSON OR ORGANIZATION TO RETALIATE AGAINST ME FOR MAKING THIS STATEMENT.

I SWEAR OR AFFIRM THAT I HAVE READ THIS STATEMENT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

64ORGL RODRIGUEZ /

SWORN TO AND SUBSCRIBED BEFORE ME THIS ( _DAY OF ⊥_____ , __ 2003.

My Commission Expires:

MARYANN K BRUNTON
NOTARY PUBLIC
MY COMMISSION EXPIRES
JULY 31, 2003

# EXHIBIT 9

## HOLYOKE POLICE DEPARTMENT
## INTEROFFICE MEMORANDUM

TO:      LIEUTENANT DAVID D. FOURNIER

FROM:    OFFICER JORGE L. RODRIGUEZ

SUBJECT: WALKER V. MONAGHAN COMPLAINT

DATE:    DECEMBER 04, 2002

CC:      IAD 02-2O

LIEUTENANT DAVID FOURNIER:

This letter is in response of your request to submit an IOC
describing in detail the comments that I heard over the WMLAC
radio. I cann't give you an exact date or time of the incidents
but I started noticing the communications about three weeks ago
around 0630 hrs. when we responded to gas up the cars. This
comments are performed after Seargent Walker is in use of our
Police Radio. In one ocassion after she went over the air some
one started singing a Rap song over WMLAC " Leak now, leak it
good, leak it real good" In other acassions when this song is heard
over the FM radio someone placed the mike cloSe to theWMLAC_•radio
to transmitted the song. In one other ooBion Seargent Walker
end radio transmission someone spoke over WMLAC saying "I am
freak out, El Freako". I cann't say with certainty that Seargent
Monaghan did the talking but the voice sounds like his. In few
other oc6asions someone goes over WMLAC radio::MeaWingLlike-a
fighting cat-after she end transmission. We have a natural duty
a-Q4 _all_ obligation to comply with the duty of Justice and the

AC=

principle of Fairness.                    Jorge L. Rodri
                        Signature:
              00046'.).

**EXHIBIT** 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
DOCKET NO. 05-30074-MAP

TAMMY WALKER,
    Plaintiff

v.

CITY OF HOLYOKE,
    Defendant

1. Please identify yourself; incbiding your frll name, social security number, (late of birth, place of birth, race or nationality, residential address, occupation and the name and address of your employer.

1.   My full name is Tammy Walker. My social security number ▮▮▮▮▮▮ I was born in Holyoke, Ma. On ▮▮▮▮▮▮ I am African American. I reside at 6 Clark Street, Holyoke, Ma. 01040_ I am currently terminated *as a* police sergeant with the Holyoke Police Department located at 138 Appleton Street, Holyoke, Ma. 01040. I am currently awaiting a Civil Service Hearing regarding this matter.

2.   Please identify by name and address each person whom you expect to call as an expel t witness at trial including:

A.   The subject matter on which each expert is expected to testify_

B.   The substance of the facts and opinions to which each expert is expected to testify.

-C. A summary of the grounds for each opinion described above.

2. These parties will testify to the amount of work related stress I was under, my physical condition, and the state of my health at the time I was employed and afterwards.

Plaintiff reserves the right to add to this list

1. Kathy Borelli, EAP 500 Beech Street Holyoke, Ma. 01040
2. Barbara Zellan 10 Central Street Westfield, Ma. 01099
3. Dr. Stephen Levine (PCP) Primary Care Physician 1221 Main Street Holyoke, Ma.01040.
4. Dr. Spellman (BSMC) Baystate Medical Center 3300 Main Street Spfld.,Ma.

01107

    5. Dr. Kalia 300 Carew Street Spfld., Ma. 01104

    6. Dr. Kereen 500 Beech <u>Street</u> Holyoke, Ma 01040

    7. Dr. Ogoke Northern Pain Management 125 Liberty Street Spfld., Ma. 01103

  3. Please state in full how you have been damaged or injured *as* a result of the acts or omissions of the Defendant, stating what the Defendant did or failed to do that damaged or injured you and list and itemize all damages or injuries, which should include any lost wage or benefits claim, you claim you suffered, including the following in your answer:

    A.  A description of each element of damage or injury claimed, including relevant dates;

    B.  A dollar breakdown of each element of damage or injury claimed;

    C.  The method that you used to assess a monetary value on your claimed damages or injuries; and

    D.  A description of each document you have relied upon to support each element of damage or injury claimed.

  3.  I went into a deep depression and was unable to leave my house. I had a feeling of despair and was afraid to go to work. I was humiliated in front of my co-workers as well as my subordinates. I suffered from heart palpitations, anxiety and panic attacks. I am unable to sleep and eat. I couldn't pull myself out of the sadness I was feeling. I was unable to get up to go to work. I did not lose any wages because whenever I called in sick, I received sick pay for <u>these</u> days.

    The harassment continued for years which forced me to continue to take days off I then ran out of sick time, vacation time, and holiday time attempting to run from the harassment. There is no dollar amount that comes to mind <u>that</u> can bring back the several years of suffering that I've had to endure. Please also refer to Exhibit "B" in the Request for Production of Documents.

  4.  If you sought medical or mental health treatment as a result of any actions or omissions of the Defendant, please state;

    A.  The name and present address of all doctors, psychiatrists, psychologists, counselors, hospitals and-other healthcare providers administering such medical or other treatment to you;

    B.  The dates on which such medical or other treatment was provided;

    C. A complete description of the medical or mental health treatment which was

provived on each such date, as well as the diagnosis;

    D. An itemized account of all expenses incurred for such treatment.

  4. A). I sought out treatment from my personal physician, Dr. Stephen Levine, 1221 Main Street, Holyoke, Ma. 01040.

    B). I began this treatment soon after October 2002.

    C). I was and still am suffering from heart palpitations, anxiety and panic attacks, headaches, depression, and (PTSD) Post Traumatic Stress Disorder.

    D). This information is not in the custody or control of the Plaintiff. The Plaintiff will supplement these Answers to Interrogatories regarding an itemization of expenses for treatments.

  5. Please identify all employment you have held since January 1, 2000, other than for the Defendant, including in your answer for each position of employment., the name and address of your employer, your title and position, the capacity in which you are or were employed, the dates on which you have been or were employed, and the amount of wages, salary, benefits or profit you presently receive or previously received.

  5. Should be contained in BPD files.

  6. Please identify by name and address each person who witnessed or has knowledge of discoverable facts pertinent to the allegations contained in your Complaint, indicating the substance of the information that each person is known or believed to possess and the date and location of each event which they witnessed.

  6. Jorge Rodriguez, 138 Appleton Street, Holyoke, Ma. 01040 had witnessed the abuse that I was taking, including comments that were made in the roll call room pertaining to the Chief and myself. Jorge heard Monaghan saying, "lick it lick it good", on the air, etc. This information is contained in the MCAD file. (See all Internal Affairs cases including IAD-0426. Union Lawyer Michael P. Clancy. Anthony Soto (Fire Commissioner).

  7. Please state whether you have ever made a formal or informal claim or have instituted a legal proceeding for discrimination, whistleblower or civil rights violations prior to, subsequent to or concurrent with your Compliant in the present action and, if so, please state:

    A. The names and addresses of the persons or entities who are the subjects of the claims;

    B. The location, including address, at which such alleged discrimination, whistleblower or civil rights violations occurred;

    C. A description of basis for your claim;

D.  The names of any insurance companies, persons or entities which compensated you for your claim;

E.  The state and federal agency or court in which any legal proceedings were filed and the docket number.

7.  The only other complaint that I made was through the MCAD when Mayor Daniel Szostkievvicz and the City of Holyoke denied my promotion. I believe this happened in 1999. MCAD complaint filed 2005, which has not yet been addressed MCAD complaint 1999, MCAD 2002 case removed still pending. MCAD 2005, Criminal Complaint filed 8/24/05 Holyoke District Court, Formal intake with Lt. Hope of the Springfield Attorney General's Office.

Formal complaint filed with Ms. Lori Martin of the Attorney General's Office in Boston Ma. Formal Complaint/Statement given to FBI Agent Susan Kossler & AUSA Kevin O'Regan on March 29th 2005.

8.  No question listed.

9. Please state all facts upon which you base your claim that the Defendant discriminated against you with regard to your gender, race and sexual orientation, including the identity of all individuals involved in the alleged discrimination, the respective dates of the alleged discrimination and state what was said or done that you believe constitutes discrimination.

9.  See lawsuit filed by Tani Saperstein.

10.  Please state all facts upon which you base your claim that the Defendant harassed you with regard to gender, race and sexual orientation, including the identity of all individuals involved in the alleged harassment, the respective dates of the alleged harassment and state what was said or done that you believe constitutes harassment.

10. See lawsuit filed by Tani Saperstein.

11. Please state all facts upon which you base your claim that the Defendant retaliated against you, including the identity of all individuals involved in the retaliation, the respective dates of the alleged retaliation, -what was said or done that you believe constitutes retaliation and identify by name and address all witnesses to the retaliation_

11.  See lawsuit filed by Tani Saperstein.

12.  Please describe all communications that you had with any representative of the Holyoke Police Department regarding any complaints or concerns that you have had

and/or expressed regarding your employment, including the date of the communication, the substance of the communication, the method of communication, the names and addresses of the individuals involved in the communication and the names and addresses of all individuals who were present.

*r* 12. I went to several people to have them talk to John Monaghan. I asked them to talk to mainly John Monaghan and not Joe Garcia regarding the name calling such as "Tyrone" and the whimlack over the radio. I do not recall the specific dates or the frequency that was being used when comments were made by Sergeant Monaghan. The comment that was made was "lick it, lick it good." Katie McCoy and Melinda Lane saw how emotionally upset I was after being out sick from work with heart palpitations when I brought in my doctors' note. I went to Chief Scott and told him what was going on_

Chief Scott referred me to Captain Fletcher. I also told Captain McCoy on Beech
/ Street, Holyoke, Ma. 01040 and asked him if he could talk to Sergeant Monaghan and have him stop from harassing me and doing what he was doing. Captain McCoy also referred me to Captain Fletcher. I spoke with Sergeant Lenihan regarding the situation, very earlier on. Lenihan's response was that he didn't want to get involved. I spoke to my cousin, Officer Lonnie Westbrook and asked him why Mr. Monaghan was doing this to me.

Mr. Westbrook stated he would speak with him about it. I went to people who I thought could talk to Mr. Monaghan and make him stop. I do not recall specific dates when these conversations occurred.

13. If you contend that any member of the Holyoke Police Dept. Or the City of Holyoke discriminated against any other employee of the Holyoke Police Dept. While you were employed there, please identify by name and address the individual who was discriminated against, describe the alleged discrimination, including the relevant dates, and provide the name and address of the individual who allegedly perpetrated the disgimination.

13. The only person that came forward was Jorge Rodriguez, which resulted in discrimination against him. Sergeants must gas up their cars in the morning. After Mr. Rodriguez came forward there was an incident where he was in line to gas up his car and Sergeant Monaghan refused to put in the code to allow him to gas up his car. Mr. Rodriguez left the fill up area and radioed the dispatch that his car would not be gassed up because Sergeant Monaghan was refusing to allow him to do so. Also, all of Sergeant Monaghan's junk mail -was repeatedly put into Mr Rodriguez's mailbox.

Mr. Rodriguez reported this to the Chief and a letter came down regarding putting mail in other people's mailboxes. Mr. Rodriguez was also present when comments were made in the roll call room regarding my claims. Mr. Rodriguez was present when Sergeant Garcia made comments during roll call such as, "Who else is going to sue me, anyone else want to sue me?' Sergeant Monaghan undeniably discriminated against Jorge Rodriguez.

14. Please describe any problems or issues you have had with John Monaghan and Joseph Garcia during the course of your employment with the Defendant, including the date of each incident, your response and identify by name and address all witnesses to the incidents.

14. I cannot recall all of the specific incidents where Sergeant Monaghan and Sergeant Garcia did not respect my orders. However, the following are a few of the incidents that I do recall specifically. I had problems with Sergeant Garcia changing my roster on a couple of occasions. I asked him to come in to speak with me about why he was changing the roster. I wrote a letter to Lieutenant Whelihan on October 20, 2002 explaining the situation with Sergeant Garcia in that Sergeant Garcia was changing the roster and not following my orders, which were not to change the roster.

I do not recall the specific dates or the frequency that was being used when comments were made by Sergeant Monaghan. The comment that was made was "lick it., lick it good." Sergeant Monaghan and Sergeant Garcia went to 7-11 following the arrest I made on October 15'¹2002 to question the clerk about an arrest I made on October 15ᵗʰ 2002. It was clear the clerk felt uncomfortable as though he was being interrogated. On June 24..1.03 at approximately 2:00am, a reserve officer Thomas Dore had called in a prank phone call to the Holyoke Police Department stating that there were four men refusing to leave the bar.

I arrived on the scene and the only people in the bar were police officers, including Sergeant Monaghan. I asked them to leave the bar. Sergeant Monaghan stood there, looked at me and proceeded to take another sip of his drink, slid the bottle across the bar table and asked if his tab was all set. I again repeated myself "LET'S GO" and Sergeant Monaghan finally left with the other three officers. Although this was a request in most people's eyes, under the Holyoke Police Standard this is a direct order, Sergeant Monaghan and other officers did **not respect** this direct order, which was stated twice. Please refer to all complaints I filed regarding members of the Holyoke Police Department.

15. Please describe the hostile work environment that you allege you were subjected to by the Defendant and state how your work was affected as a result of being subjected to this alleged environment, including in your answer all relevant dates, locations and the name and address of all witnesses to this conduct.

15. The hostile work environment started when I informed Sergeant Garcia that I was going to be granted my seniority, which-the city had agreed upon after I became a Sergeant. I told him out of respect, face to face, that I was going for my seniority. I didn't want to do this behind his back because I didn't think it was fair to do behind his back, which had happened to him before with Sgt. Pratt. In the agreement the City of Holyoke had made with me, both Sgt. Monaghan and Sgt. Garcia did not like that I would be senior to them.

It was after that they refused to communicate with me. My work was affected

because without communication there was no way for me to be an effective Sergeant. From this point on, Sgt. Garcia no longer gave me any training. I was on my own in the streets trying to figure out how to be a productive Sgt., as well as to learn the daily function of inside paperwork. I found it quite difficult to be an effective Sergeant having no communication with them. I went to Lieutenant Whelihan regarding this matter and told him that neither Sgt. Garcia nor Sgt. Monaghan was speaking to me.

I told him that due to this lack of communication, I had no way of knowing what each person was doing. I stated that I would come in on my first two nights and do the reports <u>that</u> Sgt. Monaghan and Sgt. Garcia would be responsible for gassing the cruiser, which is done through seniority. My problems with Sgt. Garcia and Sgt. Monaghan Trickled down to the subordinates, which caused a hostile environment for everyone. The subordinates felt that they could not talk to me because both Sgt. Monaghan and Sgt. Garcia were not speaking to me. They believed that if they communicated with me, Sgt. Garcia and Sgt. Monaelan would ostracize them as well.

16.   Denied time off by Lt. Eva O'Connell, transferred from area of supervision, my prisoners released after I arrested them by Sgt. Fallon and Lt. Eve O'Connell.. Suspended for <u>being</u> five minutes late for court, April 6th 2004. My performance was tracked by Lt. O'Connell in a packet given to me on August 3[1'] 2004. I was ordered to the station by Chief Scott on August 22nd 2004. I was ordered to sign statements by Chief Scott and Lt. Fournier, when I know the auto tape had been altered.

was not informed about the June 20, 1999 date that they gave other Sergeants until it was coming time to put me in front of. I didn't put the date in, the City put the date in.

I made a claim against the City for not promoting me to Sergeant and picking Joe Garcia who had scored two points lower than I had, and had less education than I did. I subsequently filed a complaint with the Civil Service Commission, which they in return and a Civil Service hearing and with myself, my Attorney, Atty. Alex Masters, City Solicitor Fitzgibbons and it was agreed upon that I would drop the MCAD suit and Civil Service appeal and be put on the next active list for Sergeant.

1 8 .  If you took time off from work because of the allegations in your Complaint, please state the dates, the reasons you did not work and state the reasons you gave to your supervisors.

18.   I called in sick on the days that I was <u>working</u> with Sgt. Monaghan due to the fact that I was not emotionally able to go in and work with this gentleman. I do not recall the specific dates that I called in sick. The psychological effect of him walking by and giving me sneers, and the harassment over the radio was too hard for me to take. I was not able to go in and face this anymore because of the depression I was going through. All of this affected my work so that I was unable to perform my duties as a Sergeant. Please see suspension for sick abuser.

