UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

TAMMY WALKER,                    )
            Plaintiff           )
                                 )
            v.                   )  CIVIL ACTION NO. 05-30074-MAP
                                 )
CITY OF HOLYOKE,                 )
            Defendant            )

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 45)

November 30, 2007

PONSOR, D.J.

I. INTRODUCTION

This case involves a number of discrimination, hostile work environment, and retaliation claims brought by Plaintiff Tammy Walker, a black, lesbian former sergeant in the Holyoke Police Department ("HPD"). Based on a series of incidents involving co-workers and some of her superiors in the police department over a span of several years, Walker charges Defendant City of Holyoke ("Holyoke") with gender, race, and sexual orientation discrimination under Mass. Gen. Laws ch. 151B (Counts I, III, and V), gender and race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Counts II and IV), race-, gender-, and sexual orientation-based harassment creating a hostile work environment under Mass. Gen. Laws ch. 151B (Counts VI, VIII, and X), race- and gender-based harassment

creating a hostile work environment under Title VII (Counts VII and IX), retaliation under Title VII and Mass. Gen. Laws ch. 151B (Counts XI and XII), retaliation in violation of the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185 (Count XIII), racial discrimination in violation of 42 U.S.C. § 1981 (Count XIV), and retaliation for her exercise of First Amendment rights in violation of 42 U.S.C. § 1983 (Count XV).

Defendant now moves for summary judgment on all claims. For the reasons stated below, this motion will be allowed as to all counts except one, the state law claim under the Whistleblower Statute (Count XIII). This claim will be dismissed without prejudice to its re-fling in state court.

## II. <u>FACTS</u>

The facts are set out below in the light most favorable to Plaintiff, noting any material disputes along the way.[1] <u>Ramirez-Carlo v. United States</u>, 496 F.3d 41, 50 (1st Cir. 2007). As the factual record in this case is extensive,

---

[1] Except where otherwise noted, the facts are taken from the following two filings: Dkt. No. 46, Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Concise Statement of Undisputed Material Facts, and Dkt. No. 56, Pl. Tammy Walker's Resps. to Def. City of Holyoke's Mot. for Summ. J. and Concise Statement of Undisputed Material Facts and Pl.'s Rule 56.1 Concise Statement of Additional Material Facts.

this summary will focus only on details material to the court's ruling.

A. <u>Comparison with Sergeant Wagner</u>

As will be discussed further below, the argument pressed most strongly by Plaintiff is that Holyoke's discriminatory treatment was exhibited by the more favorable treatment afforded Sergeant Robert Wagner, a Caucasian, heterosexual male who worked the same shift as Plaintiff.

Wagner began employment at the Holyoke Police Department in 1975.  He was promoted to sergeant in 1982 and served as Chief of Police between 1991 and 1994.  In 1994 he resigned as Chief and returned to the rank of sergeant.

In the late 1990s, Wagner was involved in an investigation of the Holyoke Police Department by the Massachusetts Attorney General's office.  He cooperated with the investigation and in 1997 went to a local newspaper with information regarding possible criminal corruption in the department.  Wagner was thereafter suspended for releasing confidential information to the newspaper.  He ultimately received several more suspensions and reprimands between 1997 and 2000, some in connection with that behavior and

3

some in response to other alleged violations of departmental regulations.[2]

In March 2003, Wagner sent an interoffice communication ("IOC") to the Chief of Police, Anthony Scott, in which he charged the mayor of Holyoke, Michael Sullivan, and the captain of his shift, Alan Fletcher, with pressuring an officer into changing someone's arrest for public intoxication into protective custody based on that person's connection to a public official. That claim was dismissed as unfounded, and Wagner was suspended for five days for failing to comply with an order to respond to Chief Scott via the chain of command, presenting inaccurate information in his IOC, and making serious accusations that could not be substantiated. Mayor Sullivan affirmed the suspension, taking into account Wagner's history of eleven previous suspensions and ten letters of reprimand. He did not grant a request by Chief Scott that Wagner be subjected to further

_____

[2] This court eventually presided over a trial related to that chain of events, in which Wagner alleged retaliation by the City of Holyoke. See Wagner v. City of Holyoke, 241 F. Supp. 2d 78 (D. Mass. 2003), aff'd, 404 F.3d 504 (1st Cir. 2005); Wagner v. City of Holyoke, 183 F. Supp. 2d 289 (D. Mass. 2001).

4

discipline beyond the five-day suspension.

In August 2005, Wagner was involved in a confrontation with Dennis Egan, a retired Holyoke police officer, at a local bank.  Chief Scott ordered an investigation and found that Wagner had followed Egan into the bank and yelled at him using obscene language.  Scott issued Wagner two suspensions of five days each for unbecoming conduct and for giving false testimony in his statement about the incident and then refusing to sign it when ordered to by Chief Scott. At this time, Wagner was scheduled to retire on March 7, 2006.

In December 2005, Wagner brought three complaints against Chief Scott relating to his suspensions for the Egan incident, accusing him of imposing discipline without cause, giving an improper order, and allowing the improper release of confidential records.  After an investigation by an outside officer from another police department, Chief Scott was exonerated.

Wagner also appealed his suspensions to Mayor Sullivan in December 2005, requesting that they be vacated, that he be compensated for his lost wages, and that he be allowed to

"retire in peace." (Dkt. No. 56, Ex. 13.) Wagner's attorney requested postponement of the hearing before the mayor, with the result that it was not held until March 29, 2006. Meanwhile, Wagner had retired on March 7 as scheduled. Mayor Sullivan affirmed the suspensions and noted that "but for [Wagner's] voluntary retirement, discharge would be imposed." (Dkt. No. 56, Ex. 19 at 6.)

B. <u>Walker's Employment History</u>.

    1. <u>Walker's Seniority Date</u>.

Walker joined the Holyoke Police Department as a full-time officer in July 1993, eighteen years after Wagner. In June 1999, she was considered for a promotion to sergeant, but was not hired. Plaintiff alleged that she was passed over because of her race and/or gender and in a subsequent settlement with the city was given the next available position as sergeant on May 5, 2002, with her seniority backdated to June 9, 1999, the date of her interview for the original slot. The city subsequently contended that her seniority should have dated from June 20, 1999, the day when Walker was formally rejected from consideration for the position, but Plaintiff declined to deviate from the date

agreed upon in the settlement.

    2. <u>Shunning by Co-Workers</u>.

    In 2002, Walker joined two other sergeants, John Monaghan and Joseph Garcia, on the 12 a.m. to 8 a.m. shift. She had worked with Monaghan before without any reported difficulties.

    In May 2002, Plaintiff reported to two of her supervisors, Lieutenant Donald Whelihan and Sergeant John Lenihan, that Monaghan and Garcia resented that she was senior to both of them due to her seniority date of June 9, 1999.[3] She stated that both sergeants had been refusing to speak with her while the three of them were on duty together and would also remain in the station for substantial parts of the shift, leaving Walker as the only sergeant to supervise from on the road. Whelihan did speak with Monaghan and Garcia, but the situation did not improve. (Dkt. No. 46, Ex. 6, Walker Dep. Vol. I at 83:6-15, 154:3-21.) Lenihan told Walker not to "make waves."[4] (<u>Id.</u> 141:7-

_____

[3] Garcia had been hired on June 20, 1999, the date that Defendant argued was Walker's "correct" seniority date.

[4] It is not clear from Walker's deposition when Lenihan made this statement. Since the incident with respect to

12.)

### 3. <u>Derogatory Radio Commentary</u>.

On June 20, 2002, as she was finishing a transmission over the Holyoke Police Department radio system, Walker heard Monaghan saying "lick it, lick it good" (a lyric from a song popular at the time) in an African-American dialect. Monaghan allegedly made the remark over a separate radio system, the Western Massachusetts Law Enforcement Channel ("WMLEC").[5]  Walker reported this occurrence to some of her supervisors, including Lieutenant David Fournier, who worked in the Professional Standards Division ("PSD") (the department's internal affairs unit), and possibly Lieutenant Whelihan.  (<u>Id.</u> 171:1-19.)  It is not clear when she made those complaints.

In September 2002, Walker told Captain Alan Fletcher about Monaghan's and Garcia's ostracism of her.  Fletcher

_____

which Plaintiff principally mentions Lenihan's involvement is this one, the court assumes that he told Walker not to "make waves" regarding Monaghan's and Garcia's ostracism. The exact timing of the comment is immaterial.

[5] Holyoke police officers use both their own local radio system and WMLEC, which all Massachusetts police officers can access.

8

responded that he thought that if Walker changed her
seniority date to the "correct" June 20 date, everything
would "work out." He also held a meeting with Walker and
Monaghan to discuss the accusation, at which Monaghan denied
both behaving badly toward Plaintiff and making the "lick
it" comment. According to Walker, "nothing changed" as a
result of her complaints.

    4. "Uncle Charlie".

Around June 2002, while Walker was giving out an order
from Chief Scott (who is African-American), she heard
Monaghan say in an assumed African-American dialect, "Uncle
Charlie done come out wit anutter order." Officer Jorge
Rodriguez later confirmed that he had also heard
unidentified officers referring to Chief Scott as "Uncle
Charlie" at various times during roll calls. It is unclear
when this was first reported, but Captain Fletcher had a
meeting with Monaghan and Walker to discuss the allegation
on October 17, 2002. Monaghan denied making the statement.