19.   Please set forth whether any statements have been obtained by you or on your behalf with the respect to the subject matter of your Complaint, and if so, set forth the following::

A.   The name, address, telephone number and place of employment of each person;

B.   The date, time, and place where such statements were obtained; and

C.   The full name, present or last address, telephone number and position of employment of the person obtaining such statement.

19.   All internal affairs investigations which lead to suspensions/termination. Letter from the Store Clerk Kuram Shahzad , unknown address. Statement given to Agent <u>Susan</u> Kossler and AUSA Kevin O'Regan.

20.   Please describe fully your performance as an employee of the City of Holyoke Police Dept., and identify all documents which substantiate your claimed performance.

20.   Should be contained in personal files.

21.   Please state whether you have ever been a party in any **civil** or criminal legal action, other than this action, and if so, please state:

   A.  The names, addresses and the telephone numbers of the parties involved;

   B.  A description of the claims, counterclaims, cross-claims and defenses;

   C.  The court in which the legal proceeding was filed and the docket number; and

   D.  A description of the outcome.

21.  This should by contained in personal files.

22.  Please give a full and complete description of any mental health conditions, illnesses or diseases which you had within five years of the incidents alleged in your Complaint, including the date and nature of any such condition, illness or disease and the name and address of any medical or mental health institution, doctor, professional or other person who rendered treatment to you, also including in your answer the extent to which you were suffering at the time of the incidents alleged in your complaint.

22.  Should be contained in personal files.

23.  Please state whether you have ever filed any claim for workers' compensation benefits due to a mental health related disability, and, if so, please state:

   A.  The nature of the disability;

   B.  A description of the basis of your claim;

   C.  The names of any insurance companies involved; and

   D.  The name of the employer.

23.  None that I can recall.

24.  If you allege that you were unable to perform your job duties with the Defendant due to a mental or physical disability, please describe the disability and identify by name and address all medical personnel from whom you received treatment.

24.  1). See letter faxed to retirement board on April 11, 2005
    2). All Work Connection files South Health files

25.  Please state all the facts upon which you base your claim that the Defendant violated your First Amendment rights, including the identity of all individuals involved in

this conduct, the respective dates of this conduct and identify by name and address all witnesses to this conduct.

25. Chief Anthony R Scott, Michael J. Sullivan, Please refer to all grievances filed.

25. B). Please state all facts upon which you base your <u>claim</u> that the Defendant violated the Whistleblower Act, including the identity of all individuals involved in this conduct, the respective dates of this conduct and identity by name and address all witnesses to this conduct.

25. B). Chief Anthony R Scott, Michael J. Sullivan. Suspended/ terminated for expressing my rights.

Plaintiff requests the right to amend this discovery upon receipt of all my discoverable documents pertaining to my case from my former Atty., Tani Saperstein, or until Chief Anthony R. Scott is ordered to release me all discovery obtained by Atty., Tani Saperstein.

Tammy Walker

EXHIBIT 1 1

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

DOCKET NO. 02SEM04081

_____

TAMMY WALKER,
      Complainant

v.

HOLYOKE POLICE DEPARTMENT,
JOHN MONAGHAN and JOSEPH
GARCIA,
      Respondents
_____

## RESPONDENTS' POSITION STATEMENT

\\I

## INTRODUCTION

The respondents, Holyoke Police Department, John Monaghan and Joseph Garcia, hereby submit this statement in response to the complaint filed by the complainant, Tammy Walker. The respondents deny that they engaged in any discriminatory practice with respect to Ms. Walker. Specifically, they deny that Ms. Walker was subjected to a hostile work environment and they deny that her gender, race or sexual orientation played any role in their actions.

## GENERAL BACKGROUND INFORMATION

Joseph Garcia was appointed a reserve police officer on June 4, 1987. He was appointed a full-time police officer on February 21, 1988.[1]

Ms. Walker was appointed a reserve police officer on April 27, 1993. She was appointed a regular full-time police officer on July 19, 1993.

_____

[1] See Exhibit A, Affidavit of Joseph Garcia.

John Monaghan was appointed a reserve police officer on April 27, 1993. He was appointed a regular full-time police officer on July 19, 1993.[2]

On February 28, 1999, former Mayor Szostkiewicz appointed Joseph Garcia and Michael McCoy as sergeants in a provisional capacity_ On March 22, 1999, he appointed David Pratt. These provisional appointments were made due to the lack of a certified list for a permanent promotion from the Human Resources Division (HRD) for the Commonwealth of Massachusetts.

On April 15, 1999, HRD issued a list of the five individuals from the Holyoke Police Department who received the highest scores on the sergeant's examination. The Holyoke Police Department received the list in order to fill two permanent full-time sergeant positions. Pursuant to HRD rules, the Holyoke Police Department could only make the two appointments from the top five candidates. On April 26, 1999, a sixth name was added, that of Joseph Garcia, because one of the candidates on the list, Denise Duguay, had already been appointed to the position of sergeant. The following is a list of the five candidates in the order they appeared on the list, as well as their scores:

1.   David Pratt..........................................................................  87
2.   Michael McCoy  ...............................................................80
3.   John Monaghan   ............................................................80
4.   Tammy Walker  ...............................................................80
5.   Joseph Garcia  ................................................................78

On June 9, 1999, former Mayor Szostkiewicz, Police Chief Marc Cournoyer, Personnel Administrator David Lawrence and City Solicitor Stephen Fitzgibbons conducted interviews of the five candidates. Each candidate was asked the same set of questions.

On June 20, 1999, former Mayor Szostkiewicz appointed Michael McCoy and Joseph Garcia to the position of permanent full-time sergeant.

---

[2] See Exhibit B, Affidavit of John Monaghan.

Because Mr. Pratt was bypassed with the selection of Mr_ McCoy and Mr. Garcia, and Mr. Monaghan and Ms. Walker were bypassed with the selection of Mr. Garcia, on July 6, 1999 former Mayor Szostkiewicz sent correspondence to HRD setting forth the reasons for his appointments. That is, pursuant to General Laws Chapter 31, Section 27, if an appointing authority, such as former Mayor Szostkiewicz, does not choose the individual with the highest score and that individual is willing to take the job, the appointing authority must file a bypass letter with HRD setting forth the reasons for appointing a person whose name was not the highest on the list. With respect to Ms. Walker, former Mayor Szostkiewicz stated that she did not have an in-depth and detailed knowledge of the police department and its programs. He also found that she lacked the requisite experience and failed to answer many questions correctly.

Since Mr. McCoy and Mr. Garcia were promoted to the position of full-time sergeant on June 20, 1999, this was the date of the original bypass of Mr. Pratt, Mr. Monaghan and Ms. Walker.

Subsequent to the appointment of Mr. Garcia, Ms. Walker filed an appeal with the Civil Service Commission, pursuant to General Laws Chapter 31, Section 2, claiming that she was as qualified or more qualified than Mr. Garcia. On October 15, 1999, Ms. Walker also filed a claim with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission, alleging that she had been discriminated against because she was not appointed to the full-time sergeant position.[3]

Following Mr. Garcia's appointment, it was readily apparent that Ms. Walker was angry that he had been appointed ahead of her. In fact, when she was eventually appointed sergeant on May 5, 2002, she informed Mr. Garcia that in a few weeks he would no longer be senior to her.

---

[3] She incorrectly stated in her MCAD complaint that Mr. Garcia was not Hispanic. **While she claimed** that **he was** not entitled to minority preference, he is, in fact, **Spanish.**

Thereafter, as outlined in Mr. Garcia's affidavit, she engaged in a pattern of making his life on the job difficult. For instance, despite the fact that she had initially wanted to be the early supervisor which required that she arrive at work at 11:00 p.m., she later insisted that Mr. Garcia be the early supervisor. She also made sure that he would be responsible for gassing up all the cruisers at the end of the shift. In addition, she reported him for changing the schedule one evening even though she had not yet arrived at work when he determined that the change was needed. Essentially, it appears that it was her goal to make sure that he would "pay" for the fact that he had originally been appointed prior to her.[4]

On August 29, 1999, Mr. Pratt was promoted to the position of permanent sergeant. Prior to the promotion, Mr. Pratt, who ranked first on the April 15, 1999 list, also filed an appeal of his bypass. On March 15, 2000, he reached a settlement agreement with the City of Holyoke, whereby he withdrew his appeal. In exchange, his seniority date was adjusted to June 20, 1999, the date of his original bypass.

On May 23, 2000, Ms_ Walker entered into a settlement agreement regarding her bypass appeal. The settlement required that she be placed at the top of the eligibility list. In addition, in the event that she were appointed, she would have her seniority date adjusted to June 9, 1999, which she incorrectly listed as the date of her bypass. That is, June 9, 1999 was the date of her interview, not the date of the bypass. Ms. Walker's discrimination claim with the MCAD and EEOC were also settled on this basis.         -

On May 5, 2002, Ms. Walker was promoted to the position of full-time permanent sergeant and, pursuant to the settlement agreement, she was given the incorrect seniority date of June 9, 1999. As a result, she was given a seniority date prior to Mr. Pratt, who received the

---

[4] See Exhibit A, Affidavit of Joseph Garcia.

highest score on the examination, Mr. McCoy, who received the second highest score, and Mr.

Garcia. This was the case even though all three had been sergeants since 1999.

In mid-May 2002, John Monaghan was appointed to the position of permanent full-time

sergeant. As he never filed a bypass appeal, his seniority date is after both Ms. Walker and Mr.

Garcia, despite the fact that his name appears before their names on the April 15, 1999 civil

service list.

On June 18, 2002, Police Chief Anthony Scott requested that the City Solicitor issue a

decision as to the seniority dates of Tammy Walker, David Pratt, Michael McCoy and Joseph

Garcia. 4 He indicated that the seniority issue was causing unnecessary disruption to the

operations of the police department.

On October 15, 2002, Ms. Walker was involved in an arrest that had occurred at a

convenience store in Holyoke. On October 16, 2002, Mr. Monaghan spoke to the clerk of the

store about the incident. Mr. Garcia was also in the store when the conversation occurred.

While they were there, Ms. Walker drove by and saw them. She was angry that Mr. Monaghan

spoke with the clerk.

On October 24, 2002, Ms. Walker filed a complaint with the Holyoke Police Department

alleging that on October 17, 2002, just one day after Mr. Monaghan spoke to the store clerk, Mr.

Monaghan sang a song which she perceived to be a reference to her sexual persuasion.

Specifically, she claims that Mr. Monaghan began to sing "You shouldn't go sticking-your

tongue where it don't belong." She alleges that the song was sung near her in the commanding

officer's office while Mr. Lenihan, Mr. Garcia and Christopher Dunn were present. All four

individuals present deny that this incident occurred.[5] In her complaint, Ms. Walker also alleged that several officers told her that Mr. Monaghan referred to her as "Tyrone."

It is important to note that this was the first time that Ms. Walker informed her supervisors that Mr. Monaghan was reportedly making comments and singing songs that could be perceived as relating to her gender, race or sexual persuasion.[4]It is also the first time that she informed her supervisors that Mr. Monaghan and Mr. Garcia were not following her orders because of her gender, race or sexual orientation. That is, contrary to the allegations contained in her complaint at paragraphs 3, 5 and 9, she never provided her supervisors with this information. She did, however, complain that she did not think that Mr. Monaghan and Mr. Garcia liked her because she claimed that they ignored her. In response, she was told by Mr. Fletcher, the captain, and Mr. Whelihan, the lieutenant, that any problems she may be having with Mr. Garcia and Mr. Monaghan had to do with the fact that she had incorrectly received a seniority date prior to theirs. In fact, Mr. Fletcher told her that it was incumbent upon her to correct the date. lie indicated that he thought her problems would self-correct once the date was changed.[6]

Contrary to Ms. Walker's contention, as stated in paragraph 11 of her complaint, that Mr. Fletcher stated that the other sergeants did not like the fact that she was senior to them because she is female and black, Mr. Fletcher never made this statement. While he did tell her that everyone has problems in the department from time to time, and shared the fact that he had once been bypassed for the sergeant's position even though he Shad the highest score, he never told her that she was being discriminated against because of her gender, race or sexual orientation.[7]

---

[5] See Exhibit A, Affidavit of Joseph Garcia; Exhibit B, Affidavit of John Monaghan; Exhibit C, Affidavit of John Lenihan.
[6] See Exhibit C, Affidavit of John Lenihan; Exhibit D, Affidavit of Alan Fletcher; Exhibit E, Affidavit of Donald Whelihan.
See Exhibit D, Affidavit of Alan Fletcher.

On October 28, 2002, Mr. Monaghan was notified of Ms. Walker's allegations. He emphatically denied them.[8]

Mr. Fletcher held a meeting with Ms. Walker, Mr. Monaghan and Mr. Whelihan to discuss Ms. Walker's allegations. At the meeting, which lasted about an hour, Ms. Walker stated that she had witnesses who informed her that Mr. Monaghan had called her "Tyrone." However, she refused to identify the witnesses. Mr. Monaghan adamantly denied singing a song to Ms. Walker and he denied making any derogatory comments to her or about her. During the meeting, Mr. Fletcher told both Ms. Walker and Mr. Monaghan that they needed to get along and needed to act like leaders since they are supervisors. Mr. Monaghan readily agreed that they needed to get along with each other.[9]

Subsequently, Chief Scott ordered the Professional Standards Division to conduct an internal investigation.

On October 28, 2002, Ms. Walker was directed to submit the names of the officers who told her that Mr. Monaghan had called her "Tyrone." On October 30, 2002, Ms. Walker refused to provide the names.

On November 13, 2002, Ms. Walker was advised by David Fournier, the Commander of the Professional Standards Division, that if she did not provide the names of the officers, the entire third shift would be questioned. Because she continued to refuse to provide the names, on November 13, 2002, a questionnaire was given to the entire shift. On November 20, 2002, Mr. Fournier received responses from the 20 members of the third shift. All 20 denied having any knowledge of Ms. Walker's allegations.

---

[8] See Exhibit B, Affidavit of John Monaghan.
[9] See Exhibit D, Affidavit of Alan Fletcher; Exhibit E, Affidavit of Donald Whelihan.

On November 27, 2002, Mr. Dunn was further questioned about his memory of working on October 17, 2002. He stated that he could not remember exactly where he was seated in the commanding officer's office that evening. He further stated that he never heard the comment "you shouldn't go sticking your tongue where it don't belong." He also stated that he never heard Mr. Monaghan refer to Ms. Walker as "Tyrone."

On November 28, 2002, Mr. Garcia and Mr. Lenihan were also questioned regarding the events of October 17, 2002. Mr. Garcia stated that he never heard Mr. Monaghan make the comment "you shouldn't go sticking your tongue where it don't belong." He also stated that he never heard Mr. Monaghan refer to Ms. Walker as "Tyrone." Mr. Lenihan stated that he did not recall the song in question or anything along those lines taking place, nor would he tolerate that kind of behavior. Mr. Lenihan indicated that he did not recall Mr. Monaghan referring to Ms. Walker as "Tyrone."[10]

As a result of the fact that the individuals that Ms. Walker identified as witnesses with respect to the alleged incident of October 17, 2002 denied hearing any of the alleged statements, and the fact that the entire third shift staff denied hearing Mr. Monaghan call Ms. Walker "Tyrone," Mr. Fournier recommended that the complaint be classified *as* "not sustained." His recommendation was also based upon the fact that Ms. Walker refused to provide the names of the officers who allegedly gave her information about Mr. Monaghan.

On December 4, 2002, the Board of Inquiry met and unanimously agreed that Ms. Walker's complaint was unfounded. Chief Scott approved this decision.

On December 9, 2002, Ms. Walker and Mr. Monaghan were notified that the complaint was investigated and determined to be unfounded.

---

[10] **See Exhibit A, Affidavit of Joseph Garcia; Exhibit C, Affidavit of John Lenihan.**

It should be noted that during the course of the investigation, Officer X[1] [1] alleged that he heard an officer sing a rap song over the WMLEC radio frequency (Western Mass. Law Enforcement Channel) which is accessible to all the surrounding communities. The individual indicated that he heard someone sing a rap song with the lyrics "leak it now, leak it good, leak it real good." He also indicated that someone placed the microphone close to the FM radio when the song was aired so that it was transmitted over WMLEC radio. In addition, he reported that someone said "I am freak out, El Freako." These statements were made after Sergeant Walker reportedly ended a radio transmission. Finally, on another occasion, he stated that someone was meowing like a fighting cat after Ms. Walker ended her transmission. It should be noted that it is quite common to hear unusual sounds over WMLEC which is accessible to many communities.[12] Officer X reported to Mr. Fournier that the voice sounded like Mr. Monaghan's voice, but "I cannot say with certainty that Sergeant Monaghan did the talking."