    5. "Tyrone".

Plaintiff filed a complaint with Chief Scott on October
25, 2002, reporting that several officers had informed her

that Monaghan referred to her as "Tyrone," rather than by her given name, "Tammy." According to Walker, Tyrone is a stereotypical African-American male name. The PSD began an investigation of this claim. Plaintiff refused to provide the PSD the names of the officers who told her about Monaghan's name-calling, citing their request not to reveal their identities.

6. <u>Other Harassment</u>.

Monaghan told Walker that she "should not be a sergeant because of her lesbian lifestyle," although Plaintiff did not report this comment to her superiors. Additionally, on October 17, 2002, Monaghan said to Plaintiff, "you shouldn't go sticking your tongue where it don't belong," which Walker reported in October 2002 along with the "Tyrone" claim.

7. <u>Investigation of Co-Worker Harassment</u>.

On November 13, 2002, everyone on Monaghan and Walker's shift was interviewed and given a questionnaire to fill out regarding any information they might have relating to Plaintiff's allegations.

On December 2, 2002, Walker filed a charge with the

Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") contending that she had been discriminated against based on her gender, color, and sexual orientation.

On December 4, 2002, Officer Rodriguez (who worked on the same shift as the three sergeants) reported in an IOC that beginning in November 2002, on at least three occasions, he noticed disparaging comments being made after Walker would finish speaking over the HPD channel -- the "lick it, lick it good" lyric as well as people saying "el-freako" and meowing like fighting cats.  He later testified at his deposition that he heard such comments two or three times a night, several nights a month, and that he recognized Monaghan's voice saying "lick it, lick it good."[6] Rodriguez noted that the times had heard the meowing it had

_____

[6] Rodriguez's deposition is somewhat confusing on the point of how often he heard such comments.  (See Dkt. No. 46, Ex. 5, Rodriguez Dep. 80-81, 95-96.)  Furthermore, Rodriguez could not recall for how many months he continued to notice the radio comments after November 2002. Construing his testimony in the light most favorable to Plaintiff, the court assumes for the purposes of this motion that Rodriguez heard the comments two or three times a night on several nights a month beginning in November 2002, for an unknown number of months.

been after a female spoke, including but not limited to
Walker.  He also stated that he had observed some
unidentified supervisors laughing while listening to the
meowing noises over the radio.

After receiving Officer Rodriguez's IOC, the PSD
investigated these claims by listening to tapes of the WMLEC
communications for the relevant time periods.  They found
nothing to substantiate either Walker's or Rodriguez's
claims regarding the radio comments.

On December 9, 2002, the PSD informed Walker that it
had found her claims regarding the "Tyrone" name-calling and
the "don't stick your tongue where it don't belong"
statement to be unfounded.

    8. Elizur's Pub.

A little after 2 a.m. on June 23, 2003, Walker
responded to a call that had come in to Officer Timothy
Skwira reporting that people were refusing to leave the
Holyoke bar Elizur's Pub.  When Plaintiff arrived, three
Holyoke police officers and Sergeant Monaghan, who were all
off-duty, were at the bar.  Plaintiff asked the bar staff if
they had called the police.  They said they had not; it

turned out to have been a prank call by the officers themselves, who were friends of Officer Skwira.  Walker asked the four policemen to leave the bar.  Monaghan took a final drink from his beer and checked with the bartender about the tab, and then all four men left.

Plaintiff reported the incident to Lieutenant Whelihan the next day.  He verbally reprimanded the officers who had been at the pub.

Walker also told Captain Fletcher about the prank call. He told her not to prepare a written report about it, but Plaintiff nevertheless did write up an incident report, which she submitted directly to Chief Scott on June 23, 2003.[7]  Scott ordered an investigation, which resulted in written reprimands to the officers who were at the pub and a thirty-day suspension of the officer who had made the prank call to Officer Skwira.  Walker also received a letter of reprimand for having violated the chain of command by submitting a report to Chief Scott directly rather than

_____

[7] Defendant disputes this claim.  Captain Fletcher stated in his deposition that he did tell Walker to write a report, but to submit it to him, not Chief Scott.  (Dkt. No. 46, Ex. 15, Fletcher Dep. 95:17-97:10, 99:19-100:10.)

13

giving it to Captain Fletcher first.

9. Court Appearance.

On April 6, 2004, a "spot check" of officer attendance at court found that Walker had arrived seven to ten minutes past the time she was supposed to sign in for a scheduled court appearance.  She and all the other late officers were directed to submit a report indicating the reason for their tardiness.  Walker's report stated she had "no excuse." Plaintiff received a one-day suspension for being late to court.  The other officers who had arrived late that day were all issued either verbal or written reprimands.

10. Terrorism Call.

On July 23, 2004, a female called the dispatch unit of the Holyoke Police Department to report that she had seen a Middle Eastern man videotaping the interior structure of the Holyoke Mall and that she was worried he was a terrorist. The dispatcher transferred the call to Walker, stating the caller "[has] some information, Sarge, she wants to give and I'm not taking it."[8]  (Dkt. No. 46, Ex. 45 at 1.)   She

_____

[8] Walker says that she only heard from the dispatcher that this was an "informational call."  (Dkt. No. 46, Ex. 6, Walker Dep. Vol. I at 226:24.)

14

spoke with the caller and told her she should speak to the mall's security personnel about such occurrences. Plaintiff did not obtain the caller's name or any contact information.[9]

Chief Scott initiated an inquiry regarding this incident. The PSD investigated Walker's handling of the call and concluded in a July 30, 2004, report that she should have gathered more information from the caller and treated the caller more seriously. (See Dkt. No. 46, Ex. 51.) On August 24, 2004, Scott suspended Plaintiff for five days and sent her case to the mayor for a further hearing, recommending further punishment in the form of a longer suspension, demotion, or discharge. Mayor Sullivan upheld the original five-day suspension and added another five-day suspension.

---

[9] Walker testified at her deposition that she thought the dispatcher had taken down the caller's contact information and also implies that she thought the caller was seeking information regarding what to do about such a situation in the future. (See Dkt. No. 46, Ex. 6, Walker Dep. Vol. I at 218:5-220:23, 227:3-228:4, 238:4-14.) Notably, Plaintiff's report written immediately after this incident states that the caller "wanted to report she saw a man, which she though was Middle Eastern video taping in the Holyoke Mall. She wanted to know what she should do." (See Dkt. No. 46, Ex. 49.)

11. <u>Crime Scene Tape</u>.

On September 6, 2004, upon arriving at a murder scene, Plaintiff discovered she did not have the yellow caution tape necessary to cordon off the area.  She saw Monaghan about twenty yards away using some caution tape, so she radioed him twice to request the tape.  Monaghan did not respond, and later stated that in the chaos of the crime scene he did not hear Walker's radio calls.  Plaintiff finally sent an officer to get the tape from Monaghan, which he gave to the officer.

On September 9, 2004, Monaghan approached Walker and told her to "start packing your bags."  Plaintiff believed this comment related to her suspension in the wake of the August terrorism call.

Walker reported these two incidents to her supervisor at the time, Lieutenant Eva O'Connell,[10] stating that she thought Monaghan's failure to respond to her radio request had created a safety issue.  O'Connell told Walker not to write a report about these occurrences and not to go to the

_____

[10] O'Connell worked the 4 p.m. to midnight shift, to which Walker was transferred in January 2004.

16

chief's office, but to inform her if anything else happened. She also told Plaintiff that she had talked to Monaghan when he joined Walker on the 4 p.m. to midnight shift to warn him she did not want any more problems between him and Plaintiff and that she had assigned Monaghan to a different sector of the city and, to the extent possible, to different nights than when Walker was on duty. (Dkt. No. 46, Ex. 57.)

On September 11, 2004, Walker submitted a written report regarding these two incidents directly to Chief Scott, asserting that she constantly feared verbal assaults by Monaghan. (Dkt. No. 46, Ex. 55.) Scott ordered an investigation of both matters, which ultimately concluded in November 2004 that it could not be determined whether Monaghan's failure to respond to Walker's radio calls was intentional or unintentional. The PSD also found that Walker's submission of a report to Chief Scott violated O'Connell's order not to take that step, but Scott determined that Walker could not be held liable for documenting these incidents.

12. <u>Dispatching Incident</u>.

In late October 2004, Plaintiff noticed that she was

17

not receiving dispatch calls over her car or hand-held radios, preventing her from keeping track of where her subordinates were in the field.  Walker believed Lieutenant O'Connell had ordered the dispatchers to send calls via e-mail rather than over the radio.  She asked O'Connell if that was the case, but O'Connell said she had not given such an order and would look into the matter.  The communications supervisor responded to an inquiry by O'Connell that he was not dispatching cruisers via e-mail.

Despite this, Walker informed Chief Scott on November 4, 2004 of her belief that O'Connell had ordered dispatches to be sent over e-mail.  Scott ordered an investigation by the PSD, which interviewed the dispatchers.  They stated that they had not been ordered by O'Connell or anyone else to dispatch cruisers over e-mail except in situations where suspects were known to have police scanners.  Computer records indicated that only five e-mails were sent from the dispatch center to police vehicles between September 15 and November 4, 2004.  The PSD also discovered that a technical problem had meanwhile been detected in Walker's radio equipment.  The PSD concluded that Plaintiff's allegations

18

against Lieutenant O'Connell were unfounded.