As a result of receiving this information, Mr. Fournier questioned Officer X who indicated that he heard the songs and the comments about three weeks before. Subsequently, each and every tape recording of the WMLEC broadcast for the dates that Officer X and Mr. Monaghan worked together over a five-week period were reviewed. (The time frame was expanded to ensure that the investigation was all inclusive.) The review showed no audible radio transmissions over WMLEC *as* described by Officer X in the time frame specified. In addition, Mr. Fournier compared the schedules of Ms. Walker and Mr. Monaghan during this period-. He determined that they did not work together on any of the days. The internal affairs investigation also concluded that Mr. Monaghan had no access to transmit on the WMLEC frequency during the time frame specified.

---

" The officer will be referred to as Officer X to protect the confidentiality of the internal affairs investigations procedure.

[12] See Exhibit A, Affidavit of Joseph Garcia.

While Ms. Walker is alleging that Mr. Garcia and Mr. Monaghan have refused to follow her orders because of her gender, race and sexual persuasion, which they deny, it is important to note that Ms. Walker, herself, has a significant history of not following the orders of her supervisors. This history began on May 13, 2002, just 8 days after she was promoted to the position of sergeant. On that date, she informed Mr. Lenihan, her supervisor, that she was going home early at 6:00 a.m. She did not ask him. She told him. When he inquired as to why she wanted to leave, she informed him about an arrangement that she had made with Mr. Whelihan. She claimed that she had worked some extra hours and was entitled to leave. When Mr. Lenihan told her that he did not feel comfortable with her leaving early on his shift because he did not have any documentation to back up her absence, she told him again that she was leaving at 6:00. In fact, she left at 6:00 a.m. without his authorization. In July 2002, Mr. Lenihan told Ms. Walker that he wanted her to speak to the other sergeants, Monaghan and Garcia, to develop a rotating detail for gassing the cruisers. In response, however, she told Mr. Lenihan that Mr. Monaghan and Mr. Garcia were going to gas the cruisers. To this day, she has not followed Mr. Lenihan's request that she be part of the schedule to gas up the cruisers. In addition, in September 2002, she was told to write a report regarding a fatal motor vehicle accident that had occurred on her shift pursuant to the order of Chief Scott. In response, she stated, "I'm not doing any report. Garcia is doing the report." Mr. Lenihan again told her that she must do a report. She has not yet complied with this order.[13]

In addition, despite the fact that Mr. Lenihan is her supervisor, Ms. Walker has had the habit of telling him what changes were going to occur on his shift since the time she became a sergeant. For instance, she told him that Mr. Monaghan and Mr. Garcia could no longer ride in a cruiser together. She told him that Mr. Monaghan and Mr. Garcia would no longer be allowed to

---

[13] See Exhibit C, Affidavit of John Lenihan_

stay in the police station "until they decided to go on the road." Furthermore, she stated that Mr. Garcia would have to become the early sergeant, arriving at work at 11:00 p.m., instead of midnight. On September 19, 2002, Mr. Lenihan sent a memo to Mr. Whelihan regarding Ms. Walker's failure to follow his directions regarding the gas schedule in July 2002 and the fatal motor vehicle accident in September 2002.[14]

### Ms. Walker's complaint must fail because she was not discriminated against.

In her complaint, Ms. Walker alleges that she was subjected to a hostile work environment due to harassment she allegedly received from respondents Monaghan and Garcia due to her gender, color and sexual orientation.

In order to establish a claim of hostile work environment under Title VII and General Laws Chapter 151B, Ms. Walker must provide sufficient evidence from which a reasonable jury could conclude that the offensive conduct is severe and pervasive enough to create an objectively hostile or abusive work environment and is subjectively perceived by the victim as abusive. *Rivera-Rodriguez v. Frito Lay Snacks Caribbean, A Division of PepsiCo Puerto Rico, Inc., 265 F.3d 15, 24 (2001).* When accessing whether a work place is a hostile work environment, courts look to the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with the employee's work performance. *Harris v. Forklift Systems, Inc., 510 US. 17, 21 (1993).*

Ms. Walker has alleged that Mr. Monahan harassed her, thereby creating a hostile work environment, in the following ways: she alleges that he sang "You shouldn't go sticking your tongue where it don't belong" as he leaned over her desk to place the roll call list into a slot. She alleges that other officers, who she refuses to identify, have informed her that Mr. Monaghan has

---

[14] See Exhibit C, Affidavit of John Lenihan.

referred to her as "Tyrone" which she claims is a black male name. She claims that when she finishes speaking over the police radio, she hears Mr. Monaghan speaking on another frequency, WMLEC, stating "lick it, lick it, good." Finally, she claims that she has heard Mr. Monaghan call Chief Scott "Uncle Charlie" and has heard him use a "black dialect" when speaking about Chief Scott. Mr. Monaghan denies ever making such a statement about Chief Scott and, in fact, has nothing but deep respect for Chief Scott, as has been witnessed by Mr. Lenihan.[15] Ms. Walker's allegations that Mr. Monaghan has racial tendencies is completely false. In fact, when Mr. Monaghan was growing up, Ms. Walker's brother, Vincent, was one of his best friends.[16]

After receiving Ms. Walker's allegations, the Holyoke Police Department conducted an extensive internal affairs investigation. In fact, each individual from the third shift was ordered to answer a questionnaire regarding Ms. Walker's allegations. All 20 members of the third shift had no knowledge whatsoever of Ms. Walker's allegations. Furthermore, the three witnesses that she identified to the October 17, 2002 incident were questioned separately. Each of them denied having any knowledge of her allegations. Since Ms. Walker alleged that she had heard Mr. Monaghan making derogatory comments over the WMLEC radio frequency, this claim was also investigated and found to be baseless.

Notwithstanding that none of the allegations made by Ms. Walker were ever sustained, it is the respondents' position that even if the statements were made, they were not severe and pervasive enough to create an objectively hostile or abusive work environment. At most, the comments would constitute merely an offensive utterance for which there can be no liability under General Laws Chapter 151B or Title VII. The evidence does not support Ms. Walker's claim that she subjectively perceived the comments to be abusive since she never reported them,

---

[15] See Exhibit B, Affidavit of John Monaghan; Exhibit C, Affidavit of John Lenihan.
[16] See Exhibit B, Affidavit of John Monaghan.

despite the fact that she claimed they were occurring for the "past several months." Moreover, Ms. Walker is known not to be shy when it comes to confronting others.[17] Indeed, it is significant that she did not file a complaint until the day after she became angry at Mr. Monahan for speaking to the convenience store clerk with regard to an incident that she was involved in on September 15, 2002.

It should also be noted that the song that Ms. Walker claims was sung over the radio seems to be a variation of the song "Push It" by the band Salt 'N Pepa. This song is sung by African American females and about men. Therefore, Ms. Walker's allegation that this song pertains to her sexual persuasion also seems to be unfounded.[18]

Ms. Walker also alleges that Mr. Garcia and Mr. Monaghan did not follow her orders, despite the fact that she was senior to them, because of her gender, race and sexual orientation. With respect to Mr. Monaghan, Ms. Walker never gave him an order.[19] With respect to Joseph Garcia, there was an incident on October 20, 2002 where Ms. Walker yelled for him to step inside her office. To the extent that this could be considered an order, Mr. Garcia did not refuse to meet with her. He only refused to meet with her without a witness. The incident involved his decision to make a change in the schedule when he came in at 11:00 p.m. and was the early supervisor. When Ms. Walker arrived at approximately 12:00, she was angry that he made the change without consulting her. However, she was not available to be consulted. Because Mr. Garcia had had negative experiences with Ms. Walker in May 2002 and July 2002, as outlined in his affidavit, he believed that he needed to have a witness present to protect himself. At the time, Ms_ Walker was visibly angry. Therefore, Mr. Garcia did not disobey Ms. Walker's order. Moreover, his insistence on having a witness had nothing to do with her gender, race or sexual

---

[17] See Exhibit C, Affidavit of John Lenihan.

[18] See Exhibit F, Lyrics of "Push It" by Salt 'N Pepa.

[19] See Exhibit B, Affidavit of John Monaghan.

orientation. It only pertained to the fact that he believed that he could be subjected to discipline. This obviously demonstrates that Mr. Garcia realized that Ms. Walker was senior to him.

In essence, as detailed above, it appears that any problems that Ms. Walker may have had with Mr. Garcia and Mr. Monahan were related solely to the seniority issue. That is, she listed her bypass date as June 9, 1999, instead of June 20, 1999, which allowed her to improperly move ahead in seniority.

### Ms. Walker's claim against the Holyoke Police Department must fail since it performed an extensive investigation regarding her allegations.

Notwithstanding that Ms. Walker's allegations are unfounded, since she had a seniority date prior to Mr. Monaghan and Mr. Garcia, the Holyoke Police Department cannot be strictly liability under the theory of respondeat superior if, in fact, her allegations are correct. *Fleenor v. Hewitt Soap Co., 81 F.3rd 48, 50 (6[117] Cir. 1996).* Under both Title VII and Chapter 151 B, where the alleged harassing conduct is between "fellow employees," the complainant must prove that the employer "knew or should have known of the conduct" to establish liability. *Sarin v. Ratheon Co., 905 F. Supp. 49, 52 (D. Mass 1995).* Where the alleged harassment is by a fellow employee having no authority of any kind over the victim, employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it. *Mikels v. City of Durham, 183 F.3d 323, 332 (4[6] Cir. 1999).*

In this case, the Holyoke Police Department did not receive any knowledge of Ms_ Walker's allegations until she filed her complaint on October 24, 2002. Prior to that, her only complaint regarding Mr. Monaghan and Mr_ Garcia was that she thought they were mad at her, did not like her or were ignoring her.[20] Once Ms. Walker's allegations were made, the Holyoke Police Department did an extensive internal affairs investigation which concluded that Ms.

---

[20] See Exhibit D, Affidavit of Alan Fletcher; Exhibit E, Affidavit of Donald Whelihan.

Walker's allegations were unfounded. To the extent that Ms. Walker claims that she has witnesses whom she has refused to identify, the same alleged witnesses denied having any knowledge to support her claim, given that the entire 20 member third shift was questioned. Therefore, Ms. Walker's claim against the Holyoke Police Department should be dismissed.

## <u>CONCLUSION</u>

For the reasons stated above which show that Ms. Walker's allegations are unfounded, the complaint filed against the Holyoke Police Department, John Monaghan and Joseph Garcia should be dismissed.

The Respondents,
Holyoke Police Department, John Monaghan and
Joseph Garcia

By Their Attorneys
Morrison, Mahoney & Miller, LLP


_____
Carole Sakowski Lync1-41, BBO#547718
1500 Main Street, Suite 2400
P.O. Box 15387
Springfield, MA 01115-5387
(413) 737-4373
(413) 739-3125 (fax)


I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the att.  ey of record for each (oth r) arty mail (by hand) on          44 aj

 _____

COMMON WEALTII OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

DOCKET NO. 02SEM0408 1

TAMMY WALKER,
     Complainant

V.

HOLYOKE POLICE DEPARTMENT,
JOHN MONAGHAN and JOSEPH
GARCIA,
     Respondents _____

AFFIRMATION

I, Chief Anthony Scott, hereby depose and say:

1.     I am the Chief of Police of the Holyoke Police Department and, in this position, I am authorized to make this affirmation on behalf of the ITolyoke Police Department.

2.     1 have read the position statement that was filed on behalf of the Respondents at the Massachusetts Commission Against Discrimination by Morrison. Mahoney & Miller, LLP. 2.     Upon information and belief, the facts set forth in that statement arc true.

Signed under the pains and penalties of perjury this _____ day of /⁴4/ **C.1** _____

_____
Chief Anthony Scott

Sworn to and subscribed before me this 3rd day of March, 2003.

My Commission expires: January

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

DOCKET NO. 02SEM04081

TAMMY WALKER,
        Complainant

v.

HOLYOKE POLICE DEPARTMENT,
JOHN MONAGHAN and JOSEPH
GARCIA,
        R e s p o n d e n t s

## **AFFIRMATION**

I, Joseph Garcia, hereby depose and say:

1.       I have read the position statement that was filed on behalf of the Respondents at

the Massachusetts Commission Against Discrimination by Morrison, Mahoney & Miller, LLP.

2.       Upon information and belief, the facts set forth in that statement are true.

Signed under the pains and penalties of perjury this   3             day of  NW $^1$7

_____2003

# EXHIBIT 12

| Docket | Case | Date Filed | C.O. | Complainant | Respondent | DocketId |
|--------|------|-----------|------|-------------|------------|----------|
| 93230160 | CLOSED | | | Jose Andino | C-Holyoke Police Dept | 93SEM0160 |
| 97230521 | CLOSED | 6/16/1997 | MFR | Robert Wagner | C-Holyoke Police Department | 97SEM0521 |
| 00230288 | CLOSED | 5/31/2000 | GLM | Kevin M. Thomas | C-Holyoke Police Department | 00SEMO288 |
| 97230265 | CLOSE | 4/7/1997 | MKB | Jorge Rodriguez | C-Holyoke Police Department | 97SEMO265 |
| 96230389 | CLOSED | 5/29/1996 | MKB | Nelson S Vasquez | C-Holyoke Police | 96SEM0389 |
| 96230705 | CLOSED | 9/27/1996 | MFR | Gary Bennett | C-Holyoke Police Dept | 96SEM0705 |
| 98230653 | CLOSED | 8/4/1998 | A C | Jorge L. Rodriquez | C-Holyoke Police Department/l B 0 P 0. Local #388 | 98SEM0653 |
| 94240038 | CLOSED | 7/6/1994 | MKB | Luis A. Flores | C-Holyoke Police Dep | 94SPA0038 |
| 96230656 | CLOSED | 9/9/1996 | MKB | Carole Stewart | C-Holyoke Police Dept | 96SEM0656 |
| 97230430 | CLOSED | 6/2/1997 | A C | Eva O'Connell | C-Holyoke Police Dept. Et Al | 97SEM0430 |
| 99230011 | Closed | 1/11/1999 | GLM | Christopher Stevenson | C-Holyoke Police Department | 99SEM0011 |
| 96230195 | Closed | 3/26/1996 | GLM | Rita Hegy | C-Holyoke Police Depart | |
| | CLOSED CLOSED | 5/19/1997 | A C | Denise M. Duguay | C-Holyoke Police Department & Daniel J. Szostkiewi | 97SEM0401 |
| 99230169 | Closed | 3/29/1999 | GLM | Rita Hegy | C-Holyoke Pblice Department | 99SEM0169 |
| 95240007 | CLOSED | 2/13/1995 | PMB | Jimmy Soto | C-Holyoke Police Dept. | 95SPA0007 |
| 99230641 | CLOSED | 10/15/1999 | MFR | Tammy Walker | C-Holyoke Police Department, Et Al. | 99SEM0641 |
| 22304081 | iActive | 12/2/2002 9:56 | MKB | Tammy Walker | Holyoke Police Department | 02SEM04081 |

| EEOC | Basis |
|------|-------|
| 160931256 | National Origin |
| 160973512 | Other |
| 16CA02203 | Age of Complainant, specified |
| 160972513 | Puerto Rican (national origin/ancestry is charged) |
| 160962911 | National Origin |
| 160964059 | Children |
| 160983272 | Paragraph 4, Retaliation |
| 160943441 | National Origin |
| 160963918 | Sex |
| 160973504 | Female |
|  | Age of Complainant, specified |
| 160961887 | Sex discrimination / Sexual Harassment |
| 160972948 | Female |
| 160992483 | Paragraph 4, Retaliation |
|  | Sex |
| 16CA00365 | Female |
| 160A300545 | Sexual orientation/affectional/sexual preference, non-specified |

# EXHIBIT 13

Date: 12-03-05
To: Mayor Michael Sullivan
From: Sergeant Robert Wagner #126
Subject: Motion to Vacate Disciplines

Mayor Sullivan,

Consider this communication my Motion to Vacate the Disciplines issued by Chief Scott, make me whole for lost wages, and allow me to retire in peace. You have the authority *as* Appointing Authority and head of the Police Department by Charter to do so.

You don't need a hearing to make the determination that the disciplines are without just cause, fundamentally improper, blatantly false, and without a basis in fact.