13. <u>Inside Duty</u>.

On November 10, 2004, O'Connell assigned Walker to "inside duty," as the booking officer, citing concerns about Walker's job performance and her emotional state.  In support of this concern, O'Connell cited an August 2004 IOC that she had submitted regarding two arrests that Plaintiff made on occasions where O'Connell believed there was no right of arrest.  Walker's benefits and salary did not change.  Plaintiff observed that O'Connell was "very upset" when she gave Walker this assignment and felt it was in retaliation for her allegation in the dispatching incident. (Dkt. No. 46, Ex. 56, Walker Dep. Vol. II at 78:17-79:2.)

14. <u>Sick Leave</u>.

Plaintiff called in sick to work with a migraine headache on November 15, 16, and 17, 2004.  Lieutenant David Fournier, a member of the PSD, observed her nevertheless driving her personal vehicle in Holyoke on November 17.  He reported this to Chief Scott, along with the information that Walker had three sick leave abuse letters in her personnel file and had zero sick days accrued.

On November 17, Walker requested holiday days off on

19

November 20 and 21.  She was granted a day off on November 21.  A written denial of her request regarding November 20 was delivered to Walker at her home on November 19.  The denial was issued by Lieutenant O'Connell in consultation with Captain Fletcher, who indicated that Walker's absence would require the mandatory use of overtime to keep the supervisory staff above minimum standards.

On November 18, Walker was examined for work-related stress by a physician and was certified to return to work the next day without restrictions.

Despite the denial of her request, Walker called in sick on November 20, merely citing "family issues."  She took her scheduled day off on November 21.  She called in sick on November 22, stating that she had re-injured her left shoulder, the site of an old on-the-job injury.

Chief Scott ordered Walker to report to his office that day (November 22) to explain her absences.  He interviewed Walker, who could not recall if she had left her home on November 17 but stated that might have been dropping off her daughter.  She also noted that on November 20 she had been scheduled to check in on her mentally ill brother.  (See Dkt. No. 46, Ex. 88.)

A physician examined Plaintiff's shoulder on November 22 and certified her to return to work without restrictions

20

on November 24.  On November 23, Walker requested a meeting with Chief Scott, stating that she had been under stress that was manifesting as pain in her shoulder and neck area and that she felt the only way to relieve the stress was to leave the police department.  (Dkt. No. 46, Ex. 91.)

Plaintiff met with Scott on November 24, reiterating her complaint of stress and tracing it to the strain of the various internal investigations, such as the one regarding the dispatch incident, along with Monaghan's mistreatment. She also objected to her assignment to indoor duty and asked to be put on First Watch from 8:00 a.m. to 4:00 p.m., but Scott informed her there were no open positions on First Watch at that time and that her reassignment to inside duty was within her supervisor's discretion.  (Dkt. No. 46, Exs. 92, 93.)

Ultimately, Scott suspended Walker for five days for sick leave abuse.  Plaintiff appealed her suspension to Mayor Sullivan.  On December 27, 2004, he affirmed the finding of sick leave abuse, adding another five-day suspension without pay.  The mayor informed Walker in writing: "I am providing you a <u>final</u> opportunity to meet fully the duties and responsibilities of your job.  Failure to do so will subject you to further discipline up to and including demotion or termination."  (Dkt. No. 46, Ex. 100

21

(emphasis in original).)

   15. <u>Fournier Complaint</u>.

   On December 12, 2004, Walker sent an IOC to Chief Scott
stating that she believed Lieutenant Fournier's viewing of
her personnel file in relation to the sick leave incident
violated several rules of the police department.  She also
filed a grievance with her union.  Chief Scott investigated
the matter and informed Walker on January 5, 2005, that he
was exonerating Fournier.  He explained that the lieutenant,
as a member of the department's internal affairs unit, had
the authority to unilaterally investigate personnel for
suspected violations of department rules and regulations.

   16. <u>Inside Duty Complaint</u>.

   On December 20, 2004, Plaintiff filed a complaint with
Chief Scott against Lieutenant O'Connell, alleging that the
lieutenant had deliberately altered the memo assigning her
to inside duty to create a discrepancy in wording between
the version Walker received and the copy of the same memo in
her personnel file.  The former prohibited her from
"visiting" the Dispatch or Records bureau, while the latter
directed her to refrain from "hanging around" those offices.
Walker also complained that O'Connell had never provided a

reason for her inside duty assignment and that the bright lighting she was exposed to while confined to the booking area caused her to have migraine headaches.  Walker filed a grievance with her union as well.

After looking into the matter, Chief Scott informed Walker on January 5, 2005, that he was exonerating O'Connell since she had the authority to change an officer's duty assignment with or without explaining the reason and since the wording discrepancy between the two memos did not violate any departmental rules.

Plaintiff requested and obtained a right to sue letter from the EEOC on January 11, 2005.

17. <u>Unfounded Complaints Suspension</u>.

On January 18, 2005, Walker was notified that she was being suspended for five days because she had filed three complaints against superior officers in the last two months (her charges against O'Connell regarding the alteration of the memo assigning her to inside duty and the alleged order to dispatch patrol cars over e-mail rather than the radio, and her objection to Fournier reading her personnel file), all of which were found to be unsubstantiated.  Chief Scott

also asked Mayor Sullivan to consider additional
disciplinary action.

On March 7, 2005, Mayor Sullivan held a hearing
regarding Walker's five-day suspension for filing three
unfounded complaints.  He affirmed the suspension and added
another fifteen-day suspension.

18. <u>Whistleblower Letter</u>.

On February 15, 2005, Plaintiff sent a letter to Chief
Scott and Mayor Sullivan claiming that her reprimands
regarding the Elizur's Pub incident, the caution tape
incident, and the e-mail dispatch incident violated the
Massachusetts whistleblower statute, Mass. Gen. Laws 149, §
185.  She requested that the city correct those violations.

19. <u>Scheduling Book</u>.

On February 25, 2005, Walker went into the police
station on a day she was not on duty in order to enter some
requests for time owed into the scheduling book.  Plaintiff
entered the Commanding Officer's office and picked up the
open scheduling book from Lieutenant O'Connell's desk.
O'Connell, who was in the office, pulled the book out of her

hands.[11]  Plaintiff then asked Jack Craven, another officer, to come into the office to serve as a witness to her conversation with O'Connell.

The details of this conversation are disputed.  The lieutenant reported that Walker was aggressive and disrespectful, using obscene language directed at O'Connell. According to Chief Scott, third-party witnesses (he did not specify who) supported O'Connell's account.  (Dkt. No. 46, Ex. 1, Scott Dep. at 117:1-118:19.)  Plaintiff contests O'Connell's version of events, but at the time of her deposition her own memory of what was said was "foggy" so she did not recall specific details.  (Dkt. No. 46, Ex. 56., Walker Dep. Vol. II at 108:5.)  Shortly after beginning this conversation, Walker left the office.

On February 27, 2005, O'Connell reported this incident to Captain Fletcher.  The same day, Walker informed Fletcher that her arm and shoulder had been injured when O'Connell pulled the book from her hands.  Fletcher denied Plaintiff's injury claim, citing Walker's lack of any reason to be in

---

[11] O'Connell, disputing Plaintiff's description, contends she merely put her hands on the scheduling book before Walker lifted it up to keep it on the desk.

25

the office that day since she was not on duty and the fact that neither eyewitness testimony nor any other evidence supported her claim.  Chief Scott affirmed the decision not to grant Walker's request for the department to pay for medical attention for her shoulder.

Plaintiff filed a separate claim with Chief Scott noting her concern for her physical safety.  Scott had the PSD investigate the incident.  Walker declined to provide a statement regarding her confrontation with O'Connell.

20. <u>Termination</u>.

On March 29, Walker filed the complaint in this case. About a week later, Chief Scott suspended Plaintiff for five days, citing her threatening behavior toward O'Connell in the confrontation over the scheduling book and the alleged filing of a false injury report after that incident.

Plaintiff appealed her suspension to Mayor Sullivan. At a hearing on April 12, which Walker left soon after it commenced, the mayor heard testimony from several witnesses to the encounter.  In a letter dated April 18, Mayor Sullivan affirmed Walker's suspension and terminated her employment, citing his belief based on the evidence

26

presented that she had behaved inappropriately toward a
superior officer (including engaging in physical aggression
and profanity) and subsequently made a false injury report.
The letter also recited all of Walker's previous
infractions, though it is not clear exactly what role those
played in the mayor's decision to discharge her.  (Dkt. No.
46, Ex. 115.)

At this time, seven members of the 120-person permanent
Holyoke police force were female.  When Walker was fired,
her position was filled by Manuel Febo, a Hispanic male.[12]

On May 4, Plaintiff sent a letter to the city claiming
that her reprimand and termination in connection with the
scheduling book incident violated the Massachusetts
whistleblower statute.

### III. DISCUSSION

In deciding a motion for summary judgment, the court
must allow the motion only if "there is no genuine issue as
to any material fact and . . . the moving party is entitled
to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

---

[12] Walker calls Febo a "white male," but has not
disputed Holyoke's subsequent contention that Febo is of
Hispanic ancestry.

There is a genuine issue where "a reasonable jury could resolve the point in favor of the nonmoving party." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). "Where . . . the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case 'is . . . not significantly probative, summary judgment may be granted.'" Davila v. Corporacion De P.R. Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007) (citation omitted).