Discipline One-Conduct Unbecoming- Concludes that I used vulgar language in the Credit Union and that I refused to answer questions by Lt. Fournier.
First of all I do not use vulgar language period. I encourage you to question people at the Credit Union who will inform you that no vulgar language was used by either Dennis Egan or myself. The statement by Mr. Ferrier is completely false, and employees of the Credit Union (who will testify in my behalf) will so state. (You might want to look into the history of Mr. Ferrier and the time of his statement for credibility reasons.)
Secondly, the questioning by Lt. Fournier is on tape. He asked three questions, and I answered three questions with my lawyer present. The meeting was concluded as complete.
Finally, the discipline should be vacated as having no basis in fact and most importantly because it was knowingly and maliciously issued well beyond the 50 day limit allowed by contract.

Discipline Two-Obedience to Orders-Makes statements that are completely false and requires adherence to illegal orders.
First of all I never refused to accept any certified letter delivered to my home. That statement is false on its face and can not be proven by Chief Scott. No one was home when the letter was first delivered, and when I did received notice some days later I chased the mail man down and caught him in front of your (Mayor Sullivan's) house on Pheasant Drive. I was informed to pick the letter up at the Post Office which I did.
Second, the order to report to the station, and sign a voluntary statement are both illegal orders. Chief Scott, in a communication dated October 26, 2005, accepted my doctor's note diagnosing me with "stress, and anxiety driven hypertension". I was then, and am now, out sick. I cannot be ordered to work while out sick with a bona fide illness recognized by the Chief.
Further I cannot be ordered to sign a voluntary statement while out sick and which I can rescind at any time. A statement which Chief Scott had already disseminated to Lawyer C. J. Moriarty in violation of HPD rules and the CORI law.
The discipline should be vacated *as* being based on false, unsubstantiated statements, and on the issuance of illegal orders by Chief Scott.

Your immediate attention to this matter is greatly appreciated. Other more involved avenues are being considered right now to rectify this wrong. I trust you can appreciate that adopting this motion to vacate is the quickest, most reasonable, and least troublesome way to end this matter.



Robert Wagner #126

# EXHIBIT 14

# HOLYOKE POLICE DEPARTMENT
## INTEROFFICE CORRESPONDENCE

TO:     SERGEANT ROBERT WAGNER

FROM:   ANTHONY R. SCOTT, CHIEF OF POLICE

SUBJECT: SERGEANT ROBERT WAGNER OFFICIAL NOTICE OF SUSPENSION
        - UNBECOMING CONDUCT, ETC.

DATE:   TUESDAY, AUGUST 19, 2003

IAD #:  03-018

---

Sergeant Robert Wagner, based on the interoffice correspondence (IOC) you sent me on March 31, 2003, in which you allege the following:

1. That Mayor Michael J. Sullivan and State Representative Michael F. Kane wanted Sergeant Michael McCoy to "do something" about the arrest of one James Peetz.,

2. That Captain Alan G. Fletcher order Sergeant Joseph Garcia to change James Peetz's arrest into a non-criminal protective custody., and

3. That Sergeant Joseph Garcia reported to you that James Peetz had been properly arrested and Captain Alan Fletcher ordered him, Sergeant Garcia, to change the arrest to a non-criminal protective custody.

An internal investigation was initiated by the undersigned based upon your official IOC, as these were serious accusations against Mayor Michael J. Sullivan, Representative Michael F. Kane and Captain Alan G. Fletcher. Upon completion of the investigation, I find the following:

As to your allegation that Mayor Sullivan interfered in the processing of the arrest of James Peetz, I find not to be truthful, therefore, based on the findings of my investigation I conclude that the allegation listed herein as #1 is unfounded.

As to your allegation that Representative Kane interfered in the processing of the arrest of James Peetz, I find not to be truthful, therefore, based on the findings of my investigation I conclude that the allegation listed herein, as #1 is unfounded.

As to your allegations that Captain Fletcher ordered
Sergeant Joseph Garcia to change James Peetz' arrest from a
"Disorderly Conduct" to a "Protective Custody" I find not
to be truthful, therefore, based on the findings of my
investigation I conclude that the allegation listed herein,
as #2 is <u>unfounded.</u>

As to your allegations that Sergeant Joseph Garcia reported
to you that Captain Fletcher ordered him to change James
Peetz' arrest from a "Disorderly Conduct" to a "Protective
Custody", I find not to be truthful, therefore, based on
the findings of my investigation I conclude that the
allegation listed herein, as #3 is <u>unfounded.</u>

I further find that your allegation that a "Disorderly
Conduct" arrest involving public intoxication has never
been changed into a "Protective Custody" by members of the
Holyoke Police' Department is not truthful or at the very
least deceitful on your part.

I further find that you knowingly and intentionally have
impaired the efficiency of the Department, of Captain
Fletcher and of Officer Garcia.

I further find that you made untruthful and incomplete
statements in your reports, knowingly and intentionally.

Additionally, in Special Order 03-052, page 1, first and
third paragraphs, you were instructed to respond back to me
via the chain-of-command. You failed to comply with the
written order contained in Special Order 03-052. I find
this <u>sustained.</u>

Based on my investigation into your allegations against
Mayor Sullivan, Representative Kane and Captain Fletcher
and your failure to comply with a written order, I find
that you violated the following departmental rules:

1. **Rule 1, Authority, 1.2 Obedience to Orders,** "Members of the
   Department shall promptly obey any lawful order emanating from any
   superior officer. Should any such order conflict with a previous order
   from any other superior officer, with any General or Special Order, or any
   provision of the Rules, the member to whom such order is given shall
   respectfully call attention to such conflict, his order shall stand and the
   responsibility shall be his, and the person obeying the same shall not be

held in any way responsible for disobedience of any orders theretofore issued. If any unlawful order is given to any member of the department, such member shall promptly report such fact in writing to the Chief of Police."

**2.** **Rule 3, Conduct and Responsibility, 3.2, Conduct Unbecoming,**
"Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorable upon the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer."

3. **Rule 4, Performance of Duty, 4.5, Submission of Reports,** "Officers shall submit all necessary reports on time and in accordance with established departmental procedure. Reports submitted by officers shall be truthful and complete, and bear the signature of the officer submitting the report. No officer shall knowingly enter or cause to be entered any inaccurate, false, or improper information."

**4.** **Rule 4, Performance of Duty, 4.12, Truthfulness In Official Dealings,**
"No member of the Department shall make false official reports, or knowingly enter or cause to be entered in any Department books, or records, any inaccurate, false, or improper entries or registration of police information or matter."

Having served as a former Chief of Police for the City of Holyoke and having been instrumental in formulating the rules and regulations of the department in the Standing Operating Procedure book issued during your administration, you are or should be aware of those rules.

By way of background, a check of the Professional Standards Division's files was conducted and I was provided with the following as to your disciplinary record:

1. In an internal investigation listed that on June 13, 1969 you were issued a written reprimand.

2. In an internal investigation listed that on October 13, 1996 you were issued a written reprimand.

3. In an internal investigation listed that on March 3, 1997 you were issued a
3 day suspension.

4 .    In an internal investigation listed that on March 3, 1997 you were suspended for 5 days.

5 .    In an internal investigation listed that on March 3, 1997 you were issued a written reprimand.

6 .    In an internal investigation listed that on March 3, 1997 you were issued two, eight hour Tours of Punishment.

7 .    In an internal investigation listed that on March 4, 1997 you were suspended for 5 days which was reduced to 3 days suspension.

8 .    In an internal investigation listed that on October 3, 1997 you were suspended for 5 days which was reduced to a 1 day suspension.

9 .    In an internal investigation listed that on September 30, 1997 you were issued a written reprimand.

10 .    In an internal investigation listed that on November 7, 1997 you were issued a written reprimand.

1 1 .    In an internal investigation listed that on November 23, 1997 you were suspended for 1 day.

12 .    In an internal investigation listed that on April 29, 1998 you were issued a written reprimand.

13 .    In an internal investigation listed that on April 30, 1998 you were suspended for 1 day.

14 .    In an internal investigation listed that on May 18, 1998 you were issued a written reprimand.

15 .    In an internal investigation listed that on June 12, 1998 you were suspended for 1 day which was reduced to a written reprimand.

16 .    In an internal investigation listed that on August 14, 1998 you were suspended for 30 days.

17 .    In an internal investigation listed that on September 3, 1998 you were issued a written reprimand.

18 .    In an internal investigation listed that on October 19, 2000 you were suspended for 5 days.

19 . In an internal investigation listed that on August 22, 2000 you were
   suspended for 5 days.

20 . In an internal investigation listed that on August 22, 2000 you were
   suspended for 5 days which was vacated.

21. In an internal investigation listed that on August_22, 2000 you were
   suspended for 5 days.

22 . In an internal investigation listed that in September 2000 you were
   suspended for 5 days.

23 . In an internal investigation listed that on September 13, 2000 you were
   issued a written reprimand.

You are hereby notified that pursuant to the powers
conferred on me by Massachusetts General Laws, Chapter 31,
Sections 41 through 45 (attached hereto), I find that your
actions are in violation of the rules stated herein and I
suspend you without pay for a period of 5 working days.
This suspension shall be on Thursday, August 21, 2003,
Friday, August 22, 2003, Tuesday, September 2, 2003,
Wednesday, September 3, 2003, Thursday, September 4, 2003.

This suspension is based upon the seriousness of your
accusations and the fact that it cannot be substantiated by
any of the parties cited in your IOC of March 31, 2003.

I further recommend to the appointing authority, the
Honorable Michael J. Sullivan, Mayor, that additional
disciplinary action be taken against you as the five
suspension days I have the authority to issue are not
sufficient.

You have a right to appeal this suspension, in writing, to
the Mayor of the City of Holyoke, the Appointing Authority,
within forty-eight (48) hours after you affix your
signature, date and time to this notice acknowledging
receipt, not guilt on the question of whether there was
just cause for the suspension. Should you appeal this
suspension to the Appointing Authority and the suspension
is upheld, you have a right to appeal this suspension to
the Civil Service Commission pursuant to General Laws
Chapter 31, Section 43, a copy of which is attached hereto
for your information, within ten (10) days following the
receipt of written notice from the Appointing Authority.

Calculating time periods such as days for appeals, etc.
referred to herein shall not include Saturdays, Sundays or
Holidays.


ARS/j as


Acknowledged:

Sergeant ert
Wagner

Date: *r ,...,2b- i2* Time: _//K

Witness:


cc: Mayor
    City Solicitor
    Professional Standards Division

EXHIBIT 15

MAYOR MICHAEL J SULLIVAN

CITY OF HOLYOKE

September 12, 2003

Mr. Robert Wagner
7 Cranberry Lane
Holyoke, MA 01040

Re: Disciplinary Suspension

Dear Mr. Wagner

I am adopting the finding and recommendation of City Solicitor
Karen Betournay made pursuant to Massachusetts Kane General Laws,
Chapter 31, §41 after the September 3, 2003 hearing in this
matter.  I am affirming the five (5) day disciplinary
suspension issued to you on August 19, 2003, by Chief Anthony
Scott. The grounds for this suspension are as follows:

    1.   You alleged in a March 31, 2003 report to Chief
       Scott that Sergeant Michael McCoy reported to you
       that "the Mayor and Representative Kane wanted him
       'do something' about the arrest of Mr. Peetz."

       Sergeant McCoy both denies any such conversation
       with the Mayor or any such conversation with you.

    2.   You state in your March 31, 2003 report without
       reference to any source other than yourself "Ser-
       geant Garcia was then summoned into Captain
       Fletcher's office where Captain Fletcher ordered
       Sergeant Garcia to change the arrest into non-crimi-
       nal protective custody."

       The evidence from both Captain Fletcher and
       Sergeant Garcia shows no such order was given and
       that no one told you such an order was given. You
       further admit that the use of the phrase "order"
       was never made by anyone but you.

    3.   Chief Scott gave you a written special order
       ordering you to follow the chain of command for
       reporting matters and directed you to submit a

report on three (3) points by that chain of command.
You submitted a "reply" to the three (3) points and
again failed to use the chain of command the Chief
set forth for you.

Having been instrumental in formulating the rules and
regulations of the department in the Standing Operating Pro-
cedure book issued I am certain that you are or should be aware
of those rules. You violated the following rules:

1. Rule 1, Authority, 1.2 Obedience to Orders,
   "Members of the Department shall promptly obey
   any lawful order emanating from any superior officer.
   Should any such order conflict with a previous order
   from any other superior officer, with any General
   or Special Order, or any provision of the Rules, the
   member to whom such order is given shall respectfully
   call attention to such conflict, his order shall
   stand and the responsibility shall be his, and the
   person obeying the same shall not be held in any way
   responsible for disobedience of any orders theretofore
   issued. If any unlawful order is given to any member
   of the department, such member shall promptly report
   such fact in writing to the Chief of Police."

2. Rule 3, Conduct and Responsibility, 3.2, Conduct
   Unbecoming,"Officers shall conduct themselves at
   all times, both on and off duty, in such a manner
   as to reflect most favorable upon the Department.
   Conduct unbecoming an officer shall include that
   which brings the Department into disrepute or reflects
   discredit upon the officer as a member of the
   Department, or that which impairs the operation or
   efficiency of the Department or officer."

3. **Rule 4, Performance of Duty, 4.5, Submission of
   Reports,** "Officers shall submit all necessary reports
   on time and in accordance with established departmen-
   tal procedure. Reports submitted by officers shall be
   truthful and complete, and bear the signature of the
   officer submitting the report. No officer shall know-
   ingly enter or cause to be entered any inaccurate,
   false or improper information."

4. **Rule 4, Performance of Duty, 4.12, Truthfulness In
   Official Dealings,** "No member of the Department shall
   make false official reports, or knowingly enter or
   cause to be entered in any Department books, or

records, any inaccurate, false, or improper entries or
registration of police information or matter."

By way of background, the following is your disciplinary record:

1.    In an internal investigation listed that on June 13,
      1969 you were issued a written reprimand.

2.    In an internal investigation listed that on October
      13, 1996 you were issued a written reprimand.

3.    In an internal investigation listed that on March 3,
      1997 you were issued a three (3) day suspension.

4.    In an internal investigation listed that on March 3,
      1997 you were suspended for five (5) days.

5.    In an in internal investigation listed that on March
      3, 1997, you were issued a written reprimand.

6.    In an internal investigation listed that on March 3,
      1997 you were issued two (2) eight (8) hour Tours of
      Punishment.

7.    In an internal investigation listed that on March 4,
      1997 you were suspended for five (5) days which was
      reduced to three (3) days suspension.

8.    In an internal investigation listed that on October 3,
      1997 you were suspended for five (5) days which was
      reduced to a one (1) day suspension.

9.    In an internal investigation listed that on September
      30, 1997 you were issued a written reprimand.

10.   In an internal investigation listed that on November
      7, 1997 you issued a written reprimand.

11.   In an internal investigation listed that on November
      23, 1997 you were suspended for one (1) day.

12.   In an internal investigation listed that on April 29,
      1998 you were issued a written reprimand.

13.   In an internal investigation listed that on April 30,
      1998 you were suspended for one (1) day.

14.   In an internal investigation listed that on May 18, 1998 you were issued a written reprimand.

15.   In an internal investigation listed that on June 12, 1998 you were suspended for one (1) day which was reduced to a written reprimand.

16.   In an internal investigation listed that on August 14, 1998 you were suspended for thirty (30) days.

17.   In an internal investigation listed that on September 3, 1998 you were issued a written reprimand.

18.   In an internal investigation listed that on October 19, 2000 you were suspended for five (5) days.

19.   In an internal investigation listed that on August 22, 2000 you were suspended for five (5) days.

20.   In an internal investigation listed that on August 22, 2000 you were suspended for five (5) days which was vacated.

21.   In an internal investigation listed that on August 22, 2000 you were suspended for five (5) days.

22.   In an internal investigation listed that in September 2000 you were suspended for five (5) days.

23.   In an internal investigation listed that on September 13, 2000 you were issued a written reprimand

While you have long service to the Department, the character of that service, evidenced by the extensive disciplinary history, does not indicate that your length of service should serve to mitigate your discipline.

You are hereby notified that pursuant to the powers conferred on me by Massachu⁻setts General Laws, Chapter 31, your actions are in violation of the rules stated herein and I affirm your suspension without pay for a period of five (5) working days. Any of the "inaccurate, improper information" in your reports or your failure to follow orders, standing alone, justifies this five (5) day suspension.

Should you fail to correct your conduct and fully meet the
duties and standards required of you in your job you may subject
yourself to further disciplinary action.