A. Discrimination Claims (Counts I-V)

Walker charges Holyoke with discrimination based on gender, race, and sexual orientation in violation of Title VII, 42 U.S.C. § 2000e, and Mass. Gen. Laws ch. 151B, § 4(1). The sexual orientation-based claim arises only under state law. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 (1st Cir. 1999). Both the federal and state discrimination claims are analyzed under the framework set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 702 (1973); see also Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005).

The McDonnell Douglas "pretext" analysis first requires Walker to make out a prima facie case of discrimination by

28

showing "that (1) [s]he belonged to a protected class . . .; (2) [s]he was performing [her] job at a level that rules out the possibility that [s]he was fired for job performance; (3) [s]he suffered an adverse job action by [her] employer; and (4) [her] employer sought a replacement for [her] with roughly equivalent qualifications." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003).

1. Prima Facie Case.

Holyoke contends that Walker has failed to establish the second prong of the prima facie case, since the alleged missteps for which she was disciplined show she did not perform her duties at an acceptable level. However, the prima facie showing is not meant to be an onerous burden. Id. Furthermore, courts that have dismissed discrimination claims at the prima facie stage based on unsatisfactory job performance have tended to do so where the employee's poor record was undisputed or unrelated to the alleged discrimination. See, e.g., Beasley v. Aramark Unif. & Career Apparel, Inc., 430 F. Supp. 2d 8, 13 (D. Mass. 2006) (plaintiff's illegal drug use was undisputed and known to employer); Ianetta v. Putnam Invs., Inc., No. 00-10385, 2002 U.S. Dist. LEXIS 3277, at *27-*28 (D. Mass. Feb. 25, 2002)

29

(plaintiff had documented history of errors and under-
performance, and was fired after mistake that exposed
company to serious liability).

Here, on the other hand, Walker disputes the details of
some of the incidents for which she was disciplined
(including the one for which she was fired, the
confrontation with Lieutenant O'Connell over the scheduling
book). Additionally, the very disciplinary sanctions that
Holyoke points to as stemming from Plaintiff's incompetence,
Walker contends are part and parcel of the discrimination
against her. This casts further doubt on Defendant's claim
that Plaintiff's job history reveals a straightforward
record of progressive discipline culminating in termination
for poor job performance.

2. Legitimate, Nondiscriminatory Reason.

Once Plaintiff makes out a prima facie case, the burden
shifts to Holyoke to articulate a legitimate,
nondiscriminatory reason for the adverse employment action.
Davila v. Corporacion De P.R. Para La Difusion Publica, 498
F.3d 9, 16 (1st Cir. 2007). "The employer's burden of
articulating a non-discriminatory reason is only a burden of
production, not a burden of persuasion; the burden of
proving unlawful discrimination rests with the plaintiff at

30

all times." <u>Freadman v. Metro. Prop. & Cas. Ins. Co.</u>, 484
F.3d 91, 99 (1st Cir. 2007).

Holyoke's contentions of poor job performance, though
not enough to undercut Walker's case at the first step of
this analysis, do suffice to explain the numerous
suspensions and ultimate termination of Plaintiff.  While
the court will not reiterate the detailed recital of the
facts laid out above, it is clear from the record that each
time Defendant sanctioned Walker it offered a rationale
rooted in Plaintiff's alleged violation of the police
department's rules and regulations rather than any
discriminatory animus.

3. <u>Pretext Analysis</u>.

After Defendant proffers a legitimate,
nondiscriminatory rationale for its actions, the burden
reverts to Walker to make the ultimate showing that she was
discriminated against based on her race, gender, and/or
sexual orientation.  <u>Davila</u>, 498 F.3d at 16.  ("At summary
judgment, this question reduces to whether or not the
plaintiff has adduced minimally sufficient evidence to
permit a reasonable factfinder to conclude that [s]he was

fired because of" her membership in a protected class.).
Plaintiff must show both that Holyoke's articulated reasons
for taking adverse action against her were mere pretexts and
that its true motive was discriminatory.  The same evidence
debunking the employer's proffered explanation may itself
support an inference of discriminatory animus.  Straughn v.
Delta Air Lines, Inc., 250 F.3d 23, 34 (1st Cir. 2001).

Walker's allegations of discrimination fail at this
step of the analysis.  She has not presented "specific facts
which would enable a jury to find that the reason given was
not only a sham, but a sham intended to cover up the
employer's real motive: discrimination."  Runyon v. Mass.
Inst. of Tech., 871 F. Supp. 1502, 1510 (D. Mass. 1994)
(citation omitted).  A review of the evidence cited by
Plaintiff in support of her pretext argument makes the
inadequacy of the record clear.

a. Treatment of Similarly Situated Employees.

Plaintiff argues that Holyoke's proffered reasons for
disciplining her are belied by its more lenient treatment of
Sergeant Robert Wagner, whom Walker contends is similarly
situated to herself except for the fact that he is a
heterosexual, Caucasian male.  Plaintiff asserts that

Wagner, though he also faced termination, was allowed to retire by Holyoke.[13]

However, Walker has offered no evidence that Wagner's retirement rather than termination was anything but a formal distinction resulting from the fact that Wagner had coincidentally been scheduled for retirement around the time of his hearing regarding the Egan incident. Mayor Sullivan specifically stated in his decision regarding Wagner's discipline that he would have terminated the sergeant had he not already retired as scheduled, confirming that the city's intentions in each case were the same. More importantly, there is no indication that there was ultimately any material difference in the fates of the two sergeants due to Wagner's serendipitous avoidance of a formal discharge.

Even assuming arguendo that there was disparate treatment of the two, "[a] claim of disparate treatment

---

[13] Both parties made factual assertions regarding Wagner's comparability to Sergeant Walker during oral argument, such as Plaintiff's contention that Wagner was allowed to erase certain disciplinary sanctions from his personnel file and Defendant's allegation that Walker herself could have put in for retirement but failed to. A review of the record revealed no evidence supporting these proffered oral statements. The court will disregard them in making its decision.

based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects." Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996). "The test is whether a 'prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" Id. (citing Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989)).

Wagner's and Walker's situations may be superficially similar in that each was subject to escalating discipline and finally left the police department after a heated confrontation with a colleague. However, Wagner had a longer and arguably more distinguished employment history than Walker, having spent almost twenty years longer as a police officer and even having served as Chief of Police for four years. Cf. Perkins, 78 F.3d at 751 (emphasizing differences in employment history in finding two employees not to be similarly situated).

Moreover, the incident precipitating the end of Wagner's employment came almost two years after his next-most-recent infraction, while Walker's confrontation with

34

O'Connell was the last in a long chain of difficulties occurring over the previous six months.  Cf. Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 106 (1st Cir. 2005) (citing other employee's recently improved performance as compared to plaintiff's consistent under-performance in finding them not to be similarly situated); Griel v. Franklin Med. Ctr., 71 F. Supp. 2d 1, 11 (D. Mass. 1999) (differentiating recent, systematic pattern of mistakes by plaintiff from isolated mistakes by other employees).

Finally, though a few of the incidents in which Walker and Wagner were involved were similar, many of their offenses, including the ones for which they were punished most severely, related to completely different incidents (e.g., Walker's mishandling of the terrorism call and sick leave abuse versus Wagner's disclosure of confidential information to a newspaper and his alleged lying to HPD investigators regarding the Egan incident).  Williams v. Frank, 757 F. Supp. 112, 119 (D. Mass. 1991) ("[T]wo employees are not similarly situated when the offense each is accused of is not the same.").  "Although the offenses of two employees need not be identical, [they] must be of

comparable seriousness." Matthews v. Ocean Spray Cranberries, 686 N.E.2d 1303, 1310 (Mass. 1997). Defendant reasonably took the view that at least one of the violations by Walker, her inadequate response to the terrorism phone call, represented a significant deficiency in performing the basic duties of a police officer that was unmatched in Wagner's record.

For all of these reasons, the court does not find it reasonable to consider Sergeants Wagner and Walker as analogous comparators. Even if the court did do so, Plaintiff has not adduced sufficient evidence to show they were subject to disparate treatment.

    b. Other Evidence of Discrimination.

Once the example of Sergeant Wagner is distinguished, there remains little to support an inference of discriminatory motivation besides Walker's bald, subjective allegation that she was suspended and later fired for illegal discriminatory reasons. See Santiago v. Canon U.S.A., 138 F.3d 1, 6 (1st Cir. 1998) ("'It is . . . well settled that an employee's subjective belief that he suffered an adverse employment action as a result of

discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason.'") (quoting Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc)).