Sincere - s

./6ulliva

e

 President of Local 409 of the I.B.P.O. w/o enclosures
Department Personnel Administration w/o enclosures
Attorney Stewart Graham

# EXHIBIT 16

Case 3:04-cv-30116-MAP   Document 18-10   Filed 09/01/2004   Page 2 of 11

# American Arbitration Association

<u>LABOR</u>   **ARBITRATION TRIBUNAL**

In the Matter of the Arbitration between

IBPO/NAGE

CITYOF HOLYOKE

CASE NUMBER:   11 390 02707 03

## AWARD **OF ARBITRATOR(S)**

I (WE), THE UNDERSIGNED ARBITRATOR(S), having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated                    and having been duly sworn and having duly heard the proofs and allegations of the parties, AWARD as follows:

```
The grievance is not arbitrable.
```

<u>April 9, 2004</u>                                    _____

(Date)                                      (Signaturt. of Arbitrator)
                                         Albert G. Murphy

STATE OF

                                         SS:

COUNTY OF

On this           day of                    , 19        , before me personally came and a p p e a r e d  ,  t o  m e  k n o w n  a n d  known to me to be the individuals) described in and who executed the foregoing instrument, and he acknowledged to me that he executed the same.

AMERICAN ARBITRATON ASSOCIATION
LABOR TIBUNAL

RULING RE: ARBITRABILITY

In the matter of:                                    Case No. 11 390 02707 03

IBPO/NAGE

CITY OF HOLYOKE

ARBITRATOR:                          Albert G. Murphy, Esq.

APPEARANCES: For the Union: Christopher M. Browne, Esq.

For the City:    Michael P. Sheridan, Esq. of
Sheridan and Sheridan

INTRODUCTORY COMMENT: The initial, procedural issues have been submitted on the papers, i.e. various documents considered pertinent by the parties They will be treated as joint exhibits and given such weight *as* appears appropriate..

ISSUES: Three issues have been raised by the Union in its brief:

1) The employer failed to complete its investigation within the fifty (50 days stipulated by the collective bargaining agreement.

2) The City did not notify the grievant of the investigation as required by Section 20.2 and 20.3.

3) The City failed to follow the procedural requirements with regards to internal affairs.

The City's version of the issue states simply that the grievance was not filed within the ten days required under the agreement.

APPLICABLE CONTRACTUAL PROVISIONS:

(Note: The contract submitted expired on December 31, 1999, before the events involved in this case. However, in the absence of indications to the contrary, I will assume that the pertinent provisions are unchanged in the present contract.)

ARTICLE EIGHTEEN
ADJUSTMENT OF GRIEVANCES

Paragraph 18.1 The City, the Union and the employees agree that in the manner and to the extent provided in this Paragraph 18.1, the exclusive method for the adjustment, processing and settlement of a grievance as defined in this paragraph 18.1 is and shall be in accordance with the grievance and arbitration procedure prescribed in this Article. A grievance is defined as a claim or dispute between the City and either an employee of the Union (sic) pertaining to the application of or compliance with the express provisions of this agreement. The City, the Union and the employees agree to observe and follow the procedure prescribed in this Article and subject to the provisions of paragraph 18.4 (F) to be bound by any decision which shall be made in accordance with this procedure.

Paragraph 18.2  The grievance shall be in writing and signed by the aggrieved employee or the Union President on a form furnished by the Department and delivered to the Chief. The written grievance shall state the available facts concerning the alleged dispute, the provisions of this Agreement allegedly violated and the relief desired by the aggrieved employee. A grievance which is not presented to the Chief as provided in this paragraph 18.2 within ten (10) days exclusive of Saturdays, Sundays, and the holidays named in Article Sixteen after the occurrence or the knowledge of the alleged cause of the grievance shall be deemed to have been waived.

Paragraph 18.3 Except as otherwise specifically provided in this Agreement, a grievance as defined in Paragraph 18.1 and otherwise subject to this Agreement shall be processed in accordance with the following grievance procedure:

> Within ten (10) days, exclusive of Saturdays, Sundays and the holidays named in article sixteen after filing of the written, there shall be a discussion of the grievance between the aggrieved employee and the Chief at which, ate the request of the aggrieved employee, one (1) representative of the Union may be present. In the event of the absence or disability of the Chief, the person designated by him shall act in his behalf. Within ten (10) days, exclusive of Saturdays, Sundays and the holidays named in Article Sixteen after the conclusion of the discussion between the Chief and the aggrieved employee, the Chief or his designee, as the case may be, shall advise the aggrieved employee in writing of the decision by the Chief concerning the grievance, bearing in mind that the best interests of the Department and of the public safety must be protected.

Paragraph 18.4 A grievance which is not settled after the completion of the grievance procedure prescribed in paragraph 18.3 may be submitted to arbitration in accordance with the following procedure:

> a. The request for arbitration may be made by the Union or by the Departmentby notification to the other party within ten (10) working days after the date of the final determination under the grievance procedure as provided in paragraph 18.3.

b.  Within ten (10) working days after such notification the party requesting arbitration shall execute and mail a written request to the American Arbitration Association at 133 Federal Street, Boston, Massachusetts, 02110, for the appointment of a panel of arbitrators and a copy of said request shall be simultaneously mailed to the other party unless during the said ten (10) day period, the Department and the Union mutually agree upon an arbitrator.

c.  The request for arbitration shall state the provisions of this Agreement allegedly violated and shall state the remedy or the relief sought by the party requesting arbitration.

d.  Within twelve (12) working days after the mailing by the American Arbitration Association of a panel of suggestive (sic) arbitrators, the representatives of the Department and of the Union shall attempt to jointly agree on an arbitrator. In the event that the parties fail to agree on an arbitrator, the parties shall each alternatively strike one (1) name until one (1) name on the panel remains. The name shall be the name of the arbitrator of Chapter 31, of the General Laws of Massachusetts.

e.  After discussion with the Chief and prior to notification for arbitration, the City and the Union will discuss the matter with the respective attorneys present.

f. The authority of the arbitrator shall be limited to the terms and provisions of this Agreement and to the question or questions which are submitted provided, however, that the arbitrator does not have the authority to establish salaries or wage rates or conditions of employment or to add to, subtract from, modify or otherwise change the terms of this Agreement. The arbitrator shall not be empowered and shall have no jurisdiction to infringe upon or limit the managerial functions, rights and responsibilities of the Chief or of the Mayor or to base his award on any alleged practices or oral understandings, which are not incorporated in writing in this Agreement. The arbitrator may not award back pay or any other form of compensation for any period beginning earlier that ten (10) days prior to the filing of the written grievance as provided in Step 2 in Paragraph 18.3. The arbitrator shall not be empowered and shall have no jurisdiction to substitute his judgment or discretion for the judgment or discretion of the Department or of the Chief in any case where the judgment or discretion is retained byh or given to the City, the Department or the Chief under a provision of law. Subject to the provisions of this Article. The arbitrator shall have the authority to enjoin violations of this Agreement and to award compensatory and other damages.

f. The arbitrator shall mail his written decision simultaneously to the Department and to the Union within fifteen (15) days after the final submission. Subject to the provisions of Paragraph 18.4(e) the decision by the

arbitrator shall be final and conclusively binding on the Department, the Union and the aggrieved employee or employees.

g. The expense of the arbitrator and the expenses directly related to the arbitration hearing shall be shared equally by the City and by the Union.

<u>Paragraph 18.6</u> Except where an extension of time has been sought and obtained in the event of the failure by either the Department, the Union or an aggrieved employee to comply with the time limitations provided by this Article, the grievance shall be deemed to have been withdrawn or affirmatively accepted as the case may be. The Department, the Union and the employees agree not to unreasonably withhold reasonable extension of the time limitations provided in this Article.

ARTICLE NINETEEN
SCOPE OF AGREEMENT

Paragraph 19.8 Except for probationary employees, no employee shall be removed, dismissed, discharged, suspended or disciplined without just cause as provided by law. All Departmental charges against a unit member shall be initiated not later than fifty (50) days from the date of complaint. The City will bear the burden to prove such delay was caused by circumstances beyond the control of the Department, which rendered the initiation of charges impracticable within the time period as specified. All matters relating to disciplinary matters shall be dealt with according to the provisions as presently contained in Chapter 31, Sections 41-46 of the Civil Service Law, and the terms of the Agreement as herein contained.

BACKGROUND OF THE CASE:

This case has to do with a five day suspension imposed on the grievant, a twenty-nine year employee of the Holyoke Police Department with the rank of sergeant. The basis for the suspension was given as violations of Departmental Rules, stated as follows:

!. Rule 1, Authority, 1.2 Obedience to Orders.
2. Rule 3, Conduct and Responsibility, 3.2, Conduct Unbecoming
3. Rule 4, Performance of Duty, 4.5, Submission of Reports
4. Rule 4, Performance of Duty, 4.12, Truthfulness in Official Dealings.

The grievant had been, as stated, an employee of the Department for approximately 29 years. He was promoted to sergeant in 1982 and served as Chief of Police during the period from 1991 to September, 1994 at which time he reverted to the rank of sergeant. During his career, the grievant accumulated 10 letters of reprimand, received 11 suspensions for a total of 64 days without pay and two eight-hour punishment tours.

At "sometime in the calendar year of 2000", according to his affidavit, the grievant filed, "a large civil rights lawsuit" against the City of Holyoke. Named as co-defendants, (according to the grievant's brief) were Locals 388 (patrolmen) and 409 (supervisors) of IBPO, NAGE, and one Captain Fletcher, apparently the Union president. The case went to trial in April, 2003.

Shortly before then, on March 31, 2003, the grievant filed a report with the Chief concerning allegations of alleged abuse of authority by certain public officials, the Mayor, a State Representative and Captain Fletcher. In his report, the grievant alleged that these three had attempted to coerce another sergeant into changing the post St. Patrick's Day drunken disorderly arrest of a citizen (whose mother allegedly dated another public official) to a "protective custody" status.

The Chief responded in a letter the next day, April 1, in which he first complemented the grievant for bringing the matter to his attention but then criticized him for not following Departmental rules in such cases. He then asked the grievant if he wished to prefer formal charges against the people involved .

The grievant responded by letter on April 4, 2003, in which he explained his reasoning in not following normal procedures, ie. because of the people involved.

The Chief then ordered the grievant to appear in his office, extending the right to be accompanied by a representative. On May 23, 2003, the grievant, accompanied by an attorney and an IBPO representative, appeared *as* ordered.

The meeting was short, lasting only a few minutes. At one point the grievant asked the Chief, "I've got a question now. Who's under investigation?" The Chief replied, "Captain Fletcher is under investigation."

The grievant then stated that he had no problem giving a statement but the Chief responded,

> " I'm concerned because I do not want to interfere with the trial that's going on and I'm going to continue this statement until after the trial, first week of June or thereabouts, when this matter is over. I really do not want to interfere with the proceedings that are going on in Federal Court."

The grievant's attorney, Mr. Graham, responded, "We're prepared to go forward but if you want to continue, that's fine."

The next meeting occurred on July 9, 2003. The grievant attended, accompanied by, again, Attorney Graham. A few minutes later, Attorney Christopher Browne, also representing the grievant, appeared.

The Chief interrogated the grievant at some length. The meeting terminated after about a half hour.

On August 19, 2003, the Chief wrote a letter to the grievant which was delivered on August 20, 2003. The letter was captioned, in part, "Official Notice of Suspension."

After certain factual allegations, the letter stated,

On September 10, 2003, a grievance was submitted personally by the grievant.. The Agreement, Section 18.2, provides that grievances not filed within ten (10) days, exclusive of Saturdays, Sundays and certain holidays, after the "occurrence or the knowledge of the alleged cause of the grievance shall be deemed to have been waived"

CITY POSITION:

As stated earlier, the City's position is basically that the Agreement provides for the filing of grievances within ten days of the events complained of, or the knowledge thereof, and that that requirement has not been adhered to. The City then goes on to cite several cases for the proposition that the arbitrator derives his authority from the contract and has no power to "add to, subtract from, or modify in any way," the terms of that agreement.

The City further quotes several authorities to the effect that the parties are entitled to the fruits of their bargain, not to be denied them by the application by the arbitrator of "his own brand of industrial justice".

The City finally makes the point that the arbitrator should not tinker with the notion of "substantial" compliance with the terms of the Agreement, i.e. by concluding that four or five days late is not sufficiently serious to void the grievance.

UNION POSITION:

The Union's main contention, stated on page 5 of its brief is:

> "The time limitations should not begin to run until Sergeant Wager (the grievant) had knowledge that the Chief violated Articles 19.8, 20,.2 and 20.3."

In support of this position, the Union makes several assertions of fact.

> On April 1, 2003, the Chief told the grievant he was not being investigated.

> On May 19, 2003, the Chief led the grievant to believe that he was not the subject of an investigation.

> On July 9, 2003, an interview with the Chief was held, recorded by a court stenographer, during which, "At no time...was Sergeant Wagner informed that he was the subject of the investigation..."

> On September 3, 2003, a Civil Service hearing was held before City Solicitor Bourtenay, at which time the grievant "learned for the first time he had been the subject of the investigation since the beginning of the investigation. At no time was he informed that he was the target of the investigation."

The grievant also argues that the City failed to bring charges within 50 days as provided in Section 19.8 (set forth above). In this connection, it makes the assertion:

> "It should be noted that the City will claim that Captain Fletcher, president of the IBPO Local 409 Union, gave the Chief additional time to investigate. This claim while true, must fail because: 1) Captain Fletcher had Sergeant Wagner removed from the Union back in 2000; 2) Captain Fletcher was a defendant in the Wagner lawsuit and, thus, waived time limits; and 3) there is evidence that Captain Fletcher either directly or indirectly was involved in Sergeant Wagner's discipline."

Essentially, the Union charges the City with having, in its words, "investigated Sergeant Wagner from the beginning of his March 31, 2003 report", (Union brief, p. 5), without having notified him that he was under investigation, in violation of the Agreement.

Also, the Union argues that, *as* a general proposition, arbitrators are inclined to interpret procedural contractual requirements in a way that favors determining the substantive issue presented. The Union implies strongly that I should apply, "the discovery" rule, presumably referring to the concept of interpreting time lines *as* beginning to run when the grievable events are in fact discovered, as opposed to the time of their actual occurrence.

DISCUSSION:

The operative facts, in what amounts to inverse order, are these.

The event which is the subject of the grievance, the suspension meted out to the grievant, took place on August 20, 2003, when the grievant received a letter informing him of that fact.

The grievance was filed when the grievant personally delivered it to the Chief on September 10, 2003, or twenty days after the imposition of the suspension. Because the contract exempts Saturdays, Sundays and certain holidays, (here, Labor Day) five days may be subtracted, leaving a balance of fifteen days, still five days over the contractual limit.

The City argues that I do not have discretion to ignore the ten day limit the parties' negotiated limit of ten days. In contrast, the Union suggests that I invoke what it terms the "discovery" rule, referring in its brief to holdings by various arbitrators wherein precise concepts of time limits were not adhered to.

Here, there is no such elasticity required; the contract already provides for the running of the time periods from the "knowledge" of the event complained of. Since it is apparent that the grievance was not filed within ten days of the imposition of suspension, the remaining question is whether or not the grievant had, or should have had, knowledge of the suspension.

It is equally apparent that the grievant, by receipt of the letter of alsponsion on August 20, 2003, knew of it on that date. At this point in the chain of reasoning, the grievant therefore was obligated to respond in ten days, but did not.

But, the grievant has interposed two matters by way of affirmative defense; the claim that the Chief had 50 days after the receipt of a complaint in which to bring departmental charges, and the further claim that the Chief violated internal affairs rules by not informing him that he was the subject of an investigation.

With respect to the 50 day claim, there are three aspects to consider.

First, there is a real question as so whether Section 19.8 applies to infra-departmental disciplinary matters, referring as it does to "the complaint", implying at least that what is considered is citizen complaints about police conduct.

Second, the Union concedes that an extension was granted by Captain Fletcher. It then proceeds to raise three reasons why Captain Fletcher had an impermissible conflict of interest which would invalidate such an extension.

Third, whether or not any or all of those reasons are effective, however, (which is doubtful at best) it is uncontested that, at the May 23, 2003, meeting, the grievant's attorney, Mr. Graham, in the grievant's presence, consented to a continuance of the inquiry until after his civil rights trial was concluded.

Finally, the grievant cites the Chief's failure to tell him in writing that he was the subject of an investigation as required by Section 20.3. Assuming that this section, in the same sense as Section 19.8, applies to other than intra-departmental disciplinary matters, whatever the Chief's posture towards the grievant was on May 23, 2003, it is obvious that his attitude became one of suspicion as the investigation proceeded.