The only direct evidence of discriminatory animus in the record is the series of comments made by Sergeant Monaghan disparaging Sergeant Walker for her sexual orientation. However, those statements, repugnant though they are, were not uttered by the decisionmakers who sanctioned Walker for her various infractions and thus reflect nothing beyond Monaghan's own animus.[14]  Monaghan

---

[14] Although she did not assert this argument, Walker could have hypothesized that the failure to punish Monaghan for his 2002 statements constituted a toleration of discrimination that might support an inference of animus by her supervisors. However, had Plaintiff done so, the court would have rejected that reasoning. Neither Lieutenant O'Connell, a key player in the later incidents for which Walker was subject to discipline, nor Mayor Sullivan, the ultimate decisionmaker regarding most of Sergeant Walker's punishments, was involved with the 2002 harassment allegations. See Davila v. Corporacion De P.R. Para La Difusion Publica, 498 F.3d 9, 16-17 (1st Cir. 2007) ("When assessing a claim of pretext in an employment discrimination case, a court's focus is necessarily on the motivations and perceptions of the decisionmaker.") (emphasis added); Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) ("'[S]tray workplace remarks,' as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process,  normally are

was not even involved in any of the occasions on which
Plaintiff was disciplined except the Elizur's Pub incident
(where he and most of the other officers received the same
punishment as Walker, a reprimand).  He was the subject of
Walker's report regarding his refusal to give her crime
scene tape, which occurred in the midst of several other
events that led to Plaintiff being sanctioned, but Walker
was not punished for that particular incident.

As for possible circumstantial evidence of
discrimination in the decision to impose an adverse
employment action, the court may look to factors such as:

> the historical background of the decision; the
> specific sequence of events leading up to the
> challenged decision; departures from the normal
> procedural sequence; . . . particularly if the
> factors usually considered important by the
> decisionmaker strongly favor a decision contrary

---

insufficient, standing alone, to establish either pretext or
the requisite discriminatory animus.") (citation omitted).
    Even assuming a jury would accept the tenuous inference
that Sullivan's treatment of Plaintiff was tied to her
relationship with different municipal personnel in a
different context, Walker still has not taken the necessary
step of rebutting the legitimate reasons offered by
Defendant for her suspensions and discharge.  Cf. Freadman
v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 100-01 (1st
Cir. 2007) (awarding summary judgment to defendant where
there was nothing "idiosyncratic or questionable" about
employer's decision, despite circumstantial evidence of
temporal proximity between plaintiff's request for
disability accommodation and her rotation to a different
position).

>to the one reached. . . .  In addition, doubts
>about the fairness of an employer's decision or an
>employer's misjudging of an employee's
>qualifications, while not necessarily dispositive,
>may be probative of whether the employer's reasons
>are pretexts for discrimination.

Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168-69 (1st

Cir. 1998) (internal quotation marks and citations omitted).

A careful review of the record discloses <u>no</u> evidence of

any of these tell-tale signs in connection with <u>any</u> of the

discipline meted out to Plaintiff.  In each instance where

Plaintiff was reprimanded, suspended, terminated, or

otherwise disciplined, Holyoke went through an extensive

decisionmaking process, including internal investigation,

issuance of factual findings and a written decision and,

with regard to the most serious punishments, even appeal to

and review by Mayor Sullivan with a second evidentiary

hearing.

Furthermore, the reasons offered to support the city's

disciplinary measures were not only nondiscriminatory, but

also facially reasonable.  <u>Cf.</u> <u>Rosado v. Radio Shack, Inc.</u>,

312 F.3d 532, 534-35 (1st Cir. 2002) (affirming summary

judgment against plaintiff where she produced no evidence of

discriminatory animus by supervisors and she had

undisputedly violated company rules).

39

The incident providing arguably the strongest (or least weak) evidence supporting Plaintiff, Walker's confrontation with Lieutenant O'Connell over the scheduling book, is unavailing for two reasons.  First, Plaintiff's own version of the event is, by her own admission, "foggy."  Second, even if Lieutenant O'Connell's version was inaccurate, Defendant reasonably relied on it.

Moreover, the mayor did not blindly accept O'Connell's story of the incident; he conducted a hearing at which Walker had the opportunity to present her own account (though she chose not to exercise that option), and at which he did hear the testimony of other eyewitnesses.  By considering the alternate report of an accused employee and/or disinterested witnesses, a decisionmaker may thus insulate himself from the taint of one biased employee's statement.  See Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 87 & n.4 (1st Cir. 2004) (stating that animus of employee involved in an incident may not matter if decision is made by an unbiased decisionmaker to whom plaintiff has a chance to present her version of events); Thompson v. Coca Cola Co., 497 F. Supp. 2d 80, 95 (D. Mass. 2007) (finding no

discrimination in termination board's decision where it was based on version of incident attested to by employee who had no reason to lie and had never demonstrated any racial bias).

Although a court must be "particularly cautious" in allowing summary judgment once a plaintiff has made out a prima facie case and the main issue is the "elusive concept" of discriminatory intent, summary judgment is not "automatically precluded." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citation omitted). "If the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation, summary judgment may be appropriate even where intent is an issue." Id. (internal quotation marks and citation omitted).

Since Walker has not offered sufficient facts to satisfy her burden to show Holyoke's proffered reasons for disciplining her were pretexts for discrimination, Defendant is entitled to summary judgment on Counts I through V. See Marsman v. Western Electric Co., 719 F. Supp. 1128, 1140-41 (D. Mass. 1988).

B. Hostile Environment Claims (Counts VI-X)

41

Walker alleges that Holyoke created a hostile work environment for her based on her race and gender, in violation of Title VII, and her race, gender, and sexual orientation, in violation of Mass. Gen. Laws ch. 151B.  As with Plaintiff's discrimination claims, the state and federal law claims are considered under substantively similar standards.  <u>Brissette v. Franklin County Sheriff's Office</u>, 235 F. Supp. 2d 63, 85 (D. Mass. 2003).  The required elements of a hostile environment claim are:

> (1) that [Plaintiff] is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership of the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of her employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

<u>Torres-Negron v. Merck & Co.</u>, 488 F.3d 34, 39 (1st Cir. 2007).

"Because this inquiry is fact specific, the determination is often reserved for a fact finder, . . . but summary judgment is an appropriate vehicle for 'policing the

baseline for hostile environment claims.'" <u>Pomales v.
Celulares Telefonica, Inc.</u>, 447 F.3d 79, 83 (1st Cir. 2006)
(citations omitted).  Relevant factors in determining
"whether an environment is 'hostile' or 'abusive' can be
determined only by looking at all the circumstances . . .
including the frequency of the discriminatory conduct; its
severity; whether it is physically threatening or
humiliating, or a mere offensive utterance; and whether it
unreasonably interferes with an employee's work
performance." <u>Conto v. Concord Hosp., Inc.</u>, 265 F.3d 79, 82
(1st Cir. 2001) (alteration in original) (<u>quoting</u> <u>Harris v.
Forklift Sys.</u>, 510 U.S. 17, 23 (1993)).

The question of whether the discriminatory harassment
was severe or pervasive enough to constitute a hostile work
environment is sometimes a close one, especially where there
were only a few overt comments, perpetrated mainly by a
single coworker, and of a non-threatening nature, but where
Plaintiff also alleges ongoing ostracism that might have
been tied to discriminatory animus.  <u>Compare</u> <u>O'Rourke v.
City of Providence</u>, 235 F.3d 713, 732 (1st Cir. 2001); <u>Kidd
v. MBNA Am. Bank, N.A.</u>, 93 Fed. Appx. 399, 402 (3d Cir.

2004); <u>Vredevelt v. GEO Group, Inc.</u>, 145 Fed. Appx. 122, 135 (6th Cir. 2005) <u>with</u> <u>Rivera-Rodriguez v. Frito Lay Snacks Caribbean</u>, 265 F.3d 15, 25 (1st Cir. 2001); <u>Landrau-Romero v. Banco-Popular de P.R.</u>, 212 F.3d 607, 614 (1st Cir. 2000). In this case, however, the court need not address this issue, since Plaintiff has failed to show that Holyoke should be held responsible for the harassment by Sergeant Monaghan.[15]

Sergeant Monaghan was Sergeant Walker's less senior co-worker rather than her supervisor. An employer is liable for a hostile environment created by a non-supervisory co-worker only if it was "negligent either in discovering or remedying the harassment," <u>Torres-Negron v. Merck & Co.</u>, 488 F.3d 34, 40 (1st Cir. 2007), or in other words if it "knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." <u>White v. N.H. Dep't of Corr.</u>, 221 F.3d 254, 261

---

[15] Defendant's clear entitlement to summary judgment makes it unnecessary to consider an alternative argument of Defendant: since most of the overtly discriminatory comments that Plaintiff was subjected to related to her sexual orientation, a class unprotected by Title VII, her hostile work environment claim belongs only in state court.

44

(1st Cir. 2000) (citation omitted).  Plaintiff bears the

burden of proof on this point.  See Crowley v. L.L. Bean,

Inc., 303 F.3d 387, 401 (1st Cir. 2002).

Where, as here, the employer did take action in

response to allegations of harassment, the First Circuit has

explained its approach to considering the adequacy of that

response:

> It may not always be within an employer's power to
> guarantee an environment free from all bigotry.
> He cannot change the personal beliefs of his
> employees; he can let it be known, however, that
> racial harassment will not be tolerated, and he
> can take all reasonable measures to enforce this
> policy.  To what lengths an employer must go we do
> not venture to say.  The seriousness of the harm
> posed by the conduct will be a factor.  But once
> an employer has in good faith taken those measures
> which are both feasible and reasonable under the
> circumstances to combat the offensive conduct we
> do not think he can be charged with discriminating
> on the basis of race.

De Grace v. Rumsfeld, 614 F.2d 796, 805 (1st Cir. 1980).