When that moment occurred is unknown. What is known however, is the fact that, in the Chief's letter of August 19, 2003, notifying him of his suspension, he stated unequivocally, "An internal investigation was initiated by the undersigned based on your official IOC..." That constituted the written notice required under the Agreement and further constituted a grievable event from which grievant had ten days to respond.

SUMMARY:

The grievance was not filed within the ten day period required by the Agreement, which I do not have the power to "add to, subtract from or modify".

With respect to the Union's 50 day claim respecting departmental charges, the grievant consented to a continuance until after his civil rights trial was concluded.

As to the claim of violation of the requirement of written notification of an investigation, such notice was contained in the notice of suspension and was not grieved in time.

AWARD:

      The grievance is not arbitrable.

# EXHIBIT 17

HOLYOKE POLICE DEPARTMENT
INTEROFFICE CORRESPONDENCE

\.1
'u  MA

TO:%,    SERGEANT ROBERT WAGNER

**FROM:**    ANTHONY R. SCOTT, CHIEF OF POLICE

SUBJECT: SERGEANT ROBERT WAGNER OFFICIAL NOTICE OF SUSPENSION
        - CONDUCT UNBECOMING, ETC.

DATE:    TUESDAY, NOVEMBER 8, 2005

**WD** #:    05-019

___

Sergeant Robert Wagner, on Wednesday, August 10, 2005 at approximately 10:45 a.m. Mr. Dennis Egan, a retired Holyoke police officer, drove his private vehicle into the parking lot of the Holyoke Credit Union located at 490 Westfield Road and parked next to a maroon van. Mr. Egan exited his vehicle, walked toward the rear entrance and entered the establishment. As he entered the rear door he met Mr. Jay Wolohan and Mr. Robert Ferrier who were standing in the vestibule between the exterior entrance and the inner entrance to the Credit Union. Upon entering the vestibule Mr. Egan states that he heard someone yelling from the parking lot words to the effect, "Take another look," and "Why don't you take another look." As Mr. Egan stood

        to Mr. Wolohan and Mr. Ferrier you exited your van, crossed the parking lot, and opened the exterior door while yelling, "Take another look." Mr. Egan then opened the inner door to the lobby of the Credit Union, entered and began his transaction. You followed Mr. Egan into the i.,.bby from the vestibule and continued to yell at him (ML. Egan) using vulgar and obscene language at the top of your voice, which was heard by witnesses.

All of your actions inside the Credit Union were captured on videotape. Your yelling and use of vulgar and obscene language with such words as "f-k" caused such a disturbance inside the Credit Union that a member of the staff ran to the basement to notify the president. A supervisory member of the Credit Union made an attempt to calm the situation but you continued to yell and use obscene language.

Thirteen (13) individuals were questioned during this investigation and all reported that you were yelling inside the Credit Union and caused a general disturbance resulting

in them being alarmed and concerned. Subsequently, a taped
statement was taken from you in which you denied using any
vulgar and obscene language. You also stated that Mr. Egan
followed your wife into the Credit Union. Mr. Wolohan and
Mr. Ferrier were standing in the vestibule where Mr. Egan
entered the Credit Union and neither stated that your wife
entered as Mr. Egan entered or entered immediately before
Mr. Egan entered. You then basically refused to provide
answers to the questions asked of you by Lieutenant David
D. Fournier and Sergeant Daniel P. McCavick.

Your actions and conduct brought discredit upon yourself
and this department. As a former chief of police and
supervisor with many years of service you, above all,
should have used better judgment. Therefore, based on the
investigation I find that you violated the following rules
of this department:

1.)   Rule 3 Conduct and Responsibility, paragraph 3.2 Unbecoming Conduct,
      Officers shall conduct themselves at all times, both on and off duty, in such a
      manner as to reflect most favorably upon the Department. Conduct
      unbecoming an officer shall include that which brings the Department into
      disrepute or reflects discredit upon the officer as a member of the
      Department, or that which impairs the operation or efficiency of the
      Department or officer. (old #1.6)

2.)   Rule 3 Conduct and Responsibility, paragraph 3.15 Courtesy Towards
      Public, (a) The use of harsh, course, profane, insolent, indecent, suggestive,
      sarcastic, or insulting language is positively prohibited, and care must be
      taken to meet the public with every decent courtesy and consideration.
      When asked a question, it must be answered with all possible attention and
      courtesy, at the same time avoiding any unnecessary conversation.
      Conversation must be conducted in a dignified and proper manner, avoiding
      the use of slang and factious expression. (old #1.52)

      (b) It shall be the duty of all members of the Department, individually and
      collectively, to cultivate and maintain the good opinion of the law abiding
      public by prompt obedience to all commands, by a steady and impartial line
      of conduct in the discharge of duties, by clean, sober, and orderly habits,
      and by a respectful bearing to all classes. (old #1.56)

(c)   Officers shall be courteous to the public. Officers shall be tactful in the
      performance of their duties, shall control their tempers, and exercise the
      utmost patience and discretion, and shall not engage in argumentative
      discussions even in the face of extreme provocation. In the performance of
      their duties, officers shall not use coarse, violent, profane or insolent
      language or gestures, and shall not express any prejudice concerning race,

religion, politics, national origin, lifestyle or similar personal characteristics. (old #1.19)

. ) Rule 4 Performance of Duty, paragraph 4.12 TRUTHFULNESS IN OFFICIAL DEALINGS, No member of the Department shall make false official reports, or knowingly enter or cause to be entered in any Department books, or records, any inaccurate, false, or improper entries or registration of police information or matter. (old #1.72)

. ) Rule 5 Restricted Activities, paragraph 5.13 Misrepresentation of Facts in Official Capacity, No member of the Department shall, under any circumstances, make any false official statement or intentional misrepresentation of facts. (old #1.71)

```
 of background, a check of the Professional Standards
    files was conducted and I was provided with the
    as to your disciplinary record:
```

.    In an internal investigation listed that on June 13, 1996 you were issued a written reprimand.

.    In an internal investigation listed that on October 13, 1996 you were issued a written reprimand.

.    In an internal investigation listed that on March 3, 1997 you were issued a 3 day suspension.

     In an internal investigation listed that on March        1 ""7        LTC
     suspended for 5 days.

.    In an internal investigation listed that on March 3, 1997 you    were issued a written reprimand.

.    In an internal investigation listed that on March 3, 1997 you    were issued two, eight hour Tours of Punishment.

.    In an internal investigation listed that on March 4, 1997 you were suspended for 5 days which was reduced to 3 days suspension.

.    In an internal investigation listed that on September 30, 1997 you were issued a written reprimand.

     .    In an internal investigation listed that on October 3, 1997 you were suspended for 5 days which was reduced to a 1 day suspension.

1 0 .    In an internal investigation listed that on November 7, 1997 you were issued a written reprimand.

1 1 .    In an internal investigation listed that on November 23, 1997 you were suspended for 1 day.

12 .    In an internal investigation listed that on April 29, 1998 you were issued a written reprimand.

13 .    In an internal investigation listed that on April 30, 1998 you were suspended for 1 day.

14 .    In an internal investigation listed that on May 18, 1998 you were issued a written reprimand.

15 .    In an internal investigation listed that on June 12, 1998 you were suspended for 1 day which was reduced to a written reprimand.

16 .    In an internal investigation listed that on August 14, 1998 you were suspended for 30 days.

17 .    In an internal investigation listed that on September 3, 1998 you were issued a written reprimand.

18 .    In an internal investigation listed that on August 22, 2000 you were suspended for 5 days.

19 .    In an internal investigation listed that on August 22, 2000 you were suspended for 5 days which was vacated.

20    In an internal investigation listed that on August 22, 2000 you were suspended for 5 days.

21 .    In an internal investigation listed that in September of 2000 you were suspended for 5 days.

22 .    In an internal investigation listed that on September 13, 2000 you were issued a written reprimand.

23 .    In an internal investigation listed that on October 19, 2000 you were suspended for 5 days.

24 .    In an internal investigation listed that on August 21, 2003 you were suspended for 5 days.

You are hereby notified that pursuant to the powers conferred on me by Massachusetts General Law, Chapter 31, Sections 41 through 45 (attached hereto), I find that your actions are in violation of the rules stated herein and I suspend you without pay for a period of 5 working days. This suspension shall be on Wednesday, November 9, 2005, Thursday, November 10, 2005, Sunday, November 13, 2005, Monday, November 14, 2003, and Tuesday, November 15, 2005.

You have a right to appeal this suspension, in writing, to the Mayor of the City of Holyoke, the Appointing Authority, within forty-eight (48) hours after you affix your signature, date and time to this notice is acknowledging receipt, not admitting guilt on the question of whether there was just cause for the suspension. Should you appeal this suspension to the Appointing Authority and the suspension is upheld, you have a right to appeal this suspension to the Civil Service Commission pursuant to General Laws Chapter 31, Section 43, a copy of which is attached hereto for your information, within ten (10) days following the receipt of written notice from the Appointing Authority.

Calculating time periods such as days for appeals, etc. referred to herein shall not include Sat-ays, Sundays or Holidays.

hony R. Sco
Chief of Police

Acknowledged:

Sergeant Robed Wagner

Date: _____    Time: _____

Witness: _____

cc: Mayor
    City Solicitor
     Professional Standards Division

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

---

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

---

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 41 Discharge; removal; suspension; transfer; abolition of office; reduction of rank or pay; hearings; review**

 Section 41. Except for just cause and except in accordance with the provisions of this paragraph, a tenured employee shall not be discharged, removed, suspended for a period of more than five days, laid off, transferred from his position without his written consent if he has served as a tenured employee since prior to October fourteen, nineteen hundred and sixty-eight, lowered in rank or compensation without his written consent, nor his position be abolished. Before such action is taken, such employee shall be given a written notice by the appointing authority, which shall include the action contemplated, the specific reason or reasons for such action and a copy of sections forty-one through forty-five, and shall be given a full hearing concerning such reason or reasons before the appointing authority or a hearing officer designated by the appointing authority. The appointing authority shall provide such employee a written notice of the time and place of such hearing at least three days prior to the holding thereof, except that if the action contemplated is the separation of such employee from employment because of lack of work, lack of money, or abolition of position the appointing authority shall provide such employee with such notice at least seven days prior to the holding of the hearing and shall also include with such notice a copy of sections thirty-nine and forty. If such hearing is conducted by a hearing officer, his findings shall be reported forthwith to the appointing authority for action. Within seven days after the filing of the report of the hearing officer, or within two days after the completion of the hearing if the appointing authority presided, the appointing authority shall give to such employee a written notice of his decision, which shall state fully and specifically the reasons therefor. Any employee suspended pursuant to this paragraph shall automatically be reinstated at the end of the first period for which he was suspended. In the case of a second or subsequent suspension of such employee for a period of more than five days, reinstatement shall be subject to the approval of the administrator, and the notice of contemplated action given to such employee shall so state. If such approval is withheld or denied, such employee may appeal to the commission as provided in paragraph (b) of section two.

 A civil service employee may be suspended for just cause for a period of five days or less without a hearing prior to such suspension. Such suspension may be imposed only by the appointing authority or by a subordinate to whom the appointing authority has delegated authority to impose such suspensions, or by a chief of police or officer

performing similar duties regardless of title, or by a subordinate to whom such chief or officer has delegated such authority. Within twenty-four hours after imposing a suspension under this paragraph, the person authorized to impose the suspension shall provide the person suspended with a copy of sections forty-one through forty-five and with a written notice stating the specific reason or reasons for the suspension and informim., him that he may, within forty-eight hours after the receipt of such notice, file a written request for a hearing before the appointing authority on the question of whether there was just cause for the suspension. If such request is filed, he shall be given a hearing before the appointing authority or a hearing officer designated by the appointing authority within five days after receipt by the appointing authority of such request. Whenever such hearing is given, the appointing authority shall give the person suspended a written notice of his decision within seven days after the hearing. A person whose suspension under this paragraph is decided, after hearing, to have been without just cause shall be deemed not to have been suspended, and he shall be entitled to compensation for the period for which he was suspended. A person suspended under this paragraph shall automatically be reinstated at the end of such suspension. An appointing authority shall not be barred from taking action pursuant to the first paragraph of this section for the same specific reason or reasons for which a suspension was made under this paragraph.

If a person employed under a provisional appointment for not less than nine months is discharged as a result of allegations relative to his personal character or work performance and if the reason for such discharge is to become part of his employment record, he shall be entitled, upon his request in writing, to an informal hearing before his appointing authority or a designee thereof within ten days of such request. If the appointing authority, after hearing, finds that the discharge was justified. the discharge shall be affirmed, and the appointing authority may direct that the reasons for such discharge become part of such person's employment record.          ihc ;ippointiiᴛ authority shall reverse such discharge, and the allegations against such person shall be stricken from such record. The decision of the appointing authority shall be final, and notification thereof shall be made in writing to such person and other parties concerned within ten days rollowing such hearing.

Any hearing pursuant to this section shall be public if either party to the hearing files a written request that it be public. The person who requested the hearing shall be allowed to answer, personally or by counsel, any of the charges which have been made against him.

If it is the decision of the appointing authority, after hearing, that there was just cause for an action taken against a person pursuant to the first or second paragraphs of this section, such person may appeal to the commission as provided in section forty-three.

Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section.

Notice of any action taken under this section shall be forwarded forthwith by the appointing authority to the personnel administrator.

# GENERAL LAWS OF MASSACHUSETTS

**PART I.**
**ADMINISTRATION OF THE GOVERNMENT**

---

**TITLE IV.**
**CIVIL SERVICE, RETIREMENTS AND PENSIONS**

---

**CHAPTER** 31. CIVIL SERVICE

**Chapter 31: Section 41A Discharge, removal or suspension; hearing before disinterested hearing** officer; review

 Section 41A. Upon the request of the appointing authority and a tenured employee, who is entitled to a hearing pursuant to the first paragraph of section forty-one, a hearing before a disinterested hearing officer, designated by the chairman of the commission, may be held in lieu of a hearing before the appointing authority. Such hearing officer shall make findings of facts and may make recommendations for decision to the commission. Following the decision of the commission, there shall be no appeal pursuant to the provisions of section forty-three; provided, however, that a petition to review may be filed pursuant to the provisions of section forty-four. All requirements relative to written notice and the holding of hearings pursuant to this section shall be governed by those set forth in section forty-one.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER** 31. CIVIL SERVICE

### Chapter 31: Section 42 Complaints; hearings; jurisdiction; filing of civil action

Section 42. Any person who alleges that an appointing authority has failed to follow the requirements of section forty-one in taking action which has affected his employment or compensation may file a complaint with the commission. Such complaint must be filed within ten days, exclusive of Saturdays, Sundays, and legal holidays, after said action has been taken, or after such person first knew or had reason to know of said action, and shall set forth specifically in what manner the appointing authority has failed to follow such requirements. If the commission finds that the appointing authority has failed to follow said requirements and that the rights of said person have been prejudiced thereby, the commission shall order the appointing authority to restore said person to his employment immediately without loss of compensation or other rights.

A person who files a complaint under this section may at the same time request a hearing as to whether there was just cause for the action of the appointing authority in the same manner as if he were a person aggrieved by a decision of an appointing authority made pursuant to all the requirements of section forty-one. In the event the commission determines that the subject matter of such complaint has been previously resolved or litigated with respect to such employee, in accordance with the provisions of section eight of chapterone hundred and filly E, or is presently being resolved in accordance with said section eight, the commission shall forthwith dismiss such complaint. If said complaint is denied, such hearing shall be conducted and a decision rendered as provided by section forty-three.

The supreme judicial court or the superior court shall have jurisdiction over any civil action for the reinstatement of any person alleged to have been illegally discharged, removed, suspended, laid off, transferred, lowered in rank or compensation, or whose civil service position is alleged to have been illegally abolished. Such civil action shall he filed within six months next following such alleged illegal act, unless the court upon a showing of cause extends such filing time.

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER** 31. CIVIL SERVICE

**Chapter 31: Section 43 Hearings before commission**

 Section 43. If a person aggrieved by a decision of an appointing authority made pursuant to section forty-one shall, within ten days after receiving written notice of such decision, appeal in writing to the commission, he shall be given a hearing before a member of the commission or some disinterested person designated by the chairman of the commission. Said hearing shall be commenced in not less than three nor more than ten days after filing of such appeal and shall be completed within thirty days after such filing unless, in either case, both parties shall otherwise agree in a writing filed with the commission, or unless the member or hearing officer determines, in his discretion, that a continuance is necessary or advisable. If the commission determines that such appeal has been previously resolved or litigated with respect to such person, in accordance with the provisions of section eight of chapter one hundred and fifty E, or is presently being resolved in accordance with such section, the commission shall forthwith dismiss such appeal. If the decision of the appointing authority is based on a performance evaluation conducted in accordance with the provisions of section six A and all rights to appeal such evaluation pursuant to section six C have been exhausted or have expired, the substantive matter involved in the evaluation shall not be open to redetermination by the commission. Upon completion of the hearing, the member or hearing officer shall file forthwith a report of his findings with the commission. Within thirty days after the tiling of such report, the commission shall render a written decision and send notice thereof to all parties concerned.