The undisputed facts regarding Holyoke's response to

Monaghan's harassment show that the city's actions were

sufficient to absolve it of liability.  The incidents that

would have alerted Defendant to the possibility of

discriminatory harassment are the "lick it good" comment;

the "Tyrone" name-calling; the "Uncle Charlie" comment; and

Monaghan telling her, "you shouldn't go sticking your tongue where it don't belong."[16]  In each case, Defendant undertook good faith, reasonable measures in response to these claims.[17]

The record does not establish when Plaintiff first informed her employer about the derogatory radio comments, but it is clear that Holyoke was aware of the issue by November 2002, when it gave out a questionnaire to officers regarding that and other allegations.  Walker also reported

_____

[16] The First Circuit has warned courts against disaggregating facially discriminatory harassment from potentially related instances of unequal treatment in determining whether there was a severely or pervasively hostile work environment.  O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001).  There is no indication, however, that this admonition should apply in determining whether notice of treatment that is not overtly discriminatory is sufficient to trigger an employer's duty to respond.

[17] Walker's initial complaints, detailing only Monaghan's and Garcia's ostracism and blaming it on resentment over her seniority date rather than any impermissible racial or sexual bias, could not be said to have alerted Holyoke to any discriminatory harassment. Captain Fletcher's recommendation in response to Plaintiff's September 2002 report of this behavior, to "fix" her seniority date in order to forestall further ostracism, may not have been the ideal reaction to her concerns.  However, it does confirm that Defendant believed any friction stemmed from resentment over Walker's "incorrect" seniority date rather than impermissible racial or sexual bias.

46

Monaghan's "Uncle Charlie" comment, the "Tyrone" name-calling, and the "don't go sticking your tongue" statement to her supervisors in October 2002.  Holyoke responded to these allegations promptly by questioning all the officers on Walker's shift about them.  See Cerqueira v. Corning Net Optix, No. 03-10306, 2004 U.S. Dist. LEXIS 17308, at *17 n.4 (D. Mass. Aug. 13, 2004) (taking action within one month of complaint is sufficiently prompt).  Defendant's investigation even elicited some further evidence in the form of Officer Rodriguez's IOC about the radio comments, indicating that it was a good faith attempt to determine the truth of Walker's claims.  Once Rodriguez corroborated Plaintiff's allegation, Defendant also took the further step of reviewing all tapes of WMLEC broadcasts over the relevant period for suspect communications, but failed to find anything to substantiate Walker's claim.

    Plaintiff has criticized Holyoke's investigation of her claims, alleging in her recital of the facts that the PSD failed to interview Rodriguez as a follow-up to his IOC and citing Rodriguez's contention that Lieutenant Fournier did not adequately investigate complaints and would always find

47

in favor of Chief Scott.  These assertions lack any basis in
the record, as they are belied by the undisputed facts
concerning the investigation.  It is difficult to criticize
Holyoke for circumventing a follow-up interview with
Rodriguez and instead referring to the most reliable source
as to what was said over WMLEC, the actual tapes of the
radio communications in question.  The weakest part of the
PSD's investigation, its somewhat limited inquiry into the
"Tyrone" allegation, can be traced to Plaintiff's own lack
of cooperation in refusing to provide the names of possible
witnesses to relevant incidents.  Finally, while the court
accepts Plaintiff's charge as to Monaghan's "Uncle Charlie"
and "don't go sticking your tongue" comments for the
purposes of this motion, that does not undercut the reality
that Defendant could reasonably (though perhaps mistakenly)
have believed those incidents did <u>not</u> occur based on the
testimony of other officers who were present on each
occasion.  See <u>Lovelace v. BP Prods. N. Am., Inc.</u>, No.
06-4324, 2007 U.S. App. LEXIS 24807, at *22-*23 (6th Cir.
Oct. 19, 2007) (holding employer's response to allegation of
racially offensive remark prompt and appropriate where

employer timely investigated incident and reviewed surveillance tape but found "insufficient corroborative evidence to pursue disciplinary action" against accused employee); Swenson v. Potter, 271 F.3d 1184, 1196 (9th Cir. 2001) ("Obviously, the employer can act reasonably, yet reach a mistaken conclusion as to whether the accused employee actually committed harassment."); Harris v. L & L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997) ("[A] good faith investigation of alleged harassment may satisfy the 'prompt and adequate' response standard, even if the investigation turns up no evidence of harassment. . . . Such an employer may avoid liability even if a jury later concludes that in fact harassment occurred.") (citations omitted); Knabe v. Boury Corp., 114 F.3d 407, 413 n.11 (3d Cir. 1997) ("[A]n employer need not credit a complaint simply because an employee makes it.").

The measures taken by Defendant sufficed to satisfy the city's obligation to respond promptly and appropriately to Walker's complaints between May and November 2002.  As the Ninth Circuit has convincingly explained, "[t]he most significant immediate measure an employer can take in

response to a [harassment] complaint is to launch a prompt investigation to determine whether the complaint is justified." Swenson v. Potter, 271 F.3d 1184, 1193 (9th Cir. 2001).  As long as the investigation is not "rigged to reach a pre-determined conclusion or otherwise conducted in bad faith," it may constitute a substantial step towards discharging the employer's legal duty.  Id.

Although Holyoke ultimately found Plaintiff's claims to be unfounded and did not take action against Monaghan, they were not obligated to punish an officer for unsubstantiated claims of harassment.  See Swentek v. USAIR, Inc., 830 F.2d 552, 558 (4th Cir. 1987) ("In taking remedial action, USAIR was obliged to investigate Swentek's charges and to present a reasonable basis for its subsequent actions.  It was not, however, required to credit all of Swentek's allegations in order to escape liability."); Wilson v. Burlington Coat Factory Warehouse of Woonsocket, Inc., No. 01-365T, 2003 U.S. Dist. LEXIS 26191, at *12 (D.R.I. Dec. 19, 2003) ("In cases where a complaint of harassment is petty or appears to lack any factual basis, it may be perfectly reasonable for an employer not to take any action."); Munoz Rivera De

<u>Torres v. Telefonica de P.R.</u>, 913 F. Supp. 81, 88 (D.P.R. 1995) (holding investigation to constitute prompt and adequate action even where administrative complaint was dismissed based on plaintiff's "lack of cooperation and commitment to the investigation").

Another consideration strongly supporting the adequacy of Defendant's response is the fact that Plaintiff has failed to establish that the discriminatory harassment continued after the investigation.  See <u>Cerqueira v. Corning Net Optix</u>, No. 03-10306, 2004 U.S. Dist. LEXIS 17308, at *20 (D. Mass. Aug. 13, 2004) ("'The chief measure of adequacy of an employer's response is not the victim's own personal sense of justice, but rather -- particularly where there is no prior history of workplace harassment -- whether the behavior that gave rise to the complaint has ceased and does not threaten to reoccur.'") (citation omitted); <u>Ruffino v. State St. Bank & Trust Co.</u>, 908 F. Supp. 1019, 1039 (D. Mass. 1995).

Once Holyoke concluded its investigation in December 2002, having found Plaintiff's claims to be unfounded, Walker did not report any further harassment by Monaghan

until September and then November 2004.  Even those
complaints did not relate to any expressions of bias.  In
September, she filed her complaint about Monaghan ignoring
her request for crime scene tape and then telling her to
"start packing her bags" in relation to her suspension in
the wake of the terrorism call.  In November, Plaintiff told
Chief Scott that stress partly attributable to harassment by
Monaghan was causing her shoulder to hurt and she was
thinking of leaving the department.  She also mentioned
Monaghan as a cause of her stress to Captain Fletcher that
same month.

The crime scene tape incident and the "packing your
bags" comment cannot be considered as continued harassment
both because Defendant once again conducted an entirely
adequate investigation into the circumstances of each and
because these were at best minor, barely offensive
interactions.  Moreover, even before the investigation
Lieutenant O'Connell responded to Walker's concerns by
assuring her that she had warned Monaghan not to cause
trouble and that she had assigned the two so as to separate
them as much as possible while they worked the same shift.

Walker's brief mention of unspecified continued harassment in November 2004 is simply insufficient to generate a triable issue of fact. Quinones v. Houser Buick, 436 F.3d 284, 289 (1st Cir. 2006); Williams v. Astra USA, Inc., 68 F. Supp. 2d 29, 33 (D. Mass. 1999). Though Walker has offered vague allegations that Monaghan's harassment continued after the 2002 investigation, she has not gone beyond those conclusory assertions. She did not mention any specific instances of harassment between January 2003 and September 2004, either at the time or in the ensuing discovery and litigation.

It is true that in some cases, courts have been willing to leave consideration of allegations of harassment lacking in substantial detail to the jury where the plaintiff claims that she has forgotten the particulars due to the passage of time or because the offenses were so common that she cannot recall all of them. Compare Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997) (denying summary judgment for defendant where plaintiff stated she could not provide particulars of harassment because she could not recall them and where coworkers substantiated allegations); Dey v. Colt Constr. &

Dev. Co., 28 F.3d 1446, 1457 (7th Cir. 1994) (reversing
grant of summary judgment for defendant where plaintiff did
not remember all the details of harassment that occurred
daily but could recall a few specific instances); Fernot v.
Crafts Inn, 895 F. Supp. 668, 677 (D. Vt. 1995) (accepting
contention that supervisor was "always" making sexual
comments where plaintiff also described specific episodes of
unwanted physical contact) with Ruffino v. State St. Bank &
Trust Co., 908 F. Supp. 1019, 1039 (D. Mass. 1995) ("Mere
allegations of 'ongoing' harassment until October of 1991
are insufficient.").  It is significant, however, that
Walker makes no such assertion here.  She has offered what
evidence may exist, and it is not enough.