 If the commission by a preponderance of the evidence determines that there was just cause for an action taken against such person it shall affirm the action of the appointing authority, otherwise it shall reverse such action and the person concerned shall be returned to his position without loss of compensation or other rights; provided, however, if the employee, by a preponderance of evidence, establishes that said action was based upon harmful error in the application of the appointing authority's procedure, an error of law, or upon any factor or conduct on the part of the employee not reasonably related to the fitness of the employee to perform in his position, said action shall not be sustained and the person shall be returned to his position without loss of compensation or other rights. The commission may also modify any penalty imposed by the appointing authority.

# GENERAL LAWS OF MASSACHUSETTS

Any hearing pursuant to this section shall be public if either party so requests in writing. The person who requested the hearing shall be allowed to answer, personally or by counsel, any of the charges which have been made against him.

**PART I**

**ADMINISTRATION OF THE GOVERNMENT**

The decision of the commission made pursuant to this section shall be subject to judicial review as provided in section forty-four.

Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section.

## GENERAL LAWS OF MASSACHUSETTS

**PART I.**
**ADMINISTRATION OF THE GOVERNMENT**

---

**TITLE IV.**
**CIVIL SERVICE, RETIREMENTS AND PENSIONS**

---

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 44 Judicial review**

Section 44. The commission may institute appropriate proceedings in the superior court for enforcement of its final orders or decisions. Any party aggrieved by a final order or decision of the commission following a hearing pursuant to any section of this chapter or chapter thirty-one A may institute proceedings for judicial review in the superior court within thirty days after receipt of such order or decision. Any proceedings in the superior court shall, insofar as applicable, be governed by the provisions of section fourteen of chapter thirty A, and may be instituted in the superior court for the county (a) where the parties or any of them reside or have their principal place of business within the commonwealth, or (b) where the commission has its principal place of business, or (c) of Suffolk. The commencement of such proceedings shall not, unless specifically ordered by the court, operate as a stay of the commission's order or decision.

# GENERAL LAWS OF MASSACHUSETTS

**PART I.**
**ADMINISTRATION OF THE GOVERNMENT**

---

**TITLE IV.**
**CIVIL SERVICE, RETIREMENTS AND PENSIONS**

---

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 45 Reimbursement for defense expenses**

 Section 45. A tenured employee who has incurred expense in defending himself against an unwarranted discharge, removal, suspension, laying off, transfer, lowering in rank or compensation, or abolition of his position and who has engaged an attorney for such defense shall be reimbursed for such expense, but not to exceed two hundred dollars for attorney fees for each of the following: (1) a hearing by the appointing authority; (2) a hearing pursuant to section forty-two or forty-three; (3) a judicial review pursuant to section forty-four; and not to exceed one hundred dollars for each of the following: (1) summons of witnesses; (2) cost of stenographic transcript; (3) any other necessary expense incurred in such defense.


 Any person seeking such reimbursement shall file with his appointing authority a written application therefor within thirty days after final disposition of his case. The appointing authority shall, within thirty days after receipt of such application. pay such reinThursement from the same source as that from which the salary of the person seeking the reimbursement is paid, but only upon receipt of satisfactory proof that such expenses were actually incurred for the purposes set forth in this section.


        s. Stinda.s, and legal holidays shall not be counted in the compuLit ion oi;in:, time period specified in this section.

# EXHIBIT 18

# TOWN OF WEST SPRINGFIELD, MASSACHUSETTS

## OFFICE OF POLICE DEPARTMENT

26 CENTRAL STREET, STE 22
WEST SPRINGHELD, MASSACHUSETTS 01089-2780

Phone: (413) 263-3210                                        Thomas E. Burke
Fax: (413) 731-6798                                             Chief of Police
Voice Mail: (413) 263-3219                                    FBI/NA 132ND


Mayor Michael Sullivan
City of Holyoke
536 Dwight St
Holyoke, Ma 01040

Dear Mayor Sullivan,

In the early part of January 2006, I was instructed by Chief Thomas Burke of the West Springfield Police Department to contact Holyoke City Solicitor Karen Beatourney about an internal investigation he wanted me to conduct for the City of Holyoke. Chief Burke went on to tell me that the complaint I was to investigate was brought by Sgt Robert Wagner against Chief Anthony Scott. Because of the obvious conflict with the complaints brought against Chief Scott, Attorney Betoumay asked that someone from our department conduct the investigation.

I contacted Attorney Beatoumay, and she told me that Sgt Wagner had made three complaints against Chief Scott for some recent disciplinary action Chief Scott bad recently taken against Sgt Wagner. Attorney Betoumay told me that the gist of the complaints were:
1.) That Chief Scott had violated CORI laws.
2.) That Chief Scott had imposed discipline without just cause, and;
3.) That Chief Scott had imposed discipline without just cause, and had given an improper order.
Attorney Betournay told me that I could get the copies of the complaints from Chief Scott, and additional information from the officers of the Professional Standards Bureau.

On January 10, 2006, I went to the Holyoke Police Department to have a pre-arranged meeting with Chief Scott: When I arrived I met with Chief Scott briefly. Chief Scott turned over to me three Holyoke Police Department Citizen/Employee Form. HPD form 6.20.

The first form filled out by Sgt Wagner was dated December 2, 2005 it lists Sgt Wagner's date of birth, and social security number. On the line that says "Personnel Complained About", Sgt Wagner has listed Chief Anthony Scott. The next line is for name, address and phone number of witness, Sgt Wagner has listed Bonnie G. Allen Esq. 1145 Main St, Springfield, 734-0100. On the section dealing with the nature of complaint, Sgt Wagner has listed, "Chief Scott (keeper of the records) released a confidential document to Attorney C.J. Moriarty in violation of HPD rule 6.2. The release of the unauthorized unauthenticated, and unsigned document to Attorney Moriarty is quite possibly a violation of the complainant's CORI. A violation of Mass Gen Law. Attorney Moriarty not being CORI cleared". It is signed by Sgt Wagner and witnessed by a Margaret Wagner. There is also a hand written cc. part under Sgt Wagner's signature with the names Attorney Graham and Mayor Sullivan. It is stamped that it was received in the Chiefs office on December 2, 2005.

The second form filled out by Sgt Wagner is dated December 5, 2005, it lists Sgt Wagner's date of birth and social security number. On the line that says "Personnel Complained About", Sgt Wagner has listed Chief Anthony Scott. The next line is for name address and phone number of witness; Sgt Wagner has listed Anthony Scott and Michael Clancy Esq. IBPO Page Blvd Springfield. On the section dealing with the nature of the complaint, Sgt Wagner has listed, "Chief Scott knowingly and maliciously imposed discipline without just cause or a basis in fact well beyond the 50 day limit allowed by the collective bargaining agreement currently in place". It is signed by Sgt Wagner and witnessed by a Margaret Wagner, and cc to Mayor Sullivan. It is stamped that it was received in the Chiefs office on December 5, 2005.

The third form filled out by Sgt Wagner is dated December 12, 2005; it lists Sgt Wagner's date of birth and social security number. On the line that says "Personnel Complained About", Sgt Wagner has listed Chief Anthony Scott. The next line is for name, address, and phone number of witness; Sgt Wagner has listed Chief Anthony Scott and Attorney Michael Clancy Esq., IBPO Page Blvd Springfield. On the section dealing with the nature of the complaint, Sgt Wagner has listed "Chief Scott ordered the complainant to comply with illegal orders. Chief Scott then knowingly and maliciously imposed discipline without just cause while aware that the orders were improper and could not be complied with (IAD 027)". It is signed by Sgt Wagner and witnessed by a Margaret Wagner, and a cc to Mayor Sullivan. It is stamped that it was received in the Chiefs office on December 12, 2005.

After I left Chief Scott, I went and met with Lt. Fournier and Sgt McCavick of the Holyoke Police Department's Professional Standards Bureau. These officers told me that Sgt Wagner's complaint stems from discipline from a complaint that these officers had received from former Holyoke Police Officer Dennis Egan. In this complaint, which took place at the Holyoke Credit Union, Mr. Egan alleges that he was both verbally and physically assaulted by Sgt Wagner while the two were inside the Holyoke Credit Union. The Holyoke Police Department's Professional Standards Bureau conducted a complete and thorough investigation into this incident. Lt. Fournier and Sgt McCavick interviewed

and recorded numerous conversations with witnesses from the credit union along with
Mr. Egan and Sgt Wagner. After conducting their investigation, these officers turned
their findings over to Chief Scott, who found Sgt Wagner guilty of HPD
    1.)  Rule 1 Authority, paragraph 1.2 OBEDIENCE TO ORDERS
    2.)  Rule 1 Authority, paragraph 1.3 OBEDIENCE TO ORDERS
    3.)  Rule 1 Authority, paragraph 1.4 COMPLIANCE TO ORDERS
Chief Scott imposed the maximum five-day suspension as allowed by Massachusetts
General Laws Chapter 31 Sections 41 through 45. Chief Scott also asked Mayor Sullivan
to impose additional disciplinary action against Sgt Wagner.

      Although he could have chosen to do so, Sgt Wagner has never complained about
the integrity of the investigation conducted by the officers of the Professional Standards
Bureau, either in writing or in subsequent conversations with this officer. Therefore for
purposes of this investigation, it is not my intention to reinvestigate what happened at the
Holyoke Credit Union. I will be dealing with the three complaints I have been given and
only those three complaints.

      Sgt Wagner's first complaint deals with allegations that Chief Scott violated the
CORI laws of Massachusetts. During my interview with Sgt Wagner I wanted to know
why he believed that Chief Scott had violated his CORI rights, I told Sgt Wagner that his
reasoning was not clear in his complaint. Sgt Wagner has three theories on why he felt
his CORI rights were violated. First he stated that he never signed his statement, and
therefore it is not part of the investigation. Sgt Wagner claims that if he never signed the
statement, then it is not an authorized statement. Sgt Wagner's second theory is that Chief
Scott in violation of CORI laws released the investigative report to Attorney C.J.
Moriarty. Sgt Wagner's third theory is that Attorney Moriarty faxed the investigation
over to his (Sgt Wagner's) attorney, Bonnie Allen without his consent. Sgt Wagner is
wrong on all theories, but we will take them one at a time.

      After the altercation that happened at the Holyoke Credit Union, Sgt Wagner's wife
Margaret went to Holyoke District Court to take out a complaint against Dennis Egan
for threats and harassment of her, which she alleges also took place at the Holyoke Credit
Union at the same time. As a result of this a show cause hearing was scheduled. Mr.
Egan retained Attorney C.J. Moriarty to represent him on this matter. As a result, Attorney
C.J. Moriarty filed a Subpoena (DUCES TECUM) to Chief Anthony Scott on September
27, 2005. Chief Scott was required to bring with him to the show cause scheduled on
September 29, 2005 "All video tapes, files, investigative reports, photos, and witness
statements that you have in your possession involving an incident at the Holyoke Credit
Union between Robert Wagner, Margaret Wagner, and Dennis Egan". Chief Scott released
the investigation report pursuant to this subpoena. Therefore he has not violated the CORI
laws of Massachusetts.

      Even if we assume for a minute that Chief Scott turned over the report from the
Professional Standards Bureau without a subpoena to Attorney Moriarty, Chief Scott still
would not have violated the CORI laws, based upon the case of ***The Worcester Gazette v.
Police Chief of Worcester.*** In this case the court ruled that internal affairs files are public

record for purposes of dissemination. As far *as* the violation of CORI laws based upon the fax sent to Attorney Allen by Attorney Moriarty, this has nothing to do with Chief Scott. If there were a violation here (and I don't believe that there is) it would be against Attorney Moriarty. Whether it is or is not is beyond the scope of this investigation.

Sgt Wagner's argument that his statement was unsigned is also unimpressive. Once Sgt Wagner spoke to the investigators, whatever he told them was going to be memorialized in their report, whether he put it in writing or not. Whether or not he signed his statement has no bearing on the CORI laws.

Therefore, based upon the aforementioned reasons the complaint of Sgt Robert Wagner against Chief Anthony Scott for violations of CORI laws dated December 2, 2000, Chief Anthony Scott has been **EXONERATED.**

In his second complaint Sgt Wagner alleges that Chief Scott imposed discipline outside of the 50-day limit allowed by the contract. When I interviewed Sgt Wagner regarding this he focused on two documents, paragraph 19.8 of the collective bargaining contract and Holyoke Police Department's General Order 95. In speaking with Attorney Michael Clancy of the IBPO that represents Sgt Wagner and Chief Scott, both sides use different starting dates as to when the clock starts to tick. In either case it is clear that discipline was given to Sgt Wagner beyond the 50-day limit. That part is clear. The question then becomes has Sgt Wagner's rights then been violated? If as Sgt Wagner first told me that 19.8 and General Order 95 were the rules that govern discipline then Sgt Wagner would have to prevail on this complaint, but they are not.

When I interviewed Chief Scott he told me that the first thing he learned when he became the police chief was that when disciplining officers of the department, rule 95 is his guide. When disciplining superior officers then rule 128 applies. Chief Scott told me he was made aware of this on his first day by Officer Arthur Therrien, the president of the patrolman's union. Rule 128 has a clause that allows for 90 days to impose discipline.

I spoke with Captain Alan Fletcher, President of the Holyoke Superior Officers Union. Captain Fletcher told me that the police department has always used rule 128 when disciplining superior officers, it is and always has been Captain Fletchers understanding that rule 128 applies to supervisors and rule 95 applies to patrolmen.

I went back and interviewed Sgt Wagner a second time. I asked him why he did not tell me about general order 128 and what his understanding of it was. Sgt Wagner never answered my first question, but admitted to me that general order 128 is used to discipline superior officers, but it is his authority to usurp general order 128 not the chiefs. After I read general order 128, I do not fmd that to be the case at all. Sgt Wagner in the two interviews I had with him wanted me to know, and told me on several oacilsions that he was the Chief of Police in Holyoke for three years. I fmd it hard to believe that he would simply forget to mention rule 128 to me when discussing this complaint. I fmd his omission to be more telling than anything.

I believe that there is a past practice in the Holyoke Police Department on relying of rule 128 to discipline superior officers. Even though past practices apply to the unions and not the city, even the presidents of the supervisors and patrolman's unions subscribe to that theory. I believe that Sgt Wagner knows this also. Telling me that it is his authority to give up is simply, for lack of a better term, not persuasive. I believe that Chief Scott acted in good faith when he disciplined Sgt Wagner on this issue, and used the collective wisdom of both the city solicitor and input from both police unions when reaching his decision.

Therefore on the second complaint of Sgt Robert Wagner against Chief Anthony Scott for imposing discipline past 50 days dated December 5, 2005, Chief Scott has been **EXONERATED.**

In his third complaint Sgt Wagner alleges that Chief Scott ordered him to comply with an illegal order, and that the orders were improper and could not be complied with. The crux of Sgt Wagner's argument here is that he ordered him (Sgt Wagner) to sign his statement that was a voluntary statement, and that he (Chief Scott) ordered him (Sgt Wagner) to sign the statement while out on sick leave.

In answering this complaint I will address the second issue first, namely that Sgt Wagner was ordered to sign his statement while on sick leave. In speaking with Captain Fletcher, I asked him what was the unions' position on this issue. Captain Fletcher told me that officers have been routinely ordered in to sign statements when they are out sick or out with an injury. Captain Fletcher told me that has been the case ever since he has been on the job. Chief Scott told me he has ordered in officers before who have been out sick to sign statements. I think it is clear in this case that again this is something that is routinely done in the Holyoke Police Department. Sgt Wagner cannot prevail on this argument.

The other issue that Sgt Wagner raises is that fact that the statement he gave was voluntary, and because it is he (Sgt Wagner) does not have to sign it. It is clear through interviews with both Attorney Clancy, and Lt. Fournier that the written statement Sgt Wagner gave to members of the Professional Standards Bureau was voluntary. In a letter sent to Sgt Wagner by Chief Scott dated October 21, 2005, Chief Scott admits that he was in error when he told Lt. Fournier that the his (Sgt Wagner's) statement was voluntary, and Chief Scott orders Sgt Wagner to sign his (Sgt Wagner) statement. Even looking at this is the light most favorable to Sgt Wagner, when he was asked to come in and give a voluntary statement, Sgt Wagner could have refused to do so. He did not. Sgt Wagner does not get to have it both ways. Once he came in and gave a statement, voluntary or not, it is well within Chief Scott's managerial rights to order Sgt Wagner to sign it.