     As a matter of law, even the evidence viewed in the
light most favorable to Plaintiff cannot support a hostile
environment claim.  Defendant's Motion for Summary Judgement
will therefore be allowed as to Counts VI through X.

     C. Retaliation Claims (Counts XI and XII)

     Walker has accused Holyoke of illegally retaliating
against her for exercising her rights under Title VII and
Chapter 151B.  "To engage the gears of either [federal or

state laws prohibiting retaliation], a plaintiff must show
that (I) she undertook protected conduct, (ii) she suffered
an adverse employment action, and (iii) the two were
causally linked." Noviello v. City of Boston, 398 F.3d 76,
88 (1st Cir. 2005). Once that prima facie case has been
proved, a retaliation claim is analyzed under the same
pretext framework as a discrimination claim, whereby "the
defendant must articulate a legitimate, nonretaliatory
reason for its action" in order to shift the burden back to
the plaintiff to show that the employer's ostensible
justification was merely a pretext for retaliatory
motivation. Billings v. Town of Grafton, 441 F. Supp. 2d
227, 239 (D. Mass. 2006).

Construing the term liberally, the "adverse employment
actions" in this case include the letter of reprimand issued
to Walker in August 2003 in connection with her report to
Chief Scott about the Elizur's Pub investigation; the one-
day suspension after she was late to court in March 2004;
the five-day suspension in August 2004 (to which Mayor
Sullivan added another five days) regarding Plaintiff's
handling of the terrorism phone call; the five-day

55

suspension in November 2004 for sick leave abuse; the
November 2004 assignment to inside duty;[18] the five-day
suspension in January 2005 (to which Mayor Sullivan added
another fifteen days) for filing of unfounded complaints
against her superiors; and finally Walker's termination in
April 2005.

Even assuming that Walker has made out a <u>prima facie</u>
case of retaliation, her allegations do not survive the
final step of the <u>McDonnell Douglas</u> analysis.  As with the
discrimination claims, Walker has failed to offer evidence
to impugn the city's articulated, legitimate reasons for its
actions.  See <u>Valentin-Almeyda v. Municipality of Aguadilla</u>,
447 F.3d 85, 95 (1st Cir. 2006).

The specifics of Holyoke's proffered reasons for each
of these measures are laid out above; concisely, Defendant
justifies its actions as legitimate responses to Walker's
poor job performance and violation of department rules and
regulations in each incident that precipitated a sanction.

---

[18] Defendant argues that this assignment cannot be
considered an adverse employment action.  This issue need
not be explored since the court will hold below that even if
the assignment was an adverse employment action it cannot as
a matter of law constitute retaliation.

Holyoke also notes that the increasingly severe suspensions followed by termination were part of its general policy of progressively escalating punishments as disciplinary violations accumulated.

In order to survive summary judgment, Plaintiff cannot simply point to this set of sanctions as retaliatory responses to her list of complaints. See King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997) ("It is insufficient for [a plaintiff] to simply recount that he complained and that he was disciplined . . . later."); Billings v. Town of Grafton, 441 F. Supp. 2d 227, 243 (D. Mass. 2006) ("[Plaintiff] must put forth evidence that the stated reasons for the [specific adverse action] were pretextual.  It is not enough that her allegations of . . . harassment set in motion a chain of events that led to her transfer.").  Walker herself has not articulated any argument highlighting possible indications that Lieutenant O'Connell, Chief Scott, or Mayor Sullivan were motivated by a retaliatory intent rather than Plaintiff's cited violations of department rules.

That leaves the court with only the temporal proximity between Walker's complaints and her subsequent punishment as

57

circumstantial evidence suggestive of retaliation.[19]
However, numerous courts have held that a mere temporal
relationship, unless extremely close, is not enough to
withstand summary judgment absent any other evidence of
pretext.  See, e.g., Calero-Cerezo v. U.S. Dep't of Justice,
355 F.3d 6, 25 (1st Cir. 2004) ("Three and four month
periods have been held insufficient to establish a causal
connection based on temporal proximity."); Swanson v. Gen.
Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997) ("Close
timing between an employee's protected activity and an
adverse action against him may provide the 'causal
connection' required to make out a prima facie case of
retaliation. . . .  However, once the employer offers a
legitimate, nondiscriminatory reason that explains both the
adverse action and the timing, the plaintiff must offer some
evidence from which the jury may infer that retaliation was

---

[19] Plaintiff did argue that when O'Connell assigned her
to indoor duty she got the sense that O'Connell was upset
with her regarding the allegation that she had ordered
dispatches to be sent over e-mail. That contention is
irrelevant since the dispatching complaint was not a
protected activity under Title VII or Chapter 151B;
Plaintiff made no claim to the police department that she
thought O'Connell was motivated by a discriminatory animus
in issuing the alleged order to dispatch over e-mail.  See
Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir.
1995).

the real motive.") (citation and footnote omitted); <u>Krouse</u>
<u>v. Am. Sterilizer Co.</u>, 126 F.3d 494, 503 (3d Cir. 1997)
(stating that for timing alone to suffice as evidence of a
causal link, it must be "unusually suggestive," as with a
mere two days between notice of complaint and firing);
<u>Holloway v. Thompson Island Outward Bound Educ. Ctr., Inc.</u>,
492 F. Supp. 2d 20, 26 (D. Mass. 2007) ("If temporal
proximity is the only evidence establishing retaliation, the
proximity must be 'very close.'") (citations omitted); <u>Cruz</u>
<u>v. McAllister Bros.</u>, 52 F. Supp. 2d 269, 288 (D.P.R. 1999)
(holding that claim must fail on summary judgment where the
timing of events was the only evidence offered to rebut non-
retaliatory reasons for adverse action that were supported
by the record).

    The protected activity by Walker most proximal to any
subsequent sanction was her commencement of this suit, which
occurred about a week before she was suspended for her
conduct in the encounter with O'Connell over the scheduling
book.  However, Plaintiff has not offered any specific facts
that would indicate Chief Scott's rationale for the
suspension was a pretext.[20]  Further buttressing Defendant's

---

    [20] As noted above, although Walker does give a "fuzzy"
account of the incident that appears to conflict with
O'Connell's, Scott had the PSD conduct an investigation and
certainly had enough evidence before him (including the

position that Plaintiff's suspension was unrelated to her bringing this suit is the fact that even before filing her complaint in March 2005, Walker had established a track record of reprimands and suspensions, along with a final warning in November 2004 that she was facing the possibility of termination.  Cf. <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); <u>Nelson v. J.C. Penney Co.</u>, 75 F.3d 343, 346 (8th Cir. 1996) (holding that timing was not enough to allow inference of discrimination where employer had articulated a legitimate reason for discharge and plaintiff "was reprimanded several times and was given a final warning about the status of his job before his supervisors knew of the age discrimination charge").  As Judge Joseph L. Tauro explained in a similar case regarding an employee terminated after accumulating a two-year record of poor performance, "It is settled law that if an employer has set a course of action regarding employee discipline, it

_____

testimony of other witnesses) to credit O'Connell's version. (Dkt. No. 46, Ex. 1 at 118.)  Furthermore, Mayor Sullivan affirmed the suspension and also accepted O'Connell's report of the incident after an independent hearing.

need not change that course of action because a Title VII claim has been made against it." <u>Ianetta v. Putnam Invs., Inc.</u>, No. 00-10385, 2002 U.S. Dist. LEXIS 3277, at *35 (D. Mass. Feb. 25, 2002).[21]

A period of less than a month also separated Plaintiff's charge in late October 2004 that O'Connell had ordered dispatches to be sent over e-mail from her assignment to inside duty in November as well as her suspension for sick leave abuse the same month. However, the court need not consider this as possible evidence of retaliation under Title VII or Chapter 151B since the Though not the determinative factor in this decision, it is also notable that the scheduling book incident with O'Connell that led to Walker's suspension in March 2007 occurred before she began litigation against Holyoke. dispatching complaint was not a protected activity. Walker did not assert at the time that she was challenging an employment

_____

[21] Though not the determinative factor in this decision, it is also notable that the scheduling book incident with O'Connell that led to Walker's suspension in March 2007 occurred before she began litigation against Holyoke. <u>Cf. Zaffuto v. City of Hammond</u>, 308 F.3d 485, 493 (5th Cir. 2002) (relying on record showing "that the events giving rise to [the plaintiff's] suspension, and the investigative fact finding, occurred before he was identified as a witness in the sexual harassment case" in finding no retaliatory action) (footnote omitted).

practice prohibited by either statute.  42 U.S.C. § 2000e-3;
Mass. Gen. Laws ch. 151B, § 4; <u>cf.</u> <u>Barber v. CSX Distrib.</u>
<u>Servs.</u>, 68 F.3d 694, 702 (3d Cir. 1995) ("A general
complaint of unfair treatment does not translate into a
charge of illegal age discrimination."); <u>Long v. Tillotson</u>
<u>Health Care Corp.</u>, 968 F. Supp. 751, 756 (D.N.H. 1997)
(holding complaint about tire-slashing was not protected
activity where nothing suggested incident was discriminatory
or even that employee believed it was).