Therefore on the third complaint of Sgt Robert Wagner against Chief Anthony Scott for maliciously imposing discipline without just cause, and issuing an improper order, Chief Scott has been **EXONERATED.**

The aforementioned findings were a result of many interviews, and review of investigative reports, collective bargaining agreements, and general orders of the Holyoke Police Department. This investigation is now closed. If you have any questions I can be reached at 263-3210 x250.

Internal Affairs Unit

West Springfield Police Department

# EXHIBIT 19

MAYOR MICHAEL J. SULLIVAN

CITY OF HOLYOKE

March 31, 2006

Michael P. Clancy, Esquire
International Brotherhood of
Police Officers
1299 Page Boulevard
Springfield MA 01104

Re:    Decision on Appeal of Suspensions 05-019 and 05-027
       Robert Wagner

Dear Attorney Clancy:

On November S, 2005, Holyoke Police Chief Anthony R. Scott issued two (2) disciplinary suspensions to Mr. Robert Wagner. Each suspension was for a period of five (5) days. The suspension (#05-019) arose out of an August 10, 2005 incident at the Holyoke Credit Union (Hai) between Mr. Wagner and Dennis Egan, a retired Holyoke Police Department (HPD) detective. The second suspension (˙05-027) was issued after Mr. Wagner failed to comply with a direct order from the Chief of Police. The Chief had issued a written order for Mr. Wagner to sign the transcript of the statement he (Wagner) provided during the investigation of the Holyoke Credit Union incident.

The notices of suspension were issued to Mr. Wagner on November 8, 2005. Mr. Wagner appealed both suspensions and requested a public hearing before the Appointing Audio˙ Hearings on the appeals were scheduled for Monday, November 14, 2005. Mr. Wagner was a member of the superior officers' bargaining unit, IBPO Local 409. IBPO Local 409 Attorney Michael Clancy requested a postponement of the hearing date and waived any claim regarding the timeliness of the hearings within the five (5) day limit. The hearings were rescheduled tor November 21, 2005 and Attorney Clancy again requested a postponement. At that point, Mr. Wagner was out of work and scheduled to retire on March 7, 2006. The City sent Attorney Clancy a Memorandum of Agreement to execute concerning holding the hearings in abeyance. Neither Attorney Clancy nor Mr. Wagner signed the agreement.

Shortly after Mr. Wagner voluntarily retired on March 7, 2006, Attorney Clancy sought to move forward with the hearings. The City scheduled the hearings for March 16, 2006 only to have another request by Attorney Clancy for a postponement. The hearings were rescheduled and finally held on N larch 29,2006 before the undersigned Michael Sullivan, Mayor of the City of 1-lolvoke. By aueement of the parties, the suspension appeals (#05-019 and -#)5-027) were consolidated for hearing. At Mr. Wagner's request, the hearing was open to the public.

Michael P. Clancy, Esquire
March 31, 2006
Page 3


At the outset of the hearing, Mr. Wagner's counsel requested that I recuse myself as the hearing officer in light of a letter from the City's attorney concerning the conduct of Mr. Wagner and his family occurring after the suspensions in question and wholly unrelated to the suspensions. I declined to recuse myself and indicated that I would decide the appeals on the basis of the evidence presented during the hearing.

 Mr. Wagner's counsel then sought immediate dismissal of the first suspension (#05-019) based on an assertion that the disciplinary action exceeded the fifty (50) day period referred to in the collective bargaining agreement between IBPO Local 409 and the City. No evidence was presented on Mr. Wagner's behalf in this regard. The union contract was not offered nor entered into evidence. The Chief testified, without contradiction, that Rule 128 governed such investigations and that he complied with the dictates of Rule 128. The Chief also credibly testified that the practice under the so-called fifty (50) day rule excluded weekends and holidays and that even under the fifty (50) day rule, as so computed, the discipline was timely. It should also be noted that Mr. Wagner himself sought to delay the investigation and did not object when informed that the Chief had granted an extension of time to complete the investigation.

Mr. Wagner's counsel also contended that the second suspension (#05-027) should be dismissed at the outset of the hearing, as Mr. Wagner was on approved sick leave at the time and, therefore, according to Nlr. Wagner's contention he could not comply with the Chief's order. Again, no testimony or other evidence was presented to support Mr. Wagner's motion to dismiss. Accordingly, that motion was also denied.


The Cit$^y$ called three (3) witnesses [Police Chief Scott, Dennis Egan and Martin LaFrennie (a customer who was in the HCU at the time of the August 1U, 20U5 incident)] and presented documentary evidence along with a videotape from the HCU surveillance cameras. Mr. Wagner called no witnesses and presented no affirmative evidence. At the close of the evidence, Mr. Wagner's counsel moved for a "directed verdict" on both suspensions. That motion was taken under advisement and both parties presented closing arguments. The motion for a "directed verdict" is hereby denied.


During the closing argument of the City's counsel, Mr. Wagner repeatedly interrupted. After being given at least four (4) separate warnings to allow the City's counsel to finish his closing argument without further interruption, and after fair warning that he would be removed if his outbursts continued, and after being instructed to allow his attorney to make any necessary objections, I had to order Mr. Wagner to be removed from the room so the City's counsel could

Michael P. Clancy, Esquire
            March 31, 2006
    Page 4

conclude his closing remarks.' It should be noted that two (2) other members of Mr. Wagner's family had to be ordered to leave the hearing room for disrupting the proceedings (e.g. calling the witnesses liars and saying "grow some balls"). Despite this display of undignified antics at the hearing, the behavior of these individuals and Mr. Wagner himself has not been considered in reaching a conclusion as to whether there was just cause for the suspension.

The evidence established that on the morning of August 10, 2005, HPD Retired Detective Dennis Egan went to the Holyoke Credit Union (HCU) to cash his check. Mr. Wagner's van was parked in the HCU parking lot and his wife went inside the credit union.

Mr. Egan credibly testified that as he exited his vehicle and walked toward the rear of the credit union he heard someone yell, "take another look," "take a picture." Mr. Egan entered the outer door at the rear of the HCU building and encountered Robert Ferrier and HCU Vice President Jay Wolohan. Even though, Mr. Ferrier and Mr. Wolohan were inside the bank building, their statements (Ex. 1) confirm that they heard Mr. Wagner yelling in the parking lot and saw him follow Mr. Egan into the credit union. Mr. Ferrier indicated that Mr. Wagner was yelling and swearing, repeatedly using the "F" word.

Mr. Egan entered the lobby of the credit union and proceeded to a counter where banking slips are filled out. While Mr. Egan was at the counter, Mr. Wagner pursued Mr. Egan into the credit union and over to the counter and continued to yell at him. While within approximately three (3) feet of Mr. Egan, Mr. Wagner continued to yell at Mr. Egan and pointed his finger towards Mr. Egan's face. Mr. Wagner accused Mr. Egan of making death threats against him and his family both by mail and by telephone.

An employee witnessing the incident ran downstairs to summon the manager. The manager proceeded to come upstairs to try to quell the situation. A female HCU employee also tried to calm Mr. Wagner down. Mr. Wagner went and stood by the rear door and continued to yell at Mr. Egan stating words to the effect that this has to end and he would be waiting for Mr. Egan in the parking lot.

Another witness, Robert LaFrennie, who was attempting to conduct banking business inside the HCU at the time, credibly testified that he stopped what he was doing and his attention was diverted to the incident as Mr. Wagner was yelling at Mr. Egan and saying he (Wagner) would be waiting outside for Mr. Egan.

_____

 Mr. Wkmer's outbursts were aimed at the City's reference to his September 14, 2005 statement to 1-11'1) investigators. Mat statement was recorded and transcribed and Mr. Wagner and his counsel were given the opportunit⁵, well before the hearing, to review the tape to insure the transcript was accurate. Mr. Wagner claimed the statement w:is not "authenticated" because he did not sign it. The document which Mr. Wagner was claiming was not authenticated was already admitted into evidence without objection and the evidentiary portion of the hearing had concluded.

Michael P. Clancy, Esquire
            March 31, 2006
  Page 5


Mr. Egan completed his paperwork at the counter, waited in line and conducted his banking business. He remained in the HCU building until an HCU employee indicated that the Wagners had left the parking lot.

That same morning, Mr. Egan went to the police department and promptly reported the incident to Captain Alan Fletcher. Captain Fletcher subsequently reported the incident to the Chief. A citizen complaint form was mailed to Mr. Egan, who completed, signed and returned the complaint form to the HPD. The complaint form was marked as received on August 29, 2005 by the HPD. On August 30, the HPD notified Mr. Wagner that an investigation of the incident was underway due to a citizen complaint by Mr. Egan.

On September 8, 2005, Mr. Wagner wrote to Chief Scott requesting that the investigation be held in abeyance due to legal proceedings being instituted against Mr. Egan as a result of the incident.-

An internal investigation was conducted by the Professional Standards Division of the HPD. The surveillance tapes were secured from the HCU. (Ex. 2) Recorded statements were obtained from all thirteen (13) individuals in the HCU at the time of the incident (both employees and customers). The recorded statements were then transcribed. Each of these witnesses signed the transcription of his/her statement.

On September 14, 2005, Mr. Wagner provided a tape recorded statement to HPD investigators. His attorney was present when he made the statement. The recorded statement was subsequently transcribed.

On September *21,* 2005, the Professional Standards Unit requested additional time to complete their investigation as Mr. Wagner had not yet reviewed the transcribed statement and signed it and because Mr. Wagner was on vacation. On October 3, 2005, Mr. Wagner was notified by the HPD that Chief Scott had granted the Professional Standards Unit additional time to complete their investigation. Neither Mr. Wagner nor his attorney voiced any objection.

On October 3, 2005, Mr. Wagner was notified that his statement was ready for signing and that he could review the statement and the tape with counsel before signing on Friday, October 7, 2005. Mr. Wagner was subsequently informed that he was not being ordered to sign the statement, that it was voluntary.

On October 13, 2005, the Commander's Complaint Review Board reviewed the complaint aoainst Mr. Wagner and unanimously voted to classify the complaint as sustained.

___  _____

['he case against NIL Egan was subsequently dismissed by the Court.

Michael P. Clancy, Esquire
March 31, 2006
Page 6

Chief Scott wrote to Mr. Wagner's Union Attorney on October 20, 2005 stating, among other things, that Mr. Wagner was told that signing the statement was voluntary and that was in error. The Chief further wrote:

> "...I am directing Sergeant Wagner to report to the Professional Standards Division's office and review and sign his statement prior to the close of business on Wednesday, October 26, 2005." (underscoring in original)

Mr. Wagner's Union Attorney replied that he did not represent Mr. Wagner for purposes of communicating the order and the Chief should follow the usual chain of command. Chief Scott then wrote to Mr. Wagner and repeated his direct order (this time bolded and underscored) to sign his statement by October 27, 2005.

The order was sent by certified mail on October 21, 2005. Mr. Wagner declined to sign for the letter until October 31, 2005.

Given Mr. Wagner's failure to timely retrieve the certified letter, on October 28, 2005, Chief Scott issued yet another written, direct order for Mr. Wagner to report and sign his statement by October 31, 2005. This letter was hand delivered to Mr. Wagner on the morning of October 28, 2005. N1r. Wagner did not comply with the order. He did not contact the Chief to indicate he ■A. as unable to report and sign the statement. He did not request that the Chief mail him the statement so he could sign it. Mr. Wagner simply refused to comply with the Chief's direct order.

With regard to suspension #05-019, I find that there was just cause to suspend Mr. Wagner for five (5) days without pay. In addition, I find that there was just cause to discharge Mr. Wagner for this incident. Inasmuch as Mr. Wagner voluntarily retired on March 7, 2006, discharge will not be imposed. However, but for his voluntary retirement, discharge would be imposed.

Mr. Wagner's conduct, while off duty, was still subject to scrutiny by the Department. Rule 3 requires officers to conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably upon the Department. Rule 3 further states that conduct unbecoming an officer shall include that which brings the Department into disrepute or that which reflects discredit upon the officer as a member of the Department. The rules also require that members of the public be treated with courtesy and respect and in a dignified manner. Mr. Wagner's conduct in following NIL Egan into the bank and screaming at him, disrupting the operations of the credit union, and publicly accusing Mr. Egan of crimes was completely inappropriate and unjustifiable, If Mr. Wagner believed that Mr. Egan had acted unlawfully in any way, he had appropriate, lawful avenues of recourse available to him. I do not credit Mr. Wagner's unsigned statement indicating that Mr. Egan threatened to harm Mr. Wagner's wife as she walked into the credit union. Mr. Egan was a highly decorated officer with an exemplary record. lie took the stand and testified credibly. I do not believe that Mr. Egan would threaten to follow Mrs. Wagner into a credit union where surveillance cameras are obviously in operation and attack her in the

Michael P. Clancy, Esquire
March 31, 2006
Page 7

presence of an audience. Mr. Egan's conduct as evidenced by his testimony and that of witness Mr. LaFrennie, as well as the HCU videotape, confirm that Mr. Egan made no movements towards Mrs. Wagner in the bank. He simply went about his business despite extreme provocation by Mr. Wagner. Mr. Wagner was the aggressor. He was shouting in the parking lot. He pursued Mr. Egan into the bank. He followed Mr. Egan to the table and pointed towards his face while hollering at him and accusing Mr. Egan of crimes. He then challenged

Mr. Egan to go into the parking lot where Mr. Wagner would be waiting for him. For a professional police officer who is given arrest powers and carries a weapon, such conduct is utterly intolerable. A police officer is expected to maintain his composure even in the face of provocation as Mr. Egan so admirably exemplified. It is evident that at least some of the individuals who witnessed the incident, recognized Mr. Wagner as a Sergeant for the HPD. (Ex. 1)

Mr. Wagner compounded his very serious misconduct by giving a false account of the incident to HPD investigators. While Mr. Wagner apparently believed he could escape the consequences of his false statement by refusing to sign it, he is bound by his statement which was admitted into evidence without objection. Police officers are called to testify in court regularly about their conduct in the line of duty. They are often falsely accused of misconduct by those they arrest. Often the only defense is the officer's credibility compared to that of the person making the accusation. An officer who lies to his own Department cannot be entrusted to continue to serve as a police officer. Mr. Wagner destroyed his own credibility.

The seriousness of Mr. Wagner's misconduct in the HCU altercation and in lying to HPD investigators is also compounded by his unenviable and extensive history of discipline. Mr. Wagner has amassed twenty-three (23) prior disciplinary actions on his record including twelve (12) prior suspensions (one [1] for thirty [30] days). It is not insignificant that the discipline spans the tenure of three (3) separate Chiefs of Police.

I also find that there was just cause to suspend Mr. Wagner for five (5) days without pay as a disciplinary action in case # 05-027. I further conclude that there was just cause to discharge Mr. Wagner for his refusal of the Chiefs direct, written order. Inasmuch as Mr. Wagner voluntarily retired on March 7, 2006, discharge will not be imposed. However, but for his voluntary retirement, discharge would be imposed.

At the hearing on March 29, 2006, Mr. Wagner's counsel maintained that Mr. Wagner was on approved sick leave at the time of the order and therefore did not need to report or sign the statement as ordered by the Chief. However, a medical note indicating that an employee cannot perform the rigorous duties of a police officer does not constitute evidence that an employee is unable to sign a statement. If Mr. Wagner felt he was physically unable to comply with the Chief's direct order for health reasons, he was at least compelled to promptly communicate that fact to the Chief The Chief credibly testified that the Department has called officers in or had them report to court even when they are unable to perform their normal police duties due to medical reasons. No countervailing evidence was offered.

Michael P. Clancy, Esquire
March 31, 2006
Page 8


 In a paramilitary organization such as a police department, following the lawful orders of a superior is a basic commandment. If an officer believes an order to be inappropriate, he can comply with the order and then file a grievance (Obey now and grieve later). The officer cannot simply refuse to comply with the order without offering any explanation whatsoever. This is especially true for a ranking officer such as Mr. Wagner. Ranking officers are expected to act as role models for subordinate officers. Mr. Wagner, who himself served as Chief of the Department at one time, should well know how critical it was to follow the Chief's direct order. His refusal to do so and his refusal to even contact the Chief to offer an explanation for his failure to comply is completely inexcusable.

Sincer4

/7/


//
/'0i(ael      ullivan
Mayor, City of Holyoke