The only potentially retaliatory punishment not subject
to summary judgment because of the lack of pretext evidence
is the January suspension for unfounded complaints, since
Holyoke specifically asserts that it was sanctioning Walker
merely for making those charges.  However, the three claims
for which Plaintiff was disciplined (two against O'Connell
for the alleged dispatching order and the discrepancy
between the two memos assigning her to inside duty and one
against Fournier for looking at her personnel file) also
were not protected conduct that could form the basis of a
retaliation claim under Title VII or Chapter 151B, as the
discussion above demonstrates.

In sum, the record reveals only a series of
disciplinary measures for which Holyoke has offered
undisputed, legitimate explanations and which are, for the

most part, distant in time from any potentially protected activity.  No jury could reasonably find these punishments were retaliatory.  See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004); Billings v. Town of Grafton, 441 F. Supp. 2d 227, 244 (D. Mass. 2006); Storlazzi v. Bakey, 894 F. Supp. 494, 503 (D. Mass. 1995).  Defendant is entitled to summary judgment on Count XI and XII.

     D. Whistleblower Claim (Count XIII)

     Plaintiff charges that the punishments imposed on her subsequent to her Elizur's Pub report, her report after the crime scene tape incident, her claim regarding dispatching via e-mail, and her IOC reporting the booking incident were retaliatory actions in violation of the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185.  The Act provides that

> [a]n employer shall not take any retaliatory action against an employee because the employee . . . [d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.

Id. § 185(b); see also Bennett v. City of Holyoke, 362 F.3d 1, 5 (1st Cir. 2004).[22]

---

    [22] Holyoke argues that Walker did not provide it with the requisite statutory notice before bringing her

Plaintiff contends that her reports about each of the listed incidents described her reasonable belief of a potential violation of law or a risk to public health, safety, or the environment.  Walker believed with respect to Elizur's Pub that the officer's refusal to leave after closing time constituted a violation of state law; as to the crime scene tape, that Monaghan's unresponsiveness to radio communication could pose a risk to public health or safety; as to the e-mail dispatches, that preventing her from tracking her subordinates' locations endangered public safety; and, as to the scheduling book incident, that O'Connell's behavior posed a safety hazard to her and the other officers in the area.

These claims are paper thin.  In each instance, Holyoke investigated Plaintiff's contentions in order to determine if any legal violation or threat to public health or safety had occurred.  Moreover, little if any evidence undercuts Defendant's articulated, legitimate reasons for disciplining her or suggests retaliation for whistleblowing.

---

whistleblower claim.  "Whistleblower Act protection does not apply to an employee who makes a disclosure to a public body unless the employee has brought the wrongful conduct at issue to the attention of a supervisor by written notice and gives the employer a reasonable opportunity to correct the activity." Putnam v. Town of Saugus, 365 F. Supp. 2d 151, 194 (D. Mass. 2005).  However, Plaintiff's reports gave the city written notice and an opportunity to address her concerns before she brought this suit.

However, both the issues of reasonable belief and retaliatory intent are relatively fact-based determinations. The court is reluctant to undertake them at this stage, especially since the sparse precedent regarding the Massachusetts Whistleblower Act, contrasting with the abundant case law on the federal law claims, provides little guidance as to the correct application of the statute. Therefore, the court will deny summary judgment on Count XIII but dismiss it as a matter of discretion without prejudice to re-filing in state court.

E. Section 1981 Claim (Count XIV)

Based on the same facts as her Title VII and Chapter 151B claims, Walker charges Defendant with discrimination against her in violation of 42 U.S.C. § 1981, which prohibits racially discriminatory impairment of contracts in violation of the Constitution.  In considering a constitutional claim of discrimination, including one under § 1981, a court applies the same analytical framework as for a Title VII claim.  Lipsett v. Univ. of P.R., 864 F.2d 881, 896 (1st Cir. 1988).  Since the court finds Plaintiff's Title VII claims inadequate to survive summary judgment, her § 1981 claim also fails.[23]  See Oliver v. Digital Equip.

_____

[23] Indeed, this claim offers an even clearer case for summary judgment than the Title VII claims.  Since § 1981 solely prohibits racial discrimination, Plaintiff can point

65

<u>Corp.</u>, 846 F.2d 103, 111 (1st Cir. 1988).

    F. <u>Section 1983 Claim</u> (Count XV)

    Finally, Walker alleges that Holyoke retaliated against

her for engaging in activities protected by the First

Amendment, in violation of 42 U.S.C. § 1983.  This claim

presents three issues:

> whether (I) the speech [the plaintiff] engaged in
> can be considered that of a public employee on a
> matter of public concern, or merely related to
> matters primarily of concern to employees (e.g.,
> internal working conditions); (ii) [the
> plaintiff's] interest in speaking, as well as the
> public interest, outweigh any legitimate
> governmental interest in the efficient performance
> of its public function; and (iii) the speech was
> either a motivating or substantial factor in the
> adverse employment action.

<u>Nethersole v. Bulger</u>, 287 F.3d 15, 18 (1st Cir. 2002).  The

first two inquiries are legal issues to be decided by the

court.  <u>Id.</u>  The First Amendment protects speech within the

workplace as well as speech to an outside audience.

<u>Torres-Rosado v. Rotger-Sabat</u>, 335 F.3d 1, 12 n.10 (1st Cir.

2003).

    Plaintiff's First Amendment claim is not viable since

Plaintiff's and the public's interest in her speech is

outweighed by the government's interest in avoiding

_____

only to the few statements implicating race (the "Tyrone"
and "Uncle Charlie" comments) to support her charge, rather
than the more numerous incidents potentially involving her
gender and/or sexual orientation.

disruption of its functions from unrestrained speech.[24]
This court has noted before that "[a] police department has
a more significant interest than the typical government
employer in regulating the speech activities of its
employees in order to promote efficiency, foster loyalty and
obedience to superior officers, maintain morale, and instill
public confidence." Wagner v. City of Holyoke, 241 F. Supp.
2d 78, 90 (D. Mass. 2003) (citation omitted); see also
Guilloty Perez v. Pierluisi, 339 F.3d 43, 53 (1st Cir. 2003)
(citing need for discipline, harmony, and loyalty in law
enforcement agencies).  The charges in this case regarding
staying at a bar a few minutes past closing time, ignoring a
radio request for crime scene tape, dispatching cars via e-
mail rather than radio, and acting aggressively during the
confrontation over the scheduling book obviously related to
internal working conditions and not matters of public
interest.

Dirrane v. Brookline Police Department offers a helpful
comparison.  In that case, Judge Richard Stearns relied on
two key considerations in finding a colorable First
Amendment claim: the seriousness of the officer's charges
(including destroying evidence and falsifying reports) and

---

[24] This is commonly known as the Pickering balancing
test, from the Supreme Court case in which it was
articulated. Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

the department's failure to make a serious effort to
investigate the allegations.  315 F.3d 65, 70 (1st Cir.
2002).  These outweighed the facts that the plaintiff had
"made one complaint after another on a wide range of topics,
some trivial, and others so serious as perhaps to be
difficult to credit" and that the plaintiff had been making
complaints for five years before the department took action
against him by transferring him.   Id.

        In this case, the factors motivating the ultimate
decision in Dirrane are missing –- most of Walker's claims
were relatively trivial and they were fully investigated.
Meanwhile, those circumstances that Judge Stearns
highlighted as dictating a judgment against a plaintiff are
present.  Walker filed a number of complaints that were
found to be unsubstantiated and that even if true would not
rise to the level of grave offenses such as falsifying
reports.  Furthermore, these charges were especially
disruptive since, for the most part, they triggered internal
investigations.  See Guilloty Perez v. Pierluisi, 339 F.3d
43, 54 (1st Cir. 2003) (outlining disruptive effect of
internal investigations).  Walker's suspension for filing
unfounded complaints confirms that her supervisors found
that her continued accusations interfered with the orderly
workings of the police department.

Walker's most substantial allegations were her contentions in 2002 and again in late 2004 that Monaghan was harassing her.  However, as the court has outlined, the mere temporal proximity of such speech to adverse actions is not sufficient to create a triable issue as to whether Holyoke's subsequent punishments were motivated by retaliatory intent. See Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 192 (1st Cir. 2003) ("The inadequacy of [the plaintiff's] Title VII claim establishes the inadequacy of her § 1983 claim."); Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 13 (1st Cir. 2003) (awarding summary judgment against plaintiff where she did not provide any evidence to counter the defendants' demonstration of legitimate reasons for adverse actions).[25]  Ultimately, Walker has not provided even a scintilla of evidence to show that Holyoke was attempting to silence complaints about important matters of public interest rather than simply attempting to keep order within the police department.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 45) is hereby ALLOWED as to

---

[25] Since the court concludes there is no First Amendment violation in this case, there is no need to consider whether Defendant is protected from monetary liability by the doctrine of qualified immunity.  See Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69 (1st Cir. 2002).

Counts I-XII and Counts XIV-XV.  The court declines to exercise supplemental jurisdiction over Count XIII, the remaining claim brought under the Massachusetts Whistleblower Act.  See Ruiz-Sulsona v. Univ. of P.R., 334 F.3d 157, 161 (1st Cir. 2003).  That count is hereby DISMISSED without prejudice to its reassertion in state court.  This case may now be closed.

It is So Ordered.


/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge